UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANTHONY OLIVER, TERRY GAYLE QUINTON, SHAWN O'KEEFE, ANDREW AMEND, SUSAN BURDETTE, GIANNA VALDES, DAVID MOSKOWITZ, ZACHARY DRAPER, NATE THAYER and MICHAEL THOMAS REID on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>AMERICAN EXPRESS COMPANY and AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, INC.,<br><br>Defendants. | No.<br><br>CLASS ACTION |

## CLASS ACTION COMPLAINT

Plaintiffs Anthony Oliver, Terry Gayle Quinton, Shawn O'Keefe, Andrew Amend, Susan Burdette, Gianna Valdes, David Moskowitz, Zachary Draper, Nate Thayer and Michael Thomas Reid ("Plaintiffs"), through the undersigned attorneys, and on behalf of themselves and all others similarly situated (the "Class" or "Class Members"), bring this action[1] for damages, restitution, and injunctive relief against the American Express Company and American Express Travel Related Services Company, Inc. (together, "American Express," "Amex," or "Defendants")

---

[1] Plaintiffs Oliver, O'Keefe, Valdes, Amend, Burdette, Reid, and Draper previously brought claims for relief based on the same facts and circumstances as alleged herein in this Court against Defendants in Case Nos. 1:15-cv-01598-NGG-RER, 1:15-cv-01770-NGG-RER, 1:15-cv-1910-NGG-RML, and 1:15-cv-03554-NGG-RER.  Those actions, and others, were consolidated by this Court on August 11, 2015.  By order dated July 15, 2015, the Court appointed the undersigned counsel to serve as interim class counsel.  Subsequently the plaintiffs voluntarily dismissed the consolidated action, with the Court ordering dismissal without prejudice on October 18, 2015. Plaintiffs entered a tolling agreement with Defendants at that time.

pursuant to federal and state antitrust laws, state consumer protection statutes, unjust enrichment, and Rule 23 of the Federal Rules of Civil Procedure.

This Complaint is alleged upon information and belief, except as to those allegations which pertain to the named Plaintiffs, which are alleged on Plaintiffs' personal knowledge.

## NATURE OF THE ACTION

1.      This antitrust action is brought on behalf of the millions of persons and entities, which used an electronic form of payment[2] other than an American Express charge or credit card purchased goods and services sold by merchants across the country at prices inflated by Amex's Non-Discrimination Provisions (referred to herein as "Anti-Steering Rules").

2.      Amex imposes Anti-Steering Rules in its merchant agreements.  These vertical restraints unreasonably restrain trade in the two-sided market for general purpose credit and charge card transactions ("credit card transactions" or "GPCC transactions").

3.      Amex's Anti-Steering Rules (i) increase two-sided credit card transaction prices to supra-competitive levels; (ii) result in fewer credit card transactions than would occur but-for the restraints; and (iii) raise consumer retail prices on goods and services purchased throughout the country by Plaintiffs and the Class.

4.      This Court presided over a seven-week bench trial in July and August 2014 in which Amex defended antitrust claims from the federal government and certain state attorneys general regarding Amex's Anti-Steering Rules, which Amex imposed, and continues to impose, on merchants.  The Court, in its February 19, 2015 trial decision, made Findings of Fact that remain undisturbed by subsequent appellate proceedings.

---

[2] As used herein, an electronic form of payment means any charge, credit, debit, stored value, prepaid or smart cards, account access devices, or other payment cards, services or products other than American Express charge or credit cards.  It excludes cash and checks.

5.      The Court found that Amex's Anti-Steering Rules were successful in preventing merchant steering, which prevents the market from setting the level of merchant fees and enables Amex, Visa, Mastercard, and Discover to charge higher merchant fees than they would absent the Anti-Steering Rules.

6.      The Court found that the Anti-Steering Rules cause increased prices for consumers, for the reason that merchants pass on most, if not all, of their higher costs to their customers in the form of higher retail prices.

7.      The Court found that higher retail prices affect shoppers who pay with Visa, Mastercard, or Discover credit cards, or debit cards, cash, or check.  Indeed, any consumer who pays by means other than an American Express card ends up subsidizing Amex's premium rewards to American Express cardholders.  Those rewards are paid for by the excessive merchant fees, which Amex extracts from card-accepting merchants.  The merchants pass-on those costs in the form of higher retail prices, paid by every purchaser.

8.       The Court concluded that the higher merchant fees that Amex collected were not wholly offset by additional reward expenditures to American Express cardholders or by other pass-through to American Express cardholders.  The result of Amex's Anti-Steering Rules, therefore, is a higher net, two-sided price for all credit or charge card transactions, whether involving Amex, Visa, Mastercard, or Discover cards.

9.      In an ongoing, consolidated action before this Court, Merchant Plaintiffs[3] are pursuing claims for relief against Amex for overcharges, which Merchant Plaintiffs pay in the form

---

[3] "Merchant Plaintiffs" refers to Ahold U.S.A., Inc.; Albertson's LLC; BI-LO, LLC; CVS Pharmacy, Inc.; The Great Atlantic & Pacific Tea Company, Inc.; H.E. Butt Grocery Co.; Hy-Vee, Inc.; The Kroger Co.; Meijer, Inc.; Publix Super Markets, Inc.; Raley's Inc.; Rite Aid Corporation and Rite Aid HDQTRS. Corp.; Safeway Inc.; Supervalu Inc.; and Walgreen Co.

of supra-competitive merchant fees caused by the Anti-Steering Rules.  The Merchant Plaintiffs affirmatively allege that they pass on the overcharges in the form of increased retail prices to consumers.

10.     Similarly, a consolidated class action before this Court on behalf of credit and charge card accepting merchants likewise affirmatively alleges that merchants pass on increased costs caused by Amex's Anti-Steering Rules to consumers in the form of higher retail prices.

11.     This action seeks to enjoin Amex's continuing enforcement of its Anti-Steering Rules under federal antitrust law.  It furthermore seeks damages under applicable state antitrust and consumer protection laws and the law of unjust enrichment/restitution on behalf of: (i) all persons or entities who do not have an American Express charge or credit card and did not have one during the relevant period, who reside in a State,[4] and who used an electronic form of payment to purchase a product or service from any merchant that accepts American Express, Visa, Mastercard, and/or Discover credit or charge cards; or, alternatively, damages are sought on behalf of the subset of (ii) persons or entities who do not have an American Express charge or credit card and did not have one during the relevant period, who reside in a State, and who used an electronic form of payment to purchase a product or service from any of the Merchant Plaintiffs.

**PARTIES**

12.     Plaintiff Anthony Oliver is a resident of California who, during the relevant class period, purchased products or services using an electronic form of payment from at least one or more Merchant Plaintiffs and other merchants.  As a result of Defendants' actions described herein,

---

[4] "State" refers to Alabama, Arizona, California, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin (collectively, the "States").

Plaintiff paid more for products or services than he would have paid in the absence of Defendants' conduct and was, therefore, injured in his business and/or property.  Plaintiff Oliver does not have, and during the relevant period did not have, an American Express charge or credit card.

13.     Plaintiff Terry Gayle Quinton is a resident of Tennessee who, during the relevant class period, purchased products or services using an electronic form of payment from at least one or more Merchant Plaintiffs and other merchants.  As a result of Defendants' actions described herein, Plaintiff paid more for products or services than he would have paid in the absence of Defendants' conduct and was, therefore, injured in his business and/or property.  Plaintiff Quinton does not have, and during the relevant period did not have, an American Express charge or credit card.

14.     Plaintiff Shawn O'Keefe is a resident of North Carolina who, during the relevant class period, purchased products or services using an electronic form of payment from at least one or more Merchant Plaintiffs and other merchants.  As a result of Defendants' actions described herein, Plaintiff paid more for products or services than he would have paid in the absence of Defendants' conduct and was, therefore, injured in his business and/or property.  Plaintiff O'Keefe does not have, and during the relevant period did not have, an American Express charge or credit card.

15.     Plaintiff Andrew Amend is a resident of Kansas who, during the relevant class period, purchased products or services using an electronic form of payment from at least one or more Merchant Plaintiffs and other merchants.  As a result of Defendants' actions described herein, Plaintiff paid more for products or services than he would have paid in the absence of Defendants' conduct and was, therefore, injured in his business and/or property.  Plaintiff Amend does not have, and during the relevant period did not have, an American Express charge or credit card.

16.     Plaintiff Susan Burdette is a resident of New Mexico who, during the relevant class period, purchased products or services using an electronic form of payment from at least one or more Merchant Plaintiffs and other merchants.  As a result of Defendants' actions described herein, Plaintiff paid more for products or services than she would have paid in the absence of Defendants' conduct and was, therefore, injured in her business and/or property.  Plaintiff Burdette does not have, and during the relevant period did not have, an American Express charge or credit card.

17.     Plaintiff Gianna Valdes is a resident of New York who, during the relevant class period, purchased products or services using an electronic form of payment from at least one or more Merchant Plaintiffs and other merchants.  As a result of Defendants' actions described herein, Plaintiff paid more for products or services than she would have paid in the absence of Defendants' conduct and was, therefore, injured in her business and/or property.  Plaintiff Valdes does not have, and during the relevant period did not have, an American Express charge or credit card.

18.     Plaintiff David Moskowitz is a resident of Oregon who, during the relevant class period, purchased products or services using an electronic form of payment from at least one or more Merchant Plaintiffs and other merchants.  As a result of Defendants' actions described herein, Plaintiff paid more for products or services than he would have paid in the absence of Defendants' conduct and was, therefore, injured in his business and/or property.  Plaintiff Moskowitz does not have, and during the relevant period did not have, an American Express charge or credit card.

19.     Plaintiff Zachary Draper is a resident of Nevada who, during the relevant class period, purchased products or services using an electronic form of payment from at least one or more Merchant Plaintiffs and other merchants.  As a result of Defendants' actions described herein, Plaintiff paid more for products or services than he would have paid in the absence of Defendants'

conduct and was, therefore, injured in his business and/or property.  Plaintiff Mokowitz does not have, and during the relevant period did not have, an American Express charge or credit card.

20.     Plaintiff Nate Thayer is a resident of Massachusetts who, during the relevant class period, purchased products or services using an electronic form of payment from at least one or more Merchant Plaintiffs and other merchants.  As a result of Defendants' actions described herein, Plaintiff paid more for products or services than he would have paid in the absence of Defendants' conduct and was, therefore, injured in his business and/or property.  Plaintiff Thayer does not have, and during the relevant period did not have, an American Express charge or credit card.

21.     Plaintiff Michael Thomas Reid is a resident of Florida who, during the relevant class period, purchased products or services using an electronic form of payment from at least one or more Merchant Plaintiffs and other merchants.  As a result of Defendants' actions described herein, Plaintiff paid more for products or services than he would have paid in the absence of Defendants' conduct and was, therefore, injured in his business and/or property.  Plaintiff Michael Thomas Reid does not have, and during the relevant period did not have, an American Express charge or credit card.

22.     Defendant American Express Company is a New York corporation with its principal place of business in New York, New York.

23.     Defendant American Express Travel Related Services Company, Inc. is a New York corporation, with its principal place of business in New York, New York, and is a wholly owned subsidiary of American Express Company.  American Express Travel Related Services Company, Inc. is generally responsible for all aspects of the payment card business conducted under the American Express brand, including the operation of the American Express network.

Depending on context, as used herein, the terms "American Express" or "Amex" may refer to Defendants, the American Express network, or the American Express brand.

24.     In this Complaint, when reference is made to any act, deed or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed, or transaction by or through its officers, directors, agents, managers, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation or limited liability entity's business or affairs.

## JURISDICTION AND VENUE

25.     Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure equitable relief against Defendants for their violations of Section 1 of the Sherman Act (15 U.S.C. § 1).  The claims for actual and exemplary damages are brought pursuant to state antitrust, unfair competition, and consumer protection laws to obtain restitution, recover damages, and secure other relief against the Defendants for violations of those state laws.  Attorneys' fees, costs, and expenses are also sought under both federal and state law.

26.     This Court has subject matter jurisdiction over the federal antitrust claims asserted in this action under Section 16 of the Clayton Antitrust Act (15 U.S.C. § 26), Section 1 of the Sherman Act, and 28 U.S.C. §§ 1331 and 1337.  This Court has subject matter jurisdiction over the state law claims pursuant to 28 U.S.C. §§ 1332(d) and 1367, in that this is a class action in which the matter or controversy exceeds the sum of $5 million, exclusive of interests and costs, and some members of the proposed Class are citizens of a state different from Defendants.

27.     This Court also has subject matter jurisdiction over this class action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d) because the aggregate amount in

controversy exceeds $5 million and at least one Plaintiff or class member is from a state different from one defendant.

28.     Venue is proper in this district pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391 (b), (c), (d) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected trade and commerce discussed below has been carried out in this District, and one or more of the Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this District.

29.     This Court has *in personam* jurisdiction over Defendants because Defendants, either directly or through the ownership and/or control of their subsidiaries, *inter alia*:  (a) are at home in this District and transacted business  in this District; (b) had substantial aggregate contacts with this forum; and/or (c) were engaged in an illegal restraint of trade that was directed at, and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District.

30.     Defendants engaged in conduct that caused, and continues to cause, direct, substantial, and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States.

31.     The activities of Defendants were and are within the flow of, were and are intended to, and did have and continue to have, a substantial effect on interstate commerce in the United States.

## FACT ALLEGATIONS

## I.     THE CREDIT CARD INDUSTRY

## A.  Credit Cards and Charge Cards

32.  General purpose credit and charge cards ("GPCCs") are a principal means by which consumers in the United States purchase goods and services from the country's millions of merchants.  According to the federal Consumer Financial Protection Bureau, in 2016 there was $3.1 trillion in purchase volume using GPCCs.  This has grown steadily from the 2010 recession-level of $2.0 trillion.

33.  Despite a steady increase in purchase volume, the total number of open GPCC accounts has declined over the same period from a high of 471 million accounts to 430 million accounts in 2017.

34.  Credit cards (as opposed to charge cards) enable cardholders to purchase goods and services at participating merchants by accessing a line of credit extended to the cardholder by the issuer of that card.  A cardholder may pay the invoiced balance in full each month or pay it off over time while interest accrues on the balance.  Most credit card issuers impose a limit on the amount of credit extended to the cardholder at any one time, typically based on the cardholder's creditworthiness.  Cards on the Visa and Mastercard platforms are credit cards.

35.  Charge cards likewise extend credit to the cardholder, but do not offer revolving credit like credit cards.  Charge cards instead require the cardholder to pay the balance in full each month, with limited exceptions, so while the cardholder benefits from the ability to defer payment it is only for the time period of the billing cycle.  Charge cards typically have no preset spending limits, but instead limit spending based on the cardholder's financial strength.  Amex primarily issues charge cards, but also issues credit cards.

## B.  Highly Concentrated Market

36.     Four firms completely dominate the GPCC market: Visa, American Express, Mastercard, and Discover.   The industry is, therefore, highly concentrated with only four competing networks, particularly as three competitors (Amex, Visa, Mastercard) are significantly larger than the fourth (Discover).

37.     As measured by the dollar value of GPCC transaction volume in 2013, the market shares of the four dominant firms were:

| | |
|---|---|
| Visa | 45% |
| Amex | 26.4% |
| Mastercard | 23.3% |
| Discover | 5.3% |

38.     The market is constrained by high barriers to entry, evidenced by the fact that there has been no successful entry into the market since Discover in 1985.

39.     Newer digital payment options used by merchants such as Square, PayPal, SumUp, Stripe, and others do not compete with GPCC networks, but function instead as GPCC-accepting merchants.

**C.      Two Types of GPCC Network Structures and the Two-Sided Platform**

**1.      Closed Loop Network vs. Open Network**

40.     Amex operates on a "closed loop network" of three parties: the merchant, Amex, and the cardholder. This means that American Express issues credit cards directly to its cardholders and opens merchant accounts directly for businesses that accept its cards.

41.     Unlike American Express, Visa, and MasterCard do not issue cards or acquire the merchants that accept Visa and Mastercard credit cards.   Instead, these companies maintain an open network where they provide core payment services but rely on banks and other financial

institutions to undertake the card issuance, merchant acquisition, and processing functions. Referred to as "4-party" or "5-party" systems, the platform involves (1) the credit card network (Visa, Mastercard), (2) cardholders, (3) banks that issue cards to cardholders ("issuing banks"), (4) merchants, and (5) acquiring banks and institutions that sign up merchants for the network and facilitate transaction processing.

42.     Discover operates a hybrid of the closed loop and open network models, issuing its own cards but relying on third parties to acquire and service merchants.

43.     GPCCs are frequently issued as "co-branded" cards, typically bearing the logo of the merchant, network, and issuing bank (if relevant).  Co-branded cards enable the cardholder to earn rewards directly from the merchant partner in connection with purchases made using the card. Examples include cards co-branded by airlines and hotels (AAdvantage card by American Airlines, Delta SkyMiles card, Marriott Rewards card).

44.     Amex has long dominated issuance of corporate cards to individuals through a corporate account with Amex, for employees' business expenditures.

**2.      The Two-Sided GPCC Platform**

45.     GPCC systems function as two-sided platforms by virtue of facilitating transactions between merchants and their cardholding consumers.  In the GPCC two-sided platform, both the merchant and the cardholder simultaneously agree to use the same GPCC network.  Amex, Visa, Mastercard, and Discover need both sides of the platform to agree to accept and use the network's card.

46.     The value of the two-sided GPCC platform to one side depends on the number and nature of the participants on the other side.  For example, a credit or charge card is more valuable to a consumer when it is accepted for payment by more and more merchants.  Similarly, a credit

or charge card network is more valuable to a merchant as its cards are used by consumers to spend more and more money.  This latter phenomenon happens as more and more consumers use a particular network's card, or if the consumers who use it spend higher and higher amounts of money.

47.     Two-sided GPCC platforms need to be sensitive to the price they charge each side of the platform for using it.  Raising the price (or cost) on one side risks losing participation on that same side, which in turn risks decreasing the value of the platform to the other side.

**D.     Two-Sided Price:  Merchant Fees and Cardholder Rewards**

48.     As a general matter, when a consumer uses a credit or charge card, the merchant's point of sale terminal relays a record of the transaction to the card's network.  The GPCC network pays the merchant the purchase price less the "merchant discount fee" (hereafter "merchant fee"), which is a percentage of the purchase price, and may also include a flat transaction fee and other types of add-on fees (for example, if the card number must be typed in, or if voice authorization is necessary).

49.     On the consumer side of the transaction, the cardholder may pay a fee for holding the particular card, such as annual fees or startup fees.  More frequently, the cardholder may receive a reward for using the card, such as a percentage-cash-back reward or an award based on a points system.  For credit cards, the cardholder may also pay finance charges for delayed repayments, and/or interest payments for the loaned amount used for the purchase.

**1.     Merchant Fees**

50.     In the Visa and Mastercard networks, merchant fees are composed of a network fee, an acquirer fee, and an interchange fee.  The network fee is retained by Visa and Mastercard. The acquirer fee is collected and kept by the institution that signed up and services the merchant.

The interchange fee is set by Visa or Mastercard and kept by the issuing bank when a transaction is settled.

51.     The interchange rate (and therefore the total merchant fee) varies depending on the industry segment to which the merchant belongs and the particular credit card used by the consumer, for example high-reward cards are subject to higher interchange rates and, thus, cost merchants more to accept.

52.     By contrast, Amex's merchant pricing model differs by charging a single merchant fee for all of Amex's various credit and charge cards.  Accordingly, a given merchant is charged the same merchant fee by Amex whether the consumer uses the high-reward Amex Platinum Card or the comparatively lower-reward Amex Green card.

53.     Amex sets its merchant fee pricing by industry segments, establishing a "headline" or "base" merchant fee charged across a given industry segment, such as airlines, hotels, supermarket and grocery, e-commerce, entertainment, restaurants, and retail.

54.     For a typical merchant in many industries, the Amex merchant fee had varied over time but is roughly 3% of the total transaction amount.  At 3%, if a cardholder presents an Amex-branded payment card to make a $100 purchase, the merchant will receive $97 from Amex, and Amex will bill its card member for $100.  The $3 difference is Amex's "discount revenue."

55.     The vast majority of Amex's revenue comes from merchant fees.  Merchant fees less the cost of rewards amounted to 75% of Amex's revenue in 2017, versus 25% derived from interest income.  For Amex's competitors, the sources of revenue are flipped  −  75-80% comes from interest income, while 20-25% comes from merchant fees.

56.     With regard to settlement, whereas Visa and Mastercard typically pay the merchant within 48 hours, Amex takes twice as long to pay merchants – typically three to seven business days.

57.     Other credit cards—including Discover-branded credit cards and even most Visa and MasterCard credit cards—are far less costly to the merchant than Amex, carrying lower merchant fees.

58.     As a general matter, the GPCC networks' merchant fees are a significant cost item for merchants of all sizes in all industries, and they are the reason that millions of small merchants either do not accept Amex cards or might not accept any GPCC cards at all.

59.     As of 2014, Amex cards were accepted by roughly 3.4 million merchants in the United States at 6.4 million locations, which was approximately 3 million fewer locations than Visa, Mastercard, and Discover.

60.     In recent years, Amex has sought to gain acceptance by small merchants, and to do so has implemented a program it named "OptBlue," which borrows elements of the Visa and Mastercard open network model.  Under OptBlue, an acquirer signs up the merchant and owns the account, sets the merchant fee based on wholesale rates from Amex, and provides merchant service and settlement of transactions.  Amex maintains "Operating Regulations" which the merchant acquirers are mandated by Amex to incorporate into the acquirer's agreement with OptBlue merchants.  Like the merchant acceptance agreements which Amex enters into directly with merchants,  the Amex Operating Regulations for OptBlue bar OptBlue merchants from steering customers to any other credit card, charge card, debit card or other types of payment products, but permit OptBlue merchants to offer discounts or in-kind incentives from the merchant's regular prices for various payment types, including cash, check, debit card, or credit card / charge card.

As with the merchant acceptance agreements which Amex enters into directly with merchants, Amex still bars the OptBlue merchant from differentiating any discounts or in-kind incentives on the basis of issuer or GPCC network (Visa, Mastercard, Discovery or American Express).

61.     Once an OptBlue merchant hits $1 million in annual Amex volume, Amex itself automatically takes over the account, and the merchant is obliged to sign a direct merchant agreement with Amex in order to continue to accept Amex cards.  When this happens, the merchant defaults to Amex's standard acceptance terms and merchant fee structure.

62.     Bank card merchant acquirers signed up approximately 1 million merchants in 2016-17 through the OptBlue program, reducing Amex's merchant coverage gap.

### 2.     Cardholder Rewards

63.     Amex competes on the cardholder side of the platform by offering its cardholders benefits such as rental car insurance, travel concierge services, airport lounge access, purchase protection, and fraud protection.  However, the overwhelming majority of Amex cardholder benefits are rewards are based on card usage.

64.     Amex's card usage rewards come primarily from the American Express Membership Rewards Program, which awards Membership Rewards points for purchases made with Amex cards.  Cardholders may redeem those points for frequent flier miles, merchandise, gift cards, and other goods and services.

65.     Visa and Mastercard also maintain programs offering cardholders various rewards or benefits based on card usage.  They do so primarily through tiered cards—offering higher-tiered cards with more substantial rewards for card use, which use tends to carry higher merchant fees for the merchant compared to acceptance of more basic Visa and Mastercard cards on the same networks.

66.     For its part, Amex cardholders include:  (i) basic cardholders who pay minimal or no annual fees but receive minimal or no rewards; (ii) mid-tier cardholders who pay annual fees but spend more, and in return receive moderate rewards; and (iii) premium cardholders who pay the highest annual fees, tend to spend the most, and in return receive the highest-value rewards. Amex's cardholder fees are higher than those charged by competing networks with comparable benefits.

67.     The level and type of Amex cardholder rewards depend on the type of Amex card used.  By way of illustration, Amex Platinum card use results in five times Membership Rewards points for every dollar spent on qualifying flights and hotels, and one point for every dollar spent on other purchases, while the Amex Blue Card only provides one Membership Reward point for each eligible dollar spent.  The Amex Gold Card awards cardholders with four times Membership Rewards points per dollar spent at U.S. restaurants and supermarkets.  The Amex Everyday Preferred Card rewards cardholders with three Membership Rewards points per dollar spent at U.S. supermarkets and two points per dollar spent at U.S. gas stations.  But as previously explained, Amex charges the merchant in each industry segment the same merchant fee per transaction, no matter what type of Amex card — high reward or low reward — is used.

68.     The "two-sided price" of GPCC transactions is the net price charged across both sides of the GPCC platform  —  accounting for both the revenue the GPCC network collects from the merchants (merchant fees and other fees), and the net expense of providing cardholder rewards.

69.     Amex has long sought to justify its comparatively higher merchant fees as necessary to cover the high level of rewards it offers to its cardholders.  However, Amex has not traditionally set its merchant fees based on the cost of its rewards to cardholders.  Rather, Amex has for decades followed an express premium pricing policy, whereby its pricing strategy has been

to charge merchants a premium over its competitors' all-in rates.  Amex's overall two-sided transaction prices (merchant fees less per-transaction rewards) is hugely profitable, and over the years, Amex's rising merchant fees have not been offset by corresponding cardholder rewards.

70.   Over the last decade, Amex's price premium has shrunk somewhat, as Visa, Mastercard, and Discover have themselves charged higher all-in fees to merchants as a result of Amex's Anti-Steering Rules removing any incentive for them to compete on price to merchants, as more fully alleged below.

## II.   AMEX'S ANTI-STEERING RULES RESTRAIN TRADE

### A.   Relevant Market

71.   The relevant geographic market is the United States, including each of the States.

72.   The relevant product market is the market for two-sided general purpose credit and charge card transactions.

73.   The two-sided credit and charge card transaction market is a distinct product market because the GPCC networks provide core services that cannot reasonably be replaced by other sources.  There are no products that are reasonably interchangeable with the network services provided by Amex, Visa, MasterCard, and Discover.  In other words, there are no reasonably close substitutes for credit and charge card transactions, and there is no cross-elasticity of demand between credit/charge card transactions and other forms of payment.

74.   American Express's public statements to courts, federal agencies, and investors prior to the Government's lawsuit were consistent, for example, that Amex did not compete with debit card networks because of the limited substitutability between credit and debit.  According to American Express in its 2009 Form 10-K, "[t]he ability to substitute debit cards for credit and charge cards is limited because there is no credit extended and the consumer must have sufficient

funds in his or her demand deposit account to pay for the purchase at the time of the transaction as opposed to charge cards where payment is due at the end of the month or credit cards where payment can be extended over a period of time."

**B.     The Anti-Steering Rules**

75.     During all relevant periods, Amex's Anti-Steering Rules have been and are contained in Defendants' acceptance agreements, which Defendants require merchants to enter into.  During the Class Period, over 3 million merchants nationwide, including Merchant Plaintiffs, were contractually bound by Defendants' Anti-Steering Rules.

76.     Amex's Anti-Steering Rules prohibit a merchant that accepts Amex cards from inducing or "steering" a customer to use the merchant's preferred card network.  As a general matter, merchant steering is commonplace in retail.  For example, merchants attempt every day to influence customers' purchasing decisions by placing certain brands of goods at eye-level on a shelf, next to the cash register, or by prominently displaying them at a store entrance. Steering of customer choices occurs with retail promotions such as "buy one, get one free" or, for instance, a 25% off coupon for a future purchase with a purchase today.  With credit and charge card payment networks, a merchant unrestrained by Amex's Anti-Steering Rules could offer a 10% discount for using Visa, free shipping for using Discover, or a 50%-off hotel incentive for using an American Express card.

77.     There are many ways that a merchant might steer transactions to a less costly GPCC network, including:

> ○ offering a discount for using a payment product that is cheaper to the merchant, such as Discover, Visa, and MasterCard branded credit cards, while not offering that discount for Amex cards;

> ○ verbally asking customers if they would mind using a different payment product, as opposed to Amex cards;

○ posting signage indicating a preference for a cheaper payment product;

○ posting the decals and signs of less expensive payment networks, while not posting the decal or sign of Amex;

○ imposing a small charge no greater than the merchant's cost of accepting the credit card (sometimes referred to as a "surcharge") for using all or any subset of Amex-branded payment cards (where the merchant is located in one of the 40 states and the District of Columbia where such surcharges are legal); or

○ taking any other actions that merchants may yet devise if they were not constrained by the anticompetitive rules against steering.

78.     Amex's Anti-Steering Rules, however, strictly prohibit merchants from engaging in such pro-competitive practices.  As set forth in Amex's "Merchant Reference Guide-U.S." beginning in or around 2007, Merchants must not:

□ indicate or imply that they prefer, directly or indirectly, any Other Payment Products over our Card;

□ try to dissuade Cardmembers from using the Card;

□ criticize or mischaracterize the Card or any of our services or programs;

□ try to persuade or prompt Cardmembers to use any Other Payment Products or any other method of payment (*e.g.*, payment by check);

□ impose any restriction, conditions, or disadvantages when the Card is accepted that are not imposed equally on all Other Payment Products, except for ACH funds transfer, cash, and checks;

□ engage in activities that harm our business or the American Express Brand (or both); or,

□ promote any Other Payment Products (except the Merchant's own private label card that they issue for use solely at their Establishments) more actively than the Merchant promotes our Card.

79.     Plaintiffs challenge these prohibitions as anticompetitive vertical restraints.

80.     Amex's Merchant Reference Guide defines "Other Payment Products" as "Any charge, credit, debit, stored value, prepaid, or smart cards, account access devices, or other payment cards, services, or products other than the [American Express] Card."

81.     The above iteration of Amex's Anti-Steering Rules, taken from the Merchant Payment Guide, is substantially mirrored in American Express's card acceptance agreements with all U.S. merchants.

82.     American Express actively monitors and enforces its Anti-Steering Rules for merchant non-compliance.  If a merchant violates the Anti-Steering Rules (and does not agree to stop steering), the violation could result in Amex terminating the merchant's card acceptance agreement with the network.  In this way, Amex would prefer to lose a merchant as a customer rather than permit a cardholder from choosing a less-expensive payment product.

83.     The intended and actual result of Amex's Anti-Steering Rules is near-total insulation from price competition amongst Amex, Visa, Mastercard, and Discovery in the fees charged to merchants.  The Anti-Steering Rules block Amex-accepting merchants from encouraging their customers to use any credit or charge card other than an Amex card, even where another card is less expensive for the merchant to accept.  This removes any incentive for Visa, Mastercard, and Discover to compete with Amex *or with one another* on the level of merchant fees.

84.     Absent Amex's restraints, merchants could use a number of different procompetitive steering devices to encourage cardholders to use a lower-cost credit card.  As described above, such steering devices include, but are not limited to, offering discounts or other monetary incentives to consumers who pay with a low-cost credit card, offering non-monetary benefits for using a lower-cost card, displaying the logo of one brand more prominently than

others, expressing the merchant's preference as to the type of card it would rather accept, or posting each card's cost of acceptance and letting customers make their own decisions as to the mode of payment they prefer.  Amex's restraints, however, forbid any of these steering devices.

85.     Steering has the following procompetitive virtues: fostering horizontal competition between the four GPCC networks; driving supra-competitive prices to merchants and two-sided GPCC transaction prices down to a competitive level by letting market forces, not Amex's restraints, determine the price; and increasing the number of credit and charge card transactions in the relevant market/s.

86.     Take, for example, the offering of discounts or merchant-sponsored points, rewards, or incentives to retail purchasers at the point of sale for using a less-expensive credit card product.  This steering device incentivizes customers, who value either merchant-sponsored rewards or point of sale discounts, to switch to less-expensive forms of payment.  These customers would increase demand for cheaper credit cards.  High-cost credit card networks (including Amex, Mastercard, Visa, and Discover) would lower merchant fees to maintain market share.  Moreover, discounts at the point of sale and merchant-sponsored rewards would encourage consumers who might otherwise use a different form of payment to use a low-cost credit card, increasing the number of credit card transactions and enhancing consumer choice.

87.     Another procompetitive steering device is the imposition of a surcharge.  Levying a surcharge (no greater than the merchant's cost of accepting that credit card) on customers using a high-cost credit card encourages a switch to a less expensive form of payment.  The resulting loss (or threatened loss) of business would cause high-cost credit card service providers, such as Amex and other credit card providers, to lower their merchant fees—or lose transactions to lower-

priced credit card platforms.  Under Amex's Anti-Steering Rules, however, a merchant can do none of these things.

### C.   The Government Action and Partial Settlement

88.   For years, Amex, Visa, and Mastercard all imposed restraints on merchants that prohibited steering.

89.   In 2010, the United States brought an action against Amex, Visa, and Mastercard to enjoin all three networks' anti-steering restraints.

90.   The government entered a settlement with Visa and Mastercard under which the two networks consented to the elimination of some of their anti-steering restraints.

91.   Amex, however, did not end its enforcement of its Anti-Steering Rules but defended the government action through trial and subsequent appeals.

92.   So long as Amex maintains enforcement of its Anti-Steering Rules, the GPCC market will remain non-competitive, as merchants that accept Amex cards, which includes nearly all of the major retailers in the country, remain unable to influence customers' choice of GPCC network because Amex's Anti-Steering Rules constrain them.  Consequently, the merchant fees charged by the four GPCC networks and the two-sided GPCC transaction prices will remain supra-competitive.

## III.   AMEX'S ANTI-STEERING RULES HAVE ANTICOMPETITIVE EFFECTS IN THE TWO-SIDED MARKET FOR GPCC TRANSACTIONS

93.   Amex's Anti-Steering Rules have had, and continue to have, actual detrimental effects on competition in the relevant market.

94.   Amex's restraints have caused, and continue to cause: (i) higher net, two-sided GPCC transaction prices than there would be absent the restraints; (ii) lower overall GPCC transactions and transaction volume than there would be absent the restraints; and (iii) higher

consumer retail prices on goods and services purchased throughout the country by Plaintiffs and the Class.

95.     There is direct evidence of these anticompetitive effects.   In addition, the anticompetitive effects are evidenced by Amex's market power in the relevant market and are evidence that Amex's Anti-Steering Rules harm competition.

**A.     Market Power**

96.     Amex has market power in the market for GPCC transactions by virtue of:  (i) its market share within a highly-concentrated market marked by high barriers to entry; (ii) cardholder insistence; and (iii) Amex's ability to impose price increases without meaningful merchant attrition.

**1.      Market Share in Highly Concentrated Market**

97.     Amex enjoys the second-largest market share in a four-firm market, where the top three firms command roughly 95% of the market.  The market has high barriers to entry in the form of sizeable setup costs of developing the infrastructure and branding necessary to compete. There is also the inherent difficulty of entering a mature, two-sided market like the GPCC transaction market, where a firm will initially struggle to convince merchants to join a network without a significant population of cardholders, and in turn it will also struggle to capture cardholders for a nascent network with few merchants.

**2.      Cardholder Insistence**

98.     Amex's market power also comes from its highly insistent, loyal cardholder base, a segment of which insists on paying with their Amex cards and who shop elsewhere or spend less if unable to use Amex.  Amex itself expressly recognizes, quantifies, and leverages the loyalty of its cardholders in its business dealings with merchants.

99.     Cardholders are incentivized to use their Amex cards by the robust rewards programs offered by Amex, at least to those cardholders with the highest-tier Amex cards, which cardholders, not coincidentally, tend to be the wealthiest.  Indeed, Amex's value proposition rests largely on the fact that it delivers, on average, more affluent cardholders who are "ready to spend" at participating merchants.  The affluent Amex cardholders tend to spend more on average per transaction, spend more on an annual basis per card, and spend more often than cardholders on competing GPCC networks.

100.    Cardholder insistence also stems from Amex's corporate cardholders, 70% of which, according to an Amex study, are subject to some form of mandate by their employers to use the Amex corporate card for business expenses.

101.    Merchants recognize that it is commercially impractical to simply stop acceptance of Amex cards.  The foregone profits associated with losing Amex-insistent customers are too great.

102.    Amex relies on the effect of cardholding insistence when explaining to merchants why ceasing to accept Amex cards would be unprofitable.  For example, in a standardized presentation used by Amex client managers when justifying price increases to restaurants in 2010, Amex warned that, according to its data, nearly 50% of Amex cardholders "[w]ould no longer dine, [w]ould dine less often or would spend less" if the restaurants chose not to accept Amex cards.

103.    In addition to relatively smaller merchants like restaurants, the largest merchants were also subject to Amex's cardholder insistence.  Walgreen, which at the time was the ninth-largest retailer in the country, decided to drop Amex in 2004 when Amex imposed an increase to its merchant fee on Walgreen.  However, Walgreen was forced to reverse its decision in the face

of public outcry from its customers, who told Walgreen that they would patronize a competitor if unable to use their Amex cards.

### 3. Amex Increases Fees Without Meaningful Merchant Attrition

104.    In the period from 2005 to 2010, Amex raised its merchant fees on twenty separate occasions.  Amex lost no appreciable market share to its rivals and indeed did not lose the business of any large merchants.  The unrestrained ability to raise price without merchant attrition is evidence of Amex's market power in the relevant market.

105.    When Amex assessed the likely profitability of its price increases, Amex did not take into account the possibility that merchants would respond to its price increases by encouraging consumers to use a different credit card because Amex's Anti-Steering Rules prohibited any such steering.  Were it not for the Anti-Steering Rules, large merchants would have responded to the price increases by encouraging customers to use other, less expensive cards.  Indeed, in the trial of the government action against Amex, this is what large merchants testified.

106.    Amex's ability to increase its own merchant fees without merchant attrition or loss of market share is further evidence of Amex's market power in the relevant market.

### B. Amex's Market Power Harmed Horizontal Interbrand Price Competition

107.    In an unrestrained market, having the highest merchant fees would make Amex susceptible to losing transaction volume, revenue, and market share to its rivals.  That is, absent its Anti-Steering Rules, Amex would face price competition on the merchant side of its two-sided transactional platform.  The competition would lead Amex and its rivals to lower their merchant fees.  However, Amex's Anti-Steering Rules insulate it and rival networks Visa, Mastercard, and Discover from such competition.  The result is higher merchant fees charged by all four GPCC networks and a raising of the two-sided transaction price above competitive levels.

108.     Discover's low-cost pricing strategy for credit card services in the late 1990s exemplifies how anti-steering rules, like Amex's, impedes competition that would benefit both sides of the two-sided credit card transaction.  In the late 1990s, Discover attempted to capitalize on what it perceived to be an opening in the market: merchant dissatisfaction with price increases from competing credit card providers.  To capture market share from disgruntled merchants, Discover decided to provide a low-priced network for credit card services.   In 1999, Discover launched a campaign to shift business to its low-priced network by highlighting the price disparity between it and its competitors.  In one tactic, Discover sent letters to every merchant in its network in order to notify them of their competitors' recent price increases and urge the merchants to move to Discover in order to save money.  In another tactic, Discover offered lower discounts to large merchants if they steered customers to Discover.  To effectuate shifting market share to Discover, merchants could, Discover suggested, employ a number of different means, such as point-of-sale signage or invest the savings in lower merchant prices to generate customer loyalty.

109.     Despite offering procompetitive benefits to both merchants and consumers, Visa, MasterCard, and American Express's anti-steering rules prevented significant market share from shifting to Discover as a result of its low-cost pricing strategy.  Discover recognized that, in a market constrained by Amex and others' anti-steering provisions, its lower prices would not drive incremental volume to its network.  Thus, in 2000, Discover began raising discount rates in order to align itself with its competitors, including Visa and MasterCard.  Today, Discover's prices are similar to those offered by Visa and MasterCard.

110.     Discover's experience with its low-cost price strategy is telling.  Amex's Anti-Steering Rules are what prevents a lowest-cost provider strategy from succeeding in the GPCC market.  This is so because merchants are unable to shift market share among various networks.

27

Absent merchant steering, a credit card provider cannot expect to receive any competitive benefit for offering a price below that of its competitors.

111.    Steering, however, would encourage market entry in the credit card services market.  Because steering would increase retail customers' demand for low-cost credit cards—and merchants would steer customers towards those cards—new entrants could capture market share by offering low-cost/low-reward cards to customers.  Therefore, absent Amex's restraints, new firms could enter—and deconcentrate—the highly concentrated credit card market.  For the same reasons, steering would encourage competitors, such as Discover, that want to increase their market share to offer lower merchant fees.

### C.    Amex's Anti-Steering Rules Inflate the Two-Sided Price of Credit Card Transactions

112.    That Amex's Anti-Steering Rules have an anticompetitive effect in the relevant market is evidenced directly by the fact that two-sided transaction prices in the GPCC market are higher than they would be absent the restraints.  That is, accounting for the cost to merchants *and* the benefit to cardholders (merchant fees minus cardholder rewards), the restraints have caused, and continue to cause, the overall, two-sided transaction price to be above competitive levels.

113.    On the merchant side of the market, Amex's Anti-Steering Rules have allowed all four GPCC networks to raise and maintain their merchant fees higher and more profitably than would have been possible were merchants permitted to influence their customers' payment decisions through steering.  The restraints have caused higher merchant fees to be charged across all four networks — Amex, Visa, Mastercard, and Discover.

114.    The increased cost to merchants in the form of higher merchant fees is not wholly offset by the rewards delivered to cardholders by Amex's comparatively more robust cardholder rewards program.  That is, Amex by itself charged merchants higher merchant fees than it would

have absent the restraints, but kept most of the higher merchant fees for itself, passing on a fraction to cardholders in the form of rewards. Indeed the government trial record shows that Amex spends less than half of the merchant fees it collects from merchants on cardholder rewards.

115. Amex cardholders earn rewards almost entirely through using the card, not by just possessing it. Indeed, it is only a group of premium Amex cardholders who receive the vast majority of Amex's rewards, with the majority of Amex cardholders receiving substantially lesser rewards. Consequently, with a focus solely on the *Amex* two-sided transaction, the amount by which the merchant fee is supra-competitive is not nearly offset by benefits to Amex cardholders, with the result that the two-sided price of Amex cardholder transactions is above competitive levels.

116. Amex's prohibitions on merchant steering have also enabled Amex's competitors Visa, Mastercard, and Discover to charge higher fees to merchants. Visa and Mastercard raised their average all-in rates more than 20% from 1997 to 2009, without fear of rival GPCC networks undercutting their prices to gain transaction volume and market share. So too Discover, which after being forced to abandon its lowest-cost-competitor strategy as a result of anti-steering prohibitions, radically increased its own merchant pricing over a short period of time in order to match rates set by its competitors.

117. From 2012 to 2015, Visa and Mastercard merchant fees, in the form of interchange fees, grew an average of 8.5% per year. As Amex's Anti-Steering Rules continue to shelter GPCC competitors from horizontal, interbrand price competition, in October of 2018 Visa announced it would raise a fee assessed to all credit sale transactions (an acquirer service fee that is passed through to merchants) by .01% to .14%, effective January 1, 2019, representing an increase of 7.1%.

118.     The largest anticompetitive effect with regard to the two-sided transaction price is seen on the cardholder side of the transaction.  Amex's Anti-Steering Rules have the effect of increasing prices for all consumers, whether they pay with a credit or charge card from Amex, Visa, Mastercard, or Discover, or they pay by other means — debit card, check, or cash.

119.     Merchants facing increased credit and charge card acceptance costs pass most, if not all, of those increased costs to their customers in the form of higher retail prices.  At the government trial, testimony from merchants and expert witnesses established this fact.

120.     Consequently, even if Amex were to pass through every dollar of its incremental revenue realized by its inflated merchant fees — which it does not — consumers who do not carry or qualify for an Amex card are nonetheless subject to higher retail prices at every card-accepting merchant they patronize, but do not receive any of the premium rewards or benefits, which Amex confers on its cardholders.  Thus, a comparatively low-income shopper who pays for groceries at a supermarket or buys items at a drugstore and pays with anything other than an Amex card ends up paying higher retail prices, and therefore, subsidizing the cost that Amex incurs to fund its premium rewards program for more affluent Amex cardholders.  If the merchants were free to offer inducements to use less expensive payment forms, or to assess a surcharge for using expensive payment forms, then only customers who choose to use an expensive payment product would be compelled to pay for the privilege.  While an affluent shopper who is 200 reward points shy of free airfare and hotel for a trip to Hawaii may not balk at a two dollar surcharge at checkout, Plaintiffs and the Class will be relieved of the obligation to subsidize that benefit to the Amex cardholder.  The raised prices to all non-Amex holding consumers is by itself a massive anticompetitive effect in the market, and in the context of the two-sided transaction price it leaves the merchant-side price anticompetitively high, while offsetting that with zero benefit on the (non-

Amex) cardholder side.  Consequently, the supra-competitive merchant fees are not offset by benefits to cardholders in the two-sided GPCC transaction market, either in the aggregate or for just Amex transactions.

### D.    Amex's Anti-Steering Rules Reduce Output

121.    Along with raising the two-sided GPCC transaction price above competitive levels, Amex's Anti-Steering Rules have the additional direct, anticompetitive effect of reducing the output of GPCC transactions and transaction volume.

122.    Absent Amex's Anti-Steering Rules, merchants would be able to influence the payment choice of their customers, and the four high-cost GPCC networks would charge lower merchant fees as a result.  Lower merchant fees, as well as lower two-sided transaction prices, would encourage merchants that do not currently accept credit or charge cards due to the high merchant fees to begin accepting them.  Broader acceptance of GPCC networks by merchants across the board, which would primarily be gained with smaller merchants, would cause the number of GPCC transactions and total transaction volume to increase.

123.    Total output in the form of GPCC transactions and transaction volume would rise for the additional reason that merchants will offer point-of-sale incentives, rewards, discounts, or benefits to retail customers, causing some of these customers, who would not otherwise use a credit card, to do so.  And, retail customers (who value low merchant prices and/or merchant-sponsored benefits over credit card rewards) would increase use of low-cost/low-reward credit cards in order to access merchant-based benefits.  Currently, Amex's unlawful restraints act to restrict demand for low-cost/low-reward credit cards because merchants cannot steer customers to these alternatives.  However, if merchants could offer discounts and incentives for the use of a low-cost/low-reward card, there would be significant retail consumer demand for such a card, which

credit card networks would then satisfy.  Because some customers would prefer those cards (and the merchant perks accrued by their use) over other credit card rewards, those customers would use them more frequently and the total number of GPCC transactions and transaction volume would increase.

124.    Because Amex's Anti-Steering Rules cause a supra-competitive two-sided transaction price, restrict the output of GPCC transactions, and raise retail prices to all consumers across the board, there is direct evidence that Amex's restraints have anticompetitive effects in the relevant market.

## IV.    INJURY TO PLAINTIFFS AND CLASS MEMBERS

125.    Without Amex's contractual restraints on merchants, merchants would steer customers between various forms of payment and GPCC networks.  The costs associated with accepting credit and charge cards are among merchants' highest costs of doing business, and so merchants have a strong economic incentive to reduce those costs as much as possible without alienating either the GPCC networks or customers.  To that end, if given the freedom to participate in their customers' card choices, merchants would steer customers.

126.    No longer insulated from price competition on the merchant side of the GPCC platform, the four GPCC networks would compete on price to merchants, and therefore merchant fees and the two-sided transaction price would be lower.

127.    Economic theory and real-world evidence show that merchants will pass-on cost savings from reduced merchant fees in the form of lower retail prices —on everything, to every consumer.

128.    In its Findings of Fact from the government action, this Court found that Amex's Anti-Steering Rules cause higher prices for consumers because merchants facing supra-

competitive credit and charge card acceptance costs will, in fact, pass on most, if not all, of that overcharge to their customers in the form of higher retail prices.  The Merchant Plaintiffs, presumably with intimate knowledge of their own business practices, affirmatively allege that they pass on their inflated credit and charge card acceptance costs to their customers.  Likewise, the class action Merchant Plaintiffs affirmatively allege the same.

129.    But-for Amex's Anti-Steering Rules, Plaintiffs and class members would have paid less for their retail purchases from all GPCC-accepting merchants in every State, including purchases from each Merchant Plaintiff.  Harm to Plaintiffs and class members occurs at the time of each retail purchase from all GPCC-accepting merchants in every State, including purchases from each Merchant Plaintiff.

## V.    THERE IS NO PROCOMPETITIVE RATIONALE FOR ANTI-STEERING RULES

130.    Amex has contended that its differentiated business model could not survive abolition of its Anti-Steering Rules because merchants could steer cardholders away from using Amex cards.  The result, according to Amex, would be fewer customers using their Amex cards for transactions, thereby causing fewer merchants to accept Amex cards and causing a downward spiral of degradation to Amex's network.

131.    Amex would also contend that its restraints have the procompetitive benefit of delivering "ready to spend," affluent Amex cardholders to merchants who are hungry for such customers and that Amex is able to do this only by charging higher merchant fees to fund robust rewards for its cardholders.

132.    However, the theory that anti-steering provisions are procompetitive because they permit Amex's preferred business model to survive is both wrong and undermined by Amex's own position.  It is wrong because to find Amex's Anti-Steering Rules to be reasonable restraints of

trade requires shielding Amex's business strategy from legitimate, horizontal, interbrand competition of the kind Discover attempted to accomplish with its lowest-cost-competitor business strategy.

133.    If Amex's merchant fees are so high that merchants can successfully steer Amex cardholders to use other cards, Amex has less restrictive means available than its Anti-Steering provisions: it can lower its merchant fees and/or spend more on cardholder rewards so that cardholders are impervious to such steering influence.  What Amex presently does —demanding contractual protection from price competition — is anticompetitive.

134.    Even if it was legally cognizable for Amex to assert its restraints are reasonable because they protect Amex (and its rivals) from legitimate interbrand price competition, Amex's dire prediction that it cannot survive without its Anti-Steering Rules is belied by Amex's own contentions and by real-world experience.  Amex insisted at the government trial that, even if there were no anti-steering prohibitions, steering would be unlikely to occur.  That position is wholly inconsistent with the grave consequences Amex suggests could result from abolition of its Anti-Steering Rules.

135.    What is more, Amex's business continues to be viable around the world even where its Anti-Steering Rules have been eliminated.  For example, in Australia, merchants have been able to surcharge Amex transactions (a form of steering) by more than the amount they surcharge other credit card transactions.  Amex, as a result, has not abandoned the Australian market but instead has adapted to the competitive landscape to be highly profitable there — with lower merchant fees.  In Canada, since 2010, merchants have been able to offer varied discounts by GPCC network.  Yet, Amex continues to profitably operate in Canada.

136.    Indeed, there are no procompetitive justifications for Amex's restraints.  However, even if Amex asserts a procompetitive justification for its restraints, the anticompetitive effects, including the increased cost of goods and services to *all* consumers, significantly outweigh any purported procompetitive justification and there are less restrictive alternatives for achieving any procompetitive justification.

## CLASS ACTION ALLEGATIONS

137.    Plaintiffs bring this action on their own behalf and as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure on behalf of all members of the following Class (the "Nationwide Class"):

> All persons or entities residing in the United States that do not have an Amex card and who use an electronic form of payment to purchase goods or services from merchants which accept Amex, Visa, Mastercard and/or Discover credit or charge cards.

> Excluded from the Class are Defendants, their parent companies, subsidiaries, agents and affiliates, all governmental entities, and any judges or justices assigned to hear any aspect of this action.

138.    Plaintiffs also bring this class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) seeking certification of thirty-two separate statewide damage classes asserting claims for damages under the antitrust statutes and/or consumer protection statutes, and law of unjust enrichment of thirty-two jurisdictions: Alabama, Arizona, California, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin (collectively, the "State Damages Classes").

139.    The State Damages Classes are comprised of:

All persons or entities residing in [State] who do not have an Amex credit card or an Amex co-branded credit card and did not have one during the period of time permitted by the applicable statute of limitations (Class Period), who used any electronic form of payment to purchase a product or service from a merchant that accepted Amex, Visa, Mastercard, and/or Discover credit or charge cards during the Class Period.

Excluded from the Class are Defendants, their parent companies, subsidiaries, agents and affiliates, all governmental entities, and any judges or justices assigned to hear any aspect of this action.

140.     Alternatively, Plaintiffs seek certification under Rules 23(a) and 23(b)(3) of the following Subclasses ("State Damages Subclasses"):

All persons or entities residing in [State] who do not have an Amex credit card or an Amex co-branded credit card and did not have one during the period of time permitted by the applicable statute of limitations (Class Period), who used any electronic form of payment to purchase a product or service from a Merchant Plaintiff during the Class Period.

Excluded from the Subclasses are Defendants, their parent companies, subsidiaries, agents and affiliates, all governmental entities, and any judges or justices assigned to hear any aspect of this action.

141.     Plaintiffs do not know the exact number of Class members.  Due to the nature of the trade and commerce involved, Plaintiffs believe that there are millions of Class members, such that joinder of all Class members is impracticable.

142.     Questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, including;

(a)      Whether Defendants entered into agreements, contracts, or combinations to restrain trade;

(b)      Whether Amex's Anti-Steering Rules contained in merchant acceptance agreements constitute an agreement, contract, or combination to unreasonably restrain trade;

(c)     Whether Defendants' conduct caused, and continues to cause, Class members to pay more for products or services than they would in the absence of the Defendants' conduct;

(d)     Whether Plaintiffs and the other members of the Classes were injured by Defendants' conduct, and, if so, the appropriate class-wide measure of damages for Class members;

(e)     Whether Amex's Anti-Steering Rules continue to exist and be enforced, causing continuing and imminent harm to Plaintiffs and Class members; and

(f)     The scope of any injunctive relief to which Plaintiffs and the other members of the Class are entitled.

143.    Plaintiffs' claims are typical of the claims of the Class(es), and Plaintiffs will fairly and adequately protect the interests of the Class(es) in that they have no conflicts with other members of the Class(es).  Plaintiffs' interests are coincident with, and not antagonistic to, those of the members of their respective Class(es).   Plaintiffs have retained competent counsel experienced in the prosecution of class actions and complex antitrust cases to represent them and the Class(es).

144.    Class action treatment is a superior method for the fair and efficient adjudication of this controversy because:

(a)     It would be virtually impossible for all members of the Class(es) to intervene as parties-plaintiff in this action;

(b)     The prosecution of separate actions by individual Class Members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants;

(c)     It will allow numerous individuals with claims too small to adjudicate on an individual basis due to the prohibitive cost of this litigation to obtain redress for their economic injuries; and

(d)     It will provide court oversight of the claims process, once
        Defendants' liability is adjudicated.

This class action is superior to any other method for the fair and efficient adjudication of this

dispute.  There will be no extraordinary difficulty in the management of this class action.

## CLAIMS FOR RELIEF

### COUNT ONE
### VIOLATION OF SECTION § 1 OF THE SHERMAN ACT

*On Behalf of All Plaintiffs, Clayton Act section 16 (15 U.S.C. § 26) For Violation of
Section 1 of the Sherman Act*

145.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

146.    During the Class Period, Defendants entered into agreements, contracts, or

combinations—the Anti-Steering Rules—with merchants, including Merchant Plaintiffs, to

unreasonably restrain trade and commerce in the United States in violation of Section 1 of the

Sherman Act (15 U.S.C. § 1).  Defendants' unlawful conduct resulted in overcharge injury to

Plaintiffs and continues to threaten loss and damage to Plaintiffs.

147.    The Anti-Steering Rules are vertical non-price restraints that threaten to continue

to cause anticompetitive effects in the market for two-sided credit and charge card transactions,

including, but not limited to:

        a.      Reduction or elimination of inter-brand price and quality competition

among providers of credit card services that would exist absent of the Amex's Anti-Steering Rules;

        b.      Supra-competitive one-sided prices paid by merchants, including Merchant

Plaintiffs, for card services and supra-competitive net two-sided GPCC transaction prices;

        c.      Deprivation of the benefits of free and open competition; and

        d.       Reduction in the number and volume of GPCC transactions.

148.    Defendants possess and exercised market power in the relevant market/s.

149.    Defendants harmed—and continue to harm—competition in the relevant market/s, which resulted in Plaintiffs and others similarly-situated being forced to pay inflated prices for goods and/or services purchased at merchants throughout the United States, including Merchant Plaintiffs.

150.    There are no procompetitive justifications for Defendants' restraints and, even if such justifications existed, any possible procompetitive benefits are substantially outweighed by the anticompetitive effects and/or could be achieved through less restrictive alternatives.

151.    Plaintiffs and other Class Members have been injured and will continue to be injured in their businesses or property by paying more for goods and/or services purchased from merchants, including Merchant Plaintiffs, than they otherwise would and will pay in the absence of Amex's restraints.

152.    Defendants' anticompetitive conduct either occurred, or its effects were felt, in each of the States whose antitrust, consumer protection and unjust enrichment laws are being asserted herein. Defendants' anticompetitive conduct injured both Plaintiffs and the Class throughout the country in the same way. Defendants' illegal course of conduct as alleged herein may be established with common proof, and such common proof gives rise to liability under of each of the state antitrust, consumer protection and unjust enrichment laws asserted herein.

153.    Plaintiffs and the Class Members are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

## **COUNT TWO**
## **VIOLATION OF STATE ANTITRUST STATUTES**

*On Behalf of All Plaintiffs, For Violation of State Antitrust Statutes*

154.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

155.    During the Class Period, Defendants engaged, and continue to engage, in agreements, contracts, or combinations with merchants, including the Merchant Plaintiffs, which contain Anti-Steering Rules in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.  Among other things, the Anti-Steering Rules represent a vertical non-price restraint that has the effect of restraining inter-brand price competition in the market for two-sided GPCC transactions.

156.    Plaintiffs and Class Members are injured in the form of overcharges passed through by merchants, including the Merchant Plaintiffs.  The overcharges to merchants, including the Merchant Plaintiffs, are the supra-competitive merchant fees (with regard to Amex, also known as the "effective discount rate" or the "overall discount rate") charged by Amex, Visa, Mastercard, and Discover as a result of Amex's Anti-Steering Rules.  Those overcharges are passed through to retail prices paid by Plaintiffs and Class Members.  The level of overcharge to Plaintiffs and Class Members has varied over time due in part to unilateral changes to merchant fees implemented by Amex, Visa, Mastercard, and Discover, which changes were not pre-ordained or triggered by governing card acceptance agreements.   Harm and injury to Plaintiffs and Class Members occurs with each new purchase at the time of the purchase.  At the time of purchases, Plaintiffs and Class Members had no ability to estimate merchant fees charged to merchants by Amex, Visa, Mastercard, and Discover, or any ability to estimate the amount of pass-through of the anticompetitive overcharge to retail prices.

157.    Defendants' anticompetitive acts described above were knowing and willful and constitute violations of the following state antitrust statutes.

158.    **Alabama**:  Defendants entered into unlawful restraints of trade in violation of Ala. Code §§ 8-10-1, *et seq.*

(a)    During the Class Period, Defendants entered into and engaged in continuing unlawful contracts or combinations that unreasonably restrained the trade or production described above in violation of the Ala. Code § 8-10-3.

(b)    Defendants' agreements, contracts, or combinations have had the following effects: (i) competition in the relevant market/s was restrained, suppressed, and eliminated throughout Alabama; (ii) prices of products or services were raised to artificially high levels throughout Alabama; (iii) Plaintiffs and members of the Class were deprived of free and open competition; and (iv) Plaintiffs and members of the Class who paid for products or services using electronic forms of payment paid artificially inflated prices for such products or services.

(c)    During the Class Period, Defendants' illegal conduct substantially affected commerce in Alabama.

(d)    Under Alabama law, indirect purchasers have standing to maintain an action based on the facts in this Complaint.  Ala. Code § 6-5-60(a).

(e)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury.

(f)    By reason of the foregoing, Defendants entered into agreements, contracts, or combinations in restraint of trade in violation of Ala. Code § 8-10-3.

(g)    Accordingly, Plaintiffs and members of the Class seek legal relief under Ala. Code § 6-5-60(a)., including the sum of $500 and all actual damages.

159.   **Arizona**: Defendants entered into unlawful restraints of trade in violation of the Ariz. Rev. Stat. Ann. §§ 44-1401, *et seq.*

(a)     Defendants entered into a contract or combination between two or more persons in restraint of trade or commerce in the relevant market/s, a substantial part of which occurred within Arizona.

(b)     Defendants' violations of Arizona law were flagrant.

(c)     Defendants' agreements, contracts, or combinations have had the following effects: (i) competition in the relevant market/s was restrained, suppressed, and eliminated throughout Arizona; (ii) prices of products or services were raised to artificially high levels throughout Arizona; (iii) Plaintiffs and members of the Class were deprived of free and open competition; and (iv) Plaintiffs and members of the Class who paid for products or services using electronic forms of payment paid artificially inflated prices for such products or services.

(d)     During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.

(e)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury. and are entitled to all legal forms of relief under Ariz. Rev. Stat. Ann. § 44-1408.

(f)     By reason of the foregoing, Defendants entered into agreements, contracts, or combinations in restraint of trade in violation of Ariz. Rev. Stat. Ann. § 44-1402.

(g)     Accordingly, Plaintiffs and members of the Class seek all legal relief available under Ariz. Rev. Stat. Ann. § 44-1408, including actual damages, treble damages for a flagrant violation, taxable costs, and reasonable attorneys' fees.

160.    **California**: Defendants entered into unlawful restraints of trade in violation of California's Cartwright Act, Cal. Bus. & Prof. Code §§ 16700, *et seq.*

(a)     During the Class Period, Defendants entered into and engaged in continuing unlawful agreements, contracts, or combinations in restraint of the trade and commerce described above in violation of Cal. Bus. & Prof. Code § 16720.  These unlawful contracts were entered into and effectuated within the State of California.

(b)     The aforesaid violations of Cal. Bus. & Prof. Code § 16720, consisted, without limitation, of continuing unlawful agreements, contracts, and/or combinations by Defendants.

(c)     The agreements, contracts, or combinations alleged herein have had, *inter alia*, the following effects: (i) competition in the relevant market/s has been restrained, suppressed, and/or eliminated in the State of California; (ii) prices paid by Class members using electronic forms of payment for products and services have been raised, to artificially high, non-competitive levels in the State of California and throughout the Class Jurisdictions; and (iii) those who purchased such products and services have been deprived of the benefit of free and open competition.

(d)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property in that they paid more for products and services than they otherwise would have paid in the absence of Defendants' unlawful conduct.  As a result of Defendants' violation of Cal. Bus. & Prof. Code § 16720, Plaintiffs and members of the Class seek treble damages, interest on actual damages pursuant to Section 16761, and their cost of suit, including reasonable attorney's fees, pursuant to Cal. Bus. & Prof. Code § 16750(a).

161.   **District of Columbia**: Defendants entered into unlawful restraints of trade in violation of the D.C. Code §§ 28-4501, *et seq.*

(a)     Defendants' agreements, contracts, or combinations have had the following effects: (i) competition in the relevant market/s was restrained, suppressed, and eliminated throughout the District of Columbia; (ii) prices of products or services were raised to artificially high levels throughout the District of Columbia; (iii) Plaintiffs and members of the Class were deprived of free and open competition; and (iv) Plaintiffs and members of the Class who paid for products or services using  any electronic forms of payment paid artificially inflated prices for such products or services.

(b)     During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury.

(d)     Under D.C. law, indirect purchasers have standing to maintain an action based on the facts in this Complaint.  D.C. Code § 28-4508(a).

(e)     By reason of the foregoing, Defendants entered into agreements, contracts, or combinations in restraint of trade in violation of D.C. Code § 28-4502.

(f)     Accordingly, Plaintiffs and members of the Class seek legal relief under D.C. Code § 28-4508(a), including actual damages, treble damages, costs of suit, and reasonable attorneys' fees.

162.   **Hawaii**: Defendants entered into unlawful restraints of trade in violation of the Haw. Rev. Stat. Ann. §§ 480-1, *et seq.*

(a)     Defendants' agreements, contracts, or combinations have had the following effects: (i) competition in the relevant market/s was restrained, suppressed, and eliminated

throughout Hawaii; (ii) prices of products or services were raised to artificially high levels throughout Hawaii; (iii) Plaintiffs and members of the Class were deprived of free and open competition; and (iv) Plaintiffs and members of the Class who paid for products or services using electronic forms of payment paid artificially inflated prices for such products or services.

(b)     During the Class Period, Defendants' illegal conduct substantially affected commerce in Hawaii.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property.

(d)     Under Hawaii law, indirect purchasers have standing to maintain an action based on the facts in this Complaint.  Haw. Rev. Stat. Ann. § 480-13.

(e)     By reason of the foregoing, Defendants entered into agreements, contracts, or combinations in restraint of trade in violation of Haw. Rev. Stat. Ann. § 480-4(a).

(f)     Accordingly, Plaintiffs and members of the Class seek legal relief under Haw. Rev. Stat. Ann. § 480-13(a)(1), including compensatory damages, costs of suit, and reasonable attorney's fees.

163.    **Illinois**: Defendants entered into unlawful restraints of trade in violation of the Illinois Antitrust Act, 740 Ill. Comp. Stat. 10/1, *et seq.*

(a)     During the Class Period, Defendants entered into and engaged in continuing unlawful contracts or combinations the unreasonably restrained the trade and commerce described above in violation of the Illinois Antitrust Act, 740 Ill. Comp. Stat. 10/3(2).

(b)     Defendants' agreements, contracts, or combinations have had the following effects: (i) competition in the relevant market/s was restrained, suppressed, and eliminated throughout Illinois; (ii) prices of products or services were raised to artificially high levels

throughout Illinois; (iii) Plaintiffs and members of the Class were deprived of free and open competition; and (iv) Plaintiffs and members of the Class who paid for products or services using electronic forms of payment paid artificially inflated prices for such products or services.

(c)      During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce.

(d)      Under Illinois law, indirect purchasers have standing to maintain an action based on the facts in this Complaint.  740 Ill. Comp. Stat. 10/7(2).

(e)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property.

(f)      By reason of the foregoing, Defendants entered into agreements, contracts, or combinations in restraint of trade in violation of the Illinois Antitrust Act, 740 Ill. Comp. Stat. 10/3(2).

(g)      Accordingly, Plaintiffs and members of the Class seek legal relief under 740 Ill. Comp. Stat. 10/7(2), including actual damages, treble damages for a willful violation, reasonable attorneys' fees, and costs.

164.      **Iowa**: Defendants entered into unlawful restraints of trade in violation of the Iowa Code §§ 553.1, *et seq.*

(a)      The Iowa Competition Law aims to "prohibit[] restraint of economic activity and monopolistic practices." Iowa Code § 553.2.

(b)      Defendants contracted or combined to restrain trade or commerce in the relevant market/s in violation of the Iowa Code § 553.4.

(c)      Defendants' agreements, contracts, or combinations have had the following effects: (i) competition in the relevant market/s was restrained, suppressed, and eliminated

throughout Iowa; (ii) prices of products or services were raised to artificially high levels throughout Iowa; (iii) Plaintiffs and members of the Class were deprived of free and open competition; and (iv) Plaintiffs and members of the Class who paid for products or services using electronic forms of payment paid artificially inflated prices for such products or services.

(d)     During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce.

(e)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property.

(f)     By reason of the foregoing, Defendants entered into agreements, contracts, or combinations in restraint of trade in violation of Iowa Code § 553.4.

(g)     Accordingly, Plaintiffs and members of the Class seek legal relief under Iowa Code § 553.12, including actual damages, exemplary damages for willful or flagrant conduct, and costs of suit, including reasonable attorneys' fees.

165.   **Kansas**: Defendants entered into unlawful restraints of trade in Kansas in violation of Kan. Stat. Ann. §§ 50-101, *et seq.*

(a)     The Kansas Restraint of Trade Act aims to prohibit practices that, *inter alia*, "tend to prevent full and free competition in the importation, transportation or sale of articles imported into this state."  Kan. Stat. Ann. § 50-112.

(b)   Defendants' agreements, contracts, or combinations have had the following effects: (i) price competition in the relevant market/s was restrained, suppressed, and eliminated throughout Kansas; (ii) prices for products or services purchased by Plaintiffs and members of the Class were raised at artificially high levels throughout Kansas; (iii) Plaintiffs and members of the Class were deprived of free and open competition; and (iv) Plaintiffs and members of the Class

paid supra-competitive, artificially inflated prices for products or services purchased using electronic forms of payment.

(c) Under the Kansas Restraint of Trade Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Kan. Stat. Ann. § 50-161(b).

(d) During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.

(e) As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property.

(f) By reason of the foregoing, Defendants entered into agreements, contracts, or combinations that restrained trade and tended to prevent full and free competition in the relevant market/s in violation of Kan. Stat. Ann. § 50-112.

(g) Accordingly, Plaintiffs and members of the Class seek legal relief under Kan. Stat. Ann. § 50-161(b)-(c), including treble the actual damages sustained, reasonable attorneys' fees, and costs.

166. **Maine**: Defendants entered into unlawful restraints of trade in violation of the Me. Rev. Stat. Ann tit. 10, §§ 1101, *et seq*.

(a) Part 3 of Title 10 of the Maine Revised Statutes generally governs regulation of trade in Maine. Chapter 201 thereof governs monopolies and profiteering, generally prohibiting contracts in restraint of trade. Me. Rev. Stat. Ann. tit. 10, §§ 1101, *et seq*.

(b) Plaintiffs and members of the Class made purchases using electronic forms of payment within the State of Maine during the Class Period. But for Defendants' conduct set for herein, the price paid for those purchases would have been lower, in an amount to be determined at trial.

(c)     Defendants' agreements, contracts, or combinations have had the following effects: (i) price competition in the relevant market/s was restrained, suppressed, and eliminated throughout Maine; (ii) prices for products or services purchased by Plaintiffs and members of the Class were raised at artificially high levels throughout Maine; (iii) Plaintiffs and members of the Class were deprived of free and open competition; and (iv) Plaintiffs and members of the Class paid artificially inflated prices for products or services purchased using electronic forms of payment.

(d)     Under Maine law, indirect purchasers have standing to maintain an action based on the facts in this Complaint.  Me. Rev. Stat. Ann. tit. 10, § 1104(1).

(e)     During the Class Period, Defendants' illegal conduct substantially affected Maine commerce.

(f)     As a result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured directly or indirectly in their business and property.

(g)     By reason of the foregoing, Defendants entered into agreements, contracts, or combinations in restraint of trade in violation of Me. Rev. Stat. Ann. tit. 10, § 1101.

(h)     Accordingly, Plaintiffs and members of the Class seek legal relief under Me. Rev. Stat. Ann. 10, § 1104(1), including treble of damages sustained and cost of suit, including necessary and reasonable investigative costs, reasonable experts' fees, and reasonable attorneys' fees.

167.    **Maryland**: Defendants entered into unlawful restraints of trade in violation of Md. Com. Law Code Ann. §§ 11-201, *et seq.*

(a)     Defendants' agreements, contracts, or combinations have had the following effects: (i) price competition in the relevant market/s was restrained, suppressed, and eliminated

49

throughout Maryland; (ii) prices for products or services purchased by Plaintiffs and members of the Class were raised at artificially high levels throughout Maryland; (iii) Plaintiffs and members of the Class were deprived of free and open competition; and (iv) Plaintiffs and members of the Class paid supra-competitive, artificially inflated prices for products or services purchased using electronic forms of payment.

(b)      Under Maryland law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint.  Md. Com. Law Code Ann. § 11-209(b)(2)(i).

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property.

(d)      By reason of the foregoing, Defendants entered into agreements, contracts, or combinations that restrained trade and tended to prevent full and free competition in the relevant market/s in violation of Md. Com. Law Code Ann. § 11-204(a)(1).

(e)      Accordingly, Plaintiffs and members of the Class seek legal relief available under Md. Com. Law Code Ann. § 11-209(b)(2), including actual damages, treble damages, costs, and reasonable attorneys' fees.

168.    **Michigan**: Defendants entered into unlawful restraints of trade in violation of the Mich. Comp. Laws §§ 445.771, *et seq.*

(a)      The Michigan Antitrust Reform Act aims "to prohibit contracts, combinations, and conspiracies in restraint of trade or commerce . . . [and] to provide remedies, fines, and penalties for violations of this act[.]" 1984 Mich. Pub. Acts 274.

(b)      Plaintiffs and members of the Class made purchases using electronic forms of payment within the State of Michigan during the Class Period.  But for Defendants' conduct set

for herein, the price paid for those purchases would have been lower, in an amount to be determined at trial.

(c)     Defendants' agreements, contracts, or combinations have had the following effects: (i) competition in the relevant market/s was restrained, suppressed, and eliminated throughout Michigan; (ii) prices of products or services were raised to artificially high levels throughout Michigan; (iii) Plaintiffs and members of the Class were deprived of free and open competition; and (iv) Plaintiffs and members of the Class who paid for products or services using electronic forms of payment paid artificially inflated prices for such products or services.

(d)     Under the Michigan Antitrust Reform Act, indirect purchasers have standing to maintain an action based on the facts in this Complaint.   Mich. Comp. Laws. § 452.778(2).

(e)     As a result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property.

(f)     By reason of the foregoing, Defendants entered into agreements, contracts, or combinations in restraint of trade or commerce in the relevant market/s in violation of Mich. Comp. Laws § 445.772.

(g)     Accordingly, Plaintiffs and members of the Class seek legal relief under Mich. Comp. Laws. § 445-778(2), including actual damages sustained, and, as determined by the court, interest on the damages from the date of the complaint, taxable costs, and reasonable attorneys' fees.

169.   **Minnesota**: Defendants entered into unlawful restraints of trade in violation of the Minn. Stat. Ann. §§ 325D.49, *et seq.*

(a)      The Minnesota Antitrust Law of 1971 aims to prohibit any contract, combination or conspiracy when any part thereof was created, formed, or entered into in Minnesota and any contract, combination or conspiracy wherever created, formed or entered into that affects Minnesota trade or commerce. Minn. Stat. Ann. § 325D.54.

(b)      Plaintiffs and members of the Class made purchases using electronic forms of payment within the State of Minnesota during the Class Period.  But for Defendants' conduct set forth herein, the price paid for those purchases would have been lower, in an amount to be determined at trial.

(c)      Defendants' agreements, contracts, or combinations have had the following effects: (i) competition in the relevant market/s was restrained, suppressed, and eliminated throughout Minnesota; (ii) prices of products or services were raised to artificially high levels throughout Minnesota; (iii) Plaintiffs and members of the Class were deprived of free and open competition; and (iv) Plaintiffs and members of the Class who paid for products or services using any electronic forms of payment paid artificially inflated prices for such products or services.

(d)      Under the Minnesota Antitrust Act of 1971, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint.  Minn. Stat. § 325D.57.

(e)      Defendants' unreasonable contract, combination, or conspiracy in restraint of trade or commerce was created, formed, or entered into both within the interstate commerce of Minnesota and outside of Minnesota, in violation of Minn. Stat. Ann. § 325D.51.

(f)      Plaintiffs and members of the Class were injured with respect to purchases they made using electronic forms of payment in Minnesota.

(g)      By reason of the foregoing, Defendants entered into contracts or combinations in restraint of trade in violation of Minn. Stat. Ann. § 325D.51.

(h)      Accordingly, Plaintiffs and members of the Class seek legal relief under Minn. Stat. Ann. § 325D.57, including treble the actual damages sustained, together with costs and disbursements, including reasonable attorneys' fees.

170.   **Mississippi**: Defendants entered into unlawful restraints of trade in violation of the Miss. Code Ann. §§ 75-21-1, *et seq.*

(a)      Title 75 of the Mississippi Code regulates trade, commerce, and investments.  Chapter 21 thereof generally prohibits trusts and combines in restraint or hinderance of trade, with the aim that "trusts and combines may be suppressed, and the benefits arising from competition in business [are] preserved" to Mississippians.  Miss. Code Ann. § 75-21-39.

(b)      Trusts are combinations, contracts, understanding or agreements, express or implied, when inimical to the public welfare and with the effect of, *inter alia*, restraining trade, increasing the price or output of a commodity, or hindering competition in the production or sale of a commodity. Miss. Code Ann. § 75-21-1.

(c)      Plaintiffs and members of the Class made purchases using electronic forms of payment within the State of Mississippi during the Class Period.  But for Defendants' conduct set forth herein, the price paid for those purchases would have been lower, in an amount to be determined at trial.

(d)      Defendants' agreements, contracts, or combinations have had the following effects: (i) competition in the relevant market/s was restrained, suppressed, and eliminated throughout Mississippi; (ii) prices of products or services were raised to artificially high levels throughout Mississippi; (iii) Plaintiffs and members of the Class were deprived of free and open competition; and (iv) Plaintiffs and members of the Class who paid for products or services using electronic forms of payment paid artificially inflated prices for such products or services.

(e)     Under Mississippi law, indirect purchasers have standing to maintain an action under the antitrust provisions of the Mississippi Code based on the facts alleged in this Complaint.  Miss. Code Ann. § 75-21-9.

(f)     Defendants' combinations, contracts, and agreements restrained trade, increased prices, and hindered competition in the relevant market/s in a manner inimical to public welfare, in violation of Miss. Code Ann. § 75-21-1(a).

(g)     During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.

(h)     Plaintiffs and members of the Class were injured as a result of Defendants' unlawful conduct.

(i)     By reason of the foregoing, Defendants entered into agreements, contracts, or combinations in restraint of trade in violation of Miss. Code Ann. §§ 75-21-1, *et seq.*

(j)     Accordingly, Plaintiffs and members of the Class seek legal relief under Miss. Code Ann.§ 75-21-9, including actual damages and a penalty of $500 per instance of injury.

171.    **Nebraska**: Defendants entered into unlawful restraints of trade in violation of the Neb. Rev. Stat. Ann. §§ 59-801, *et seq.*

(a)     Chapter 59 of the Nebraska Revised Statute generally governs business and trade practices.  Sections 801 through 831 thereof, known as the Junkin Act, prohibit antitrust violations such as restraints of trade.

(b)     Plaintiffs and members of the Class made purchases using electronic forms of payment within the State of Nebraska during the Class Period.  But for Defendants' conduct set for herein, the price paid for those purchases would have been lower, in an amount to be determined at trial.

(c)     Defendants' agreements, contracts, or combinations have had the following effects: (i) competition in the relevant market/s was restrained, suppressed, and eliminated throughout Nebraska; (ii) prices of products or services were raised to artificially high levels throughout Nebraska; (iii) Plaintiffs and members of the Class were deprived of free and open competition; and (iv) Plaintiffs and members of the Class who paid for products or services using electronic forms of payment paid artificially inflated prices for such products or services.

(d)     Under Nebraska law, indirect purchasers have standing to maintain an action under the Junkin Act based on the facts alleged in this Complaint.  Neb. Rev. Stat Ann. § 59-821.

(e)     Defendants contracted or combined in restraint of trade or commerce within the intrastate commerce of Nebraska in violation of Neb. Rev. Stat. Ann. § 59-801.

(f)     Plaintiffs and members of the Class were injured in their business or property as a result of Defendants' unlawful conduct in Nebraska.

(g)     By reason of the foregoing, Defendants entered into agreements, contracts, or combinations in restraint of trade in violation of Neb. Rev. Stat. Ann. §59-801.

(h)     Accordingly, Plaintiffs and members of the Class seek legal relief under Neb. Rev. Stat. Ann. § 59-821, including actual or liquidated damages, in an amount which bears a reasonable relation to the actual damages that have been sustained and which damages are not susceptible of measurement by ordinary pecuniary standards, and the costs of suit, including reasonable attorneys' fees.

172.   **Nevada**: Defendants entered into unlawful restraints of trade in violation of Nevada Unfair Trade Practices Act, Nev. Rev. Stat. §§ 598A.010, *et seq.*

(a)     Members of the Class made purchases using electronic forms of payment within the State of Nevada during the Class Period.  But for Defendants' conduct set forth herein, the price paid for those purchases would have been lower, in an amount to be determined at trial.

(b)     Defendants entered into a contract or combination in restraint of trade to raise, fix, and/or stabilize prices in the relevant market/s.

(c)     Defendants' agreements, contracts, or combinations have had the following effects: (i) competition in the relevant market/s was restrained, suppressed, and eliminated throughout Nevada; (ii) prices of products or services were raised to artificially high levels throughout Nevada; (iii) Plaintiffs and members of the Class were deprived of free and open competition; and (iv) Plaintiffs and members of the Class who paid for products or services using electronic forms of payment paid artificially inflated prices for such products or services.

(d)     Under Nevada law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint.  Nev. Rev. Stat. § 598A.210.

(e)     Defendants contracted or combined in restraint of trade or commerce within the intrastate commerce of Nevada, in violation of Nev. Rev. Stat. §598A.060(1).

(f)     Plaintiffs and members of the Class were injured or threatened with injury or damage as a result of Defendants' unlawful conduct in Nevada.

(g)     By reason of the foregoing, Defendants entered into agreements, contracts, or combinations in restraint of trade in violation of Nev. Rev. Stat. §598A.060(1).

(h)     Accordingly, Plaintiffs and members of the Class seek legal relief under Nev. Rev. Stat. § 598A.210(2), including treble damages, reasonable attorneys' fees, and costs.

173.   **New Hampshire**: Defendants entered into unlawful restraints of trade in violation of the N.H. Rev. Stat. §§ 356:1, *et seq.*

(a)     Title XXXI of the New Hampshire Statutes generally governs trade and commerce.  Chapter 356 thereof governs combinations and prohibits restraints of trade.  N.H. Rev. Stat. § 356:2.

(b)     Members of the Class made purchases using electronic forms of payment within the State of New Hampshire during the Class Period.  But for Defendants' conduct set for herein, the price paid for those purchases would have been lower, in an amount to be determined at trial.

(c)     Defendants' agreements, contracts, or combinations have had the following effects: (i) competition in the relevant market/s was restrained, suppressed, and eliminated throughout New Hampshire; (ii) prices of products or services were raised to artificially high levels throughout New Hampshire; (iii) Plaintiffs and members of the Class were deprived of free and open competition; and (iv) Plaintiffs and members of the Class who paid for products or services using  electronic forms of payment paid artificially inflated prices for such products or services.

(d)     Under New Hampshire law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint.  N.H. Rev. Stat. § 356:11(II).

(e)      Plaintiffs and members of the Class were injured due to Defendants' unlawful conduct in New Hampshire.

(g)     By reason of the foregoing, Defendants entered into agreements, contracts, or combinations in restraint of trade in violation of N.H. Rev. Stat. §§ 356:2.

(h)     Accordingly, Plaintiffs and members of the Class seek legal relief under N.H. Rev. Stat. §§ 356:11(II), including actual damages sustained, treble damages for willful or flagrant violations, reasonable attorneys' fees, and costs of suit.

174.   **New Mexico**: Defendants entered into unlawful restraints of trade in violation of the New Mexico Antitrust Act, N.M. Stat. Ann. §§ 57-1-1, *et seq.*

(a)   The New Mexico Antitrust Act aims to prohibit restraints of trade and monopolistic prices.  N.M. Stat. Ann. § 57-1-15.

(b)   Defendants' agreements, contracts, or combinations had the following effects: (i)  price competition in the relevant market/s was restrained, suppressed, and eliminated throughout New Mexico; (ii) prices for products or services purchased by Plaintiffs and members of the Class were raised at artificially high levels throughout New Mexico; (iii) Plaintiffs and members of the Class were deprived of free and open competition; and (iv) Plaintiffs and members of the Class paid artificially inflated prices for products or services purchased using electronic forms of payment.

(c)   Under New Mexico law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint.  N.M. Stat. Ann. § 57-1-3(A).

(d)   Defendants contracted, agreed or combined in restraint of trade or commerce within the intrastate commerce of New Mexico in violation of N.M. Stat. Ann. § 57-1-1.

(e)   Plaintiffs and members of the Class were injured as a result of Defendants' unlawful conduct in New Mexico.

(f)   By reason of the foregoing, Defendants entered into restraints of trade in violation of N.M. Stat. Ann. § 57-1-1.

(g)   Accordingly, Plaintiffs and members of the Class seek legal relief under N.M. Stat. Ann. § 57-1-3(A), including actual damages, treble damages, reasonable attorneys' fees, and costs.

175.   **New York**: Defendants entered into unlawful restraints of trade in violation of New York's Donnelly Act, N.Y. Gen. Bus. Law §§ 340, *et seq.*

(a)      Article 22 of the New York General Business Law generally prohibits contracts or agreements in restraint of trade, with the policy of encouraging competition or the free exercise of any activity in the conduct of any business, trade or commerce in New York. N.Y. Gen. Bus. Law § 340(1).

(b)      Defendants' agreements, contract, or combinations had the following effects: (i) price competition in the relevant market/s was restrained, suppressed, and eliminated throughout New York; (ii) prices for products or services purchased by Plaintiffs and members of the Class were raised at artificially high levels throughout New York; (iii) Plaintiffs and members of the Class were deprived of free and open competition; and (iv) Plaintiffs and members of the Class paid artificially inflated prices for products or services purchased using electronic forms of payment, or purchased products that were otherwise of lower quality than they would have been absent the Defendants' illegal acts, or were unable to purchase products that they would have otherwise have purchased absent the illegal conduct.

(c)      Under New York law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint.  N.Y. Gen. Bus. Law § 340(6).

(d)      Plaintiffs and members of the Class were injured as a result of Defendants' unlawful conduct in New York.

(e)      Defendants restrained competition in the free exercise of business within the intrastate commerce of New York in violation of N.Y. Gen. Bus. Law § 340(1).

(f)     Accordingly, Plaintiffs and members of the Class seek legal relief under N.Y. Gen. Bus. Law § 340(5), including actual damages, treble damages sustained, costs not exceeding $10,000, and reasonable attorneys' fees.

176.     **North Carolina**: Defendants entered into unlawful restraints of trade in North Carolina in violation of N.C. Gen. Stat. §§ 75-1, *et seq.*

(a)     Defendants entered into contracts or combinations in the form of trust of otherwise in restraint of trade or commerce, a substantial part of which occurred within North Carolina.

(b)     Defendants' agreements, contracts, or combinations had the following effects: (i) price competition in the relevant market/s was restrained, suppressed, and eliminated throughout North Carolina; (ii) prices for products or services purchased by Plaintiffs and members of the Class were raised at artificially high levels throughout North Carolina; (iii) Plaintiffs and members of the Class were deprived of free and open competition; and (iv) Plaintiffs and members of the Class paid artificially inflated prices for products or services purchased using electronic forms of payment.

(c)     During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce.

(d)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury.

(e)     Under North Carolina law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.C. Gen. Stat. §§ 75-16.

(f)     By reason of the foregoing, Defendants entered into restraints of trade in violation of N.C. Gen. Stat. §§ 75-1 and 75-2.

(g)     Accordingly, Plaintiffs and members of the Class seek legal relief under N.C. Gen. Stat. § 75-16, including treble damages.

177.   **North Dakota**: Defendants entered into an unlawful restraints of trade in violation of North Dakota's States Uniform Antitrust Act, N.D. Cent. Code §§ 51-08.1, *et seq.*

(a)     The North Dakota Uniform State Antitrust Act generally prohibits restraints on or monopolization of trade.  N.D. Cent. Code §§ 51-08.1, *et seq.*

(b)     Defendants' agreements, contracts, or combinations had the following effects: (i) price competition in the relevant market/s was restrained, suppressed, and eliminated throughout North Dakota; (ii) prices for products or services purchased by Plaintiffs and members of the Class were raised at artificially high levels throughout North Dakota; (iii) Plaintiffs and members of the Class were deprived of free and open competition; and (iv) Plaintiffs and members of the Class paid artificially inflated prices for products or services purchased using electronic forms of payment.

(c)     Under the North Dakota Uniform State Antitrust Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.D. Cent. Code § 51-08.1-08(3).

(d)     Defendants contracted, combined, or conspired in restraint of trade or commerce in violation of N.D. Cent. Code § 51-08.1-02.

(e)     Plaintiffs and members of the Class were injured with respect to purchases in North Dakota.

(f)     By reason of the foregoing, Defendants entered into restraints of trade in violation of N.D. Cent. Code § 51-08.1, *et seq.*

(g)     Accordingly, Plaintiffs and members of the Class seek legal relief under N.D. Cent. Code § 51-08.1-08(2), including damages sustained, treble damages for flagrant violations, taxable costs, and reasonable attorneys' fees.

178.   **Oregon**: Defendants entered into unlawful restraints of trade in violation of the Or. Rev. Stat. §§ 646.705, *et seq.*

(a)     Chapter 646 of the Oregon Revised Statutes generally governs business and trade processes within Oregon.  Section 705 through 899 thereof govern antitrust violations, with a policy to "encourage free and open competition in the interest of the general welfare and economy of the state."  Or. Rev. Stat. § 646.715.

(b)     Plaintiffs and members of the Class made purchases using electronic forms of payment within the State of Oregon during the Class Period.  But for Defendants' conduct set for herein, the price paid for those purchases would have been lower, in an amount to be determined at trial.

(c)     Defendants' agreements, contracts, or combinations had the following effects: (i) price competition in the relevant market/s was restrained, suppressed, and eliminated throughout Oregon; (ii) prices for products or services purchased by Plaintiffs and members of the Class were raised at artificially high levels throughout Oregon; (iii) Plaintiffs and members of the Class were deprived of free and open competition; and (iv) Plaintiffs and members of the Class paid artificially inflated prices for products or services purchased using electronic forms of payment.

(d)     Under Oregon law, indirect purchasers have standing under the antitrust provisions of the Oregon Revised Statutes to maintain an action based on the facts alleged in this Complaint.  Or. Rev. Stat. § 646.780(1)(a).

(e)     Defendants contracted, combined, or conspired in restraint of trade or commerce in violation of Or. Rev. Stat. § 646.725.

(f)     Plaintiffs and members of the Class were injured due to Defendants' unlawful restraints within the intrastate commerce of Oregon, or alternatively, to interstate commerce involving actual or threatened injury to persons located in Oregon..

(g)     By reason of the foregoing, Defendants entered into restraints of trade in violation of Or. Rev. Stat. §§ 646.705, *et seq.*

(h)     Accordingly, Plaintiffs and members of the Class seek legal relief under Or. Rev. Stat.§ 646.780(1)(a), including actual damages, treble damages, reasonable attorneys' fees, expert witness fees, and investigative costs.

179.    **Rhode Island**: Defendants entered into unlawful restraints of trade in violation of R.I. Gen. Laws §§ 6-36-1, *et seq.*

(a)     The Rhode Island Antitrust Act aims to promote the unhampered growth of commerce and industry throughout Rhode Island by prohibiting unreasonable restraints of trade and monopolistic practices that hamper, prevent, or decrease competition.  R.I. Gen. Laws § 6-36-2(a)(2).

(b)     Defendants' agreements, contracts, or combinations have had the following effects: (i) competition in the relevant market/s was restrained, suppressed, and eliminated throughout Rhode Island; (ii) prices of products or services were raised to artificially high levels throughout Rhode Island; (iii) Plaintiffs and members of the Class were deprived of free and open

competition; and (iv) Plaintiffs and members of the Class who paid for products or services using electronic forms of payment paid artificially inflated prices for such products or services.

(c)      Under the Rhode Island Antitrust Act, as of January 1, 2008, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint.  R.I. Gen. Laws § 6-36-11(a).  In Rhode Island, the claims for Plaintiffs and the Class alleged herein run from January 1, 2008, through the date that the effects of Defendants' anticompetitive conduct cease.

(d)      Defendants contracted or combined in restraint of trade within the intrastate commerce of Rhode Island in violation of R.I. Gen. Laws § 6-36-4.

(e)      Plaintiffs and members of the Class were injured due to Defendants illegal conduct in Rhode Island.

(f)      Accordingly, Plaintiffs and members of the Class seek all legal relief available under R.I. Gen. Laws § 6-36-11(a), including treble damages sustained, reasonable costs of suit, and reasonable attorneys' fees.

**South Dakota**: Defendants entered into unlawful restraints of trade in violation of the S.D. Codified Laws §§ 37-1-1, *et seq.*

(a)      Chapter 37-1 of the South Dakota Codified Laws prohibits restraint of trade. S.D. Codified Laws §§ 37-1-3.1.

(b)      Defendants' agreements, contracts, or combinations had the following effects: (i) price competition in the relevant market/s was restrained, suppressed, and eliminated throughout South Dakota; (ii) prices for products or services purchased by Plaintiffs and members of the Class were raised at artificially high levels throughout South Dakota; (iii) Plaintiffs and members of the Class were deprived of free and open competition; and (iv) Plaintiffs and members

of the Class paid artificially inflated prices for products or services purchased using electronic forms of payment.

(c)     Under South Dakota law, indirect purchasers have standing under the antitrust provisions of the South Dakota Codified Laws to maintain an action based on the facts alleged in this Complaint.  S.D. Codified Laws § 37-1-33.

(d)     Defendants contracted or combined in restraint of trade or commerce within the intrastate commerce of South Dakota in violation of S.D. Codified Laws § 37-1-3.1.

(e)     Plaintiffs and members of the Class were injured in South Dakota due to Defendants' unlawful conduct.

(f)     Accordingly, Plaintiffs and members of the Class seek legal relief under S.D. Codified Laws § 37-1-14.3, including damages sustained, treble the damages sustained, taxable costs, and reasonable attorneys' fees.

180.    **Tennessee**: Defendants entered into unlawful restraints of trade in violation of Tenn. Code Ann. §§ 47-25-101, *et seq.*

(a)     The Tennessee Trade Practices Act generally governs commerce and trade in Tennessee, and it prohibits, *inter alia*, all arrangements, contracts, agreements, or combinations between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition in goods in Tennessee.   All such arrangements, contracts, agreements, or combinations between persons or corporations designed, or which tend, to increase the prices of any such goods, are against public policy, unlawful, and void.  Tenn. Code § 47-25-101.

(b)     Defendants restrained trade as forth herein, in violation of Tenn. Code § 47-25-101.

(c)     Defendants' conduct violated the Tennessee Trade Practice Act because it was an arrangement, contract, agreement, or combination to lessen full and free competition in goods in Tennessee, and because it tended to increase the prices of goods in Tennessee. Specifically, Defendants' agreements, contracts, or combinations have had the following effects: (i) competition in the relevant market/s was restrained, suppressed, and eliminated throughout Tennessee; (ii) prices of products or services were raised to artificially high levels throughout Tennessee; (iii) Plaintiffs and members of the Class were deprived of free and open competition; and (iv) Plaintiffs and members of the Class who paid for products or services using any electronic forms of payment paid artificially inflated prices for such products or services.

(d)     During the Class Period, Defendants' illegal conduct substantially affected Tennessee commerce.

(e)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property and are threatened with further injury.

(f)     Under Tennessee law, indirect purchasers (such as Plaintiff and the Class) have standing under the Tennessee Trade Practices Act to maintain an action based on the facts alleged in this Complaint.

(g)     Plaintiffs and members of the Tennessee Class were injured in Tennessee due to Defendants' unlawful conduct .

(h)     By reason of the foregoing, Defendants entered into agreements, contracts, or combinations in restraint of trade in violation of Tenn. Code Ann. § 47-25-101.

(i)     Accordingly, Plaintiffs and members of the Class seek legal relief under Tenn. Code Ann. § 47-25-106, including the full consideration or sum paid by the injured person

66

for any goods, wares, merchandise, or articles, the sale of which is controlled by such combination or trust.

181.   **Utah**: Defendants entered into unlawful restraints of trade in violation of Utah Code Ann. §§ 76-10-3101, *et seq.*

(a)   The Utah Antitrust Act aims to "encourage free and open competition in the interest of the general welfare and economy of this state by prohibiting monopolistic and unfair trade practices, combinations and conspiracies in restraint of trade or commerce[.]" Utah Code Ann. § 76-10-3102.

(b)   Plaintiffs purchased goods or services affected by Defendants' unlawful conduct during the Class Period.  But for Defendants' conduct set forth herein, prices paid by Plaintiffs and the Class would have been lower, in an amount to be determined at trial.

(c)   Defendants' agreements, contracts, or combinations have had the following effects: (i) competition in the relevant market/s was restrained, suppressed, and eliminated throughout Utah; (ii) prices of products or services were raised to artificially high levels throughout Utah; (iii) Plaintiffs and members of the Class were deprived of free and open competition; and (iv) Plaintiffs and members of the Class who paid for products or services using  electronic forms of payment paid artificially inflated prices for such products or services.

(d)   Under the Utah Antitrust Act, indirect purchasers who are either Utah residents or Utah citizens have standing to maintain an action based on the facts alleged in this Complaint.  Utah Code Ann. § 76-10-3109(1)(a).

(e)   Defendants contracted, combined or conspired in restraint of trade or commerce in violation of Utah Code Ann. § 76-10-3104(1).

(f)     Plaintiffs and members of the Class who are either Utah residents or Utah citizens were injured in Utah due to Defendants' illegal conduct.

(g)     Accordingly, Plaintiffs and members of the Class seek legal relief under Utah Code Ann. § 76-10-3109(1)(a)-(b), including three times the amount of damages sustained, costs of suit, and reasonable attorneys' fees.

182.    **Vermont**: Defendants entered into unlawful restraints of trade in violation of Vt. Stat. Ann. tit. 9, §§ 2453, *et seq*.

(a)     Plaintiffs purchased goods or services affected by Defendants' unlawful conduct during the Class Period.  But for Defendants' conduct set forth herein, prices paid by Plaintiffs and the Class would have been lower, in an amount to be determined at trial.

(b)     Defendants' agreements, contracts, or combinations have had the following effects: (i) competition in the relevant market/s was restrained, suppressed, and eliminated throughout Vermont; (ii) prices of products or services were raised to artificially high levels throughout Vermont; (iii) Plaintiffs and members of the Class were deprived of free and open competition; and (iv) Plaintiffs and members of the Class who paid for products or services using electronic forms of payment paid artificially inflated prices for such products or services.

(c)     Under Vt. Stat. Ann. tit. 9, § 2465(b), indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint.

(d)     Defendants engaged in unfair methods of competition, as alleged herein, in violation of Vt. Stat. Ann. tit. 9, § 2453(a).

(e)     Accordingly, Plaintiffs and members of the Class seek legal relief under Vt. Stat. Ann. tit. 9, § 2465(a), including actual damages, consideration or value of consideration given, reasonable attorney's fees, and exemplary damages.

183.     **West Virginia**: Defendants entered into unlawful restraints of trade in violation of the West Virginia Antitrust Act, W. Va. Code §§ 47-18-1, *et seq.*

(a)      The violations of federal antitrust law set forth above also constitute violations of section 47-18-1 of the West Virginia Code.

(b)      During the Class Period, Defendants engaged in contracts or combinations in unreasonable restraint of trade and commerce in violation of W. Va. Code § 47-18-3(a).

(c)      Defendants' agreements, contracts, or combinations had the following effects: (i) price competition in the relevant market/s was restrained, suppressed, and eliminated throughout West Virginia; (ii) prices for products or services purchased by Plaintiffs and members of the Class were raised at artificially high levels throughout West Virginia; (iii) Plaintiffs and members of the Class were deprived of free and open competition; and (iv) Plaintiffs and members of the Class paid artificially inflated prices for products or services purchased using electronic forms of payment.

(d)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property.  As a result of Defendants' violation of W. Va. Code § 47-18-3, Plaintiffs and members of the Class seek treble the damages sustained and reasonable costs of suit, including reasonable attorneys' fees, pursuant to W. Va. Code § 47-18-9.

184.     **Wisconsin**: Defendants entered into unlawful restraints of trade in violation of the Wis. Stat. §§ 133.01, *et seq.*

(a)      Chapter 133 of the Wisconsin Statutes governs trust and monopolies, with the intent "to safeguard the public against the creation or perpetuation of monopolies and to foster

and encourage competition by prohibiting unfair and discriminatory business practices which destroy or hamper competition." Wis. Stat. § 133.01.

(b)     Plaintiffs purchased goods or services affected by Defendants' unlawful conduct during the Class Period.  But for Defendants' conduct set forth herein, prices paid by Plaintiffs and the Class would have been lower, in an amount to be determined at trial.

(c)     Defendants' agreements, contracts, or combinations had the following effects: (i) price competition in the relevant market/s was restrained, suppressed, and eliminated throughout Wisconsin; (ii) prices for products or services purchased by Plaintiffs and members of the Class were raised at artificially high levels throughout Wisconsin; (iii) Plaintiffs and members of the Class were deprived of free and open competition; and (iv) Plaintiffs and members of the Class paid artificially inflated prices for products or services purchased using electronic forms of payment.

(d)     Under Wisconsin law, indirect purchasers have standing under the antitrust provisions of the Wisconsin Statutes to maintain an action based on the facts alleged in this Complaint.  Wis. Stat. § 133.18(1)(a).

(e)     Defendants contracted or combined in restraint of trade or commerce in violation of Wis. Stat. § 133.03(1).

(f)     Plaintiffs and members of the Class were injured in Wisconsin due to Defendants' unlawful conduct in that the actions alleged herein substantially affected the people of Wisconsin, with at least thousands of consumers in Wisconsin paying substantially higher prices in Wisconsin.

(g)     Accordingly, Plaintiffs and members of the Class seek legal relief under Wis. Stat. § 133.18(1)(a), including treble damages, costs of suit, and reasonable attorneys' fees.

(h)      Defendants' anticompetitive activities have directly, foreseeably and proximately caused injury to Plaintiffs and the Class.  Their injuries consist of: (1) being denied the opportunity to purchase lower-priced products from Merchant Plaintiffs and other merchants throughout the State of Wisconsin, and (2) paying higher prices for goods and services purchased from Merchant Plaintiffs and other Merchants in Wisconsin than they would have in the absence of Defendants' conduct.  These injuries are of the type the laws of Wisconsin were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

185.    Plaintiffs and members of the Class in each of the above states have been injured in their business and property by reason of Defendants' unlawful agreements, contracts, or combinations.  Plaintiffs and members of the Class have paid more for products and services purchased using any electronic forms of payment than they otherwise would have paid in the absence of Defendants' unlawful conduct.  This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

186.    In addition, Defendants profited significantly from the aforesaid conduct in illegal restraint of trade.  Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of Plaintiffs and the members of the Class.

187.    Accordingly, Plaintiffs and the members of the Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

## COUNT THREE
## VIOLATION OF STATE CONSUMER PROTECTION STATUTES

*On Behalf of All Plaintiffs, For Violation of State Consumer*
*Protection Statutes*

188.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

189.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

190.    **California**: Defendants engaged in unfair competition or unfair unconscionable, deceptive or fraudulent acts or practices in violation of  Cal. Bus. & Prof Code §§ 17200, *et seq.*

(a)    Plaintiffs incorporate and realleges as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

(b)    Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the UCL by engaging in the acts and practices specified above.

(c)     This claim is instituted pursuant to Cal. Bus. & Prof. Code §§ 17203 and 17204, to obtain restitution from Defendants for acts, as alleged herein, that violated Cal. Bus. & Prof. Code §§ 17200, *et seq.*, commonly known as the Unfair Competition Law.

(d)    Defendants' conduct, as alleged herein, violated Cal. Bus. & Prof. Code § 17200.  The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of the UCL, including, but not limited to, the violations of Cal. Bus. & Prof. Code §§ 16720, *et seq.*, set forth above.

(e)      Defendants' acts or practices are unfair to members of the Class in the State of California within the meaning of Cal. Bus. & Prof. Code § 17200.

(f)      Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of Cal. Bus. & Prof. Code §§ 16720, *et seq.*, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful, or fraudulent.

(g)      Plaintiffs and members of the Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices.

(h)      The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

(i)       The unlawful and unfair business practices of Defendants, as described above, has caused and continues to cause Plaintiffs and the members of the Class to pay artificially-inflated prices for products or services purchased using non-Amex electronic forms of payment. Plaintiffs and the members of the Class suffered injury in fact and lost money or property as a result of such unfair competition.

(k)      As alleged in this Complaint, Defendants have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition.  Plaintiffs and the members of the Class are accordingly entitled to restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the Cal. Bus. & Prof. Code § 17204.

191.    **District of Columbia**: Defendants engaged in unfair or deceptive trade practices in violation of D.C. Code §§ 28-3901, *et seq.*

(a)      Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.  Defendants entered into contracts or combinations between two or more persons in restraint of trade or commerce in the relevant market/s, a substantial part of which occurred within the District of Columbia.

(b)      Defendants established or maintained their unlawful contracts or combinations in the relevant market/s for the purpose of excluding competition or controlling or maintaining prices in the relevant market/s, a substantial portion of which occurred in the District of Columbia.

(c)      Defendants' conduct was an unfair method of competition and an unfair or deceptive act or practice within the conduct of commerce within the District of Columbia.

(d)      The foregoing conduct constitutes "unfair or deceptive trade practices," within the meaning of D.C. Code § 28-3904(e).

(e)      Defendants are "merchants" within the meaning of D.C. Code § 28-3901(a)(3).

(f)      Plaintiffs and members of the Class purchased goods or services affected by Defendants' unlawful conduct for personal, family, or household purposes.

(g)      Defendants' unlawful conduct substantially affected the District of Columbia's trade and commerce.

(h)      As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business or property and are threatened with further injury.

(i)      By reason of the foregoing, Plaintiffs and members of the Class seek legal relief, including treble damages or $1,500 per violation (whichever is greater), punitive damages,

reasonable attorneys' fees, and any other relief the court deems proper under D.C. Code § 28-3905(k)(2).

192. **Florida**: Defendants have engaged in unfair methods of competition, unconscionable acts or practices, or unfair or deceptive acts or practices in the conduct of any trade or commerce in violation of Fla. Stat. §§ 501.201, *et seq.*

(a)     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

(b)     Defendants engaged in unfair competition in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.* (the "FDUTPA"), which generally prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Fla. Stat. § 501.204(1).

(c)     The primary policy of the FDUTPA is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2).

(d)     A claim for damages under the FDUTPA has three elements: (1) a prohibited practice; (2) causation; and (3) actual damages.

(e)     Under Florida law, indirect purchasers have standing to maintain an action under the FDUTPA based on the facts alleged in this Complaint.  Fla. Stat. § 501.211(a) ("anyone aggrieved by a violation of this [statute] may bring an action").

(f)     Members of the Class purchased goods or services affected by Defendants' unlawful conduct within the State of Florida during the Class Period.  But for Defendants' conduct

set forth herein, prices paid by Plaintiffs and the Class for those goods and services would have been lower, in an amount to be determined at trial.

(g)     During the Class Period, Defendants entered into contracts or combinations between two or more persons in restraint of the trade and commerce in the relevant market/s, described above, a substantial part of which occurred within the State of Florida.

(h)     Defendants established or maintained contracts or combinations in restraint of trade in the relevant market/s for the purpose of excluding competition or controlling or maintaining prices in Florida at a level higher than the competitive market.

(i)     Defendants' conduct was an unfair method of competition and an unfair or deceptive act or practice within the conduct of commerce within the State of Florida.

(j)     Defendants' unlawful conduct substantially affected Florida's trade and commerce.

(k)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business or property and are threatened with further injury.

(l)     By reason of the foregoing, Plaintiffs and members of the Class seek legal relief, including actual damages, reasonable attorneys' fees, and court costs pursuant to Fla. Stat. § 501.211.

193.   **Hawaii**: Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Haw. Rev. Stat. Ann. §§ 480-1, *et seq.*

(a)     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

(b)     Defendants' unlawful conduct had the following effects: (i) price competition in the relevant market/s was restrained, suppressed, and eliminated throughout Hawaii; (ii) prices for products or services purchased by Plaintiffs and members of the Class were raised at artificially high levels throughout Hawaii; (iii) Plaintiffs and members of the Class were deprived of free and open competition; and (iv) Plaintiffs and members of the Class paid artificially inflated prices for products or services purchased using electronic forms of payment.

(c)     During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce and consumers.

(d)     As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and members of the Class have been injured and are threatened with further injury.

(e)     Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of Haw. Rev. Stat. Ann. § 480-2.

(f)     Accordingly, Plaintiffs and the members of the Class seek all legal relief available under Haw. Rev. Stat. Ann. §§ 480-1, *et seq.*

194.   **Illinois**: Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 Ill. Comp. Stat. 505/1, *et seq.*

(a)     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

(b)     Defendants entered into contracts or combinations between two or more persons in restraint of trade or commerce in the relevant market/s, a substantial part of which occurred in Illinois.

(c)     Defendants established or maintained their unlawful contracts or combinations for the purpose of excluding competition or controlling or maintaining prices in the relevant market/s, a substantial portion of which occurred within the State of Illinois.

(d)     Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Illinois.

(e)     Defendants' unlawful conduct had the following effects: (i) price competition in the relevant market/s was restrained, suppressed, and eliminated throughout Illinois; (ii) prices for products or services purchased by Plaintiffs and members of the Class were raised at artificially high levels throughout Illinois; (iii) Plaintiffs and members of the Class were deprived of free and open competition; and (iv) Plaintiffs and members of the Class paid artificially inflated prices for products or services purchased using electronic forms of payment.

(f)     Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to Plaintiffs and members of the Class.

(g)     Defendants' illegal conduct substantially affected Illinois's trade and commerce.

(h)     As a direct and proximate result of Defendants unlawful conduct, Plaintiffs and the members of the Class were actually deceived and have been injured in their business or property and are threatened with further injury.

(i)     Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 Ill. Comp. Stat. 505/2.

(j)     By reason of the foregoing, Plaintiffs and members of the Class seek legal relief, including actual damages and any other relief the Court deems proper under 815 Ill. Comp. Stat. Ann. 505/10a(a).

195. **Massachusetts**: By reason of the foregoing, Defendants have violated the Massachusetts Consumer and Business Protection Act, Mass. Gen. Laws Ch. 93A, §§ 1, *et seq.*

(a) Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

(b) Defendants were engaged in trade or commerce as defined by Mass. Gen. Laws Ch. 93A, § 1.

(c) Defendants entered into contracts or combinations between two or more persons in restraint of trade or commerce in the relevant market/s, a substantial part of which occurred in Massachusetts.

(d) Defendants established or maintained their unlawful contracts or combinations for the purpose of excluding competition or controlling or maintaining prices in the relevant market/s, a substantial portion of which occurred within the State of Massachusetts.

(e) Defendants' unlawful conduct had the following effects: (1) price competition in the relevant market/s was restrained, suppressed, and/or eliminated throughout Massachusetts; (2) the prices for products and services paid by Plaintiffs and members of the Class when using an electronic form of payment were raised, fixed, maintained, and/or stabilized at artificially high levels throughout Massachusetts; (3) Plaintiffs and members of the Class were deprived of free and open competition; and (4) members of the Class paid supra-competitive, artificially inflated prices for goods and services when paying by an electronic form of payment.

(f) Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of Massachusetts.

(g) As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs members of the Class were injured and are threatened with further injury.

(h)     Each of the Defendants or their representatives have been served with a demand letter in accordance with Mass. Gen. Laws Ch. 93A, § 9(a), or such service of demand letter was unnecessary due to the defendant not maintaining a place of business within the Commonwealth of Massachusetts or not keeping assets within the Commonwealth.  More than thirty days has passed since such demand letters were served, and each Defendant served has failed to make a reasonable settlement offer.

(i)     For the foregoing reasons, Defendants engaged in unfair competition and unfair or deceptive acts or practices, in violation of Mass. Gen. Laws Ch. 93A, § 2(a).

(j)     Plaintiffs and members of the Class seek legal relief under to Mass. Gen. Laws Ch. 93A, §§ 9, 11, including double or treble damages, attorneys' fees and costs, and multiple damages for Defendants' knowing or willful violations of Chapter 93A.

196.   **Montana**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Montana Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code §§ 30-14-101, *et seq.*

(a)     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

(b)     Defendants' unlawful conduct had the following effects: (i) price competition in the relevant market/s was restrained, suppressed, and eliminated throughout Montana; (ii) prices for products or services purchased by Plaintiffs and members of the Class using electronic forms of payment were raised at artificially high levels throughout Montana; (iii) Plaintiffs and members of the Class were deprived of free and open competition; and (iv) Plaintiffs and members of the Class paid artificially inflated prices for products or services purchased using electronic forms of payment.

(c)     During the Class Period, Defendants' illegal conduct substantially affected Montana commerce and consumers.

(d)     As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Class have been injured and are threatened with further injury.

(e)     Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of Montana's Unfair Trade Practices and Consumer Protection Act, Mont. Code §§ 30-14-103and  30-14-205and, accordingly, Plaintiffs and the members of the Class seek legal relief under Mont. Code § 30-14-133, including actual damages or $500, whichever is greater, and, in the Court's discretion, treble damages.

197.    **New Hampshire**: Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of New Hampshire's Consumer Protection Act, N.H. Rev. Stat. Ann. §§ 358-A:1, *et seq.*

(a)     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

(b)     Defendants have entered into contracts or combinations between two or more persons in restraint of trade or commerce in the relevant market/s, a substantial part of which occurred within New Hampshire.

(c)     Defendants established or maintained their unlawful contracts or combinations for the purpose of excluding competition or controlling or maintaining prices in the relevant market/s, a substantial portion of which occurred within the State of New Hampshire.

(d)     Defendants' unlawful conduct had the following effects: (i) price competition in the relevant market/s was restrained, suppressed, and eliminated throughout New Hampshire; (ii) prices for products or services purchased by Plaintiffs and members of the Class

using electronic forms of payment were raised at artificially high levels throughout New Hampshire; (iii) Plaintiffs and members of the Class were deprived of free and open competition; and (iv) Plaintiffs and members of the Class paid artificially inflated prices for products or services purchased using electronic forms of payment.

(e)     Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of New Hampshire.

(f)     Defendants' conduct was willful and knowing.

(g)     Defendants' conduct misled consumers, withheld material facts, and had a direct or indirect impact upon Plaintiffs and members-of-the-Class's ability to protect themselves.

(h)     Defendants' unlawful conduct substantially affected New Hampshire's trade and commerce.

(i)     As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business or property and are threatened with further injury.

(j)     Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. Ann. § 358-A:2.

(k)     By reason of the foregoing, Plaintiffs and members of the Class seek legal relief under N.H. Rev. Stat. Ann. § 358-A:10-I, including actual damages or $1,000, whichever is greater, and as much as three times, but not less than two times, such an amount for a willful or knowing violation, costs of suit, and reasonable attorneys' fees.

198.     **New Mexico**: By reason of the conduct alleged herein, Defendants have violated New Mexico's Unfair Practices Act, N.M. Stat. Ann. §§ 57-12-1, *et seq.*

(a)       Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

(b)       Defendants entered into contracts or combinations between two or more persons in restraint of trade or commerce in the relevant market/s, a substantial part of which occurred within New Mexico.

(c)       Defendants established or maintained their unlawful contracts or combinations for the purpose of excluding competition or controlling or maintaining prices in the relevant market/s, a substantial portion of which occurred within the State of New Mexico.

(d)       The aforementioned conduct on the part of Defendants constituted "unconscionable trade practices" in that such conduct, *inter alia*, resulted in a gross disparity between the value received by members of the Class and the price paid by them for goods and services using an electronic form of payment as set forth in N.M. Stat. Ann. § 57-12-2(E).

(e)       Defendants' unlawful conduct had the following effects: (i) price competition in the relevant market/s was restrained, suppressed, and eliminated throughout New Mexico; (ii) prices for products or services purchased by Plaintiffs and members of the Class using an electronic form of payment were raised at artificially high levels throughout New Mexico; (iii) Plaintiffs and members of the Class were deprived of free and open competition; and (iv) Plaintiffs and members of the Class paid artificially inflated prices for products or services purchased using electronic forms of payment.

(f)       Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of New Mexico.

(g)       Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to Plaintiffs and members of the Class.

(h)     Defendants' illegal conduct substantially affected New Mexico's trade and commerce.

(i)     Defendants' conduct was willful.

(j)     As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the Class have been injured in their business or property and are threatened with further injury.

(k)     Defendants engaged in unfair or deceptive trade practices and unconscionable trade practices in violation of N.M. Stat. Ann. §§ 57-12-3, and, accordingly, Plaintiffs and the members of the Class seek legal relief, including actual damages, treble damages, plus reasonable attorneys' fees, and costs under N.M. Stat. Ann. § 57-12-10(B), (C), (E).

199.   **Ohio** –Defendants have engaged in unfair or deceptive acts or practices in violation of Ohio Rev. Code §§ 1345.01, *et seq.*

(a)     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

(b)     Defendants entered into contracts or combinations between two or more persons in restraint of trade or commerce in the relevant market/s, a substantial part of which occurred in Ohio.

(c)     Defendants established or maintained their unlawful contracts or combinations for the purpose of excluding competition or controlling or maintaining prices in the relevant market/s, a substantial portion of which occurred within the State of Ohio.

(d)     Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of Ohio.

(e)      Defendants' unfair or deceptive act or practice was made in connection with a consumer transaction.

(f)      Defendants' unlawful conduct had the following effects: (i) price competition in the relevant market/s was restrained, suppressed, and eliminated throughout Ohio; (ii) prices for products or services purchased by Plaintiffs and members of the Class were raised at artificially high levels throughout Ohio; (iii) Plaintiffs and members of the Class were deprived of free and open competition; and (iv) Plaintiffs and members of the Class paid artificially inflated prices for products or services purchased using electronic forms of payment.

(g)      Defendants' illegal conduct substantially affected Ohio's trade and commerce.

(h)      As a direct and proximate result of Defendants unlawful conduct, Plaintiffs and the members of the Class have been injured in their business or property and are threatened with further injury.

(i)      Defendants engaged in unfair or deceptive acts, as alleged herein, in violation of Ohio Rev. Code § 1345.02(A).

(j)      By reason of the foregoing, Plaintiffs and members of the Class seek legal relief under Ohio Rev. Code § 1345.09, including damages and other appropriate relief, as well as reasonable attorneys' fees and nontaxable costs pursuant to Ohio Rules of Civ. P. § 23(G).

200.   **Rhode Island**:  By reason of the conduct alleged herein, Defendants have violated R.I. Gen. Laws §§ 6-13.1-1, *et seq.*

(a)      Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set for in the preceding paragraphs of this Complaint.

(b)    Defendants engaged in unfair or deceptive acts or practices with the intent to injure competitors and consumers through supra-competitive profits.

(c)    Defendants have entered into contracts or combinations between two or more persons in restraint of trade or commerce in the relevant market/s, a substantial part of which occurred within Rhode Island.

(d)    Defendants established or maintained their contracts or combinations for the purpose of excluding or limiting competition or controlling or maintaining prices within the relevant market/s, a substantial part of which occurred within Rhode Island.

(e)    Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of Rhode Island.

(f)    Defendants' conduct amounted to an unfair or deceptive act or practice committed in connection with a consumer transaction.

(g)    Defendants' unlawful conduct substantially affected Rhode Island's trade and commerce.

(h)    Defendants' conduct was willful.

(i)    Defendants' deliberately failed to disclose material facts to Plaintiffs and members of the Class concerning Defendants' unlawful activities, including the artificially inflated prices for goods and services purchased with electronic forms of payment.

(j)    Defendants' deception, including its affirmative misrepresentations and/or omissions constitutes information necessary to Plaintiffs and the Class relating to purchases for goods and services made with an electronic form of payment.

(k)    Plaintiffs and members of the Class purchased goods and services affected by Defendants' unlawful conduct primarily for personal, family, or household purposes.

(l)     As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business or property and are threatened with further injury.

(m)     Defendants engaged in unfair or deceptive conduct in trade or commerce, as alleged herein, in violation of R.I. Gen Laws § 6-13.1-2.

(n)     By reason of the foregoing, Plaintiffs and members of the Class seek legal relief, including actual damages or $200 per violation, whichever is greater, punitive damages, and reasonable attorney's fees and costs under R.I. Gen Laws § 6-13.1-5.2(a), (b), (d).

## FOUR
## UNJUST ENRICHMENT

*On Behalf of All Plaintiffs*

201.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

202.     As the result of Defendants' conduct, Plaintiffs and other Class members in the State Damages Classes conferred a benefit upon Defendants, Defendants received and retained this benefit under such circumstances that it would be inequitable and unconscionable to permit them to retain it without paying this benefit's reasonable value to Plaintiffs and other Class members.

203.     Defendants' Anti-Steering Rules enabled Defendants to profitably raise its merchant discount rates during the Class Period, which resulted in ill-gotten gains.

204.     To the extent Plaintiffs are required by any state's law to have exhausted administrative remedies before bringing an unjust enrichment claim, exhaustion of any such remedies is not required in this instance because (a) the issues are of the type that would be appropriate for judicial determination, (b) Plaintiffs would suffer substantial hardship if compelled

to exhaust remedies, and (c) applying the doctrine here would result in substantial inequity and economic inefficiency and violate public policy.

205.    As a direct and proximate result of Defendants' unjust enrichment, Plaintiffs and Class members suffered injury and seek an order directing Defendant to make restitution to Plaintiffs and Class Members.

## IX.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that the Court enter judgment on their behalf and on behalf of the Class(es) herein, adjudging and decreeing that:

A.    The claims alleged herein under the Sherman Act and state antitrust, consumer protection, and unfair competition laws may be maintained as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and as informed by the respective state class action laws, with Plaintiffs as the designated Class representatives (or where appropriate, subclass representatives) and Plaintiffs' counsel as Class Counsel;

B.    Defendants engaged in agreements, contracts, or combinations that were unreasonable restraints of trade or commerce in violation of Section 1 of the Sherman Act;

C.    Defendants engaged in agreements, contracts, or combinations that were an unreasonable restraint of trade or commerce in violation of state antitrust laws and that Plaintiffs and the members of the Class(es) have been injured in their business and property as a result of Defendants' violations;

D.    Declaring that American Express's Anti-Steering Rules are illegal and directing their rescission;

E.    Plaintiffs and the members of the Class(es) recover damages sustained by them, to the maximum extent possible, as provided by state antitrust and consumer protection laws, and

that a judgment in favor of Plaintiffs and the Class(es) be entered against the Defendants in an amount to be trebled to the extent such trebling is permitted pursuant to such laws;

F.      Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, contracts, or combinations alleged herein, or from entering into any other contracts, conspiracy, or combinations having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

G.      Plaintiffs and other Class members recover restitution, including disgorgement of ill-gotten gains obtained by Defendants as a result of their acts, in an amount to be proven at trial;

H.      Plaintiffs and members of the Class(es) be awarded pre-judgment and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

I.      Plaintiffs and members of the Class(es) recover their costs of this suit, including reasonable attorneys' fees as provided by law; and,

J.      Plaintiffs and members of the Class(es) receive such other and further relief as may be just and proper.

DATED:  January 29, 2019                  Respectfully submitted,

                                          **BERMAN TABACCO**

                                          By:   */s/ Joseph J. Tabacco, Jr.*
                                                Joseph J. Tabacco, Jr. (JT1994)

Todd A. Seaver
Colleen Cleary
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
Email: jtabacco@bermantabacco.com
       tseaver@bermantabacco.com
       ccleary@bermantabacco.com

Gordon Ball
Jonothan T. Ball
**GORDON BALL LLC**
7001 Old Kent Dr.
Knoxville, TN 37919
Telephone: (865) 525-7028
Facsimile: (865) 525-4679
Email: gball@gordonball.com

Jay B. Shapiro
Samuel O. Patmore
**STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.**
150 West Flagler Street, Suite 2200
Miami, FL 33130
Telephone: (305) 789-3200
Facsimile: (305) 789-3395
Email: jshapiro@stearnsweaver.com
       spatmore@stearnsweaver.com

Christopher Lovell
Gary S. Jacobson
**LOVELL STEWART HALEBIAN
JACOBSON LLP**
61 Broadway, Suite 501
New York, NY 10006
Telephone: (212) 608-1900
Facsimile: (212) 719-4775
Email: clovell@lshllp.com
       gsjacobson@lshllp.com

Marvin A. Miller
Andrew Szot
**MILLER LAW LLC**
115 S. LaSalle Street, Suite 2910
Chicago, IL 60603
Telephone: (312) 332-3400
Facsimile: (312) 676-2676
Email: mmiller@millerlawllc.com
        aszot@millerlawllc.com

Jared B. Stamell
Richard J. Schager, Jr.
Andrew Goldenberg
**STAMELL & SCHAGER, LLP**
260 Madison Ave., 16/F
New York, NY 10016-2410
Telephone: (212) 566-4057
Facsimile: (212) 566-4061
Email: stamell@ssnylaw.com
        schager@ssnylaw.com
        goldenberg@ssnylaw.com

Simon Paris
**SALTZ MONGELUZZI BARRET &
BANDESKY**
One Liberty Place, 52nd Floor
1650 Market Street
Philadelphia, PA 19103
Telephone: (215) 496-8282
Facsimile: (215) 496-0999
Email: sparis@smbb.com

Eric. D. Barton
**WAGSTAFF & CARTMELL LLP**
4740 Grand Avenue Suite 300
Kansas City MO 64112
Telephone: (816) 701-1167
Facsimile: (816) 531-2372
Email: ebarton@wcllp.com

Lewis S. Kahn
Melinda A. Nicholson
**KAHN SWICK & FOTI, LLC**
1100 Poydras Street, Suite 3200
New Orleans, Louisiana 70163
Telephone: (504) 455-1400

Facsimile: (504) 455-1498
Email: lewis.kahn@ksfcounsel.com
melinda.nicholson@ksfcounsel.com

*Counsel for Plaintiffs*