UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| ANTHONY OLIVER, TERRY GAYLE QUINTON, SHAWN O'KEEFE, ANDREW AMEND, SUSAN BURDETTE, GIANNA VALDES, DAVID MOSKOWITZ, ZACHARY DRAPER, NATE THAYER and MICHAEL THOMAS REID on behalf of themselves and all others similarly situated, | **MEMORANDUM & ORDER 19-CV-566 (NGG) (SMG)** |
|---|---|

Plaintiffs,

-against-

AMERICAN EXPRESS COMPANY and
AMERICAN EXPRESS TRAVEL RELATED
SERVICES COMPANY, INC.,

Defendants.

NICHOLAS G. GARAUFIS, United States District Judge.

This is a putative class action brought against Defendants American Express Company and American Express Travel Related Services Company, Inc. (together, "Amex"). Plaintiffs, consumers who made purchases using a non-Amex electronic form of payment, challenge the non-discrimination provisions contained in Amex's contracts with merchants who accept its cards (the "Anti-Steering Rules"). (Compl. (Dkt. 1) ¶ 1.) Currently before the court is Amex's motion to dismiss the complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (Mot. to Dismiss ("Mot.") (Dkt. 37).) For the following reasons, Amex's motion is GRANTED IN PART and DENIED IN PART.

## I.   BACKGROUND

This action challenges Amex's Anti-Steering Rules. (Compl. ¶ 1.) Plaintiffs allege that Amex's Anti-Steering Rules unreasonably restrain trade in the two-sided market for credit- and charge-card

1

transactions ("credit card transactions") because they: "(i) increase two-sided credit card transaction prices to supracompetitive levels; (ii) result in fewer credit card transactions than would occur but-for the restraints; and (iii) raise consumer retail prices on goods and services purchased throughout the country by Plaintiffs and the Class." (*Id.* ¶ 3.)

The Anti-Steering Rules have been the subject of much litigation. That background—including the procedural history of relevant cases, the workings of the credit-card market in general, and Amex's platform in particular, etc.—has been discussed at great length in this court's previous opinions. *See In re Am. Exp. Anti-Steering Rules Antitrust Litig.*, --- F. Supp. 3d ---, 2020 WL 227425, at *2-4 (E.D.N.Y. Jan 15. 2020) (*"Non-Amex Merchants"*);[1] *In re Am. Exp. Anti-Steering Rules Antitrust Litig.*, 361 F. Supp. 3d 324, 331-33 (E.D.N.Y. 2019); *In re Am. Exp. Anti-Steering Rules Antitrust Litig.*, No. 11-MD-2221 (NGG), 2016 WL 748089, at *1-4 (E.D.N.Y. Jan. 7, 2016); *United States v. Am. Exp. Co.* (*"U.S. v. Amex"*), 88 F. Supp. 3d 143, 149-67 (E.D.N.Y. 2015), *rev'd* 838 F.3d 179 (2d Cir. 2016), *aff'd sub nom. Ohio v. Am. Exp. Co.* (*"Ohio"*), 138 S. Ct. 2274 (2017). The background necessary to introduce and decide the instant motion is laid out below.

### A. The Parties

This action is brought by ten named Plaintiffs: (1) Anthony Oliver, a resident of California; (2) Terry Gayle Quinton, a resident of Tennessee; (3) Shawn O'Keefe, a resident of North Carolina; (4) Andrew Amend, a resident of Kansas; (5) Susan Burdette, a resident of New Mexico; (6) Gianna Valdes, a resident of New York; (7) David Moskowitz, a resident of Oregon; (8) Zachary Draper, a resident of Nevada; (9) Nate Thayer, a resident of Massachusetts; and (10) Michael Thomas Reid, a resident of Florida

---

[1] When quoting cases, unless otherwise noted, all citations and quotation marks are omitted and all alterations are adopted.

(collectively, "Plaintiffs"). Plaintiffs bring this action on their own behalf and, pursuant to Federal Rule of Civil Procedure 23(b)(2), on behalf of a proposed "Nationwide Class" defined as:

> All persons or entities residing in the United States that do not have an Amex card and who use an electronic form of payment to purchase goods or services from merchants which accept Amex, Visa, Mastercard and/or Discover credit or charge cards.

> Excluded from the Class are Defendants, their parent companies, subsidiaries, agents and affiliates, all governmental entities, and any judges or justices assigned to hear any aspect of this action.

(Compl. ¶ 137.) Plaintiffs also bring this action pursuant to Rule 23(a) and 23(b)(3) on behalf of thirty-two separate statewide damage classes asserting claims for damages under the antitrust statutes or consumer protection statutes and the law of unjust enrichment of thirty-two jurisdictions: Alabama, Arizona, California, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin (collectively, the "State Damages Classes"). (*Id.* ¶ 138.) Like the Nationwide Class, the State Damages Classes are made up of individual consumers who do not have an Amex card and who used any electronic form of payment to purchase a product from a merchant that accepted Amex, Visa, Mastercard, or Discover credit or charge cards. (*Id.* ¶ 139.)

Defendant American Express Company is a New York Corporation. (*Id.* ¶ 22.) Defendant American Express Travel Related Services Company, Inc. is a New York Corporation, with its principal place of business in New York, New York. (*Id.* ¶ 23.) It is a wholly owned subsidiary of American Express Company. (*Id.*)

### B. The Relevant Market

Plaintiffs assert that the relevant geographic market is "the United States, including each of the States." (*Id.* ¶ 71.) The relevant product market is "the market for two-sided general purpose credit and charge card transactions." (*Id.* ¶ 72.)

### C. Factual Allegations

#### 1. The Credit Card Industry

Amex is one of four significant competitors in the nationwide credit card market. (*Id.* ¶ 36.) The others are Visa, Mastercard, and Discover. (*Id.*) According to Plaintiffs, the market shares of these four companies as of 2013 were Visa 45%, Amex 26.4%, MasterCard 23.3%, and Discover 5.3%. (*Id.*; *see Ohio*, 138 S. Ct. at 2282.) The market is also constrained by high barriers to entry; in fact, there has not been a successful entry into the market since Discover in 1985. (*Id.* ¶ 38.)

Credit card companies provide services both to cardholders, who use the cards to purchase goods and services, and to merchants, who accept those cards as payment in exchange for goods and services. These credit card companies thus operate a two-sided platform, offering services to two, distinct groups (merchants and consumers) and facilitating transactions between them. *See Ohio*, 138 S. Ct. at 2280. Credit card companies need to make a sale to both sides of the market to succeed; after all, "no credit-card transaction can occur unless both the merchant and the cardholder agree to use the same credit-card network." *Id.*; (*see also* Compl. ¶¶ 45-47). Amex offers services directly to both merchants and consumers. (Compl. ¶ 40.)

As Plaintiffs allege, "when a consumer uses a credit or charge card, the merchant's point of sale terminal relays a record of the transaction to the card's network." (*Id.* ¶ 48.) The network then pays, or facilitates the payment of, money for that transaction to

the merchant, consisting of the purchase price charged to the customer minus the fee that network or bank charges merchants (the "merchant fee"). (*Id.*) Consumers may also pay fees to use their credit cards and get rewards for making purchases with a particular card. (*Id.* ¶ 49.) Unlike its competitors, who charge variable merchant fees depending on the particular card the individual consumer is using, Amex "charg[es] a single merchant fee for all of [its] various credit and charge cards." (*Id.* ¶ 52.) Amex sets its merchant fee pricing by industry segments, and, in general, its merchant fees are higher than those of its competitors. (*Id.* ¶¶ 53, 69.) Plaintiffs further allege that, in contrast to its competitors, "the vast majority of Amex's revenue comes from merchant fees." (*Id.* ¶ 55.)

### 2.   The Anti-Steering Rules

The target of this litigation is a provision in the Card Acceptance Agreement ("CAA"), known as the Anti-Steering Rules, to which all merchants who accept Amex cards must agree. Pursuant to the Anti-Steering Rules, Merchants may not:

- indicate or imply that they prefer, directly or indirectly, any Other Payment Products over [Amex] Card[s];
- try to dissuade cardholders from using [their Amex] Card;
- criticize or mischaracterize [the Amex] Card or any of [Amex's] services or programs;
- try to persuade or prompt cardholders to use any Other Payment Products or any other method of payment (e.g., payment by check);
- impose any restriction, conditions, or disadvantages when the Card is accepted that are not imposed equally on all Other Payment Products, except for ACH funds transfer, cash, and checks;
- engage in activities that harm [Amex's] business or the American Express Brand (or both);

- or promote any Other Payment Products (except the Merchant's own private label card that they issue for use solely at their establishments) more actively than the Merchant promotes [Amex's] Card.

(*Id.* ¶ 78.)

### 3. Harm to Plaintiffs

Plaintiffs allege that the "intended and actual result of Amex's Anti-Steering Rules is near-total insulation from price competition amongst Amex, Visa, Mastercard, and Discover in the fees charged to merchants." (*Id.* ¶ 83.) This is because the Anti-Steering Rules prevent merchants from encouraging customers to use non-Amex cards, even where another card is less expensive for the merchant to accept. (*Id.*) In turn, any incentive for Visa, Mastercard, and Discover "to compete with Amex *or with one another* on the level of merchant fees" is removed. (*Id.*) Absent the Anti-Steering Rules, merchants could—and would—use "a number of different procompetitive steering devices to encourage cardholders to use a lower- cost credit card." (*Id.* ¶ 84.) This steering, Plaintiffs allege, would have many procompetitive virtues, including: "fostering horizontal competition between the four [credit card] networks; driving supra-competitive prices to merchants and two-sided [credit card] transaction prices down to a competitive level by letting market forces, not Amex's restraints, determine the price; and increasing the number of credit and charge card transactions in the relevant markets." (*Id*. ¶ 85.) Plaintiffs allege that the Anti-Steering Rules have stifled this competition and have caused and continue to cause higher credit card transaction prices, a lower volume of overall credit card transactions, and higher consumer retail prices on goods and services purchased throughout the country. (*Id.* ¶ 94.)

Plaintiffs allege that the Anti-Steering Rules do not just insulate Amex from competition, but also result in higher merchant fees charged by Visa, Mastercard, and Discover as well. (*Id.* ¶ 107.)

This is because "[a]bsent merchant steering, a credit card pro-vider cannot expect to receive any competitive benefit for offering a price below that of its competitors." (*Id.* ¶ 110.) As a result, Visa, Mastercard, and Discover have all raised their mer-chant fees. (*Id.* ¶¶ 70, 116, 117.) And, with steering in place, the total number of credit card transactions, and the volume of those transactions, would also increase. (*Id.* ¶¶ 121-124.)

Plaintiffs allege that without the Anti-Steering Rules, merchants, seeking cost savings, would steer customers to other credit card networks because Amex's merchant fees are generally the high-est. That steering would motivate competition between all credit card networks to lower merchant fees in an attempt to convince merchants to steer customers to their network. That market com-petition would drive down the costs merchants paid to credit card networks. As a result, instead of passing along higher mer-chant fees as higher retail costs, merchants would pass on these merchant fee cost-savings in the form of lower retail prices "on everything, to every consumer." (Compl. ¶ 127.) Instead, with the Anti-Steering Rules in place, "[h]arm to Plaintiffs and class members occurs at the time of each retail purchase from all [credit card]-accepting merchants in every State." (*See generally id.* ¶¶ 125-129.)

### D. Procedural History

Plaintiffs Oliver, O'Keefe, Valdes, Amend, Burdette, Reid, and Draper previously brought claims for relief in this court against Amex based on the same facts and circumstances as alleged herein. These actions were consolidated under *Jaynes et al. v. Am. Ex. et al.*, 15-CV-1598 (E.D.N.Y. July 7, 2015). After the Second Circuit's decision in *U.S. v. Amex*, the parties executed a tolling agreement, in which Plaintiffs agreed to dismiss their claims against Amex without prejudice with the right to re-file those claims within sixty days after all rights of appeal in *U.S. v. Amex* were exhausted. Plaintiffs subsequently filed their complaint in

this action on January 29, 2019. (Compl.) On July 24, 2019, Amex filed a fully briefed motion to dismiss the complaint. (*See* Amex Mem. in Supp. of Mot. ("Mem.") (Dkt. 38); Pls. Mem. in Opp. to Mot. ("Opp.") (Dkt. 40); Amex Reply in Supp. of Mot ("Reply.") (Dkt. 32).)

## II. LEGAL STANDARD

### A. Rule 12(b)(1)

Under Rule 12(b)(1), a district court should dismiss a case when it "lacks statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). In reviewing a motion to dismiss under Rule 12(b)(1), the court must accept all material factual allegations in the complaint as true, but should not draw "argumentative inferences favorable to the party asserting jurisdiction." *Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.*, 968 F.2d 196, 198 (2d Cir. 1992) (citing *Norton v. Larney*, 266 U.S. 511, 515 (1925)). The court may refer to evidence outside the pleadings. *See Makarova*, 201 F. 3d at 113 (citing *Kamen v. American Tel. & Tel. Co.*, 791 F. 2d 1006, 1011 (2d Cir. 1986) (stating that "evidentiary matter may be presented by affidavit or otherwise" under a Rule 12(b)(1) motion)). The plaintiff bears the burden of showing, by a preponderance of the evidence, that the court has subject matter jurisdiction over its claims. *See id.*

### B. Rule 12(b)(6)

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint must contain facts that do more than present a "sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. To decide Defendants' motion to

dismiss, the court "will accept all factual allegations in the [c]om-
plaint as true and draw all reasonable inferences in [Plaintiffs']
favor." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 429 (2d
Cir. 2011). However, the court will "identify[] pleadings that, be-
cause they are no more than conclusions, are not entitled to the
assumption of truth." *Iqbal*, 556 U.S. at 679. The court must then
evaluate the "well-pleaded factual allegations" and "determine
whether they plausibly give rise to an entitlement to relief." *Iq-
bal*, 556 U.S. at 679. This plausibility analysis "does not impose
a probability requirement at the pleading stage," but requires the
complaint to provide "enough fact to raise a reasonable expecta-
tion that discovery will reveal evidence of illegality." *Arista
Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting
*Twombly*, 550 U.S. at 556).

## III. DISCUSSION

### A.  Federal Claims

Section 16 of the Clayton Act entitles "[a]ny person, firm, corpo-
ration, or association" to sue for injunctive relief "against
threatened loss or damage by a violation of the antitrust laws."
15 U.S.C. § 26. At the pleading stage, "[a]n antitrust plaintiff
must show both constitutional standing and antitrust standing."
*Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 770 (2d Cir. 2016);
*see also Eastman Kodak Co. v. Henry Bath LLC*, 936 F.3d 86, 94
(2d Cir. 2019). Amex claims that Plaintiffs have not met either
burden.

#### 1.   Article III Standing

To satisfy the "irreducible constitutional minimum" of Article III
standing, a plaintiff must demonstrate (1) an "injury in fact," (2)
a "causal connection" between the injury and complained-of con-
duct, and (3) a likelihood "that the injury will be redressed by a
favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-

61 (1992). The second and third requirements of standing, "causation" and "redressability," require a plaintiff to demonstrate that the "injury-in-fact" she suffers is "fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable decision." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125 (2014).

### a.   Injury in Fact

Plaintiffs' adequately allege an injury-in-fact: that they "pa[y] more for goods and/or services purchased from merchants . . . than they otherwise would and will pay in the absence of Amex's restraints." (Compl. ¶ 152.) Amex does not dispute that this type of economic harm is sufficient for the purposes of standing.

### b.   Traceability

A more difficult question concerns whether Plaintiffs' respective injuries are "fairly traceable" to Amex's Anti-Steering Rules. "The traceability requirement for Article III standing means that the plaintiff must demonstrate a causal nexus between the defendant's conduct and the injury." *Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013). *Rothestein* explained that "[t]he requirement that a complaint allege an injury that is fairly traceable to defendants' conduct for the purposes of constitutional standing is a lesser burden than the requirement that it show proximate cause." *Id.* at 92. Thus, a plaintiff "does not lack standing simply by virtue of the indirectness of his or her injury." *Heldman v. Sobol*, 962 F.2d 148, 156 (2d Cir. 1992); *see also id.* ("[P]laintiffs' injury would satisfy the fairly traceable requirement if they had alleged all the links in the chain of causation."). This "lesser burden" as between traceability and proximate cause is "particularly [true] at the pleading stage." *Connecticut v. Am. Elec. Power Co., Inc.*, 582 F.3d 309, 346 (2d Cir. 2009), *rev'd on other grounds*, 564 U.S. 410 (2011). Accordingly, "the fact that there is an intervening cause of the plaintiff's injury may foreclose a finding of proximate cause but is not necessarily a basis for finding that the

injury is not 'fairly traceable' to the acts of the defendant." *Rothstein*, 708 F.3d at 92.

Here, Plaintiffs meet this low burden. Plaintiffs allege that, absent the Anti-Steering Rules, merchants would steer customers to the credit card networks that charged merchants the lowest merchant fee. This would precipitate price competition between credit card companies on the merchant side of the transaction, *i.e.* incentivize credit card networks to lower their merchant fees to attract merchant business. Those lower fees would lead to increased savings for merchants, a portion of which they would pass on in the form of lower retail prices to Plaintiffs.

Accepting these allegations as true, Plaintiffs have met their "relatively modest" burden to demonstrate traceability. Plaintiffs' allegations rely on certain basic economic assumptions about supply and demand: that, for instance, credit card networks would respond to merchant demand for lower fees and that merchants would respond to consumer demand for lower prices and pass on a certain amount of savings. While raising potential proximate cause problems, such assumptions are acceptable at the pleading stage to meet the traceability requirement, especially in the antitrust context. *See Adams v. Watson*, 10 F.3d 915, 923 (1st Cir. 1993) (allegations of economic harm "based on standard principles of supply and demand" are "routinely credited by courts in a variety of contexts"); *Ill. Brick Co. v. Illinois*, 431 U.S. 720, 758 (1977) (Brennan, J., dissenting) (noting that antitrust cases often involve "tracing a cost increase through several levels of a chain of distribution").

The court finds the reasoning in *Osborn v. Visa* persuasive. 797 F.3d 1057 (D.C. Cir. 2015). In *Osborn*, users and operators of independent automatized teller machines ("ATMs") brought suit against Visa, Mastercard, and certain affiliated banks alleging anticompetitive schemes for pricing ATM access fees. *Osborn*, 797 F.3d at 1060. When a cardholder uses an independent ATM, two

fees are paid: (1) the cardholder's bank pays an "interchange" fee to the ATM; and (2) the ATM pays a network fee to the ATM network (operated by, among other companies, Visa and Mastercard) that connects the ATM to the cardholder's bank. *Id.* at 1060-61. The difference between those two fees (the "net interchange fee") represents a portion of the ATM operator's profit. In addition to the net interchange fee collected each time a consumer uses an ATM, ATM operators also collect revenue from ATM access fees which are paid directly by the cardholder. *Id.* In *Osborn*, plaintiffs alleged that Visa and Mastercard generally charged relatively higher network fees (meaning the net interchange fee for the ATM operator would be lower) while competing networks charged comparatively lower network fees (meaning that the net interchange fee for the ATM operator would be greater). *Id.*

Visa and Mastercard imposed non-discrimination provisions as conditions for ATM operators to access their network. *Id.* These provisions provided that "no ATM operator may charge customers whose transactions are processed on Visa or Mastercard networks a greater access fee than that charged to any customer whose transaction is processed on an alternative ATM network." *Id.* at 1061. As the court explained, these "anti-steering" provisions meant that "operators cannot say to cardholders: 'We will charge you $2.00 for a MasterCard or Visa transaction, but if you [use a lower-cost card], we will charge you only $1.75.'" *Id.* Plaintiffs alleged that these non-discrimination provisions prevented independent ATM operators from incentivizing cardholders to choose and use cards "that are most efficient and less costly than either Visa or Mastercard's." *Id.*

Particularly relevant to the present motion, the court in *Osborn* described the theory of harm of the plaintiff-consumers (who, unlike the ATM operators, were themselves not subject to the non-discrimination provisions) as follows:

The consumers' theory of harm complements that of the operators. The consumers allege that they pay inflated access fees when they visit ATMs. They believe that the Access Fee Rules inhibit competition in both the network services market and the market for ATM access fees. But for the [nondiscrimination provisions], some ATM operators would offer discounted access fees for cards linked to lower-cost ATM networks, and this discounting would create downward pressure on access fees generally.

*Id.* at 1064. Rejecting the district court's determination that plaintiffs' allegations constituted an "attenuated, speculative chain of events that relies on numerous independent actors . . . that fails both because of uncertainty of several individual links and because of the number of speculative links that must hold for the chain to connect the challenged acts to the asserted particularized injury," the court held plaintiffs had standing, emphasizing that "[a] Rule 12(b)(1) motion . . . is not the occasion for evaluating the empirical accuracy of an economic theory." *Id.* at 1064-65. To the contrary, because "the economic facts alleged by the Plaintiffs are specific [and] plausible . . . they pass muster for standing purposes at the pleadings stage." *Id.* at 1066.

*Osborn*'s logic applies here. Relying on the same basic economic assumptions regarding competition and supply and demand as the consumer-plaintiffs in *Osborn*, Plaintiffs here allege specific facts supporting the causal link between Amex's Anti-Steering Rules and their economic harm. According to Plaintiffs, Amex's Anti-Steering rules insulate both Amex and its competitors from competition on fees charged to merchants. (Compl. ¶¶ 82-84.) Plaintiffs allege that between 2012 and 2015, because of a lack of incentive to compete on the merchant side of the market, Visa and Mastercard merchant fees have grown an average of 8.5% per year and that Visa announced a further fee increase in October 2018. (*Id.* ¶ 117.) At the same time, Plaintiffs allege that

Amex raised its merchant fees on twenty separate occasions between 2005 and 2010 without losing any appreciable market share. (*Id.* ¶ 104.) Plaintiffs also highlight Discover's experience with its "low-cost pricing strategy" in the late 1990s, in which Discover sought to "capture market share from disgruntled merchants" by "provid[ing] a low-priced network for credit card services." (*Id.* ¶ 108.) However, the Anti-Steering Rules prevented significant market share from shifting to Discover,[2] and Discover "began raising discount rates in order to align itself with its competitors"; today, Discover's merchant fees are "similar to those offered by Visa and Mastercard." (*Id.* ¶¶ 108-109.) Finally, Plaintiffs allege that increased competition would lead to lower merchant fees and savings for merchants, and that "merchants will pass-on cost saving from reduced merchant fees in the form of lower retail prices." (*Id.* ¶ 127.) Taken together, these allegations plausibly state the necessary causal connection between Amex's Anti-Steering Rules and Plaintiffs' injury required for traceability under Article III at the pleading stage.

### c.   *Redressability*

The third and final requirement for Article III standing is redressability. Amex focuses its argument on this prong, arguing that "because Plaintiffs' alleged multiple-step theory of causation depends on the actions of multiple third-party payment networks as well as merchants, it is entirely speculative that any relief that could be awarded in this case against Amex would redress the injury alleged." (Mem. at 5-6.) The court disagrees.

The redressability inquiry "focuses . . . on whether the injury that a plaintiff alleges is likely to be redressed through the litigation." *Sprint Comms. Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 286-87

---

[2] Not to mention that, as perhaps one of the clearest signs of the anti-competitive nature of the credit card market, there "has been no successful entry into the [credit card] market since Discover in 1985"—more than three decades ago. (Compl. ¶ 38.)

(2008). To satisfy the redressability requirement, a plaintiff must establish that "it is likely and not merely speculative that the plaintiff's injury will be remedied by the relief plaintiff seeks in bringing suit." *Id.* at 273-74 (citing *Lujan*, 504 U.S. at 560-61). Importantly, the redressability prong does not require that court-ordered relief completely redress all injury, *see Knight First Amendment Inst. at Columba Univ. v. Trump*, 302 F. Supp. 3d 541, 561 (S.D.N.Y. 2018), and it "is not a demand for mathematical certainty," *Mhany Mgmt., Inc. v. County of Nassau*, 819 F. 3d 581, 602 (2d Cir. 2016). As the Second Circuit recently explained, redressability is "an issue that is closely related to the question of causation." *Citizens for Responsibility and Ethics in Washington v. Trump*, 953 F.3d 178, 194 (2d Cir. 2019) ("*CREW*"). "When the injury alleged is caused by the illegal conduct, in many instances (at least where continuation of the illegal conduct will continue to cause harm), the cessation of the illegal conduct will be likely to at least diminish further instance of the injury." *Id.*

The principle announced in *CREW* applies with full force here. Because Plaintiffs' have adequately plead causation (for the purposes of standing at the pleadings stage), it follows that the "cessation of the illegal conduct"—Amex's Anti-Steering Rules—will "at least diminish further instance of the injury"—higher retail prices paid by Plaintiffs. That cessation could be achieved by the injunction Plaintiffs seek. Amex argues that Plaintiffs' injury would not be diminished by such an injunction "because the relationship between the [Anti-Steering Rules] and the price Plaintiffs pay for goods and services is so tenuous." (Mem. at 6.) While Amex frames this argument in terms of redressability, it really is one of traceability—*i.e.* the causal relationship between the injury and the conduct is too speculative and attenuated. Yet, as explained above, Plaintiffs have adequately pleaded traceability for the purposes of Article III standing, and Amex's argument therefore fails.

15

Accordingly, the court holds that Plaintiffs have Article III standing.

### 2.   Antitrust Standing

Amex next argues that Individual Plaintiffs and the putative Nationwide Class lack antitrust standing to pursue their claims. At the motion to dismiss stage, "a private antitrust plaintiff must plausibly allege (a) that it suffered a special kind of antitrust injury, and (b) that it is a suitable plaintiff to pursue the alleged antitrust violation and thus is an efficient enforcer of the antitrust laws." *In re London Silver Fixing, Ltd., Antitrust Litig.*, 213 F. Supp. 3d 530, 549 (S.D.N.Y. 2016). Because the court finds that Plaintiffs are not efficient enforcers of the antitrust law, it will not address whether they have plausibly alleged antitrust injury.

As the Second Circuit has explained:

> The efficient enforcer inquiry turns on: (1) whether the violation was a direct or remote cause of the injury; (2) whether there is an identifiable class of other persons whose self-interest would normally lead them to sue for the violation; (3) whether the injury was speculative; and (4) whether there is a risk that other plaintiffs would be entitled to recover duplicative damages or that damages would be difficult to apportion among possible victims of the antitrust injury.

*Gelboim*, 823 F. 3d at 772; *see also Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters ("AGC")*, 459 U.S. 519, 535 (1983) (the "*AGC* factors"). "[These] factors reflect a concern about whether the putative plaintiff is a proper party to perform the office of a private attorney general and thereby vindicate the public interest in antitrust enforcement." *Gelboim*, 823 F. 3d at 780. "These four factors need not be given equal weight," and "the relevant significance of each factor will depend on the circumstances of the particular case." *IQ Dental Supply Inc. v. Henry Schein, Inc.*, 924 F. 3d 57, 65 (2d. Cir. 2019).

16

This court recently applied the *AGC* factors to determine that a class of merchants who did not accept Amex (the "Non-Amex Class") were not efficient enforcers to challenge Amex's Anti-Steering Rules. *See Non-Amex Merchants*, 2020 WL 227425, at *6-11. There, this court held that (1) the Non-Amex Class's alleged harm was not sufficiently direct to Amex; (2) there was an identifiable other class of more direct victims—namely, the class of merchants who accept Amex—which has "litigated the same issue, and remains free to do so pursuant to the arbitration process laid out in their agreement with Amex"; (3) that "Plaintiffs' damages calculation would necessarily rest on multiple layers of speculation"; and (4) that the availability of other enforcement mechanisms "reinforce[d] the conclusion that the remaining Plaintiffs are not efficient enforcers of the antitrust laws." *Id.*

### a.   Directness

"Directness in the antitrust context means close in the chain of causation." *Gatt Comms., Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 78 (2d Cir. 2013) "The overall inquiry is akin to proximate cause in tort law—plaintiffs may not be too remote so as to avoid duplicative recovery and limitlessly increase the universe of potential plaintiffs." *Harry v. Total Gas & Power N. Am., Inc.*, 889 F.3d 104, 116 (2d Cir. 2018). As a general matter, those entities most directly injured by anticompetitive conduct are customers or competitors of the defendant. *See In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 159 (2d Cir. 2016).

Nonetheless, a plaintiff who is not a customer or competitor may suffer a direct injury if it is "a participant in the very market directly distorted by the antitrust violation" and its injury is "inextricably intertwined with the injury the [defendants] sought to inflict." *Id.* at 159, 160; *see also SAS of PR, Inc. v. PR Telephone Co.*, 48 F.3d 39, 46 (1st Cir. 1995). "[T]o assess the plausibility of a putative plaintiff's claim to antitrust injury as being inextricably intertwined with the injury the defendants ultimately

sought to inflict," this court must "ask whether the plaintiff was manipulated or utilized by defendant as a fulcrum, conduit[,] or market force to injure competitors or participants in the relevant product and geographical markets." *In re Aluminum Warehousing*, 833 F.3d at 161.

Plaintiffs are indisputably participants in the two-sided credit card market—the very market allegedly distorted by Amex's actions. The question is thus whether their supposed injury is inextricably intertwined with the injury Amex sought to inflict. It is not, for many of the same reasons that the alleged injury of the Non-Amex Class was not.[3] The crux of Plaintiffs' argument is that Amex's Anti-Steering Rules have led Visa, Mastercard, and Discover to raise merchant fees more than they would have absent the Anti-Steering Rules (and that, absent the Anti-Steering Rules, those competitors would all *lower* their merchant fees). (*See, e.g.* Compl. ¶¶ 125-129.) In turn, merchants have passed on increased costs to consumers. This is exactly the argument this court rejected in *Non-Amex Merchants*. There, the court explained that "Amex was not, according to the allegations in the complaint, using its market power to force its competitors to charge higher merchant fees across the board." *Non-Amex Merchants*, 2020 WL 227425 at *8. Instead, it "forc[ed] those merchants

---

[3] Amex argues that Plaintiffs have not alleged a direct injury and instead present only a so-called umbrella theory of liability. (Mem. at 11-13.) The Second Circuit has not yet explicitly addressed the viability of antitrust claims that rely on an umbrella theory of liability, but it has expressed concerns about allowing such claims to proceed. *See Gelboim*, 823 F.3d at 779 (noting that allowing claims under an umbrella theory of liability could "vastly extend the potential scope of antitrust liability" and could allow recovery for "damages disproportionate to wrongdoing."). Because the court holds that Plaintiffs are not efficient enforcers under the *AGC* factors, it need not rule on whether an umbrella theory of liability may ever create antitrust standing (or if umbrella standing concerns alone should determine that Plaintiffs are not efficient enforcers).

who did accept its cards to refrain from steering customers to-wards other cards and, in so doing, insulated its ability to charge those merchants ultracompetitive fees." *Id.* Even if "[p]laintiffs [were] right that this had an effect on the fees other credit card networks charged to the Non-Amex Class, . . . any such effect was incidental to Amex's alleged anticompetitive behavior." *Id; see also id.* at * 9 ("Plaintiffs allegations involve Amex's competitors reacting—perhaps in predictable ways—to a contractual provision entered into between Amex and the Amex Class.").

Here, Plaintiffs rely on the same unpersuasive argument to try and bridge the causal gap. The complaint alleges that "no longer insulated from price competition on the merchant side of the [credit card] platform [absent the Anti-Steering Rules], the four [credit card] networks would compete on price to merchants, and therefore merchant fees and the two-sided transaction price would be lower." (Compl. ¶ 126.) That logic—Amex's Anti-Steering Rules have caused Visa, Mastercard, and Discover to make decisions that have led to increased cost for Plaintiffs—under-girds Plaintiffs' entire theory. Yet, Plaintiffs do not allege that Amex's Anti-Steering Rules are a "direct agreement with any other party to manipulate or limit entry into the credit card mar-ket," *Non-Amex Merchants*, 2020 WL 227425 at *8, and, like the Non-Amex Class, fail to demonstrate how the fees charged by Amex's competitors (that, absent the Anti-Steering Rules, would have been lower and therefore led to reduced costs to consumer) are not "incidental to Amex's alleged anti-competitive behavior," *id.*

In arguing that Plaintiffs' alleged injury is sufficiently close to Amex's anticompetitive behavior for Plaintiffs to be efficient en-forcers, Plaintiffs rely solely on *Ohio* and its articulation of the "two-sided market." (Opp. at 8-9.) Plaintiffs argue that "in the context of the two-sided market for [credit card] transactions . . . Amex, Visa, Mastercard, and Discover provide transactions that

19

are 'jointly consumed by a cardholder, who uses the payment card to make a transaction, and a merchant, who accepts the payment card as a method of payment.'" (*Id.* (quoting *Ohio*, 138 S. Ct. at 2286).) Therefore, Plaintiffs contend, Plaintiffs and merchants are "cohabitants" on the credit-card platforms, and "Plaintiffs' injury flows from having a direct relationship with the other three [credit card] networks." (Opp. at 9.)

Plaintiffs are of course correct that *Ohio* held that the credit card market is a "two-sided market" that "facilitate[s] a single, simultaneous transaction between participants," each one of which is "jointly consumed" by a cardholder and a merchant. *Ohio*, 138 S. Ct. at 2286-87. Yet, this observation does not change the fact that the theory of Plaintiffs' injury relies on the actions taken by "the three other [credit card] networks," actions this court has held to be "incidental" to Amex's alleged anticompetitive behavior. *See Non-Amex Merchants*, 2020 WL 227425, at *8. Further, as Amex points out, the two-sided credit card market in which both Amex and Plaintiffs are participants "involve multiple suppliers and consumers," not all of whom have a direct relationship. (Reply at 4.) To endorse Plaintiffs' argument would be to find that all consumers have a direct relationship with all suppliers without an inquiry into the actual relationship between the parties in question. This would not "reflect a concern about whether the putative plaintiff is a proper party to . . . vindicate the public interest in antitrust enforcement," *Gelboim*, 823 F. 3d at 772, and the court declines to adopt such a rule here.

### b.   *Identifiable Class of Other More Direct Victims*

The second efficient-enforcer factor recognizes "that not every victim of an antitrust violation needs to be compensated under the antitrust laws in order for the antitrust laws to be efficiently enforced." *Gelboim*, 823 F.3d at 779. This is particularly relevant, where, as here, multiple sets of plaintiffs have sued the defendant over the same alleged antitrust violations. *See IQ Dental*, 924 F.3d

at 66. In this case, there is an obvious class of "better positioned" victims who have been "more directly injured by the alleged antitrust [violation]" than Plaintiffs—the class of Amex merchants who are bound by Amex's Anti-Steering Rules. *Id.* Plaintiffs' assertion that Plaintiffs "bear the brunt of the alleged antitrust violation" (Opp. at 9), is unconvincing in light of the existence of that class of Amex-accepting merchants. *See IQ Dental*, 924 F. 3d at 66 ("Given that [the plaintiff] is further removed from the harm caused by Defendants than the parties directly affected by the boycott that have already sued the Defendants, the second efficient-enforcer factor weighs against [the plaintiff's] antitrust standing.").

*Daniel v. American Bd. of Emergency Medicine* does not compel a different result. 428 F.3d 408 (2d Cir. 2005). Plaintiffs note that, in *Daniel*, the Second Circuit affirmed denial of antitrust standing for a plaintiff "which was without 'natural economic self-interest' to reduce costs and favoring antitrust standing for ultimate payors which bore [the] brunt of alleged overcharges." (Opp. at 10 (quoting *Daniel*, 428 F.3d at 444).)  In contrast, Plaintiffs here argue they are "significantly motivated [to pursue their claims] due to their natural economic self-interest in paying the lowest price possible." *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 689 ("DDAVP") (2d Cir. 2009). That fact alone, however, is not enough to sway this factor in Plaintiffs' favor because "denying [them] a remedy on the basis of [their] allegations in this case is not likely to leave a significant antitrust violation undetected or unremedied." *IQ Dental*, 924 F.3d at 66. Here, as in *Daniel*, there are other parties better suited to "vindicate the public interest in antitrust enforcement" than Plaintiffs. *Daniel*, 428 F. 3d at 443.

c.  *Speculative Nature of the Injury*

The existence of only "highly speculative damages is a sign that a given plaintiff is an inefficient engine of enforcement." *Gelboim*, 823 F.3d at 779. "At the same time, some degree of uncertainty stems from the nature of antitrust law." *Id.* "Impediments to reaching a reliable damages estimate often flow from the nature and complexity of the alleged antitrust violation." *Id.* at 780. Here, like in *Non-*Amex *Merchants*, Plaintiffs' claim "would involve assessing the pricing decision on Amex's non-party competitors, all of whom are competing against one another as well as against Amex on both sides of the two-sided market." 2020 WL 227425 at *10. As this court explained:

> [T]he calculation involves several stages of speculation: how much steering would occur if merchants accepting Amex cards were permitted to engage in it? What effect would this have on Amex's merchant fees? What effect would any change in Amex's merchant fees have on the decisions of its competitors regarding their own merchant fees? And, perhaps most important in terms of the speculative nature of this clam, how would those decisions trickle over into the parallel situation of the Non-Amex Class members?

*Id.* Here, too, those questions remain unanswered—the most important of which, for these Plaintiffs, is how these decisions would trickle over into the retail costs charged to non-Amex consumers.

*DDAVP* does not tilt this factor toward Plaintiffs' favor. In that case, direct purchasers of a drug called DDAVP brought suit against the drug's brand name manufacturer alleging that the brand name manufacturer inflated DDAVP's price by suppressing generic competition in violation of the antitrust laws. *DDAVP*, 585 F.3d at 682. The Second Circuit held that, under the third efficient-enforcer factor, plaintiffs' harm was not overly speculative because there was clear evidence that "generic

22

manufacturers would have decided to compete for DDAVP sales," because those "manufacturers [had] sought approval for generic DDAVP when [the defendants' patent] was still enforceable." *Id.* at 689. Thus, the panel held that while "it may be difficult to account precisely for the likely effects of generic competition . . . we have little doubt that those effects can be sufficiently estimated and measured." *Id.* Here, though, there is not a similarly tight nexus between the anticompetitive behavior and the harm, and simply asserting that there will be "competition on the merchant side of the market" absent Amex's Anti-Steering Rules does not address the numerous open questions regarding the pricing decisions of Amex's competitors. While "such exogenous factors are, to be sure, insufficient by themselves to defeat antitrust standing; nonetheless, their presence is relevant to the efficient enforcer analysis." *Non-Amex Merchants*, 2020 WL 227425 at *10.

### d.   Duplicative Recovery and Complex Apportionment

As a preliminary matter, Plaintiffs argue that this factor is "not relevant to Plaintiffs' federal claim for injunctive relief," and Amex agrees. (*See* Opp. at 7 n.11 (citing *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 111 n.6 (1986); Mem at 16.) In *Cargill*, the Supreme Court explained that "because standing under § 16 [of the Clayton Act] raises no threat of multiple lawsuits or duplicative recoveries, some of the factors other than antitrust injury that are appropriate to a determination of standing under § 4 are not relevant under § 16." *Cargill*, 479 U.S. at 11 n. 6.

Whether or not *Cargill* is applicable to this case, the court finds the other *AGC* efficient-enforcer factors all cut strongly against the Plaintiffs, and, accordingly, finds that Plaintiffs have not established federal antitrust standing.   Therefore, Count I is dismissed with prejudice.

23

### B.   Count II—State Antitrust Claims

Under Count Two, Plaintiffs bring claims alleging antitrust viola-
tions under the laws of 28 jurisdictions. (Compl. ¶¶ 154-187.)
Amex moves for dismissal of those claims on two grounds. First,
Amex argues that Plaintiffs lack Article III standing to assert
claims on behalf of consumers in 22 states for which Plaintiffs
have not named any resident Plaintiffs. (*See* Mem. at 13-18.) Sec-
ond, Amex contends that Plaintiffs have failed to plead antitrust
standing under the laws of the remaining 10 states in which the
named Plaintiffs reside. (*Id.*) For the following reasons, Amex's
motion is granted in part and denied in part.

#### 1.   Non-Resident Plaintiff Standing

Plaintiffs seek to certify 32 separate state damages classes.
(Compl. ¶ 138.) While the Complaint alleges named Plaintiffs for
10 of those jurisdictions, it does not identify individual resident
Plaintiffs for the remaining 22.[4] Amex argues that "this is fatal"
because "the law is clear that Plaintiffs lack Article III standing to
assert claims on behalf of consumers in the 22 states for which
Plaintiffs have no named any resident plaintiff." (Mem. at 14.)

Amex is wrong. In *Langan v. Johnson & Johnson Consumer Cos.,
Inc.*, the Second Circuit held that "as long as the named plaintiffs
have standing to sue the named defendants, any concern about
whether it is proper for a class to include out-of-state, nonparty
class members with claims subject to different state laws is a
question of predominance under Rule 23(b)(3) . . . not a ques-
tion of adjudicatory competence under Article III." 897 F.3d 88,
93 (2d Cir. 2018). In its reply, Amex responds that *Langan* does

---

[4] These jurisdictions are: Alabama, Arizona, District of Columbia, Hawaii,
Illinois, Iowa, Maine, Maryland, Michigan, Minnesota, Mississippi, Mon-
tana, Nebraska, New Hampshire, North Dakota, Ohio, Rhode Island, South
Dakota, Utah, Vermont, West Virginia, and Wisconsin. (Mem. at 15.)

not apply because the parties there agreed that the named plaintiff had standing to sue, whereas, in this case, "no Plaintiff named in the Complaint has standing to bring a claim under the law of the state where he or she purports to sue as an individual." (Reply at 10.) However, as discussed below, the individual named plaintiffs residing in Kansas, North Carolina, Oregon, and Tennessee have standing to bring claims under the antitrust laws of the states in which they reside. Therefore, under the plain language of *Langan*, Plaintiffs have standing to bring claims under the antitrust laws of the 22 states in which no named Plaintiff resides.

> 2.   Resident Named Plaintiff Standing.

The named Plaintiffs reside in 10 states: California, Florida, Kansas, Massachusetts, Nevada, New Mexico, New York, North Carolina, Oregon, and Tennessee. (Compl. ¶¶ 12-21.) In Count Two, Plaintiffs allege claims under the antitrust laws of California, Kansas, Nevada, New Mexico, New York, North Carolina, Oregon, and Tennessee. (*Id.* ¶¶ 154-187.) Amex argues that Plaintiffs lack antitrust standing to bring claims under the antitrust laws of these states because each has adopted the *AGC* factors for antitrust standing, and Plaintiffs fail that test. (Mem. at 15-18.) Amex also argues that Plaintiffs lack standing to sue under Tennessee law because Plaintiffs are neither direct nor indirect purchasers. (*Id.* at 17-18.) Plaintiffs argue that they have standing because New York, California, Kansas, Oregon, North Carolina, do not apply the *AGC* test. (Opp. at 14-15.) Plaintiffs also argue they have standing under Tennessee law. (*Id.*)

A federal court adjudicating state law "look[s] to the state's decisional law, as well as to its constitution and statutes." *Santalucia v. Sebright Transp., Inc.*, 232 F.3d 293, 297 (2d Cir. 2000). When the state law is unsettled, the court "is obligated to carefully predict how the state's highest court would resolve the uncertainty or ambiguity." *Id.* The court must give the "fullest weight" to the

pronouncements of the state's highest court while giving "proper regard" to the rulings of the state's lower courts. *Id.*

### a.   California

In *Non-Amex Merchants,* this court had occasion to examine whether antitrust standing under California state law is properly analyzed under the same framework used to determine federal antitrust standing. *Non-Amex Merchants*, 2020 WL 227425, at *12.  While noting that "courts have disagreed on the issue," this court found the California state court decision *Vinci v. Waste Mgmt., Inc.*, 43 Cal. Rptr. 2d 337, 338-39 (Cal. Ct. App. 1995) persuasive and held that it would "apply the federal factors to analyze antitrust standing under California law." *Non-Amex Merchants*, 2020 WL 227425, at *12. Plaintiffs have not advanced any new arguments to convince the court to reconsider its decision in *Non-Amex Merchants*. Therefore, the court applies the *AGC* factors to Plaintiffs' claim under California antitrust law, and dismisses Plaintiffs' claim for the reasons stated above.

### b.   Kansas

Amex cites no state court cases applying the *AGC* factors to determine antitrust standing under Kansas law. Instead, Amex cites one federal district court opinion as support for its position. (*See* Mem. at 16 (citing *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, No. 09-cv-3690, 2015 WL 3988488, at *9 (N.D. Ill. June 29, 2015) ("*Dairy Farmers*")).) Plaintiffs, for their part, also cite a single federal district court opinion to argue that the court should not apply the *AGC* factors to claims brought under Kansas' antitrust law. (Opp. at 17 (citing *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 259 (S.D.N.Y. 2019) ("*Keurig*")).)

While the lack of Kansas authority makes it a close decision, the court finds that Plaintiffs and the *Keurig* court have the better argument. In *Keurig*, Judge Broderick conducted a review of the

26

limited authority from Kansas courts—including an unpublished trial court opinion and federal district court cases—and concluded that "[t]hese cases do not clearly lead to the conclusion that the Kansas Supreme Court would apply the *AGC* factors in accordance with federal precedents." *Id.* Furthermore, *Keurig* explained that:

> The harmonization provision in the Kansas Restraint of Trade Act does not alter this conclusion. Subsection (b) states, "Except as otherwise provided in subsections (d) and (e), the Kansas restraint of trade act shall be construed in harmony with ruling judicial interpretations of federal antitrust law by the United States supreme court." Kan. Stat. Ann. § 50-163. Subsection (d) states, "The Kansas restraint of trade act shall not be construed to prohibit . . . actions or proceedings by indirect purchasers pursuant to [Kan. Stat. Ann. §] 50-161, and amendments thereto . . . ." *Id.* Although it is plausible that the Kansas courts could interpret the harmonization provision to repeal *Illinois Brick* but still require application of the *AGC* factors in accordance with federal precedent, [Defendant] has provided no persuasive authority or argument supporting that reading.

*Id.* The court agrees, and Plaintiffs' claim under Kansas antitrust law survives.

### c.   *Nevada and New Mexico*

Amex cites persuasive state law authority for the proposition that Nevada and New Mexico apply the *AGC* factors under their respective state antitrust laws. (Mem. at 15-16 (citing *Nev. Recycling and Salvage, Ltd. V. Reno Disposal Co.*, 423 P.3d 605 (Nev. 2018); *Nass-Romero v. Visa U.S.A. Inc.*, 279 P.3d 772 (N.M. Ct. App. 2012)).) Both cases analyzed the relevant statutory language and case law and concluded that the *AGC* factors should apply to the antitrust standing determination. *Nev. Recycling*, 423 P.3d at 607-08; *Nass-Romero*, 279 P.3d at 779-81. Plaintiffs have

not identified any contrary authority. As such, the court concludes that both Nevada and New Mexico would apply the *AGC* factors, and Plaintiffs therefore lack standing to bring claims under Nevada and New Mexico antitrust law. Because Plaintiff Zachary Draper does not have a cause of action under either the Sherman Act or Nevada antitrust law, he is dismissed from this case.

### d.   New York

New York's Donnelly Act prohibits "[e]very contract, agreement, arrangement or combination whereby . . . competition . . . may be restrained." N.Y. Gen. Bus. Law § 340(1). The parties dispute whether *AGC*'s efficient-enforcer factors apply to claims brought under the Donnelly Act. (*See, e.g.*, Mem. at 15-16; Opp. at 16-17.) The New York Court of Appeals has not squarely addressed this question, but it has noted that the Donnelly Act, "should generally be construed in light of Federal precedent and given a different interpretation only where State policy, differences in the statutory language or the legislative history justify such a result." *X.L.O. Concrete Corp. v. Rivergate Corp.*, 83 N.Y.2d 513, 518 (1994). Plaintiffs urge that the Donnelly Act's lack of prohibition from recovery of antitrust plaintiffs who have "not dealt directly with the defendant" is itself indicative of New York's different policy with respect to antitrust such that "it is not conceivable that the state's highest court would apply [the] *AGC* factors to bar Plaintiffs here." (Opp. at 16.) However, in *Gatt*, the Second Circuit explained "[w]e see no reason . . . to interpret the Donnelly Act differently than the Sherman Act with regard to antitrust standing." *Gatt*, 711 F.3d at 81.

Plaintiffs have not pointed to any post-*Gatt* authority from either the Second Circuit or the New York Court of Appeals that compels a different outcome here. Accordingly, the court holds that

the *AGC* factors apply to Plaintiffs' claim under New York's Don-
nelly Act, and dismisses Plaintiffs' claim for lack of antitrust
standing for the reasons discussed above.

### e.   North Carolina

Amex cites a single federal district court case from Illinois for the
proposition that North Carolina would apply the *AGC* factors to
determine standing under its state antitrust law. (Mem. at 16
(citing *Dairy Farmers*, 2015 WL 3988488, at *15).) Plaintiffs re-
spond that the North Carolina Court of Appeals has held that
indirect purchasers have a cause of action under the state's anti-
trust law, *see Hyde v. Abbott Labs, Inc.*, 473 S.E.2d 680, 688 (N.C.
Ct. App. 1996), and "that the *AGC* factors do not apply in deter-
mining which indirect purchasers have standing to sue under the
North Carolina antitrust statutes," *Teague v. Bayer AG*, 671 S.E.2d
550, 557 (N.C. Ct. App. 2009).

The court finds the Superior Court decision in *Dicesare v. Char-
lotte-Mecklenburg Hosp. Auth.*, No. 16-CVS-16404, 2017 WL
1359599 (N.C. Super. Apr. 11, 2017), to be a cogent analysis of
the current state of the law on this issue in North Carolina. *Dic-
esare* involved a suit brought by consumers of various third-party
health insurance companies against the market-leading hospital
in the Charlotte-Mecklenburg area (the "Hospital"). *Id.* at *1-5.
Plaintiffs alleged that the Hospital required the third-party insur-
ers like Cigna and Blue Cross/Blue Shield ("BCBS") to enter into
Anti-Steering provisions which restricted the insurers' ability to
steer consumers to insurance plans that included the Hospital's
lower-cost competitors. *Id.* The court explained plaintiffs' allega-
tions as follows:

> Plaintiffs allege that they pay for and receive health insur-
> ance from Cigna and BCBS. The [Fist Amended Complaint]
> alleges that the Hospital imposes Anti–Steering Provisions in
> its contracts with the Four Insurers, which includes Cigna

and BCBS. Plaintiffs contend that the Anti–Steering Provisions reduce competition between the Hospital and other providers of acute inpatient hospital services in the Charlotte Area and, as a result, Plaintiffs pay more for health insurance, incur higher out-of-pocket costs, have fewer insurance plans to choose from, and are denied access to truthful information that would enable Plaintiffs to comparison-shop based on cost and quality.

*Id.* at *7.

In finding that the plaintiffs had standing to assert a claim under the North Carolina antitrust law, the *Dicesare* court made several salient observations. First, the court held that "until the Supreme Court of North Carolina rules otherwise, *Teague* is controlling."[5] *Id.* at 9. Second, *Dicesare* held that, under *Teague*, plaintiffs were "not required at the pleading stage to prove a causal chain between the Hospital's challenged conduct and the [p]laintiffs' alleged injury." *Dicesare*, 2017 WL 1359599, at *8 (citing *Teague*, 671 S.E.2d at 557-58). Third, unlike the *AGC* analysis, *Dicesare* held that the inherent complexity of antitrust cases—and, specifically, the "complicated questions of causation and damages"—are not "sufficient reason[s] to dismiss for lack of standing." *Id.* Fourth, the court rejected the defendant Hospital's argument that plaintiff consumers lacked standing because the price premium consumers paid to third-party insurance companies was "the result of the independent action of the insurance companies,"

---

[5] *Dairy Farmers*, upon which Amex relies, rejected *Teague* for what it called its "sometimes-dubious and often-difficult-to-follow analysis," and chose to rely on an earlier trial court decision in finding that North Carolina courts would apply the *AGC* factors. *Dairy Farmers*, 2015 WL 3988488, at *15. Yet, a federal court's view that a state appellate court decision is wrongly decided (or would lead to results with which the federal court would disagree) is not grounds for the federal court to ignore the state court's ruling.

finding instead that it would be premature to dismiss for lack of standing on those grounds. *Id.* at *9.

The North Carolina Supreme Court declined to review the trial court's ruling in *Dicesare*. *See Dicesare v. Charlotte-Mecklenburg Hospital Authority*, 370 N.C. 215 (2017) (order denying writ of certiorari to review order of trial court). While this does not equate to a wholesale adoption of *Dicesare*'s analysis by the high court, it does add persuasive weight to *Teague*'s holding (emphasized by *Dicesare*) that the *AGC* factors "do not apply . . . under the North Carolina antitrust statutes." *Teague*, 671 S.E.1d at 557.

Therefore, the court finds that the *AGC* factors do not apply in evaluating Plaintiffs' claim under North Carolina law. Because Plaintiffs' "allegations . . . are sufficient to demonstrate standing," under North Carolina law, *see Dicesare*, 2017 WL 1359599, at *7, the court finds that Plaintiffs' North Carolina antitrust claim survives.[6]

---

[6] Amex cites *Dicesare* for the proposition that, because the North Carolina Supreme Court "has not spoken on the means . . . by which state courts are to distinguish those indirect purchasers who have sustained actual injuries from those who have sustained injuries that are too remote or attenuated to warrant relief," state courts in North Carolina "may still consider the *AGC* factors." (Reply at 7 n.7 (quoting *Dicesare*, 2017 WL 1359599, at *12).) This is not an accurate representation of *Dicesare*. *Dicesare* notes that the state's "Court of Appeals expressly held that the *AGC* factors do not apply in determining which indirect purchasers have standing to sue under the North Carolina antitrust statues." *Dicesare*, 2017 WL 1359599, at *11. The court goes on to note that "antitrust cases—especially those involving indirect purchasers—will often involve complicated causation and damages issues," and that the state's Supreme Court "has not spoken on this precise complex issue." *Id.* Recognizing the potential burdens and costs faced by the parties should the case continue to discovery and the importance of this issue to the state as a whole, *Dicesare* welcomed state Supreme Court review of its decision, noting that it would exercise its discretion to stay further proceedings should the state Supreme Court take up the issue. *Id.* Contrary to Amex's representation, however, nowhere in this

   *f.   Oregon*

The court is not aware of binding authority from Oregon state
courts regarding the application of the *AGC* factors to determine
antitrust standing under Oregon law. Amex cites to a federal dis-
trict court decision predicting that the Oregon Supreme Court
would apply the *AGC* factors (Mem. at 15 (citing *In re Dealer
Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d 510, 545 (N.D. Ill.
2019) (*"Dealer Mgmt."*)), while Plaintiffs cite to a federal district
court decision that came to the opposite conclusion. (Opp. at 17
(citing *Keurig*, 383 F. Supp. 3d at 261).) The analysis in *Dealer
Mgmt.* is quite limited. There, the court reasoned that "the pres-
ence of a statutory harmonization provision (either statutory or
common law), absent any countervailing statutory law or case
law from a state appellate court, is sufficient to permit a district
court to apply federal antitrust standing law—including  *AGC*—
to claims brought under that state's antitrust laws." *Dealer Mgmt.*,
362 F. Supp. 3d at 545. Because Oregon has a statutory harmo-
nization provision, the *Dealer Mgmt.* court held that the *AGC*
factors apply under Oregon law. In *Keurig*, by contrast, the court
disagreed, explaining that "the Oregon antitrust statute states
that federal precedents are persuasive, but not binding," and
holding that "[a]bsent any authority from the Oregon state courts
regarding the application of the *AGC* factors to determine anti-
trust standing under Oregon law, [the court] cannot conclude

_____

part of its analysis does the court *mention* the *AGC* factors, let alone hold
(or even suggest) that the state Supreme Court's silence on this issue meant
that "state courts may still consider the *AGC* factors." (Reply at 7 n.7.) To
the contrary, *Dicesare* discusses the *AGC* factors twice: first in the context
of *Teague's* "controlling" holding that the *AGC* factors do not apply to de-
terminations of standing under the North Carolina antitrust statutes, and
second in the context of an earlier Superior Court case that applied a "mod-
ified" version of *AGC*, which *Teague* rejected. *See Dicesare*, 2017 WL
1359599, at *11-12.

that the Oregon Supreme Court would apply *AGC*." *Keurig*, 383 F. Supp. 3d at 261.

The court finds *Keurig* to be the more persuasive opinion. A harmonization provision in a state's antitrust statute does not *require* a state's Supreme Court to find that state antitrust law must be analyzed under the federal standard. That is particularly true where, like here, the harmonization provision finds that federal law is "merely persuasive". *Cf. In re Packaged Seafood Products Antitrust Litig.*, 242 F. Supp. 3d 1033, 1108 (S.D. Cal. 2017). Accordingly, the court agrees with Judge Broderick that it "cannot conclude that the Oregon Supreme Court would apply *AGC*," *Keurig*, 383 F. Supp. 3d at 261, and finds that Plaintiffs have standing under Oregon antitrust law.

> g.   Tennessee

The Tennessee Trade Practices Act ("TTPA") prohibits anti-competitive conduct which tends to lessen "full and free competition in the importation or sale of articles imported into this state . . . or which tend to advance, reduce, or control the price or the cost to the producer or the consumer of any such product . . . ." Tenn. Code Ann. § 47-25-101. The TTPA provides a civil remedy to "any person who is injured or damaged by such arrangement." *Id.* § 47-25-106. The Tennessee Supreme Court has held that this includes claims brought by indirect purchasers. *See Freeman Indust., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 519-20 (Tenn. 2005).

The court is convinced the Supreme Court of Tennessee would not apply the *AGC* factors. In holding that the TTPA included a right of action for indirect purchasers, the *Freeman* court noted that, unlike other state antitrust statutes, the TTPA lacks a mandatory harmonization clause requiring consistency between interpretation of the TTPA and interpretations of federal antitrust laws. *Id.* at 519. The *Freeman* court also rejected some of the factors—such as the risk of multiple liability and recovery and the

speculative risk of complex damages assessments—that moti-
vated the Supreme Court in *AGC* to craft prudential standing
limitations on who may sue under federal antitrust law. *Id.* at
520. Finally, the parties have not provided the court with any
decision in which the Tennessee state courts apply the *AGC* fac-
tors to claims brought under the TTPA.[7]

Amex argues that Plaintiffs nonetheless lack standing because
they are neither direct nor indirect purchasers of any product the
sale of which is "controlled" by Amex. (Mem. at 17 (quoting
Tenn. Code Ann. § 47-25-106.) However, the *Freeman* court ex-
plained that the TTPA's use of "control" includes "the ability to
exercise a restraining or directing influence over something."
*Freeman Indus.*, 172 S.W.3d at 517-18. Plaintiffs' allegations that
Amex's Anti-Steering Rules restrained the credit card transaction
market and caused Plaintiffs to pay more for consumer goods is
sufficient, at this stage, to establish standing to sue under the
TTPA.[8]

---

[7] In lieu of the *AGC* factors, traditional constitutional standing principles
apply. A party has standing to sue under Tennessee law when it meets the
minimum constitutional requirements of standing under federal law. *See,
e.g.*, *In re Petition of Youngblood*, 895 S.W.2d 322, 326 (Tenn. 1995)
(adopting federal constitutional standard); *Cox v. Shell Oil Co.*, 196 S.W.3d
747, 757-58 (Tenn. Ct. App. 2005) (state law standing "parallels the con-
stitutional restriction on federal court jurisdiction to 'cases and
controversies'"). As discussed above, Plaintiffs meet that baseline constitu-
tional standard.

[8] Amex argues that Plaintiffs' claim "is not an indirect purchaser claim,"
but "[r]ather, Plaintiffs allege that merchants passed some portion of al-
leged overcharges from credit card fees to consumers through increased
prices on some unknown portion of goods sold and services rendered. This
[c]ourt would need to track overcharges on countless items—paid by con-
sumers with no relationship to Amex whatsoever, to merchants who may
or may not accept Amex." (Mem. at 18.) Yet, the Tennessee Supreme Court

### C.   Count III—State Consumer Protection Claims

Under Count III, Plaintiffs allege violations of the state consumer protection laws of California, the District of Columbia, Florida, Hawaii, Illinois, Massachusetts, Montana, New Hampshire, New Mexico, Ohio, and Rhode Island. (Compl. ¶¶ 188-200.) Amex argues that Plaintiffs' claims under California, Florida, Massachusetts, and New Mexico law should be dismissed for lack of standing under the laws of each respective state. (Mem. at 18-23.)[9] The court evaluates Plaintiffs' standing to assert claims under the laws of each state in turn.

#### 1.   California

Plaintiffs assert claims under the California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*, based on the same underlying conduct as their federal and state antitrust claims. (Compl. ¶¶ 188-190.) However, under California law, "[w]here a plaintiff fails to state an antitrust claim, and where an unfair competition claim is based upon the same allegations, such state claims are properly dismissed." *Formula One Licensing, B.V. v. Purple Interactive Ltd.*, 2001 WL 34792530, at *4 (N.D. Cal. Feb. 6, 2001); *see also In re Wellpoint, Inc., Out-of-Network UCR Rates Litig.*, 903 F. Supp. 2d 880, 927-28 (C.D. Cal. 2012) (dismissing UCL claims base on lack of antitrust standing for plaintiffs' Sherman Act claims). Here, the court has dismissed

---

has explicitly rejected the concerns Amex raises of complex damage assessment and fear of multiple liability as relevant to a standing analysis under TTPA (even though they are central to the *AGC* analysis).

[9] Amex describes the claims brought under the laws of these four states as Plaintiffs' "remaining state consumer protection law claims" (Mem. at 18), likely assuming that the claims brought under the consumer protection laws of the states in which no named Plaintiff is a resident must be dismissed. However, as discussed *supra*, *Langan* compels the opposite result. Therefore, Plaintiffs' claims under the consumer protection laws of District of Columbia, Hawaii, Illinois, Montana, New Hampshire, Ohio, and Rhode Island survive Amex's motion.

Plaintiffs' underlying antitrust claims under both federal and California law. Therefore, because Plaintiffs have "made no attempts to distinguish their antitrust claims from their consumer-protection claims," *Dairy Farmers*, 2015 WL 3988488, at *18, the court dismisses Plaintiffs' claim under the UCL. Because Plaintiff Anthony Oliver does not have a cause of action under the Sherman Act, California antitrust law, or the UCL, he is dismissed from this case.

### 2. Florida

The same reasoning applies to Plaintiffs' claims under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"). *See QSGI, Inc. v. IBM Glob. Fin.*, No. 11-80880-CIV, 2012 WL 1150402, at *4 (S.D. Fla. Mar. 14, 2012 )("When, as here, plaintiff's FDUTPA claim is based on the same allegations as its antitrust claim, failure to establish a violation of antitrust law is sufficient to conclude that the plaintiff has also failed to state a FDUPTA claim."); *see also JES Props., Inc. v. USA Equestrian, Inc.*, No. 8:02-cv-1585-T-24MAP, 2005 WL 1126665, at *19 (M.D. Fla. May 9, 2005). Because Plaintiffs' claim under the FDUTPA is identical to their antitrust claim, it must be dismissed. Plaintiff Michael Thomas Reid, who lacks a cause of action under either the Sherman Act or the FDUPTA, is dismissed from this case.

### 3. Massachusetts

The Massachusetts Consumer and Business Protection Act, Mass. Gen. Laws Ch. 93A ("CBPA") provides a cause of action for "any person . . . who has been injured by another person's use or employment of any . . . unfair method of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." CBPA, § 2, § 9(1). Amex argues that Plaintiffs' claim must be dismissed because "Plaintiffs are consumers who have no business dealings with Amex and are neither direct nor indirect purchasers." (Mem. at 20.)

Both Plaintiffs and Amex direct the court towards *Ciardi v. F. Hoff-mann-La Roche, Ltd.*, 436 Mass. 53 (2002), in which the Supreme Judicial Court of Massachusetts analyzed the CBPA in detail. In *Ciardi*, the court held that indirect purchasers can assert claims for anticompetitive conduct under the CBPA, even where they have no standing to bring such claims under Massachusetts state antitrust law. *Id.* at 55. In so holding, the court emphasized that the CBPA is "a statute of broad impact which creates new substantive rights and provides new procedural devices for the enforcement of those rights." *Id.* at 59. In affirming the trial court's denial of the defendants' motion to dismiss, *Ciardi* explicitly rejected defendants' argument that plaintiff had "failed to allege a sufficiently close nexus between herself and the defendants to state a claim under [the CBPA]." *Id.* at 65; *see also id.* ("The defendants contend that plaintiff would be hard pressed to show how a portion of an overcharge was passed on at *each* stage of the distribution chain and by which defendants."). The court reasoned that "defendants' contentions essentially relate to whether the plaintiff can prove her claim under [the CBPA], not whether she is entitled, as an indirect purchaser, to assert such a claim." *Id.* Finally, the *Ciardi* defendants argued that public policy considerations should compel the court to bar indirect purchaser claims under the CBPA. In response, the court noted that "it is the province of the Massachusetts Legislature to make its own policy decisions about whether to permit claims by indirect purchasers for antitrust violations under Massachusetts law. We read the language of [the CBPA] as a clear statement of legislative policy to protect Massachusetts consumers through the authorization of such indirect purchaser actions." *Id.* at 66-67.

The court finds that *Ciardi* supports the conclusion that Plaintiffs have standing to sue under the CBPA.[10] *Ciardi* makes clear that the CBPA is to be construed broadly in light of its goals of protecting Massachusetts consumers, regardless of whether Plaintiffs have standing under either federal or state antitrust laws. Amex's contention that Plaintiffs are not indirect purchasers is unavailing. *Ciardi* explains that a CBPA plaintiff must "allege[] a connection" between plaintiff and defendant, even if it is an "indirect one." *Ciardi*, 436 Mass. at 65. Here, Plaintiffs have met this "relatively light burden," *id.*, by alleging such a connection—namely, that Amex's Anti-Steering Rules restrain competition in such a way that Plaintiffs pay more for consumer goods than they would absent Amex's anticompetitive behavior.

### 4. New Mexico

Finally, New Mexico's Unfair Practices Act ("NMUPA") provides that "[u]nfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce are unlawful." N.M. Stat. Ann. § 57-12-3. The NMUPA defines "unconscionable trade practice" as:

---

[10] Amex cites to the federal district court opinion *Cash Energy Inc. v. Weiner*, but that case is distinguishable. (Mem. at 20 (citing *Cash Energy, Inc. v. Weiner*, 768 F. Supp. 892, 894 (D. Mass. 1991)).) *Cash* involved landowners bringing suit against defendants who had stored chemical solvents on an adjacent property that had allegedly contaminated plaintiffs' property. *Cash*, 768 F. Supp. at 893. The court dismissed plaintiffs' claim under the CBPA, holding that plaintiffs and defendants did not have "some transactional business relationship" as required by the CBPA. *Id.* at 894. Here, by contrast, Plaintiffs are not neighboring landowners with a dispute sounding in common law, but, accordingly to Plaintiffs, are participants in the same "two-sided market" as Defendants. At this stage, those allegations are sufficient—especially in light of the CBPA's "broad impact" and "clear statement of legislative policy to protect consumers," *Ciardi*, 436 Mass. at 59, 65, factors that were not implicated in *Cash*.

an act or practice in connection with the sale, lease, rental or loan, or in connection with the offering for sale, lease, rental or loan, of any goods or services, including services provided by licensed professionals, or in the extension of credit or in the collection of debts that to a person's detriment:

> (1) takes advantage of the lack of knowledge, ability, experience or capacity of a person to a grossly unfair degree; or

> (2) results in a gross disparity between the value received by a person and the price paid.

*Id.* at § 57-12-2(E). Plaintiffs allege that Amex's Anti-Steering Rules constitute an "unconscionable trade practice" because it "resulted in a gross disparity between the value received by members of the Class and the price paid by them for goods and services using an electronic form of payment." (Compl. ¶ 198(d).) Amex argues that Plaintiffs cannot sue for an NMUPA violation because "Plaintiffs are neither direct nor indirect purchasers of any product from Amex" (Mem. at 20), and "New Mexico law makes clear that only those who purchase a good or service from a defendant may sue under the NMUPA." (*Id.* (citing *Hicks v. Eller*, 280 P.3d 304 (N.M. Ct. App. 2012)).)

The court agrees with Amex and finds that Plaintiffs have not stated a claim under the NMUPA. *Hicks* is instructive. That case involved a claim under the NMUPA brought by a seller of certain paintings to a defendant who subsequently sold the paintings to other buyers for a much higher price than originally paid to the plaintiff. *Hicks*, 280 P.3d at 307. The court held that the plaintiff did not state a claim under the NMUPA because "the [NM]UPA gives standing only to buyers of goods ands services," and the plaintiff who sold the paintings was not such a buyer. *Id.* at 309. While the court acknowledged that the NMUPA "does not require a transaction between a claimant and a defendant," it explained that the statute did require that "the claimant did purchase an

item that was at some point sold by the defendants." *Id.* Plaintiffs fail to meet this standard and therefore lack standing under the NMUPA. Because Plaintiff Susan Burdette does not have a cause of action under the Sherman Act, New Mexico antitrust law, or the NMUPA, she is dismissed from this case.

## IV. COUNT IV—UNJUST ENRICHMENT

Under Count IV, Plaintiffs argue that New York law entitles them to damages for unjust enrichment. (*See* Opp. at 23-24.)[11] Plaintiffs allege that "[a]s a result of Defendants' conduct, Plaintiffs and other Class members in the State Damages Classes conferred a benefit upon Defendants, Defendants received and retained this benefit under such circumstances that it would be inequitable and unconscionable to permit them to retain it without paying the benefit's reasonable value to Plaintiffs and other Class members." (Compl. ¶ 202.) The court agrees with Amex that this claim should be dismissed.

The New York Court of Appeals has held that while a plaintiff "need not be in privity with the defendant to state a claim for unjust enrichment," the connection between the defendant and the plaintiff must not be "too attenuated." *Sperry v. Crompton Corp.*, 8 N.Y.3d 204, 215-16 (2007); *see also Carmona v. Spanish Broad. Sys., Inc.*, No. 08-cv-4475 (LAK), 2009 WL 890054, at *6 (S.D.N.Y. Mar. 30, 2009) (plaintiffs must allege "direct dealings or an actual, substantive relationship" with defendants."). In *Sperry*, for example, the Court of Appeals held that "the connection between the purchaser of tires and producers of chemicals

---

[11] The complaint alleges claims for damages under the "law of unjust enrichment of thirty-two jurisdictions." (Compl. ¶ 138.) However, Plaintiffs argue in their brief that the court should apply New York law to their unjust enrichment claim, and Amex did not contest application of New York law in its reply. (Opp. at 23-25; Reply at 10.) Because "implied consent is sufficient to establish choice of law," *Krumme v. WestPoint Stevens, Inc.*, 238 F.3d 133, 138 (2d Cir. 2000), the court applies New York law.

used in the rubber-making process is simply too attenuated to support" an unjust enrichment claim. *Sperry*, 8 N.Y.3d at 216; *see also Keurig*, 383 F. Supp. 3d at 272 (dismissing unjust enrichment claim brought under New York law because alleged relationship between parties was "too attenuated."). The court finds that, as in *Sperry* and *Keurig*, the alleged relationship between the parties is "too attenuated" to support a claim of unjust enrichment under New York law. Accordingly, Count IV is dismissed with prejudice. Because Plaintiff Gianna Valdes does not have a cause of action under the Sherman Act, the Donnelly Act, or the law of unjust enrichment, she is dismissed from this case.

## V.   CONCLUSION

For the foregoing reasons, Defendants' (Dkt. 37) motion to dismiss is GRANTED in part and DENIED in part. Specifically:

- Count I is DISMISSED in its entirety with prejudice;
- Count II is DISMISSED in part. The claims that are dismissed are those asserted under the antitrust laws of: California, Nevada, New Mexico, and New York. The claims asserted under the antitrust laws of the remaining 24 jurisdictions remain;
- Count III is DISMISSED in part. The claims that are dismissed are those asserted under the consumer protection laws of California, Florida, and New Mexico. The claims asserted under the consumer protection laws of the remaining eight jurisdictions remain;
- Count IV is DISMISSED in its entirety with prejudice; and
- The following named Plaintiffs are dismissed from this case: Anthony Oliver, Susan Burdette, Gianna Valdes, Zachary Draper, and Michael Thomas Reid.

The Parties are DIRECTED to contact the chambers of Magistrate Judge Gold regarding next steps in this case.

SO ORDERED.

Dated: Brooklyn, New York
   April 30, 2020

              /s/ Nicholas G. Garaufis
             NICHOLAS G. GARAUFIS
             United States District Judge