**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ANTHONY OLIVER, TERRY GAYLE QUINTON, SHAWN O'KEEFE, ANDREW AMEND, SUSAN BURDETTE, GIANNA VALDES, DAVID MOSKOWITZ, ZACHARY DRAPER, NATE THAYER, MICHAEL THOMAS REID, ALLIE STEWART, ANGELA CLARK, JOSEPH REALDINE, RICKY AMARO, ABIGAIL BAKER, JAMES ROBBINS IV, EMILY COUNTS, DEBBIE TINGLE, NANCI-TAYLOR MADDUX, SHERIE MCCAFFREY, MARILYN BAKER, WYATT COOPER, ELLEN MAHER, SARAH GRANT and GARY ACCORD on behalf of themselves and all others similarly situated,<br><br>      Plaintiffs,<br><br>v.<br><br>AMERICAN EXPRESS COMPANY and AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, INC.,<br><br>      Defendants. | No. 1:19-cv-00566-NGG-SJB<br><br>**CLASS ACTION**<br><br>**Oral argument requested** |

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR CLASS CERTIFICATION**

Date Served: September 30, 2022

**HIGHLY CONFIDENTIAL**

# PUBLIC REDACTED VERSION

## TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................................ 1

II.   THE CLASS ................................................................................................... 3

    A.   Class definition ..................................................................................... 3

    B.   Defined terms within the class definition ................................................. 4

    C.   The class is ascertainable. ...................................................................... 6

III.  PROCEDURAL HISTORY ............................................................................... 6

IV.   RELEVANT BACKGROUND .......................................................................... 8

    A.   Amex's Anti-Steering Rules continue to restrain the relevant market. ................. 8

        1.   Visa and Mastercard relinquish their Anti-Steering Rules ....................... 8

        2.   With Amex accepted at 99 percent of merchant locations, Amex's
              Anti-Steering Rules restrain the entire market ............................................ 8

    B.   Amex and other GPCC networks continue to raise merchant fees ..................... 9

    C.   Amex and issuers of Visa, Mastercard, and Discover credit cards would
        respond to price competition on the merchant side with price competition on
        the cardholder side. ............................................................................... 13

V.    THE CLASS SATISFIES RULE 23(a) ............................................................... 16

    A.   Class members are so numerous that joinder is impracticable. ........................ 16

    B.   The claims present common issues of law and fact. ...................................... 17

    C.   The Named Plaintiffs' claims are typical of the claims of the class .................. 17

    D.   The Named Plaintiffs are adequate class representatives. .................................. 18

VI.   THE CLASS SATISFIES RULE 23(b)(3) BECAUSE COMMON ISSUES
     PREDOMINATE ............................................................................................ 18

    A.   Legal standards for predominance ........................................................... 18

        1.   Common issues distinguished from individual issues ............................ 19

        2.   A common question is capable of common proof where the common
              evidence offered by plaintiffs is admissible and sufficient. ...................... 19

    B.   Common questions of law predominate. ..................................................... 20

    C.   Common evidence of Amex's liability predominates. .................................... 21

        1.   Common evidence of the relevant market ............................................. 22

i

2.      Common evidence of anticompetitive effects in the relevant market....... 23

          a)      Merchants' GPCC acceptance costs would be lower but-for
                  the Anti-Steering Rules................................................................ 23

          b)      In a world without Amex's Anti-Steering Rules, cardholder
                  rewards levels would not shrink nor would annual fees
                  increase ....................................................................................... 26

D.      Plaintiffs will prove class-wide impact with common evidence. ......................... 27

    1.      But-for Amex's Anti-Steering Rules, Qualifying Merchants would
            have reliably passed on cost savings on credit card acceptance to
            their retail prices. ................................................................................... 27

    2.      Accepted economic theory predicts pass through of Qualifying
            Merchants' credit card acceptance costs to retail prices ......................... 28

    3.      The Qualifying Merchants are low-margin retailers which makes it
            highly likely they pass on a high percentage of credit card
            acceptance costs. ..................................................................................... 29

    4.      Sworn testimony by some of the Qualifying Merchants that they
            pass on credit card fees is evidence that they all do. ............................... 30

    5.      The Australia experience is common evidence of pass-on. ...................... 32

E.      Plaintiffs will establish aggregate damages through common evidence. ............. 34

F.      Resolving this dispute as a class action is superior to any alternative................. 37

VII.    THE COURT SHOULD APPOINT BERMAN TABACCO, GORDON BALL,
        LLC, AND PLAINTIFFS' EXECUTIVE COMMITTEE AS CLASS COUNSEL ....... 37

VIII.   CONCLUSION............................................................................................................ 39

## **TABLE OF AUTHORITIES**

### CASES

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997)..................................................................................... 3, 18, 37

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013).............................................................................................. 18

*Comcast v. Behrend*,
  569 U.S. 27 (2013)................................................................................................ 34

*Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*,
  502 F.3d 91 (2d Cir. 2007) ................................................................................... 21

*Dial Corp. v. News Corp.*,
  314 F.R.D. 108 (S.D.N.Y. 2015),
  *amended on other grounds*, No. 13-cv-6802, 2016 WL 690895 (S.D.N.Y. 2016) ................. 37

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
  No. 06-MD-1175 (JG)(WP), 2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014),
  *report and recommendation adopted*, No. 06-MD-1775 JG VVP, 2015 WL 5093503
  (E.D.N.Y. July 10, 2015) ................................................................. 17, 20, 34, 38

*In re Am. Int'l Grp., Inc. Sec. Litig.*,
  689 F.3d 229 (2d Cir. 2012) ................................................................................. 18

*In re Broiler Chicken Antitrust Litig.*,
  No. 16 C 8637, 2022 WL 1720468 (N.D. Ill. May 27, 2022) ................................ 31

*In re DRAM Antitrust Litig.*,
  No. M 02-1486 PJH, 2006 WL 1530166 (N.D. Cal. June 5, 2006) ........................ 27

*In re High-Tech Emp. Antitrust Litig.*,
  985 F. Supp. 2d 1167 (N.D. Cal. 2013).................................................................. 17

*In re Literary Works in Elec. Databases Copyright Litig.*,
  654 F.3d 242 (2d Cir. 2011) ................................................................................. 18

*In re Namenda Indirect Purchaser Antitrust Litig.*,
  338 F.R.D. 527 (S.D.N.Y. 2021) ........................................................................... 34

*In re Petrobras Sec.*,
  862 F.3d 250 (2d Cir. 2017) ....................................................................... 6, 18, 32

*In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.* (*Restasis*),
335 F.R.D. 1 (E.D.N.Y. 2021) ................................................................................... 3, 32

*In re Visa Check/MasterMoney Antitrust Litig.*,
280 F.3d 124 (2d Cir. 2001),
*overruled on other grounds by In re Initial Public Offerings Sec. Litig.*, 471 F.3d 24 (2d Cir.
2006) ................................................................................................................................. 21

*Langan v. Johnson & Johnson Computer Cos., Inc.*,
897 F.3d 88 (2d Cir. 2018) ............................................................................................. 20

*Marisol A. v. Giuliani*,
126 F.3d 372 (2d. Cir. 1997) ......................................................................................... 17

*Meredith Corp. v. SESAC LLC*,
87 F. Supp. 3d 650 (S.D.N.Y. 2015) ............................................................................. 21

*New York v. Julius Nasso Concrete Corp.*,
202 F.3d 82 (2d Cir. 2000) ............................................................................................. 34

*Ohio v. American Express Co.*,
138 S.Ct. 2274 (2018) ............................................................................................. passim

*Olean Wholesale Grocery Coop., Inc., v. Bumble Bee Foods LLC*,
31 F.4th 651 (9th Cir. 2022) ......................................................................................... 19

*Pa. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co.*,
772 F.3d 111 (2d Cir. 2014) ........................................................................................... 16

*Shady Grove Orthopedic Assoc., P.A. v. Allstate Ins. Co.*,
293 F.R.D. 287 (E.D.N.Y. 2013) ................................................................................... 17

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
282 U.S. 555 (1931) ......................................................................................................... 34

*Sykes v. Mel S. Harris & Assocs. LLC*,
780 F.3d 70 (2d Cir. 2015) ............................................................................................. 18

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*,
546 F.3d 196 (2d Cir. 2008) ........................................................................................... 19

*Tyson Foods, Inc. v. Bouaphakeo*,
577 U.S. 442 (2016) ................................................................................... 19, 20, 32, 34

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) ......................................................................................................... 17

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
  395 U.S. 100 n.9 (1969)..................................................................................... 27

**RULES**

Fed. R. Civ. P. 23(b)(3)........................................................................... 18, 37

Fed. R. Evid. 803(8)........................................................................................ 33

**OTHER AUTHORITIES**

Phillip E. Areeda et al., Antitrust Law, ¶359b3 (3d ed. 2007) ..................................... 35

## **KEY DEFINED TERMS**

| | |
|---|---|
| Amex | Defendants American Express Company and American Express Travel Related Services Company, Inc. |
| Amex Trial | The 2014 trial in the Government Action, defined below. |
| Anti-Steering Rules | Also known as "non-discrimination provisions," are provisions in Amex's contracts with U.S. merchants that prohibit merchants from steering consumers to use forms of payment other than an Amex card. |
| Government Action | Action brought by the United States and certain States' Attorneys General in *United States v. American Express Co.*, No. 10-cv-04496 (NGG) (RER) (E.D.N.Y.) |
| GPCC | Stands for "general purpose credit and charge cards" and means credit and charge cards that can be used to make purchases from a variety of merchants and do not include cards that can be used at only one merchant (such as a department store card) |

## I.     INTRODUCTION

Plaintiffs are consumers alleging violations of fourteen state antitrust and consumer protection laws. Plaintiffs allege that Amex's continued imposition of its Anti-Steering Rules unreasonably restrain competition, causing anticompetitive effects by inflating two-sided credit card prices above a competitive level. Trial will focus on Amex's Anti-Steering Rules and their market-wide stifling of competition—competition that would, in a world without Amex's Anti-Steering Rules, result in lower two-sided prices for all GPCC transactions, because merchant credit card acceptance fees would be lower, while at the same time cardholder reward levels would not shrink, but would likely rise.

Plaintiffs' claims are well-suited to certification under Rule 23 of the Federal Rules of Civil Procedure, because they focus on the unlawful actions of Amex, not on the actions of individual plaintiffs. Plaintiffs' claims will stand or fall based on common proof of Amex's Anti-Steering Rules' class-wide effects. All class members will use the same documents, witness testimony, and other evidence to prove that Amex's Anti-Steering Rules are anticompetitive under the rule-of-reason analysis prescribed for this two-sided transaction market by the Supreme Court in *Ohio v. American Express Co.*, 138 S.Ct. 2274 (2018).

At trial, Plaintiffs will present common evidence of the anticompetitive effects caused by Amex's Anti-Steering Rules, and common evidence of the resulting class-wide injury. The same evidence will be offered for every class member, consisting of business records, admissions by Amex, former trial testimony, and the expert opinion testimony of economist Dr. Russell L. Lamb.[1] Dr. Lamb applies established economic principles and theory to the facts and circumstances of the case and concludes that, because of Amex's continued imposition of its Anti-Steering Rules, the Qualifying Merchants paid higher overall costs to accept credit cards than they would have but-for Amex's Anti-Steering Rules. Dr. Lamb's analysis uses well-accepted economic principles and industry analysis to find that merchants, including the

---

[1] Dr. Lamb's September 30, 2022 Report ("Lamb Rpt.") is attached as Exhibit A to the Declaration of Todd A. Seaver ("Seaver Decl."), filed herewith.

Qualifying Merchants (defined *infra*), reliably pass through credit card acceptance costs into their retail prices, and in a but-for world would have passed on at least some portion of their cost savings to their customers. On the cardholder side, Dr. Lamb relies on economic literature concerning two-sided payment markets and real-world market facts and finds it highly likely that profit-maximizing GPCC issuers would have responded to increased competition on the merchant side by competing more on the cardholder side, and so would refrain from decreasing cardholder rewards or raising annual cardholder fees. Consequently, economic analysis determines that in a but-for world without Amex's Anti-Steering Rules, virtually all class members would have paid lower, net two-sided prices on their credit card and debit card purchases from Qualifying Merchants, thereby establishing fact of injury.

Dr. Lamb then sets forth a reliable, class-wide methodology that can be used to calculate a reasonable estimate of aggregate damages. Dr. Lamb first employs the commonly accepted benchmark methodology to measure the amount of overcharge to Qualifying Merchants caused by Amex's Anti-Steering Rules. Second, Dr. Lamb describes how he will use industry data to estimate the volume of class members' affected credit card and debit card transactions at Qualifying Merchants for each of the relevant states during the class periods. Finally, Dr. Lamb draws on economic literature for an estimate of the rate of pass-through of the overcharge into retail prices paid by class members. All the inputs Dr. Lamb uses—including Amex's internal documents, relevant market data, and economic literature—are common to all class members. The methodology is capable of calculating a reasonable estimate of class-wide, aggregate damages.

This action aims to recover monetary damages for American consumers stemming from harm that observers and participants in the U.S. credit card market have long recognized. Central banks, economists, and merchants understand that costs of accepting payment with credit cards is highest in the United States, and that merchants typically pass on those costs to all consumers. The United States Supreme Court in 2018 announced a new rule for how the relevant market here, and the restraint of trade at issue here, must be analyzed for anticompetitive effects.

Plaintiffs have gathered the necessary evidence to prove those anticompetitive effects and the resulting injury and damage to consumers. Because that proof is common to every class member, the claims for every class member will stand or fall together.

The class action device is not only the most efficient and fair means of resolving the claims, it is the only way. Because of the unlawful, anticompetitive actions of Amex, millions of class members have paid overcharges in their everyday lives that, while significant to them, are small enough not to make individual lawsuits rational. "Rule 23(b)(3) was designed with such plaintiffs 'dominantly in mind.'" *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.* (*Restasis*), 335 F.R.D. 1 (E.D.N.Y. 2021) (Gershon, J.) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997)).

Plaintiffs request that the Court certify the proposed classes under Rule 23(a) and (b)(3), appoint the proposed class representatives, and appoint Class Counsel pursuant to Rule 23(g).

## II.   THE CLASS

### A.   Class definition

The Motion seeks certification under Rule 23(a) and (b)(3) of two classes statewide for each of thirteen states and the District of Columbia:[2]

> **Credit Card Class**
> All card account holders, who are natural persons, and whose account billing address was in [State] during the applicable Class Period, and whose Visa, Mastercard, or Discover General Purpose Credit or Charge Card account was used by an account holder or an authorized user for a purchase of a good or service from a Qualifying Merchant during the Class Period that occurred in [same State].

> **Debit Card Class**
> All card account holders, who are natural persons, and whose account address was in [State] during the applicable Class Period, and whose Visa or Mastercard Debit Card account was used by an account holder or an authorized user, for a purchase of a good or service from a Qualifying Merchant during the Class Period that occurred in [same State].

---

[2] Pursuant to the Court's order dated December 7, 2021 (adopting parties' Joint Proposed Scheduling Order (Docket Entry ("DE") 84)), Plaintiffs provided advance notice to Amex of this class definition, including the particulars of the defined terms within the class definition, on February 15, 2022. *See* Seaver Decl. ¶ 2 & Ex. B.

<u>Excluded from the classes are:</u>

- Those who are Amex credit or charge card (including Amex co-branded cards) account holders or authorized users, or who were during the applicable Class Periods.

- Purchases of prescription drugs or other medical services from a pharmacy for which the purchaser only paid a flat copay per their insurance plan.

- Defendants, their parent companies, subsidiaries, agents and affiliates, all governmental entities, and any judges or justices assigned to hear any aspect of this action.

**B.     Defined terms within the class definition**

- "General Purpose Credit or Charge Card" (or "GPCC" card) means an electronic payment card, for use on the Visa, Mastercard, or Discover network, that permits a consumer to make purchases without accessing or reserving the consumer's funds at the time of the purchase, and that permits the consumer to pay for the purchases at some time after the purchase is made. GPCC cards include co-branded cards and affinity cards but do not include cards that can be used at only one merchant (such as a department store card).

- "Debit Card" means an electronic payment card that a consumer can use to make purchases from a merchant for which no credit is extended and the consumer must have sufficient funds in a demand deposit account, or pre-loaded on the card, to pay for the purchase at the time of the transaction.

The "Class Period" means the following:

| State | Class Period |
|---|---|
| Alabama | January 29, 2015–June 1, 2022 |
| District of Columbia | January 29, 2015–June 1, 2022 |
| Hawaii | January 29, 2015–June 1, 2022 |
| Kansas | January 29, 2016–June 1, 2022 |
| Maine | January 29, 2015–June 1, 2022 |
| Mississippi | January 29, 2016–June 1, 2022 |
| North Carolina | January 29, 2015–June 1, 2022 |
| Oregon | January 29, 2015–June 1, 2022 |
| Utah | January 29, 2015–June 1, 2022 |
| Vermont | June 17, 2016–June 1, 2022 |
| West Virginia | January 29, 2015–June 1, 2022 |
| Illinois | January 29, 2016–June 1, 2022 |
| Montana | January 29, 2017–June 1, 2022 |
| Ohio | January 29, 2017–June 1, 2022 |

- "Qualifying Merchants" are the following merchants, including, without limitation, their retail stores, brands, or banners as listed below:

4

| Merchant | Retail Store, Brand, or Banner |
|---|---|
| Academy Sports and Outdoors, Inc. | Academy Sports + Outdoors |
| Advance Auto Parts, Inc. | Advance Auto Parts |
| Albertsons Companies, Inc. | Albertsons, Safeway, Vons, Pavilions, Randalls, Tom Thumb, Carrs, Jewel-Osco, Acme, Shaw's, Star Market, United Supermarkets, Market Street, Haggen, Kings Food Markets, and Balducci's Food Lovers Market |
| American Eagle Outfitters, Inc. | American Eagle Outfitters, Aerie, Todd Snyder New York |
| Bed Bath & Beyond Inc. | Bed Bath & Beyond, buybuy BABY, Harmon, Harmon Face Values, Face Values, Harmon Health and Beauty, Decorist |
| Best Buy Co., Inc. | Best Buy, Best Buy Business, Best Buy Express, Best Buy Health, CST, Geek Squad, GreatCall, Lively, Magnolia, and Pacific Kitchen and Home |
| Big Lots, Inc. | Big Lots |
| BI-LO, LLC | BI-LO |
| BJ's Wholesale Club Holdings, Inc. | BJ's Wholesale Club |
| Burlington Stores, Inc. | Burlington Stores, Baby Depot, Burlington Coat Factory, Cohoes Fashions, MJM Designer Shoes |
| Camping World Holdings, Inc. | Camping World, Good Sam Club |
| Circle K Stores, Inc. | Circle K |
| CVS Health Corporation | CVS Pharmacy |
| Dick's Sporting Goods, Inc. | Dick's Sporting Goods, Golf Galaxy, Field & Stream, and GameChanger |
| Foot Locker, Inc. | Foot Locker |
| GameStop Corp. | GameStop |
| The Gap, Inc. | Gap, Old Navy, Banana Republic, Athleta, Intermix, Janie and Jack |
| H&M Hennes & Mauritz Ab | H&M, COS, H&M Home, "& other stories" |
| The Home Depot, Inc. | Home Depot |
| Hy-Vee, Inc. | Hy-Vee |
| Ikea, Inc. | Ikea |
| Kohl's Corporation | Kohl's |
| The Kroger Co. | Kroger |
| Lowe's Companies, Inc. | Lowe's |
| Meijer, Inc. | Meijer |
| Michaels Stores, Inc. | Michaels |
| Publix Super Markets, Inc. | Publix Super Markets |
| Rite Aid Corporation | Rite Aid |
| Ross Stores, Inc. | Ross Dress for Less |
| Sprouts Farmers Market, Inc. | Sprouts Farmers Market |
| Target Corporation | Target |
| The TJX Companies, Inc. | T.J. Maxx, Marshalls, and HomeGoods |
| Tractor Supply Company | Tractor Supply Company |

| Merchant | Retail Store, Brand, or Banner |
|---|---|
| Ulta Beauty, Inc. | Ulta Beauty, Ulta Salon, Cosmetics & Fragrance |
| United Natural Foods, Inc. | SuperValu |
| Walgreens Boots Alliance, Inc. | Walgreens |
| Walmart Inc. | Walmart, Sam's Club |
| Williams-Sonoma, Inc. | Williams Sonoma, Pottery Barn, Pottery Barn Kids, Pottery Barn Teen, West Elm, Williams Sonoma Home, Rejuvenation, Mark and Graham |

### C.      The class is ascertainable.

The class is ascertainable because membership in it is defined by reference to "objective criteria" with "definite boundaries." *In re Petrobras Sec.*, 862 F.3d 250, 264 (2d Cir. 2017).

By way of illustration, when a notice of pendency is disseminated, people will know they are in the Credit Card Class if they did not have an Amex card during the applicable class period, and they or an authorized user of their Visa, Mastercard, or Discover credit card account made a purchase transaction from a Qualifying Merchant during the applicable class period, where the purchase is made in the same state as their credit card account's billing address. The people meeting those objective criteria are in the Credit Card Class, and damages are sought for all of their qualifying purchases.

Ascertainability poses no hurdle to class certification.

### III.    PROCEDURAL HISTORY

Plaintiffs filed their initial class-action complaint on January 29, 2019. DE 1. On April 30, 2020, the Court issued an order granting in part and denying in part AmEx's Rule 12(b)(1) and 12(b)(6) motion to dismiss. DE 43. On January 25, 2021, the Court granted in part and denied in part AmEx's Rule 12(c) motion for judgment on the pleadings. DE 63, 66. After these Rule 12 motions, Plaintiffs had live claims remaining under state antitrust and/or consumer protection statutes in 14 jurisdictions (13 states and the District of Columbia).

On August 19, 2021, Plaintiffs sought leave to file an amended complaint. DE 71. The sole ground for the amendment was to allow Plaintiffs to join fifteen individual consumers as party-plaintiffs who had relevant transactions in jurisdictions with sustained claims. Leave to

amend was granted in an order dated September 16, 2021 and Plaintiffs filed their Amended Class Action Complaint ("Am. Compl.") on September 21, 2021. DE 76.

In an order dated December 7, 2021, the Court set a schedule for, among other things, discovery and class certification deadlines. On May 9, 2022, Plaintiffs filed a request to extend those deadlines by eight months. DE 86. Plaintiffs requested more time to permit completion of third-party discovery, in particular to obtain data from GPCC networks and others to include in Plaintiffs' expert's damages analysis. DE 86 at 2–3; DE 86-1, at ¶¶ 53–62. In an order dated May 20, 2022, the Court granted the motion in part and extended by four months the third-party discovery cutoff and deadline to serve the motion for class certification and expert reports related to merits and class topics to September 30, 2022.[3]

On August 1, 2022, Plaintiffs filed a motion to compel Amex to disclose information about Project RAMP, an endeavor within Amex that, according to sworn deposition testimony of an Amex designee, was about how Amex would operate its business in the United States if it could not enforce its Anti-Steering Rules. DE 99. The Project RAMP materials appear highly relevant insofar as they contain information or admissions by Amex about how Amex would conduct business in the U.S. market without the ability to impose its Anti-Steering Rules. In particular, Plaintiffs' expert economist Dr. Lamb would consider that information in forming his opinion about the but-for world.

Magistrate Bulsara denied this motion on August 12, 2022. DE 102. Plaintiffs objected to and appealed the Magistrate's decision to the District Court on August 26, 2022. DE 107. The objection/appeal was *sub judice* as of the date of service of Plaintiffs' motion for class certification.

---

[3] Visa produced data for 2017–2021 on August 30, 2022 and data for 2015–2017 on September 26, 2022. Mastercard produced data on September 19, 2022. Discover produced data on September 22, 2022. Interim class counsel and their consulting experts are at the initial stages of reconciling the Mastercard and Discover data, and more time is required before Plaintiffs' consulting experts can use that data in the damages study. Seaver Decl. ¶¶ 10–11.

## IV.   RELEVANT BACKGROUND

Litigation challenging Amex's Anti-Steering rules went on, apart from this action, for over a decade, and largely in this Court. The features of the U.S. credit card market and Amex's role within it are well known to the Court, so the purpose of this section is focus on the status quo and also the developments in the market since the Amex Trial in 2014.

### A.   Amex's Anti-Steering Rules continue to restrain the relevant market.

### 1.   Visa and Mastercard relinquish their Anti-Steering Rules

Visa and Mastercard entered into a Consent Decree in 2011 ("2011 Consent Decree") with the U.S. Department of Justice ("DOJ") which required Visa and Mastercard to permit merchants to steer consumers' choice of payment, other than via surcharging.[4] Shortly thereafter in 2013, Visa and Mastercard settled a class action brought by merchants. As part of this 2013 merchant class action settlement ("2013 Settlement"), Visa and Mastercard agreed to modify their merchant agreements to permit merchants to surcharge credit card transactions, subject to certain limitations, beginning on January 27, 2013.[5] Even as that settlement approval was ultimately vacated and reversed by the Second Circuit in 2016, Visa and Mastercard have continued to abide by the settlement's terms with regard to steering.[6]

### 2.   With Amex accepted at 99 percent of merchant locations, Amex's Anti-Steering Rules restrain the entire market

Amex was not a party to either the 2011 Consent Decree or the 2013 Settlement, so continued to impose its Anti-Steering Rules.

Amex's Anti-Steering Rules are included as part of Amex's standard policies and procedures for Amex card acceptance.[7] In plain terms, Amex's Anti-Steering Rules prohibit an Amex-accepting merchant from (among other things) engaging in practices that would allow it to reduce its costs of GPCC acceptance by steering customers to less costly GPCCs, such as

---

[4] Lamb Rpt. ¶¶ 92–95.

[5] *Id.* ¶ 96.

[6] *Id.*

[7] Seaver Decl. Ex. C (April 2022 Amex Merchant Reference Guide), at 2, 7.

preference campaigns, or efforts to induce an Amex cardholder to use a form of payment less expensive to accept than Amex (an "Other Payment Product").[8]

With regard to discounting and surcharging, Amex's Anti-Steering Rules prohibit an Amex-accepting merchant from imposing differential pricing, whether in the form of differential discounts or differential surcharges, on customers depending on which brand or product of GPCC they use (such as different GPCCs). Rather, Amex's Anti-Steering Rules require that any surcharge assessed by a merchant must be the same for every GPCC it accepts, as well as for certain other forms of payment such as debit cards.[9]

Combined, through the 2011 Consent Decree and the 2013 Settlement, Visa and MasterCard since January 27, 2013 permit merchants to engage in the types of steering that Amex's Anti-Steering Rules continue to prohibit Amex-accepting merchants from carrying out. This results in Amex-accepting merchants being barred from steering their customers to less expensive GPCCs.[10]

Whereas Amex in 2014 had a "merchant coverage gap" that saw Amex accepted at 80 percent of merchant locations, by 2018–2019 that gap had evaporated, and Amex achieved parity with Visa, Mastercard and Discover with regard to merchant acceptance, with Amex cards accepted at 99 percent of merchant locations.[11]

### B.  Amex and other GPCC networks continue to raise merchant fees

Since the Amex Trial in 2014, the GPCC networks have continued their abandonment of competition on price to the merchant side of the two-sided market (the other side being the cardholder side). With Amex's Anti-Steering Rules continuing to be imposed, there remains no

---

[8] *Id.* at 7. Amex defines "Other Payment Products" as "[a]ny charge, credit, debit, stored value, prepaid, or smart cards, account access devices, or other payment cards, services, or products other than the Card." *Id*. at 50.

[9] *Id*. at 7.

[10] Lamb Rpt. ¶¶ 98–105.

[11] Seaver Decl. Ex. D (AMEX-CP-000094699) (showing Amex cards accepted at merchant locations as follows 2014 – 80%; 2016 – 85%; 2018 – 93%; 2019 – 99%).

incentive for Amex or its GPCC competitors to lower price to merchants as a means to increasing charge volume. Visa and Mastercard rates have therefore predictably climbed to reach even Amex's expensive heights. This is an excerpt from an August 2020 presentation to Amex's Chief Executive Officer ("CEO"), Stephen J. Squeri, �these

██████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████ For its part, Amex was still using single-rate pricing, whereby Amex charged a single merchant discount fee, depending on the size of the merchant and the particular industry segment, for every Amex card product.[12]

A May 2016 presentation to Amex's Board of Directors ████████████████████████

████████████████████████████████████████████████

█████████████████████████████████"[13] It is noteworthy that dicta in the *Ohio v. American Express Co.* majority opinion erroneously assigns a price-*lowering* effect to product-based pricing when in fact it has a price-raising effect, "To maintain their *lower* merchant fees, Visa and MasterCard have created a sliding scale for their various cards—charging merchants less for low-reward cards and more for high-reward cards. This differs from Amex's strategy, which is to [use single rate pricing]." 138 S.Ct. at 2282 (emphasis added).

██████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████.[14] In July 2018, Amex instituted product-based pricing ████████████████████████████████

███████████████████████.[15]

████████████████████████████████████████████████

████████████████████████████████████████████.[16]

████████████████████████.[17]

---

[12] Seaver Decl. Ex. E (AMEX-CP-0000067646–668), at 648.

[13] *Id.*

[14] Seaver Decl. Ex. F (AMEX-CP-000094309), at 310.

[15] *Id.* at 312.

[16] *Id.* at 310.

[17] Seaver Decl. Ex. G (Amex 30(b)(6) Dep. Tr. (Ouellette)) at 80:17–82:15.

11

�altheight. Ordinarily, in a competitive market, a firm competes to deliver goods or services at lower prices than its rivals. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. This warped concept of "competition" is a byproduct of the fact that Amex's Anti-Steering Rules eliminate all incentive to compete on price to merchants for acceptance or for transaction volume. ▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬"[18] ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬"[19]

It may be tempting to think we have been down this road before. ▬▬▬▬▬▬ Amex's "Value Recapture" which from 2005 to 2010 extracted $1.37 billion in incremental revenue from merchants.[20] After all, the Supreme Court in *Ohio v.* American *Express* faulted the Government for "stak[ing] their entire case on proving that Amex's agreements increase merchant fees." 138 S.Ct. at 2287. But at the trial of this action, Plaintiffs will not "[f]ocus[] on merchant fees alone" but will couple the merchant-side proof with evidence that on the cardholder side, rewards levels would not have shrunk in the but-for world, but indeed were likely to have risen. With this evidence Plaintiffs will prove, by a preponderance of the evidence, that "Amex's antisteering provisions increased the cost of credit-card transactions above a competitive level." *Id*.

---

[18] *Id.* at 55:19–56:11.

[19] *Id.*

[20] Lamb Rpt. ¶ 161 (citing 2014 Amex Trial PX1753A at AMEXNDR12459031).

### C.     Amex and issuers of Visa, Mastercard, and Discover credit cards would respond to price competition on the merchant side with price competition on the cardholder side.

On the cardholder side of the two-sided GPCC transaction platform, issuers of credit cards such as Amex, JP Morgan, Citi, Capital One, Discover, and Wells Fargo are subject to competitive forces that make it highly unlikely that they would respond to price competition on the merchant side by reducing cardholder rewards levels and/or increasing annual fees. What is more likely is that the opposite would occur.

First, the ease with which consumers can switch between credit cards in their wallet or acquire a new credit card from a different issuer keeps competition high for transactions. Households can switch from one card to another if cash-back or other rewards become more attractive with one card versus another, or if finance charges fall, credit lines expand, millions of cardholders can react by simply pulling one card from their wallet rather than another. Getting a new credit card often involves just signing on to an attractive offer that arrives in the mail or online. At a 30(b)(6) deposition in this matter of the Amex witness designated to testify on the issuer/cardholder side of the business, Jonathan Gantman of Amex testified to the ease with which consumers can substitute one GPCC for another at the point of sale, and can apply for a new GPCC that they didn't already have if incentivized to do so with an attractive offer.[21] Third-party comparison outfits online, such as NerdWallet and The Points Guy, ensure consumers have timely and accurate information and the ability to compare credit card product.[22]

Second, rewards are the single most important tool which credit card issuers have capable of attracting consumers to get their card in the first place, and then use it to spend on purchases. Incentivizing spend is what drives revenues and profits for all GPCC issuers.

Indeed, GPCC issuers compete with each other to obtain "top of wallet" status among consumers conducting point-of-sale GPCC transactions, and, similarly, "card on file" status among consumers conducting online GPCC transactions on merchant e-commerce sites, in order

---

[21] Seaver Decl. Ex. H (30(b)(6) Dep. Tr. (Gantman)), at 146:18–148:5.

[22] *Id.* at 129:20–133:14.

to maximize purchase volume and balances on their cards. Rewards are critical to being "top of wallet."[23] According to a 2021 U.S. CFPB report covering the consumer credit card market, its findings show that rewards are "the predominant factor in choosing a card."[24] Further, this report finds that, while the popularity of cardholder rewards programs had historically been driven by affluent consumers' spending, in more recent years "even consumers with deep subprime scores put more than 60 percent of their credit card purchase volume on rewards cards, and consumers with near-prime scores put nearly three-fourths of their spending on rewards cards."[25] Jonathan Gantman of Amex testified that cardholder rewards were a "critical factor" for Amex acquiring new card members in the first place and then getting them to spend on their Amex card once they have it.[26] Likewise, in a 2013 Management Analysis, Visa noted that "increased payments and transaction volume" are what drive Visa's net revenues.[27] ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.[28] A Senior Business Director at Capital One ▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, stated in a

declaration that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

---

[23] In addition to cardholder rewards that are earned in direct connection with spending, the "other major form of earning is the 'sign-up bonus.' Sign-up bonuses tend to be structured differently as an incentive to consumers both to originate the account as well as to commence using it." *See* Seaver Decl. Ex. I (2015 Consumer Financial Protection Bureau ("CFPB") Report), at 213. "The general formula for sign-up bonuses awards consumers a substantial lump sum payment of additional rewards. To receive this payment, consumers must meet a spending target within some period following the origination of the account. This period is usually no more than a few months." *Id.*

[24] Seaver Decl. Ex. J (2021 CFPB Report), at 88.

[25] *Id.* at 87.

[26] Seaver Decl. Ex. H (30(b)(6) Dep. Tr. (Gantman)), at 142:23–143:21.

[27] Seaver Decl. Ex. K (2013 Visa Annual Report on Form 10-K), at 45.

[28] Seaver Decl. Ex. L (Discover internal presentation), DFS0000001–8, at 5, 7.

████████████████████████████████████████████"[29] Thus, maximizing GPCC transaction volume is a central component of the business model of GPCC issuers. As profit-maximizing firms, Amex and other GPCC issuers are unlikely to reduce rewards and risk attrition of cardholders and drop in spend.

The COVID-19 pandemic offered a natural experiment that illustrates how profit-maximizing impulses make it unlikely GPCC issuers would have reduced rewards in the but-for world. As the pandemic unfolded, many credit card issuers rearranged their rewards offerings completely, moving from airline and hotel rewards to grocery and home delivery, streaming services, and wireless telephone credits.[30] According to the CFPB, credit card issuers made these dramatic changes to "keep[] customers from moving spending away from their card, downgrading to lower-fee products, or canceling their card altogether."[31] Amex CEO Stephen J. Squeri explained to investors how Amex increased its cardholder rewards (and other cardholder value propositions) in response to the pandemic in order to protect its market share and "ensure [its] success."[32] A 2020 *Wall Street Journal* article reported how traditional cardholder rewards that "banks ha[d] spent years fine-tuning the cards to appeal to big-spending jet-setters" were viewed as less attractive during the pandemic, adding:

> Banks are scrambling to keep those hard-won customers. JPMorgan Chase & Co. delayed a planned $100 increase on Sapphire Reserve's $450 annual fee. It is also doling out extra points on grocery purchases through the end of June. Citigroup Inc. rolled out extra points on online grocery, drugstore and other purchases made with its premium Prestige card through August. AmEx is offering consumers who

---

[29] Seaver Decl. Ex. W (Laura Williams Declaration) ¶ 5.

[30] Seaver Decl. Ex. J (2021 CFPB Report), at 89; Seaver Decl., Ex. W (Williams Decl.) ¶ 4. Laura Williams of Capital One stated that ████████████████████████████████████
████████████████████████████████████████

[31] *Id.*

[32] Stating that Amex has "added limited time offers and statement credits in categories that are relevant for today, such as wireless, grocery, streaming services, business essentials, and food delivery. Early results from these enhancements are encouraging." Seaver Decl. Ex. M (Amex Q2 2020 Earnings Call, dated July 24, 2020), at 3.

have the Platinum card up to $320 in statement credits when they use their card to buy certain streaming and wireless-phone services.[33]

In sum, with onset of a global pandemic, the GPCC issuers rushed to preserve their market share. They did not move to cut rewards, even as it was plain they would be seeing billions of dollars of revenue decreases.

The reality is that the market force that drives credit card acquisition and use by consumers are the rewards for signing up and the rewards directly connected to spending. The real-world facts, which will be augmented at trial by Dr. Lamb's economic analysis and other common evidence, show it is highly unlikely that Amex and other GPCC issuers would respond to price competition on the merchant side by reducing rewards on the cardholder side. If Amex's Anti-Steering Rules did not restrain competition on the merchant side, the opposite would be much more likely to occur.

## V.   THE CLASS SATISFIES RULE 23(a)

Class actions are governed by Rule 23 of the Federal Rules of Civil Procedure. Plaintiffs must satisfy the numerosity, commonality, typicality, and adequacy requirements of Rule 23(a). In addition to the prerequisites of Rule 23(a), plaintiffs must also satisfy one of the provisions of Rule 23(b). Plaintiffs here move for certification of statewide damage classes under Rule 23(b)(3).

### A.   Class members are so numerous that joinder is impracticable.

The Credit Card Class and the Debit Card Class together contain millions individual consumers, making joinder impracticable. Rule 23(a)(1)'s "numerosity" requirement is presumptively satisfied when the class consists of at least 40 individuals. *Pa. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co*., 772 F.3d 111, 120 (2d Cir. 2014), so the classes here arr sufficiently numerous.

---

[33] Seaver Decl. Ex. N (AnnaMaria Andriotis, *Travel Bans Take Shine Off Banks' Premium Rewards Cards*, Wall St. J., June 28, 2020).

## B.   The claims present common issues of law and fact.

Commonality exists where "plaintiffs' grievances share a common question of law or of fact." *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d. Cir. 1997). A single common question satisfies Rule 23(a)(2)'s "commonality" requirement. *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1175 (JG)(WP), 2014 WL 7882100, at *30 (E.D.N.Y. Oct. 15, 2014) ("commonality does not present plaintiffs with a particularly exacting standard" (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011) ("[e]ven a single [common] question will do"))), *report and recommendation adopted*, No. 06-MD-1775 JG VVP, 2015 WL 5093503 (E.D.N.Y. July 10, 2015). In this action, "[a]ntitrust liability alone constitutes a common question that 'will resolve an issue that is central to the validity' of each class member's claim 'in one stroke.'" *In re High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d 1167, 1180 (N.D. Cal. 2013) (quoting *Dukes*, 564 U.S. at 350). Additional common questions abound, including whether Plaintiffs identify a relevant market, whether Amex's conduct is anticompetitive, and whether the class members have been injured.

## C.   The Named Plaintiffs' claims are typical of the claims of the class

"Where the same conduct is alleged to have been directed at or affected both the named plaintiff[s] and the class sought to be represented, [Rule 23(a)(3)'s] typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Shady Grove Orthopedic Assoc., P.A. v. Allstate Ins. Co*., 293 F.R.D. 287, 301 (E.D.N.Y. 2013) (citation and internal quotation marks omitted). The named Plaintiffs' claims here are the same as those of the absent class members. Plaintiffs challenge the Anti-Steering Rules in Amex's contracts with merchants as causing adverse effects on competition in the relevant market, and alleging they cause merchants to pay inflated costs to accept GPCC cards, which those costs are passed through to retail prices paid by consumers, causing them to pay overcharges when they purchased retail goods and services with a (non-Amex) credit card or a debit card. Am. Compl. ¶¶ 108–51. Typicality is easily met.

17

### D.     The Named Plaintiffs are adequate class representatives.

Adequacy under Rule 23(a)(4) is satisfied unless the named plaintiffs' "interests are antagonistic to the interest of other members of the class." *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 90 (2d Cir. 2015) (citation omitted). Here, the named Plaintiffs' and the class members' interests are fully aligned with regard to recovering damages from Amex under state antitrust and consumer protection laws for Amex's continued imposition of its Anti-Steering Rules in its contracts with merchants. There is no conflict among class members, let alone the type of "fundamental conflict" that must exist to violate Rule 23(a)(4). *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 249 (2d Cir. 2011). Adequacy is satisfied.

## VI.    THE CLASS SATISFIES RULE 23(b)(3) BECAUSE COMMON ISSUES PREDOMINATE

### A.     Legal standards for predominance

A class may be certified under Rule 23(b)(3) where "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). "Predominance" exists if "(1) resolution of any material legal or factual questions can be achieved through generalized proof, and (2) these common issues are more substantial than the issues subject only to individualized proof." *Petrobras*, 862 F.3d at 270 (internal quotation marks and alterations omitted). The predominance requirement does not require plaintiffs to prove that each and every element of a claim is susceptible to common proof, but rather that common questions "*predominate* over any questions affecting only individual class members." *Id.* at 268 (quoting *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 469 (2013)) (alteration omitted). The requirement is "'readily met in certain cases alleging … violations of the antitrust laws.'" *In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d 229, 240 (2d Cir. 2012) (quoting *Amchem Prods.*, 521 U.S. at 625).

Predominance is therefore a "comparative standard" that is "more qualitative than quantitative." *Petrobras*, 862 F.3d at 271 (citation omitted). The inquiry "asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-

common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (citation omitted).

Plaintiffs' burden at class certification is to show the Rule 23 prerequisites are satisfied by a preponderance of the evidence. *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008).

### 1. Common issues distinguished from individual issues

How to distinguish "common" issues from "individual" issues for predominance analysis is explained by the Supreme Court:

> An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing, or the issue is susceptible to generalized, class-wide proof."

*Tyson Foods*, 577 U.S. at 453 (citation, internal quotation marks, and alterations omitted).

### 2. A common question is capable of common proof where the common evidence offered by plaintiffs is admissible and sufficient.

To meet their burden of showing facts necessary for certifying a class under Rule 23(b)(3), the Supreme Court explained in *Tyson Foods* that plaintiffs may use *any* admissible evidence. *See Tyson Foods*, 577 U.S. 454–55 (explaining that the admissibility of evidence at certification must meet all the usual requirements of admissibility and citing to the Federal Rules of Evidence 401, 403, and 702); *see also Olean Wholesale Grocery Coop., Inc., v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 (9th Cir. 2022) (applying *Tyson Foods* and concluding Plaintiffs can satisfy 23(b)(3) with any admissible evidence).

Once plaintiffs identify the types of admissible evidence they intend to introduce at trial to prove material fact questions, the question of whether the plaintiffs' chosen "means to establish" liability is permissible "turns not on the form a proceeding takes—be it a class or individual action—but on the degree to which the evidence is reliable in proving … the elements of the relevant cause of action." *Tyson Foods*, 577 U.S. at 454–55. That is, plaintiffs' common evidence identified at class certification as that which will prove an element of their claim at trial need not "conclusively establish" that element; rather "it is enough that a reasonable juror could

19

rely on the inferences permitted by this evidence to find [the element] by a preponderance standard." *Air Cargo Shipping*, 2014 WL 7882100, at *46.

The inferences permitted from the evidence plaintiffs introduce to establish Rule 23(b)(3) predominance need only be "just and reasonable" and not based on "implausible assumptions." *Tyson Foods*, 577 U.S. at 459 (citation omitted). The Supreme Court summed it up this way in *Tyson Foods* with regard to common evidence under Rule 23(b)(3): "Once a district court finds evidence to be admissible, its persuasiveness is, in general, a matter for the jury." *Id*.

### B.      Common questions of law predominate.

Class certification is sought here for twelve statewide damage classes,[34] with each statewide class having a Credit Card subclass and a Debit Card subclass. *See* Section II, *supra*. Each statewide class has one or more proposed class representatives (*see* table, below). Consequently, the class certification here does not present a question about choice-of-law, or uncertainty over whether questions of law predominate, because this is not a so-called "multistate" class action where a plaintiff that is a resident of one state brings state law claims under the laws of other states on behalf of other states' residents. In such a multi-state class action, "whether a [named] plaintiff can bring a class action under the state laws of multiple states is a question of predominance under Rule 23(b)(3)." *Langan v. Johnson & Johnson Computer Cos., Inc.*, 897 F.3d 88, 96 (2d Cir. 2018). No such question is present here. On the contrary, there is one or more class representative for each statewide class who brings t*hat* state law antitrust and/or consumer protection claim on behalf of *that* state's residents, and on behalf of no one else. Plaintiffs will offer common evidence to establish the elements of each state's antitrust and/or consumer protection statute for each statewide class.

Each state antitrust law and consumer protection law for which claims are asserted requires proof of the same basic elements: violation, causation, damage. *See* Appendix A (setting

---

[34] As of the date of this Motion, no class representative from the states of Montana or West Virginia has stepped forward. Consequently, Plaintiffs do not include the Montana or West Virginia claims on behalf of Montana or West Virginia statewide classes at this time.

forth state law chart). Moreover, each state antitrust statute for which claims are made mirrors federal antitrust laws, contains a federal harmonization provision, and/or has been interpreted in harmony with federal law. *See* Appendix A. Consequently, Plaintiffs will rely on common evidence to establish each element of their claims: (1) Amex's violation of the antitrust laws and consumer protection statutes, (2) the violation's impact on the members of the classes, and (3) aggregate damages. *Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 104–05 (2d Cir. 2007) (identifying violation, impact, and damages as elements of all putative class members' claims) (quoting *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 136 (2d Cir. 2001), *overruled on other grounds by In re Initial Public Offerings Sec. Litig.*, 471 F.3d 24 (2d Cir. 2006)).

The tables below shows the class representatives for each statewide class and subclass (Credit and Debit):

| State | Credit Card Class Proposed Class Representatives | Debit Card Class Proposed Class Representatives |
|---|---|---|
| Alabama | Hannah Joy Kikta | Angela Clark; Allie Stewart |
| D.C. | Sarah Grant | Sarah Grant |
| Hawaii | Jess Dykma | |
| Illinois | Ricky Amaro | Ricky Amaro |
| Kansas | Andrew Amend | Andrew Amend |
| Maine | Abigail Baker | Abigail Baker |
| Mississippi | Emily Clunan Counts; Nanci-Taylor Maddux | Emily Clunan Counts; Nanci-Taylor Maddux; Debbie Tingle; James Steele Robbins |
| North Carolina | Shawn O'Keefe; Britton Lee Rust-Chester | Shawn O'Keefe; Britton Lee Rust-Chester |
| Ohio | Sherie McCaffrey; Marilyn Baker | Sherie McCaffrey; Marilyn Baker |
| Oregon | | David Moskowitz |
| Utah | Wyatt Cooper | Wyatt Cooper |
| Vermont | Ellen Maher | |

**C.   Common evidence of Amex's liability predominates.**

Whether Amex is liable for violating the antitrust laws is the most substantial issue in this case, and resolution of this issue will occur through the presentation of generalized proof and evidence that is common to all class members. *See Meredith Corp. v. SESAC LLC*, 87 F. Supp. 3d 650, 661 (S.D.N.Y. 2015) ("The central issue … is whether [defendants] engaged in anti-

competitive conduct proscribed by § 1 or § 2 of the Sherman Act. Resolution of this issue will not vary among class members.") (internal quotation marks omitted).

Here, the antitrust rule-of-reason standard applies to the vertical, non-price restraint at issue. To establish Amex's liability at trial, Plaintiffs must satisfy the analytical framework for the two-sided credit card transactions market set out by the Supreme Court in *Ohio v. American Express Co*., 138 S.Ct. 2274 (2018). Plaintiffs will therefore prove at trial that Amex's Anti-Steering Rules caused "anticompetitive effects on the two-sided credit-card market as a whole" by persuading the jury "that Amex's antisteering provisions increased the cost of credit-card transactions above a competitive level, reduced the number of credit-card transactions, *or* otherwise stifled competition in the two-sided credit-card market." *Id.* at 2287 (emphasis added).

Plaintiffs proof of liability at trial in this action will focus on how Amex's Anti-Steering Rules "increased the cost of credit-card transactions above a competitive level" or, as the Supreme Court stated another way, how "the [two-sided] price of credit-card transactions was higher than the price one would expect to find in a competitive market." 138 S.Ct. at 2287–88. By doing so, Plaintiffs will satisfy their burden under the first step of the rule of reason. *Id.* at 2284.

To illustrate, Plaintiffs summarize just some of the common evidence of the anticompetitive effects of Amex's Anti-Steering Rules below.

### 1.    Common evidence of the relevant market

The legal issue of the proper antitrust relevant product market is a common question susceptible to classwide proof. Here, Dr. Lamb will offer expert testimony that is common to all class members which relies on economic literature and well-accepted economic analysis to support his opinion that the relevant antitrust market for assessing Amex's alleged anticompetitive conduct is the two-sided GPCC transactions market in the United States. *See* Lamb Rpt. ¶¶ 56–75; 106–37.

### 2.     Common evidence of anticompetitive effects in the relevant market.

Plaintiffs will offer common evidence at trial to prove that Amex's Anti-Steering rules had anticompetitive effects in the relevant market, and thereby prove violation of the state antitrust and consumer protection laws. Specifically, Plaintiffs will use common evidence to prove that Amex's Anti-Steering Rules caused the two-sided price of GPCC transactions to be "above a competitive level." *Ohio v. American Express*, 138 S.Ct. at 2287.

Plaintiffs' common evidence addresses *both* the merchant side and the cardholder side of the two-sided market. It will show that in a competitive market without the Anti-Steering Rules, merchants' cost of accepting GPCC cards would be lower. At the same time, on the cardholder side, GPCC cardholders' rewards levels would stay the same or even rise, and their annual cardholder fees paid would be constant or lower. As a result, the two-sided price of GPCC transactions in the but-for world would have been lower. Necessarily, therefore, the common evidence is sufficient to prove that price of GPCC transactions "was higher than the price one would expect to find in a competitive market." 138 S.Ct. at 2288.

### a)     Merchants' GPCC acceptance costs would be lower but-for the Anti-Steering Rules.

Common evidence shows that Amex's continued imposition of its Anti-Steering Rules has artificially inflated GPCC acceptance costs for all Amex-accepting merchants.

First, common evidence will establish what Amex's Anti-Steering Rules are, what types of steering by merchants they prohibit, and how they are responsible for preventing steering by merchants since 2013. *See* Section IV.A., *supra* (describing some of this common evidence). In addition, Dr. Lamb applies economic theory to opine that merchant steering is effective, and steering (and the threat of it) would have had the effect of lowering merchants' GPCC acceptance costs during the class periods. Lamb Rpt. ¶¶ 77–84; 187–233. Dr. Lamb further analyzes evidence of Discover's abandonment of its low-cost competitor strategy (evidence that is independently admissible at trial) and applies generally-accepted economic principles to assess its effects on competition. He opines that the Anti-Steering Rules continued to thwart low-cost competition from Discover through the class periods. Lamb Rpt. ¶¶ 179–86. Discover's CEO

23

Roger Hochschild testified that Discover realized it was "giving away money" and "leaving money on the table" by offering lower prices to merchants when those merchants lacked the ability to persuade customers to use Discover cards. Lamb Rpt. ¶ 183 & n.471. Dr. Lamb similarly analyzes the effect on competition of preference campaigns, which Amex's Anti-Steering Rules thwarted. Lamb Rpt. ¶¶ 191–99. One example is the "We Prefer Visa" campaign, featuring memorable advertising seen everywhere in the 1990s. Lamb Rpt. ¶¶ 191–199. The campaign was successful at shifting market share away from Amex towards Visa. *Id.* at ¶ 194. Amex debated how to respond—lowering price to merchants, increasing rewards for cardholders—before ultimately deciding to defeat the campaign by bludgeoning participating merchants with Amex's Anti-Steering Rules. Lamb Rpt. ¶¶ 195–97.

In Dr. Lamb's expert analysis, Amex's continued imposition of its Anti-Steering Rules has artificially inflated GPCC acceptance costs for all Amex-accepting merchants during the class periods. *See* Lamb Rpt. ¶¶ 147–269. Based on economic theory and principles, Dr. Lamb opines that in a but-for world without Amex's Anti-Steering Rules, merchants (especially large merchants) would steer customers to less-expensive GPCC cards. According to economic theory, it is economically rational for merchants operating in competitive markets to seek to reduce their costs to remain competitive. Lamb Rpt. ¶ 214. Admissions by Amex are consistent with economic theory. For example, Amex recognizes that without its Anti-Steering Rules, the threat that merchants would engage in differential surcharging was quite real. "Merchants [would] differentially surcharge because it is in their best financial interest to do so,"[35] acknowledging that it "is rational for a merchant to differentially surcharge."[36] Rational, but prohibited by Amex's Anti-Steering Rules, which Amex states function as "surcharging protections" depriving merchants of negotiating leverage to lower their card-acceptance fees. Lamb Rpt. ¶ 211.

Dr. Lamb observes that GPCC acceptance costs constitute a substantial share of costs, as shown by market information that card swipe fees are one of the highest operating costs for most

---

[35] Seaver Decl. Ex. O (AMEX-DOJ-10039910–953) at 911, 926.
[36] Seaver Decl. Ex. P (AMEX-DOJ-10133629–638) at 631.

merchants, after labor costs and sometimes rent. Lamb Rpt. ¶¶ 214–15. The sworn testimony of large merchants from the Amex Trial, such as Crate & Barrel, Home Depot, and Sinclar Oil, are consistent with this finding. Lamb Rpt. ¶ 216 & n.540–42. Other merchants likewise testified in the Amex Trial that controlling costs is crucial for merchants to remain competitive, so they would in fact steer customers to lower-cost payment options. Lamb Rpt. ¶¶ 215–18 (citing testimony of Best Buy, Walgreens, IKEA, Alaska Airlines, Southwest Airlines).[37]

Dr. Lamb opines further based on the economic literature and consistent merchant testimony that economically rational merchants cannot drop Amex acceptance. Along with Amex's ability to raise its prices without any attrition of merchant acceptance and ability to price discriminate, the economic evidence shows that Amex exercises market power in the relevant market. Lamb Rpt. ¶¶ 234–48.

Finally, Dr. Lamb applies economic analysis to the Reserve Bank of Australia's payment market reforms, which capped Visa and Mastercard interchange fees and eliminated rules against steering, including differential surcharging. Lamb Rpt. ¶¶ 254–69. Dr. Lamb observes that when merchants have the economic leverage to steer GPCC transaction volume, lower prices charged to merchants for GPCC acceptance is a direct result. Dr. Lamb observes that, when facing a credible threat of steering in the form of differential surcharging of credit card transactions, Amex behaved as an economically rational firm to quickly negotiate agreements with large merchants whereby the merchants agreed not to differentially surcharge Amex cards in exchange for Amex substantially lowering their merchant discount rate. Lamb Rpt. ¶¶ 256–57, 266.

In sum, common evidence will show that in a competitive market without the Anti-Steering Rules, merchants' cost of accepting GPCC cards would be lower.

---

[37] The former testimony of merchants (as well as other witnesses) from the trial of the Government Action will generally be admissible at the trial of this action pursuant to Rule 804(b)(1) of the Federal Rules of Evidence.

> **b)** **In a world without Amex's Anti-Steering Rules, cardholder rewards levels would not shrink nor would annual fees increase**

Common evidence will also prove that, absent Amex's Anti-Steering Rules, the price competition on the merchant side of the market would in turn result in increased competition on the cardholder side of the market. For cardholders, a world without the Anti-Steering Rules more likely than not would see cardholder rewards levels stay the same or even rise, without any increase to annual cardholder fees. With the price to merchants for credit card acceptance going down, and the cardholder side of the market seeing rewards levels static or even increasing, it necessarily follows that the two-sided GPCC transaction price would be lower in the but-for world.

Dr. Lamb carries out an economic analysis of the cardholder side of the market. *See* Lamb Rpt. ¶¶ 271–91. Dr. Lamb analyzes the likely profit-maximizing response of Amex and the other GPCC card issuers (such as Citibank, JP Morgan, Capital One, Discover, Wells Fargo, etc.) to a world without Amex's Anti-Steering Rules, where merchants are free to use various types of steering to shift transaction volume to lower-cost credit cards. In this regard, Dr. Lamb relies on the economic literature for two-sided payment markets, an analysis of consumers' ease of switching between credit cards, and an analysis of GPCC card issuers response to the onset of the COVID-19 pandemic. Lamb Rpt. ¶¶ 274–78. Based on these facts and other evidence, Dr. Lamb opines that economic theory predicts that the profit-maximizing response on the cardholder side of the market in a world without Amex's Anti-Steering Rules would be, among other things, to preserve the level of rewards connected to transactions as a means to incentivize cardholders to increase their card use, and as a means to attract new cardholders to switch away from competing credit cards. Lamb Rpt. ¶¶ 278–80.

In addition, the evidence described in Section IV.C. is common evidence that is admissible and is sufficient to make the prima facie case that but-for Amex's Anti-Steering Rules, the cardholder side of the market would see increased competition, resulting in rewards levels not shrinking and even rising.

All the evidence of anticompetitive effects bears out the trial testimony of Jack Funda, then the Amex Senior Vice President for Global Merchant Pricing:

> Q. But since the American Express [Anti-Steering Rules] exist today, American Express does not need to either reduce its merchant discount rate or provide these extra rewards, correct?
>
> A. Well, we would be fighting to retain the business by any means necessary, right. So, yes, we may need to increase incentives to consumers. We may need to reduce pricing to merchants. All of that is economically negative to American Express, and all of that we believe is unnecessary because we believe our [Anti-Steering Rules] are there for a good reason.[38]

Mr. Funda's testimony is more common evidence Plaintiffs will introduce at trial to prove that in a but-for world, unrestrained competition would act to lower the two-sided GPCC transaction price.

Evidence common to every class member will show Amex's continued imposition of its Anti-Steering Rules caused two-sided GPCC transaction prices to be inflated above a competitive level.

### D.      Plaintiffs will prove class-wide impact with common evidence.

Injury, or "impact" is "the 'fact of damage' that results from a violation of the antitrust laws." *In re DRAM Antitrust Litig*., No. M 02-1486 PJH, 2006 WL 1530166, at *7 (N.D. Cal. June 5, 2006). Impact exists if class members suffered some injury from the antitrust violation— "inquiry beyond this minimum point goes only to the amount and not the fact of damage." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n.9 (1969).

### 1.      But-for Amex's Anti-Steering Rules, Qualifying Merchants would have reliably passed on cost savings on credit card acceptance to their retail prices.

As set out above, common evidence will be offered at trial to prove that Amex's Anti-Steering Rules have anticompetitive effects. The anticompetitive effect that will be proven is that two-sided GPCC transaction prices were above a competitive level. On the merchant side, the

---

[38] Seaver Decl. Ex. Q (2014 Amex Trial Tr.) at 2754:1–2755:6.

Anti-Steering Rules caused all merchants to be charged higher credit card acceptance costs than they would have been charged in a but-for world.

Here the proof of common impact becomes focused. As the class definition indicates, Plaintiffs do not seek to prove that *all* merchants passed through inflated GPCC acceptance costs to *all* consumers' retail purchases. Rather, Plaintiffs will prove with common evidence that the retail prices paid by class members for their purchases from 38 large merchants (the Qualifying Merchants) using their credit cards (non-Amex) and debit cards were artificially inflated because of Amex's Anti-Steering Rules, and that absent Amex's Anti-Steering Rules, Qualifying Merchants would have passed on at least some portion of their cost savings to their customers.

The proof of pass-on consists of the expert economic analysis of Dr. Lamb, which relies on bedrock economic theory and principles, financial data, economic literature, and is supported by testimony and statements of many of the Qualifying Merchants.

> ### 2. Accepted economic theory predicts pass through of Qualifying Merchants' credit card acceptance costs to retail prices

Dr. Lamb concludes that Qualifying Merchants could not and cannot avoid passing through some portion of their artificially inflated credit card acceptance costs to customers in the form of higher retail prices. Dr. Lamb's common impact conclusions are based on well accepted economic theories of pass on. *See* Lamb Rpt. ¶¶ 294–301.

Dr. Lamb explains how the retailer segment of the economy in which the Qualifying Merchants reside is highly competitive, and yet "product differentiation can be expected at the retail level (for example, due to branding or quality) such that products sold by different retailers are not perfect substitutes for one another. Although no one firm or set of firms has complete control over price, each retail firm would have some control over price." Lamb Rpt. ¶ 298. Dr. Lamb describes how, in a competitive sector like retail, economic theory dictates that a high percentage of a monopoly overcharge will typically be passed on to the consumer, notwithstanding the fact that retailer merchants might engage in different types of strategic

pricing behavior, because market pressures tend to result in prices approximating their marginal costs. Lamb Rpt. ¶ 299.

Merchants must recover their costs to stay in business. Dr. Lamb finds that the Qualifying Merchants set price close to their costs, and closely track and incorporate changes in their total costs (including credit card acceptance costs). When setting prices on the products they sell, they pass on at least a portion of their artificially-inflated credit card acceptance costs. Lamb Rpt. ¶¶ 305–07 and notes cited therein (citing evidence by Qualifying Merchants Best Buy, IKEA, �it, Home Depot, Lowes and Ulta Beauty as well as other merchants). Moreover, Dr. Lamb observes that credit card acceptance costs are among the highest costs of doing business for the Qualifying Merchants, typically surpassed only by labor costs or rent. The Qualifying Merchants cannot help but account for the costs and fold them into retail prices. *Id.*

### 3. The Qualifying Merchants are low-margin retailers which makes it highly likely they pass on a high percentage of credit card acceptance costs.

Dr. Lamb determines that the 38 Qualifying Merchants operate in highly competitive, low-margin retail subsectors. The Industry Classification Benchmark places the 38 Qualifying Merchants in various highly competitive retail subsectors, such as apparel retailer, food retailer and wholesaler, drugstore retailer, diversified retailer, and more. Lamb Rpt. ¶ 313. Economic principles dictate that such merchants are much more likely to pass on an increase in costs, for the simple fact that they cannot absorb increases in cost. Lamb Rpt. ¶¶ 309–18.

Dr. Lamb uses standard sources of financial data to collect and analyze the actual net profit margins of the Qualifying Merchants for the various class periods. Lamb Rpt. ¶ 317. Analsysis shows that their median net profit margins ranged between 0.02 percent and 8.69 percent. Only four of the 38 had net profit margins above 6.99 percent (Home Depot, Ross Stores, TJX, and Ulta Beauty), while 24 of 38 had net profit margins under 3.86 percent. It bears emphasis, then, that in 2019 the all-in merchant discount rates estimated by Amex ranged from ▮▮▮▮▮▮▮▮▮▮▮▮ *See* Section IV.B., *infra*. For the 24 of 38 Qualifying

Merchants with margins below 3.86 percent, absorbing credit card fees and not passing on any portion of them is out of the question, and for the others it is highly unlikely.

### 4. Sworn testimony by some of the Qualifying Merchants that they pass on credit card fees is evidence that they all do.

Sworn testimony and statements from more than one-third of the Qualifying Merchants show they pass on changes in operating costs to retail prices. Dr. Lamb observes this evidence is consistent economic theory and his opinion. *See* Lamb Rpt. ¶¶ 321–24 and notes cited therein (collecting Qualifying Merchants testimony and statements regarding pass on).

Some examples of sworn testimony:

Diedre O'Malley of **Best Buy**, which had median net profit margin of 3.12 percent from 2015–2021, testified at her pretrial deposition that the competitiveness of the retail sector means it is "Econ 101" that a retailer in Best Buy's position will pass on to its customers any savings in the event credit card acceptance costs were to go down:

> Q. If you were able to lower the cost of accepting credit cards, would you pass some of those savings on to customers? […]
>
> THE WITNESS: Yes.
>
> Q. What's your basis for saying that? […]
>
> THE WITNESS: Again, the retail community is—there's nothing more competitive. So kind of by Econ 101 default, that's—that's what happens. In addition, we've publicly stated things such as low price guarantee. We have price matching for products so you just—you cannot escape passing everything on to the consumer in our business.[39]

Regarding a potential preference campaign partnership with Mastercard that would lower its overall credit acceptance costs, Ms. O'Malley testified at the 2014 Amex Trial:

> Q. If you are able to save money on the cost of acceptance, for example, what would you do with those savings?
>
> A. Get passed on to the consumer.[40]

When asked at the 2014 Amex Trial what **Home Depot** would do with its savings if it could reduce its costs of accepting general purpose card, Dwaine Kimmet testified that Home

---

[39] Seaver Decl. Ex. R (2012 O'Malley Deposition) at 58:19–59:10.

[40] Seaver Decl. Ex. S (2014 Amex Trial Tr.) at 1543:10–1544:6.

Depot has "a long standing practice [where,] for any cost reduction we get, we pass along, generally about 60 percent of that to customers, typically in the form of a price decrease, to help drive volume to our stores."[41] It is noteworthy that Home Depot from 2015–2021 has had the second-highest median net profit margin of all 38 Qualifying Merchants, at 8.55 percent.

Michael Ross of **Meijer** testified in a related litigation:



.[42]

Testimony like the examples above is sufficient proof of pass on at the class certification stage. Indeed, one district court recently decided that indirect purchasers in an antitrust class action involving price-fixed broiler chickens "easily met" their burden to show common proof of pass on because they offered deposition testimony of direct purchasers "that they always pass on costs." *See In re Broiler Chicken Antitrust Litig.*, No. 16 C 8637, 2022 WL 1720468, at *18 (N.D. Ill. May 27, 2022).

Moreover, much of the sworn testimony of Qualifying Merchants that is already in hand will be admissible when offered at trial as former testimony under Rule 804(b)(1) of the Federal Rules of Evidence, and so can be published to the jury. It can furthermore be admitted as

---

[41] Seaver Decl. Ex. T (2014 Amex Trial Tr.) at 1278:1–7. Mr. Kimmet added: "It is our fundamental philosophy, if we take price down, we will garner more business and we have actually effectively done that over the years. As a matter of fact, we have now gotten to a point, where we have publicly communicated that we have capped our gross margin so that we send additional savings now all to the top line. Which means we take down costs. We take down prices to customers." *Id.* at 1278:8–14.

[42] Seaver Decl. Ex. U (Michael Ross (Meijer) Dep. Tr.) at 39:9–20.

evidence of "an organization's routine practice" under Fed. R. Evid. 406 to prove that on those "particular occasion[s]" of class members' purchase transactions at that Qualifying Merchant, the Qualifying Merchant "acted in accordance with the … routine practice" of passing on overcharges to customers.

Indeed, evidence of one Qualifying Merchant's routine practice of passing through overcharges operates as representative evidence, where actions by the organization at other times is used to prove how it most likely acted during the event in question. Here, the Qualifying Merchants are similarly situated by virtue of occupying the highly competitive retail sector and operating with low profit margins. Because they are similarly situated, evidence that one or more Qualifying Merchants routinely and automatically pass on overcharges to class members permits a reasonable inference by the jury that *all* the Qualifying Merchants did likewise. *See Tyson Foods*, 577 U.S. at 458–59 (finding that where employees were "similarly situated" the "experiences of a subset of employees can be probative as to the experiences of all of them"); *Restasis*, 335 F.R.D. at 25 (explaining that "the Second Circuit has accepted the use of representative evidence … to prove classwide injury"); *see also Petrobras*, 862 F.3d at 272 (indicating plaintiffs cold have satisfied the predominance requirement if they had "suggest[ed] a form of representative proof that would answer the question of domesticity for individual class members").

### 5.    The Australia experience is common evidence of pass-on.

The Reserve Bank of Australia ("RBA") was commissioned by the Australian government to study payments in Australia and carry out necessary reforms, and to report data and analyses on the reforms' implementation. Lamb Rpt. ¶¶ 326–28. The regulations permitted differential surcharging on credit card transactions (effective January 2003) and the interchange rates charged on Visa and Mastercard credit card transactions were capped at 55 basis points

32

(effective October 2003), and later 50 basis points (effective November 2006). Lamb Rpt. ¶ 326.[43]

Amex responded to these new RBA reforms by executing a strategy in which it secured agreements with merchants in which merchants agreed not to differentially surcharge Amex credit cards in exchange for reduced merchant discount fees, which allowed merchants to lower their overall credit card acceptance costs. Dr. Lamb analyzed several studies and analyses conducted by the RBA, which show that merchants generally passed at least some portion of the cost savings they achieved in the form of reduced credit card acceptance costs onto customers in the form of lower retail prices. The RBA concluded in 2008:

> Despite the difficulties of measurement, the Board's judgement remains that the bulk of these savings have been, or will eventually be, passed through into savings to consumers. This judgement is consistent with standard economic analysis which suggests that, ultimately, changes in business costs are reflected in the prices that businesses charge.[44]

The RBA's conclusions and its public report are not only properly relied on by a professional economist such as Dr. Lamb, the report is likely admissible at trial and publishable to the jury under Fed. R. Evid. 803(8), for the truth of the matters asserted, as a public record of matters observed under a duty to report.

The nature of the common proof of pass on of overcharges from Qualifying Merchants to class members outlined above, and more fully set forth in Dr. Lamb's report, means that it is highly unlikely that any class member escaped injury. Stated another way, it is highly doubtful that any class member escaped paying even one penny of a passed-on overcharge that was baked-in to the retail price they paid at Qualifying Merchants for even just one credit or debit card transaction, which is all that is required.

> It is important to remember … that the plaintiffs do not have to show that each class member suffered an overcharge on each and every purchase they made.

---

[43] As part of this government regulation in Australia, Amex agreed as part of an "Undertaking" with the RBA that it would not enforce anti-steering rules that barred differential surcharging. Lamb Rpt. ¶ 326 n.805.

[44] Seaver Decl. Ex. V (2008 RBA Study), at 23.

Rather, it is enough if they provide sufficient evidence to demonstrate that substantially all class members were overcharged at least once. Thus, even if many class members were able to avoid an overcharge on some, or even many, transactions … they are still victims of the alleged [antitrust violation] and proper class members if they paid a supra-competitive price on a single transaction.

*Air Cargo Shipping*, 2014 WL 7882100, *45; *see also In re Namenda Indirect Purchaser Antitrust Litig.*, 338 F.R.D. 527, 562, 563 (S.D.N.Y. 2021) (holding that where class members each engaged in countless transactions "any one [class member] would have suffered an antitrust injury as long as it provided reimbursement for just one overcharged transaction").

Here, Plaintiffs show they will offer admissible, common evidence of class-wide injury, including evidence of pass-on. The evidence is capable of proving that the Qualifying Merchants pass-on inflated credit card acceptance costs to all or virtually all of the class members. Consequently, under Rule 23(b)(3): "[o]nce a district court finds evidence to be admissible, its persuasiveness is, in general, a matter for the jury." *Tyson Foods*, 577 U.S. at 459.

### E.   Plaintiffs will establish aggregate damages through common evidence.

At the class certification stage, Plaintiffs must only show that "damages are capable of measurement on a classwide basis." *Comcast v. Behrend*, 569 U.S. 27, 34 (2013). With regard to the measure of damages, "[c]alculations need not be exact." *Id* at 35. Once the fact of injury is established, courts apply a relaxed standard under which damage must be based on a "just and reasonable inference, although the result be only approximate." *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931). "[T]he … burden of proving antitrust damages is not as rigorous as in other types of cases." *New York v. Julius Nasso Concrete Corp.*, 202 F.3d 82, 88 (2d Cir. 2000).

Dr. Lamb provides a well-established, generally-accepted methodology that is capable of measuring class-wide damages and, when the time comes, individual damages for each class member. The methodology proceeds in three steps. First, Dr. Lamb determines the difference in the credit card acceptance costs (merchant discount fees) that Qualifying Merchants incurred in the actual world with those they would have incurred in the but-for world. Dr. Lamb considered two alternative benchmarks. A benchmark is a commonly-accepted methodology for estimating

damages. *See* Phillip E. Areeda et al., Antitrust Law, ¶359b3 (3d ed. 2007) (observing that a benchmark method "is especially useful" where prices in the same market cannot be analyzed "before and after" the challenged restraint). A before-and-after look is impossible here because Amex has had some form of anti-steering rules for over fifty years.

Dr. Lamb considered a benchmark using the Australia experience with the RBA reforms to the Australian credit card market, and considered another using Discover's low-cost provider strategy in the U.S. credit card market. Dr. Lamb selected the Discover benchmark. Lamb Rpt. ¶¶ 350–52.

Dr. Lamb uses his training in economics to analyze Discover's strategy of abandoning its low-cost provider strategy in 2000 and increasing its prices over time to closely match those of Visa and MasterCard. Lamb Rpt. ¶¶ 354–59. Dr. Lamb determines that the extent to which Discover raised its merchant discount rates following its decision that its low-cost provider strategy could not succeed due to Amex's Anti-Steering Rules (and, at the time, those of Visa and Mastercard as well) represent a reasonable proxy for the extent to which, beginning in January 2013 (following the 2011 Consent Decree and 2013 Settlement), Amex's continued imposition and enforcement of its Anti-Steering Rules caused merchant discount rates to be artificially inflated. Lamb Rpt. ¶ 357. Dr. Lamb concludes that an observed ███████ ██████ over time in Discover's effective merchant discount rate represents a reasonable proxy that could be used as a benchmark in his damages methodology to estimate of the overcharge to the Qualifying Merchants (Lamb Rpt. ¶¶ 358–59), which he confirms with cross-checks (Lamb Rpt. ¶¶ 360–64).

Dr. Lamb next describes how he will estimate the rate of pass-through of the estimated overcharge into retail prices paid by the class members that would have occurred in the but-for world. For this estimate, Dr. Lamb describe the nature and sources of the information and data he will use, including ████████████████████████████████████████ ████████████████████████████████████████. Dr. Lamb then describes how

he will apply the estimated overcharge derived from the Discover benchmark to the appropriate data sets. Lamb Rpt. ¶¶ 365–80.

Finally, Dr. Lamb consults relevant and reliable economic literature to arrive at an estimated rate of pass-on of the overcharge, i.e., an estimate of what portion of the overcharge is passed on. In particular Dr. Lamb relies on a recent research paper from the Federal Reserve Bank of Kansas City, in which economists from the Federal Reserve Bank of Boston, Federal Reserve Bank of Kansas City, and Bank of Canada study the credit card market in the U.S. and Canada for the purpose, in part, of estimating the pass through rate of credit card acceptance fees in order to measure the distributional effects of those fees across income cohorts of consumers. The Federal Reserve economists consider numerous empirical studies of pass-through and based in part on those empirical studies, they utilize a pass through rate of 90 percent to measure the effect of merchant discount fees on retail prices. Lamb Rpt. ¶¶ 367–69.

Dr. Lamb concurs with the Federal Reserve Bank economists' study, which in his professional opinion provides a reasonable estimate of the rate at which Qualifying Merchants would have passed through this GPCC cost savings per dollar of sales they would have realized during the Class Periods absent Amex's Anti-Steering Rules. *Id.*

In calculating the difference between the but-for world two-sided credit and debit card prices paid by class members and those in the actual world, Dr. Lamb resolves to keep the but-for world rewards level constant with the actual world. This is conservative in that it undercounts damages. Lamb Rpt. ¶¶ 370–71. Dr. Lamb makes other appropriate adjustments to account for the exclusion of Amex card transactions and pharmaceutical drug purchases. Lamb Rpt. ¶ 374. Dr. Lamb refers to the passed-on overcharge as the "Retail Overcharge." Lamb Rpt. ¶¶ 372–75.

The last step in the damages methodology is to apply the Retail Overcharge to the summary transaction volume data for the various class periods and split up by relevant state. Lamb Rpt. ¶¶ 373–80.

### F.      Resolving this dispute as a class action is superior to any alternative.

Class certification is far superior to any alternative method for adjudicating this dispute. *See* Fed. R. Civ. P. 23(b)(3). First, the Supreme Court has recognized that a "core" purpose of class actions is "to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action." *Amchem Prods*., 521 U.S. at 617. That purpose is plainly served for a case of this complexity, where prosecuting these claims requires millions of dollars. Second, no class members have brought independent litigation, so superiority is not lessened by that circumstance. Third, as compared to the hypothetical alternative of individual actions, class-wide litigation of common issues promotes judicial efficiency. *Dial Corp. v. News Corp*., 314 F.R.D. 108, 121 (S.D.N.Y. 2015), *amended on other grounds*, No. 13-cv-6802, 2016 WL 690895 (S.D.N.Y. 2016). Fourth, no inherent difficulties undermine the maintenance of this action as a class action.

## VII.    THE COURT SHOULD APPOINT BERMAN TABACCO, GORDON BALL, LLC, AND PLAINTIFFS' EXECUTIVE COMMITTEE AS CLASS COUNSEL

Plaintiffs request the appointment of Berman Tabacco, Gordon Ball LLC, and the other firms of the Executive Committee—Lovell Stewart Halebian Jacobsen LLP; Miller Law LLC; Stamell & Schager, LLP; Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A.; Saltz, Mongeluzzi & Bendesky, P.C.; Wagstaff & Cartmell, LLP; and Kahn Swick & Foti, LLC—as class counsel.

On June 18, 2020, Magistrate Gold appointed these firms to serve as Plaintiffs' Executive Committee of interim class counsel and appointed Berman Tabacco and Gordon Ball, LLC as Co-Chairs of Plaintiffs' Executive Committee of interim class counsel. DE 55. The Motion for Appointment of Interim Class Counsel was unopposed. DE 50. Plaintiffs ask the Court to make the same appointments on a non-interim basis.

Rule 23(g)(1)(A) identifies four factors used to determine class counsel: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel

will commit to representing the class." *Air Cargo Shipping*, 2014 WL 7882100, at *66 (quoting Rule 23(g)). In appointing interim class counsel, Magistrate Gold "considered all of the enumerated factors." DE 55, at 2.

Each Rule 23(g) factor continues to favor appointment of interim class counsel as class counsel. As Magistrate Gold found, "Berman Tabacco and Gordon Ball, LLC, as Co-Chairs and the members of Plaintiffs' Executive Committee, have extensive experience in litigating antitrust class actions, other complex litigation, and the claims of the type asserted in this action and have demonstrated sufficient knowledge of the applicable law." DE 55, at 2. The supporting declarations submitted with the motion to appoint interim class counsel demonstrate that the firms serving as interim class counsel are qualified to serve as class counsel. DE 50-2 through 50-11.

Interim class counsel have worked vigorously investigating and prosecuting this case on behalf of the putative class members. Counsel successfully defeated, in significant part, Amex's Rule 12(b)(1) and 12(b)(6) motions to dismiss the case and Rule 12(c) motion for judgment on the pleadings. DE 43, 63, 66.

Party discovery through four separate sets of document requests yielded a massive amount of documentary evidence in excess of five terabytes of data consisting of approximately 2.15 million document files. Seaver Decl. ¶¶ 3–4. Plaintiffs served Amex with two sets of interrogatories and three sets of requests for admission. *Id*. ¶¶ 5–6. Plaintiffs took the Rule 30(b)(6) deposition of Amex, deposing three separate designee witnesses during three days of testimony. *Id*. ¶ 7. As Magistrate Bulsara described, "Plaintiffs have been moving with diligence to obtain" third-party discovery. Order dated May 20, 2022. Plaintiffs served over 60 subpoenas seeking documents and testimony from third parties, including payment-card networks, card-issuing banks, merchants, and acquiring banks. Seaver Decl. ¶¶ 9, 12–14. Discovery yielded documents, testimony, admissions, and interrogatory answers that will form the basis of the Class' case-in-chief at trial.

Interim class counsel have committed substantial resources to this case to date to litigate this matter. Seaver Decl. ¶ 16. Counsel have sufficient resources to commit to continue to effectively represent the class.

The Court should appoint, as class counsel under Rule 23(g), Berman Tabacco and Gordon Ball, LLC, as Co-Chairs of Plaintiffs' Executive Committee and appoint Lovell Stewart Halebian Jacobsen LLP; Miller Law LLC; Stamell & Schager, LLP; Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A.; Saltz, Mongeluzzi & Bendesky, P.C.; Wagstaff & Cartmell, LLP; Kahn Swick & Foti, LLC, Berman Tabacco; and Gordon Ball, LLC as Plaintiffs' Executive Committee.

## VIII.   CONCLUSION

For the reasons set forth herein, the Court should grant the motion.

Dated: September 30, 2022

**BERMAN TABACCO**

By:  */s/ Todd A. Seaver*
       Todd A. Seaver

Joseph J. Tabacco, Jr. (JT1994)
Carl N. Hammarskjold
Colleen L. Cleary
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
Email: jtabacco@bermantabacco.com
      tseaver@bermantabacco.com
      chammarskjold@bermantabacco.com
      ccleary@bermantabacco.com

Justin N. Saif
**BERMAN TABACCO**
One Liberty Square
Boston, MA 02109
Telephone: (617) 542-8300
Facsimile: (617) 542-1194
Email: jsaif@bermantabacco.com

*Co-Chairs of Plaintiffs' Executive Committee*

Gordon Ball
Jonathan T. Ball
**GORDON BALL LLC**
7001 Old Kent Dr.
Knoxville, TN 37919
Telephone: (865) 525-7028
Facsimile: (865) 525-4679
Email: gball@gordonball.com

*Co-Chairs of Plaintiffs' Executive Committee*

Jay B. Shapiro
Samuel O. Patmore
**STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.**
150 West Flagler Street, Suite 2200
Miami, FL 33130
Telephone: (305) 789-3200
Facsimile: (305) 789-3395
Email: jshapiro@stearnsweaver.com
spatmore@stearnsweaver.com

Christopher Lovell
Gary S. Jacobson
**LOVELL STEWART HALEBIAN JACOBSON LLP**
61 Broadway, Suite 501
New York, NY 10006
Telephone: (212) 608-1900
Facsimile: (212) 719-4775
Email: clovell@lshllp.com
gsjacobson@lshllp.com

Marvin A. Miller
Andrew Szot
**MILLER LAW LLC**
115 S. LaSalle Street, Suite 2910
Chicago, IL 60603
Telephone: (312) 332-3400
Facsimile: (312) 676-2676
Email: mmiller@millerlawllc.com
aszot@millerlawllc.com
Jared B. Stamell
Richard J. Schager, Jr.
Andrew Goldenberg
**STAMELL & SCHAGER, LLP**
260 Madison Ave., 16/F
New York, NY 10016-2410
Telephone: (212) 566-4057
Facsimile: (212) 566-4061
Email: stamell@ssnylaw.com
schager@ssnylaw.com
goldenberg@ssnylaw.com

40

Simon Paris
**SALTZ MONGELUZZI & BENDESKY**
One Liberty Place, 52nd Floor
1650 Market Street
Philadelphia, PA 19103
Telephone: (215) 496-8282
Facsimile: (215) 496-0999
Email: sparis@smbb.com

Eric. D. Barton
**WAGSTAFF & CARTMELL LLP**
4740 Grand Avenue Suite 300
Kansas City MO 64112
Telephone: (816) 701-1167
Facsimile: (816) 531-2372
Email: ebarton@wcllp.com

Lewis S. Kahn
Melinda A. Nicholson
**KAHN SWICK & FOTI, LLC**
1100 Poydras Street, Suite 3200
New Orleans, Louisiana 70163
Telephone: (504) 455-1400
Facsimile: (504) 455-1498
Email: lewis.kahn@ksfcounsel.com
melinda.nicholson@ksfcounsel.com

*Plaintiffs' Executive Committee*

Robert G. Methvin (*pro hac vice* forthcoming)
James M. Terrell (*pro hac vice* forthcoming)
Brooke B. Rebarchak (*pro hac vice* forthcoming)
**METHVIN TERRELL YANCEY STEPHENS & MILLER, P.C.**
2201 Arlington Avenue South
Birmingham, AL 35205
Telephone: (205) 939-0199
Facsimile: (205) 939-0399
Email: rgm@mtattorneys.com
jterrell@mtattorneys.com
brebarchak@mtattorneys.com

Michael R. Williams (*pro hac vice* forthcoming)
Thomas H. Bienert, Jr. (*pro hac vice* forthcoming)
**BIENERT KATZMAN LITTRELL WILLIAMS LLP**
903 Calle Amanecer, Suite 350
San Clemente, CA 92673
Telephone: (949) 369-3700

Facsimile: (949) 369-3701
Email: mwilliams@bklwlaw.com
tbienert@bklwlaw.com

Daniel R. Karon (*pro hac vice* forthcoming)
Beau D. Hollowell (*pro hac vice* forthcoming)
**KARON LLC**
700 W. St. Clair Ave, Suite 200
Cleveland, OH 44113
Telephone: (216) 622-1851
Facsimile: (216) 241-8175
Email: dkaron@karonllc.com
bhollowell@karonllc.com

Jon Cuneo (*pro hac vice* forthcoming)
Daniel Cohen (admitted *pro hac vice*)
**CUNEO GILBERT & LADUCA, LLP**
4725 Wisconsin Ave, NW, Suite 200
Washington, D.C., 20016
Telephone: (202) 789-3960
Facsimile: (202) 789-1813
Email: jonc@cuneolaw.com
danielc@cuneolaw.com

*Additional Plaintiffs' Counsel*

# Appendix A

*Elements*—Each state antitrust law and consumer protection law for which claims are asserted requires proof of the same basic elements: violation, causation, damage.

*Harmony*—Each state antitrust statute for which claims are made mirrors federal antitrust laws, contains a federal harmonization provision, and/or has been interpreted in harmony with federal law.

| Statute | Elements | Harmony |
|---|---|---|
| **Alabama** | | |
| ALA. CODE § 8-10-3.<br><br>Making it illegal for any person or corporation to restrain or attempt to restrain, the freedom of trade or production, or to monopolize, or attempt to monopolize. | *Southtrust Corp. v. Plus Sys.*, Inc., 913 F. Supp. 1517, 1525 (N.D. Ala. 1995).<br><br>"Section 8–10–3 provides in part that persons or corporations which restrain the freedom of trade or production, or attempt to destroy competition shall be liable." | *City of Tuscaloosa v. Harcros Chems.*, 158 F.3d 548, 555 n.8 (11th Cir. 1998).<br><br>Federal antitrust law "prescribes the terms of unlawful monopolies and restraints of trade" under Alabama law. |
| **District of Columbia** | | |
| D.C. CODE § 28-4502.<br><br>"Every contract, combination in the form of a trust or otherwise, or conspiracy in restraint of trade or commerce all or any part of which is within the District of Columbia is declared to be illegal." | *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 335 F.R.D. 1, 14, n. 8 (E.D.N.Y. 2020).[1]<br><br>To establish a claim under the antitrust laws of D.C. and other states, a plaintiff must prove (1) a violation of antitrust law; (2) injury and causation; and (3) damages. | D.C. CODE § 28-4515.<br><br>"[I]n construing this chapter, a court of competent jurisdiction may use as a guide interpretations given by federal courts to comparable antitrust statutes." |

---

[1] The plaintiffs in *Restasis* sought certification of state law claims, including under D.C.'s, Hawaii's, Kansa's, Maine's, Mississippi's, North Carolina's, Oregon's and Utah's antitrust laws.

| Statute | Elements | Harmony |
|---|---|---|
| **Hawaii** | | |
| HAW. REV. STAT. § 480-1, *et seq.*<br><br>Prohibiting restraints on trade and monopolization. | *Davis v. Four Seasons Hotel Ltd.*, 122 Haw. 423, 435 (2010).<br><br>To prevail, plaintiffs must prove: "(1) a violation of HRS chapter 480; (2) which causes an injury to the plaintiff's business or property; and (3) proof of the amount of damages." | HAW. REV. STAT. § 480-3.<br><br>Hawaii antitrust statute must be "construed in accordance with judicial interpretations of similar federal antitrust statutes, except that lawsuits by indirect purchasers may be brought as provided by this chapter." |
| HAW. REV. STAT. § 480-2.<br><br>Declaring unlawful, pursuant to Hawaii's Unfair and Deceptive Acts or Trade Practices ("UDAP") law, that unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. | *Aquilina v. Certain Underwriters at Lloyd's*, 465 F. Supp. 3d 1088, 1099 (D. Haw. 2020).<br><br>Consumers must show that defendants violated HRS § 480-2(a) prohibiting "unfair or deceptive acts or practices in the conduct of any trade or commerce" and Plaintiffs suffered injury resulting in damages. | n/a |

2

| Statute | Elements | Harmony |
|---|---|---|
| **Illinois** | | |
| 815 ILL. COMP. STAT. ANN. § 505/1, *et seq.*<br><br>Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") declares unlawful any unfair methods of competition and unfair or deceptive acts or practices. | *Siegal v. GEICO Cas. Co.*, 523 F. Supp. 3d 1032, 1041 (N.D. Ill. 2021), *motion to certify appeal denied*, No. 1:20-CV-04306, 2021 WL 2413155 (N.D. Ill. June 14, 2021).<br><br>"[A] plaintiff must plead and prove that the defendant committed a deceptive or unfair act with the intent that others rely on the deception, that the act occurred in the course of trade or commerce, and that it caused actual damages." | n/a |
| **Kansas** | | |
| KAN. STAT. ANN. § 50-101, *et seq.*<br><br>Kansas Restraint of Trade Act prohibits practices and trusts that prevent full and free competition. | *Restasis*, 335 F.R.D. at 14, n. 8.<br><br>To establish a claim under the antitrust laws of Kansas and other states, a plaintiff must prove (1) a violation of antitrust law; (2) injury and causation; and (3) damages. | KAN. STAT. ANN. § 50-163(b).<br><br>The Kansas Restraint of Trade Act shall be construed in harmony with ruling judicial interpretations of federal antitrust law by the United States supreme court. |
| **Maine** | | |
| ME. REV. STAT. ANN. TIT. 10, § 1101, *et seq.*<br><br>Maine's "monopolies and profiteering" (or antitrust) law. | *Restasis*, 335 F.R.D. at 14, n. 8.<br><br>To establish a claim under the antitrust laws of Maine and other states, a plaintiff must prove (1) a violation of antitrust law; (2) injury and causation; and (3) damages. | *Davric Maine Corp. v. Rancourt*, 216 F.3d 143, 149 (1st Cir. 2000)(internal citations and quotations omitted).<br><br>The Maine antitrust statutes "parallel the Sherman Act" and are analyzed pursuant to federal antitrust doctrine. |

3

| Statute | Elements | Harmony |
|---|---|---|
| **Mississippi** | | |
| MISS. CODE ANN. § 75-21-1, *et seq.*<br><br>Prohibits trusts and combines in restraint or hinderance of trade, with the aim that trusts and combines may be suppressed, and the benefits arising from competition in business are preserved to Mississippians. | *Restasis*, 335 F.R.D. at 14, n. 8.<br><br>To establish a claim under the antitrust laws of Mississippi and other states, a plaintiff must prove (1) a violation of antitrust law; (2) injury and causation; and (3) damages. | *Walker v. U-Haul Co. of Mississippi*, 734 F.2d 1068, 1071 n.5 (5th Cir.), *on reh'g*, 747 F.2d 1011 (5th Cir. 1984).<br><br>Treating state and federal antitrust claims as analytically identical. |
| **North Carolina** | | |
| N.C. GEN. STAT. §§ 75-1, *et seq.*<br><br>Prohibits monopolies, trusts, and restraints of trade. | *Restasis*, 335 F.R.D. at 14, n. 8.<br><br>To establish a claim under the antitrust laws of North Carolina and other states, a plaintiff must prove (1) a violation of antitrust law; (2) injury and causation; and (3) damages. | *Hyde v. Abbott Lab'ys, Inc.*, 123 N.C. App. 572, 578 (1996).<br><br>"Federal case law interpretations of the federal antitrust laws are persuasive authority in construing our own antitrust statutes." |
| **Ohio** | | |
| OHIO REV. CODE §§ 1345.01, *et seq.*<br><br>The Ohio Consumer Sales Practices Act (OCSPA) prohibits an unfair or deceptive act or practice in connection with a consumer transaction. | *Gerboc v. ContextLogic, Inc.*, 867 F.3d 675 (6th Cir. 2017).<br><br>To establish an OCSPA violation, the consumer must allege and prove that the consumer suffered actual damages proximately caused by the defendant's deceptive practice. | n/a |

4

| Statute | Elements | Harmony |
|---|---|---|
| **Oregon** | | |
| OR. REV. STAT. §§ 646.705, *et seq.*<br><br>Encourages free and open competition in the interest of the general welfare and economy of the state, by preventing monopolistic and unfair practices, combination, and conspiracies in restraint of trade and commerce. | *Restasis*, 335 F.R.D. at 14, n. 8.<br><br>To establish a claim under the antitrust laws of Oregon and other states, a plaintiff must prove (1) a violation of antitrust law; (2) injury and causation; and (3) damages. | OR. REV. STAT. § 646.715(2).<br><br>Declares legislative intent that federal court decisions interpreting federal antitrust law "shall be persuasive authority." |
| **Utah** | | |
| UTAH CODE ANN. §§ 76-10-3101, *et seq.*<br><br>The Utah Antitrust Act aims to encourage free and open competition in the interest of the general welfare and economy of this state by prohibiting monopolistic and unfair trade practices, combinations, and conspiracies in restraint of trade or commerce. | *Restasis*, 335 F.R.D. at 14, n. 8.<br><br>To establish a claim under the antitrust laws of Utah and other states, a plaintiff must prove (1) a violation of antitrust law; (2) injury and causation; and (3) damages. | UTAH CODE ANN. § 76-10-3118.<br><br>Declares legislative intent that "the courts, in construing this act, will be guided by interpretations given by the federal courts to comparable federal antitrust statutes and by other state courts to comparable state antitrust statutes." |
| **Vermont** | | |
| VT. STAT. ANN. TIT. 9, §§ 2453, *et seq.*<br><br>Vermont's antitrust law prohibits unfair methods of competition in commerce. | *Wright v. Honeywell Int'l, Inc.*, 2009 VT 123, ¶ 17.<br><br>A plaintiff presenting an antitrust claim must prove (1) a violation of the antitrust laws, (2) an injury or impact suffered as a result of that violation, and (3) an estimated measure of damages. | VT. STAT. ANN. TIT. 9, § 2453a.<br><br>Regarding collusion, the courts of Vermont shall be guided by the construction of federal antitrust law and the Sherman Act, as amended, as interpreted by the courts of the United States. |