# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

**HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER**

| | |
|---|---|
| ANTHONY OLIVER, TERRY GAYLE QUINTON, SHAWN O'KEEFE, ANDREW AMEND, SUSAN BURDETTE, GIANNA VALDES, DAVID MOSKOWITZ, ZACHARY DRAPER, NATE THAYER, MICHAEL THOMAS REID, ALLIE STEWART, ANGELA CLARK, JOSEPH REALDINE, RICKY AMARO, ABIGAIL BAKER, JAMES ROBBINS IV, EMILY COUNTS, DEBBIE TINGLE, NANCI-TAYLOR MADDUX, SHERIE MCCAFFREY, MARILYN BAKER, WYATT COOPER, ELLEN MAHER, SARAH GRANT and GARY ACCORD on behalf of themselves and all others similarly situated, ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 1:19-cv-00566 (NGG)(SJB) |
| Plaintiffs, ) ) ) | |
| v. ) ) | |
| AMERICAN EXPRESS COMPANY and AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, INC., ) ) ) ) | |
| Defendants. ) ) | |

**EXPERT REPORT**

**Dr. Russell L. Lamb**
**President**
Monument Economics Group, LLC
1000 Wilson Boulevard
Suite 2650
Arlington, VA 22209

September 30, 2022

# PUBLIC REDACTED VERSION

# TABLE OF CONTENTS

I.    Introduction and Summary of Conclusions ..................................................1

   A.    Expert Background and Qualifications.................................................1

   B.    Summary of Plaintiffs' Allegations .....................................................2

   C.    Assignment ........................................................................................4

   D.    Materials Reviewed ............................................................................5

   E.    Summary of Conclusions....................................................................5

II.   Industry Background ...................................................................................7

   A.    Payment Systems ................................................................................8

      i.    General Purpose Credit and Charge Cards ......................................9

      ii.   Debit Cards ...................................................................................12

      iii.  Other Forms of Payment................................................................16

      iv.  Emerging Technologies .................................................................17

   B.    General Purpose Credit and Charge Card Payment Networks .........22

      i.    The Amex Payment Network .........................................................24

      ii.   The Visa and Mastercard Payment Networks.................................26

      iii.  The Discover Payment Network .....................................................35

   C.    Payment Card Markets are Two-Sided Markets................................38

      i.    Definition of Two-Sided Markets...................................................38

      ii.   Payment Card Networks as a Two-Sided Market...........................40

      iii.  Cardholder Rewards ......................................................................42

III.  Amex's Anti-Steering Rules.......................................................................49

      i.    Steering is Commonly Used by Merchants to Control Costs ..........49

      ii.   Overview of Amex's Anti-Steering Rules......................................53

      iii.  The Durbin Amendment ................................................................56

      iv.  Visa and Mastercard's 2011 Consent Decree and 2013 Merchant Plaintiff

          Settlement ......................................................................................58

      v.    The "American Express Problem"...................................................61

IV.   The GPCC Transaction Market in the United States Constitutes a Relevant Antitrust

Market........................................................................................................67

A. Common Evidence Consistent with the Finding that the GPCC Transactions Market is a Relevant Antitrust Product Market...................................................67

i. Debit Card Transactions Do Not Discipline Pricing of GPCC Transactions, and Thus are Not an Economic Substitute for GPCC Transactions.........................69

a. Durbin Amendment Practical Indicia ...............................................................75

b. GPCC Payment Networks Consider Pricing of Accepting Other GPCCs Rather than Accepting Debit Card When Setting Prices...............................................78

c. Amex and other GPCC Payment Networks Acknowledge that Debit Card Transactions are not Economic Substitutes for GPCC Transactions.................79

ii. Emerging Technologies Are Not Economic Substitutes for GPCC Transactions 82

B. The Relevant Antitrust Geographic Market is the United States .......................86

V. Common Evidence Demonstrates that Amex's Continued Imposition and Enforcement of its Anti-Steering Rules Have Caused Anticompetitive Effects ..............86

A. Common Evidence Demonstrates that Amex's Continued Imposition and Enforcement of its Anti-Steering Rules Caused Amex-Accepting Merchants (Including Qualified Merchants) to Incur Higher Overall GPCC Acceptance Costs than they Otherwise Would Have............................................................87

i. Amex's Anti-Steering Rules Excessively Tilt the GPCC Transaction Price Structure Toward Merchants ...............................................................................88

ii. Amex's Continued Imposition and Enforcement of its Anti-Steering Rules Artificially Inflated the Price Levels for GPCC Transactions...........................90

iii. Amex Exercised Market Power in the Market for GPCC Transactions in the United States During the Class Period.................................................................92

a. Amex Merchant Discount Fees Are Not Determined by Cost .........................93

b. Amex's Market Power in the Market for GPCC Transactions Allowed it to Routinely Impose Profitable Price Increases to Merchants...............................95

c. Amex's Successful Price Discrimination .......................................................102

iv. Common Evidence Demonstrates how Amex Used its Anti-Steering Rules to Forestall Competition on the Merchant Side of the Market for GPCC

Transactions, Resulting in Artificially-Inflated Merchant Discount Fees Paid by Merchants..........................................................................................................105

a. Common Evidence Demonstrates that Amex's Continued Imposition and Enforcement of its Anti-Steering Rules Forestalled Greater Price-Based Competition from Discover during the Class Periods ......................................107

b. Common Evidence Demonstrates that Amex Successfully Used its Anti-Steering Rules to Prevent Merchants from Lowering their Overall GPCC Acceptance Costs via Preferencing Agreements and Other Forms of Steering113

• Common Evidence Demonstrates that Amex Understood the Benefits of Steering that are Prohibited by its Own Anti-Steering Rules .................115

• Common Evidence Demonstrates that Amex Successfully Used its Anti-Steering Rules to Thwart Merchant Participation in "We Prefer Visa" and Other Visa Preference Campaigns ...........................................................116

• Common Evidence Demonstrates that Amex Successfully Used its Anti-Steering Rules to Thwart Merchant Participation in Mastercard Preference Campaigns ............................................................................................121

• Common Evidence Also Demonstrates that Amex Successfully Used its Anti-Steering Rules to Prevent Amex-Accepting Merchants from Posting the Relative GPCC Acceptance Costs they Incur from Each GPCC Payment Network ..................................................................................125

• Common Evidence Also Demonstrates that Amex's Anti-Steering Rule Successfully Prevented Amex-Accepting Merchants from Credibly Threatening to Differentially Surcharge GPCC Transactions.................128

v. Absent Amex's Continued Imposition and Enforcement of its Anti-Steering Rules, Amex-Accepting Merchants would have Utilized Pro-Competitive Steering Methods to Lower their Overall GPCC Acceptance Costs ...............129

a. Absent Amex's Anti-Steering Rules, it would be Economically Rational for Merchants to Steer their Customers to Less-Expensive GPCCs ......................130

b. Amex-Accepting Merchants Acknowledged that Amex's Continued Imposition and Enforcement of its Anti-Steering Rules Prevented them from Utilizing Pro-Competitive Steering Methods to Lower their Overall GPCC Acceptance Costs 132

    vi.  Common Evidence Demonstrates that Amex's Anti-Steering Rules caused Visa, Mastercard, and Discover Merchant Discount Fees to be Higher than they would have Been Absent Amex's Anti-Steering Rules...............................................140

    vii. Most Amex-Accepting Merchants Cannot Practically Drop Amex GPCC Acceptance to Avoid Effects of Amex's Anti-Steering Rules ..........................143

    viii. Discover is Unlikely to have Blocked Pro-Competitive Steering Strategies by Merchants During the Class Periods Absent Amex's Anti-Steering Rules......152

    ix.  Amex's Pricing Strategy in Australia Following Reserve Bank of Australia Reforms...........................................................................................................156

    x.   Amex Viewed its Experience in Australia as a Benchmark for How to Manage the Threat of Differential Surcharging in the U.S. ...........................................160

  B.   Common Evidence Demonstrates that Amex's Continued Imposition and Enforcement of its Anti-Steering Rules was Anticompetitive in that it Caused Higher Net Two-Sided Prices on GPCC Transactions than Otherwise would have Occurred ...................................................................................................165

    i.   Raising Annual Fees Net of Rewards in a World Absent Amex's Anti-Steering Rules Would be Contrary to the Economic Self-Interests of GPCC Issuers....167

    ii.  Acknowledgments from Amex Further Demonstrate that GPCC Cardholders Would Not Have Paid Higher Annual Fees Net of Rewards in a World Absent Amex's Anti-Steering Rules...........................................................................178

VI.  Common Evidence Demonstrates that All or Nearly All Members of the Credit Card Class and Debit Card Class were Injured by Amex's Continued Imposition and Enforcement of its Anti-Steering Rules..........................................................................183

  A.   All or Nearly All Members of the Credit Card Class were Injured by Amex's Continued Imposition and Enforcement of its Anti-Steering Rules.................185

    i.   Economic Theory is Consistent with the Conclusion that at Least Some Portion of the Artificially-Inflated GPCC Acceptance Costs Borne by Qualified Merchants would have been Passed Through to their Customers in the Form of Higher Retail Prices........................................................................................185

ii. Common Evidence Demonstrates that Qualified Merchants Routinely Track and Incorporate Changes in Total Costs (including Total GPCC Acceptance Costs) When Setting the Prices of the Products they Sell............................................189

iii. Qualified Merchants Operated in Competitive Industries and Earned Low Net Profit Margins During the Class Periods ..........................................................194

a. Common Evidence Demonstrates that the Qualified Merchants Operated in Highly Competitive Industries..........................................................................194

b. Qualified Merchants Earned Low Net Profit Margins During the Class Periods 198

iv. Common Evidence Demonstrates that Qualified Merchants Passed On At Least Some Portion of the Artificially-Inflated Costs of GPCC Acceptance that Resulted from Amex's Continued Imposition and Enforcement of its Anti-Steering Rules in the Form of Higher Retail Prices..........................................201

v. Studies and Analyses Conducted by the RBA Found that the GPCC Acceptance Cost Savings that Resulted from its Payment System Reforms in Australia were Passed on to Customers in the Form of Lower Retail Prices............................206

vi. Common Evidence Demonstrates that All or Nearly All Members of the Credit Card Class Paid Higher Net GPCC Cardholder Prices than they Otherwise would have ......................................................................................................208

B. Common Evidence Demonstrates that Amex's Continued Imposition and Enforcement of its Anti-Steering Rules Resulted in Additional Adverse Effects Borne by Consumers.............................................................................................209

C. All or Nearly All Members of the Debit Card Class were Injured by Amex's Continued Imposition and Enforcement of its Anti-Steering Rules................214

VII. Summary of Class-Wide Damages Methodology (Credit Card Class) ..................219

A. Estimation of Merchant Discount Overcharges during Class Periods..............220

B. Estimation of Pass-Through ............................................................................231

C. Estimation of Damages Suffered by Members of the Credit Card Class .........236

VIII. Summary of Class-Wide Damages Methodology (Debit Card Class) ...................239

IX. Conclusions.............................................................................................................243

## I.  Introduction and Summary of Conclusions

### A.  *Expert Background and Qualifications*

1.       I am the President and co-founder of Monument Economics Group ("Monument"), an economic consulting firm based in Arlington, VA. Monument provides economic research and quantitative and statistical analyses to clients in the United States, Canada, and elsewhere internationally. I have studied the economics of markets and prices and have consulted on these issues for over 30 years. I have previously been asked to opine on a variety of economic issues, including the existence of monopolization or cartel behavior in various markets, damages arising from anti-competitive conduct, and class-wide impact arising from alleged price-fixing and anticompetitive conduct as well as class-wide injury arising from allegations of consumer fraud or breach of warranty. A copy of my curriculum vitae, including a list of the matters in which I have submitted expert testimony in the past four years, is attached to this report as Appendix A.

2.       I graduated from the University of Tennessee, Knoxville in 1987 (*summa cum laude*, Phi Beta Kappa) as the top graduate in my class in the College of Arts and Sciences. I earned a Master's degree in economics from the University of Maryland in 1989. I received the Doctor of Philosophy degree in economics from the University of Pennsylvania in 1994. My economic research has been published in peer-reviewed journals such as the *Journal of Econometrics*, *Journal of Development Economics*, *CATO Journal*, *Regulation*, and others. I have also served as a referee for leading economics journals, including the *International Economic Review*, *Journal of Business and Economic Statistics*, *Journal of Labor Economics*, *American Journal of Agricultural Economics*, and *Contemporary Economic Policy*.

3.       Prior to co-founding Monument, I held a variety of positions in government, academia, and other consulting firms. From 1994 until 1999, I was an Economist (later Senior Economist) with the Federal Reserve System of the United States in Washington, DC and Kansas City, Missouri. From 1999 until 2004, I taught economics and agricultural economics at North Carolina State University in Raleigh, North Carolina. I have also been hired as an economic consultant to the World Bank and the Government

of Peru, in addition to being retained on a wide range of economic consulting projects in a variety of contexts. Courts in the United States and Canada have accepted my economic analyses of the market as evidence in litigation involving allegations of anticompetitive conduct in a number of cases including, for example, *In re: Domestic Drywall Antitrust Litigation, Fond Du Lac Bumper Exchange Inc., et al. v. Jui Li Enterprise Company Ltd. et al., In re: Puerto Rican Cabotage Antitrust Litigation, In re: Aftermarket Auto Lighting Products Antitrust Litigation, In re: Titanium Dioxide Antitrust Litigation, Eugene Allan, et al.* In addition to my consulting activities, I most recently have taught economics at the University of Tennessee, Knoxville, where I am an adjunct faculty member in the Department of Economics in the Haslam College of Business. Monument is being compensated for my work in this matter at my hourly rate of $850 per hour. Monument's compensation in this matter is not contingent upon the content of my testimony or the outcome of this litigation.

### B. *Summary of Plaintiffs' Allegations*

4.      I understand that an Amended Class Action Complaint was filed on July 30, 2021 by Plaintiffs against American Express Company and American Express Travel Related Services Company, Inc. (collectively "Amex" or "Defendant").[1] I understand from Counsel for the Plaintiffs that Plaintiffs' allegations in this matter involve Amex's continued imposition and enforcement of Non-Discrimination Provisions (Amex's "Anti-Steering Rules") in its merchant agreements, which unreasonably restrain trade in the two-sided market for general purpose credit and charge card transactions ("GPCC Transactions"). I understand from Counsel for the Plaintiffs that Plaintiffs allege that during the applicable Class Periods (defined below), Amex's continued imposition and enforcement of its Anti-Steering Rules during the Class Periods i) increased two-sided GPCC Transaction prices to supra-competitive levels; and ii) artificially inflated consumer retail prices on goods and services purchased throughout the country by all consumers, including all or nearly all members of the Credit Card Class (defined below). I also understand from Counsel for the Plaintiffs that Plaintiffs allege that Amex's

---

[1] United States District Court Eastern District of New York, *Anthony Oliver, et al., Plaintiffs, v. American Express Company and American Express Travel Related Services Company, Inc., Defendants,* Amended Class Action Complaint, No. 1:19-cv-00566-NGG-SJB, July 30, 2021 at p. 1.

2

continued imposition and enforcement of its Anti-Steering Rules during the Class Periods artificially inflated consumer retail prices on goods and services purchased throughout the country by all or nearly all members of the Debit Card Class (defined below).

5.    I understand from Counsel for the Plaintiffs that, following various Court rulings in this matter, Plaintiffs' action seeks damages under applicable state antitrust and consumer protection laws on behalf of two classes[2] statewide for each of thirteen states and the District of Columbia:[3]

### Credit Card Class

All card account holders, who are natural persons, and whose account billing address was in [State] during the applicable Class Period,[4] and whose Visa, Mastercard, or Discover General Purpose Credit or Charge Card[5] account was used by an account holder or an authorized user for a purchase of a good or service from a Qualifying Merchant[6] during the Class Period that occurred in [same State] (hereafter "Qualified GPCC Purchases").

### Debit Card Class

---

[2] I understand from Counsel for the Plaintiffs that excluded from the classes are those who are Amex credit or charge card (including Amex co-branded cards) account holders or authorized users, or who were during the applicable Class Periods. I also understand from Counsel for the Plaintiffs that excluded from the classes are purchases of prescription drugs or other medical services from a pharmacy for which the purchaser only paid a flat copay per their insurance plan. I also understand from Counsel for the Plaintiffs that excluded from the classes are Defendants, their parent companies, subsidiaries, agents and affiliates, all governmental entities, and any judges or justices assigned to hear any aspect of this action.

[3] Throughout the remainder of this Expert Report I use the term "Relevant States" to collectively refer to the thirteen states (and District of Columbia) at issue in this matter: Alabama, District of Columbia, Hawaii, Kansas, Maine, Mississippi, North Carolina, Oregon, Utah, Vermont, West Virginia, Illinois, Montana, and Ohio. See Letter from Carl Hammarskjold to Peter T. Barbur, dated February 15, 2022 (hereafter "February 2022 Hammarskjold Letter").

[4] A summary of the applicable Class Periods for each Relevant State is included as Appendix C to this Expert Report.

[5] I understand from Counsel for the Plaintiffs that, for the purposes of their allegations, General Purpose Credit or Charge Card (or "GPCC") means an electronic payment card, for use on the Visa, Mastercard, or Discover network, that permits a consumer to make purchases without accessing or reserving the consumer's funds at the time of the purchase, and that permits the consumer to pay for the purchases at some time after the purchase is made. GPCC Cards include co-branded cards and affinity cards but do not include cards that can be used at only one merchant (such as a department store card).

[6] A summary of the Qualifying Merchants, which includes, without limitation, their retail stores, brands, or banners, is included as Appendix D to this Expert Report.

3

All card account holders, who are natural persons, and whose account address was in [State] during the applicable Class Period, and whose Visa or Mastercard Debit Card[7] account was used by an account holder or an authorized user, for a purchase of a good or service from a Qualifying Merchant during the Class Period that occurred in [same State] (hereafter "Qualified Debit Card Purchases").

### C. Assignment

6.     I have been asked by Counsel for Plaintiffs to give opinion testimony on the following topics:

> a. Whether economic analysis and evidence establishes that the relevant antitrust market for assessing Amex's alleged anticompetitive conduct is the GPCC Transactions market in the United States;
>
> b. Whether economic analysis and evidence establishes that Amex's continued imposition and enforcement of its Anti-Steering Rules resulted in substantial anticompetitive effects in the market for GPCC Transactions;
>
> c. Whether economic analyses and evidence common to the Credit Card Class as a whole, rather than specific to individual members, establishes that Amex's continued imposition and enforcement of its Anti-Steering Rules caused injury to all or nearly all Credit Card Class members;
>
> d. Whether economic analyses and evidence common to the Debit Card Class as a whole, rather than specific to individual members, establishes that Amex's continued imposition and enforcement of its

---

[7] I understand from Counsel for the Plaintiffs that, for the purposes of their allegations, Debit Card means an electronic payment card that a consumer can use to make purchases from a merchant for which no credit is extended and the consumer must have sufficient funds in a demand deposit account, or pre-loaded on the card, to pay for the purchase at the time of the transaction.

Anti-Steering Rules caused injury to all or nearly all Debit Card Class members;

e. Whether economic analyses and evidence establishes that a standard and reliable economic methodology exists that would allow me to estimate of the aggregate amount of overcharge damages suffered by members of the Credit Card Class as a result of Amex's continued imposition and enforcement of its Anti-Steering Rules on a class-wide basis without resorting to individualized inquiry; and

f. Whether economic analyses and evidence establishes that a standard and reliable economic methodology exists that would allow me to estimate of the aggregate amount of overcharge damages suffered by members of the Debit Card Class as a result of Amex's continued imposition and enforcement of its Anti-Steering Rules on a class-wide basis without resorting to individualized inquiry.

I discuss these topics below.

### *D. Materials Reviewed*

7. In performing my analyses, I have undertaken economic research and analysis based on publicly available documents, as well as materials produced as part of this litigation, in order to understand the GPCC Transactions market in the United States, as well as the various fees and rewards associated with these transactions. I have also reviewed documents produced by the parties in this matter, trade press, and academic literature. A complete list of the materials I have relied upon in forming my opinions is contained in Appendix B.

### *E. Summary of Conclusions*

8. Based on my analyses and research into the market for GPCC Transactions in the United States, as well as my training and experience in economics, I have reached the following conclusions:

5

a.  Common evidence I have reviewed demonstrates that the market for GPCC Transactions in the United States constitutes the relevant antitrust market.

b.  Common evidence I have reviewed demonstrates that Amex's continued imposition and enforcement of its Anti-Steering Rules caused Amex-accepting merchants to incur higher overall GPCC acceptance costs during the Class Periods than they otherwise would have. Further, common evidence demonstrates that GPCC issuers would not have reduced cardholder rewards earned by GPCC cardholders or increased annual fees charged to GPCC cardholders in a world where Amex was unable to impose or enforce its Anti-Steering Rules. Thus, taken together, this common evidence demonstrates that Amex's continued imposition and enforcement of its Anti-Steering Rules during the Class Periods was anticompetitive, as it forestalled competition, resulting in higher net two-sided prices during the Class Periods than otherwise would have prevailed.

c.  Common evidence I have reviewed demonstrates that Qualified Merchants passed on at least some portion of the artificially-inflated GPCC acceptance costs that resulted from Amex's continued imposition and enforcement of its Anti-Steering Rules in the form of higher retail prices during the Class Periods, and that absent Amex's Anti-Steering Rules, Qualified Merchants would have passed on at least some portion of their cost savings to their customers.

d.  Common evidence I have reviewed demonstrates that all consumers, not just those paying with GPCCs, paid the artificially-inflated retail prices charged by Qualified Merchants during the Class Periods that resulted from Amex's continued imposition and enforcement of its Anti-Steering Rules.

e.  Common evidence I have reviewed demonstrates that Amex's continued imposition and enforcement of its Anti-Steering Rules

6

> during the Class Periods caused all or nearly all members of the Credit
> Card Class to suffer antitrust injury in that they paid higher Net GPCC
> Cardholder Prices (defined below) than they otherwise would have.

f.   Common evidence I have reviewed demonstrates that Amex's
continued imposition and enforcement of its Anti-Steering Rules
during the Class Periods caused all or nearly all members of the Debit
Card Class to suffer antitrust injury in that they paid higher Net Debit
Cardholder Prices (defined below) than they otherwise would have.

g.   A standard and reliable economic methodology exists that would allow
me to estimate of the aggregate amount of overcharge damages
suffered by members of the Credit Card Class and Debit Card Class as
a result of Amex's continued imposition and enforcement of its Anti-
Steering Rules on a class-wide basis without resorting to
individualized inquiry.

## II.   Industry Background

9.   According to one academic journal article, the "purpose of a payment system is to
transfer money, or a legal claim to money, from buyers to sellers. All else equal, the
efficiency and competitiveness of a payment system increases with the speed and
accuracy with which money moves from buyer to seller and declines as the costs and fees
associated with payments increase."[8]  The five core payment systems in the United States
include: cash, check, card systems, Automated Clearing House (ACH), and wire
transfers.[9]  Overall, personal consumption expenditures for goods and services in the
United States in 2020 amounted to almost $11 trillion.[10]  The majority of those purchases

---

[8] Alan S. Frankel and Allan L. Shampine, "The Economic Effects of Interchange Fees," *Antitrust Law Journal*, Vol. 73, No. 3, 2006, 627–673 (hereafter "Frankel and Shampine") at p. 627.

[9] Carol Coye Benson, Scott Loftesness, and Russ Jones, *Payments Systems in the U.S.: A Guide for the Payments Professional*. Third Edition, San Francisco, CA: Glenbrook Partners LLC, 2017 (hereafter "Benson et al.") at pp. 7-8. Wire transfers make up a small percentage of total transactions but the majority of the transaction volume due to the "high-value financial market transactions that use wire transfers." See Benson et al. at pp. 7-8.

[10] The Nilson Report, No. 1210, December 2021 (hereafter "Nilson Report, Issue #1210") at p. 5. See, also, U.S. Bureau of Economic Analysis, *National Data: National Income and Product Accounts*, 2022 at Tables 2.4.5, 6.11D., and 7.12. Personal Consumption Expenditures totaled $14.048 trillion, however 23.7

were made using payment cards such as credit and debit cards.[11] I discuss the card system segment of the payment systems in the U.S. in greater detail below.

## *A. Payment Systems*

10. In the U.S. there are three primary types of payment cards: credit cards, charge cards, and debit cards.[12] Credit cards allow cardholders to make purchases using a revolving, unsecured line of credit, with the "option of paying the balance off in full at the end of the billing period, or 'revolving' and paying the balance over a period of time based upon terms set by the card issuer."[13] Charge cards largely function like credit cards, except the "cardholder pays in full, at the end of the billing period, for all charges incurred during that month."[14] Contrary to credit and charge cards, debit cards allow consumers to make purchases by allowing merchants to access funds in the cardholder's checking account.[15]

11. The usage of payment cards in the U.S. has increased since the beginning of the Class Periods. Total purchase volume in 2015 was $2,832.41 billion (59.2 percent of card purchases) for credit cards and $1,953.79 billion (40.8 percent of card purchases) for debit cards and in 2021 and was $4,564.39 billion (53.9 percent of card purchases) for credit cards and $3,896.67 billion (46.1 percent of card purchases) for debit cards.[16]

---

percent of those expenditures are considered nonpurchases (i.e., employer contributions for food, lodging, and health insurance to employees; financial services furnished without payment; rental value of nonresidential fixed assets owned and used by nonprofit institutions serving households; etc.).

[11] In terms of 2020 purchase volume, Nilson reports that 34.13 percent of those purchases (or $3.66 trillion) were credit card payments, 34.86 percent (or $3.73 trillion) were debit card payments, 13.51 percent (or $1.45 trillion) were preauthorized or remote electronic payments, 13.32 percent (or $1.43 trillion) were cash or check payments, 0.47 percent (or $50.07 billion) were money orders, official checks, or travelers cheques, and 3.73 percent (or $0.40 trillion) were prepaid cards or SNAP EBT payments. See Nilson Report, Issue #1210 at p. 6.

[12] Benson et al. at pp. 72-73.

[13] Benson et al. at p. 72.

[14] Benson et al. at p. 72.

[15] Federal Trade Commission, "Credit, Debit, and Charge Cards," August 2012; See Benson et al. at pp. 72-73, 96. Prepaid cards are a special type of debit cards, which are tied to accounts that are pre-funded by the cardholder (or by the purchaser of a card that has been gifted to the cardholder). See Benson et al. at pp. 73, 102.

[16] The Nilson Report, No. 1080, February 2016 (hereafter "Nilson Report, Issue #1080") at p. 8 and The Nilson Report, No. 1213, December 2022 (hereafter "Nilson Report, Issue #1213") at p. 5. Debit card purchase volume includes prepaid cards.

Table 1 below summarizes the purchase volume, purchase transactions, and number of cards in circulation in 2021 in the U.S.

## Table 1
## Summary of Payment Card Purchasing Volume, Transactions, and Cards in Circulation (2021)

| Brand | Purchase Vol. (billions) | Transactions (billions) | Cards in Circulation (millions) |
|---|---|---|---|
| **Credit** | | | |
| Visa | $ 2,405.40 | 27.59 | 368.0 |
| Mastercard | $ 1,084.64 | 11.86 | 274.0 |
| Amex | $ 892.23 | 6.16 | 56.4 |
| Discover | $ 182.13 | 3.26 | 61.0 |
| Subtotal | $ 4,564.39 | 48.87 | 759.4 |
| **Debit & Prepaid** | | | |
| Visa | $ 2,805.21 | 57.49 | 793.0 |
| Mastercard | $ 1,091.46 | 23.21 | 299.0 |
| Subtotal | $ 3,896.67 | 80.71 | 1,092.0 |
| **Total** | **$ 8,461.06** | **129.57** | **1,851.4** |

Source: Nilson Report, Issue #1213.

### i. General Purpose Credit and Charge Cards

12. General purpose credit and charge cards (GPCCs) are payment cards that can be used at any business that accepts that particular brand of card.[17] Credit cards allow cardholders to make purchases and extend loans, with interest, on any unpaid balance when not paid on time or in full.[18] Charge cards function similarly to credit cards, but the balance must be paid in full each period because card issuers do not extend loans on these products.[19]

---

[17] For the purposes of this Expert Report, private label cards, which are payment cards issued by merchants that can only be used at that merchant, are not GPCCs.

[18] Benson et al. at p. 93.

[19] Benson et al. at p. 93. According to a July 2021 article regarding the differences between credit and charge cards, "[c]harge cards are quickly becoming a relic," adding that "American Express was the last major issuer of charge cards in the U.S., but even those cards now allow you to pay for certain purchases (but not all) over time." See Gregory Karp, "Difference Between Credit Cards and Charge Cards," Nerdwallet, July 19, 2021. Further, one personal finance website explains that "[c]harge cards in the past

9

13.    GPCCs come in a variety of forms, including: standard, premium, affinity, co-branded, and corporate card programs.[20]  Standard GPCCs are intended for consumers who meet the issuer's minimum credit requirements, but may not qualify for riskier cards for the issuers, such as premium cards.[21]  Premium credit cards have higher credit limits and generally are marketed to consumers with higher income and credit worthiness.[22]  Affinity GPCCs reflect a partnering between the GPCC issuer and an unaffiliated group, such as a nonprofit organization.[23]  Co-branded GPCCs reflect a partnering between the card issuer and a for-profit unaffiliated group, such as a chain of retail merchants.[24]  Corporate GPCCs are issued to business employers, and the GPCCs are then issued to their employees as authorized users.[25]

14.    According to the Bureau of Consumer Financial Protection, the credit card market "continued to grow in almost all measures" during the last few years prior to 2020, where "[t]he COVID-19 pandemic significantly impacted how many consumers used and interacted with credit cards."[26]  Even with the pandemic's setback on financial markets, including the credit card market, "credit cards continued to play a vital role as both a payment method and source of credit."[27]

---

came with no interest because they required cardholders to pay off their balances in full each month. However, several charge cards now come with an interest-based pay-over-time feature, which makes them function much like conventional credit cards." See Rajiv Baniwal, "Best Charge Cards & Cards with No Preset Spending Limits," Moneygeek, August 24, 2022 (hereafter "Moneygeek"). This personal finance website further notes that "American Express dominates this sphere because not many credit card issuers provide charge cards now." See Moneygeek. Thus, given that the issuance of credit cards has dominated the market for GPCC Transactions in recent years, industry analysts often refer to "credit cards" as including both credit and charge cards. See, for example, Benson et al. at pp. 91-96. Therefore, in discussing the GPCC industry background in the sections that follow, I adopt the same terminology as the underlying market research being cited, which either includes both general purpose credit and charge cards, or otherwise provides a reasonable proxy for the market for GPCC Transactions.

[20] Federal Deposit Insurance Corporation, "Credit Cards–General Overview," *Risk Management Examination Manual of Credit Card Activities*, March 2007 (hereafter "FDIC Credit Card Manual Overview") at pp. 11-13.
[21] FDIC Credit Card Manual Overview at p. 12.
[22] FDIC Credit Card Manual Overview at p. 12.
[23] FDIC Credit Card Manual Overview at p. 12.
[24] FDIC Credit Card Manual Overview at p. 12.
[25] FDIC Credit Card Manual Overview at p. 13; Benson et al. at p. 94.
[26] Bureau of Consumer Financial Protection, "The Consumer Credit Card Market," September 2021 (hereafter "2021 CFPB Report") at p. 5.
[27] 2021 CFPB Report at p. 5.

10

15.     In 2021, Amex had the third largest share of the GPCC market in terms of purchase volume and transactions, but the fewest number of cards in circulation among the GPCC payment networks, in the U.S.[28] In 2021, purchase volumes (and purchase volume shares) in the U.S. for Visa, Mastercard, Amex, and Discover were $2,405.40 billion (52.7 percent), $1,084.64 billion (23.8 percent), $892.23 billion (19.5 percent), and $182.13 billion (4.0 percent), respectively.[29] Similarly, the number of purchase transactions (and purchase transaction share) in the U.S. for Visa, Mastercard, Amex, and Discover were 27.59 billion (56.5 percent), 11.86 billion (24.3 percent), 6.16 billion (12.6 percent), and 3.26 billion (6.7 percent), respectively.[30] Lastly, the share of credit cards in circulation (and credit cards in circulation share) in the U.S. for Visa, Mastercard, Amex, and Discover were 368 million (48.5 percent), 274 million (36.1 percent), 56.4 million (7.4 percent), and 61 million (8.0 percent), respectively.[31] Figure 1 below summarizes the percent of purchase volume, purchase transactions, and cards in circulation attributed to each GPCC payment network in 2021 in the U.S.

**Figure 1**
**Share of Credit Purchase Volume, Purchase Transactions, and Cards in Circulation (2021)**



Source: Nilson Report, Issue #1213.

---

[28] Nilson Report, Issue #1213 at p. 5.
[29] Nilson Report, Issue #1213 at p. 5.
[30] Nilson Report, Issue #1213 at p. 5.
[31] Nilson Report, Issue #1213 at p. 5.

16.    As of 2021, the top 10 credit card issuers accounted for $3,801.33 billion in purchases volume (or 83.28 percent of the total credit card purchase volume) in the U.S.[32] The top ten credit card issuers by purchase volume in the U.S. (in order): Chase, Amex, Citi, Capital One, Bank of America, Discover, U.S. Bank, Wells Fargo, Barclays, and Synchrony.[33] Table 2 below summarizes the top ten credit card issuers in terms of purchase volume, purchase transactions, and cards in circulation as of 2021, in the U.S.

## Table 2
## Top 10 Credit Card Issuers by Purchase Volume

| Rank | Issuer | | Purchase Vol. (billions) | Transactions (billions) | Cards (millions) |
|---|---|---|---|---|---|
| 1 | Chase | $ | 950.47 | 11.26 | 149.3 |
| 2 | Amex[1] | $ | 867.59 | 5.83 | 48.4 |
| 3 | Citi[2] | $ | 482.60 | 4.73 | 78.7 |
| 4 | Capital One | $ | 454.96 | 5.19 | 106.9 |
| 5 | Bank of America[2] | $ | 413.97 | 4.55 | 55.4 |
| 6 | Discover[1] | $ | 182.13 | 3.26 | 61.0 |
| 7 | U.S. Bank[2] | $ | 165.71 | 1.50 | 22.4 |
| 8 | Wells Fargo[2] | $ | 138.59 | 1.40 | 23.6 |
| 9 | Barclays[2] | $ | 79.54 | 0.84 | 11.5 |
| 10 | Synchrony | $ | 65.77 | 0.87 | 28.9 |
| | **Top 10 Subtotal** | **$** | **3,801.33** | **39.43** | **586.1** |
| | **Total** | **$** | **4,564.39** | **48.87** | **759.4** |

Source: Nilson Report, Issues #1213 and #1214.

Note: Includes all credit cards, including consumer, small business, purchasing, corporate, and fleet cards. Excludes private label cards.

[1] Excludes cards issued by third parties.

[2] Includes the Amex cards it issues (does not apply for Bank of America and Barclays cards).

ii.    **Debit Cards**

---

[32] The Nilson Report, No. 1214, February 2022 (hereafter "Nilson Report, Issue #1214") at pp. 5-6. As I discuss in greater detail below, a credit card issuer "solicits new consumers, receives and underwrites applications to acquire new customers, furnishes each customer with a card, authorizes and clears card transactions, and provides ongoing statements to cardholders, collections, and customer service." See Benson et al. at p. 76.

[33] Nilson Report, Issue #1214 at p. 6.

17.     Another type of payment system in the U.S. is debit cards, which differ from GPCCs in that each card is tied to a checking account.[34] Additionally, the funds for each transaction are debited from the checking account connected to the debit card "either on the day of, or the day after, the transaction."[35] In contrast to GPCCs, individuals do not make a "buying decision to acquire a debit card."[36] Rather, banks issue a debit card automatically upon opening a checking account and the debit card corresponds to that account.[37] The debit card, which also serves as an ATM card, is a "feature of a checking account," individuals may consider when deciding to open a checking account.[38] Although debit cards do not typically earn substantial (if any) rewards for cardholders,[39] they are still a widely used payment product for individuals wanting to "spend the money they have in their bank account […] [t]hey can withdraw cash from their account […]; they can write a check on the account, or they can use their debit card. The debit card, for many people, wins on convenience and ease of use."[40] Similar to a credit card transaction, debit card transactions earn revenue for banks through interchange fees.[41]

18.     According to Nilson, nearly all debit cards in the U.S. are issued under the Visa or Mastercard brand.[42] In 2021, the share of debit card purchase volume in the U.S. for Visa and Mastercard was $2,805.21 billion (72 percent share) and $1,091.46 billion (28 percent share), respectively, while the share of debit card purchase transactions in the U.S. for Visa and Mastercard was 57.49 billion (71.2 percent share) and 23.21 billion (28.8 percent share), respectively.[43] Similarly, the number of debit cards in circulation in the U.S. for Visa and Mastercard was 793 million (72.6 percent share) and 299 million (27.4 percent share), respectively.[44] Table 3 below summarizes the breakdown of debit

---

[34] Benson et al. at pp.72-73.

[35] Benson et al. at pp.72-73.

[36] Benson et al. at p. 98.

[37] Benson et al. at p. 98; Rebecca Lake, "What Is A Checking Account And How Does It Work?" Forbes Advisor, May 26, 2022 (hereafter "Lake").

[38] Other features one may consider when choosing a checking account include type of financial institution (e.g., brick-and-mortar bank, online bank, or credit union), types of fee schedules, and whether there are rewards available. Lake; Benson et al. at p. 98.

[39] Benson et al. at pp. 99-100.

[40] Benson et al. at p. 102.

[41] Benson et al. at p. 99.

[42] Nilson Report, Issue #1213 at p.5.

[43] Nilson Report, Issue #1213 at p. 5.

[44] Nilson Report, Issue #1213 at p. 5. Note, these debit card figures include prepaid debit cards.

card purchase volume, number of transactions, and cards in circulation across Visa and Mastercard.

## Table 3
## Debit Card Purchase Volume, Purchase Transactions, and Cards in Circulation (2021)

| Brand | Purchase Vol. (billions) | Transactions (billions) | Cards in Circulation (millions) |
|---|---|---|---|
| Visa | $ 2,805.21 | 57.49 | 793.0 |
| Mastercard | $ 1,091.46 | 23.21 | 299.0 |
| **Total** | **$ 3,896.67** | **80.71** | **1,092.0** |

Source: Nilson Report, Issue #1213.
Note: Includes debit and prepaid cards.

19.    As of 2021, the top 50 debit card issuers accounted for $2,728.75 billion in debit card purchase volume (or 70.0 percent of all debit (including prepaid debit) purchases across all issuers).[45] In 2021, the top 10 debit card issuers by debit purchase volume were (in order): Bank of America, Wells Fargo, JPMorgan Chase, PNC Bank, U.S. Bank, Navy FCU, Truist, The Bancorp Bank, USAA, and TD Bank.[46] Table 4 below summarizes the top 10 debit card issuers in terms of purchase volume, purchase transactions, and cards in circulation as of 2021.

---

[45] The Nilson Report, No. 1218, April 2022 (hereafter "Nilson Report, Issue #1218") and Nilson Report, Issue #1213 at p. 5.
[46] Nilson Report, Issue #1218 at pp. 6-7.

14

## Table 4
## Top 10 Debit Card Issuers by Purchase Volume

| Rank | Issuer | Purchase Vol. (millions) | Transactions (millions) | Cards (thousands) |
|---|---|---|---|---|
| 1 | Bank of America | $ 453,259.2 | 9,340.5 | 63,050 |
| 2 | Wells Fargo | $ 451,012.7 | 9,645.7 | 40,924 |
| 3 | JPMorgan Chase | $ 430,122.8 | 8,992.6 | 41,410 |
| 4 | PNC Bank | $ 112,094.2 | 2,429.6 | 12,238 |
| 5 | U.S. Bank | $ 94,524.1 | 2,116.8 | 49,320 |
| 6 | Navy FCU | $ 93,154.9 | 2,226.7 | 10,717 |
| 7 | Truist | $ 88,538.4 | 2,172.2 | 7,696 |
| 8 | The Bancorp Bank[1] | $ 85,812.5 | 2,122.1 | 183,473 |
| 9 | USAA | $ 84,291.7 | 1,839.3 | 7,867 |
| 10 | TD Bank | $ 68,296.6 | 1,348.3 | 9,423 |
| | **Total** | **$ 1,961,107.1** | **42,233.8** | **426,118** |

Source: Nilson Report, Issues #1213 and #1218.
Note: Includes debit and prepaid cards. Includes consumer, small business, and commercial cards.
[1] Includes China UnionPay and Uber prepaid cards.

20.     There are two primary types of Debit Card Transactions: 1) Signature debit ("routed through the Visa or Mastercard networks") and 2) PIN debit ("routed through one or more of the ATM or PIN debit networks").[47] Signature and PIN debit cards differ by the authentication method used for transactions, cardholder signature and PIN entry, respectively, and by transaction processing, dual message and single message, respectively.[48] The same debit card can be used to complete a transaction on either the Signature or PIN debit network.[49] Prior to the Durbin Amendment (discussed in greater detail later in this Expert Report), merchants might have steered Debit Card Transactions to the lower cost PIN debit network; however the Durbin Amendment "eliminated any

---

[47] Benson et al. at pp. 72-73, 96.
[48] Benson et al. at pp. 81, 96-97.
[49] Benson et al. at pp. 73, 96.

potential differential in cost between signature and PIN debit for regulated debit card issuers."[50]

### iii.    Other Forms of Payment

21.    Use of credit and debit cards represents the majority of purchase volume for goods and services (approximately $7.4 trillion out of $10.7 trillion in 2020, or approximately 69 percent).[51] Non-payment card purchasing methods include: cash, checks, money orders, official checks, travelers cheques, and electronic payments (preauthorized and remote).[52] Other card payment methods besides credit and debit cards include private label (prepaid) cards and Supplement Nutrition Assistance Program ("SNAP") electronic benefits transfer ("EBT") payments.[53]

22.    In 2020, purchase volume for goods and services in the U.S. was $310.1 billion for private label (prepaid) cards and $89.1 billion for Snap EBT cards (or 2.9 percent and 0.8 percent of purchase volume for goods and services, respectively).[54] Similarly, transactions for goods and services totaled 7.6 billion for private label (prepaid) cards and 2.6 billion for Snap EBT cards (or 4 percent and 1.4 percent of payment card transactions for goods and services, respectively).[55] Table 5 below summarizes purchase volume and transactions for goods and services by card payment type.

---

[50] Benson et al. at pp. 96-97. "Regulation II required issuers to equip cards to be routed over at least two unaffiliated debit networks." Additionally, the Durbin Amendment's resulting regulation, "Federal Reserve Regulation II," also requires issuers to "equip their cards so they can be routed over at least two unaffiliated debit networks." See Benson et al. at p. 97.

[51] Nilson Report, Issue #1210 at p. 6.

[52] Nilson Report, Issue #1210 at p. 6. Remote payments are made using a computer or telephone and include payments made during online banking sessions, person-to-person money transfers, and bill payments made at the ATM. Preauthorized payments are ACH payments, which include recurring bills such as utilities, but exclude mortgage payments.

[53] U.S. Department of Agriculture, Food Nutrition Service, "What is Electronic Benefits Transfer (EBT)?" August 26, 2022.

[54] Nilson Report, Issue #1210 at p. 6.

[55] Nilson Report, Issue #1210 at p. 6.

## Table 5
## Purchase Volume and Transactions for Goods and Services by Card Type (2020)

| Card Type | Purchase Vol. (billion) | | Share | Transactions (billion) | | Share |
|-----------|------------------------:|---|------:|------------------------:|---|------:|
| Credit | $ | 3,656.64 | 46.94% | $ | 41.09 | 29.92% |
| Debit | $ | 3,734.02 | 47.93% | $ | 85.98 | 62.61% |
| Prepaid (Private Label) | $ | 310.12 | 3.98% | $ | 7.64 | 5.56% |
| SNAP EBT | $ | 89.06 | 1.14% | $ | 2.61 | 1.90% |
| **Total** | **$** | **7,789.84** | **100.00%** | **$** | **137.32** | **100.00%** |

Source: Nilson Report, Issue #1210.
Note: Prepaid cards counted in this summary are private label. General purpose prepaid cards are included with debit cards.

#### iv. Emerging Technologies

23.     In recent years, emerging technologies have expanded the ability of individuals to make payments. For example, these technologies include digital and mobile wallets, which "enable transactions to be initiated by a mobile device at a point of sale (POS), online or in-app."[56] Digital wallets benefit consumers by syncing eligible GPCCs to their mobile phones to facilitate in-store purchases.[57] The recent growth in digital wallets in the U.S. "has come from the participation of major industry players, such as Visa Inc., MasterCard Incorporated and the American Express Company."[58]

24.     There are five primary "wallet models that use a variety of technology platforms, processes, and security tools," including: device-centric mobile proximity wallet,[59]

---

[56] U.S. Payments Forum, "Mobile and Digital Wallets: U.S. Landscape and Strategic Considerations for Merchants and Financial Institutions," Version 1.0, January 2018 (hereafter "U.S. Payments Forum") at p. 7.

[57] Marley Brocker, "Credit Card Processing & Money Transferring in the US," IBISWorld, Industry Report 52232, January 2022 (hereafter "2022 IBIS Report") at p. 15.

[58] 2022 IBIS Report at p. 15.

[59] "The device-centric mobile proximity wallet stores payment credentials in the mobile device. Near Field Communication (NFC) technologies or Magnetic Secure Transmission (MST) are leveraged to enable proximity payments at the POS. The POS must interact with the mobile device physically (a wave, a tap, a magnetic transmission)." See U.S. Payments Forum at p. 7. "The wallet is considered an open wallet because it accepts any eligible credit or debit card from any participating financial institution for funding, and it can be used at any contactless-enabled merchant (or if MST-enabled, any POS that accepts cards)." See U.S. Payments Forum at p. 7.

device-centric mobile in-app wallet,[60] card-not-present card-on-file wallet,[61] QR code wallet,[62] and digital checkout wallet.[63]  Examples of device-centric digital wallets include Apple Pay, Android Pay, and Samsung Pay; examples of bank-centric digital wallets include Capital One, Citi Pay, and Chase Pay, examples of network-centric digital wallets include Amex Express Checkout, Masterpass, and Visa Checkout; and examples of merchant-centric digital wallets include Starbucks, Level Up, Walmart Pay, and Yelp Eat24.[64]  Figure 2 below illustrates the transaction flow for a device-centric mobile proximity and in-app wallets.

---

[60] "The device-centric mobile in-app wallet is used for an in-app card-not-present (CNP) mobile purchase. Unlike purchases made using a specific merchant's native mobile app, this wallet model uses EMV payment tokenization and issuer ID&V for an in-app payment.  The tokenized payment credentials can be stored in the mobile phone or in the cloud.  The device-centric in-app wallet model works with e-commerce 'in-app' and browser-based tokenized mobile payments through participating merchants' native mobile apps or mobile browsers (for example, an Apple Pay button).  Consumers authenticate themselves and authorize a payment with a biometric or passcode." See U.S. Payments Forum at pp. 7-8.

[61] "The CNP card-on-file (CoF) wallet uses previously stored payment credentials for transactions. Card-on-file is the term used to refer to the authorized storage of a consumer's payment credentials by a merchant or payment service provider (PSP) that allows the consumer to make repeated or automatic CNP payments without re-entering payment credentials each time.  The stored payment data can be used by a single merchant or by multiple merchants that have integrated the PSP wallet solution. Examples include PayPal, Pay with Amazon, or a merchant's mobile app. Consumers are authenticated using some type of verifiable access methodology (e.g., password, fingerprint), but the payment method is not provisioned by the financial institution that issued the card or account." See U.S. Payments Forum at p. 8.

[62] "QR code wallets are similar to CNP wallets in that they are cloud-based and device-agnostic. These wallets use QR codes to complete purchases at the POS. They may be merchant or financial institution-branded and are usually closed loop. QR codes are also used by petroleum merchants to identify or authorize fuel pumps." See U.S. Payments Forum at p. 8.

[63] "The payment networks offer digital checkout wallets or digital acceptance services to both issuers and merchants. The networks support web browser, mobile app, and in-app channels. The consumer can then pay online or in-app for CNP purchases, and one payment network has also enabled the checkout service for POS contactless purchases. The wallet can be accessed on an issuer's website and through their mobile app using the consumer's banking credentials. This approach enables a single banking and payment app for use by the consumer. Issuers can also automatically tokenize the card credentials to deliver a high level of security. Merchants can add the digital checkout wallet payment option to their mobile browser or mobile app checkout cart." See U.S. Payments Forum at p. 9.

[64] U.S. Payments Forum at pp. 25-27.

18

**Figure 2**
**Illustration of a Device-Centric Point-Of-Sale and In-App Transaction Flow**



Source: U.S. Payments Forum at p. 13.

25.     In addition, in "recent years, card networks have added new operating rules that allow a firm to act as a 'Payment Facilitator' to sign up and process payments for small merchants."[65]  Examples of such payment facilitators include PayPal, Square, and Stripe, "who all board small merchants as 'sponsored merchants' within their systems" who can then gain access to the payment facilitator's relationships with acquiring banks.[66]  These payment facilitators "have enabled card payment acceptance to be cost effectively

---

[65] Benson et al. at p. 110.

[66] Benson et al. at p. 110; 2022 IBIS Report at p. 12.  These payment facilitators "are sometimes referred to as 'aggregators' because they aggregate a number of smaller merchants to be processed by a single acquirer." See Benson et al. at p. 110.

19

extended to a much broader base of smaller merchants than was historically the case" given the "expensive infrastructure and fees charged on payments."[67]

26. Another recent emerging technology that has expanded the ability of individuals and businesses to make payments is peer-to-peer ("P2P") payments, which facilitates the "transfer of funds between two parties using their individual banking accounts or credit cards through a website or mobile app."[68] To use P2P payment platforms, users simply need to sign up for an account and link their bank account, credit card, or debit card to the account.[69] From there, users can find other users based on their username, email address, or phone number.[70] Once a transaction amount is entered and submitted into the website or mobile app, "the time it takes for money to transfer can range anywhere from a few seconds to three business days."[71] P2P payment services benefit individuals through their, "ease-of-use, convenience, and speed."[72] For use of this payment platform, "[s]ome P2P payment services charge a flat-fee or low percentage fee, while other P2Ps do allow for fee-free payment."[73] Examples of popular P2P payment platforms include PayPal, Venmo, Zelle, and Cash App.[74]

27. An additional emerging technology that has grown in popularity in the payment systems space in the U.S. in recent years is buy now, pay later ("BNPL"),[75] which is a "type of short-term loan that allows consumers to make purchases and pay for them at a future date over a series of installments."[76] According to one e-commerce website,

[67] Benson et al. at p. 110; 2022 IBIS Report at p. 12.
[68] Discover Bank, "What Are Peer-to-Peer Payments?," February 11, 2022 (hereafter "Peer-to-Peer Payments"); Jacob Harrison, "4 P2P Payment Platforms for Businesses and How to Use Them," U.S. Chamber of Commerce, CO—, July 12, 2022 (hereafter "Harrison").
[69] Peer-to-Peer Payments; Harrison.
[70] Peer-to-Peer Payments.
[71] Peer-to-Peer Payments. Furthermore, "[m]any applications keep the money stored in the app until you manually release the money into your personal banking account." See Peer-to-Peer Payments.
[72] Peer-to-Peer Payments.
[73] Peer-to-Peer Payments.
[74] Harrison.
[75] "BNPL is also known as 'pay-over-time,' 'point-of-sale financing,' and 'point-of-sale loans.'" See Mike Eckler, "What Merchants Should Know about 'Buy Now, Pay Later,'" Practical Ecommerce, August 24, 2020 (hereafter "Eckler").
[76] Julian Alcazar and Terri Bradford, "The Appeal and Proliferation of Buy Now, Pay Later: Consumer and Merchant Perspectives," Federal Reserve Bank of Kansas City, November 10, 2021 (hereafter "Alcazar et al.") at p. 1. "BNPL divides a consumer's purchase into multiple equal payments, with the first due at checkout. […] Repayment of a purchase with these services usually involves four equal, interest-free

20

"[w]hen a customer chooses the BNPL option, the provider will conduct a real-time credit check. If the customer is approved, the provider will display to the customer the terms of service — the repayment schedule. From there, customers can check out as usual."[77] Shorter-term BNPL loans typically do not require the consumer to pay interest, whereas some longer-term BNPL loans may charge interest.[78] While BNPL was originally utilized for online purchases,[79] it has more recently expanded to allow consumers to take out such loans for in-store purchases as well.[80] The five most prominent fintech providers of BNPL payments are Affirm, AfterPay, Klarna, Sezzle, and Zip (formerly known as QuadPay).[81]

28.     There are two main types of BNPL products that primarily differ in how they are offered to consumers: "[o]ne type of BNPL product is offered directly to consumers by fintechs before a purchase is made; the other is offered during a purchase through a merchant who partners with a fintech or financial institution."[82] As noted in a briefing issued by specialists at the Federal Reserve Bank of Kansas City, "[r]evenue for the fintechs or financial institutions that provide both types of these loans is primarily derived from fees charged to the merchants that accept the loans as a customer payment

---

installments, with 25 percent paid at the time of purchase and the remaining balance paid in three two-week cycles." See Alcazar et al. at p. 1.
[77] Eckler.
[78] Alcazar et al. at p. 1.
[79] Online merchants "typically display a BNPL payment button alongside the usual credit-card and PayPal logos, and any other payment method." See Eckler.
[80] Alcazar et al. at p. 1.
[81] Alcazar et al. at p. 1. This article notes that, as of November 2021, there were approximately two dozen domestic providers of BNPL. See Alcazar et al. at p. 1.
[82] Alcazar et al. at p. 1. "The first type of BNPL products generally targets millennials, Generation Z (Gen Z) consumers, and financially underserved consumers such as those with no credit or bad credit. The credit limits associated with these services tend to be lower, ranging from hundreds of dollars up to thousands, with only a soft credit check that verifies credit history, age, and salary but does not rely on a consumer's credit score. However, credit limits may increase as a consumer demonstrates creditworthiness." See Alcazar et al. at p. 1. The second type of BNPL product, offered through merchants, "targets broader consumer segments and offers longer-term installments. In addition to millennials and Gen Z consumers, baby boomers and affluent customers may also be targeted. BNPL products offered through merchants tend to have higher credit limits that may reach up to tens of thousands of dollars and repayment terms that range from six weeks to 60 months (depending on the type of merchant). Unlike shorter-term loans, longer-term loans (3 months or more) typically require no upfront payment at the time of purchase. Interest rates vary according to the length and value of the loan and can range from 0 percent to nearly 30 percent." See Alcazar et al. at pp. 1-2. "Recently, a third type of BNPL product has emerged, which credit card issuers can offer to their cardholders after purchases have been made." See Alcazar et al. at p. 6.

21

option. However, revenue may also be generated from late fees or penalties charged to consumers who fail to comply with the terms of repayment."[83]

29. Convenience is a primary factor for consumers that have chosen to use BNPL, along with "transparency of terms, interest avoidance, cash conservation, and less impact to their credit score."[84] While there are a number of benefits to merchants that choose to accept BNPL payments, doing so typically comes at a premium over the cost of accepting GPCCs and other forms of payment.[85] According to specialists at the Federal Reserve Bank of Kansas City, the "cost of a BNPL transaction for merchants ranges from 1.5 to 7 percent of the purchase value (including tax), while the cost of a typical debit or credit-card transaction ranges from 1 to 3 percent."[86] Following the initial transaction, "[m]ost [BNPL] providers will deposit funds, minus the fee, in a merchant's account within two business days."[87]

## B. General Purpose Credit and Charge Card Payment Networks

30. As I noted above, GPCCs are two primary types of payment cards. As I discuss in greater detail below, GPCCs issued in the U.S. operate on one of a handful of payment networks.[88] As described in a report by IBISWorld, "[t]he Credit Card Issuing industry issues credit cards, providing the funds required to buy goods and services in return for payment on a full balance or installment basis."[89] To allow for these transactions to be authorized, cleared, and settled, multiple parties are required, with the GPCC payment networks operating as processing hubs in the middle of each transaction.[90]

31. There are four major GPCC payment networks operating in the U.S.: Visa, Mastercard, American Express, and Discover.[91] Each network can be analyzed as a

---

[83] Alcazar et al. at p. 2.

[84] Alcazar et al. at p. 3; Eckler. In a March 2021 poll, "45 percent of U.S. adults who were BNPL users said they used these services to make purchases that otherwise would not fit their budget." See Alcazar et al. at p. 3. See, also, Maurie Backman and Jack Caporal, "Study: Buy Now, Pay Later Services Grow in Popularity," The Ascent, July 18, 2022.

[85] Alcazar et al. at p. 4.

[86] Alcazar et al. at p. 4.

[87] Eckler.

[88] Louis DeNicola, "What is a Credit Card Network," Experian, December 13, 2021 (hereafter "DeNicola").

[89] Derek Longhini, "Credit Card Issuing in the US," IBISWorld, Industry Report 52221, July 2021 at p. 5.

[90] Benson et al. at p. 81.

[91] DeNicola; Benson et al. at p. 74.

platform in the two-sided market (defined below) for GPCC transactions. These four GPCC payment networks differ in how they coordinate the cardholder (issuer) and merchant (acquirer) sides of the GPCC Transaction market.[92] These forms of coordination lead to different payment network architectures.[93] I discuss the similarities and differences between the GPCC payment network architectures and pricing structures in greater detail below.

32.     There are two primary types of GPCC payment networks in the U.S.: 1) the "closed-loop" network (or "three-party model"); and 2) the "open-loop" network (or "four-party model"). These models differ in terms of the types of parties involved and how the transaction flows through the system.[94] In addition to these GPCC payment networks, a third type of GPCC payment network, the "hybrid" network, is essentially a blend of the open-loop and closed-loop GPCC payment networks also operates in the U.S.[95] I discuss each of these GPCC payment networks in greater detail below.

33.     Any time a customer pays for goods or services using a GPCC, the merchant pays a fee known as a "merchant discount" fee for which the magnitude is determined by a fixed fee, a percentage of the value of the overall transaction for which the GPCC is used, or a combination of both.[96]   Merchant discount fees are "normally expressed as a fixed fee plus a percentage of the value of the transaction."[97]  When consumers purchase goods and services using a GPCC, they are mostly unaware of the fees paid by the merchant associated with the merchant's acceptance of the consumer's GPCC.[98] Nevertheless, as I discuss in greater detail throughout this Expert Report, consumers unknowingly pay at

---

[92] Benson et al. at pp. 74-75.

[93] Benson et al. at p. 89.

[94] Benson et al. at p. 75.

[95] Hybrid networks open one side of the GPCC payment network to permit other entities to issue or acquire on its behalf. See Benson et al. at p. 75.

[96] Benson et al. at pp. 87-90, 108-109; Robin A. Prager, Mark D. Manuszak, Elizabeth K. Kiser, and Ron Borzekowski, "Interchange Fees and Payment Card Networks: Economics, Industry Developments, and Policy Issues," *Finance and Economics Discussion Series*, No. 2009-23, Board of Governors of the Federal Reserve System, 2009 (hereafter "Prager et al.") at pp. 11-13.

[97] Benson et al. at pp. 108-109. Merchants may also be liable for other fees like terminal fees and statement fees. See Optimized Payments Consulting and NACHA, "Understanding the Cost of Processing Card Payments," 2017 (hereafter "NACHA") at p. 4.

[98] Jakub Górka, *Interchange Fee Economics: To Regulate or Not to Regulate?* Cham, Switzerland: Springer Nature Switzerland AG, 2018 (hereafter "Górka") at p. 14.

23

least some portion of these fees since the retail prices of goods and services account for merchant discount fees.[99]

### i. The Amex Payment Network

34.    Amex operates the primary closed-loop payment network in the U.S., as it coordinates merchants and cardholders directly.[100] Amex is therefore a bank holding company as well as a card network.[101] As a bank holding company with a U.S. bank subsidiary, Amex can contract directly with merchants and cardholders.[102] As a closed-loop GPCC payment network, Amex sets the two-sided pair of fees (cardholder and merchant) directly, earning all merchant discount revenue and net cardholder fees.[103]

35.    Given its direct relationship with the cardholder and the merchant, Amex can act as both the acquiring bank, serving the merchant, and the issuing bank, serving the cardholder.[104] Amex also sets the acceptance rules, authorizes, and processes GPCC Transactions, and moves money between customers and merchants to complete the transaction.[105] When an Amex GPCC is used for a transaction, Amex authorizes the GPCC Transaction directly and credits the merchant's account with the amount (less the merchant discount fee) and posts a charge to the cardholder's account, to be collected from the cardholder at the end of the billing cycle.[106]

---

[99] Górka at p. 14.

[100] Górka at p. 16; Stan Sienkiewicz, "Credit Cards and Payment Efficiency," *Consumer Finance Institute Discussion Papers*, No. 01-02, Federal Reserve Bank of Philadelphia, 2001 (hereafter "Sienkiewicz") at p. 4.  As I discuss in greater detail below, a portion of Discover's GPCC Transaction volume is routed through a closed-loop network. See Benson et al. at p. 90.

[101] Amex 2021 10-K 2021 at p. 1, 11. Discover is also a bank holding company. See Discover Financial Services SEC Form 10-K for the fiscal year ended December 31, 2021 (hereafter "Discover 2021 10-K") at p. 1.

[102] Amex 2021 10-K at p. 2. "We maintain direct relationships with both our Card Members (as a card issuer) and merchants (as an acquirer), and we handle all key aspects of those relationships. These relationships create a 'closed loop' in that we have direct access to information at both ends of the card transaction, which distinguishes our integrated payments platform from the bankcard networks." See Amex 2021 10-K at p. 2. Amex organizes itself according to cardholder-facing operating segments Global Consumer Services Group and Global Commercial Services and the merchant-facing Global Merchant and Network Services segment. See Amex 2021 10-K at pp. 1-2.

[103] Amex 2021 10-K at p. 44, 98. "In a closed loop network, the entire discount fee is kept by the network rather than being shared among three parties." See Benson et al. at p. 90.

[104] Benson et al. at p. 75; Prager et al. at p. 12.

[105] Benson et al. at pp. 82-86.

[106] Prager et al. at p. 12. See, also, CGAP, "Acquiring Models," October 2019 (hereafter "CGAP").

24

36.     As I noted above, a closed-loop network is a three-party model. Within this system, there are three main parties involved in a given GPCC Transaction: 1) the GPCC payment network; 2) the cardholder (customer) making a purchase using their GPCC; and 3) the merchant accepting the GPCC.[107]  Figure 3 below illustrates the flow of a GPCC Transaction through a typical closed-loop network.  As shown, for a GPCC Transaction occurring on Amex's closed-loop network, the payment network interacts simultaneously with the merchant and the cardholder, directly charging fees to its end users.[108]

## Figure 3
## Illustration of Typical Closed-Loop GPCC Payment Network



Source: Jean-Charles Rochet and Jean Tirole, "An Economic Analysis of the Determination of Interchange Fees in Payment Card Systems," Review of Network Economics, Vol. 2, No. 2, June 2003, 69-79 at p. 72.

37.     In a closed-loop network, the merchant discount fee is a single charge assessed by the payment network and paid by the merchant.[109]  Since Amex deals directly with both the cardholder and the merchant for Amex GPCC transactions, there is no explicit interchange fee; rather the interchange fee is embedded in the merchant discount fee paid by the merchant.[110]  In that regard, Amex's merchant discount fee is parallel to the merchant discount fee in the open-loop system (discussed in greater detail below), where

---

[107] Prager et al. at p. 10.
[108] Benson et al. at p. 6.
[109] Prager et al. at p. 12. See, also, Benson et al. at pp. 89-90.
[110] Prager et al. at pp. 12, 25-26; Benson et al. at pp. 89-90.  The interchange fee is a fee paid to the issuing bank that "may take the form of a flat fee per transaction, a percentage of the purchase price, or both."  See Prager at pp. 11-12.

the total merchant discount fee primarily comprises network fees, the interchange fee, and the acquirers fees.[111]

38.     While Amex primarily operates a closed-loop network (in which it interacts with both merchants and cardholders directly), in 2014, Amex launched a new program, OptBlue, in which it contracts with third-party acquirers that then "onboard and recruit merchants across the U.S. to accept American Express as mode of payment."[112] To be eligible for the OptBlue Program, U.S. merchants must have Amex charge volume of less than $1 million dollars per year.[113] The purpose of the OptBlue program was to close Amex's "gap in merchant coverage, meaning fewer merchants accepted American Express as compared to Visa, MasterCard, and Discover."[114] Opening one side of a closed-loop network, as Amex did with OptBlue, to other entities is commonly referred to as a "hybrid" model.[115]

### ii.    The Visa and Mastercard Payment Networks

39.     In contrast to Amex, neither Visa nor Mastercard is a bank.[116] The Visa and Mastercard payment networks thus coordinate with merchants and cardholders indirectly through a network of banking intermediaries.[117]

40.     Merchants who wish to accept Visa or Mastercard GPCCs contract with an acquiring bank participating in the Visa or Mastercard network to "accept, process, and

---

[111] Benson et al. at pp. 87-88. See, also, NACHA.

[112] 30(b)(6) Deposition of Antonio Gagliardi, July 26, 2022 (hereafter "Gagliardi 30(b)(6) Deposition") at 19:22-21:15; American Express, "OptBlue FAQs." (hereafter "OptBlue FAQs"). I note that Amex had a previous program, I Program, starting around 2006-2007 which allowed merchants to contract with third-party acquirers. See United States District Court for the Eastern District of New York, *United States of America, et al., Plaintiffs, v. American Express Company and American Express Travel Related Services Company, Inc., Defendants*, Trial Transcript, No. 10-CV-04496-NGG-RER, July 7, 2014 (hereafter "2014 Amex Trial Transcript") at 4607:12-4610:25.

[113] OptBlue FAQs.

[114] Gagliardi 30(b)(6) Deposition at 21:16-22:2.

[115] Benson et al. at p. 75.  Currently, the vast majority of Amex-accepting merchants "accept Amex by contracting with third-party acquirers."  See United States District Court Eastern District of New York, *Anthony Oliver, et al., Plaintiffs, v. American Express Company, et al., Defendants*, Defendants' Amended Responses and Objections to Plaintiffs' First Set of Interrogatories, No. 1:19-cv-00566-NGG-SJB, January 14, 2022 (hereafter "Amex's Interrogatory Responses") at p. 7.

[116] Visa SEC Form 10-K for the fiscal year ended December 31, 2021 (hereafter "Visa 2021 10-K") at p. 5; Mastercard SEC Form 10-K for the fiscal year ended December 31, 2021 (hereafter "Mastercard 2021 10-K") at pp. 6, 10.

[117] Benson et al. at pp. 74-75.

26

settle credit card transactions."[118] The acquiring banks compete for merchants.[119] In an open-loop GPCC Transaction, an acquiring bank collects transaction data from the merchant, processes the data over the payment network, receives payment from the issuing bank (less the interchange fee), and finally credits the merchant account (less the merchant discount fee).[120] Acquiring banks also collect fees for their services, which I discuss in greater detail below.[121] Generally speaking, "acquiring refers to functions supporting all of a merchant's needs in card payments acceptance, including POS terminals, software, card processing, dispute management, and merchant customer service."[122] In practice, acquiring banks often contract with third parties, processors, to perform merchant-acquiring functions.[123] However, the acquiring banks bear financial responsibility to the payment network for the merchant's and processor's actions for GPCC Transactions.[124] Since acquirers maintain relationships with merchants, they are commonly referred to as "merchant banks" or as "merchant acquirers."[125]

41.      Similarly, a consumer who wishes to pay with a Visa- or Mastercard-branded GPCC contracts with an issuing bank (issuer) who is part of the Visa and/or Mastercard payment network. A GPCC issuer "solicits new consumers, receives and underwrites applications to acquire new customers, furnishes each customer with a card, authorizes and clears card transactions, and provides ongoing statements to cardholders, collections,

[118] Federal Deposit Insurance Corporation, "Glossary," *Risk Management Examination Manual of Credit Card Activities*, March 2007 (hereafter "FDIC Credit Card Manual Glossary").

[119] David S. Evans and Richard Schmalensee, *Paying with Plastic: The Digital Revolution in Buying and Borrowing*. Second Edition, Cambridge, MA: MIT Press, 2005 (hereafter "Evans and Schmalensee") at p. 258.

[120] "The merchant's acquiring bank, of course, passes this interchange expense along to its customer, the merchant." See Benson et al. at pp.87-88; FDIC Credit Card Manual Glossary. The acquiring bank also ensures that the merchant has the necessary facilities, such as point-of-sale hardware, necessary to conduct transactions using payment cards. See CGAP.

[121] Benson et al. at pp. 108-109.

[122] Benson et al. at p. 76. "In the narrow and most formal sense, it refers to the requirement, in an open-loop network, that the merchant submit and receive transactions to the network through a contract with a bank that is a member of that network and bound by its operating rules. In practice, the term 'acquiring' can include all or only some of these functions." See Benson et al. at p. 76.

[123] Benson et al. at pp. 106-108.

[124] Ann Kjos, "The Merchant-Acquiring Side of the Payment Card Industry: Structure, Operations, and Challenges," *Consumer Finance Institute Discussion Papers*, No. 07-12, Federal Reserve Bank of Philadelphia, 2007 (hereafter "Kjos") at pp. 2-4; Benson et al. at pp. 76-77.

[125] FDIC Credit Card Manual Glossary. "In some cases, the extensive scope of merchant-acquiring services provided by these specialized third-party firms has led these companies to be commonly identified as merchant acquirers." See Kjos at pp. 2-3.

27

and customer service."[126] As of 2018, over 5,000 depository institutions, including commercial banks, credit unions, and savings institutions issue credit cards on the Visa and Mastercard payment networks.[127] However, as of mid-2021, the top 10 issuers by purchase volume on the Visa and Mastercard payment networks accounted for 81.1 percent of the credit card purchase volume on those networks.[128] Issuers are free to set the terms and conditions for the Visa and Mastercard GPCCs they issue.[129] In general, an issuer establishes interest rates based on a customer's risk profile.[130] This rate applies when the cardholder does not pay off the full balance of the account at the end of the billing cycle, and instead makes partial payments over a period of time.[131] Figure 4 below summarizes the top 10 issuers of Visa and Mastercard credit cards in the U.S. as of mid-year 2021. As I discuss in greater detail later in this Expert Report, these banks compete for GPCC cardholders.

---

[126] Benson et al. at p. 76.
[127] Board of Governors of the Federal Reserve System, "Report to the Congress on the Profitability of Credit Card Operations of Depository Institutions – July 2018," 2018 (hereafter "Federal Reserve July 2018 Report") at footnote 7.
[128] Nilson Report, Issue #1213 at p. 5; Nilson Report, Issue #1214 at pp. 8-9.
[129] Federal Reserve July 2018 Report at pp. 7-8, footnote 7.
[130] Federal Reserve July 2018 Report at p. 9.
[131] Benson et al. at p. 93; Federal Reserve July 2018 Report at p. 9.

## Figure 4



Source: Nilson Report September 2021, Issue #1204 at p. 11.

42.     Visa and Mastercard do not contract directly with merchants and cardholders because they do not operate as an issuing or acquiring bank. Therefore, they cannot unilaterally set all of the various fees levied within the open-loop network as Amex does in the closed-loop network.[132] Instead, Visa and Mastercard charge a network (assessment or switch) fee on all transactions made with a card carrying the payment network brand.[133] Additionally, Visa and Mastercard set the interchange fee, but do not receive any revenue from the interchange fee.[134] Further, Visa and Mastercard do not

---

[132] Benson et al. at pp. 85-89.

[133] Prager et al. at p. 12; Benson et al. at pp. 85-89.

[134] Benson et al. at p. 86.

29

earn any banking related fees such as interest payments and late fees.[135] These charges are instead paid directly to the cardholder's issuing bank.[136]

43.    In an open-loop network such as Visa's and Mastercard's, the merchant discount fee is comprised of three main parts: network fees, the interchange fee, and acquirer fees.[137] As I discussed above, the network fees and interchange fee are set by the GPCC payment network. The acquirer fees are set by the acquiring bank for its merchant services and is expressed as a fixed fee plus a percentage of the transaction.[138] The acquirer fee is the additional fee earned by the acquiring bank for its merchant services and includes any costs the acquiring bank incurs as well as any margin the acquiring bank earns.

44.    The merchant, rather than acquiring bank, is the entity that pays the interchange fee.[139] The acquiring bank does not make an interchange payment to the issuing bank, rather the interchange fee is withheld from the payment the issuing bank sends to the acquiring bank, and thus, is a cost that the acquiring bank must cover.[140] Similarly, the merchant discount fee, which accounts for the interchange fee withheld from the acquiring bank, is withheld from the payment the acquiring bank sends to the merchant.[141]

45.    The acquiring business is highly competitive, particularly for servicing large merchants such as Qualified Merchants.[142] The interchange fee and the network fees are

---

[135] Visa 2021 10-K at p. 5; Mastercard 2021 10-K at p. 10.

[136] Visa 2021 10-K at p. 5; Mastercard 2021 10-K at p. 10.; Benson et al. at Figure 5-5: Card Network Interchange.

[137] Kjos at pp. 2-4. Prager et al. at pp. 11-12, footnote 23. See, also, Benson et al. at Figure 5-5: Card Network Interchange and pp. 108-109. "While it is conceptually important to understand the distinction between interchange fees and merchant-discount fees, the terms are effectively interchangeable insofar as the merchant ultimately pays the interchange fee as a portion of its merchant-discount fee." See Samuel J. Merchant, "Merchant Restraints: Credit-Card-Transaction Surcharging and Interchange-Fee Regulation in the wake of Landmark Industry Changes," *Oklahoma Law Review*, Vol. 68, No. 2, 2016, 327-380 (hereafter "Merchant Restraints") at p. 335.

[138] Benson et al. at pp. 108-109. These fees can be quoted by acquiring banks to merchants as interchange plus, typically for larger merchants, or a blended rate, typically for smaller merchants. See Benson et al. at p. 88.

[139] Benson et al. at p. 87.

[140] Kjos at p. 20.

[141] Kjos at pp. 19-21.

[142] Office of the Comptroller of the Currency, Comptroller's Handbook, "Merchant Processing," Version 1.0, August 2014 (hereafter "Comptroller's Handbook") at p. 31; Kjos at pp. 17-18. "With intense

30

typically non-negotiable, forming the floor for the merchant discount fee, and the competition between acquirers leads to the acquirer fees being competed downward resulting in the merchant discount fee paid by large merchants to be very close to this floor.[143] Large merchants, such as Qualified Merchants, typically have "unbundled" or "interchange plus" merchant discount fee structures.[144] In this arrangement, the merchant discount fee on any given transaction is the interchange fee and network fees plus the separate acquirer fees.[145] Thus, under the "interchange plus" approach, any changes in the interchange fee or network fees can be immediately passed through from the acquirers to the merchants (resulting in immediate one-for-one changes in the merchant discount fee that these large merchants pay) and the merchants have transparency on any changes.[146]

46.     As I noted above, an open-loop network is a four-party model[147] consisting of four main parties involved in a given GPCC Transaction: 1) the cardholder (customer) making a purchase using their Visa or Mastercard GPCC; 2) the issuing bank (issuer); 3) the acquiring bank (acquirer); and 4) the merchant accepting the payment.[148] Figure 5 below illustrates the flow of a GPCC Transaction through a typical open-loop network.

---

competition among acquirers and thin margins in recent years in the United States, the interchange fee seems to be passed on to merchants." See Evans and Schmalensee at p. 155. "[T]here is evidently intense competition for merchant accounts, and it is common for merchants to switch among acquirers in an effort to get the best possible price [...] Large national merchants, in particular, have a lot of bargaining power since their volume provides acquirers with scale efficiencies." See Evans and Schmalensee at p. 261.

[143] NACHA at p. 4; Kjos at p. 21.

[144] Benson et al. at p. 88. See, also, Comptroller's Handbook at p. 31.

[145] For example, a "merchant discount fee, therefore, may have a price of 'interchange plus assessments' (the card network fee assessed to the acquirer) plus 'x cents per transaction plus y% of the transaction value.'" Benson et al. at p. 109.

[146] Benson et al. at p. 88.

[147] Prager et al. at footnote 12. Since any bank can join, these networks are considered "open." The open loop networks are however closed to nonbanks like American Express. See Marc Rysman, "The Economics of Two-Sided Markets," *Journal of Economic Perspectives*, Vol. 23, No. 3, 2009, 125-143 (hereafter "Rysman (2009)") at pp. 132-133.

[148] CGAP. The term "four-party system" is "something of a misnomer because the network is, in fact, a fifth party involved in a transaction." See Prager et al. at footnote 14.

### Figure 5
### Illustration of Typical Open-Loop GPCC Payment Network



Source: Prager et al. at p. 73.

47.     The information flow between the parties in an open-loop network occurs in a similar fashion to the closed-loop network. As illustrated in Figure 5 above, after a cardholder uses a Visa or Mastercard GPCC for a transaction, the merchant sends the transaction data to the acquiring bank.[149] The acquiring bank then forwards the transaction request to the issuing bank by passing it through the relevant payment network (i.e., Visa or Mastercard).[150] After running automated fraud checks, the payment network forwards the transaction to the issuing bank for authorization.[151] If the transaction is authorized, the issuing bank posts a charge for the transaction to the cardholder's account and sends payment to the acquiring bank, less the interchange

---

[149] Prager et al. at p. 10.
[150] Prager et al. at p. 10. See, also, CGAP.
[151] CGAP.

fee.[152] Finally, the merchant account is credited by the acquiring bank, less the merchant discount fee.[153]

48.    As I previously discussed, in an open-loop network, the merchant discount fee includes the network fees, the interchange fee, and acquirer fees.[154] The network fee is paid to Visa or Mastercard depending on the card being used, and the acquirer fee is paid to the acquiring bank.[155] Unlike network fees and the interchange fee, the acquiring fee is negotiable because the acquirers operate in a highly competitive market as the acquiring side involves little product differentiation.[156] Additionally, the network fee is relatively low; according to a 2019 study, "[t]he average network fee per transaction was $0.10 in 2019, almost unchanged from 2018."[157] Both the network fees and the acquirer fees are a relatively small proportion of the overall merchant discount fee. For instance, in 2019 the average network fee per transaction was 0.3 percent of the average transaction value.[158] In contrast, the interchange fee is a significant proportion of the merchant discount fee.[159]

49.    Visa and Mastercard publish their schedules of interchange rates.[160] There is not a single interchange rate for all transactions; rather, the interchange rate associated with a

---

[152] Prager et al. at p. 10; CGAP. The issuing bank pays network fees to the payment network. See Prager et al. at p. 73.

[153] Prager et al. at p. 10; CGAP. The merchant discount fee does not take into account the issuing bank's network fees. "The merchant discount is generally equal to the sum of the interchange fee, the acquirer [network] fee, other acquirer costs, and an acquirer markup." See Prager et al. at footnote 23 (emphasis added).

[154] The fee may include other fees like terminal depreciation, risk, merchant servicing, operating expense, and some profit margin for the acquirer itself. See CGAP. See, also, Prager et al. at pp. 11-12 and footnote 23.

[155] NACHA at pp. 3-4.

[156] Evans and Schmalensee at pp. 258-261.

[157] Board of Governors of the Federal Reserve System, "2019 Interchange Fee Revenue Covered Issuer Costs, and Covered Issuer and Merchant Fraud Losses Related to Debit Card Transactions," May 2021 (hereafter "2019 Interchange Fee Revenue") at p. 4. "[I]n terms of per-transaction value and percentage of transaction value, network fees have little changed (in 2015 USD 0.10 and 0.27% o, respectively)." See Górka at p. 68.

[158] 2019 Interchange Fee Revenue at p. 4.

[159] Benson et al. at pp. 87-88. "While interchange is often equated with the merchant discount fee, it's not the same thing  just the largest component." See Benson et al. at pp. 87-88. "Interchange is the single largest expense for card processing. For most merchants, it represents 70 to 85 percent of the total cost of processing." See NACHA at p.3.

[160] VISA, "Visa USA Interchange Reimbursement Fees: Visa Supplemental Requirements," April 23, 2022 (hereafter "Visa April 2022 Interchange Rates"); Mastercard, "Mastercard 2022-2023 U.S. Region Interchange Programs and Rates," April 22, 2022 (hereafter "Mastercard April 2022 Interchange Rates").

33

particular transaction depends on the merchant's category, the size of the merchant, the rewards tier of the card, the card type (e.g., consumer or corporate card), and the type card acceptance (e.g., swipe, chip, card-not-present), among other things.[161] For example, as of April 2022, for Visa transactions in the U.S., interchange rates for consumer credit used at merchants defined by Visa as Tier 0[162] Supermarkets equal 1.40 percent of the transaction value plus $0.05 per transaction for Visa Signature, Visa Signature Preferred, or Visa Infinite cards.[163] For credit cards considered traditional rewards, and all other consumer credit card products, the interchange rate is 1.15 percent of the transaction value plus $0.05 per transaction.[164] Likewise, interchange rates for consumer credit used at merchants defined by Visa as Performance Threshold I[165] Retail are: 2.10 percent of the transaction value plus $0.10 per transaction for Visa Signature Preferred and Visa Infinite, Spend Qualified account, cards; 1.65 percent of the transaction value plus $0.10 per transaction for Visa Signature and Visa Infinite, Spend Not Qualified account, cards; and 1.43 percent of the transaction value plus $0.10 per transaction for traditional rewards credit cards and all other consumer credit card products.[166]

50.    Mastercard has similar categories and interchange rates for U.S. consumer credit cards. For example, interchange rates for consumer credit cards used with merchants classified by Mastercard as Tier I Supermarkets[167] have interchange rates of 1.15 percent of transaction value plus $0.05 per transaction for Core and Enhanced Value credit card products and 1.25 percent of transaction value plus $0.05 per transaction for World, World High Value, and World Elite credit care products.[168] Likewise, Mastercard's

---

[161] Benson et al. at pp. 88-90.

[162] To be considered a Tier 0 merchant, the merchant must have annual minimums of: 370 million transactions, $19.6 billion in transaction volume, a maximum dispute ratio of 0.020 percent, and be PCI Compliant. See Visa April 2022 Interchange Rates at p. 10.

[163] Visa April 2022 Interchange Rates at p. 7. I note there is a distinction between Visa Infinite with Spend Qualified Account and a Visa Infinite Spend Not Qualified Account; however, this distinction does not affect Tier 0 Supermarket interchange rates. See Visa April 2022 Interchange Rates at p. 9.

[164] Visa April 2022 Interchange Rates at p. 7.

[165] To meet the Threshold I requirements a merchant must have annual minimums of: 105.5 million transactions, $7.3 billion in transaction volume, a maximum dispute ratio of 0.020 percent, and be PCI Compliant. See Visa April 2022 Interchange Rates at p. 10.

[166] Visa April 2022 Interchange Rates at p. 7.

[167] Tier I Supermarkets have annual purchase volume of $6 billion. See Mastercard April 2022 Interchange Rates at p. 3.

[168] Mastercard April 2022 Interchange Rates at p. 2.

Merit III[169] Tier 1[170] merchants face interchange rates of: 1.43 percent of transaction value plus \$0.10 per transaction for Core and Enhanced Value credit card products; 1.53 percent of transaction value plus \$0.10 for World credit card products; and 2.05 percent of transaction value plus \$0.10 for World High Value and World Elite credit card products.[171]

### iii. The Discover Payment Network

51.     As I noted above, the last major GPCC payment network in the U.S. is Discover Financial Services ("Discover"). Discover is the financial services company behind the Discover Card.[172] The Discover payment network acts as both a closed-loop network and as a hybrid of Amex's closed-loop network and Visa and Mastercard's open-loop networks.[173] Like Amex, Discover is a bank and the sole issuer of Discover GPCCs.[174] However, Discover also acquires merchants alongside a network of merchant acquirers.[175] While Discover originally launched as a closed-loop network like Amex, in 2005 it shifted its acceptance model by working with merchant acquiring banks.[176] Like Amex, Discover issues GPCCs to cardholders and businesses and also functions as an acquiring bank contracting directly with merchants.[177] Additionally, Discover allows for external banks to perform the role of acquiring banks.[178] Discover also differs from Visa's and Mastercard's open-loop networks in that it functions as both an issuing bank and the payment network for the GPCCs it issues.[179] Given that Discover also acts as the

---

[169] This is the best qualification level for in-person sales. See Dharma Merchant Services, "Mastercard Merit III (In-Person)."

[170] Merit III Tier I merchants have minimum annual purchase volume of \$1.8 billion. See Mastercard April 2022 Interchange Rate at p. 3.

[171] Mastercard April 2022 Interchange Rates at p. 1.

[172] Discover 2021 10-K at pp. 1-2.

[173] Benson et al. at pp. 6, 75. As I discussed above, Amex also partially operates a hybrid payment network. Benson et al. at p. 75.

[174] "We are a bank holding company under the Bank Holding Company Act of 1956 as well as a financial holding company under the Gramm-Leach-Bliley Act and therefore are subject to oversight, regulation and examination by the Board of Governors of the Federal Reserve System (the "Federal Reserve")." Discover 2021 10-K at p. 1. "We currently offer and issue credit cards to consumers." Discover 2021 10-K at p. 2.

[175] Discover distinguishes "direct merchants' who contract directly with Discover and "indirect merchants" who use merchant acquirers as intermediaries between themselves and Discover. Discover 2021 10-K at p. 2.

[176] 2014 Amex Trial Transcript at 824:7-14.

[177] Discover 2021 10-K at p. 2; Benson et al. at pp. 6, 75.

[178] Discover 2021 10-K at p. 2.

[179] Discover 2021 10-K at p. 2; Benson et al. at pp. 6, 75.

acquiring bank for some GPCC Transactions, as of 2014, Discover possessed direct relationships with roughly 1,300 merchants who "represent well north of 50 percent of all spending on the Discover network."[180]

52.     Discover sets cardholder fees, which include the "cashback rewards" it offers to all cardholders.[181] For merchants Discover contracts with directly, it sets the merchant discount fee directly.[182] When Discover does not contract with the merchant directly (and a merchant acquirer is utilized and Discover operates similarly to an open-loop network), Discover sets the interchange fee.[183]

53.     Figure 6 below illustrates the flow of a GPCC Transaction through Discover's payment network for both a closed-loop and hybrid transaction (the numbers in parentheses below correspond to the numbers in Figure 6). As shown below, a cardholder uses their Discover GPCC at a merchant who is part of the Discover payment network (1).[184] If the merchant has a contract directly with Discover, the Discover payment network functions as a closed-loop network.[185] Next, the merchant submits the transaction to Discover (2).[186] Afterwards, Discover reimburses the merchant for the amount of the transaction less the merchant discount fee (3).[187]

---

[180] 2014 Amex Trial Transcript at 813:22-814:05

[181] Unlike Amex, Discover does not charge annual fees on any of its card. However, they do charge other types of fees such as, "late payments, returned checks, balance transfer transactions and cash advance transactions." See Discover, "Busting Common Myths About Discover Card's Acceptance," updated March 31, 2022; Discover 2021 10-K at pp. 2, 6.

[182] Discover 2021 10-K at p. 2.

[183] Benson et al. at pp. 85-91. See, also, Discover 2021 10-K at p. 2.

[184] Discover 2020 Annual Report at p. 2.

[185] Discover 2020 Annual Report at p. 2.

[186] Discover 2020 Annual Report at p. 2.

[187] Discover 2020 Annual Report at p. 2.

36

**Figure 6**
**Illustration of Discover GPCC Transaction Cycle**



Source: Discover 2020 Annual Report at p. 2.

54. On the other hand, when a Discover GPCC Transaction occurs in which Discover does not function as the acquiring bank for the merchant, the Discover payment network functions similarly to a hybrid network.[188] The merchant submits the GPCC Transaction to a separate merchant acquirer that it has contracted with (4). The merchant acquirer then reimburses the merchant for the transaction amount less the merchant discount fee (5).[189] The acquiring bank then submits the transaction to Discover (6) who reimburses the acquirer for the amount of the transaction less the interchange fee (7).[190] Discover then posts a charge to the cardholder's account for the amount of the transaction (8) and the cardmember pays Discover (9).[191]

55. The discussion above describes the various types of GPCC payment networks that that Amex, Visa, Mastercard, and Discover operate on in the market for GPCC

---

[188] Benson et al. at p. 75.
[189] Discover 2020 Annual Report at p. 2.
[190] Discover 2020 Annual Report at p. 2.
[191] Discover 2020 Annual Report at p. 2.

Transactions. In the next section, I discuss how the market for GPCC Transactions are two-sided markets.

### C. Payment Card Markets are Two-Sided Markets

56.     Economists have found the concept of a two-sided market to be useful in understanding the structure of certain markets with two distinct sets of customers or users which function through an intermediary.[192] Payment cards are one such market.[193] I discuss the concept of two-sided markets in greater detail below.

### i. Definition of Two-Sided Markets

57.     In a two-sided market, a platform intermediary connects two distinct groups of users where the decisions of each group affect the outcomes of the other group.[194] Because the platform cannot produce output without participation from members of each group, the intermediary faces the central problem of "get[ting] both sides on board."[195] This problem is commonly referred to as the chicken-and-egg problem.[196]

58.     According to Jean-Charles Rochet and Jean Tirole, "[c]onceptually, the theory of two-sided markets is related to the theories of network externalities and of (market or regulated) multi-product pricing. From the former [...] it borrows the notion that there are noninternalized externalities among end-users. From the latter, it borrows the focus on price structure...."[197] In a two-sided market, the key externality is the increase in value to one side of the market that comes from membership on the other side of the market.[198]

---

[192] Rysman (2009) at p. 125.

[193] Rysman (2009) at pp. 125-126. "The multi-sided nature of many Internet and high-technology markets, as well as new payment systems and media outlets, suggest that two-sided and multi-sided markets are becoming increasingly important." See Rysman (2009) at pp. 125-126.

[194] Rysman (2009) at p. 125. "Broadly speaking, a two-sided market is one in which 1) two sets of agents interact through an intermediary or platform, and 2) the decisions of each set of agents affects the outcomes of the other set of agents, typically through an externality." See Rysman (2009) at p. 125.

[195] Jean-Charles Rochet and Jean Tirole, "Platform Competition in Two-Sided Markets," *Journal of the European Economic Association*, Vol. 1, No. 4, 2003, 990-1029 (hereafter "Rochet and Tirole (2003)") at p. 990. See, also, Evans and Schmalensee at p. 143.

[196] Rochet and Tirole (2003) at p. 990; Rysman (2009) at p.132. See, also, Evans and Schmalensee at p. 144, 2014 Amex Trial Transcript at 820:23-821:16.

[197] Jean-Charles Rochet and Jean Tirole, "Two-sided markets: a progress report," *RAND Journal of Economics*, Vol. 37, No. 3, 2006, 645-667 (hereafter "Rochet and Tirole (2006)") at p. 646.

[198] Evans and Schmalensee at pp. 135-136; Rochet and Tirole (2006) at pp. 652-657.

59.     A common example of a two-sided market is a market for a local newspaper.[199] A newspaper publisher can earn revenue both from selling newspapers to readers and from selling advertising in the newspaper.[200] The value to the advertisers of placing an ad in a print newspaper depends on how many readers subscribe to the newspaper.[201] Because the value of the advertising side of the market depends on the membership of the readership side, an increase in readership has a positive externality on the advertising side of the market.[202] Therefore, to maximize profits, the publisher typically will take into account this externality and set relatively lower prices for readership side of the market.[203]

60.     A firm operating as a platform intermediary in a two-sided market sets prices for both groups of users.[204] Two-sided prices are characterized in two ways: 1) the total price or *price level*; and 2) the *price structure*.[205] The first, the total price or *price level*, is equal to the sum of the two prices, $p = p_1 + p_2$, where the prices for each group of users are denoted by $p_1$ and $p_2$, respectively.[206] The price level is sometimes referred to as the "two-sided price" or "net two-sided price." The second, the *price structure,* describes the allocation of the total price between the two groups of users.[207] In general, the price structure is not symmetric, meaning that the prices to each group of users are not equal.[208] Indeed, Rochet and Tirole take an asymmetric price structure to be a defining feature of two-sided markets: "a market is two-sided if the platform can affect the volume of transactions by charging more to one side of the market and reducing the price paid by the other side by an equal amount; in other words, the price structure matters, and platforms must design it so as to bring both sides on board."[209]

---

[199] Rochet and Tirole (2006) at p. 645.

[200] Rochet and Tirole (2006) at p. 645.

[201] Rochet and Tirole (2006) at pp. 645-647.

[202] Evans and Schmalensee at p. 141.

[203] Evans and Schmalensee at p. 140 and Table 6.2.

[204] Rochet and Tirole (2006) at pp. 645-647.

[205] Rochet and Tirole (2003) at p. 990. "[American Express] can vary both the level of prices (the average total price that cardholders and merchants combined pay for transactions) and the structure of prices (the shares of the total price that cardholders and merchants each pay)." See Evans and Schmalensee at p. 189.

[206] Rochet and Tirole (2003) at pp. 996, 998. As I discuss below, these prices are generally asymmetric.

[207] Rochet and Tirole (2003) at p. 990.

[208] Rochet and Tirole (2003) at 991, Table 1: Illustrations of Existing Business Models.

[209] Rochet and Tirole (2006) at pp. 664-665.

### ii. Payment Card Networks as a Two-Sided Market

61.     Economists have long analyzed the market for GPCC Transactions as a two-sided market.[210] Within this construct, one side of the GPCC Transaction market is comprised of cardholders who wish to pay for their purchases with a GPCC.[211] The price faced by cardholders for GPCC Transactions is the cardholder fee, which includes the (typically negative) cost, if one exists, of using the card to transact and any annual cost associated with owning the card (but not including the cost of using the revolving credit feature of the card).[212] The other side of the GPCC Transaction market is comprised of merchants who wish to accept GPCCs as payment for goods and services.[213] The price faced by merchants to accept GPCCs is the merchant discount fee, which I discussed in detail above.

62.     The cardholder fee is generally broken down into a fixed annual fee paid by the cardholder to the card-issuing bank and a per-transaction fee that depends on the value of the transaction (hereafter the "Annual Fee Net of Rewards").[214] The variable component of the Annual Fee Net of Rewards, which largely consists of cardholder rewards the cardholder receives from using the GPCC for a GPCC Transaction, is generally negative from the perspective of the cardholder, which means that the cardholder's issuing bank makes a payment to the cardholder.[215] I discuss the various types and forms of cardholder rewards earned by cardholders on GPCC Transactions in greater detail later in this Expert Report.

---

[210] Some early examples include Richard Schmalensee, "Payment Systems and Interchange Fees," *Journal of Industrial Economics*, Vol. 50, No. 2, 2002, 103-122; Jean-Charles Rochet and Jean Tirole, "Cooperation among Competitors: Some Economics of Payment Card Associations," *RAND Journal of Economics*, Vol. 33, No. 4, 2002, 549-570 (hereafter "Rochet and Tirole (2002)"); and Julian Wright, "One-sided Logic in Two-sided Markets," *Review of Network Economics*, Vol. 3, No. 1, 2004, 44-64. I have noted that some economists have used other analytical strategies that do not depend on the theory of two-sided markets. See, for example, Dennis W. Carlton and Ralph A. Winter, "Vertical Most-Favored-Nation Restraints and Credit Card No-Surcharge Rules," *Journal of Law and Economics*, Vol. 61, 2018, 215-251.

[211] Rochet and Tirole (2006) at pp. 646-647.

[212] Rochet and Tirole (2002).

[213] Rochet and Tirole (2002) at pp. 551-552.

[214] Rochet and Tirole (2002) at p. 553.

[215] Rochet and Tirole (2002) at p. 553; Benson et al. at pp. 94-95.

63.     The price level in the GPCC Transaction market is the sum of the merchant discount fee and the Annual Fee Net of Rewards per dollar of GPCC transaction value.[216] When the Annual Fee Net of Rewards is negative, the two-sided price is less than the merchant discount fee and the price structure allocates more than 100% of the two-sided price to the merchant side of the market.[217]

64.     When the GPCC payment networks were nascent they had to overcome the chicken-and-egg problem and get both sides (merchants and cardholders) onboard.[218] Before there were many cardholders for a particular GPCC payment network, a merchant may not have had the incentive to incur the costs of accepting the particular network's GPCC Transactions, regardless of the cost.[219]  Likewise, before there was widespread merchant acceptance of a particular GPCC payment network, potential cardholders may not have been interested in becoming cardholders of that GPCC payment network.[220] One reason for initially setting negative prices on the cardholder side was to solve this chicken-and-egg problem.[221]  As more consumers became GPCC cardholders and wanted to use their GPCCs, there was a network effect whereby more merchants wanted to accept the GPCCs, and this wider acceptance then further increased demand from GPCC cardholders.[222]

65.     However, now that the GPCC payment networks are mature, the impact of an additional GPCC cardholder on merchant acceptance or the impact of additional merchant acceptance on cardholder use is likely to be small.[223]  As explained by Frankel and Shampine in 2006: "Visa and MasterCard now operate the largest card payment systems and enjoy almost ubiquitous penetration among major merchants. Thus, they

[216] Evans and Schmalensee at p. 189.
[217] Rysman (2009) at p. 130.
[218] Rochet and Tirole (2003) at p. 990.
[219] Evans and Schmalensee at p. 143. See, also, Rochet and Tirole (2002) at p. 551.
[220] Evans and Schmalensee at pp. 143-144.
[221] Evans and Schmalensee at pp. 143-144.
[222] Evans and Schmalensee at pp. 143-144.
[223] Sienkiewicz at p. 10; Fumiko Hayashi, "Do U.S. Consumers Really Benefit from Payment Card Rewards?," *Economic Review*, Federal Reserve Bank of Kansas City, First Quarter 2009, 37-63 (hereafter "Hayashi") at p. 48.

41

probably have little continued need to overcome chicken-and-egg entry barriers."[224] Similarly, Levitin explained in his 2008 paper:

> Negative network effects are only a reasonable concern in the first place if the existence of the network itself produces net social welfare. This is the assumption that underlies much of the economic modeling of payment networks. This assumption makes sense if there are no good substitutes for the networked product or if the entrance of a new product to a market creates beneficial competition in the market. The assumption makes little sense in the context of mature products, like credit cards, that compete with other network products.[225]

### iii.    Cardholder Rewards

66.    For many years, issuers of GPCCs have incentivized consumers to become GPCC cardholders and to use GPCCs for their purchases.[226]  Some of these incentives are introductory in nature, designed to encourage consumers to apply for or begin using a GPCC.[227]  Such "introductory" incentives may include introductory interest rates (for credit cards), statement credits, or offers for premium goods.[228]  Other types of incentives are "ongoing in nature and serve both to differentiate a credit card product and to encourage that product's use."[229]  Such "ongoing" incentives may include reducing interest rates over time based on account spending or term.[230]

67.    One major type of incentive offered by issuers of GPCCs to encourage card use are commonly referred to as cardholder or membership "rewards."[231]  The value of

---

[224] Frankel and Shampine at pp. 655-656.

[225] Adam J. Levitin, "Priceless?  The Economic Costs of Credit Card Merchant Restraints," *UCLA Law Review*, Vol. 55, 2008, 1348-1409 (hereafter "Levitin") at p. 1386.  Levitin further noted: "Even by the logic of the network effects claim, as ahistorical as it is, merchant restraint rules have transformed from a shield to a sword as credit card networks have matured and new payment system networks have emerged. The network effect justification for merchant restraints is inappropriate in the context of a mature network that competes with other mature networks."  See Levitin at p. 1388.

[226] Bureau of Consumer Financial Protection, "The Consumer Credit Card Market," December 2015 (hereafter "2015 CFPB Report") at p. 209.

[227] 2015 CFPB Report at p. 209.

[228] 2015 CFPB Report at p. 209; Levitin at pp.1360-1361.

[229] 2015 CFPB Report at p. 209.

[230] 2015 CFPB Report at p. 209.

[231] 2015 CFPB Report at pp. 209-210.

rewards programs can be measured by a rewards rate (rewards cost divided by card sales volume)—such that, "premium rewards credit cards have a higher rewards rate than basic rewards credit cards, which in turn have a higher rewards rate than rewards debit cards (in the United States only)."[232]  For example, between 2016 and 2019, the rewards rate for Discover was reported to be between 1.19 and 1.33 percent.[233]

68.     According to a 2015 report covering the consumer credit card market published by the Consumer Financial Protection Bureau ("CFPB"), cardholder rewards offered by issuers of GPCCs typically share several key characteristics, including:

- Rewards are quasi-pecuniary and therefore denominated in fungible and equivalent units of value such as "miles" or "points;"

- Rewards can be accumulated over time in an account held either by the issuer or a third-party partner and, subject to conditions imposed by the program, redeemed automatically or at the consumer's discretion for money or for specified good or services; and

- Rewards are usually earned according to a predetermined formula based primarily on consumers' spending volume.  Typically, rewards are based on a percentage of consumer spending, sometimes but not always varying according to certain spend categories.  There may also be a lump-sum rewards "bonus" for meeting a specific spend level, often within a defined period after the account is opened.[234]

69.     The same 2015 CFPB report notes that, while rewards can take a variety of different forms, most fall into one of three categories:[235]

---

[232] Marie-Hélène Felt, Fumiko Hayashi, Joanna Stavins, and Angelika Welte, "Distributional Effects of Payment Card Pricing and Merchant Cost Pass-through in the United States and Canada," *Research Working Papers*, No. 20-18, Federal Reserve Bank of Kansas City, December 2020 (hereafter "Felt et al.") at p. 19.

[233] The Nilson Report, No. 1124, January 2018 at p. 12; The Nilson Report, No. 1146, January 2019 at p. 9; The Nilson Report, No. 1168, January 2020 (hereafter "Nilson Report, Issue #1168") at p. 7; Discover Financial Services SEC Form 10-K for the fiscal year ended December 31, 2017; Discover Financial Services SEC Form 10-K for the fiscal year ended December 31, 2018; Felt et al. at p. 13.

[234] 2015 CFPB Report at p. 209.

[235] Some cardholder rewards fall under multiple categories such as points that can be redeemed for cashback or other goods and services. See 2015 CFPB Report at pp. 211-212.

43

- "Cashback" rewards that consumers can redeem for statement credits, checks, deposits to an asset account, or cash at an ATM;

- Issuer "currency" that consumers can redeem for specific kinds of goods and services, such as travel or gift cards, or for discounts or rebates on such good[s] or services. Redemption can be via an issuer-provided marketplace or at the point of sale. In some cases, issuer currency may be exchangeable for loyalty points or miles in a third party's proprietary rewards program; and

- Co-branded rewards, in which a credit card issuer partners with a non-financial business to allow consumers to earn rewards in the partner's proprietary rewards program. These are most frequently airlines, hotels, and retailers.[236]

70.     Despite the existence of a large variety of cardholder rewards programs giving rise to a "similar proliferation of conditions, mechanisms, and policies" associated with individual rewards programs, there "is nevertheless an overall structure to rewards programs that can be generalized to almost all programs."[237] The process by which cardholders accumulate, or "earn," cardholder rewards is "generally a linear function of spending volume by consumers."[238] In some instances, the linear function under which cardholders earn rewards is simple: "A consumer earns a fixed quantity of miles, points, or money in invariant proportion to the amount spent."[239] In many other instances, consumers earn different rewards amounts based on different conditions.[240] These conditions can include earning nothing, or a base amount, if no additional conditions are met, but cardholders can then earn more if they meet one or more additional conditions.[241] Aside from cardholder rewards earned in the manner described above, the

---

[236] 2015 CFPB Report at pp. 211-212.
[237] 2015 CFPB Report at p. 212.
[238] 2015 CFPB Report at p. 212.
[239] 2015 CFPB Report at p. 212.
[240] 2015 CFPB Report at p. 212.
[241] 2015 CFPB Report at p. 212. "Those conditions are often related to spending at particular merchant [sic] or a merchant falling under a certain category. These conditions can be permanent features of the program structure or be made available only on a rotating basis (*e.g.*, a different category each season)." See 2015 CFPB Report at pp. 212-213.

"other major form of earning is the 'sign-up bonus.' Sign-up bonuses tend to be
structured differently as an incentive to consumers both to originate the account as well
as to commence using it."[242]

71.     Cardholder rewards programs offered by issuers of GPCCs remained popular
throughout the Class Periods. According to one February 2019 discussion paper
published by the Federal Reserve Bank of Philadelphia, "2005 was the first year in the
Panel when rewards cards equaled nonrewards cards in the share of wallet; in every year
since then, the share of rewards has increased until it reached 84 percent in 2017 (this
equates to 89 percent of credit cardholders having a rewards product)."[243] This paper
further found that the "shift in card spend has been even more drastic, with 95 percent of
credit card spend reported by the 2017 Panel being made on rewards cards," adding that
"[r]ewards products are so ubiquitous that the vast majority of revolving card balances
are now on rewards products (83 percent in 2017 compared with 71 percent in 2013); this
reflects a shift from prior years when the value of rewards products were primarily with
heavy transactors."[244]

72.     According to a 2021 CFPB report covering the consumer credit card market,
"[s]hifting preferences towards rewards cards reflect survey findings that show rewards
as the predominant factor in choosing a card."[245] Further, this report found that, while the
popularity of cardholder rewards programs has been "driven by the higher end of the
credit spectrum," by the "end of 2020, even consumers with deep subprime scores put
more than 60 percent of their credit card purchase volume on rewards cards, and
consumers with near-prime scores put nearly three-fourths of their spending on rewards
cards."[246] Figure 7 below illustrates the trends in the share of credit card purchase

---

[242] 2015 CFPB Report at p. 213. "The general formula for sign-up bonuses awards consumers a substantial lump sum payment of additional rewards. To receive this payment, consumers must meet a spending target within some period following the origination of the account. This period is usually no more than a few months." See 2015 CFPB Report at p. 213.
[243] Tom Akana, "Discussion Paper Consumer Payment Preferences and the Impact of Technology and Regulation: Insights from the Visa Payment Panel Study," *Consumer Finance Institute Discussion Papers*, No. 19-01, Federal Reserve Bank of Philadelphia, February 2019 (hereafter "Akana") at pp. 9-10.
[244] Akana at p. 10.
[245] 2021 CFPB Report at p. 88.
[246] 2021 CFPB Report at pp. 87-88.

volume made on rewards cards by credit score tier from 2017 to 2020.[247] As shown below, according to this analysis, while the highest shares of rewards credit card spending volume came from cardholders with the highest credit scores, no credit score tier accounted for less than 60 percent in 2020, with the overall share of rewards credit card purchase volume was consistently over 80 percent in every year from 2017 to 2020.

**Figure 7**

SHARE OF PURCHASE VOLUME ON A REWARDS CARD, GENERAL PURPOSE (Y-14+)



■ 2017  ■ 2018  ■ 2019  ■ 2020

Source: 2021 CFPB Report at p. 87.

73.     This same 2021 CFPB report noted that "[c]ardholders continue to embrace rewards cards, and increasingly prefer cash rewards to miles," adding that in 2020, "cash rewards card spending increased the most of any group, accounting for one third of general purpose card spending."[248] This report further noted that "[s]pending on miles rewards cards fell to 18 percent in 2020, which coincided with a sharp decline in travel spending as a result of pandemic-related travel restrictions," and further that "[c]ards that earn other types of rewards, such as points, special offers, or discounts, remain the most common by purchase volume at 39 percent."[249] Figure 8 below illustrates the share of credit card purchase volume by type of reward for each year from 2017 to 2020.

---

[247] The underlying data for Figures 7 and 8, denoted Y-14+, are a combination of the Board of Governors of the Federal Reserve System's monthly data collection from banks with total consolidated assets exceeding $50 billion, which account for approximately 70 percent of outstanding balances on consumer credit cards as of year-end 2020. These data are supplemented to, "allow for a broader or more detailed perspective into certain facets of the market" and to "cover a larger and more representative portion of the credit card market." 2021 CFPB at pp. 17-18 and footnote 29.

[248] 2021 CFPB Report at p. 88.

[249] 2021 CFPB Report at p. 88.

# Figure 8

SHARE OF PURCHASE VOLUME BY REWARD TYPE, GENERAL PURPOSE (Y-14+)



Source: 2021 CFPB Report at p. 89.

74.     As a result of the growing popularity of rewards GPCCs, GPCC issuers have significantly increased their rewards-based marketing materials as compared to two decades ago. Figure 9 below illustrates the share of acquisition mailings[250] associated with rewards credit cards from 2002 to 2017. As shown, the share of acquisition mailings associated with rewards credit cards was approximately 20 percent around the beginning of 2002. This share peaked near 75 percent in 2010, and has since stabilized around 60 percent.

---

[250] Acquisition mailings are defined as, "solicitations sent to potential new customers." See Bureau of Consumer Financial Protection, "The Consumer Credit Card Market," December 2017 (hereafter "2017 CFPB Report") at footnote 37.

## **Figure 9**

SHARE OF ACQUISITION MAILINGS ASSOCIATED WITH REWARDS CARDS (MINTEL COMPEREMEDIA)



Source: 2017 CFPB Report at p. 60.

75.     Evidence indicates that the recent COVID-19 pandemic caused GPCC issuers to change their cardholder rewards offerings as a result of the ensuing changes in consumer spending and rewards redemption brought on by the pandemic.[251]  In particular, the CFPB noted that "[d]uring the pandemic, several issuers made changes to bonus earning by increasing rewards for spending in areas such as grocery and home delivery and by offering statement credits or redemption options for items people were more likely to use while staying home such as video streaming services and cellphone bills."[252]  According to the CFPB, these "programmatic changes were likely aimed at keeping customers from moving spending away from their card, downgrading to lower-fee products, or canceling their card altogether."[253]  Along these lines, as Amex explained in a "Submission to the Reserve Bank of Australia," the "intent [of cardholder rewards programs] is to encourage the cardmember not only to remain loyal to the rewards-earning card product but also to consolidate all plastic charge activity on the same product."[254]

---

[251] 2021 CFPB Report at p. 89.

[252] 2021 CFPB Report at p. 89.  The CFPB added that "[s]ome issuers also extended the time allowed to meet spend requirements to earn sign-up bonuses." See 2021 CFPB Report at p. 89.

[253] 2021 CFPB Report at p. 89.

[254] AMEX-CP-000029726-755 at 739.

48

### III. Amex's Anti-Steering Rules

76.    As I discussed above, I understand that Plaintiffs' allegations in this matter involve Amex's continued imposition and enforcement of the Anti-Steering Rules contained in its merchant agreements, which unreasonably restrain trade in the two-sided market for GPCC Transactions. In the section below, I discuss Amex's Anti-Steering Rules in greater detail, including how they continued to bind Amex-accepting merchants from engaging in pro-competitive steering methods that would have allowed them to lower their overall costs of GPCC acceptance after Visa and Mastercard agreed to drop key provisions in their non-discrimination policies contained in their merchant acceptance agreements.

### i.    Steering is Commonly Used by Merchants to Control Costs

77.    "Steering" is a commonly-used method by merchants to attempt to influence consumer's choices to those more beneficial to the merchant. As Judge Garaufis noted in an Opinion in a related matter, "[m]erchants routinely attempt to influence customers' purchasing decisions, whether by placing a particular brand of cereal at eye level rather than on a bottom shelf, discounting last year's fashion inventory, or offering promotions such as 'buy one, get one free.'"[255] In his 2007 academic journal article, Alexander Raskovich noted that "[r]etailers have an incentive to recommend goods on which they earn relatively high margins – a practice sometimes called 'steering.'"[256] Warren S. Grimes explained in his 1995 article that retailers have a "substantial incentive" to steer customers away from a brand of product that offers them lower margins than their favored brand."[257]

78.    Another form of steering merchants often utilize to steer consumers is known as "upselling," which involves "encouraging customers to buy a higher-end version of a product than what they originally intended to purchase."[258] Merchants may also utilize

---

[255] United States District Court for the Eastern District of New York, *United States of America, et al., Plaintiffs, v. American Express Company and American Express Travel Related Services Company, Inc., Defendants*, Opinion, No. 10-cv-04496-NGG-RER, February 19, 2015 at p. 3.
[256] Alexander Raskovich, "Retail Buyer Power through Steering," *Economics Letters*, Vol. 96, 2007, 221-225 at p. 222.
[257] Warren S. Grimes, "Brand Marketing, Intrabrand Competition, and the Multibrand Retailer: the Antitrust Law of Vertical Restraints," *Antitrust Law Journal*, Vol. 64, No. 1, 1995, 83-136 at p. 107.
[258] Salesforce, "What is Upselling."

the "decoy effect," also known as the "asymmetric dominance effect," which consists of offering two products (one low-price, lower-quality product and one high-price, higher-quality product), and then offering a third product that is of higher quality and lower cost compared to the original high-quality product, enticing consumers to choose the third product.[259] Additionally, due to more recent technological innovation, merchants are "[u]sing increasingly granular data, from detailed demographics and psychographics to consumers' clickstreams on the web, [...] to create highly customized offers that steer consumers to the 'right' merchandise or services."[260] Technology-based steering methods such as these can include digital coupons for grocery stores based on past purchases or Amazon's "people who bought this also bought that" feature.[261]

79.   Common evidence I have reviewed demonstrates that Amex itself has used steering as a strategy with its own suppliers in order to help control costs and increase profits. For example, in its role as "one of the large [travel] agencies in the United States," whereby it sells airline, hotel, and rental car services to travelers, Amex frequently steers its customers to preferred suppliers as a means of reducing its costs.[262] As Pamela Arway of Amex explained to other Amex executives in a September 2003 email, to "become preferred within Amex Travel, a supplier must agree to pay a Business Development Agreement fee," adding that this fee to Amex "is the price of entry for any supplier who wants to become a preferred vendor and list their product within our network."[263] Ms. Arway further described the rationale for the Business Development Agreement fee as follows:

> Our second principle is that we try to sell and promote only preferred
> suppliers, and we actively sell away from non-preferred suppliers. This
> reinforces the value of the BDA for suppliers that are willing to pay, and it
> gives teeth to the whole Preferred Supplier program. Very few suppliers

---

[259] UBC Sauder School of Business, "Retailers use 'decoy effect' to lure consumers into buying pricier products: study," September 8, 2021 (hereafter "UBC"). "The decoy strategy is used in everything from magazine subscriptions to food sales." See UBC.

[260] Thomas H. Davenport, Leandro DalleMule, and John Lucker, "Know What Your Customers Want Before They Do," *Harvard Business Review*, December 2011 (hereafter "Davenport et al.").

[261] Davenport et al.

[262] 2014 Amex Trial Transcript at 3460:3-3461:1.

[263] AMEXNDR08498685-86 at 85.

50

> elect to be non-preferred with Amex, because we are rigorous in not allowing non-preferreds the same benefits as preferreds. We run incentives for counselors to move business to preferreds and we are aggressive with those that support non-preferreds. […] But, part of what keeps our preferreds coming back to us is their fear of how aggressive we actually are against non-preferreds (for example, [British Airways]).[264]

At the 2014 Amex Trial, Patrick Corbett, Vice President of Global Supplier Relations for the Americas at Amex, testified that Amex still utilized this preferred supplier program at that time, noting further that the "whole point of being a preferred supplier to American Express Business Travel is to have volume shifted towards [the supplier]."[265]

80.     Common evidence demonstrates that Amex's preferred vendor program or preferred supplier program was effective at shifting share away from non-preferred vendors to preferred vendors.[266] At the 2014 Amex Trial, Scott Miller, general manager over ancillary revenue at Delta Airlines, testified that Amex could "move a lot of share away from Delta to Delta's competitors" by "preferencing Delta's competitors over Delta."[267] Mr. Miller further testified that such preferencing away from Delta to its competitors can make "a big difference in revenues for a company like Delta."[268] When British Airways decided in 2002 to cease accepting GPCCs for corporate fares in the UK, Amex responded by "implement[ing] an aggressive share-shift programme that will significantly reduce [British Airways] travel sales-volumes with AmEx worldwide."[269] This initiative resulted in Amex reducing British Airways' global air sales volume with Amex by 15.5 percent from June 1, 2002 to November 11, 2002, with a reduction in the

---

[264] AMEXNDR08498685-86 at 86; 2014 Amex Trial Transcript at 3480:4-11.

[265] 2014 Amex Trial Transcript at 3467:2-3468:15, 3478:2-14.

[266] I have noted that Amex acknowledged that its dealings with suppliers through its preferred supplier programs are similar to a retail store: "Q: So in that sense, you're kind of like a store where the shelves are stocked with the various airlines, hotels and rental car companies that you can then provide to your corporate customers, correct? A: Well, there is another intermediary; the global distribution systems. Our content comes through the global distribution systems. Q: So I'm trying to simplify the process. So through the mechanisms of global distribution systems, you have suppliers that are providing you with inventory that stock the shelves of the store that you then can provide to your business customers; is that fair? A: Yes, we do sell their inventory." See 2014 Amex Trial Transcript at 3462:4-17.

[267] 2014 Amex Trial Transcript at 5310:22-5311:11, 5389:1-5390:2.

[268] 2014 Amex Trial Transcript at 5389:1-5390:5.

[269] AMEXNDR14224940-950 at 941. Another of Amex's stated objectives for this initiative was to "[s]top other carriers from pursuing the same action." See AMEXNDR14224940-950 at 941.

US of 28.8 percent during this 23-week period.[270] Similarly, when Northwest Airlines attempted to raise its global distribution (GDS) fees on Amex effective September 2004, Amex "immediately replied" by un-preferencing Northwest Airlines globally at the point of sale, and also contacting all of the "top NWA customers" to inform them of the new fee, and "[o]rganized boycott by 50% of accounts with NWA activity."[271] As a result, Amex reported that this effort resulted in "10-16% decrease in NWA booking within 2 weeks," and that "NWA rescinded GDS fee on 9/02/04," one day after instituting the new fee with one factor being the "decrease in bookings from AXP travel."[272]

81.     In the context of this matter, steering refers to a merchant's ability to induce, or "steer" a customer to use a GPCC payment network that is less expensive for the merchant to accept (or is otherwise preferred by the merchant), thus better allowing the merchant to control and reduce the costs it incurs as part of a GPCC Transaction.[273] In a competitive market, there are a number of ways a merchant can reduce their GPCC acceptance costs through steering. These methods include, for example, presenting signage (or otherwise expressing) at the point of sale that the merchant prefers one type of GPCC payment network over another;[274] verbally encouraging the customer at the point of sale that the merchant prefers a different GPCC payment network over the one the customer initially wishes to pay with; offering discounts or other in-kind incentives to customers to use a particular GPCC payment network over another; or, in support of these methodologies, post information regarding the relative GPCC acceptance costs for the different GPCC brands.[275]

82.     An additional type of steering that is relevant to this matter is a merchant's ability to impose differential surcharges on customers (i.e., surcharges that could differ based on the GPCC brand or product they pay with for a given GPCC Transaction). There are several ways in which differential surcharging can benefit merchants by allowing them to

---

[270] AMEXNDR14224940-950 at 942.
[271] AMEX-DOJ-10039083-9124 at 9114. See, also, AMEXNDR07218059.
[272] AMEX-DOJ-10039083-9124 at 9114.
[273] Merchant Restraints at pp. 327-328.
[274] For an online purchase, such signage might be in the form of a banner ad located on the payments page of the company's website that is visible to the customer before the payment is made. See Frankel and Shampine at p. 648.
[275] American Express, "Merchant Reference Guide - U.S.," April 2022 (hereafter "April 2022 Amex Merchant Reference Guide") at p. 7.

52

control and/or reduce their overall costs of GPCC acceptance. One such way is that having the freedom to differentially surcharge customers for some or all of the amount of the merchant discount fee it incurs for accepting a given GPCC (along with the freedom to provide price transparency for cardholders to better understand the costs associated with their preferred payment choice) could cause a significant amount of GPCC cardholders to opt to pay with a less expensive GPCC for a given transaction (or a less expensive alternative form of payment). Such a response from GPCC cardholders would allow merchants to lower their overall blended costs of GPCC acceptance.

83.     Importantly, given the effectiveness of differential surcharging in steering consumers towards paying with a less expensive GPCC for a given transaction (or a less expensive alternative form of payment), merchants do not need to actually impose surcharges on their customers in order for the freedom to differentially surcharge to allow merchants to lower their overall GPCC acceptance costs. Rather, as I explain in greater detail later in this Expert Report, the freedom to differentially surcharge constitutes a credible threat that would incentivize GPCC payment networks to negotiate reduced merchant discount fees (in some instances via a lower interchange rate) that merchants pay on those GPCCs in exchange for agreements from those merchants not to surcharge that GPCC payment network's cards.

84.     In the sections below, I discuss in greater detail how Amex's continued imposition and enforcement of its Anti-Steering Rules during the Class Periods prevented merchants from taking advantage of the pro-competitive benefits associated with steering. Later in this Expert Report, I discuss common evidence demonstrating that, in the absence of Amex's continued imposition and enforcement of its Anti-Steering Rules during the Class Periods, Amex-accepting merchants would have engaged in these forms of steering, allowing them to reduce their overall costs of GPCC acceptance.

## ii.     Overview of Amex's Anti-Steering Rules

85.    Amex introduced the American Express Card in 1958.[276] As early as 1959,
Amex's standard Card Acceptance Agreement included the following non-discrimination
provisions:

> You agree that the prices (including shipping or other charges) charged to
> holders of our credit cards will not be greater than those charged to your
> other customers. You also agree to accept charges of holders of our Credit
> Cards for advertised sales and that the prices charged for such purchases
> shall be no greater than those charged to your other customers.[277]

86.    In the years since the launch of the American Express Card, Amex has revised
and/or strengthened the language of the non-discrimination provisions contained in its
Card Acceptance Agreements in ways that have made them more restrictive.[278] For
example, in 1986 after Visa established its Merchant Relations Group to "aggressively
attack competitors in the card market at the merchant level," Amex responded by
"revis[ing] its standard form Card Acceptance Agreement to protect against denigration
at the point of sale by expanding the non-discrimination language to prohibit the more
active promotion of other debit or credit cards (in addition to charge cards)."[279] Later, in
1992, in response to Visa's continued "We Prefer Visa" promotional campaign, "Amex
elaborate[d] the existing [non-discrimination provisions] to expressly prohibit stating or
publishing a 'preference' for any card over the American Express Card."[280] I discuss in
greater detail below the current form of Amex's non-discrimination provisions that
constitute the Anti-Steering Rules at issue in this matter.[281]

87.    Amex's current Merchant Reference Guide contains the following language with
respect to Amex's Anti-Steering Rules:

---

[276] AMEX-CP-000030935-958 at 935.

[277] AMEX-CP-000030935-958 at 935. The Card Acceptance Agreement also included a provision
concerning the display of promotional materials by merchants: "You also agree to display prominently the
identifying insignia of the American Express Credit Card Plan and to include mention of the Plan in your
advertising and promotional literature." See AMEX-CP-000030935-958 at 935.

[278] For a more comprehensive timeline of changes to Amex's Anti-Steering Rules from 1958 through 2010,
see AMEX-CP-000030935-958.

[279] AMEX-CP-000030935-958 at 940.

[280] AMEX-CP-000030935-958 at 944.

[281] For a more detailed summary of the evolution of non-discrimination provisions contained in Amex's
Card Acceptance Agreements, see AMEX-CP-000030935-958.

54

Except as expressly permitted by Applicable Law, Merchants must not:

- indicate or imply that they prefer, directly or indirectly, any Other Payment Products over our Card,

- try to dissuade Cardmembers from using the Card,

- criticize or mischaracterize the Card or any of our services or programs,

- try to persuade or prompt Cardmembers to use any Other Payment Products or any other method of payment (e.g., payment by check),

- impose any restrictions, conditions, disadvantages, or fees when the Card is accepted that are not imposed equally on all Other Payment Products, except for electronic funds transfer, or cash and check,

- suggest or require Cardmembers to waive their right to dispute a Transaction,

- engage in activities that harm our business or the American Express Brand (or both),

- promote any Other Payment Products[282] (except the Merchant's own private label card that they issue for use solely at their Establishments) more actively than the Merchant promotes our Card, or

- convert the currency of the original sales Transaction to another currency when requesting Authorization or submitting Transactions (or both).[283]

88. The terms above are included as part of American Express' standard policies and procedures for Card acceptance.[284] In plain terms, Amex's Anti-Steering Rules prohibit an Amex-accepting merchant from (among other things) engaging in certain practices

---

[282] Amex defines Other Payment Products as "[a]ny charge, credit, debit, stored value, prepaid, or smart cards, account access devices, or other payment cards, services, or products other than the Card." See April 2022 Amex Merchant Reference Guide at p. 50.

[283] April 2022 Amex Merchant Reference Guide at p. 7.

[284] April 2022 Amex Merchant Reference Guide at pp. 2, 7.

that would allow it to reduce its costs of GPCC acceptance by steering customers to less costly GPCCs, such as preference campaigns, or efforts to dissuade customers from using Amex GPCCs at the point of sale in favor of Other Payment Products.[285]  In addition, Amex's Anti-Steering Rules prohibit an Amex-accepting merchant from imposing differential surcharges on customers depending on which brand or product of GPCC they use (such as different GPCCs), thus taking away a merchant's ability to credibly threaten to differentially surcharge; rather, Amex's Anti-Steering Rules require that any surcharge assessed by a merchant must be the same for every GPCC it accepts, as well as for certain other forms of payment such as Debit Cards.[286]

### iii.    The Durbin Amendment

89.    On July 21, 2010, Congress passed the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), whose stated purpose was to "promote the financial stability of the United States by improving accountability and transparency in the financial system, to end 'too big to fail', to protect the American taxpayer by ending bailouts, to protect consumers from abusive financial services practices, and for other purposes."[287]  Section 1075 of Dodd-Frank (the "Durbin Amendment"), "authorize[d] the Federal Reserve Board to mandate regulations to ensure that any interchange transaction fee received by a debit card issuer is reasonable and proportional to the cost incurred by the issuer."[288]  The Durbin Amendment's (and subsequent Federal Reserve Board regulation) new standard for Debit Card interchange fees applied to transactions made using "debit cards issued by financial institutions with assets of $10 billion or more."[289]  On June 29, 2011, the Federal Reserve Board issued its final rule ("Regulation II") which went into effect on October 1, 2011.[290]  Regulation II capped per-transaction Debit Card

---

[285] April 2022 Amex Merchant Reference Guide at p. 7.

[286] April 2022 Amex Merchant Reference Guide at p. 7.

[287] "Dodd-Frank Wall Street Reform and Consumer Protection Act," Public Law 111-203, July 21, 2010 at 124 STAT. 1376; AMEX-CP-000095201-237 at 237.

[288] Darryl E. Getter, "Regulation of Debit Interchange Fees," Congressional Research Service, R41913, May 16, 2017 (hereafter "Getter") at p. 1.

[289] Robert J. Shapiro, "The Costs and Benefits of Half a Loaf: The Economic Effects of Recent Regulation of Debit Card Interchange Fees," *Sonecon*, October 1, 2013 (hereafter "2013 Shapiro") at pp. 1-2; Getter at p. 5. See, also, Board of Governors of the Federal Reserve System, "Federal Reserve issues a final rule establishing standards for debit card interchange fees and prohibiting network exclusivity arrangements and routing restrictions," June 29, 2011 (hereafter "June 2011 Federal Reserve Press Release").

[290] 2013 Shapiro at p. 1. See, also, June 2011 Federal Reserve Press Release.

56

interchange fees at $0.21 plus an additional 0.05 percent of the transaction's value, and a $0.01 charge "for debit card issuers that meet certain fraud prevention standards."[291]

90.     In addition to new standards for Debit Card interchange fees, the Durbin Amendment contained provisions that required payment networks to allow merchants to "provide a discount or in-kind incentive for payment by the use of cash, checks, debit cards, or credit cards," subject to certain restrictions,[292] as well as to set a minimum transaction amount (not to exceed $10) for the acceptance of GPCCs on that transaction.[293]  Prior to the Durbin Amendment, Amex's Anti-Steering Rules only permitted differential pricing in the form of discounts for payments using cash, ACH funds transfer, or check, subject to certain restrictions.[294]  However, in 2010, following the Durbin Amendment, Amex revised its Anti-Steering Rules to account for these additional forms of discounting.[295]

91.     The Durbin Amendment, however, did not prevent GPCC payment networks such as Amex from enforcing the aspects of their non-discrimination provisions that prohibited merchants from: i) offering discounts or in-kind incentives to customers based on the brand of GPCC they paid with (for example, discounting all Visa GPCCs but not discounting Mastercard GPCCs); ii) utilizing differential surcharging on GPCC Transactions by brand or product (for example, the Amex Gold card or Visa Chase Sapphire Preferred card); or iii) from promoting or expressing a preference for one brand of GPCC over another.[296]  In the following section, I discuss two events prior to the Class Periods in this matter which led to Visa and Mastercard agreeing to drop certain key aspects of their own non-discrimination policies with the intention of driving greater levels of competition on the merchant side of the market for GPCC Transactions.  In the section that follows, I discuss common evidence demonstrating how Amex's continued imposition and enforcement of its Anti-Steering Rules following these events and during

---

[291] 2013 Shapiro at p. 1; Getter at p. 5. See, also, Federal Reserve System, "Final Rule, Regulation II, Debit Card Interchange Fees and Routing," July 20, 2011 (hereafter "Federal Reserve Regulation II Final Rule") at p. 43404.
[292] The discount or in-kind incentive cannot differ based on the issuer or payment card network.
[293] Federal Reserve Regulation II Final Rule at p. 43445; AMEX-CP-000030935-958 at 955-956.
[294] AMEX-CP-000030935-958 at 953-954.
[295] AMEX-CP-000030935-958 at 955-957.
[296] AMEX-CP-000030935-958 at 955-957.

57

the Class Periods effectively prevented Amex-accepting merchants from utilizing the kinds of pro-competitive steering methods intended by these Visa and Mastercard agreements in order to lower their overall GPCC acceptance costs.

**iv.     Visa and Mastercard's 2011 Consent Decree and 2013 Merchant Plaintiff Settlement**

92.     As I discussed above, following the passage of Dodd-Frank, GPCC payment networks were still permitted to enforce the non-discrimination provisions contained in their merchant agreements. At the time, Visa and Mastercard required merchants to adhere to certain non-discrimination policies that were similar to those Amex imposed on its merchants. Essentially, Visa and Mastercard prohibited merchants from engaging in any GPCC acceptance practice that discouraged the use of their GPCC brand in favor of another GPCC brand.[297]

93.     Shortly after the passage of Dodd-Frank, Visa and Mastercard entered into a Consent Decree ("2011 Consent Decree") with the U.S. Department of Justice ("DOJ") which required Visa and Mastercard to permit merchants to offer customers discounts, benefits, or other incentives to switch to a particular brand of GPCC, or alternative form of payment, as well as to promote or express a preference for a particular brand of GPCC, or alternative forms of payment.[298] Additionally, Visa and Mastercard agreed to permit merchants to "communicat[e] to a Customer the reasonably estimated or actual costs incurred by the Merchant when a Customer uses a particular Brand or Type of General Purpose Card or a particular Form of Payment or the relative costs of using different Brands or Types of General Purpose Cards or different Forms of Payment."[299]

94.     Prior to entering the 2011 Consent Decree, the DOJ stated in its Competitive Impact Statement:

---

[297] United States District Court for the Eastern District of New York, *United States of America, et al., Plaintiffs, v. American Express Company and American Express Travel Related Services Company, Inc., Defendants*, Final Judgment As To Defendants Mastercard International Incorporated And Visa Inc., No. 1:10-cv-04496-NGG-RER, July 20, 2011 (hereafter "2011 Consent Decree") at p. 10.
[298] 2011 Consent Decree at pp. 5-6.
[299] 2011 Consent Decree at p. 7.

> The purpose of Section IV.A is to free merchants to influence the method
> of payment used by their customers by providing them information,
> discounts, benefits, and choices at the point of sale. For example,
> merchants will be able to encourage customers, using the methods
> described in Section IV.A, to use one General Purpose Card instead of
> another, to use one type of General Purpose Card instead of another (such
> as by offering a discount for the use of a cheaper non-rewards Visa card
> instead of a premium-level Visa rewards card), or to use a different
> General Purpose Card or form of payment than the General Purpose Card
> the customer initially presents to the merchant. Merchants will also be
> able to encourage the use of any other payment form, such as cash, check,
> or debit cards, by using the methods described in Section IV.A.[300]

As Judge Garaufis noted, the purpose of the 2011 Consent Decree was for Visa and
Mastercard "to allow Merchants to attempt to influence the General Purpose Card or
Form of Payment Customers select by providing choices and information in a
competitive market," adding that this "Final Judgment should be interpreted to promote
such efforts and not limit them."[301] The 2011 Consent Decree only applied to Visa and
Mastercard; Amex did not enter into the 2011 Consent Decree nor agree to any of the
terms that were intended to promote greater competition on the merchant side of the
market for GPCC Transactions.[302]

95.     While the 2011 Consent Decree discussed above was intended to "provid[e]
choices and information in a competitive market," one key aspect of Visa's and
Mastercard's non-discrimination policies that remained in place following this agreement
(as well as the passage of the Durbin Amendment) was its continued enforcement of its
no-surcharge rules.[303] As described in the Final Approval of a 2013 settlement involving

---

[300] United States District Court for the Eastern District of New York, *United States of America, et al.,
Plaintiffs, v. American Express Company and American Express Travel Related Services Company, Inc.,
Defendants*, Competitive Impact Statement, No 1:10-cv-04496-NGG-CLP, October 4, 2010 at p. 11.
[301] 2011 Consent Decree at p. 5.
[302] 2011 Consent Decree at p. 5.
[303] United States District Court Eastern District of New York, *In Re: Payment Card Interchange Fee and
Merchant Discount Antitrust Litigation*, Payment Card Interchange Fee Settlement, No. 1:05-md-01720-
JG-JO, December 13, 2013 (hereafter "2013 Settlement") at p. 5; 2011 Consent Decree at p. 5.

Visa and Mastercard in a related matter involving a group of merchant Plaintiffs ("2013 Settlement"), the "no-surcharge rules prohibit merchants from adding a surcharge to a transaction involving either of the networks' credit cards," and the 2013 Settlement further explains that "a merchant who must pay a 2% interchange fee upon accepting a Visa or MasterCard credit card is prohibited from adding a 2% surcharge (or any surcharge at all) to either discourage the use of that card or to recoup the cost of acceptance."[304]

96.     However, as part of the 2013 Settlement, Visa and Mastercard agreed to modify their merchant agreements to "permit merchants to surcharge on Visa- or MasterCard-branded credit card transactions at both the brand and product levels."[305] In connection with the 2013 Settlement, both Visa and Mastercard allowed merchants to add a surcharge to credit card transactions (subject to certain limitations included in the agreement) beginning on January 27, 2013.[306] In its Final Approval of the 2013 Settlement in a December 2013 Memorandum and Order, the Court described the intended procompetitive benefits that Visa and MasterCard dropping its no-surcharge provisions would have in the market for GPCC Transactions:

> The proposed elimination of the no-surcharge rules finally would allow
> merchants to make transparent and avoidable what has been opaque and

---

[304] 2013 Settlement at p. 8.

[305] 2013 Settlement at p. 8. Among other things, the 2013 Settlement provided for the "[a]uthorization for merchants that operate multiple businesses under different 'trade names' or 'banners' to accept Visa and or MasterCard at fewer than all of its businesses," as well as the "locking-in of the reforms in the Durbin Amendment and the DOJ consent decree with Visa and MasterCard, even if those reforms are repealed or otherwise undone." See 2013 Settlement at p. 8. The new surcharge system agreed to in the 2013 Settlement had four elements:

- Merchants may surcharge the full average discount fee incurred (as determined by the prior month or last 12 months);
- Merchants may surcharge brand-wide (e.g., all Visa or MasterCard credit cards), or they employ a more nuanced strategy and impose surcharges on one or more product groups (e.g., Visa Signature cards or MasterCard World Elite cards, which carry higher fees for many merchants);
- Merchants must disclose to consumers that the surcharge does not exceed the merchant's cost of acceptance, and disclose the amount of the surcharge both before it is incurred and on a receipt; and
- If another more expensive network brand that the merchant accepts continues to restrict surcharging, the merchant may not surcharge Visa and MasterCard without also surcharging transactions on that competitor network. This is the "level-playing-field" provision.

See 2013 Settlement at p. 38.

[306] See Visa, "Surcharging Credit Cards-Q&A for Merchants." See, also, Mastercard, "U.S. Merchant Class Settlement Frequently Asked Questions   Merchant Surcharge."

60

> inevitable. Customers can be told what it costs the merchant to accept a
> particular card. Merchants can use their ability to disfavor one network at
> the point of sale by surcharging. That power will incentivize both
> networks to moderate or lower their interchange fees to avoid being
> disfavored. The customer can then choose between using the premium
> card that is subject to a surcharge (she may value the rewards of the high-
> cost card more than a lower purchase price) or being steered to a lower-
> cost card and paying less for the transaction.

> The ability to surcharge allows merchants to recoup the higher acceptance
> costs of the expensive cards. It allows them to steer customers to less
> costly cards or to other payment mechanisms, decreasing their card-
> acceptance costs. It allows market forces to operate on the previously
> invisible (to customers) array of interchange fees, and will exert
> downward pressure on those fees by injecting a form of competition the
> current rules have prohibited.[307]

Like the 2011 Consent Decree, Amex was not a party to the 2013 Settlement, and did not
agree to drop the no-surcharge provisions of its Anti-Steering Rules at or around the same
time as Visa and Mastercard did.[308] Rather, as I discussed above, Amex continues to
impose the no-surcharge provisions of its Anti-Steering Rules as of the writing of this
Expert Report.[309]

97.     In spite of the intended pro-competitive effects of the 2011 Consent Decree and
2013 Settlement entered into by Visa and Mastercard, I discuss below common evidence
demonstrating that Amex's continued enforcement of its Anti-Steering Rules
significantly forestalled the intended pro-competitive benefits of these agreements in the
market for GPCC Transactions.

   **v.    The "American Express Problem"**

---

[307] 2013 Settlement at pp. 32-33.
[308] 2013 Settlement.
[309] See, for example, April 2022 Amex Merchant Reference Guide at p. 7.

61

98.     As I noted above, while Visa and Mastercard agreed to make major changes to the
non-discrimination policies contained in their merchant agreements following the 2011
Consent Decree and the 2013 Settlement, Amex did not enter into similar agreements,
nor did it make similar changes to its Anti-Steering Rules around the same time.
Conversely, since the revision to its Anti-Steering Rules in 2010 in response to the
passage of Dodd-Frank, Amex has not made any significant changes to these rules
through the present.[310]

99.     Common evidence I have reviewed demonstrates that Amex's continued
enforcement of its Anti-Steering Rules after Visa and Mastercard entered into these

---

[310] AMEX-CP-000030935-958 at 955-958; April 2022 Amex Merchant Reference Guide at p. 7. I
understand that on April 30, 2015, a "trial court issued an injunction requiring [Amex] to change the
provisions in [its] agreements with merchants accepting American Express cards in the U.S. that prohibit
merchants from engaging in various actions to encourage Card Members to use other credit or charge card
products or networks." See American Express SEC Form 10-Q for the Quarterly Period Ended June 30,
2015 (hereafter "Amex 10-Q For Period Ending June 30, 2015") at p. 35. This injunction became effective
on July 20, 2015, but was later stayed on December 18, 2015 by the Second Circuit. See Amex 10-Q For
Period Ending June 30, 2015 at p. 35; Kevin Penton, "2nd Circ. Pauses Feds' Win in AmEx Anti-Steering
Suit," Law360, December 18, 2015; United States Court of Appeals For The Second Circuit, *United States
of America, et al., Plaintiffs, v. American Express Company, et al., Defendants*, Stay of Order, No. 10-cv-
4496, December 18, 2015. As part of this injunction, Amex was required "make reasonable efforts" to
inform each Amex-accepting merchant of these changes, using specific language including in the Court's
injunction. See United States District Court for the Eastern District of New York, *United States of
America, et al., Plaintiffs, v. American Express Company and American Express Travel Related Services
Company, Inc., Defendants*, Order Entering Permanent Injunction as to the American Express Defendants,
No. 1:10-cv-04496-NGG-RER, April 30, 2015. As of the filing of this Expert Report, I am not aware of
any evidence of Amex-accepting merchants engaging in a significant amount of steering during the
approximately five-month period this injunction was in effect. To the extent that Amex-accepting
merchants did not take advantage of their ability to steer using methods prohibited by Amex's Anti-
Steering Rules, this outcome would be consistent with Amex's public communications regarding the
injunction. For example, when Amex disclosed the injunction in a Form 10-Q, it also noted it was
"vigorously pursuing an appeal of the decision and judgement." See Amex 10-Q For Period Ending June
30, 2015 at pp. 35, 68, 77-78. Furthermore, in one letter Amex sent to a merchant informing it of the
injunction, Amex also concluded by stating: "American Express is presently appealing the federal court's
ruling. If the federal court's ruling is reversed or modified as a result of the appeal, American Express
reserves all rights to cancel or revise these modifications. We will apprise you of any such updates in the
future." See "US Law for the Tussle Between Different Modes of Payment," Confessions of a Supply-Side
Liberal, November 17, 2015 (hereafter "US Law for the Tussle between Pay"). I have noted that this
particular letter Amex sent to this merchant informing it of the injunction was dated October 7, 2015, a
little less than three months after the injunction became effective, and a little more than two months before
it was stayed. See US Law for the Tussle between Pay. Thus, given the nature of Amex's aggressive
public communications regarding the injunction, it wouldn't be surprising that a significant amount of
Amex-accepting merchants did not undertake the time and effort necessary to engage in steering during the
approximately five months Amex was prevented from enforcing its Anti-Steering Rules until there was
greater clarity as to their ability to do so over a longer-term horizon. Should any additional information
regarding Amex-accepting merchant steering behavior during this this temporary injunction become
available at a later date, I reserve the right to revise my analysis in this regard at an appropriate stage of this
litigation.

agreements significantly forestalled the intended pro-competitive benefits of the agreements in the market for GPCC Transactions. With respect to the 2011 Consent Decree Visa and Mastercard entered, common evidence I have reviewed demonstrates that the intended pro-competitive effects of this agreement were largely nullified by Amex's continued enforcement of its Anti-Steering Rules. This is due to the fact that, while the 2011 Consent Decree required Visa and Mastercard to permit merchants to offer customers discounts, benefits, or other incentives to switch to a particular brand of GPCC, or alternative form of payment,[311] Amex's Anti-Steering Rules require that "the discount or in-kind incentive does not differentiate on the basis of the Issuer or, except as expressly permitted by applicable state statute, payment card network (e.g., Visa, MasterCard, Discover, JCB, American Express)."[312] Thus, Amex-accepting merchants are effectively prevented from providing differential discounts or in-kind incentives (as permitted by Visa and Mastercard following the 2011 Consent Decree) as a method of steering customers towards less-expensive GPCCs.

100.    In addition, as I discussed above, while the 2011 Consent Decree required Visa and Mastercard to permit merchants to promote or express a preference for a particular brand of GPCC, or alternative forms of payment, Amex's Anti-Steering Rules require Amex-accepting merchants must not "indicate or imply that they prefer, directly or indirectly, any Other Payment Products over our Card."[313] Thus, after the 2011 Consent Decree, Amex's Anti-Steering Rules continued to bind Amex-accepting merchants from engaging in marketing campaigns whereby they expressed a preference for a particular (e.g., less-expensive) non-Amex GPCC in an effort to steer customers towards using that GPCC, as Amex interpreted such campaigns as discriminating against the Amex brand (even if the promotion itself did not reference Amex in any way).

101.    By way of example of how Amex's Anti-Steering Rules continued to bind merchants from steering Visa, Mastercard, or Discover GPCCs even after the 2011 Consent Decree, Joseph Quagliata of Amex testified:

---

[311] 2011 Consent Decree at pp. 5-6.

[312] April 2022 Amex Merchant Reference Guide at p. 7.

[313] April 2022 Amex Merchant Reference Guide at p. 7. This language was incorporated into Amex's Anti-Steering Rules prior to the 2011 Consent Decree. See AMEX-CP-000030935-958.

> THE COURT: So if that sign said, We do our best to keep our costs and
> your prices down, if you're planning to use a MasterCard or a Visa and
> you have a Discover card in your wallet, we'd rather have you use a
> Discover card, would that in any way be in violation of the terms of your
> contract with the merchant regarding the use of the American Express
> Card, because it raises the specter of the American Express Card having a
> certain cost, even though it's not mentioned?
>
> THE WITNESS: Yes, absolutely so. And I think that's where the line is
> crossed because in the communication that you just outlined, it could be
> misconstrued by the card member, the American Express Card member
> saying not only is Discover a more advantageous product to use versus
> Visa or MasterCard, but also American Express.
>
> THE COURT: Even though it's not mentioned?
>
> THE WITNESS: Even those [sic] it's not mentioned, yes.[314]

Thus, Amex-accepting merchants were left with little choice but to continue not engaging
in such preference campaigns (even though they were permitted to do so by Visa and
Mastercard following the 2011 Consent Decree) to be able to continue accepting Amex
GPCCs.

102.    While the 2011 Consent Decree entered into by Visa and Mastercard addressed
the forms of merchant steering discussed above, this agreement did not require Visa and
Mastercard to permit merchants to assess surcharges on GPCC Transactions involving
Visa or Mastercard GPCCs. However, as noted above, the 2013 Settlement entered into
by Visa and Mastercard addressed this issue by permitting merchants to surcharge Visa
and Mastercard GPCCs at either the brand or product level beginning in January 2013.[315]

103.    Common evidence I have reviewed, however, demonstrates that the intended pro-
competitive effects of the 2013 Settlement were largely nullified by Amex's continued
imposition and enforcement of its Anti-Steering Rules. This is due to the fact that, with

---

[314] 2014 Amex Trial Transcript at 671:7-22.
[315] Visa, "Surcharging Credit Cards-Q&A for Merchants;" Mastercard, "U.S. Merchant Class Settlement
Frequently Asked Questions — Merchant Surcharge."

64

respect to surcharging, Amex's Anti-Steering Rules "require parity with any other competitive payment product (other than EFT, cash, and check)."[316] Thus, unlike the Visa and Mastercard merchant agreements which, following the 2013 Settlement, permitted merchants to differentially surcharge Visa and Mastercard GPCCs at both the brand and product levels, Amex's Anti-Steering Rules required a merchant that wished to surcharge GPCC Transactions to apply the same surcharge to all GPCC brands and products, no matter what the costs of merchant acceptance for those various GPCCs were.[317] Therefore, Amex's Anti-Steering Rules effectively prohibited Amex-accepting merchants from differentially surcharging GPCC Transactions (and, thus, prevented Amex-accepting merchants from credibly threatening to differentially surcharge a given GPCC). Furthermore, as Amex explained in a June 2021 presentation, due to the way the no-surcharge provision in Amex's Anti-Steering Rules is written, "[m]erchants accepting AXP who want to surcharge, have to surcharge credit and debit equally."[318] As this Amex presentation went on to explain, an Amex-accepting merchant that wants to differentially surcharge GPCC Transactions (consistent with Visa's and Mastercard's revised rules following the 2013 Settlement) had to either "[v]iolate AXP's policy requirements," or "[d]rop AXP acceptance."[319] Similarly, in a December 2019 presentation regarding the threat of surcharging in the U.S., Amex stated that to "implement credit surcharging, merchants have 3 options: violate AXP rules, drop AXP acceptance, or drop V/MC debit acceptance."[320]

[316] AMEX-CP-000094461-492 at 468; April 2022 Merchant Reference Guide at p. 7.
[317] April 2022 Amex Merchant Reference Guide at p. 7. Amex refers to this type of surcharging that is "applied equally across all Credit products" as "Parity Surcharging." See AMEX-CP-000094461-492 at 464.
[318] AMEX-CP-000094461-492 at 468 (emphasis in original).
[319] AMEX-CP-000094461-492 at 468. Further adding to ways in which Amex's Anti-Steering Rules prevent Amex-accepting merchants from differentially surcharging is that Visa's and Mastercard's merchant acceptance policies prohibit merchants from surcharging Visa and Mastercard Debit Card Transactions. See AMEX-CP-000094461-492 at 465, 468. Thus, given the fact that Amex's Anti-Steering Rules require Amex-accepting merchants who wish to surcharge do so equally across all GPCC Transactions and Debit Card Transactions (which are significantly less costly for the merchant than GPCC Transactions), then those merchants would, in effect, have to cease accepting Visa and Mastercard Debit Cards. See AMEX-CP-000094461-492 at 465, 468. According to a February 2022 Nilson Report, virtually all debit card purchases (including prepaid debit) in 2021 were made using Visa or Mastercard debit cards. See Nilson Report, Issue #1213 at p. 5.
[320] AMEX-CP-000095201-237 at 203, 212.

65

104.   Regarding objectors' assertions that the "elimination of the no-surcharge rule is rendered useless by what all parties have termed the 'level-playing-field' provision," Judge Gleeson noted in his December 2013 Memorandum and Order regarding the final approval of the 2013 Settlement: "Since many merchants accept American Express, which carries an even higher cost acceptance, and the American Express rules prohibit surcharging, most merchants will, as a practical matter, be precluded from surcharging Visa and MasterCard products."[321]   Judge Gleeson further added: "this objection, like many of the objectors' claims, places in sharp relief the limited extent to which the problems merchants complain about in this industry can be addressed in a single lawsuit,"[322] adding:

> I note preliminarily that the mere fact that merchants may *choose* not to
> avail themselves of the proposed relief ( *i.e.*, by continuing to accept
> American Express) does not compel the conclusion that the indisputably
> procompetitive rules changes are not a valuable achievement. [...] The
> mere fact that American Express, through rules similar to those challenged
> here, may continue to engage in what the objectors would describe as
> anticompetitive conduct is hardly an indictment of the proposed settlement
> before me. The merchants who support the proposed settlement are fully
> justified in the view that "the American Express problem" is not only a
> problem that must be (and in fact is being) addressed elsewhere, but that
> isolating American Express as the only remaining major network insulated
> from price competition will assist in the effort to "fix" it. In any event, the
> problem posed by American Express's merchant restraints does not alter
> the fact that the essence of the injunctive relief obtained by the proposed
> settlement will permit procompetitive actions by merchants at the point of
> sale, and that those actions have the potential to ameliorate the precise
> anticompetitive effect—supracompetitive interchange fees—that these
> lawsuits were brought to challenge.[323]

---

[321] 2013 Settlement at p. 36.
[322] 2013 Settlement at pp. 36-37.
[323] 2013 Settlement at pp. 36-37 (emphasis in original).

66

105. Indeed, as I noted above, to date, Amex has not made any significant changes to its Anti-Steering Rules since the 2010 passage of Dodd-Frank. Further, Amex noted in a September 2019 strategic planning presentation that "AXP won Supreme Court case, enabling non-discrimination provisions to remain in place and preventing differential surcharging."[324] Later in this Expert Report, I discuss extensive common evidence in the form of acknowledgments from Amex, other GPCC payment networks, and Amex-accepting merchants that Amex's continued imposition and enforcement of its Anti-Steering Rules following the 2011 Consent Decree and 2013 Settlement that created the "American Express Problem" have persisted, preventing Amex-accepting merchants from utilizing the kinds of pro-competitive steering methods intended by the 2011 Consent Decree and 2013 Settlement in order to lower their overall GPCC acceptance costs. As I also discuss in greater detail later in this Expert Report, as a result, Amex's continued enforcement of its Anti-Steering Rules caused anticompetitive effects, resulting in injury to the Classes.

## IV. The GPCC Transaction Market in the United States Constitutes a Relevant Antitrust Market

106. As I previously discussed, I understand that Plaintiffs' allegations in this matter involve Amex's continued imposition and enforcement of the Anti-Steering Rules contained in its merchant agreements, which unreasonably restrain trade in the two-sided market for GPCC Transactions. To evaluate Plaintiffs' claims in this regard, it is necessary to determine whether the GPCC Transaction Market constitutes a relevant antitrust market. Based on my own analysis of the documents produced in this litigation, published economic literature, and my training and experience in economics, I have concluded that the GPCC Transactions market constitutes a relevant antitrust product market. I have also concluded that the United States constitutes the relevant antitrust geographic market for evaluating the alleged misconduct. I discuss my reasons for these conclusions below.

### A. Common Evidence Consistent with the Finding that the GPCC Transactions

---

[324] AMEX-CP-000094638-670 at 664.

67

### *Market is a Relevant Antitrust Product Market*

107.    In economics, a relevant antitrust product market is comprised of the smallest possible set of goods for which a hypothetical monopolist could exercise market power to raise prices on that set of products by a small, but significant, amount without losing so much in sales volume that the increase in price is unprofitable.[325] If the analysis concludes that there are other products which would make such a price increase unprofitable, the market definition is broadened to include that set of goods, and the hypothetical monopolist test is applied again. In general, an economic analysis of the relevant antitrust product market requires identifying "products that are close demand or supply substitutes."[326] That is, a relevant market should contain all the products which are substitutable for each other in the face of small but significant, non-transitory price increases; an analysis of the relevant market thus necessarily focuses on an analysis of *economic* substitutability. Based on my research and analysis into the GPCC Transactions market and my training and experience in economics, I have determined that the GPCC Transactions market constitutes a relevant antitrust product market. I base this conclusion on the fact that there are no economic substitutes for GPCC Transactions. In particular, as I describe below, transactions involving other forms of payment (such as

---

[325] One of the tools economists rely upon in defining relevant antitrust product and geographic markets is the so-called "SSNIP" test. A SSNIP test is based upon a hypothetical "small but significant and non-transitory increase in price," as described in the Horizontal Merger Guidelines. The SSNIP test is used by the FTC and the DOJ to define relevant economic markets. The SSNIP test is intended to ascertain whether a hypothetical monopolist can exercise market power in a relevant product or geographic market. If the hypothetical monopolist is able to permanently (that is, in a "non-transitory" way) raise prices for a product or group of products by a "small but significant" amount, usually assumed to be five percent, without losing so much in sales volume that the increase in price is unprofitable, then that product or group of products constitutes a relevant antitrust product market. See U.S. Department of Justice and the Federal Trade Commission, "Horizontal Merger Guidelines," August 19, 2010 (hereafter "Horizontal Merger Guidelines") at § 4.1.2. "Even when the evidence necessary to perform the hypothetical monopolist test quantitatively is not available, the conceptual framework of the test provides a useful methodological tool for gathering and analyzing evidence pertinent to customer substitution and to market definition." See Horizontal Merger Guidelines at § 4.1.3.

[326] Dennis Carlton and Jeffrey Perloff, *Modern Industrial Organization*. Fourth Edition, Reading, MA: Addison Wesley, 2000 (hereafter "Carlton & Perloff") at p. 670. "Product B is a *demand substitute* for A if an increase in the price of A causes consumers to use more B instead. Product B is a *supply substitute* for A if, in response to an increase in the price of A, firms that are producing B switch some of their production facilities to the production of A." See Carlton & Perloff at p. 646 (emphasis in original). See, also, Horizontal Merger Guidelines at § 4.

68

Debit Cards, pre-paid gift cards, and cash) are not economic substitutes for GPCC Transactions.

108.    A product is an "economic substitute" for another product if a small but significant change in price for that product results in increased demand for the other product.[327] The change in price necessary to cause consumers to switch to a substitute good is often considered to be around five percent.[328] I discuss the evidence, both from the public domain and in documents produced in discovery as part of this litigation, demonstrating that there were no economic substitutes for GPCC Transactions during the Class Period in greater detail below.

## i.    Debit Card Transactions Do Not Discipline Pricing of GPCC Transactions, and Thus are Not an Economic Substitute for GPCC Transactions

109.    Earlier in this Expert Report I discussed Debit Cards and how they compared to GPCCs. Common evidence I have reviewed demonstrates that Debit Cards and GPCCs possess different key features, benefits, and uses that differentiate them from one another and cause them not to be economic substitutes for one another. As described above, one key difference between Debit Cards and GPCCs is that credit is not extended through Debit Card Transactions.[329] That is, funds for a Debit Card purchase are debited from the debit cardholder's account, while GPCC purchases are made using the bank's funds that must be paid back by the cardholder.[330] As a result, a source of revenue for Debit Card issuers is the net interest income on cardholder deposit account balances, in contrast to GPCC issuers that earn interest charged to cardholder revolving balances or loans.[331] The debit cardholder, unlike the GPCC cardholder, must have sufficient funds in their checking account to be able to make a purchase.[332] Therefore, the debit cardholder

---

[327] Robert S. Pindyck and Daniel L. Rubinfeld, *Microeconomics*. Eighth Edition, Upper Saddle River, New Jersey: Pearson Education, 2013 (hereafter "Pindyck & Rubinfeld (8th edition)") at pp. 24-25.

[328] Five percent is the number commonly adopted by the U.S. Department of Justice and the Federal Trade Commission when evaluating the competitive effects of mergers. See Horizontal Merger Guidelines at § 4.1.2.

[329] Benson et al. at p. 96.

[330] Lake.

[331] Benson et al. at pp. 94, 96, 98.

[332] Benson et al. at p. 96. Currently the Federal Reserve Bank requires banks to allow checking account/debit card holders to opt into overdraft protection. Prior to this, account holders might be

69

"cannot incur much debt because you can only spend what is in your bank account plus a small 'courtesy overdraft' amount," while GPCC cardholders "incur debt with every purchase" and therefore bear a greater risk of "overspending."[333]

110.     Debit Cards are issued based on where an individual chooses to open a bank account.[334] Therefore, the approval process for a Debit Card is much easier, relative to the approval process for a GPCC that requires the individual to have a qualifying credit score.[335] Debit Cards, along with other bank account services, such as automated bill paying and direct deposit, help Debit Card issuers "attract customers that are likely to use additional financial products, including loans."[336] Diversifying the financial products customers use allows depository institutions to "cross-subsidize their costs and financial risks more effectively."[337] Debit Cards serve as an extension of the individual's checking account product; Debit Card Transactions are more convenient than check and cash transactions and earn interchange revenue for Debit Card issuing banks.[338] As an extension of a bank account, when "you use a debit card, funds are immediately drawn from your bank account, as if it were an instant check."[339] On the other hand, credit cards are like "mini loans that you can use over and over again" as a form of revolving credit.[340] Debit Cards are "most often used when making smaller payments for general merchandise" and are "more convenient than cash or check in most cases."[341] Debit Cards can also be used to withdraw cash from an ATM or to withdraw cash when

---

subjected to overdraft fees when making purchases with insufficient funds in account balances. See Benson et al. at pp. 96, 99. Authorization of Debit Card Transactions is typically more challenging than for GPCC Transactions because, without extending credit, transactions must be checked against an "ever-changing account balance." See Benson et al. at p. 99.

[333] Megan Doyle, "Cash, Debit, or Credit  How to Choose Which to Use?," American Express (hereafter "Doyle").

[334] Benson et al. at p. 98.

[335] Megan Doyle, "Fundamental Differences Between Credit and Debit Cards," American Express, Credit Intel, January 31, 2020 (hereafter "Doyle 2020").

[336] Getter at p. 8.

[337] Getter at p. 8.

[338] Benson et al. at pp. 98-99.

[339] Doyle 2020.

[340] Doyle 2020. See, also, Discover Bank, "The Difference Between Credit Cards and Debit Cards: Explained" (hereafter "The Difference Between Credit Cards and Debit Cards").

[341] Doyle.

70

completing transactions at a register, whereas GPCCs will "most likely charge you a cash advance fee if that feature is available."[342]

111. Furthermore, GPCC rewards programs might include "cash back rewards, airline miles, or points in a cardholder loyalty program" or additional perks like "free rental car insurance, airport lounge access, concierge services, and even extended warranties on electronics."[343] On the other hand, Debit cardholders "used to high reward levels on most of their credit cards, are often disappointed with the relatively low levels of rewards on debit cards."[344] According to one textbook on payment systems in the U.S., offering rewards for Debit Card usage may make more sense for "non-regulated" debit issuing banks, (i.e., debit issuing banks with less than $10 billion in assets are not subjected to interchange fee caps).[345] The rewards programs that are provided may focus on bank account actions (e.g., different points for PIN and signature debit, electronic bill payment service, receipt of electronic statements, etc.) or the rewards on purchases may be funded by merchant partners.[346] In contrast, the issuance of GPCCs typically uses lucrative rewards and benefits not offered by Debit Cards to incentivize individuals to sign up for GPCCs and encourage using GPCCs to make purchases.[347]

112. Several factors, such as customer preferences, customer attributes, and card characteristics, will impact whether the customer chooses to complete a purchase using a Debit Card or GPCC.[348] As I discussed above, given the risk of extending credit through GPCCs, individuals with poor credit or financial management skills are often advised to use their Debit Card to make purchases in order to avoid the high interest rates and late fees associated with credit card debt that "could send that debt spiraling out of control at

---

[342] The Difference Between Credit Cards and Debit Cards. See Doyle. See, also, Doyle 2020.

[343] Doyle 2020.

[344] Benson et al. at p. 101.

[345] Benson et al. at pp. 97, 101, 149.

[346] Benson et al. at p. 101.

[347] Andrew P. Scott, "Merchant Discount, Interchange, and Other Transaction Fees in the Retail Electronic Payment System," Congressional Research Service, IFI1893, August 6, 2021 (hereafter "Scott"). "A lot of credit cards boast lucrative rewards (which often come with a higher annual fee), but even the most basic credit cards come with benefits that debit cards don't." See Doyle 2020.

[348] The Difference Between Credit Cards and Debit Cards.

71

a rapid speed."[349]  According to the Federal Reserve, in 2021 approximately 50 percent of credit cardholders carried a balance at least once during the last 12 months.[350] Oftentimes, given the associated credit risks, GPCCs may not be an option of many consumers with poor credit scores.  For example, according to Discover, poor credit scores could result in available GPCCs being less appealing due to low credit limits or high interest rates, or result in the potential cardholder being ineligible to qualify for the card.[351]  Individuals looking to build or rebuild their personal credit scores may prefer to use "a single credit card with a small limit that you pay off in full each month to build a credit history."[352]  For online or larger purchases, a customer may prefer to use a credit card for greater product coverage, in the case of "a dispute with the merchant."[353]  The differences in consumer liability resulting from Debit Card and GPCC billing issues is, in part, due to Debit Cards and GPCCs being subject to different regulations.[354]  In sum, while Debit Card Transactions and GPCC Transactions "look the same, feel the same, and they're both convenient ways to pay," there are "fundamental differences" that will impact the how cards are used and who uses those cards.[355]

113.  Further demonstrating that Debit Card Transactions and GPCC Transactions are not economic substitutes is the fact that GPCCs cost significantly more for merchants to accept as payment as compared to Debit Cards, yet those merchants continue to accept both GPCCs and less-expensive Debit Cards. At the 2014 Amex Trial, the parties

---

[349] Doyle 2020. "Credit cards require a responsible approach to your personal finances because you have the ability to spend beyond what you might have as cash in your bank account. [...] If you're struggling to manage or get out of debt, a debit card should be your 'go-to Id,' [...] You can't get out of debt if you keep charging." See The Difference Between Credit Cards and Debit Cards.
[350] See Board of Governors of the Federal Reserve System, "Economic Well-Being of U.S. Households in 2020," May 2021 at Table 10.
[351] "If you've reached your credit limit, you won't be able to use the card for more purchases until you pay off at least part of the balance. You owe a minimum payment each month. [...] [K]now that most credit cards carry an interest rate [...]. 'If you have a lower credit score, you may still get approved, but you might have a lower credit limit.'" See The Difference Between Credit Cards and Debit Cards.
[352] The Difference Between Credit Cards and Debit Cards.
[353] The Difference Between Credit Cards and Debit Cards.
[354] For example, in an October 2018 analysis regarding GPCC and Debit Card billing issues, the FDIC stated: "What can you do to protect your money? There are federal laws in place to assist consumers and limit their liability for debit and credit billing issues   Regulation E and the Electronic Funds Transfer Act (EFTA) for debit cards and Regulation Z and the Truth in Lending Act (TILA) for credit cards." See Federal Deposit Insurance Corporation, "Credit and Debit Card Billing Issues: What You Need to Know," October 2018.
[355] Doyle 2020.

72

stipulated that of the top 100 retailers in the US as identified by the National Retail Federation based on 2010 sales, 98 of those retailers accepted GPCCs.[356] As John Robinson of Ikea testified at the 2014 Amex Trial, "[c]redit cards are our most expensive payment form that we accept."[357] Dwaine Kimmet of Home Depot similarly testified that that for Home Depot, "bank card credit is about four times the cost of our debit."[358] Consistent with this testimony, Table 6 below summarizes the total merchant processing fees in the U.S. for various payment card types in 2016 and 2021. As shown, the merchant acceptance costs associated with GPCCs are significantly higher than for signature and PIN Debit Cards.

**Table 6**
**Summary of Merchant Processing Fees by**
**Payment Card**

| Payment Card | 2016 | 2021 |
|---|---|---|
| Amex GPCC | 2.36% | 2.26% |
| Visa/Mastercard GPCC | 2.12% | 2.22% |
| Discover GPCC | 2.04% | 2.15% |
| Private Label Card | 1.17% | 1.25% |
| Visa/Mastercard Debit | 0.73% | 0.72% |
| PIN Debit | 0.67% | 0.66% |

Source: Nilson Report, Issue #1109 at p. 7; Nilson Report, Issue #1216 at 9.

114.   Therefore, given the differences in features, benefits, and uses afforded to cardholders between Debit Cards and GPCCs, merchants are left with little choice but to accept both Debit Cards and GPCCs. Consistent with this, common evidence I have reviewed in the form of statements and testimony from merchants demonstrates that merchants do not view Debit Card Transactions and GPCC Transactions as close substitutes for one another. For example, at the 2014 Amex Trial, Dwaine Kimmet of Home Depot testified that after the Durbin Amendment caused the cost of accepting Debit Cards to fall "[r]oughly by half," Home Depot continued accepting GPCCs because

---

[356] 2014 Amex Trial Transcript at 6750:14-6752:6.
[357] 2014 Amex Trial Transcript at 380:8-12.
[358] 2014 Amex Trial Transcript at 1230:19-22. See, also, 2014 Amex Trial Transcript at 1683:24-1684:17, 2401:6-19; 2014 Amex Trial PX1348, PX2615, PX2616.

it has "a certain segment of [its] customers who want to pay with credit and [it] technically [has] to take that tender as a transaction to effect that sale."[359] Mr. Kimmet further explained that Home Depot is "almost required to accept credit cards" due to the relatively high average ticket size at Home Depot, explaining: "given that our average ticket is higher, our average ticket is $52, more customers tend to pay with credit just because it is a higher average ticket, and they may want to finance it or whatever the case maybe [sic]. That is the primary reason that credit is a higher percentage of our business."[360]

115.    At this same trial, Frank Bruno of Crate & Barrel testified:

> Q. So has Crate & Barrel considered dropping credit cards due to the
> decreased rate of debit?
>
> A. No. They are totally different products.[361]

When asked why Ikea couldn't simply stop accepting GPCCs and instead run its business accepting Debit Cards, John Robinson testified:

> [W]e have customers who have a preference toward using debit. Those
> customers may be people who don't want to carry a balance at the end of
> the month; they may be people who are budget conscious and simply not
> want to spend more than what's in their bank account. Then we have
> other customers who want to purchase and who are willing to, basically,
> carry a balance from month to month and, again, our experience has
> shown us different customers, have different preferences, and we have to
> offer those choices.[362]

---

[359] 2014 Amex Trial Transcript at 1234:8-1235:5.

[360] 2014 Amex Trial Transcript at 1231:1-1232:12. When asked about the possibility of ceasing acceptance of GPCCs in favor of Debit Cards, Mr. Robinson testified: "I think there is a segment of the customer base - - if you assume that our competitors continue to accept credit cards, I would assume that there would be a segment of the customer base that would clearly move to our competitors. Because they want to pay with credit, they can only pay with credit. So they would go to the respective retailer who would afford them that ability, and then there is a segment of customers who may tend to shift or whatever." See 2014 Amex Trial Transcript at 1232:13-24.

[361] 2014 Amex Trial Transcript at 2322:5-7.

[362] 2014 Amex Trial Transcript at 387:8-388:7. Mr. Robinson further testified to a form of steering that Ikea engaged in for two separate time intervals between 2003 and 2012 whereby Ikea offered discounts on

Similarly, Diedre O'Malley testified that Best Buy never considered accepting only Debit Cards and not GPCCs despite the cost of accepting Debit Cards being "much lower" because "consumers are expecting to pay with credit cards," adding: "Additionally we have a pretty high average ticket. We sell a lot of big items. And for individuals it can be a challenge to put them on debit card, on occasion for the limits set from banks."[363]

116.    Furthermore, common evidence I have reviewed demonstrates that merchants would not cease acceptance of GPCCs if the cost of accepting GPCCs (the merchant discount) were to increase by a small but significant amount. For example, at the 2014 Amex Trial, Mr. Kimmet of Home Depot testified that if the average cost of accepting GPCCs increased by ten percent, Home Depot would continue to accept GPCCs, noting that it is his "job to ensure that I can take payments on the tender that our customers want to pay with, obviously within reason. And, I think given the materiality of credit in our business, it would be, you know, impossible for me to not accept bank card credits."[364]

117.    The common evidence discussed above demonstrates that Debit Cards and GPCCs possess different key features, benefits, and uses that differentiate them from one another and cause them not to be economic substitutes for one another. This constitutes one piece of common evidence demonstrating that the market for GPCC Transaction constitutes a relevant antitrust product market.

### a.  **Durbin Amendment Practical Indicia**

118.    As I previously discussed, one central element of the Durbin Amendment to Dodd-Frank (which was enacted in July 2010; with the final rule (Regulation II) being issued in June 2011 and becoming effective in October 2011) was the implementation of

---

future purchases to customers for using PIN debit, which was less expensive for Ikea to accept than checks and Signature debit, as well as, of course, GPCCs. Mr. Robinson noted that both of these steering efforts were successful in that it increased the use of PIN debit at the expense of more expensive payment options (i.e., checks during the 2003 to 2006 promotion and Signature debit during the 2008 to 2012 promotion). However, Mr. Robinson testified that neither of those promotions resulted in a reduction in GPCC use by customers in favor of paying with less-expensive PIN debit. See 2014 Amex Trial Transcript at 398:8-406:20.

[363] 2014 Amex Trial Transcript at 1525:9-21.

[364] 2014 Amex Trial Transcript at 1233:8-25. At the same trial, Jennifer Dale of Sprint testified that, despite GPCCs being the most expensive form of payment for Sprint to accept (she estimated GPCCs were over five times more expensive to accept than Debit Cards), Sprint would continue to accept GPCCs in the face of a ten percent increase in the cost of acceptance because of the potential loss of customers and sales to competitors if it did not accept GPCCs. See 2014 Amex Trial Transcript at 1683:24-1685:6.

a cap on per-transaction Debit Card interchange fees at $0.21, with an additional 0.05 percent of the transaction's value and $0.01 charge "for debit card issuers that meet certain fraud prevention standards."[365] According to the Federal Reserve, the Durbin Amendment resulted in a 46 basis point decline in the average interchange rate for Debit Card Transactions when comparing the last three months of 2011 to the first nine months of 2011.[366] This constituted a 37 percent decrease in the interchange fees paid by merchants for accepting Debit Cards.[367] At the 2014 Amex Trial, Jack Funda, then Amex Senior Vice President for Global Merchant Pricing at Amex, testified that the caps on fees for Debit Card acceptance caused by the Durbin Amendment was a "significant drop from what the debit cost was before the Durbin Amendment."[368]

119.   Given this, the significant caps on interchange rates associated with Debit Card Transactions is akin to an increase in the interchange rates (and, thus, merchant discount fees) associated with GPCC Transactions relative to interchange rates associated with Debit Card Transactions. Thus, the Durbin Amendment provides a further useful form of practical indicia to analyze whether or not Debit Card Transactions are economic substitutes for GPCC Transactions.

120.   Common evidence I have reviewed demonstrates that the implementation of the cap on interchange fees associated with Debit Card Transactions following the Durbin Amendment did not result in a significant number of merchants dropping acceptance of GPCCs in favor of Debit Cards. For example, at the 2014 Amex Trial, Peter Haslam of Office Max testified:

> Q. And did Office Max average debit rates go down substantially after the Durbin Amendment?
>
> A. They did.

---

[365] 2013 Shapiro at p. 1; Getter at pp. 5-6. See, also, June 2011 Federal Reserve Press Release. As I noted above, the Durbin Amendment did not cause the interchange rates charged for GPCC Transactions to be capped. See 2013 Shapiro at p. 3.

[366] 2014 Amex Trial PX2702 at p. 63.

[367] Board of Governors of the Federal Reserve System, "2011 Interchange Fee Revenue, Covered Issuer Costs, and Covered Issuer and Merchant Fraud Losses Related to Debit Card Transactions," March 5, 2013 at Table 5.

[368] 2014 Amex Trial Transcript at 2720:15-2721:2.

> Q. As a result of that debit price decrease, did you think about canceling
> all credit cards?
>
> A. No.
>
> Q. Why not cancel credit cards?
>
> A. Because canceling can't - - stopping the acceptance of credit cards
> would make it difficult for many of our customers to pay and would hurt
> the customer's experience.[369]

As I noted above, Dwaine Kimmet of Home Depot testified that the Durbin Amendment
caused the cost of accepting Debit Cards to fall by "[r]oughly by half," yet Home Depot
continued accepting GPCCs because it has "a certain segment of [its] customers who
want to pay with credit and [it] technically [has] to take that tender as a transaction to
effect that sale."[370] Similarly, Diedre O'Malley testified that Best Buy's costs of
accepting Debit Cards went down following the Durbin Amendment while the cost of
accepting GPCCs was unaffected by the Durbin Amendment, yet Best Buy did not
consider "accepting only debit card[s] and not credit cards" as a result.[371] As a result of
the Durbin Amendment reducing Crate & Barrel's costs of accepting Debit Cards, Frank
Bruno testified that the company never considered "dropping credit cards due to the
decreased rate of debit" because "[t]hey are totally different products."[372] In fact, at the
2014 Amex Trial, Jack Funda, formerly of Amex, testified that in the "couple of years
[following] the actual Durbin Amendment," he could not identify a single merchant "that
stopped accepting credit all together [sic] and relied solely on debit."[373]

121.    The fact that the implementation of the Durbin Amendment did not result in a
significant number of merchants dropping acceptance of GPCCs in favor of significantly
less-expensive Debit Cards constitutes one piece of common evidence demonstrating that
Debit Card Transactions and GPCC Transactions are not economic substitutes for one

---

[369] 2014 Amex Trial Transcript at 2159:6-17.
[370] 2014 Amex Trial Transcript at 1234:8-1235:5.
[371] 2014 Amex Trial Transcript at 1525:9-1526:6.
[372] 2014 Amex Trial Transcript at 2321:21-2322:7.
[373] 2014 Amex Trial Transcript at 2723:2-8.

another, and that the market for GPCC Transactions constitutes a separate and distinct relevant antitrust product market.

### b. GPCC Payment Networks Consider Pricing of Accepting Other GPCCs Rather than Accepting Debit Card When Setting Prices

122.    Consistent with the practical indicia the Durbin Amendment provides demonstrating that Debit Card Transactions and GPCC Transactions are not economic substitutes for one another, additional common evidence I have reviewed demonstrates that GPCC payment networks generally focus on the pricing of GPCCs and not on Debit Cards when setting their own prices. This constitutes another piece of common evidence demonstrating that GPCC payment networks don't view Debit Cards as close substitutes to GPCCs.

123.    For example, at the 2014 Amex Trial, Jack Funda, then Amex Senior Vice President for Global Merchant Pricing at Amex, testified that the baseline it uses in setting its prices for its merchant discount rates is the commensurate "all in" merchant discount rate (including the interchange, acquirer, and network fees) charged by Visa and Mastercard for GPCC acceptance, and does not consider fees associated with Debit Card acceptance.[374] Further, when asked if Amex considers a blend of credit and debit prices when setting merchant discount rates for Amex GPCCs, Mr. Funda testified: "We don't, because we think that credit, as you said, is a different enough product with a sufficiently different feature set from, let's say, debit, and a sufficiently different cost structure than debit, that it should be priced on its own merits and not combined with debit."[375]

124.    In Amex's Amended Responses and Objections to Plaintiffs' First Set of Interrogatories in this matter, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[374] 2014 Amex Trial Transcript at 2562:3-2563:9; 2014 Amex Trial PX1240 at AMEXNDR19210091.
[375] 2014 Amex Trial Transcript at 2730:17-23. In a 2008 email with colleagues regarding a negotiation with one merchant, Mark Moncher of Amex stated: "The financials were of course the main challenge, but I do believe we convinced them of our value vs 28bps of difference to their visa/mc rate. We made it clear we do not compete with debit so we didn't include it in analysis." See 2014 Amex Trial PX0010 at AMEXNDR10545506. See, also, 2014 Amex Trial Transcript PX2528 at AMEXNDR19567229, AMEXNDR19567247.

[376]

[377]

125.   Similarly, Roger Hochschild of Discover testified:

Q. When Discover sets prices for its credit card network services for
merchants, does it consider the prices of the debit card networks?

A. No.

Q. When setting credit card network prices for merchants, which
competitors prices does Discover look to?

A. Discover looks to the pricing of Visa, MasterCard, and American
Express' credit card volumes.[378]

126.   The common evidence discussed above demonstrates that GPCC payment
networks generally focus on the pricing of GPCCs and not on Debit Cards when setting
their own prices.  This constitutes one piece of common evidence demonstrating that
Debit Card Transactions and GPCC Transactions are not economic substitutes for one
another.

c.   **Amex and other GPCC Payment Networks Acknowledge that
Debit Card Transactions are not Economic Substitutes for GPCC
Transactions**

127.   Another piece of common evidence I have reviewed demonstrating that Debit
Card Transactions and GPCC Transactions are not economic substitutes for one another
is that Amex and the other major payment networks themselves have acknowledged the
lack of economic substitutability between the two.  For example, in a 2004 Complaint

---

[376] Amex's Interrogatory Responses at pp. 6-7.

[377] Amex's Interrogatory Responses at pp. 6-7.
[378] 2014 Amex Trial Transcript at 818:16-23.

79

against Visa, Mastercard, and their member issuing banks, Amex asserted that "[t]he 'general purpose card network services market' or 'network services market' is a distinct 'Relevant Product Market,'" and that in the U.S., the "principal competitors in the general purposes card network services market are Visa, MasterCard, American Express, and Discover."[379] Amex further asserted in this Complaint that "[t]he 'debit card network services market' in the United States constitutes a separate and distinct 'Relevant Market,'" adding that "[c]onsumers do not consider debit cards to be reasonably interchangeable with general purpose credit and charge cards."[380] Similarly, in its October 2018 brief in support of its Motion to Dismiss or, alternatively Summary Judgment in the related Merchant Plaintiff matter, Amex asserted that the market for GPCC Transactions constituted a separate and distinct relevant antitrust product market.[381]

128.    Consistent with these previous assertions from Amex that GPCC Transactions and Debit Card Transactions constitute separate relevant antitrust markets (and, thus, are not economic substitutes for one another), in a January 2020 article titled "Fundamental Differences Between Credit and Debit," Amex stated: "'Credit or debit?' It's a question we've heard so many times, we might take the differences between the two for granted. They look the same, feel the same, and they're both convenient ways to pay at the point of retail sale (cash is *so* yesterday). But there are a number of fundamental differences of debit vs. credit cards—and they can be critically important to understand."[382]  Amex also noted that at "the most basic level, debit cards and credit cards pull funds from different sources. But there's a lot more to it than that. Specifically, credit cards offer numerous benefits that debit cards don't. But these benefits come with a potentially serious

---

[379] 2014 Amex Trial PX0106 at pp. 18-19.

[380] 2014 Amex Trial PX0106 at p. 40.

[381] United States District Court Eastern District of New York, *In Re: American Express Anti-Steering Rules Antitrust Litigation (II),* Memorandum of Law in Support of Defendants' Motion to Dismiss or in the Alternative for Summary Judgment with Respect to the Individual Plaintiffs' One-Sided and Amex-Only Market Claims, No. 11-MD-02221-NGG-RER, October 12, 2018 at pp. 8-17.

[382] Doyle 2020 (emphasis in original).  Amex further stated: "Debit vs. credit card differences are significant."  See Doyle 2020.

financial risk: debt."[383] Further, Amex's "[t]akeaway" from its analysis of GPCCs and Debit Cards was:

> Although they might seem like the same thing on the surface, debit and credit cards couldn't be more different. Debit cards are a fairly innocuous way to make payments using money you already have, whereas credit cards offer some hard-to-resist benefits that come with the financial risk of rising debt. To understand what's right for you, assess your own needs, spending habits, and financial discipline.[384]

129.    In addition, Discover has noted that GPCC Transactions and Debit Card Transactions are not economic substitutes for one another. Regarding the reason why consumers "did not switch between debit and credit after the Durbin price change," Roger Hochschild of Discover testified:

> Consumers seem to have very strong preferences in terms of the products they use. Credit cards are used by transactors, people who do not carry a balance. They tend to use credit cards for every purchase. And then those would be higher income consumers. More middle and lower income consumers may not have the availability of credit or may be carrying a balance, and so frequently will prefer the control and discipline of a debit card. Especially for their day-to-day purchases such as gas, groceries, drug stores, et cetera. So they're relatively strong preferences by consumers for either credit or debit.[385]

---

[383] Doyle 2020. Amex also noted that GPCCs help cardholders build their credit, are safer than Debit Cards, and allow cardholders to earn rewards on their purchases, as well as additional perks; whereas with Debit Cards, there is no risk of debt and there are no bills to pay, it costs less to withdraw cash, and Debit Cards are easier for an individual to acquire than GPCCs. See Doyle. Amex also noted: "When you use a debit card, funds are immediately drawn from your bank account, as if it were an instant check. This means you usually can't spend more money than what's in your account. You can also use your debit card to withdraw cash from an ATM, either for free or at a nominal fee. Credit cards, on the other hand, are like mini loans that you can use over and over again—as long as you pay them back quickly enough. When you pay by credit card, your card issuer pays the vendor, then you repay your card company. If you don't pay your entire balance each month, you'll usually pay interest on whatever amount remains (and interest can add up—fast). You can also use your credit card to get cash, but you'll still have to pay the card company back, often with interest and a fee." See Doyle 2020.

[384] Doyle 2020.

[385] 2014 Amex Trial Transcript at 819:11-820:5.

130. The common evidence discussed above demonstrates that Amex and other GPCC payment networks have acknowledged the lack of economic substitutability between the two. This constitutes one piece of common evidence demonstrating that Debit Card Transactions and GPCC Transactions are not economic substitutes for one another, and further that GPCC Transactions constitute a separate and distinct relevant antitrust product market.

131. The common evidence discussed above demonstrates that there is a lack of economic substitutability between the Debit Card Transactions and GPCC Transactions. Taken together, this evidence, which is common to the Classes as a whole, demonstrates that the market for GPCC Transactions constitutes a separate and distinct relevant antitrust product market.

## ii. Emerging Technologies Are Not Economic Substitutes for GPCC Transactions

132. In addition to Debit Card Transactions, common evidence I have reviewed demonstrates that other emerging technologies are not economic substitutes for GPCC Transactions. Earlier in this Expert Report I discussed certain emerging technologies that have expanded the ability of individuals to make payments in recent years, including digital wallets, payment facilitators, P2P payments, and BNPL payments. Common evidence I have reviewed demonstrates that none of these emerging technologies are economic substitutes for GPCC Transactions. For example, as I discussed above, the primary function of digital wallets such as Apple Pay, Android Pay, and Samsung Pay is to provide a convenient method of payment, which is accomplished by consumers linking their existing payment cards (such as GPCCs) to their digital wallet, which can then be presented for payment.[386] Thus, a digital wallet can be thought of as analogous to a physical wallet, which holds the various forms of payment (including GPCCs) that a consumer chooses to carry.[387] Therefore, digital wallets do not perform the same function as

---

[386] 30(b)(6) Deposition of Jonathan Gantman, July 14, 2022 (hereafter "Gantman 30(b)(6) Deposition") at 48:24-50:11.

[387] As Jonathan Gantman of Amex described at deposition, "instead of the traditional pull a wallet out of your pocket or your purse, [with a digital wallet,] you'll have on your phone all the different cards you have uploaded in there, you'll pick which one you do and you'll never touch a piece of plastic or metal. You'll only be touching that phone." See Gantman 30(b)(6) Deposition at 48:24-49:20.

GPCCs, as GPCC cardholders could not substitute a digital wallet for their GPCC to pay for a good or service; rather, to use their digital wallet, they would still need their GPCC actively synced to their digital wallet in order to complete the transaction. Thus, since digital wallets are not functional substitutes for GPCCs, they cannot be economic substitutes for GPCC Transactions.

133. Similarly, neither payment facilitators (such as Square or Stripe), nor P2P payment platforms (such as PayPal, Venmo, Zelle, and Cash App) perform the same function as GPCCs. For example, a payment facilitator (or payment aggregator) primarily acts as as an intermediary in a GPCC Transaction by leveraging its relationships with acquiring banks to cost-effectively provide its base of (typically small) merchants access to Amex GPCC acceptance. Thus, payment facilitators are not functional substitutes in that they do not replace GPCC Transactions, but instead they merely facilitate GPCC Transactions for merchants. Like payment facilitators, P2P payments are not functional substitutes for traditional GPCC Transactions; rather, as I discussed above, P2P payment platforms facilitate the transfer of funds between two parties (individuals and/or businesses) using their individual banking accounts or GPCCs through a website or mobile app. Therefore, P2P payment platforms do not perform the same function as GPCCs, as GPCC cardholders could not substitute a a P2P platform for their GPCC to pay for a good or service; rather, to utilize their P2P payment platform, they would still need their GPCC actively linked to their P2P payment account in order to complete the transaction. Thus, since P2P payments are not functional substitutes for GPCC Transactions, they cannot be economic substitutes for GPCC Transactions.[388]

134. Furthermore, while BNPL payments are similar to GPCC Transactions in that the purchaser is extended credit in the form of a short-term loan that allows them to take immediate possession of goods and delay payment, common evidence I have reviewed indicates that GPCC Transactions and BNPL payments are not economic substitutes for one another. For example, in an October 2021 Amex earnings call, Steve Squeri,

---

[388] ████████████████████████████████████████

████████████████████████████████████████

████████ See AMEX-CP-000094638-670 at 666.

Chairman and CEO of Amex, stated that BNPL is "not really a big competitive threat to us," adding that BNPL "tends to be targeted at low FICO, it tends to be targeted at a lot of debit card users. It's used as a customer acquisition vehicle and that's just not the game that we're pla[ying]."[389] In an October 2021 interview, Roger Hochschild of Discover stated that the "economic model for buy-now, pay-later is still very early, and the economics haven't settled down," adding that Discover has "heard from merchants that, over time, unless they see very significant value, they'll be reluctant to pay more than they do to accept other forms of payment."[390] Roger Hochschild also stated in a Q4 2021 Earnings Call that "[t]here's nothing to support a view that buy now, pay later is having any impact on payment rate," adding: "I think clearly, what everyone's watching is, buy now pay later. As I mentioned earlier, we haven't seen that have a noticeable impact on our base. In my mind, it's closer to traditional sales finance."[391] In a 2022 Investor Day presentation, JPMorgan Chase noted: "We have not seen cannibalization in our core business" from BNPL, which it reported accounted for less than 0.5 percent of its "total credit and debit spend as of 1Q22."[392] In a separate 2022 Investor Day presentation, JPMorgan Chase noted the following regarding recent innovations in payment such as digital wallets and BNPL: "So, what's the data telling us? It's telling us that new and emerging payment venues still represent less than 5% of all spend, including leading digital wallets and Buy Now Pay Later. Yes, they are growing, but they're growing from a small base and in both cases they are leveraging the mature card payments ecosystem. And I like our hand as the largest issuer in those venues because as they grow, we grow."[393]

---

[389] American Express Q3 2021 Earnings Call Transcript, October 22, 2021 at p. 13; Jennifer Surane, "Credit-Card Giants Shrug Off Rising Buy-Now, Pay-Later Threat," Bloomberg, October 22, 2021 (hereafter "Surane").

[390] Surane.

[391] Discover Q4 2021 Earnings Call, January 20, 2022. Furthermore, I have noted that, consistent with the assertion that BNPL does not constitute a viable economic substitute for GPCC Transactions, ▮

See AMEX-CP-000094638-670 at 666. As of 2021, BNPL spending accounted for two percent of online sales in the U.S. See Alcazar et al. at p. 3.

[392] "Consumer & Community Banking," JPMorgan Chase & Co, 2022 at p. 36.

[393] JPMorgan Chase & Co 2022 Investor Day Transcript, May 23, 2022 (hereafter "JPMorgan Chase May 2022 Investor Day Transcript") at p. 16.

135.  Relatedly, a September 2021 study conducted by TransUnion that analyzed the role of BNPL in the credit market and its impact on consumers found that "consumers seeking Buy now, Pay Later (BNPL) and Point-of-Sale (POS) financing are also actively utilizing traditional credit – contrary to the assumption that these new credit offerings are taking market share away from credit card issuers and other lenders."[394] Regarding this study, Liz Pagel, Senior Vice President of Consumer Lending at TransUnion stated: "Consumers who may utilize point-of-sale financing are not doing so at the expense of traditional credit. We saw consumers who have applied for POS financing building balances on bank and retail cards, and applying for new credit at higher levels than the general credit population. These new forms of financing are growing the credit pie – opening up more opportunities for both consumers and lenders."[395]  TransUnion further found that "BNPL and POS offerings did not appear to have a major impact on a consumer's usage of other forms of credit. In fact, the BNPL/POS applicants generally used other forms of credit more than the rest of the population."[396]  Thus, the fact that GPCC payment networks did not view BNPL as a competitive threat to the market for GPCC Transactions, as well as the fact that BNPL payments were not found to be taking significant market share away from GPCC Transactions, demonstrates that BNPL payments are not economic substitutes for GPCC Transactions.

136.  The common evidence discussed above demonstrates that other forms of payment, including emerging technologies such as digital wallets, payment facilitators, P2P payments, and BNPL payments, do not constitute economic substitutes for GPCC Transactions. This common evidence, taken together, along with the extensive evidence discussed above demonstrating that Debit Card Transactions and GPCC Transactions are

---

[394] "Point-of-Sale Loan Applicants Generally Use Other Forms of Credit More Actively," TransUnion, September 23, 2021 (hereafter "2021 TransUnion Study"). The study's findings "showed that POS financing applicants have more credit products, such as credit cards, retail cards and installment loans in their wallet compared to the general credit active population. Credit cards were most popular among POS financing applicants (89%), followed by retail cards (75%) and auto loans (73%)." See "Point-of-Sale Loan Applicants Generally Use Other Forms of Credit More Actively," TransUnion, September 23, 2021 (hereafter "2021 TransUnion Study").

[395] 2021 TransUnion Study. Ms. Pagel added: "Consumers are looking for new ways to finance purchases and the convenience and budgeting POS offerings provide are driving them to finance more, larger purchases." See 2021 TransUnion Study.

[396] 2021 TransUnion Study; Surane.

not economic substitutes for one another, demonstrates that the market for GPCC Transactions constitutes a separate and distinct relevant antitrust product market.

### B. The Relevant Antitrust Geographic Market is the United States

137.    As part of my analysis of Plaintiffs' claims with respect to the alleged misconduct, I have concluded that the relevant antitrust geographic market was the United States. Payment systems, including GPCC payment networks, are governed by U.S. law and regulations.[397] Such U.S. laws and regulations include the Federal Truth in Lending Act of 1968, Fair Credit and Charge Card Disclosure Act of 1988, Credit Card Accountability Responsibility and Disclosure Act of 2009, and the Dodd-Frank Act of 2010, which created the Consumer Financial Protection Bureau to consolidate Federal consumer financial protection authority in one place.[398] In the case of GPCC Transactions, this constitutes evidence that the relevant antitrust geographic market is the United States.

## V.    Common Evidence Demonstrates that Amex's Continued Imposition and Enforcement of its Anti-Steering Rules Have Caused Anticompetitive Effects

138.    As I discussed above, I have been asked by Counsel for the Plaintiffs to analyze whether economic analysis and evidence establishes that Amex's conduct with respect to its continued imposition and enforcement of its Anti-Steering Rules during the Class Periods caused anticompetitive effects. As a matter of economics, conduct on the part of a firm is considered to be anticompetitive if that firm possesses significant market power, and exercises that market power in an effort to forestall competition, resulting in lower market output to customers, or higher prices paid by customers. Based on my analysis of the documents produced in this litigation, as well as my training and experience in economics and my research and analysis into the market for GPCC Transactions, I have concluded that Amex's continued imposition and enforcement of its Anti-Steering Rules during the Class Periods was anticompetitive in that it forestalled competition in the

---

[397] Benson et al. at pp. 17-18, 84-85. See, also, American Express SEC Form 10-K for the fiscal year ended December 31, 2021 (hereafter "2021 American Express 10-K") at pp. 11-20.

[398] For a detailed overview of the various federal legislations that regulate the GPCCs in the U.S., see Benson et al. at pp. 17-18, 84-85.

market for GPCC Transactions, resulting in higher net two-sided prices during the Class Periods than otherwise would have prevailed.

139.     Over the next two sections, I discuss common evidence demonstrating that Amex's continued imposition and enforcement of its Anti-Steering Rules has resulted in anticompetitive effects in that they caused net two-sided GPCC Transaction prices to be higher than they otherwise would have been. In the next section, I discuss common evidence demonstrating that Amex's continued imposition and enforcement of its Anti-Steering Rules caused Amex-accepting merchants (including Qualified Merchants) to incur higher costs of GPCC acceptance (merchant discount fees) than they otherwise would have. In the section that follows, I discuss common evidence demonstrating that the lower costs of GPCC acceptance that would have prevailed had Amex ceased imposing and enforcing its Amex's Anti-Steering Rules would not have been offset by increased Annual Fees Net of Rewards paid by GPCC cardholders.

*A.  Common Evidence Demonstrates that Amex's Continued Imposition and Enforcement of its Anti-Steering Rules Caused Amex-Accepting Merchants (Including Qualified Merchants) to Incur Higher Overall GPCC Acceptance Costs than they Otherwise Would Have*

140.     Earlier in this Expert Report I discussed common evidence demonstrating how Amex's continued imposition and enforcement of its Anti-Steering Rules following the 2011 Consent Decree and 2013 Settlement rendered the intended pro-competitive effects of those agreements ineffective, as Amex-accepting merchants were essentially unable to steer GPCC cardholders to less expensive GPCCs or other forms of payment. Later in this Expert Report I further discuss how, as a practical matter, Amex-accepting merchants could not simply cease accepting Amex GPCCs in order to avoid the effects of Amex's Anti-Steering Rules following the 2011 Consent Decree and 2013 Settlement.

141.     Thus, as I discuss in greater detail below, as a result of Amex's continued imposition and enforcement of its Anti-Steering Rules following the 2011 Consent Decree and 2013 Settlement, Amex-accepting merchants (including Qualified Merchants) were denied the use of a competitive toolkit (in the form of various pro-competitive steering methods) that would have allowed them to lower their overall GPCC acceptance

87

costs. Particularly, in the absence of Amex's Anti-Steering Rules, Amex-accepting merchants would have gained the ability to credibly threaten Amex and the other GPCC payment networks with steering to the merchant's preferred GPCC payment option, thus providing those merchants with important leverage to use in negotiations with GPCC payment networks to extract more favorable financial terms (i.e., lower merchant discount rates or other financial incentives) in exchange for i) agreements to steer customers towards a specific GPCC (e.g., a preference campaign promoting that merchant's preference for a specific GPCC); or ii) agreements not to steer customers away from using a specific GPCC (e.g., an agreement not to surcharge a specific GPCC, or to at least to not surcharge it more than any other GPCC). Therefore, as I discuss in greater detail below, as a result of Amex's continued implementation and enforcement of its Anti-Steering Rules, Amex-accepting merchants (such as Qualified Merchants) incurred higher GPCC acceptance costs (merchant discount rates) on GPCC Transactions than they otherwise would have.

## i.   Amex's Anti-Steering Rules Excessively Tilt the GPCC Transaction Price Structure Toward Merchants

142.   As I discussed above, in their 2006 journal article, Rochet and Tirole noted that "a market is two-sided if the platform can affect the volume of transactions by charging more to one side of the market and reducing the price paid by the other side by an equal amount; in other words, the price structure matters, and platforms must design it so as to bring both sides on board."[399] Due to the "must-take *this* card" situation created by Amex's Anti-Steering Rules (discussed above), merchants are practically unable to avoid higher merchant discount fee costs when they are imposed by *any* GPCC payment network. Thus, Amex's continued imposition and enforcement of its Anti-Steering Rules during the Class Periods has effectively canceled any pro-competitive effect that would have been expected from the abandonment of key anti-steering rules by Visa and Mastercard following the 2011 Consent Decree and the 2013 Settlement (discussed above).

---

[399] Rochet and Tirole (2006) at pp. 664-665.

143.     Merchants' cost of GPCC acceptance associated with GPCC Transactions for a transaction of average size is a weighted sum of card acceptance costs by payment network. One can think of the weights in two different ways. The *ex ante* weights are probabilities that a customer who wishes to pay with a GPCC presents a card from each of the four major GPCC payment networks. The *ex post* weights are the shares of customers paying with cards from each of the four major GPCC payment networks. Amex's Anti-Steering Rules force the *ex post* weights to be equal to the *ex ante* weights. Because Amex-accepting merchants cannot express a preference for any GPCC, the shares of customers paying with GPCCs from each payment network are determined entirely by customers' initial choice of GPCC payment network.

144.     Cardholders' choice of which GPCCs to use to purchase goods and services from merchants is heavily influenced by the presence of a cardholder rewards program (discussed above). Because many cardholders generally choose the GPCCs that reward them most, merchants face aggregate GPCC acceptance costs that are tilted toward higher merchant discount fees.[400]

145.     As I discussed above, two-sided markets are characterized by asymmetric price structures. As a matter of economics, it is further reasonable to expect that the price structure for GPCC Transactions would be tilted toward merchants, because merchants internalize their customers' preferences for GPCC payments.[401] However, Amex's Anti-Steering Rules tilt the GPCC Transaction price structure even further toward merchants than would be expected under greater levels of competition at the merchant level with multi-homing customers and merchants. Amex's Anti-Steering Rules allow GPCC payment networks to compete for GPCC Transaction market share by increasing cardholder rewards (encouraging cardholders to use a single network exclusively or 'single-home') and passing the costs of increased rewards – and then some – through to

---

[400] Later in this Expert Report I discuss common evidence concerning the factors that drive cardholder choice at the point of sale.

[401] Julian Wright, "Why payment card fees are biased against retailers," *RAND Journal of Economics,* Vol. 43, No. 4, 2012,761-780; Graeme Guthrie and Julian Wright, "Competing Payment Schemes," *Journal of Industrial Economics,* Vol. 55, No. 1, 2007, 37-67 (hereafter "Guthrie and Wright (2007)").

merchants, who must accept cards from all GPCC payment networks and lack the ability to steer customers toward lower-cost forms of payment.[402]

146.    In addition to Amex's continued imposition and enforcement of its Anti-Steering Rules during the Class Periods resulting in the pricing *structure* in the market for GPCC Transactions being tilted excessively towards merchants, I next discuss common evidence demonstrating that Amex's continued imposition and enforcement of its Anti-Steering Rules also artificially inflated the price *levels* for GPCC Transactions faced by merchants.

## ii.    Amex's Continued Imposition and Enforcement of its Anti-Steering Rules Artificially Inflated the Price Levels for GPCC Transactions

147.    In addition to causing the pricing structure in the market for GPCC Transactions to be tilted excessively towards merchants, common evidence further demonstrates that Amex's continued imposition and enforcement of its Anti-Steering Rules also artificially-inflated the merchant discount fees for GPCC Transactions incurred by Amex-accepting merchants above competitive levels by forestalling price-based competition for merchant acceptance for GPCC Transactions. As a matter of economics, this resulted in the prices of GPCC Transactions that are excessively allocated to merchants being artificially inflated themselves.

148.    As I discussed above, merchants cannot make GPCC acceptance decisions on the basis of price because they fear losing purchase volumes from single-homing GPCC cardholders (i.e., GPCC cardholders who are only willing to pay with GPCCs from one payment network). Accordingly, most merchants accept all major GPCCs. Earlier in this Expert Report I also explained how *ex ante* GPCC acceptance costs are a probability distribution across all GPCC payment networks, and that merchants cannot control *ex post* GPCC usage decisions due to Amex's Anti-Steering Rules (i.e., merchants cannot use price transparency and other steering methods to encourage customers to pay with a less expensive GPCC (or other less expensive form of payment)). Thus, *ex post* payment

---

[402] Guthrie and Wright (2007) at pp. 51-52:

decisions are driven by GPCC cardholders' *ex ante* preferences, and merchants have no bargaining power with their customers concerning the choice of GPCC.

149. Because merchants lack bargaining power with their customers over their choice of GPCC, they also lack bargaining power with the GPCC payment networks. Merchants, therefore, are unable to shift any amount of purchase volume from a high-cost GPCC payment network to a lower-cost GPCC payment network. Since merchants are unable to credibly threaten GPCC payment networks with reduced demand via steering, merchants must accept GPCCs at artificially-inflated prices.

150. However, absent Amex's continued imposition and enforcement of its Anti-Steering Rules, merchants would be able to (or credibly threaten to) increase the share (or weight) of less expensive GPCC in their overall GPCC acceptance costs. Some share of customers who have an *ex ante* preference to use the GPCCs of one payment network can be persuaded (via steering) by the merchant to complete their purchase *ex post* with a lower-cost GPCC. Merchant tools to steer customers away from more costly GPCCs that are prohibited by Amex's Anti-Steering Rules include differential surcharges, promotions, disclosures, stated or implied preferences, or other forms or prompting or persuasion at the point of sale.[403]

151. Thus, in the absence of Amex's Anti-Steering Rules, competition among GPCC payment networks would shift from i) maximizing *ex ante* transaction volume market share by becoming a cardholder's exclusive payment choice to ii) maximizing *ex post* transaction volume market share by becoming the payment network jointly preferred by GPCC cardholders and merchants. Thus, economic theory predicts merchants would seek to (or could credibly threaten to) steer GPCC-using customers to the GPCC network offering the lowest merchant discount fee. In a world without Amex's Anti-Steering Rules, it is in the interest of each GPCC payment network to have the lowest merchant discount fee faced by each merchant.[404] Competition for this position can be expected to discipline excess costs and margins at the issuing bank and GPCC payment network levels. Also, as I discuss in greater detail later in this Expert Report, the negotiating

---

[403] April 2022 Amex Merchant Reference Guide at p. 7.
[404] Later in this Expert Report I discuss acknowledgments from Amex-accepting merchants that Amex did not provide greater value of benefits to the merchant compared to its competitors.

leverage gained by merchants through their ability to credibly threaten to shift transaction volume to less expensive GPCCs in the absence of Amex's Anti-Steering Rules would provide merchants with bargaining power to negotiate lower overall costs of GPCC acceptance either through an agreement to steer customers towards one or more specific GPCCs, or an agreement not to steer customers away from one or more specific GPCCs.

### iii.    Amex Exercised Market Power in the Market for GPCC Transactions in the United States During the Class Period

152.    As a matter of economics, the degree of market power that Amex possess over merchants is a key factor in analyzing the existence of anticompetitive effects resulting from Amex's continued imposition and enforcement of its Anti-Steering Rules during the Class Periods. Earlier in this Expert Report I demonstrated that the relevant antitrust product market at issue in this case is the market for GPCC Transactions in the United States. This means that a hypothetical monopolist could raise price well above competitive levels without fearing a large enough loss in sales such that a price increase would become unprofitable. The market power possessed by such a hypothetical monopolist is defined by one standard economic textbook as follows:

> In contrast to a price-taking competitive firm, a monopoly knows that it can set its own price and that the price chosen affects the quantity it sells. A monopoly can set its price above its marginal cost but does not necessarily make a supracompetitive profit. For example, if a monopoly incurs a fixed cost, its profit may be zero (the competitive level) even if its price exceeds its marginal cost. It is common practice to say that whenever a firm can profitably set its price above its marginal cost without making a loss, it has *monopoly power* or *market power*.[405]

153.    Thus, market power refers to the ability of a firm to persistently price at a level that is significantly higher than the competitive price. One primary way in which economists analyze whether a firm possesses market power is by looking for the actual *exercise* of market power in the form of higher prices. Put another way, evidence of a

---

[405] Carlton & Perloff at p. 117 (emphasis in original).

firm's *exercise* of market power constitutes strong direct evidence that that firm *possesses* market power. I discuss below common evidence I have reviewed demonstrating that Amex exercised market power over merchants in the market for GPCC Transactions during the Class Periods, allowing it to set prices to merchants above competitive levels. Thus, this *exercise* of monopoly power over merchants constitutes one piece of evidence, taken together with other common evidence discussed throughout this section, establishing that Amex's continued imposition and enforcement of its Anti-Steering Rules during the Class Periods had anticompetitive effects in that it caused Amex-accepting merchants (such as Qualified Merchants) to incur higher GPCC acceptance costs (merchant discount rates) on GPCC Transactions than they otherwise would have.

## a. Amex Merchant Discount Fees Are Not Determined by Cost

154.    One measure of market power is the ability of a firm to price in excess of marginal cost. As explained in one economics textbook: *"For the competitive firm, price equals marginal cost; for the firm with monopoly power, price exceeds marginal cost.* Therefore, a natural way to measure monopoly power is to examine the extent to which the profit-maximizing price exceeds marginal cost."[406] As noted above, one form of common evidene demonstrating that Amex exercised market power over merchants in the market for GPCC Transactions (causing them to incur higher GPCC acceptance costs than they otherwise would have) is the fact that its merchant discount fees are not determined based on cost (including cardholder rewards). As Jack Funda of Amex testified at the 2014 Amex Trial when asked if a prior request from Home Depot to see Amex's costs for providing Home Depot with Amex's GPCC network services would be helpful to Home Depot to determine if the prices Amex was charging were fair: "It might

---

[406] Pindyck & Rubinfeld (8ᵗʰ edition) at p. 371 (emphasis in original). In 1934, economist Abba Lerner proposed the price-cost margin as "the index of the degree of monopoly power," commonly known as the Lerner Index. "If $P$ = price and $C$ = marginal cost, then the index of the degree of monopoly power is $(P-C)$ $P$" see A.P. Lerner, "The Concept of Monopoly and the Measurement of Monopoly Power," *The Review of Economic Studies*, Vol. 1, No. 3, 1934, 157-175 at p. 169. Economists often use this index to measure market power, where the larger the Lerner Index is, the greater is the degree of monopoly power. See Pindyck & Rubinfeld (8ᵗʰ edition) at p. 371. By construction, the Lerner Index is always between zero and one; for a perfectly competitive firm, price equals marginal cost; so, the Lerner's index equals zero.

93

be if we were a cost plus pricing organization, we are not, we price based on value not on our cost structure."[407]

155.    In its amended responses to Plaintiffs' first set of interrogatories in this matter, Amex explained that prior to July 1, 2018, it "generally used a system of single rate, industry-based pricing to set merchant discount rates for proprietary merchants," with rates organized "by industry segment and charge volume."[408]  Amex further explained that on July 1, 2018, it "transitioned most proprietary merchants to product-based pricing, a model that applies different rates based on the type of card product,"

[409]

Furthermore, as Monique Ouellette of Amex testified at deposition in this matter, Amex

---

[407] 2014 Amex Trial Transcript at 2832:10-25.
[408] Amex's Interrogatory Responses at p. 6; 30(b)(6) Deposition of Monique Ouellette, July 8, 2022 (hereafter "Ouellette 30(b)(6) Deposition") at 19:22-20:13, 30:17-23.  Amex explained that, under this earlier pricing structure, "[c]ertain incentives or other financial consideration might be applied to the base rate, but merchants subject to the industry-based pricing paid a single effective rate across all Amex products."  See Amex's Interrogatory Responses at pp. 6-7.
[409] Amex's Interrogatory Responses at pp. 6-7; Ouellette 30(b)(6) Deposition at 19:22-20:13, 30:17-23.

See Amex's Interrogatory Responses at p. 7.
[410] Amex's Interrogatory Responses at p. 7; Ouellette 30(b)(6) Deposition at 45:12-46:2.

[411]

156.    Notably, as Amex acknowledges,

By way of example, Ms. Ouellette further testified at deposition

.[412]  When explaining this outcome, Ms. Ouellette

[413]

157.    The common evidence discussed above demonstrates that the merchant discount fees Amex charged merchants for the provision of GPCC Transactions were not determined by the costs Amex incurred associated with those GPCC Transactions. This exercise of market power constitutes one piece of common evidence demonstrating that Amex's continued imposition and enforcement of its Anti-Steering Rules caused Amex-accepting merchants (such as Qualified Merchants) to incur higher GPCC acceptance costs (merchant discount rates) on GPCC Transactions than they otherwise would have.

### b.  **Amex's Market Power in the Market for GPCC Transactions**

---

[411] Ouellette 30(b)(6) Deposition at 20:17-22:8.
[412] Ouellette 30(b)(6) Deposition at 38:6-39:8.

See AMEX-CP-000094309-341 at 319.
[413] Ouellette 30(b)(6) Deposition at 38:6-48:22.

See Ouellette 30(b)(6)
Deposition at 52:21-54:22, Exhibit 2 at AMEX-CP-000067650.  As Ms. Ouellette explained at deposition,

See Ouellette 30(b)(6) Deposition at 35:11-46:2.

## Allowed it to Routinely Impose Profitable Price Increases to Merchants

158. Another piece of common evidence of Amex's exercise of market power over merchants is the pattern of profitable price increases it has successfully imposed on merchants over the years in the form of higher merchant discount fees without experiencing a significant loss in sales via a drop in merchant acceptance. When firms operating in competitive markets increase prices (absent a corresponding increase in costs), economic theory predicts that such price increases would typically result in a loss in sales that would render such a price increase unprofitable. However, common evidence I have reviewed demonstrates that Amex was able to exercise the market power it possessed over Amex-accepting merchants to profitably impose such price increase over its merchants. I discuss this common evidence in greater detail below.

159. For example, beginning at least as early as 2005, Amex embarked on a program referred to as "value recapture," which consisted of a series of price increases (in the form of higher merchant discount fees) "over a substantial portion of [Amex's merchant] base" in order to allow Amex to maintain a "rate premium" over Visa and Mastercard (as opposed to an increase in costs associated with the provision of Amex GPCC Transactions).[414] A July 2009 Amex presentation regarding its value recapture initiative noted that by that time, Amex had "implemented over 20 Value Recapture initiatives since 2006 and thereby raised rates on 65% of the total [Merchant Services US] charge volume."[415] This included value capture initiatives in the following industries: airlines, automotive (and other transportation), car rental, communication, education, entertainment, healthcare, lodging, mail order, oil, services, professional/financial services, restaurant, department stores, shops, Costco, supermarkets, government, and charities.[416]

---

[414] 2014 Amex Trial PX1240 at AMEXNDR19210100; 2014 Amex Trial PX0051 at AMEXNDR10546677; 2014 Amex Trial PX0121 at AMEXNDR11964459; 2014 Amex Trial Transcript at 708:9-710:3.
[415] 2014 Amex Trial PX0121 at AMEXNDR11964459.
[416] 2014 Amex Trial PX0121 at AMEXNDR11964459.

96

160.    Additional common evidence I have reviewed demonstrates that Amex's value recapture initiatives around this time had been profitable for the company. For example, in an April 2010 Amex pricing presentation, Amex reported: "Since 2006, Value Recapture benefits have more than offset industry and account level rate investments."[417] Regarding the "Global Cumulative Benefit of Value Recapture," Amex reported that by "the end of 2010, the Value Recapture program will have delivered $1.37B in incremental [pre-tax income] and a 6.8 bps improvement in Global Discount Rate."[418] Amex further reported that the incremental revenue it generated from its value recapture initiatives between 2006 and 2009 was significantly greater than its incremental costs associated with those initiative for both large merchants (managed accounts) and small merchants (unmanaged accounts).[419]

161.    Common evidence also demonstrates that, despite these price increases imposed on Amex-accepting merchants, very few merchants actually dropped Amex acceptance in response. For example, Jack Funda, former Senior Vice President for Global Merchant Pricing at Amex, testified in 2012 that he was not aware of any Amex managed accounts that ceased accepting Amex GPCCs as a result of the price increases they incurred as a result of Amex's value recapture initiatives.[420] Stephen McCurdy of Amex similarly testified in 2012 that he was not aware of any accounts Amex lost as a result of the price increases it imposed on those accounts through its value recapture initiatives.[421] Similarly, Shane Berry, then Senior Vice President of Amex's National Client Group,[422]

---

[417] 2014 Amex Trial PX1753A at AMEXNDR12459029.
[418] 2014 Amex Trial PX1753A at AMEXNDR12459031. Amex further noted that the impact on the merchant discount rate in the U.S. would be 8.8 basis points, with an expected cumulative benefit from 2006 to 2010 of $1.3 billion. See 2014 Amex Trial PX1753A at AMEXNDR12459031; 2014 Amex Trial PX0357 at AMEXNDR00085949.
[419] 2014 Amex Trial PX1753A at AMEXNDR12459032-33. For example, according to Amex's analysis, for every dollar of investment Amex made towards its value recapture initiatives between 2006 and 2009, it earned between $19.60 and $64.00. See 2014 Amex Trial PX1753A at AMEXNDR12459032; Deposition of Stephen B. McCurdy, November 8, 2012 (hereafter "2012 McCurdy Deposition") at 598:9-601:14.
[420] Deposition of Jack Funda, November 19, 2012 at 196:20-200:20.
[421] 2012 McCurdy Deposition at 601:15-603:14.
[422] Mr. Berry described his role as being "responsible for managing the relationships that American Express has with the largest national - - nationally-focused merchant relationships in the U.S." See Deposition of Shane Berry, September 27, 2012 (hereafter "2012 Berry Deposition") at 7:4-16.

97

testified in 2012 that since 2009, Amex's National Client Group had experienced 100 percent retention among Amex's largest, nationally-focused merchant accounts.[423, 424]

162.     In a 2011 draft memo to Amex's Global Pricing Group regarding "Evolving the AXP Pricing Strategy and Pricing Architecture," Amex analyzed certain factors that could threaten its continued implementation of price increases to merchants through its value recapture program.[425] I have noted that one such factor was the "regulatory, legislative, litigation" environment, about which it stated that caps on the interchange rates charged for Visa and Mastercard GPCC Transactions "could significantly increase AXP premiums in the short term, but likely erode our rates in the moderate to long term."[426] Amex further noted the following regarding the "regulatory, legislative, litigation" environment: "Any form of legalized surcharging could significantly constrain AXP's ability to continue with Value Recapture."[427]

163.     Furthermore, as I discussed above, in 2018, Amex launched a shift in its pricing to its product-pricing strategy, under which it applies different rates based on the type of Amex GPCC product. As I discussed, Amex's

---

[423] 2012 Berry Deposition at 179:7-188:17. Similarly, a 2006 performance review of Amex's William Glenn, then President at Amex, noted: "Implement Value Recapture in lodging, restaurants and [card-not-present] with no cancellations." See AMEXNDR12913588-594 at 591. In a November 2009 presentation, Amex reported that it imposed its value recapture initiatives on approximately 2,600 restaurant accounts year-to-date, and that Amex had still achieved a 99.9 percent retention rate during that time. See 2014 Amex Trial PX0706 at AMEXNDR09134676, 685.

[424] In a related exercise of Amex's market power over merchants in the market for GPCC Transactions, common evidence I have reviewed demonstrates that in 2009, Amex effectively raised the "gross pay fee" (the fee charged by Amex to merchants who wished to pay a one-time amount at the end of each month covering the total merchant discount fees owed to Amex for that month rather than individual transaction-by-transaction merchant discount fees throughout the month) in two ways: 1) Amex "[reduced] the threshold at which a merchant had to pay a fee to get gross pay," and 2) Amex "increased the gross pay fee." See 2014 Amex Trial Transcript at 1089:11-19, 1194:22-1195:3. At the time these gross fee increases were being considered, Joseph Quagliata of Amex emailed Beverly Anderson, Amex's Vice President of Account Strategy and Merchant Development, stating: "Upon further reflection, I am increasingly concerned about the scope of impact within the Field. […] Approximately 50 percent of the portfolio will be impacted." See 2014 Amex Trial PX0784 at AMEXNDR10311380. When Ms. Anderson raised the gross pay fee discussion with a group of Amex General Managers, Tom Pojero of Amex responded: "We will be lowering the threshold for [Monthly Gross Pay fees] from $100k to $50k. Purely being done because we can and it will generate incremental ($1.4mm) revenue." See 2014 Amex Trial PX1168 at AMEXNDR18084021. At the 2014 Amex Trial, Mr. Quagliata testified that Amex ultimately decided to implement these gross pay fee increases. See 2014 Amex Trial Transcript at 1200:8-10.
[425] AMEXNDR07146018-022.
[426] AMEXNDR07146018-022 at 020.
[427] AMEXNDR07146018-022 at 020.



[428]

[429] Further, in September 2019, Amex forecasted

[430]

[431]

[432]

[433]

164.    Common evidence I have reviewed indicates that the

Rather, as Daniel Henry, then CFO at Amex, explained at a June 2013 conference, Amex does not invest the entirety of the premium it earns on its merchant discount rates in cardholders benefits or rewards; rather, Amex keeps a portion of that premium as profit: "We take that premium pricing, and part of it we drop to the bottom line, but part of it we invest in better value propositions for the cardmembers, and that enables us to both retain the cardmembers we have as well as attract new

---

[428] Ouellette 30(b)(6) Deposition at 35:11-46:2.

[429] AMEX-CP-000094309-341 at 319.

[430] AMEX-CP-000094309-341 at 310.

See AMEX-CP-000094309-341 at 310. According to its 2021 Annual Report, Amex earned net income of $8.060 billion in the year ended December 31, 2021. See 2021 American Express Annual Report at p. 43.

[431] AMEX-CP-000094309-341 at 310; AMEX-CP-000094671-4747 at 708-710.

[432] AMEX-CP-000094671-4747 at 4710-4712.

[433] AMEX-CP-000068225-291 at 257.

cardmembers."[434] Furthermore, I have noted that in Amex's internal analyses, when discussing the rationale, objectives, or implementation of

.[435]

165. In addition, I have noted that Amex-accepting merchants have acknowledged that they do not receive additional value from accepting Amex GPCCs that justified Amex's higher prices. For example, at the 2014 Amex Trial, John Robinson of Ikea testified:

> Q Did Ikea receive anything new, any new value or services in exchange for the higher cost of accepting Amex?
>
> A No.[436]

Executives from Hilton Hotels, Sprint, and Alaska Airlines similarly testified that they did not receive additional benefits from Amex in exchange for the higher costs of accepting Amex GPCCs.[437]

166. In particular, a number of executives from Amex-accepting merchants testified at the 2014 Amex Trial that Amex took longer to pay merchants than competing GPCC networks,[438] which Jack Funda of Amex recognized was an area of Amex's business that was "less attractive" compared to Visa and Mastercard.[439] Executives from Alaska Airlines, Southwest Airlines, and Sears calculated the costs incurred by the extended period of time it takes those retailers to get paid by Amex to be approximately ten basis

---

[434] 2014 Amex Trial PX1475 at p. 2.
[435] See, for example, AMEX-CP-000094309-341; AMEX-CP-000094671-4747; AMEX-CP-000068225-291; AMEX-CP-000067646-668; AMEX-CP-000083185-193.

[436] 2014 Amex Trial Transcript at 395:14-16.
[437] 2014 Amex Trial Transcript at 198:6-11, 1608:25-1609:22, 1687:9-11.
[438] For example, Kevin Thiel of Alaska Airlines testified that Amex takes seven-to-ten days to pay Alaska Airlines after a sale, whereas it gets "next day funding with [its] Visa and MasterCard transactions." See 2014 Amex Trial Transcript at 188:6-189:12. Similarly, Chris Priebe of Southwest Airlines testified that Amex pays Southwest seven calendar days after a transaction, which was "much slower" than Amex's competitors. See 2014 Amex Trial Transcript at 2390:19-2391:19. Also, Denis Bouchard of Sears testified that Amex's "speed of pay" was three days, as compared to one day for other credit card companies. See 2014 Amex Trial Transcript at 558:9-19.
[439] 2014 Amex Trial Transcript at 2581:24-2582:9.

points, seven basis points, and three basis points, respectively.[440] Jeffrey Rein of Walgreens also testified that Amex cardholders did not account for a higher average sales value compared to cardholders of competing GPCCs.[441] Furthermore, several Amex-accepting merchants testified that they did not see great value in the data analytics Amex made available to merchants, as well as raised concerns as to how Amex may have been sharing their data with their direct competitors.[442]

167.    In January 2015, as Amex's negotiations with Costco to extend its exclusive deal as the sole GPCC accepted at the retailer (under which Costco's costs to accept Amex GPCCs was reported to be approximately "0.6 percent of every purchase") continued, Amex offered to cut its merchant discount rate even further, but Costco insisted on opening up negotiations with other GPCC payment networks to negotiate the lowest costs possible.[443] As Amex CEO Ken Chenault continued to fight for the deal with Costco, he reminded Costco CEO Craig Jelinek that "Amex hadn't only furnished Costco with its prestigious card; it had been Costco's 'trusted partner,'" at which time Mr. Jelinek was reported to have interrupted Mr. Chenault "and told him that as far as he was concerned, Amex was another vendor, just like the one that sold Costco ketchup."[444] When Mr. Chenault disclosed the failure to reach a new deal with Costco to investors in February 2015, he also disclosed that "10 percent of the 112 million Amex cards were Costco-branded."[445] Upon learning this figure, Moshe Orenbuch, an analyst at Credit Suisse, determined that co-branded cards accounted for "23 percent of its $1 trillion in overall card spending last year," adding: "Amex maintains that it has the best brand. [...] Yet

---

[440] 2014 Amex Trial Transcript at 216:22-217:1, 558:9-560:4, 2391:3-2392:6.

[441] 2014 Amex Trial Transcript at 1401:13-19. Mr. Rein noted that Walgreens had to continue to accept Amex GPCCs despite the higher costs of doing so with no additional value to Walgreens because if it did not, it would lose sales from insistent Amex GPCC cardholders who would "take their business somewhere else" if Walgreens ceased accepting Amex. See 2014 Amex Trial Transcript at 1401:13-25. Along these same lines, Denis Bouchard of Sears testified: "Q. Does having the American Express card make you spend more? A. No. Q. Being richer make [sic] you spend more? A. Yes. Q. But having a card doesn't make you spend more? A. No. It's like if you were going to fill up your gas tank, you wouldn't overfill it just because you have an American Express." 2014 Amex Trial Transcript at 603:24-604:15.

[442] See, for example, 2014 Amex Trial Transcript at 396:25-397:21, 574:18-576:12, 2437:3-2438:10, 2524:8-2525:25, 2547:6-2550:6, 5396:5-21.

[443] Devin Leonard and Elizabeth Dexheimer, "How Bad Will It Get for American Express?," Bloomberg, October 15, 2015 (hereafter "Leonard and Dexheimer").

[444] Leonard and Dexheimer. Costco eventually signed an exclusive GPCC acceptance deal with Visa for "better terms" than it had been getting with Amex. See Leonard and Dexheimer.

[445] Leonard and Dexheimer.

they decided not to tell us that 23 percent of their business was actually co-branded, which means its using someone else's brand. I find those two things somewhat inconsistent."[446]

168.    Along these lines, when asked at the 2014 Amex Trial if it was necessary to have market power to command a premium price from merchants, Roger Hochschild of Discover testified:

> I suppose if you could show incremental sales or something else, possibly. But I think in general, and you saw this from the rapid escalation of pricing for the merchants. Merchants felt they were seeing their prices go up without an increase in the underlying costs for the networks or any change in value for the merchant, which I think is almost, by definition, execution of market power.[447]

169.    The common evidence discussed above demonstrates that Amex was able to exercise its market power over merchants in the market for GPCC Transactions by imposing profitable increases in the costs of Amex GPCC acceptance borne by Amex-accepting merchants. This constitutes an additional piece of common evidence demonstrating that Amex was able to exercise market power it possessed in the in the market for GPCC Transactions, causing Amex-accepting merchants (such as Qualified Merchants) to incur higher GPCC acceptance costs (merchant discount rates) on GPCC Transactions than they otherwise would have.

### c.  Amex's Successful Price Discrimination

170.    As I noted above, a firm that can profitably set its price above its marginal cost without incurring a loss possesses some degree of market power. As one standard textbook on economics notes, one necessary condition for a firm to be able to price discriminate (i.e. it charges customers different prices for the same product or service based on their price elasticity of demand as opposed to the cost to the firm for providing such a product or service) is that the "firm must have some *market power* (the ability to set price above marginal cost profitably); otherwise, it can never succeed in charging any

---

[446] Leonard and Dexheimer.
[447] 2014 Amex Trial Transcript at 857:8-17.

consumer more than the competitive price."[448]  Common evidence I have reviewed demonstrates that, as a standard practice, Amex successfully price discriminated in that it charged merchants different prices for GPCC Transactions depending on the relative elasticity of demand for a given industry category.

171.    As I discussed above, when setting prices that merchants pay to accept Amex GPCCs (merchant discount rates), Amex did not factor in the costs associated with the provision of GPCC Transactions on its network; rather, they based those prices largely on the "value" Amex perceived that acceptance of its GPCCs afforded merchants in a given industry category.  I discussed above in detail a pricing initiative Amex implemented known as "Value Recapture" under which Amex implemented a series of targeted, industry-specific price increases (in the form of higher merchant discount fees) "over a substantial portion of [Amex's merchant] base" in order to allow Amex to maintain a "rate premium" over Visa and Mastercard (as opposed to an increase in costs associated with the provision of Amex GPCC Transactions).[449]

172.    Figure 10 below is an illustration of Amex's "Value Recapture Decision Framework" from a March 2010 Amex presentation.[450]  As shown, when deciding on whether or not to implement price increases on merchants in a given industry category, Amex considered if it was able to "capture additional value" from those merchants, and if so, it then sought to determine which "pricing structure is most appropriate" to capture the additional "value" that Amex could absorb from those merchants.  In performing this "[p]rice/[v]alue assessment," Amex analyzed measures of cardholder and merchant "insistence" for Amex GPCCs in a given industry category in order to determine the amount of "Rational Room to Increase" its merchant discount rates in those industry categories.[451]

---

[448] Carlton & Perloff (3rd Edition) at p. 277 (emphasis in original).
[449] 2014 Amex Trial PX1240 at AMEXNDR19210100; 2014 Amex Trial PX0051 at AMEXNDR10546677; 2014 Amex Trial PX0121 at AMEXNDR11964459; 2014 Amex Trial Transcript at 708:9-710:3.
[450] 2014 Amex Trial PX1240 at AMEXNDR19210090.
[451] See, for example, 2014 Amex Trial PX1240.



**Figure 10**

Source: 2014 Amex Trial PX 1240 at AMEXNDR19210090.

173.   Furthermore, 

.[453]  As I discussed, this allowed Amex to impose even greater levels of price discrimination based on the elasticity of demand for each of the industry categories.

174.   The common evidence discussed above demonstrates that, as a standard practice, Amex successfully price discriminated in that it charged merchants different prices for GPCC Transactions depending on the industry category a given merchant belonged to or,

. This constitutes an additional piece of common evidence demonstrating that Amex was able to

---

[452]

. See Amex's Interrogatory Responses at p. 7.

[453] Ouellette 30(b)(6) Deposition at 35:11-46:2; Amex's Interrogatory Responses at p. 7.

exercise market power it possessed in the in the market for GPCC Transactions, causing Amex-accepting merchants (such as Qualified Merchants) to incur higher GPCC acceptance costs (merchant discount rates) on GPCC Transactions than they otherwise would have.

175.    Taken together, the common evidence discussed above demonstrates that Amex exercised market power it possessed in the in the market for GPCC Transactions, causing Amex-accepting merchants (such as Qualified Merchants) to incur higher GPCC acceptance costs (merchant discount rates) on GPCC Transactions than they otherwise would have.

iv.    **Common Evidence Demonstrates how Amex Used its Anti-Steering Rules to Forestall Competition on the Merchant Side of the Market for GPCC Transactions, Resulting in Artificially-Inflated Merchant Discount Fees Paid by Merchants**

176.    Earlier in this Expert Report I explained how Amex's continued imposition and enforcement of its Anti-Steering Rules following the 2011 Consent Decree and 2013 Settlement resulted in Amex-accepting merchants essentially being prevented from steering *any* GPCCs to less expensive GPCCs (or less expensive forms of payment). Later in this Expert Report I explain that, as a practical matter, Amex-accepting merchants could not simply cease accepting Amex GPCCs in order to avoid the effects of Amex's Anti-Steering Rules following the 2011 Consent Decree and 2013 Settlement. In light of this, as a matter of economics, Amex's Anti-Steering rules remove all incentives for GPCC payment networks (Amex, Visa, Mastercard, Discover) to compete on the basis of price for merchant acceptance. As Chris Priebe of Southwest Airlines testified at the 2014 Amex Trial:

> Q. [..] Do you have any sense that Visa, American Express or MasterCard are competing for Southwest business on the basis of price?
>
> A. No, I don't.
>
> Q. Why not?

> A. I think the market is broken. I mean, you know, I've been in the
> business for 17 years and I look to other international rates and I see 30
> basis points here and 70 basis points there, and I look at our average rates
> well in excess of that, and I can't justify to myself that there is -- that this
> is a competitive market in the US.[454]

177.    Merchants' lack of freedom to steer customers to use less expensive GPCCs (or
less expensive forms of payment) hindered their ability to control and/or lower their costs
of GPCC acceptance in several key ways. One such way is through preference
campaigns or other forms of point-of-sale steering, which would allow merchants to
lower their overall GPCC acceptance costs to the extent they are able to successfully
encourage customers to pay with a less expensive GPCC or payment option than the
GPCC they presented at the point of sale. Along these same lines, another steering
mechanism that would allow merchants to reduce their overall GPCC acceptance costs is
through the imposition of a differential surcharge (or the ability to credibly threaten to
impose a differential surcharge) based on the brand or product of GPCC used in a given
GPCC Transaction. In this regard, Mr. Priebe further testified:

> Q. Are you, Mr. Priebe, Southwest Airlines, currently able to greatly
> reward the credit card network that it -- offers it the lowest price?
>
> A. No.
>
> Q. Would Southwest Airlines like to be able to do that?
>
> A. I believe it would be a competitive tool.[455]

Similarly, Russell Gibson of Sinclair Oil testified that "under the current scenario where
there is no steering and the rates for the credit card companies are relatively in parity,
there's no benefit to be gained by attempting to steer a customer to a form of credit
payment."[456]

---

[454] 2014 Amex Trial Transcript at 2440:4-15.
[455] 2014 Amex Trial Transcript at 2440:23-2441:3.
[456] 2014 Amex Trial Transcript at 3219:17-3220:15.

178. Furthermore, in the absence of Amex's Anti-Steering Rules, Amex-accepting merchants would gain the ability to credibly threaten Amex and the other GPCC payment networks with steering to a less expensive GPCC payment option, thus providing those merchants with leverage to use in negotiations with GPCC payment networks to extract more favorable financial terms (i.e., lower merchant discount rates or other financial incentives) in exchange for i) agreements to steer customers towards a specific GPCC (e.g., a preference campaign promoting that merchant's preference for a specific GPCC); or ii) agreements not to steer customers away from using a specific GPCC (e.g., an agreement not to surcharge a specific GPCC). Thus, as I discuss in greater detail below, the added leverage afforded to Amex-accepting merchants in the absence of Amex's Anti-Steering Rules would provide them with bargaining power to effectively lower their overall costs of GPCC acceptance. However, as I continue to discuss in greater detail below, as a result of Amex's continued imposition and enforcement of its Anti-Steering Rules during the Class Periods, the four GPCC payment networks (Amex, Visa, Mastercard, and Discover) were not incentivized to, and thus, did not, compete on the basis of price for merchant acceptance in these ways.

a. **Common Evidence Demonstrates that Amex's Continued Imposition and Enforcement of its Anti-Steering Rules Forestalled Greater Price-Based Competition from Discover during the Class Periods**

179. One piece of common evidence demonstrating that Amex's Anti-Steering Rules successfully forestalled competition in the market for GPCC Transactions can be seen from Amex's Anti-Steering Rules (and, prior to 2013, those of Visa and MasterCard as well) foreclosing Discover's low-cost provider strategy. When it launched in 1985, Discover embarked on an innovative low-cost strategy whereby it "priced the product very aggressively for merchants" in order to offer merchants a "great value proposition."[457] In pursuit of this strategy, when "Visa and MasterCard were rapidly

---

[457] 2014 Amex Trial Transcript at 820:23-821:16. Discover's launch strategy also focused on offering a unique value proposition to cardholders by offering no annual fees, as well as being the "first card to have any form of rewards with providing cash back on every transaction." See 2014 Amex Trial Transcript at 820:23-821:16.

increasing their prices to merchant[s]" in the late 1990s, Discover sought to capitalize on the opportunity by "launch[ing] a major campaign to bring the merchants' attention to this increase in pricing, and to try and get them to shift their business to the lower-priced network, Discover."[458]

180.    In an April 1999 Credit Card Forum Speech, David Nelms of Discover discussed a survey of 500 merchants conducted by C&R Research Services that "found that 63% of merchants nationwide are frustrated by the increase in credit card processing fees. In fact, most of these frustrated merchants said they would encourage customers to use a particular credit card brand if that brand charged lower processing fees."[459] Mr. Nelms added:

> With similarly priced VISA and Mastercard together representing an estimated 75% market share of U.S. card volume, most merchants find it a difficult business decision to stop accepting these brands. They can't turn to 19% share American Express for help, because their prices are even higher. The only viable option U.S. merchants have for lower prices and better service, is to turn to 6% share Discover Card. From where I sit, this is a great opportunity! […] For new merchants we are saying "Taking Discover Card will help lower your costs." […] For the over three million merchant locations that already accept our card, we are telling them that we have programs to help them save money by encouraging their customers to pay with Discover Card.[460]

181.    Following this speech, Discover embarked on a number of marketing efforts to try and convince merchants to save money on GPCC acceptance costs by encouraging customers to pay with the less-expensive Discover Card, including i) sending letters to the millions of Discover-accepting merchants informing them of Visa's and Mastercard's price increases and how they could save money by "shift[ing] volume to Discover;"[461]

---

[458] 2014 Amex Trial Transcript at 832:24-833:11.
[459] See 2014 Amex Trial PX1277 at DFS00162094.
[460] See 2014 Amex Trial PX1277 at DFS00162090-95.
[461] 2014 Amex Trial Transcript at 835:18-836:16.

and ii) offering greater discounts to its largest merchants "for incremental volume shifted to Discover."[462]

182. Figure 11 below, which was taken from a 2002 proposal Discover made to Walmart "highlighting the savings opportunities available to them by shifting more volume to the lower-cost [Discover] network,"[463] illustrates the value proposition from Discover's low-cost strategy.[464] As shown, if Walmart successfully steers an incremental increase in Discover market share at Walmart/Sams Club, it would realize a savings of $366 million, which Discover suggests could be used by the merchant to drive increased "[c]onsumer [l]oyalty," which would benefit consumers, in addition to the cardmember benefits offered by Discover.[465] Further, as shown, Discover proposed that it would benefit from the increased share and new accounts that would result from Walmart's efforts to steer customers to Discover.[466] At the 2014 Amex Trial, Roger Hochschild of Discover testified that Discover made similar proposals to this to "10 to 50" major

---

[462] 2014 Amex Trial Transcript at 836:23-837:25. At the 2014 Amex Trial, Roger Hochschild of Discover testified: "We felt [offering these discounts] would be profitable for the merchant and profitable for Discover. While we may sacrifice some revenue per transaction in terms of interchange we would make it up buy [sic] growing the number of transactions and getting other revenues on those transactions from its either other merchants or from the interest that our cardholders paid." See 2014 Amex Trial Transcript at 837:19-25.

[463] 2014 Amex Trial Transcript at 842:15-24. Discover described the "Current Situation" at the time of this proposal in the following way: "Discover Card currently provides Walmart a significantly lower cost payment option than other general purpose credit cards including a per transaction fee that has not increased for the last three years." See 2014 Amex Trial PX1293 at DFS1071866.

[464] "Discover proposes an opportunity where by […] Walmart can significantly increase savings" and "Discover can increase business volume at Walmart." See 2014 Amex Trial PX1293 at DFS1071867.

[465] 2014 Amex Trial PX1293 at DFS1071876. As shown, Discover notes that these savings via "Discover's low cost supports Walmart's everyday low price strategy." See 2014 Amex Trial PX1293 at DFS1071876. As part of this proposal, Discover also suggested Walmart "[d]isplay additional POS signage in checkout lanes and throughout the store" and to "[m]ake Discover preferred card at Walmart and Sam's," as well as other "marketing tools and promotions to support shift in share." See 2014 Amex Trial PX1293 at DFS1071871-75. At the 2014 Amex Trial, Roger Hochschild of Discover testified that "[t]rying to get your signage as close to the point of sale as possible has always been viewed as key in the industry for networks. That is a time when consumers are deciding which payment vehicle to use. And so that traditionally is viewed as the optimal place to portray a preference message or have your signage visible." See 2014 Amex Trial Transcript at 840:24-841:6.

[466] At the 2014 Amex Trial, Roger Hochschild of Discover contrasted Discover's value proposition in this regard to that of the other major GPCC payment networks: "So as opposed to the higher-priced card networks taking the merchant's money and using it to create loyalty to that network, which really becomes a vicious circle for the merchant, the merchants would have their money back and could use it to drive loyalty to that merchant." Mr. Hochschild added: "In an environment where networks with market power can keep increasing their interchange rates to merchants, they can then use some of that money for profits or for exclusive comp or other things. They can also reinvest some of that money in building loyalty to their card and keep that going. So in a sense taking the merchant's money and using it against it." See 2014 Amex Trial Transcript at 847:8-848:1.

109

merchants in the US, and given the size of Discover's sales force, "talked to tons of smaller merchants as well."[467]

## Figure 11
## Illustration of Discover's Value Proposition



Source: 2014 Amex Trial PX1293 at DFS1071876.

183.    Despite the mutually-beneficial value proposition offered by Discover through its low-cost strategy, Discover was unsuccessful in moving a significant share of transaction volume from Visa, Mastercard, and Amex to the Discover brand.[468] When asked why this was the case, Mr. Hochschild testified: "In some of the discussions with the largest merchants, they made it clear that the rules of other card networks prohibited them from preference programs or a lot of the other ways or tools they would employ to shift share to Discover network."[469] Similarly, when asked why Discover was not "able to execute a low price strategy without using steering to shift shares to Discover," Mr. Hochschild testified: "Providing a lower price to merchants isn't transparent to customers.  They

---

[467] 2014 Amex Trial Transcript at 848:2-11.
[468] 2014 Amex Trial Transcript at 848:15-20.
[469] 2014 Amex Trial Transcript at 848:21-849:2.

don't, right now, know the interchange or the pricing that a merchant might pay. So if you don't also let the merchant shift share, you'll be giving away money in the form of a lower interchange rate without getting any benefit in return."[470]

184.    Given the obstacles to executing a low-cost strategy that the Amex, Visa, and Mastercard merchant acceptance rules imposed on Discover at the time, "Discover shifted [its] pricing strategy with merchants and started increasing [its] prices to more closely match those of Visa and MasterCard."[471] According to Nilson, in 2021, merchants paid an average processing fee of 2.15 percent for Discover GPCC Transactions, compared to 2.22 percent for Visa and Mastercard and 2.26 percent for Amex.[472] At the 2014 Amex Trial, Mr. Hochschild was asked about the 2011 Consent Decree:

> Q. It is your understanding that Visa and MasterCard's steering rule for discounts and promotions were removed at that time?
>
> A. For merchants that did not have another network that had a rule against steering.
>
> Q. Did Discover do anything to try to take advantage of the possibility of steering as a result of the change in other, in Visa and MasterCard steering rulings?
>
> A. Yes.
>
> Q. What did you do?
>
> A. We formed a task force to look for opportunities. We focused on our largest merchants. Unfortunately for our top 100 merchants, all of them also accept American Express. So with that, and again the key leverage

---

[470] 2014 Amex Trial Transcript at 849:8-15.
[471] 2014 Amex Trial Transcript at 853:23-854:3. Mr. Hochschild added: "To the extent that offering a lower price was not going to give us any business benefits, it was leaving money on the table. It wasn't the right answer for us as a company. It wasn't the right answer for our shareholders. We should be - - we needed to be competitively priced. Because, again, giving the retailers a discount without getting anything in return didn't make business sense." See 2014 Amex Trial Transcript at 854:7-15. Mr. Hochschild estimated these price increases began around 2000 or 2001. See 2014 Amex Trial Transcript at 854:4-6.
[472] The Nilson Report, No. 1216, March 2022 at p. 9.

> was focusing on the largest merchant. Based on that we ended up
> disbanding the task force and not taking any action.
>
> Q. What was the purpose or mandate for the task force?
>
> A. The task force's mandate was to identify new opportunities to leverage
> this new found power to work in conjunction with merchants to see if we
> could put programs in place to shift volume to Discover network.
>
> Q. If American Express's rules were not in place preventing merchants
> from steering would Discover renew a similar task force?
>
> A. Yes.[473]

Furthermore, Mr. Hochschild testified that in a world absent Amex's Anti-Steering Rules where "there were no restrictions on what Discover could do with respect to steering at the point of sale," Discover "would aggressively pursue a strategy of lowering [its] prices and providing incentives to merchants that would steer incremental volume to Discover."[474]

185.    I have also reviewed common evidence demonstrating that Amex used its Anti-Steering Rules to prevent merchants from participating in preference campaigns with Discover in an effort to reduce their overall GPCC acceptance costs. For example, in 2004, an Amex executive uncovered that the Ravina Music Festival in Highland, Illinois had entered into a preference agreement with Discover whereby it included the "Discover logo along with Preferred Card of Ravina language [...] included in advertising; ie:

---

[473] 2014 Amex Trial Transcript at 986:5-987:4.

[474] 2014 Amex Trial Transcript at 872:3-10. Mr. Hochschild further testified: "Q. In a world without American Express' anti-steering rules, how would merchant benefits [sic] in your view? A. The merchants would have the ability to manage their costs of credit card acceptance by steering customers to a lower cost network. And they could reinvest that savings in more profits or in enhancing their own value proposition to their customers. Q. In a world without American Express' anti-steering rules, how would Discover's cardholders benefit? A. Whatever preference programs the merchants put into place to steer customers, it would be some sort of positive incentive for them to use their Discover card. That would be a benefit for our cardholders. Q. In world without American Express' anti-steering rules, could Discover still compete for third-party issuers? A. Yes. Q. Mr. Hochschild, in a world without American Express' anti-steering rules, could Discover still develop brand loyalty for the Discover product? A. Yes. Q. Could you in fact enhance brand loyalty for your product? A. Yes. Q. And all the rewards that you've discussed today, in a world without American Express' anti-steering rules, could you still offer competitive rewards in the rewards market today? A. Yes. Q. In general, if the American Express rules were not in place, Mr. Hochschild, do you think that competition among the is [sic] credit card networks would be more robust than it is today? A. Yes." See 2014 Amex Trial Transcript at 872:11-873:15.

website, ticket order forms, brochures and decals within the park."[475] However, when presented by Amex with the Anti-Steering Rules in its card acceptance agreement with Amex, Ravina Music Festival agreed to remove any use of preferencing language in its advertising materials, thus depriving Ravina with the ability to use that preferencing language to steer customers to the generally less-expensive Discover GPCC.[476]

186.    The common evidence discussed above demonstrates how Amex's continued imposition and enforcement of its Anti-Steering Rules foreclosed Discover's low-cost provider strategy during the Class Periods, which would have allowed merchants to reduce their overall average GPCC acceptance costs by steering GPCC cardholders to less-expensive Discover GPCCs.

> **b.  Common Evidence Demonstrates that Amex Successfully Used its Anti-Steering Rules to Prevent Merchants from Lowering their Overall GPCC Acceptance Costs via Preferencing Agreements and Other Forms of Steering**

187.    Additional common evidence I have reviewed demonstrates that Amex used its Anti-Steering Rules to prevent merchants (including Qualified Merchants) from lowering their overall GPCC acceptance costs by blocking merchants from entering into preferencing campaign agreements and other forms of steering with all three other major GPCC payment networks in exchange for lower merchant discount rates or increases in investment that otherwise would have lowered the overall cost for merchants to accept a given GPCC. Furthermore, by blocking merchants from using these forms of steering to lower their overall GPCC acceptance costs, Amex's Anti-Steering Rules essentially eliminated merchant bargaining power with GPCC payment networks, as they could not credibly threaten to steer customers to less-expensive GPCCs if certain GPCCs were unwilling to offer lower acceptance costs.

188.    In a July 1998 memo from David House to Amex executives, Amex's Head of Merchant Services, Mr. House described the competitive landscape on the merchant side of the GPCC Transactions market in the following way:

---

[475] 2014 Amex Trial PX0458 at AMEXNDR01036428.
[476] 2014 Amex Trial PX0458 at AMEXNDR01036428.

> In the past year, we have seen a significant increase in competitor
> activities with our Merchant partners designed to shift share from
> American Express. Visa, and increasingly MasterCard and Discover, have
> been growing their preference program presence at the Merchant, Market
> and Industry levels. As a result, we are introducing new policy and
> process requirements to provide clear direction for Client Managers on
> how to handle common competitive situations with the goal of ensuring
> parity treatment with our Merchant partners. [...] We must continue our
> forceful efforts to eliminate suppression activity and improve POP
> visibility among our Merchants and to discourage participation in
> competitor's preference oriented marketing activity as much as
> possible.[477]

As part of this new policy, Amex stated that it "will continue our aggressive stance
against suppression activity by Merchants," and also that Amex "will aggressively
discourage Merchants from participation in preference marketing programs particularly at
the POS and go so far as to exclude Merchants from marketing program availability as
per policy for the particular situation."[478]  Figure 12 below is a table from this new Amex
policy which summarizes types of "Competitive or Merchant Programs Leading to
Active Suppression" covered by this new policy, which includes examples of these types
of steering programs, as well as Amex's new policy for thwarting these kinds of
programs.  As shown, Amex's "[r]equired action" if merchants were to fail to cease
participation in these types of steering programs included a suspension of marketing
programs with that merchant, excluding that merchant from upcoming marketing or
industry programs, or termination of that merchant from Amex GPCC acceptance.[479]

---

[477] 2014 Amex Trial PX1103 at AMEXNDR16476396; 2014 Amex Trial Transcript at 4509:2-21.
[478] 2014 Amex Trial PX1103 at AMEXNDR16476397.  Mr. House also stated that this new policy "covers six categories and examples of competitively oriented Merchant activity," including: "1. Competitive and Merchant programs leading to active suppression 2. Competitive and Merchant programs leading to passive suppression 3. Merchant customer'generic preference marketing activity 4. Merchant participation in market preference programs 5. Merchant participation in industry preference programs 6. Merchant participation in competitor sponsorships and philanthropic." See 2014 Amex Trial PX1103 at AMEXNDR16476397.
[479] 2014 Amex Trial PX1103 at AMEXNDR16476405.

**Figure 12**

1. Competitive or Merchant Programs Leading to Active Suppression

| Program Type: | Priority: | Examples: | Policy: |
|---|---|---|---|
| 1. **Switching:** Customer presents/mentions Amex Card and Merchant asks for another form of payment | **High** | Sales clerk: "Do you have a Visa card instead? Amex charges us too high a fee" Telephone: "Do you have another card? We only accept Amex if the customer doesn't have Visa or Mastercard." | **Goal/objective:** • Merchant ceases switching **Required action if Merchant continues:** • Termination **Approvals needed to execute** • Field: RVP and VP • SRG: Team leader and SVP |
| 2. **Prompting:** Merchant suggests another card at point of sale | **High** | Sales clerk: "Would you like to put that on your Visa Card" Telephone: "May I charge that to your MasterCard?" | **Goal/objective:** • Merchant mentions Amex acceptance directly after prompt or • Amex receives the same treatment as all other cards accepted by Merchant outside prompted card (e.g. and we also accept other cards) **Required action if Merchant continues:** • Suspend marketing programs with account for duration of activity • Exclude from upcoming market/industry programs for duration of activity **Approvals needed to execute:** • Field: DOS and RVP • SRG: Team leader and SVP |

Source: 2014 Amex Trial PX1103 at AMEXNDR16476405.

189.    The common evidence I discuss below demonstrates how Amex used its Anti-Steering Rules to block attempts by merchants (including Qualified Merchants) to enter into these kinds of steering agreements with Visa, Mastercard, and Discover, causing merchant GPCC acceptance costs to remain artificially inflated.

- ***Common Evidence Demonstrates that Amex Understood the Benefits of Steering that are Prohibited by its Own Anti-Steering Rules***

190.    Common evidence I have reviewed demonstrates that Amex understood the benefits of steering that are prohibited by its own Anti-Steering Rules. In particular, common evidence demonstrates that Amex entered into agreements with merchants whereby those merchants agreed to steer customers towards using Amex GPCCs through various types of expressions of preference for Amex GPCCs, thus demonstrating Amex's understanding of the competitive advantage GPCC payment networks could gain with merchants by entering into such steering agreements with them. For example, in the mid-1990s, as a condition for Amex's sponsoring of Radio City Music Hall concert series, Radio City Music Hall was contractually obligated to establish an exclusive box office window during "peak ticket sales periods" exclusively for purchasers using Amex GPCCs, as well as to incorporate the language that "Radio City Welcomes the American Express Card" in promotional materials seen by customers.[480] In 2009, Amex entered

---

[480] 2014 Amex Trial PX0150 at AMEX0001420036.

into a Sponsorship Marketing Agreement with Ticketmaster whereby Ticketmaster agreed to incorporate the language "Thank you for calling Ticketmaster, where we proudly accept the American Express Card" into the "initial message on any general or main information lines" that callers dial into.[481] Similarly, in 2013, Amex updated their Corporate Sponsorship Agreement with Universal Studios, designating Amex as the "exclusive 'Official Payment Services Products Provider' and 'Official Payment Services Products Sponsor" for the Universal Studios Theme Park.[482] As part of this agreement, theme park hotels were required try and get hotel clerks to ask a customer "if they would like to use their American Express card when completing a purchase or making a reservation."[483] This agreement also afforded Amex cardholders various discounts at Universal parks.[484] As I discuss in greater detail below, Amex imposed and enforced its Anti-Steering Rules against other GPCC payment networks' attempts to enter into similar kinds of pro-competitive agreements with merchants.

- **_Common Evidence Demonstrates that Amex Successfully Used its Anti-Steering Rules to Thwart Merchant Participation in "We Prefer Visa" and Other Visa Preference Campaigns_**

191. One piece of common evidence demonstrating that Amex's Anti-Steering Rules successfully forestalled competition in the market for GPCC Transactions resulting in artificially-inflated merchant GPCC acceptance costs can be seen from Amex's successful efforts to "thwart" Visa's aggressive "We Prefer Visa" marketing campaign (as well as other Visa preferencing campaigns with merchants) via aggressive enforcement of its existing, and later revised, Anti-Steering Rules. In the late 1980s, Visa became aware of a more aggressive approach by Amex where Amex appeared less concerned about focusing on "carriage trade merchants," but rather was taking steps in "broadening their merchant base into merchant segments which represent [Visa's] bread

---

[481] 2014 Amex Trial PX0355 at AMEXNDR00080411. An August 1995 Coverage Awareness Test indicated that "American Express has been paying Ticketmaster to inform callers that the Card is the preferred card for over-the-phone ticket orders." See 2014 Amex Trial PX2766 at AMEX0001420142.
[482] 2014 Amex Trial PX2602 at AMEXNDR19364937-38.
[483] 2014 Amex Trial Transcript at 4557:4-4558:17; 2014 Amex Trial PX2602 at AMEXNDR19364945.
[484] 2014 Amex Trial Transcript at 4569:4-17, 4571:10-4572:4; 2014 Amex Trial PX2602 at AMEXNDR19364950-51; 2014 Amex Trial PX2552.

116

and butter."[485] In response to Amex's efforts to expand its merchant base, Visa formed a merchant relations group to embark on an "effective trade advertising campaign" and initiate "direct communications" with merchants in order to "do a better job of telling the Visa story to merchants."[486] Part of this group's focus was to "take the lead in providing the bankcard industry sales forces with materials and training which help them to better communicate the comparative value of using bankcards versus American Express," adding that by "doing that, we should help to put pressure on Amex's merchant discount."[487]

192.    The early stages of this Visa marketing endeavor included sending merchants a "Visa Profit Improvement Calculator" to help merchants better understand how they could "[i]mprove [their] profits by shifting sales volume from American Express to Visa."[488] As part of this marketing effort, Visa also communicated to merchants "[t]ips for shifting business for higher profits," including "install[ing] signage which favors your most profitable payment options," as well as "[t]rain[ing] your sales people to ask for a more profitable payment option" with a "simple suggestion such as 'Would you like to put this on your Visa?'" at the point of sale.[489]

193.    Shortly after Visa formed its merchant relations group to respond to the growing competitive threat from Amex, Visa embarked on its "We Prefer Visa" marketing campaign that was focused on convincing merchants to communicate to their customers

---

[485] 2014 Amex Trial PX0132 at 0003867; 2014 Amex Trial Transcript at 3312:24-3313:6. A June 1989 presentation from Bradford Morgan to Visa's board of directors stated: "As we understand it, American Express is now routinely approving applications for consumers with average annual incomes of $15,000 or less. If you think that American Express' initiatives threaten only a small part of your cardholder base, you're dead wrong." See 2014 Amex Trial PX0132 at 0003867. This presentation further noted that Amex was expanding into "new merchant categories which look a lot like our targets - - fast food, gas stations, movie theatres, etc." See 2014 Amex Trial PX0132 at 0003867.
[486] 2014 Amex Trial PX0132 at 0003882; 2014 Amex Trial Transcript at 3317:10-3318:15.
[487] 2014 Amex Trial PX0132 at 0003882. Visa also noted that the "key Amex vulnerability is their merchant discount. American Express is currently charging a discount of about 3.25 percent versus 1.75 percent for bank cards." See 2014 Amex Trial PX0132 at 0003880.
[488] 2014 Amex Trial PX0082; 2014 Amex Trial Transcript at 3318:16-3320:12.
[489] 2014 Amex Trial PX0082 at AMEXNDR16479544. Visa's Brad Morgan testified at the 2014 Amex Trial that, in his experience, "the merchant employee who had the direct interaction with the customer could influence the customer's choice of payment method." See 2014 Amex Trial Transcript at 3382:12-25.

117

that their preference was for customers to pay with Visa GPCCs.[490] One of Visa's stated objectives of its "We Prefer Visa" campaign was to "shift share from other payment methods – specifically American Express – to Visa and to increase sales volume for members."[491] Brad Morgan of Visa explained that, as part of this campaign, Visa "provided signage and decals and other pieces of promotion material to say 'We Prefer Visa.' And we hoped that the merchants would train people at the point of sale to specifically ask for a Visa card."[492]

194.    Common evidence I have reviewed indicates that the "We Prefer Visa" campaign was successful in shifting market share away from Amex towards Visa. For example, a Visa Merchant Relations Fact Sheet regarding an expansion of the "We Prefer Visa" campaign noted that the initial launch of the campaign at Vail Resorts resulted in a "25% - 45% shift from American Express to Visa."[493] In a June 1992 Product Development and Marketing Committee Meeting summary, Visa noted that "point-of-sale signage expressing a preference for Visa typically yields Visa volume gains of 15 percent or more among [travel & entertainment] merchants."[494] In an April 1998 American Express Establishment Services Group presentation, Amex noted that the "We Prefer Visa" campaign had been "gaining traction - - from mass media to point of purchase," with "[p]roven evidence of share shift from Amex to Visa."[495] At the 2014 Amex Trial, Ken Chenault of Amex testified that the "We Prefer Visa" campaign "was certainly perceived as a problem" by Amex.[496]

---

[490] 2014 Amex Trial Transcript at 3321:21-3322:16. According to Brad Morgan of Visa, the "We Prefer Visa" campaign began at Vail Resorts, and then Visa decided to expand it more broadly. See 2014 Amex Trial Transcript at 3321:21-3322:16.

[491] 2014 Amex Trial PX0133 at 0142985.

[492] 2014 Amex Trial Transcript at 3322:11-16. Mr. Morgan further testified that Visa's research at the time "showed if there were point-of-sales materials present, that it would influence the card selection process when it came to paying the bill," adding that working with the merchants to get that signage up meant that it was "more guaranteed" to be communicated to the customer (as opposed to relying on the sales clerk) and thus, more likely to be effective. See 2014 Amex Trial Transcript at 3325:17-3326:3. Mr. Morgan later added that "when a person pulled out their wallet and made the decision of which card to pull out to give to the merchant, that's when you had the greatest impact." See 2014 Amex Trial Transcript at 3455:9-14.

[493] 2014 Amex Trial PX0133 at 0142986; 2014 Amex Trial Transcript at 3324:11-3325:9.

[494] 2014 Amex Trial PX0084 at 0607555; 2014 Amex Trial Transcript at 3327:18-3330:8.

[495] 2014 Amex Trial DX7595 at p. 3; 2014 Amex Trial Transcript at 4972:10-22.

[496] 2014 Amex Trial Transcript at 4498:3-4499:5; 2014 Amex Trial PX0163.

118

195.    In a March 1992 "creative brainstorming process" summary, Amex summarized a list of ideas it had generated of "ways that American Express could respond to Visa's We Prefer [Visa] campaign," many of which focused on increased benefit to merchants and consumers.[497]  These ideas included priced-based responses by Amex such as negotiating lower merchant discount rates or increases in cooperative advertising or marketing investment (including membership rewards incentives) in exchange for the merchant not engaging in preference campaigns with other payment networks, as well as responding by eliminating the merchant discount rate in merchant categories where Visa pursued preference campaigns.[498]  Another idea included in this brainstorm summary was to incentivize Amex cardholders to shop at certain merchant locations by offering double membership rewards points for doing so.[499]  Amex also considered a marketing campaign of its own to counter Visa's "We Prefer Visa" campaign that focused on "choice" over preference, and how that would translate to "more consumer spend in total" for merchants.[500]

196.    However, common evidence I have reviewed demonstrates that, rather than pursue these strategies that benefitted merchants and/or consumers, Amex used its Anti-Steering Rules to thwart this kind of competition from Visa by notifying merchants that the "We Prefer Visa" campaign was a violation of Amex's Anti-Steering Rules.[501]  At the 2014 Amex Trial, Ken Chenault of Amex testified that, following the launch of the "We Prefer Visa" campaign, Amex added language to its Anti-Steering Rules "specifically prohibiting the use of the word 'preferred'" partly in response to Visa's preference marketing campaigns.[502]  A June 1992 Visa Product Development and Marketing Committee Meeting summary noted that Amex's new merchant acceptance agreement offered a 35 basis point reduction in the merchant discount rate in exchange for a "new

---

[497] 2014 Amex Trial PX0163; 2014 Amex Trial Transcript at 4499:20-23.
[498] 2014 Amex Trial PX0163 at AMEX0003830033; 2014 Amex Trial Transcript at 4500:18-4503:12.
[499] 2014 Amex Trial PX0163 at AMEX0003830032; 2014 Amex Trial Transcript at 4504:3-11.
[500] 2014 Amex Trial PX0163 at AMEX0003830030.
[501] 2014 Amex Trial Transcript at 4490:13-4491:5.
[502] 2014 Amex Trial Transcript at 4492:12-4493:8.

119

set of restrictions," which included: "The merchant must not state or imply a preference for any other card brand."[503]

197.    In addition to the tactics described above, common evidence demonstrates that Amex went as far as to terminate certain merchants for their participation in the "We Prefer Visa" campaign. For example, when asked about Amex's new merchant acceptance agreement in response to the "We Prefer Visa" campaign, Brad Morgan of Visa testified:

> As the program started rolling out and they were getting a lot of publicity and the merchant community was all talking about the American Express took isolated merchants who were working with us with a promotion and basically told them they can no longer use American Express. They booted them out of the system which appeared to be, you know, trying to teach a lesson or make an object lesson for other merchants.[504]

Ken Chenault of Amex similarly testified that, during his tenure at Amex, Amex terminated merchants that violated its Anti-Steering Rules.[505]

198.    Common evidence I have reviewed indicates that Amex's efforts to thwart Visa's "We Prefer Visa" marketing campaign (along with the lower GPCC acceptance costs merchants could enjoy through participation in the campaign) were successful. For example, in a 1996 speech given by Ken Chenault of Amex titled "Market Share – The Will to Win," Mr. Chenault noted that Amex was "neutralizing Visa's efforts to get We Prefer Visa campaigns off the ground. We stopped at least a dozen such campaigns last year. We just wouldn't take no for an answer. And that's the kind of attitude we need to win in the marketplace."[506] Similarly, in a 1997 memo to all Amex managers, Harvey

---

[503] 2014 Amex Trial PX0084 at 0607556. At the 2014 Amex Trial, Mr. Morgan of Visa testified that, even with this 35 basis point reduction in the merchant discount rate that Amex was offering for compliance with its stricter Anti-Steering Rules, Amex's merchant discount rate was still higher for merchants to accept than Visa. See 2014 Amex Trial Transcript at 3330:15-3331:6.

[504] 2014 Amex Trial Transcript at 3331:25-3332:21. Mr. Morgan recalled that Amex had terminated the Steamboat Ski and Resort Corp., Laura Ashley Holdings plc., and the La Bodega restaurant in Toronto, Canada, for participation in the "We Prefer Visa" Campaign. See 2014 Amex Trial Transcript at 3332:22-3335:24; 2014 Amex Trial PX0087.

[505] 2014 Amex Trial Transcript at 4491:6-18.

[506] 2014 Amex Trial DX 0319 at AMEXNDR16476005.

Golub and Ken Chenault of Amex discussed Amex's efforts to thwart other preference campaigns Visa had sought to enter into with merchants:

> We thwarted a nationwide Visa marketing campaign in a number of key markets including New York, Boston and Chicago. Visa had approached merchant associations and businesses affiliated with major U.S. shopping streets to gain their participation in 'Famous Streets,' a nationwide preference campaign scheduled to run during the summer. Establishment Services, with the support of our State Government Affairs colleagues, persuaded merchants not to participate. This is one win in an ongoing battle with Visa.[507]

199.    The common evidence discussed above demonstrates that Amex successfully used its Anti-Steering Rules to thwart merchant efforts to participate in Visa preference campaigns (notably the "We Prefer Visa" campaign) that would have allowed merchants to lower their GPCC acceptance costs by steering customers to less-expensive Visa GPCCs. This constitutes one piece of common evidence demonstrating that Amex's continued imposition and enforcement of its Anti-Steering Rules artificially inflated the GPCC acceptance costs (merchant discount rates) paid by merchants (including Qualified Merchants).

- ***Common Evidence Demonstrates that Amex Successfully Used its Anti-Steering Rules to Thwart Merchant Participation in Mastercard Preference Campaigns***

200.    In addition to Visa preference campaigns, common evidence I have reviewed also demonstrates that Amex used its Anti-Steering Rules to prevent merchants from participating in preference campaigns, and other forms of steering, with Mastercard, which would have allowed those merchants to lower their overall GPPC acceptance costs. For example, at the 2014 Amex Trial, Nina Biornstad of Mastercard testified that preference campaigns (such as the one using the "We Prefer MasterCard" banner) were an "effective" marketing tool for Mastercard because "it designates to the consumer that

---

[507] 2014 Amex Trial PX0152 at AMEX0001630183.

121

the merchant prefers that the consumer uses the MasterCard over any other forms of payment."[508] Given Mastercard's success with these kinds of preference campaigns, Ms. Biornstad testified that Mastercard was "willing to offer more financial incentives" to merchants for displaying its logo closer to the point of sale, for merchants to express a preference for the use of Mastercard GPCCs, as well as for fixed banner positions at the point of sale.[509] These financial incentives to merchants allowed merchants to lower their overall GPCC acceptance costs.

201.     Similar to the steps Amex took to prevent merchants from participating in preference campaigns with Visa, Amex similarly used its Anti-Steering Rules to prevent merchants from participating in the types of successful Mastercard preference campaigns described by Ms. Biornstad.[510] For example, in November 2002, Mastercard entered into a preference agreement with Travelocity whereby Travelocity was obligated to "communicate that they prefer MasterCard as a form of payment" in exchange for a "substantial financial incentive" paid to Travelocity by Mastercard.[511] This preference agreement was successful in that it shifted Travelocity sales volume to Mastercard from its competitors.[512] Upon learning of Mastercard's preference agreement with Travelocity, Amex sent Mastercard a letter informing them that Amex had "noted a number of MasterCard advertisements and activities over the past several months whereby merchants who accept American Express Cards indicate a preference for MasterCard," adding further that such preference advertisements violate Amex's Anti-Steering Rules and demanding that, as such, Mastercard "immediately cease and desist all such

---

[508] 2014 Amex Trial Transcript at 3239:12-22. Ms. Biornstad added that the "closer I get to the point of sale or the point of interaction, it becomes much more important for MasterCard to deliver that message to use your MasterCard." See 2014 Amex Trial Transcript at 3240:13-22.
[509] 2014 Amex Trial Transcript at 3240:18-3241:17.
[510] Ms. Biornstad testified: "Q. So let me ask you about some specific incidents. First let me ask you this question, Ms. Biornstad: Has American Express done anything in your experience to make it difficult for MasterCard to enter into promotions with T&E merchants? A. Promotions? Anything that    where we've been challenged before, is anything that gets close to the point of sale or point of interactions can sometimes be challenging. Q. And how can they be challenging? A. Because from what I understand from merchants that I've worked with, that there is language in the acceptance agreement that they have with American Express presents some challenges for them. Q. Okay. And by "challenges," are you referring to challenges in steering at the point of sale? A. Yes." See 2014 Amex Trial Transcript at 3244:1-17.
[511] 2014 Amex Trial Transcript at 3245:15-3246:5. See, also, 2014 Amex Trial Transcript at 2891:22-2892:2; 2014 Amex Trial PX1324 at MCW DOJ 00369615.
[512] 2014 Amex Trial Transcript at 3246:6-13.

122

advertising and activities."[513] Two months later, after Mastercard failed to stop engaging in preference campaigns with merchants following Amex's cease and desist letter, Amex sent Travelocity a letter informing it that Amex was terminating its relationship with Travelocity due to its ongoing preference campaign with Mastercard.[514]

202.    In response to this cancellation letter from Amex, Travelocity agreed to "remove all 'preference' language" for Mastercard GPCCs, and instead refer to Mastercard as "Travelocity's Official Card," despite disagreeing with Amex's assertion that its preference campaign with Mastercard violated Amex's Anti-Steering Rules.[515] Following this decision, Mastercard observed less Travelocity transaction volume shift from its competitors to Mastercard, as Ms. Biornstad noted that with the new "official card" marketing slogan, "[i]t became harder for [Mastercard] to really have an impact" as compared to when Travelocity promoted Mastercard as its preferred card and succeeded in shifting transaction volume to Mastercard.[516] Further, Ms. Biornstad testified that, as a result of Amex's use of its Anti-Steering Rules to prevent Travelocity from participating in a preference campaign with Mastercard, Mastercard reduced the total financial package it paid Travelocity from the "substantial" amount it had previously negotiated with Travelocity to be promoted as Travelocity's preferred card, causing Travelocity's overall cost of GPCC acceptance to increase.[517]

203.    In a similar instance, in 2004, Mastercard negotiated the terms of a preference agreement with Orbitz whereby, in exchange for financial incentives that would lower its overall cost of GPCC acceptance, Orbitz would promote that it preferred customers pay with Mastercard in order to shift more Orbitz transaction volume to Mastercard from its competitors.[518] However, this preference agreement was never finalized, as Orbitz

[513] 2014 Amex Trial PX0385; 2014 Amex Trial Transcript at 2897:1-2899:5.

[514] 2014 Amex Trial Transcript at 2892:5-2896:25; 2014 Amex Trial PX1085; 2014 Amex Trial PX0466.

[515] 2014 Amex Trial PX0449; 2014 Amex Trial PX1324; 2014 Amex Trial Transcript at 2899:11-2900:24; 2014 Amex Trial Transcript at 3246:17-3248:1.

[516] 2014 Amex Trial Transcript at 3248:18-3249:3.

[517] "Q. After the events in which Travelocity changed the way it was marketing because of American Express, did the total financial package MasterCard gave to Travelocity change? A. Yes. Q. How did it change? A. It was reduced. Q. And if you had been able to continue with the preference campaign that you wanted to use, would you have continued to offer the same financial package it offered before? A. Yes. Q. In your view, would that have helped MasterCard shift share from your competitors to MasterCard? A. Yes." See 2014 Amex Trial Transcript at 3296:22-3297:10.

[518] 2014 Amex Trial Transcript at 3254:23-3255:15.

123

informed Mastercard that it "could no longer fulfill [Mastercard's] contractual obligations
for preferencing" due to "concerns about what [Mastercard was] trying to achieve with
Orbitz because of their relationship with American Express."[519] Following this
notification, Elizabeth Ward of Mastercard emailed colleagues: "we've had to change the
terms [of the agreement with Orbitz] significantly due to Amex. The funding is cut in
half...and so are some of the benefits."[520]

204.    As I discussed above, the examples discussed above how Amex used its Anti-
Steering Rules to prevent merchants from participating in preference campaigns with
Mastercard that would allow them to reduce their overall GPCC acceptance costs through
the steering of customers to less-expensive GPCCs, as well as other financial incentives
often included as part of preference agreements such as these. At the 2014 Amex Trial,
Nina Biornstad testified that Amex's use of its Anti-Steering Rules to prevent merchants
from participating in preferencing campaigns with Mastercard made it more difficult for
her to work with merchants on promotional opportunities and, as a result, she seeks out
such promotional opportunities to work with merchants less often than she did before
these incidents with Amex.[521] Ms. Biornstad further testified:

> Q. Okay. If American Express did not have its restrictions on merchants to
> steer, in particular, to use preference steering at the point of sale, would
> you do more of it with merchants?
>
> A. Yes.
>
> Q. Would you work hard so that MasterCard is the preferred brand of
> some merchants?
>
> A. Yes.

---

[519] 2014 Amex Trial Transcript at 3254:23-3256:6; 2014 Amex Trial PX1928.

[520] 2014 Amex Trial PX1928 at MCI_MDL02_00276042. In another similar example, when an Amex
executive noticed a "We Prefer Mastercard" logo on the payments form she was given at an event at
Chelsea Piers in New York, she notified colleagues of this "violation of [Amex's] Card Acceptance
Agreement" so that they could "address with Chelsea Piers, and ensure that the We Prefer logo is
removed." See 2014 Amex Trial PX0425 at AMEXNDR00704698. When Amex contacted Chelsea Piers,
they were informed that Chelsea Piers had "changed everything online and in print to refer to Mastercard as
the 'Official Card of Chelsea Piers.'" See 2014 Amex Trial PX0425 at AMEXNDR00704698.

[521] 2014 Amex Trial Transcript at 3257:19-3258:25.

124

Q. And if your competitors were seeking to be the preferred brand, would that make competing harder?

A. Yes.

Q. And is MasterCard willing to allocate marketing funds to merchants to help do more steering?

A. Yes.[522]

- ***Common Evidence Also Demonstrates that Amex Successfully Used its Anti-Steering Rules to Prevent Amex-Accepting Merchants from Posting the Relative GPCC Acceptance Costs they Incur from Each GPCC Payment Network***

205.    Additional common evidence I have reviewed demonstrates that Amex used its Anti-Steering Rules to prevent Amex-accepting merchants (including Qualified Merchants) from posting the relative GPCC Acceptance Costs the incur from each of the GPCC payment networks in an effort to encourage customers to pay with an alternative, less-expensive brand of GPCC.  At the 2014 Amex Trial, Joseph Quagliata testified that, under Amex's Anti-Steering Rules, a merchant cannot "inform its customers how much it costs to accept the various credit cards," and that "a merchant cannot post the credit card costs for its consumers."[523]  By way of example, Mr. Quagliata testified that Amex's Anti-Steering Rules prohibit merchants from posting a sign like the one depicted in Figure 13 below, even if the information on the sign is accurate.[524]

---

[522] 2014 Amex Trial Transcript at 3259:1-14.
[523] 2014 Amex Trial Transcript at 651:11-653:25.
[524] 2014 Amex Trial Transcript at 654:17-655:12; 2014 Amex Trial PX2620.

## Figure 13
### Example of GPCC Acceptance Cost Signage Prohibited by Amex's Anti-Steering Rules



Source: 2014 Amex Trial PX2620.

206.     Common evidence I have reviewed demonstrates that Amex utilized its Anti-
Steering Rules to thwart attempts by Amex-accepting merchants to post their relative
GPCC acceptance costs in an effort to encourage customer to pay with an alternative,
less-expensive brand of GPCC, thus allowing those merchants to lower their overall costs
of GPCC acceptance. At the 2014 Amex Trial, Chris Priebe of Southwest testified that
he once received a "specific request from marketing [...] for clarity" on the distinctions
between co-brand and Amex card offerings "to be able to describe exactly how they
compare to other payment products, including American Express."[525] Mr. Priebe testified
that Southwest would like to publicize such comparisons, including a comparison to its
own co-branded GPCC, because "[t]here are economic benefits that accrues [sic] to
Southwest associated with the purchase activity on those [co-branded] cards, both at

---

[525] 2014 Amex Trial Transcript at 2517:2-16.

126

Southwest and not at Southwest."[526] However, as Mr. Priebe testified, any time a new
marketer has the idea to publicize such relative costs or benefits, Southwest has to inform
them that doing so is a "prohibitive clause" in Amex's Anti-Steering Rules.[527]

207.    Similarly, Scott Brennan of Hilton Hotels testified that he would have been
interested in seeing how a direct comparison of its co-branded GPCC and Amex's GPCC
would work, but was prohibited from doing so due to Amex's Anti-Steering Rules.[528] In
2008, merchant Billiards.com had a pop-up message on the payments page of its website
when a customer tried to pay with an Amex GPCC that said:

> American Express charges us 80% higher processing fees than other credit
> card companies. As you can tell by our low prices, we try to pass as much
> savings along to our customers as we possibly can. If Visa, Mastercard or
> Discover is an option for you, we'd prefer it. Thanks.[529]

Mr. Quagliata of Amex testified that this Billiards.com pop-up message was a violation
of Amex's Anti-Steering Rules, and that Amex's initial response in such a situation
would not be to "offer the merchant a lower discount rate to alleviate the merchant's
desire to have such a pop-up."[530] Rather, Mr. Quagliata testified that Amex's policy
would be to reach out to the merchant "to try to correct the problem," but if the merchant
did not take the pop-up down, Amex would "reserve [its] right to cancel the
relationship."[531]

208.    The common evidence discussed above demonstrates that Amex used its Anti-
Steering Rules to prevent Amex-accepting merchants (including Qualified Merchants)
from posting the relative GPCC Acceptance Costs the incur from each of the GPCC
payment networks in an effort to encourage customers to pay with an alternative, less-

---

[526] 2014 Amex Trial Transcript at 2426:1-15.
[527] 2014 Amex Trial Transcript at 2426:1-24.
[528] 2014 Amex Trial Transcript at 1612:21-1613:19, 1670:5-15. Mr. Brennan further testified that Hilton
Hotels' contract with Amex had "provisions restricting what Hilton could say or do regarding the credit
cards of American Express' competitors," and that Hilton's position was that it "wanted to remove all
restrictions" in this regard, but it was unable to make that happen. See 2014 Amex Trial Transcript at
1612:21-1613:6.
[529] 2014 Amex Trial PX0238.
[530] 2014 Amex Trial Transcript at 784:6-785:10.
[531] 2014 Amex Trial Transcript at 784:6-785:10.

127

expensive brand of GPCC. This constitutes an additional piece of common evidence demonstrating that Amex successfully used its Anti-Steering Rules to prevent merchants from lowering their overall GPCC acceptance costs via pro-competitive steering methodologies.

- ***Common Evidence Also Demonstrates that Amex's Anti-Steering Rule Successfully Prevented Amex-Accepting Merchants from Credibly Threatening to Differentially Surcharge GPCC Transactions***

209. Additional common evidence I have reviewed demonstrates that Amex used its Anti-Steering Rules to prevent Amex-accepting merchants (including Qualified Merchants) from lowering their overall GPCC acceptance costs by blocking merchants from differentially surcharging customers based on the GPCC brand or product they paid for on a GPCC Transaction, thus preventing Amex-accepting merchants from credibly threatening to differentially surcharge on the basis of GPCC brand or product, which would have provided those merchants with additional negotiating leverage with GPCC payment networks to lower their overall costs of GPCC acceptance.

210. For example, at the 2014 Amex Trial, Jack Funda, then Amex Senior Vice President for Global Merchant Pricing at Amex, testified how an agreement among networks and acquirers giving merchants the ability to differentially price by GPCC payment network in Canada would result in "rate pressure," which would result in a "negotiating lever for our merchants to approach us with" and "a position to demand significant rate reductions" from Amex.[532] However, Mr. Funda further testified that this particular type of steering is not permitted under Amex's Anti-Steering Rules, and, therefore, "that particular pressure on the American Express discount rate does not exist in the United States because of the nondiscrimination rules."[533]

---

[532] 2014 Amex Trial Transcript at 2692:22-2694:5; 2014 Amex Trial PX0005 at AMEXNDR11680346. In an analysis of this agreement, Amex found that merchants' ability to differential discount customers based on GPCC payment network as opposed to making discounting available to all buyers, that "there is no economic downside for merchants to discount and [Cardmember Volume] at risk is significant," adding that "[u]nder selective discounting, discounting by network does drive additional AXP [Cardmember Volume] at risk." See 2014 Amex Trial PX0005 at AMEXNDR11680347.
[533] 2014 Amex Trial Transcript at 2692:22-2694:24.

128

211.    Mr. Funda's testimony is consistent with the common evidence I discussed earlier in this Expert Report demonstrating how the intended pro-competitive effects of the 2013 Settlement (in which Visa and Mastercard agreed to permit merchants to surcharge Visa and Mastercard GPCCs at both the brand and product levels) were largely nullified by Amex's continued imposition and enforcement of its Anti-Steering Rules. For example, as Amex noted in a June 2021 presentation, "[s]urcharging market pressures" had grown over the past ten years, but that Amex's Anti-Steering Rules affords "[s]urcharging protections" against this threat.[534]

212.    The common evidence discussed above demonstrates that Amex used its Anti-Steering Rules to prevent Amex-accepting merchants (including Qualified Merchants) from lowering their overall GPCC acceptance costs by preventing merchants from differentially surcharging customers based on the GPCC brand or product they paid for on a GPCC Transaction, thus preventing Amex-accepting merchants from credibly threatening to differentially surcharge on the basis of GPCC brand or product, which would have provided those merchants with additional negotiating leverage with GPCC payment networks to lower their overall costs of GPCC acceptance.

v.    **Absent Amex's Continued Imposition and Enforcement of its Anti-Steering Rules, Amex-Accepting Merchants would have Utilized Pro-Competitive Steering Methods to Lower their Overall GPCC Acceptance Costs**

213.    Common evidence I have reviewed in the form of acknowledgments and testimony from Amex-accepting merchants (including Qualified Merchants)

---

[534] AMEX-CP-000094461-492 at 468. As Amex explained in this presentation, due to the way no-surcharge provision in Amex's Anti-Steering Rules is written, "[m]erchants accepting AXP who want to surcharge, have to surcharge credit and debit equally." See AMEX-CP-000094461-492 at 468 (emphasis in original). Therefore, as this Amex presentation went on to explain, an Amex-accepting merchant that wants to differentially surcharge GPCC Transactions by brand or product (consistent with Visa's and Mastercard's revised rules following the 2013 Settlement) had to either "[v]iolate AXP's policy requirements," or "[d]rop AXP acceptance." See AMEX-CP-000094461-492 at 468. Further adding to ways in which Amex's Anti-Steering Rules prevent Amex-accepting merchants from credibly threatening to differentially surcharge a given GPCC is that Visa's and Mastercard's merchant acceptance policies prohibit merchants from surcharging Visa and Mastercard Debit Card Transactions. See AMEX-CP-000094461-492 at 465, 468. Thus, given the fact that Amex's Anti-Steering Rules require Amex-accepting merchants who wish to surcharge do so equally across all GPCC Transactions and Debit Card Transactions (which are significantly less costly for the merchant than GPCC Transactions), then those merchants would, in effect, have to cease accepting Visa and Mastercard Debit Cards. See AMEX-CP-000094461-492 at 465, 468.

demonstrates that, in the absence of Amex's continued imposition and enforcement of its Anti-Steering Rules, those merchants would have utilized pro-competitive steering methods to lower their overall GPCC acceptance costs. I discuss this common evidence in greater detail below.

> ### a. Absent Amex's Anti-Steering Rules, it would be Economically Rational for Merchants to Steer their Customers to Less-Expensive GPCCs

214.    As I previously discussed, absent Amex's Anti-Steering Rules, Amex-accepting merchants would have been able to use various methods to steer customers to less-expensive GPCCs (or credibly threaten to do so to gain negotiating leverage) in order to reduce their overall GPCC acceptance costs. Earlier in this Expert Report I discussed how merchants commonly use other forms of steering in order to control costs (such as negotiating more favorable rates with preferred suppliers or vendors). Similarly, as a matter of economics, given the overall significance of the GPCC acceptance costs incurred by merchants (discussed in greater detail below), merchants operating in competitive markets would seek to reduce these costs as much as possible in order to remain competitive in their respective markets.

215.    Common evidence I have reviewed demonstrates that GPCC acceptance costs (merchant discount fees) constitute a substantial share of costs for many merchants. For example, in a prepared statement ahead of a May 2022 Senate Judiciary Committee Hearing on the subject of "Excessive Swipe Fees and Barriers to Competition in the Credit and Debit Card Systems," the National Retail Federation ("NRF") stated that "[s]wipe fees are most merchant's highest operating costs after labor, averaging 2.22 percent of the transaction amount for Visa and Mastercard credit cards."[535] Similarly, in its prepared statement ahead of the same hearing, the Food Industry Association ("FMI")

---

[535] Stephanie Martz, National Retail Federation (NRF), Letter to Dick Durbin and Chuck Grassley, May 3, 2022 (hereafter "NRF Letter"). The "NRF is the world's largest retail trade association, representing discount and department stores, home goods, and specialty stores, Main Street merchants, grocers, wholesalers, chain restaurants and internet retailers from the United States and more than 45 countries." See NRF Letter.

stated that "[s]wipe fees are most retailers' highest operating cost after labor and rent."[536] In addition, in its prepared statement ahead of the same hearing, the National Grocers Association ("NGA") stated that for "many of our members, the fees associated with accepting credit and debit cards is one of the highest costs of doing business."[537] Each of these industry associations, collectively representing a broad swatch of retailers in the U.S., explained in their statements to the Senate Judiciary Committee the significance of these costs, as well as how the lack of competition on the merchant side of the GPCC Transactions has negatively impacted retailers (as well as consumers) in the U.S.[538]

216. _____, in a 2008 deposition in a related matter, Michael Ross of Meijer testified that _____

_____[539] At the 2014 Amex Trial, Frank Bruno of Crate & Barrel testified that GPCC acceptance costs are a "significant cost for our company."[540] Dwaine Kimmet testified that Home Depot spent approximately $500 million in GPCC acceptance costs in the previous year; Home Depot's fourth largest cost after costs of running its stores, wages and salaries, and health care.[541] GPCC acceptance costs similarly are the fourth largest cost component for Ikea as well.[542] Russell Gibson of Sinclair Oil also testified that merchant discount fees charged by GPCC payment networks constitute "a significant

---

[536] The Food Industry Association (FMI), "Statement for the Record," Senate Judiciary Committee Hearing: Excessive Swipe Fees and Barriers to Competition in the Credit and Debit Card Systems, May 4, 2022 (hereafter "FMI Statement for the Record"). "FMI is a trade association representing food retailers, wholesalers, and product suppliers, including nearly 1,000 supermarket member companies that collectively operate almost 33,000 food retail outlets and 12,000 pharmacies." See FMI Statement for the Record.

[537] National Grocers Association (NGA), Letter to Dick Durbin and Chuck Grassley, "National Grocers Association's Statement for the Record – Committee on the Judiciary Hearing, "Excessive Swipe Fees and Barriers to Competition in the Credit and Debit Card Systems," May 4, 2022 (hereafter "NGA Letter"). The NGA "represents an industry comprising more than 21,000 independent community grocers across the country and the wholesalers, manufacturers and suppliers who service them." See NGA Letter.

[538] NRF Letter; FMI Statement for the Record; NGA Letter.

[539] Deposition of Michael Ross, July 25, 2008 (hereafter "Ross Deposition") at 38:15-39:7.

[540] 2014 Amex Trial Transcript at 2318:24-2319:19. Mr. Bruno further testified that Crate & Barrel is unable to control its GPCC acceptance costs: "Q. Does Crate & Barrel work to control the cost it spends on acceptance and credit card acceptance? A. Well, we try to, but there is really only so much we're able to do. So we put in place you know, we send tier one and tier two data that brings the costs down. But we really don't have the ability to control these costs." See 2014 Amex Trial Transcript at 2319:20-25.

[541] 2014 Amex Trial Transcript at 1222:5-17.

[542] 2014 Amex Trial Transcript at 387:1-4. John Robinson of Ikea testified that "[s]taff is the highest followed by advertising, followed by rent and then payment services." See 2014 Amex Trial Transcript at 387:5-7.

expense," and that "the majority of th[e] profit on a gallon of gas went to the credit card company."[543]

217.    Furthermore, common evidence confirms that, for profit maximizing merchants, controlling costs is a crucial element in remaining competitive in their industries. For example, John Robinson of Ikea testified at the 2014 Amex Trial that Ikea's business model focuses on being a "low-price, value-oriented retailer," thus, Ikea must "achieve low cost in [its] operations" in order to sell at a low price.[544] Diedre O'Malley of Best Buy testified that it's important for Best Buy to keep its costs of GPCC acceptance down in order to offer its customers its "low price guarantee" to remain competitive against its brick-and-mortar and online competition.[545] Jeffrey Rein of Walgreens testified that, with the company earning a 3.5 percent margin, it is "absolutely critical to control costs."[546] Executives from Alaska Airlines and Southwest Airlines testified to the critical importance reducing costs has on their ability to offer low fares to their customers to remain competitive in the airline industry.[547]

218.    The common evidence discussed above demonstrates that GPCC acceptance costs (merchant discount fees) constitute a substantial share of costs for many merchants and, further, given the overall significance of the GPCC acceptance costs, merchants operating in competitive markets would seek to reduce these costs as much as possible in order to remain competitive in their respective markets. In the next section I discuss common evidence of merchant acknowledgements that, in the absence of Amex's Anti-Steering Rules, Amex-accepting merchants (including Qualifying Merchants) would have utilized pro-competitive steering methods to lower their overall costs of GPCC acceptance.

### b. **Amex-Accepting Merchants Acknowledged that Amex's Continued Imposition and Enforcement of its Anti-Steering Rules**

---

[543] 2014 Amex Trial Transcript at 3155:17-3156:8. See, also, 2014 Amex Trial Transcript at 192:9-21, 2523:7-18.
[544] 2014 Amex Trial Transcript at 375:7-12.
[545] 2014 Amex Trial Transcript at 1522:21-23.
[546] 2014 Amex Trial Transcript at 1343:5-1344:4. Mr. Rein added: "I should preface this by saying it is important that we lower costs to make sure that we can pass on those costs and stay competitive with our competitors. If we just kept raising prices, the competition would come out and clean our clock." See 2014 Amex Trial Transcript at 1344:17-1345:20.
[547] 2014 Amex Trial Transcript at 219:6-221:18, 2370:25-2372:13.

132

## Prevented them from Utilizing Pro-Competitive Steering Methods to Lower their Overall GPCC Acceptance Costs

219.    I have also reviewed common evidence in the form of acknowledgments and testimony from Amex-accepting merchants (including Qualified Merchants) demonstrating that, in the absence of Amex's continued imposition and enforcement of its Anti-Steering Rules, those merchants would have utilized pro-competitive steering methods to lower their overall GPCC acceptance costs. In particular, common evidence I have reviewed in the form of acknowledgments from Amex-accepting merchants that demonstrates that, in the absence of Amex's Anti-Steering Rules, Amex-accepting merchants would gain the ability to credibly threaten Amex and the other GPCC payment networks with steering to less expensive GPCC payment option, thus providing those merchants with important leverage to use in negotiations with GPCC payment networks to extract more favorable financial terms (i.e., lower merchant discount rates or other financial incentives) in exchange for i) agreements to steer customers towards a specific GPCC (e.g., a preference campaign promoting that merchant's preference for a specific GPCC); or ii) agreements not to steer customers away from using a specific GPCC (e.g., an agreement not to surcharge a specific GPCC).

220.    For example, at the 2014 Amex Trial, Dwaine Kimmet of Home Depot testified that Home Depot would be able to lower its overall GPCC acceptance costs "if American Express' steering restrictions were no longer enforced," adding that Amex's Anti-Steering Rules allow Home Depot to steer customers to Amex GPCCs, but not the other major GPCC payment networks: "So again, the issue being that operationally, I have challenge [sic] on steering to more than one, but what I would like to have is the ability to approach any network, to steer to my great volume. So, what I would ideally like to do is steering to my absolute low cost vendor which is Discover and that I cannot do."[548] Similarly, Frank Bruno testified that Crate & Barrel would "consider steering or promoting to other general purpose credit cards" if it weren't precluded from doing so by Amex's Anti-Steering Rules, adding:

---

[548] 2014 Amex Trial Transcript at 1276:1-1277:7.

133

I think what we would look to do is to cultivate and enrich a larger partnership with a specific card brand. We would most likely introduce some competition. We would put out an RFP for not only a preferred merchant card-related status with our company, but we have a wide array of other book of business and services that we could utilize with card companies. So I could very well see that we would put up RFPs, let the various general purpose card companies know what our total array of offerings look like that we could work together to cultivate a larger partnership and an opportunity for hopefully some concession pricing that we could, you know, then look to return some of those savings to our customers.[549]

221. Another example of how Amex-accepting merchants would gain bargaining power in negotiations with GPCC payment networks that would allow them to lower their overall GPCC acceptance costs but for Amex's Anti-Steering Rules can be seen through a negotiation Hilton Hotels once had with Visa. In negotiating that deal, Hilton Hotels determined the extent to which they could seek a small shift in share to Visa GPCCs in exchange for a "substantial" rebate on the interchange fee that Hilton Hotels paid on Visa GPCC Transactions.[550] At the 2014 Amex Trial, Scott Brennan of Hilton Hotels testified that, had it not been for Amex's Anti-Steering Rules, Hilton Hotels would have "sought a more sizable deal with Visa" that would have allowed it to further reduce its overall cost of GPCC acceptance.[551] Jennifer Dale of Sprint testified that Sprint would consider expressing a preference for a particular GPCC other than Amex if it could because it would "give us the opportunity to be able to go out and negotiate with the various brands and we would probably negotiate across the board with all the brands on various marketing opportunities," adding further that Sprint's objective in its negotiations

---

[549] 2014 Amex Trial Transcript at 2328:9-2329:4. Similarly, Denis Bouchard of Sears and Russell Gibson of Sinclair Oil testified that, absent Amex's Anti-Steering Rules, both Sears and Sinclair Oil would have gained negotiating leverage in their negotiations with GPCC payment networks that they could then use to provide lower its costs and provide additional value to their customers. See 2014 Amex Trial Transcript at 580:9-581:12, 3219:17-3220:15.

[550] 2014 Amex Trial Transcript at 1614:8-1617:3.

[551] 2014 Amex Trial Transcript at 1617:4-7.

with the other GPCC payment networks would be "[t]o lower our costs."[552] When asked
if Southwest Airlines was well-positioned to "take advantage of the freedoms now
blocked by the American Express rules," Chris Priebe of Southwest testified:

> Yeah. I mean, given the opportunity to reduce a material line item, we
> will exhaust efforts to seek the best solution that's publicly available. To
> date, those solutions have been limited. But given newfound authority to
> do so, we would absolutely in the name of low cost try to encourage
> customers; consistent with how we've done our co-brand. Our co-brand
> returns value to us. We've motivated our co-brand and our co-brand
> customers to utilize that payment through points and through dollars off,
> and I would see it similarly in nature, whether it's a discount or surcharge,
> we have that opportunity to motivate the customer.[553]

Peter Haslam of Office Max similarly testified that in the absence of Amex's Anti-
Steering Rules, Office Max would have gained more leverage in its ability to negotiate
pricing terms with Amex.[554] Similarly, Denis Bouchard of Sears testified that if Sears

---

[552] 2014 Amex Trial Transcript at 1705:6-1706:9. Ms. Dale further testified: "I'm sure there are other things that we would look at and consider doing if we were not bound by [Amex's Anti-Steering Rules]. Obviously, we haven't spent a lot of time and resources on it because we are bound by it." See 2014 Amex Trial Transcript at 1706:5-13.

[553] 2014 Amex Trial Transcript at 2432:7-2433:5. Regarding a 2009 price hike Amex imposed on Southwest Airlines, Mr. Priebe testified: "Q. So let me ask you, Mr. Priebe, if the rules that we're about to get more deeply into, but the rules prohibiting steering were in place in the timing of the 2009 negotiations, could Southwest have mitigated the size of the price hike by telling American Express that it would steer card holders to the other cards, could that price hike go into -- A. Can I be absolutely clear on that question? Did you say if those rules weren't in place? Q. If they weren't in place, right. If you had the ability to steer in 2009, how would that have changed the negotiation dynamics, if at all? A. I believe that we would have been able to negotiate on price significantly based on our creativity and how we could have leveraged that right that we currently don't have." See 2014 Amex Trial Transcript at 2418:3-17.

[554] "Q. So let's take a step back and wanted to know, in your view, to what extent did Office Max have negotiating leverage on pricing terms with American Express in 2010? A. We had no leverage. Q. Under your contract with American Express, did Office Max have ability to steer customers to particular cards or payment forms? A. Can you ask the question again, please. Q. Sure, I was just asking, whether you had the ability under the contract to steer customers to particular payment forms? A. With the exception of a carve out for the private label card, the answer is no. Q. In your view, would Office Max have had a different degree of leverage in negotiation with American Express if you had had greater ability to steer customers? A. Yes. Q. Would that be more or less? A. We would have more leverage." See 2014 Amex Trial Transcript at 2170:25-2171:18.

"could make differentiation among the different credit card brands by steering," Sears could "could get additional negotiating leverage with the different brands."[555]

222.    Relatedly, unlike with GPCCs (which Amex's Anti-Steering Rules prevented them from doing so), common evidence I have reviewed demonstrates that merchants routinely used competitive tactics to elicit lower interchange rates on Debit Card Transactions in exchange for an agreement to route a greater amount of PIN Debit Card Transactions through a particular Debit Card payment network. Prior to the Durbin Amendment (discussed above), merchants were generally unable to select the payment network through which it routed a PIN Debit Card transaction.[556] However, with the passage of the Durbin Amendment, merchants were given the flexibility to choose from multiple Debit Card payment networks through which to route the transaction.[557]

223.    At the 2014 Amex Trial, Dwaine Kimmet of Home Depot testified that, with the added flexibility merchants were given as to which Debit Card payment network to route PIN Debit Card Transactions through, Home Depot used "routing tables" with Debit Card acceptance cost information to route the transaction "to the lowest cost network."[558] Mr. Kimmet further testified that, with the cap imposed on Debit Card Transaction interchange fees by the Durbin Amendment, "we saw a competitive environment where each one of those respective [Debit Card] processors were vying for […] volume. So, then we would actually see price reductions and that is where we would get additional leverage."[559] Thus, with capped (lower) Debit Card interchange rates and merchant flexibility in selecting the Debit Card payment network to route a given PIN Debit Card Transaction through brought about by the Durbin Amendment, Home Depot used this "additional leverage" to successfully negotiate lower Debit Card interchange rates with

---

[555] 2014 Amex Trial Transcript at 580:25-581:8. Mr. Bouchard added that with this "additional negotiating leverage," Sears "could also provide value to [its] customers, you know, of a certain brand, you know." See 2014 Amex Trial Transcript at 580:25-581:8.
[556] 2014 Amex Trial Transcript at 1237:12-1238:8.
[557] Federal Reserve Regulation II Final Rule. See, also, 2014 Amex Trial Transcript at 1237:12-1238:8.
[558] 2014 Amex Trial Transcript at 1237:19-1238:11. "Q. How does Home Depot decide which debit card network to route PIN debit transactions to? A. We route through the lowest cost transaction." See 2014 Amex Trial Transcript at 1238:9-11.
[559] 2014 Amex Trial Transcript at 1238:12-1239:6.

every PIN Debit Card payment network, allowing it to "reduce its costs of accepting debit cards."[560] Mr. Kimmet further testified:

> Q. Based on your experience dealing with the debit card networks, what do you expect would happen if the Home Depot could make the credit card networks enter similar discussions?

> A. I think it would play out candidly exactly like the debit card network has played out. And any bit of opportunity that I have, I can get to insert any type of leverage, I will use to help take the costs down.[561]

Similarly, Sprint. using the leverage it gained from the Durbin Amendment, "negotiated agreements with MasterCard and Visa for routing of debit transactions that we would route additional business to Visa and MasterCard in return for interchange rebates."[562]

224.    The common evidence discussed above demonstrates how Amex-accepting merchants have used the flexibility to steer to certain Debit Card payment networks provided by the Durbin Amendment to start negotiating lower Debit Card acceptance costs and/or financial incentives in exchange for engaging in similar steering strategies (routing PIN Debit Card Transaction volume through specific Debit Card payment networks) that are prohibited by Amex's Anti-Steering Rules in the GPCC Transactions market. This constitutes on piece of common evidence demonstrating that Amex-accepting merchants would utilize similar steering strategies in the GPCC Transactions

---

[560] 2014 Amex Trial Transcript at 1238:12-1242:8.

[561] 2014 Amex Trial Transcript at 1244:16-1245:2. Mr. Kimmet added: "If you look at the costs of credit in the United States relative to other countries, we are amongst the highest. And I can't think of a country where a network has backed away when price reductions, on credit, caps have come in or more kind of competitive environment is put in place." See 2014 Amex Trial Transcript at 1244:16-1245:2. Mr. Kimmet also testified: "Q Do you expect that sort of dynamic would play out in discussions with Visa? A. On credit? Q. Yes. A. I do. Q. Do you expect that that sort of dynamic would play out with discussions with MasterCard in regards to credit card rates? A. Absolutely. Q. Do you expect it would play out with respect to American Express? A. I would think so. Q. And Discover as well? A. I do, yes." See 2014 Amex Trial Transcript at 1245:3-16.

[562] 2014 Amex Trial Transcript at 1745:21-1747:9. At the 2014 Amex Trial, Jennifer Dale of Sprint testified: "Q. So, if I am understanding right, they paid you rebates to route transaction volume to them? A. They gave us rebates against any debit transactions. We made the decision internally to stop routing through the PINless debit networks and route the additional volume to Visa and MasterCard because it resulted in a costs savings to the company. Q. So they offered you these financial rebates and you made the decision to switch your debit routing to them? A. Correct." See 2014 Amex Trial Transcript at 1745:21-1747:19.

137

market in order to lower their overall GPCC acceptance costs if Amex were no longer
able to enforce its Anti-Steering Rules.

225.    Consistent with this finding, another piece of common evidence demonstrating
that Amex-accepting merchants would utilize steering strategies in the GPCC
Transactions market in order to lower their overall GPCC acceptance costs if Amex were
no longer able to enforce its Anti-Steering Rules is the fact that merchants have requested
that Amex grant them greater freedom to steer GPCC cardholders to less expensive
GPCCs, only to have those requests denied by Amex.  For example, as part of a 2011
negotiation with Amex, Home Depot sought to "remove the restrictions on steering" that
Amex imposed, only to have that request denied by Amex.[563]  When asked why Home
Depot wanted Amex to remove these restrictions, Dwaine Kimmet of Home Depot
testified:

> Very similar to the Durbin Amendment, where I get opportunities of
> leverage.  I always want to have those in my pocket for potential use.  So
> those restrictions were in place which limits my ability today to steer on
> the credit side and I want to have that flexibility to help give me some
> leverage with respect to networks in whatever form they play out.[564]

Similarly, Diedre O'Malley of Best Buy testified that it has asked American Express to
allow Best Buy to express a preference for its private label card due to the fact that, in
part, "from a financial standpoint, it is very beneficial for us to have our consumer use
that card," only to have Amex reject those requests.[565]  Glenda McNeal of Amex testified
that, as part of a negotiation for a 2007 agreement between Amex and Target, Target was
denied a request to express a "preference" for its own less-expensive private label card.[566]
Ms. McNeal further testified that other merchants have "asked to be able to use the word

---

[563] 2014 Amex Trial Transcript at 1257:12-1258:19.
[564] 2014 Amex Trial Transcript at 1258:8-14.
[565] 2014 Amex Trial Transcript at 1541:11-23.
[566] 2014 Amex Trial Transcript at 5972:20-5972:22.

138

'preference' in negotiations" with Amex, but that Amex's "position has been consistent" that it does not allow merchants to express a preference for certain non-Amex GPCCs.[567]

226.    Another piece of common evidence demonstrating that, in the absence of Amex's continued imposition and enforcement of its Anti-Steering Rules, Amex-accepting merchants would have utilized pro-competitive steering methods currently prohibited by Amex's Anti-Steering Rules to lower their overall GPCC acceptance costs is the fact that many Amex-accepting merchants currently use certain steering methods to do so to the extent that Amex's Anti-Steering Rules currently allow. Thus, consistent with economic theory and the common evidence discussed above, if given even greater negotiating leverage to utilize similar steering strategies to even further reduce their overall GPCC acceptance costs (via the absence of Amex's Anti-Steering Rules), profit maximizing merchants would seek to take advantage of these opportunities to lower their costs to remain competitive in their industries.

227.    For example, at the 2014 Amex Trial, Diedre O'Malley of Best Buy testified that Best Buy had a private label card that was its "least costly of all payment product" for Best Buy to accept.[568] Best Buy was able to obtain certain carve-outs in its merchant acceptance agreement with Amex that allowed it to promote the use of the Best Buy private label card to customers through offers of extended financing or additional loyalty points from Best Buy's loyalty program, though it is prohibited from expressing a "preference" for its own private label card.[569] Ms. O'Malley testified that, through its limited ability to promote its private label card, Best Buy was successful in shifting transaction volume to its private label card, which lowered its overall cost of GPCC acceptance.[570] Ms. O'Malley further testified that if Best Buy were permitted to express a preference for its private label card, it would like to do so, as it would be "very beneficial" to Best Buy "from a financial standpoint."[571]

---

[567] 2014 Amex Trial Transcript at 5973:23-5974:20. Ms. McNeal testified that in 2008, Amex refused to allow Dell the ability to steer customers to other less-expensive GPCCs. See 2014 Amex Trial Transcript at 6063:1-24. See, also, 2014 Amex Trial Transcript at 261:7-263:9, 411:3-412:10, 1612:21-1614:10, 1697:10-1698:16, 5891:11-5892:12; 2014 Amex Trial PX1178 at AMEXNDR18388278.
[568] 2014 Amex Trial Transcript at 1536:23-1537:17.
[569] 2014 Amex Trial Transcript at 1537:6-1540:4; 2014 Amex Trial PX0345 at AMEXNDR00018346-48.
[570] 2014 Amex Trial Transcript at 1538:23-1539:8.
[571] 2014 Amex Trial Transcript at 1541:5-23.

139

228.  Similarly, Crate & Barrel and Sears obtained the ability to promote their private label cards and/or co-branded cards at the point of sale, though neither was able to express a preference for their respective private label and/or co-branded cards.[572] Through the limited allowable promotion for these cards Crate & Barrel and Sears were permitted to engage in, executives from both companies testified that they were successful in driving GPCC transaction volume to these cards, which allowed them to lower their overall GPCC acceptance costs.[573]

229.  The common evidence discussed above demonstrates that GPCC acceptance costs (merchant discount fees) constitute a substantial share of costs for many merchants and, further, given the overall significance of the GPCC acceptance costs, Amex-accepting merchants operating in competitive industries would seek to reduce these costs as much as possible in order to remain competitive in their respective industries. The common evidence discussed above also demonstrates that, in the absence of Amex's continued imposition and enforcement of its Anti-Steering Rules, Amex-accepting merchants (including Qualified Merchants) would have utilized pro-competitive steering methods to lower their overall GPCC acceptance costs. This constitutes one piece of common evidence demonstrating that as a result of Amex's continued implementation and enforcement of its Anti-Steering Rules, Amex-accepting merchants (such as Qualified Merchants) incurred higher GPCC acceptance costs (merchant discount rates) on GPCC Transactions than they otherwise would have.

vi.  **Common Evidence Demonstrates that Amex's Anti-Steering Rules caused Visa, Mastercard, and Discover Merchant Discount Fees to be Higher than they would have Been Absent Amex's Anti-Steering Rules**

230.  Consistent with my conclusion above that Amex's continued imposition and enforcement of its Anti-Steering Rules during the Class Periods resulted in artificially-inflated costs of GPCC acceptance (merchant discounts fees) incurred by Amex-

---

[572] 2014 Amex Trial Transcript at 576:18-578:9, 2324:5-2325:3, 2340:9-2341:10.
[573] 2014 Amex Trial Transcript at 577:17-578:22, 2325:1-2327:5. At the 2014 Amex Trial, Frank Bruno of Crate & Barrel testified that in the two years the company started promoting its private label card it saw its "private label credit card activity jump to 10 percent on an overall weighted basis for the entire year," which allowed Crate & Barrel to reduce its overall GPCC acceptance costs "considerably" See 2014 Amex Trial Transcript at 2326:15-2327. See, also, 2014 Amex Trial Transcript at 2426:1-2427:11.

accepting merchants (including Qualified Merchants) common evidence in the form of acknowledgments from GPCC payment networks themselves demonstrates that Amex's Anti-Steering Rules caused those GPCC payment networks' merchant discount fees to be higher than they would have been absent Amex's Anti-Steering Rules. For example, earlier in this Expert Report I discussed common evidence demonstrating how Amex's continued imposition and enforcement of its Anti-Steering Rules foreclosed Discover's low-cost provider strategy, which would have allowed merchants to reduce their overall average GPCC acceptance costs by steering GPCC cardholders to less-expensive Discover GPCCs. Particularly, as Roger Hochschild of Discover testified at the 2014 Amex trial:

> Q. So given these roadblocks you described, the rules on steering and Visa and Visa and MasterCard and American Express, what did Discover do?
>
> A. Discover shifted our pricing strategy with merchants and started increasing our prices to more closely match those of Visa and MasterCard. [...]
>
> Q. And why did Discover start increasing its prices to merchants?
>
> A. To the extent that offering a lower price was not going to give us any business benefits, it was leaving money on the table. It wasn't the right answer for us as a company. It wasn't the right answer for our shareholders. We should be -- we needed to be competitively priced. Because, again, giving the retailers a discount without getting anything in return didn't make business sense.[574]

Furthermore, as I explained above, following the 2011 Consent Decree and 2013 Settlement, Mr. Hochschild testified that in a world absent Amex's Anti-Steering Rules where "there were no restrictions on what Discover could do with respect to steering at the point of sale," Discover "would aggressively pursue a strategy of lowering [its] prices

---

[574] 2014 Amex Trial Transcript at 853:23-854:15

and providing incentives to merchants that would steer incremental volume to Discover."[575]

231.    In addition to Discover acknowledging that Amex's continued imposition and enforcement of its Anti-Steering Rules caused it to charge higher merchant discount rates than it otherwise would have, common evidence indicates that Amex's Anti-Steering Rules allowed Visa and Mastercard to charge merchants higher merchant discount rates (via higher interchange rates) than they would have absent Amex's Anti-Steering Rules. In particular, earlier in this Expert Report I discussed several instances where Visa and Mastercard sought to partner with merchants whereby Visa and Mastercard would offer merchants financial incentives that would lower those merchants' GPCC acceptance costs in exchange for those merchants promoting Visa or Mastercard as their "preferred" card, only to have Amex block such partnerships via enforcement of its Anti-Steering Rules. As a result, Visa and Mastercard reduced or eliminated the financial incentives if offered those merchants, thus causing those merchants' GPCC acceptance costs to be higher than they otherwise would have been absent Amex's Anti-Steering Rules.

232.    In another example of how Amex's Anti-Steering Rules resulted in Visa and Mastercard charging higher merchant discount rates than they otherwise would have, Jeffrey Rein of Walgreens testified at the 2014 Amex trial that in 2004, both Visa and Mastercard "warned Walgreens they can justify future rate increases because we pay Amex's high fees."[576] Around that same time, Walgreens lost a public negotiation with Amex whereby Amex refused to reduce its merchant discount rate by an acceptable

---

[575] 2014 Amex Trial Transcript at 872:3-10. Mr. Hochschild further testified: "Q. In a world without American Express' anti-steering rules, how would merchant benefits in your view? A. The merchants would have the ability to manage their costs of credit card acceptance by steering customers to a lower cost network. And they could reinvest that savings in more profits or in enhancing their own value proposition to their customers. Q. In a world without American Express' anti-steering rules, how would Discover's cardholders benefit? A. Whatever preference programs the merchants put into place to steer customers, it would be some sort of positive incentive for them to use their Discover card. That would be a benefit for our cardholders. Q. In world without American Express' anti-steering rules, could Discover still compete for third-party issuers? A. Yes. Q. Mr. Hochschild, in a world without American Express' anti-steering rules, could Discover still develop brand loyalty for the Discover product? A. Yes. Q. Could you in fact enhance brand loyalty for your product? A. Yes. Q. And all the rewards that you've discussed today, in a world without American Express' anti-steering rules, could you still offer competitive rewards in the rewards market today? A. Yes. Q. In general, if the American Express rules were not in place, Mr. Hochschild, do you think that competition among the is credit card networks would be more robust than it is today? A. Yes." See 2014 Amex Trial Transcript at 872:11-873:15.

[576] 2014 Amex Trial Transcript at 1378:17-1379:3; 2014 Amex Trial PX1960 at WLGVMC 038974.

amount, but after announcing it was no longer going to accept Amex GPCCs in its stores, Walgreens "capitulated to American Express" and agreed to Amex's terms to continue accepting Amex GPCCs in its stores (I discuss this negotiation in greater detail later in this Expert Report).[577] Given Visa's and Mastercard's warning, Mr. Rein testified that Walgreens was concerned that, having lost its public negotiation with Amex to reduce its GPCC acceptance costs, Visa and Mastercard would "raise their interchange fees."[578] Mr. Rein further testified:

> Because we were the only one in the retail industry, no matter what it was,
> to my knowledge, that tried to stop accepting American Express. Because
> we were very very concerned. This is exactly what would happen, is that
> Visa and MasterCard would raise their rates because of the way the banks
> make the money and American Express and Visa and MasterCard make
> their money. So, as soon as they saw we were not successful, we can use
> the word, capitulated to American Express, Visa and MasterCard, in
> looking at this chart, raised their rates.[579]

233. The common evidence discussed above demonstrates how Amex's Anti-Steering Rules caused those GPCC payment networks' merchant discount fees to be higher than they would have been absent Amex's Anti-Steering Rules. This constitutes one piece of evidence demonstrating that as a result of Amex's continued implementation and enforcement of its Anti-Steering Rules, Amex-accepting merchants (such as Qualified Merchants) incurred higher GPCC acceptance costs (merchant discount rates) on GPCC Transactions than they otherwise would have.

## vii.    Most Amex-Accepting Merchants Cannot Practically Drop Amex GPCC Acceptance to Avoid Effects of Amex's Anti-Steering Rules

---

[577] 2014 Amex Trial Transcript at 1516:8-1519:8.
[578] 2014 Amex Trial Transcript at 1378:21-1379:8, 1516:8-1519:8. Mr. Rein testified: "Q. Should be on the screen maybe. The fourth bullet says, Visa and MasterCard are threatened. Both have warned Walgreens, they can justify future rate increases because we pay Amex high fees? A. Right. Q. What did you want to convey to the Board with that bullet? A. Wanted to let them know because of the way the banks issue these credit cards, that it was in  if we did not do anything to stop American Express than [sic] Visa and MasterCard would for sure raise their interchange fees." See 2014 Amex Trial Transcript at 1378:24-1379:8.
[579] 2014 Amex Trial Transcript at 1516:8-1519:8.

234.    In their 2011 article in the *Journal of the European Economic Association*, Jean-Charles Rochet and Jean Tirole characterize GPCCs as "must-take cards" due to the fact that a significant amount of customers wish to pay with GPCCs rather than other forms of payment.[580]  Though it may be cheaper for merchants to accept less expensive forms of payment such as cash or Debit Cards, most merchants accept GPCC payments to avoid losing business from customers who cannot or will not pay with cash or debit.[581]  In light of this, the vast majority of merchants in the U.S. (by GPCC volume) accept GPCCs from all networks.  For example, as of 2010, 98 of the 100 largest merchants in the U.S. as identified by the National Retail Federation accepted Amex GPCCs.[582]  The two merchants that did not accept Amex GPCCs did not accept GPCCs from any GPCC payment networks.[583]  In its 2019 Annual Report, Amex noted that "as of year-end 2019, [Amex] achieved virtual parity merchant acceptance, with approximately 99 percent of credit card-accepting merchants in the U.S. now able to accept American Express."[584]

235.    As I discussed above, following the 2011 Consent Decree and 2013 Settlement, Visa's and Mastercard's non-discrimination policies were revised to allow merchants to offer customers discounts, benefits, or other incentives to switch to a different, less expensive, brand of GPCC, or alternative form of payment, to promote a preference for different, less expensive, brands of GPCC, or alternative forms of payment, as well as to allow merchants to assess surcharges on Visa or Mastercard GPCC Transactions.  I further discussed common evidence demonstrating Amex's continued enforcement of its

---

[580] Jean-Charles Rochet and Jean Tirole, "Must-Take Cards: Merchant Discounts and Avoided Costs," *Journal of the European Economic Association*, Vol. 9, No. 3, June 2011, 462-495 (hereafter "Rochet and Tirole (2011)").

[581] "First, the paper validates the must-take cards argument by showing that retailers may be willing to accept cards even if the fee they have to pay exceeds their convenience benefit for card payments. This is because accepting cards increases the retailer's quality of service by offering to his customers an additional payment option. This property holds whether retailers are perfect competitors, Hotelling-Lerner-Salop competitors or even local monopolists. Thus it is not due to a hypothetical prisoner's dilemma situation where retailers would accept cards only to steal business from each other." See Rochet and Tirole (2011) at p. 463.

[582] United States District Court for the Eastern District of New York, *United States of America, et al., Plaintiffs, v. American Express Company and American Express Travel Related Services Company, Inc., Defendants*, Stipulation Regarding Non-Standard Card Acceptance Agreements and Merchant Acceptance of American Express, No. 1:10-cv-10-04496-NGG-RER, August 17, 2014 (hereafter "U.S. v. Amex Stipulation") at p. 4.

[583] U.S. v. Amex Stipulation at p. 4.

[584] 2019 American Express Annual Report at p. ii.

144

Anti-Steering Rules following the 2011 Consent Decree and 2013 Settlement largely nullified the intended pro-competitive benefits of these agreements in the market for GPCC Transactions. In light of this, Amex's Anti-Steering Rules amplified the aforementioned "must-take cards" scenario faced by merchants to must-take *this* card (i.e., a situation in which merchants accept Amex GPCC payments to avoid losing business from "single-homing" customers who cannot or will not pay with a GPCC issued by another payment network). Indeed, common evidence I have reviewed demonstrates that, as a practical matter, Amex-accepting merchants could not simply cease accepting Amex GPCCs in order to avoid the effects of Amex's Anti-Steering Rules following the 2011 Consent Decree and 2013 Settlement.

236. For example, statements and testimony from Amex-accepting merchants (including Qualified Merchants) illustrate the anticipated commercial impact of dropping acceptance of Amex GPCCs due to a significant portion of customers that prefer Amex GPCCs foregoing purchases at those merchants in favor of competitors who accepted Amex. At the 2014 Amex Trial, John Robinson of Ikea testified that Ikea could not stop accepting Amex because a large enough percentage of its customers expressed a preference for using Amex such that it "couldn't drop American Express without suffering a loss in sales," adding that the "percentage of customers that said they might move [was] large enough for Ikea to make a determination not to stop accepting American Express."[585] When asked at the 2014 Amex Trial if he ever recommended dropping acceptance of Amex GPCCs, Frank Bruno of Crate & Barrel responded by saying that with "that large percentage of spend coming through American Express, I would be extremely nervous that it would adversely impact sales. So no, I would not make that recommendation."[586] Peter Haslam of Office Max similarly testified that it would not be a good financial decision to stop accepting Amex GPCCs because it would

---

[585] 2014 Amex Trial Transcript at 389:10-390:10.
[586] 2014 Amex Trial Transcript at 2322:21-2323:4. Mr. Bruno stated that approximately 33 percent of Crate & Barrel's GPCC transaction volume was represented by Amex. See 2014 Amex Trial Transcript at 2322:8-16. When asked why Crate & Barrel accepts Amex GPCCs, Mr. Bruno testified: "Because our competition accepts them and we have to compete. But also it's a tender that our customers use so we want to make sure that we're able to transact with them." See 2014 Amex Trial Transcript at 2322:17-20.

145

lose sales to its competitors.[587] Diedre O'Malley of Best Buy similarly testified that in 2010, following an increase in the cost of accepting Amex GPCCs in 2008, Best Buy was considering dropping acceptance of Amex GPCCs and performed an analysis of the impact of doing so. Ms. O'Malley testified that, based on the results of this analysis, Best Buy determined that the potential loss of sales from dropping acceptance of Amex GPCCs outweighed any potential benefits from doing so, and thus, Best Buy opted to continue to accept Amex GPCCs.[588]

237.     Consistent with these findings, Walgreens embarked on a plan to negotiate with Amex for lower merchant discount rates on Amex GPCCs to levels that were consistent with the rates charged for acceptance of Visa and Mastercard GPCCs in mid-2004.[589] Jeffrey Rein of Walgreens testified that, at the time, Amex GPCC cost of acceptance was the highest of the four major GPCC payment networks, costing approximately 30 percent more that Visa and Mastercard, which Walgreens considered to be "way, way out of line."[590] Mr. Rein further noted that, given Walgreens' 3.5 percent net margins, it was "absolutely critical to control costs."[591] At the time, Walgreens was confident that it could negotiate a better merchant discount rate with Amex given its status as the largest number one drugstore chain in terms of store count and sales, and as the ninth-largest retailer in the US.[592] However, after approximately six months of negotiations, Amex's final offer to Walgreens was to reduce its merchant discount rate by ten basis points, or a four percent decrease, which still left Visa's and Mastercard's overall merchant discount rates "much lower" than Amex's.[593]

238.     Walgreens considered Amex's final offer to be "unacceptable," and as a result, in December 2004, informed Amex of its intention to terminate its acceptance of Amex

---

[587] 2014 Amex Trial Transcript at 2159:18-2161:4. Mr. Haslam noted that Office Max's competitors accepted Amex, which influenced Office Max's decision to continue to accept Amex: "Well, if they accept American Express and we don't accept American Express for some customers, it would become more difficult to shop at Office Max and they would be more likely to shop at our competitors." See 2014 Amex Trial Transcript at 2160:9-23.

[588] 2014 Amex Trial Transcript at 1528:22-1536:22.

[589] 2014 Amex Trial Transcript at 1352:13-1353:14.

[590] 2014 Amex Trial Transcript at 1352:23-1353:11.

[591] 2014 Amex Trial Transcript at 1343:5-1344:4.

[592] 2014 Amex Trial Transcript at 1342:21-1343:4, 1353:19-1354:6.

[593] 2014 Amex Trial Transcript at 1362:9-1364:17.

GPCCs effective January 2005.[594] Upon being informed of Walgreens' decision, Amex began developing a plan to start steering customers away from Walgreens towards Walgreens competitors. As John Theiss of Amex noted in a December 2004 email to colleagues, Amex began working with teams on "deciphering which markets and which accounts would make sense approaching for a campaign to shift share away from Walgreens," and further that Amex had discovered that it had "the ability to communicate directly to Walgreens 'shopper' list […] so we can market directly where it hurts them the most."[595] In particular, Amex had devised plans to offer customers "CVS Below the Line Offers" such as a \$25 gift card for new or transferred prescriptions or spending \$50 or more on certain items.[596]

239. However, before Amex was able to implement its plans to steer business away from Walgreens towards its competitors, Walgreens came to realize the "absolute mistake" it was making in dropping acceptance of Amex GPCCs and agreed to new acceptance terms with Amex effective January 2005, despite Amex "not offer[ing] [Walgreens] anything additional to cause them to change their position."[597] Rather, Walgreens' decision was based on the "widespread disaffection" that was communicated to it by its customers and the realization that its decision could result in a significant amount of customers shopping at its competitors in order to keep using their Amex GPCCs.[598]

240. Another reason Amex-accepting merchants could not simply cease accepting Amex GPCCs in order to avoid the effects of Amex's Anti-Steering Rules following the 2011 Consent Decree and 2013 Settlement is the extent to which a given merchant's

---

[594] 2014 Amex Trial Transcript at 1363:11-1365:19; 2014 Amex Trial PX1966 at WLGVMC 000190; 2014 Amex Trial DX 2219.

[595] 2014 Amex Trial PX0934 at AMEXNDR12768897.

[596] AMEXNDR12060217; 2014 Amex Trial PX1814; 2014 Amex Trial Transcript at 4845:25-4846:20, 4852:2-23. Amex further considered having Walgreens removed from the PBM network for its employees' health plans, a move it understood would "hurt Walgreens['] bottom line." See 2014 Amex Trial PX0886; 2014 Amex Trial Transcript at 4853:24-4857:19.

[597] 2014 Amex Trial Transcript at 1391:21-1392:18, 1397:6-1399:4; 2014 Amex Trial PX1962; 2014 Amex Trial PX1965; 2014 Amex Trial PX0142. Regarding the new deal reached between Amex and Walgreens, Stephen Samoy of Amex told a colleague in a January 2005 email that Walgreens "actually settled for a deal that was not quite as rich for them as the one we had back in Nov/Dec. Go figure?!," adding that Walgreens "must be receiving major customer complaints at the store level." See 2014 Amex Trial PX0446.

[598] 2014 Amex Trial Transcript at 1368:7-1397:2; 2014 Amex Trial PX1960.

customers engage in "single-homing," which is when GPCC users are only willing to use GPCCs from a single GPCC payment network such as Amex.[599] To the extent that customers single-home with a specific GPCC, it would be more difficult for a merchant to convince that customer to pay with a different GPCC or alternative form of payment if that merchant did not accept that particular GPCC. According to a July 2011 study conducted for Amex by Brookfield Research, ten percent of respondents said that Amex was the only major card it carried, and twelve percent of respondents said that Amex was the only major card it had carried in the prior month.[600]

241.    Following Amex's implementation of a third phase of value recapture (merchant discount fee increase) for the restaurant industry in April 2010, Amex prepared a presentation for restaurants to justify the price increase.[601] In that presentation, Amex noted that the fact that 40 percent of casual dining Amex cardholders "[u]sed only American Express Cards and no other major credit or charge cards."[602] Amex further noted that "49% of Cardmembers report that they would feel less positive about a casual dining restaurant that did not accept American Express Cards."[603] Similarly, in a June 2009 "Partnership Overview" presentation Amex prepared for Hilton Hotels, Amex noted that "14% [of Amex cardholders] carry American Express, but do not carry any other major credit or charge cards," adding that "49% agree that American Express is their Card of choice."[604]

242.    Furthermore, common evidence I have reviewed demonstrates that Amex was aware of the extent that such cardholder insistence would factor into a merchant's willingness to cease accepting Amex.[605] Earlier in this Expert Report I discussed how Amex's Anti-Steering Rules tilt the GPCC Transaction price structure further toward

---

[599] Oz Shy, "How Many Cards Do You Use?," *Research Department Working Papers*, No. 13-13, Federal Reserve Bank of Boston, 2013 (hereafter "Shy") at p. 1.
[600] 2014 Amex Trial PX0815 at AMEXNDR10977290.
[601] 2014 Amex Trial PX0957.
[602] 2014 Amex Trial PX0957 at AMEXNDR13238917.
[603] 2014 Amex Trial PX0957 at AMEXNDR13238917. Amex also noted that 46 percent of casual dining Amex cardholders "[u]sed only American Express Cards and no other major credit or charge cards," and that "56% of Cardmembers report that they would feel less positive about a fine dining restaurant that did not accept American Express Cards." See 2014 Amex Trial PX0957 at AMEXNDR13238924.
[604] 2014 Amex Trial DX 7249 at AMEXNDR01562207.
[605] Amex sometimes refers to this cardholder insistence as "brand loyalty." See, for example, 2014 Amex Trial Transcript at 758:24-759:6.

merchants than would be expected under greater levels of competition at the merchant level with multi-homing customers and merchants, and further how Amex's Anti-Steering Rules allow GPCC payment networks to compete for GPCC Transaction market share by increasing cardholder rewards (encouraging cardholders to use a single network exclusively or 'single-home') and passing the costs of increased rewards – and then some – through to merchants, who must accept cards from all GPCC payment networks and lack the ability to steer customers toward lower-cost forms of payment.

243.    One way Amex generates cardholder insistence is through the rewards programs it offers cardholders. In a 2004 Amex "Discussion of Sales at Risk" presentation regarding Walgreens, Amex identified Amex cardholders enrolled in loyalty programs as one of the "Loyalist Segments at Walgreens," which included "Cardmembers enrolled in *Membership Rewards*, Delta SkyMiles, Costco rewards, Blue Cash, and others."[606] Amex noted that this group of cardholders is "[d]riven by ability to earn points, miles, or cash rebates, many use American Express exclusively to consolidate rewards," adding that Walgreens would experience a "39% loss in sales due to Cardmembers no longer shopping or spending less if AXP not accepted."[607]   In a 2005 letter from William Glenn of Amex to Jeffrey Rein of Walgreens, Mr. Glenn noted that Amex cardholders will spend approximately $700 million at Walgreens in 2005, adding: "This is a very insistent and loyal base of corporate, small business, and membership rewards enrollees, who we have unique relationships with.  Understanding this relationship is critical as you evaluate your costs and competitive position."[608]

244.    In a 2008 Amex "Merchant Services Overview" presentation to Alaska Airlines, Amex noted: "Through best-in-class rewards & capabilities, American Express has built a very loyal base.  59% of Alaska Airlines' charge volume comes from Cardmembers that are enrolled in Loyalty Programs," adding that "93% of American Express Loyalty Program Cardmembers have used only American Express to pay for tickets on Alaska or Horizon Airlines in the past 12 months."[609]  In a 2008 Amex Presentation to Shell Oil,

---

[606] 2014 Amex Trial PX0426 at AMEXNDR00709649 (emphasis in original).
[607] 2014 Amex Trial PX0426 at AMEXNDR00709649.  Amex noted this loss translated to $181,649,718 in 2004 sales at risk.  See 2014 Amex Trial PX0426 at AMEXNDR00709649.
[608] 2014 Amex Trial PX1974 at WLGAMX00375318-19.
[609] 2014 Amex Trial PX0111 at AMEXNDR10160812.

149

Amex noted that "[a]pproximately 88% of Shell's 2007 US$2.376 billion charge volume is insistent. American Express Consumer Cardmembers are incented to use their American Express Cards through a variety of rich rewards program[s]."[610] A 2009 "Value Tool" put together by Amex noted that "Membership Reward Enrollees are addicted to their points and usually only shop at establishments that accept the card."[611] In 2011, Brookfield Research performed a research report for Amex that found that "84% of American Express Cardmembers report being enrolled in an American Express loyalty program, which is 1.3 times as many as the 65% of Non-Cardmembers who report being enrolled in a Visa, MasterCard, Discover or Diners Club loyalty program."[612]

245.    As discussed above, the rewards programs Amex offers its cardholders constitutes one example of why most Amex-Accepting merchants cannot practically drop Amex GPCC acceptance to avoid the effects of Amex's Anti-Steering Rules, as these rewards programs incentivize Amex GPCC cardholders to increase the amount of spending they choose to make with their Amex GPCCs, which, in turn, risks a greater potential sales loss for Amex-accepting merchants if they were to cease accepting Amex GPCCs in order to avoid the effects of Amex's Anti-Steering Rules, allowing them to reduce their overall GPCC acceptance costs. Another such example of such cardholder insistence that Amex acknowledges also increases this risk of lost sales is due to the strength of its corporate card segment.

246.    In 2015, Amex noted that it was the "industry leader" in the "Global Payments business," adding that "63% of the Fortune Global 500, including many of the biggest names in the business world, are American Express clients."[613] In a 2009 "Value Tool"

[610] 2014 Amex Trial PX0906 at AMEXNDR12178821.

[611] 2014 Amex Trial PX1689 at AMEXNDR08568547.

[612] 2014 Amex Trial PX0815 at AMEXNDR10977284. Brookfield Research further noted that "83% of Loyalty Program American Express Cardmembers say they are much or somewhat more likely to use American Express because they are enrolled in an American Express loyalty program." See 2014 Amex Trial PX0815 at AMEXNDR10977284.

[613] American Express Investor Day Transcript, March 25, 2015 at p. 22. In a 2018 Amex Investor Day presentation, Amex noted that it is the "#1 Corporate Card issuer in the US." See American Express Investor Day Presentation, March 7, 2018 at p. 78. At a 2019 Investor Day Presentation, Anna Elizabeth Marrs stated: "In SME in the U.S., we are the leading issuer of small business cards, larger than our nearest five competitors combined. SME customers don't want to think about financial services. They want providers to be easy to use so they can focus on running their business. For global and large customers, our corporate card is and has long been the industry leader. We have relationships with more than 60% of the

150

put together by Amex, Amex noted that "Corporate CMs are among the most loyal. MOST of them HAVE TO use their cards when paying for a business expenses [sic]. So, if a merchant does not take the card, our Corporate CMs can't spend there."[614] In an Amex "2010 Cardmember Study – US Summary Report," regarding its corporate card segment, Amex noted that "[m]andation is relatively high, especially among [Global Client Group] and Large CMs."[615] At the 2014 Amex Trial, Joseph Quagliata of Amex testified that the insistence to use Amex corporate GPCCs when issued by one's company is driven by the "inconvenience" of having to use a different (personal) GPCC for a business expense, which requires them to "submit it and wait for reimbursement," which "[v]ery few people want to do."[616] Consistent with this notion, at the 2014 Amex Trial, Jennifer Dale of Sprint testified that when Sprint considered ceasing its acceptance of Amex GPCCs in 2008, it ultimately decided against doing so, as there "was a concern that we would lose customers, particularly in the business segment, if we made that decision," adding:

> There was just a concern because of the way that the corporate commercial card use is mandated within certain companies, that if we stopped accepting American Express, that we would lose those business customers because they would not be able to continue with Sprint because we did not offer that particular form of payment.[617]

Similarly, George Satkowski of Enterprise similarly testified that Enterprise decided to continue accepting Amex GPCCs because it "had too many corporate customers who had

Fortune Global 500. And for these customers what matters is global consistency, integrated tools and data. Taken together, we're the number one commercial card issuer by volume across all segments globally." See American Express Investor Day Transcript, March 13, 2019 at p. 10.
[614] 2014 Amex Trial PX1689 at AMEXNDR08568547.
[615] 2014 Amex Trial PX0634 at AMEXNDR07563112. According to this presentation, 58 percent of US GCG [(Global Client Group)] and 53 percent of large cardmembers were "[r]equired to use AmexCorporate Card for all business expenses when possible." See 2014 Amex Trial PX0634 at AMEXNDR07563112.
[616] 2014 Amex Trial Transcript at 755:3-25.
[617] 2014 Amex Trial Transcript at 1687:24-1689:11. Ms. Dale further testified: "Q. Did Sprint's concern about losing those business customers outweigh the potential savings from shifting to another credit card brand? A. Yes, it did." See 2014 Amex Trial Transcript at 1689:8-11.

151

objected to the notion of paying with a different credit card or a direct bill method of payment."[618]

247.    The common evidence discussed above demonstrates that Amex's strong presence in the corporate GPCC segment provided an additional form of cardholder insistence that made it so that Amex-accepting merchants cannot practically cease accepting Amex GPCCs in order to avoid the effects of Amex's Anti-Steering Rules following the 2011 Consent Decree and 2013 Settlement, as doing so would result in those merchants losing a significant amount of sales from corporate GPCC cardholders who are required to use their corporate Amex GPCCs for all business expenses, or simply wish to avoid the inconvenience of having to submit business expenses incurred on alternate (e.g. personal) GPCCs to their company and wait for reimbursement. Additional common evidence I have reviewed demonstrating that most Amex-Accepting Merchants cannot practically drop Amex GPCC acceptance to avoid the effects of Amex's Anti-Steering Rules comes in the form of threats Amex itself made to merchants considering dropping Amex acceptance that doing so would result in a significant loss of sales. By way of example, at the 2014 Amex Trial, Dwaine Kimmet of Home Depot testified that, "over time," and specifically during a 2011 negotiation with Amex where Home Depot sought to reduce its Amex GPCC acceptance costs, Amex claimed that Home Depot would "lose sales if it stopped accepting American Express cards."[619]

248.    The common evidence discussed above demonstrates that most Amex-Accepting Merchants cannot practically drop Amex GPCC acceptance to avoid the effects of Amex's Anti-Steering Rules. This constitutes one piece of evidence demonstrating that as a result of Amex's continued implementation and enforcement of its Anti-Steering Rules, Amex-accepting merchants (such as Qualified Merchants) incurred higher GPCC acceptance costs (merchant discount rates) on GPCC Transactions than they otherwise would have.

viii.    **Discover is Unlikely to have Blocked Pro-Competitive Steering Strategies by Merchants During the Class Periods Absent Amex's Anti-Steering Rules**

---

[618] 2014 Amex Trial Transcript at 489:15-20.
[619] 2014 Amex Trial Transcript at 1261:10-1262:18.

249.    Following the 2011 Consent Decree and 2013 Settlement, Discover had a set of merchant operating regulations covering "Equal Treatment of Cards Issued or Operating on the Discover Network with Other Payment Cards;[620] Equal Treatment of Card Issues,"[621] as well as "Surcharges and Discounts," that were similar in nature to Amex's Anti-Steering Rules.[622] However, despite these Discover provisions remaining in place following the 2011 Consent Decree and 2013 Settlement, at the 2014 Amex Trial, Roger Hochschild of Discover testified:

> Q. If Discover were the only credit card network that had a
> nondiscrimination rule and merchants indicated that was a barrier to
> steering that the merchants wanted to do to the low cost competitor
> network, would Discover bar that activity?
>
> A. No.[623]

Contrary to Amex continued imposition and enforcement of its Anti-Steering Rules, regarding Discover's use of these provisions in the past, Mr. Hochschild testified:

> Q. I want to ask you again about Discover's nondiscrimination or equal
> treatment rule. Has Discover ever enforced its rule against a merchant?
>
> A. No.

---

[620] Section 2.4 reads: "Other than with respect to discounts as permitted in Section 2.5, you may not institute or adopt any practice, including any discount or in-kind incentive, that unfavorably discriminates against or provides unequal and unfavorable treatment of any Issuer, Cards operating on the Discover network versus cards operating on other payment networks, or any Person who elects to pay using a type of Card (e.g., credit, debit, prepaid) versus any payment card of the same type that you accept (except for any proprietary payment card issued by you or any payment card issued under a formal co-branding relationship between you and a card issuer), except to the extent such restrictions are prohibited by Requirements of Law or permitted as set forth in Sections 2.5 and 5.11." See 2014 Amex Trial DX 6116 at p. 8.

[621] Section 2.5 reads: "You may assess a surcharge on a Card Sale provided that (a) the amount of the surcharge may not exceed the Merchant Fee payable by you to us for the Card Sale; and (b) you assess surcharges on Card Sales conducted using other cards accepted by you, in each case subject to the restrictions in Section 2.4; and (c) you otherwise comply with Section 2.4  You may not assess a surcharge or other penalty fee of any kind other than as set forth above. You may offer discounts or in-kind incentives for payment by different tender types (e.g., a discount for payment by cash versus payment by credit card) subject to the restrictions in Section 2.4." See 2014 Amex Trial DX 6116 at p. 8.

[622] Roger Hochschild of Discover testified that the Discover Merchant Operating Guidelines published on April 13, 2012 were still in place as of July 2014, and that these versions of the provisions in Sections 2.4 and 2.5 were last updated in the late 1990s. See 2014 Amex Trial Transcript at 926:6-19.

[623] 2014 Amex Trial Transcript at 985:13-17.

153

Q. Has Discover ever told a merchant that he needs to stop steering volume to one of Discover's competitors?

A. No.

Q. Has Discover ever threatened to cancel a merchant that was steering to one of Discover's competitors?

A. No.

Q. Has Discover ever threatened one of its competitors for violating Discover's nondiscrimination rule?

A. No.[624]

250.    Consistent with Mr. Hochschild's testimony, given Discover's preferred low-cost strategy (discussed above) that it ultimately chose not to pursue following the 2011 Consent Decree and 2013 Settlement given Amex's continued imposition and enforcement of its Anti-Steering Rules, enforcing the equal treatment and/or surcharging and discounting provisions of its merchant operating rules in the but-for world (where Amex can no longer enforce its Anti-Steering Rules) would run counter to Discover's own economic self-interest, as its preferred low-cost strategy is dependent on Discover's ability to successfully convince merchants to steer customers to the Discover GPCC payment network.

251.    Common evidence in the form of acknowledgements from Amex-accepting merchants (including Qualified Merchants) further demonstrates that, in the absence of Amex's Anti-Steering Rules, it wouldn't be prudent for Discover, which accounted for market shares (based on purchase volume) ranging from 3.69 percent to 4.18 percent of the GPCC Transactions market between 2015 and 2021 to continue to try and enforce its equal treatment and/or surcharging and discounting provisions of its merchant operating

---

[624] 2014 Amex Trial Transcript at 984:16-985:3.

rules in a way that interferes with, or negatively impacts, a merchant's business operations.[625]  As Diedre O'Malley of Best Buy testified at the 2014 Amex Trial:

> Q. Okay. So if the treatment provision we just looked at in your AmEx contract no longer existed, wouldn't Discover's rules prevent you from encouraging customers to use, for example, a MasterCard?
>
> A. I think the rules would state that. I don't think Discover would prevent it.
>
> Q. Why don't you think Discover would prevent it?
>
> A. They are the self-proclaimed small guy out there and I don't think they have the market power required to make a merchant stop doing that.[626]

252.   Similarly, George Satkowski of Enterprise testified that Enterprise has had conversations with Discover informing them that if Amex were to ever drop its Anti-Steering Rules, "Discover would either need to remove that clause or, if in such case they felt that they couldn't, that we would have to reconsider our agreement with the Discover product," adding that Enterprise has "done a lot of research with Discover and we're fully comfortable that if we were to eliminate the Discover brand that we will not see any loss in any business."[627]  Both Ikea and Southwest Airlines successfully used the threat of ceasing acceptance of Discover GPCCs to convince Discover to forego rate increases or the imposition of new fees.[628]

253.   The common evidence discussed above demonstrates that Discover is unlikely to have blocked pro-competitive steering strategies by merchants during the Class Periods

---

[625] Nilson Report, Issue #1080; The Nilson Report, No. 1103, February 2017 (hereafter "Nilson Report, Issue #1103"); The Nilson Report, No. 1125, February 2018 (hereafter "Nilson Report, Issue #1125"); The Nilson Report, No. 1147, February 2019 (hereafter "Nilson Report, Issue #1147"); The Nilson Report, No. 1191, February 2021 (hereafter "Nilson Report, Issue #1191"); and Nilson Report, Issue #1213.
[626] 2014 Amex Trial Transcript at 1544:14-23.
[627] 2014 Amex Trial Transcript at 504:1-23.  Kevin Thiel of Alaska Airlines testified: "Q. If the Government wins this lawsuit, and you no longer have the American Airlines rules, what will you do?  A. Well, I guess the first thing that we would do is pick up the phone and call Discover and just say there's been a significant change with one of your competitors and we would like to discuss the language in our agreement and we would try to negotiate an amendment the[n].  Q. Do you think you would have the ability to negotiate with them an amendment? A. Yes."  See 2014 Amex Trial Transcript at 370:3-12.
[628] 2014 Amex Trial Transcript at 457:23-458:22, 2416:17-2418:2.  See, also, 2014 Amex Trial Transcript at 1608:7-13, 2550:14-19.

absent Amex's Anti-Steering Rules. This constitutes one piece of evidence demonstrating that as a result of Amex's continued implementation and enforcement of its Anti-Steering Rules, Amex-accepting merchants (such as Qualified Merchants) incurred higher GPCC acceptance costs (merchant discount rates) on GPCC Transactions than they otherwise would have.

ix.   **Amex's Pricing Strategy in Australia Following Reserve Bank of Australia Reforms**

254.   In December 2001, the Reserve Bank of Australia ("RBA") announced reforms to credit card schemes in Australia "designed to promote greater efficiency, transparency and competition in the Australian payments system."[629] Under these new reforms, differential surcharging was permitted on Visa and Mastercard GPCC Transactions (effective January 2003) and the interchange rates charged on Visa and Mastercard GPCC Transactions were capped at 55 basis points (effective October 2003).[630] In November 2006, the cap on Visa and Mastercard GPCC Transaction interchange fees was reduced to 50 basis points.[631] As part of this government regulation in Australia, Amex agreed as part of an "Undertaking" with the RBA that it would "not prohibit, or take any action that has the effect of prohibiting, a merchant in Australia from charging an American Express card holder any fee or surcharge for use of an American Express credit or charge card on a transaction."[632]

255.   Common evidence I have reviewed demonstrates that Amex was aware of the negative impacts the RBA regulations would have on its business. For example, in an April 2007 Amex presentation regarding the differential surcharging permitted by the RBA regulations, Amex noted: "If we are unable to meet the challenge head on our position could deteriorate significantly."[633] In June 2007, regarding the impact that differential surcharging was having in Australia following the RBA regulations, Edward Gilligan, Vice Chairman at Amex, "used the phrase '[R]ome is burning' to describe his

---

[629] Reserve Bank of Australia, "2002 Annual Report," 2002 at p. 29.
[630] AMEX-DOJ-10039910-953 at 916.
[631] AMEX-DOJ-10039910-953 at 916.
[632] Deposition and Exhibits 910, 932 of Colm Lorigan, August 5, 2012 (hereafter "2012 Lorigan Deposition Exhibit 910, 932") at AMEX-CP-000029712.
[633] AMEXNDR17380767-785 at AMEXNDR17380770.

view on the urgency of acting now to stem the tide of differential surcharge."[634] A similar Amex presentation from August 2007 noted that differential surcharging was the "[k]ey [c]hallenge [w]e [f]ace," adding that "[m]erchants differentially surcharge because it is in their best financial interest to do so."[635] In another August 2007 presentation, Amex acknowledged that it "is rational for a merchant to differentially surcharge," adding that "[c]ardmembers either pay surcharge or switch payment products. They do not leave establishments."[636]

256.    In January 2003 (following the RBA's announcement of its reforms), to "[m]itigate [r]isks," Amex "proactively reduced discount rates to over 80,000 merchants by 5-35bp across a range of industries   Retail, Restaurants, Professional/Financial Services, Lodging and Auto Sales/Service. This was designed to minimize the threat of surcharge and assist in coverage efforts."[637] However, despite these initial proactive efforts, the ongoing impact of differential surcharging, notably, the threat of differential surcharging, remained a significant concern for Amex. As a result, common evidence I have reviewed demonstrates that, in order to avoid the negative impact that merchants' differentially surcharging Amex GPCC Transactions would have on its business, Amex adopted a strategy whereby it would offer merchants a significant reduction in their merchant discount fee in exchange for agreeing not to differentially surcharge Amex GPCCs.

257.    For example, in an August 2006 update presentation regarding the RBA reforms, Amex noted that by the end of 2005, there had "been a significant trend in the Australia market towards surcharging in general and differentially surcharging American Express in particular," adding the following update: "Differential [s]urcharge significantly impacts our business and we are therefore taking steps to eliminate this by actively reducing our price for those merchants with Welcome Acceptance or Parity

---

[634] 2014 Amex Trial PX0230 at AMEX-DOJ-11069928-29.
[635] AMEX-DOJ-10039910-953 at 911, 926.
[636] AMEX-DOJ-10133629-638 at 631. Amex also noted that, unlike with differential surcharging, there were "[n]o material impacts witnessed for Amex from cases of parity surcharge."
[637] AMEXNDR00655707-725 at 710. Amex noted that this "move coincided with the introduction of surcharging but pre-dated the Visa/Mastercard rate reductions by 10 months." See AMEXNDR00655707-725 at 710.

157

Surcharge."[638]  In a June 2007 update presentation on its response to the RBA reforms, Amex noted that between 2003 and 2006, it had "successfully executed [its] core strategy: minimize effect of surcharging on billings and aggressively leverage opportunities."[639]  In this same presentation, Amex updated its "Strategic Challenges" for Australia from "2007 onwards" in the following way:

> Our original strategy focused on securing the top accounts in the marketplace to set a marketplace standard of no surcharge.  New threats have evolved in the marketplace from small/medium merchants. [...] Bedding down 'no surcharge' contracts with key merchants was costly, bringing many key accounts to the point of being virtually non-profitable.[640]

258.    The RBA began tracking quarterly data on the average merchant discount fees for debit, credit, and charge cards beginning in Q1'2003 (the same time frame Amex began its strategy of securing accounts in the marketplace "to set a marketplace standard of no surcharge").[641]  Figure 14 below summarizes the quarterly average merchant discount fees paid by merchants to reporting acquiring institutions (as a percentage of purchase value) for all Amex GPCCs in Australia from Q1'2003 through Q2'2022.[642]  As shown, during this time period, Amex's average merchant discount declined steadily, dropping 47.98 percent overall.  In total, Amex's average merchant discount declined from 248 basis points in Q1'2003 to 129 basis points in Q2'2022 (a 119 basis point decline).

---

[638] 2012 Lorigan Deposition Exhibit 910, 932 at AMEXNDRAUS00000235.  I describe Amex's preference for parity surcharging over differential surcharging later in this Expert Report.

[639] AMEX-DOJ-10070929-953 at 934.

[640] AMEX-DOJ-10070929-953 at 935.

[641] See Reserve Bank of Australia, "Payments Data." Available at: https:/ www.rba.gov.au/payments-and-infrastructure/resources/payments-data.html. See, also, AMEX-DOJ-10070929-953 at 934-935.

[642] See Reserve Bank of Australia, *Retail Payment Statistics, C3: Average Merchant Fees for Debit, Credit and Charge Cards* (hereafter "RBA Payments Data"). Available at: https:/ www.rba.gov.au/payments-and-infrastructure/resources/payments-data.html.

**Figure 14**
**Summary of Quarterly Average Amex Merchant Discount Rates in Australia**

2.60
2.40
2.20
2.00
1.80
1.60
1.40
1.20
1.00
(%)
Mar-2003
Sep-2003
Mar-2004
Sep-2004
Mar-2005
Sep-2005
Mar-2006
Sep-2006
Mar-2007
Sep-2007
Mar-2008
Sep-2008
Mar-2009
Sep-2009
Mar-2010
Sep-2010
Mar-2011
Sep-2011
Mar-2012
Sep-2012
Mar-2013
Sep-2013
Mar-2014
Sep-2014
Mar-2015
Sep-2015
Mar-2016
Sep-2016
Mar-2017
Sep-2017
Mar-2018
Sep-2018
Mar-2019
Sep-2019
Mar-2020
Sep-2020
Mar-2021
Sep-2021
Mar-2022
Sep-2022

**Source: RBA Payments Data.**

259. The common evidence discussed above demonstrates that, in response to the RBA reforms announced in 2002, Amex, recognizing the significant negative impact those regulations would have on its business in Australia, responded with a strategy in which it secured agreements with merchants (beginning with its top 50 merchants) whereby merchants agreed not to differentially surcharge Amex GPCCs in exchange for reduced merchant discount fees.[643] Thus, consistent with the common evidence discussed earlier in this Expert Report, once the RBA reforms afforded merchants in Australia with the leverage to differentially surcharge customers based on which GPCC they used (a practice that is prohibited in the U.S. via Amex's Anti-Steering Rules), the credible threat of such surcharging caused Amex to quickly respond with a strategy to protect its business which allowed merchants to lower their overall costs of GPCC acceptance in exchange for not engaging in a particular form of steering (differential surcharging) of

[643] Amex recognized that the RBA's regulations did not prevent merchants from entering into agreements with Amex in which it waived its rights to differentially surcharge since merchants would only enter into such an agreement with Amex if doing so was in the merchant's best interests. See, Deposition of Colm Lorigan, August 5, 2012 at 126:5-128:5.

customers away from Amex GPCCs. This constitutes one piece of evidence demonstrating that as a result of Amex's continued implementation and enforcement of its Anti-Steering Rules, Amex-accepting merchants (such as Qualified Merchants) incurred higher GPCC acceptance costs (merchant discount rates) on GPCC Transactions than they otherwise would have. In the next section, I discuss common evidence demonstrating that Amex looked to its experience in Australia following the RBA reforms to help Amex's Merchant Services U.S. division "assess and manage the threat effectively by creating and operationalizing a Preparedness Plan" for the U.S.[644]

x.    **Amex Viewed its Experience in Australia as a Benchmark for How to Manage the Threat of Differential Surcharging in the U.S.**

260.    Common evidence I have reviewed indicates that Amex viewed its experience in Australia following the RBA reforms as a benchmark for what might happen in the U.S. if it were to similarly lose its ability to enforce its Anti-Steering Rules (particularly, if differential surcharging were to be permitted in the U.S.). For example, in a 2009 "Global Pricing & Revenue Management" presentation, Amex included a case study of its experience with the RBA regulations in Australia, noting that after "[m]erchants begin to react to surcharge option," Amex "[l]inked pricing and marketing concessions to 'no differential surcharge' conditions."[645] Among the "Key AXP Learnings" Amex listed from its experience in Australia was that the "[n]umber of negotiations sky rocket – Plan for increasing resources as well as training," and also that "[m]arketing $ is a key lever to protect long term premium."[646]

261.    In a March 2010 "Discussion with MS Americas Leadership Team" presentation regarding "Regulation Driven Surcharging/Discounting Threats," Amex sought to discern what insights it could glean from other countries that faced regulation to consider strategies for "[c]ombating the [t]hreat" in the U.S.[647] Regarding its experience in

---

[644] AMEXNDR07125828-851 at 830.

[645] AMEXNDR06627933-28009 at 27950.

[646] AMEXNDR06627933-28009 at 27950.

[647] AMEXNDR19209938-968 at 940. In particular, the topics of this presentation included: "Review the **threat from regulatory developments on surcharging / discounting across the globe, with focus on Americas**;" "Agree the **criticality and timing of planning and combating** potential differential surcharging / discounting threats in Americas;" and "Discuss how **Surcharging/Discounting Toolkit** can help planning and combating efforts." See AMEXNDR19209938-968 at 939 (emphasis in original).

Australia, Amex noted that "DS [(Differential Surcharging) is] a virus, can be contained !!" noting further its eventual strategy whereby the "Australia team established DS baseline, linked pricing and marketing concessions to 'no differential surcharge' conditions, and began developing strategies & programs to address issue."[648]  In this presentation, Amex concluded that it "can leverage the learning for combating DS in Australia and other markets to help plan for both surcharging and discounting threats across [Merchant Services Americas]."[649]  In another 2010 Amex presentation regarding "Potential Surcharging/Discounting Threats" to Amex's U.S. Merchant Services leadership, Amex included a section on "Australia Learning," in which it noted that "NDSA (No Differential Surcharging Agreement) is a key tool to enforce parity / no surcharge [...] NDSAs allow AXP to incentivize merchants ( pricing, marketing, etc) to adopt a no-surcharge position (3-5 years)," adding that "NDSA are more effective when offered to merchants before they start to DS."[650]

262.

[651]

263.

[652]

---

[648] AMEXNDR19209938-968 at 949.

[649] AMEXNDR19209938-968 at 950 (emphasis in original).  Amex further noted that "DS impact on business can be significant.  Once merchants start to DS, it spreads quickly," adding that if "allowed, can have a **significant business impact** (up to 50% of [Discount Business Volume] at risk  - Australia DS experience)."  See AMEXNDR19209938-968 at 950 (emphasis in original).

[650] AMEXNDR07125828-851 at 850.

[651] AMEX-CP-000094461-492 at 465, 468.  See, also, Gagliardi 30(b)(6) Deposition at 125:21-126:5.  I have noted that in this presentation, Amex noted that "Compliant Surcharging," which is "[s]urcharging that is applied equally across all Credit and Debit products," is permissable under its Anti-Steering Rules. See AMEX-CP-000094461-492 at 464.

[652] AMEX-CP-000094461-492 at 463; AMEX-CP-000094540-560 at 542.  See, also, Gagliardi 30(b)(6) Deposition at 121:9-122:3.

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓[653] ▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Amex's findings in a presentation from ten years prior, when it noted that "DS [(Differential Surcharge)] impact on business can be significant.  Once merchants start to DS, it  spreads quickly," adding that if "allowed, can have a **significant business impact** (up to 50% of [Discount Business Volume] at risk  - Australia DS experience)."[654]

264.     Regarding the growing threat of surcharging to Amex addressed ▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓[655]▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓[656]

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓[657]

265.    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓[658]  As a matter of economics, it stands to reason that Amex's preferred strategy ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓[659]▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓.  Given that Amex is generally the most expensive GPCC for merchants to accept, differential surcharging would most likely lead to Amex GPCCs being surcharged by the highest amount, whereas under parity surcharging, all GPCCs would be surcharged the same amount and, therefore, Amex would not be disadvantaged relative to

---

[653] AMEX-CP-000094461-492 at 463.

[654] AMEXNDR1920993**8**-968 at 950 (emphasis in original).

[655] AMEX-CP-000094461-492 at 472 (emphasis in original); AMEX-CP-000094540-560 at 544.  Under parity surcharging, "[d]ebit may not be surcharged or is surcharged differently" that Credit products.  See AMEX-CP-000094461-492 at 464.

[656] AMEX-CP-000094461-492 at 472; AMEX-CP-000094540-560 at 544.

[657] AMEX-CP-000094461-492 at 472.

[658] AMEX-CP-000094461-492 at 464, 472.

[659] Amex defines differential surcharging in this context as "[s]urcharging that is not applied equally across Credit products"  See AMEX-CP-000094461-492 at 464.

Visa, Mastercard, and Discover GPCCs under parity surcharging. As Amex reported in an August 2007 presentation summarizing what it had learned 3.5 years after the RBA reforms in Australia: there had been "[n]o material impacts witnessed for Amex from cases of parity surcharge," "[h]owever, Differential Surcharge is an extremely damaging Brand experience."[660]

266. As I noted above, one of Amex's takeaways from its experience in Australia was that "NDSA (No Differential Surcharging Agreement) is a key tool to enforce parity / no surcharge," adding that "NDSA are more effective when offered to merchants before they start to DS."[661]



[660] AMEX-DOJ-10133629-638 at 631. As Antonio Gagliardi of Amex explained at deposition, compliant surcharging is "better than parity and certainly much better than differential because all modes of payment get surcharged the same," later adding that "parity surcharging or differential surcharging, even worse, is not something we like." See Gagliardi 30(b)(6) Deposition at 90:6-15, 143:3-19.

[661] AMEXNDR07125828-851 at 850. Amex further found that "NDSAs allow AXP to incentivize merchants ( pricing, marketing, etc) to adopt a no-surcharge position (3-5 years)." See AMEXNDR07125828-851 at 850.

[662] AMEX-CP-000094343 at Slide 2.

[663] AMEX-CP-000094343 at Slide 14.

[664] AMEX-CP-000094343 at Slide 6, 14.

[665] AMEX-CP-000102914-929 at 915. See, also, AMEX-CP-000102897 at Slide 18.

267. ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨
▨▨▨▨▨▨▨▨▨▨▨▨▨▨[666]▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨
▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨ I understand that Amex
also undertook ▨▨▨▨ analysis, which it called Project Ramp.[667] At his deposition,
Jonathan Gantman of Amex testified that Project Ramp, which he estimated took place
around the time that "other court cases [] were prevailing," focused on analyzing "how
[Amex] would operate" in "the event [Amex] could not enforce [its] NDPs."[668] I
understand that, as of the filing of this Expert Report, Amex has refused to turn over any
documents or other materials related to it Project Ramp.[669] Given the significant
relevance to the present matter that the scope of Project Ramp (as described by Mr.
Gantman) appears to have, any Amex documents or other materials related to Project
Ramp could significantly inform my analysis of the but-for world in which Amex was
unable to continue to impose or enforce its Anti-Steering Rules. Thus, should any such
documents or other materials regarding Amex's Project Ramp become available at a later
date, I reserve my right to revise my analysis accordingly.

268. The common evidence discussed above demonstrates that Amex viewed its
experience in Australia, in which RBA reforms permitted merchants to differentially
surcharge Amex GPCCs, to which Amex responded by executing a strategy in which it
secured agreements with merchants not to differentially surcharge Amex GPCCs in
exchange for reduced merchant discount fees, ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

---

[666] AMEX-CP-000095201-237; Gagliardi 30(b)(6) Deposition at 163:15-164:11.

[667] Gantman 30(b)(6) Deposition at 92:24-94:3. See, also, American Express' Response to Plaintiffs'
Letter Motion, Oliver v. American Express Co., Case No. 1:19-cv-00566 (NGG) (SJB), August 8, 2022;
United States District Court Eastern District of New York, *Anthony Oliver, et al., Plaintiffs, v. American
Express Company, et al., Defendants,* Case No. 1:19-cv-00566-NGG-SJB, Declaration of David H. Korn,
August 1, 2022.

[668] Gantman 30(b)(6) Deposition at 82:11-88:12, 92:24-94:3.

[669] United States District Court Eastern District of New York, *Anthony Oliver, et al., Plaintiffs, v. American
Express Company, et al., Defendants,* Plaintiffs' Fourth Set of Requests for Production of Documents
Directed to Defendants American Express Company and American Express Travel Related Services
Company, Inc., No. 1:19-cv-00566-NGG-SJB, April 29, 2022 at pp. 7-8. See, also, United States District
Court Eastern District of New York, *Anthony Oliver, et al., Plaintiffs, v. American Express Company, et al.,
Defendants,* Declaration of Peter T. Barbur, No. 1:19-cv-00566-NGG-SJB, August 8, 2022 at ¶4; United
States District Court Eastern District of New York, *Anthony Oliver, et al., Plaintiffs, v. American Express
Company, et al., Defendants,* Declaration of Todd A. Seaver in Support of Motion to Compel Production of
Documents and Testimony, No. 1:19-cv-00566-NGG-SJB, August 1, 2022.

[redacted] [670] Furthermore, [redacted] its takeaway from Australia that the best strategy to prevent differential surcharging was to negotiate such no-surcharge agreements with merchants before they began differentially surcharging, common evidence demonstrates that, [redacted]

[redacted] [redacted].[671] This constitutes one piece of evidence demonstrating that as a result of Amex's continued implementation and enforcement of its Anti-Steering Rules, Amex-accepting merchants (such as Qualified Merchants) incurred higher GPCC acceptance costs (merchant discount rates) on GPCC Transactions than they otherwise would have.

269.    Taken together, the economic theory and common evidence discussed above demonstrates that Amex's continued imposition and enforcement of its Anti-Steering Rules caused Amex-accepting merchants (including Qualified Merchants) to incur higher overall GPCC acceptance costs than they otherwise would have. In the next section, I discuss common evidence demonstrating that the lower costs of GPCC acceptance that would have prevailed absent Amex's Anti-Steering Rules would not have been offset by increased Annual Fees Net of Rewards paid by GPCC cardholders, and how, therefore, Amex's continued imposition and enforcement of its Anti-Steering Rules caused net two-sided prices for GPCC Transactions to be higher than they otherwise would have been.

**B.   *Common Evidence Demonstrates that Amex's Continued Imposition and Enforcement of its Anti-Steering Rules was Anticompetitive in that it Caused Higher Net Two-Sided Prices on GPCC Transactions than Otherwise would have Occurred***

270.    Earlier in this Expert Report, I discussed common evidence demonstrating that Amex's continued imposition and enforcement of its Anti-Steering Rules forestalled competition in the market for GPCC Transactions, causing Amex-accepting merchants (including Qualified Merchants) to incur higher overall GPCC acceptance costs

---

[670] AMEXNDR07125828-851 at 830.
[671] AMEX-CP-000094461-492 at 463; AMEX-CP-000094540-560 at 542. See, also, Gagliardi 30(b)(6) Deposition at 121:9-122:3.

(merchant discount fees) during the Class Periods than they otherwise would have. In this section, I discuss common evidence, as well as economic theory, demonstrating that Amex's continued imposition and enforcement of its Anti-Steering Rules during the Class Periods was anticompetitive in that it caused higher two-sided prices on GPCC Transactions during the Class Periods than otherwise would have prevailed.

271.    As I discussed in greater detail above, the market for GPCC Transactions is a two-sided market. As I explained, the overall price level in this market is the sum of the merchant discount fee and the Annual Fee Net of Rewards. I explained that cardholder fee is generally broken down into a fixed annual fee paid by the cardholder to the card-issuing bank and a variable per-transaction fee (cardholder reward) that typically depends on the value of the transaction. The variable component of the Annual Fee Net of Rewards is generally negative, which means that the cardholder's issuing bank makes a payment to the cardholder in the form of cardholder rewards. If the rate at which the cardholder earns rewards exceeds the amortized annual fee, then the Annual Fee Net of Rewards is negative.

272.    In light of this, in order to determine whether Amex's continued imposition and enforcement of its Anti-Steering Rules had anticompetitive effects, it is necessary to consider any differences in the Annual Fees Net of Rewards paid by GPCC cardholders in the absence of Amex's Anti-Steering Rules during the Class Periods. If Amex's continued imposition and enforcement of its Anti-Steering Rules would have resulted in GPCC cardholders paying lower Annual Fees Net of Rewards (either through lower annual fees and/or higher cardholder rewards) than they otherwise would have, it would be necessary to determine whether, and to what extent, these lower Annual Fees Net of Rewards would have offset the artificially-inflated merchant discount rates that resulted from Amex's continued imposition and enforcement of its Anti-Steering Rules (discussed above) in order to determine whether Amex's Anti-Steering Rules resulted in higher net two-sided prices on GPCC Transactions. However, as I discuss in greater detail below, based on my review of common evidence and my training and experience in economics, I concluded that the Annual Fees Net of Rewards paid by GPCC cardholders would not have increased in a but-for world absent Amex's continued imposition and enforcement of its Anti-Steering Rules. In fact, as I discuss in greater detail below, in many instances,

166

GPCC issuers likely would have responded to increased competition on the merchant side of the market for GPCC Transactions by decreasing Annual Fees Net of Rewards (either through lower annual fees and/or higher cardholder rewards). Given this, at a minimum, the artificially-inflated merchant discount fees paid by Amex-accepting merchants as a result of Amex's continued imposition and enforcement of its Anti-Steering Rules would not have been offset by reductions in the levels of cardholder rewards earned by GPCC cardholders or increases in the annual fees paid by GPCC cardholder. I discuss the common evidence that forms the basis of this conclusion in greater detail below.

## i. Raising Annual Fees Net of Rewards in a World Absent Amex's Anti-Steering Rules Would be Contrary to the Economic Self-Interests of GPCC Issuers

273. I discussed above how Amex's continued imposition and enforcement of its Anti-Steering Rules forestalled competition on the merchant side of the market for GPCC Transactions. As a matter of economics, in a world free from Amex's Anti-Steering Rules, it would be contrary to the economic self-interests for GPCC payment networks and/or issuing banks to increase the Annual Fee Net of Rewards paid by GPCC cardholders in response to the greater levels of competition on the merchant side of the GPCC Transactions market that would have occurred in the but-for world.

274. On the issuing side of the GPCC Transactions market, GPCC payment networks and/or issuing banks compete with one another for GPCC payments transaction volume, as greater transaction volume for a given set of GPCCs typically allows the GPCC payment networks and/or issuing banks that issue the cards to earn greater revenue from swipe fees and/or interest payments.[672] According to one textbook on payment cards authored by David Evans and Richard Schmalensee, "[s]uccessful card issuers are good at 'prospecting' for cardholders who will generate long-run profits for the issuer. For finance-oriented cards, that means finding consumers who will carry balances but have little likelihood of defaulting. For transaction-oriented cards, that means finding consumers who will charge a lot yet pay their charges off in full and on time."[673] As

---

[672] Benson et al. at p. 84. See, also, 2014 Amex Trial Transcript at 2794:17-2795:20.

[673] Evans and Schmalensee at p. 225.

167

Amex, which, as noted above, primarily operates a closed-loop payment network, described in its 2021 Annual Report: "Our 'spend-centric' business model focuses on generating revenues primarily by driving spending on our cards and secondarily through finance charges and fees."[674] Similarly, in discussing the success of its Consumer Payments business in a May 2022 Investor Day presentation, JPMorgan Chase noted: "We already have an award winning and diverse Payments franchise with more than 65 million active customers, over a third of whom are highly engaged, transacting more than once a day."[675] In a 2013 Management Analysis, Visa noted that "increased payments and transaction volume" are what drive Visa's net revenues.[676]

[677] Thus, maximizing GPCC transaction volume is central component of the business model of GPCC issuers.

275. Furthermore, in their textbook on payment cards, Evans and Schmalensee discuss the ease with which consumers can switch GPCCs (i.e., consumer switching costs are low).[678] As noted by Evans and Schmalensee, there are two types of switching; the first involves households that have more than one GPCC.[679] "These households can switch their transactions easily depending on the relative benefits and costs of using each of their cards. If rewards programs become better, finance charges fall, credit lines expand, or more merchants take a card, millions of cardholders can react by simply pulling one card from their wallet rather than another."[680] The "other sort of switching is replacing one card with another, and that is also easy. To add a card often involves just saying yes to an attractive offer that arrives in the mail, though to drop a card with an annual fee it is typically necessary to call or write the issuer."[681] At his deposition in this matter,

---

[674] 2021 Amex Annual Report at p. 4.
[675] JPMorgan Chase May 2022 Investor Day Transcript at p. 15.
[676] 2013 Visa Annual Report at p. 53.
[677] DFS0000001-08 at 07.
[678] Evans and Schmalensee at p. 232.
[679] Evans and Schmalensee at p. 232. At the time their textbook was published (2005), Evans and Schmalensee noted that "about 66 percent [of households] have more than one card, and they account for more than 80 percent of credit card transaction volume." See Evans and Schmalensee at p. 232.
[680] Evans and Schmalensee at p. 232.
[681] Evans and Schmalensee at p. 232.

Jonathan Gantman of Amex testified to the ease at which consumers could substitute one GPCC for another at the point of sale, and also could apply for a new GPCC that they didn't already have if incentivized to do so with an attractive offer.[682]

276.    A key contributing factor to the ease with which consumers can switch GPCCs is the fact that "consumers have good information about the choices available to them," "largely because of issuers' marketing activities."[683]  20 years ago, GPCC issuers primarily marketed the features and benefits of their GPCCs to consumers through direct mail solicitations and newspaper advertisements.[684]  Today, GPCC issuers "primarily solicit consumer demand for credit cards through broad-based advertising like television commercials, and through targeted marketing, which is increasingly shifting away from direct mail towards digital channels."[685]  Furthermore, "[o]nce a consumer is actively looking for a new credit card, third-party comparison sites (TPC sites) offer information intended to make it easier for consumers to compare credit cards."[686]  These TPC sites are dynamic, as "content is updated quickly and routinely to respond to new product information."[687]  TPC sites "are built around a queryable database of credit card products that is regularly and frequently updated to incorporate new products, eliminate obsolescent products, and refresh card terms and conditions as they change."[688]  Many TPC sites also provide links and other pathways for consumers to apply for the GPCC products they find on these sites after comparing their features and benefits with other, comparable cards based on a given consumer's query parameters.[689]

277.    Given the ease with which consumers are able to switch which GPCC it chose to use for a given GPCC Transaction, GPCC issuers compete with each other to obtain "top of wallet" status among consumers conducting point-of-sale GPCC Transactions, and, similarly, "card on file" status among consumers conducting online GPCC Transactions on merchant e-commerce sites, in order to maximize purchase volume and balances on

---

[682] Gantman 30(b)(6) Deposition at 146:18-148:5.
[683] Evans and Schmalensee at pp. 229-231.
[684] Evans and Schmalensee at pp. 231-232.
[685] Bureau of Consumer Financial Protection, "The Consumer Credit Card Market," August 2019 (hereafter "2019 CFPB Report") at p. 72.
[686] 2019 CFPB Report at p. 73.
[687] 2017 CFPB Report at p. 268.
[688] 2017 CFPB Report at p. 268.
[689] 2017 CFPB Report at pp. 272-273.

their cards.[690] As I described earlier in this Expert Report, one primary way GPCC issuers compete with one another to attract and incentivize consumers to use a particular GPCC is through cardholder or membership rewards programs.[691] According to a 2021 CFPB report covering the consumer credit card market, "[s]hifting preferences towards rewards cards reflect survey findings that show rewards as the predominant factor in choosing a card."[692] According to a 2017 national survey of people who opened credit cards in the prior year conducted by Magnify Money, "85.4% of the people surveyed said that the ongoing features and benefits of the product were most important in their decision."[693] Further, this report found that, while the popularity of cardholder rewards programs has been "driven by the higher end of the credit spectrum," by the "end of 2020, even consumers with deep subprime scores put more than 60 percent of their credit card purchase volume on rewards cards, and consumers with near-prime scores put nearly three-fourths of their spending on rewards cards."[694] Consistent with this, in a January 2021 presentation regarding the "Future of Membership Rewards," Amex called its cardholder rewards a "[p]owerful [a]sset," noting further that its cardholder rewards "plays an important role in our engagement with customers, particularly in acquisition

---

[690] Benson et al. at p. 92.

[691] As I described, the process by which cardholders accumulate, or "earn," cardholder rewards is "generally a linear function of spending volume by consumers." See 2015 CFPB Report, p. 212. In some instances, the linear function under which cardholders earn rewards is simple: "A consumer earns a fixed quantity of miles, points, or money in invariant proportion to the amount spent." See 2015 CFPB Report, p. 212. In many other instances, consumers earn different rewards amounts based on different conditions (i.e., "a consumer may earn either nothing or only a 'base' amount if no additional conditions are met, but can earn more if they meet one or more conditions." See 2015 CFPB Report, p. 212. "Those conditions are often related to spending at particular merchant [sic] or a merchant falling under a certain category. These conditions can be permanent features of the program structure or be made available only on a rotating basis (e.g., a different category each season)." See 2015 CFPB Report, pp. 212-213. Aside from cardholder rewards that are earned under a linear function of spending, the "other major form of earning is the 'sign-up bonus.' Sign-up bonuses tend to be structured differently as an incentive to consumers both to originate the account as well as to commence using it." See 2015 CFPB Report, p. 213. "The general formula for sign-up bonuses awards consumers a substantial lump sum payment of additional rewards. To receive this payment, consumers must meet a spending target within some period following the origination of the account. This period is usually no more than a few months." See 2015 CFPB Report, p. 213.
[692] 2021 CFPB Report at p. 88.
[693] "Spending on credit card rewards has exploded in banks' frenzied competition over customers," Magnify Money, May 5, 2017 (hereafter "Magnify Money").
[694] 2021 CFPB Report at pp. 87-88. Similarly, a "2011 Mercator Customer Monitor Survey showed that consumers said rewards were the number one reason to apply for a selected [GPCC]." See Bureau of Consumer Financial Protection, "Card Act Report," October 1, 2013 (hereafter "2013 Card Act Report") at p. 82. "Further, Mercator's 2012 survey showed that "more credit and charge card owners (36%) said they try to use the credit card with the richest rewards than said they try to use the card with the lowest rates and fees (26%) or for purchases they want to finance (12%)." See 2013 Card Act Report at pp. 82-83.

170

and customer spend."[695] Regarding this presentation, Jonathan Gantman of Amex testified that cardholder rewards were a "critical factor" for Amex acquiring card members in the first place and then "getting them to spend on their Amex card once they have it."[696]

278.    One particular recent example of the significant role cardholder rewards offerings play in driving GPCC purchase volume and balances can be seen in how GPCC issuers responded to changes in consumer spending and rewards redemption brought on by the recent COVID-19 pandemic.[697] In particular, the CFPB noted that "[d]uring the pandemic, several issuers made changes to bonus earning by increasing rewards for spending in areas such as grocery and home delivery and by offering statement credits or redemption options for items people were more likely to use while staying home such as video streaming services and cellphone bills."[698] According to the CFPB, these "programmatic changes were likely aimed at keeping customers from moving spending away from their card, downgrading to lower-fee products, or canceling their card altogether."[699] On a 2020 earnings call, Stephen J. Squeri of Amex explained how Amex adjusted and enhanced its cardholder rewards (and other cardholder value propositions) in response to the pandemic in order to protect its market share and "ensure [its] success."[700] At the 2014 Amex Trial, Nina Biornstad of Mastercard testified that one of Mastercard's objectives is to steal market share from Amex and Visa "by strengthening

---

[695] AMEX-CP-000103395-3428 at 3397.

[696] Gantman 30(b)(6) Deposition at 142:23-143:21. Further demonstrating the significant importance that the rewards programs offered by GPCC issuers have in convincing consumers to use a given GPCC (and, thus, maximize GPCC purchase volume and balances) is the fact that GPCC issuers have significantly increased their rewards-based marketing materials as compared to two decades ago. As I described earlier in this Expert Report, the share of rewards-based marketing mailings was around 20 percent around the beginning of 2002. This share peaked at close to 75 percent in 2010, and since then has stabilized close to 60 percent.

[697] 2021 CFPB Report at p. 89.

[698] 2021 CFPB Report at p. 89. The CFPB added that "[s]ome issuers also extended the time allowed to meet spend requirements to earn sign-up bonuses." See 2021 CFPB Report at p. 89.

[699] 2021 CFPB Report at p. 89.

[700] "Our next priority is protecting our customers and our brand. To ensure our future success, it's critical that we continue providing a reliable world-class experience to help our customers manage through these extraordinary times. In recognition of our customers' evolving needs in this environment, we've enhanced our value propositions on many of our consumer and small business products, including adjusting our rewards programs and added limited time offers and statement credits in categories that are relevant for today, such as wireless, grocery, streaming services, business essentials, and food delivery. Early results from these enhancements are encouraging." See American Express Q2 2020 Earnings Call, July 24, 2020 at p. 3.

171

brand benefits to the mass affluent target."[701] Regarding the "pandemic-era pullback in travel spending," Richard Fairbank, CEO of GPCC issuer Capital One Financial, stated on a January 2021 earnings call: "We've seen increases in rewards levels. [...] And I think that's probably a natural thing for us to expect in this particular environment, even though paradoxically it's associated with so much pullback."[702] One 2020 *The Wall Street Journal* article discussed how traditional cardholder rewards that "banks ha[d] spent years fine-tuning [their] cards to appeal to big-spending jet-setters" were viewed as less attractive during the pandemic, adding:

> Banks are scrambling to keep those hard-won customers. JPMorgan Chase
> & Co. delayed a planned $100 increase on Sapphire Reserve's $450
> annual fee. It is also doling out extra points on grocery purchases through
> the end of June. Citigroup Inc. rolled out extra points on online grocery,
> drugstore and other purchases made with its premium Prestige card
> through August. AmEx is offering consumers who have the Platinum card
> up to $320 in statement credits when they use their card to buy certain
> streaming and wireless-phone services.[703]

279.    As a matter of economics, given how GPCC issuers' business model focuses on GPCC transaction volume and balances in order to maximize profits, it is highly unlikely that GPCC issuers would have reduced the level of rewards it offered on their GPCCs in response to the increased level of competition on the merchant side of the market for GPCC Transactions that would have resulted in the absence of Amex's Anti-Steering Rules. As I discussed above, Amex's continued imposition and enforcement of its Anti-

---

[701] 2014 Amex Trial Transcript at 3280:17-24.

[702] Kevin Wack, "Card issuers reliant on miles, hotel rewards await travel rebound," American Banker, March 22, 2021 (hereafter "Wack"). Furthermore, "Industry observers expect strong competition in credit card rewards this year, as issuers offer more attractive perks in an effort to rebuild loan portfolios that were eroded during the pandemic. Card companies have long used travel-related rewards to win the business of wealthier consumers, but many Americans who were stuck at home during the pandemic have been finding cash-back offers more attractive. [...] Over the last year, card companies that traditionally lured customers with points redeemable for frequent-flyer miles scrambled to adjust their rewards to match consumers' stay-at-home lifestyles." See Wack.

[703] AnnaMaria Andriotis, "Travel Bans Take Shine Off Banks' Premium Rewards Cards," *The Wall Street Journal*, June 28, 2020.

Steering Rules caused Amex-accepting merchants' overall GPCC acceptance costs (merchant discount fees) to be higher than they otherwise would have been. However, given GPCC issuers' focus on GPCC transaction volume and balances in order to maximize profits, the significant importance of cardholder rewards in incentivizing consumers to use a particular GPCC, and the ease with which consumers can switch between GPCCs, it would have been contrary to their economic self-interests for GPCC issuers to reduce the level of rewards it offered GPCC cardholders to offset the lower merchant discount/interchange fees they would have earned in the but-for world, as doing so would have only served to drive cardholders away to competing GPCCs, thus reducing their overall GPCC Transaction volume and balances (and, ultimately, profits). Rather, economic theory predicts that in the but-for world, GPCC issuers would have been incentivized to compete even more rigorously for GPCC transaction volume by offering even greater levels of cardholder rewards on GPCC Transactions to incentivize current cardholders to continue (and increase) use their card, as well as attract incentivize new cardholders to switch away from the competition to their card.

280.   Consistent with this economic theory, at the 2014 Amex Trial, Jack Funda, then Amex Senior Vice President for Global Merchant Pricing at Amex, articulated how, given the business model and structure of the issuing side of the GPCC Transactions market, reducing the cardholder rewards offered to consumers would be contrary to a GPCC issuer's economic self-interest:

> Q. Now, you described earlier, I believe, both in response to questions about Mr. Glass, as well as in response to some of the questions I asked, about the costs that American Express incurs that help bring about preference for cardmembers to want to use their card. Is that a cost that is a one-time cost per -- or at least mostly a one-time cost -- per cardmember; one you've got them, they're in?
>
> A. No. It's, in fact, very much an ongoing cost. We, as we've established, compete in a very competitive environment for the attention and loyalty of our cardmembers. And we have to continually reinforce and earn that

> loyalty to maintain the preference that they exhibit for our card products.
> So these investments are significant and ongoing.
>
> Q. What would happen if American Express substantially reduced or
> stopped engaging in those costs?
>
> A. We would have in all probability seen fewer cardmembers show the
> kind of strength of preference they do today for using our cards. We would
> have seen less loyalty to American Express. And we would have seen less
> value driven by American Express to our merchant customers because of
> that.
>
> Q. And how would that affect American Express's business?
>
> A. This would have certainly been a negative for the American Express
> business. Fewer cardmembers mean less spending, it means less revenue,
> it means less relevance. And it becomes a circular reinforcing dynamic in
> which, you know, the American Express business is increasingly less
> relevant to our merchants.[704]

In its 2015 10-K, Amex explained: "One of the ways in which we attract new Card Members, reduce Card Member attrition and seek to retain or capture a greater share of customers' total spending is through our Membership Rewards program, as well as other Card Member benefits," adding that one of the risks it faces is that "many credit card issuers have instituted rewards and cobrand programs that are similar to ours, and issuers may in the future institute programs and services that are more attractive than ours."[705]

---

[704] 2014 Amex Trial Transcript at 2794:17-2795:20.

[705] American Express SEC Form 10-K for the fiscal year ended December 31, 2015 at p. 35. On a 2021 earnings call, Stephen J. Squeri of Amex stated: "We have a good story to tell here as well. Card Member attrition on our proprietary products, which also includes our co-brands continues to be lower than in the previous years and customer satisfaction levels remain higher in pre-COVID levels. The additional value we provided on several of our premium products helped drive card member loyalty and spending in 2020 and as we believed has been sustained into this year." See American Express Q1 2021 Earnings Call, April 23, 2021 at p. 3. In its 2021 10-K, Amex noted that one of the ways it "acquire[s] and retain[s] high-spending, engaged and creditworthy Card Members" was by "[u]sing incentives to drive spending on our various card products and engender loyal Card Members, including our Membership Rewards program, cash-back reward features and participation in loyalty programs sponsored by our cobrand and other partners." See 2021 American Express 10-K at p. 6.

174

281.    Furthermore, other GPCC issuers have acknowledged the significant importance that cardholder rewards play in their ability to attract and retain consumers to protect and grow their market share and, thus, why it would be contrary to their own economic self-interests to reduce the levels of cardholder rewards absent Amex's Anti-Steering Rules. For example, co-founder and CEO of Magnify Money, Nick Clements, stated that the "smartest credit card issuers are luring consumers with a big incentive (the sign-on bonus), and they are keeping them with strong ongoing value proposition."[706] In its 2021 Annual Report, Capital One stated: "In our credit card business, competition for rewards customers may result in higher rewards expenses, or we may fail to attract new customers or retain existing rewards customers due to increasing competition for these consumers."[707] After joining Citigroup as Head of U.S. Branded Cards in July 2020, Pam Habner was tasked with finding ways to boost the bank's market share after its "loan book and roster of active customers contracted during the pandemic."[708] To do so, Citigroup "prioritized a cash-back, no-fee card that was easy to use via smartphone app," and, "[l]ike competitors, the product has a $200 signing bonus."[709] With a similar strategy, JPMorgan Chase stated in a 2022 Investor Day Presentation: "We believe we have the best products and the best partners and it shows in the strength of our market share at above 22%. We refreshed our entire branded card portfolio over the last two years. And these products are resonating and performing well with branded card new accounts in the second half of 2021 up 20% since 2019."[710] Regarding its plan to focus on "sustaining profitable growth" in 2017, Discover stated that "[i]n card, we will

---

[706] Magnify Money. Mr. Clements added: "The purpose of a sign-on bonus is to encourage people to act. Most people do not wake up in the morning wanting to open a credit card   and a sign-on bonus is a way for a credit card company to encourage people to reconsider their options. It is no different from a sale in a traditional department store.  But what really matters to consumers, as these results reveal, is the ongoing value proposition."  See Magnify Money.  This Magnify Money article further notes that "[c]redit card rewards have become increasingly lucrative, as credit card issuers battle for customers."  See Magnify Money.

[707] 2021 Capital One Annual Report at p. 32.

[708] Hugh Son, "The credit card wars are heating up again as Citigroup takes on JPMorgan with new 5% cash-back card," CNBC, June 10, 2021 (hereafter "Son").

[709] Son.

[710] JPMorgan Chase May 2022 Investor Day Transcript at p. 16.

175

continue to enhance our products by introducing innovative features and benefits and prudently adjusting reward offerings to drive greater customer engagement."[711]

282.    In addition, as I discussed above, the Annual Fees Net of Rewards paid by some GPCC cardholders includes a fixed annual fee for use of a given GPCC, typically GPCCs with higher levels of rewards.  Common evidence I have reviewed demonstrates that the level of annual fees is another important factor for consumers when selecting a GPCC. For example, a 2012 Mercator Advisory Services Group survey of GPCC cardholders found that the second most common reason cardholders gave for selecting their GPCC (after the level of rewards offered on the card) was that it had the "lowest rates and fees."[712]  Thus, for the same reasons discussed above regarding cardholder rewards, given GPCC issuers' focus on GPCC transaction volume and balances in order to maximize profits, and the ease with which consumers can switch between GPCCs, it is highly unlikely that GPCC issuers would have increased the annual fees it charged on certain of their GPCCs in response to the increased level of competition on the merchant side of the market for GPCC Transactions that would have resulted in the absence of Amex's Anti-Steering Rules since doing so would have been contrary to their economic self-interests as it would have only served to drive cardholders away to competing GPCCs, thus reducing their overall GPCC Transaction volume and balances (and, ultimately, profits).

283.    Furthermore, at deposition,

[713]

---

[711] Discover Q4 2016 Earnings Call, January 25, 2017 at p. 3.  In its 2015 10-K, Discover stated: "Many credit card issuers have instituted rewards programs that are similar to ours, and, in some cases, are more attractive to customers than our programs. These competitive factors affect our ability to attract and retain customers, increase usage of our products and maximize the revenue generated by our products."  See Discover SEC Form 10-K for the fiscal year ended December 31, 2015 at p. 27.

[712] 2013 Card Act Report at p. 83.  A similar Mercator survey from 2011 found that the second most popular reason why consumers selected their GPCC (after "An Attractive Rewards Program") was 'No Annual Fee."  See 2013 Card Act Report at p. 82.

[713] Gantman 30(b)(6) Deposition at 76:8-77:15.

[714]

, it is unlikely that it would raise its annual fees in response to the lower merchant discount rates that would have resulted in a world absent Amex's Anti-Steering Rules. Further, consistent with the economic theory discussed above, it is unlikely that a GPCC issuer would have increased annual fees on GPCCs without corresponding increases in the level of rewards and benefits in a world absent Amex's Anti-Steering Rules.

284.    The common evidence discussed above demonstrates that the Annual Fees Net of Rewards (cardholder rewards and annual fees) are a significant strategic factor for GPCC issuers in order to compete effectively for GPCC transaction volume and balances in order to maximize revenues and profits. As Amex noted in a May 2017 Board of Directors Offsite presentation,

"[715] This constitutes one piece of common evidence demonstrating that it would be contrary to the economic self-interests for GPCC payment networks and/or issuing banks to increase the Annual Fees Net of Rewards paid by GPCC cardholders in response to the greater levels of competition on the merchant side of the GPCC Transactions market that would have occurred in the but-for world.

---

[714] Gantman 30(b)(6) Deposition at 90:17-91:3.

[715] AMEX-CP-000068081-8125 at 8097. At deposition, Jonathan Gantman of Amex explained these

See Gantman 30(b)(6) Deposition at 121:25-125:20. Mr. Gantman also testified: "Q. What is the role that card member rewards play in efforts by American Express to attract card members and grow card member spend? A. So I will probably sound a little bit like a broken record as I answer this, right, but they're an important piece of it, a very important piece of it, along with the other benefits that we'd offer and sort of the relative fees that we'll price." See Gantman 30(b)(6) Deposition at 137:8-138:22.

ii.    **Acknowledgments from Amex Further Demonstrate that GPCC Cardholders Would Not Have Paid Higher Annual Fees Net of Rewards in a World Absent Amex's Anti-Steering Rules**

285.    Consistent with the economic theory and evidence discussed above, another piece of common evidence demonstrating that Annual Fees Net of Rewards would not have increased in a world in which Amex had not continued to impose and enforce its Anti-Steering Rules during the Class Periods comes in the form of acknowledgements from Amex itself. As Amex explained in a "Submission to the Reserve Bank of Australia" regarding the impact of the RBA's reforms, the "intent [of cardholder rewards programs] is to encourage the cardmember not only to remain loyal to the rewards-earning card product but also to consolidate all plastic charge activity on the same product."[716] In this regard, Amex noted further:

> Supporting an attractive credit card-related rewards program with funding from non- credit card transactional earnings makes economic sense for card issuers, given that the cost of **acquiring** a new customer is now some 3-5 times the cost of **retaining** a customer. Rationally, therefore, banks and a number of consumer goods companies are spending disproportionately higher amounts to support their loyalty programs as a defense against expensive customer attrition.[717]

286.    In mid-2010, prior to the passage of the Durbin Amendment, Amex analyzed the implications that the Durbin Amendment could have on its business, which, at the time, would have allowed merchants to differentially discount (steering) based on both GPCC payment network (i.e., Amex, Visa, Mastercard, Discover) or form of payment (i.e., GPCC, Debit Card, cash, etc.).[718] In a May 2010 presentation analyzing the "Implications for MSA" of the Durbin Amendment (in which Amex considered a "Key Provision" to be that "[m]erchants to be allowed to differentially discount across

---

[716] AMEX-CP-000029726-755 at 739.
[717] AMEX-CP-000029726-755 at 740 (emphasis in original).
[718] See, for example, 2014 Amex Trial PX0090, PX1176; 2014 Amex Trial Transcript at 2740:14-2755:6. As I discussed earlier in this Expert Report, the final version of the Durbin Amendment did not allow merchants to differentially discount based on GPCC payment network.

178

networks and form of payment"), Amex considered three potential response strategies to avoid having merchants cancelling, or steering away from, Amex GPCCs.[719] The first response strategy was to "[r]emove [e]conomic incentive for merchants to discount /cancel AXP" by reducing its merchant discount rates in higher risk industries "to the point where discounting or cancelling [Amex GPCCs] is not economically advantageous for merchants."[720] The second such response strategy Amex listed was to "[e]nrich rewards on credit/charge to counteract incentives offered to [cardmembers] by merchants to switch to debit," adding that for cardmembers, this strategy "helps justify using AXP card, reinforces utility of AXP cards."[721] Notably, none of Amex's response strategies to prevent Amex-accepting merchants from cancelling or steering away from Amex GPCCs to less expensive GPCCs or other forms of payment following the passage of the Durbin included a reduction in cardmember rewards or benefits.

287. Similarly, in a June 2010 "Durbin Scenario Assessment: Short Term Response Strategy" presentation, Amex stated that, with respect to its strategy towards cardmembers, the "goal should be to mitigate the likelihood of Cardmembers' being persuaded to use another form of payment at the point of sale."[722] To accomplish this goal in the short-term, Amex proposed a strategy of i) educating cardmembers on the value of their cardmember benefits; ii) engaging in targeted communications to cardmembers to drive them towards merchants less likely to steer customers away from using Amex GPCCs; and iii) offer "[t]iered loyalty programs" that consisted of "rewards accelerators tied to select spend/behavioral thresholds."[723] Amex's strategy to accomplish this goal over the medium term was to "[a]dd / enhance Card benefits" offered to cardmembers to "[c]ombat discounting and suppression with improved [cardmember] benefits."[724] Again, none of Amex's "Action Plan" for cardmembers in

---

[719] 2014 Amex Trial PX0090 at AMEXNDR12537467.

[720] 2014 Amex Trial PX0090 at AMEXNDR12537473.

[721] 2014 Amex Trial PX0090 at AMEXNDR12537473. The third strategic option Amex listed was to "[p]itch AXP credit + debit option" where it would "agree to provide a [discount rate] concession in exchange for exclusive credit acceptance." See 2014 Amex Trial PX0090 at AMEXNDR12537473.

[722] 2014 Amex Trial PX1176 at AMEXNDR18367385.

[723] 2014 Amex Trial PX1176 at AMEXNDR18367385.

[724] 2014 Amex Trial PX1176 at AMEXNDR18367385. Amex further noted as part of this medium-term strategy, it would: "Launch new capabilities, improve existing benefits and drive [cardmember] awareness of benefits." See 2014 Amex Trial PX1176 at AMEXNDR18367385.

anticipation of the Durbin Amendment contemplated a reducing the level of cardmember
rewards or benefits, as such a reduction would be unlikely to "mitigate the likelihood of
Cardmembers' being persuaded to use another form of payment at point of sale."[725]

288.    At the 2014 Amex Trial, Jack Funda, then Amex Senior Vice President for Global
Merchant Pricing at Amex, was asked about Amex's proposed strategy to increase
cardholder rewards in response to the Durbin Amendment relate to the potential outcome
of the trial (i.e., the potential that Amex could no longer enforce its Anti-Steering Rules):

> Q. So one possible action in the face of merchants steering from one
> network brand to another would be to provide cardholders with more
> benefits to make them resistant to that type of steering, correct?
>
> A. That would be one strategy clearly, yes.
>
> Q. And that's a strategy that American Express might undertake if the
> United States prevails in this case and the nondiscrimination rules are
> eliminated, correct?
>
> A. Well, we today invest billions of dollars in improving the value
> proposition to our cardmembers. So could we improve it further?
> Absolutely. We work on it hard every day. This would force, right, us to
> potentially increase benefits at a huge cost to the company just to be able
> to fight against what we would argue is essentially free riding on the
> network and steering people at the point of sale.[726]

Mr. Funda further described at the 2014 Amex Trial how Amex's inability to
impose and enforce its Anti-Steering Rules would result in Amex sacrificing
profits in order to compete in the market for GPCC Transactions, rather than
offset losses from reduced merchant discount rates with increased Annual Fees
Net of Rewards (via increased annual fees and/or reduced cardholder rewards):

---

[725] 2014 Amex Trial PX1176 at AMEXNDR18367385.
[726] 2014 Amex Trial Transcript at 2748:3-17.

> Q. So I think what you're saying is that if the United States prevails in this
> case, one outcome could be that American Express cardholders get more
> rewards and it comes at the expense of American Express profits?
>
> A. That's part of what I'm saying, yeah. I'm also saying that removing
> nondiscrimination provisions would have a huge negative impact on what
> is the smallest of the networks that we're talking about between AMEX,
> Visa and MasterCard.
>
> Q. And the negative impact would be the loss of some of the profit that
> would be forced to be spent on cardholder rewards, correct?
>
> A. Well, the loss would be essentially the fact that we are probably least
> prepared to deal with a situation like that. The reason we have
> nondiscrimination provisions is to level the playing field and to create a
> level playing field at the point of sale and not have our cardmembers'
> choice of payment type be interfered with. And so Visa/MasterCard could
> easily create incentives for merchants to steer our discount towards them
> in a way that we could never match.[727]

However, as Mr. Funda further explained at the 2014 Amex Trial, Amex's Anti-Steering
Rules protected it from the "huge negative impact" it would have faced due to the
increased levels of competition in the market for GPCC Transactions in the but-for
world:

> Q. But since the American Express nondiscrimination provisions exist
> today, American Express does not need to either reduce its merchant
> discount rate or provide these extra rewards, correct?
>
> A. Well, we would be fighting to retain the business by any means
> necessary, right. So, yes, we may need to increase incentives to
> customers. We may need to reduce pricing to merchants. All of that is
> economically negative to American Express, and all of that we believe is

---

[727] 2014 Amex Trial Transcript at 2748:18-2749:12.

unnecessary because we believe our nondiscrimination provisions are there for a good reason.[728]

289. The common evidence discussed above demonstrates that GPCC issuers would not have increased Annual Fees Net of Rewards (either through reduced cardholder rewards or increased annual fees) to GPCC cardholders in response to the lower merchant discount fees that would have resulted absent Amex's continued imposition and enforcement of its Anti-Steering Rules. This constitutes another piece of evidence demonstrating that Amex's continued imposition and enforcement of its Anti-Steering Rules during the Class Periods was anticompetitive in that it forestalled competition in the market for GPCC Transactions, resulting in higher net two-sided prices during the Class Periods than otherwise would have prevailed.

290. The common evidence discussed in extensive detail above demonstrates that Amex's continued imposition and enforcement of its Anti-Steering Rules have caused anticompetitive effects. In Section V.A above, I discussed common evidence demonstrating that Amex's continued imposition and enforcement of its Anti-Steering Rules caused Amex-accepting merchants (including Qualified Merchants) to incur higher overall GPCC acceptance costs (merchant discount fees) during the Class Periods than they otherwise would have. Furthermore, in Section V.B, I discussed common evidence demonstrating that, at a minimum, GPCC issuers would not have increased the Annual Fees Net of Rewards (either through reduced cardholder rewards or increased annual fees) charged to GPCC cardholders in a world where Amex was unable to impose or enforce its Anti-Steering Rules. In fact, as I discussed above, economic theory and common evidence demonstrate that, in many instances, GPCC issuers likely would have *reduced* the Annual Fees Net of Rewards (through reduced annual fees or increased cardholder rewards) charged to GPCC cardholders in response to the increased levels of competition on the merchant side of the market for GPCC Transactions that would have occurred absent Amex's Anti-Steering Rules. This common evidence, taken together, as well as my training and experience in economics, forms the basis of my conclusion that Amex's continued imposition and enforcement of its Anti-Steering Rules during the

---

[728] 2014 Amex Trial Transcript at 2748:18-25, 2754:21-2755:6.

Class Periods was anticompetitive in that it forestalled competition in the market for GPCC Transactions, resulting in higher two-sided prices paid by GPCC cardholders during the Class Periods than otherwise would have prevailed.[729]

291.    In Section VI below, I discuss common evidence demonstrating that all or nearly all members of the Credit Card Class and Debit Card Class were injured by Amex's continued imposition and enforcement of its Anti-Steering Rules. In particular, I discuss common evidence demonstrating that Qualified Merchants passed at least some portion of the artificially-inflated GPCC acceptance costs that resulted from Amex's continued imposition and enforcement of its Anti-Steering Rules in the form of higher retail prices (and that absent Amex's Anti-Steering Rules, Qualified Merchants would have passed on at least some portion of their cost savings to their customers). Furthermore, in Section V.B below, I discuss common evidence demonstrating that all consumers, not just those paying with GPCCs (such as all or nearly all members of the Credit Class), paid the artificially-inflated retail prices charged by Amex-accepting merchants (including Qualified Merchants) during the Class Periods that resulted from Amex's continued imposition and enforcement of its Anti-Steering Rules.

## VI.    Common Evidence Demonstrates that All or Nearly All Members of the Credit Card Class and Debit Card Class were Injured by Amex's Continued Imposition and Enforcement of its Anti-Steering Rules

292.    I established above that there is common evidence that demonstrates that Amex-accepting merchants (including Qualified Merchants) incurred higher overall costs of GPCC acceptance (i.e., paid higher overall merchant discount fees) for GPCC Transactions than they otherwise would have absent Amex's continued imposition and enforcement of its Anti-Steering Rules. I also established above that, at a minimum, GPCC issuers would not have increased the Annual Fees Net of Rewards (either through reduced cardholder rewards or increased annual fees) charged to GPCC cardholders

---

[729] I understand that Amex has argued in the past, and may argue again here in this matter, that its continued implementation and enforcement of its Anti-Steering Rules during the Class Periods was pro-competitive. I have not seen any evidence to support such a conclusion, and thus, have not addressed such an assertion in this Expert Report. However, if Amex were to make such a claim in this matter, I reserve the right to address such claims at an appropriate stage of this litigation.

183

(including all or nearly all members of the Classes) in a world where Amex was unable to impose or enforce its Anti-Steering Rules.[730] Thus, as I established above, Amex's continued imposition and enforcement of its Anti-Steering Rules during the Class Periods was anticompetitive in that it forestalled competition in the market for GPCC Transactions, resulting in higher two-sided prices during the Class Periods than otherwise would have prevailed.

293.    In order to establish class-wide injury in this matter, it is necessary to determine whether all or nearly all members of the Credit Card Class and Debit Card Class paid higher prices on their Qualified GPCC Transactions or Qualified Debit Card Transactions, respectively, as result of Amex's continued imposition and enforcement of its Anti-Steering Rules. This analysis proceeds in two steps: i) I establish, using economic theory and evidence common to the Classes, that Amex's continued imposition and enforcement of its Anti-Steering Rules caused Qualified Merchants to incur higher overall GPCC acceptance costs (merchant discount fees) during the Class Periods than they otherwise would have, and that Qualified Merchants passed at least some portion of the artificially-inflated GPCC acceptance costs that resulted from Amex's continued imposition and enforcement of its Anti-Steering Rules in the form of higher retail prices (and that absent Amex's Anti-Steering Rules, Qualified Merchants would have passed on at least some portion of their cost savings to their customers); and ii) I establish, using economic theory and evidence common to the Classes, that members of the Credit Card Class and Debit Card Class would not have paid higher Annual Fees Net of Rewards (either through higher annual fees and/or lower cardholder rewards) as a result of the greater levels of competition on the merchant side of the GPCC Transactions market that would have occurred in the but-for world. Unless otherwise noted, throughout the remainder of this Expert Report, I refer to the prices paid on a given Qualified GPCC Transaction (calculated as the sum of the retail price and the Annual Fees Net of Rewards) by members of the Credit Card Class as the "Net GPCC Cardholder Price."

---

[730] In fact, as I established above, economic theory and common evidence demonstrate that, in many instances, GPCC issuers likely would have *reduced* the Annual Fees Net of Rewards (through reduced annual fees or increased cardholder rewards) charged to GPCC cardholders in response to the increased levels of competition on the merchant side of the market for GPCC Transactions that would have occurred absent Amex's Anti-Steering Rules.

Relatedly, unless otherwise noted, throughout the remainder of this Expert Report, I refer to the prices paid on a given Qualified Debit Card Transaction (calculated as the sum of the retail price and the Annual Fees Net of Rewards) by members of the Debit Card Class as the "Net Debit Cardholder Price."

### A. *All or Nearly All Members of the Credit Card Class were Injured by Amex's Continued Imposition and Enforcement of its Anti-Steering Rules*

294.    In this section, I focus my analysis on demonstrating that all or nearly all members of the Credit Card Class were injured by Amex's continued imposition and enforcement of its Anti-Steering Rules during the Class Periods. Later in this Expert Report, I separately analyze whether all or nearly all members of the Debit Card Class were injured by Amex's continued imposition and enforcement of its Anti-Steering Rules during the Class Periods.

### i.    Economic Theory is Consistent with the Conclusion that at Least Some Portion of the Artificially-Inflated GPCC Acceptance Costs Borne by Qualified Merchants would have been Passed Through to their Customers in the Form of Higher Retail Prices

295.    As I discussed above, common evidence that demonstrates that Amex-accepting merchants (including Qualified Merchants) incurred higher overall costs of GPCC acceptance (i.e., paid higher overall merchant discount fees) for GPCC Transactions than they otherwise would have absent Amex's continued imposition and enforcement of its Anti-Steering Rules. Thus, in order to demonstrate whether the retail prices paid by members of the Credit Card Class on their Qualified GPCC Transactions were artificially-inflated as result of Amex's continued imposition and enforcement of its Anti-Steering Rules, it is necessary to determine if at least some portion of the artificially-inflated GPCC acceptance costs borne by Qualified Merchants would have been passed through to their customers (including all or nearly all members of the Credit Card Class) in the form of higher retail prices.

296.    The economics of pass-through demonstrates that the artificially-inflated GPCC acceptance costs borne by Qualified Merchants would have been passed through to their customers in the form of higher retail prices during the proposed Class Periods. The

economic theory of the pass-through of higher input costs to indirect purchasers is well-established. According to one academic journal article, "in markets in which monopoly overcharges are likely to be found, a high degree of passing on almost always occurs eventually and is likely to occur quite rapidly."[731] Another academic journal article discusses the use of "incidence theory" from tax analysis to calculate "the theoretical percentage of any overcharge that a firm at one level [of the distribution chain] can pass-on to a firm at the next level."[732] This approach draws a parallel between the overcharge imposed by a cartel and a tax levied upon a good – both of which result in a higher price.[733] Just as the incidence of a unit tax depends on the response of demand in the intermediate market, the amount of an overcharge passed through to indirect purchasers along a distribution channel depends on the manufacturer's willingness to supply a product at a given price (elasticity of supply), and the consumer's willingness to purchase a product at a given price (elasticity of demand).[734] In a perfectly competitive market characterized by a large number of price-taking firms producing a homogeneous product, the rate of pass-through is greater when demand for a given product is less responsive to changes in price (that is, demand is less "elastic") and supply of that product is more responsive to changes in price (or supply is more elastic).

297.    The theory of pass-through from the economic literature on tax incidence shows that secondary purchasers can incur from zero to 100 percent of the tax imposed on an intermediate supplier, depending on market supply and demand.[735] When quantity demanded for a given product goes to zero in response to a price increase, we say demand is "perfectly elastic," (i.e. an increase in price of that product would lead to a 100 percent decrease in quantity sold). In that case, no portion of a price increase can be

---

[731] Robert G. Harris and Lawrence A. Sullivan, "Passing on the Monopoly Overcharge: A Comprehensive Policy Analysis," *University of Pennsylvania Law Review*, Vol. 128, No. 2, 1979 (hereafter "Harris and Sullivan") at p. 274.

[732] John Cirace, "Apportioning Damages between Direct and Indirect Purchasers in consolidated Antitrust Suits: ARC America Unravels the Illinois Brick Rule," *Villanova Law Review*, Vol. 35, No. 2, 1990 (hereafter "Cirace") at pp. 311-317. Incidence theory involves determining if a tax imposed at a particular level of a distribution channel can be passed through to indirect purchasers along the distribution channel and ultimately to consumers. For additional discussion of incidence theory as it pertains to price increases passed through to indirect purchasers, see Pindyck & Rubinfeld (8th edition) at pp. 346-348.

[733] Tax incidence theory applied to pass-through of anticompetitive pricing behavior has an established record in the academic literature. For example, see Harris and Sullivan.

[734] Cirace at pp. 311-312. See, also, Pindyck & Rubinfeld (8th Edition) at pp. 346-347.

[735] Harris and Sullivan at p. 273.

passed through to consumers.[736] Likewise, when supply for a given product is such that firms will sell as much of it as is demanded at the market price, we say it is perfectly elastic, and the pass-through rate in a perfectly competitive market is 100 percent. However, this circumstance represents an "extreme case" that "rarely occur[s]."[737] According to one article, perfectly elastic demand for a good or service is "not likely to be encountered in any real market."[738] This article also concludes that "in a multiple-level chain of distribution, *passing on monopoly overcharges is not the exception: it is the rule.*"[739] In contrast, in a monopoly market, the rate of pass-through depends on the shape of the demand curve.[740]

298. As a practical matter, neither perfect competition nor monopoly is likely to be the case in most markets; the "more likely" case is when a products' supply and demand are neither "completely elastic [n]or inelastic at any of the production or distribution levels."[741] Instead, most markets fall under the category of imperfect competition. In a market with imperfect competition, pass-through rates vary over a range, and the exact magnitude of that pass-through rate depends on the curvature of the demand curve. The Amex-accepting Qualified Merchants constitute a special case of imperfect competition known as monopolistic competition. That is, although the retailer segment in the distribution chain tends to be highly competitive, some amount of product differentiation can be expected at the retail level (for example, due to branding or quality) such that products sold by different retailers are not perfect substitutes for one another. Although no one firm or set of firms has complete control over price, each retail firm would have some control over price.

---

[736] Cirace at p. 314. The opposite extreme is when demand for a given product is completely inelastic (i.e. an increase in price of said product would not lead to any loss in sales). In this case, the entirety of the price increase may be passed through to consumers. See Cirace at pp. 312-313.
[737] Cirace at p. 314.
[738] Harris and Sullivan at p. 285.
[739] Harris and Sullivan at p. 276 (emphasis in the original).
[740] In cases where the monopolist faces a linear demand curve, pass-through rates will always fall below 100 percent, and in cases where the monopolist faces non-linear demand curve with constant elasticity, pass-through rates will always exceed 100 percent. See Ronald Cotterill, Leonard Egan and William Buckhold, "Beyond Illinois Brick: The Law and Economics of Cost Pass-Through in the ADM Price Fixing Case," *Review of Industrial Organization*, 2001 at pp. 50-51.
[741] Cirace at p. 314.

187

299.    In a competitive market, economic theory dictates that "a high percentage of a monopoly overcharge typically will be passed on" to the consumer.[742] This is true even though firms in each of these product markets might engage in different types of strategic behavior or pricing strategies since "market pressures" tend to result in prices approximating marginal costs.[743]

300.    In an ABA Section of Antitrust Law, Theon van Dijk and Frank Verboven note that, in some instances, "[i]n imperfectly competitive markets, the pass-on rate does not depend solely on supply-and demand elasticities, but also on the way in which the firm's price-cost margin is adjusted as price increases."[744] In their succeeding paragraph, however, the authors clarify this conclusion stating that, "[a]n insight from recent oligopoly theory is that the extent to which the price-cost margin is adjusted depends on the *curvature* of the demand faced by the firm. [...] When the price elasticity of demand is constant, [...], firms find it optimal to keep their *percentage* price-cost markup constant regardless of the cost conditions. This implies that a cost increase would lead to a higher *absolute* price cost-margin, which promotes pass-on."[745] If price-cost margins are increasing, prices are increasing by more than costs. Thus, a cost increase that results in higher price-cost margins by definition is a pass-through rate over 100 percent.[746]

301.    As a matter of economics, merchants must recover their costs to remain in business. Thus, the costs of GPCC acceptance for merchants are therefore passed through to customers in the form of higher prices. Further, as I discussed above, as a result of Amex's continued imposition and enforcement of its Anti-Steering Rules, net two-sided prices of GPCC Transactions are artificially inflated. Accordingly, as I discuss in greater detail below, customers (including all or nearly all members of the Credit Card Class)

---

[742] Harris and Sullivan at pp. 294, 310.

[743] Harris and Sullivan at p. 310.

[744] Theon van Dijk and Frank Verboven, "Quantification of Damages," *Issues in Competition Law and Policy*, Vol. 3, ABA Section of Antitrust Law, 2008 (hereafter "Quantification of Damages") at p. 2342.

[745] Quantification of Damages at p. 2342 (emphasis in original).

[746] Another article contains a discussion on why the shape of the demand curve facing a retailer governs why pass-through rates at the retail level can exceed 100 percent. Specifically, Tyagi states that "there exists a subset of convex consumer demand functions for which a retailer rationally engages in greater than 100% pass-through. This subset contains many simple, commonly used demand functions, such as the constant elasticity demand function, the negative exponential demand function, and many other varying elasticity demand functions." Rajeev K. Tyagi, "A Characterization of Retailer Response to Manufacturer Trade Deals," *Journal of Marketing Research*, Vol. 36, No. 4, 1999, 510-516 at pp. 510-511.

therefore pay higher Net GPCC Cardholder Prices than they would in a world where the cost of GPCC acceptance was determined by greater levels of competition.

302. Furthermore, given the structure of Amex's Anti-Steering Rules, Qualified Merchants are left with no practical alternative to raising (or lowering) retail prices on *all* customers (including customers paying with Debit Cards or cash) in order account for any increases (or decreases) in overall GPCC acceptance costs. By way of example, if grocers' wholesale costs of milk and other dairy products increased, retail grocery stores typically would likely respond by increasing the retail prices of its milk and dairy products in order to account for those cost increases, while leaving the retail prices of all unaffected items sold in their stores largely unchanged. However, as I discussed above, Amex's Anti-Steering Rules prohibit Qualified Merchants from applying differential surcharges to GPCC Transactions in order to fully (or partially) offset the relative cost of accepting a specific GPCC. Rather, if a Qualified Merchant wished to use surcharging as a method of pass-through to offset some or all of its costs of GPCC acceptance, Amex's Anti-Steering Rules require that that merchant apply the same surcharge rate to every GPCC and Debit Card accepted by that merchant, no matter what the underlying acceptance cost for any single card (or form of payment) may be.[747] As a result, Amex-accepting merchants "typically do not differentiate prices at checkout based on the payment method."[748] Further, "[u]niform pricing implies that merchants pass through [GPCC acceptance] costs to all consumers as higher retail prices."[749] Later in this Expert Report, I discuss how, "[a]s a result, the higher cost of accepting credit cards is spread over all transactions, and credit card transactions may be cross-subsidized by cheaper debit and cash payments."[750]

ii. **Common Evidence Demonstrates that Qualified Merchants Routinely Track and Incorporate Changes in Total Costs (including Total GPCC Acceptance Costs) When Setting the Prices of the Products they Sell**

---

[747] See, for example, April 2022 Amex Merchant Reference Guide at p. 7.
[748] Felt et al. at pp. 1-2.
[749] Felt et al. at p. 2.
[750] Felt et al. at p. 2.

303.    Earlier in this Expert Report I discussed in extensive detail how GPCC acceptance costs constituted a significant overall expense for most merchants in the U.S.[751] Economic theory, as well as other common evidence I have reviewed, demonstrates that the total costs of GPCC acceptance are routinely accounted for and reflected in the retail prices charged by these merchants.  As Dennis Stokely of Safeway described at a deposition in a related matter, █████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████[,]"[752]

304.    One peer-reviewed economic journal article, authored by Ronald Cotterill, analyzed the citric acid cartel, and illustrates this point.  His article states that "[o]ne cannot falsely infer [that] firms cannot raise unit prices a fraction of a cent and therefore the increase in input price is absorbed by the direct purchaser or retailers. [...] [U]nder standard cost accounting practices, cost of inputs are summed to the total cost of production that the firm strives to cover.  The very reason for cost accounting is to make sure that all costs, including costs on small ingredients as well as large, are measured and covered by the firm."[753]  In fact, Dr. Cotterill concludes that for small cost increases, "firms can quietly fold this small cost increase into the general rise in price that consumers expect due to inflation in the economy without causing them to change their purchase behavior."[754]

305.    Consistent with economic theory, common evidence I have reviewed demonstrates that Qualified Merchants routinely tracked their overall costs of GPCC acceptance as part of their normal business operations for purposes of setting prices.  For example, at the 2014 Amex Trial, John Robinson of Ikea testified that "in order to be able

---

[751] For example, as I noted above, in a prepared statement ahead of a May 2022 Senate Judiciary Committee Hearing on the subject of "Excessive Swipe Fees and Barriers to Competition in the Credit and Debit Card Systems," the NRF, which represents "discount and department stores, home goods and specialty stores, Main Street merchants, grocers, wholesalers, chain restaurants and internet retailers from the United States and more than 45 countries," stated that "[s]wipe fees are most merchants' highest operating cost after labor."  See NRF Letter at pp. 1-2.

[752] Deposition of Dennis Stokely, July 15, 2008 (hereafter "Stokely Deposition") at 204:14-25.

[753] Ronald W. Cotterill, "Estimation of Cost Pass Through to Michigan Consumers in the ADM Price Fixing Case," *University of Connecticut Department of Agricultural and Resource Economics Research Report Series*, November 1998 (hereafter "Cotterill 1998") at p. 3.

[754] Cotterill 1998 at p. 4.

to sell at a low price we have to achieve low cost in our operations."[755] When asked how Ikea's achievement of lower overall operating costs translates to the retail prices it charges, Mr. Robinson explained:

> There's an ongoing analysis that our operations group does about our projected cost of operations. They look at real trends, they look at the savings that we've realized in our operations when we work for economies of scale. So they get a projected cost of operations and over time that projected cost of operations has gone down and when those costs [are] going down they can also plan the retail pricing in a way that allows us to lower prices for our customers.[756]

As part of Ikea's ongoing monitoring of its operating costs, Mr. Robinson testified that Ikea closely tracks its overall costs of GPCC acceptance "in the ordinary course of business," including the preparation of a summary document that tracks the all-in rates and costs Ikea pays for accepting GPCCs (as well as each GPCC payment network's share of total Ikea payments) that Ikea "then use[s] to highlight and assess the changes in payment patterns over time with our customers."[757]

306. Similarly, Diedre O'Malley of Best Buy testified:

> Q. Why does Best Buy offer these low price guarantee?

---

[755] 2014 Amex Trial Transcript at 375:7-12.

[756] 2014 Amex Trial Transcript at 382:19-383:7. Mr. Robinson further testified that Ikea has successfully lowered its overall costs of operations through economies of scale as it increased its volume of sales, as well as through competitive bidding processes with suppliers to lower costs. However, as Mr. Robinson testified, Ikea was unable to lower its costs of GPCC acceptance through increases in volume or through competitive bidding processes with GPCC payment networks: "We've not been able to - -we can't really bid for credit card services. We accept those services but we can't discriminate or we can't express a preference, and as a result we're locked into a cost structure that doesn't change." See 2014 Amex Trial Transcript at 380:13-382:19.

[757] 2014 Amex Trial Transcript at 375:7-386:19; 2014 Amex Trial PX2615. While it is not a Qualified Merchant in this matter, I have noted that Ben Mitchell of Official Payments testified that Official Payments tracks its GPCC acceptance costs "very closely," adding: "We either know in realtime what the cost of a particular transaction is going to be or the next day when the transactions settle or in worst case, it's the end of the month." See 2014 Amex Trial Transcript at 6123:8-15. Mr. Mitchell added that there "is not a single transaction that we process that we don't know the exact cost of that transaction by the end of the month." See 2014 Amex Trial Transcript at 6123:8-15. When asked why Official Payments tracks its costs of GPCC acceptance so closely, Mr. Mitchell testified: "Because our whole business model is founded on understanding the cost of the transaction so that we can then offer appropriate levels of service to our consumers at the lowest cost possible to them." See 2014 Amex Trial Transcript at 6123:8-24.

A. In our competitive state that we are in retail, it is an expectation of
consumers these days.

Q. So to stay competitive?

A. Yes.

Q. To offer these low prices does Best Buy need to focus on keeping its
costs down?

A. Absolutely.

Q. Including the costs of payments?

A. Yes. […]

Q. In the ordinary course of its business, does Best Buy track the
percentage of sales that are on - - made on credit cards?

A. Yes, we do. […]

Q. In the ordinary course of its business, does Best Buy track the costs of
acceptance by payment type?

A. Yes, we do.[758]

307.    Similarly, Dwaine Kimmet of Home Depot testified that Home Depot routinely
tracks and compares its overall costs of GPCC acceptance, as well as the costs of
acceptance for each GPCC payment network, in the ordinary course of business.[759]  In a
February 2022 earnings call, William P. Boltz of Lowe's stated:

> [W]e've really put in a very robust process and analytical tools around this
> such that we're measuring and monitoring as we take our increases from a
> cost perspective. First, we push back on that when appropriate, we take a
> portfolio approach to adjusting our pricing and then we measure and
> monitor the performance on a unit velocity perspective and we adjust as
> needed when we need to do that such that we get the best price point from

---

[758] 2014 Amex Trial Transcript at 1523:5-1525:5; 2014 Amex Trial PX2632.
[759] 2014 Amex Trial Transcript at 1332:23-1333:11; 2014 Amex Trial PX2422 at USDOJE-THRDP2-
00102.

a consumable-perspective, but importantly, what also drives the economic
value here at Lowe's.[760]

Similarly, Dave Kimball, CEO of Ulta, stated on a March 10, 2022 earnings call: "But as
cost pressures increased, both on our business and our brand partners' business, we'll be
clearly tracking this closely and making sure we're addressing -- adjusting [prices]
appropriately as we manage through the year."[761]  In a related matter, Chris Mielke of
Albertsons testified:



762

308.    The economic theory and common evidence discussed above demonstrate that
Qualified Merchants (as well as other Amex-Accepting merchants) routinely track and
incorporate changes in total costs (including total GPCC acceptance costs) when setting
the prices of the products they sell.  This constitutes one piece of common evidence

---

[760] Lowe's Earnings Call, February 23, 2022 at p. 15.

[761] Ulta Earnings Call, March 10, 2022 at pp. 12-13. Similarly, while they are not Qualified Merchants in
this matter, I have noted that executives from Sears, Southwest Airlines, Sinclair Oil, and Enterprise
testified that their respective companies routinely track and compare their overall costs of GPCC
acceptance, as well as the costs of acceptance for each GPCC payment network, in order to help better
understand and manage their overall costs to make informed business decisions such as pricing.  See 2014
Amex Trial Transcript at 473:6-481:23, 550:21-23, 554:12-558:8, 2370:25-2382:6, 3144:14-3145:22,
3153:18-3156:17; 2014 Amex Trial PX1348 at Southwest Airlines-000002; 2014 Amex Trial PX2617.
When asked about Southwest's efforts to "reduce payment-related costs," Chris Priebe of Southwest
testified: "Well, I mean, Southwest is our brand, is low cost.  Our CEO mentions low cost in everything
that is public face.  And we have to set prices in our business.  If we don't drive our costs down, we can't
set our prices; somebody else will do that for us.  And if that happens, we face severe competitive
pressures."  See 2014 Amex Trial Transcript at 2370:25-2372:13.  George Satkowski of Sinclair Oil
testified that Sinclair closely tracks its GPCC acceptance costs on a monthly basis, noting that its merchant
discount fees are "a fairly significant expense to our company so we do follow this and monitor it on a
regular basis," adding: "It is a significant expense.  We monitor this expense along with others as separate
line items and it is an expense that each one of our locations reviews monthly to see what they can do to
manage that properly."  Mr. Satkowski added that Enterprise is able to use the blended overall GPCC
acceptance costs it calculates "to make business decisions."  See 2014 Amex Trial Transcript at 473:6-
481:23.

[762] Deposition of Chris S. Mielke, June 13, 2008 (hereafter "Mielke Deposition") at 76:5-12.  Mr. Mielke
added: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮ ▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  See Mielke Deposition at
76:13-17.

demonstrating that Qualified Merchants passed at least some portion of the artificially-inflated GPCC acceptance costs that resulted from Amex's continued imposition and enforcement of its Anti-Steering Rules in the form of higher retail prices.

### iii.    Qualified Merchants Operated in Competitive Industries and Earned Low Net Profit Margins During the Class Periods

309.    As a matter of economics, one factor that impacts the amount of the artificially-inflated merchant discount fees that Qualified Merchants passed through to customers (including members of the Credit Card Class) is the competitive landscape that those Qualified Merchants operate in. Economic theory indicates that in "workably competitive" industries, "a high percentage of a monopoly overcharge will typically be passed on" to the consumer.[763] This is true even though retailers in each of these industries might engage in different types of strategic behavior or pricing strategies since "market pressures" tend to result in prices approximating marginal costs.[764]

310.    Furthermore, economic theory indicates that retailers operating at low profit margins are more likely to pass along a price increase to their customers than retailers operating at high profit margins. This is because retailers with higher profit margins have a greater capacity to absorb increases in cost without raising prices than retailers with low margins.[765] In contrast, when profit margins are very slim, higher input costs would result in negative earnings unless passed on to purchasers.

311.    As I discuss in greater detail below, the Qualified Merchants in this matter operated in highly competitive industries and earned low net profit margins during the Class Periods.

### a.   Common Evidence Demonstrates that the Qualified Merchants Operated in Highly Competitive Industries

312.    As I noted above, economic theory indicates that firms that operate in highly competitive markets are more likely to pass along a price increase to their customers.

---

[763] Harris and Sullivan at pp. 294, 310. An important distinction is made here between the "workably competitive" industries that the Qualified Merchants operate in (discussed below) and the anticompetitive market for GPCC Transactions.

[764] Harris and Sullivan at p. 310.

[765] Harris and Sullivan at pp. 277-298.

Each of the 38 Qualified Merchants in this matter are retailers. Common evidence I have reviewed demonstrates that the retail industry in general is characterized as being highly competitive. For example, Bed Bath & Beyond and Academy Sports have stated that the "retail business is highly competitive."[766] Similarly, Kohl's, Ross Stores, and BJ's Wholesale Club stated in recent 10-Ks, respectively, that the "retail industry is highly competitive," while Big Lots recently stated that it "operate[s] in the highly competitive retail industry."[767] In 2018, Burlington Stores stated that the "retail sector is highly competitive," while GameStop stated that the "retail environment is intensely competitive."[768]

313.    In 2005, Dow Jones and FTSE jointly developed the Industry Classification Benchmark ("ICB"), a "rules based, transparent classification methodology" that is comprised of a "four-tier structure [that] offers a robust system for comparing and analyzing like organizations."[769] 32 of the 38 Qualified Merchants at issue in this litigation operate are currently classified as operating in one of seven different ICB subsectors: Apparel Retailers,[770] Diversified Retailers,[771] Drug Retailers,[772] Food Retailers And Wholesalers,[773] Home Improvement Retailers,[774] Recreational Vehicles

---

[766] Bed Bath & Beyond SEC Form 10-K for the fiscal year ended March 2, 2019 (hereafter "2018 Bed Bath & Beyond 10-K") at p. 8; Academy Sports SEC Form 10-K for the fiscal year ended January 30, 2021 (hereafter "2021 Academy Sports 10-K") at p. 9.

[767] Kohl's SEC Form 10-K for the fiscal year ended February 2, 2019 (hereafter "2018 Kohl's 10-K") at p. 4; Ross Stores SEC Form 10-K for the fiscal year ended February 2, 2019 (hereafter "2018 Ross Stores 10-K") at p. 7; BJ's Wholesale Club SEC Form 10-K for the fiscal year ended February 1, 2020 (hereafter "2019 BJ's Wholesale Club 10-K") at p. 13; Big Lots SEC Form 10-K for the fiscal year ended February 2, 2019 (hereafter "2018 Big Lots 10-K") at p. 4.

[768] Burlington Stores SEC Form 10-K for the fiscal year ended February 2, 2019 (hereafter "2018 Burlington Stores 10-K") at p. 6; GameStop SEC Form 10-K for the fiscal year ended February 2, 2019 (hereafter "2018 GameStop 10-K") at p. 7.

[769] FTSE Russell, "Industry Classification Benchmark (ICB)," 2022; Bloomberg, "ICB <GO> Classification Browser Help Page." Accessed on: August 29, 2022. This four-tier structure organizes companies into eleven industries, 20 supersectors, 45 sectors, and 173 subsectors. See FTSE Russell, "Industry Classification Benchmark (ICB)," 2022.

[770] Apparel Retailer Qualified Merchants include: American Eagle Outfitters, Burlington Stores, Foot Locker, The Gap, H&M, Kohl's, Ross Stores, and TJX.

[771] Diversified Retailer Qualified Merchants include: Academy Sports & Outdoors, Bed Bath & Beyond, Big Lots, BJ's Wholesale Club, Target, and Walmart.

[772] Drug Retailer Qualified Merchants include: CVS Health, Rite Aid, and Walgreens Boots Alliance.

[773] Food Retailer and Wholesaler Qualified Merchants include: Albertsons, Kroger, Sprouts Farmer's Market, and United Natural Foods.

[774] Home Improvement Qualified Merchants include: Home Depot and Lowe's.

And Boats,[775] and Specialty Retailers.[776] Five of the six remaining Qualified Merchants that do not have an ICB subsector classification from Dow Jones/FTSE operated in industries consistent with one of these seven ICB subsectors,[777] while the sixth Qualified Merchant, Circle K Stores, is a "convenience store and gas station chain."[778]

314. Common evidence I have reviewed demonstrates that each of the industry categories described above that the Qualified Merchants operate in are characterized as being highly competitive. For example, the aforementioned Circle K Stores' parent company, Alimentation Couche-Tard, stated in its 2022 Annual Report that "the industries and geographic areas in which we operate are highly competitive."[779] American Eagle Outfitters, an Apparel Retailer, stated in its 2019 10-K that the "global retail apparel industry is highly competitive both in stores and online," adding: "Our business is highly competitive and we face significant pricing pressures from existing and new competitors."[780] In its 2018 10-K, Diversified Retailer Walmart stated: "We operate in the highly competitive omni-channel retail industry in all of the markets we serve."[781]

---

[775] Recreational Vehicles and Boats Qualified Merchants include: Camping World.

[776] Specialty Retailer Qualified Merchants include: Advance Auto Parts, Best Buy, Dick's Sporting Goods, GameStop, Michaels, Tractor Supply Company, Ulta Beauty, and Williams-Sonoma.

[777] Four of these Qualified Merchants (Bi-Lo, Hy-Vee, Meijer, and Publix Supermarkets) have previously been classified by Amex as operating in the "Grocery Store" industry. See, for example, AMEXNDR09570235. For the purposes of my analysis, I include these four Qualified Merchants in the Food Retailers and Wholesalers ICB subsector. The fifth of these Qualified Merchants (Ikea) has previously been classified by Amex as operating in the "Furniture Home Store" industry. For the purposes of my analysis, I include Ikea in the Specialty Retailers ICB subsector.

[778] Circle K website. Available at: https: www.circlek.com.

[779] 2022 Alimentation Couche-Tard Annual Report at p. 61. Alimentation Couche-Tard further noted: "We compete with other convenience store chains, independent convenience stores, gas station operators, large and small food retailers, quick service restaurants, local pharmacies and pharmacy chains and dollar stores." See 2022 Alimentation Couche-Tard Annual Report at p. 61.

[780] American Eagle Outfitters SEC Form 10-K for the fiscal year ended February 1, 2020 at pp. 9, 11. Similarly, The Gap, another Apparel Retailer, stated in its 2020 10-K that the "global apparel retail industry is highly competitive," noting further the "highly competitive nature of our business in the United States and internationally." See The Gap SEC Form 10-K for the fiscal year ended January 30, 2021 at pp. 5, 21. Foot Locker, also an Apparel Retailer, stated in its 2018 10-K that the "retail athletic footwear and apparel business is highly competitive." See Foot Locker SEC Form 10-K for the fiscal year ended February 2, 2019 at p. 2. Another Apparel Retailer, Burlington Stores, stated in its 2018 10-K that the "U.S. retail apparel and home furnishings markets are highly fragmented and competitive," adding: "We anticipate that competition will increase in the future." See 2018 Burlington Stores 10-K at p. 26. TJX stated in its 2018 10-K that the "retail apparel and home fashion business is highly competitive." See TJX SEC Form 10-K for the fiscal year ended February 2, 2019 at p. 6. See, also, 2018 Ross Stores 10-K at p. 7; 2018 Kohl's 10-K at p. 4.

[781] Walmart SEC Form 10-K for the fiscal year ended January 31, 2019 at p. 2018. Another Diversified Retailer, Academy Sports, stated in its 2021 10-K that the "market for sporting and outdoor recreation

Similarly, Drug Retailers CVS, Rite Aid, and Walgreens have all recently characterized their industry as highly competitive.[782] Regarding the Food Retailer and Wholesaler industry, United Natural Foods stated: "Our business is a low margin business and our profit margins may decrease due to intense competition and consolidation in the grocery industry," adding that the "food distribution industry is highly competitive."[783] Further, both Home Improvement Retailer Qualified Merchants, Home Depot and Lowe's have recently characterized their industry as highly competitive.[784] Camping World, the lone Recreational Vehicles And Boats Qualified Merchant, stated in its 2018 10-K that the "markets for services, protection plans, products and resources targeting RV, outdoor and

---

goods is highly fragmented and intensely competitive." See 2021 Academy Sports 10-K at pp. 9, 26. Similarly, Diversified Retailer Big Lots noted in its 2018 10-K that it competes in the "highly competitive discount retail industry." See 2018 Big Lots 10-K at pp. 4, 7. Also in 2018, Diversified Retailer Bed Bath & Beyond stated that it "operates in a highly competitive business environment." See 2018 Bed Bath & Beyond 10-K at pp. 7-8. See, also, 2019 BJ's Wholesale Club 10-K at p. 13.

[782] In its 2018 10-K, Walgreens stated: "The retail pharmacy and pharmaceutical wholesale industries across the globe are highly competitive and dynamic and have experienced consolidation and an evolving competitive landscape in recent years." See Walgreens SEC Form 10-K for the fiscal year ended August 31, 2019 at p. 3. Rite Aid also noted in 2018 that the "retail drugstore industry is highly competitive and consolidation has accelerated." See Rite Aid SEC Form 10-K for the fiscal year ended March 2, 2019 at p. 7. In its 2019 10-K, CVS stated that the "retail pharmacy business is highly competitive," adding: "Each of our segments operates in a highly competitive and evolving business environment; and gross margins in the industries in which we compete may decline." See CVS SEC Form 10-K for the fiscal year ended December 31, 2019 at pp. 7, 29.

[783] 2018 United Natural Foods 10-K at pp. 8, 10. Also in 2018, Food Retailer and Wholesaler Kroger stated that the "operating environment for the food retailing industry continues to be characterized by intense price competition, aggressive expansion, increasing fragmentation of retail and online formats, entry of non-traditional competitors and market consolidation," while another Food Retailer and Wholesaler, Albertsons, stated: "The food and drug retail industry is large and dynamic, characterized by intense competition among a collection of local, regional and national participants," adding further that "[c]ompetition in our industry is intense, and our failure to compete successfully may adversely affect our profitability and operating results." See Kroger SEC Form 10-K for the fiscal year ended February 3, 2018 at p. 4; Albertsons SEC Form 10-K for the fiscal year ended February 23, 2019 at pp. 6-7. Also, in its 2019 10-K, Food Retailer and Wholesaler Sprouts Farmers Market stated: "We operate within the intensely competitive and highly fragmented grocery store industry which encompasses a wide array of food retailers, including large conventional independent and chain supermarkets, warehouse clubs, small grocery and convenience stores, and natural and organic, specialty, mass, discount and other food retail and online formats." See Sprouts Farmers Market SEC Form 10-K for the fiscal year ended December 29, 2019 at p. 10. See, also, NGA Letter.

[784] In its 2018 10-K, Home Depot stated: "Our industry is highly competitive and evolving," adding that the "internet facilitates competitive entry, price transparency, and comparison shopping, increasing the level of competition we face." See Home Depot SEC Form 10-K for the fiscal year ended February 3, 2019 at p. 8. Similarly, in 2018, Lowe's stated: "We operate in a highly competitive market for home improvement products and services and have numerous large and small, direct and indirect competitors." See Lowe's SEC Form 10-K for the fiscal year ended February 1, 2019 (hereafter "2018 Lowe's 10-K") at p. 13. Lowe's further stated: "We face growing competition from online and omni-channel retailers who have a similar product or service offering. Customers are increasingly able to quickly comparison shop and determine real-time product availability and price using digital tools." See 2018 Lowe's 10-K at p. 13.

active sports enthusiasts are highly fragmented and competitive."[785] Consistent with these characterizations, Specialized Retailer Williams-Sonoma stated in its 2018 10-K that the "specialty e-commerce and retail businesses are highly competitive."[786]

315.    The common evidence discussed above demonstrates that the Qualified Merchants in this matter operated in highly competitive industries. Consistent with the economic theory discussed above, this constitutes one piece of common evidence demonstrating that at least some portion of the artificially-inflated GPCC acceptance costs borne by Qualified Merchants would have been passed through to their customers (including all or nearly all members of the Credit Card Class) in the form of higher retail prices.

## b.  **Qualified Merchants Earned Low Net Profit Margins During the Class Periods**

316.    As I noted above, economic theory indicates that firms that earn low profit margins are more likely to pass along a price increase to their customers. Common evidence I have reviewed demonstrates that, consistent with firms operating in highly competitive industries, the 38 Qualified Merchants at issue in this matter consistently earned low net profit margins during the Class Periods.

317.    For example, Table 7 summarizes the annual net profit margins reported by Bloomberg earned by each Qualified Merchant from 2015 to 2021. As shown below, during this time period, among the Qualified Merchants for which Bloomberg reported

---

[785] Camping World SEC Form 10-K for the fiscal year ended December 31, 2018 at pp. 34-35.
[786] Williams-Sonoma SEC Form 10-K for the fiscal year ended February 3, 2019 at p. 5. Consistent with this characterization, other Specialty Retailer Qualified Merchants have characterized the industries they operate in as being highly competitive. For example, in 2018, Specialty Retailer Dick's Sporting Goods stated: "The market for sporting goods retailers is highly fragmented and intensely competitive." See Dick's Sporting Goods SEC Form 10-K for the fiscal year ended February 2, 2019 at p. 7. Likewise, in 2019, Advance Auto Parts stated that the "sale of automotive parts, accessories and maintenance items is highly competitive," while Specialty Retailer Michaels stated that the "retail arts and crafts industry, including custom framing, is competitive, which could result in pressure to reduce prices and losses in our market share." See Advance Auto Parts SEC Form 10-K for the fiscal year ended December 28, 2019 at p. 6; Michaels SEC Form 10-K for the fiscal year ended February 2, 2019 at p. 10. In addition, Specialty Retailers Tractor Supply Company, Ulta Beauty, and GameStop have recently characterized the industries they operate in as being highly competitive. See Tractor Supply Company SEC Form 10-K for the fiscal year ended December 29, 2018 at p. 11; Ulta Beauty SEC Form 10-K for the fiscal year ended February 2, 2019 at p. 11; 2018 GameStop 10-K at pp. 5, 7; GameStop Q2 2016 Earnings Call, August 25, 2016 at p. 14.

net profit margins,[787] the average and median net profit margins ranged between -0.92 percent and 8.96 percent, and 0.02 percent and 8.69 percent, respectively.[788]

---

[787] The "PROF_MARGIN" field in Bloomberg is calculated as (Net Income Revenue) x 100. Net Income is adjusted by Bloomberg to exclude abnormal items.

[788] As shown in Table 7, there are six Qualified Merchants for which Bloomberg did not report any net profit margins during this time period. As I noted above, four of these Qualified Merchants; BI-LO, Hy-Vee, Meijer, and Publix Supermarkets; are Food Retailers and Wholesalers. As I noted earlier in this Expert Report, according to the NGA, "[g]rocery is a highly competitive industry with net profit margins ranging from 1-2% annually." See NGA Letter. Another of the Qualified Merchants for which Bloomberg did not report net profit margins was Ikea, a Specialty Retailer that sells furniture and home goods. At the 2014 Amex Trial, John Robinson of Ikea stated: "In our business, we need to operate on margin." See 2014 Amex Trial Transcript at 456:2-9. In its fiscal year 2021 financial summary, Inter Ikea Group reported net income of €1,433 million on total revenues of €25,615 million in fiscal year 2021, a net income margin of 5.59 percent. IKEA, "Inter IKEA Group Financial Summary FY21," at p. 7. The last of the Qualified Merchants for which Bloomberg did not report net profit margins was Circle K, a convenience store and gas station chain. According to one Circle K article by investment firm Harding Loevner, Circle K's parent company, Couche-Tard, earns net profits of five-to-six percent. See "The Future of Charging: Strange Things Are Afoot at the Circle K," *Harding Loevner*, March 2022.

Table 7
Summary of Qualified Merchant Net Profit Margins, 2015 - 2021

| Company | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | Mean | Median |
|---|---|---|---|---|---|---|---|---|---|
| Academy Sports and Outdoors, Inc. | | | | 1.21% | 0.45% | 2.49% | 5.43% | 2.39% | 1.85% |
| Advance Auto Parts, Inc. | 4.86% | 4.80% | 5.07% | 4.42% | 5.01% | 4.88% | 5.60% | 4.95% | 4.88% |
| Albertsons Companies, Inc. | | -0.86% | -0.63% | 0.08% | 0.22% | 0.75% | 1.22% | 0.13% | 0.15% |
| American Eagle Outfitters, Inc. | 2.45% | 6.19% | 5.89% | 5.38% | 6.49% | 4.44% | -5.57% | 3.61% | 5.38% |
| Bed Bath & Beyond Inc. | 8.06% | 6.95% | 5.61% | 3.44% | -1.14% | -5.50% | -1.63% | 2.26% | 3.44% |
| Best Buy Co., Inc. | 3.06% | 2.27% | 3.12% | 2.37% | 3.41% | 3.53% | 3.80% | 3.08% | 3.12% |
| Big Lots, Inc. | 2.21% | 2.75% | 2.94% | 3.61% | 3.00% | 4.55% | 10.15% | 4.17% | 3.00% |
| BI-LO, LLC | | | | | | | | | |
| BJ's Wholesale Club Holdings, Inc. | | 0.19% | 0.36% | 0.39% | 0.98% | 1.42% | 2.73% | 1.01% | 0.69% |
| Burlington Stores, Inc. | 1.36% | 2.93% | 3.86% | 6.30% | 6.22% | 6.38% | -3.76% | 3.33% | 3.86% |
| Camping World Holdings, Inc. | 5.36% | 5.43% | 0.70% | 0.22% | -1.24% | 2.25% | 4.03% | 2.39% | 2.25% |
| Circle K Stores, Inc. | | | | | | | | | |
| CVS Health Corporation | 3.42% | 2.99% | 3.58% | -0.31% | 2.58% | 2.67% | 2.71% | 2.52% | 2.71% |
| Dick's Sporting Goods, Inc. | 5.05% | 4.54% | 3.63% | 3.77% | 3.79% | 3.40% | 5.53% | 4.24% | 3.79% |
| Foot Locker, Inc. | 7.27% | 7.30% | 8.55% | 3.65% | 6.81% | 6.13% | 4.28% | 6.29% | 6.81% |
| GameStop Corp. | 4.23% | 4.10% | 4.43% | 0.41% | -8.12% | -7.28% | -4.23% | -0.92% | 0.41% |
| The Gap, Inc. | 7.68% | 5.82% | 4.36% | 5.35% | 6.05% | 2.14% | -4.82% | 3.80% | 5.35% |
| H&M Hennes & Mauritz Ab | 11.55% | 9.69% | 8.09% | 6.01% | 5.78% | 0.66% | 5.53% | 6.76% | 6.01% |
| The Home Depot, Inc. | 7.63% | 7.92% | 8.41% | 8.55% | 10.28% | 10.20% | 9.74% | 8.96% | 8.55% |
| Hy-Vee, Inc. | | | | | | | | | |
| Ikea, Inc. | | | | | | | | | |
| Kohl's Corporation | 4.56% | 3.50% | 2.83% | 4.28% | 3.96% | 3.46% | -1.02% | 3.08% | 3.50% |
| The Kroger Co. | 1.59% | 1.86% | 1.71% | 1.55% | 2.55% | 1.36% | 1.95% | 1.80% | 1.71% |
| Lowe's Companies, Inc | 4.80% | 4.31% | 4.76% | 5.02% | 3.25% | 5.93% | 6.51% | 4.94% | 4.80% |
| Meijer, Inc. | | | | | | | | | |
| Michaels Stores, Inc. | 4.59% | 7.39% | 7.28% | 7.28% | 6.06% | 5.37% | 5.60% | 6.22% | 6.06% |
| Publix Super Markets, Inc. | | | | | | | | | |
| Rite Aid Corporation | 7.95% | 0.80% | 0.02% | 4.38% | -1.95% | -2.06% | -0.38% | 1.25% | 0.02% |
| Ross Stores, Inc. | 8.37% | 8.55% | 8.69% | 9.64% | 10.59% | 10.36% | 0.68% | 8.13% | 8.69% |
| Sprouts Farmers Market, Inc. | 3.59% | 3.07% | 3.40% | 3.04% | 2.66% | 4.44% | 4.00% | 3.46% | 3.40% |
| Target Corporation | -2.25% | 4.56% | 3.94% | 4.01% | 3.90% | 4.20% | 4.67% | 3.29% | 4.01% |
| The TJX Companies, Inc. | 7.62% | 7.36% | 6.93% | 7.27% | 7.85% | 7.84% | 0.28% | 6.45% | 7.36% |
| Tractor Supply Company | 6.59% | 6.45% | 5.82% | 6.73% | 6.73% | 7.05% | 7.83% | 6.74% | 6.73% |
| Ulta Beauty, Inc. | 7.93% | 8.15% | 8.44% | 9.44% | 9.80% | 9.54% | 2.86% | 8.02% | 8.44% |
| United Natural Foods, Inc. | 1.69% | 1.48% | 1.40% | 1.62% | -1.28% | -1.03% | 0.55% | 0.64% | 1.40% |
| Walgreens Boots Alliance, Inc. | 4.08% | 3.56% | 3.45% | 3.82% | 2.91% | 0.37% | 1.92% | 2.87% | 3.45% |
| Walmart Inc. | 3.37% | 3.05% | 2.81% | 1.97% | 1.30% | 2.84% | 2.42% | 2.54% | 2.81% |
| Williams-Sonoma, Inc. | 6.57% | 6.23% | 6.01% | 4.90% | 5.88% | 6.04% | 10.04% | 6.52% | 6.04% |

Source: Bloomberg.

318.    The common evidence discussed above demonstrates that, consistent with firms operating in highly competitive industries, the 38 Qualified Merchants at issue in this matter consistently earned low net profit margins during the Class Periods.  Consistent with the economic theory discussed above, this constitutes one piece of common evidence demonstrating that at least some portion of the artificially-inflated GPCC acceptance costs borne by Qualified Merchants would have been passed through to their customers (including all or nearly all members of the Credit Card Class) in the form of higher retail prices.

iv. **Common Evidence Demonstrates that Qualified Merchants Passed On At Least Some Portion of the Artificially-Inflated Costs of GPCC Acceptance that Resulted from Amex's Continued Imposition and Enforcement of its Anti-Steering Rules in the Form of Higher Retail Prices**

319.    Consistent with the economic theory discussed above that retailers operating in highly competitive industries and/or earn low profit margins are more likely to pass along a price increase to their customers, I have reviewed additional common evidence demonstrating that Qualified Merchants would have passed through at least some portion of the artificially-inflated costs of GPCC acceptance (merchant discount fees) that resulted from Amex's continued imposition and enforcement of its Anti-Steering Rules to consumers in the form of higher retail prices (and that absent Amex's Anti-Steering Rules, Qualified Merchants would have passed on at least some portion of their cost savings to their customers). I discuss this common evidence in greater detail below.

320.    For example, in a prepared statement ahead of a May 2022 Senate Judiciary Committee Hearing on the subject of "Excessive Swipe Fees and Barriers to Competition in the Credit and Debit Card Systems," the NRF, which represents "discount and department stores, home goods and specialty stores, Main Street merchants, grocers, wholesalers, chain restaurants and internet retailers from the United States and more than 45 countries," noted that "[s]wipe fees are most merchants' highest operating cost after labor," adding that these "fees drive up consumer prices, amounting to more than $700 a year for the average American family."[789] Similarly, the NGA stated in its May 2022 statement to the Senate Judiciary Committee: "For independent grocery – a high-volume, low-margin industry – swipe fees are too costly to absorb fully and, unfortunately, some portion must be passed onto American consumers in the form of higher prices."[790] The NGA added: "Grocery is an incredibly competitive industry in which even a few cents can drive life-long customers to shop at a different store. In this environment,

---

[789] NRF Letter at pp. 1-2. The NRF added: "As a percentage of the transaction, they go up as prices go up, creating a multiplier effect for already-soaring inflation." See NRF Letter at p. 2.

[790] NGA Letter. The NGA similarly reported that the "average American family pays more than $700 per year in swipe fees." See NGA Letter. Furthermore, As I noted earlier in this Expert Report, eight of the 38 Qualified Merchants in this matter (Albertsons, Bi-Lo, Hy-Vee, Kroger, Meijer, Sprouts Farmer's Market, Publix Supermarkets, and United Natural Foods) operated in the Food Retailers And Wholesalers industry.

accurate

independent grocers do all they can to keep costs low and maximize savings that can be passed on to their customers."[791]

321.    Additional common evidence I have reviewed demonstrating that at least some portion of the artificially-inflated costs of GPCC acceptance (merchant discount fees) that resulted from Amex's continued imposition and enforcement of its Anti-Steering Rules was passed on to consumers in the form of higher retail prices (and that absent Amex's Anti-Steering Rules, Qualified Merchants would have passed on at least some portion of their cost savings to their customers) is comprised by the statements and acknowledgements made by Qualified Merchants themselves. For example, at a 2012 deposition, Diedre O'Malley of Best Buy testified:

> Q. If you were able to lower the cost of accepting credit cards, would you pass some of those savings on to customers? […]
>
> THE WITNESS: Yes.
>
> Q. What's your basis for saying that? […]
>
> THE WITNESS: Again, the retail community is – there's nothing more competitive. So kind of by Econ 101 default, that's - that's what happens. In addition, we've publicly stated things such as low price guarantee. We have price matching for products so you just -- you cannot escape passing everything on to the consumer in our business.[792]

Regarding a potential preference campaign partnership with Mastercard that would lower its overall GPPC acceptance costs, Ms. O'Malley testified at the 2014 Amex Trial:

> Q. If you are able to save money on the cost of acceptance, for example, what would you do with those savings?

---

[791] NGA Letter. Similarly, as the FMI explained: "The hidden processing fees negatively impact U.S. consumers   at an average of $700 a year for an American family. The $137.8 billion in hidden processing fees artificially drives up the price consumers pay for goods and services. Retailers are forced to incorporate these fees in their pricing decisions and sell items at the 'credit card' price to cover costs." See FMI Statement for the Record.

[792] Deposition of Diedre K.M. O'Malley, December 17, 2012 at 58:19-59:10.

A. Get passed on to the consumer.[793]

322.   When asked at the 2014 Amex Trial what Home Depot would do with its savings
if it "could reduce its costs of accepting general purpose cards," Dwaine Kimmet testified
that Home Depot has "a long standing practice [where,] for any cost reduction we get, we
pass along, generally about 60 percent of that to customers, typically in the form of a
price decrease, to help drive volume to our stores."[794]  In a May 25, 2016 earnings call,
Julie Whalen of Williams-Sonoma explained how the company was able to achieve "cost
reductions across the board," in part due to "direct negotiation from the vendor," that
allowed it to pass those cost savings onto its customers.[795]

[793] 2014 Amex Trial Transcript at 1543:10-1544:6. In a 2021 earnings call, regarding recent cost increases and expected future cost increases, Advance Auto Parts stated: "As a reminder, our industry has historically been very rationale [sic] and successful in passing on inflationary costs in the form of price and that is our intention this year as well." See Advance Auto Parts Q1 2021 Earnings Call, June 2, 2021 at p. 6. Relatedly, in a 2018 earnings call, Advance Auto Parts stated: "Importantly, through successful actions, we've been able to pass cost increases through price. We remain diligent in our effort working with our supplier partners to mitigate cost increases where possible. We're confident that in line with historical pricing trend [sic], our industry will continue to pass along future tariffs or other inflationary cost increases through pricing actions." See Advance Auto Parts Q3 2018 Earnings Call, November 13, 2018 at p. 4. Furthermore, in a December 3, 2021 earnings call, Bruce Thorn of Big Lots stated: "Right now, we are actually seeing that the price increases that we've put through as a result of covering the costs that we're getting from input product and freight is being absorbed by the customer. She wants the product -- especially going into forth [sic] quarter, she knows that she needs to shop early. We're not seeing that resistance. Most of our pricing has been well, it's been across all categories, and we've been doing it year-to-date and we play a little bit of a catch-up, because we want to make sure we're anchoring entry price points along with the price leaders out there. And we don't want to anticipate or lose that value position with our customers before we actually understand the true cost. And as we implement these increases, we're realizing that she's taking them. I think the most elastic category would be food because of the competitive nature of that, but even that is not that high of a resistance. So we're expecting to be able to continue to pass along these price increases." See Big Lots Earnings Call, December 3, 2021 at pp. 14-15.
[794] 2014 Amex Trial Transcript at 1278:1-14. Mr. Kimmet added: "It is our fundamental philosophy, if we take price down, we will garner more business and we have actually effectively done that over the years. As a matter of fact, we have now gotten to the point, where we have publicly communicated that we have capped our gross margin so that we send additional savings now all to the top line. Which means we take down costs. We take down prices to customers." See 2014 Amex Trial Transcript at 1278:1-14. In a February 23, 2022 earnings call, Marvin R. Ellison of Lowe's stated: "You still will have millions of people who will primarily work from home, that's going to drive certainly investments AND repair and maintenance that we think (inaudible) past 2022 and the work that the merchants and the financing has done to drive cost out and they will make sure that whatever price increases driven by inflation, we are pushing towards our customers, we're still doing that at a very competitive price because we're taking more suitable actions to ensure that we're trying to drive other factors for cost out." See Lowe's Earnings Call, February 23, 2022 at p. 15.
[795] "Part of it is product acquisition costs and I'd say the bigger piece of it which is still a subset of that is the fact that we have our insourcing of our foreign agents which is driving incredible cost reductions across the board, [sic] that allows us to pass that along to the customer. So those are probably the biggest pieces that are enabling us to not only still be promotional like everybody is [sic], it's not that the promotional

203

323.    In a related matter, Dennis Stokely of Safeway (an Albertsons company) testified:



John Briggs of Hy-Vee testified that ███████████████████████████
███████████████████████[797] Chris Mielke of Albertsons also testified ███████
███████████████████████████[798]  Furthermore,

---

environment hasn't changed, it's very promotional. But we are able to compete by the fact that we can lower our cost both from a direct negotiation from the vendor. But also by the fact that we've got our own agents insourced in our company and we can pass that cost along." See Williams-Sonoma Q1 2016 Earnings Call, May 25, 2016 at p. 14. Regarding a recent reorganization of its produce department aimed at developing stronger relationships with smaller local farmers, Sprouts Farmers Market stated: "We're giving long-term commitments to these growers, which provides fresher products and cost benefits that we are proud to pass on to our customers in better pricing." See Sprouts Farmers Market Q1 2022 Earnings Call, May 4, 2022 at p. 4.

[796] Stokely Deposition at 206:2-207:11.

[797] Deposition of John Briggs, May 28, 2008 (hereafter "Briggs Deposition") at 224:11-225:23. Mr. Briggs also testified: ██████  ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████  See Briggs Deposition at
242:18-243:8.  Mr. Briggs added: ███████ |  ████████████████████
████████████████  See Briggs Deposition at 226:13-21.

[798] ███████
████████████████████████████████████████████████
See Mielke Deposition at 76:13-77:5.

Daniel Webb of Meijer testified that [redacted]

[redacted] [799]

324.     In late 2004, when Walgreens decided to cease accepting Amex GPCCs due to Amex's high merchant discount fees, Walgreens sent a letter to its store managers in which it noted that the "high cost of doing business with American Express will be reflected in higher prices for all Walgreens customers, not just those who use American Express cards. We don't think that's fair."[800] Regarding this statement, Jeffrey Rein of Walgreens testified:

> Yes, it is if we continue to take American Express and charge a higher fee than others, we have to pass those costs on to our customers. The customers eventually have to pay. And so if we have higher fees from them, we look at our total costs in totality and we go ahead and set retail prices, we would have to take, this is one component of our cost. We pass it on to customers.[801]

Conversely, Mr. Rein further testified: "Any time you can lower costs, you can pass it on to the customers, you lower your prices, you get more business, you get more productive and voila, your costs are going down per unit or per sale. Then you keep doing that until you get more and more [...] customers."[802] Similarly, John Robinson of Ikea testified that as Ikea has found ways to lower its cost of operations, that has allowed it to "also plan the retail pricing in a way that allows us to lower prices to our customers."[803] In a

---

[799] Deposition of Daniel Webb, August 22, 2008 at 155: 23-156:2. Relatedly, Michael Ross of Meijer testified: [redacted]

[redacted]

[redacted] See Ross Deposition at 39:9-20.

[800] 2014 Amex Trial DX 2214 at WLGEDVMC00010345. On a 2022 earnings call, CVS noted that "for the most part, [it has been] able to pass inflation through to [its] customers." See CVS Q2 2022 Earnings Call, August 3, 2022 at p. 15. See, also, Kroger Earnings Call, June 17, 2021 at pp. 7-8; Sprouts Farmers Market Q1 2022 Earnings Call, May 4, 2022 at pp. 2, 6, 10; United Natural Foods Q4 2018 Earnings Call, September 20, 2018 at pp. 2-3.

[801] 2014 Amex Trial Transcript at 1405:22-1406:18.

[802] 2014 Amex Trial Transcript at 1346:19-1347:13. Mr. Rein referred to this as a "virtuous cycle." See 2014 Amex Trial Transcript at 1346:19-1347:13.

[803] 2014 Amex Trial Transcript at 382:19-383:7. While Sears is not a Qualified Merchant in this matter, I have noted that Denis Bouchard of Sears testified: "Q. Would there be an effect on Sears' customers if you

November 2020 earnings call, Michael O'Sullivan of Burlington Stores stated that the "buying environment in Q2 and Q3 was very strong and our merchants took advantage of great opportunistic deals. These deals allowed us to successfully pass along terrific value to the customer."[804]

325. The additional common evidence discussed further demonstrates that at least some portion of the artificially-inflated costs of GPCC acceptance (merchant discount fees) that resulted from Amex's continued imposition and enforcement of its Anti-Steering Rules was passed on to consumers (including all or nearly all members of the Credit Card Class) in the form of higher retail prices, and that absent Amex's Anti-Steering Rules, Qualified Merchants would have passed on at least some portion of their cost savings to their customers.

   **v.    Studies and Analyses Conducted by the RBA Found that the GPCC Acceptance Cost Savings that Resulted from its Payment System Reforms in Australia were Passed on to Customers in the Form of Lower Retail Prices**

326. Earlier in this Expert Report I discussed a set of reforms announced by the RBA in August 2002 under which differential surcharging was permitted on GPCC Transactions (effective January 2003) and the interchange rates charged on Visa and Mastercard GPCC Transactions were capped at 55 basis points (effective October 2003),

---

were able to reduce your credit card costs? A. Yes. Q. Or stop the increases in your credit cards costs? A. Yes, I think that the -- you know, just the fact that we are in a competitive market with the likes of Walmart and Target and Kohl's and Home Depot and Lowe's, you know, [w]e could be able to lower our prices further and be more competitive with those folks, or offer additional value." See 2014 Amex Trial Transcript at 582:4-12. Also, while Enterprise is not a Qualified Merchant in this matter, I have noted that George Satkowski of Enterprise testified: "Q. Okay. So, under the steering scenario we talked about, would Enterprise save money if it was steering from a more expensive brand to a less expensive brand? A. Well, in theory, you could do that but what our goal here is that we would take the price difference and we're passing it on to the customer which really be [sic] the point there is to increase their satisfaction so that we have a committed customer where we believe that's far more important in the long run than saving that at that point in time. Q. So, if I understand you, you take the savings and put that in the incentive that you're offering the customer? A. That's correct. So when we're renting cars and every transaction and every location, they are reviewing their net bottom line in the margin and by doing what I just mentioned is we're maintaining the margins that they're currently at but providing a higher value to the customer who, in turn, becomes a more valuable customer." See 2014 Amex Trial Transcript at 499:8-25. Similarly, while Crate & Barrel is not a Qualified Merchant in this matter, Frank Bruno of Crate & Barrel testified that, in the event that Amex could no longer enforce its Anti-Steering Rules and it could reduce its overall GPCC acceptance costs through steering, "Crate & Barrel would then "look to return some of those savings to our customers." See 2014 Amex Trial Transcript at 2328:2-2329:4.
[804] Burlington Earnings Call, November 24, 2020 at p. 2.

and later 50 basis points (effective November 2006).[805]  I further discussed common evidence demonstrating how Amex responded to these new RBA reforms by executing a strategy in which it secured agreements with merchants in which merchants agreed not to differentially surcharge Amex GPCCs in exchange for reduced merchant discount fees, which allowed merchants to lower their overall GPCC acceptance costs.  In addition, common evidence I have reviewed in the form of studies and analyses conducted by the RBA demonstrates that RBA merchants generally passed at least some portion of the cost savings they achieved in the form of reduced costs of GPCC acceptance following the RBA's reforms onto customers in the form of lower retail prices.  I discuss this common evidence in greater detail below.

327.    For example, in March 2005, Philip Lowe, formerly the Assistant Governor of the Financial System in Australia, stated the following regarding the impact of the RBA's reforms at that time:

> We are confident that the merchants' lower costs are flowing through into lower prices, given the competitive environment in which most merchants operate.  Our estimate is that the cost savings will, over time, mean that the Consumer Price Index will be 0.1 to 0.2 percentage points lower than would have otherwise been the case.  This may sound small, but it represents a significant benefit to consumers.[806]

Following up on this conclusion, in 2007 and 2008, the RBA conducted a review of the RBA's reforms to Australia's payments system.[807]  Regarding the difficulty in demonstrating the pass-through of these cost savings, the RBA stated:

> [T]his is not surprising as the effect is difficult to isolate.  The Bank had previously estimated that the cost savings would be likely to lead to the

---

[805] AMEX-DOJ-10039910-953 at 916.  I further discussed how, as part of this government regulation in Australia, Amex agreed as part of an "Undertaking" with the RBA that it would "not prohibit, or take any action that has the effect of prohibiting, a merchant in Australia from charging an American Express card holder any fee or surcharge for use of an American Express credit or charge card on a transaction." See 2012 Lorigan Deposition Exhibit 910, 932 at AMEX-CP-000029712.

[806] Philip Lowe, "Address to Visa International Australia and New Zealand Member Forum," *Reserve Bank of Australia: Reform of the Payments System Speech,* March 2, 2005.

[807] Reserve Bank of Australia, "Reform of Australia's Payments System  Preliminary Conclusions of the 2007/08 Review," April 2008 (hereafter "2008 RBA Study").

207

> CPI being around 0.1 to 0.2 percentage points lower than would otherwise be the case over the longer term (all else constant). It is very difficult to detect this against a background where other costs are changing by much larger amounts and the CPI is increasing by around 2½ per cent per year on average. Despite the difficulties of measurement, the Board's judgement remains that the bulk of these savings have been, or will eventually be, passed through into savings to consumers. This judgement is consistent with standard economic analysis which suggests that, ultimately, changes in business costs are reflected in the prices that businesses charge.[808]

328.    The common evidence discussed above in the form of studies and analyses conducted by the RBA demonstrates that, following the RBA's reforms to its payments system that it announced in 2002, which resulted in lower costs of GPCC acceptance for merchants in Australia, merchants generally passed-through at least some portion of these new cost savings to customers in the form of lower retail prices. This constitutes one piece of common evidence demonstrating that Qualified Merchants passed at least some portion of the artificially-inflated GPCC acceptance costs that resulted from Amex's continued imposition and enforcement of its Anti-Steering Rules in the form of higher retail prices.

### vi.    Common Evidence Demonstrates that All or Nearly All Members of the Credit Card Class Paid Higher Net GPCC Cardholder Prices than they Otherwise would have

329.    As I discussed above, having established using economic theory and common evidence, that the retail prices paid by members of the Credit Card Class on their Qualified GPCC Transactions were artificially-inflated as result of Amex's continued imposition and enforcement of its Anti-Steering Rules, and that absent Amex's Anti-Steering Rules, Qualified Merchants would have passed on at least some portion of their cost savings to members of the Credit Card Class in the form of lower retail prices, in order to determine if all or nearly all members of the Credit Card Class were injured by

---

[808] 2008 RBA Study at p. 23.

Amex's continued imposition and enforcement of its Anti-Steering Rules, I must also consider whether the lower retail prices members of the Credit Card Class would have paid on Qualified GPCC Transactions in the but-for world would have been offset by higher Annual Fees Net of Rewards (either through higher annual fees and/or lower cardholder rewards). Put another way, it is necessary to determine if members of the Credit Card Class would have paid lower Net GPCC Cardholder Prices in a world absent Amex's continued imposition and enforcement of its Anti-Steering Rules.

330.    However, as I explained in extensive detail earlier in this Expert Report, common evidence demonstrates that, at a minimum, GPCC issuers would not have increased the Annual Fees Net of Rewards (either through reduced cardholder rewards or increased annual fees) charged to GPCC cardholders in a world where Amex was unable to impose or enforce its Anti-Steering Rules. In fact, as I discussed above, economic theory and common evidence demonstrate that, in many instances, GPCC issuers likely would have *reduced* the Annual Fees Net of Rewards (through reduced annual fees or increased cardholder rewards) charged to GPCC cardholders in response to the increased levels of competition on the merchant side of the market for GPCC Transactions that would have occurred absent Amex's Anti-Steering Rules. Given this, the lower retail prices members of the Credit Card Class would have paid on Qualified GPCC Transactions in the but-for world would not have been offset by higher Annual Fees Net of Rewards and, therefore, all or nearly all members of the Credit Card Class were injured by Amex's continued imposition and enforcement of its Anti-Steering Rules in that, absent Amex's continued imposition and enforcement of its Anti-Steering Rules, they would have paid lower Net GPCC Cardholder Prices.

## B. *Common Evidence Demonstrates that Amex's Continued Imposition and Enforcement of its Anti-Steering Rules Resulted in Additional Adverse Effects Borne by Consumers*

331.    Earlier in this Expert Report I discussed in detail the structure of the two-sided GPCC Transactions market. I also discussed how Amex's continued imposition and enforcement of its Anti-Steering Rules caused Amex-accepting merchants (including Qualified Merchants) to incur higher overall costs of GPCC acceptance (merchant

discount fees) on GPCC Transactions than they otherwise would have, and how merchants pass through their total costs of GPCC acceptance, generally raising the price of goods and services at retail. Below I discuss common evidence demonstrating an additional adverse effect of Amex's continued imposition and enforcement of its Anti-Steering Rules is that all consumers, not just those paying with GPCCs (such as members of the Credit Card Class), paid for an Amex-accepting merchant's artificially-inflated average cost of GPCC acceptance in the form of higher retail prices.

332.    Typically, the most expensive GPCCs to accept tend to be the ones that afford users of those cards the highest level of cardholder benefits.[809] Thus, due to the premium rewards (i.e., negative cardholder fees) they earned on higher-cost GPCCs (and because Amex's Anti-Steering Rules prohibit Amex-accepting merchants from differentially surcharging GPCCs based on the brand and product of the GPCC to recoup some or all of the costs associated with accepting those GPCCs), users of those higher-cost GPCCs pay a relatively lower portion of the merchant's average cost of accepting GPCCs, which constitute incremental benefits enjoyed by users of premium, higher-cost GPCCs.

333.    However, users of these premium, higher-cost GPCCs obtain these incremental benefits at the expense of lower-cost GPCC users, who pay a relatively higher portion of the merchant's average cost of accepting GPCCs, as they earn below-average rates of cardholder rewards, or no rewards at all. Each is an incremental loss for lower-cost card users. Further, since merchants raise prices to *all* customers in order to cover their average costs of GPCC acceptance, all other customers who pay with other, less-expensive forms of payment such as Debit Cards, cash, and checks also experience an incremental loss in order to subsidize the premium rewards enjoyed by higher-cost GPCC users. Thus, the differences in outcomes for higher- and lower-cost GPCC users (as well as users of Debit Cards, cash, and checks) constitutes a transfer from lower- or no-cost payers to higher-cost GPCC users that occurs when members of each group purchase similar bundles of goods at the same merchant.

---

[809] 2015 CFPB Report at pp. 209-212.

334.    Consistent with this, in their December 2020 paper for the Federal Reserve Bank of Kansas City titled "Distributional Effects of Payment Card Pricing and Merchant Cost Pass-through in the United States and Canada," Felt et al. concluded:

> When consumers make payments, they directly receive benefits or pay costs, such as credit card rewards, bank account fees, and ATM fees. Consumers also pay another cost—typically without being aware of it—in the form of higher retail prices. In the United States and Canada, merchants do not typically differentiate prices at checkout, but instead pass through their costs of accepting payment methods to all consumers, even though credit cards are more expensive for them to accept than either debit cards or cash. As a result, credit card transactions are cross-subsidized by cheaper debit and cash payments. Because, compared with low-income consumers, high-income consumers are more likely to hold rewards cards, tend to hold cards with higher rewards levels, and tend to spend more on those cards, these cross-subsidies across payment methods likely become transfers from low-income to high-income consumers.[810]

In their 2010 study, Shapiro and Vellucci reached similar conclusions regarding the "[r]egressive [c]ross [s]ubsidies" that are typically borne by lower-income consumers who are more likely to pay with cash or use GPCCs that do not offer cardholder rewards.[811]

---

[810] Felt et al. at p. 32.

[811] Robert J. Shapiro and Jiwon Vellucci, "The Costs of 'Charging It' in America," *Sonecon*, February 2010 (hereafter "Shapiro et al.") at p. 11. "Since the largest direct effect of interchange fees is the higher prices that merchants have to charge, and the credit card networks forbid price differentiation based on how a consumer pays for a good or service, all consumers bear this cost whether or not they use credit cards. [...] As a result, the interchange fee system creates cross-subsidies in which consumers who don't use credit cards or who cannot qualify for high-reward cards pay higher prices to support not only the banks issuing the cards but also the rewards offered to other consumers. Because lower-income consumers are more likely to pay cash or use credit cards that do not offer rewards, and higher-income consumers are more likely to use the rewards-based credit cards, these cross subsidies are generally regressive." See Shapiro et al. at p. 11. Shapiro and Vellucci further concluded: "These subsidies have expanded rapidly, because the use of rewards-linked cards and the higher fees they impose on everyone have risen sharply. In 2001, rewards-linked cards accounted for 23.5 percent of all new credit cards; by 2005, they accounted for 58.0 percent of new cards. Moreover, an industry study has estimated that by 2008, 71 percent of credit card holders used rewards-linked cards. But an estimated 54 percent of all lower-income and moderate-income Americans have no credit cards, yet still have to pay higher prices to support the rewards cards used by

211

335.    At the 2014 Amex Trail, Jeffrey Rein of Walgreens described how Amex's imposition and enforcement of its Anti-Steering Rules resulted in a regressive cross subsidy borne by all its customers, including lower-income customers who generally do not use Amex GPCCs.  For example, in late 2004, when Walgreens decided to cease accepting Amex GPCCs due to Amex's high merchant discount fees (discussed in detail above), Walgreens sent a letter to its store managers in which it noted that the "high cost of doing business with American Express will be reflected in higher prices for all Walgreens customers, not just those who use American Express cards.  We don't think that's fair."[812]  Regarding this letter, at the 2014 Amex Trial, Mr. Rein was asked about his understanding of the "income demographic of Amex cardholders" at Walgreens:

> Q. And what is that demographic?
>
> A. My knowledge and understanding is that they serve a higher income demographic, people with more disposable income.
>
> Q. Does Walgreens only sell goods to people with higher incomes, higher disposable income?
>
> A. No.
>
> Q. Are prices that Walgreens charges for such goods as diapers, toothpaste and milk impacted by American Express' higher rates?
>
> A. It is in the sense that we take into account all of our costs, we look at competition, and if our costs are higher than the competition, we have to have retailers that are higher than the competition to make up for that and we're going to get beat.  We lose sales.[813]

336.    As John Briggs of Hy-Vee explained at a deposition in a related matter:

---

higher-income people and the competition among banks for the business of those cardholders."  See Shapiro et al. at p. 11.

[812] 2014 Amex Trial Transcript at 1404:15-1406:18; 2014 Amex Trial DX 2214.  When asked what was meant by that statement in this letter, Mr. Rein testified: "Yes, it is if we continue to take American Express and charge a higher fee than others, we have to pass those costs on to our customers. The customers eventually have to pay. And so if we have higher fees from them, we look at our total costs in totality and we go ahead and set retail prices, we would have to take, this is one component of our cost. We pass it on to customers."  See 2014 Amex Trial Transcript at 1405:22-1406:18.
[813] 2014 Amex Trial Transcript at 1406:19-1407:11.



814

337.    Relatedly, in a prepared statement for the record ahead of a May 2022 Senate Judiciary Committee Hearing on the subject of "Excessive Swipe Fees and Barriers to Competition in the Credit and Debit Card Systems," FMI noted the following regarding the higher retail prices "[r]etailers are forced to incorporate" into their retail prices: "Our customers who lose out the most are those who rely on cash or do not have access to high rewards credit cards – they gain no benefit from paying the higher 'credit card' price."[815] Regarding these higher retail prices, the NGA similarly explained: "Whether a customer pays with a credit card or not – or receives points, miles or other rewards – all Americans have to pay for these increased costs."[816]

338.    The common evidence demonstrates that Amex's continued imposition and enforcement of its Anti-Steering Rules caused *all* consumers, not just those paying with GPCCs (such as members of the Credit Card Class), to pay for a merchant's artificially-inflated average cost of GPCC acceptance in the form of higher retail prices. In particular, the common evidence discussed above demonstrates that this regressive cross-subsidy largely resulted in a transfer from lower-income consumers (who were typically unable to enjoy the benefits of premium rewards GPCCs) to higher-income consumers

---

[814] Briggs Deposition at 242:18-243:8.

[815] FMI Statement for the Record.

[816] NGA Letter. As the FMI recently explained, the impact of these higher retail prices caused by higher swipe fees "disproportionally hurts lower income Americans, those who rely on cash, and those who do not have access to high credit card rewards. The current credit card market leaves lower income Americans paying for bloated credit card rewards they will never enjoy." See FMI Statement for the Record.

(who were most likely to use the premium rewards GPCCs that were among the most expensive for merchants to accept). This constitutes one piece of common evidence demonstrating that Amex's continued imposition and enforcement of its Anti-Steering Rules resulted in additional adverse effects borne by consumers during the Class Periods.

## C. All or Nearly All Members of the Debit Card Class were Injured by Amex's Continued Imposition and Enforcement of its Anti-Steering Rules

339.    As I discussed above, I have also been asked by Counsel for the Plaintiffs to determine whether all or nearly all members of the Debit Card Class were injured as a result of Amex's continued imposition and enforcement of its Anti-Steering Rules during the Class Periods. In my discussion of antitrust injury suffered by all or nearly all members of the Credit Card Class earlier in this Expert Report, I discussed how i) Amex's continued imposition and enforcement of its Anti-Steering Rules caused Qualified Merchants to incur higher overall GPCC acceptance costs (merchant discount fees) during the Class Periods than they otherwise would have; and ii) Qualified Merchants passed at least some portion of the artificially-inflated GPCC acceptance costs that resulted from Amex's continued imposition and enforcement of its Anti-Steering Rules in the form of higher retail prices (and that absent Amex's Anti-Steering Rules, Qualified Merchants would have passed on at least some portion of their cost savings to their customers). I also discussed how, at a minimum, GPCC issuers would not have increased the Annual Fees Net of Rewards (either through reduced cardholder rewards or increased annual fees) charged to GPCC cardholders in a world where Amex was unable to impose or enforce its Anti-Steering Rules.[817]   Thus, given this, I discussed how all or nearly all members of the Credit Card Class were injured as a result of Amex's continued imposition and enforcement of its Anti-Steering Rules in that they paid higher Net GPCC Cardholder Prices than they otherwise would have in the but-for world. Furthermore, I also discussed above how Amex's continued imposition and enforcement of its Anti-Steering Rules resulted in a regressive cross-subsidization that caused *all consumers*, not

---

[817] In fact, as I discussed above, economic theory and common evidence demonstrate that, in many instances, GPCC issuers likely would have *reduced* the Annual Fees Net of Rewards (through reduced annual fees or increased cardholder rewards) charged to GPCC cardholders in response to the increased levels of competition on the merchant side of the market for GPCC Transactions that would have occurred absent Amex's Anti-Steering Rules.

just those paying with GPCCs, to pay the artificially-inflated retail prices charged by Amex-accepting merchants (including Qualified Merchants) during the Class Periods.

340.    Given this, it was not just members of the Credit Card Class that suffered antitrust injury due to Amex's continued imposition and enforcement of its Anti-Steering Rules. Rather, as I discussed above, *all* purchasers of goods and services from Qualified Merchants paid artificially-inflated retail prices during the Class Periods. Thus, this includes all or nearly all members of the Debit Card Class. Therefore, as I discuss in greater detail below, Amex's continued imposition and enforcement of its Anti-Steering Rules caused all or nearly all members of the Debit Card Class to suffer antitrust injury in that they paid higher Net Debit Cardholder Prices during the Class Periods than they otherwise would as well.

341.    Like the market for GPCC Transactions, the market for Debit Card Transactions is also a two-sided market, which is comprised of merchants who wish to accept Debit Cards as payment for goods and services on one side of the market, and cardholders who wish to pay for their purchases with a Debit Card on the other side of the market.[818] Therefore, having determined that all or nearly all members of the Debit Card Class paid artificially-inflated retail prices on Qualified Debit Card Transactions as a result of Amex's continued imposition and enforcement of its Anti-Steering Rules, in order to determine whether all or nearly all members of the Debit Card Class were injured as a result of Amex's alleged misconduct (i.e., they paid higher Net Debit Cardholder Prices in the actual world than they would have absent Amex's continued imposition and enforcement of its Anti-Steering Rules), it is necessary to consider any differences in the Annual Fees Net of Rewards paid by members of the Debit Card Class in the absence of Amex's continued imposition and enforcement of its Anti-Steering Rules during the Class Periods. If Amex's continued imposition and enforcement of its Anti-Steering Rules would have resulted in Debit Card Class members paying higher Annual Fees Net of Rewards (either through higher routine monthly fees and/or lower cardholder rewards)[819] than they otherwise would have, it would be necessary to determine whether,

---

[818] See, for example, Rochet and Tirole (2011).
[819] Benson et al. at pp. 96-102.

and to what extent, these higher Annual Fees Net of Rewards would have offset the artificially-inflated retail prices they paid as a result of Amex's continued imposition and enforcement of its Anti-Steering Rules in order to determine whether all or nearly all members of the Debit Card Class paid higher Net Debit Cardholder Prices during the Class Periods. However, as I discuss in greater detail below, based on my review of evidence common to the Debit Card Class as a whole and my training and experience in economics, I concluded that the Annual Fees Net of Rewards paid by Debit Card Class members would not have been impacted by Amex's inability to impose and enforce its Anti-Steering Rules. Thus, given that the Annual Fees Net of Rewards paid by members of the Debit Card Class would not have changed (critically, would not have increased) in the but-for world, I have concluded that all or nearly all members of the Debit Card Class suffered antitrust injury in that they paid higher Net Debit Cardholder Prices as a result of Amex's continued imposition and enforcement of its Anti-Steering Rules. I discuss the bases for this conclusion in greater detail below.

342. Earlier in this Expert Report, I discussed in extensive detail common evidence demonstrating that GPCC Transactions constitute a separate and distinct relevant antitrust product market, and that Debit Card Transactions are not an economic substitute for GPCC Transactions, and thus do not discipline pricing of GPCC Transactions. In particular, I discussed common evidence demonstrating that Debit Cards and GPCCs possess different key features, benefits, and uses that differentiate them from one another and cause them not to be economic substitutes for one another.[820] I also discussed common evidence in the form of practical indicia following the implementation of the Durbin Amendment demonstrating that the implementation of the cap on interchange fees associated with Debit Card Transactions following the Durbin Amendment did not result

---

[820] As Amex noted in a January 2020 article: "Although they might seem like the same thing on the surface, debit and credit cards couldn't be more different. Debit cards are a fairly innocuous way to make payments using money you already have, whereas credit cards offer some hard-to-resist benefits that come with the financial risk of rising debt. To understand what's right for you, assess your own needs, spending habits, and financial discipline." See Doyle 2020. Amex also stated: "'Credit or debit?' It's a question we've heard so many times, we might take the differences between the two for granted. They look the same, feel the same, and they're both convenient ways to pay at the point of retail sale (cash is *so* yesterday). But there are a number of fundamental differences of debit vs. credit cards—and they can be critically important to understand." See Doyle 2020 (emphasis in original). Amex further stated: "Debit vs. credit card differences are significant." See Doyle 2020.

216

in a significant number of merchants dropping acceptance of GPCCs in favor of Debit
Cards. Further, I discussed common evidence in the form of acknowledgements from
Amex and other GPCC Payment Networks that Debit Card Transactions are not
economic substitutes for GPCC Transactions, and thus, the market for GPCC
Transactions constitutes a separate and distinct relevant antitrust product market.

343.    I also discussed in extensive detail earlier in this Expert Report common evidence
demonstrating that, due to the fact that GPCC Transactions and Debit Card Transactions
were not economic substitutes for one another, GPCC payment networks consider the
pricing for the acceptance of other GPCCs rather than for the acceptance of Debit Cards
when setting prices. For example, when asked at the 2014 Amex Trial if Amex considers
a blend of credit and debit prices when setting merchant discount rates for Amex GPCCs,
Jack Funda, then Amex Senior Vice President for Global Merchant Pricing at Amex,
testified: "We don't, because we think that credit, as you said, is a different enough
product with a sufficiently different feature set from, let's say, debit, and a sufficiently
different cost structure than debit, that it should be priced on its own merits and not
combined with debit."[821]

344.    Thus, as a matter of economics, given that they are in separate relevant antitrust
product markets and are characterized by different features, benefits, and uses, as well as
different cost structures, that lead GPCC Transactions to be priced separately, "on its own
merits" from Debit Card Transaction on the merchant side, it would be highly unlikely
that a reduction in merchant discount fees for GPCC Transactions would have led to

---

[821] 2014 Amex Trial Transcript at 2730:17-23. In a 2008 email with colleagues regarding a negotiation
with one merchant, Mark Moncher of Amex stated: "The financials were of course the main challenge, but
I do believe we convinced them of our value vs 28bps of difference to their visa/mc rate. We made it clear
we do not compete with debit so we didn't include it in analysis." See 2014 Amex Trial PX0010 at
AMEXNDR10545506. Mr. Funda further testified that the baseline it uses in setting its prices for its
merchant discount rates is the commensurate "all in" merchant discount rates (including the interchange,
acquirer, and network fees) charged by Visa and Mastercard for GPCC acceptance, and does not consider
fees associated with Debit Card acceptance. See 2014 Amex Trial Transcript at 2562:3-2563:9; 2014 Amex
Trial PX1240 at AMEXNDR19210091. Similarly, Roger Hochschild of Discover testified: "Q. When
Discover sets prices for its credit card network services for merchants, does it consider the prices of the
debit card networks? A. No. Q. When setting credit card network prices for merchants, which competitors
prices does Discover look to? A. Discover looks to the pricing of Visa, MasterCard, and American
Express' credit card volumes." See 2014 Amex Trial Transcript at 818:16-23.

217

changes (specifically, increases) in Annual Fees Net of Rewards charged to cardholders associated with Debit Card Transactions.

345. Furthermore, the nature of competition on the cardholder side of the market for Debit Card Transactions further illustrates why it is highly unlikely that the reduced costs of GPCC acceptance incurred by merchants that would have occurred in a world absent Amex's Anti-Steering Rules would have led to changes (specifically, increases) in Annual Fees Net of Rewards charged to cardholders associated with Debit Card Transactions. For example, according to one textbook on payment systems in the U.S.:

> For the consumer's bank, the debit card is not a product in the same sense that a credit card is. A debit card is a component—now, a very important component—of the checking account product. [...] Unlike with credit cards—where a consumer might choose to have several cards from different issuers—only one debit card from their primary relationship bank is typically in the consumer's wallet.[822]

This textbook further noted: "Although some revenues, and some expenses, can be attributed directly to the debit card, the consumer does not make a buying decision to acquire a debit card. Rather, the consumer chooses a bank for their checking account, and is then automatically issued a debit card (which, of course, is also an ATM card)."[823]

346. Furthermore, as I discussed earlier in this Expert Report, GPCC issuers primarily compete with one another for GPCC Transaction volume. Similarly, Debit Card issuers seek to "increase[e] the use of debit cards, particularly as they displace check and cash transactions," in order to "grow revenue at [the] bank."[824] Thus, Debit Card issuers

---

[822] Benson et al. at p. 98. This textbook further noted that this "is true both for consumer and small business checking accounts." See Benson et al. at p. 98.

[823] Benson et al. at p. 98. Thus, "[b]anks' share of the debit card market naturally tracks the distribution of checking accounts." See Benson et al. at p. 100. Further, "[a]s the U.S. is not a concentrated retail banking market, debit card issuers are much less concentrated than credit card issuers. Also, a consumer may have multiple credit cards, but typically only one debit card. In general, debit card issuance follows a retail bank's checking account market share." See Benson et al. at p. 100.

[824] Benson et al. at p. 99. "There is, however, competition in the debit brand and network areas—and it is a bit more complex than that for credit cards. Competition exists between the signature debit and PIN debit networks (discussed above), and among brands within signature and PIN debit. Visa and Mastercard compete for signature debit volume, but also own PIN debit networks (in the case of Visa, one of the major ones). There are multiple PIN debit networks, many operating on a local or regional basis. The national

218

primarily do not seek to compete with GPCC issuers to shift purchase volume from
GPCC Transactions to Debit Card Transactions; rather, Debit Card issuing banks "spend
time and attention on debit card activation, the industry term used for getting a consumer
to start using the debit card—not just for ATM access but also for everyday
purchases."[825] Therefore, given that consumers do not make buying decisions to acquire
Debit Cards (rather, these consumers make a buying decision as to which bank to open a
checking account in, and then are issued a Debit Card by that bank) and thus, that
competition on the cardholder side of the market for Debit Card Transactions focuses on
growing revenues by opening a greater number of checking accounts (and convincing
users of those checking accounts to activate their Debit Cards and utilize them over cash
and check transactions), it is highly unlikely that Debit Card issuing banks would have
changed (specifically, increased) the Annual Fees Net of Rewards paid by members of
the Debit Card Class in response to the reduced costs of GPCC acceptance incurred by
merchants that would have resulted absent Amex's continued imposition and
enforcement of its Anti-Steering Rules during the Class Periods.

347.    The common evidence discussed above demonstrates that all or nearly all
members of the Debit Card Class were injured by Amex's continued imposition and
enforcement of its Anti-Steering Rules in that they paid artificially-inflated retail prices
on their Qualified Debit Card Purchases than they otherwise would have, and the lower
retail prices that would have prevailed absent Amex's Anti-Steering Rules would not
have been offset by any increases in the Annual Fees Net of Rewards paid by those Debit
Card Class members.  In other words, Amex's continued imposition and enforcement of
its Anti-Steering Rules caused all or nearly all members of the Debit Card Class to pay
higher Net Debit Cardholder Prices than they otherwise would have absent Amex's Anti-
Steering Rules.

## VII.    Summary of Class-Wide Damages Methodology (Credit Card Class)

348.    I have been asked by Counsel for the Plaintiffs whether a standard and reliable
economic methodology exists that would allow me to estimate the aggregate amount of

---

PIN debit networks (STAR, NYCE, and Accel Exchange) are owned by major bank processors." See
Benson et al. at p. 100.
[825] Benson et al. at p. 99.

overcharge damages suffered by members of the Credit Card Class as a result of Amex's continued imposition and enforcement of its Anti-Steering Rules on a class-wide basis without resorting to individualized inquiry. Based on my training and experience in economics and my review and analysis of the documents and limited summary data produced to me in this matter, I have developed a benchmark methodology that can be used to estimate damages under the but-for world for the Credit Card Class using a class-wide, formulaic method and common evidence. The overcharge damages estimated by my methodology arise from the difference between the actual Net GPCC Cardholder Prices Credit Card Class members paid on their Qualified GPCC Purchases, and the Net GPCC Cardholder Prices Credit Card Class members would have paid for said Qualified GPCC Purchases absent Amex's continued imposition and enforcement of its Anti-Steering Rules. I discuss this methodology in greater detail below.

## A. *Estimation of Merchant Discount Overcharges during Class Periods*

349. In order to estimate class-wide damages suffered by members of the Credit Card Class, the first step in my methodology is to determine the difference in the GPCC acceptance costs (merchant discount fees) Qualified Merchants incurred in the actual world with those they would have incurred in the but-for world absent Amex's continued imposition and enforcement of its Anti-Steering Rules. As I discussed above, I understand that Amex has performed internal analyses as to "how [Amex] would operate" in "the event [Amex] could not enforce [its] NDPs,"[826] and that Counsel for the Plaintiffs has sought these materials in discovery; however, as of the filing of this Expert Report, Amex has refused to turn over any documents or other materials related to

---

[826] Gantman 30(b)(6) Deposition at 82:11-88:12, 92:24-94:3.

220

SJB Document 157-3 Filed 04/20/23 Page 228 of 295 PageID #: 10103

Project Ramp.[827,828] Furthermore, I understand Counsel for the Plaintiffs sought similar information from the other GPCC payment networks (Visa, Mastercard, Discover) regarding internal analyses or forecasts of the competitive landscape in the market for GPCC Transactions in a world absent Amex's Anti-Steering Rules, but that as of the filing of this Expert Report, no such materials have been produced by these entities.[829]

350.    However, since such analyses forecasting market conditions in the U.S. in the event Amex were no longer able to impose or enforce its Anti-Steering Rules have been made available to me through discovery in this matter, I considered alternative reliable sources to estimate but-for merchant discount fees in the market for GPCC Transactions during the Class Periods.[830]  To do so, I considered two such alternative sources: one

---

[827] United States District Court for the Eastern District of New York, *Anthony Oliver, et al., Plaintiffs, v. American Express Company et al., Defendants,* Plaintiffs' First Requests For Production of Documents, No. 1:19-cv-00566-NGG-SMG, November 30, 2020; United States District Court Eastern District of New York, *Anthony Oliver, et al., Plaintiffs, v American Express Company, et al., Defendants,* Plaintiffs' Fourth Set of Requests for Production of Documents Directed to Defendants American Express Company and American Express Travel Related Services Company, Inc., No. 1:19-cv-00566-NGG-SJB, April 29, 2022 at pp. 7-8. See, also, United States District Court Eastern District of New York, *Anthony Oliver, et al., Plaintiffs, v. American Express Company, et al., Defendants,* Declaration of Peter T. Barbur, No. 1:19-cv-00566-NGG-SJB, August 8, 2022 at ¶4; United States District Court Eastern District of New York, *Anthony Oliver, et al., Plaintiffs, v. American Express Company, et al., Defendants,* Declaration of Todd A. Seaver in Support of Motion to Compel Production of Documents and Testimony, No. 1:19-cv-00566-NGG-SJB, August 1, 2022.  I understand that, as part of these internal analyses, Amex retained outside consultants from Boston Consulting Group who worked out of a conference room at Amex's headquarters and produced work product (including PowerPoint) presentations.  See United States District Court Eastern District of New York, *Anthony Oliver, et al., Plaintiffs, v. American Express Company, et al., Defendants,* Case No. 1:19-cv-00566-NGG-SJB, Declaration of David H. Korn, August 1, 2022.

[828] As I noted above, given the significant relevance to the present matter that the scope of Project Ramp appears to have, any Amex documents or other materials related to Project Ramp could significantly inform my analysis of the but-for world in which Amex was unable to continue to impose or enforce its Anti-Steering Rules.  Thus, should any such documents or other materials regarding Amex's Project Ramp become available at a later date, I reserve my right to revise my analysis accordingly.

[829] See, for example, United States District Court for the Eastern District of New York, *Oliver, et al., Plaintiff, v. American Express Company, et al., Defendant,* Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action, Civil Action No. 1:119-cv-00566 (NGG)(SJB), dated July 11, 2022 at Attachment A; United States District Court for the Eastern District of New York, *Oliver, et al., Plaintiff, v. American Express Company, et al., Defendant,* Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action, Civil Action No. 1:119-cv-00566 (NGG)(SJB), dated July 13, 2022 at Attachment A; United States District Court for the Eastern District of New York, *Oliver, et al., Plaintiff, v. American Express Company, et al., Defendant,* Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action, Civil Action No. 1:119-cv-00566 (NGG)(SJB), dated July 29, 2022 at Attachment A.

[830] Should any analyses or related materials forecasting market conditions in the U.S. in the event Amex were no longer able to impose or enforce its Anti-Steering Rules be produced following the filing of this Expert Report, I reserve the right to revise my damages methodology accordingly at a later stage of this litigation.

based on Amex's response and evaluation of the RBA reforms in Australia, and another based on Discover's abandonment of its low-cost provider strategy (both of which I discussed in detail earlier in this Expert Report). As I discuss below, while both events forecast a similar outcome regarding GPCC acceptance costs (merchant discount rates) in the but-for world, for the purposes of applying a reasonable benchmark for the estimation of damages in this matter, I have determined that the latter option (Discover's abandonment of its low-cost provider strategy) is more appropriate to use as part of my damages methodology, as it is the more conservative of the two alternative sources.

351.    As I noted above, the first alternative benchmark source relates to the RBA reforms in Australia discussed earlier in this report, under which differential surcharging was permitted on Visa and Mastercard GPCC Transactions (effective January 2003) and the interchange rates charged on Visa and Mastercard GPCC Transactions were capped at 55 basis points (effective October 2003).[831] As I noted above, as part of this government regulation in Australia, Amex agreed as part of an "Undertaking" with the RBA that it would "not prohibit, or take any action that has the effect of prohibiting, a merchant in Australia from charging an American Express cardholder any fee or surcharge for use of an American Express card or charge card on a transaction."[832] In order to "[m]itigate [r]isks" after the RBA's announcement of its reforms, Amex "proactively reduced discount rates to over 80,000 merchants by 5-35bp across a range of industries – Retail, Restaurants, Professional/Financial Services, Lodging and Auto Sales/Service."[833] However, as I discussed, despite these initial proactive efforts, the ongoing impact of differential surcharging, notably, the threat of differential surcharging, remained a significant concern for Amex and, thus, in order to avoid the negative impact that merchants' differentially surcharging Amex GPCC Transactions would have on its business, Amex adopted a strategy whereby it would offer merchants a significant

---

[831] AMEX-DOJ-10039910-953 at 916. In November 2006, the cap on Visa and Mastercard GPCC Transaction interchange fees was reduced to 50 basis points. See AMEX-DOJ-10039910-953 at 916.
[832] 2012 Lorigan Deposition Exhibit 910, 932 at AMEX-CP-000029712.
[833] "This was designed to minimize the threat of surcharge and assist in coverage efforts." See AMEXNDR00655707-725 at 710. Amex noted that this "move coincided with the introduction of surcharging but pre-dated the Visa/Mastercard rate reductions by 10 months."

reduction in their merchant discount fee in exchange for agreeing not to differentially surcharge Amex GPCCs.

352. Furthermore, earlier in this Expert Report I discussed in extensive detail how Amex routinely analyzed its experience in Australia following the RBA reforms as a benchmark for what might happen in the U.S. if it were to similarly lose its ability to enforce its Anti-Steering Rules (particularly, if differential surcharging were to be permitted in the U.S. and Amex-accepting merchants could credibly threaten to differentially surcharge a given GPCC). Thus, Amex's experience in Australia following the RBA reforms provides a reasonable benchmark for estimating the extent to which Amex's continued imposition and enforcement of its Anti-Steering Rules caused merchant discount rates to be artificially-inflated during the Class Periods.

353. Figure 15 below illustrates the significant decline in Amex merchant discount rates in Australia from Q1 2003 (when the first of the RBA reforms became effective) through Q4 2011. As shown, the merchant discount rates charged by Amex in Australia during this time declined steadily, dropping from 248 basis points in Q1 2003 to 185 basis points in Q4 2011, a decline of 63 basis points. This 63 basis point decline occurred over a nine-year period, which is roughly the same amount of time from when Visa and Mastercard dropped their no-surcharge provisions as part of the 2013 Settlement until the end of the Class Periods.

## Figure 15
## Summary of Quarterly Average Amex Merchant
## Discount Rates in Australia, 2003-2011



Source: RBA Payments Data.

354.    The second alternative benchmark source that could be used to estimate but-for
merchant discount fees in the market for GPCC Transactions during the Class Periods
relates to the low-cost provider strategy Amex's Anti-Steering Rules (and, prior to 2013,
those of Visa and MasterCard as well) foreclosed Discover from executing that I
discussed in detail earlier in this Expert Report.  As I noted above, when Discover
launched in 1985, it pursued an innovative low-cost strategy whereby it "priced the
product very aggressively for merchants" in order to offer merchants a "great value
proposition."[834]  I also explained how, despite the mutually-beneficial value proposition
offered by Discover through its low-cost strategy, Discover was unsuccessful in moving a
significant share of transaction volume from Visa, Mastercard, and Amex to the Discover

---

[834] 2014 Amex Trial Transcript at 820:23-821:16.  Discover's launch strategy also focused on offering a
unique value proposition to cardholders by offering no annual fees, as well as being the "first card to have
any form of rewards with providing cash back on every transaction."  See 2014 Amex Trial Transcript at
820:23-821:16.

brand due to the Amex's Anti-Steering Rules, as well as the similar rules Visa and Mastercard had in place at the time.[835]

355. When asked why Discover was not "able to execute a low price strategy without using steering to shift shares to Discover," Mr. Hochschild testified: "Providing a lower price to merchants isn't transparent to customers. They don't, right now, know the interchange or the pricing that a merchant might pay. So if you don't also let the merchant shift share, you'll be giving away money in the form of a lower interchange rate without getting any benefit in return."[836] Furthermore, as I explained, Mr. Hochschild testified that following the 2011 Consent Decree and 2013 Settlement, in a world absent Amex's Anti-Steering Rules where "there were no restrictions on what Discover could do with respect to steering at the point of sale," Discover "would aggressively pursue a strategy of lowering [its] prices and providing incentives to merchants that would steer incremental volume to Discover."[837]

356. Given the obstacles executing a low-cost strategy that the Amex, Visa, and Mastercard merchant acceptance rules imposed on Discover at the time, "Discover shifted [its] pricing strategy with merchants and started increasing [its] prices to more closely match those of Visa and Mastercard."[838] As Mr. Hochschild testified: "To the extent that offering a lower price was not going to give us any business benefits, it was leaving money on the table. It wasn't the right answer for us as a company. It wasn't the

---

[835] 2014 Amex Trial Transcript at 848:15-849:2.

[836] 2014 Amex Trial Transcript at 849:8-15.

[837] 2014 Amex Trial Transcript at 872:3-10. Mr. Hochschild further testified: "Q. In a world without American Express' anti-steering rules, how would merchant benefits [sic] in your view? A. The merchants would have the ability to manage their costs of credit card acceptance by steering customers to a lower cost network. And they could reinvest that savings in more profits or in enhancing their own value proposition to their customers. Q. In a world without American Express' anti-steering rules, how would Discover's cardholders benefit? A. Whatever preference programs the merchants put into place to steer customers, it would be some sort of positive incentive for them to use their Discover card. That would be a benefit for our cardholders. Q. In world [sic] without American Express' anti-steering rules, could Discover still compete for third-party issuers? A. Yes. Q. Mr. Hochschild, in a world without American Express' anti-steering rules, could Discover still develop brand loyalty for the Discover product? A. Yes. Q. Could you in fact enhance brand loyalty for your product? A. Yes. Q. And all the rewards that you've discussed today, in a world without American Express' anti-steering rules, could you still offer competitive rewards in the rewards market today? A. Yes. Q. In general, if the American Express rules were not in place, Mr. Hochschild, do you think that competition among the is [sic] credit card networks would be more robust than it is today? A. Yes." See 2014 Amex Trial Transcript at 872:11-873:15.

[838] 2014 Amex Trial Transcript at 853:23-854:3. Mr. Hochschild estimated these price increases began around 2000 or 2001. See 2014 Amex Trial Transcript at 854:4-6.

right answer for our shareholders. We should be - - we needed to be competitively priced. Because, again, giving the retailers a discount without getting anything in return didn't make business sense."[839]

357.    Discover's strategy of abandoning its low-cost provider strategy and "increasing [its] prices to more closely match those of Visa and MasterCard" began in 2000, when Discover unbundled its merchant discount (where merchants were no longer paying a single merchant discount rate, rather, Discover began charging merchants separate fees consistent with Visa's and Mastercard's pricing structures).[840] Furthermore, as part of this continued effort, Discover also raised its merchant discount rates and began charging merchants additional fees to further close the gap between its merchant discount rates and the rest of the GPCC Transactions market.[841] As I discussed in detail earlier in this Expert Report, Amex's continued imposition and enforcement of its Anti-Steering Rules forestalled meaningful price competition between the GPCC payment networks on either interchange or merchant discount rates. The difference between Discover's merchant discount rates when attempting to compete on price to merchants and Discover's merchant discount rates after it realized the futility of such a strategy given Amex's Anti-Steering Rules (and, prior to 2013, those of Visa and Mastercard) is one measure of the magnitude of the effect that such competition would have had on all GPCC payment networks' merchant discount rates following the 2011 Consent Decree and 2013 Settlement absent Amex's Anti-Steering Rules. Thus, the extent to which Discover raised its merchant discount rates to "more closely reflect the market" following its decision that its low-cost provider strategy could not succeed due to Amex's Anti-Steering Rules (and, at the time, those of Visa and Mastercard as well) represent a reasonable proxy for the extent to which, beginning in January 2013 (following the 2011 Consent Decree and 2013 Settlement), Amex's continued imposition and enforcement of its Anti-Steering Rules caused merchant discount rates to be artificially inflated ("Merchant Discount Overcharge"), thus causing the GPCC acceptance costs incurred by

---

[839] 2014 Amex Trial Transcript at 854:7-15. Mr. Hochschild estimated these price increases began around 2000 or 2001. See 2014 Amex Trial Transcript at 854:4-6.
[840] 2014 Amex Trial Transcript at 853:23-856:17; 2014 Amex Trial PX0075.
[841] 2014 Amex Trial Transcript at 855:12-858:10; 2014 Amex Trial PX0075, PX1285.

the Qualified Merchants in this matter to be higher than they otherwise would have been.[842]

358.    In October 2007, Discover put together a "Pricing & Product Strategy" presentation that summarized the success it had achieved to date in its efforts to abandon its low-cost provider strategy and increase its merchant discount rate to more closely match those of Visa and MasterCard.[843] Figure 16 below is a pricing chart from this 2007 Discover presentation that illustrates Discover's effective merchant discount rate, noting the period (beginning with its inception) it engaged in its "Low Cost Provider Strategy" (1986 – 1999) as well as an eight-year "Close Competitive Gap" period that followed (2000 – 2007).[844] At the 2014 Amex Trial, Roger Hochschild of Discover testified that this "Close Competitive Gap" period "depict[ed] the increase in price levels to merchants as part of the new strategy" to increase Discover's prices to more closely match those of Visa and MasterCard.[845] As shown in Figure 16 below, during the eight-year period Discover's pricing efforts were geared towards closing the competitive gap between itself and Visa and Mastercard following the abandonment of its low cost provider strategy, Discover's effective merchant discount rate increased from 150.1 basis points in 2000 to approximately 186.1 basis points in 2007, an increase of approximately 36 basis points during this period.

---

[842] 2014 Amex Trial Transcript at 856:8-857:1. As Roger Hochschild testified at the 2014 Amex Trial: "If steering were permitted, I believe we would have continued with our first strategy, which is to be the low cost network and have merchants steer volume to that." See 2014 Amex Trial Transcript at 858:11-859:8.
[843] 2014 Amex Trial PX1285.
[844] 2014 Amex Trial PX1285 at DFS0455474.
[845] 2014 Amex Trial Transcript at 853:23-862:19. I have noted that in this October 2007 presentation, Discover's forecasted price increase for 2008 was part of a separate, new period it referred to as "Competitively Priced Robust Product Suite." See 2014 Amex Trial PX1285 at DFS0455474. Mr. Hochschild testified that since Amex's merchant discount rates were consistently higher than Visa's and Mastercard's at the time Discover pursued this new pricing strategy, it focused its strategy on closing the competitive gap between it and Visa and Mastercard, while remaining "lower than American Express." See 2014 Amex Trial Transcript at 856:8-858:10.

227



**Figure 16**
**Discover Network Merchant Discount Effective Rate (including fees)**

Source: 2014 Amex Trial PX1285 at DFS0455474.

359. Thus, this approximately 36 basis point increase in Discover's effective merchant discount rate represents a reasonable proxy that could be used as a benchmark in my damages methodology to estimate of the Merchant Discount Overcharge that resulted from Amex's continued imposition and enforcement of its Anti-Steering Rules following the 2011 Consent Decree and 2013 Settlement, and continuing through the Class Periods in this matter. To apply this benchmark in my damages methodology, I would reduce the effective merchant discount rates of the four GPCC payment networks (Amex, Visa, Mastercard, and Discover) by 36 basis points over an eight-year period (the same amount of time Discover's pricing strategy focusing on closing the competitive gap between its prices and the market) using linear interpolation. This amounts to an annual 4.5 basis point reduction in each GPCC payment network's merchant discount rates beginning in January 2013 and continuing through most of the Class Periods in this matter.[846] Figure 17 below compares the actual and estimated but-for merchant discount rates on an annual

---

[846] As I noted above, the "Close Competitive Gap" period that followed Discover's abandonment of its low cost provider strategy lasted eight years. Thus, in order to be conservative, I could hold the but-for merchant discount rates flat at 2020 levels during the time period January 2021 through May 2022 (the Class Periods in this matter end on June 1, 2022).

228

basis for each GPCC payment network (Merchant Discount Overcharges) beginning in 2013 using the approach outlined as part of my damages methodology.



# Figure 17
## Summary of Actual and But-For Merchant Discount Rates by Payment Network

Sources: Nilson Report, Issues #1022, 1041, 1065, 1109, 1131, 1155, 1176, and 1201; 2014 Amex Trial PX1285 at DFS0455474.

360. Common evidence I have reviewed indicates that this annual 4.5 basis point reduction in merchant discount rates for the purposes of estimating the Merchant Discount Overcharge caused by Amex's continued imposition and enforcement of its Anti-Steering Rules during the Class Periods is a reasonable estimate. For example, as I discussed above, in order to "[m]itigate [r]isks" after the RBA's announcement of its reforms, Amex "proactively reduced discount rates to over 80,000 merchants by 5-35bp across a range of industries – Retail, Restaurants, Professional/Financial Services, Lodging and Auto Sales/Service," and later, when the threat of differential surcharging still remained a significant risk in Australia despite these initial price reductions, Amex adopted a strategy whereby it would offer merchants a significant reduction in their

merchant discount fee in exchange for agreeing not to differentially surcharge Amex GPCCs in addition to the proactive price reductions Amex had already offered.[847]

361.    Furthermore, common evidence I have reviewed indicates that as part of its strategy in response to the RBA reforms, Amex prioritized making a significant investment in securing no surcharge provisions with its largest merchant accounts in Australia. As I noted above, in a June 2007 "Australia Differential Surcharge Update on Response Strategy" presentation, Amex noted that its "original strategy focused on securing the top accounts in the marketplace to set a marketplace standard of no surcharge," adding that "[b]edding down 'no surcharge' contracts with key merchants was costly, bringing many key accounts to the point of being virtually non-profitable."[848] Thus, given that the 38 Qualified Merchants are among the largest retailers in the U.S., and given the common evidence discussed above demonstrating that Amex viewed its experience in Australia as a benchmark for how to manage the threat of differential surcharging in the U.S., it is reasonable to conclude that Amex's response in the U.S. to the threat of differential surcharging in the absence of its Anti-Steering Rules would be to prioritize large merchants such as the Qualified Merchants in a similar way.

362.    In addition, as I noted above, at the 2014 Amex Trial, Ken Chenault of Amex testified that, following the launch of the "We Prefer Visa" campaign, Amex added language to its Anti-Steering Rules "specifically prohibiting the use of the word 'preferred'" partly in response to Visa's preference marketing campaigns.[849] A June 1992 Visa Product Development and Marketing Committee Meeting summary noted that Amex's new merchant acceptance agreement offered a 35 basis point reduction in the merchant discount rate in exchange for a "new set of restrictions," which included: "The merchant must not state or imply a preference for any other card brand."[850]

[847] AMEXNDR00655707-725 at 710.
[848] AMEX-DOJ-10070929-953 at 935. Amex also noted that as part of its successful execution of its core strategy (to "minimize [the] effect of surcharging on billings and aggressively leverage opportunities) from 2003 to 2006, it had "[s]ecure[d its] top 50 accounts." See AMEX-DOJ-10070929-953 at 934.
[849] 2014 Amex Trial Transcript at 4492:12-4493:8.
[850] 2014 Amex Trial PX0084 at 0607556. At the 2014 Amex Trial, Mr. Morgan of Visa testified that, even with this 35 basis point reduction in the merchant discount rate that Amex was offering for compliance with its stricter Anti-Steering Rules, Amex's merchant discount rate was still higher for merchants to accept that Visa. See 2014 Amex Trial Transcript at 3330:15-3331:6.

363.    Thus, as Amex's pricing response to both the RBA reforms in Australia, as well as Visa's aggressive "We Prefer Visa" campaign indicate, it is reasonable to estimate that, in a world where Amex could no longer impose or enforce its Anti-Steering Rules and merchants gain leverage in negotiations (discussed earlier in this Expert Report), GPCC payment networks such as Amex would be willing to offer significant reductions in merchant discount rates in exchange for agreements with merchants to agree to either steer as many customers as possible towards a specific GPCC brand (e.g., preferencing campaigns), or agree not to steer customers away from a specific GPCC brand (e.g., differential steering).

364.    The discussion above summarizes the benchmark methodology I would incorporate into my damages model for the purposes of providing a reasonable estimate of the difference in the GPCC acceptance costs (merchant discount fees) Qualified Merchants incurred in the actual world with those they would have incurred in the but-for world absent Amex's continued imposition and enforcement of its Anti-Steering Rules (Merchant Discount Overcharge).[851] The next step in my damages methodology is to estimate the extent to which Qualified Merchants would have passed through the cost savings that would have resulted absent Amex's Anti-Steering Rules on to customers in the form of lower retail prices. I discuss my methodology to do so in the following section.

## B. *Estimation of Pass-Through*

365.    In order to estimate the extent to which Qualified Merchants would have passed through the cost savings that would have resulted absent Amex's Anti-Steering Rules on to customers (including all or nearly all members of the Credit Card Class) as part of my damages methodology, it is first necessary to determine the total volume of GPCC Transactions from each GPCC payment network and for each Relevant State at Qualified Merchants during the Class Periods (collectively "Relevant GPCC Transaction

---

[851] In the event that additional documents, data, or other materials becomes available to me after the submission of this Expert Report that further informs my analysis or opinions regarding a reasonable benchmark for estimating the difference in the GPCC acceptance costs (merchant discount fees) Qualified Merchants incurred in the actual world with those they would have incurred in the but-for world absent Amex's continued imposition and enforcement of its Anti-Steering Rules, I reserve the right to revise my damages methodology in this regard accordingly at an appropriate stage of this litigation.

Volume"). I understand Counsel for the Plaintiffs sought detailed GPCC Transaction-level data as part of discovery in this matter, however, such data were not made available to me as of the submission of this Expert Report.[852] However, limited summary data from Visa, Mastercard, and Discover were produced as part of discovery in this matter which contain,

                                                                                [853] While these summary data were not produced with enough time for me to adequately analyze and interpret them,[854] based on a preliminary review of these data, it is my opinion that these data could be used as part of my damages methodology to determine the amount of Relevant GPCC Transaction Volume.[855] Once I determine the Relevant GPCC Transaction Volume using these summary data as part of my damages methodology, then, for each Relevant State and for

---

[852] See, for example, United States District Court Eastern District of New York, Plaintiffs Letter Motion to Magistrate Judge Sanket J. Bulsara, *Oliver v. American Express Co.*, Case No. 1:19-cv-00566(NGG)(SJB), May 9, 2022; United States District Court Eastern District of New York, Declaration of Todd A. Seaver, Oliver et al., Plaintiffs v. American Express Company et al., Defendants, No. 1:19-cv-00566-NGG-SJB, May 9, 2022 at ¶¶28-34, Exhibit D, Exhibit E.

[853] VISAOLIVER-000013482-83 at 82; VISAOLIVER-000013484; VISAOLIVER-000014105; MCW OLIVER 00000001-039; DFS0010162; DFS0010162.

[854] On August 30, 2022, Visa produced

                                                          See VISAOLIVER-000013482-83 at 82; VISAOLIVER-000013484. On September 26, 2022, Visa produced additional
                                                          See VISAOLIVER-000014105, Letter from Andrew Talbot to Carl Hammarskjold, dated September 26, 2022. On September 19, 2022, Mastercard produced
                                                          . See MCW OLIVER 00000001-039; Email from Gary R. Carney to Carl Hammarskjold et al., dated July 22, 2022. Furthermore, on September 23, 2022, Discover produced
                                                          . See DFS0010162; DFS0010162.

[855] In the event that        Amex summary-level GPCC sales data for Qualified Merchants in the Relevant States during the Class Periods is not made available to me, I could use the annual GPCC purchase volume totals reported by Nilson for Amex from 2015 through 2021 to project Amex's Relevant GPCC Transaction Volume during those years (Amex Relevant GPCC Transaction Volume for January 1, 2022 through June 1, 2022 could be estimated using the 2021 market share adjustment). See Nilson Report, Issue #1080 at p. 8; Nilson Report, Issue #1103 at p. 8; Nilson Report, Issue #1125 at p. 8; Nilson Report, Issue #1147 at p. 7; Nilson Report, Issue #1169 at p. 7; Nilson Report, Issue #1191 at p. 5; Nilson Report, Issue #1213 at p. 5. In the event that

                       are not made available to me, I could estimate those 2015 Discover sales figures using the 2016 Discover sales figures and the annual growth rate in Discover GPCC purchase volume from 2015 to 2016 as reported by Nilson. See Nilson Report, Issue #1080 at p. 8; Nilson Report, Issue #1103 at p. 8. In the event that additional documents, data, or other materials becomes available to me after the submission of this Expert Report that replaces, supplements, or further informs my understanding of these summary sales data for the purposes of calculating a reasonable estimate of the Relevant GPCC Transaction Volume, I reserve the right to revise my opinions in this regard accordingly at an appropriate stage of this litigation.

each year during the Class Periods, I would then apply the annual Merchant Discount Overcharge for each GPCC payment network to those networks' Relevant GPCC Transaction Volume to determine the extent to which Qualified Merchants' overall GPCC acceptance costs would have been lower in the but-for world absent Amex's Anti-Steering Rules.

366. As I explained earlier in this Expert Report, because Amex's Anti-Steering Rules prevent Amex-accepting merchants from passing through the costs of accepting a given GPCC to consumers using those GPCCs via differential surcharges, merchants typically raise retail prices to *all* customers in order to cover their average costs of GPCC acceptance.[856] Thus, since GPCC Transactions account for a portion of a given Qualified Merchant's overall sales (in addition to other payment options such as Debit Cards and cash), as part of my damages methodology, I would estimate the GPCC cost savings Qualified Merchants would have realized in the but-for world per dollar of overall Qualified Merchant sales in the Relevant States during the Class Periods.[857]

367. Once I have determined the amount of GPCC cost savings per dollar of sales Qualified Merchants would have realized in the Relevant States during the Class Periods in a world absent Amex's Anti-Steering Rules, the next step in my damages methodology is to determine the extent to which Qualified Merchants would have passed through this cost savings to its customers (including all or nearly all members of the Credit Card Class) in the form of lower retail prices. I understand that Counsel for the Plaintiffs

---

[856] Shapiro et al. at p. 11. "Since the largest direct effect of interchange fees is the higher prices that merchants have to charge, and the credit card networks forbid price differentiation based on how a consumer pays for a good or service, all consumers bear this cost whether or not they use credit cards." See Shapiro et al. at p. 11.

[857] This adjustment could be made using the annual purchase volume totals reported by Nilson for each U.S. consumer payment system from 2015 through 2020 (overall Qualified Merchant Transaction Volume in the Relevant States for January 1, 2021 through June 1, 2022 could be estimated using the 2020 payment systems share adjustment). See Nilson Report, Issue #1100 at p. 11; Nilson Report, Issue #1122 at p. 11; Nilson Report, Issue #1144 at p. 9; Nilson Report, Issue #1166 at p. 11; Nilson Report, Issue #1188 at p. 6; Nilson Report, Issue #1210 at p. 6. In so doing, I would exclude annual purchase volume totals as reported by Nilson for Remote Payments and Preauthorized Payments, as these methods of payment are generally not applicable to purchases made at Qualified Merchants. According to Nilson in 2020: "**Remote payments** are made using a computer or telephone and include payments made during online banking sessions, person-to-person money transfers, check conversions at the point of sale, as well as bill payments made at ATMs, self-service kiosks and clerk-assisted machines at supermarkets. **Preauthorized payments** are handled electronically end to end through the automated clearing house system. They include payments for insurance premiums and recurring bills such as utilities and gym memberships. Mortgage payments are excluded." See Nilson Report, Issue #1210 at p. 6 (emphasis in original).

233

sought data or information pertaining to prices and/or cost of sales from Qualified Merchants as part of discovery in this matter, but no such data or information were produced as of the submission of this Expert Report.[858] In the alternative, however, I have reviewed evidence in the form of a recent research paper from the Federal Reserve Bank of Kansas City which provides a reasonable estimate of the rate at which Qualified Merchants would have passed through this GPCC cost savings per dollar of sales they would have realized during the Class Periods absent Amex's Anti-Steering Rules.

368.    In this research paper, economists from the Federal Reserve Bank of Boston, Federal Reserve Bank of Kansas City, and Bank of Canada utilize a pass through rate of 90 percent to measure the effect of merchant discount fees on retail prices.[859] The authors determined that the 90 percent pass-through rate is appropriate because it is "about the midpoint of long-run pass-through rates on retail prices due to industry-wide cost changes estimated by previous empirical studies on U.S. industries."[860] Consistent with the opinions of the authors, it is my opinion that this constitutes a reasonable measure of pass through because, as a matter of economics, the pass through of merchant discount fees would be the same as the pass through of any other industry-wide change in variable cost.

369.    As recognized by the authors, merchants generally "pass through their cost of accepting payments to customers […] in a way that does not differentiate prices by payment method, but instead raises retail prices paid by **all customers**."[861] Thus, the authors apply the 90 percent pass-through as a fixed percentage increase in retail prices

---

[858] See, for example, United States District Court Eastern District of New York, Plaintiffs Letter Motion to Magistrate Judge Sanket J. Bulsara, *Oliver v. American Express Co.*, Case No. 1:19-cv-00566(NGG)(SJB), May 9, 2022; United States District Court Eastern District of New York, Declaration of Todd A. Seaver, Oliver et al., Plaintiffs v. American Express Company et al., Defendants, No. 1:19-cv-00566-NGG-SJB, May 9, 2022 at ¶¶35-36, Exhibit F. Should any such data on Qualified Merchant prices or costs be made available to me after the submission of this Expert Report, I reserve the right to revise my analyses accordingly at an appropriate stage of this litigation, if necessary.

[859] Felt et al. The authors measure the effect of merchant discount fees, rewards, and extent of payment card usage on net retail prices paid (including pass through of merchant discount fees, other fees paid by customers to financial institutions, and rewards earned) by income cohort.

[860] Felt et al. at footnote 13. The authors cite published peer-reviewed and/or empirical studies estimating pass through on coffee (90 percent or 92 percent); gasoline (81 percent or 100 percent); and processed cheese (73-103 percent).

[861] Felt et al. at pp. 5-6 (emphasis added).

on **all goods and services** sold by the merchant.[862] Thus, I could utilize the same approach to estimate the extent to which Qualified Merchants would have passed through the GPCC cost savings Qualified Merchants would have realized in the but-for world to its customers (including all or nearly all members of the Credit Card Class) in the form of lower retail prices.

370.    As I discussed earlier in this Expert Report, the price faced by cardholders for GPCC Transactions is the Annual Fee Net of Rewards, which includes the (typically negative) cost, if one exists, of using the GPCC to transact and any annual cost associated with owning the card (but not including the cost of using the revolving credit feature of the card).[863] Thus, in estimating the extent to which Qualified Merchants would have passed through the GPCC cost savings that would have resulted absent Amex's Anti-Steering Rules on to customers (including all or nearly all members of the Credit Card Class) as part of my damages methodology ("Retail Overcharge"), it is necessary to consider the extent, if any, to which any Annual Fees Net of Rewards paid by members of the Credit Card Class would have been higher in the but-for world in order to net those higher Annual Fees Net of Rewards out of my estimates of the Retail Overcharge.

371.    However, earlier in this Expert Report I discussed in extensive detail common evidence demonstrating that, at a minimum, GPCC issuers would not have increased the Annual Fees Net of Rewards (either through reduced cardholder rewards or increased annual fees) charged to GPCC cardholders in a world where Amex was unable to impose or enforce its Anti-Steering Rules. In fact, as I discussed above, economic theory and common evidence demonstrate that, in many instances, GPCC issuers likely would have *reduced* the Annual Fees Net of Rewards (through reduced annual fees or increased cardholder rewards) charged to GPCC cardholders in response to the increased levels of competition on the merchant side of the market for GPCC Transactions that would have

---

[862] Felt et al. at p. 8. As a sensitivity, the paper examines results based on pass through of 100 percent and 75 percent. Felt et al. at p. 24. An earlier paper also analyzing the impact of merchant discount fees on retail prices used a pass-through rate of 100 percent as a base case and 110 percent as a sensitivity. The use of a pass through greater than 100 percent was due to an assumption of constant markup of 10 percent. See, Scott Schuh, Oz Shy, and Joanna Stavins, "Who Gains and Who Loses from Credit Card Payments? Theory and Calibrations," *Public Policy Discussion Papers*, No. 10-03, Federal Reserve Bank of Boston, 2010 at pp. 39-40.

[863] Rochet and Tirole (2002).

occurred absent Amex's Anti-Steering Rules. Given this, in order to be conservative in my estimation of damages suffered by the Credit Card Class, I would assume that GPCC issuers would have kept Annual Fees Net of Rewards constant in the but-for world during the Class Periods. Therefore, it would not be necessary to apply any adjustment to my estimation of Retail Overcharges as part of my estimation of damages suffered by members of the Credit Card Class.

372.   The discussion above summarizes the methodology I would use to provide a reasonable estimate of the extent to which Qualified Merchants would have passed through the GPCC cost savings that would have resulted absent Amex's Anti-Steering Rules on to customers (including all or nearly all members of the Credit Card Class) for the purposes of my damages analysis ("Retail Overcharge").[864] The next step in my damages methodology is to estimate the amount of antitrust damages suffered by all or nearly all members of the Credit Card Class as a result of Amex's continued imposition and enforcement of its Anti-Steering Rules. I discuss my analysis in this regard in the next section.

## C. Estimation of Damages Suffered by Members of the Credit Card Class

373.   Once I have determined a reasonable estimate of the annual Retail Overcharge during the Class Periods, the next step in my damages methodology is to determine the annual amount of Qualified GPCC Purchase volume made by members of the Credit Card Class during the Class Periods to apply to the annual Retail Overcharge. As I previously discussed, detailed GPCC Transaction-level data were not made available to me as part of discovery in this matter. However, the Relevant GPCC Transaction Volume for each GPCC payment network estimated using the summary data produced by Visa, Mastercard, and Discover (discussed above), as well as other publicly available information, would allow me to calculate a reasonable estimate of the Qualified GPCC Purchases for the purposes of estimating class-wide antitrust damages.

---

[864] In the event that additional documents, data, or other materials becomes available to me after the submission of this Expert Report that further informs my analysis or opinions regarding my methodology to calculate a reasonable estimate of the extent to which Qualified Merchants would have passed through the cost savings that would have resulted absent Amex's Anti-Steering Rules, I reserve the right to revise my opinions in this regard accordingly at an appropriate stage of this litigation.

374.    In order to do this, it would be necessary to make additional adjustments to these
combined Relevant GPCC Transaction Volume Data, including;

 i)  Excluding purchases of prescription drugs made by Credit Card Class
  members for which the purchaser only paid a flat copay per their insurance
  plan;[865]

---

[865] While detailed data regarding prescription drug purchases made at Qualified Merchants by Credit Card Class members who only paid a flat copay per their insurance plan have not been made available to me, in order to determine a conservative estimate of such purchases as part of my damages methodology, I could exclude *all* dollar purchases of prescription drugs made by members of the Credit Card Class based on information regarding the portion of a Qualified Merchant's overall sales that were accounted for by prescription drug sales. In particular, for Qualified Merchants classified as Drug Retailers (CVS Health, Rite Aid, and Walgreens Boots Alliance) I could estimate the percentage of overall sales that were accounted for by prescription drug sales based on breakdowns of sales reported by these merchants. For example, Walgreens reports annual breakdowns in sales between its Pharmacy and Retail business units. See 2015 Walgreens 10-K at p. 4; 2016 Walgreens 10-K at p. 5; 2017 Walgreens 10-K at p. 4; 2018 Walgreens 10-K at p. 4; 2019 Walgreens 10-K at p. 5; 2020 Walgreens 10-K at p. 5; and 2021 Walgreens 10-K at p. 5. I could estimate 2022 Drug Retailer sales using Walgreens' 2021 sales breakdown. For Qualified Merchants classified as Food Retailers and Wholesalers (Albertsons, Kroger, Sprouts Farmer's Market, United Natural Foods, Bi-Lo, Hy-Vee, Meijer, and Publix Supermarkets) I could also estimate the percentage of overall sales that were accounted for by prescription drug sales based on breakdowns of sales reported by these merchants. For example, Albertsons reports annual breakdowns in segment sales, which includes a separate Pharmacy category. See 2017 Albertsons 10-K at p. 108; 2018 Albertsons 10-K at p. 66; 2019 Albertsons 10-K at p. 63; 2020 Albertsons 10-K at p. 134; and 2021 Albertsons 10-K at p. 77. I could estimate 2022 Food Retailer and Wholesaler sales using Albertsons' 2021 sales breakdown. Furthermore, evidence I have reviewed indicates that Diversified Retailer Walmart sold prescription drugs during the Class Periods. A 2015 Reuters article noted that "Wal-Mart's pharmacy generates $19 billion a year in annual revenue." See Nathan Layne, "Wal-Mart's drug problem: pharmacy business drags on profit," Reuters Business News, August 18, 2015. According to its 2015 Annual Report, Walmart's U.S. net sales revenue was $288 billion in 2015, thus yielding an estimated 6.6 percent of Walmart's annual revenue accounted for by prescription drug sales, which I could incorporate into my estimated exclusion of prescription drug sales at Walmart during the Class Periods for the purposes of estimating damages suffered by members of the Credit Card Class. See Walmart, 2015 Annual Report at p. 2. Furthermore, on December 16, 2015, Target sold its clinic and pharmacy businesses to CVS, and following the sale, CVS operated the pharmacy in Target stores under a perpetual operating agreement. See Target Corporation SEC Form 10-K for fiscal year ended January 28, 2017 at p. 2. Thus, for Qualified GPCC Purchases made at Target in 2015, I could use Walmart's annual revenue accounted for by prescription drug sales as a reasonable proxy for Target's annual revenue accounted for by prescription drug sales. I have noted that excluding all prescription drug sales for Qualified Merchants is a conservative approach since not all Credit Card Class members purchased prescription drugs through an insurance plan, or an insurance plan through which they paid a flat copay. In order to apply a more accurate (yet still conservative) estimate of the portion of Qualified GPCC Purchases that were accounted for by prescription drug purchases where members of the Credit Card Class paid a flat copay, I could further apply estimates of the dollar volume splits in prescription drug purchases between payments made by consumers and payments made by third-party payors. Should any additional information regarding the portion of Qualified GPCC Purchases that were accounted for by prescription drug purchases where members of the Credit Card Class paid a flat copay become available at a later stage of this litigation, I reserve the right to revise my analysis accordingly at an appropriate time.

ii) Excluding any GPCC Transaction volume associated with corporate or government cards;[866]

iii) Excluding Amex GPCC Transaction volume from the data;[867] and

iv) Excluding Visa, Mastercard, and Discover GPCC Transaction Volume made by cardholders who were also Amex GPCC (including co-branded cards) account holders or authorized users during the Class Periods.[868]

---

[866] I have noted that Visa ████████████████████████████████████████████ it produced in this matter. See VISAOLIVER-000013482-83 at 82.

[867] As noted above, Amex GPCC (including Amex co-branded cards) account holders or authorized users are excluded from the Credit Card Class. See February 2022 Hammarskjold Letter.

[868] While I was not provided with any documents or data that would allow me to directly identify Visa, Mastercard, and Discover GPCC Transactions by individuals who were also Amex GPCC account holders or authorized users, certain information from the public domain would allow me to calculate a reasonable estimate of the portion of relevant Visa, Mastercard, and Discover GPCC Transaction volume that comes from individuals who were also Amex GPCC account holders or authorized users in order to exclude it from my damages analysis. For example, the Diary of Consumer Payment Choice ("DCPC") is a study of the "understanding of the cash and noncash payment behavior of adult consumers (ages 18 and older) in the United States," which has been conducted by the Federal Reserve Bank of Atlanta, Boston, and San Francisco seven times since 2012 (2012, 2015-2020). See Claire Greene, Scott Schuh, and Joanna Stavins, "The 2012 Diary of Consumer Payment Choice," *Federal Reserve Bank of Boston, Research Data Reports*, No. 18-1., January 17, 2018; Marco Angrisani, Kevin Foster, and Marcin Hitczenko, "The 2015 and 2016 Diaries of Consumer Payment Choice: Technical Appendix," *Federal Reserve Bank of Boston, Research Data Reports*, No. 18-2, March 2018; Claire Greene and Scott Schuh, "The 2016 Diary of Consumer Payment Choice," *Federal Reserve Bank of Boston, Research Data Reports*, No. 17-7, December 1, 2017; Claire Greene and Joanna Stavins, "The 2017 Diary of Consumer Payment Choice," *Federal Reserve Bank of Atlanta, Research Data Reports*, No. 18-05, September 17, 2018; Claire Greene and Joanna Stavins, "The 2018 Diary of Consumer Payment Choice," *Federal Reserve Bank of Atlanta, Research Data Reports*, No. 19-03 November 25, 2019; Claire Greene and Joanna Stavins, "The 2019 Diary of Consumer Payment Choice," *Federal Reserve Bank of Atlanta, Research Data Reports*, No. 20-4, June 15, 2020; Claire Greene and Joanna Stavins, "The 2020 Diary of Consumer Payment Choice," *Federal Reserve Bank of Atlanta, Research Data Reports*, No. 21-2, May 7, 2021. The DCPC is "an online survey administered to diary respondents ('diarists') over three consecutive days," which can be used to estimate the "number, value, and average value of payments that all US adult consumers make using various payment instruments." See Claire Greene and Joanna Stavins, "The 2020 Diary of Consumer Payment Choice," *Federal Reserve Bank of Atlanta, Research Data Reports*, No. 21-2, May 7, 2021. In particular, the DCPC includes information on the type (e.g., GPCC, Debit Card) and brand (e.g., Amex, Visa, Mastercard, Discover) of payment instrument that diarists possessed during their survey period, as well as which brand/type of payment instrument was used for each specific purchase during that time, which could allow me to reasonably estimate the share of GPCC purchases made using Visa, Mastercard, and Discover GPCCs by consumers who were also Amex GPCC (including co-branded cards) account holders or authorized users during the Class Periods (and, thus, excluded from the Credit Card Class). See Claire Greene and Joanna Stavins, "The 2020 Diary of Consumer Payment Choice," *Federal Reserve Bank of Atlanta, Research Data Reports*, No. 21-2, May 7, 2021. See, also, Shy. As noted in one such DCPC study, an "important goal of the DCPC is to provide estimates of payment statistics for the entire population of U.S. consumers over the age of 18." See Marco Angrisani, Kevin Foster, and Marcin Hitczenko, "The 2015 and 2016 Diaries of Consumer Payment Choice: Technical Appendix," *Federal Reserve Bank of Boston, Research Data Reports*, No. 18-2, March 2018. Should any additional information regarding the volume of relevant Visa,

375.    Once I've made these adjustments to estimate the amount of Qualified GPCC Purchases, I then apply the annual Qualified GPCC Purchases for Visa, Mastercard, and Discover for each Relevant State during the applicable Class Period by the corresponding annual Retail Overcharge.

## VIII.    Summary of Class-Wide Damages Methodology (Debit Card Class)

376.    I have also been asked by Counsel for the Plaintiffs whether a standard and reliable economic methodology exists that would allow me to estimate the aggregate amount of overcharge damages suffered by members of the Debit Card Class as a result of Amex's continued imposition and enforcement of its Anti-Steering Rules on a class-wide basis without resorting to individualized inquiry. Based on my training and experience in economics and my review and analysis of the documents and limited summary data produced to me in this matter, I have developed a benchmark methodology that can be used to estimate damages under the but-for world for the Debit Card Class using a class-wide, formulaic method and common evidence. The overcharge damages estimated by my methodology arise from the difference between the actual Net Debit Cardholder Prices Debit Card Class members paid on their Qualified Debit Card Purchases, and the Net Debit Cardholder Prices Debit Card Class members would have paid for said Qualified Debit Card Purchases absent Amex's continued imposition and enforcement of its Anti-Steering Rules. I discuss this methodology in greater detail below.

377.    As I discussed in detail earlier in this Expert Report, Amex's continued imposition and enforcement of its Anti-Steering Rules caused the GPCC acceptance costs (merchant discount rates) to be artificially inflated, and that, absent Amex's Anti-Steering Rules, Qualified Merchants would have passed through at least some portion of the cost savings they would have realized absent Amex's Anti-Steering Rules to all customers (including all or nearly all members of the Debit Card Class) in the form of lower retail prices. Given this, the lower retail prices members of the Debit Card Class would have

Mastercard, and Discover GPCC Transaction volume associated with members of the Credit Card Class who were also Amex GPCC account holders or authorized users become available at a later stage of this litigation, I reserve the right to revise my damages methodology to incorporate such information accordingly at an appropriate time.

paid on their Qualified Debit Card Purchases are the same as the lower retail prices members of the Credit Card Class would have paid on their Qualified GPCC Purchases (discussed above). Thus, the annual Retail Overcharges I would estimate as part of my methodology for estimating damages suffered by all or nearly all members of the Credit Card Class also apply to my estimation of damages suffered by all or nearly all members of the Debit Card Class.[869],[870]

378.    Given that the reasonable estimate of the annual Retail Overcharges during the Class Periods I would estimate as part of my methodology for estimating damages suffered by all or nearly all members of the Credit Card Class also applies to the Debit Card Class, in order to estimate the amount of antitrust injury suffered by all or nearly all members of the Debit Card Class, the next step of my damages methodology is to determine the annual amount of Qualified Debit Card Purchase volume made by members of the Debit Card Class during the Class Periods to apply to the annual Retail Overcharges. As I previously discussed, detailed Debit Card Transaction-level data were not made available to me as part of discovery in this matter. However, the summary data produced by Visa and Mastercard (discussed above)

---

[869] Furthermore, as I explained earlier in this Expert Report, like the market for GPCC Transactions, the market for Debit Card Transactions is also a two-sided market, which is comprised of merchants who wish to accept Debit Cards as payment for goods and services on one side of the market, and cardholders who wish to pay for their purchases with a Debit Card on the other side of the market. Thus, in estimating the Retail Overcharges paid by all or nearly all members of the Debit Card Class, it is necessary to consider the extent, if any, to which any Annual Fees Net of Rewards paid by members of the Debit Card Class would have been higher in the but-for world in order to net those higher Annual Fees Net of Rewards out of my estimates of the Retail Overcharge. However, as I discussed in greater earlier in this Expert Report, based on my review of evidence common to the Debit Card Class as a whole and my training and experience in economics, I concluded that the Annual Fees Net of Rewards paid by Debit Card Class members would not have been impacted by Amex's inability to impose and enforce its Anti-Steering Rules in the but-for world. Thus, given that the Annual Fees Net of Rewards paid by members of the Debit Card Class would not have changed (critically, would not have increased) in the but-for world, it is not necessary to apply any adjustment to my estimations of Retail Overcharge as part of my methodology to estimate damages suffered by all or nearly all members of the Debit Card Class.

[870] I understand Counsel for the Plaintiffs sought detailed Debit Card Transaction-level data as part of discovery in this matter, however, such data were not made available to me as of the submission of this Expert Report. See, for example, United States District Court Eastern District of New York, Plaintiffs Letter Motion to Magistrate Judge Sanket J. Bulsara, *Oliver v. American Express Co.*, Case No. 1:19-cv-00566(NGG)(SJB), May 9, 2022; United States District Court Eastern District of New York, Declaration of Todd A. Seaver, Oliver et al., Plaintiffs v. American Express Company et al., Defendants, No. 1:19-cv-00566-NGG-SJB, May 9, 2022 at ¶30, Exhibit E.

871

As I noted above, while these summary data were not produced with enough time for me to adequately analyze and interpret them, based on a preliminary review of these data, it is my opinion that these data can be used as part of my damages methodology to determine the amount of Qualified Debit Card Purchase Volume.

379.    In order to do this, I made additional adjustments to the combined Visa and Mastercard Relevant Debit Card Transaction Volume Data, including;

   i)   Excluding purchases of prescription drugs made by Debit Card Class members for which the purchaser only paid a flat copay per their insurance plan;[872]

   ii)  Excluding any Relevant Debit Card Transaction volume associated with corporate or government cards;[873]

   iii) Excluding Visa and Mastercard Debit Card Transaction volume made by cardholders who are also Amex GPCC (including co-branded cards) account holders or authorized users during the Class Periods.[874]

---

[871] VISAOLIVER-000013482-83 at 82; VISAOLIVER-000013482; MCW_OLIVER_00000001-039.
[872] While detailed data regarding prescription drug purchases made at Qualified Merchants by Debit Card Class members who only paid a flat copay per their insurance plan have not been made available to me, in order to determine a conservative estimate of such purchases as part of my methodology to estimate damages suffered by all or nearly all members of the Debit Card Class, I would exclude *all* dollar purchases of prescription drugs made by members of the Debit Card Class based on information regarding the portion of a Qualified Merchant's overall sales that were accounted for by prescription drug sales using the same approach as my Credit Card Class damages methodology (discussed above). Should any additional information regarding the portion of Qualified Debit Card Purchases that were accounted for by prescription drug purchases where members of the Debit Card Class paid a flat copay become available at a later stage of this litigation, I reserve the right to revise my analysis accordingly at an appropriate time.
[873] I have noted that Visa

See VISAOLIVER-000013482-83 at 82.
[874] While I was not provided with any documents or data that would allow me directly identify Visa and Mastercard Debit Card Transactions by individuals who were also Amex GPCC account holders or authorized users, certain information from the public domain would allow me to calculate a reasonable estimate of the portion of relevant Visa and Mastercard Debit Card Transaction volume that comes from individuals who were also Amex GPCC account holders or authorized users in order to exclude it from my damages analysis.  For example, the DCPC studies conducted by the Federal Reserve Bank of Atlanta, Boston, and San Francisco discussed as part of my methodology to estimate damages suffered by members of the Credit Card Class above could also allow me to reasonably estimate the share of Debit Card purchases made using Visa and Mastercard Debit Cards by consumers who were also Amex GPCC (including co-branded cards) account holders or authorized users during the Class Periods (and, thus, excluded from the Debit Card Class).

241

380.    Once I've made these adjustments to estimate the amount of Qualified Debit Card Purchases, I then apply the annual Qualified Debit Card Purchases for each of Visa and Mastercard for each Relevant State during the applicable Class Period by the corresponding annual Retail Overcharge.

## IX. Conclusions

381. As I discuss in extensive detail throughout this Expert Report, based on my analyses and research into the market for GPCC Transactions in the United States, as well as my training and experience in economics, and the common evidence I have reviewed, I have concluded that the market for GPCC Transactions in the United States constitutes the relevant antitrust market. I have also concluded that Amex's continued imposition and enforcement of its Anti-Steering Rules caused Amex-accepting merchants to incur higher overall GPCC acceptance costs during the Class Periods than they otherwise would have. I also concluded that GPCC issuers would not have reduced cardholder rewards earned by GPCC cardholders or increased annual fees charged to GPCC cardholders in a world where Amex was unable to impose or enforce its Anti-Steering Rules. Taken together, this demonstrates that Amex's continued imposition and enforcement of its Anti-Steering Rules during the Class Periods was anticompetitive, as it forestalled competition, resulting in higher net two-sided prices in the market for GPCC Transactions during the Class Periods than otherwise would have prevailed.

382. Further, I concluded that Qualified Merchants passed on at least some portion of the artificially-inflated GPCC acceptance costs that resulted from Amex's continued imposition and enforcement of its Anti-Steering Rules in the form of higher retail prices during the Class Periods, and that absent Amex's Anti-Steering Rules, Qualified Merchants would have passed on at least some portion of their cost savings to their customers. I also concluded that all consumers, not just those paying with GPCCs, paid the artificially-inflated retail prices charged by Qualified Merchants during the Class Periods that resulted from Amex's continued imposition and enforcement of its Anti-Steering Rules.

383. In addition, as I discussed in detail earlier in this Expert Report, I concluded that Amex's continued imposition and enforcement of its Anti-Steering Rules during the Class Periods caused all or nearly all members of the Credit Card Class to suffer antitrust injury in that they paid higher Net GPCC Cardholder Prices (defined below) than they otherwise would have, and similarly, that Amex's continued imposition and enforcement of its Anti-Steering Rules during the Class Periods caused all or nearly all members of

243

the Debit Card Class to suffer antitrust injury in that they paid higher Net Debit Cardholder Prices (defined below) than they otherwise would have.  Lastly, I concluded that a standard and reliable economic methodology exists that would allow me to estimate of the aggregate amount of overcharge damages suffered by members of the Credit Card Class and Debit Card Class during the Class Periods as a result of Amex's continued imposition and enforcement of its Anti-Steering Rules on a class-wide basis without resorting to individualized inquiry.

Russell L. Lamb, Ph.D.

September 30, 2022

# Appendix A



# Russell Lamb, Ph.D.

President
Monument Economics Group
Phone: (703) 615-3474
Email: rlamb@megconsulting.com

**Professional Summary**

Russell Lamb is an expert in antitrust economics and has testified concerning antitrust liability, impact, and damages. He has an extensive background in applied econometrics and has developed econometric models to measure damages in a number of matters involving allegations of horizontal price fixing. He has provided expert testimony in State and Federal Courts in the United States and in Canada on a range of issues including class-certification and economic damages in antitrust, RICO and consumer fraud matters. In addition, he has provided expert advice to client attorneys at all levels of the litigation. Dr. Lamb has an extensive background in the analysis of domestic and international agricultural markets and has authored more than 50 articles in peer-reviewed economics journals, trade press, and major newspapers.

Dr. Lamb's work has been cited by courts in certifying classes in the United States and Canada. For example, in In re Aftermarket Automotive Lighting Products Antitrust Litigation, the court held that his analysis provided "a sufficient basis from which to conclude that Plaintiffs would adduce common proof concerning the effect of Defendants' alleged price-fixing conspiracy on prices class members paid." In certifying the Class in In re: Titanium Dioxide Antitrust Litigation, the Court said, "This Court finds that Dr. Lamb's regression analysis accurately reflects the characteristics of the titanium dioxide industry, and the facts in this case." In In Re: Domestic Drywall Antitrust Litigation, the Court cited extensively to Dr. Lamb's analysis in its decision to certify the Class: "Dr. Lamb's expert opinion fits the facts of the case, is relevant, and is therefore admissible to show classwide injury and measurable damages in support of Plaintiffs' Motion for Class Certification. [...] The Court [...] has thoroughly considered Dr. Lamb's opinion in its decision on the DPPs' Class Certification Motion." In the Canadian LCD Competition Act Class Action, the Court held that Dr. Lamb's analysis provided "evidence of a viable methodology for the determination of loss on a class-wide basis." In In re: Puerto Rican Cabotage Litigation, the Court held that "Dr. Lamb [had] set

forth a reputable and workable model for determining damages as to individual class members." In certifying the class in Clarke and Rebecca Wixon, et al. v. Wyndham Resort Development Corp., et al., the Court held that "Dr. Lamb [had] presented a plausible class-wide method of proof." In certifying the class in Eugene Allan, et al., v. Realcomp II, Ltd., et al., the Court held that "the Plaintiffs have produced sufficient evidence that common proofs will yield a finding of class-wide damages that predominates over any specific individualized damages. The Lamb Report and Lamb Reply are sufficient to establish this fact." Furthermore, Dr. Lamb was the Indirect Purchaser Plaintiffs' expert in the In re: Polyurethane Foam Antitrust Litigation matter, which was certified by the Court in April 2014.

With regard to agricultural economics, Dr. Lamb has a particular expertise in agricultural markets and has undertaken extensive original research and econometric analysis on markets for agricultural commodities. His articles on agricultural economics have been published in peer-reviewed journals, trade press, and major newspapers. Dr. Lamb regularly presents at conferences on topics including the state of the U.S. Economy and farm policy.

Prior to co-founding Monument Economics Group, Dr. Lamb was a Senior Vice President at Nathan Associates Inc., where he directed the firm's litigation consulting practice nationally. Dr. Lamb previously served as a Principal at AACG in Arlington, VA, and as Managing Director and DC Office Head at Econ One Research. He earlier served as an Assistant Professor of Agricultural Economics and faculty member of the Graduate Group in Economics at North Carolina State University and as an Economist and Senior Economist in the Federal Reserve System of the United States, at the Federal Reserve Board and the Federal Reserve Bank of Kansas City.

### Education

- Ph.D., Economics, University of Pennsylvania, 1994
- M.A., Economics, The University of Maryland, 1989
- B.A., Economics, The University of Tennessee, 1987

**Expert Testimony Offered**

**2022** *Las Vegas Sun, Inc. v. Sheldon Adelson, et al.*

- United States District Court District of Nevada
- Case No. 2:19-cv-01667
- Expert Report, September 19, 2022
- Opinion concerning damages issues
- Retained by Lewis Roca Rothgerber Christie LLP

*Value Drug Company v. Takeda Pharmaceuticals U.S.A., Inc., et al.*

- United States District Court Eastern District of Pennsylvania
- Case No. 21-CV-3500
- Expert Report, July 25, 2022
- Amended Expert Report, July 28, 2022
- Testified at deposition, August 17, 2022
- Testified at deposition, September 15, 2022
- Opinion concerning class certification and damages issues
- Retained by Berger & Montague, P.C.

*Serge Asselin v. Ainsi Canada, Inc. Et al.*

- Cour Supérieure District de Québec
- Case No. 200-06-000203-169
- Expert Report, May 31, 2022
- Opinion concerning market factors
- Retained by Siskinds LLP, Sotos LLP

*In Re Caustic Soda Antitrust Litigation*

- United States District Court Western District of New York
- Case No. 1:19-cv-00385-EAW-MJR
- Expert Report, April 25, 2022
- Testified at deposition, June 6, 2022
- Expert Reply Report, August 25, 2022
- Testified at deposition, September 23, 2022
- Opinion concerning class certification and damages issues
- Retained by CERA LLP

*Boothe Farms, Inc., et al. v. The Dow Chemical Co., et al.*

- United States District Court Eastern District of Arkansas Northern Division
- Case No. 3:19-cv-00264-DPM
- Expert Report, April 15, 2022
- Supplemental Expert Report, April 20, 2022
- Testified at deposition, May 4, 2022
- Declaration, May 19, 2022
- Opinion concerning damages issues
- Retained by Lieff Cabraser Heimann & Bernstein, LLP

**2021** *In Re: Takata Airbag Product Liability Litigation*

- United States District Court Southern District of Florida Miami Division

- MDL No. 2599
- Expert Report, December 23, 2021
- Opinion concerning class certification and damages issues
- Retained by Podhurst Orseck

*In Re: Broiler Chicken Antitrust Litigation*

- United States District Court Northern District of Illinois Eastern Division
- Case No. 1:16-cv-08637
- Expert Report, December 20, 2021
- Testified at deposition, February 8, 2022
- Expert Rebuttal Report, July 29, 2022
- Testified at deposition, September 1, 2022
- Opinion concerning damages issues
- Retained by Polsinelli

*KPH Healthcare Services, Inc. a/k/a Kinney Drugs, Inc. v Gilead Sciences, Inc., et al.*

- United States District Court Northern District of California San Francisco Division
- Case No. 3:20-cv-06961-EMC
- Expert Report, October 19, 2021
- Declaration, February 25, 2022
- Declaration, April 13, 2022
- Declaration, April 26, 2022
- Testified at deposition, May 18, 2022
- Expert Merits Report, June 28, 2022
- Expert Rebuttal Report, June 30, 2022
- Testified at deposition, July 19, 2022
- Testified at deposition, July 25, 2022
- Expert Rebuttal Report, August 12, 2022
- Expert Rebuttal Damages Report, August 16, 2022
- Testified at deposition, August 31, 2022
- Opinion concerning class certification and damages issues
- Retained by Roberts Law Firm, P.A.

*In Re: Mallinckrodt plc, et al.*

- United States Bankruptcy Court District of Delaware
- Case No. 20-12522 (JTD)
- Expert Report, August 13, 2021
- Expert Reply Report, August 26, 2021
- Testified at deposition, September 8, 2021
- Supplemental Expert Report, October 29, 2021
- Testified at trial, November 12 and 15, 2021
- Expert Reply Report, December 1, 2021
- Testified at trial, December 16, 2021
- Opinion concerning damages
- Retained by Eimer Stahl LLP and Willkie Farr & Gallagher LLP

*Rebotix Repair LLC v. Intuitive Surgical, Inc.*

- United States District Court Middle District of Florida Tampa Division

- Case No. 8:20-cv-02274-VMC-TGW
- Expert Report, July 26, 2021
- Testified at deposition, October 19, 2021
- Opinion concerning monopolization issues
- Retained by Dovel & Luner

*Irene Breckon and Gregory Sills v. Alsaker AS, et al.*

- Federal Court of Canada
- Court File No. T-1664-19
- Expert Report, July 1, 2021
- Opinion concerning class certification issues
- Retained by Siskinds LLP, Sotos LLP, and Koskie Minsky LLP

*Gazarek Realty Holdings Ltd., et al. v. Corning Incorporated, et al.*

- Ontario Superior Court of Justice
- Court File No. CV-16-549735-00CP
- Expert Report, April 15, 2021
- Opinion concerning class certification issues
- Retained by Camp Fiorante Matthews Mogerman LLP, Sotos LLP, Siskinds LLP

*Kate O'Leary Swinkels v. ZF Friedrichshafen Ag, et al.*

- Ontario Superior Court of Justice
- Court File No. CV-18-00604648-00CP
- Expert Report, April 15, 2021
- Expert Reply Report, January 19, 2022
- Opinion concerning class certification issues
- Retained by Camp Fiorante Matthews Mogerman LLP, Sotos LLP, Siskinds LLP

*David Regan v. Masonite International Corporation, et al.*

- Federal Court of Canada
- Court File No. T-1049-20
- Expert Report, March 31, 2021
- Opinion concerning class certification issues
- Retained by Siskinds LLP

*In Re: JELD-WEN Holding, Inc. Securities Litigation*

- United States District Court for the Eastern District of Virginia Richmond Division
- Case No. 3:20-CV-00112-JAG
- Expert Declaration, January 4, 2021
- Expert Reply Declaration, February 15, 2021
- Testified at deposition, February 26, 2021
- Opinion concerning anticompetitive conduct issues
- Retained by Labaton Sucharow LLP and Robbins Gellar Rudman & Dowd LLP

**2020** *In Re Namenda Indirect Purchaser Antitrust Litigation*

- United States District Court Southern District of New York
- Case No. 1:15-CV-06549
- Expert Report, July 6, 2020

- Testified at deposition, July 23, 2020
- Expert Reply Report, September 21, 2020
- Opinion concerning class certification and damages issues regarding indirect purchasers
- Retained by Miller Law LLC and Safirstein Metcalf LLP

*In Re: Interior Molded Doors Antitrust Litigation*

- United States District Court for the Eastern District of Virginia Richmond Division
- Case No. 3:18-CV-00718-JAG
- Class Certification and Trial Expert Report, January 31, 2020
- Testified at deposition, March 4, 2020
- Class Certification and Trial Expert Reply Report, June 9, 2020
- Testified at deposition, July 16, 2020
- Opinion concerning class certification and damages issues
- Retained by Spector Roseman Kodroff & Willis, P.C., and Berger & Montague, P.C.

**2019** *In Re Zetia (Ezetimibe) Antitrust Litigation*

- United States District Court for the Eastern District of Virginia Norfolk Division
- Case No. 2:18-MD-02836-RBS-DEM
- Expert Declaration, November 18, 2019
- Testified at deposition, December 20, 2019
- Expert Trial Declaration, January 13, 2020
- Expert Reply Declaration, February 20, 2020
- Testified at class certification hearing, May 1, 2020
- Expert Trial Reply Declaration, May 8, 2020
- Expert Supplemental Declaration, May 15, 2020
- Testified at deposition, June 9, 2020
- Opinion concerning class certification and damages issues
- Retained by Miller Law LLC and Motley Rice LLC

*GAËTAN ROY c. JTEKT Corporation & al. (Bearings/Roulements)*

- Cour Supérieure District de Québec
- Case No. 200-06-000159-130
- Expert Report, November 12, 2019
- Opinion concerning class certification issues
- Retained by Siskinds LLP, Sotos LLP

*First Impressions Salon, Inc., et al., v. National Milk Producers Federation, et al.*

- United States District Court for the Southern District of Illinois
- Case No. 3:13-cv-00454-NJR-SCW
- Expert Report, January 4, 2019
- Testified at deposition, February 13, 2019
- Expert Reply Report, May 3, 2019
- Testified at deposition, May 17, 2019
- Opinion concerning class certification and damages issues
- Retained by Barrett Law Group, NastLaw LLC, and Roberts Law Firm

*Sheridan Chevrolet Cadillac Ltd., et al., v. JTEKT Corporation, et al.*

- Ontario Superior Court of Justice
- Court File No. CV-13-478644-00CP
- Expert Report, January 2, 2019
- Opinion concerning class certification issues
- Retained by Sotos LLP

**2018** *Sheridan Chevrolet Cadillac Ltd., et al., v. Hitachi Ltd., et al.*

- Ontario Superior Court of Justice
- Court File No. CV-14-506683-00CP
- Expert Report, October 4, 2018
- Opinion concerning class certification issues
- Retained by Sotos LLP

*In Re Suboxone Direct Purchaser Antitrust Litigation*

- United States District Court for the Eastern District of Pennsylvania
- Case No. 2:13-MD-02445-MSG
- Expert Report, September 18, 2018
- Testified at deposition, October 30, 2018
- Merits Expert Report, November 30, 2018
- Expert Rebuttal Report, January 11, 2019
- Testified at deposition, January 17, 2019
- Expert Merits Rebuttal Report, April 26, 2019
- Testified at deposition, June 12, 2019
- Opinion concerning class certification, merits, and damages issues
- Retained by Berger & Montague, P.C.; Garwin Gerstein & Fisher LLP; and Faruqi & Faruqi LLP

*William Rushing, et al. v. Williams-Sonoma, Inc., et al.*

- United States District Court Northern District of California, San Francisco Division
- Case No. 3:16-cv-01421-WHO
- Expert Report, July 25, 2018
- Opinion concerning class certification issues
- Retained by Rose Law Group, PC

*The Hospital Authority of Metropolitan Government of Nashville and Davidson County, Tennessee, et al. v. Momenta Pharmaceuticals, Inc., et al.*

- United States District Court Middle District of Tennessee Nashville Division
- Civil Action No. 15-cv-1100
- Testified at deposition, October 10, 2018
- Expert Report, June 22, 2018
- Expert Reply Report, September 21, 2018
- Testified at class certification hearing, May 13, 2019
- Declaration, May 21, 2019
- Expert Merits Report, May 24, 2019
- Declaration, June 18, 2019
- Expert Report, July 5, 2019
- Expert Supplemental Reply Report, July 5, 2019

- Testified at hearing, July 12, 2019
- Expert Merits Reply Report, July 29, 2019
- Testified at deposition, August 13, 2019
- Opinion concerning class certification and damages issues regarding indirect purchasers
- Retained by Lieff Cabraser Heimann & Bernstein, LLP

**2017** *Fady Samaha and Urlin Rent a Car Ltd. v. Yamashita Rubber Co., Ltd., et al.*

- Ontario Superior Court of Justice
- Court File No. CV-13-472262-00CP
- Expert Report, December 4, 2017
- Supplemental Report, July 13, 2018
- Expert Reply Report, January 23, 2020
- Testified at deposition, April 20, 2020
- Supplemental Report, September 30, 2020
- Opinion concerning class certification issues
- Retained by Siskinds LLP

*In Re Lamictal Direct Purchaser Antitrust Litigation*

- United States District Court New Jersey
- Case No. 1 2-95 -WHW-MCA
- Expert Report, November 6, 2017
- Revised Expert Reply Report, April 16, 2018
- Testified at deposition, June 6, 2018
- Opinion concerning class certification and damages issues
- Retained by Berger & Montague, P.C.

*In Re Namenda Direct Purchaser Antitrust Litigation*

- United States District Court Southern District of New York
- Case No. 1:15-CV-07488
- Expert Report, September 15, 2017
- Amended Expert Report, September 20, 2017
- Expert Reply Report, October 25, 2017
- Amended Expert Reply Report November 9, 2017
- Testified at deposition, October 6, 2017
- Opinion concerning class certification and damages issues
- Retained by Berger & Montague, P.C.; and Garwin Gerstein & Fisher LLP

*In Re Capacitors Antitrust Litigation*

- United States District Court Northern District of California San Francisco Division
- Case No. 3:14-CV-03264 -JD
- Expert Declaration, February 24, 2017
- Expert Reply Declaration, April 28, 2017
- Testified at deposition, May 17, 2017
- Expert Trial Declaration, November 30, 2018
- Expert Trial Reply Declaration, April 19, 2019
- Testified at deposition, May 23, 2019
- Expert Declaration, July 2, 2021

- Opinion concerning class certification issues regarding indirect purchasers
- Retained by Cotchett, Pitre & McCarthy, LLP

**2016** *Deere Construction, LLC, v. Cemex Construction Materials Florida, LLC, et al.*

- United States District Court Southern District of Florida
- Case No. 15-24375-CIV-ALTONAGA/O'Sullivan
- Expert Report, September 14, 2016
- Testified at deposition, September 27, 2016
- Opinion concerning class certification issues
- Retained by Kozyak Tropin & Throckmorton, LLP; Harke Clasby & Bushman, LLP; and McCallum, Methvin & Terrell, P.C.

*Luke Begonja v. Wyndham Vacation Resorts, Inc., et al. (Case No. 2015-CA-010943)*

*Gerrit Brouwer, Jr., et al. v. Wyndham Vacation Resorts, Inc., et al. (Case No. 2014-CA-008533)*

*Gary Gottschalk, et al. v. Wyndham Vacation Resorts, Inc., et al. (Case No. 2015-CA-001957)*

*Susan Hatzipetro, et al. v. Wyndham Vacation Resorts, Inc., et al. (Case No. 2014-CA-007996)*

*Shelly Keegan, et al. v. Wyndham Vacation Resorts, Inc., et al. (Case No. 2015-CA-001953)*

*Yvonne Klebba, et al. v. Wyndham Vacation Resorts, Inc., et al. (Case No. 2014-CA-008535)*

*Adriane McConville, et al. v. Wyndham Vacation Resorts, Inc., et al. (Case No. 2015-CA-001960)*

*Ernest W. Yeager Jr., et al. v. Wyndham Vacation Resorts, Inc., et al. (Case No. 2014-CA-008054)*

- In the Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida
- Expert Report, September 14, 2016
- Testified at deposition, October 27-28, 2016
- Testified at deposition, March 2-3, 2017
- Expert Report, May 19, 2017
- Testified at deposition, August 29, 2017
- Opinion concerning damages issues
- Retained by Badham & Buck, LLC

*In Re: Evanston Northwestern Healthcare Corporation Antitrust Litigation*

- United States District Court for the Northern District of Illinois Eastern Division
- No. 07-C-4446
- Expert Report, July 28, 2016
- Expert Reply Report, January 25, 2017
- Testified at deposition, September 20, 2016
- Testified at deposition, February 22, 2017
- Opinion concerning damages issues
- Retained by Miller Law LLC

*In Re: Ductile Iron Pipe Fittings ("DIPF") Direct Purchaser Antitrust Litigation*

- United States District Court for the District of New Jersey
- Civ. No. 12-711 (AET)(LHG)
- Declaration, May 27, 2016
- Reply Declaration, March 31, 2017
- Testified at deposition, July 8, 2016

- Opinion concerning class certification, merits, and damages issues
- Retained by Cohen Milstein Sellers & Toll PLLC; and Kaplan Fox & Kilsheimer LLP

*Nestlé Purina Petcare Company v. Blue Buffalo Company, Ltd.*

*Blue Buffalo Company, Ltd. v. Nestlé Purina Petcare Company, et al.*

*Blue Buffalo Company, Ltd. v. Wilbur-Ellis Company, et al.*

*Diversified Ingredients, Inc. v. Wilbur-Ellis Company, et al.*

*Diversified Ingredients, Inc. v. Custom AG Commodities, LLC, et al.*

- United States District Court for the Eastern District of Missouri Eastern Division
- Cause No.: 4:14-CV-00859 RWS
- Affidavit, March 17, 2016
- Opinion concerning pricing issues
- Retained by Lashly & Baer, P.C.

*In Re: Cast Iron Soil Pipe and Fittings Antitrust Litigation*

- United States District Court Eastern District of Tennessee at Chattanooga
- Case No.: 1:14-md-2508
- Declaration, March 4, 2016
- Testified at deposition, May 19, 2016
- Opinion concerning class certification and damages issues
- Retained by Cohen Milstein Sellers & Toll PLLC; Cera LLP; and Kaplan Fox & Kilsheimer LLP

*Darren Ewert v. Denso Corporation, et al.*

- Supreme Court of British Columbia
- Case No. S-135610
- Expert Report, February 12, 2016
- Expert Reply Report, January 5, 2017
- Opinion concerning class certification issues
- Retained by Camp Fiorante Matthews Mogerman

*Serge Asselin v. Hitachi, LTD & al.*

- Cour Supérieure Disctirct de Québec
- Case No. 200-06-000180-144
- Expert Report, February 11, 2016
- Opinion concerning class certification issues
- Retained by Siskinds LLP

**2015** *Thomas Mervyn v. Atlas Van Lines, Inc., et al.*

- United States District Court Northern District of Illinois Eastern Division
- Case No. 1:13-CV-03587
- Expert Declaration, September 3, 2015
- Expert Report, February 4, 2016
- Opinion concerning data issues
- Opinion concerning damages issues
- Retained by Miller Law LLC

*Thomas Mervyn v. Nelson Westerberg, Inc.*

- United States District Court Northern District of Illinois Eastern Division
- Case No. 1:11-CV-06594
- Expert Report, July 27, 2015
- Opinion concerning damages issues
- Retained by Miller Law LLC

*Lane's Gifts and Collectibles, LLC v. Microsoft Online, Inc.*

- United States District Court Western District of Washington at Seattle
- No. 2:12-cv-01181-BJR
- Expert Report, March 23, 2015
- Testified at deposition, May 21, 2015
- Opinion concerning damages issues
- Retained by Nix, Patterson & Roach, L.L.P.; and Kessler Topaz Meltzer & Check, LLP

*BlueCross BlueShield of Tennessee, Inc., et al. v. King Pharmaceuticals, Inc., et al.*

- In the Circuit Court for Cocke County, Tennessee
- Civil Action No. 32941-II
- Expert Report, January 23, 2015
- Opinion concerning impact and damages issues
- Retained by Miller Law LLC

*In Re: Domestic Drywall Antitrust Litigation*

- United States District Court for the Eastern District of Pennsylvania
- MDL No. 2437 13-MD-2437
- Trial Expert Report, January 23, 2015
- Reply Expert Report, April 23, 2015
- Expert Report concerning class certification, August 3, 2016
- Expert Reply Report concerning class certification, January 9, 2017
- Affidavit, July 11, 2019
- Testified at deposition, February 25, 2015
- Testified at deposition, August 30, 2016
- Testified at deposition, February 17, 2017
- Testified at class certification hearing, April 27, 2017
- Expert Supplemental Report, July 31, 2017
- Opinion concerning merits issues regarding direct purchasers
- Opinion concerning class certification issues, impact and damages regarding direct purchasers
- Retained by Cohen Milstein Sellers & Toll PLLC; Berger & Montague, P.C.; and Spector Roseman Kodroff & Willis, P.C.

*In Re: Processed Egg Products Antitrust Litigation*

- United States District Court for the Eastern District of Pennsylvania
- MDL No. 2002
- Expert Declaration, January 22, 2015
- Expert Reply Declaration, April 3, 2015
- Testified at deposition, May 7, 2015
- Opinion concerning merits and damages issues regarding indirect purchasers

- Retained by Straus & Boies, LLP

**2014** *In Re: Class 8 Transmission Indirect Purchaser Antitrust Litigation*

- United States District Court for the District of Delaware
- Civil Action No. 11-cv-00009 (SLR)
- Declaration, November 3, 2014
- Reply Declaration, March 6, 2015
- Trial Declaration, March 27, 2015
- Trial Reply Declaration, July 2, 2015
- Testified at deposition, December 17, 2014
- Testified at deposition, March 16, 2015
- Testified at class certification hearing, March 25, 2015
- Testified at deposition, May 1, 2015
- Opinion concerning class certification issues regarding indirect purchasers
- Opinion concerning merits and damages issues regarding indirect purchasers
- Retained by Glancy Binkow & Goldberg LLP

*Mark S. Wallach, et al., v. Eaton Corporation, et al.*

- United States District Court District of Delaware
- Civil Action No. 10-260-SLR
- Expert Report, November 3, 2014
- Expert Reply Report, March 6, 2015
- Trial Expert Report, March 27, 2015
- Trial Expert Reply Report, July 2, 2015
- Testified at deposition, December 16, 2014
- Testified at deposition, March 16, 2015
- Testified at class certification hearing, March 25, 2015
- Testified at deposition, May 1, 2015
- Opinion concerning class certification issues regarding direct purchasers
- Opinion concerning merits and damages issues regarding direct purchasers
- Retained by Cohen Milstein Sellers & Toll PLLC

*Sheridan Chevrolet Cadillac Ltd., et al., v. Furukawa Electric Co. Ltd., et al.*

*Sheridan Chevrolet Cadillac Ltd., et al., v. Mitsubishi Electric Corporation, et al.*

- Ontario Superior Court of Justice
- Court File Nos. CV-12-446737-00CP / CV-14-496994-00CP
- Expert Report, April 15, 2016
- Expert Report, October 14, 2014
- Opinion concerning class certification issues
- Retained by Siskinds LLP

*Resco Products, Inc., v. Bosai Minerals Group Co., Ltd., et al.*

- United States District Court for the Western District of Pennsylvania
- Civil Action No.: 2:06-cv-235-JFC
- Expert Report, September 24, 2008
- Expert Report, September 29, 2014
- Supplemental Expert Report, December 15, 2014
- Testified at deposition, February 13, 2015

- Opinion concerning damages
- Retained by Boies, Schiller & Flexner LLP

*Fond Du Lac Bumper Exchange Inc., et al. v. Jui Li Enterprise Company Ltd. et al.*

- United States District Court Eastern District of Wisconsin
- Case No.: 2:09-cv-00852-LA
- Affidavit, August 1, 2014
- Affidavit, November 4, 2014
- Declaration, April 24, 2015
- Expert Report, July 15, 2015
- Expert Reply Report, November 24, 2015
- Expert Surreply Report, January 15, 2016
- Expert Trial Report, August 18, 2016
- Expert Trial Reply Report, December 20, 2016
- Testified at deposition, October 1, 2015
- Testified at deposition, February 13, 2017
- Opinion concerning class certification and damages issues
- Opinion concerning Defendants' replacement data
- Opinion concerning Defendant and LKQ transaction-level data
- Opinion concerning merits and damages issues
- Retained by Stueve Siegel Hanson, LLP

*Meredith Corporation, et al., v. SESAC, LLC, et al.*

- United States District Court for the Southern District of New York
- 09 Civ. 9177 (PAE)
- Expert Report, July 10, 2014
- Opinion concerning class certification issues
- Retained by Weil, Gotshal & Manges LLP

*Janet Skold, et al., v. Intel Corporation, et al.*

- Superior Court of the State of California for the County of Santa Clara
- Case No. 1-05-CV-039231
- Expert Report, June 14, 2007
- Testified at deposition, August 31, 2007
- Testified at deposition, January 10, 2014
- Opinion concerning class certification issues
- Opinion concerning damages issues
- Retained by Girard Gibbs LLP

*In Re: Polyurethane Foam Antitrust Litigation*

- United States District Court Northern District of Ohio Western Division 8
- MDL No. 2196
- Declaration, June 11, 2013
- Reply Declaration, October 23, 2013
- Trial Declaration, March 18, 2014
- Reply Trial Declaration, June 30, 2014
- Testified at deposition, August 20, 2013
- Testified at deposition, November 20, 2013

- Testified at class certification hearing, January 15, 2014
- Testified at deposition, April 14, 2014
- Testified at deposition, July 14, 2014
- Opinion concerning class certification issues regarding indirect purchasers
- Opinion concerning merits and damages issues
- Retained by Miller Law LLC

**Professional Experience**

**Economic Consulting Positions**

**Monument Economics Group**, Oct. 11, 2016 - Present

**Nathan Associates, Inc.**, Arlington, VA, *Senior Vice President*, Jan. 2013 – Sep. 20, 2016

**Advanced Analytical Consulting Group, Inc.**, Washington, DC, *Principal*, Mar. 2011– Jan. 2013

**Econ One Research, Inc.**, Washington, DC, Managing Director and DC Office Head, Jul. 2006 – Mar. 2011

- Opened and staffed the DC office; managed office affairs on a daily basis

- Retained as an expert witness for damages and class certification issues in antitrust, breach of contract, product liability and RICO cases; representative testimony includes determination of liability and damages in a case involving resale price maintenance in consumer products, class certification in a horizontal price-fixing case involving international travel in the airline industry, class certification in a consumer class action involving RICO claims in state court

- Industry pre-litigation analyses for consumer products, chemicals, and other industries

**Navigant Consulting, Inc.**, Washington, DC, *Associate Director*, Feb. 2006 – Jul. 2006

- Case manager for damages analysis in asbestos litigation and personal injury claims

**Nathan Associates, Inc.**, Arlington, VA, *Managing Economist*, Jul. 2004 – Feb. 2006

- Case manager for economic analysis of class certification and damages issues in antitrust and RICO cases involving the chemical, consumer products, and tobacco industries

- Retained as expert on damages for direct purchasers of NBR in the Crompton Global Settlement; submitted an Affidavit on damages and appeared before the Special Master for the Crompton Global Settlement (the Hon. Kenneth Feinberg)

**Board Membership**

- Board of Advisors, American Antitrust Institute, Washington, DC

- Department of Economics Advisory Council, University of Tennessee, Knoxville, Chairman, Spring 2006 – April 2011

## Teaching Positions

- The University of Tennessee, Knoxville, *Adjunct Professor*, Spring 2019 – present
- The George Washington University, Washington, DC, *Adjunct Assistant Professor of Economics*, Fall 2004 – present
- North Carolina State University (NCSU), *Assistant Professor* (Department of Agricultural and Resource Economics), Fall 1999 – Spring 2004
- The University of Pennsylvania, *Adjunct Instructor*, Summer 1990 – Spring 1994

## Additional Teaching Experience

- The Wharton School Evening Division, Philadelphia, PA, summer 1993
- Rutgers University, Camden, NJ, summer 1993
- Philadelphia College of Textiles and Science, Philadelphia, PA, fall 1992
- The Pennsylvania State University, Media, PA, 1991
- St. Mary's College of Maryland, St. Mary's City, MD, summer 1989
- The University of Maryland University College, College Park, MD, 1988-1989

## Courses Taught

- Managerial Economics for MBA students (George Washington University)
- Law and Economics (George Washington University)
- Intermediate Microeconomics – graduate level (George Washington University)
- Latin American Economic Development (George Washington University)
- International Trade: Theory and Policy (George Washington University)
- International Finance: Theory and Policy (George Washington University)
- Agricultural Production and Supply – Ph.D. field course (North Carolina State University)
- U.S. Agricultural Policy (North Carolina State University)
- Microfinance: Theory, Practice and Regulation (Superintendencia de Banca y Seguros)
- Statistical Analysis for Economics (University of Pennsylvania)
- Principles of Microeconomics (University of Maryland, St. Mary's College of Maryland)
- Principles of Macroeconomics (University of Pennsylvania, The Wharton School, Penn State University)
- Fundamentals of Micro/Macro Economics (University of Maryland)
- Environmental and Natural Resource Economics (Rutgers)

## Federal Reserve Experience

Federal Reserve Bank of Kansas City, *Senior Economist* Jan. 1998 – Aug. 1999; *Economist*, Jan. – Dec. 1997

- Analysis of regional, macroeconomic developments in agriculture, and energy

15

- Research on public policy towards agriculture in the U.S., especially the impact of farm policy reform
- Briefings to the Bank president and outside groups on the regional economy, agriculture, agricultural trade

Board of Governors of the Federal Reserve System, *Economist*, Jun. 1994 – Dec. 1996

- Analysis of macroeconomic conditions, commodity markets, and prices (CPI, PPI, Core prices)
- Forecasting of agricultural output, prices, and income
- Briefings to the Board of Governors on agriculture and food-price developments

**Other Consulting Experience**

World Perspectives, Inc., 2003 - 2004

- Analysis of trade barriers for U.S. exports of feed ingredients, pet food ingredients, and food ingredients
- Analysis of the impact of a Free Trade Area of the Americas on U. S. soybean producers
- Analysis of the potential for U.S. Halal-certified meat exports to the Middle East

Womble Carlyle Sandridge & Rice, LLP, 2003 - 2004

- Provided expert testimony related to the estimation of business profitability Smith-Moore, 2002 - 2003
- Provided economic analysis of the U.S. Tobacco Program

Superintendencia de Banca y Seguros (Lima, Peru), 1998 - 2000

- Developed and taught a class on Microfinance issues (in English) to students enrolled in a training program for bank examiners; the program was sponsored by the Inter-American Development Bank.

World Bank, Africa Technical Department, 1992 – 1993

- Summarized and provided an overview of data available on African economic and social indicators

ACG-Afrique, January 1993

- Provided critical review of a study document outlining the impact of structural adjustment on African agriculture

**Professional Organizations**

- National Association for Business Economics
- American Economic Association

**Papers, Publications, and Speeches**

## Papers Published in Refereed Journals

- "Losing the Forest for the Trees: On the Loss of Economic Efficiency and Equity in Federal Price-Fixing Class Actions," (with Martin A. Asher and Gregory K. Arenson) *Virginia Law & Business Review*, Vol. 16, No. 2, Spring 2022, 293-325

- "Government Regulation and Quality in the U.S. Beef Market," (with Peyton Ferrier) *Food Policy*, Vol. 32, No. 1, February 2007, 84-97

- "Rent-seeking in U.S.-Mexican Avocado Trade," *Cato Journal*, Vol. 26, No. 1, December 2006, 159-177

- "Consolidation in U.S. Agriculture and the Role of Public Policy," *The ICFAI Journal of Agricultural Economics,* Vol. 1, 2004, 7-16

- "Fertilizer Use, Risk, and Off-farm Labor Markets in the Semi-Arid Tropics of India," *American Journal of Agricultural Economics,* Vol. 85, No. 2, May 2003, 359-371

- "Inverse Productivity: Land Quality, Labor Markets, and Measurement Error," *Journal of Development Economics,* Vol. 71, No. 1, June 2003, 71-95

- "A Market-Forces Policy for the New Farm Economy?" *Review of Agricultural Economics,* Vol. 24, No. 1, 1 March 2002, 15-30

- "Food Crops, Exports, and the Short-run Policy Response of Agriculture in Africa," *Agricultural Economics,* Vol. 22, No. 3, April 2000, 271-298

- "FAIR Act Implications for Land Values in the Corn Belt," (with Jason Henderson) *Review of Agricultural Economics,* Vol. 22, No. 1, Summer – Spring 2000, 102-119

- "Why are Estimates of Agricultural Supply Response So Variable?" (with Francis X. Diebold) *Journal of Econometrics,* Vol. 76, No. 1-2, January – February 1997, 367-373

## Non-refereed Publications, Articles, and Editorials

- "The Predominance Requirement for Antitrust Class Actions – Can Relevant Market Analysis Help?" (with Jeffrey Leitzinger) American Bar Association – Section of Antitrust Law, *Economics Committee Newsletter*, Vol. 7, No. 1, Spring 2007, 17-22

- "Reform of U.S. Farm Policy in an Integrating World Economy," *Developing Countries in the WTO System*, 2006

- "New Farm Economy," *Regulation*, Winter 2003-2004, Cato Institute for Public Policy Research, 2003

- "What Road Will U.S. Economy Take in 2003?" *Southeast Farm Press*, 5 February 2003

- "Fast Track for the Tax Cuts," guest editorial, *News and Observer*, 18 January 2003

- "The 2002 Farm Bill," (with Blake Brown and Michele Marra) *NC State Economist,* November – December 2002

- "Economy-minded Tax Cuts: Bush's Reductions Provided the Boost to Lift U.S. From Recession," guest editorial, *News and Observer*, 2 July 2002

- "Policy Only Effective if Farm Economy is Recognized," special report to *Feedstuffs*, 5 June 2000

- "Aid During Crisis of Little Long-term Help to Farmers," guest editorial, *Kansas City Star*, 23 August 1999

- "Survey of Agricultural Credit Conditions," Federal Reserve Bank of Kansas City," *Regional Economic Digest*, various issues, 1997-1999

- "U.S. Agriculture at the Crossroads in 1999," *Economic Review*, Federal Reserve Bank of Kansas City, Vol. 84, No. 1, 1999, 73-91

- "Can U.S. Oil Production Survive the 20th Century?" *Economic Review,* Federal Reserve Bank of Kansas City, Vol. 84, Quarter I, 1999

- "Will the Tenth District Catch the Asian Flu?" (with Ricardo Gazel) *Economic Review,* Federal Reserve Bank of Kansas City, Vol. 83, Quarter II, 1998, 9-26

- "From the Plains to the Plate: Can the Beef Industry Regain Market Share?" (with Michelle Beshear) *Economic Review,* Federal Reserve Bank of Kansas City, Vol. 83, Quarter IV, 1998, 49-66

- "U.S. Agriculture: Another Solid Year in 1998?" (with Mark Drabenstott) *Economic Review,* Federal Reserve Bank of Kansas City, Vol. 83, No. 1, Quarter I, 1998, 55-74

- "How Will the 1996 Farm Bill Affect the Outlook for District Farmland Values?" *Economic Review*, Federal Reserve Bank of Kansas City, Vol. 82, Quarter IV, 1997, 85-101

- "Food Prices and the Farm Sector," monthly *Greenbook*, Federal Reserve Board of Governors, various issues 1994-1996

- "Hedge to Arrive Contracts," Memo to the Board of Governors, Federal Reserve Board of Governors, 5 June 1996

- "Prices in the May Greenbook," Federal Reserve Board of Governors, 19 May 1996

- "Prices in the March Greenbook," Federal Reserve Board of Governors, 24 March 1996

- "Commodity Price Developments," Weekly memo to the Board of Governors, Federal Reserve Board of Governors, August 1994 – December 1996

## Conference Presentations

- "Class Action Developments," panelist at the American Antitrust Institute's 6th Annual Private Antitrust Enforcement Conference, Washington, DC: 4 December 2012

- "Consequences for Antitrust Thought and Practice," presented at the American Antitrust Institute Invitational Symposium: Antitrust Challenge of Multi-Channel Distribution in the Internet Age, Washington, DC: 22 June 2011

- "The U.S. Economy in the Year Ahead," presented at the Long Company Annual Conference, Chicago, IL: 11 September 2009 and 19 September 2008

- "The U.S. Economic Outlook," presented at the Industry Outlook Conference, Chicago, IL: 17 October 2006 and 18 October 2005

- "How Will the Economy Impact Your Business?" presented at the Long Company Annual Conference, Las Vegas, NV: 14 August 2004

- "Focus on The Economy" presented at *Milling and Baking News* Annual Purchasing Managers' Conference, Kansas City, MO: 14 June 2004, 10 June 2003 and 11 June 2002

- "The U.S. Economic Outlook and Agriculture," presented at the Industry Outlook Conference, Chicago, IL: October 2003

- "The U.S. Economic Outlook and Agriculture," presented at the Industry Outlook Conference, Breckenridge, CO: 7 April 2002

- "The U.S. Economic Outlook: The Cost of Terror," presented at the Southern Agricultural Outlook Conference, Atlanta, GA: 24 September 2001

- "The Economy in Focus," presented at *Milling and Baking News* annual purchasing managers' conference, Kansas City, MO: 5 June 2001

- "The Great American Growth Machine," presented at the Southern Agricultural Outlook Conference, Atlanta, GA: 27 September 2000

- "The Economy in Focus," presented at *Milling and Baking News* annual purchasing managers' conference, Kansas City, MO: 6 June 2000

- "The Outlook for the U.S. Pork Sector," presented to the Industry Outlook Conference, Las Vegas, NV: 17 April 2000

- "The National Economic Outlook: The Road Ahead," presented to the Food Industry Outlook Conference, Breckenridge, CO: 11 April 1999

- "Farm Policy for the New Millennium," presented to Federal Reserve Bank of Kansas City, Division of Bank Supervision and Regulation, Bank Examiners' Annual Training Conference, 7 January 1999

- "The Impact of the 1996 Farm Bill on Farmland Values," (with Jason Henderson) first place poster presentation at the annual meetings of the American Agricultural Economics Association, Salt Lake City, UT: 4 August 1998

- "A Note on the Inverse Productivity Relationship," presented at the annual meetings of the Western Economic Association International, Seattle, WA: July 1997

- "Off-farm Labor Supply and Fertilizer Use in the Semi-Arid Tropics of India," presented at the annual meetings of the American Agricultural Economics Association, August 1995

- "Prices for Food-Away-From-Home and Core Inflation: Some Empirical Relationships," (with James E. Kennedy) presented at the Federal Reserve System Committee on Agriculture, Richmond, VA: October 1995

- "Some Simple Dynamics of Farming," presented at the annual meetings of the American Agricultural Economics Association, Orlando, FL: August 1993

- "Structural Adjustment and Food Security," (with W. Graeme Donovan), presented at the annual meetings of the American Agricultural Economics Association, Orlando, FL: August 1993

- "Structural Adjustment and African Agricultural Supply Response to Exchange Rate and Price Movements," (with W. Graeme Donovan), presented at the annual meetings of the Southern Agricultural Economics Association, Tulsa, OK: January 1993

## Other Presentations

- Panelist, "If I Am Uninjured, Do I Not Bleed? The Packaged Seafood Decision," American Bar Association Webinar, 22 June 2022

- Panelist, "Antitrust Class Actions – Where Are We? A 360 Degree Perspective," NYSBA Annual Antitrust Law Section Meeting," 30 January 2014

- Panelist, Retrospective on the Baby Products Litigation, ABA Section of Antitrust Law: Pricing Conduct Committee, 31 July 2013

- Panelist, Economic Forecasting Summit, Northern Indiana Workforce Investment Board, Inc., 29 March 2007

- "The Welfare Benefits of USDA Beef Quality Certification Programs" (with Peyton Ferrier), presentation memo, 2007

- "Reform of U.S. Farm Policy in an Integrating World Economy," presented to the Cordell Hull Institute, Trade Policy Roundtable on Reform of U.S. Farm Policy and the WTO System, Washington, DC: 31 March 2006

- "The Case for a Market-forces Farm Policy in the U.S." presented at the Cordell Hull Institute Trade Policy Roundtable, Washington DC: 26 May 2005

- "How Will the Economy Impact Your Business?" presented at the Apple Processors Association annual meeting, Homewood Resort, 20 June 2004

- "The U.S. and International Economic Outlook," presented at the AgFirst Loan Officer's Seminar, Atlanta, GA: 30-31 October 2002

- "Will the U.S. Economy Bounce or Crawl?" presented to the Eastern Bankruptcy Institute, North Myrtle Beach, SC: 1 June 2002

- "The U.S. Economic Outlook and Agriculture," presented to the National Pork Producers Pork Action Group, Washington, DC: 10 April 2002

- "The U.S. Economic Outlook" presented to the Risk Management Associates, Raleigh, NC: 7 February 2002

- "The U.S. Economic Outlook: The Cost of Terror," presented at the National Pork Producers Pork Action Group, Marco Island, FL: 14 November 2001

- "Consolidation in Agriculture and the Role of Public Policy," paper presented to the Southern Extension Meetings, Williamsburg, VA: 13 June 2000

- "The New Farm Economy," presented at the annual meetings of the National Association of County Agricultural Agents, Omaha, NE: 14 September 1999

- "Regional Economic Update," presented to bankers in Kansas, Nebraska, Missouri, and Oklahoma as part of the Regulatory Update Seminar, Federal Reserve Bank of Kansas City, April 1999

- "The National Economic Outlook," presented to Oklahoma State University Advanced Cattle Management Seminar, Stillwater, OK: 11 March 1999

- "Regional Economic Update," presented to Thomas Hoenig, President, Federal Reserve Bank of Kansas City, 13 November 1998

- "Can the Tenth District Survive the Asian Flu?" The Federal Reserve Bank of Kansas City Economic Forums, nine presentations to bankers in Wyoming, Oklahoma, and New Mexico, 21 September – 21 October 1998

- "The Impact of Asian Economic Developments on Tenth District Agriculture," presented to Thomas Hoenig, President, Federal Reserve Bank of Kansas City, 30 January 1998

- "The Outlook for the Nebraska Economy," The Federal Reserve Bank of Kansas City: Nebraska Economic Forums, six presentations to bankers in Nebraska, 6-15 October 1997

- "Update on the Macroeconomy and Special Briefing on Forecast Performance at the Kansas City Fed," presented to Thomas Hoenig, President, Federal Reserve Bank of Kansas City, 13 August 1997

- "Regional Economic Update," presented to Thomas Hoenig, President, Federal Reserve Bank of Kansas City, 14 May 1997 and 21 March 1997

- "Producer Prices, Retail Sales, and Agricultural Commodity Markets," presented to the Board of Governors of the Federal Reserve System, 15 July 1996

**Referee Experience**

## Referee for the Following Academic Journals

- World Development, 1993
- Journal of Development Economics, 1994, 1995
- International Economic Review, 1995
- Journal of Human Resources, 1997
- Journal of Business and Economics Statistics, 1997
- American Journal of Agricultural Economics, 1999, 2001, 2002
- Agricultural Economics, 2000, 2001, 2004

- Agricultural Finance Review, 2000, 2004
- Review of Agricultural Economics, 2000, 2002, 2004
- Journal of Agricultural and Resource Economics, 2000, 2001, 2002
- Emerging Markets Review, 2001
- Contemporary Economic Policy, 2004

## Fellowships, Honors, and Awards

### Fellowships

- Departmental Fellowship, University of Pennsylvania, 1989-1990
- Dean's Fellowship, University of Pennsylvania, 1991-1992
- Graduate School Fellowship, University of Maryland, College Park, 1987-1989

### Honor Societies and Professional Organizations

- Phi Eta Sigma National Honor Society
- Mortar Board National Honor Society
- Golden Key National Honor Society
- Vice President for Professional Activities, Delta Sigma Pi

### Awards

- Top Graduate in Liberal Arts, University of Tennessee, Knoxville, Spring 1987
- Chancellor's Citation for Extraordinary Professional Promise, University of Tennessee, Knoxville
- Chancellor's Citation for Outstanding Academic Achievement, University of Tennessee, Knoxville
- First place poster presentation, American Agricultural Economics Association annual meetings, August 1998 (with Jason Henderson)
- Honorable mention, American Agricultural Economics Association, Essay for the 21st Century, 2001, "A Market Forces Policy for the New Farm Economy"
- Honorable mention, American Antitrust Institute Antitrust Enforcement Awards, Outstanding Antitrust Litigation Achievement in Economics (for work in *In Re Titanium Dioxide Antitrust Litigation*)
- American Antitrust Institute Antitrust Enforcement Awards, Outstanding Antitrust Litigation Achievement in Economics (for work in *In Re Domestic Drywall Antitrust Litigation*)
- American Antitrust Institute Antitrust Enforcement Awards, Outstanding Antitrust Litigation Achievement in Economics (for work in *In Re Namenda Direct Purchaser Antitrust Litigation*)

**External Funding**

- "Unmanufactured Flue-Cured Tobacco Exports and the Export Component of the Quota Formula." $13,890 NC Tobacco Foundation. With Blake Brown 2000 – 2001.

**Professional Activities and Services**

**Graduate Student Advising**

M.A. degree, North Carolina State University

- Joe Weinberg (Political Science)

Master of Economics, North Carolina State University

- William Pole (2000)
- Dwight Wilder (Chairman, 2002)
- Adrian Atkeson (2002)
- Sarah Spivey
- Li Zhang (Chairman, 2003)
- Nia Atmadja (2003)

Doctor of Philosophy, North Carolina State University

- William Deese (2003)
- Peyton Ferrier (Chairman, 2004)
- Yang Wang (2003)
- Bobby Huggett (2003)
- Syed Wadood (Chairman, 2004)
- Henry Kuo

**Economic and Statistical Modeling Skills**

- Experience with all major statistical software including SAS, STATA, LIMDEP and C++; applied econometric modeling skills in damage analysis of consumer industries, chemicals industries, and agricultural markets, correlation analysis for class certification.

# Appendix B

**HIGHLY CONFIDENTIAL**

# Materials Relied Upon

## Pleadings and Legal Correspondence

Letter from Andrew Talbot to Carl Hammarskjold, dated September 26, 2022.

Letter from Carl Hammarskjold to Peter T. Barbur, dated February 15, 2022.

National Grocers Association (NGA), Letter to Dick Durbin and Chuck Grassley, "National Grocers Association's Statement for the Record – Committee on the Judiciary Hearing, "Excessive Swipe Fees and Barriers to Competition in the Credit and Debit Card Systems," May 4, 2022.

The Food Industry Association (FMI), "Statement for the Record," Senate Judiciary Committee Hearing: Excessive Swipe Fees and Barriers to Competition in the Credit and Debit Card Systems, May 4, 2022.

United States District Court Eastern District of New York, *Anthony Oliver, et al., Plaintiffs, v. American Express Company, et al., Defendants*, Plaintiffs' Fourth Set of Requests for Production of Documents Directed to Defendants American Express Company and American Express Travel Related Services Company, Inc., No. 1:19-cv-00566-NGG-SJB, April 29, 2022.

United States District Court Eastern District of New York, *Anthony Oliver, et al., Plaintiffs, v. American Express Company, et al., Defendants*, Subpoena to Mastercard, Inc. to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action, No. 1:19-cv-00566-NGG-SJB, June 13, 2022.

United States District Court Eastern District of New York, *Anthony Oliver, et al., Plaintiffs, v. American Express Company, et al., Defendants*, Subpoena to Visa Inc. to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action, No. 1:19-cv-00566-NGG-SJB, June 9, 2022.

United States District Court Eastern District of New York, *Anthony Oliver, et al., Plaintiffs, v. American Express Company and American Express Travel Related Services Company, Inc., Defendants*, Amended Class Action Complaint, No. 1:19-cv-00566-NGG-SJB, July 30, 2021.

United States District Court Eastern District of New York, *Anthony Oliver, et al., Plaintiffs, v. American Express Company, et al., Defendants*, Defendants' Amended Responses and Objections to Plantiffs' First Set of Interrogatories, No. 1:19-cv-00566-NGG-SJB, January 14, 2022.

United States District Court Eastern District of New York, Anthony Oliver, et al., Plaintiffs, v. American Express Company, et al., Defendants, Subpoena to Mastercard, Inc. to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action, No. 1:19-cv-00566-NGG-SJB, June 13, 2022.

United States District Court Eastern District of New York, *In Re: American Express Anti-Steering Rules Antitrust Litigation (II)*, Memorandum of Law in Support of Defendants' Motion to Dismiss or in the Alternative for Summary Judgment with Respect to the Individual Plaintiffs' One-Sided and Amex-Only Market Claims, No. 11-MD-02221-NGG-RER, October 12, 2018.

United States District Court Eastern District of New York, *In Re: Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, Notice of Class Plaintiffs' Motion for Class Settlement Preliminary Approval, No. 1:05-md-01720-MKB-VMS, October 19, 2012.

United States District Court Eastern District of New York, *In Re: Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, Payment Card Interchange Fee Settlement, No. 1:05-md-01720-JG-JO, December 13, 2013.

United States District Court Eastern District of New York, Plaintiffs Letter Motion to Magistrate Judge Sanket J. Bulsara, *Oliver v. American Express Co.,* No. 1:19-cv-00566(NGG)(SJB), May 9, 2022.

United States District Court for the Eastern District of New York, United States of America, et al., *Plaintiffs, v. American Express Company and American Express Travel Related Services Company, Inc., Defendants*, Competitive Impact Statement, No 1:10-cv-04496-NGG-CLP, October 4, 2010.

United States District Court for the Eastern District of New York, *United States of America, et al., Plaintiffs, v. American Express Company and American Express Travel Related Services Company, Inc., Defendants*, Order Entering Permanent Injunction as to the American Express Defendants, No. 1:10-cv-04496-NGG-RER, April 30, 2015.

United States District Court for the Eastern District of New York, *United States of America, et al., Plaintiffs, v. American Express Company and American Express Travel Related Services Company, Inc., Defendants*, Stipulation Regarding Non-Standard Card Acceptance Agreements and Merchant Acceptance of American Express, No. 1:10-cv-10-04496-NGG-RER, August 17, 2014.

United States District Court for the Eastern District of New York, Anthony Oliver, et al., Plaintiffs, v. American Express Company et al., Defendants, Plaintiffs' First Requests For Production of Documents, No. 1:19-cv-00566-NGG-SMG, November 30, 2020.

United States District Court for the Eastern District of New York, *United States of America, et al., Plaintiffs, v. American Express Company and American Express Travel Related Services Company, Inc., Defendants*, Opinion, No. 10-cv-04496-NGG-RER, February 19, 2015.

United States District Court for the Eastern District of New York, *United States of America, et al., Plaintiffs, v. American Express Company and American Express Travel Related Services Company, Inc., Defendants*, Final Judgment As To Defendants Mastercard International Incorporated And Visa Inc., No. 1:10-cv-04496-NGG-RER, July 20, 2011.

United States District Court for the Eastern District of New York, American Express' Response to Plaintiffs' Letter Motion, *Oliver v. American Express Co.,* Case No. 1:19-cv-00566 (NGG) (SJB), August 8, 2022.

United States District Court for the Eastern District of New York, *United States of America, et al., Plaintiffs, v. American Express Company and American Express Travel Related Services Company, Inc., Defendants*, Trial Transcript and Exhibits, No. 10-CV-04496-NGG-RER, July 7, 2014.

United States District Court for the Eastern District of New York, Anthony Oliver, et al., Plaintiffs, v. American Express Company, et al., Defendants, Subpoena to Discover Financial Services, Inc. to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action, No. 1:19-cv-00566-NGG-SJB, June 29, 2022.

United States District Court for the Eastern District of New York, Anthony Oliver, et al., Plaintiffs, v. American Express Company, et al., Defendant, Subpoena to Visa, Inc. to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action, No. 1:19-cv-00566-NGG-SJB, June 9, 2022.

United States District Court for the Eastern District of New York, Oliver, et al., Plaintiff, v. American Express Company, et al., Defendant, Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action, Civil Action No. 1:119-cv-00566 (NGG)(SJB), July 29, 2022.

United States District Court for the Eastern District of New York, Oliver, et al., Plaintiff, v. American Express Company, et al., Defendant, Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action, Civil Action No. 1:119-cv-00566 (NGG)(SJB), July 13, 2022.

United States District Court for the Eastern District of New York, Oliver, et al., Plaintiff, v. American Express Company, et al., Defendant, Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action, Civil Action No. 1:119-cv-00566 (NGG)(SJB), July 11, 2022.

Depositions and Declarations:

30(b)(6) Deposition of Monique Ouellette, July 8, 2022.

30(b)(6) Deposition of Antonio Gagliardi, July 26, 2022.

30(b)(6) Deposition of Jonathan Gantman, July 14, 2022.

Deposition and Exhibits 910, 932 of Colm Lorigan, August 5, 2012.

Deposition of Chris S. Mielke, June 13, 2008.

Deposition of Daniel Webb, August 22, 2008.

Deposition of Dennis Stokely, July 15, 2008.

Deposition of Diedre K.M. O'Malley, December 17, 2012.

Deposition of Jack Funda, November 19, 2012.

Deposition of John Briggs, May 28, 2008.

Deposition of Michael Ross, July 25, 2008.

Deposition of Shane Berry, September 27, 2012.

Deposition of Stephen B. McCurdy, November 8, 2012.

United States District Court Eastern District of New York, *Anthony Oliver, et al., Plaintiffs, against American Express Company, et al., Defendants*, Declaration of Peter T. Barbur, No. 1:19-cv-00566-NGG-SJB, August 8, 2022.

United States District Court Eastern District of New York, Declaration of Todd A. Seaver, *Oliver v. American Express Co.*, No. 1:19-cv-00566-NGG-SJB, August 1, 2022.

United States District Court Eastern District of New York, Declaration of Todd A. Seaver, Oliver et al., Plaintiffs v. American Express Company et al., Defendants, No. 1:19-cv-00566-NGG-SJB, May 9, 2022.

United States District Court Eastern District of New York, Declaration of Todd A. Seaver, Oliver et al., Plaintiffs v. American Express Company et al., Defendants Exhibit D, No. 1:19-cv-00566-NGG-SJB, May 9, 2022.

United States District Court Eastern District of New York, Declaration of Todd A. Seaver, Oliver et al., Plaintiffs v. American Express Company et al., Defendants Exhibit E, No. 1:19-cv-00566-NGG-SJB, May 9, 2022.

United States District Court Eastern District of New York, Declaration of Todd A. Seaver, Oliver et al., Plaintiffs v. American Express Company et al., Defendants Exhibit F, No. 1:19-cv-00566-NGG-SJB, May 9, 2022.

United States District Court for the Eastern District of New York, Anthony Oliver, et al., Plaintiffs, v. American Express Company et al., Defendants, Declaration of David H. Korn, No. 1:19-cv-00566-NGG-SJB, August 8, 2022.

### Laws and Regulations

"Dodd-Frank Wall Street Reform and Consumer Protection Act," Public Law 111-203, July 21, 2010.

**Bates-Stamped Materials**

| | |
|---|---|
| AMEX-CP-000030935 | AMEXNDR00655707 |
| AMEX-CP-000067646 | AMEXNDR06627933 |
| AMEX-CP-000068081 | AMEXNDR07125828 |
| AMEX-CP-000068225 | AMEXNDR07146018 |
| AMEX-CP-000083185 | AMEXNDR07218059 |
| AMEX-CP-000094309 | AMEXNDR08498685 |
| AMEX-CP-000094343 | AMEXNDR09570235 |
| AMEX-CP-000094461 | AMEXNDR12913588 |
| AMEX-CP-000094540 | AMEXNDR14224940 |
| AMEX-CP-000094638 | AMEXNDR17380767 |
| AMEX-CP-000094671 | AMEXNDR19209938 |
| AMEX-CP-000095201 | AXP-CP-000095201 |
| AMEX-CP-000102897 | DFS0000001 |
| AMEX-CP-000102914 | DFS0010162 |
| AMEX-CP-000103395 | MCW_Oliver_000000001 |
| AMEX-DOJ-10039910 | VISAOLIVER-000013482 |
| AMEX-DOJ-10070929 | VISAOLIVER-000014105 |
| AMEX-DOJ-10133629 | |

**Third Party Materials**

Academic Literature

A.P. Lerner, "The Concept of Monopoly and the Measurement of Monopoly Power," *The Review of Economic Studies*, Vol. 1, No. 3, 1934.

Adam J. Levitin, "Priceless? The Economic Costs of Credit Card Merchant Restraints," *UCLA Law Review*, Vol. 55, 2008, 1348-1409.

Alan S. Frankel and Allan L. Shampine, "The Economic Effects of Interchange Fees," *Antitrust Law Journal*, Vol. 73, No. 3, 2006, 627–673.

Alexander Raskovich, "Retail Buyer Power through Steering," *Economics Letters*, Vol. 96, 2007, 221-225.

Carol Coye Benson, Scott Loftesness, and Russ Jones, *Payments Systems in the U.S.: A Guide for the Payments Professional*. Third Edition, San Francisco, CA: Glenbrook Partners LLC, 2017.

David S. Evans and Richard Schmalensee, *Paying with Plastic: The Digital Revolution in Buying and Borrowing*. Second Edition, Cambridge, MA: MIT Press, 2005.

Dennis Carlton and Jeffrey Perloff, *Modern Industrial Organization*. Third Edition, Reading, MA: Addison Wesley, 2000.

Dennis Carlton and Jeffrey Perloff, *Modern Industrial Organization*. Fourth Edition, Reading, MA: Addison Wesley, 2005 .

Dennis W. Carlton and Ralph A. Winter, "Vertical Most-Favored-Nation Restraints and Credit Card No-Surcharge Rules," *Journal of Law and Economics*, Vol. 61, 2018, 215-251.

Graeme Guthrie and Julian Wright, "Competing Payment Schemes," *Journal of Industrial Economics*, Vol. 55, No. 1, 2007, 37-67.

Jakub Górka, *Interchange Fee Economics: To Regulate or Not to Regulate?* Cham, Switzerland: Springer Nature Switzerland AG, 2018.

Jean-Charles Rochet and Jean Tirole, "An Economic Analysis of the Determination of Interchange Fees in Payment Card Systems," *Review of Network Economics*, Vol. 2, No. 2, June 2003, 69-79

Jean-Charles Rochet and Jean Tirole, "Cooperation among Competitors: Some Economics of Payment Card Associations," *RAND Journal of Economics*, Vol. 33, No. 4, 2002, 549-70.

Jean-Charles Rochet and Jean Tirole, "Must-Take Cards: Merchant Discounts and Avoided Costs," *Journal of the European Economic Association*, Vol. 9, No. 3, June 2011, 462-495.

Jean-Charles Rochet and Jean Tirole, "Platform Competition in Two-Sided Markets," *Journal of the European Economic Association*, Vol. 1, No. 4, 2003, 990-1029.

Jean-Charles Rochet and Jean Tirole, "Two-sided markets: a progress report," *RAND Journal of Economics*, Vol. 37, No. 3, 2006, 645-667.

John Cirace, "Apportioning Damages between Direct and Indirect Purchasers in consolidated Antitrust Suits: ARC America Unravels the Illinois Brick Rule," *Villanova Law Review*, Vol. 35, No. 2, 1990.

Julian Wright, "One-sided Logic in Two-sided Markets," *Review of Network Economics*, Vol. 3, No. 1, 2004, 44-64.

Julian Wright, "Why payment card fees are biased against retailers," *RAND Journal of Economics*, Vol. 43, No. 4, 2012, 761-780.

Marc Rysman, "The Economics of Two-Sided Markets," *Journal of Economic Perspectives*, Vol. 23, No. 3, 2009, 125-143.

Rajeev K. Tyagi, "A Characterization of Retailer Response to Manufacturer Trade Deals," *Journal of Marketing Research*, Vol. 36, No. 4, 1999, 510-516

Rajeev K. Tyagi, "Pricing Patterns as Outcomes of Product Positions," *Journal of Business*, Vol. 72, No. 1, 1999.

Richard Schmalensee, "Payment Systems and Interchange Fees," *Journal of Industrial Economics*, Vol. 50, 2002.

Robert G. Harris and Lawrence A. Sullivan, "Passing on the Monopoly Overcharge: A Comprehensive Policy Analysis," *University of Pennsylvania Law Review*, Vol. 128, No. 2, 1979.

Robert J. Shapiro and Jiwon Vellucci, "The Costs of 'Charging It' in America," *Sonecon*, February 2010.

Robert J. Shapiro, "The Costs and Benefits of Half a Loaf: The Economic Effects of Recent Regulation of Debit Card Interchange Fees," *Sonecon*, October 1, 2013.

Robert S. Pindyck, and Daniel L. Rubinfeld, *Microeconomics*. Eighth Edition, Upper Saddle River, New Jersey: Pearson Education, 2013.

Ronald Cotterill, Leonard Egan and William Buckhold, "Beyond Illinois Brick: The Law and Economics of Cost Pass-Through in the ADM Price Fixing Case," *Review of Industrial Organization*, 2001.

Ronald W. Cotterill, "Estimation of Cost Pass Through to Michigan Consumers in the ADM Price Fixing Case," *University of Connecticut Department of Agricultural and Resource Economics Research Report Series*, November 1998.

Samuel J. Merchant, "Merchant Restraints: Credit-Card-Transaction Surcharging and Interchange-Fee Regulation in the Wake of Landmark Industry Changes," *Oklahoma Law Review*, Vol. 68, No. 2, 2016, 327-380.

Theon van Dijk and Frank Verboven, "Quantification of Damages," *Issues in Competition Law and Policy*, Vol. 3, ABA Section of Antitrust Law, 2008.

Warren S. Grimes, "Brand Marketing, Intrabrand Competition, and the Multibrand Retailer: the Antitrust Law of Vertical Restraints," *Antitrust Law Journal*, Vol. 64, No. 1, Fall 1995, 83-136.

Industry Materials

"Busting Common Myths About Discover Card's Acceptance," updated March 31, 2022.

"Point-of-Sale Loan Applicants Generally Use Other Forms of Credit More Actively," TransUnion, September 23, 2021.

"Spending on credit card rewards has exploded in banks' frenzied competition over customers," Magnify Money, May 5, 2017.

American Express, "Merchant Reference Guide - U.S.," April 2022.

CGAP, "Acquiring Models," October 2019.

Dharma Merchant Services, "Mastercard Merit III (In-Person)."

Discover Bank, "The Difference Between Credit Cards and Debit Cards: Explained."

Discover Bank, "What Are Peer-to-Peer Payments?," February 11, 2022.

Stephanie Martz, National Retail Federation (NRF), Letter to Dick Durbin and Chuck Grassley, May 3, 2022.

Rajiv Baniwal, "Best Charge Cards & Cards with No Preset Spending Limits," Moneygeek, August 24, 2022.

Gregory Karp, "Difference Between Credit Cards and Charge Cards," Nerdwallet, July 19, 2021.

Jacob Harrison, "4 P2P Payment Platforms for Businesses and How to Use Them," U.S. Chamber of Commerce, CO—, July 12, 2022.

Louis DeNicola, "What is a Credit Card Network," Experian, December 13, 2021.

Mastercard, "Mastercard 2022-2023 U.S. Region Interchange Programs and Rates," April 22, 2022.

Megan Doyle, "Cash, Debit, or Credit—How to Choose Which to Use?," American Express.

Megan Doyle, "Fundamental Differences Between Credit and Debit Cards," American Express, Credit Intel, January 31, 2020.

Mike Eckler, "What Merchants Should Know about 'Buy Now, Pay Later,'" Practical Ecommerce, August 24, 2020.

Optimized Payments Consulting and NACHA, "Understanding the Cost of Processing Card Payments," 2017.

Rebecca Lake, "What Is A Checking Account And How Does It Work?" Forbes Advisor, May 26, 2022.

U.S. Payments Forum, "Mobile and Digital Wallets: U.S. Landscape and Strategic Considerations for Merchants and Financial Institutions," Version 1.0, January 2018.

Visa, "Surcharging Credit Cards-Q&A for Merchants."

VISA, "Visa USA Interchange Reimbursement Fees: Visa Supplemental Requirements," April 23, 2022.


Investor Materials

"Consumer & Community Banking," JPMorgan Chase & Co, 2022.

Advance Auto Parts Q1 2021 Earnings Call, June 2, 2021.

Advance Auto Parts Q3 2018 Earnings Call, November 13, 2018.

American Express Investor Day Presentation, March 7, 2018.

American Express Investor Day Transcript, March 13, 2019.

American Express Investor Day Transcript, March 25, 2015.

American Express Q1 2021 Earnings Call, April 23, 2021.

American Express Q2 2020 Earnings Call, July 24, 2020.

American Express Q3 2021 Earnings Call Transcript, October 22, 2021.

Big Lots Earnings Call, December 3, 2021.

Burlington Earnings Call, November 24, 2020.

CVS Q2 2022 Earnings Call, August 3, 2022.

Discover Q4 2016 Earnings Call, January 25, 2017.

Discover Q4 2021 Earnings Call, January 20, 2022.

GameStop Q2 2016 Earnings Call, August 25, 2016.

IKEA, "Inter IKEA Group Financial Summary FY21."

JPMorgan Chase & Co 2022 Investor Day Transcript, May 23, 2022.

Kroger Earnings Call, June 17, 2021.

Lowe's Earnings Call, February 23, 2022.

Sprouts Farmers Market Q1 2022 Earnings Call, May 4, 2022.

Ulta Earnings Call, March 10, 2022.

United Natural Foods Q4 2018 Earnings Call, September 20, 2018.

Williams-Sonoma Q1 2016 Earnings Call, May 25, 2016.


SEC Filings

2013 Visa Annual Report.

2015 Walmart Annual Report.

2019 American Express Annual Report.

2020 Discover Annual Report.

2021 American Express Annual Report.

2021 Capital One Annual Report.

2022 Alimentation Couche-Tard Annual Report.

Academy Sports SEC Form 10-K for the fiscal year ended January 30, 2021.

Advance Auto Parts SEC Form 10-K for the fiscal year ended December 28, 2019.

Albertsons SEC Form 10-K for the fiscal year ended February 23, 2019.

Albertsons SEC Form 10-K for the fiscal year ended February 24, 2018.

Albertsons SEC Form 10-K for the fiscal year ended February 26, 2022.

Albertsons SEC Form 10-K for the fiscal year ended February 27, 2021.

Albertsons SEC Form 10-K for the fiscal year ended February 29, 2020.

American Eagle Outfitters SEC Form 10-K for the fiscal year ended February 1, 2020.

American Express SEC Form 10-K for the fiscal year ended December 31, 2015.

American Express SEC Form 10-K for the fiscal year ended December 31, 2021.

American Express SEC Form 10-Q for the Quarterly Period Ended June 30, 2015.

Bed Bath & Beyond SEC Form 10-K for the fiscal year ended March 2, 2019.

Big Lots SEC Form 10-K for the fiscal year ended February 2, 2019.
BJ's Wholesale Club SEC Form 10-K for the fiscal year ended February 1, 2020.
Burlington Stores SEC Form 10-K for the fiscal year ended February 2, 2019.
Camping World SEC Form 10-K for the fiscal year ended December 31, 2018.
CVS SEC Form 10-K for the fiscal year ended December 31, 2019.
Dick's Sporting Goods SEC Form 10-K for the fiscal year ended February 2, 2019.
Discover Financial Services SEC Form 10-K for the fiscal year ended December 31, 2017.
Discover Financial Services SEC Form 10-K for the fiscal year ended December 31, 2018.
Discover Financial Services SEC Form 10-K for the fiscal year ended December 31, 2021.
Discover SEC Form 10-K for the fiscal year ended December 31, 2015.
Foot Locker SEC Form 10-K for the fiscal year ended February 2, 2019.
GameStop SEC Form 10-K for the fiscal year ended February 2, 2019.
Home Depot SEC Form 10-K for the fiscal year ended February 3, 2019.
Kohl's SEC Form 10-K for the fiscal year ended February 2, 2019.
Kroger SEC Form 10-K for the fiscal year ended February 3, 2018.
Lowe's SEC Form 10-K for the fiscal year ended February 1, 2019.
Mastercard SEC Form 10-K for the fiscal year ended December 31, 2021.
Michaels SEC Form 10-K for the fiscal year ended February 2, 2019.
Rite Aid SEC Form 10-K for the fiscal year ended March 2, 2019.
Ross Stores SEC Form 10-K for the fiscal year ended February 2, 2019.
Sprouts Farmers Market SEC Form 10-K for the fiscal year ended December 29, 2019.
Target Corporation SEC Form 10-K for fiscal year ended January 28, 2017.
The Gap SEC Form 10-K for the fiscal year ended January 30, 2021.
TJX SEC Form 10-K for the fiscal year ended February 2, 2019.
Tractor Supply Company SEC Form 10-K for the fiscal year ended December 29, 2018.
Ulta Beauty SEC Form 10-K for the fiscal year ended February 2, 2019.
United Natural Foods SEC Form 10-K for the fiscal year ended August 3, 2019.
Visa SEC Form 10-K for the fiscal year ended December 31, 2021.
Walgreens Boots Alliance SEC Form 10-K for the fiscal year ended August 31, 2019.
Walgreens Boots Alliance SEC Form 10-K for the fiscal year ended August 31, 2017.
Walgreens Boots Alliance SEC Form 10-K for the fiscal year ended August 31, 2016.
Walgreens Boots Alliance SEC Form 10-K for the fiscal year ended August 31, 2021.
Walgreens Boots Alliance SEC Form 10-K for the fiscal year ended August 31, 2020.
Walgreens Boots Alliance SEC Form 10-K for the fiscal year ended August 31, 2018.
Walmart SEC Form 10-K for the fiscal year ended January 31, 2019.

9

Government Agency Publications

Andrew P. Scott, "Merchant Discount, Interchange, and Other Transaction Fees in the Retail Electronic Payment System," Congressional Research Service, IF11893, August 6, 2021.

Ann Kjos, "The Merchant-Acquiring Side of the Payment Card Industry: Structure, Operations, and Challenges," *Consumer Finance Institute Discussion Papers*, No. 07-12, Federal Reserve Bank of Philadelphia, 2007.

Board of Governors of the Federal Reserve System, "Federal Reserve issues a final rule establishing standards for debit card interchange fees and prohibiting network exclusivity arrangements and routing restrictions," June 29, 2011.

Board of Governors of the Federal Reserve System, "2011 Interchange Fee Revenue, Covered Issuer Costs, and Covered Issuer and Merchant Fraud Losses Related to Debit Card Transactions," March 5, 2013.

Board of Governors of the Federal Reserve System, "2019 Interchange Fee Revenue Covered Issuer Costs, and Covered Issuer and Merchant Fraud Losses Related to Debit Card Transactions," May 2021.

Board of Governors of the Federal Reserve System, "Economic Well-Being of U.S. Households in 2020," May 2021.

Board of Governors of the Federal Reserve System, "Report to the Congress on the Profitability of Credit Card Operations of Depository Institutions – July 2018," 2018.

Bureau of Consumer Financial Protection, "Card Act Report," October 1, 2013.

Bureau of Consumer Financial Protection, "The Consumer Credit Card Market," December 2015.

Bureau of Consumer Financial Protection, "The Consumer Credit Card Market," December 2017.

Bureau of Consumer Financial Protection, "The Consumer Credit Card Market," August 2019.

Bureau of Consumer Financial Protection, "The Consumer Credit Card Market," September 2021.

Darryl E. Getter, "Regulation of Debit Interchange Fees," Congressional Research Service, R41913, May 16, 2017.

Federal Deposit Insurance Corporation, "Credit and Debit Card Billing Issues: What You Need to Know," October 2018.

Federal Deposit Insurance Corporation, "Credit Cards–General Overview," *Risk Management Examination Manual of Credit Card Activities*, March 2007.

Federal Deposit Insurance Corporation, "Glossary," *Risk Management Examination Manual of Credit Card Activities*, March 2007.

Federal Reserve System, "Final Rule, Regulation II, Debit Card Interchange Fees and Routing," July 20, 2011.

Federal Trade Commission, "Credit, Debit, and Charge Cards," August 2012.

Fumiko Hayashi, "Do U.S. Consumers Really Benefit from Payment Card Rewards?," Economic Review, Federal Reserve Bank of Kansas City, First Quarter 2009, 37-63.

Julian Alcazar and Terri Bradford, "The Appeal and Proliferation of Buy Now, Pay Later: Consumer and Merchant Perspectives," Federal Reserve Bank of Kansas City, November 10, 2021.

10

Marie-Hélène Felt, Fumiko Hayashi, Joanna Stavins, and Angelika Welte, "Distributional Effects of Payment Card Pricing and Merchant Cost Pass-through in the United States and Canada," *Research Working Papers*, No. 20-18, Federal Reserve Bank of Kansas City, December 2020.

Office of the Comptroller of the Currency, Comptroller's Handbook, "Merchant Processing," Version 1.0, August 2014.

Oz Shy, "How Many Cards Do You Use?," *Research Department Working Papers*, No. 13-13, Federal Reserve Bank of Boston, 2013.

Philip Lowe, "Address to Visa International Australia and New Zealand Member Forum," *Reserve Bank of Australia: Reform of the Payments System Speech*, March 2, 2005.

Reserve Bank of Australia, "Reform of Australia's Payments System – Preliminary Conclusions of the 2007/08 Review," April 2008.

Robin A. Prager, Mark D. Manuszak, Elizabeth K. Kiser, and Ron Borzekowski, "Interchange Fees and Payment Card Networks: Economics, Industry Developments, and Policy Issues," *Finance and Economics Discussion Series*, No. 2009-23, Board of Governors of the Federal Reserve System, 2009.

Scott Schuh, Oz Shy, and Joanna Stavins, "Who Gains and Who Loses from Credit Card Payments? Theory and Calibrations," *Public Policy Discussion Papers*, No. 10-03, Federal Reserve Bank of Boston, 2010.

Stan Sienkiewicz, "Credit Cards and Payment Efficiency," *Consumer Finance Institute Discussion Papers*, No. 01-02, Federal Reserve Bank of Philadelphia, 2001.

Tom Akana, "Discussion Paper – Consumer Payment Preferences and the Impact of Technology and Regulation: Insights from the Visa Payment Panel Study," *Consumer Finance Institute Discussion Papers*, No. 19-01, Federal Reserve Bank of Philadelphia, February 2019.

U.S. Bureau of Economic Analysis, *National Data: National Income and Product Accounts*, 2022.

U.S. Department of Agriculture, Food Nutrition Service, "What is Electronic Benefits Transfer (EBT)?" August 26, 2022.

U.S. Department of Justice and the Federal Trade Commission, "Horizontal Merger Guidelines," August 19, 2010.


Market Research

Derek Longhini, "Credit Card Issuing in the US," IBISWorld, Industry Report 52221, July 2021.

FTSE Russell, "Industry Classification Benchmark (ICB)," 2022.

"Retailers use 'decoy effect' to lure consumers into buying pricier products: study," UCB Sauder School of Business, August 9, 2021.

Marley Brocker, "Credit Card Processing & Money Transferring in the US," IBISWorld, Industry Report 52232, January 2022.

The Nilson Report, No. 1022, July 2013.

The Nilson Report, No. 1041, May 2014.

The Nilson Report, No. 1065, June 2015.

The Nilson Report, No. 1080, February 2016.

HIGHLY CONFIDENTIAL

The Nilson Report, No. 1103, February 2017.

The Nilson Report, No. 1109, May 2017.

The Nilson Report, No. 1124, January 2018.

The Nilson Report, No. 1125, February 2018.

The Nilson Report, No. 1131, May 2018.

The Nilson Report, No. 1146, January 2019.

The Nilson Report, No. 1147, February 2019.

The Nilson Report, No. 1155, June 2019.

The Nilson Report, No. 1168, January 2020.

The Nilson Report, No. 1176, May 2020.

The Nilson Report, No. 1191, February 2021.

The Nilson Report, No. 1201, July 2021.

The Nilson Report, No. 1204, September 2021.

The Nilson Report, No. 1210, December 2021.

The Nilson Report, No. 1213, December 2022.

The Nilson Report, No. 1214, February 2022.

The Nilson Report, No. 1216, March 2022.

The Nilson Report, No. 1218, April 2022.

News Articles

AnnaMaria Andriotis, "Travel Bans Take Shine Off Banks' Premium Rewards Cards," *The Wall Street Journal*, June 28, 2020.

Thomas H. Davenport, Leandro DalleMule, and John Lucker, "Know What Your Customers Want Before They Do," *Harvard Business Review*, December 2011.

Hugh Son, "The credit card wars are heating up again as Citigroup takes on JPMorgan with new 5% cash-back card," CNBC, June 10, 2021.

Kevin Wack, "Card issuers reliant on miles, hotel rewards await travel rebound," American Banker, March 22, 2021.

Jennifer Surane, "Credit-Card Giants Shrug Off Rising Buy-Now, Pay-Later Threat," Bloomberg, October 22, 2021.

Devin Leonard and Elizabeth Dexheimer, "How Bad Will It Get for American Express?," Bloomberg, October 15, 2015.

Maurie Backman and Jack Caporal, "Study: Buy Now, Pay Later Services Grow in Popularity," The Ascent, July 18, 2022.

Publicly Available Data

Reserve Bank of Australia, *Retail Payment Statistics, C3: Average Merchant Fees for Debit, Credit and Charge Cards.* Available at: https://www.rba.gov.au/payments-and-infrastructure/resources/payments-data.html.

## Websites

"US Law for the Tussle Between Different Modes of Payment," Confessions of a Supply-Side Liberal, November 17, 2015.

Salesforce, "What is Upselling."

American Express, "OptBlue FAQs."

Circle K website.

Mastercard, "U.S. Merchant Class Settlement Frequently Asked Questions - Merchant Surcharge."

Nathan Layne, "Wal-Mart's drug problem: pharmacy business drags on profit," Reuters Business News, August 18, 2015.

Reserve Bank of Australia, "Payments Data." Available at: https://www.rba.gov.au/payments-and-infrastructure/resources/payments-data.html.

# Appendix C

**Appendix C**
**Summary of Relevant States and Class Periods**

| Relevant State | Class Period |
|---|---|
| Alabama | January 29, 2015–June 1, 2022 |
| District of Columbia | January 29, 2015–June 1, 2022 |
| Hawaii | January 29, 2015–June 1, 2022 |
| Kansas | January 29, 2016–June 1, 2022 |
| Maine | January 29, 2015–June 1, 2022 |
| Mississippi | January 29, 2016–June 1, 2022 |
| North Carolina | January 29, 2015–June 1, 2022 |
| Oregon | January 29, 2015–June 1, 2022 |
| Utah | January 29, 2015–June 1, 2022 |
| Vermont | June 17, 2016–June 1, 2022 |
| West Virginia | January 29, 2015–June 1, 2022 |
| Illinois | January 29, 2016–June 1, 2022 |
| Montana | January 29, 2017–June 1, 2022 |
| Ohio | January 29, 2017–June 1, 2022 |

Source: February 2022 Hammarskjold Letter.

# Appendix D

**Appendix D**
**Summary of Qualified Merchants**

| No. | Qualified Merchant | Retail Store, Brand, or Banner |
|---|---|---|
| 1 | Academy Sports and Outdoors, Inc. | Academy Sports + Outdoors |
| 2 | Advance Auto Parts, Inc. | Advance Auto Parts; Autopart International; Carquest; Worldpac |
| 3 | Albertsons Companies, Inc. | Acme (Acme Markets); Albertsons; Balducci's Food Lovers Market; Carrs; Haggen; Jewel-Osco; Kings Food Markets; Market Street; Pavilions; Randalls; Safeway; Shaw's; Star Market; Tom Thumb; United Supermarkets |
| 4 | American Eagle Outfitters, Inc. | Aerie; American Eagle Outfitters; Tailgate; Todd Snyder New York |
| 5 | Bed Bath & Beyond Inc. | Bed Bath & Beyond; buybuy BABY; Chef Central; Cost Plus; Cost Plus World Market; Decorist; Face Values; Harmon; Harmon Face Values; Harmon Health and Beauty; Linen Holdings; Of a Kind; One Kings Lane; PersonalizedMall.com ("PMall"); T-Y Group; World Market |
| 6 | Best Buy Co., Inc. | Best Buy; Best Buy Business; Best Buy Direct; Best Buy Express; Best Buy Health; BioSensics; Critical Signal Technologies, Inc. ("CST"); Geek Squad; GreatCall; Lively; Magnolia; Pacific Kitchen and Home |
| 7 | Big Lots, Inc. | Big Lots |
| 8 | BI-LO, LLC | BI-LO (BI-LO Inc., not Bi-Lo Foods, Inc.) |
| 9 | BJ's Wholesale Club Holdings, Inc. | BJ's Wholesale Club |
| 10 | Burlington Stores, Inc. | B; Baby Depot; BCF; Burlington; Burlington Coat Factory; Burlington Stores; Cohoes; Luxury Linens; MJM Designer Shoes |
| 11 | Camping World Holdings, Inc. | Camping World; Good Sam Club |
| 12 | Circle K Stores, Inc. | Circle K |
| 13 | CVS Health Corporation | CVS; CVS Health; CVS Pharmacy; CVS Specialty; HealthHUB; Longs Drugs; MinuteClinic; Navarro Discount Pharmacy; Navarro Health Services; OmniCare |
| 14 | Dick's Sporting Goods, Inc. | Dick's Sporting Goods; Field & Stream; GameChanger; Golf Galaxy; True Runner |
| 15 | Foot Locker, Inc. | Foot Locker |
| 16 | GameStop Corp. | GameStop |
| 17 | The Gap, Inc. | Athleta; Baby Gap; Banana Republic; Gap; Gap Kids; Hill City; Intermix; Janie and Jack; Old Navy; Piperlime; Weddington Way |
| 18 | H&M Hennes & Mauritz Ab | H&M; COS; H&M Home; "& other stories" |
| 19 | The Home Depot, Inc. | Home Depot; The Home Depot Pro |
| 20 | Hy-Vee, Inc. | Hy-Vee |
| 21 | Ikea, Inc. | Ikea |
| 22 | Kohl's Corporation | Kohl's |
| 23 | The Kroger Co. | Kroger |
| 24 | Lowe's Companies, Inc. | Lowe's |
| 25 | Meijer, Inc. | Meijer |
| 26 | Michaels Stores, Inc. | Michaels |
| 27 | Publix Super Markets, Inc. | Publix Super Markets |
| 28 | Rite Aid Corporation | Rite Aid |
| 29 | Ross Stores, Inc. | dd's DISCOUNTS; Ross Dress for Less |
| 30 | Sprouts Farmers Market, Inc. | Sprouts Farmers Market |

**Appendix D**
**Summary of Qualified Merchants**

| No. | Qualified Merchant | Retail Store, Brand, or Banner |
|---|---|---|
| 31 | Target Corporation | Target |
| 32 | The TJX Companies, Inc. | HomeGoods; Marmaxx; Marshalls; T.J. Maxx |
| 33 | Tractor Supply Company | Del's Feed & Farm Supply; HomeTown Pet; Petsense; Tractor Supply Company |
| 34 | Ulta Beauty, Inc. | Ulta; Ulta Beauty; Ulta Salon, Cosmetics & Fragrance |
| 35 | United Natural Foods, Inc. (parent of Supervalu) | Cub Foods; Hornbacher's; Save-a-Lot; Shop 'n Save; Shoppers Food & Pharmacy; SuperValu |
| 36 | Walgreens Boots Alliance, Inc. | Duane Reade; Walgreens |
| 37 | Walmart Inc. | Walmart; Sam's Club |
| 38 | Williams-Sonoma, Inc. | Mark and Graham; Outward; PBteen; Pottery Barn; Pottery Barn Kids; Pottery Barn Teen; Rejuvenation; West Elm; Williams Sonoma; Williams Sonoma Home |

Source: United States District Court Eastern District of New York, Anthony Oliver, et al., Plaintiffs, v. American Express Company, et al., Defendants, Plaintiffs' Fourth Set of Requests for Production of Documents Directed to Defendants American Express Company and American Express Travel Related Services Company, Inc., No. 1:19-cv-00566-NGG-SJB, April 29, 2022; United States District Court Eastern District of New York, Anthony Oliver, et al., Plaintiffs, v. American Express Company, et al., Defendants, Subpoena to Mastercard, Inc. to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action, No. 1 19-cv-00566-NGG-SJB, June 13, 2022; United States District Court Eastern District of New York, Anthony Oliver, et al., Plaintiffs, v. American Express Company, et al., Defendants, Subpoena to Visa Inc. to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action, No. 1:19-cv-00566-NGG-SJB, June 9, 2022.