UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANTHONY OLIVER, TERRY GAYLE QUINTON, SHAWN O'KEEFE, ANDREW AMEND, SUSAN BURDETTE, GIANNA VALDES, DAVID MOSKOWITZ, ZACHARY DRAPER, NATE THAYER, MICHAEL THOMAS REID, ALLIE STEWART, ANGELA CLARK, JOSEPH REALDINE, RICKY AMARO, ABIGAIL BAKER, JAMES ROBBINS IV, EMILY COUNTS, DEBBIE TINGLE, NANCI-TAYLOR MADDUX, SHERIE MCCAFFREY, MARILYN BAKER, WYATT COOPER, ELLEN MAHER, SARAH GRANT and GARY ACCORD on behalf of themselves and all others similarly situated, | Case No. 1:19-cv-00566-NGG-SJB<br><br>Date Served: January 16, 2023<br><br>**Oral argument requested** |
| Plaintiffs, | |
| -against- | |
| AMERICAN EXPRESS COMPANY and AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, INC., | |
| Defendants. | |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

**HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER**

**PUBLIC REDACTED VERSION**

TABLE OF CONTENTS

Page

I.     PRELIMINARY STATEMENT ...................................................................................1

II.    FACTUAL BACKGROUND ......................................................................................5

III.   ARGUMENT ............................................................................................................10

       A.    Plaintiffs Cannot Satisfy the Rule 23(b) Requirement of Predominance. .............11

             1.    Plaintiffs' "Cross-Subsidization" Theory Undermines Any Claim of Class-wide Injury and Common Impact. .............................................................12

             2.    Plaintiffs Cannot Establish Their Multi-Step Theory of Harm Through Common Proof. ..............................................................................................13

             3.    Dr. Lamb's Damages Methodology Does Not Satisfy *Comcast*. .............31

       B.    Plaintiffs Cannot Satisfy the Rule 23(a) Requirement of Adequacy. ...................38

             1.    Named Plaintiffs Are Inadequate Representatives for the Classes in Which No Named Plaintiff Is a Member. ..............................................................39

             2.    Named Plaintiffs Are Inadequate Because of Their Relationships with Class Counsel and Lack of Understanding of the Case. ...........................40

             3.    Named Plaintiffs Who Were Account Holders or Authorized Users of Amex Cards Are Not Adequate Representatives. .....................................42

       C.    Because Plaintiffs Cannot Know the State Where Transactions Occurred, They Cannot Satisfy the Ascertainability or Predominance Requirements. ..................43

IV.    CONCLUSION ........................................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amchem Prods., Inc. v. Windsor,*
    521 U.S. 591 (1997)................................................................................11, 38

*Avery v. State Farm Mut. Auto. Ins. Co.,*
    835 N.E.2d 801 (Ill. 2005) .......................................................................45

*Bakalar v. Vavra,*
    237 F.R.D. 59 (S.D.N.Y. 2006) ...............................................................10

*Blades v. Monsanto,*
    400 F.3d 562 (8th Cir. 2005) ..............................................................15, 27

*Burka v. N.Y.C. Transit Auth.,*
    110 F.R.D. 595 (S.D.N.Y. 1986) .........................................................39, 40

*Comcast Corp. v. Behrend,*
    569 U.S. 27 (2013)........................................................................11, 31, 33

*Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.,*
    502 F.3d 91 (2d Cir. 2007).......................................................................11

*Cuevas v. Citizens Fin. Grp., Inc.,*
    526 F. App'x 19 (2d Cir. 2013) ...............................................................11

*Danvers Motor Co. v. Ford Motor Co.,*
    543 F.3d 141 (3d Cir. 2008).....................................................................12

*DDMB, Inc. v. Visa, Inc.,*
    No. 05-MD-1720, 2021 WL 622136 (E.D.N.Y. Sep. 27, 2021)................40

*E. Texas Motor Freight Sys. Inc. v. Rodriguez,*
    431 U.S. 395 (1977).................................................................................38

*Gordon v. Sonar Cap. Mgmt. LLC,*
    92 F. Supp. 3d 193 (S.D.N.Y. 2015).........................................................40

*In re Aluminum Warehousing Antitrust Litig.,*
    336 F.R.D. 5 (S.D.N.Y. 2020) ........................................................ *passim*

*In re Am. Express Anti-Steering Rules Antitrust Litig.,*
    433 F. Supp. 3d 395 (E.D.N.Y. 2020) ........................................................1

*In re Class 8 Transmission Indirect Purchaser Antitrust Litig.*,
   679 F. App'x (3d Cir. 2017) ...................................................................35, 36

*In re Class 8 Transmission Indirect Purchaser Antitrust Litig.*,
   140 F. Supp. 3d 339 (D. Del. 2015).......................................................34, 36

*In re IMAX Sec. Litig.*,
   272 F.R.D. 138 (S.D.N.Y. 2010) ...........................................................38, 40

*In re Indus. Diamonds Antitrust Litig.*,
   197 F.R.D. 374 (S.D.N.Y. 1996) ...................................................................20

*In re Initial Pub. Offerings Sec. Litig.*,
   471 F.3d 24 (2d Cir. 2006)......................................................................10, 11

*In re Lamictal Direct Purchaser Antitrust Litig.*,
   957 F.3d 184 (3d Cir. 2020)................................................................. *passim*

*In re Lamictal Indirect Purchaser & Antitrust Consumer Litig.*,
   No. 12-CV-00995, 2018 WL 6567709 (D.N.J. Dec. 18, 2018)...................13

*In re Lamictal Indirect Purchaser Antitrust Litig.*,
   No. 12-995, 2021 WL 2349828 (D.N.J. June 7, 2021)................................14

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
   299 F. Supp. 3d 430 (S.D.N.Y. 2018).........................................................38

*In re Literary Works in Elec. Databases Copyright Litig.*,
   654 F.3d 242 (2d Cir. 2011).........................................................................38

*In re Namenda Indirect Purchaser Antitrust Litig.*,
   338 F.R.D. 527 (S.D.N.Y. 2021) ...........................................................11, 12

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
   986 F. Supp. 2d 207 (E.D.N.Y. 2013) ..........................................................9

*In re Petrobras Sec.*,
   862 F.3d 250 (2d Cir. 2017).....................................................................10, 43

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
   725 F.3d 244 (D.C. Cir. 2013) .....................................................................29

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
   934 F.3d 619 (D.C. Cir. 2019) .....................................................................11

*IQ Dental Supply, Inc. v. Henry Schein, Inc.*,
   924 F.3d 57 (2d Cir. 2019)...........................................................................27

*Irvin v. Harris*,

944 F.3d 63 (2d Cir. 2019)............................................................................39, 40

*Jacob v. Duane Reade, Inc.*,
293 F.R.D. 578 (S.D.N.Y. 2013) ...............................................................11, 12, 31

*Langan v. Johnson & Johnson Consumer Cos., Inc.*,
897 F.3d 88 (2d Cir. 2018)................................................................................39

*Marisol A. v. Giuliani*,
126 F.3d 372 (2d Cir. 1997)............................................................................39

*Maywalt v. Parker & Parsely Petroleum Co.*,
67 F.3d 1072 (2d Cir. 1995)............................................................................40

*Oliver v. Am. Express Co.*,
No. 19-CV-566, 2020 WL 2079510 (E.D.N.Y. Apr. 30, 2020) ................................1

*Rivera v. Google Inc.*,
238 F. Supp. 3d 1088 (N.D. Ill. 2017) ............................................................45

*Seijas v. Republic of Argentina*,
606 F.3d 53 (2d Cir. 2010)..............................................................................12

*Spagnola v. Chubb Corp.*,
264 F.R.D. 76 (S.D.N.Y. 2010) ......................................................................40

*Susman v. Lincoln Am. Corp.*,
561 F.2d 86 (7th Cir. 1977) ............................................................................40

*Sykes v. Mel S. Haris & Assocs. LLC*,
780 F.3d 70 (2d Cir. 2015)..............................................................................29

*United States v. Am. Express Co.*,
838 F.3d 179 (2d Cir. 2016)..............................................................................5

*United States v. Am. Express Co.*,
No. 10-CV-04496, 2011 WL 2974094 (E.D.N.Y. July 20, 2011)..............................9

*Value Drug Co. v. Takeda Pharms., U.S.A., Inc.*,
No. CV 21-3500, 2022 WL 17177267 (E.D. Pa. Nov. 23, 2022).................... *passim*

*Verheecke ex rel. Hinckley v. Jones*,
No. 09-CV-4066, 2010 WL 1241829 (C.D. Ill. Mar. 19, 2010)..............................45

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)........................................................................................39

*Wang v. Tesla*,
338 F.R.D. 428 (E.D.N.Y. 2021) ....................................................................45

**Statutes & Rules**

Fed. R. Civ. P. 23 ................................................................................... *passim*

D.C. Code § 26-131.08 (2022) ...........................................................................16

Me. Stat. tit. 9-A § 8-509 (2022) .......................................................................16

**Other Authorities**

Reserve Bank of Australia, *A Variation to the Surcharging Standards:  Final Reforms and Regulation Impact Statement* (June 2012) ...........................................................9

Kateryna Occhiutto, Reserve Bank of Australia, *The Cost of Card Payments for Merchants* (Mar. 2020) ................................................................................10, 23

Finextra, *Why the Real Beneficiaries of the Durbin Amendment Are Networks and Acquirers* (Mar. 9, 2015) ....................................................................................23

Reserve Bank of Australia, *Reform of Australia's Payment Systems:  Preliminary Conclusions from the 2007/08 Review* § 5.2.1 (Apr. 2008).................................10, 37

Todd J. Zywicki et al., *Price Controls on Payment Card Interchange Fees:  The U.S. Experience*........................................................................................................23

# I.     PRELIMINARY STATEMENT

In this putative class action, Plaintiffs seek to certify 24 statewide debit and credit card classes, comprised of Visa, Mastercard or Discover credit or debit cardholders who reside in one of twelve specified states, and who used their non-Amex cards to make purchases at one or more of the 38 "Qualifying Merchants" in the same state as their card account billing address within the relevant class periods.  Plaintiffs allege that Amex's non-discrimination provisions ("NDPs") have caused all four networks (Amex, Visa, Mastercard and Discover) to inflate the merchant fees charged on general purpose credit and charge card ("GPCC") transactions, which merchants passed on in the form of higher retail prices, thereby harming Plaintiffs.

As this Court recognized nearly three years ago, Plaintiffs' case rests on a "highly speculative" theory of harm.  *Oliver v. Am. Express Co.*, No. 19-CV-566, 2020 WL 2079510, at *11 (E.D.N.Y. Apr. 30, 2020).  In particular, Plaintiffs' claims "involve assessing the pricing decision on Amex's non-party competitors, all of whom are competing against one another as well as against Amex on both sides of the two-sided market." *Id.* (quoting *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 433 F. Supp. 3d 395, 412 (E.D.N.Y. 2020)).  Such an assessment implicates a number of considerations:  "how much steering would occur if merchants accepting Amex cards were permitted to engage in it?  What effect would this have on Amex's merchant fees?  What effect would any change in Amex's merchant fees have on the decisions of its competitors regarding their own merchant fees?"  And—"most important[ly]"— "how these decisions would trickle over into the retail costs charged to non-Amex consumers". *Id.*

Because Plaintiffs' theory of antitrust injury turns on an attenuated causal chain implicating the independent decisions of at least five groups of economic actors—merchants, consumers, issuers, acquirers and networks—Plaintiffs cannot prove class-wide injury with

common proof and thus cannot satisfy Federal Rule of Civil Procedure 23(b).  For example:

- In Plaintiffs' but-for world, some class members will pay surcharges when they use their preferred credit card or they will be forced to use a less-preferred form of payment and lose rewards and other benefits.  Paying a 2% surcharge on a transaction, or losing 1% in rewards when steered from a 3% cashback card to a 2% cashback card, will necessarily overwhelm the amount—approximately 0.1% of each transaction—that Plaintiffs conclude consumers will save in the form of lower retail prices.  Those putative class members will be harmed in the but-for world, even if others gain.

- Plaintiffs affirmatively argue that, by virtue of the NDPs, some class members (those who pay with debit or low-rewards credit cards) "cross-subsidize" other class members with premium high rewards credit cards.  This means that, on Plaintiffs' own theory, some class members will be benefitted if steering is permitted and others will be harmed; that is the exact opposite of class-wide injury.

- There are thousands of issuers that offer payment cards with different rewards, fees and discount rates charged to merchants.  Yet Plaintiffs assume that a small issuer offering a no-fee, low-rewards card would react to reduced discount rates in exactly the same way that a large issuer with a high-fee, high-rewards card would.  There is no basis for this assumption.  If some issuers respond to reduced discount revenue by increasing fees or lowering rewards—as the real-world evidence suggests they will—then some consumers (and class members) will be harmed in the but-for world.

Plaintiffs try to wish away some of their class certification problems by focusing only on purchases at the 38 Qualifying Merchants, which are large retailers with relatively low profit margins.  However, in Plaintiffs' but-for world, class members will not just shop at the Qualifying Merchants—they will also shop at and be affected by transactions at all other merchants who will be permitted to engage in steering absent the NDPs.  Some of these are small merchants who are very unlikely to either benefit from lower discount rates or pass on any savings to consumers.  Many of them are also much more likely to impose surcharges that harm class members in amounts that would swamp any possible cost savings.  And, in any event, focusing on the Qualifying Merchants does not solve Plaintiffs' problem because there are significant sources of heterogeneity even among the Qualifying Merchants.  For instance, many but not all of the Qualifying Merchants currently have cobrand credit cards with Visa or Mastercard,

██████████████████████████████████████████████████████

██████████████████████████████████████████. It is implausible to suggest, as Plaintiffs do, that these merchants' fees would go down if the NDPs were eliminated. Consumers who predominantly shop at Qualifying Merchants with cobrand cards will thus be affected differently than consumers who predominantly shop at other Qualifying Merchants.

Moreover, Plaintiffs' expert—Dr. Russell Lamb—has developed a damages model that improperly masks uninjured class members by relying on averages and implausible assumptions. As one example, Dr. Lamb's model implausibly presumes that the discount rates for all Qualifying Merchants will decrease by the same amount and that all Qualifying Merchants will pass through the cost savings associated with reduced discount rates at a uniform rate of 90%. ████████████████████████████████████████, Dr. Lamb's assumption of a uniform discount-rate reduction in the but-for world means that some merchants (such as ███████) would have *negative* discount rates with some networks—that is, Dr. Lamb postulates that ████████ would pay ████████ for the processing of credit card transactions, rather than the other way around. In addition, Dr. Lamb takes his 90% pass-through rate from a working paper that had nothing to do with reductions in interchange fees, and Dr. Lamb did nothing to test whether this rate was a reasonable number even for the Qualifying Merchants, much less for other merchants. This and the many other issues discussed below make clear that Plaintiffs have failed to satisfy Rule 23(b)'s predominance requirement.

Plaintiffs have also failed to satisfy the adequacy requirement set forth in Rule 23(a). To start, there are several classes—the Hawaii Credit and Debit classes, the Alabama Credit and Oregon Credit classes and the Vermont Debit class—for which there is no Named Plaintiff and for which a class therefore cannot be certified. In addition, all the Named Plaintiffs are

inadequate representatives because—as described in greater detail in Appendix A to this brief—they have close, personal relationships with class counsel and little to no understanding of this case.  There is thus ample reason to doubt that any of the Named Plaintiffs could demonstrate the "independent judgment" necessary to serve as class representatives.  Moreover, at least one of the Named Plaintiffs (a class representative for Mississippi) is not a member of any putative class because she is an authorized user of an Amex card, and Plaintiffs excluded such individuals from their class definition.  There is a similar problem with the class representative for the Vermont Credit class.

Finally, because Plaintiffs have no way of knowing the state where any transactions occurred, Plaintiffs cannot satisfy the ascertainability or predominance requirements. Membership in Plaintiffs' putative classes turns on whether potential class members made a purchase in the same state as their credit or debit card account's billing address, yet Plaintiffs' expert lacks the data to know whether consumers and merchants were located in the same state. Plaintiffs claim that individuals will themselves know if they qualify as class members, but this too is wrong.  Where a transaction has been "made" is a complicated question of state law that varies across jurisdictions, particularly for online transactions, and will turn on the specific facts and circumstances of a transaction.  Thus, even if this issue does not render the class unascertainable, it at the very least means that Plaintiffs have failed to establish predominance, as Plaintiffs have not even acknowledged the state law issues implicated by their class definition, let alone shown that common questions will predominate.

Because Plaintiffs cannot establish that common questions predominate over individualized inquiries, cannot establish that the Named Plaintiffs are adequate representatives and have failed to construct an ascertainable class, Plaintiffs' motion must be denied.

## II.    FACTUAL BACKGROUND

Given this Court's familiarity with the issues presented in suits challenging Amex's NDPs, this section focuses on the facts most pertinent to resolving Plaintiffs' present motion.

1.  The credit and debit card industries operate two-sided platforms, with merchants on one side of the platform and cardholders on the other.  (Declaration of Peter T. Barbur ("Barbur Decl.") Ex. 1 (⬛⬛⬛⬛⬛⬛⬛⬛); Declaration of Todd A. Seaver ("Seaver Decl.") Ex. A (Lamb Rpt. ¶ 56).)  In this industry, there are thousands of credit and debit card issuers—financial institutions that issue cards to cardholders, *United States v. Am. Express Co.*, 838 F.3d 179, 184-85 (2d Cir. 2016)—whose products vary based on rewards, cardholder fees, benefits and merchant fees.  (*See* Seaver Decl. Ex. A (Lamb Rpt. ¶ 13); Barbur Decl. Ex. 2 (Lamb Tr. at 190:25-191:6); Barbur Decl. Ex. 3 (⬛⬛⬛⬛⬛⬛⬛).)  Acquirers allow merchants to accept credit and debit cards and make payments to merchants.  (Barbur Decl. Ex. 4 (AMEX-CP-000077415 at -420).)  The networks sit in the middle and facilitate the transactions.  (*Id.*)

2.  Unlike many issuing banks, Amex operates a "spend-centric" model, which means that the majority of Amex's revenue is driven by the discount rate that merchants pay on Amex card transactions.  (Barbur Decl. Ex. 5 (Gagliardi Tr. at 79:3-11); Barbur Decl. Ex. 6 (Gantman Tr. at 26:4-16); Barbur Decl. Ex. 7 (AMEX-CP-000083265 at -277).)  Banks issuing Visa and Mastercard products, by contrast, have a "lend-centric" model, meaning that they make most of their money through interest charges on revolving credit.  (Barbur Decl. Ex. 7 (AMEX-CP-000083265 at -277); Barbur Decl. Ex. 6 (Gantman Tr. at 62:2-7).)  Because of Amex's spend-centric model, Amex depends more on discount revenue to fund rewards and other cardholder benefits.  (*See* Barbur Decl. Ex. 8 (AMEX-CP-000083790 at -791 (showing rewards expense expressed as a percentage of billing revenue)).)  If discount revenue declines, Amex would have

an even greater need to lower the incentives and value propositions it offers to customers.  (*See, e.g.*, Barbur Decl. Ex. 9 (AMEX-CP-000052339 at -435, -440 to -441 (Stocks Tr. at 97:5-11, 102:4-103:13)).)

3.  Unlike Visa and Mastercard, Amex operates a "closed-loop" model, meaning that Amex often serves as the issuer, acquirer and network.  (Barbur Decl. Ex. 10 (AMEX-CP-000095029 at -040 to -041).)  Visa and Mastercard, by contrast, operate an open-loop system, involving the network, issuing banks, acquiring banks, merchants and consumers.  (Seaver Decl. Ex. A (Lamb Rpt. ¶¶ 43, 46, Figure 5).)  Under Visa and Mastercard's model, the networks publish a set of fees and interchange rates ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮ (*See, e.g.*, Barbur Decl. Ex. 11 (AMEX-CP-000080891 at -897); Seaver Decl. Ex. A (Lamb Rpt. ¶¶ 43-44).)  The interchange rates are set by the networks but paid to issuing banks. (Seaver Decl. Ex. A (Lamb Rpt. ¶¶ 43-44).)  The merchant fees also include a network fee (which is paid to the networks) and an acquirer margin (which is paid to the acquirers).  (Barbur Decl. Ex. 12 (Ouellette Tr. at 19:10-21); Seaver Decl. Ex. A (Lamb Rpt. ¶¶ 43-44).)

4.  Amex's NDPs encourage "welcome acceptance" and eliminate practices that would discourage cardholders from using their Amex at the point of sale.  (Barbur Decl. Ex. 5 (Gagliardi Tr. at 79:3-80:17, 81:15-82:5); Barbur Decl. Ex. 13 (AMEX-CP-000099293 at -325).)  Under the NDPs, merchants agree not to discriminate against Amex cardholders (orally, with signage or through differential pricing) as compared to customers who use other payment forms, or to engage in conduct that harms the Amex cardholder's experience or denigrates Amex's brand.  (Seaver Decl. Ex. C (Amex Merchant Reference Guide (Apr. 2022) § 3.2).)  The NDPs prohibit both "differential surcharging"—*i.e.*, imposing a different surcharge based on credit card brand or type—and "parity surcharging"—*i.e.*, imposing an equal surcharge on all forms of

GPCC but not on debit.  (Barbur Decl. Ex. 14 (AMEX-CP-000094461 at -464, 468).)

5.  When deciding whether to surcharge credit products, merchants must weigh the surcharge revenue they would obtain plus any savings they might gain by steering customers to debit or cash against the risk that consumers will walk away from the transaction or refuse to return to the merchant.  (Barbur Decl. Ex. 15 (Gaier Rpt. ¶ 23); Barbur Decl. Ex. 16 (Emch Rpt. § V.B.1).)  Losses from walk aways can easily exceed any savings a merchant might realize from surcharging.  (Barbur Decl. Ex. 14 (Gaier Rpt. ¶ 23); Barbur Decl. Ex. 16 (Emch Rpt. § V.B.1); Barbur Decl. Ex. 17 (AMEX-CP-000094579 at -584); Barbur Decl. Ex. 18 (AMEX-CP-000094540 at -551, -553, -554).)

The decision of whether to steer also turns on the nature and degree of the price differential among the various payment products.  It only makes sense to steer from one payment product to another if there is a significant price difference between the two.  However, since the time of the DOJ trial in 2014, ███████████████████████████████████████████ ███████████████████████████████████████ (Barbur Decl. Ex. 19 (AMEX-CP-000094308 at -308); Seaver Decl. Ex. F (AMEX-CP-000094309 at -314); Barbur Decl. Ex. 20 (AMEX-CP-000068126 at -136).)  For example, ███████████████████ ████████████████████████████████████████████ ███████████████████████████.  (Barbur Decl. Ex. 21 (AMEX-CP-000094281 at 17, 19); Barbur Decl. Ex. 10 (AMEX-CP-000095029 at -065).)

6.  Since the time of the DOJ trial, Amex has also effectively closed the "merchant coverage gap"—that is, virtually all merchants that accept Visa and Mastercard now also accept Amex.  (Barbur Decl. Ex. 22 (AMEX-CP-000094935 at -975); Barbur Decl. Ex. 23 (AMEX-CP-000094671 at -698 to -699).)  Amex's success in closing the acceptance gap is attributable in

large measure to the OptBlue program, which Amex launched in 2014 to increase card acceptance among small merchants.  (Barbur Decl. Ex. 24 (AMEX-CP-000064973 at -009); Barbur Decl. Ex. 5 (Gagliardi Tr. at 21:16-22:2); Barbur Decl. Ex. 25 (AMEX-CP-000067581 at -585); Barbur Decl. Ex. 26 (AMEX-CP-000068225 at -246).)  With OptBlue, Amex ceded control of pricing and contracting with merchants to third-party acquirers, who contract directly with merchants for Amex acceptance.  (Barbur Decl. Ex. 5 (Gagliardi Tr. at 21:2-10); Barbur Decl. Ex. 12 (Ouellette Tr. at 27:5-12).)  For OptBlue, Amex charges acquirers a wholesale rate ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.  (Barbur Decl. Ex. 12 (Ouellette Tr. at 28:13-17).)  The acquirers then charge some mark up on Amex's wholesale rates to merchants.  (*Id.* at 29:9-18.)  Amex does not know or influence the rates that acquirers charge merchants.  (*Id.* at 29:14-23, 26:13-17.)

7.  Even though merchant discount rates on GPCC are essentially uniform across the major networks, merchant acceptance fees for credit/charge products are significantly higher than for debit products.  (Barbur Decl. Ex. 27 (AMEX-CP-000095201 at -217).)  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.  (Barbur Decl. Ex. 14 (AMEX-CP-000094461 at -463); Barbur Decl. Ex. 28 (AMEX-CP-000094343 at 2-3).)  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.  (Barbur Decl. Ex. 28 (AMEX-CP-000094343 at 6); Barbur Decl. Ex. 18 (AMEX-CP-000094540 at -547).)  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

███████████████████████████. (Barbur Decl. Ex. 28 (AMEX-CP-000094343 at 2-3); Barbur Decl. Ex. 12 (Ouellette Tr. at 121:24-122:2).)

8. Although Amex's NDPs prohibit surcharging and steering by Amex-accepting merchants in the United States, there is real-world evidence of what happens when steering and surcharging are allowed. In the United States, Visa- and Mastercard-accepting merchants were allowed to begin steering (without differential surcharging) under those networks' rules in 2011 and to begin differentially surcharging in 2013. *United States v. Am. Express Co.*, No. 10-CV-04496, 2011 WL 2974094, at *3-4 (E.D.N.Y. July 20, 2011); *In re Payment Card Interchange Fee & Merch. Discount Antitrust Litig.*, 986 F. Supp. 2d 207, 217 (E.D.N.Y. 2013). Before Amex achieved parity coverage with Visa and Mastercard, there were nearly three million merchants that did not accept Amex and were free to steer or differentially surcharge. (*See* Barbur Decl. Ex. 29 (AMEX-CP-000067982 at -987).) Effectively none actually did so, and their merchant fees did not decline. (Barbur Decl. Ex. 15 (Gaier Rpt. ¶ 96).)

In addition, differential surcharging has been allowed in Australia since the early 2000s. (Barbur Decl. Ex. 30 (AMEXNDR00655707 at 2).) In that country—where Amex's rates have been and remain higher than its competitors'—differential surcharging became commonplace and has grown over time. (Barbur Decl. Ex. 14 (AMEX-CP-000094461 at -492); Barbur Decl. Ex. 31 (AMEX-DOJ-10041541 at -543).) Merchants in Australia also engage in excessive and abusive surcharging practices by, among other things, imposing surcharges that far exceed the costs of credit card acceptance. (Barbur Decl. Ex. 32 (Reserve Bank of Australia, *A Variation to the Surcharging Standards: Final Reforms and Regulation Impact Statement* (June 2012) at 1, 4-5).) As a result, the Reserve Bank of Australia ("RBA") tried to remedy the problem by imposing a cap on surcharges, *id.* at 1, and the Australian Parliament eventually implemented

legislation to curtail excessive surcharging (Barbur Decl. Ex. 33 (Competition and Consumer Amendment (Payment Surcharges) Act 2016).).  In the United Kingdom, too, merchants in the Travel and Entertainment ("T&E") industries engaged in excessive and abusive surcharging practices.  (Barbur Decl. Ex. 27 (AMEX-CP-000095201 at -207).)

When Australia authorized differential surcharging, it also capped Visa's and Mastercard's interchange rates.  (*Id.* at -206.)  Amex's discount rates fell as a result.  (Barbur Decl. Ex. 34 (Kateryna Occhiutto, RBA, *The Cost of Card Payments for Merchants* (Mar. 2020) at 22); Barbur Decl. Ex. 16 (Emch Rpt. ¶ 246).)  This decrease in discount revenue caused Amex to increase annual fees and reduce rewards on its credit card offerings in Australia.  (Barbur Decl. Ex. 9 (AMEX-CP-000052339 at -435, 440 to 441 (Stocks Tr. at 97:5-11, 102:4-103:13).)  More broadly, the RBA determined that "lower interchange fees in the Mastercard and Visa credit card systems [in Australia] resulted in a reduction in the value of rewards and higher annual fees" for cardholders writ large.  (Barbur Decl. Ex. 35 (RBA, *Reform of Australia's Payment Systems:  Preliminary Conclusions from the 2007/08 Review* § 5.2.1 (Apr. 2008).)

## III.   ARGUMENT

To obtain class certification, Plaintiffs must satisfy the four Rule 23(a) requirements—numerosity, commonality, typicality and adequacy of representation—as well as the Rule 23(b) requirements of predominance and superiority.  *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 32 (2d Cir. 2006).  Plaintiffs also must establish that the class is ascertainable, meaning that the class must be defined "using objective criteria that establish a membership with definite boundaries".  *In re Petrobras Sec.*, 862 F.3d 250, 264 (2d Cir. 2017).  It is Plaintiffs' burden to establish all of Rule 23's requirements, including predominance, adequacy and ascertainability, *Bakalar v. Vavra*, 237 F.R.D. 59, 63 (S.D.N.Y. 2006), and Plaintiffs must satisfy this burden

with actual "evidentiary proof", not just assumptions, *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). Here, Plaintiffs cannot satisfy the requirements of predominance, adequacy or ascertainability. Plaintiffs' motion should thus be denied.

### A.  Plaintiffs Cannot Satisfy the Rule 23(b) Requirement of Predominance.

The predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation". *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). "The predominance inquiry is a rigorous one." *Jacob v. Duane Reade, Inc.*, 293 F.R.D. 578, 592-93 (S.D.N.Y. 2013), *aff'd*, 602 F. App'x 3 (2d Cir. 2015). The court must "'assess all of the relevant evidence admitted at the class certification stage' and resolve all material disputed facts". *Cuevas v. Citizens Fin. Grp., Inc.*, 526 F. App'x 19, 22 (2d Cir. 2013) (quoting *In re Initial Pub. Offerings*, 471 F.3d at 42).

In an antitrust case, putative class plaintiffs must show that the existence of an antitrust violation and antitrust impact can be both established by common proof and measured on a class-wide basis. *See Comcast*, 569 U.S. at 30; *In re Namenda Indirect Purchaser Antitrust Litig.*, 338 F.R.D. 527, 551 (S.D.N.Y. 2021). "Antitrust injury 'poses two distinct questions': first, 'whether the plaintiff has indeed suffered harm, or injury-in-fact'; and second, 'whether any such injury is injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 44-45 (S.D.N.Y. 2020) (quoting *Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 106 (2d Cir. 2007)). "Without common proof of injury and causation, [antitrust] plaintiffs cannot establish predominance." *Id.* (quoting *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619, 623 (D.C. Cir. 2019)).

The putative class plaintiffs must also show that there are "measurable damages

attributable to a plaintiff's theory of liability". *Namenda*, 338 F.R.D. at 551. "This means that a damages estimate proffered by a plaintiff's expert must actually correspond to the specific theory of liability that plaintiffs advance." *Id.* Put differently, "there cannot be a mismatch between the injury and the remedy", *Jacob*, 293 F.R.D. at 587, and the damages estimate must "roughly reflect[] the aggregate amount owed to class members", *Namenda*, 338 F.R.D. at 552 (quoting *Seijas v. Republic of Argentina*, 606 F.3d 53, 58-59 (2d Cir. 2010)).

### 1. Plaintiffs' "Cross-Subsidization" Theory Undermines Any Claim of Class-wide Injury and Common Impact.

"The most fundamental prerequisite to certification of an antitrust class is the identification of a common methodology capable of allowing the trier of fact to determine that each member of the proposed class suffered antitrust injury and damages as a result of the challenged conduct." *Aluminum*, 336 F.R.D. at 45 (quoting 1 McLaughlin on Class Actions § 5:36 (16th ed.) (2019). Thus, because Plaintiffs theorize that some putative class members are harmed while others are benefitted by Amex's NDPs, Plaintiffs cannot secure class certification.

Dr. Lamb argues that Amex's NDPs cause some class members—*i.e.*, those who pay with "lower-cost" payment methods, like debit or low-rewards credit cards—to "cross-subsidize" other class members who use premium, high-rewards credit cards. (Seaver Decl. Ex. A (Lamb Rpt. ¶¶ 302, 333).) Dr. Lamb goes so far as to refer to "differences in outcomes for higher- and lower-cost GPCC users" and "a transfer from lower- or no-cost payers to higher-cost GPCC users that occurs when members of each group purchase similar bundles of goods at the same merchant". (*Id.*) Thus, on Plaintiffs' own theory, some class members would be benefitted if steering were permitted (the low-cost card users), while others would be harmed (the high-cost card users). This is the exact opposite of class-wide injury. *See Danvers Motor Co. v. Ford Motor Co.*, 543 F.3d 141, 148-49 (3d Cir. 2008) (holding that plaintiffs could not satisfy the

predominance requirement where some members of the proposed class benefitted from the alleged price discrimination while other members of the proposed class were allegedly harmed). Plaintiffs cannot satisfy the predominance requirement for this reason alone.

### 2. Plaintiffs Cannot Establish Their Multi-Step Theory of Harm Through Common Proof.

Plaintiffs also cannot satisfy the predominance requirement because they cannot show class-wide injury through common proof across each step in their elongated causal chain.

Where, as here, Plaintiffs' theory of harm turns on a "multi-step causal chain", the court must "closely examine[]" each piece of the "elongated causal chain" to determine whether Plaintiffs have adequately shown "by competent common proof each step in the causal chain leading from" Amex's NDPs to "price impact" on the members of the putative class. *Aluminum*, 336 F.R.D. at 44. A plaintiff's "refus[al] to 'address the multi-leveled microeconomic analysis of what each [market participant] would or would not have possibly done in the but-for world'" makes it "impossible to determine whether . . . individualized issues" are at play. *In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184, 193 (3d Cir. 2020) (quoting *In re Lamictal Indirect Purchaser & Antitrust Consumer Litig.*, No. 12-CV-00995, 2018 WL 6567709, at *6 (D.N.J. Dec. 18, 2018)).

Critically, requiring competent common proof means just that—actual "evidentiary proof". *Value Drug Co. v. Takeda Pharms., U.S.A., Inc.*, No. CV 21-3500, 2022 WL 17177267, at *10 (E.D. Pa. Nov. 23, 2022). Thus, where plaintiffs rely "centrally (if not entirely)" on an expert "to prove their antitrust impact theory", the expert must "cite facts or data supporting [the] theory of impact". *Id.* at *10. The failure to do so is fatal to a motion for class certification. Thus, for example, in *Value Drug*, the court denied plaintiffs' motion for class certification because their expert—Dr. Russell Lamb, who is also Plaintiffs' expert here—had based his

"opinions showing class-wide injury" on "unsupported assumptions". *Id.* at *11. The court likewise denied class certification in *In re Lamictal*, No. CV 12-995, 2021 WL 2349828 (D.N.J. June 7, 2021), because Dr. Lamb, again serving as the economic expert for plaintiffs, had failed to provide "critical supporting evidence" to back plaintiffs' theory of harm. *Id.* at *20 ("Plaintiffs' theory, however rational it may be, is missing critical supporting evidence.").

Dr. Lamb's analysis in this case suffers from the same flaws. As noted in Dr. Eric Gaier's expert report, Dr. Lamb's theory of antitrust injury depends on a seven-part chain of causation (Barbur Decl. Ex. 15 (Gaier Rpt. ¶¶ 18-19)):

*First*, merchants must engage in (or credibly threaten to engage in) steering consumers at the point of sale to the merchant's preferred payment method.

*Second*, credit card networks must reduce interchange rates or merchant discount fees in reaction to actual or threatened steering.

*Third*, acquirers (where relevant) must pass through any reduced interchange or discount rates to merchants in the form of lower merchant discount fees.

*Fourth*, merchants must actually save money taking into account both reduced discount rates and lost sales from customer walk-aways.

*Fifth*, merchants must pass through some or all of these savings to consumers via lower retail prices.

*Sixth*, lower retail prices must not be offset by surcharges or other harms imposed on consumers from merchant steering.

*Seventh*, lower retail prices must not be offset by issuers increasing cardholder annual fees or reducing rewards, despite earning lower revenues from reduced merchant fees.

Not only are there multiple steps in the chain of causation, but there are also multiple

types of independent economic actors in the chain of causation—namely, merchants, consumers, issuers, acquirers and networks.  Dr. Lamb assumes that each of these millions of independent actors would act essentially uniformly, such that there will be a common impact on all or nearly all Plaintiffs in the putative class.  But Dr. Lamb does not actually analyze what decisions the various economic actors would make, and how those decisions would affect other decisionmakers in the chain.  As in *Value Drug* and *Lamictal*, Dr. Lamb's assumed homogeneity is not backed by evidence, and Plaintiffs cannot show class-wide injury.

### a)      Step 1:  Merchant Surcharging

Plaintiffs and Dr. Lamb claim that "in a but-for world without Amex's Anti-Steering Rules, merchants (especially large merchants) would steer customers to less-expensive GPCC cards".  (Pls. Br. at 24; *see also* Seaver Decl. Ex. A (Lamb Rpt. ¶ 213 ("[I]n the absence of Amex's continued imposition and enforcement of its Anti-Steering Rues, [Amex-accepting] merchants would have utilized pro-competitive steering methods to lower their overall GPCC acceptance costs.")).)  However, although Dr. Lamb describes different techniques that merchants *could* use to steer customers, he does not opine on whether or the extent to which merchants will actually use any given form of steering.  (Barbur Decl. Ex. 2 (Lamb Tr. at 12:16-17:19, 20:16-22:16, 31:4-32:5).)  This failure to analyze what merchants would actually do in the but-for world dooms Plaintiffs' motion because they must show class-wide harm through evidentiary proof, and they cannot do that if they do not even analyze what the but-for world would look like.  *See Lamictal*, 957 F.3d at 193-94 (holding that the court needed to examine market structure and how market players would have acted in the but-for world when assessing whether plaintiffs could show that common issues predominated); *Blades v. Monsanto*, 400 F.3d 562, 569 (8th Cir. 2005) (holding an expert must construct and examine a but-for market to establish antitrust impact).  Depending on whether and the type of steering a merchant engages

in, the impact on the putative class members will vary widely—with many putative class members not being harmed at all.

For instance, Dr. Lamb refers to the possibility that merchants would "impose differential surcharges"—*i.e.*, different surcharges across credit card brands or credit card types.  (Seaver Decl. Ex. A (Lamb Rpt. ¶¶ 81, 177); Barbur Decl. Ex. 2 (Lamb Tr. at 25:24-26:4).).  However, despite recognizing that surcharging could be costly to merchants (Barbur Decl. Ex. 2 (Lamb Tr. at 26:24-27:3)), Dr. Lamb does not even acknowledge, much less analyze, the impact of differential surcharging.  Some merchants would lose sales from customers who walk away from a transaction rather than pay a surcharge ("walk aways"), and those losses could swamp any benefit from lower discount rates.  (Barbur Decl. Ex. 15 (Gaier Rpt. ¶ 23); Barbur Decl. Ex. 16 (Emch Rpt. § V.B.1).)  Moreover, merchants in certain class states—such as D.C. and Maine—are limited as a matter of law in their ability to impose credit card surcharges.  *See, e.g.*, D.C. Code § 26-131.08 (2022); Me. Stat. tit. 9-A, § 8-509 (2022).  Merchants operating in those states therefore face a different set of steering options than merchants elsewhere.  On the consumer side, some consumers will pay surcharges, and those payments would more than offset any savings flowing from lower discount rates.  Indeed, Dr. Lamb assumes merchants will impose surcharges "for some or all of the amount of the merchant discount fee"—about 2.2% on average—yet he determines there will be consumer cost savings of about 0.1% on average. (Barbur Decl. Ex. 15 (Gaier Rpt. ¶ 53).)  This means that consumers who pay a surcharge will lose more in surcharge payments than they gain in lower retail prices.

Dr. Lamb also ignores the fact that any given merchant's incentive to engage in differential surcharging to steer away from Amex will turn on whether Amex is more expensive than other credit card products.  (*Id.* ¶ 23.)  Dr. Lamb simply assumes that "Amex is generally

the most expensive GPCC for merchants to accept", but he cites no data in support of that assertion.  (Seaver Decl. Ex. A (Lamb Rpt. ¶ 265).)  Table 6 in Dr. Lamb's report shows that there is in fact almost no difference in the rates charged by the four networks.  (Seaver Decl. Ex. A (Lamb Rpt. Table 6).)  And the excerpt of an Amex presentation set forth on page 10 of Plaintiffs' opening brief makes this point even more clearly.  As that slide shows, Amex forecasted that its discount rates in 2020 would be ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉  (Pls.' Br. at 10.)  Neither Plaintiffs nor Dr. Lamb purport to explain why merchants would engage in—or even credibly threaten to engage in—differential surcharging by network under those circumstances.

In addition to discussing differential surcharging, Dr. Lamb also references ▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉  (Seaver Decl. Ex. A (Lamb Rpt. ¶¶ 263-66).)  ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉.  (Barbur Decl. Ex. 28 (AMEX-CP-000094343 at 3, 7); Barbur Decl. Ex. 18 (AMEX-CP-000094540 at -554).)

The effect of parity surcharging on putative class members would vary widely:  if merchants were to engage in parity surcharging, some consumers would walk away and patronize other merchants.  Some consumers, by contrast, would pay the surcharge (and thus be harmed) or switch from their preferred GPCC to a debit card and lose rewards (and thus be harmed in a different way).  (Barbur Decl. Ex. 15 (Gaier Rpt. ¶¶ 53-55, 60).)  Many consumers would be unable to switch because they lack sufficient funds in their checking accounts—and that would harm both merchants and consumers in ways that Dr. Lamb fails to consider.  (*Id.*

¶¶ 55, 60, 64); Barbur Decl. Ex. 2 (Lamb Tr. at 136:20-137:3).)  For instance, several of the Named Plaintiffs in this case made clear that they rely on the ability to use credit cards when funds are tight in their checking accounts and using debit would not be a viable option.  (Barbur Decl. Ex. 36 (M. Baker Tr. at 44:16-20, 151:24-152:2, 154:2-10); Barbur Decl. Ex. 37 (A. Baker Tr. at 69:17-70:7); Barbur Decl. Ex. 38 (Moskowitz Tr. at 128:16-129:4).)  Those Named Plaintiffs would be harmed by parity surcharging in ways that other Named Plaintiffs, who do not rely on credit cards as a backstop for insufficient funds, would not be.  (Barbur Decl. Ex. 39 (Grant Tr. at 123:12-17).)  And Plaintiffs' theory that surcharging will cause networks to lower rates is belied by the record evidence.  ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.  (Barbur Decl. Ex. 28 (AMEX-CP-000094343 at 3); Barbur Decl. Ex. 18 (AMEX-CP-000094540 at -542, -544).)

Dr. Lamb further fails to consider whether and the extent to which merchants would engage in excessive or abusive surcharging practices in his but-for world.  (Barbur Decl. Ex. 2 (Lamb Tr. at 115:2-8, 121:7-19).)  After surcharging became permissible in Australia and the United Kingdom, many merchants engaged in abusive and excessive surcharging practices by imposing surcharges that far exceeded their costs of credit card acceptance or by shrouding the surcharge at the point of sale.  (Barbur Decl. Ex. 15 (Gaier Rpt. ¶¶ 47, 50, 98); Barbur Decl. Ex. 16 (Emch Rpt. ¶¶ 294-99).)  Dr. Lamb does not even acknowledge these practices, let alone consider the harm to consumers that would result.  Given that any given customer's experience with excessive or abusive surcharging will vary depending on the precise mix of merchants that customer frequents, the harm to putative class members of these practices would necessarily be heterogenous and not susceptible to common proof.

Dr. Lamb also opines that merchants *might* (although he does not say that they would) engage in other forms of steering such as "preference campaigns", posting signage or offering discounts.  (Seaver Decl. Ex. A (Lamb Rpt. ¶¶ 81, 177).)  However, absent agreements between networks and merchants to provide lower rates in return for steering—a subject we address further in the next section—Dr. Lamb offers no explanation for how any of these forms of steering would actually benefit merchants or cardholders.  And every form of steering has the possible downside of annoying customers who are dissuaded from using their preferred form of payment—which is not good for merchants or consumers.

With respect to the possibility of merchants posting signage (both in physical stores and on websites) concerning their costs of acceptance, Dr. Lamb does not estimate how many merchants would do that or how effective it would be.  (*Id.* ¶ 81 & n.274).)  Dr. Lamb ignores that merchants can face hundreds of different amounts and types of fees depending on what card a consumer uses, making any form of signage impractical.  He also ignores that such signage would almost certainly be inaccurate since most merchants do not have a good understanding of their costs of acceptance.  (Barbur Decl. Ex. 15 (Gaier Rpt. § III.C.3).)

      **b)**      **Step 2:  Lower Interchange Fees**

In the second step in the causal chain, Dr. Lamb and Plaintiffs presume that networks will lower merchant fees for merchants in the face of steering or credible threats of steering.  (Barbur Decl. Ex. 2 (Lamb Tr. at 245:23-246:5).)  Dr. Lamb opines, in particular, that networks may enter into individually negotiated arrangements with merchants, wherein the networks will agree to lower their merchant fees in exchange for preferable steering practices.  (Seaver Decl. Ex. A (Lamb Rpt. ¶¶ 187, 230-31); *see also* Pls.' Br. at 24.)  Plaintiffs cannot establish common harm through common proof at this step for at least two reasons.

*First*, the fact that Dr. Lamb assumes there will be individually negotiated agreements

20

between networks and merchants itself defeats class certification.  *See Lamictal*, 957 F.3d at 192, 194 (explaining that plaintiffs may be unable "to show that injury is capable of common proof . . . in a market characterized by individual negotiations . . . .  [b]ecause each class member could not rely on the same common evidence to show injury"); *see also In re Indus. Diamonds Antitrust Litig.*, 197 F.R.D. 374, 384 (S.D.N.Y. 1996) (determining that individualized issues predominated in a market where price was based on "negotiations with each purchaser" such that the court would be "required to scrutinize each transaction to ascertain whether the purchaser paid a supracompetitive price").

    *Second*, it is implausible that there would be individually negotiated agreements with any but a small number of the largest merchants.  The vast majority of merchants do not contract directly with any of the networks, including Amex.  There are currently [redacted] merchants in the United States with custom-negotiated contracts with Amex, (Barbur Decl. Ex. 12 (Ouellette Tr. at 126:8-12)), and as of 2019, approximately [redacted] of Amex-accepting merchants accepted Amex through a third-party aggregator or acquirer.  (Seaver Decl. Ex. F (AMEX-CP-000094309 at -312).)  Notably, although [redacted] of the Qualifying Merchants are on custom-negotiated agreements with Amex, the remaining [redacted] are on standard preprinted agreements with standard pricing terms.  (Barbur Decl. Ex. 40 (Ltr. from R. Schindel to T. Seaver, dated June 24, 2022).)  The vast majority of Visa and Mastercard-accepting merchants likewise typically do not engage in individual negotiations with those networks.  Rather, as Dr. Lamb recognizes, merchants accept Visa and Mastercard indirectly through acquiring banks (Seaver Decl. Ex. A (Lamb Rpt. ¶ 40)), and Visa and Mastercard "publish their schedules of interchange rates", which vary based "on the merchant's category, the size of the merchant, the rewards tier of the card, the card type (*e.g.*, consumer or corporate card), and the type [of] card

acceptance (*e.g.*, swipe, chip, card-not-present), among other things" (*id.* ¶ 49).  Although Dr. Lamb cites three examples from the early aughts of individual negotiations between certain merchants and Visa or Mastercard, these were all large merchants.  (*See id.* ¶ 201 (Travelocity), ¶ 203 (Orbitz), ¶ 221 (Hilton).)  There is no evidence or basis to believe that networks would engage in individualized negotiations with smaller merchants.  And even as to large merchants, whether any given network would be willing to enter into an individual negotiation with any given merchant would depend on whether the network thought it would make more through additional steered transactions than it would lose in reduced discount revenue.  Such individualized considerations mean that the effect on putative class members, each of whom shops at a different set of merchants, is necessarily heterogenous.  *See Lamictal*, 957 F.3d at 194.

At his deposition, Dr. Lamb sought to elide these issues by claiming that, in addition to lowering fees through individually negotiated agreements, networks would also lower interchange fees unilaterally and uniformly even without entering into individually negotiated agreements.  (Barbur Decl. Ex. 2 (Lamb Tr. at 144:25-148:5).)  But Dr. Lamb offered no explanation as to why a merchant would bother to negotiate with a network to lower its interchange rate if the network would lower its interchange rate by the same amount even absent an agreement.  (*Id.* at 148:21-150:2.)  Dr. Lamb also failed to explain why he assumes that rates will decrease homogenously for the Qualifying Merchants, given that many of those merchants—unlike the vast majority of smaller merchants—have negotiated contracts with █████.  Indeed, as Dr. Gaier shows, the rates currently paid by the Qualifying Merchants ███████████████████████████████████████.  It is illogical to suggest that all these merchants would secure the same level of rate reductions (or any rate reductions) in the but-for world.  (Barbur Decl. Ex. 15

(Gaier Rpt. Figure 30, § III.A.2).)

### c)      Step 3:  Acquirer Pass-Through

As noted above, the vast majority of merchants accept credit cards through third-party acquirers or aggregators.  (*See* Seaver Decl. Ex. A (Lamb Rpt. ¶¶ 38 & n.115, 40).)  For these merchants, the networks do not set the ultimate rate paid by the merchant.  For instance, for merchants in Amex's OptBlue program, Amex sets a wholesale rate charged to third-party acquirers, which set the rates paid by the OptBlue merchants, retaining a profit margin.  (Barbur Decl. Ex. 12 (Ouellette Tr. at 27:3-12, 29:8-17); Barbur Decl. Ex. 26 (AMEX-CP-000068225 at -259).)  Amex has no visibility into or influence over the ultimate rate that OptBlue merchants pay their third-party acquirers.  (Barbur Decl. Ex. 12 (Ouellette Tr. at 29:19-23).)  The same general process applies for Visa- and Mastercard-accepting merchants (Seaver Decl. Ex. A (Lamb Rpt. ¶¶ 40, 43)), and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*see, e.g.*, Barbur Decl. Ex. 41 (GP_OLVR_0000024); Barbur Decl. Ex. 42 (GP_OLVR_0000050)).  Nevertheless, in the third step of the causal chain, Plaintiffs and Dr. Lamb assume that if networks lowered their interchange fees, acquirers would necessarily pass on the cost savings associated with those reduced fees to merchants in a uniform way.  (Barbur Decl. Ex. 2 (Lamb Tr. at 247:16-20).)  Indeed, Dr. Lamb assumes there will be 100% acquirer pass-through, even though he has done no empirical analysis to support that assumption.  (*Id.* at 177:18-24, 185:5-14.)  This assumption, too, is implausible.

To start, there is no requirement under either the Visa or Mastercard four-party system or Amex's OptBlue program that acquirers pass through any reductions in interchange or discount rates to merchants.  (Barbur Decl. Ex. 15 (Gaier Rpt. ¶ 28).)  Nor does Dr. Lamb identify any evidence that acquirers would pass on savings from reduced wholesale rates, and he certainly does not offer any support for the assumption that all acquirers would pass on savings in the

same amount, let alone all at a 100% rate.  In fact, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓ (Barbur Decl. Ex. 43 (AMEX-CP-000084293 at 10)), and there is no

reason to believe that acquirers would pass on savings from lower interchange or discount rates

in a uniform way.  Notably, Dr. Lamb did not study competition among third-party acquirers,

and he did not analyze pass-through rates from third-party acquirers to merchants.  Once again,

Plaintiffs cannot obtain class certification where their expert's "opinions showing class-wide

injury" are based on "unsupported assumptions".  *Value Drug*, 2022 WL 17177267, at *11.

The available evidence actually suggests that acquirers would *not* pass on savings to

merchants.  (Barbur Decl. Ex. 15 (Gaier Rpt. ¶ 29).)  The Durbin Amendment to the Dodd-Frank

Wall Street Reform and Consumer Protection Act, which was passed in 2010, led to significantly

lower debit interchange rates.  Yet, as Dr. Gaier notes, studies have shown that acquiring banks

used the regulation "as an opportunity to increase their profitability by not passing through

savings to merchants in their entirety".  (Barbur Decl. Ex. 44 (Finextra, *Why the Real*

*Beneficiaries of the Durbin Amendment Are Networks and Acquirers* (Mar. 9, 2015).)  Nearly all

the benefits of the reduced interchange rates were "captured by the acquiring banks—and only

7% passed through to merchants".  (Barbur Decl. Ex. 45 (Todd J. Zywicki et al., *Price Controls*

*on Payment Card Interchange Fees:  The U.S. Experience*, GMU Law and Economics Research

Paper Series 14-18); Barbur Decl. Ex. 15 (Gaier Rpt. ¶ 29).)

#### d)      Step 4:  Merchants Cost Savings

Even assuming acquirers pass through cost savings, merchants must actually save money

when accounting for the benefits and costs of steering.  Dr. Lamb recognizes that different

customers might react differently to different forms of steering (Barbur Decl. Ex. 2 (Lamb Tr. at

28:4-21, 40:8-15)), but he then ignores the implication of that fact.  As noted above, some may

pay a surcharge or switch payment products, but others will walk away from the transaction.

Still others may walk away from the merchant and never return.  (Barbur Decl. Ex. 15 (Gaier

Rpt. ¶¶ 23, 30-31); Barbur Decl. Ex. 16 (Emch Rpt. ¶ 249).)  Thus, a merchant that engages in

steering may not actually experience any overall savings because the costs of steering (*i.e.*, lost

customers and lost transactions) may outweigh the potential benefits (*i.e.*, lower discount fees).

Indeed, the deposition testimony of the class representatives in this case highlights the

variability at play in this step of the causal chain.  One class representative, Debbie Tingle,

testified that it would make her feel uncomfortable if a merchant tried to steer her to a different

card, and when asked whether she would consider walking away from the merchant, she

responded:  "Depends."  (Barbur Decl. Ex. 46 (Tingle Tr. at 56:6-20).)  Another class

representative, Angela Clark, likewise testified that it would "[p]robably" make her feel

uncomfortable to be steered away from her preferred payment method and that she would

"[p]robably not" return to a merchant that steered her repeatedly at the point of sale.  (Barbur

Decl. Ex. 47 (Clark Tr. at 104:16-105:11).)  By contrast, another class representative, Ricky

Amaro, testified that he regularly pays a 3% surcharge to use his credit card at a restaurant

because he "do[es] not have the available cash to be able to pay for the purchase".  (Barbur Decl.

Ex. 48 (Amaro Tr. at 156:6-157:21).)  And yet another class representative, Sarah Grant, testified

that she feels "[a] little" bad when she pays with a credit card at an establishment with a sign that

another form of payment is preferred, and she tries to pay with cash when she goes there if it is

available to her and not earmarked for a different purchase.  (Barbur Decl. Ex. 39 (Grant Tr. at

137:25-138:18).)

Dr. Lamb does not account for the various responses cardholders may have to steering

and surcharging, or for the fact that the costs of surcharging may exceed the benefits for certain

merchants.  (Barbur Decl. Ex. 2 (Lamb Tr. at 170:4-13, 242:4-25).)  As a result, Plaintiffs have

not offered common proof that all merchants would save money in the but-for world.

e)   **Step 5:  Merchant Pass Through**

At the fifth step in their causal chain, Plaintiffs and Dr. Lamb assume that merchants will pass through cost savings to retail customers.  (Pls.' Br. at 27-34; Barbur Decl. Ex. 2 (Lamb Tr. at 247:21-248:2).)  Plaintiffs and Dr. Lamb insist that they need not show that "*all* merchants passed through inflated GPCC acceptance costs to *all* consumers' retail purchases", and they claim that they need not even show that all Qualifying Merchants passed on some or all GPCC acceptance costs in a uniform way to establish class-wide harm.  (Pls.' Br. at 28.)  As discussed in greater detail in the section below, this is wrong.  To start, as Dr. Lamb conceded at his deposition, in Plaintiffs' but-for world Amex's NDPs would be eliminated for *all* U.S. merchants.  (Barbur Decl. Ex. 2 (Lamb Tr. at 33:13-17).)  Thus, unless Plaintiffs can establish that all merchants would pass through reduced interchange rates, they have no way to deal with the fact that some putative class members might be harmed by elimination of the NDPs because, for instance, they predominantly shop at merchants who do not pass through reduced interchange costs but who do force customers to either pay a surcharge or lose rewards by being steered to a less preferred card.  But even setting this fundamental error aside, Plaintiffs cannot show through common proof what they purport to be able to establish—namely, "that absent Amex's Anti-Steering Rules, Qualifying Merchants would have passed on at least some portion of their cost savings to their customers".  (*Id.* at 28.)

Plaintiffs claim, first, that they can establish such pass through as a matter of "economic theory".  (*Id.* at 28-29.)  They argue, in particular, that low-margin retailers such as the Qualifying Merchants "are much more likely [than other merchants] to pass on an increase in costs, for the simple fact that they cannot absorb increases in costs".  (*Id.* at 29 (citing Seaver Decl. Ex. A (Lamb Rpt. ¶¶ 309-18)).)  Plaintiffs and Dr. Lamb ignore, however, that scholarly

research shows that merchants are much more likely to pass through cost *increases* rather than cost decreases.  (Barbur Decl. Ex. 15 (Gaier Rpt. ¶ 131).)  Merchants are also much more likely to pass through large cost changes than small ones, and the cost changes at play here are indisputably small—less than half of one percent of any given transaction.  (*Id.*)  Plaintiffs and Dr. Lamb also ignore that merchants are more likely to pass through changes in costs that are common to all merchants in a market (*e.g.*, an increase in excise tax for alcohol) than costs that are merchant-specific.  For instance, an FTC study concluded that when Staples' (the office superstore) own marginal costs decreased by 1%, its average prices declined by just 0.15%.  When, however, industry-wide marginal costs fell by 1%, Staples' average price decreased by 0.85%.  (*Id.*)  Plaintiffs and Dr. Lamb ignore these dynamics entirely.

Plaintiffs next claim that "[s]worn testimony by some of the Qualifying Merchants that they pass on credit card fees is evidence that they all do".  (Pls.' Br. at 30.)  Again, Plaintiffs are wrong.  "[B]road generalizations by market participants . . . cannot, in the absence of a proper chain of expert models, serve as common proof that all . . . members of the class suffered pricing injury."  *Aluminum*, 336 F.R.D. at 50.  Certainly, the decade-old testimony Plaintiffs cite from Best Buy, Home Depot and ███ cannot establish that all the Qualifying Merchants would pass on credit card fees in a uniform way since one merchant said that any reduction in interchange fees would be fully passed on (Best Buy), another said that only 60% of the reduction would be passed on (Home Depot) and the third said nothing ████████████████ ████████████.

Finally, Plaintiffs assert that the "Australia experience is common evidence of pass-on". (*Id.* at 32-33.)  They claim, in particular, that "Dr. Lamb analyzed several studies and analyses conducted by the RBA, which show that merchants generally passed on at least some portion of

the cost savings they achieved in the form of reduced credit card acceptance costs onto customers in the form of lower retail prices." (*Id.* at 33.)  In fact, the 2008 RBA study that Plaintiffs quote said the exact opposite, explaining that the RBA had not measured the extent to which merchants passed on *any* cost savings to customers.  And a later RBA report went even further, explaining that "[i]t is impossible—given the imprecision in any econometric model of consumer price inflation—to measure exactly how these reductions in merchant services fees have flowed through into prices for consumers".  (Barbur Decl. Ex. 15 (Gaier Rpt. ¶ 129).) Plaintiffs cannot point to the RBA's unverified and unverifiable expectation of some unknown amount of pass-through in Australia as evidence of class-wide injury in the United States.

#### f) Step 6:  Harm to Consumers and Potential Offsets to Lower Retail Prices

To succeed on their antitrust claims, Plaintiffs must show that they were "worse off than [they] would be if the market were free of anticompetitive forces".  *IQ Dental Supply, Inc. v. Henry Schein, Inc*., 924 F.3d 57, 64 (2d Cir. 2019).  Here, Dr. Lamb undertakes no analysis to show that any reductions in retail price would actually offset any surcharges or other harms imposed on consumers.  (Barbur Decl. Ex. 2 (Lamb Tr. at 90:18-91:21).)  As set forth above, whether any given consumer is harmed in the but-for world is going to depend on the types of steering or surcharging they face, their reaction to such behavior, the degree to which merchants' card acceptance costs are reduced where they shop and the degree to which merchants pass on those savings.  For some putative class members, the harm from surcharging and steering will necessarily overwhelm any reductions in retail price, which means those consumers are harmed in the but-for world.  This heterogeneity defeats class certification.  *See, e.g.*, *Blade*, 400 F.3d at 570-71 (holding plaintiffs could not satisfy the predominance requirement where they simply "presume[d] class-wide impact without any consideration of whether the markets or the alleged

conspiracy at issue here actually operated in such a manner so as to justify that presumption", and where "[t]he evidence demonstrated that defendants and their distributors often lowered the 'overall' price of certain seeds, or gave discounts and rebates to certain farmers to offset any alleged premium, and that some farmers in fact paid no premium").

In his deposition, Dr. Lamb attempted to correct for this error by claiming that he expected surcharging among Qualifying Merchants to be fairly uncommon in the but-for world because the "credible threat" of surcharging would itself lead payment networks to lower their merchant discount fees. (Barbur Decl. Ex. 2 (Lamb Tr. at 86:23-87:6, 94:14-95:24).)  In support, Dr. Lamb cited "the experience in Australia", which he claims led Amex to proactively offer lower merchant fees to 80,000 merchants if they agreed not to surcharge and caused actual surcharging in Australia to be "limited". (*Id.* at 18:9-16, 94:14-95:24, 102:9-103:4.)  Dr. Lamb, however, is wrong on the facts.  After surcharging was authorized in Australia, surcharging grew over time and became widespread.  According to the RBA, eight years after the reforms authorizing surcharging were first imposed, nearly 50% of "very large merchants" were actually surcharging credit cards and even about 25% of "small merchants" were actually surcharging. (Barbur Decl. Ex. 15 (Gaier Rpt. ¶ 42).)  What is more, surcharging was not only prevalent, it was abusive.  In 2016, the Australian Parliament thus enacted a new law in an attempt to curtail excessive surcharging. (*Id.* ¶ 47.)  Dr. Lamb's "theory" that surcharging will be rare in his but-for world because the mere threat of surcharging will be sufficient to lead to lower discount rates is nothing more than counterfactual speculation.

Ultimately, Plaintiffs claim that they just need to show "that substantially all class members were overcharged at least once", and that it is "highly doubtful" that any putative class member would have avoided such harm. (Pls.' Br. at 33-34.)  But Plaintiffs do not only need to

show that each class member was overcharged; they also need to show that each class member was actually harmed as a result of this overcharge, when accounting for whatever harms putative class members might experience in the form of steering and surcharging in the but-for world. Dr. Lamb and Plaintiffs cannot simply wish away this step of the analysis.  *See Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 82 (2d Cir. 2015) ("[W]e do expect common evidence to show all class members suffered some injury." (quoting *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 252 (D.C. Cir. 2013))).  Where Plaintiffs make no effort to account for the many heterogenous decisions that merchants, consumers, issuers, acquirers and networks might make in the chain of events purportedly leading from Amex's NDPs to Plaintiffs' alleged injuries, then Plaintiffs cannot make this showing on a class-wide basis.

### g)      Step 7:  Cardholder Rewards and Fees

Finally, at the seventh step in the causal chain, Dr. Lamb presumes that credit card issuers would not increase annual fees or reduce rewards in the but-for world, despite earning lower revenues from reduced merchant fees.  (Barbur Decl. Ex. 2 (Lamb Tr. 247:8-15).)  As discussed in Dr. Emch's report, both economic theory and real-world evidence indicate that annual fees net of rewards would instead increase in the but-for world.  (Barbur Decl. Ex. 16 (Emch Rpt. ¶¶ 317-21, §§ VI.B-D).)  At the very least, Dr. Lamb has no basis to assert that all issuers would act in an essentially uniform fashion.

There are thousands of issuers offering different payment products with different characteristics, including level and form of rewards, level of annual fees and discount rates charged to merchants. (Barbur Decl. Ex. 2 (Lamb Tr. at 190:25-191:6, 193:21-25, 194:21-195:2).)  Yet Dr. Lamb posits that a small issuer offering a no-fee, low-rewards card would react to reduced discount rates in exactly the same way that a large issuer, like Chase, would with respect to a high-fee, high-rewards card, like the Sapphire Reserve card.  (*Id.* at 195:3-196:2.)

Dr. Lamb offers no justification for this assumption.  Instead, he focuses on the fact that issuers often compete on the basis of rewards and fees to attract cardmembers and cardmember spend. (Seaver Decl. Ex. A (Lamb Rpt. ¶¶ 273-84).)  But that does nothing to refute the basic idea that different issuers would react differently to reduced discount revenue.[1]

Dr. Lamb's assumption that all issuers would react in essentially the same way is particularly inconsistent with the fact that some issuers, such as Amex, have a spend-centric business model and earn most of their revenue through "swipe fees", whereas other issuers (such as many Visa- and Mastercard-issuing banks) have lend-centric business models and earn most of their revenue through interest on revolving credit.  (Barbur Decl. Ex. 6 (Gantman Tr. at 26:4-11, 64:4-9).)  An overall decrease in discount rates will have a greater impact on "spend-centric" issuers than it does on "lend-centric" issuers, and it thus defies logic to assume that they will all react in the same way.

>           h)        **The Same Causal Chain Issues Also Affect the Debit Class.**

Just as there is no common proof as to any step in the causal chain as to the Credit classes, there is likewise no common proof as to the Debit classes.  Dr. Lamb does not separately examine class-wide injury for the Debit classes, and the issues identified above apply with equal force to both the Credit and Debit classes.  For instance, for both types of classes, Dr. Lamb's theory of anticompetitive harm requires the same long chain of causation that defeats Plaintiffs' ability to establish predominance.  And members of the putative Debit classes would likely also be harmed in the but-for world by paying surcharges or being steered away from their preferred

---

[1] Plaintiffs and Dr. Lamb also focus on the fact that "several issuers" apparently responded to the changes in consumer spending and rewards redemption brought on by the COVID-19 pandemic by adjusting and enhancing rewards.  (Seaver Decl. Ex. A (Lamp Rpt. ¶ 278).)  How some issuers responded to a short-term shock like the COVID-19 pandemic says nothing about how all issuers would respond to a long-term reduction in discount revenue.

payment products.  In addition, most members of the putative Debit classes—including most Named Plaintiffs—are also members of the putative Credit classes.  In Plaintiffs' but-for world, members of the putative Debit classes will be harmed in all the same ways discussed above (paying surcharges, losing rewards, etc.) when they use their credit cards.

### 3.     Dr. Lamb's Damages Methodology Does Not Satisfy *Comcast*.

Under *Comcast*, class certification should be rejected where Plaintiffs' liability theory is not consistent with their damages theory.  569 U.S. at 35.  In other words, "there cannot be a mismatch between the injury and the remedy".  *Jacob*, 293 F.R.D. at 587.  In addition, "[f]ollowing *Comcast*, circuit courts in antitrust cases have consistently, and correctly, read that decision to require that district courts carefully examine, at the class certification stages, the soundness of an expert's model relied upon to establish classwide impact" and damages. *Aluminum*, 336 F.R.D. at 47.  In particular, "where an expert's model is the basis for a plaintiff's claim of classwide impact and causation, a court is obliged to rigorously examine the soundness of that model at the class certification stage.  A court may certify a class under these circumstances only where the Court finds the model methodologically sound."  *Id.* at 46.  Here, Dr. Lamb's damages methodology does not align with Plaintiffs' theory of liability, and it is not methodologically sound.  Thus, for both reasons, Plaintiffs have failed to satisfy *Comcast*.

### a)     Dr. Lamb's Damages Methodology Does Not Match Plaintiffs' Theory of Liability.

Plaintiffs' theory of liability is that Amex's NDPs are anticompetitive as enforced against *any* Amex-accepting merchant.  (*See* Dkt. 76, Am. Compl. ¶¶ 128-29, 144.)  Thus, as Dr. Lamb conceded in his deposition, Amex's NDPs would not be in effect as to any merchant in Plaintiffs' and Dr. Lamb's but-for world.  (Barbur Decl. Ex. 2 (Lamb Tr. at 33:13-17).)  Dr. Lamb's damages methodology, however, considers only transactions at Qualifying Merchants,

which are limited to 38 large retail merchants.  (Seaver Decl. Ex. A (Lamb Rpt. ¶¶ 349, 365).)

His analysis fails to account for the impact of Amex's NDPs on transactions that putative class

members make at other merchants.  (Barbur Decl. Ex. 2 (Lamb Tr. at 269:15-270:3).)  In

particular, Dr. Lamb fails to consider whether class members will be worse off overall because

they will be harmed in connection with transactions at non-Qualifying Merchants by paying

surcharges or being steered to lower-rewards cards without realizing any cost savings, even if

they are benefitted in connection with transactions at Qualifying Merchants.  Notably, as

discussed above, Dr. Lamb does not assess whether there would be *any* cost savings at non-

Qualifying Merchants.  There is in fact good reason to think that small merchants would not

secure reduced interchange fees since (i) unlike large merchants, they do not engage in

individually negotiated rate arrangements with networks; and (ii) they have little incentive to

engage in differential surcharging because many do not understand their costs of acceptance, do

not have access to the point-of-sale technology needed to surcharge effectively and did not

engage in steering even when they could.[2]  In addition, the set of non-Qualifying Merchants

includes merchants in the T&E industry.  In Australia, T&E merchants engaged in widespread

and abusive surcharging and steering practices.  (Barbur Decl. Ex. 15 (Gaier Rpt. ¶ 98).)  Thus,

customers with significant T&E purchases may be harmed more by excessive surcharging at

T&E merchants than they gain from lower retail prices at the Qualifying Merchants.  Even

though Dr. Lamb concedes that there is "a difference between all merchants and some

merchants, most merchants, Qualifying Merchants, all of the Qualifying Merchants" (Barbur

---

[2] Visa and Mastercard authorized merchants to engage in certain forms of steering in 2011
and to engage in differential steering in 2013.  Thus, by 2013, nearly three million merchants that
did not then accept Amex were free to steer or differentially surcharge.  Effectively none actually
did so, and their merchant fees did not decline. (Barbur Decl. Ex. 15 (Gaier Rpt. ¶ 96).)

Decl. Ex. 2 (Lamb Tr. at 32:17-24)), Dr. Lamb and Plaintiffs do not account for these differences

or their disparate impact among putative class members.

> **b)**   **Dr. Lamb's Damages Methodology Rests on Improper
> Averages and Implausible Assumptions.**

If a damages methodology "masks uninjured class members by using an 'averaging'

mechanism to allocate injury across the class, or otherwise fails to demonstrate with scientific

rigor that classwide impact can be established through common proof", then plaintiffs cannot

establish predominance.  *Aluminum*, 336 F.R.D. at 49.  "Scientific rigor" means that the model

cannot purport to measure class-wide damages by relying on implausible assumptions.  *See*

*Value Drug*, 2022 WL 17177267, at *11 (holding plaintiffs could not establish predominance

where Dr. Lamb failed to evaluate the plausibility of the assumptions in his damages model); *see*

*also Comcast*, 569 U.S. at 35-36 (holding plaintiffs' damages methodology fails under Rule

23(b), even if "it can be applied classwide", if its measurements are "arbitrary" and

"speculative").  As discussed in greater detail in Dr. Gaier's report, Dr. Lamb's model "masks

uninjured class members" by improperly relying on averaging or implausible assumptions in a

multitude of ways.  (Barbur Decl. Ex. 15 (Gaier Rpt. § IV).)  Here are four examples:

*First*, Dr. Lamb assumes that, in the but-for world, the merchant fees for all networks

would be reduced by the same amount for all the Qualifying Merchants.  (Seaver Decl. Ex. A

(Lamb Rpt. ¶ 359).)  This assumption would be implausible in almost any case, but it is

particularly implausible here given that 16 of the 38 Qualifying Merchants offered a Visa or

Mastercard cobrand credit card during the class periods.  As its name suggests, a cobrand card

bears the brand marks of both the network (Visa or Mastercard), and the merchant, and the

rewards from using the card are determined by the merchant.  (Barbur Decl. Ex. 5 (Gagliardi Tr.

at 70:2-22); Barbur Decl. Ex. 6 (Gantman Tr. at 110:7-21).)  Qualifying Merchants with cobrand

cards are among the largest in terms of sales volume and thus are disproportionately significant
for putative class members.  (Barbur Decl. Ex. 15 (Gaier Rpt. ¶ 15).)  As Dr. Lamb
acknowledged in his deposition, networks have to compensate merchants for cobrand
relationships, and one way in which merchants are compensated is through lower discount rates
for transactions on the cobrand network.  (Barbur Decl. Ex. 2 (Lamb Tr. at 220:4-21).) ▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*Id.* at 224:7-15; Barbur Decl. Ex. 15 (Gaier Rpt. ¶¶ 83-85,
Figures 6-7).) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮, applying Dr. Lamb's assumption of a homogenous 36 basis-point reduction in discount
rates across all merchants leads to the wholly nonsensical result that some merchants, such as
▮▮▮▮▮, would have paid a *negative* interchange rate for ▮▮▮▮▮▮ credit card transactions
during much of the class periods.  In other words, Dr. Lamb's methodology means that absent
the NDPs, ▮▮▮▮▮▮ would have *paid* ▮▮▮▮▮ to process ▮▮▮▮▮▮ credit card transactions.
(Barbur Decl. Ex. 15 (Gaier Rpt. ¶ 89, Figure 8).)  When an expert's assumptions are so
implausible that they lead to absurd results, Plaintiffs have failed to show that they can prove
class-wide injury based on common proof.  *See Value Drug*, 2022 WL 17177267, at *11; *see
also In re Class 8 Transmission Indirect Purchaser Antitrust Litig.*, 140 F. Supp. 3d 339, 352-53
(D. Del. 2015) (holding that Dr. Lamb—again serving as an expert for plaintiffs in an indirect
purchaser suit—had failed to show measurable class-wide harm and damages because his
methodology for calculating overcharges assumed that sales data for one product line, which
reflected "less than 60 percent of half of the data", was representative of sales for all relevant

product lines during the class period), *vacated in part on other grounds*, 679 F. App'x 135 (3d Cir. 2017).

*Second*, Dr. Lamb's damages model assumes that all Qualifying Merchants will pass through the cost savings associated with reduced discount rates at a uniform rate of 90%.[3] (Seaver Decl. Ex. A (Lamb Rpt. ¶ 368).)  This rate is not based on data or information related to the Qualifying Merchants.  (*Id.* ¶ 367.)  Rather, the rate comes from a 2020 working paper, which described 90% as "about the midpoint of long-run pass-through rates on retail prices due to industry-wide cost changes estimated by previous empirical studies on U.S. industries".  (*Id.*) Dr. Lamb simply assumed that this rate constituted a "reasonable measure of pass through" for the Qualifying Merchants "because, as a matter of economics, the pass through of merchant discount fees would be the same as the pass through of any other industry-wide change in variable cost".  (*Id.*)  Dr. Lamb did not cite a single source in support of that hypothesis; he did not undertake any effort to assess the reliability of the previous empirical studies underpinning the 90% pass-through rate; and he did not do anything to assess whether this rate was a reasonable number for the Qualifying Merchants.  Notably, the very paper on which Dr. Lamb relies made clear that pass-through rates vary across markets, and the economic literature indicates that pass-through rates are highly variable across firms.  (Barbur Decl. Ex. 15 (Gaier Rpt. § IV.B; ¶¶ 124-25).)  Moreover, the assumption that all Qualifying Merchants would pass through cost savings at the same rate is belied by the record in this case.  As Plaintiffs themselves acknowledge, Home Depot indicated that it would only pass through 60% of any

---

[3] As noted in Section III.A.2.e above, Dr. Lamb claims that he only need to show *some* pass-through for purposes of establishing injury-in-fact, as opposed to damages.  But Dr. Lamb has not actually established even the fact of pass-through as to all merchants.  And, as discussed above, because there are countervailing costs to cardholders who pay surcharges or lose rewards, the magnitude of pass-through matters, not just the fact of pass-through.

interchange-related cost savings, whereas Best Buy said that any reduction in interchange fees would be fully passed on.  (Pls.' Br. at 30-31.)  Finally, as noted above, Dr. Lamb's damages model excludes non-Qualifying Merchants entirely.  Even if his assumed 90% pass-through rate were appropriate for the Qualifying Merchants (which it is not), it cannot possibly be a valid measure of pass through for non-Qualifying merchants because it is based on a study of pass-through rates for retail merchants that says nothing about merchants in other industries.  Once again, this matters for both ascertaining injury and measuring damages because class members will be affected by their transactions at all merchants, not just Qualifying Merchants and not just retail merchants.

Dr. Lamb has been faulted for making such implausible pass-through assumptions before.  In *In re Class 8*, indirect purchasers of transmissions used in heavy-duty trucks sued transmission manufacturers and suppliers, claiming that exclusive dealing agreements resulted in artificially high prices for direct purchasers, which were then passed on to plaintiffs (the indirect purchasers).  140 F. Supp. 3d at 351-53.  As he does in this case, Dr. Lamb developed a methodology to calculate the overcharge paid by the direct purchasers, and he then calculated a 94.2% pass-through rate to the indirect purchasers.  *Id.* at 352-53.  The court determined that Dr. Lamb's pass-through analysis was flawed because it was based on fewer than 1% of truck sales and "on the assumption that the pass-through rate for the transmission alone is the same as that for the entire truck".  *Id.* at 356.  As a result, the court found that plaintiffs could not offer common evidence of class-wide injury or measurable damages, *id.* at 352-55, and the Third Circuit upheld the district court's predominance rulings, *In re Class 8*, 679 F. App'x at 140.  The same errors doom Dr. Lamb's analysis—and Plaintiffs' motion for class certification—here.

*Third*, Dr. Lamb's damages methodology assumes that issuers will not decrease rewards

or increase annual fees in the face of reduced discount rates.  (Seaver Decl. Ex. A (Lamb Rpt. ¶ 273).)  Dr. Lamb offers no empirical support for this assumption, which is contradicted by real-world evidence.  In Australia, for instance, Amex responded to a decline in its merchant discount revenue by systematically reducing rewards and increasing cardholder fees.  (Barbur Decl. Ex. 9 (AMEX-CP-000052339 at -439 to -441 (Stocks Tr. at 101:2-9, 102:4-10, 103:4-9)); *see also* Barbur Decl. Ex. 16 (Emch Rpt. ¶¶ 332-36).)  More broadly, the RBA concluded that "lower interchange fees in the Mastercard and Visa credit card systems [in Australia] resulted in a reduction in the value of rewards and higher annual fees".  (Barbur Decl. Ex. 35 (RBA, *Reform of Australia's Payment Systems*, *supra*, § 5.2.1).)  And after the Durbin Amendment capped interchange fees on debit transactions in the U.S., banks increased prices to account-holders and slashed rewards on debit products.  (Barbur Decl. Ex. 15 (Gaier Rpt. ¶ 103); Barbur Decl. Ex. 16 (Emch Rpt. § VI.D.2).)

        Dr. Lamb also ignores testimony that directly contradicts his theory.  For instance, Jon Gantman, Amex's Senior Vice President in charge of Amex's consumer cobrand business, testified that when the Amex Platinum card began losing transaction volume to the Chase Sapphire product (which Dr. Lamb posits may happen in the but-for world), Amex responded by increasing annual fees on the Platinum card.  (Barbur Decl. Ex. 6 (Gantman Tr. at 70:4-71:9).)  Amex also increased cardholder benefits, ███████████████████████████████████.  (*Id.*)  Similarly, ██████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████████.  (Barbur Decl. Ex. 3 (Gaughan Tr. at 33:21-22, 34:6-18, 42:16-19, 58:3-6, 61:9-62:6).)

        *Fourth*, Dr. Lamb uses national averages to determine the share of revenue at the

Qualifying Merchants attributable to credit card transactions, thereby assuming that all Qualifying Merchants would be affected equally by the allegedly inflated merchant fees.  (Seaver Decl. Ex. A (Lamb Rpt. ¶ 366 & n.857).)  This assumption is wholly implausible.  Each Qualifying Merchant's share of revenue on credit cards, or credit and debit cards is unique, and thus each Qualifying Merchant is affected differently under Plaintiffs' theory of harm.  If, for example, CVS earned 10% of its revenue on credit card transactions and American Eagle earned 90% of its revenue on credit card transactions, then American Eagle would be affected nine times as much as CVS from Plainitffs' alleged inflation of credit card rates.  Once again, Dr. Lamb's damages methodology simply ignores these distinctions.  Thus, because Dr. Lamb's methodology rests on improper assumptions that lack logical or empirical support, Plaintiffs have failed to establish predominance.  *Aluminum*, 336 F.R.D. at 49.

### B.      Plaintiffs Cannot Satisfy the Rule 23(a) Requirement of Adequacy.

"The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent."  *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 249 (2d Cir. 2011) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997)).  "To satisfy Rule 23(a)(4), the named plaintiffs must 'possess the same interest[s] and suffer the same injur[ies] as the class members.'" *Id.* (quoting *E. Texas Motor Freight Sys. Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)).

In assessing inadequacy, a court need not find that a named plaintiff's "representation would in fact be inadequate".  *In re IMAX Sec. Litig.*, 272 F.R.D. 138, 157 (S.D.N.Y. 2010).  Rather, "the possibility of inadequacy and the appearance of impropriety are sufficient for [a court] to deny certification".  *Id.*; *see also In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 568 (S.D.N.Y. 2018) (quoting *IMAX*, 272 at 157).

1.    **Named Plaintiffs Are Inadequate Representatives for the Classes in Which No Named Plaintiff Is a Member.**

Plaintiffs seek certification of 12 statewide Debit Card classes and 12 statewide Credit Card classes.  (Pls.' Br. at 3, 20.)  However, there is no proposed class representative for either the Hawaii Credit or Debit class.  (*Id.* at 20.)  There is also no class representative for the Alabama or Oregon Credit classes or the Vermont Debit classes.  Without a Named Plaintiff for these five classes, Plaintiffs cannot pursue claims on their behalf.  *See Irvin v. Harris*, 944 F.3d 63, 70 (2d Cir. 2019) ("[A] class representative must be part of the class and possess the same interest and suffer the same injury as the class members." (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348-49 (2011))).  Plaintiffs apparently already recognize this requirement, as they are expressly not seeking certification of their claims under Montana or West Virginia law because there are no class representatives from those states.  (Pls.' Br. at 20 n.34.)[4]

Plaintiffs suggest that they do not need to identify a class representative for each class based on *Langan v. Johnson & Johnson Consumer Cos., Inc.*, 897 F.3d 88 (2d Cir. 2018), but that argument is wrong.  *Langan* involved a single class pursuing claims under multiple states' laws, *id.* at 95-96, whereas this case involves 24 separate classes.  Nothing in *Langan* disturbs the longstanding rule that there must be a class representative for every class (or subclass).[5]  *See*

---

[4] At times, Plaintiffs refer to the Debit and Credit classes as "subclasses" (*see* Pls.' Br. at 20), even though their class definition referred to each Credit and Debit class as a separate "class" (*see id.* at 3).  This distinction does not matter because subclasses are treated as classes and the same requirements apply to both.  *Burka v. N.Y.C. Transit Auth.*, 110 F.R.D. 595, 601 (S.D.N.Y. 1986) (holding that "the subclass representative [must be] a member of the subclass that he seeks to represent"); *see also Marisol A. v. Giuliani*, 126 F.3d 372, 379 (2d Cir. 1997); Fed. R. Civ. P. 23(c)(5) (stating that subclasses "are each treated as a class under this rule").

[5] In ruling on Amex's motion to dismiss, this Court held that Plaintiffs have standing to sue for claims under state laws where no Named Plaintiff resides under *Langan*.  (Dkt. 43 at 23-24.) The issue now, however, is about adequacy, so *Langan*'s holding as to standing is inapposite.

*Irvin*, 944 F.3d at 70; *Burka*, 110 F.R.D. at 601.  Nor can Plaintiffs argue that the representative

for a Debit class could adequately represent the Credit class for the same state (or vice versa),

given Plaintiffs' theory that debit cards and credit cards are "not economic substitutes" and are

not in the same relevant market.  (Seaver Decl. Ex. A (Lamb Rpt. ¶¶ 109-17).)  Thus, because no

Named Plaintiff is a member of the Hawaii Credit or Debit classes, the Alabama Credit class, the

Oregon Credit class or the Vermont Debit class, certification as to those classes must be denied.

### 2. Named Plaintiffs Are Inadequate Because of Their Relationships with Class Counsel and Lack of Understanding of the Case.

"[C]lose relationship[s]" between Named Plaintiffs and class counsel renders the Named

Plaintiffs inadequate.  *See DDMB, Inc. v. Visa, Inc.*, No. 05-MD-1720, 2021 WL 622136, at *35

(E.D.N.Y. Sep. 27, 2021); *see also Gordon v. Sonar Cap. Mgmt. LLC*, 92 F. Supp. 3d 193, 199

(S.D.N.Y. 2015); *Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 96-97 (S.D.N.Y. 2010).  The concern

is that a "class representative who is *closely associated* with the class attorney would allow

settlement on terms less favorable to the interests of absent class members".  *IMAX*, 272 F.R.D.

at 156 (quoting *Susman v. Lincoln Am. Corp.*, 561 F.2d 86, 91 (7th Cir. 1977)).

The dangers of a close relationship between class representatives and class counsel are

exacerbated where, as here, the Named Plaintiffs have little to no understanding of their case.  In

*Gordon*, for instance, the court found that, if concerns about the relationship between a class

representative and class counsel, "standing alone, would not necessarily suffice to render [him]

an inadequate class representative", the named plaintiff's "difficulties with recollection and lack

of familiarity with the litigation indicate that he is wholly dependent on counsel to make crucial

decisions affecting the interests of absent class members.  This lack of independent judgment,

combined with his intimate relationship with one of the counsel having a financial interest in the

outcome, render him inadequate to serve as a class representative."  92 F. Supp. 3d at 200; *see*

*also Maywalt v. Parker & Parsely Petroleum Co.*, 67 F.3d 1072, 1077-78 (2d Cir. 1995)

("[C]lass certification may properly be denied 'where the class representatives ha[ve] so little

knowledge of and involvement in the class action that they would be unable or unwilling to

protect the interests of the class against the possibly competing interests of the attorneys.'"

(quoting *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 727 (11th Cir. 1987))).

  Here, the Named Plaintiffs raise all the red flags identified above, and then some.  As

Appendix A makes clear, the class representatives are connected to the lawyers representing

Plaintiffs in this case, generally as friends, family, colleagues, employees or clients, and were

plainly recruited to serve as class representatives based on those relationships.  And most of the

Named Plaintiffs lack even a basic understanding of their claims.  When their depositions were

taken, they said they did not know if they were harmed by Amex's NDPs or whether consumers

would be benefitted if Amex changed its NDPs (Barbur Decl. Ex. 49 (Amend Tr. at 168:23-

169:6); Barbur Decl. Ex. 47 (Clark Tr. at 115:22-25); Barbur Decl. Ex. 39 (Grant Tr. at 194:14-

19, 195:7, 195:18-22, 202:10-19); Barbur Decl. Ex. 50 (Maddux Tr. at 232:11-14)); they did not

know whether merchants' fees would be lower absent Amex's NDPs (Barbur Decl. Ex. 37 (A.

Baker Tr. at 118:16-21)); and they did not know why they were suing Amex, what Amex had

allegedly done wrong, what about Amex's rules they were seeking to change or what they were

seeking to gain in the suit (Barbur Decl. Ex. 39 (Grant Tr. at 195:23-24, 196:4-10, 185:12-17,

198:2-7); Barbur Decl. Ex. 38 (Moskowitz Tr. at 173:15-25, 32:25-33:7); Barbur Decl. Ex. 46

(Tingle Tr. at 61:7-21)).  Some thought they were suing for greater merchant choice in what card

products to accept (Barbur Decl. Ex. 38 (Moskowitz Tr. at 173:15-25); Barbur Decl. Ex. 39

(Grant Tr. at 157:2-158:9)), while others thought they were suing for greater consumer choice in

what card products to use (Barbur Decl. Ex. 51 (O'Keefe Tr. at 31:6-11)).

Many class representatives also staked out positions that are nonsensical and contrary to the Plaintiffs' theory of harm.  For instance, several class representatives claimed that they were indifferent to rewards even though rewards are an undisputed financial benefit to the cardholders receiving them.  (Barbur Decl. Ex. 48 (Amaro Tr. at 134:7-10); Barbur Decl. Ex. 49 (Amend Tr. at 130:23-131:4); Barbur Decl. Ex. 37 (A. Baker Tr. at 70:16-19); Barbur Decl. Ex. 52 (Cooper Tr. at 155:10-15, 183:3-4, 177:2-178:5); Barbur Decl. Ex. 39 (Grant Tr. at 179:4-7); Barbur Decl. Ex. 53 (Maher Tr. at 104:22-105:4).)  Some class representatives even testified that they could not say whether they would rather receive 5% cash back or 1% cash back on a purchase, all else equal (Barbur Decl. Ex. 54 (Counts Tr. at 66:23-67:8); Barbur Decl. Ex. 53 (Maher Tr. at 108:6-111:16)) or whether they care about redeeming thousands of dollars' worth of rewards, all else equal (Barbur Decl. Ex. 52 (Cooper Tr. at 168:25-169:6); Barbur Decl. Ex. 55 (McCaffrey Tr. at 82:21-83:12)).  One even said she was indifferent to whether she paid 5% more or 5% less for a given item.  (Barbur Decl. Ex. 39 (Grant Tr. at 168:11-25).)  Put simply, in a lawsuit that is all about money, the Named Plaintiffs cannot possibly serve as adequate representatives when they purport not to care about money.

**3.     Named Plaintiffs Who Were Account Holders or Authorized Users of Amex Cards Are Not Adequate Representatives.**

Plaintiffs' class definition excludes "[t]hose who are Amex credit or charge card (including Amex cobranded cards) account holders or authorized users, or who were during the applicable Class Periods".  (Pls.' Br. at 4.)  However, Nanci-Taylor Maddux, one of the putative class representatives for the Mississippi classes, is an "authorized user" of an Amex credit card issued to her employer, the Barrett Law Group.  (Barbur Decl. Ex. 50 (Maddux Tr. at 75:16-25).)  She testified that the card bears her name, that she has online account credentials in her name, that she carries it on her person and that she can use it for business-related expenses.  (*Id.* at

75:16-25, 71:11-14, 77:14-19, 84:6-18.)  In connection with their motion, Plaintiffs do not even acknowledge that Ms. Maddux is an authorized user of an Amex card, let alone explain how Ms. Maddux could serve as a class representative when she is not in the putative class.

There is also an issue with the representative for the Vermont Credit class, Ellen Maher. The Vermont class period runs from June 17, 2016 to June 1, 2022.  (Pls.' Br. at 4.)  Ms. Maher currently holds a Costco Citi Visa card, and she testified that she held this Costco card when it was a cobrand card with Amex, before the portfolio transitioned to Citi.  (Barbur Decl. Ex. 53 (Maher Tr. at 53:8-54:2, 75:14-19).)  Because the Costco card portfolio did not transition to Citi until June 20, 2016, Ms. Maher was thus apparently an Amex cardholder for part of the class period.  (*Id.* at 53:8-10, 53:18-54:2, 75:14-19.)  Plaintiffs' motion ignores this issue entirely.

### C.    Because Plaintiffs Cannot Know the State Where Transactions Occurred, They Cannot Satisfy the Ascertainability or Predominance Requirements.

To be ascertainable, a class must be "defined using objective criteria that establish a membership with definite boundaries".  *In re Petrobras Sec.*, 862 F.3d at 264.  Here, membership in Plaintiffs' putative classes turns on whether potential class members "made a purchase . . . in the same state as their credit [or debit] card account's billing address".  (Seaver Decl. Ex. B (Ltr. from C. Hammarskjold to P. Barbur, dated Feb. 15, 2022).)  Yet Plaintiffs do not have *any* data showing where transactions actually took place.  Instead, Dr. Lamb relies on summary data from Visa and Mastercard, which include a merchant-state field but that information is simply provided to Visa and Mastercard by acquirers.  (Barbur Decl. Ex. 56 (Ltr. from G. Carney to R. Schindel, dated Oct. 24, 2022).)  ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  (Barbur

Decl. Ex. 2 (Lamb Tr. at 336:25-339:16).)  He also has no way of knowing whether the



he therefore cannot know whether the

for which putative class members could actually recover.  (*Id.* at 333:10-

19.)  The problem is even worse for Discover, since Discover produced only

(*Id.* at 339:22-343:22; Seaver Decl. Ex. A (Lamb Rpt. ¶ 365 nn.854-55).)  Because Dr.

Lamb does not know where either the consumers or the merchants are located for the

, he simply apportions                                   to the relevant states based on

population shares.  As a result, he ends up attributing

to states where they do not even have any retail operations.  For instance, Dr. Lamb

in Ohio, even though there are no

locations in the entire state.  (Barbur Decl. Ex. 15 (Gaier Rpt. ¶ 137, Figure 16).)

    To attempt to overcome this issue, Plaintiffs claim that class members will know whether

they are in the relevant classes "when a notice of pendency is disseminated" because they will

know "if they did not have an Amex card during the applicable class period, and they or an

authorized user of their Visa, Mastercard, or Discover credit card account made a purchase

transaction from a Qualifying Merchant during the applicable class period, where the purchase is

made in the same state as their credit card account's billing address".  (Pls.' Br. at 6.)  But this,

too, is wrong.  Individuals cannot know whether they "made" a transaction "in the same state" as

their card account's billing address, especially given Plaintiffs' failure to define what "making" a

transaction "in the same state" even means.  If a customer makes an online purchase from a

merchant located in another state but the goods are sent to the customer's home state, is that

transaction "made in the same state"?  Neither Plaintiffs nor Dr. Lamb say.  Recently, proposed

class was deemed unascertainable when membership turned on whether car accidents involved a

"hazard", but where plaintiffs had not defined that term and an individual in an accident would

have no way of knowing "whether the 'sensor suite assessed an imminent hazard'".  *Wang v.

Tesla*, 338 F.R.D. 428, 439-40 (E.D.N.Y. 2021).  The same logic applies here.

      Moreover, even if these problems did not render the class unascertainable, they

nevertheless mean that Plaintiffs have not met their burden to establish predominance.  Where a

transaction has been "made" is a question of state law that varies across jurisdictions—

particularly for online transactions—with at least one of the class states requiring individualized,

case-by-case inquiries.  In Illinois, for instance, "there is no single formula or bright-line test for

determining whether a transaction occurs within [the] state."  *Avery v. State Farm Mut. Auto. Ins.

Co.*, 835 N.E.2d 801, 854 (Ill. 2005).  Rather, [c]ircumstances will vary in every case", and this

"totality-of-the-circumstances standard has not yet produced much guidance in the context of

online conduct".  *Rivera v. Google Inc.*, 238 F. Supp. 3d 1088, 1101 (N.D. Ill. 2017); *cf.

Verheecke ex rel. Hinckley v. Jones*, No. 09-CV-4066, 2010 WL 1241829, at *3 (C.D. Ill. Mar.

19, 2010) (noting "the Court cannot determine what the 'location' of a check, online transfer,

letter, annuity, or other payment would be").  Other states, such as Maine, have not yet provided

guidance on where an online transaction is "made".  Plaintiffs do not address these state law

issues, let alone analyze the extent to which state law will require individualized determinations

of where a transaction occurred.  For this reason, too, class certification should be denied.

## IV.    CONCLUSION

      For the foregoing reasons, Amex respectfully requests that the Court deny Plaintiffs'

motion for class certification.

January 16, 2023

CRAVATH, SWAINE & MOORE LLP,

by

/s/ Peter T. Barbur
Evan R. Chesler
*echesler@cravath.com*
Peter T. Barbur
*pbarbur@cravath.com*
Rory A. Leraris
*rleraris@cravath.com*
Members of the Firm

Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for Defendants American Express Company and American Express Travel Related Services Company, Inc.*

**Appendix A**

| Named Plaintiff | Relationship to Counsel |
|---|---|
| Ricky Amaro | Formerly employed by Miller Law LLC (class counsel).  Andrew Szot of Miller Law approached Mr. Amend to be a class representative.  (Barbur Decl. Ex. 48 (Amaro Tr. at 18:9-20:11).) |
| Andrew Amend | Introduced to Alayne Goibielle and Melinda Nicholson (class counsel) through a mutual friend.  (Barbur Decl. Ex. 49 (Amend Tr. at 22:25-26:18).) |
| Abigail Baker | Niece of Richard Schager (class counsel).  Ms. Baker testified that Mr. Schager called her about the case, and they decided she "would be a good candidate".  (Barbur Decl. Ex. 37 (A. Baker Tr. at 21:11-22:19).) |
| Marilyn Baker | Sister of Richard Schager (class counsel) and mother of class representative Abigail Baker.  Ms. Baker testified that Mr. Schager "approached [her] informally to describe the case to see if [she] would have interest".  (Barbur Decl. Ex. 36 (M. Baker Tr. at 20:15-21:19).) |
| Angela Clark | Introduced to Brooke Rebarchak (class counsel) through a mutual friend.  Ms. Rebarchak asked Ms. Clark's friend "if they knew anyone who fit the criteria and so she reached out to [Ms. Clark]".  (Barbur Decl. Ex. 47 (Clark Tr. at 19:22-22:12).) |
| Wyatt Cooper | Learned about the case "through speaking with counsel", who "reached out to [him]" about being a class representative.  (Barbur Decl. Ex. 52 (Cooper Tr. at 23:22-25:25).) |
| Emily Counts | Introduced to class counsel through her employer, an attorney named Floyd Melton III.  (Barbur Decl. Ex. 54 (Counts Tr. at 15:10-16:2).) |
| Sarah Grant | Close family friends with Danny Cohen (class counsel).  Ms. Grant has known Mr. Cohen her whole life, as he is a close friend and former colleague of her father.  Mr. Cohen approached Ms. Grant about serving as a class representative in this case.  (Barbur Decl. Ex. 39 (Grant Tr. at 23:9-24:20).) |
| Sherie McCaffrey | Sister-in-law to Joseph Tabacco (class counsel).  Ms. McCaffrey testified that she and Mr. Tabacco were having a conversation about work, Mr. Tabacco mentioned the case and she expressed interest.  (Barbur Decl. Ex. 55 (McCaffrey Tr. at 18:25-19:24).) |
| Nanci-Taylor Maddux | Employed by a friend and former colleague of Gordon Ball (class counsel).  Mr. Ball contacted Ms. Maddux's boss, Don Barrett of Barrett Law Group "about looking for a class rep".  Mr. Barrett approached Ms. Maddux and "explained the case", and she agreed to be a class representative.  (Barbur Decl. Ex. 50 (Maddux Tr. at 21:21-25:17).) |
| Ellen Maher | Friends with Joseph Tabacco (class counsel).  Ms. Maher first came to |

| Named Plaintiff | Relationship to Counsel |
|---|---|
|  | know Mr. Tabacco because her husband and Mr. Tabacco worked together on an antitrust case early in their careers. Mr. Tabacco reached out to Ms. Maher directly about being involved in the case. (Barbur Decl. Ex. 53 (Maher Tr. at 20:2-21:6).) |
| David Moskowitz | Friends with Richard Schager (class counsel). They met through Mr. Moskowitz's boss and bonded over their shared interest in fly fishing and conservation. Mr. Schager told Mr. Moskowitz about this case when they were talking about work. Mr. Schager instructed Mr. Moskowitz not to answer questions at his deposition about whether Mr. Moskowitz had asked to be involved in the case or whether Mr. Schager had asked Mr. Moskowitz to be involved. (Barbur Decl. Ex. 38 (Moskowitz Tr. at 24:10-26:22).) |
| Shawn O'Keefe | Friends from college with Jose Sepulveda (class counsel). Mr. O'Keefe testified that Mr. Sepulveda "discussed the case with me, told me what it was about and I agreed to help be part of the case because I believed in what he said and wanted to help him". (Barbur Decl. Ex. 51 (O'Keefe Tr. at 27:17-29:22).) |
| James Steele Robbins | Introduced to class counsel through mutual friend of class counsel, Floyd Melton III. Mr. Robbins and Mr. Melton have been friends for most of their lives, and Mr. Robbins testified that they "casually discuss[ed]" the case while "eating dinner or something", and that Mr. Melton asked if Mr. Robbins had an Amex card. Mr. Melton later formally approached Mr. Robbins about being a class representative. (Barbur Decl. Ex. 57 (Robbins Tr. at 18:23-24:7).) |
| Allie Stewart | Introduced to Brooke Rebarchak (class counsel) through her soon-to-be mother-in-law, who is a lawyer and friends with Ms. Rebarchak. (Barbur Decl. Ex. 58 (Stewart Tr. at 25:9-27:4).) |
| Debbie Tingle | Employed by Floyd Melton III, a friend of class counsel. Ms. Tingle testified that Mr. Melton was talking about the case in the office, and she told him she was interested. Ms. Tingle also testified that she knew Bob Methvin (class counsel) from having worked with his law firm on other matters. Mr. Melton participated in Ms. Tingle's deposition preparation for this case, along with Jim Terrell and Bob Methvin (class counsel). (Barbur Decl. Ex. 46 (Tingle Tr. at 13:6-11, 14:25-15:23).) |