# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

**HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER**

| | |
|---|---|
| ANTHONY OLIVER, TERRY GAYLE QUINTON, SHAWN O'KEEFE, ANDREW AMEND, SUSAN BURDETTE, GIANNA VALDES, DAVID MOSKOWITZ, ZACHARY DRAPER, NATE THAYER, MICHAEL THOMAS REID, ALLIE STEWART, ANGELA CLARK, JOSEPH REALDINE, RICKY AMARO, ABIGAIL BAKER, JAMES ROBBINS IV, EMILY COUNTS, DEBBIE TINGLE, NANCI-TAYLOR MADDUX, SHERIE MCCAFFREY, MARILYN BAKER, WYATT COOPER, ELLEN MAHER, SARAH GRANT and GARY ACCORD on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) Case No. 1:19-cv-00566 (NGG)(SJB) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| AMERICAN EXPRESS COMPANY and AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, INC., | ) ) ) ) |
| Defendants. | ) ) ) |

**EXPERT REPLY REPORT**

**Dr. Russell L. Lamb**
**President**
Monument Economics Group, LLC
1000 Wilson Boulevard
Suite 2650
Arlington, VA 22209

March 17, 2023

# PUBLIC REDACTED VERSION

**TABLE OF CONTENTS**

I.   Summary of Opinions, Assignment, and Conclusions ...............................................1

   A.   Summary of Opinions in the Lamb Report ...............................................................1

   B.   Summary of Opinions in the Lamb Supplemental Report ......................................3

   C.   Assignment ..............................................................................................................3

   D.   Summary of Conclusions .........................................................................................4

II.   Defendants' Economists' Reports Contain Several Overarching, Critical Flaws ......5

   A.   Contrary to Defendants' Economists' Claims, the Analysis and Conclusions Reached in the Lamb Report Properly Considered the Market for GPCC Transactions as a Two-Sided Market ...................................................................7

   B.   Many of the Criticisms Contained in Defendants' Economists' Reports Reflect a Critical Misunderstanding of the But-For World ...............................................10

     i.   Amex's Inability to Continue Imposing and Enforcing its Anti-Steering Rules would Result in a New Competitive Equilibrium in the Market for GPCC Transactions ......................................................................................................11

     ii.   Defendants' Economists Incorrectly Assume that Prices in the Market for GPCC Transactions Cannot Decline Without Destroying the Market or Bankrupting the Card Networks .........................................................................................................12

     iii.   Defendants' Economists Incorrectly Assert that Current Levels of Cardholder Rewards Are Constrained by Interchange and/or Merchant Discount Rates .....21

     iv.   Dr. Emch Acknowledges that Heightened Levels of Competition in the Market for GPCC Transactions Would Cause Two-Sided Prices to Decline .................26

   C.   Defendants' Economists' Fixation on Surcharging in the But-For World is Misplaced and Inappropriate .............................................................................31

     i.   The Threat of Surcharging Would Discipline Prices in the Market for GPCC Transactions ......................................................................................................32

     ii.   Australia's Experience Demonstrates that GPCC Payment Networks Would Respond Pro-Actively and Aggressively to Credible Merchant Threats to Surcharge in the U.S. by Lowering Merchant Discount Rates ..........................34

     iii.   Defendants' Economists Fail to Consider the Differences in Regulation that Conditioned the Experience of Surcharging in Australia ...................................41

III.   Defendants' Economists Do Not Dispute the Conclusions Reached in the Lamb Report that the GPCC Transaction Market in the United States Constitutes the Relevant Antitrust Market..................................................................................................45

IV.   None of Defendants' Economists Opinions Undermine the Conclusions Reached in the Lamb Report that Amex's Continued Imposition and Enforcement of its Anti-Steering Rules Have Caused Anticompetitive Effects ......................................46

   A.   Dr. Emch's Claims Regarding My Analysis of Amex's Market Power are Meritless ...............................................................................................47

     i.   Dr. Emch Does Not Dispute that Amex's Pricing is Disconnected from the Marginal Cost of GPCC Transactions ................................................49

    ii.   Dr. Emch's Criticisms of my Analysis of Amex's Persistent and Profitable Price Increases are Fundamentally Flawed and Unreliable .........................52

     a.   Dr. Emch's Claims that Amex's Persistent and Profitable Price Increases Were Significantly Driven by the "Value" Merchants Received in Return Lack Merit 55

     b.   Dr. Emch's Purported Analyses of Amex's Two-Sided Prices are Misleading and Inaccurate ......................................................................................61

   iii.   Dr. Emch's Defense of Amex's Successful Price Discrimination Lacks Merit .69

   iv.   Dr. Emch's Claims About Merchants' Ability to Practically Drop Amex Acceptance are Contradicted by Extensive Evidence.........................................70

    v.   Dr. Emch's Claims Regarding Purported Indirect Evidence of Amex's Lack of Market Power are Both Fundamentally Flawed and Irrelevant..........................76

   B.   None of Defendants' Economists Opinions have Caused Me to Change the Conclusions Reached in the Lamb Report that Amex's Continued Imposition and Enforcement of its Anti-Steering Rules was Anticompetitive in that it Caused Higher Net Two-Sided Prices on GPCC Transactions than Otherwise Would Have Occurred ....................................................................................81

    i.   Amex's Continued Imposition and Enforcement of its Anti-Steering Rules Successfully Forestalled Competition on the Merchant Side of the Market for GPCC Transactions..............................................................................81

ii.  Contrary to Dr. Emch's Fundamentally-Flawed Assertions, Absent Amex's Anti-Steering Rules, Merchants' Overall Costs Of GPCC Acceptance Would Have Been Lower ......................................................................83

a.  Dr. Emch's Speculative Claims Regarding Supposed Obstacles to Merchant Steering ...............................................................................84

b.  Dr. Emch's Claims Regarding Merchant Acquirer Absorption of Reduced GPCC Acceptance Costs are Specious and Irrelevant........................................87

c.  Dr. Emch's Claims Regarding Discover's Business Strategy Further Reveal the Anticompetitive Nature of Amex's Anti-Steering Rules....................................94

d.  Dr. Emch's Claims that Amex's Australia Experience Does Not Support My Conclusions Regarding Anticompetitive Effects Lack Merit...........................100

iii.  Dr. Emch's Claims Regarding Annual Fees Net of Rewards Lack Merit........104

a.  Dr. Emch's Criticisms of the Economic Theory and Common Evidence I Cited in the Lamb Report Lack Merit ...............................................................107

b.  Dr. Emch's Empirical Analysis is Misguided .................................114

C.  Dr. Bernheim's Assertions Regarding Procompetitive Effects of Amex's Anti-Steering Rules are Fatally Flawed and Misguided ...........................................121

i.  Dr. Bernheim's Claims Regarding the Risk of Degradation to Amex's Brand are Misguided and Lack Merit.........................................................126

ii.  Dr. Bernheim's Claims Regarding the Nature and History of Amex's Anti-Steering Rules are Misguided .......................................................136

iii.  Dr. Bernheim's Claims that Amex's Anti-Steering Rules Prevent Merchants from Adopting Strategies that Are Harmful to Consumers and Undermine Competition Lack Merit..................................................................139

V.  None of Defendants' Economists' Opinions have Caused Me to Change the Conclusions Reached in the Lamb Report that All or Nearly All Members of the Credit Card Class and Debit Card Class were Injured by Amex's Continued Imposition and Enforcement of its Anti-Steering Rules.........................................................143

A.  Dr. Gaier's Claims Regarding the Chain of Causation Necessary to Establish Class-Wide Injury are Misguided ......................................................144

     i.    Contrary to Dr. Gaier's Claims, an Appropriate Analysis of the But-For World Can Be Conducted Without Positing an Elaborate Causal Chain or Attempting to Predict the Specific Behaviors of Every Actor in the GPCC Transaction Market ................................................................................................144

    ii.   Dr. Gaier's Claims Regarding Uniformity Throughout His Chain of Causation Lack Merit ................................................................................152

B.   Dr. Gaier's Assertions Regarding the "Obvious Harms" of Merchant Steering are Fundamentally-Flawed, Meritless, and Have No Bearing on the Establishment of Class-Wide Injury ................................................154

     i.    Dr. Gaier's Claims Regarding the "Obvious Harms" of Surcharging are Misguided and Incorrect ................................................157

    ii.   Dr. Gaier's Claims Regarding the "Obvious Harms" of Other Forms of Merchant Steering are Flawed and Meritless ................................160

C.   Dr. Gaier's Assertions Regarding the Impact of Co-Brand are Fatally-Flawed ................................................................................163

D.   Dr. Gaier's Assertions Regarding Cross-Subsidization are Wrong .................170

E.   Dr. Gaier's Assertions Regarding the Impact of Amex's Anti-Steering Rules on Non-Qualifying Merchants have No Bearing on the Question of Class-Wide Injury ................................................................................171

F.   Dr. Gaier's Claims Regarding Annual Fees Net of Rewards Absent Amex's Anti-Steering Rules Lack Merit ................................................172

G.   None of the Criticisms in Dr. Gaier's Report Have Caused Me To Change the Conclusions I Reached in the Lamb Report Regarding Antitrust Injury Suffered by All Or Nearly All Members of the Debit Card Class ................................173

VI.   My Estimation of Damages Suffered by Members of the Credit Card Class and Debit Card Class is Reasonable ................................................174

A.   Dr. Gaier's Criticisms of the Use of My Benchmark in My Damages Methodology are Misguided ................................................175

     i.    Discover's Abandonment of its Low-Cost Provider Strategy Provides a Sound and Reasonable Benchmark for My Damages Methodology ...........................175

    ii.   The Additional Criticisms Contained in the Gaier Report Regarding My Use of Discover's Abandonment of its Low-Cost Provider Strategy as a Benchmark in My Damages Methodology are Incorrect ........................................................178

  B.   Dr. Gaier's Criticisms of My Analysis of Pass-Through are Irrelevant ...........183

    i.   Dr. Gaier's Assertions Regarding Alternative Studies of Pass-Through are Meaningless ....................................................................................184

    ii.   Dr. Gaier's Additional Criticisms of My Analysis of Pass-Through of GPCC Cost Savings are Inconsistent with Statements and Acknowledgments made by Qualified Merchants .............................................................................186

  C.   Dr. Gaier's Assertions Regarding the Impact of Co-Branded Cards on My Damages Methodology are Purely Speculative and Fatally Flawed ................192

  D.   Dr. Gaier's Additional Flawed and Unsupported Criticisms of My Damages Methodology ....................................................................................194

  E.   Updated Estimation of Damages Suffered by Members of the Credit Card Class and Debit Card Class ........................................................................197

VII.  Conclusions..................................................................................203

## I.    Summary of Opinions, Assignment, and Conclusions

1.      I listed my background and qualifications in the Lamb Report filed in this matter on September 30, 2022.[1]  Since the filing of the Lamb Report, I also filed a Supplemental Expert Report in this matter on October 19, 2022.[2]  An updated copy of my C.V., including a list of the matters in which I have submitted expert testimony in the past four years, is attached to this report as Appendix A.

### A.  *Summary of Opinions in the Lamb Report*

2.      In the Lamb Report, I concluded, based on my analyses and research into the payment card industry in the United States, as well as my training and experience in economics, that the market for GPCC Transactions in the United States constitutes the relevant antitrust market.[3]  I further concluded that common evidence demonstrates that Amex's continued imposition and enforcement of its Anti-Steering Rules caused Amex-accepting merchants to incur higher overall GPCC[4] acceptance costs during the Class Periods[5] than they otherwise would have.  Further, common evidence demonstrates that GPCC issuers would not have increased Annual Fees Net of Rewards[6] in a world where Amex was unable to impose or enforce its Anti-Steering Rules.  Thus, taken together, this common evidence demonstrates that Amex's continued imposition and enforcement of its Anti-Steering Rules during the Class Periods was anticompetitive, as it forestalled

---

[1] United States District Court Eastern District of New York, *Anthony Oliver, et al., Plaintiffs, v. American Express Company and American Express Travel Related Services Company, Inc., Defendants,* Expert Report of Dr. Russell L. Lamb, No. 1:19-cv-00566-NGG-SJB, September 30, 2022 (hereafter "Lamb Report").

[2] United States District Court Eastern District of New York, *Anthony Oliver, et al., Plaintiffs, v. American Express Company and American Express Travel Related Services Company, Inc., Defendants,* Supplemental Expert Report of Dr. Russell L. Lamb, No. 1:19-cv-00566-NGG-SJB, October 19, 2022 (hereafter "Lamb Supplemental Report").

[3] Lamb Report at ¶¶106-137.

[4] I understand from Counsel for the Plaintiffs that, for the purposes of their allegations, General Purpose Credit or Charge Card (or "GPCC") means an electronic payment card, for use on the Visa, Mastercard, or Discover network, that permits a consumer to make purchases without accessing or reserving the consumer's funds at the time of the purchase, and that permits the consumer to pay for the purchases at some time after the purchase is made. GPCC Cards include co-branded cards and affinity cards but do not include cards that can be used at only one merchant (such as a department store card).

[5] A summary of the applicable Class Periods for each Relevant State is included as Appendix C to the Lamb Report.

[6] In the Lamb Report, I defined the Annual Fee Net of Rewards as the cardholder fee, which is generally broken down into a fixed annual fee paid by the cardholder to the card-issuing bank and a per-transaction fee that depends on the value of the transaction. See Lamb Report at ¶62.

competition, resulting in higher net two-sided prices during the Class Periods than otherwise would have prevailed.[7]

3.       I further concluded in the Lamb Report that common evidence demonstrates that Qualified Merchants[8] passed on at least some portion of the artificially-inflated GPCC acceptance costs that resulted from Amex's continued imposition and enforcement of its Anti-Steering Rules in the form of higher retail prices during the Class Periods, and that absent Amex's Anti-Steering Rules, Qualified Merchants would have passed on at least some portion of their cost savings to their customers.[9]  I also concluded in the Lamb Report that common evidence demonstrates that all consumers, not just those paying with GPCCs, paid the artificially-inflated retail prices charged by Qualified Merchants during the Class Periods that resulted from Amex's continued imposition and enforcement of its Anti-Steering Rules.[10]

4.       In addition, I concluded in the Lamb Report that common evidence demonstrates that Amex's continued imposition and enforcement of its Anti-Steering Rules during the Class Periods caused all or nearly all members of the Credit Card Class[11] to suffer antitrust injury in that they paid higher Net GPCC Cardholder Prices[12] than they otherwise would have, and that Amex's continued imposition and enforcement of its Anti-Steering Rules during the Class Periods caused all or nearly all members of the Debit Card Class[13] to suffer antitrust injury in that they paid higher Net Debit Cardholder

---

[7] Lamb Report at ¶¶138-291.

[8] A summary of the Qualified Merchants, which includes, without limitation, their retail stores, brands, or banners, is included as Appendix D to the Lamb Report.

[9] Lamb Report at ¶¶294-330.

[10] Lamb Report at ¶¶331-338.

[11] I understand from Counsel for the Plaintiffs that the Credit Card Class refers to: All card account holders, who are natural persons, and whose account billing address was in [State] during the applicable Class Period, and whose Visa, Mastercard, or Discover General Purpose Credit or Charge Card account was used by an account holder or an authorized user for a purchase of a good or service from a Qualifying Merchant during the Class Period that occurred in [same State] (hereafter "Qualified GPCC Purchases").

[12] In the Lamb Report, I defined Net GPCC Cardholder Prices to be the prices paid on a given Qualified GPCC Transaction (calculated as the sum of the retail price and the Annual Fees Net of Rewards) by members of the Credit Card Class as the "Net GPCC Cardholder Price." Lamb Report at ¶293. Unless otherwise noted, I use that same definition of the Net GPCC Cardholder Price in this Expert Reply Report as well.

[13] I understand from Counsel for the Plaintiffs that the Credit Card Class refers to: All card account holders, who are natural persons, and whose account address was in [State] during the applicable Class Period, and whose Visa or Mastercard Debit Card account was used by an account holder or an authorized user, for a

Prices[14] than they otherwise would have.[15]  I also concluded in the Lamb Report that standard and reliable economic methodology exists that would allow me to estimate aggregate amount of overcharge damages suffered by members of the Credit Card Class and Debit Card Class as a result of Amex's continued imposition and enforcement of its Anti-Steering Rules on a class-wide basis without resorting to individualized inquiry.[16]

### B.  Summary of Opinions in the Lamb Supplemental Report

5.      In the Lamb Supplemental Report, I discussed the implementation of the standard and reliable economic methodology that allowed me to estimate the aggregate damages suffered as a result of Amex's continued imposition and enforcement of its Anti-Steering Rules by members of the Credit Card Class and Debit Card Class on a class-wide basis without resorting to individualized inquiry based on the Summary-Level Sales Data that were produced by Visa, Mastercard, and Discover shortly before the submission of the Lamb Report.[17]  As I discussed in the Lamb Supplemental Report, using this methodology, I estimated the aggregate amount of overcharge damages suffered by members of the Credit Card Class by Relevant State[18] during the applicable Class Periods to be $326.4 million, and the aggregate amount of overcharge damages suffered by members of the Debit Card Class by Relevant State during the applicable Class Periods to be $374.8 million.

### C.  Assignment

6.      Since preparing the Lamb Report and the Lamb Supplemental Report, I have been asked by Counsel for Plaintiffs in this matter to review the reports prepared by Dr. B.

---

purchase of a good or service from a Qualifying Merchant during the Class Period that occurred in [same State] (hereafter "Qualified Debit Card Purchases").

[14] In the Lamb Report, I defined Net Debit Cardholder Prices to be the prices paid on a given Qualified GPCC Transaction (calculated as the sum of the retail price and the Annual Fees Net of Rewards) by members of the Debit Card Class as the "Net Debit Cardholder Price." Lamb Report at ¶293. Unless otherwise noted, I use that same definition of the Net Debit Cardholder Price in this Expert Reply Report as well.

[15] Lamb Report at ¶¶339-347.

[16] Lamb Report at ¶¶348-380.

[17] Lamb Supplemental Report at ¶¶1-5.

[18] Throughout the remainder of this Expert Reply Report I use the term "Relevant States" to collectively refer to the thirteen states (and District of Columbia) at issue in this matter: Alabama, District of Columbia, Hawaii, Kansas, Maine, Mississippi, North Carolina, Oregon, Utah, Vermont, West Virginia, Illinois, Montana, and Ohio.  See Letter from Carl Hammarskjold to Peter T. Barbur, dated February 15, 2022 (hereafter "February 2022 Hammarskjold Letter").

Douglas Bernheim ("Bernheim Report"), Dr. Eric Emch ("Emch Report"), and Dr. Eric M. Gaier ("Gaier Report") (collectively, "Defendants' Economists").[19]  In particular, I have been asked to consider Defendants' Economists' criticisms of the Lamb Report and/or the Lamb Supplemental Report in order to determine whether anything in their reports causes me to change my conclusions.  Finally, I was asked to prepare this Expert Reply Report to present my findings regarding the opinions expressed by Defendants' Economists.  A complete list of the materials I relied upon in forming my opinions, in addition to those cited in the Lamb Report and Lamb Supplemental Report, is contained in Appendix B.

### D. Summary of Conclusions

7.      Based on my review of the Defendants' Economists' reports, back-up materials, deposition testimony, and my further analyses and research into the market for GPCC Transactions in the United States, as well as my training and experience in economics, I have reaffirmed the conclusions set forth in the Lamb Report and reiterated above.  As I discuss in greater detail below, I find that many of Defendants' Economists' analyses are flawed and unreliable, or immaterial to my findings and conclusions, or both.  Further, I find that their criticisms of the analyses contained in the Lamb Report are either flawed; based upon a critical misunderstanding of Plaintiffs' allegations, the evidence, and the nature of Amex's alleged anticompetitive conduct, and, thus, are unreliable and without merit; and/or are irrelevant to the conclusions I reached in the Lamb Report.  I detail the numerous flaws in Defendants' Economists' reports below.[20]

---

[19] United States District Court Eastern District of New York, *Anthony Oliver, et al., Plaintiffs, v. American Express Company and American Express Travel Related Services Company, Inc., Defendants,* Expert Report of B. Douglas Bernheim, No. 1:19-cv-00566-NGG-SJB, January 16, 2023 (hereafter "Bernheim Report"); United States District Court Eastern District of New York, *Anthony Oliver, et al., Plaintiffs, v. American Express Company and American Express Travel Related Services Company, Inc., Defendants,* Expert Report of Eric Emch, PhD, No. 1:19-cv-00566-NGG-SJB, January 16, 2023 (hereafter "Emch Report"); United States District Court Eastern District of New York, *Anthony Oliver, et al., Plaintiffs, v. American Express Company and American Express Travel Related Services Company, Inc., Defendants,* Expert Report of Eric M. Gaier, PhD, No. 1:19-cv-00566-NGG-SJB, January 16, 2023 (hereafter "Gaier Report").

[20] It was neither practical nor necessary for me to respond to every argument and opinion that was expressed by the Defendants' Economists. That I do not explicitly address certain of Defendants' Economists' opinions is not an admission that I agree with those opinions. For the reasons I discuss below, I have concluded that none of the Defendants' Economists. conclusions or findings have caused me to change or modify the opinions set forth in the Lamb Report.

8.      Furthermore, based on new information about the Summary-Level Sales Data I learned since the serving of the Lamb Report and Lamb Supplemental Report, as well as two minor criticisms in Dr. Gaier's report I felt were reasonable, I have updated my reasonable estimate of damages suffered by members of the Credit Card Class and Debit Card Class.[21]   The estimated aggregate amount of overcharge damages suffered by members of the Credit Card Class by Relevant State during the applicable Class Periods total $251.6 million, and the estimated aggregate amount of overcharge damages suffered by members of the Debit Card Class by Relevant State during the applicable Class Periods total $319.7 million.

## II.    Defendants' Economists' Reports Contain Several Overarching, Critical Flaws

9.      In the Lamb Report, I explained in extensive detail the nature of the but-for world that would have emerged following the 2011 Consent Decree[22] and 2013 Settlement,[23] where Amex would be unable to continue to impose and enforce its Anti-Steering Rules.[24]  As I explained, as a result of Amex's continued imposition and enforcement of its Anti-Steering Rules following the 2011 Consent Decree and 2013 Settlement, Amex-accepting merchants (including Qualified Merchants) were denied the availability of a competitive toolkit (in the form of various pro-competitive steering methods) that would have allowed them to lower their overall GPCC acceptance costs.  Particularly, in the absence of Amex's Anti-Steering Rules, Amex-accepting merchants would have gained

---

[21] I understand from Counsel for the Plaintiffs that, for the purposes of their allegations, Debit Card means an electronic payment card that a consumer can use to make purchases from a merchant for which no credit is extended and the consumer must have sufficient funds in a demand deposit account, or pre-loaded on the card, to pay for the purchase at the time of the transaction.

[22] Shortly after the passage of Dodd-Frank, Visa and Mastercard entered into a Consent Decree with the U.S. Department of Justice which required Visa and Mastercard to permit merchants to offer customers discounts, benefits, or other incentives to switch to a particular brand of GPCC, or alternative form of payment, as well as to promote or express a preference for a particular brand of GPCC, or alternative forms of payment.  See United States District Court for the Eastern District of New York, *United States of America, et al., Plaintiffs, v. American Express Company and American Express Travel Related Services Company, Inc., Defendants*, Final Judgment As To Defendants Mastercard International Incorporated And Visa Inc., No. 1:10-cv-04496-NGG-RER, July 20, 2011 at pp. 5-6.

[23] A 2013 settlement involving Visa and Mastercard in a related matter involving a group of merchant Plaintiffs.  See United States District Court Eastern District of New York, *In Re: Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, Payment Card Interchange Fee Settlement, No. 1:05-md-01720-JG-JO, December 13, 2013.

[24] Lamb Report at ¶¶138-233.

the ability to credibly threaten Amex and the other GPCC payment networks with steering to the merchant's preferred GPCC payment option, thus providing those merchants with important leverage to use in negotiations with GPCC payment networks to extract more favorable financial terms (i.e., lower merchant discount rates) in exchange for i) agreements to steer customers towards a specific GPCC (e.g., a preference campaign promoting that merchant's preference for a specific GPCC); or ii) agreements not to steer customers away from using a specific GPCC (e.g., an agreement not to surcharge a specific GPCC, or to at least to not surcharge it more than any other GPCC). Therefore, as I discussed, as a result of Amex's continued implementation and enforcement of its Anti-Steering Rules, Amex-accepting merchants (such as Qualified Merchants) incurred higher GPCC acceptance costs (merchant discount rates) on GPCC Transactions than they otherwise would have.

10.    Furthermore, I discussed in extensive detail in the Lamb Report how, in a world absent Amex's Anti-Steering Rules, two-sided prices for GPCC Transactions would have been lower than they actually were.[25] As I discussed, in order to determine whether Amex's continued imposition and enforcement of its Anti-Steering Rules had anticompetitive effects, it is necessary to consider any differences in the Annual Fees Net of Rewards paid by GPCC cardholders in the absence of Amex's Anti-Steering Rules during the Class Periods. If the removal of Amex's Anti-Steering Rules resulted in GPCC cardholders paying higher Annual Fees Net of Rewards (either through higher annual fees and/or lower cardholder rewards) than they otherwise would have, it would be necessary to determine whether, and to what extent, these higher Annual Fees Net of Rewards offset the reduced overall costs of GPCC acceptance that would have resulted absent Amex's Anti-Steering Rules in order to determine whether Amex's Anti-Steering Rules resulted in higher net two-sided prices on GPCC Transactions. However, as I discussed, based on my review of common evidence and my training and experience in economics, I concluded that the Annual Fees Net of Rewards paid by GPCC cardholders would not have increased in a but-for world absent Amex's continued imposition and enforcement of its Anti-Steering Rules. In fact, in many instances, GPCC issuers likely

---

[25] Lamb Report at ¶¶270-291.

would have responded to increased competition on the merchant side of the market for GPCC Transactions by decreasing Annual Fees Net of Rewards (either through lower annual fees and/or higher cardholder rewards). Given this, at a minimum, the reduced costs of GPCC acceptance Amex-accepting merchants would have paid absent Amex's Anti-Steering Rules would not have been offset by reductions in the levels of cardholder rewards earned by GPCC cardholders and/or increases in the annual fees paid by GPCC cardholder, and further, the benefit to consumers from Amex-accepting merchants' pass-through of reduced merchant discount fees to retail prices would not have been offset by increases in Annual Fees Net of Rewards.

11.    The opinions and assertions contained in Defendants' Economists' reports suffer from a number of overarching, critical flaws that render their opinions irrelevant and incorrect. In particular, the opinions reached by Drs. Bernheim, Emch, and Gaier reflect a fundamental misunderstanding of the but-for world and the nature of competition in the market for GPCC Transactions. Furthermore, many of the opinions and conclusions Defendants' Economists reach in their reports are based on the incorrect notion that I did not properly analyze the market for GPCC Transactions as a two-sided market. I discuss these overarching, critical flaws in greater detail below.

### A. *Contrary to Defendants' Economists' Claims, the Analysis and Conclusions Reached in the Lamb Report Properly Considered the Market for GPCC Transactions as a Two-Sided Market*

12.    As I explained in detail in the Lamb Report, I have analyzed the market for GPCC Transactions as a two-sided market and my inquiry into the potential anticompetitive effects of Amex's continued imposition and enforcement of its Anti-Steering Rules, as well as class-wide injury or damages does consider the market as a two-sided market.[26]

---

[26] See, for example, Lamb Report at ¶¶56-75, 139, 269-272, 290-295, 341. For example, in the section of the Lamb Report where I analyzed the anticompetitive effects of Amex's continued imposition and enforcement of its Anti-Steering Rules, I explained: "the market for GPCC Transactions is a two-sided market. As I explained, the overall price level in this market is the sum of the merchant discount fee and the Annual Fee Net of Rewards. I explained that cardholder fee is generally broken down into a fixed annual fee paid by the cardholder to the card-issuing bank and a variable per-transaction fee (cardholder reward) that typically depends on the value of the transaction. The variable component of the Annual Fee Net of Rewards is generally negative, which means that the cardholder's issuing bank makes a payment to the cardholder in the form of cardholder rewards. If the rate at which the cardholder earns rewards exceeds

However, throughout their reports, Defendants' Economists assert that my analyses are improper because I do not properly analyze the market for GPCC Transactions as a two-sided market, and, therefore, are invalid. This is incorrect. In fact, Defendants' Economists themselves often fail to account for important features of two-sided markets in their analyses.

13.     Given the two-sided nature of the market for GPCC Transactions, I often discussed my analyses in the Lamb Report separately, looking at the merchant side of the market first, the cardholder side second, and then considering the various parts of this analysis en route to reaching my conclusions about the GPCC Transactions market as a whole.[27] Often, when incorrectly criticizing me for failing to properly analyze the market

---

the amortized annual fee, then the Annual Fee Net of Rewards is negative. In light of this, in order to determine whether Amex's continued imposition and enforcement of its Anti-Steering Rules had anticompetitive effects, it is necessary to consider any differences in the Annual Fees Net of Rewards paid by GPCC cardholders in the absence of Amex's Anti-Steering Rules during the Class Periods." See Lamb Report at ¶¶271-272.

[27] See, for example, Lamb Report at ¶¶139, 269-272, 290-292. By way of example, when introducing the section of the Lamb Report that analyzed the anticompetitive effects of Amex's continued imposition and enforcement of its Anti-Steering Rules, I explained: "Over the next two sections, I discuss common evidence demonstrating that Amex's continued imposition and enforcement of its Anti-Steering Rules has resulted in anticompetitive effects in that they caused net two-sided GPCC Transaction prices to be higher than they otherwise would have been. In the next section, I discuss common evidence demonstrating that Amex's continued imposition and enforcement of its Anti-Steering Rules caused Amex-accepting merchants (including Qualified Merchants) to incur higher costs of GPCC acceptance (merchant discount fees) than they otherwise would have. In the section that follows, I discuss common evidence demonstrating that the lower costs of GPCC acceptance that would have prevailed had Amex ceased imposing and enforcing its Amex's Anti-Steering Rules would not have been offset by increased Annual Fees Net of Rewards paid by GPCC cardholders." See Lamb Report at ¶139. Furthermore, when concluding my analysis of the anticompetitive effects of Amex's continued imposition and enforcement of its Anti-Steering Rules in the Lamb Report, I explained: "The common evidence discussed in extensive detail above demonstrates that Amex's continued imposition and enforcement of its Anti-Steering Rules have caused anticompetitive effects. In Section V.A above, I discussed common evidence demonstrating that Amex's continued imposition and enforcement of its Anti-Steering Rules caused Amex-accepting merchants (including Qualified Merchants) to incur higher overall GPCC acceptance costs (merchant discount fees) during the Class Periods than they otherwise would have. Furthermore, in Section V.B, I discussed common evidence demonstrating that, at a minimum, GPCC issuers would not have increased the Annual Fees Net of Rewards (either through reduced cardholder rewards or increased annual fees) charged to GPCC cardholders in a world where Amex was unable to impose or enforce its Anti-Steering Rules. In fact, as I discussed above, economic theory and common evidence demonstrate that, in many instances, GPCC issuers likely would have *reduced* the Annual Fees Net of Rewards (through reduced annual fees or increased cardholder rewards) charged to GPCC cardholders in response to the increased levels of competition on the merchant side of the market for GPCC Transactions that would have occurred absent Amex's Anti-Steering Rules. This common evidence, *taken together,* as well as my training and experience in economics, forms the basis of my conclusion that Amex's continued imposition and enforcement of its Anti-Steering Rules during the Class Periods was anticompetitive in that it forestalled competition in the market for GPCC Transactions, resulting in higher two-sided prices paid by GPCC

for GPCC Transactions as a two-sided market, Defendants' Economists focus on an analysis or discussion on one side of the market (typically the merchant side of the market) and claim that that analysis or discussion is invalid because it fails to consider the other side of the market and, thus, fails to analyze the GPCC Transactions market as a two-sided market.[28] Defendants' Economists' criticisms in this regard lack merit.

14.      Furthermore, in rendering these incorrect criticisms of my analyses and opinions contained in the Lamb Report, Defendants' Economists more specifically claim that my analyses focus only on the merchant side of the two-sided GPCC Transactions market.[29] While this is incorrect for the reasons discussed above, I have noted that, generally speaking, my analyses contained in the Lamb Report tend to focus more on the merchant side of the GPCC Transactions market compared to the cardholder side of the GPCC Transaction market.  The reason for this is simply because Amex's Anti-Steering Rules that are the focus of the alleged misconduct in this matter most directly affect merchants, as these provisions are contained within the Card Acceptance Agreements that merchants enter into with Amex.  Thus, it stands to reason that, in some instances, a larger portion of a given discussion or analysis in the Lamb Report focuses on the merchant side of the market.  However, as I noted above this focus does not mean that I failed to properly consider the cardholder side of the market when analyzing the effect of Amex's continued imposition and enforcement of its Anti-Steering Rules on the overall GPCC Transactions market, as Defendants' Economists erroneously assert throughout their reports.

15.      Defendants' Economists' incorrect assertions that the analyses and conclusions contained in the Lamb Report fail to properly consider the market for GPCC Transactions as a two-sided market underpin many of the conclusions they reached in their reports, rendering them meaningless.  I discuss these erroneous assertions in greater detail later in this Expert Reply Report.[30]  In addition to this serious flaw of the criticisms contained in

---

cardholders during the Class Periods than otherwise would have prevailed."  See Lamb Report at ¶290 (emphasis added).
[28] See, for example, Emch Report at ¶¶140-143, 148-153.
[29] See, for example, Bernheim Report at ¶16; Emch Report at ¶10.
[30] Later in this Expert Reply Report, I address Dr. Bernheim's misguided claims regarding network externalities in the two-sided market for GPCC Transactions.

Defendants' Economists' reports, Defendants' Economists' criticisms also contain overarching, critical flaws that render their opinions irrelevant and incorrect, in that they reflect a fundamental misunderstanding of the but-for world and the nature of competition in the market for GPCC Transactions.  I discuss the critical flaws in Defendants' Economists' opinions in this regard in the next section.

### B. Many of the Criticisms Contained in Defendants' Economists' Reports Reflect a Critical Misunderstanding of the But-For World

16.     As I noted above, many of the criticisms contained in Defendants' Economists' reports demonstrate a fundamental misunderstanding of the but-for world and the nature of competition in the market for GPCC Transactions.  In the Lamb Report, I explained in extensive detail the nature of the but-for world that would have emerged following the 2011 Consent Decree and 2013 Settlement, in which Amex would be unable to continue to impose and enforce its Anti-Steering Rules.[31]  As I explained, as a result of Amex's alleged misconduct, Amex-accepting merchants (including Qualified Merchants) were denied the availability of a competitive toolkit that would have allowed them to lower their overall GPCC acceptance costs.  Therefore, as I discussed, as a result of Amex's continued implementation and enforcement of its Anti-Steering Rules, Amex-accepting merchants (such as Qualified Merchants) incurred higher GPCC acceptance costs (merchant discount rates) on GPCC Transactions than they otherwise would have.

17.     Furthermore, I discussed in extensive detail in the Lamb Report how, in a world absent Amex's Anti-Steering Rules, the enhanced bargaining power enjoyed by Amex-accepting merchants would have caused two-sided prices for GPCC Transactions to be lower than they otherwise were.[32]  As I discussed, based on my review of common evidence and my training and experience in economics, I concluded that the Annual Fees Net of Rewards paid by GPCC cardholders would not have increased in a but-for world absent Amex's continued imposition and enforcement of its Anti-Steering Rules and, therefore, at a minimum, the artificially-inflated merchant discount fees paid by Amex-accepting merchants as a result of Amex's continued imposition and enforcement of its

---

[31] Lamb Report at ¶¶138-233.
[32] Lamb Report at ¶¶270-291.

Anti-Steering Rules would not have been offset by reductions in the levels of cardholder rewards earned by GPCC cardholders or increases in the annual fees paid by GPCC cardholders.[33]

18.     In their reports, Defendants' Economists make a number of incorrect claims regarding the nature of competition in the market for GPCC Transactions, as well as what competition would look like in the but-for world. I discuss these misguided claims in greater detail below. I further discuss how, at his deposition, Dr. Emch agreed with my overarching opinions about the impact that greater levels of competition in the market for GPCC Transactions has on the two-sided prices for GPCC Transactions.

   **i.     Amex's Inability to Continue Imposing and Enforcing its Anti-Steering Rules would Result in a New Competitive Equilibrium in the Market for GPCC Transactions**

19.     As I previously explained, the but-for world in this matter is a world in which, following the 2011 Consent Decree and 2013 Settlement, Amex is no longer able to exercise its market power to impose and enforce its Anti-Steering Rules on merchants. Thus, when Amex's Anti-Steering Rules are removed from the market for GPCC Transactions, keeping all else constant, you are introducing a new form of competition among GPCC payment networks that previously was not there, which creates a new, more competitive equilibrium in the market. In this new, more competitive equilibrium, merchants possess increased leverage with which they can bargain for lower merchant discount rates.[34]

20.     As I explained in the Lamb Report and at my deposition, there are a number of actions that merchants and/or GPCC payment networks could take that would lead to a more competitive equilibrium in the market for GPCC Transactions absent Amex's Anti-Steering Rules.[35] However, it is not necessary to analyze various hypotheticals about

---

[33] In fact, in many instances, GPCC issuers likely would have responded to increased competition on the merchant side of the market for GPCC Transactions by decreasing Annual Fees Net of Rewards (either through lower annual fees and/or higher cardholder rewards).

[34] Lamb Report at ¶¶141,176-269.

[35] Lamb Report at ¶¶81-83, 141, 176-269; Deposition of Dr. Russell L. Lamb, January 5, 2023 (hereafter "Lamb Deposition") at 141:19-150:2. This could include agreements between GPCC payment networks

how the overall costs of GPCC acceptance *could* be reduced in the but-for world (as Dr. Gaier asserts is necessary)[36] in order to conclude as I have that the removal of Amex's Anti-Steering Rules would have reduced merchants' costs of GPCC acceptance.[37] Rather, as I explained in deposition, "if you unleash greater competition[,] that is going to push the price down, the merchants understand that, cardholders understand it, the platforms, the GPCC networks understand it, and you get to the new equilibrium where the fees are lower. That's how the economics of it works."[38] Furthermore, given the fact that, in the but-for world, GPCC issuers would not have increased Annual Fees Net of Rewards paid by GPCC cardholders (which I discussed in extensive detail in the Lamb Report and later in this Expert Reply Report),[39] this reduction in merchant discount rates caused by the absence of Amex's Anti-Steering Rules would have resulted in an overall reduction in the two-sided price for GPCC Transactions.

ii. **Defendants' Economists Incorrectly Assume that Prices in the Market for GPCC Transactions Cannot Decline Without Destroying the Market or Bankrupting the Card Networks**

21.     In further support of their contention that the net two-sided prices may have been higher in world absent Amex's Anti-Steering Rules, Defendants' Economists rely on an economic theory known as the "seesaw principle" to assert that Annual Fees Net of Rewards paid by GPCC cardholders would have increased if the removal of Amex's Anti-Steering Rules caused merchants' overall costs of GPCC acceptance to be competed

---

and merchants to steer customers towards a specific GPCC, agreements between GPCC payment networks and merchants not to steer customers away from using a specific GPCC, or even unilateral decisions by GPCC payment networks to lower merchant discount rates prior to any explicit threats or negotiations with merchants took place. As I noted in the Lamb Report, Discover CEO Roger Hochschild testified that in a world absent Amex's Anti-Steering Rules where "there were no restrictions on what Discover could do with respect to steering at the point of sale," Discover "would aggressively pursue a strategy of lowering [its] prices and providing incentives to merchants that would steer incremental volume to Discover." See United States District Court for the Eastern District of New York, United States of America, et al., Plaintiffs, v. American Express Company and American Express Travel Related Services Company, Inc., Defendants, Trial Transcript, No. 10-CV-04496-NGG-RER, July 7, 2014 (hereafter "2014 Amex Trial Transcript") at 872:3-10.

[36] Gaier Report at ¶¶18-31.

[37] In the Lamb Report, I discussed extensive common evidence demonstrating that merchants' overall costs of GPCC acceptance would have been lower in a world absent Amex's Anti-Steering Rules. See Lamb Report at ¶¶176-269.

[38] Lamb Deposition at 164:4-167:10.

[39] Lamb Report at ¶¶270-291.

downward.[40]  However, as I discuss below, Defendants' Economists' assertions in this regard demonstrate their misunderstanding of the nature of competition in the market for GPCC Transactions in the but-for world.

22.      In his report, Dr. Bernheim presents two figures meant to illustrate the nature of two-sided pricing under different market conditions.  The first of these figures is reproduced below in Figure 1, which Dr. Bernheim represents as a "two-sided price for an Amex transaction."[41]  Using this figure, Dr. Bernheim asserts that an increase in the merchant discount rate ($M'$) would result in an increase in the level of consumer rewards ($C'$) of the same magnitude, resulting in a new two-sided price ($P'$) that was the same as the original two-sided price ($P$),[42] assuming that "either the resulting quantities do not differ much between the two cases, or alternatively platforms' returns to scale are roughly constant."[43]

---

[40] Bernheim Report at ¶¶60-62; Emch Report at ¶¶317-321; Gaier Report at ¶¶100-104.

[41] Bernheim Report at ¶58.

[42] "In effect, the higher merchant fee funds the greater reward.  It follows that the two-sided prices, P and P', are identical even though P' is associated with a higher merchant fee."  See Bernheim Report at ¶58.  I have noted that in this illustration, Dr. Bernheim does not consider the impact of higher merchant discount rates on merchant participation in the GPCC payment network.  In a two-sided market, higher prices would affect participation on each side, with consequences for the overall value of the network.  By ignoring the impact of pricing on cardholder and merchant participation, Dr. Bernheim commits a fundamental error when he concludes that a GPCC payment network would be indifferent between all configurations of merchant discount rates and cardholder rewards that result in the same two-sided price.  Dr. Bernheim connects prices to user participation in his report, but only after making his specious argument about the supposedly strong theoretical and empirical connection between merchant discount fees and cardholder rewards.  See Bernheim Report at ¶¶63-65.

[43] Bernheim Report at footnote 89.

13

**Figure 1**



**Figure 1: Two-sided prices**

**Merchant fees and consumer rewards**

Source: Bernheim Report at p. 28.

23.     Dr. Bernheim then presents a second figure in his report that contains two pricing charts meant to illustrate the nature of two-sided pricing under different market conditions.  This second figure is reproduced below in Figure 2.  In Panel A of this figure, Dr. Bernheim purports to show how competition in the market for GPCC Transactions determines the level of cardholder rewards when merchant discount fees are fixed at a high level, asserting that, in this instance, "[i]ntense competition for consumers would drive rewards to the level $C$ at which the two-sided price, $P$, just covers costs and a competitive return on investment."[44]  He adds that "with a higher level of rewards ($C_2 > C$), the providers of transactions platforms would fail to earn a competitive return on investments.  Consequently, each would have strong incentives to reduce rewards."[45]  He reaches the same conclusion in regards to a scenario where the merchant discount rate ($M'$) was lower, as shown in Panel B below.[46]  From this, Dr. Bernheim concludes that, assuming economic costs are held constant, that the "two-sided price would be the same," adding that "sufficient competition on the consumer side of the market eliminates market power (in the sense that the platform provider cannot sustain a two-sided price that delivers a supra-competitive return on investments) regardless of the process that

---

[44] Bernheim Report at ¶60.
[45] Bernheim Report at ¶60.
[46] Bernheim Report at ¶60.

determines merchant fees."[47]  In these examples, Dr. Bernheim fails to understand the mechanics of two-sided markets.  Rather, Dr. Bernheim treats merchant discount fees as revenue and cardholder rewards as a variable cost, so that the difference between the two – the two-sided price for GPCC Transactions – is simply a rate of profit.  Because Dr. Bernheim assumes, without evidence, that the prevailing two-sided price for GPCC Transactions is set at competitive levels, he assumes his conclusion that merchant discount rates cannot fall without "an offsetting adjustment on the opposite side of the market to restore the competitive two-sided price."[48]

### Figure 2

Figure 2: Competition with two-sided prices





Source: Bernheim Report at p. 30.

24.      Therefore, Dr. Bernheim's analysis in this regard suffers from a critical flaw: none of the figures he created to illustrate the nature of competition in the market for GPCC Transactions, nor the conclusions he draws from them, are reflective of the nature

---

[47] Bernheim Report at ¶60.
[48] Bernheim Report at ¶62.

of competition that would prevail in a world absent Amex's Anti-Steering Rules. Regarding his pricing analysis discussed above, Dr. Bernheim concludes:

> The preceding analysis makes it clear that consumer rewards are inextricably tied to merchant fees. At some level this point is obvious: absent an ability to recoup the costs of consumer rewards through merchant fees, Amex would offer no rewards. Likewise, a reduced ability to recoup the costs of consumer rewards through merchant fees inevitably leads to lower rewards.[49]

25.     In reaching this conclusions, Dr. Bernheim makes a number of incorrect assumptions about competition in the but-for world, which ultimately leads to him assuming his own conclusions regarding two-sided prices in the but-for world. First and foremost, Dr. Bernheim simply assumes that two-sided prices in the market for GPCC Transactions are generally set at competitive levels.[50] Applying this misguided assumption to his analysis allows Dr. Bernheim to then conclude: "As a general matter, when prevailing prices fall below competitive levels, competitive firms adjust their prices upwards despite the risk of losing business. In this context, a reduction in merchant fees would push the two-sided price below competitive levels, necessitating an offsetting adjustment on the opposite side of the market to restore the competitive two-sided price." (i.e., the "seesaw principle").[51]

26.     Unlike Dr. Bernheim, who fundamentally misunderstands the "seesaw principle," Dr. Emch correctly connects two-sided prices to the number of users on each side.[52] However, Dr. Emch exaggerates the universality of the seesaw principle. Though he identifies a recent paper that demonstrates "the seesaw principle is far from general,"[53]

---

[49] Bernheim Report at ¶61.
[50] Bernheim Report at ¶62.
[51] Bernheim Report at ¶62.
[52] Bernheim Report at ¶62, Emch Report at ¶¶317-321.
[53] E. Glen Weyl, "A Price Theory of Multi-Sided Platforms," *American Economic Review,* Vol. 100, No. 4, 2010, 1642-1672 (hereafter "Weyl 2010") at p. 1661.

Dr. Emch banishes this inconvenient result to a footnote in which he simply insists that the seesaw principle operates in the market for GPCC transactions.[54]

27.     Dr. Bernheim's assumption that two-sided prices in the market for GPCCs are determined by GPCC payment networks' costs (and the conclusions he draws from said assumption) is at odds with extensive common evidence in this matter that demonstrates the contrary.  For example, in the Lamb Report, [55]  This fact is uncontroversial, as Amex acknowledged as much in its amended responses to Plaintiffs' first set of interrogatories in this matter.[56]  I further discussed common evidence demonstrating that Amex itself acknowledged that it is not a "cost plus pricing organization."[57]  Furthermore, as Monique Ouellette of Amex testified at deposition in this matter,

---

[54] Emch Report at footnote 545. Dr. Emch argues "the principle is likely to hold when the benefits from interaction (e.g., transactions) are the main drivers of differences in how much users value the platform. Weyl argues this is a salient characteristic of credit card markets since 'credit card users primarily differ in the interaction (or usage) value they take from merchants accepting cards.'" See Weyl (2010) at p. 1643. Dr. Emch's discussion of when the seesaw principle holds is incomplete, and the quote he offers as purported support of his position is unconnected to the discussion of the principle. Rather, Weyl shows that the applicability of the seesaw principle depends on whether participation rates on each side of the market "are substitutes *for the platform*" in the sense that they can be traded off without affecting profits.  See Weyl (2010) at pp. 1658-1660.

[55] Lamb Report at ¶¶154-157.

[56] In its amended responses to Plaintiffs' first set of interrogatories in this matter, Amex described the factors is takes into consideration when setting merchant discount rates:

See United States District Court Eastern District of New York, *Anthony Oliver, et al., Plaintiffs, v. American Express Company and American Express Travel Related Services Company, Inc., Defendants*, Defendants' Amended Responses and Objections to Plaintiffs' First Set of Interrogatories, No. 1:19-cv-00566-NGG-SJB, January 14, 2022 (hereafter "Amex's Interrogatory Responses") at p. 7. See, also, 30(b)(6) Deposition of Monique Ouellette, July 8, 2022 (hereafter "Ouellette 30(b)(6) Deposition") at 45:12-46:2.; Lamb Report at ¶¶154-157.

[57] Lamb Report at ¶¶154-157. For example, Jack Funda, then Amex Senior Vice President for Global Merchant Pricing at Amex, testified at the 2014 Amex Trial to the following when asked if a prior request from Home Depot to see Amex's costs for providing Home Depot with Amex's GPCC network services would be helpful to Home Depot to determine if the prices Amex was charging were fair: "It might be if we were a cost plus pricing organization, we are not, we price based on value not on our cost structure."

█████████████████████████.[58]  When explaining this outcome, Ms. Ouellette ████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████.[59]  This common evidence (which Dr. Bernheim ignores) is squarely at odds with Dr. Bernheim's underpinning assertion that "it [is] clear that rewards are inextricably tied to merchant fees" and, as a result, two-sided prices are set at competitive levels and "a reduction in merchant fees would push the two-sided price below competitive levels."[60]

28.     Additional common evidence I discussed in the Lamb Report that is at odds with Dr. Bernheim's assertion that two-sided prices in the market for GPCC Transactions are set at competitive levels is the fact that Amex has routinely imposed price increases in the form of higher merchant discount rates that were profitable for the company (i.e., they were not fully offset by corresponding changes in Annual Fees Net of Rewards paid by GPCC cardholders (which includes cardholder rewards)).[61]  For example, as I discussed, beginning at least as early as 2005, Amex embarked on a program referred to as "value recapture," which consisted of a series of price increases (in the form of higher merchant discount fees) "over a substantial portion of [Amex's merchant] base" in order to allow Amex to maintain a "rate premium" over Visa and Mastercard (as opposed to an increase

---

[58] Ouellette 30(b)(6) Deposition at 38:6-39:8. ██████████████████████████████
████████  See AMEX-CP-000094309-341 at 319.
[59] Ouellette 30(b)(6) Deposition at 38:6-48:22. ███████████████████████████

█████████████████████████████████████.  See Ouellette 30(b)(6) Deposition at 52:21-54:22, Exhibit 2 at AMEX-CP-000067650.  As Ms. Ouellette explained at deposition, ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████.  See Ouellette 30(b)(6) Deposition at 35:11-46:2.
[60] Bernheim Report at ¶¶61-62.
[61] Lamb Report at ¶¶158-169.  I discuss Dr. Emch's flawed criticisms of my analysis of Amex's value recapture initiatives later in this Expert Reply Report.

in costs associated with the provision of Amex GPCC Transactions).[62]  Common evidence further demonstrates that these value recapture initiatives had been profitable for Amex and, notably, "the incremental revenue [Amex] generated from its value recapture initiatives between 2006 and 2009 was significantly greater than its incremental costs associated with those initiative for both large merchants (managed accounts) and small merchants (unmanaged accounts).[63]

29.    As I noted in the Lamb Report, the purpose of Amex's value recapture program was to allow Amex to maintain a "rate premium" over Visa and Mastercard, which had been diminishing over time.[64]  Regarding the rate premium Amex enjoyed over Visa and Mastercard approximately eight years after this initiative began, Daniel Henry, then CFO at Amex, explained at a June 2013 conference that Amex does not invest the entirety of the premium it earns on its merchant discount rates in cardholders benefits or rewards; rather, Amex keeps a portion of that premium as profit: "We take that premium pricing, and part of it we drop to the bottom line, but part of it we invest in better value propositions for the cardmembers, and that enables us to both retain the cardmembers we have as well as attract new cardmembers."[65]

---

[62] 2014 Amex Trial PX1240 at AMEXNDR19210100; 2014 Amex Trial PX0051 at AMEXNDR10546677; 2014 Amex Trial PX0121 at AMEXNDR11964459; 2014 Amex Trial Transcript at 708:9-710:3.  A July 2009 Amex presentation regarding its value recapture initiative noted that by that time, Amex had "implemented over 20 Value Recapture initiatives since 2006 and thereby raised rates on 65% of the total [Merchant Services US] charge volume."  See 2014 Amex Trial PX0121 at AMEXNDR11964459.  This included value capture initiatives in the following industries: airlines, automotive (and other transportation), car rental, communication, education, entertainment, healthcare, lodging, mail order, oil, services, professional/financial services, restaurant, department stores, shops, Costco, supermarkets, government, and charities.  See 2014 Amex Trial PX0121 at AMEXNDR11964459.  In an April 2010 Amex pricing presentation, Amex reported: "Since 2006, Value Recapture benefits have more than offset industry and account level rate investments."  See 2014 Amex Trial PX1753A at AMEXNDR12459029. Regarding the "Global Cumulative Benefit of Value Recapture," Amex reported that by "the end of 2010, the Value Recapture program will have delivered $1.37B in incremental [pre-tax income] and a 6.8 bps improvement in Global Discount Rate."  See 2014 Amex Trial PX1753A at AMEXNDR12459031.  Amex further noted that the impact on the merchant discount rate in the U.S. would be 8.8 basis points, with an expected cumulative benefit from 2006 to 2010 of $1.3 billion.  See 2014 Amex Trial PX1753A at AMEXNDR12459031; 2014 Amex Trial PX0357 at AMEXNDR00085949.
[63] 2014 Amex Trial PX1753A at AMEXNDR12459032-33.  For example, according to Amex's analysis, for every dollar of investment Amex made towards its value recapture initiatives between 2006 and 2009, it earned between $19.60 and $64.00.  See 2014 Amex Trial PX1753A at AMEXNDR12459032; Deposition of Stephen B. McCurdy, November 8, 2012 (hereafter "2012 McCurdy Deposition") at 598:9-601:14.
[64] Lamb Report at ¶159.  See, also, 2014 Amex Trial PX1240 at AMEXNDR19210100; 2014 Amex Trial PX0051 at AMEXNDR10546677; 2014 Amex Trial PX0121 at AMEXNDR11964459; 2014 Amex Trial Transcript at 708:9-710:3.
[65] 2014 Amex Trial PX1475 at p. 2.

30.  ███████████████████████████████████████████

██████, in 2018, Amex launched a shift in its pricing to its product-pricing strategy, under which it applies different rates based on the type of Amex GPCC product.[66]  As I discussed in the Lamb Report, Amex's ███████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████.[67] █████████████████████

██████████████████████████████████████████████████

████████████."[68] however, I have noted that in Amex's internal analyses, when discussing the rationale, objectives, or implementation of █████████████████.

██████████████████████████████████████████████████

██████████████████████████████████████████████████

█████.[69]

31.  In sum, Dr. Bernheim performs no analysis or provides no evidence that demonstrates that the two-sided prices in the market for GPCC Transactions are set at levels that imply a lack of economic profitability for the card networks.  This flawed assumption is critical to the claim Dr. Bernheim makes that "it [is] clear that rewards are inextricably tied to merchant fees" and, as a result, two-sided prices are set at competitive

---

[66] Lamb Report at ¶163.
[67] Ouellette 30(b)(6) Deposition at 35:11-46:2.
[68] AMEX-CP-000094309-341 at 319.  Further, in September 2019, Amex forecasted █████████████ .  See AMEX-CP-000094309-341 at 310.  █████████████████████████████████████ .  See AMEX-CP-000094309-341 at 310.  According to its 2021 Annual Report, Amex earned net income of $8.060 billion in the year ended December 31, 2021.  See 2021 American Express Annual Report at p. 43. ██████████████████████████████████████████████████ ██████████████████████████████████ .  See AMEX-CP-000094309-341 at 310; AMEX-CP-000094671-4747 at 708-710. ██████████████████████████████████████████ '  See AMEX-CP-000094671-4747 at 4710-4712.
[69] See, for example, AMEX-CP-000094309-341; AMEX-CP-000094671-4747; AMEX-CP-000068225-291; AMEX-CP-000067646-668; AMEX-CP-000083185-193. ██████████████████████████████████████████████████ ████████████████████ .

levels and "a reduction in merchant fees would push the two-sided price below competitive levels."[70]  Put another way, Dr. Bernheim has merely assumed his own conclusions regarding pricing of GPCC Transactions in a world absent Amex's Anti-Steering Rules.  As I noted, Dr. Bernheim's assumptions regarding pricing of GPCC Transactions, and the conclusions he draws from that assumption, are at odds with the extensive evidence discussed above and in the Lamb Report.  In the next section, I discuss common evidence further demonstrating the critical flaws in Dr. Bernheim's underlying assumptions, and his resulting misapplication of the seesaw principle.

### iii.   Defendants' Economists Incorrectly Assert that Current Levels of Cardholder Rewards Are Constrained by Interchange and/or Merchant Discount Rates

32.     In the section above, I established that the basis for Dr. Bernheim's claims that two-sided prices in the GPCC Transactions market are set at competitive levels and that, thus, "a reduction in merchant fees would push the two-sided price below competitive levels, necessitating an offsetting adjustment on the opposite side of the market to restore the competitive two-sided price" depends critically on his incorrect claim that "consumer rewards are inextricably tied to merchant fees."  In this section, I discuss additional common evidence refuting the claim that current levels of cardholder rewards can only be funded by maintaining prevailing interchange rates or merchant discount rates, further undermining Dr. Bernheim's claim that "consumer rewards are inextricably tied to merchant fees."[71]

33.     Dr. Bernheim's assumption that GPCC Transactions are priced at zero-profit levels, and, thus, that any reduction in merchant discount rates that would result due to heightened levels of competition would be fully offset by reductions in cardholder rewards, implies an expectation that GPCC issuers such as Amex would be able to

---

[70] Bernheim Report at ¶¶61-62.
[71] Bernheim Report at ¶¶61-62. Later in this Expert Reply Report, I discuss in detail Defendants' Economists' flawed criticisms that the reduction in the overall GPCC acceptance costs merchants would realize in a world absent Amex's Anti-Steering Rules would result in an increase in the Annual Fees Net of Rewards paid by cardholders via lower cardholder rewards and/or higher annual fees.

maintain the same profit margins and scale in the but-for world.[72]  Having dispensed with the notion that Amex's two-sided GPCC Transaction prices are priced at competitive levels above and in the Lamb Report, which amply demonstrates that Amex possesses and exercised market power, I note here that, contrary to Dr. Bernheim's assertion, in order to maintain its share in the market for GPCC Transactions, Amex (and other GPCC issuers) would no longer earn the supracompetitive profits they earned in the actual world as prices would be competed downward.

34.      Dr. Bernheim's apparent belief that Amex could not, or would not, maintain or increase the levels of cardholder rewards in response to heightened competition in the market for GPCC Transactions is contradicted by testimony Jack Funda, then Amex Senior Vice President for Global Merchant Pricing at Amex, gave at the 2014 Amex Trial:

> Q. Now, when the cost to provide cards to American Express cardholders go up, it's fair to say American Express could keep the merchant discount rate stable and fund those increases in American Express cardholder costs by reducing its profit, correct?
>
> A. Certainly. That would be one strategy, yes.
>
> Q. So today, American Express makes profit, right, it's a profitable company?
>
> A. It is. […]
>
> Q. But it's fair to say that you can increase the costs to provide cardholders with the benefits without increasing the costs to merchants of accepting American Express?
>
> A. Absolutely.[73]

---

[72] Bernheim Report at ¶¶58-62. The literature on the seesaw principle assumes that card networks can substitute between cardholders and merchants while maintaining profitability.  See, for example, Weyl (2010) at pp. 1658-1661.

[73] 2014 Amex Trial Transcript at 2629:9-2631:17.  Mr. Funda further similarly testified: "Q. So I think what you're saying is that if the United States prevails in this case, one outcome could be that American Express cardholders get more rewards and it comes at the expense of American Express profits?  A. That's part of what I'm saying, yeah. I'm also saying that removing nondiscrimination provisions would have a huge negative impact on what is the smallest of the networks that we're talking about between AMEX, Visa and MasterCard."  See 2014 Amex Trial Transcript at 2748:18-2749:12.

35.     However, even if one were to accept the faulty premise that the lower merchant discount fees on GPCCs that would have prevailed in a world absent Amex's Anti-Steering Rules might not solely fund the existing levels of cardholder rewards on certain of those GPCCs, that still does not imply that GPCC issuers would necessarily reduce the cardholder rewards on those cards to offset the revenue losses due to the reduced merchant discount rates, contrary to Dr. Bernheim's misguided assertion.  According to one industry publication, "among major issuers, interest usually makes up the biggest share of overall revenue, and interchange and fees contribute a smaller portion," adding: "It's often said that interchange revenue is what pays for credit card rewards.  But while it certainly helps fuel them, the connection isn't quite as direct."[74]  Rather, as Brian Riley, Director of the Credit Advisor Service at Mercator Advisory Group, explains regarding how cardholder rewards are funded: "When you put all the dollars in, it's like making a stew," adding further than "[y]ou don't say 'these dollars came from this' and 'these dollars came from that.'"[75]  As noted by Fumiko Hayashi in her 2009 Federal Reserve article:

> While rewards and merchant fees are related, it is not clear how closely. Over the past several years in the United States, we have observed increasingly more generous rewards as well as rising interchange and merchant fees. But this does not necessarily imply that rewards have caused merchant fees to rise. Merchant fees depend not only on rewards but also on the costs of handling a card transaction by the card issuer or the acquirer, as well as their profit margins. Rewards can be financed by different sources, including reducing the card issuer's profit margin. Therefore, higher fees do not necessarily imply more generous rewards, and vice versa.[76]

---

[74] Claire Tsosie, "Where Does the Money for Credit Card Rewards Come From?," Nerdwallet, December 21, 2022 (hereafter "Tsosie").

[75] Tsosie.

[76] Fumiko Hayashi, "Do U.S. Consumers Really Benefit from Payment Card Rewards?," Federal Reserve Bank of Kansas City Economic Review, First Quarter 2009, (hereafter "Hayashi") 37-63 at p. 42.  Another recent Federal Reserve Study also noted how interest payments and fees (e.g., late and overlimit fees) constitute "[a]nother source of funding for credit card rewards."  See Sumit Agarwal, Andrea F. Presbitero, Andre F. Silva, and Carlo Wix, "Who Pays For Your Rewards? Redistribution in the Credit Card Market," Finance and Economics Discussion Series, Board of Governors of the Federal Reserve System, December 2022 at p. 9.

Thus, the ability of a GPCC issuer to maintain its cardholder rewards levels in the but-for world does not depend on interchange or merchant discount rates to be high enough to fund those rewards alone, contrary to Dr. Bernheim's assertions.

36.     Consistent with this understanding that cardholder rewards are not necessarily solely and entirely funded by merchant discount rates or interchange rates (or that cardholder rewards are not "inextricably tied to merchant fees," as Dr. Bernheim claims), common evidence demonstrates that "[i]nterchange doesn't always cover 100% of the cost of rewards."[77]  By way of example, some GPCCs "offer 5% rewards in certain spending categories, up to a certain spending cap. The issuer would make much less than that on interchange."[78] Thus, as Mr. Riley of Mercator Advisory Group explains: "In some ways, [rewards] could be a loss leader."[79]  One example of such a loss leader scenario proffered by one industry publication is one where "interchange might not fully cover a cardholder's rewards, but that customer might end up paying enough interest that the issuer makes a profit on the account."[80]

37.     The common evidence discussed above is consistent with the extensive common evidence discussed in the Lamb Report demonstrating that the Annual Fees Net of Rewards paid by GPCC cardholders would not have increased in a but-for world (via either increased annual fees or reduced cardholder rewards) absent Amex's continued imposition and enforcement of its Anti-Steering Rules.[81] This included extensive common evidence demonstrating that it would be contrary to GPCC issuers' desire to remain customers' 'top of wallet' choice for them to increase the Annual Fee Net of Rewards paid by GPCC cardholders in response to lower merchant discount fees in the but-for world,[82] as well as contrary to acknowledgments from Amex itself that GPCC cardholders would not have paid higher Annual Fees Net of Rewards in a world absent

---

[77] Bernheim Report at ¶¶61-62; Tsosie.

[78] Tsosie.

[79] Tsosie.

[80] Tsosie.

[81] Lamb Report at ¶¶270-291.  As I further noted in the Lamb Report, in many instances, GPCC issuers likely would have responded to increased competition on the merchant side of the market for GPCC Transactions by decreasing Annual Fees Net of Rewards (either through lower annual fees and/or higher cardholder rewards).  See Lamb Report at ¶¶270-291.

[82] Lamb Report at ¶¶273-284.

Amex's Anti-Steering Rules.[83]  I discuss this extensive common evidence in greater detail later in this Expert Reply Report in the context of certain other Defendants' Economists' criticisms of the conclusions I reached in the Lamb Report in this regard.

38.      In a world where Amex was unable to continue imposing and enforcing its Anti-Steering Rules following the 2011 Consent Decree and 2013 Settlement, GPCC issuers such as Amex would not have increased their Annual Fees Net of Rewards borne by cardholders.  Thus, given the lower overall costs of GPCC acceptance realized by merchants as a result of the greater levels of competition on the merchant side of the market, the loss of Amex's Anti-Steering Rules would result in lower net two-sided prices in the but-for world.  As I noted above, none of the pricing analyses contained in Dr. Bernheim's report described or illustrated the nature of pricing in a world free from Amex's Anti-Steering Rules.  Using similar formatting as Dr. Bernheim,[84] in Figure 3 below I illustrate how prices would be impacted by the change in the competitive equilibrium in the market for GPCC Transactions in a world absent Amex's Anti-Steering Rules where, at a minimum, GPCC issuers would not have increased their Annual Fees Net of Rewards borne by cardholders.[85]  As shown, the shaded area representing the two-sided price in a world absent Amex's Anti-Steering Rules (P′) is smaller than the two-sided price in the actual world (P), thus reflecting how Amex's continued imposition and enforcement of its Anti-Steering Rules caused two-sided prices in the market for GPCC Transactions to be higher than they otherwise were, contrary to Defendants' Economists' flawed assertions.

---

[83] Lamb Report at ¶¶285-289.

[84] I have noted that Dr. Bernheim did not produce any backup materials related to the creation of Figures 1 and 2 of his report.

[85] For consistency, I kept the parameters and formatting of Figure 3 below the same as Figure 1 and Figure 2 of Dr. Bernheim's Report.



**Figure 3**
**Competition in GPCC Transactions Market Absent Amex's Anti-Steering Rules**
Consumer rewards held constant

Merchant fees and consumer rewards

39.     In sum, as I discussed above and in additional detail later in this Expert Reply Report, many of the claims and criticisms contained in Defendants' Economists' reports reflect a critical misunderstanding of the nature of competition that would exist in a world absent Amex's Anti-Steering Rules.  Therefore, none of Defendants' Economists' criticisms in this regard have caused me to change the opinions or conclusions I reached in the Lamb Report.

### iv.     Dr. Emch Acknowledges that Heightened Levels of Competition in the Market for GPCC Transactions Would Cause Two-Sided Prices to Decline

40.     At his deposition, Dr. Emch was presented with a blatant contradiction in the opinions and conclusions contained in his report.  On the one hand, when arguing that Amex could not have reduced merchant discount rates without a corresponding increase in Annual Fees Net of Rewards, Dr. Emch argued that reduced merchant discount rates along with increased cardholder rewards was "unsustainable."[86]  However, elsewhere in

---

[86] Emch Report at ¶325.  Dr. Emch based his assertion on a private conversation he had with Jonathan Gantman of Amex, for which Dr. Emch did not produce and written or recorded materials concerning this conversation in his backup materials.  At his deposition, Dr. Emch testified that Mr. Gantman's statement about the unsustainability of "significantly" lower merchant discount rates along with increased rewards was in response to a question posed by Dr. Emch "along the lines of if there were a negative shock to Amex's merchant discount revenue, what impact in, you know, the long run would that likely have on rewards."  See Emch Deposition at 107:18-109:16.  He later characterized the conversation in the following way: "So I posited this hypothetical of: Suppose Amex's merchant discount revenue had had a negative

his report, in an attempt to demonstrate that Amex did not possess market power in the market for GPCC Transactions, Dr. Emch claimed that, ▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉ and further purported that ▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉'

▉▉▉▉▉▉▉▉▉▉▉ ▉.[87]

41.     When presented with this stark contradiction in his opinions at deposition, Dr. Emch agreed with my conclusions regarding the impact that the greater levels of competition that would result absent Amex's Anti-Steering Rules would have on two-sided prices in the market for GPCC Transactions:

> So competition in a market is going to cause the two-sided price to come down.
> The two-sided price coming down means more rewards and lower merchant discounts.[88]

Dr. Emch's attempt to explain this contradiction in his opinions further demonstrates his lack of understanding of competition in the market for GPCC Transactions in both the actual and but-for worlds.

42.     For example, one way Dr. Emch attempts to justify his flawed assertion that ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ by claiming that "both sides of the two-sided price [were] getting competitive pressure, ▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉"[89]

However, Dr. Emch's assumption that there was competitive pressure on both sides of the market is contradicted by Amex's own pricing initiatives, as well as statements from Amex itself.  As I discussed in detail in the Lamb Report, and in even greater detail later in this Expert Reply Report, over the years, Amex has exercised its market power to

---

shock, what do you think would happen to cardholder rewards of cardholder – I think either I said rewards or rewards and fees, what would happen in response."  See Emch Deposition at 108:23-109:16.  As I discuss below, the hypothetical Dr. Emch posed to Mr. Gantman leading to this response is inconsistent with the nature of competition that would have emerged in a world absent Amex's Anti-Steering Rules.
[87] Emch Report at ¶¶152-158, 216-226 (emphasis added).
[88] Deposition of Dr. Eric Emch, March 9, 2023 (hereafter "Emch Deposition") at 111:10-112:14.
[89] Emch Deposition at 111:10-112:14.  I discuss the numerous flaws and inaccuracies in Dr. Emch's purported calculations of Amex's two-sided prices in detail later in this Expert Reply Report.

implement persistent and profitable price increases as part of its value recapture  .[90]  Amex explained that its intention for these price increases was to increase the price premium it was charging merchants over the merchant discount rates paid by merchants on Visa and Mastercard GPCC Transactions, as opposed to competing more vigorously with its GPCC payment network rivals.[91]

43.     Regarding Amex's 

."[92]  Similarly, at the 2014 Amex Trial, Jack Funda of Amex testified: "I don't think anybody's business strategy is to be cheaper than the next guy."[93]  Thus, contrary to Dr. Emch's assertion, Amex did not view charging lower prices than its competition as being a "competitive" strategy, and instead implemented these pricing initiatives in order to charge even higher prices to merchants than its rival GPCC payment networks. This is consistent with testimony given by Chris Priebe of Southwest Airlines at the 2014 Amex Trial.[94]

44.     Further explanation given by Dr. Emch at deposition regarding his acknowledgement that "competition in a market is going to cause the two-sided price to come down" also demonstrates his lack of understanding of competition in the market for GPCC Transactions in but-for world.  In an attempt to distinguish his opinion regarding the impact on two-sided prices following increased levels of competition in the market for GPCC Transactions, Dr. Emch asserts that the but-for world I described above and in

---

[90] Lamb Report at ¶¶158-169.
[91] 2014 Amex Trial PX1240 at AMEXNDR19210100; 2014 Amex Trial PX0051 at AMEXNDR10546677; 2014 Amex Trial PX0121 at AMEXNDR11964459; 2014 Amex Trial Transcript at 708:9-710:3.
[92] "The intent here was that single rate pricing means that, regardless of what product is presented at the point of sale, it would have the same rate, ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ See Ouellette Deposition at 55:19-56:11.
[93] 2014 Amex Trial Transcript at 2667:23-2668:9.  Regarding strategies to incentivize Amex-accepting merchants to grow, Mr. Funda stated in a February 2011 email to colleagues: "We need to be careful here. We should not compete on cost vs. V/MC and the intent of the growth incentive is not to make Amex cheaper than V/MC."  See PX0038 at AMEXNDR09506702.
[94] "Q. [..] Do you have any sense that Visa, American Express or MasterCard are competing for Southwest business on the basis of price?  A. No, I don't.  Q. Why not?  A. I think the market is broken. I mean, you know, I've been in the business for 17 years and I look to other international rates and I see 30 basis points here and 70 basis points there, and I look at our average rates well in excess of that, and I can't justify to myself that there is -- that this is a competitive market in the US."  See 2014 Amex Trial Transcript at 2440:4-15.

the Lamb Report is one in which the removal of Amex's Anti-Steering Rules would result in an exogenous "negative shock to merchant discount rates," which is "likely to reduce card member rewards or […] card member fees net of rewards."[95] Dr. Emch described the exogenous negative shock of the removal of Amex's Anti-Steering Rules in the but-for world as a "factor outside of the market [that] is forcing prices down or up."[96] Further, Dr. Emch testified that, in his view of the but-for world as compared to the actual world which form the basis of his claims, "there's no change in competition."[97]

45.     However, Dr. Emch's claims as to why the but-for world is inconsistent with his correct opinion that "competition in a market is going to cause the two-sided price to come down" is based on a misunderstanding of the difference between the but-for and actual worlds.  Contrary to Dr. Emch's claims, the lower overall costs of GPCC acceptance that would result in the but-for world would not be the result of an exogenous negative shock.  Rather, as I explained, in the but-for world, a vertical restraint to competition in the market for GPCC Transactions (Amex's Anti-Steering Rules) would be removed, which would result in GPCC payment networks competing more vigorously on the merchant side of the market.

46.     For example, Discover would not be forced to revert back to its low-cost provider strategy in the but-for world; rather, Discover stated that in a world absent Amex's Anti-Steering Rules where "there were no restrictions on what Discover could do with respect to steering at the point of sale," Discover "would aggressively pursue a strategy of lowering [its] prices and providing incentives to merchants that would steer incremental volume to Discover."[98]  Amex would not be forced to aggressively and proactively

---

[95] Emch Deposition at 111:10-115:18.  I note that "card member fees net of rewards," or Annual Fees Net of Rewards, would not decrease in the but-for world.
[96] Emch Deposition at 113:8-114:18.
[97] Emch Deposition at 111:10-117:14.
[98] 2014 Amex Trial Transcript at 872:3-10.  Mr. Hochschild further testified: "Q. In a world without American Express' anti-steering rules, how would merchant benefits [sic] in your view? A. The merchants would have the ability to manage their costs of credit card acceptance by steering customers to a lower cost network. And they could reinvest that savings in more profits or in enhancing their own value proposition to their customers. Q. In a world without American Express' anti-steering rules, how would Discover's cardholders benefit? A. Whatever preference programs the merchants put into place to steer customers, it would be some sort of positive incentive for them to use their Discover card. That would be a benefit for our cardholders. Q. In world without American Express' anti-steering rules, could Discover still compete for third-party issuers? A. Yes. Q. Mr. Hochschild, in a world without American Express' anti-steering

negotiate lower merchant discount rates with merchants in exchange for agreements not to differentially surcharge Amex GPCCs; rather, Amex concluded based on its experience in Australia that if it lost its ability to enforce the no-surcharge provisions of its Anti-Steering Rules, its best strategy would be to more aggressively and proactively enter into such agreements with merchants to prevent widespread differential surcharging among merchants before it took place in the U.S. in order to remain competitive in the market for GPCC Transactions.[99]  Visa and Mastercard (or the other GPCC payment networks) would not be forced to negotiate lower interchange rates in exchange for merchants' expressing a preference for their brand of GPCC; something they tried to do in the past only to be thwarted by Amex's Anti-Steering Rules.[100]

47.     In fact, none of the various pro-competitive steering methods that would be available to merchants in a world absent Amex's Anti-Steering Rules would be forced upon those merchants.  Rather, as I explained above and in the Lamb Report, if merchants were no longer prohibited from using (or credibly threatening to use) any number of these pro-competitive steering methods by Amex's Anti-Steering Rules, a new, more competitive equilibrium would emerge whereby GPCC payment networks would be incentivized to compete more vigorously on the merchant side of the market. Thus, consistent with Dr. Emch's understanding of competition in the market for GPCC Transactions, the heightened level of competition that would emerge in the market would

---

rules, could Discover still develop brand loyalty for the Discover product? A. Yes. Q. Could you in fact enhance brand loyalty for your product? A. Yes. Q. And all the rewards that you've discussed today, in a world without American Express' anti-steering rules, could you still offer competitive rewards in the rewards market today? A. Yes. Q. In general, if the American Express rules were not in place, Mr. Hochschild, do you think that competition among the is [sic] credit card networks would be more robust than it is today? A. Yes." See 2014 Amex Trial Transcript at 872:11-873:15.

[99] Lamb Report at ¶¶254-268.  I discuss Amex's strategy in this regard in greater detail later in this Expert Reply Report.

[100] Lamb Report at ¶¶181-183, 191-204.  For example, as Nina Biornstad of Mastercard testified at the 2014 Amex Trial: "Q. Okay. If American Express did not have its restrictions on merchants to steer, in particular, to use preference steering at the point of sale, would you do more of it with merchants?  A. Yes. Q. Would you work hard so that MasterCard is the preferred brand of some merchants?  A. Yes.  Q. And if your competitors were seeking to be the preferred brand, would that make competing harder?  A. Yes.  Q. And is MasterCard willing to allocate marketing funds to merchants to help do more steering?  A. Yes." See 2014 Amex Trial Transcript at 3259:1-14.

result in lower two-sided prices, as the "two-sided price coming down means more rewards and lower merchant discounts."[101]

48.     In sum, Dr. Emch and I are in agreement as to the impact that greater levels of competition would have on net two-sided prices in the market for GPCC Transactions. However, Dr. Emch's critical misunderstanding of the but-for world and assumptions about competition in the actual world, as well as his erroneous claims that the level of competition in the market for GPCC Transactions would be unchanged in the but-for world, or that the removal of Amex's Anti-Steering Rules would constitute an exogenous negative shock that would force merchant discount rates to be lower in the but-for world completely undermine the credibility of his opinions regarding anticompetitive effects caused by Amex's Anti-Steering Rules, rendering them fatally-flawed and meaningless. Later in this Expert Reply Report, I discuss additional ways in which Dr. Emch's key arguments regarding these anticompetitive effects are rendered meritless and unreliable by his assumptions regarding exogenous negative shocks in payment card markets.

### C.  Defendants' Economists' Fixation on Surcharging in the But-For World is Misplaced and Inappropriate

49.     As I explained in the Lamb Report, Amex-accepting merchants (including Qualified Merchants) were deprived of a competitive toolkit that would have allowed them to lower their overall GPCC acceptance costs.[102]  One tool potentially available to merchants in such a competitive toolkit is the credible threat to differentially surcharging customers based on the GPCC brand or product they paid for on a GPCC Transaction. The credible threat of differential surcharging would have provided those merchants with negotiating leverage with GPCC payment networks to lower their overall costs of GPCC acceptance.[103]  At the 2014 Amex Trial, Jack Funda, then Senior Vice President for Global Merchant Pricing at Amex, testified how an agreement among networks and acquirers giving merchants the ability to differentially price by GPCC payment network

---

[101] Emch Deposition at 111:10-112:14.  In the Lamb Report, I concluded that, at a minimum, Annual Fees Net of Rewards would not have been increased absent Amex's Anti-Steering Rules.  See Lamb Report at ¶¶270-290.
[102] Lamb Report at ¶141.
[103] Lamb Report at ¶¶209-212.

in Canada would result in "rate pressure," which would result in a "negotiating lever for our merchants to approach us with" and "a position to demand significant rate reductions" from Amex.[104]  However, Mr. Funda further testified that this particular type of steering is not permitted under Amex's Anti-Steering Rules, and, therefore, "that particular pressure on the American Express discount rate does not exist in the United States because of the nondiscrimination rules."[105]

50.      Throughout their reports, Defendants' Economists' criticisms regarding my opinions in the Lamb Report concerning the anticompetitive effects of Amex's continued imposition and enforcement of its Anti-Steering Rules, as well as class-wide injury and damages, often rely on their assertions that, in the but-for world, merchants would engage in widespread and abusive surcharging, making consumers worse off in a world absent Amex's Anti-Steering Rules.[106]  However, as I explained at my deposition in this matter, Defendants' Economists' assertions in this regard are incorrect, as actual surcharging in a world absent Amex's Anti-Steering Rules would have been very limited, as such surcharging would rarely be desirable for GPCC payment networks, merchants, or cardholders.[107]  I discuss the flaws in Defendants' Economists' assertions regarding surcharging in greater detail below.

### i.      The Threat of Surcharging Would Discipline Prices in the Market for GPCC Transactions

51.      In making these assertions about surcharging, Defendants' Economists overlook the role that the credible threat to impose differential surcharges in a world absent Amex's Anti-Steering Rules would have in disciplining prices and creating a more competitive equilibrium in the market for GPCC Transactions.  Indeed, Defendants' Economists dispute the credibility of such a threat, using hypothetical analyses like Dr.

---

[104] 2014 Amex Trial Transcript at 2692:22-2695:5; 2014 Amex Trial PX0005 at AMEXNDR11680346.  In an analysis of this agreement, Amex found that merchants' ability to differential discount customers based on GPCC payment network as opposed to making discounting available to all buyers, that "there is no economic downside for merchants to discount and [Cardmember Volume] at risk is significant," adding that "[u]nder selective discounting, discounting by network does drive additional AXP [Cardmember Volume] at risk."  See 2014 Amex Trial PX0005 at AMEXNDR11680347.
[105] 2014 Amex Trial Transcript at 2692:22-2694:24.
[106] See, for example, Bernheim Report at ¶¶79-112; Emch Report at ¶¶240, 249-264, 289-309; Gaier Report at ¶¶37-62.
[107] Lamb Deposition at 45:4-51:22.

Emch's calculation of walk-away rates to argue that surcharging would be self-defeating.[108]  As I explained in deposition, removing Amex's Anti-Steering Rules introduces a credible threat of differential surcharging in the market for GPCC Transactions by changing the nature of bargaining discussions between the GPCC payment networks and merchants, "and the threat of surcharging itself allows merchants to obtain the benefit of lower interchange fees without ever having to impose the differential surcharge."[109]  As Levitin described in his 2008 paper:

> Ultimately, though, whether merchants would actually surcharge is irrelevant.  The ability to surcharge would give merchants negotiating leverage to gain lower fees, and with lower fees, there would be no need to surcharge.  The level and frequency of surcharging would vary according to the market, but by subjecting the interchange rate to market discipline, the mere ability to surcharge would lead to a market equilibrium at lower prices.[110]

52.     In a world absent Amex's Anti-Steering Rules, it is reasonable to expect that a GPCC payment network would aggressively seek to pre-empt merchant surcharging by negotiating reduced merchant discount fees (Amex, Discover) or interchange fees (Visa, Mastercard). As I discussed in the Lamb Report, GPCC payment networks realize enormous benefits stemming from cardholders' tendency to use a single card for almost all of their purchase volume, a behavior known as "single-homing."[111]  Presenting merchants with prices that prompt surcharging would incentivize multi-homing by cardholders, putting GPCC payment networks' market shares at risk and eroding issuer margins.  Thus, to preserve single-homing behavior by cardholders, GPCC payment networks would aggressively seek to avoid transaction volume losses through differential surcharging and other forms of merchant steering.[112]  As Amex noted in a 2007 Presentation regarding the impact of differential surcharging, "Differential Surcharge is

---

[108] Emch Report at ¶¶252-259.
[109] See, for example, Lamb Deposition at 34:14-36:4.
[110] Adam J. Levitin, "Priceless?  The Economic Costs of Credit Card Merchant Restraints," *UCLA Law Review*, Vol. 55, 2008, 1348-1409 (hereafter "Levitin") at p. 1355.
[111] Lamb Report at ¶¶145, 148, 235, 240-247, 276-277.
[112] Lamb Deposition at 28:22-29:13.

an extremely damaging Brand experience."[113]   As I discuss in greater detail in the next
section, this is consistent with the strategy developed by Amex for how to deal with a
scenario where it was unable to enforce the no-surcharge provisions in its Anti-Steering
Rules in the U.S. based on its similar experience in Australia following the RBA
regulations.

###### ii.    Australia's Experience Demonstrates that GPCC Payment Networks Would Respond Pro-Actively and Aggressively to Credible Merchant Threats to Surcharge in the U.S. by Lowering Merchant Discount Rates

53.    As I explained in the Lamb Report and at my deposition, one way in which the
significance of the threat of differential surcharging in the U.S. should Amex lose its
ability to impose and enforce its Anti-Steering Rules (and, thus, no longer prohibit
differential surcharging) can be seen is through its response to, and key takeaways from,
its experience in Australia in which it was no longer able to enforce its no surcharge
rules.[114]   As I explained, at the time, Amex understood the significant risk that was posed
to its business by the threat of differential surcharging.  For example, in an April 2007
Amex presentation regarding the differential surcharging permitted by the RBA
regulations, Amex noted: "If we are unable to meet the challenge head on our position
could deteriorate significantly."[115]   In June 2007, regarding the impact that differential
surcharging was having in Australia following the RBA regulations, Edward Gilligan,
Vice Chairman at Amex, "used the phrase '[R]ome is burning' to describe his view on
the urgency of acting now to stem the tide of differential surcharge."[116]

---

[113] AMEX-DOJ-10133629-638 at 631.

[114] Lamb Report at ¶¶254-268; Lamb Deposition at 17:20-24:13, 34:24-38:7, 45:12-47:25, 58:24-60:19,
94:14-95:24.  As I explained in the Lamb Report, under a new set of RBA reforms first announced in
December 2001, Amex agreed as part of an "Undertaking" with the RBA that it would "not prohibit, or
take any action that has the effect of prohibiting, a merchant in Australia from charging an American
Express card holder any fee or surcharge for use of an American Express credit or charge card on a
transaction."  See Deposition of Colm Lorigan, August 5, 2012 (hereafter "2012 Lorigan Deposition")
Exhibits 910, 932.

[115] AMEXNDR17380767-785 at 770.

[116] 2014 Amex Trial PX0230 at AMEX-DOJ-11069928-29.  A similar Amex presentation from August
2007 noted that differential surcharging was the "[k]ey [c]hallenge [w]e [f]ace," adding that "[m]erchants
differentially surcharge because it is in their best financial interest to do so."  See AMEX-DOJ-10039910-
953 at 911, 926.  In another August 2007 presentation, Amex acknowledged that it "is rational for a
merchant to differentially surcharge," adding that "[c]ardmembers either pay surcharge or switch payment

54.     Thus, in light of these risks, and consistent with my description of how the threat of differential surcharging can discipline prices for GPCC Transactions, in January 2003 (following the RBA's announcement of its reforms), to "[m]itigate [r]isks," Amex "proactively reduced discount rates to over 80,000 merchants by 5-35bp across a range of industries – Retail, Restaurants, Professional/Financial Services, Lodging and Auto Sales/Service.  This was designed to minimize the threat of surcharge and assist in coverage efforts."[117]  Amex noted that this "move coincided with the introduction of surcharging but pre-dated the Visa/MasterCard rate reductions by 10 months."[118]

55.     However, despite these aggressive and proactive efforts on the part of Amex to stem the threat of differential surcharging in Australia, the threat persisted.  As a result, as I explained in the Lamb Report, in order to avoid the negative impact that merchants' differentially surcharging Amex GPCC Transactions would have on its business, Amex adopted a strategy whereby it would offer merchants a significant reduction in their merchant discount fee in exchange for agreeing not to differentially surcharge Amex GPCCs.[119]  For example, in an August 2006 update presentation regarding the RBA reforms, Amex noted that by the end of 2005, there had "been a significant trend in the Australia market towards surcharging in general and differentially surcharging American Express in particular," adding the following update: "Differential [s]urcharge significantly impacts our business and we are therefore taking steps to eliminate this by actively reducing our price for those merchants with Welcome Acceptance or Parity Surcharge."[120]  In a June 2007 update presentation on its response to the RBA reforms, Amex noted that between 2003 and 2006, it had "successfully executed [its] core strategy: minimize effect of surcharging on billings and aggressively leverage

_____

products.  They do not leave establishments."  See AMEX-DOJ-10133629-638 at 631.  Amex also noted that, unlike with differential surcharging, there were "[n]o material impacts witnessed for Amex from cases of parity surcharge."  See AMEX-DOJ-10133629-638 at 631.
[117] AMEXNDR00655707-725 at 710.
[118] AMEXNDR00655707-725 at 710.
[119] Amex recognized that the RBA's regulations did not prevent merchants from entering into agreements with Amex in which it waived its rights to differentially surcharge since merchants would only enter into such an agreement with Amex if doing so was in the merchant's best interests.  See, 2012 Lorigan Deposition at 126:5-128:5.
[120] 2012 Lorigan Deposition Exhibits 910, 932 at AMEXNDRAUS00000235.

opportunities."[121]  In this same presentation, Amex updated its "Strategic Challenges" for Australia from "2007 onwards" in the following way:

> Our original strategy focused on securing the top accounts in the marketplace to set a marketplace standard of no surcharge.  New threats have evolved in the marketplace from small/medium merchants. […] Bedding down 'no surcharge' contracts with key merchants was costly, bringing many key accounts to the point of being virtually non-profitable.[122]

56.     Additional common evidence I have reviewed indicates the threat of surcharging in Australia was effective at disciplining prices in the market for GPCC Transactions.  A May 2021 RBA Consultation Paper concerning the Retail Payments Regulation in Australia cited by Dr. Emch stated: "Most merchants choose not to surcharge card payments, though having the ability to do so can help lower their payment costs and promote competition between card schemes."[123]  In a July 2011 Submission to the RBA, the Australian Merchant Payments Forum stated: "Importantly, many merchants have used the threat of surcharging to negotiate lower merchant service fees and then have refrained from surcharging after gaining a reduced price. Therefore the impact of merchants' ability to surcharge is more widespread that may be seen by the frequency and level of surcharges in the market."[124]  In 2011, Woolworths, currently Australia's largest retailer,[125] reaffirmed that: "[T]he intention to surcharge has been one of Woolworths' single most effective pricing negotiation tool for the domestic and international card schemes. This has assisted Woolworths' brands, which undertake 18% of all debit transactions and 12% of all credit card transactions in Australia, in not introducing surcharging currently. In certain brands we have achieved an almost 50%

---

[121] AMEX-DOJ-10070929-953 at 934.
[122] AMEX-DOJ-10070929-953 at 935.
[123] Reserve Bank of Australia, "Review of Retail Payments Regulation - Consultation Paper," May 2021 at p. 4.
[124] Australian Merchant Payments Forum, "Submission to the Reserve Bank of Australia – Response to Review of Card Surcharging," July 20, 2011 at p. 9.
[125] Sezen Bakan, "Revealed: Australia's top retailers as shoppers shift priorities amid cost of living crunch," The New Daily, August 12, 2022.

reduction in pricing, allowing us in the current economic and highly competitive environment to provide our customers with better value."[126]

57.     I further explained in the Lamb Report that Amex viewed its experience in Australia following the RBA reforms as a benchmark for what might happen in the U.S. if it were to similarly lose its ability to enforce its Anti-Steering Rules (particularly, if differential surcharging were to be permitted in the U.S.).[127]  For example, in a 2009 "Global Pricing & Revenue Management" presentation, Amex included a case study of its experience with the RBA regulations in Australia, noting that after "[m]erchants begin to react to surcharge option," Amex "[l]inked pricing and marketing concessions to 'no differential surcharge' conditions."[128]  Among the "Key AXP Learnings" Amex listed from its experience in Australia was that the "[n]umber of negotiations sky rocket [sic] – Plan for increasing resources as well as training," and also that "[m]arketing $ is a key lever to protect long term premium."[129]

58.     In a March 2010 "Discussion with MS Americas Leadership Team" presentation regarding "Regulation Driven Surcharging/Discounting Threats," Amex sought to discern what insights it could glean from other countries that faced regulation to consider strategies for "[c]ombating the [t]hreat" in the U.S.[130]  Regarding its experience in Australia, Amex  noted that "DS [(Differential Surcharging) is] a virus, can be contained !!," noting further its eventual strategy whereby the "Australia team established DS baseline, linked pricing and marketing concessions to 'no differential surcharge' conditions, and began developing strategies & programs to address issue."[131]  In this presentation, Amex concluded that it "can leverage the learning for combating DS in Australia and other markets to help plan for <u>both</u> surcharging and discounting threats

---

[126] Letter from Dhun Karai, Head of Group Financial Services, Woolworths Ltd., to Dr. Chris Kent, Head of Payments Policy Department, Reserve Bank of Australia, July 25, 2011 at p. 1.
[127] Lamb Report at ¶¶260-269.
[128] AMEXNDR06627933-28009 at 27950.
[129] AMEXNDR06627933-28009 at 27950.
[130] AMEXNDR19209938-968 at 940.  In particular, the topics of this presentation included: "Review the **threat from regulatory developments on surcharging / discounting across the globe, with focus on Americas**;" "Agree the **criticality and timing of planning and combating** potential differential surcharging / discounting threats in Americas;" and "Discuss how **Surcharging/Discounting Toolkit** can help planning and combating efforts."  See AMEXNDR19209938-968 at 939 (emphasis in original).
[131] AMEXNDR19209938-968 at 949.

across [Merchant Services Americas]."[132]  In another 2010 Amex presentation regarding "Potential Surcharging/Discounting Threats" to Amex's U.S. Merchant Services leadership, Amex included a section on "Australia Learning," in which it noted that "NDSA (No Differential Surcharging Agreement) is a key tool to enforce parity / no surcharge […] NDSAs allow AXP to incentivize merchants ( pricing, marketing, etc) to adopt a no-surcharge position (3-5 years)," adding that "*NDSA are more effective when offered to merchants before they start to DS.*"[133]

59.     As the common evidence discussed above and in the Lamb Report demonstrates, when assessing how it could apply the lessons learned from its experience in Australia to combat a scenario in which it would no longer to be able to enforce the no-surcharge provisions of its Anti-Steering Rules in the U.S. (thus, permitting differential surcharging by merchants),

60.     As I further explained in the Lamb Report, Amex's strategy in this regard is consistent with [134]

---

[132] AMEXNDR19209938-968 at 950 (emphasis in original).  Amex further noted that "DS impact on business can be significant.  Once merchants start to DS, it  spreads quickly," adding that if "allowed, can have a **significant business impact** (up to 50% of [Discount Business Volume] at risk  - Australia DS experience)."  See AMEXNDR19209938-968 at 950 (emphasis in original).
[133] AMEXNDR07125828-851 at 850 (emphasis added).
[134] AMEX-CP-000094461-492 at 463; AMEX-CP-000094540-560 at 542.  See, also, 30(b)(6) Deposition of Antonio Gagliardi, July 26, 2022 (hereafter "Gagliardi 30(b)(6) Deposition") at 121:9-122:3.  As part of [redacted]  See AMEX-CP-000094461-492 at 472 (emphasis in original); AMEX-CP-000094540-560 at 544.  Under parity surcharging, which Amex defines as "[s]urcharging that is applied equally across all Credit products," "[d]ebit may not be surcharged or is surcharged differently" than Credit products.  See AMEX-CP-000094461-492 at 464, 472. [redacted]  See AMEX-CP-000094461-492 at 472; AMEX-CP-000094540-560 at 544. [redacted]

Amex's findings in a presentation from ten years prior, when it noted that "DS [(Differential Surcharge)] impact on business can be significant.  Once merchants start to DS, it spreads quickly," adding that if "allowed, can have a **significant business impact** (up to 50% of [Discount Business Volume] at risk  - Australia DS experience)."[136]

61. Amex's understanding from its experience in Australia described above that "NDSA (No Differential Surcharging Agreement) is a key tool to enforce parity / no surcharge," and that "NDSA are more effective when offered to merchants before they start to DS,"[137] Amex's Anti-Steering Rules remained in force and, thus, still protected it from the imminent threat of differential surcharging in the U.S., [139]

---

 See AMEX-CP-000094461-492 at 472.

 As Amex reported in an August 2007 presentation summarizing what it had learned 3.5 years after the RBA reforms in Australia: there had been "[n]o material impacts witnessed for Amex from cases of parity surcharge," "[h]owever Differential Surcharge is an extremely damaging Brand experience."  See AMEX-DOJ-10133629-638 at 631.  As Antonio Gagliardi of Amex explained at deposition, compliant surcharging is "better than parity and certainly much better than differential because all modes of payment get surcharged the same," later adding that "parity surcharging or differential surcharging, even worse, is not something we like."  See Gagliardi 30(b)(6) Deposition at 90:6-15, 143:3-19.

[135] AMEX-CP-000094461-492 at 463.
[136] AMEXNDR19209938-968 at 950 (emphasis in original).
[137] AMEXNDR07125828-851 at 850.  Amex further found that "NDSAs allow AXP to incentivize merchants ( pricing, marketing, etc) to adopt a no-surcharge position (3-5 years)."  See AMEXNDR07125828-851 at 850.
[138] AMEX-CP-000094343 at Slide 2.
[139] See, for example, AMEX-CP-000094461-492 at 465, 468.  See, also, Gagliardi Deposition at 125:21-126:2; 2014 Amex Trial Transcript at 2692:22-2694:24.

62. ███████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████ █

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

██████████████████████████████ [141] ████████████████████

███████████████████████████████████████████

████████████████████████████████████████

████████████████ [142] Later in this Expert Reply Report I discuss why Amex not

explicitly referencing ███████████████████████████████████

██████████████████████████████████████████████ does not

reflect an inconsistency from its Australia-based strategy; rather, ████████████████

██████████████████████████████████████████████

████████████████████████████ the threat of differential surcharging is far less

imminent due to Amex's continued ability to impose and enforce its Anti-Steering Rules

(and, thus, merchants had significantly less bargaining power).

63.     In sum, the common evidence discussed above and in the Lamb Report

demonstrates how, based on its learning experiences from the RBA regulations in

Australia, Amex concluded that its best strategy would be to more aggressively and

proactively enter into agreements with merchants whereby merchants would agree not to

differentially surcharge Amex GPCCs in exchange for lower costs of Amex GPCC

acceptance through "pricing and marketing concessions" to prevent widespread

differential surcharging among merchants (particularly its top merchant accounts) to

combat a scenario in which it would no longer to be able to enforce the no-surcharge

provisions of its Anti-Steering Rules in the U.S.  In the next section, I discuss additional

---

[140] AMEX-CP-000094343 at Slide 14.
[141] AMEX-CP-000094343 at Slide 6, 14.
[142] AMEX-CP-000102914-929 at 915.  See, also, AMEX-CP-000102897 at Slide 18.

common evidence demonstrating that, contrary to Defendants' Economists' assertions regarding differential surcharging that occurred in Australia following the RBA regulations, in a world absent Amex's Anti-Steering Rules, such surcharging would be very limited in the U.S.

### iii. Defendants' Economists Fail to Consider the Differences in Regulation that Conditioned the Experience of Surcharging in Australia

64.     As I noted above, when assessing how it could apply the lessons learned from its experience in Australia to combat such a scenario in the U.S., ▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. Put another way, ▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. Thus, to the extent that there were some instances of differential surcharging that took place in Australia following the RBA regulations, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ As I noted above, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓.

65.     Furthermore, at my deposition, I explained that actual surcharging in a world absent Amex's Anti-Steering Rules would be limited because, to the extent that a merchant "imposed a surcharge on a -- differential surcharges on GPCC cards, I believe it would be a transitory thing because the GPCC card platforms would very quickly act to remove that."[143]  This is, in fact, consistent with part of Amex's strategy in how it dealt with differential surcharging in Australia.  For example, in an August 2007 presentation regarding "Differential Surcharge and the Australian Marketplace Current Reality,

---

[143] Lamb Deposition at 38:8-40:3.

Immediate Plans and Future Opportunities," Amex stated: "We are aggressively fighting every case of differential surcharge while attempting to influence the direction of opinion and regulation," and further laid out detailed strategies it was taking fight any such cases among "Small Merchants," "Mid Tier Merchants," and "Large Merchants."[144]

66.     In addition, in criticizing my opinion that surcharging would be very limited in a world absent Amex's Anti-Steering Rules, Defendants' Economists fail to account for the significant differences in the effect on competition between the RBA regulations in Australia and the but-for world in this matter.  As I explained in the Lamb Report, the change in the competitive landscape in Australia was driven by a set of new regulations implemented by the RBA "designed to promote greater efficiency, transparency and competition in the Australian payments system."[145]  Under these new reforms, differential surcharging was permitted on Visa and Mastercard GPCC Transactions (effective January 2003) and the interchange rates charged on Visa and Mastercard GPCC Transactions were capped at 55 basis points (effective October 2003).[146]  This represented an approximately 40 percent reduction in Visa and Mastercard interchange rates.[147]  In November 2006, the cap on Visa and Mastercard GPCC Transaction interchange fees was reduced to 50 basis points.[148]

67.     In setting the initial interchange rate caps for Visa and Mastercard, the RBA established a "cost-based benchmark" from which the interchange fee caps would be determined, based on the following eligible costs:

(i)     issuers' costs incurred principally in processing credit card transactions, including the costs of receiving, verifying, reconciling and settling such transactions;

(ii)    issuers' costs incurred principally in respect of fraud and fraud prevention in connection with credit card transactions;

(iii)   issuers' costs incurred principally in providing authorisation of credit card transactions; and

---

[144] AMEX-DOJ-10133629-638 at 633.
[145] Reserve Bank of Australia, "2002 Annual Report," 2002 at p. 29.
[146] AMEX-DOJ-10039910-953 at 916.
[147] Reserve Bank of Australia, "Reform of Credit Card Schemes in Australia," August 27, 2002 (hereafter "Reform of Credit Card Schemes in Australia").
[148] AMEX-DOJ-10039910-953 at 916.

(iv)   issuers' costs incurred in funding the interest-free period on credit card transactions, calculated using the average of the cash rate published by the Reserve Bank of Australia over the three financial years prior to the date by which the cost-based benchmark must be calculated.[149]

Notably, costs associated with the provision of cardholder rewards were not included in the cost-based benchmark from which these significant interchange rate caps were determined.

68.     Further, as part of this government regulation in Australia, Amex agreed as part of an "Undertaking" with the RBA that it would "not prohibit, or take any action that has the effect of prohibiting, a merchant in Australia from charging an American Express card holder any fee or surcharge for use of an American Express credit or charge card on a transaction."[150]  Furthermore, as Amex noted in a submission to the RBA, while Amex's merchant discount fees were not explicitly regulated by the RBA as part of these reforms, its "merchant service fees have declined sharply in response to competition from the lower merchant fees of our competitors and pressure from merchants following the implementation of the Interchange Standard by the dominant schemes," adding:

> This outcome was an explicit assumption and expectation of the Reserve Bank when it published its final credit card reforms. Furthermore, the Reserve Bank has ensured the realisation of its own prediction by its regulatory policy toward American Express coupled with its direct encouragement to merchants to bring pressure to bear on American Express in a series of unprecedented public statements by its senior officers.[151]

69.     As I've discussed, in a world in which Amex could no longer impose or enforce its Anti-Steering Rules, merchants would be afforded greater negotiating leverage with which to negotiate lower interchange rates or merchant discount rates, resulting in a new competitive equilibrium in which merchants' overall costs of GPCC acceptance are lower

---

[149] Reserve Bank of Australia, "Reform of Credit Card Schemes in Australia IV: Final Reforms and Regulation Impact Statement," August 2002 (hereafter "Reform of Credit Card Schemes in Australia IV") at pp. 42-43.
[150] 2012 Lorigan Deposition Exhibits 910, 932.
[151] American Express, "Review of Payments System Reforms: A Submission to the Reserve Bank of Australia," August 2007 (hereafter "American Express Submission to the Reserve Bank of Australia") at p. 11.

than they otherwise were.  As I explained, one important way in which merchants gain greater negotiating leverage absent Amex's Anti-Steering Rules is through the credible threat to differentially surcharge a given GPCC payment network's cards, which would allow merchants to negotiate lower interchange rates or merchant discount rates.  Thus, the merchants are incentivized to use their credible threat to differentially surcharge a given GPCC payment network's GPCCs to negotiate lower interchange rates or merchant discount rates in exchange for agreeing not to differentially surcharge that network's cards.

70.     However, the design of the RBA's regulations was such that, in addition to providing merchants with this same kind of negotiating leverage via the elimination of no-surcharge rules like those contained in Amex's Anti-Steering Rules, the RBA took the additional step of significantly reducing interchange fees charged by Visa and Mastercard towards the costs of providing GPCC Transactions via regulation, leaving Amex with little choice but to respond to these regulated fee reductions with significant reductions of its own as the threat of surcharging increased.[152]  Thus, having achieved significantly reduced interchange rates and merchant discount rates via regulation without having to give up anything in return, it is not surprising that some merchants may have been inclined to also take advantage of their ability to differentially surcharge certain GPCCs. In contrast, in the U.S. absent Amex's Anti-Steering Rules (where no such government regulation regarding caps on interchange and/or merchant discount rates would take place), this sort of newfound leverage would likely be used in negotiations in order to extract lower interchange rates or merchant discount rates, ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮  In fact, common evidence indicates that the RBA designed its regulations with the intention of seeing some merchants surcharge.[153]

---

[152] AMEXNDR00655707-725 at 710.

[153] For example, in a 2005 address by Dr. Philip Lowe, Assistant Governor (Financial System) in Australia, Dr. Lowe stated: "Just as we have said that we would like to see merchants charge for credit card use where they see it as in their interest, so too would we like to see merchants steering customers to cards that offer them better value for money. Again, to repeat a key theme of the reforms, the various payment systems should compete on their merits, not on the basis of interchange payments between financial institutions or by restrictions on merchants."  See Reserve Bank of Australia, "Reform of the Payment System - Address by Dr Philip Lowe, Assistant Governor (Financial System), to Visa International Australia and New Zealand Member Forum, Werribee: Reform of the Payment System," March 2, 2005 at p. 17.

44

71.     The common evidence discussed above demonstrates that, contrary to Defendants' Economists' assertions regarding differential surcharging that occurred in Australia following the RBA regulations, in a world absent Amex's Anti-Steering Rules, such surcharging would be very limited in the U.S.[154]

### III.     Defendants' Economists Do Not Dispute the Conclusions Reached in the Lamb Report that the GPCC Transaction Market in the United States Constitutes the Relevant Antitrust Market

72.     In the Lamb Report, I concluded, based on my own analysis of the documents produced in this litigation, published economic literature, and my training and experience in economics, that the GPCC Transactions market constitutes a relevant antitrust product market, and that the United States constitutes the relevant antitrust geographic market for evaluating the alleged misconduct.[155]  In particular, I discussed methodologies and common evidence in the Lamb Report demonstrating that Debit Cards and other emerging technologies such as digital wallets, payment facilitators, P2P payments, and BPNL payments are not economic substitutes for GPCC Transactions, and thus, are not part of the same relevant antitrust product market as GPCC Transactions.[156]

73.     In his report, Dr. Emch focuses much of his discussion of the relevant antitrust product market on "[c]ompetition from outside the GPCC transactions market," including Debit Cards and "electronic alternatives" to GPCC Transactions, such as digital wallets, P2P payments and BNPL payments.[157]  However, at no point in his report does Dr. Emch assert or conclude that any of these payment products are part of the same relevant

---

[154] Additional common evidence I have reviewed indicates that the differential surcharging that occurred in Australia tended to be limited to a handful of industries.  For example, in a July 2005 presentation, Amex stated: "Retail industry leaders have not risked competitive disadvantage by introducing surcharging. No surcharge agreements reached have prevented Amex only surcharge."  See AMEXNDR00655707-725 at 720.  According to a July 2013 study on credit card surcharging conducted by the Commonwealth Consumer Affairs Advisory Council of Australia: "While surcharging is not a universal practice, it is more common in industries typically seen to lack strong competitive pressures."  See Commonwealth Consumer Affairs Advisory Council, "Credit Card Surcharges and Non-transparent Transaction Fees: A study," July 2013 at p.viii.  Further, in an August 2007 presentation on "Differential Surcharging and the Australian Marketplace," Amex found that "90% of differential surcharge cases and 90% of coverage gap is in small merchants with average billings of approximately US$7,000."  See AMEX-DOJ-10133629-638 at 635.
[155] Lamb Report at ¶¶106-137.
[156] Lamb Report at ¶¶106-137.
[157] Emch Report at ¶¶93-131.

antitrust product market as GPCC Transactions, thus not refuting the conclusions I reached in the Lamb Report in this regard. In fact, Dr. Emch expressly acknowledges that he "do[es] not offer an opinion as to whether debit transactions should be part of a formal antitrust market definition with GPCC."[158] Similarly, Dr. Emch does not offer any opinion as to whether or not the emerging payment technologies discussed in the Lamb Report are part of the same relevant antitrust product market as GPCC Transactions.[159]

74.     Thus, given that Dr. Emch does not offer an opinion as to what the relevant antitrust product market is, nor does he dispute the conclusions reached in the Lamb Report that the GPCC Transaction market in the United States constitutes a relevant antitrust market, I have not changed any of the opinions or conclusions I reached in the Lamb Report in this regard.[160]

### IV.     None of Defendants' Economists Opinions Undermine the Conclusions Reached in the Lamb Report that Amex's Continued Imposition and Enforcement of its Anti-Steering Rules Have Caused Anticompetitive Effects

75.     In the Lamb Report, I discussed extensive common evidence demonstrating that Amex's continued imposition and enforcement of its Anti-Steering Rules following the 2011 Consent Decree and 2013 Settlement caused anticompetitive effects in the market for GPCC Transactions. As I discuss in detail in the section below, none of the criticisms contained in the reports of Defendants' Economists have caused me to change or revise the conclusions I reached in the Lamb Report in this regard.

76.     In Sections IV.A and IV.B below, I primarily discuss the many claims and assertions contained in Dr. Emch's report concerning the anticompetitive effects caused by Amex's continued imposition and enforcement of its Anti-Steering Rules, as he is the Defendants' Economist whose assignment explicitly included analyzing the opinions and conclusions I reached in the Lamb Report concerning these anticompetitive effects.[161] As

---

[158] Emch Report at ¶98.

[159] Emch Report at ¶¶122-131.

[160] I have noted that none of the Defendants' Economists dispute my conclusion that the United States constitutes the relevant antitrust geographic market.

[161] Emch Report at ¶6. I discuss Dr. Bernheim's claims and assertions regarding purported pro-competitive benefits of Amex's Anti-Steering Rules in Section IV.C below.

an initial matter, I note here again that, at his deposition, Dr. Emch acknowledged that "competition in a market is going to cause the two-sided price to come down," and further that "two-sided price coming down means more rewards and lower merchant discounts."[162]  As I noted above, while Dr. Emch and I agree about this critical understanding about the impact on two-sided prices in the market for GPCC Transactions following heightened levels of competition, Dr. Emch's bases for why this would not apply to a world in which Amex's Anti-Steering Rules were removed depends on his flawed assumption that the level of competition in the market for GPCC Transactions would be unchanged in the but-for world, and that the removal of Amex's Anti-Steering Rules would constitute an exogenous negative shock that would force merchant discount rates to be lower in the but-for world.  Thus, while I address the many flaws in Dr. Emch's claims and assertions regarding the anticompetitive effects caused by Amex's continued imposition and enforcement of its Anti-Steering Rules in detail in Sections IV.A and IV.B below, I note here that Dr. Emch's misunderstandings in this regard completely undermine the credibility of his opinions, rendering them fatally-flawed and meaningless.  Later in this Expert Reply Report, I discuss additional ways in which Dr. Emch's assumptions regarding exogenous negative shocks in payment card markets render some of his key arguments regarding these anticompetitive effects even further meritless and unreliable.

### A.  Dr. Emch's Claims Regarding My Analysis of Amex's Market Power are Meritless

77.    As I explained in the Lamb Report, market power refers to the ability of a firm to persistently price at a level that is significantly higher than marginal cost.[163]  I further explained in the Lamb Report, one method commonly used by economists to assess a firm's market power involves analysis of direct evidence of the *exercise* of market power, which is available when the conduct being considered has already occurred and has already (potentially) affected the market.[164]  The exercise of market power is evidence of

---

[162] Emch Deposition at 111:10-112:14.
[163] Lamb Report at ¶153.
[164] Lamb Report at ¶153.

the possession of market power, and, as I discussed in the Lamb Report, there is such evidence of the exercise of market power here.[165]

78.     In his report, Dr. Emch attempts to challenge the opinions and conclusions I reached in the Lamb Report on a number of flawed and misguided grounds. For example, Dr. Emch distorts the conclusions I reached in the Lamb Report by addressing certain evidence I discussed in the Lamb Report in isolation, leading to flawed criticisms of my analysis and conclusions. However, contrary to Dr. Emch's assertions, I presented various forms of direct evidence in the Lamb Report that, *taken together*, demonstrates that Amex was able to exercise its market power to persistently price GPCC Transactions that were significantly above competitive levels.[166] I discuss this direct evidence in the context of Dr. Emch's criticisms of my analysis and conclusions in this regard in greater detail later in this section.

79.     Furthermore, Dr. Emch incorrectly claims that my analysis of Amex's market power in the market for GPCC Transactions "focuses entirely on the merchant side of the market" and, thus, improperly fails to consider both the merchant side and the cardholder side of the two-sided market for GPCC Transactions.[167] This is incorrect. As I discussed in the Lamb Report and describe in greater detail below, my analysis of Amex's market power considered the impact that Amex's pricing behavior on both the merchant and cardholder side of the market, thus invalidating Dr. Emch's claim in his regard. While it is the case that a significant portion of my analysis of Amex's market power focuses on the merchant side of the market, it stands to reason that this would be the case given that the subject of this litigation, Amex's Anti-Steering Rules, were imposed in the standard merchant Card Acceptance Agreement, and were enforced on merchants and not cardholders. This does not imply, as Dr. Emch claims, that my analysis of Amex's market power failed to consider both sides of the market for GPCC Transactions.

80.     Rather, contrary to Dr. Emch's claims, the extensive common evidence I discussed in the Lamb Report illustrates how Amex persistently exercised its market power to raise prices paid by merchants across many different industries that were both

---

[165] Lamb Report at ¶¶152-175.
[166] Lamb Report at ¶¶152-175.
[167] See, for example, Emch Report at ¶137.

profitable (i.e., were not offset by increases in cardholder rewards or reductions in annual fees paid by cardholders), and did so without losing any significant amount of market share or acceptance from merchants.  And further, Amex implemented these price increases not because of increases in costs, or demand for its products, or because of enhanced "value" offered by its network, but rather, as Tom Pojero of Amex articulated regarding one such successful price increase: "Purely being done *because we can* and it will generate incremental [] revenue."[168]

81.     I discuss Dr. Emch's flawed assertions regarding Amex's exercise of market power in the market for GPCC Transactions in additional detail in the sections below.

### i.     Dr. Emch Does Not Dispute that Amex's Pricing is Disconnected from the Marginal Cost of GPCC Transactions

82.     In his report, Dr. Emch criticizes my analysis of Amex's market power by claiming that it confuses "technical" market power -- which, practically speaking, most firms possess to some degree by virtue of facing a downward sloping demand curve -- and "antitrust" market power, which, as Dr. Emch describes, requires "the ability to charge and profit from a price substantially in excess of the appropriate competitive benchmark for an extended period of time, even when other potentially substitutable goods are priced at cost."[169] Dr. Emch makes no attempt to establish what "competitive benchmark" would be appropriate for the standard he claims I failed to meet.

83.     Nevertheless, the direct common evidence I discussed in the Lamb Report, taken together, establishes that Amex possessed market power and exercised that market power to persistently set prices significantly above its marginal costs.  One such piece of evidence is the fact that Amex itself acknowledges that it does not set prices based on its costs associated with providing GPCC Transactions (such as cardholder rewards), rather, it bases these costs on the "value" it perceives merchants receive for accepting Amex

---

[168] 2014 Amex Trial PX1168 at AMEXNDR18084021 (emphasis added).
[169] Emch Report at ¶134.  See, also, Louis Kaplow, and Carl Shapiro, "Chapter 15 Antitrust," Handbook of Law and Economics. Vol. 2, Elsevier B.V., 2007 (hereafter "Kaplow and Shapiro") 1073-1225 at pp. 1079-1098.

GPCCs.[170]  This is at odds with the publication Dr. Emch cites in support of his claims that my analysis confuses technical market power with "antitrust" market power, which states that technical market power reflects the fact that, often times, firms' average costs are higher than their marginal costs, and so those firms must set prices to exceed marginal costs "to remain viable in the long run."[171]  While Amex and other GPCC payment networks have substantial fixed costs that would make their average costs larger than their marginal costs, these costs are not what dictates their pricing.  Rather, as Jack Funda of Amex testified at the 2014 Amex Trial, "we price based on value not on our cost structure."[172]

84.     In addition, as I noted in the Lamb Report, in its amended responses to Plaintiffs' first set of interrogatories in this matter, Amex described the factors it takes into consideration when setting merchant discount rates, 

.[173]  As Monique Ouellette of Amex testified at deposition in this matter,

.[174]  When explaining this outcome, Ms. Ouellette

---

[170] The 'value' touted by Amex appears to refer to what economists would call a 'network externality,' or the benefits members of a network enjoy by being able to transact with one another. Later in this Expert Reply Report, I explain that the opportunities that cardholders and merchants have to transact with one another outside of the Amex network imply that the network externalities and 'value' provided by Amex appear to be far less than Amex itself asserts.

[171] Kaplow and Shapiro at p. 1079.

[172] 2014 Amex Trial Transcript at 2832:10-25.

[173] Lamb Report at ¶155.

                    See Amex's Interrogatory Responses at p. 7.  See, also, Ouellette 30(b)(6) Deposition at 45:12-46:2.  Furthermore, as Monique Ouellette of Amex testified at deposition in this matter, Amex

                                                                                                    See Ouellette 30(b)(6) Deposition at 20:17-22:8.

[174] Ouellette 30(b)(6) Deposition at 38:6-39:8.

          See AMEX-CP-000094309-341 at 319.

[redacted][175]

85.     Another claim Dr. Emch makes in criticizing my analysis of how Amex sets its merchant discount fees is that I fail to consider how demand for Amex's products might have factored into how Amex was setting its prices.[176]  However, in making this assertion, Dr. Emch conducts no analysis or cites no evidence to demonstrate that cardholder and/or merchant demand for Amex's network was driving Amex's persistent and profitable increases in price.[177]  Later in this Expert Reply Report I discuss common evidence demonstrating that Amex, and Defendants' Economists, tend to overstate the benefit and value that Amex GPCC acceptance affords merchants.

86.     However, contrary to Dr. Emch's speculation that increased merchant demand might be a factor in how Amex sets its prices, an analysis of the market for GPCC transactions demonstrates relative stability in Amex's market share.  As shown in Figure 4 below, which is a reproduction of Figure 18 from Dr. Emch's report where he calculated the shares in U.S. charge volume for major GPCC payment networks, Amex's market share over the last 32 years has ranged from a minimum of 19.2 percent (2020) to a maximum of 26.4 percent (2013).  Indeed, given how Amex claims that its business model is built around attracting "wealthier" and "higher value" cardholders who spend more than the average cardholder, it is hard to see how Amex could substantially grow its market share and the purported "value" it offers to merchants without undermining its brand.[178]

---

[175] Ouellette 30(b)(6) Deposition at 38:6-48:22. [redacted]

[redacted]. See Ouellette 30(b)(6) Deposition at 52:21-54:22, Exhibit 2 at AMEX-CP-000067650.  As Ms. Ouellette explained at deposition, [redacted]

[redacted] See Ouellette 30(b)(6) Deposition at 35:11-46:2.

[176] Emch Report at ¶¶145-147.
[177] Emch Report at ¶¶145-146.
[178] See, for example, Emch Report at ¶286, footnote 484; Bernheim Report at ¶21.

**Figure 4**
**Reproduction of Figure 18 from Dr. Emch's Report**
Figure 18: US charge volume shares for major credit card networks, 1990–2021



Source: *Nilson Reports.*
Source: Emch Report Figure 18.

## ii.    Dr. Emch's Criticisms of my Analysis of Amex's Persistent and Profitable Price Increases are Fundamentally Flawed and Unreliable

87.    In his report, Dr. Emch criticizes my analysis of the persistent, profitable price increases Amex implemented, claiming that I failed to consider changes in consumer demand as a driver of those price increases, rather than an exercise of its market power.[179]  He claims: "Starting at a current, profit-maximizing price, no firm in a competitive market or in a monopoly market and no firm in any other market would increase its price in the absence of changes in market conditions, because such a price increase would lead to an unprofitable loss in sales.  What would cause a price change, in all cases, is a change in market conditions such as cost or consumer demand (or a

---

[179] Emch Report at ¶¶148-159.

recognition or expectation of such a change) that would change the profit-maximizing price for the firm."[180]

88.     However, Dr. Emch's assertion is fundamentally flawed, as it depends entirely on his assumption that Amex is always pricing at the profit-maximizing price.  Put another way, Dr. Emch appears to confuse Amex's desire to operate profitably with an assumption that Amex maximizes profits.[181]  However, in order for a firm such as Amex to set profit-maximizing prices (as Dr. Emch assumes), it must possess perfect knowledge of its revenues and costs, as well as the revenues and costs of its competitors.[182] However, such firms typically do not adequately possess such detailed and accurate information.[183]  Furthermore, firms generally operate with a degree of uncertainty regarding the market demand curve, and, thus, learn about demand by experimenting with price.[184]

89.     Thus, Dr. Emch is merely assuming his own conclusion.  Per his logic, no profit-maximizing firm with "antitrust" market power could ever be accused of exercising its market power.  On the contrary, any profit-increasing business strategy Amex may pursue should not be confused with successfully maximizing profits, as Dr. Emch incorrectly asserts.

90.     In furtherance of his claims in this regard, Dr. Emch states: "Dr. Lamb asserts ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮ that ▮▮▮▮▮▮▮▮▮▮▮▮

---

[180] Emch Report at ¶149

[181] Dr. Emch further asserts: "Dr. Lamb's claim is that Amex's charge volume is essentially insensitive to its merchant discounts.  But that conclusion means that Amex must not be acting to maximize profit.  Said differently, the fact that Amex maximizes profits implies that merchant acceptance must be far more sensitive to merchant discounts than Dr. Lamb claims."  See Emch Report at footnote 290.

[182] Dennis Carlton and Jeffrey Perloff, *Modern Industrial Organization.* Fourth Edition, Global Edition, Boston, MA: Pearson, 2015 at pp. 182-184, 212-213, 594; Robert S. Pindyck and Daniel L. Rubinfeld, *Microeconomics.* Eighth Edition, Upper Saddle River, New Jersey: Pearson Education, 2013 (hereafter "Pindyck & Rubinfeld (8th edition)") at pp. 282-284, 371; Jeffrey Church and Roger Ware, *Industrial Organization: A Strategic Approach.* New York, NY: Irwin McGraw-Hill, 2000 at pp. 65-66.

[183] Pindyck & Rubinfeld (8th edition) at pp. 488, 495.

[184] Pindyck & Rubinfeld (8th edition) at pp. 25, 495.  It is further likely that Amex does not operate at the profit-maximizing level of output (even for a monopolist) because the supply of "wealthy" and "higher value" cardholders is limited.  See Emch Report at ¶286, footnote 484; Bernheim Report at ¶21. Accordingly, one cannot assume that Amex's pricing is determined by profit maximization, or that changes in prices are determined by changes in demand or costs.

53

�+ [185] However, in making this claim, Dr. Emch conflates Amex's persistent and profitable price increases with being accompanied by higher merchant benefits through Amex's OptBlue program.  Dr. Emch stated that ▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ."[186] However, when summarizing the strategy that Amex used to successfully implement its OptBlue program,[187] Dr. Emch left out the aspect of OptBlue ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.  Put another way, rather than ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

91.    For example, one trade press article announcing OptBlue quoted Ed Jay, Amex's Executive Vice President of merchant services for its Americas Group as saying: "Third-party acquirers can now establish prices to match Visa, MasterCard or Discover."[188] Regarding this announcement, Trent Voigt, CEO of merchant acquirer JetPay Payment Services, stated: "It was common to hear merchants complain about paying around 3.5% for Amex transactions when they paid only 2% on Visa or MasterCard transactions," adding that "[t]hey were asking, why would they take American Express?"[189] Mr. Voigt further stated that the "high-end use has eroded over the years, and American Express had to do this [OptBlue] to get in the game with small merchants."[190] Payment processor Host Merchant Services described OptBlue as "essentially a more affordable Amex processing program."[191] Merchant acquirer Cartis explains in a recent newsletter: "In

---

[185] Emch Report at ¶159.
[186] Emch Report at ¶159.
[187] The elements of Amex's strategy described by Dr. Emch included: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ See Emch Report at ¶159.
[188] David Heun, "Amex Lets Acquirers Price-Match Rival Cards to Win Small Merchants," PaymentsSource, May 6, 2014 (hereafter "Heun").
[189] Heun.
[190] Heun.
[191] Host Merchant Services, "A Complete Guide to the American Express OptBlue Program," (hereafter "Host Merchant Services"). Host Merchant Services adds further: "Businesses that could otherwise not

contrast to American Express merchant services, the American Express OptBlue Solution offers the option to accept Amex without the high fees and even the score for businesses."[192]

92.     Furthermore, on a number of earnings calls, Amex executives explained how the OptBlue program would drive merchant discount rates downward, but that it came with a trade-off of driving greater merchant acceptance to close Amex's merchant coverage gap compared to the other GPCC payment networks.[193]  In its April 2022 OptBlue Program Operating Regulations, Amex explains the OptBlue program ██████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████[194]

93.     In sum, contrary to Dr. Emch's claims, Amex's persistent and profitable increases were not accompanied by any purported benefits of Amex's OptBlue Program (thus justifying said price increases).  Conversely, ██████████████████████

████████████████████████████████████████

███████████████

   a.   **Dr. Emch's Claims that Amex's Persistent and Profitable Price Increases Were Significantly Driven by the "Value" Merchants Received in Return Lack Merit**

94.     As I noted above, in many of the criticisms contained in Dr. Emch's report regarding my analysis of Amex's market power, he tends to conflate the "value" that Amex asserts its merchants receive from accepting Amex GPCCs with consumer demand

_____

afford the Amex processing fees may now be able to afford it and/or qualify. The OptBlue program gives merchant acquirers (the banks offering the credit cards) wholesale rates. This makes it more affordable for the payment processors to pass along their rates to you – the merchant." See Host Merchant Services.
[192] Mayer Hyman, "Some love it, some hate it.  Some score points with it, some need to settle a score with it. What is it? Answer: American Express," *Cartis*, February 7, 2023 (hereafter "Hyman").  Cartis further explained: "Reduced Amex rates – While Amex Direct merchants are on a fixed discount rate, merchants enrolled on the OptBlue program through a payment processor benefit from wholesale discount rates." See Hyman.
[193] See, for example, American Express Q1 2014 Earnings Call Transcript, April 16, 2014 at p. 13; American Express Q3 2014 Earnings Call Transcript, October 15, 2014 at pp. 4, 9. See, also, American Express 2016 Shareholder/Analyst Meeting Transcript, October 3, 2016 at pp. 29-30.
[194] AMEX-CP-000099293-9511 at 9305.

for those products, claiming then that this "value" often drove Amex's persistent and profitable price increases, as opposed to Amex exercising its market power to do so. In the Lamb Report, I discussed common evidence of Amex-accepting merchant acknowledgements that they do not receive additional value from accepting Amex GPCCs that justified Amex's higher prices.[195]

95.      In addition, common evidence I have reviewed undermines Amex's own claims of the premium value merchants receive by accepting Amex GPCCs. For example, the results of a February 2007 (shortly after the "value recapture" program began) Amex Merchant Satisfaction Program survey noted that "AMEX performs at a competitive disadvantage on most acceptance-related attributes across both mSat and hSat Tier 4 merchants."[196] In a November 2008 Amex Merchant Satisfaction survey, Amex noted: "Pricing remains an issue for merchants overall; most do not agree with the AXP Price/Value Equation."[197] A March 2009 Amex Merchant Satisfaction Survey found: "Overall, American Express scores highest on the transparency of our pricing structure, but lowest in areas of overall price / value and price flexibility."[198] Similarly, a March 2011 Amex Merchant Satisfaction Research Survey found that "[m]erchant satisfaction tends to be higher for our competitors across the board."[199] Regarding a question about merchants' price/value satisfaction with Amex, Amex found that "[p]erceived value is significantly higher for Visa/MC that for Amex."[200]

---

[195] Lamb Report at ¶¶165-167.
[196] 2014 Amex Trial PX0705 at AMEXNDR09107726. mSat merchants are unmanaged merchants that had one to three locations, and hSat merchants are unmanaged merchants that had four or more locations. See 2014 Amex Trial Transcript at 1812:9-20.
[197] 2014 Amex Trial PX0042 at AMEXNDR09517994. Amex also noted: "Not surprisingly, pricing is an issue with most merchants—about 1/3 are very dissatisfied." See 2014 Amex Trial PX0042 at AMEXNDR09517994. It also noted: "Some merchants have 'done the math,' and the price/value equation doesn't add up." See 2014 Amex Trial PX0042 at AMEXNDR09517994. Further, when asked if "Increasing American Express' Share of My Total Charge Volumes Would Have a Positive Impact on My Business?," 11.1 percent, 16.4 percent, 28.1 percent, and 24.1 percent of Tier 1, Tier 2, Tier 3, and Tier 4 merchants said they agreed. 2014 Amex Trial PX0042 at AMEXNDR09517994. In response to this question, Amex noted that Enterprise responded: "Would increasing Amex's share of my total charge volumes have a positive impact on my business? No. 1 out of 10. I completely disagree." See 2014 Amex Trial PX0042 at AMEXNDR09517994.
[198] 2014 Amex Trial PX0041 at AMEXNDR12028098.
[199] 2014 Amex Trial PX0043 at AMEXNDR09032963.
[200] 2014 Amex Trial PX0043 at AMEXNDR09032965. See, also, 2014 Amex Trial PX1246 at AMEXNDR19345526-28.

96.     The timing of these surveys conducted by Amex that found that merchants persistently valued Amex less than its competitors (such as Visa and Mastercard) coincides with many of the persistent and profitable price increases Amex implemented that I discussed in the Lamb Report for which Dr. Emch claims shifting "value" (consumer demand) played a key role in setting.[201]  For example, as I noted in the Lamb Report, Amex first embarked on its "value recapture" program beginning at least as early as 2005, which consisted of a series of price increases (in the form of higher merchant discount fees) "over a substantial portion of [Amex's merchant] base" in order to allow Amex to maintain a "rate premium" over Visa and Mastercard (as opposed to an increase in costs associated with the provision of Amex GPCC Transactions).[202]  A July 2009 Amex presentation regarding its value recapture initiative noted that by that time, Amex had "implemented over 20 Value Recapture initiatives since 2006 and thereby raised rates on 65% of the total [Merchant Services US] charge volume."[203]  This included value capture initiatives in the following industries: airlines, automotive (and other transportation), car rental, communication, education, entertainment, healthcare, lodging, mail order, oil, services, professional/financial services, restaurant, department stores, shops, Costco, supermarkets, government, and charities.[204]

---

[201] I further discussed common evidence in the Lamb Report demonstrating that, despite these price increases imposed on Amex-accepting merchants, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮.  See Lamb Report at ¶¶161-163.

[202] 2014 Amex Trial PX1240 at AMEXNDR19210100; 2014 Amex Trial PX0051 at AMEXNDR10546677; 2014 Amex Trial PX0121 at AMEXNDR11964459; 2014 Amex Trial Transcript at 708:9-710:3.

[203] 2014 Amex Trial PX0121 at AMEXNDR11964459.

[204] 2014 Amex Trial PX0121 at AMEXNDR11964459.  I further discussed in the Lamb Report common evidence demonstrating that despite these price increases imposed on Amex-accepting merchants, very few merchants actually dropped Amex acceptance in response.  For example, Jack Funda, former Senior Vice President for Global Merchant Pricing at Amex, testified in 2012 that he was not aware of any Amex managed accounts that ceased accepting Amex GPCCs as a result of the price increases they incurred as a result of Amex's value recapture initiatives.  See Deposition of Jack Funda, November 19, 2012 at 196:20-200:20.  Stephen McCurdy of Amex similarly testified in 2012 that he was not aware of any accounts Amex lost as a result of the price increases it imposed on those accounts through its value recapture initiatives. See 2012 McCurdy Deposition at 601:15-603:14.  Similarly, Shane Berry, then Senior Vice President of Amex's National Client Group, testified in 2012 that since 2009, Amex's National Client Group had experienced 100 percent retention among Amex's largest, nationally-focused merchant accounts.  See Deposition of Shane Berry, September 27, 2012 (hereafter "2012 Berry Deposition") at 179:7-188:17.  Similarly, a 2006 performance review of Amex's William Glenn, then President at Amex, noted: "Implement Value Recapture in lodging, restaurants and [card-not-present] with no cancellations." See AMEXNDR12913588-594 at 591.  In a November 2009 presentation, Amex reported that it imposed

97.     In a related exercise of Amex's market power in the market for GPCC Transactions that occurred at the same time the negative Amex merchant satisfaction surveys discussed above were conducted, common evidence I have reviewed demonstrates that in 2009, Amex effectively raised the "gross pay fee" (the fee charged by Amex to merchants who wished to pay a one-time amount at the end of each month covering the total merchant discount fees owed to Amex for that month rather than individual transaction-by-transaction merchant discount fees throughout the month) in two ways: 1) Amex "[reduced] the threshold at which a merchant had to pay a fee to get gross pay," and 2) Amex "increased the gross pay fee."[205]  At the time these gross fee increases were being considered, Joseph Quagliata of Amex emailed Beverly Anderson, Amex's Vice President of Account Strategy and Merchant Development, stating: "Upon further reflection, I am increasingly concerned about the scope of impact within the Field. […] Approximately 50 percent of the portfolio will be impacted."[206]  When Ms. Anderson raised the gross pay fee discussion with a group of Amex General Managers, Tom Pojero of Amex articulated Amex's exercise of market power in implementing this price increase: "We will be lowering the threshold for [Monthly Gross Pay fees] from $100k to $50k. *Purely being done because we can and it will generate incremental ($1.4mm) revenue.*"[207]  I have noted that Amex ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬[208]

---

its value recapture initiatives on approximately 2,600 restaurant accounts year-to-date, and that Amex had still achieved a 99.9 percent retention rate during that time. See 2014 Amex Trial PX0706 at AMEXNDR09134676, 685. Mr. Berry described his role as being "responsible for managing the relationships that American Express has with the largest national - - nationally-focused merchant relationships in the U.S." See 2012 Berry Deposition at 7:4-16.

[205] 2014 Amex Trial Transcript at 1089:11-19, 1194:22-1195:3.

[206] 2014 Amex Trial PX0784 at AMEXNDR10311380.

[207] 2014 Amex Trial PX1168 at AMEXNDR18084021 (emphasis added). At the 2014 Amex Trial, Mr. Quagliata testified that Amex ultimately decided to implement these gross pay fee increases. See 2014 Amex Trial Transcript at 1200:8-10.

[208] Lamb Report at ¶163. See, also, Emch Report at ¶¶158-159. As I noted, in 2018, Amex launched a shift in its pricing to its product-pricing strategy, under which it applies different rates based on the type of Amex GPCC product. As I discussed, Amex's ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. See Ouellette 30(b)(6) Deposition at 35:11-46:2. ▬▬▬▬▬▬▬▬▬▬▬

98.     The fundamental flaw in Dr. Emch's assertion that the persistent and profitable price increases associated with its "value recapture" initiative is perhaps best illustrated by Amex's "Value Recapture Decision Framework" from a March 2010 Amex presentation, which is shown in Figure 5 below. As shown, the first step of this Value Recapture Decision Framework is to ask: "Does the price reflect value provided to merchant?"[209]  If the answer to this question is "yes," the next step in this framework is to ask: "Can we capture additional value?," and if so, to determine what an appropriate pricing structure would be for that merchant.[210]   More egregiously, if the price does not reflect the value provided to the merchant, Amex does not appear to believe any remedial action is necessary.

## Figure 5



Source: 2014 Amex Trial PX1240 at AMEXNDR19210090.

99.     Thus, contemporaneous decision-making about prices at Amex was completely at odds with Dr. Emch's claims that Amex's persistent and profitable price increases

---

                                                                                                See AMEX-CP-
000094309-341 at 319.
[209] 2014 Amex Trial PX1240 at AMEXNDR19210090.
[210] 2014 Amex Trial PX1240 at AMEXNDR19210090.

associated with its "value recapture" initiative reflected greater "value" that Amex was offering merchants. Consider the first step in this framework above: under Dr. Emch's logic, if Amex were to find that the price it was charging a merchant reflected the value that merchant was receiving from Amex, it wouldn't (or couldn't) increase prices any further. However, as shown above, that's exactly what Amex sought to do in situations where it found that the pricing it was charging merchants already reflected the value those merchants received. I have also noted that, as part of this decision framework, if Amex found that the price merchants were charged did *not* reflect the value those merchants received, Amex took no further pricing action (as opposed to lowering its price to levels that reflected the value that merchant was receiving), as Dr. Emch's claims suggest they would do.[211] Thus, this decision framework illustrates how Amex, after determining its prices that it charged merchants reflected the value received by those merchants, sought to exercise its market power to impose a higher, "most appropriate" pricing structure on those merchants. As I noted above, Amex successfully raised prices on a "substantial portion" of its merchant base above the level of value those merchants received from Amex.[212]

100.     The common evidence demonstrates that Dr. Emch's assertions that the "value" that Amex provided merchants played a significant role in Amex's persistent and profitable price increases lack merit, as they are contradicted by Amex's own internal analyses which demonstrated that Amex persistently performed worse than competitors such as Visa and Mastercard in terms of the value their merchants received for the cost of accepting Amex GPCCs, as well as overall merchant satisfaction.

---

[211] 2014 Amex Trial PX1240 at AMEXNDR19210090.

[212] 2014 Amex Trial PX0121 at AMEXNDR11964459. Also consistent with the fundamental flaws in Dr. Emch's assertions that the "value" that Amex provided merchants played a significant role in Amex's persistent and profitable price in increases, in a 2011 draft memo to Amex's Global Pricing Group regarding "Evolving the AXP Pricing Strategy and Pricing Architecture," Amex analyzed certain factors that could threaten its continued implementation of price increases to merchants through its value recapture program. See AMEXNDR07146018-022. I have noted that one such factor was the "regulatory, legislative, litigation" environment, about which it stated that caps on the interchange rates charged for Visa and Mastercard GPCC Transactions "could significantly increase AXP premiums in the short term, but likely erode our rates in the moderate to long term." See AMEXNDR07146018-022 at 020. Amex further noted the following regarding the "regulatory, legislative, litigation" environment: "Any form of legalized surcharging could significantly constrain AXP's ability to continue with Value Recapture." See AMEXNDR07146018-022 at 020.

### b.   Dr. Emch's Purported Analyses of Amex's Two-Sided Prices are Misleading and Inaccurate

101.   As I noted above, in criticizing my analysis of Amex's exercise of market power in implementing its persistent and profitable price increases, Dr. Emch claims I fail to adequately consider changes in price on the cardholder side of the market.[213]  In so doing, Dr. Emch largely ignores the common evidence I discussed in the Lamb Report in support of my conclusions in this regard.[214]

102.   As I discussed in the Lamb Report, the market for GPCC Transactions is a two-sided market, where one side of the market is comprised of cardholders who wish to pay for their purchases with a GPCC, and the other side of the market is comprised of merchants who wish to accept GPCCs as payment for goods and services.[215]  The price faced by cardholders for GPCC Transactions is the cardholder fee, which includes the (typically negative) cost, if one exists, of using the card to transact and any annual cost associated with owning the card (but not including the cost of using the revolving credit feature of the card).[216]  The price faced by merchants to accept GPCCs is the merchant discount fee.[217]  Thus, the price level in the GPCC Transaction market is the sum of the merchant discount fee and the Annual Fee Net of Rewards per dollar of GPCC transaction value.[218]

103.   It bears noting here that the two-sided price in the market for GPCC Transactions is not a price that is paid by participants on either side of the market.  Rather, it is a hypothetical pricing metric that can be used to analyze prices in two-sided markets such as the market for GPCC Transactions.  As such, two-sided prices are not tracked or measured by GPCC payment networks and/or GPCC issuers in the ordinary course of

---

[213] Emch Report at ¶¶152-153.
[214] Lamb Report at ¶¶158-169.  Dr. Emch claims my support for these conclusions was "only a statement from an Amex executive at a 2013 conference that its value pricing initiative was profitable, and a series of documents that he claims also show that the Amex's price discrimination was profitable and was not 'fully offset' by increases in cardholder rewards."  See Emch Report at ¶152.
[215] Lamb Report at ¶61.
[216] Lamb Report at ¶61.
[217] Lamb Report at ¶61.
[218] Lamb Report at ¶¶61-63.  See, also, David Evans and Richard Schmalensee, *Paying with Plastic.* Second Edition, Cambridge, MA: MIT Press, 2005 (hereafter "Evans and Schmalensee") at p. 189.

business, as doing so is not feasible.[219]  In particular, in open-loop payment systems like those of Visa and Mastercard, the various components of merchant discount fees (the interchange fee, acquirer fee, and network fee) are earned by different participants in the GPCC payment system, making it even more difficult for Visa and Mastercard to practically observe or track two-sided prices for GPCC Transactions.[220]  While GPCC issuers generally track *costs* associated with the provision of cardholder rewards, this is not the same thing as the *value* of the cardholder rewards that are earned by cardholders on a given GPCC Transaction, which is a key component of the two-sided price paid by cardholders.[221]

104.    Nevertheless, Dr. Emch claims my analysis and conclusions in this regard fail to consider the cardholder side of the market for GPCCs, and "that omission itself invalidates any inferences that might be drawn from [my] analysis."[222]  In a misguided effort to refute my analysis and conclusions, Dr. Emch presents a series of analyses where he claims to "systematically examine[] trends in the data," including "trends in Amex's overall merchant discount rates [and] trends in its 'two-sided' price, which incorporates cardholder rewards" ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆,
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
▆▆▆▆▆▆▆▆▆▆▆▆[223]  I discuss the many fundamental flaws in Dr. Emch's analyses below.

105.    As an initial matter, I note that many of the analyses Dr. Emch performs in purportedly calculating the two-sided prices rely on data that originated from an internal Amex database referred to as MIRA (formerly referred to by Amex as GMAPS) that Amex produced to Dr. Emch (as well as Dr. Gaier) but not to me.[224]  However, in their expert backup productions, Defendants' Economists failed to produce the raw, original

---

[219] At deposition, Dr. Emch was not aware of any fields or variables that measure or track Amex's two-sided price in its P&L or GMAPS database.  However, he was unaware as to why that was.  See Emch Deposition at 58:14-59:7.
[220] Lamb Report at ¶¶39-50.
[221] See, for example, Emch Report at ¶213.
[222] Emch Report at ¶152.
[223] Emch Report at ¶¶152-155.
[224] See, for example, Emch Report Figures 12, 25-27, 43-45, 47; Emch Deposition at 63:4-64:21; Letter from Peter T. Barbur to Todd Seaver, dated February 14, 2023 at Appendix B p. 7.

data and instead produced intermediate datasets (which Amex refers to as a "join of relevant variables" that came from two tables within Amex's MIRA database)[225] that had been processed by Defendants' Economists, in part by pulling and manipulating specific data and information from the raw MIRA database.[226]  Defendants did not produce the raw MIRA data tables relied upon by Defendants' Economists, nor the computer codes and/or programs Defendants' Economists used to clean, process, and/or harmonize those data, and refused to do so when asked.[227]

106.    At deposition, Dr. Emch acknowledged that the intermediate dataset produced in his backup materials included only the fields he relied upon in his analyses that he pulled from one of two raw MIRA data tables,[228] but did not include any of the other fields included in those raw MIRA data tables.[229]  He further acknowledged that, by not producing the raw MIRA data tables from which his analysis originated from, I was unable to determine if there were any other fields included in those data that would also have been appropriate (or more appropriate) to include in such analysis.[230]  And further, in the event that a mistake was made when pulling, cleaning, and/or harmonizing the data Dr. Emch pulled from the raw MIRA data tables when creating the intermediate dataset he produced in his backup, it would be impossible for me to check and/or identify such mistakes since neither the raw MIRA data tables Dr. Emch relied upon, nor the computer codes and/or programs Defendants' Economists used to clean, process, and/or harmonize

---

[225] Letter from Peter T. Barbur to Todd Seaver, dated February 14, 2023 at Appendix B p. 3.

[226] Letter from Todd Seaver to Peter T. Barbur, dated February 10, 2023 (hereafter "Seaver Feb. 10 Letter"); Letter from Todd Seaver to Peter T. Barbur, dated February 20, 2023 (hereafter "Seaver Feb. 20 Letter").

[227] Seaver Feb. 10 Letter; Seaver Feb. 20 Letter; Letter from Peter T. Barbur to Todd Seaver, dated February 14, 2023; Letter from Peter T. Barbur to Todd Seaver, dated February 16, 2023; Letter from Peter T. Barbur to Todd Seaver, dated February 22, 2023.

[228] While Counsel for Amex states that Dr. Emch's intermediate dataset pulled from two raw MIRA data tables, at deposition, Dr. Emch stated that he didn't "know if it was two or more than two."  See Emch Deposition at 62:21-63:3.

[229] Emch Deposition at 62:4-68:12.

[230] Emch Deposition at 68:13-70:10.  At deposition, Dr. Emch stated that one could calculate a two-sided price with or without consideration of the annual fees paid by cardholders.  See Emch Deposition at 35:6-36:5.  However, because Dr. Emch chose not to include annual fees in his purported calculations of two-sided prices, his backup production of the intermediate data did not include a field for annual fees, despite Dr. Emch's acknowledgment that it could be appropriate to include annual fees in such an analysis.  See Emch Deposition at 35:6-36:5, 62:4-68:12; AMEX-CP-000035105-5481; Letter from Peter T. Barbur to Todd Seaver, dated February 14, 2023 at Appendix B pp. 5, 8.  Given the nature of his backup production, it is unclear what other fields Dr. Emch from the raw MIRA data tables that Dr. Emch chose not to use in his analysis that may also have been relevant to consider.

those data in creating his intermediate dataset, were provided to me.[231]  Given this, without the raw MIRA data tables Dr. Emch used to create his intermediate dataset and the aforementioned computer codes and/or programs, it was impossible for me to fully analyze whether or not Dr. Emch accurately and appropriately used those raw data in creating the intermediate datasets that feed into certain of his analyses of purported two-sided prices in the market for GPCC Transactions.

107.    However, a cursory review of Dr. Emch's analyses indicates he did not actually perform the analysis he claims to have performed.  As Dr. Emch notes, in a two-sided market, the "proper unit of observation is a transaction, each of which involves a cardholder and a merchant," adding that the "price of a transaction is the sum of the prices paid by (or to) the merchants and the cardholder."[232]  However, Dr. Emch's purported calculations of two-sided prices do not even reflect his own definition of a two-sided price.  For example, rather than incorporating a measure of the prices paid to cardholders (i.e., the *value* of the cardholder rewards earned by cardholders on Amex GPCC Transactions), Dr. Emch instead incorporates accounting estimates of the *costs* incurred by Amex for the provision of cardholder rewards to Amex cardholders on their Amex GPCC Transactions.  Thus, rather than calculating two-sided prices for Amex GPCC Transactions as he explicitly claims he does, Dr. Emch instead performs an unreliable measure of Amex accounting costs and profitability.

108.    Setting aside the fact that Dr. Emch does not actually perform an analysis of Amex's two-sided price (as he explicitly claims he does),[233] I note that the accounting exercise he does perform incorporates a number of unreliable elements that, taken together, completely undermine the credibility of Dr. Emch's analysis, even as a measure of the profitability of Amex's GPCCs.  For example, a key source of information Dr. Emch uses in his analysis for the cardholder side of the market is referred to as "Rewards Expense."[234]  Amex's Rewards Expense is an estimate of the total (present and future) cost that Amex will ultimately incur on the cardholder rewards earned in a given period

---

[231] Emch Deposition at 70:11-74:19.
[232] Emch Report at ¶213.
[233] Emch Report at ¶¶214-215, 224-226; Emch Deposition at 9:6-14.
[234] See, for example, Emch Report at Figure 30, footnote 400; Emch Deposition at 32:23-33:18.

based on the total dollars spent on GPCC Transactions during that time, multiplied by Amex's internal estimates of Ultimate Redemption Rate ("URR") and Weighted Average Cost ("WAC") per point.[235] Further, the Rewards Expense Dr. Emch incorporates into his analyses constitutes a significant input into the overall estimate of Rewards Liability Amex tracks as part of its regular course of business.[236] Regarding these estimates, Amex stated in its 2014 Annual Report: "The process of estimating the Membership Rewards liability includes a high degree of judgment. Actual redemptions and associated redemption costs could differ significantly from management's judgment, resulting in either higher or lower Membership Rewards expense."[237]

109.    Furthermore, as noted above, a key component of the Rewards Expense Dr. Emch used in his analysis is the URR, which Amex defines as "[m]anagement's estimate of the percentage of points earned that a Card Member will ultimately have redeemed when they exit the MR Program."[238] At deposition, Dr. Emch was unaware what the URR was, despite it being a key input into the Rewards Expense he uses in his analysis.[239] After being reminded by his staff what the URR was, Dr. Emch testified that he was not aware if Amex had changed its URR during the time period of his analysis, or how Amex determined its URR.[240] However, an analysis of Amex's URR over the period of Dr. Emch's analysis reveals that it had a significant impact on the Rewards Expense used by Dr. Emch.  For example, in the U.S. from 2002 to 2022, Amex's estimated URR ███████████████████████████████████.[241]  Notably, in the first five years of Amex's Value Recapture initiative in the U.S., Amex's estimated URR increased from 79 percent (2005) to 86 percent (2009).[242]  In its 2021 Annual Report, Amex explained the significance that even small changes in its estimated URR can have on the Rewards Expense Dr. Emch used in his analysis to purportedly calculate the

---

[235] See, for example, 30(b)(6) Deposition of Jonathan Gantman, July 14, 2022 (hereafter "Gantman 30(b)(6) Deposition") at 223:20-226:25.

[236] Gantman 30(b)(6) Deposition at 223:20-226:25.

[237] 2014 American Express Annual Report at p. 55.

[238] Gantman 30(b)(6) Deposition Exhibit 11 at AMEX-CP-000103453.

[239] Emch Deposition at 32:19-32:22.

[240] Emch Deposition at 38:25-41:9.

[241] See, for example, AMEXNDR00270324-355 at 328; Gantman 30(b)(6) Deposition Exhibit 9 at AMEX-CP-000078156; Gantman 30(b)(6) Deposition Exhibit 10 at AMEX-CP-000078591; Gantman 30(b)(6) Deposition Exhibit 8 at AMEX-CP-000062446; Gantman 30(b)(6) Deposition at 177:19-180:16.

[242] AMEXNDR00270324-355 at 328; AMEXNDR08846397-6422 at 6406.

cardholder side of the two-sided price: "As of December 31, 2021, an increase in the estimated URR of current enrollees of 25 basis points would increase Membership Rewards liability and corresponding rewards expense by approximately $140 million."[243]

110. As another example of the impact that Amex's estimated URR can have on its Rewards Expense, Amex explained in its 2011 Annual Report: "Cardmembers' increased engagement with the Company's Membership Rewards program drove an increase in the ultimate redemption rate to 92 percent in 2011 from 91 percent in 2010. This resulted in higher rewards expenses primarily driven by increased recent redemption patterns by U.S. cardmembers."[244] Conversely, the following year, Amex stated in its Annual Report: "Membership Rewards expenses decreased $84 million as compared to the prior year as a result of a $353 million reduction in expenses related to a slower average URR growth rate (including the effects of enhancements to the U.S. URR estimation process of $342 million in 2012 and $188 million in 2011) and a shift in the redemption mix that drove a favorable change in the WAC assumption, offset by higher expenses of $269 million relating to an increase in new points earned."[245] In light of the impact that Amex's URR can have on its estimated Rewards Expense, it is perhaps unsurprising that in Figure 28 of his report, which plots "Amex US rewards as a fraction of charge volume," that he observes an increase in Rewards Expense in 2011, and a decrease in Rewards Expense in 2012.

111. Further underscoring the flaws in Dr. Emch's analyses in this regard is that his results are completely at odds with statements made by Amex about the profitability of its value recapture and product-based pricing initiatives. As I noted in the Lamb Report, the purpose of Amex's value recapture program was to allow Amex to maintain a "rate premium" over Visa and Mastercard, which had been diminishing over time.[246]

---

[243] 2021 American Express Annual Report at p. 80.
[244] Amex 2011 Annual Report at p. 24. Amex also noted: "Cardmember rewards expenses increased $1.2 billion or 24 percent to $6.2 billion in 2011 from $5.0 billion in 2010, reflecting higher rewards-related spending volumes and co-brand expense." See Amex 2011 Annual Report at p. 24. However, Amex did not attribute its increase in Rewards Expense to higher levels of rewards offered by Amex to its cardholders.
[245] Amex 2012 Annual Report at pp. 25-26.
[246] Lamb Report at ¶159. See, also, 2014 Amex Trial PX1240 at AMEXNDR19210100; 2014 Amex Trial PX0051 at AMEXNDR10546677; 2014 Amex Trial PX0121 at AMEXNDR11964459; 2014 Amex Trial Transcript at 708:9-710:3.

Regarding the rate premium Amex enjoyed over Visa and Mastercard approximately eight years after this initiative began, Daniel Henry, then CFO at Amex, explained at a June 2013 conference that Amex does not invest the entirety of the premium it earns on its merchant discount rates in cardholders benefits or rewards; rather, Amex keeps a portion of that premium as profit: "We take that premium pricing, and part of it we drop to the bottom line, but part of it we invest in better value propositions for the cardmembers, and that enables us to both retain the cardmembers we have as well as attract new cardmembers."[247]

[248] Dr. Emch's claims are also at odds with the additional statements made by Amex regarding the success and profitability of these aforementioned pricing initiatives, thus further underscoring their flaws.[249] For these reasons, Dr. Emch's purported analysis of two-sided prices is entirely

---

[247] 2014 Amex Trial PX1475 at p. 2.

[248] Emch Report at ¶¶152-155.

[249] For example, in an April 2010 Amex pricing presentation, Amex reported: "Since 2006, Value Recapture benefits have more than offset industry and account level rate investments." See 2014 Amex Trial PX1753A at AMEXNDR12459029. Regarding the "Global Cumulative Benefit of Value Recapture," Amex reported that by "the end of 2010, the Value Recapture program will have delivered $1.37B in incremental [pre-tax income] and a 6.8 bps improvement in Global Discount Rate." See 2014 Amex Trial PX1753A at AMEXNDR12459031. Amex further noted that the impact on the merchant discount rate in the U.S. would be 8.8 basis points, with an expected cumulative benefit from 2006 to 2010 of $1.3 billion. See 2014 Amex Trial PX1753A at AMEXNDR12459031; 2014 Amex Trial PX0357 at AMEXNDR00085949. Amex further reported that the incremental revenue it generated from its value recapture initiatives between 2006 and 2009 was significantly greater than its incremental costs associated with those initiatives for both large merchants (managed accounts) and small merchants (unmanaged accounts). See 2014 Amex Trial PX1753A at AMEXNDR12459032-33. For example, according to Amex's analysis, for every dollar of investment Amex made towards its value recapture initiatives between 2006 and 2009, it earned between $19.60 and $64.00. See 2014 Amex Trial PX1753A at AMEXNDR12459032; 2012 McCurdy Deposition at 598:9-601:14. Furthermore, in 2018, Amex launched a shift in its pricing to its product-pricing strategy, under which it applies different rates based on the type of Amex GPCC product. As I discussed, Amex's ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. See Ouellette 30(b)(6) Deposition at 35:11-46:2. ████████████████████████████████████████████ See Ouellette 30(b)(6) Deposition Exhibit 3 at AMEX-CP-000094319. Further, in September 2019, Amex forecasted ████████████████████████████████████████████████████████████████ See Ouellette 30(b)(6) Deposition Exhibit 3 at AMEX-CP-000094310. According to its 2021 Annual Report, Amex earned net income of $8.060 billion in the year ended December 31, 2021. See 2021 American Express Annual Report at p. 43.

unreliable and irrelevant for the purposes of assessing Amex's market power in the market for GPCC Transactions.

112.    In addition to being an inaccurate and unreliable measure of the profitability of Amex's value recapture and product-based pricing initiatives, (as well as not representing the two-sided prices of Amex's GPCC Transactions in any meaningful way, contrary to Dr. Emch's claims), I have noted that Dr. Emch's assertions that the results of his analyses in this regard demonstrate that ██████████████████████████; ████████████████████████████ are at odds with Defendants' Economists' overarching claims that "consumer rewards are inextricably tied to merchant fees," and therefore, if Amex were to reduce its merchant discount rates in a world absent Amex's Anti-Steering Rules, it would have no choice but to reduce cardholder rewards by a corresponding amount.[250]  Dr. Emch fails to explain how, in a world absent Amex's Anti-Steering Rules, Amex could not reduce its merchant discount rates in response to the new, more competitive equilibrium that would emerge without corresponding decreases in cardholder rewards (as he claims), but then also claims that ███████████████ ████████████████████████████ as part of its value recapture and product-based pricing initiatives, and further purports that █████████████ ████████████████████████████████████████ ██████████████████████████ █████[251]

113.    Thus, given the fact that Dr. Emch's analyses discussed above do not even come close to measuring Amex's two-sided prices (as he explicitly claims) based on Dr. Emch's own stated definition, and given the fact that his analyses further represent inaccurate and unreliable estimates of Amex's profitability related to its value recapture and product-based pricing initiatives, as well as the fact that Dr. Emch's assertions are at odds with Amex's own statements regarding the success of these pricing initiatives, none

_____

████████████████████████████████████████████████. See Ouellette 30(b)(6) Deposition Exhibit 3 at AMEX-CP-000094310; AMEX-CP-000094671-4747 at 708-710. ████████████████████████████████████████████████████████ ████████████████████████████████████████. See AMEX-CP-000094671-4747 at 4710-4712.
[250] Bernheim Report at ¶¶61-62; Emch Report at ¶¶155, 312-321.
[251] Emch Report at ¶¶154-158, 216-226.

of Dr. Emch's opinions in this regard have caused me to change the conclusions I reached in the Lamb Report regarding Amex's exercise of its market power.

### iii.  Dr. Emch's Defense of Amex's Successful Price Discrimination Lacks Merit

114.  In his report, Dr. Emch insists that Amex's successful price discrimination in the market for GPCC Transactions is "not surprising," as "different merchants hav[ing] different willingness to pay for Amex's services" is a "function of the value that Amex provides them," and is benign and constrained by competition.[252]  Dr. Emch is incorrect.

115.  Elsewhere in this Expert Reply Report, I refute Dr. Emch's assumptions concerning the purported value Amex delivers to merchants and the origin of Amex's market power. As with Dr. Emch's other arguments, Amex's practice of raising prices to extract surplus at Amex-accepting merchants is easily distinguished from the sort of "garden variety" price discrimination aimed at making additional sales below the monopolist's price.  Furthermore—considering Dr. Emch's claim in the best possible light—Amex's price discrimination practices can be distinguished from a variety of two-sided price discrimination that allows a monopolist platform to expand participation on the other side of the market.[253]

116.  In addition to the market power distortion that allows monopolists to price above marginal cost, a second well-known distortion arises with respect to the level of "quality" provided by a monopolist. This latter quality distortion arises because a monopolist's pricing decision depends on the valuation of a *marginal* user, while the total surplus enjoyed from quality improvement depends on the valuation of the *average* user. If the marginal user enjoys quality less than the average user, the monopolist will generally under-provide quality.[254]

117.  In a two-sided market, the 'quality' provided to one side of a market by a platform monopolist is participation on the other side. When Amex sets a single price for merchants, it only extracts the surplus of a marginal merchant—that is, the merchant who

---

[252] Emch Report at ¶¶147, 160-166.
[253] Emch Report at ¶163.
[254] A. Michael Spence, "Monopoly, Quality, and Regulation," *Bell Journal of Economics,* Vol. 6, No. 2, 1975, 417-429.  Spence, a Nobel Laureate, notes that the two distortions are interdependent.

has the least surplus of all the merchants participating at a given merchant discount rate. In principle, this merchant discount revenue can be used to subsidize the participation of cardholders on the other side of the market. If Amex could price discriminate among the other participating merchants (the 'inframarginal' merchants), it could, in theory, use the additional fees to recruit more cardholders and provide more 'quality' to participating merchants.[255]

118.   However, as the common evidence discussed in the Lamb Report and elsewhere in this Expert Reply Report demonstrates, when increasing its levels of price discrimination in the market for GPCC Transactions, Amex did not do so with the goal of increasing the value offered to its merchants.[256]  Amex did not use the surplus extracted from inframarginal merchants to acquire more cardholders or offer greater levels of cardholder rewards.  Rather, Amex's price discrimination reflected an exercise of its market power to extract incremental revenues and profits, simply because it could, and contrary to Dr. Emch's flawed characterization of Amex's conduct in this regard as something akin to a store loyalty program.

### iv.   Dr. Emch's Claims About Merchants' Ability to Practically Drop Amex Acceptance are Contradicted by Extensive Evidence

119.   In the Lamb Report I discussed extensive common evidence demonstrating that, as a practical matter, Amex-accepting merchants could not simply cease accepting Amex GPCCs in order to avoid the effects of Amex's Anti-Steering Rules following the 2011 Consent Decree and 2013 Settlement.[257]  Dr. Emch criticizes the analyses and conclusions contained in the Lamb Report in this regard because, as he claims, "Amex does not 'lock in' its cardmembers," and that it's "axiomatic that market power cannot exist in situations where consumers can and do switch easily."[258]  He further conflates Amex's status as a "must-take card" with the notion that "both Amex and the merchant

---

[255] Weyl (2010).  The same calculus applies on the cardholder side. If the value of the marginal cardholder recruited with the aid of additional fees is below the value of the average cardholder to the merchant, the quality of the Amex network is eroded from the merchant's perspective. In such cases, merchants' willingness to pay declines, and price discrimination on the cardholder side is welfare-destroying, even though it increases participation.  See Weyl (2010).

[256] Lamb Report at ¶¶170-175.

[257] Lamb Report at ¶¶234-248.

[258] Emch Report at ¶¶167-168.

find acceptance mutually beneficial."[259]  Dr. Emch's assertions in this regard, however, are contradicted by statements and testimony from Amex-accepting merchants (including Qualified Merchants), which illustrate the anticipated commercial impact of dropping acceptance of Amex GPCCs due to a significant portion of customers that prefer Amex GPCCs foregoing purchases at those merchants in favor of competitors who accepted Amex.[260]

120.     For example, at the 2014 Amex Trial, John Robinson of Ikea testified that Ikea could not stop accepting Amex because a large enough percentage of its customers expressed a preference for using Amex such that it "couldn't drop American Express without suffering a loss in sales," adding that the "percentage of customers that said they might move [was] large enough for Ikea to make a determination not to stop accepting American Express."[261]  When asked at the 2014 Amex Trial if he ever recommended dropping acceptance of Amex GPCCs, Frank Bruno of Crate & Barrel responded by saying that with "that large percentage of spend coming through American Express, I would be extremely nervous that it would adversely impact sales. So no, I would not make that recommendation."[262]  Peter Haslam of Office Max similarly testified that it would not be a good financial decision to stop accepting Amex GPCCs because it would lose sales to its competitors.[263]  Diedre O'Malley of Best Buy similarly testified that in 2010, following an increase in the cost of accepting Amex GPCCs in 2008, Best Buy was considering dropping acceptance of Amex GPCCs and performed an analysis of the impact of doing so.  Ms. O'Malley testified that, based on the results of this analysis, Best

---

[259] Emch Report at ¶169.

[260] It is important not to confuse merchant decisions about acceptance with merchant decisions about use, as Dr. Emch tends to do.  Eliminating Amex's Anti-Steering Rules would allow merchants to make decisions about use in individual GPCC Transactions in many ways they haven't previously been permitted to.

[261] 2014 Amex Trial Transcript at 389:10-390:10.

[262] 2014 Amex Trial Transcript at 2322:21-2323:4.  Mr. Bruno stated that approximately 33 percent of Crate & Barrel's GPCC transaction volume was represented by Amex. See 2014 Amex Trial Transcript at 2322:8-16.  When asked why Crate & Barrel accepts Amex GPCCs, Mr. Bruno testified: "Because our competition accepts them and we have to compete.  But also it's a tender that our customers use so we want to make sure that we're able to transact with them."  See 2014 Amex Trial Transcript at 2322:17-20.

[263] 2014 Amex Trial Transcript at 2159:18-2161:4.  Mr. Haslam noted that Office Max's competitors accepted Amex, which influenced Office Max's decision to continue to accept Amex: "Well, if they accept American Express and we don't accept American Express for some customers, it would become more difficult to shop at Office Max and they would be more likely to shop at our competitors."  See 2014 Amex Trial Transcript at 2160:9-23.

Buy determined that the potential loss of sales from dropping acceptance of Amex GPCCs outweighed any potential benefits from doing so, and thus, Best Buy opted to continue to accept Amex GPCCs.[264]

121.    A Walgreens negotiation with Amex is particularly instructive on how merchants cannot practically drop Amex despite the higher merchant discount fees it imposes.  In mid-2004, Walgreens embarked on a plan to negotiate with Amex for lower merchant discount rates on Amex GPCCs to levels that were consistent with the rates charged for acceptance of Visa and Mastercard GPCCs.[265]  Jeffrey Rein of Walgreens testified that, at the time, Amex GPCC cost of acceptance was the highest of the four major GPCC payment networks, costing approximately 30 percent more that Visa and Mastercard, which Walgreens considered to be "way, way out of line."[266]  Mr. Rein further noted that, given Walgreens' 3.5 percent net margins, it was "absolutely critical to control costs."[267]  At the time, Walgreens was confident that it could negotiate a better merchant discount rate with Amex given its status as the number one drugstore chain in terms of store count and sales, and as the ninth-largest retailer in the US.[268]  However, after approximately six months of negotiations, Amex's final offer to Walgreens was to reduce its merchant discount rate by ten basis points, or a four percent decrease, which still left Visa's and Mastercard's overall merchant discount rates "much lower" than Amex's.[269]

122.    Walgreens considered Amex's final offer to be "unacceptable," and as a result, in December 2004, informed Amex of its intention to terminate its acceptance of Amex GPCCs effective January 2005.[270]  Upon being informed of Walgreens' decision, Amex began developing a plan to start steering customers away from Walgreens towards Walgreens competitors.  As John Theiss of Amex noted in a December 2004 email to colleagues, Amex began working with teams on "deciphering which markets and which accounts would make sense approaching for a campaign to shift share away from

---

[264] 2014 Amex Trial Transcript at 1528:22-1536:22.
[265] 2014 Amex Trial Transcript at 1352:13-1353:14.
[266] 2014 Amex Trial Transcript at 1352:23-1353:11.
[267] 2014 Amex Trial Transcript at 1343:5-1344:4.
[268] 2014 Amex Trial Transcript at 1342:21-1343:4, 1353:19-1354:6.
[269] 2014 Amex Trial Transcript at 1362:9-1364:17.
[270] 2014 Amex Trial Transcript at 1363:11-1365:19; 2014 Amex Trial PX1966 at WLGVMC 000190; 2014 Amex Trial DX 2219.

Walgreens," and further that Amex had discovered that it had "the ability to communicate directly to Walgreens 'shopper' list [...] so we can market directly where it hurts them the most."[271]  In particular, Amex had devised plans to offer customers "CVS Below the Line Offers" such as a $25 gift card for new or transferred prescriptions or spending $50 or more on certain items.[272]

123.    However, before Amex was able to implement its plans to steer business away from Walgreens towards its competitors, Walgreens came to realize the "absolute mistake" it was making in dropping acceptance of Amex GPCCs and agreed to new acceptance terms with Amex effective January 2005, despite Amex "not offer[ing] [Walgreens] anything additional to cause them to change their position."[273]  Rather, Walgreens' decision was based on the "widespread disaffection" that was communicated to it by its customers and the realization that its decision could result in a significant amount of customers shopping at its competitors in order to keep using their Amex GPCCs.[274]

124.    Dr. Emch further incorrectly criticizes the analyses and conclusions contained in the Lamb Report in this regard by arguing that Amex has made investments in order to build customer loyalty, and "this loyalty is not a fixed trait that Amex exploits, but a response to Amex's investments, innovations, and terms of service."[275]  Dr. Emch's treatment loyalty as an unrelated consequence of Amex's pricing is refuted by evidence of Amex's own negotiating tactics, which often involved threats Amex itself made to merchants that dropping Amex acceptance, or not agreeing to Amex's terms, would result in a significant loss of sales due to customer loyalty to the Amex brand.  By way of

---

[271] 2014 Amex Trial PX0934 at AMEXNDR12768897.

[272] AMEXNDR12060217; 2014 Amex Trial PX1814; 2014 Amex Trial Transcript at 4845:25-4846:20, 4852:2-23.  Amex further considered having Walgreens removed from the PBM network for its employees' health plans, a move it understood would "hurt Walgreens['] bottom line."  See 2014 Amex Trial PX0886 at AMEXNDR11999654; 2014 Amex Trial Transcript at 4853:24-4857:19.

[273] 2014 Amex Trial Transcript at 1391:21-1392:18, 1397:6-1399:4; 2014 Amex Trial PX1962; 2014 Amex Trial PX1965; 2014 Amex Trial PX0142 at AMEXM50102087.  Regarding the new deal reached between Amex and Walgreens, Stephen Samoy of Amex told a colleague in a January 2005 email that Walgreens "actually settled for a deal that was not quite as rich for them as the one we had back in Nov/Dec.  Go figure?!," adding that Walgreens "must be receiving major customer complaints at the store level."  See 2014 Amex Trial PX0446.

[274] 2014 Amex Trial Transcript at 1368:7-1397:2; 2014 Amex Trial PX1960.

[275] Emch Report at ¶¶171-177.

example, at the 2014 Amex Trial, Dwaine Kimmet of Home Depot testified that, "over time," and specifically during a 2011 negotiation with Amex where Home Depot sought to reduce its Amex GPCC acceptance costs, Amex claimed that Home Depot would "lose sales if it stopped accepting American Express cards."[276]

125.    Internal Amex planning documents also demonstrate how Amex seeks to "exploit" its customer loyalty against merchants (i.e., exercise its market power), contrary to Dr. Emch's assertion.  For example, Figure 6 below is a slide taken from a 2007 Amex presentation "Australian Surcharge Overview & Strategy" concerning its strategy to mitigate the threat of differential surcharging.  As shown in this slide, part of Amex's strategy was to "*use CM insistence as a weapon against merchants* who differentially surcharge."[277]

Figure 6

| Strategy is to better align our price/value and use CM insistence as a weapon against merchants who differentially surcharge | | |
|---|---|---|
| **Small Merchants** | **Mid Tier Merchants** | **Large Merchants** |
| "Remove potential to surcharge through changing pricing structure" | "Deepen relationship beyond payment processing" | "More aggressively make use of existing assets" |
| **Common Actions** | " Develop strategy to lobby regulation; and Engage in PR efforts to: * Reduce overall likelihood of surcharging; * Minimise CM impact when it does occur; * Reduce attractiveness of surcharging to merchants" | |

Note  Small Merchants A$0-A$50K DBV, Mid Tier Merchants A$50k-A$1MM DBV, Large Merchants >A$1MM DBV
Source: AMEX-DOJ-10039910-953 at 930.

---

[276] 2014 Amex Trial Transcript at 1261:10-1262:18.
[277] AMEX-DOJ-10039910-953 at 930 (emphasis added).

126.     Furthermore, following Amex's implementation of a third phase of value recapture (merchant discount fee increase) for the restaurant industry in April 2010, Amex prepared a presentation for restaurants to justify the price increase.[278]  In that presentation, Amex included a discussion of "How Card Acceptance Can Influence Behavior," which included a breakdown of "[c]ardmember behavior if the American Express Card was not accepted on last casual dining occasion."[279]  This breakdown found that 45 percent of cardholders "[w]ould no longer dine. Would dine less often or would spend less," while 43 percent of cardholders "[w]ould be unlikely to return."[280]  Under the "Coaching Tips" section for this slide of the presentation, Amex reps were coached to explain that "[e]ven customers who are familiar and loyal to your restaurant are affected by card acceptance. Almost half would not return, would return less often, and/or would spend less if American Express was not accepted, adding: This addresses the objection that in the restaurant, the customer belongs to the merchant and not American Express. Clearly, the customer is shared."[281]

127.     Furthermore, at the time Amex was increasing prices to the airline industry, Amex similarly put together presentation materials to inform airlines that they were at risk of losing sales if they opted to no longer accept Amex.  For example, in presentation slides put together for United Airlines around October 2008, Amex claimed that "92% of American Express Cardmembers say there is more than 1 airline that goes places they'd need or want to go," and that "83% of American Express cardmembers would choose an

---

[278] 2014 Amex Trial PX0957.
[279] 2014 Amex Trial PX0957 at AMEXNDR13238916.
[280] 2014 Amex Trial PX0957 at AMEXNDR13238916.  In this same presentation on a slide titled "Insistent Cardmembers," Amex noted that the fact that 40 percent of casual dining Amex cardholders "[u]sed only American Express Cards and no other major credit or charge cards."  See 2014 Amex Trial PX0957 at AMEXNDR13238917.  Amex further noted that "49% of Cardmembers report that they would feel less positive about a casual dining restaurant that did not accept American Express Cards."  See 2014 Amex Trial PX0957 at AMEXNDR13238917.  Under the "Coaching Tips" section for this slide of the presentation, Amex reps were coached to explain that "[l]oyalty groups are highly insistent, and have and overall less positive experience when they cannot use their preferred form of payment."  See Trial PX0957 at AMEXNDR13238917.  On another slide of this presentation, Amex also noted that 46 percent of casual dining Amex cardholders "[u]sed only American Express Cards and no other major credit or charge cards," and that "56% of Cardmembers report that they would feel less positive about a fine dining restaurant that did not accept American Express Cards."  See 2014 Amex Trial PX0957 at AMEXNDR13238924. See, also, 2014 Amex Trial PX0957 at AMEXNDR13238909-912, 919-921.
[281] 2014 Amex Trial PX0957 at AMEXNDR13238916.

airline that accepts American Express over one that does not, all things being equal."[282]
Amex made similar representations to Alaska Airlines, American Airlines, and Southwest
Airlines.[283]  In a set of talking points for Amex reps to use with Delta Airlines regarding
value recapture in April 2008, it was noted that "$2.3B of Delta's charge volume comes
from highly insistent customers, who are very loyal to American Express.  This consists
of $410M of highly insistent consumer spending and $1.8B of small business and
corporate spending."[284]

128.    The common evidence discussed above and in the Lamb Report regarding
merchants' inability to practically drop Amex acceptance in order to avoid the effects of
Amex's Anti-Steering Rules constitutes one piece of evidence, taken together with the
other evidence discussed above and in the Lamb Report, demonstrating that Amex
possessed significant market power in the market for GPCC Transactions.  None of the
flawed criticisms and assertions contained in Dr. Emch's report have caused me to
change the conclusions I have reached in this regard.

> **v.    Dr. Emch's Claims Regarding Purported Indirect Evidence of Amex's Lack
> of Market Power are Both Fundamentally Flawed and Irrelevant**

129.    In his report, Dr. Emch attempts to bolster his flawed assertions that Amex does
not possess "antitrust" market power by appealing to certain forms of indirect evidence
that he claims I failed to consider.[285]  However, given the extensive direct evidence of
Amex's exercise of market power in the market for GPCC Transactions, discussed above
and in the Lamb Report, it is not necessary to also demonstrate indirect evidence of
Amex's market power in order to reach the conclusions I reached in the Lamb Report that
Amex exercised market power in the market for GPCCs in the United States, and further
that Amex's continued imposition and enforcement of its Anti-Steering Rules have
caused anticompetitive effects.  However, I note here that the fact that I do not respond in
detail to all of Dr. Emch's flawed and irrelevant assertions regarding supposed indirect

---

[282] 2014 Amex Trial PX0047 at AMEXNDR10163327.
[283] See, for example, 2014 Amex Trial PX1218 at AMEXNDR18983334; 2014 Amex Trial PX0517 at AMEXNDR03676026; 2014 Amex Trial PX1601 at AMEX-DOJ-10015263.
[284] 2014 Amex Trial PX0231 at AMEX-DOJ-10073055.
[285] Emch Report at ¶¶194-212.

evidence of a lack of market power by Amex should not be taken as an indication that I agree with any of Dr. Emch's flawed opinions in this regard.

130.     For example, in his report, Dr. Emch asserts that Amex's relatively low market share is "inconsistent with an inference of substantial and sustained market power."[286] However, Dr. Emch's assertions in this regard fail to consider the nature of two-sided markets could impact the possession of market power without significantly high market shares.  In their 2012 journal article, Rysman and Wright explain the following in regards to the two-sidedness of the GPCC Transactions market: "Card networks have monopoly power over access to those consumers to the extent that the consumers only want to use that form of payment (e.g. if consumers single home).  In that case, card platforms can theoretically have a type of 'market power' with regard to merchants even if the card platforms have relatively small market shares among consumers."[287]  Rysman and Wright add: "Note in this case, that market power exists despite possibly intense inter-platform competition. The result is known in the literature as the competitive bottleneck."[288]  I note further that Amex's lower market shares is consistent with its stated business strategy to focus on "high-value" consumers that generally do not revolve balances, rather than a lack of market power.

131.     The other assertion of supposed indirect evidence of a lack of market power by Amex contained in Dr. Emch's report is that ████████████████████████ ████████████████████████████[289]  However, in direct contradiction to Dr. Emch's claims in this regard, ████████████████████ ████████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████ ████████████████████████

---

[286] Emch Report at ¶¶194-204.
[287] Marc Rysman and Julian Wright, "The Economics of Payment Cards," *Review of Network Economics*, Vol. 13, No. 3, 2015, 303-353 (hereafter "Rysman and Wright") at p. 327.
[288] Rysman and Wright at p. 327, footnote 20. I discussed the impact of "single-homing" in my extensive discussion of how most Amex-accepting merchants cannot practically drop Amex GPCC acceptance to avoid the effects of its Anti-Steering Rules.  See Lamb Report at ¶240.
[289] Emch Report at ¶¶205-212.

132.     As I explained in extensive detail above and in the Lamb Report, Amex viewed its experience in Australia following the RBA reforms (where it was essentially forced to allow Amex-accepting merchants to differentially surcharge) as a benchmark for what might happen in the U.S. if it were to similarly lose its ability to enforce its Anti-Steering Rules (particularly, if differential surcharging were to be permitted in the U.S.).[290]  As I explained, ███████████████████████████████████████████████████████.[291]

Dr. Emch claims that the mere fact that ████████████████████████████████████████ constitutes indirect evidence that Amex lacked market power.[292]  However, contrary to Dr. Emch's assertions in this regard, Amex itself acknowledges that its imposition and enforcement of its Anti-Steering Rules prohibited merchants from differentially or parity surcharing GPCCs in the U.S.  As Antonio Gagliardi of Amex testified in this matter:

Q. Okay.  And it is - - it is American Express' non-discrimination provisions that - - those are what prevent American Express accepting merchants from differentially surcharging, correct?

A. And parity surcharging.[293]

Amex further ███████████████████████████████████:.[294]  Thus, the fact that Amex ████████████████████████████████████████████

---

[290] Lamb Report at ¶¶260-262.  For example, in a 2009 "Global Pricing & Revenue Management" presentation, Amex included a case study of its experience with the RBA regulations in Australia, noting that after "[m]erchants begin to react to surcharge option," Amex "[l]inked pricing and marketing concessions to 'no differential surcharge' conditions."  See AMEXNDR06627933-28009 at 27950. Among the "Key AXP Learnings" Amex listed from its experience in Australia was that the "[n]umber of negotiations sky rocket – Plan for increasing resources as well as training," and also that "[m]arketing $ is a key lever to protect long term premium."  See AMEXNDR06627933-28009 at 27950.
[291] AMEX-CP-000094461-492 at 463; AMEX-CP-000094540-560 at 542.  See, also, Gagliardi 30(b)(6) Deposition at 121:9-122:3.
[292] Emch Report at ¶¶205-212.
[293] Gagliardi Deposition at 125:21-126:2.
[294] See, for example, AMEX-CP-000094461-492 at 465, 468.  This is also consistent with testimony given by then Amex Senior Vice President for Global Merchant Pricing at Amex, Jack Funda, in which he described how an agreement among networks and acquirers giving merchants the ability to differentially

██████ says nothing of the market power Amex currently possesses, and has possessed and exercised throughout the Class Periods in this matter; rather, it ████████

████████████ one would expect from a large and sophisticated financial institution such as Amex.[295]

133.   Furthermore, in his report, Dr. Emch claims that ██████████████

█████████████████████████████ "[s]urcharging that is applied equally across all Credit products.  Debit may not be surcharged or is surcharged differently."[296]  However, ████████████████████████.

████████████████████████████

██████[297] █████████████████████

█████████████████████████

████████████████████████████████

███████████████████████████

████████████████████████.[298]

134.   Dr. Emch further argues that "unlike in ██████████████████

██████████████████████████████████

██████████████████████████[299]  Instead, as I noted in the Lamb Report, ███████████████████████████

██████████████████████████████

---

price by GPCC payment network in Canada would result in "rate pressure," which would result in a "negotiating lever for our merchants to approach us with" and "a position to demand significant rate reductions" from Amex.  See 2014 Amex Trial Transcript at 2692:22-2694:5; 2014 Amex Trial PX0005 at AMEXNDR11680346.  However, Mr. Funda further testified that this particular type of steering is not permitted under Amex's Anti-Steering Rules, and, therefore, "that particular pressure on the American Express discount rate does not exist in the United States because of the nondiscrimination rules."  See 2014 Amex Trial Transcript at 2692:22-2694:24.
[295] As I noted in the Lamb Report, regarding the growing threat of surcharging to Amex addressed ██████ ████████████████████████████████████████████████  See AMEX-CP-000094461-492 at 472 (emphasis in original).
[296] AMEX-CP-000094461-492 at 464; Emch Report at ¶206 (emphasis in original).
[297] AMEX-CP-000094461-492.
[298] I discuss the differences in impact of parity and differential surcharging in detail in the Lamb Report.  See Lamb Report at ¶¶262-266.
[299] Emch Report at ¶¶206-212.

▮▮▮▮▮▮[300] Dr. Emch's assertion in this regard fails to consider one key difference between Amex's experience in Australia and ▮▮▮▮▮▮▮▮▮▮▮. ▮▮▮▮▮▮▮▮▮▮ The credible threat to differentially surcharge Amex GPCCs in the U.S. does not currently exist in any meaningful way because Amex's Anti-Steering Rules are still in place in the U.S., whereas, in Australia, Amex was forced to drop its no-surcharge provisions, giving merchants a credible threat to differentially surcharge Amex GPCCs unless Amex were willing to offer more favorable financial terms to merchants in exchange for agreeing not to surcharge. Put another way, merchants do not have the same bargaining power to extract the same levels of reductions in financial terms in the U.S. as they did in Australia because Amex's Anti-Steering Rules remain in place in the U.S., which denies merchants the leverage to negotiate the same sorts of more-favorable financial terms.

135.    However, to the extent that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, it stands to reason that it might ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, given the lack of bargaining power U.S. merchants possessed in the U.S. due to Amex's Anti-Steering Rules remaining in place.[301]

136.    In the Lamb Report I discussed extensive common evidence that, taken together, demonstrates that Amex exercised market power it possessed in the market for GPCC Transactions. Given this evidence and the discussion above, none of Dr. Emch's misguided and meritless assertions contained in his report have caused me to change the

---

[300] AMEX-CP-000094343 at Slide 14.
[301] Dr. Emch further points to the fact that, as part of this strategy, Amex ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮" as evidence that Amex ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ See Emch Report at ¶¶205-210. However, it's unclear why Dr. Emch appears to believe that ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ equates to Amex ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮.

opinions and conclusions I reached in the Lamb Report concerning Amex's market power in the market for GPCC Transactions.

**B.  *None of Defendants' Economists Opinions have Caused Me to Change the Conclusions Reached in the Lamb Report that Amex's Continued Imposition and Enforcement of its Anti-Steering Rules was Anticompetitive in that it Caused Higher Net Two-Sided Prices on GPCC Transactions than Otherwise Would Have Occurred***

137.    In the Lamb Report, I discussed extensive common evidence demonstrating that Amex's continued imposition and enforcement of its Anti-Steering Rules resulted in higher net two-sided prices on GPCC Transactions than otherwise would have occurred. As I explained in the Lamb Report, I conducted my analysis of net two-sided prices on GPCC Transactions in this regard in two parts: 1) I discussed common evidence demonstrating that Amex's continued imposition and enforcement of its Anti-Steering Rules caused Amex-accepting merchants (including Qualified Merchants) to incur higher costs of GPCC acceptance (merchant discount fees) than they otherwise would have; and 2) I discuss common evidence demonstrating that the lower costs of GPCC acceptance that would have prevailed had Amex ceased imposing and enforcing its Amex's Anti-Steering Rules would not have been offset by increased Annual Fees Net of Rewards paid by GPCC cardholders.[302]  I discuss below how none of Defendants' Economists' flawed criticisms have caused me to change the conclusions I reached in the Lamb Report in this regard.

**i.    Amex's Continued Imposition and Enforcement of its Anti-Steering Rules Successfully Forestalled Competition on the Merchant Side of the Market for GPCC Transactions**

138.    In the Lamb Report, I discussed extensive common evidence that, taken together, demonstrates that Amex used its Anti-Steering Rules to forestall competition in the merchant side of the market for GPCC Transactions, resulting in artificially-inflated merchant discount fees paid by merchants.[303]  One such piece of common evidence

---

[302] Lamb Report at ¶¶138-139.
[303] Lamb Report at ¶¶176-212.

demonstrates that Amex's continued imposition and enforcement of its Anti-Steering Rules forestalled greater price-based competition from Discover during the Class Periods.[304]  Another piece of common evidence I discussed demonstrates that Amex understood the benefits to itself of steering that are prohibited by its own Anti-Steering Rules,[305] and successfully used its Anti-Steering Rules to prevent merchants from lowering their overall GPCC acceptance costs via preferencing agreements and other forms of steering and, critically, by blocking merchants from using these forms of steering to lower their overall GPCC acceptance costs, Amex's Anti-Steering Rules essentially eliminated merchant bargaining power with GPCC payment networks, as they could not credibly threaten to steer customers to less-expensive GPCCs if certain GPCCs were unwilling to offer lower acceptance costs.[306]  The common evidence I discussed in the Lamb Report of the "aggressive" tactics Amex used to successfully use its Anti-Steering Rules to prevent merchants from lowering their overall GPCC acceptance costs included its thwarting of Visa's "We Prefer Visa" campaign and similar campaigns from Mastercard,[307] its prevention of Amex-Accepting merchants from posting the relative GPCC acceptance costs they incur from each GPCC payment network,[308] and its prevention of Amex-accepting merchants from credibly threatening to differentially surcharge GPCC transactions.[309]

139.    I discuss the critical flaws in Dr. Emch's criticisms of the conclusions I reached in the Lamb Report that Amex's use of its Anti-Steering Rules to successfully thwart competition on the merchant side of the market for GPCC Transactions resulted in higher net two-sided prices on GPCC transactions than otherwise would have occurred in the section below.

---

[304] Lamb Report at ¶¶179-186.
[305] In the Lamb Report, I discussed common evidence demonstrating that Amex entered into agreements with merchants whereby those merchants agreed to steer customers towards using Amex GPCCs through various types of expressions of preference for Amex GPCCs, thus demonstrating Amex's understanding of the competitive advantage GPCC payment networks could gain with merchants by entering into such steering agreements with them.  See Lamb Report at ¶190.
[306] Lamb Report at ¶¶187-212.
[307] Lamb Report at ¶¶191-204.
[308] Lamb Report at ¶¶205-208.
[309] Lamb Report at ¶¶209-212.

ii.   **Contrary to Dr. Emch's Fundamentally-Flawed Assertions, Absent Amex's Anti-Steering Rules, Merchants' Overall Costs Of GPCC Acceptance Would Have Been Lower**

140.   Regarding the first part of my analysis of net two-sided prices on GPCC Transactions, I discussed in the Lamb Report extensive common evidence that, taken together, demonstrates that in the absence of Amex's Anti-Steering Rules Amex-accepting merchants would gain the ability to credibly threaten Amex and the other GPCC payment networks with steering to a less expensive GPCC payment option. Thus those merchants would gain leverage to use in negotiations with GPCC payment networks to extract more favorable financial terms (i.e., lower merchant discount rates or other financial incentives) in exchange for i) agreements to steer customers towards a specific GPCC (e.g., a preference campaign promoting that merchant's preference for a specific GPCC); or ii) agreements not to steer customers away from using a specific GPCC (e.g., an agreement not to surcharge a specific GPCC). I also discussed how, critically, the added leverage afforded to Amex-accepting merchants in the absence of Amex's Anti-Steering Rules would provide them with bargaining power to effectively lower their overall costs of GPCC acceptance.[310]

141.   In particular, I discussed extensive common evidence demonstrating that it would be economically rational for merchants to utilize pro-competitive steering methods to lower their overall costs of GPCC acceptance,[311] as well as acknowledgments from merchants that Amex's continued imposition and enforcement of its Anti-Steering Rules prevented them from utilizing pro-competitive steering methods to lower their overall GPCC acceptance costs.[312] I also discussed common evidence demonstrating that Amex's Anti-Steering Rules caused Visa, Mastercard, and Discover merchant discount fees to be higher than they would have been absent Amex's Anti-Steering Rules.[313] Furthermore, I discussed common evidence in the form of Amex's pricing strategy in Australia following reforms implemented by the RBA beginning in 2003, as well as how

---

[310] Lamb Report at ¶¶176-269.
[311] Lamb Report at ¶¶213-218.
[312] Lamb Report at ¶¶219-229.
[313] Lamb Report at ¶¶230-233.

Amex viewed its experience in Australia as a benchmark for how to manage the threat of differential surcharging in the U.S. should it face a significant threat of differential surcharging by Amex-accepting merchants in the U.S.[314]  I discuss below how none of Dr. Emch's flawed criticisms have caused me to change the conclusions I reached in the Lamb Report in this regard.

### a. Dr. Emch's Speculative Claims Regarding Supposed Obstacles to Merchant Steering

142.    In his report, Dr. Emch criticizes my conclusions regarding the added leverage afforded to Amex-accepting merchants in the absence of Amex's Anti-Steering Rules that would provide them with bargaining power to effectively lower their overall costs of GPCC acceptance by claiming that I do not "consider the costs or practical obstacles" associated with merchant steering.[315]  Again, Dr. Emch focuses on merely one tool in the competitive toolkit enjoyed by merchants in the but-for world.  To support his flawed claim, Dr. Emch constructs a "framework" that he claims "considers both the costs and benefits to merchants of steering in order to evaluate how effective the threat of steering could be in obtaining lower merchant discount rates."[316]  This "framework" consists of a speculative measure of the "opportunity cost on the merchant in the form of a risk that a customer may discontinue the transaction or refuse to patronize the merchant for future transactions," which he calls the "walk-away" rate.[317]

143.    However, Dr. Emch's speculative "analysis" in this regard is contradicted by Amex's own internal analyses of merchant steering.  For example, in a 2007 Australian Surcharge Overview & Strategy presentation, Amex performed a cost-benefit analysis of a merchant's decision to differentially surcharge an Amex GPCC.[318]  That analysis is shown in Figure 7 below.  As shown, Amex's own cost-benefit analysis in this regard assumes a walk away rate of 0 percent, which it based on "merchant responses to market research questions."[319]  In this same presentation, Amex noted the following regarding

---

[314] Lamb Report at ¶¶254-269.
[315] Emch Report at ¶¶248-264.
[316] Emch Report at ¶248.
[317] Emch Report at ¶¶249-259.
[318] AMEX-DOJ-10039910-953 at 926.
[319] AMEX-DOJ-10039910-953 at 926.

the impact of differential surcharging: "Merchants believe that even if CMs were asked to pay a differential surcharge: 38% of them will still use their AXP Card and pay the surcharge; and they would not lose any customers as the remaining % of CMs would just switch payment methods."[320]  This finding by Amex is consistent with another 2007 analysis conducted by Amex as part of a "Differential Surcharge and the Australian Marketplace" presentation, which found that it "is rational for a merchant to differentially surcharge," adding that "[c]ardmembers either pay surcharge or switch payment products. They do not leave establishments."[321]

**Figure 7**



Merchants differentially surcharge because it is in their best financial interest to do so

Source: AMEX-DOJ-10039910-953 at 926.

144.    In addition to his flawed assertions regarding costs to merchants if consumers walked away from transactions in response to merchant efforts to steer those consumers, Dr. Emch further asserts that a merchant's ability to understand its costs of GPCC

---

[320] AMEX-DOJ-10039910-953 at 921.
[321] AMEX-DOJ-10133629-638 at 631.  See, also, AMEX-CP-000007335-378 at 348.  I have noted that Amex's own estimate of 30bp in savings available to merchants from surcharging is quite close to my own estimate of damages based on the credible threat of steering.

acceptance across brands and cards would further mitigate the credibility of the threat of merchants to steer in a world absent Amex's Anti-Steering Rules.[322]  However, Dr. Emch's claims in this regard, as well as his claims regarding opportunity costs to merchants associated with steering, are contradicted by the extensive evidence discussed in the Lamb Report and throughout this Expert Reply Report demonstrating that Amex took the competitive threat posed by merchant steering very seriously and went to great lengths to prevent or stifle such actions on the part of merchants.[323]  Thus, contrary to Dr. Emch's speculative claims regarding potential costs or difficulties associated with merchant steering that could undermine the threat of such steering in the but-for world, Amex's own analyses and actions for decades aimed at preserving its ability to continue to impose and enforce its Anti-Steering Rules, and using (and strengthening) those rules to prevent and/or thwart any such merchant steering in the market for GPCC Transactions demonstrates that such a threat was significant enough to impose discipline on pricing, allowing merchants to lower their overall costs of GPCC acceptance.

145.    Along these same lines, Dr. Emch claims that my "theory that merchant steering would cause networks to bid down merchant fees is speculative."[324]  Contrary to Dr. Emch's claim that my opinion is "speculative" in this regard, I discussed extensive common evidence in the Lamb Report and throughout this Expert Reply Report, including economic theory, as well as acknowledgements from merchants, Amex, and other GPCC payment networks, that, in a world absent Amex's Anti-Steering Rules, merchants would have had available to them a competitive toolkit (in the form of various pro-competitive steering methods) that would have allowed them to lower their overall GPCC acceptance costs.[325]

146.    Dr. Emch ignores this extensive evidence and instead, appeals to the notion that,

"[326]  However, as I explained earlier

---

[322] Emch Report at ¶¶260-264.
[323] See, for example, Lamb Report at ¶¶176-212.
[324] Emch Report at ¶¶265-276.
[325] See, for example, Lamb Report at ¶¶176-269.
[326] Emch Report at ¶¶207, 266.

in this Expert Reply Report, Amex not explicitly referencing ▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓ the threat of differential surcharging is
far less imminent due to the existence of Amex's Anti-Steering Rules (and, thus,
merchants have significantly less bargaining power).

### b. Dr. Emch's Claims Regarding Merchant Acquirer Absorption of Reduced GPCC Acceptance Costs are Specious and Irrelevant

147.      Dr. Emch further claims that, in reaching my conclusions regarding the reduction
in overall costs of GPCC acceptance in a world absent Amex's Anti-Steering Rules, that
my analysis does not take into account the possibility that acquirers might not pass the
savings from reduced interchange rates onto merchants, thus demonstrating that the
merchant discount rates paid by merchants might not be lower in the but-for world.[327]
First, Dr. Emch points to evidence demonstrating that merchant acquirers tend to earn
higher margins on GPCC Transactions at smaller merchants than they do on larger
merchants.[328] This fact is unsurprising and uncontroversial, given that "[l]arge merchants
have more bargaining power because they are bringing more transactions to a scale
business" as compared to smaller merchants.[329] As one prominent study on the subject of
the merchant acquiring side of the payment card industry cited by Dr. Emch noted, the
small merchants that pay these higher markups to merchant acquiring banks "account[]
for only a small percentage of overall sales volume."[330] However, Dr. Emch uses this
fact in an attempt to assert that, due to the higher margins earned from GPCC

---

[327] Emch Report at ¶270.
[328] Emch Report at ¶¶270-272.
[329] Ann Kjos, "The Merchant-Acquiring Side of the Payment Card Industry: Structure, Operations, and Challenges," *Consumer Finance Institute Discussion Papers*, Federal Reserve Bank of Philadelphia, No. 07-12, October 2007 (hereafter "Kjos") at p. 21.
[330] Kjos at p. 21.

Transactions from small merchants, the reduced interchange rates and/or merchant discount rates that would have resulted in a world absent Amex's Anti-Steering Rules may not be passed through at all, or in their entirety, by merchant acquirers to smaller merchants.[331]

148.    Before addressing Dr. Emch's specious assertions in this regard, I note as an initial matter that, even if one were to accept the most extreme version of Dr. Emch's hypothetical outcome and assume that a significant number of merchant acquirers would absorb the entire amount of the reduced interchange rates that would have resulted absent Amex's Anti-Steering Rules for a sustained period of time such that the merchants associated with those merchant acquirers did not receive any of the benefit of the reduced costs of GPCC acceptance (assuming they did not also contract directly with Amex on Amex GPCC acceptance), that still would not undermine the conclusions I reached in the Lamb Report that Amex's continued imposition and enforcement of its Anti-Steering Rules caused anticompetitive effects in the market for GPCC Transactions.

149.    For example, to the extent that there are merchants that would not experience *any* GPCC acceptance cost savings in the but-for world because the merchant acquirer(s) they contract with absorbed the entirety of those cost savings, that would mean that those merchants' overall costs of GPCC acceptance would be unchanged (i.e., a neutral outcome).  This would not result in a scenario where those merchants' overall costs of GPCC acceptance would *increase*, and therefore would not lead to any offset of the lower costs of GPCC acceptance that the remaining merchants would experience in the absence of Amex's Anti-Steering Rules. Thus, given this, and the fact that Annual Fees Net of Rewards would have, at a minimum, remained unchanged in the but-for world, even the most extreme outcome of Dr. Emch's assertions in this regard would still result, on balance, in anticompetitive effects in the market for GPCC Transactions.

150.    However, even setting aside the irrelevance of Dr. Emch's assertions in this regard as to the question of anticompetitive effects caused by Amex's continued imposition and enforcement of its Anti-Steering Rules, I note further that any such absorption of GPCC cost savings by acquiring banks that might occur absent Amex's

---

[331] Emch Report at ¶¶268-276; Gaier Report at ¶95.

Anti-Steering Rules (and, thus, not passed through to small merchants), would be de minimis, given the highly competitive nature of merchant acquiring, which I described in the Lamb Report.[332] Dr. Emch's bases his assertions in this regard on a small handful of materials that purported to analyze the extent to which any Debit Card acceptance cost savings were passed through from merchant acquirers to merchants following the Durbin Amendment.[333]

151.    For instance, common evidence I have reviewed demonstrates that certain aspects of the design and implementation of the Durbin Amendment created key differences in the effect of reduced costs of card acceptance as compared to the more competitive equilibrium that would emerge in the absence of Amex's Anti-Steering Rules that limit the usefulness of the Durbin Amendment as an analog for whether or not merchants experienced a cost savings.  One such difference is the "small-ticket effect" that the Durbin Amendment caused whereby the costs of Debit Card Acceptance actually *increased* for many merchants on small Debit Card Transactions, where, in response to this government regulation, Debit Card payment networks eliminated discounts associated with smaller-ticket purchases, causing the costs of these Debit Card Transactions to increase.[334]  Furthermore, as I explained in the Lamb Report, Debit Card issuing banks with less than $10 billion in assets were exempted from the Debit Card

---

[332] Lamb Report at ¶45; Office of the Comptroller of the Currency, Comptroller's Handbook, "Merchant Processing," Version 1.0, August 2014 (hereafter "Comptroller's Handbook") at p. 31; Kjos at pp. 17-18. "With intense competition among acquirers and thin margins in recent years in the United States, the interchange fee seems to be passed on to merchants."  See Evans and Schmalensee at p. 155. "[T]here is evidently intense competition for merchant accounts, and it is common for merchants to switch among acquirers in an effort to get the best possible price […] Large national merchants, in particular, have a lot of bargaining power since their volume provides acquirers with scale efficiencies." See Evans and Schmalensee at p. 261.

[333] Emch Report at ¶¶273-276.

[334] Zhu Wang, Scarlett Schwartz, and Neil Mitchell, "The Impact of the Durbin Amendment on Merchants: A Survey Study," *Federal Reserve Bank of Richmond Economic Quarterly*, Vol. 100, No. 3, Third Quarter 2014, 183-208 (hereafter "Wang et al.") at p. 194.  As described in one Federal Reserve study: "Merchant sectors that typically generate small-dollar transactions (less than $10) saw an *increase* in interchange fees after the regulations. These sectors include coffee shops and quick service restaurants. For example, for a $5 signature debit transaction at quick service restaurants, MasterCard assessed a fee of about 12 cents before the regulations. After the regulations, it continues to assess the same fee for the same transaction on cards issued by exempt banks, but the fee is now about 22 cents on cards issued by regulated banks" (emphasis in original).  See Fumiko Hayashi, "The New Debit Card Regulations: Effects on Merchants, Consumers, and Payments System Efficiency," *Federal Reserve Bank of Kansas City Economic Review*, First Quarter 2013, 89-118 (hereafter "Hayashi (2013)") at p. 94.

interchange fee caps imposed by the Durbin Amendment.[335]  Therefore, Debit Card Transactions involving Debit Cards issued by exempted Debit Card issuing banks likely would not have resulted in lower costs of Debit Card acceptance for merchants on those transactions.

152.     Given these complications, the authors of the Federal Reserve study whose results were also cited by Dr. Emch stated the following:

> As mentioned before, the mixed cost impact on merchants may result from several complication factors discussed in Section 1, which could vary substantially by sector. Merchants who had reduced total debit costs could be those who gained more from the large-ticket transactions than losing on small-ticket ones. Merchants who had no change on total debit costs could be those whose customers were primarily using debit cards from exempt issuers or whose loss from small-ticket transactions balanced out gains from large-ticket ones. Finally, merchants who had increased total debit costs could be those who specialized on small-ticket transactions.[336]

153.     However, contrary to the design and implementation of the Durbin Amendment, and the "unintended consequences" it had on the overall costs of Debit Card acceptance, the more competitive equilibrium that would emerge in the absence of Amex's Anti-Steering Rules would not be subject to the same features of the Durbin Amendment that would cause such instances of acceptance costs either staying the same, or going up on a significant number of GPCC Transactions, causing many merchants to experience overall increasing costs of GPCC acceptance, unchanged costs of GPCC acceptance due to offsetting effects from differing Debit Cost acceptance changes, or perhaps greater levels

---

[335] Lamb Report at ¶89; Wang et al. at p. 184.  Another complicating factor involving the analysis of merchant cost savings following the Durbin Amendment is the fact that prior to the Durbin Amendment, merchant interchange rates were largely determined by a pricing structure depending on the industry of the merchant (similar to GPCC interchange rates).  However, the Durbin Amendment caused Debit Card interchange rates charged by non-exempt issuing banks to be capped at the new, lower levels of $0.21 plus an additional 0.05 percent of the transaction's value, and a $0.01 charge "for debit card issuers that meet certain fraud prevention standards." See Lamb Report at ¶89; Wang et al. at p. 186.  Thus, the extent to which a given merchant may have saved in Debit Card acceptance costs on Debit Cards issued by a non-exempt bank also depends on the industry they operate in and, accordingly, the levels of interchange rates they were paying on those Debit Card Transactions prior to the Durbin Amendment.  See Wang et al. at p. 186.
[336] Wang et al. at pp. 193-194.

of uncertainty as to the impact on Debit Card acceptance costs given these various complicating factors. Rather, as I explained above and in the Lamb Report, in a world absent Amex's Anti-Steering Rules, a new competitive equilibrium would emerge, causing the overall costs of GPCC acceptance to all merchants to be reduced in response to the heightened levels of competition that would result.

154.   Further, Dr. Emch's assertion that the results of the Federal Reserve study he cites demonstrates that some merchant acquirers may not have passed through some portion of the GPCC acceptance cost savings that would have resulted absent Amex's Anti-Steering Rules is undermined by additional common evidence I have reviewed. For example, another Federal Reserve paper study I reviewed articulates why, for some small merchants, they might not experience an *immediate* cost savings:

> Larger merchants typically choose the interchange plus fee structure because it is more transparent and reflects any changes in interchange fees more fully and quickly. Smaller merchants tend to choose the bundled fee structure because it simplifies their budgeting for card transactions. If a merchant opts into the interchange plus fee structure, it must know all the different fees and stay abreast of any changes to predict its overall costs for card transactions. Unlike large merchants, small merchants may not have enough resources to take this approach. In contrast to the interchange plus fee structure, the bundled fee structure does not reflect recent changes in interchange fees, at least not immediately. Before merchant acquirers will reset the bundled fees to reflect any recent, new fee reductions, the acquirers need to ascertain the distribution of a given merchant's debit card transactions between exempt and regulated banks. Small merchants that have chosen the bundled fees, therefore, may not immediately see cost savings.[337]

155.   However, given the intense level of competition among merchant acquirers for merchant business, studies have shown that any short-term delays in merchant acquirers passing through cost savings to merchants are typically quickly competed away, and, thus, pass-through of interchange fees is typically 100 percent. For example, according to one textbook on payment cards authored by David Evans and Richard Schmalensee,

---

[337] Hayashi (2013) at pp. 97-98.

over the years, costs associated with merchant processing "have come down as the volumes have increased. As we would expect in a competitive market, these savings have been passed on to the merchants."[338] Regarding this "intense competition for merchant accounts," Evans and Schmalensee stated that "merchants 'are often willing to switch from one bankcard processor to another simply to save a few hundredths of a percentage point on fees.'"[339] A study by Ann Kjos of the Federal Reserve bank of Philadelphia cited by Dr. Emch states: "As evidence of the intense competition among merchant acquirers and their efforts to develop differentiated business strategies, Abbey noted that approximately 1.4 million merchants change acquiring relationships each year."[340] One Federal Reserve study found: "It does appear that pass-through of interchange fees is 100 percent on the acquiring side, while on the issuing side it is less than 100 percent."[341]

156.    The additional purported evidence Dr. Emch cites to support his specious claim that some merchant acquirers may not have passed through some portion of the GPCC acceptance cost savings that would have resulted absent Amex's Anti-Steering Rules also demonstrates that any short-term delays in merchant acquirers passing through cost savings to merchants are typically quickly competed away. One source Dr. Emch quotes from is a report from a consulting firm written by a consultant with "over four years of experience" specializing in the banking industry which states that in the short term, the Durbin Amendment "created a profit opportunity for acquirers" because acquirers were not necessarily obligated to pass the savings onto merchants.[342] However, the next sentence in this report states: "In the long term, competition is likely to eliminate this

---

[338] Evans and Schmalensee at p. 263.
[339] Evans and Schmalensee at p. 261. Evans and Schmalensee also state: "Merchants are notorious for jumping from one portfolio to another whenever a better price comes along." See Evans and Schmalensee at p. 261.
[340] Kjos at pp. 17-18. Kjos added that this "[i]n large part this reflects price shopping, but it also speaks to acquirers' ability to develop new strategies to attract emerging merchant categories." Kjos at p. 18
[341] Fumiko Hayashi and Stuart E. Weiner, "Interchange Fees in Australia, the UK, and the United States: Matching Theory and Practice," *Federal Reserve Bank of Kansas City Economic Review*, Third Quarter 2006, 75-112 at p. 95. Similarly, Evans and Schmalensee stated: "With intense competition among acquirers and thin margins in recent years in the United States, the interchange fee seems to be passed on to merchants. That is, changes in the interchange fee lend to changes in the merchant discount. (In the United States, large merchants typically pay an acquirer fee plus the interchange fee; the effect on smaller merchants may not be as direct or immediate)." See Evans and Schmalensee at p. 155.
[342] Aneet Bansal, "Challenges & Opportunities for Merchant Acquirers," Capgemini, 2012 (hereafter "Bansal") at pp. 12, 28.

extra margin and acquirers will have little option but to design an innovative and personalized [merchant discount rate] for merchants while keeping their own margins intact."[343]  This report  further states that "[a]s merchant services are highly commoditized, price is the most important competitive element while acquiring new business," adding: "The fundamental challenge for acquirers globally is the commoditized nature of the services offered. This commoditization has led to price wars and brought down acquiring margins to very low levels, propelling the industry to opt for consolidation in order to leverage economies of scale."[344]

157.    Relatedly, Dr. Emch cites a 2013 Annual Report from merchant acquirer Global Payments Inc. stating that it earned higher spreads on credit card transactions "as a result of lower interchange expense."[345]  However, the next sentence in that annual report that Dr. Emch fails to cite states: "We believe that any future benefits resulting from the Durbin Amendment are uncertain due to our competitive marketplace."[346]

158.    One piece of "[a]cademic research" Dr. Emch cites to support this claim is a working paper from the George Mason University Law and Economics Paper Series.[347] According to Dr. Emch, this working paper calculated that 93 percent of the reduced interchange rates that resulted from the Durbin Amendment were captured by acquiring banks, while only 7% were passed through to merchants.[348]  Setting aside the significant flaws with this working paper relied upon by Dr. Emch, I note that the paper itself states the following about the figures cited by Dr. Emch: "We should stress that these calculations are somewhat tentative because of the relatively small sample of merchants in each case, the use of data that includes both covered and exempt banks, and in the case of SMEs, extrapolates by using data on all transactions."[349]

---

[343] Bansal at p. 12.
[344] Bansal at pp. 9, 18.  This report states further: "Now, one of the only ways left to compete in this market is by increasing operational efficiency by breaking technology silos and use of flexible systems; outsourcing of non-core activities; and creating differentiation by offering innovative value-added services like analytics to customers. In addition, acquirers should focus on several key areas to enhance their competitiveness in the market and address the prevailing challenges in the industry."  See Bansal at p. 18.
[345] Emch Report at footnote 474; Global Payments Inc 2013 Annual Report at p. 38.
[346] Global Payments Inc 2013 Annual Report at p. 38.  See, also, Emch Deposition at 97:5-98:6.
[347] Emch Report at ¶273; Lamb Deposition Exhibit 4.
[348] Emch Report at ¶273; Lamb Deposition Exhibit 4 at p. 23.
[349] Lamb Deposition Exhibit 4 at p. 25.  I note further that this paper states that it expected over time for interchange rates for small and medium banks to be lower.  See Lamb Deposition Exhibit 4 at p. 23.

159.    Another source Dr. Emch features prominently to support his assertions in this regard is a post by an unnamed author on a community blog called Finextra, which Dr. Emch states is the "leading independent newswire and information source for the worldwide financial technology community."[350]  However, Dr. Emch leaves out Finextra's disclaimer included with the blog post he cites that states: "This content is provided by an external author without editing by Finextra. It expresses the views and opinions of the author."[351]  Finextra also states that posts to their "Communities" website (any member, including the one who authored the post cited by Dr. Emch, can publish articles)[352] are subject to the following Finextra terms of use: "Finextra Research Ltd is not responsible for the accuracy or veracity of content posted on the Finextra Communities Website, or for the content, accuracy and opinions expressed on links to third party sites."[353]  Thus, despite Dr. Emch's efforts to lend credibility to this particular source, a closer examination reveals that no meaningful conclusion can be drawn as to whether or not a substantial number of merchant acquirers would have absorbed the reduced costs of GPCC acceptance that would have resulted absent Amex's Anti-Steering Rules.

160.    In sum, for the reasons discussed above, none of Dr. Emch's specious claims regarding merchant acquirer pass-through of the lower costs of GPCC acceptance that would have occurred absent Amex's Anti-Steering Rules have caused me to change the conclusions I reached in the Lamb Report that Amex's continued imposition and enforcement of its Anti-Steering Rules was anticompetitive in that it caused higher net two-sided prices on GPCC Transactions than otherwise would have occurred.

**c.   <u>Dr. Emch's Claims Regarding Discover's Business Strategy Further Reveal the Anticompetitive Nature of Amex's Anti-</u>**

---

[350] Emch Report at ¶276.
[351] Emch Deposition Exhibit 4.
[352] At deposition, Dr. Emch was unable to identify the author of this blog post that he relies upon in reaching his conclusions in this regard.  See Emch Deposition at 93:9-95:21.
[353] Finextra, Our terms, "Terms and conditions of use." Available at: https://www.finextra.com/community/terms-of-use.aspx.  See, also, Emch Deposition Exhibit 5.

**Steering Rules**

161.    In the Lamb Report, I discussed extensive common evidence demonstrating that Amex's continued imposition and enforcement of its Anti-Steering Rules forestalled greater levels of competition in the market for GPCC Transactions by foreclosing Discover's low-cost provider strategy.[354]  In his report, Dr. Emch asserts that Amex's Anti-Steering Rules "did not preclude the [low-cost provider] strategy Discover attempted in the 1990s" because Visa and Mastercard had similar Anti-Steering Rules in place at the time.[355]  However, as I noted in the Lamb Report, Dr. Emch's assertion in this regard is at odds with Discover's own experience following the 2011 Consent Decree and 2013 Settlement.  For example, at the 2014 Amex Trial, Mr. Hochschild was asked about the 2011 Consent Decree:

> Q. It is your understanding that Visa and MasterCard's steering rule for discounts and promotions were removed at that time?
>
> A. For merchants that did not have another network that had a rule against steering.
>
> Q. Did Discover do anything to try to take advantage of the possibility of steering as a result of the change in other, in Visa and MasterCard steering rulings?
>
> A. Yes.
>
> Q. What did you do?
>
> A. We formed a task force to look for opportunities. We focused on our largest merchants. Unfortunately for our top 100 merchants, all of them also accept American Express. So with that, and again the key leverage was focusing on the largest merchant. Based on that we ended up disbanding the task force and not taking any action.
>
> Q. What was the purpose or mandate for the task force?

---

[354] Lamb Report at ¶¶179-186.
[355] Emch Report at ¶¶278.

> A. The task force's mandate was to identify new opportunities to leverage this new found power to work in conjunction with merchants to see if we could put programs in place to shift volume to Discover network.
>
> Q. If American Express's rules were not in place preventing merchants from steering would Discover renew a similar task force?
>
> A. Yes.[356]

Furthermore, Mr. Hochschild testified that in a world absent Amex's Anti-Steering Rules where "there were no restrictions on what Discover could do with respect to steering at the point of sale," Discover "would aggressively pursue a strategy of lowering [its] prices and providing incentives to merchants that would steer incremental volume to Discover."[357]

162.    Dr. Emch further contradicts the testimony of Discover executives and other internal Discover analyses and reaches his own opinions that Amex's Anti-Steering Rules did not "inhibit[] Discover's entry and expansion in the US GPCC market," and further that Amex's Anti-Steering Rules "may make Discover a stronger competitor, not a weaker one."[358] First, Dr. Emch points to the fact that "Amex has only very recently closed the merchant acceptance gap with Visa and Mastercard," and therefore, Discover could have gone after the "millions of merchants who did not accept Amex" in order to more successfully grow and expand in the GPCC Transactions market.[359] However, as I noted elsewhere in the Expert Reply Report, the merchants Dr. Emch is referring to that were part of Amex's recent efforts to close the merchant coverage gap were primarily small merchants with less than $1 million in charge volume annually.[360] It's not clear why Dr. Emch believes that Discover's business strategy to achieve sustained growth and expansion in the market for GPCC Transactions should have been to focus on the smallest merchants in the U.S.[361]

---

[356] 2014 Amex Trial Transcript at 986:5-987:4.
[357] 2014 Amex Trial Transcript at 872:3-10.
[358] Emch Report at ¶¶279-286.
[359] Emch Report at ¶280.
[360] See, for example, Emch Report at ¶¶159, 270.
[361] I address Dr. Emch's flawed assertions regarding the opportunity costs associated with merchant steering discussed in his report elsewhere in this Expert Reply Report.  See Emch Report at ¶281.

163.    Dr. Emch further blames Discover's lack of growth and expansion on the fact that Discover had a relatively small cardholder base, asserting that the "success of a strategy focused on gaining volume through working with merchants to steer volume to Discover also depends in part on the value that Discover brings to merchants, including the number of Discover cardholders."[362] Dr. Emch further claims that the "relatively small number of and lower-spend characteristics of Discover cardholders limits the effectiveness of these potential benefits to merchants, thus limiting the attractiveness of Discover's proposal to merchants."[363]

164.    As an initial matter, I have noted that, despite Dr. Emch's appeal to the Discover's "relatively small" cardholder base as a reason for its lack of growth and expansion, Discover had a higher number of cardholders than Amex in the U.S. in every year during the Class Periods, and a higher number of GPCCs in circulation than Amex in every year during the Class Periods other than 2015.[364]  Further, in making this claim, Dr. Emch is conveniently assuming his own conclusion regarding the success and effectiveness of Discover's business strategy.  Consider for a moment that Discover did, in fact, provide the kinds of value and benefits to merchants that Dr. Emch believes are most attractive to merchants (as opposed to the lowest cost of GPCC acceptance). Even under this scenario, Amex's Anti-Steering Rules would prevent merchants from steering customers to the cards that had the benefits those merchants value the most, again inhibiting Discover's ability to grow and expand in the market for GPCC Transactions (and depriving those merchants of that added value).

165.    Dr. Emch's assertions that Discover's lack of growth and expansion is attributable to its own business strategy and not Amex's Anti-Steering Rules is also directly contradicted by Qualified Merchants themselves.  For example, at the 2014 Amex Trial, Dwaine Kimmet of Home Depot testified that Home Depot would be able to lower its

---

[362] Emch Report at ¶282.
[363] Emch Report at ¶282.
[364] For example, in the U.S. in 2021, Discover had 46.6 million cardholders and 61.0 million GPCCs in circulation, as compared to 40.9 million and 56.4 million for Amex, respectively.  See The Nilson Report, No. 1213, February 2022 at p. 7; See, also, The Nilson Report, No. 1191, February 2021 at p. 7; The Nilson Report, No. 1169, February 2020 at p. 9; The Nilson Report, No. 1147, February 2019 at p. 10; The Nilson Report, No. 1125, February 2018 at p. 10; The Nilson Report, No. 1103, February 2017 at p. 10; The Nilson Report, No. 1080, February 2016 at p. 10.

overall GPCC acceptance costs "if American Express' steering restrictions were no longer enforced," adding that Amex's Anti-Steering Rules allow Home Depot to steer customers to Amex GPCCs, but not the other major GPCC payment networks: "So again, the issue being that operationally, I have challenge [sic] on steering to more than one, but what I would like to have is the ability to approach any network, to steer to my great volume. *So, what I would ideally like to do is steering to my absolute low cost vendor which is Discover and that I cannot do*."[365]

166.    In regards to Dr. Emch's claims that Amex's Anti-Steering Rules "may make Discover a stronger competitor, not a weaker one," Dr. Emch asserts:

- While the elimination of NDPs would permit Discover to bid at the point of sale for transactions that would otherwise employ other payment methods, it would also permit other payment networks to bid at the point of sale for transactions that would otherwise employ Discover. There is no reason to think that the net effect would operate in Discover's favor.

- NDPs protect smaller networks such as Amex and Discover from denigration at the point of sale by Visa and Mastercard. Without NDPs, Discover would therefore find itself competing at the point of sale on a highly uneven playing field, to its detriment.[366]

167.    In making these assertions, Dr. Emch is inadvertently demonstrating that, absent Amex's Anti-Steering Rules, there would be greater levels of competition in the market for GPCC Transactions, as all four GPCC payment networks would "bid at the point of sale" for GPCC Transactions, thus reducing merchant overall cost of GPCC acceptance. Further, in making the second point above, Dr. Emch demonstrates that Amex's Anti-Steering Rules are designed to protect Amex (and, according to Dr. Emch, Discover) from the effects of greater levels of competition against Visa and Mastercard.

---

[365] 2014 Amex Trial Transcript at 1276:1-1277:7 (emphasis added).
[366] Emch Report at ¶285. Dr. Emch further notes that "Discover's own merchant agreements contain a form of NDPs." See Emch Report at ¶285. In the Lamb Report, I explain in extensive detail why, due to Discover's own lack of market power in the market for GPCC Transactions, it is unlikely to have blocked pro-competitive steering strategies by merchants during the Class Periods absent Amex's Anti-Steering Rules. See Lamb Report at ¶¶249-253.

168.    Contrary to Dr. Emch's assertions as to how Discover can be a "stronger competitor," I have noted that the types of competition Dr. Emch claims Amex's Anti-Steering Rules protect Discover from are exactly the types of competition Discover wants to engage in, but are prevented from doing so by Amex's Anti-Steering Rules.  As I noted above, at his deposition, Dr. Emch acknowledged that greater levels of competition in the market for GPCC Transactions would cause a reduction in two-sided prices.[367] Ironically, while Dr. Emch (and Dr. Bernheim) claim that Discover's inability to effectively grow and expand in the market for GPCC Transactions is due to its flawed business strategy and not Amex's Anti-Steering Rules, I have noted that it is Amex, and not Discover, that claims that its core business strategy, and its ability to compete effectively in the market for GPCC Transactions, "hinges critically" on the protections from competition its Anti-Steering Rules affords.[368]

169.    Rather, contrary to Dr. Emch's assertions as to how Amex's Anti-Steering Rules made Discover a "stronger competitor," Discover CEO Roger Hochschild testified:

> Q. In a world without American Express' anti-steering rules, how would merchant benefits [sic] in your view?
>
> A. The merchants would have the ability to manage their costs of credit card acceptance by steering customers to a lower cost network. And they could reinvest that savings in more profits or in enhancing their own value proposition to their customers.
>
> Q. In a world without American Express' anti-steering rules, how would Discover's cardholders benefit?
>
> A. Whatever preference programs the merchants put into place to steer customers, it would be some sort of positive incentive for them to use their Discover card. That would be a benefit for our cardholders.
>
> Q. In world without American Express' anti-steering rules, could Discover still compete for third-party issuers?
>
> A. Yes.

---

[367] Emch Deposition at 111:10-112:14.
[368] Emch Report at ¶¶285-286; Bernheim Report at ¶¶124-144.

Q. Mr. Hochschild, in a world without American Express' anti-steering rules, could Discover still develop brand loyalty for the Discover product?

A. Yes.

Q. Could you in fact enhance brand loyalty for your product?

A. Yes.

Q. And all the rewards that you've discussed today, in a world without American Express' anti-steering rules, could you still offer competitive rewards in the rewards market today?

A. Yes.

Q. In general, if the American Express rules were not in place, Mr. Hochschild, do you think that competition among the is [sic] credit card networks would be more robust than it is today?

A. Yes.[369]

### d.   Dr. Emch's Claims that Amex's Australia Experience Does Not Support My Conclusions Regarding Anticompetitive Effects Lack Merit

170.   In his Report, Dr. Emch asserts that the "Australian experience does not support Dr. Lamb's theory of anticompetitive harm."[370]  A number of the claims he makes in this regard relate to the existence of surcharging of GPCCs in Australia following the RBA regulations.  However, I addressed the numerous flaws in Defendants' Economists' assertions in this regard earlier in this Expert Reply Report in my discussion of the importance of the threat of differential surcharging that would exist absent Amex's Anti-Steering Rules, and why, absent these rules, such differential surcharging would be very limited in the U.S.  In this section, I address additional flawed claims rendered by Dr. Emch regarding the Australia experience as they pertain to his criticisms of my conclusion that Amex's continued imposition and enforcement of its Anti-Steering Rules caused anticompetitive effects in the market for GPCC Transactions.

---

[369] 2014 Amex Trial Transcript at 872:11-873:15.
[370] Emch Report at ¶¶289-309.

171.     In his report, Dr. Emch makes the bewildering claim that a single document I cited[371] in the Lamb Report was "central to [my] theory of harm" that the threat of differential surcharging posed to Amex's business resulted in reductions in Amex's merchant discount rates.[372]  Contrary to Dr. Emch's claims, I cited numerous documents, including numerous internal Amex documents, in supporting the conclusions I reached in the Lamb Report in this regard.[373]  In the Lamb Report, I cited this document referred to by Dr. Emch when discussing how, in January 2003, Amex proactively reduced merchant discount rates to over 80,000 merchants in Australia, with reductions ranging from 5-35bp.[374]  In referring to this document, Dr. Emch asserts that "the document explicitly calls out 'the increasing premium on our discount rate over Visa/MasterCard,' which is tied to merchant incentives to differentially surcharge, as a reason for Amex's lowering its merchant discount rates to some 80,000 merchants."[375]  Here, and elsewhere in this discussion in Dr. Emch's report, he attempts to undermine my conclusions by trying to create uncertainty over the cause of Amex's reductions in its merchant discount rates to assert such decreases would not occur in the U.S. if Amex were to lose its ability to impose and enforce its Anti-Steering Rules in the U.S.  Dr. Emch's efforts in this regard are meritless.

172.     For instance, Dr. Emch's suggestion that Amex's reductions were not directly tied to the threat of differential surcharging are easily disputed by explicit statements made by Amex that it had reduced merchant discount rates in response to the threat of differential surcharging, both proactively, as well as part of agreements with merchants in exchange

---

[371] AMEXNDR00655707-725.  I have noted that Dr. Emch refers the document I cited to as AMEX-CP-000030009, however, I do not cite to this version of the document anywhere in the Lamb Report. However, the two documents appear to be nearly identical.
[372] Emch Report at ¶293.  Dr. Gaier makes a similar claim that I "base this assertion on a single July 2005 Amex document."  See Gaier Report at ¶41.
[373] See, for example, Lamb Report at ¶¶255-259.
[374] Lamb Report at ¶256.
[375] Emch Report at ¶293.  While the language Dr. Emch cites regarding the increasing premium on Amex's discount rate can be found in the same presentation on a different page, I have noted that the quote he references regarding proactive reductions in merchant discount rate for over 80,000 merchants references the threat of differential surcharging directly: "AXP proactively reduced discount rates to over 80,000 merchants by 5-35bp across a range of industries – Retail, Restaurants, Professional/Financial Services, Lodging and Auto Sales/Service.  This was designed to minimize the threat of surcharge and assist in coverage efforts."  See AMEXNDR00655707-725 at 710.

for those merchants agreeing not to differentially surcharge Amex GPCCs, which I cited in the Lamb Report.[376]

173.  Furthermore, Dr. Emch claims that the reason Amex was compelled to respond to the threat of surcharging following the RBA regulations was because the merchant discount premium in Australia at the time of the RBA regulations was "85 basis points in 2002 and was forecast to widen to 130 basis points in 2004" due to the regulated interchange rate caps on Visa and Mastercard GPCCs, adding further that the "Australian rate premium is fundamentally different from the rate premium in the United States where it has essentially disappeared."[377]  However, Dr. Emch's claim in this regard is contradicted by statements made by Dr. Philip Lowe, Assistant Governor (Financial System) in Australia at a May 2005 panel discussion regarding interchange fees following the RBA's regulations.[378]  Further, even if this were the case, then one would not expect Amex to view its Australia experience as a benchmark for what would happen in the U.S. if Amex were to lose its ability to enforce the no-surcharge provisions of its Anti-Steering Rules.  However, as I discussed above and in the Lamb Report, Amex commonly assessed how it could apply the lessons learned from its experience in

---

[376] See, for example, Lamb Report at ¶¶254-269.

[377] Emch Report at ¶¶293, 302-304.  I have noted that at the 2014 Amex Trial, Joseph Quagliata of Amex testified that "when you look at the analysis today, our premium relative to Visa or MasterCard has evaporated.  It no longer exists."  See 2014 Amex Trial Transcript at 702:7-25.

[378] "Merchants have, however, complained that they don't have very much bargaining power. What we have tried to do there is to at least remove restrictions or a lack of transparency that might have artificially affected merchants' negotiations with American Express. We asked American Express to publish its average merchant service fee so that merchants would know what other merchants were paying. We have asked them to publish their market share, so that people know just what presence they have in the market. I think more importantly, we have asked them to change their merchant contracts to remove the anti-steering provisions. They have agreed to do all these things. Now a merchant can say to a cardholder who presents an American Express card, "Yes, we accept American Express, but it is a lot cheaper for us to take a Visa. Would you consider using a Visa?" American Express has had a clause in its merchant contracts that prevented merchants from doing this. What we try to do is make sure the market is working competitively. I think the difference with the four-party schemes is there is no floor under the merchant discount. In the four-party schemes, the interchange fee sets a floor. That floor is not determined by normal competitive forces. In three-party schemes, there is no floor. If the merchants see value, they'll accept the American Express cards, but the negotiation over the fee is not influenced by the floor set by the interchange fee. We saw how important that floor is when we reduced the interchange fee in four-party schemes and the merchant fees came down one for one. So the floor is really driving the outcome there. This is not the case with the American Express arrangements. There is no interchange fee and there is no floor." See Thomas M. Hoeing, Philip Lowe, Guillermo Ortíz, and Gertrude Tumpel-Gugerell, "Interchange Fees: Central Bank Perspectives and Options – General Discussion," discussion presented at the conference "Interchange Fees in Credit and Debit Card Industries: What Role for Public Authorities?", Federal Reserve Bank of Kansas City, May 4-6, 2005, 297-307 (hereafter "2005 Australian Interchange Fee Panel Discussion") at p. 304.

Australia to combat a scenario in which it would no longer to be able to enforce the no-surcharge provisions of its Anti-Steering Rules in the U.S. (thus, permitting differential surcharging by merchants), concluding that its best strategy would be ▨▨▨▨

▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨.

▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨

▨▨▨▨▨▨▨▨

174.    Dr. Emch continues to assert that I have "not attempted to determine what portion, if any, of Amex's declining merchant fees in Australia was caused by the RBA's prohibition of no-surcharge provisions and what portion was caused by the sharp increase in its merchant discount rate premium relative to Visa and Mastercard or the threat of regulation from the RBA."[379]  However, contrary to Dr. Emch's assertion, it is not necessary to quantify the extent (if any) to which the decline in Amex's merchant discount rates was due to the loss of its no-surcharge provisions versus any other aspects of the RBA's regulations in order to reach the conclusions I reached in the Lamb Report regarding the anticompetitive effects caused by Amex's Anti-Steering Rules.  That's because, despite Dr. Emch's confusion of the issue, Amex itself explicitly acknowledged that it had proactively reduced its merchant discount rates in response to the pending threat of differential surcharging,[380] and furthermore that it had negotiated lower merchant discount rates in exchange for agreements from merchants not to differentially surcharge Amex GPCCs.[381]  And furthermore, as I noted above, Amex itself considered

---

[379] Emch Report at ¶300.  Dr. Emch further states that the "RBA's regulation of point-of-sale provisions limiting merchant surcharging was only one part of an extensive set of regulatory changes that impacted credit and debit card networks in Australia."  See Emch Report at ¶301.

[380] In January 2003 (following the RBA's announcement of its reforms), to "[m]itigate [r]isks," Amex "proactively reduced discount rates to over 80,000 merchants by 5-35bp across a range of industries – Retail, Restaurants, Professional/Financial Services, Lodging and Auto Sales/Service.  This was designed to minimize the threat of surcharge and assist in coverage efforts."  See AMEXNDR00655707-725 at 710.  Amex noted that this "move coincided with the introduction of surcharging but pre-dated the Visa/Mastercard rate reductions by 10 months." See AMEXNDR00655707-725 at 710.

[381] In a March 2010 "Discussion with MS Americas Leadership Team" presentation, in regards to its experience in Australia, Amex noted that "DS [(Differential Surcharging) is] a virus, can be contained !!" noting further its eventual strategy whereby the "Australia team established DS baseline, linked pricing and marketing concessions to 'no differential surcharge' conditions, and began developing strategies &

its Australia experience a benchmark for what would happen in the U.S. if differential surcharging were permitted.[382]

### iii.    Dr. Emch's Claims Regarding Annual Fees Net of Rewards Lack Merit

175.    As I discussed above and in the Lamb Report, the market for GPCC Transactions is a two-sided market, where the overall price level in this market is the sum of the merchant discount fee and the Annual Fee Net of Rewards.[383]  As I explained, in light of this, in order to determine whether Amex's continued imposition and enforcement of its Anti-Steering Rules had anticompetitive effects, it is necessary to consider any differences in the Annual Fees Net of Rewards paid by GPCC cardholders in the absence of Amex's Anti-Steering Rules during the Class Periods.  If Amex's continued imposition and enforcement of its Anti-Steering Rules resulted in GPCC cardholders paying lower Annual Fees Net of Rewards (either through lower annual fees and/or higher cardholder rewards) than they otherwise would have, it would be necessary to determine whether, and to what extent, these lower Annual Fees Net of Rewards offset the artificially-inflated merchant discount rates that resulted from Amex's continued imposition and enforcement of its Anti-Steering Rules (discussed above) in order to determine whether Amex's Anti-Steering Rules resulted in higher net two-sided prices on GPCC Transactions.  However, as I discussed in extensive detail in the Lamb Report, based on my review of common evidence and my training and experience in economics, I

---

programs to address issue."  AMEXNDR19209938-968 at 949.  In another 2010 Amex presentation regarding "Potential Surcharging/Discounting Threats" to Amex's U.S. Merchant Services leadership, Amex included a section on "Australia Learning," in which it noted that "NDSA (No Differential Surcharging Agreement) is a key tool to enforce parity / no surcharge [...] NDSAs allow AXP to incentivize merchants ( pricing, marketing, etc) to adopt a no-surcharge position (3-5 years)," adding that "NDSA are more effective when offered to merchants before they start to DS." See AMEXNDR07125828-851 at 850.

[382] Furthermore, I have noted that, when estimating merchant discount rates in the but-for world for my damages calculation in the Lamb Report, I did not use a benchmark based on the Australia experience; rather, I used a benchmark that is more conservative than the Australia experience that in my opinion is more appropriate for measuring damages associated with Amex's alleged misconduct.  See Lamb Report at ¶¶349-364.

[383] Lamb Report at ¶¶61-63.  As I explained, that cardholder fee is generally broken down into a fixed annual fee paid by the cardholder to the card-issuing bank and a variable per-transaction fee (cardholder reward) that typically depends on the value of the transaction.  The variable component of the Annual Fee Net of Rewards is generally negative, which means that the cardholder's issuing bank makes a payment to the cardholder in the form of cardholder rewards.  If the rate at which the cardholder earns rewards exceeds the amortized annual fee, then the Annual Fee Net of Rewards is negative.  See Lamb Report at ¶¶61-63, 270-271.

concluded that the Annual Fees Net of Rewards paid by GPCC cardholders would not have increased in a but-for world absent Amex's continued imposition and enforcement of its Anti-Steering Rules.[384]

176.    For example, in the Lamb Report I discussed extensive common evidence demonstrating in a world free from Amex's Anti-Steering Rules, it would be contrary to the economic self-interests of GPCC payment networks and/or issuing banks to increase the Annual Fee Net of Rewards paid by GPCC cardholders in response to the greater levels of competition on the merchant side of the GPCC Transactions market that would have occurred in the but-for world.[385]  This included evidence demonstrating the importance of transaction volume as a driver of success for issuers of GPCCs, as well as the ease with which consumers can switch GPCCs, especially given the availability of good information through GPCC issuer marketing activities, that affords cardholders better information about the benefits of the various GPCCs available in the marketplace.[386]  I further discussed common evidence demonstrating that the primary way in which GPCC issuers compete with one another for "top of wallet" status among consumers conducting point-of-sale GPCC Transactions, and, similarly, "card on file" status among consumers conducting online GPCC Transactions on merchant e-commerce sites, is through the level of rewards they offer to cardholders.[387]

177.    Given this extensive common evidence, I explained why it is highly unlikely that GPCC issuers would have increased Annual Fees Net of Rewards in response to the increased level of competition on the merchant side of the market for GPCC Transactions that would have resulted in the absence of Amex's Anti-Steering Rules.  As I discussed, Amex's continued imposition and enforcement of its Anti-Steering Rules caused Amex-accepting merchants' overall GPCC acceptance costs (merchant discount fees) to be higher than they otherwise would have been.  However, given GPCC issuers' focus on GPCC transaction volume and balances in order to maximize profits, the significant

---

[384] Lamb Report at ¶¶270-290.  In fact, as I discussed in in the Lamb Report, in many instances, GPCC issuers likely would have responded to increased competition on the merchant side of the market for GPCC Transactions by decreasing Annual Fees Net of Rewards (either through lower annual fees and/or higher cardholder rewards).  See Lamb Report at ¶¶270-290.
[385] Lamb Report at ¶¶273-284.
[386] Lamb Report at ¶¶274-276.
[387] Lamb Report at ¶¶277-278.

importance of cardholder rewards in incentivizing consumers to use a particular GPCC, and the ease with which consumers can switch between GPCCs, it would have been contrary to their economic self-interests for GPCC issuers to reduce the level of rewards it offered GPCC cardholders to offset the lower merchant discount/interchange fees they would have earned in the but-for world, as doing so would only serve to drive cardholders away to competing GPCCs, thus reducing their overall GPCC Transaction volume and balances (and, ultimately, profits) even further. Rather, economic theory predicts that in the but-for world, GPCC issuers would have been incentivized to compete even more rigorously for GPCC transaction volume by offering even greater levels of cardholder rewards on GPCC Transactions to incentivize current cardholders to continue (and increase) use their card, as well as incentivize new cardholders to switch away from the competition to their card. As I noted in the Lamb Report, common evidence in the form of acknowledgments from Amex[388] and other GPCC issuers[389] underscore the

---

[388] Lamb Report at ¶280. For example, consistent with this economic theory, at the 2014 Amex Trial, Jack Funda, then Amex Senior Vice President for Global Merchant Pricing at Amex, articulated how, given the business model and structure of the issuing side of the GPCC Transactions market, reducing the cardholder rewards offered to consumers would be contrary to a GPCC issuer's economic self-interest: "Q. Now, you described earlier, I believe, both in response to questions about Mr. Glass, as well as in response to some of the questions I asked, about the costs that American Express incurs that help bring about preference for cardmembers to want to use their card. Is that a cost that is a one-time cost per -- or at least mostly a one-time cost -- per cardmember; one you've got them, they're in? A. No. It's, in fact, very much an ongoing cost. We, as we've established, compete in a very competitive environment for the attention and loyalty of our cardmembers. And we have to continually reinforce and earn that loyalty to maintain the preference that they exhibit for our card products. So these investments are significant and ongoing. Q. What would happen if American Express substantially reduced or stopped engaging in those costs? A. We would have in all probability seen fewer cardmembers show the kind of strength of preference they do today for using our cards. We would have seen less loyalty to American Express. And we would have seen less value driven by American Express to our merchant customers because of that. Q. And how would that affect American Express's business? A. This would have certainly been a negative for the American Express business. Fewer cardmembers mean less spending, it means less revenue, it means less relevance. And it becomes a circular reinforcing dynamic in which, you know, the American Express business is increasingly less relevant to our merchants." 2014 Amex Trial Transcript at 2794:17-2795:20. See, also, American Express SEC Form 10-K for the fiscal year ended December 31, 2015 at p. 35; American Express Q1 2021 Earnings Call, April 23, 2021 at p. 3; 2021 American Express 10-K at p. 6.

[389] For example, co-founder and CEO of Magnify Money, Nick Clements, stated that the "smartest credit card issuers are luring consumers with a big incentive (the sign-on bonus), and they are keeping them with strong ongoing value propositions." Magnify Money, Insider, "Spending on credit card rewards has exploded in banks' frenzied competition over customers," May 5, 2017 (hereafter "Magnify Money"). Mr. Clements added: "The purpose of a sign-on bonus is to encourage people to act. Most people do not wake up in the morning wanting to open a credit card – and a sign-on bonus is a way for a credit card company to encourage people to reconsider their options. It is no different from a sale in a traditional department store. But what really matters to consumers, as these results reveal, is the ongoing value proposition." See Magnify Money. This Magnify Money article further notes that "[c]redit card rewards have become

significant role that cardholder rewards play in their ability to attract and retain consumers to protect and grow their market share and, thus, why it would be contrary to their own economic self-interests to reduce the levels of cardholder rewards absent Amex's Anti-Steering Rules. As Dr. Emch states in his report, it "is uncontroversial that a reduction in rewards (without any other changes) would result in fewer cardholders and transactions."[390]

178.     Given this, at a minimum, the artificially-inflated merchant discount fees paid by Amex-accepting merchants as a result of Amex's continued imposition and enforcement of its Anti-Steering Rules would not have been offset by reductions in the levels of cardholder rewards earned by GPCC cardholders or increases in the annual fees paid by GPCC cardholder.  I discuss the many flaws in the criticisms contained in the Emch Report regarding the conclusions I reached in the Lamb Report regarding the levels of Annual Fees Net of Rewards in greater detail below.

### a.   Dr. Emch's Criticisms of the Economic Theory and Common

---

increasingly lucrative, as credit card issuers battle for customers." See Magnify Money.  In its 2021 Annual Report, Capital One stated: "In our credit card business, competition for rewards customers may result in higher rewards expenses, or we may fail to attract new customers or retain existing rewards customers due to increasing competition for these consumers." See 2021 Capital One Annual Report at p. 32. After joining Citigroup as Head of U.S. Branded Cards in July 2020, Pam Habner was tasked with finding ways to boost the bank's market share after its "loan book and roster of active customers contracted during the pandemic."  To do so, Citigroup "prioritized a cash-back, no-fee card that was easy to use via smartphone app," and, "[l]ike competitors, the product has a $200 signing bonus."  See Hugh Son, CNBC "The credit card wars are heating up again as Citigroup takes on JPMorgan with new 5% cash-back card," June 10, 2021. With a similar strategy, JPMorgan Chase stated in a 2022 Investor Day Presentation: "We believe we have the best products and the best partners and it shows in the strength of our market share at above 22%. We refreshed our entire branded card portfolio over the last two years. And these products are resonating and performing well with branded card new accounts in the second half of 2021 up 20% since 2019." See JPMorgan Chase & Co., "2022 Investor Day - Transcript," May 23, 2022 at p. 16.   Regarding its plan to focus on "sustaining profitable growth" in 2017, Discover stated that "[i]n card, we will continue to enhance our products by introducing innovative features and benefits and prudently adjusting reward offerings to drive greater customer engagement."  See Discover Q4 2016 Earnings Call, January 25, 2017 at p. 3.  In its 2015 10-K, Discover stated: "Many credit card issuers have instituted rewards programs that are similar to ours, and, in some cases, are more attractive to customers than our programs. These competitive factors affect our ability to attract and retain customers, increase usage of our products and maximize the revenue generated by our products."  See Discover Financial Services, SEC Form 10-K, filed February 25, 2016 p. 27.
[390] Emch Report at ¶324.

## Evidence I Cited in the Lamb Report Lack Merit

179.   In his report, Dr. Emch criticizes the conclusions I reached in the Lamb Report regarding the levels of Annual Fees Net of Rewards as being "economically illogical" because "the profitability of *all* businesses depends on transaction (or sales) volume, but this does not imply that businesses focus on increasing volume *per se*," adding that as "profit-maximizing entities, GPCC issuers will consider the potential revenues and costs from any change in volumes and will not increase transaction volume if the cost of doing so exceeds the benefits."[391]   On these points, Dr. Emch and I agree.  He continues to assert that my "analysis ignores the cost of providing cardholder rewards," adding that my "argument suggests that GPCC issuers would always have incentives to increase rewards to attract and retain volume, and would never reduce rewards because that would reduce volume."[392]   On these points, Dr. Emch is wrong.

180.   My opinion in this regard is not that GPCC issuers would *never* reduce the levels of cardholder rewards due to the corresponding loss in transaction volume, or that GPCC issuers could simply keep increasing levels of cardholder rewards *ad infinitum* to grow market share, as Dr. Emch suggests.  Rather, my opinion is that, in response to the heightened levels of competition that would occur in the market for GPCC Transactions absent Amex's Anti-Steering Rules, GPCC issuers at a minimum would not increase the Annual Fees Net of Rewards (via annual fee increases or reductions in cardholder rewards) to offset the lower interchange rate or merchant discount rates that would result in the but-for world, as GPCC issuers would look to protect their existing cardholder base to avoid even greater future losses in this more competitive equilibrium.[393]  At his deposition, Dr. Emch agreed that "competition in a market is going to cause the two-sided price to come down," adding: "The two-sided price coming down means more rewards and lower merchant discounts."[394]

---

[391] Emch Report at ¶¶312-313 (emphasis in original).
[392] Emch Report at ¶314.  See, also, Gaier Report at ¶¶99-101.
[393] Lamb Report at ¶¶270-290.  I further opined that in many instances, GPCC issuers likely would have responded to increased levels of competition in the market for GPCC Transactions by reducing Annual Fees Net of Rewards (either through lower annual fees and/or higher cardholder rewards).  See Lamb Report at ¶¶270-290.
[394] Emch Deposition at 111:10-112:14.

181.    By way of example, as I noted in the Lamb Report, in a "Submission to the Reserve Bank of Australia" regarding the impact of the RBA's reforms, Amex explained that the "intent [of cardholder rewards programs] is to encourage the cardmember not only to remain loyal to the rewards-earning card product but also to consolidate all plastic charge activity on the same product."[395]   Regarding Amex's incentive to keep existing cardholders loyal to protect its cardholder base, Amex explained:

> Supporting an attractive credit card-related rewards program with funding from non- credit card transactional earnings makes economic sense for card issuers, given that the cost of **acquiring** a new customer is now some 3-5 times the cost of **retaining** a customer. Rationally, therefore, banks and a number of consumer goods companies are spending disproportionately higher amounts to support their loyalty programs as a defence against expensive customer attrition.[396]

Thus, as Amex explains, it makes sense that Amex and other GPCC issuers would continue to invest in at least the same level of rewards, even sacrificing profits by using non-credit card transactional earnings to fund such continued investments, in an effort to protect their market share in the new competitive equilibrium that would result in the but-for world, as it would be much costlier to lose cardmembers and then try to replace them later than it would be to sacrifice some profits and continue to make these kinds of investments in cardholder rewards in order to maintain their existing market share.

182.    In fact, Dr. Emch includes an example in his own report of a time where he asserts Amex ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛
⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛
⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛. As Dr. Emch explains,
⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛
⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛[397]⬛⬛⬛⬛⬛⬛⬛⬛
⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛
⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛
⬛⬛⬛⬛⬛⬛⬛⬛⬛"[398]  Thus, Dr. Emch ⬛⬛⬛⬛⬛⬛⬛⬛



---

[395] AMEX-CP-000029726-755 at 739.
[396] AMEX-CP-000029726-755 at 740 (emphasis in original).
[397] Emch Report at ¶193.
[398] Emch Report at ¶193.

�altered that contradicts his own claims that, when faced with increased competition causing losses in cardholders to rival cards in the absence of Amex's Anti-Steering Rules, Amex could not, or would not, raise, the level of cardholder rewards relative to the level of merchant discount fees.

183.   Furthermore, as I discussed earlier in this Expert Reply Report, despite asserting that it would be "economically illogical" for a GPCC issuer to reduce merchant discount rates without a corresponding reduction in Annual Fees Net of Rewards, Dr. Emch himself also opined that in implementing its value recapture and product-based pricing initiatives, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮.[399]  Dr. Emch further purported ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[400]  Thus, according to Dr. Emch's logic, Amex has been setting levels of merchant discount rates and cardholder rewards in an "economically illogical" way for more than two decades.

184.   In further support of his flawed claims, Dr. Emch asserts that my "assertion that credit card issuers would not increase cardholder annual fees or reduce cardholder rewards when faced with lower merchant fees is contradicted by testimony from Jason Gaughan, head of consumer credit cards at Bank of America."[401]  Dr. Emch is incorrect. In the testimony cited by Dr. Emch, Mr. Gaughan ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[402]  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮"[403]

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[404]  Dr. Emch relies on this testimony anyway, unburdened by context.

---

[399] Emch Report at ¶¶152-158, 216-226.
[400] Emch Report at ¶¶152-158, 216-226.
[401] Emch Report at ¶327.
[402] Emch Report at ¶327; Deposition of Jason Gaughan, October 24, 2022 (hereafter "Gaughan Deposition") at 56:4-58:6.
[403] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮' See Gaughan Deposition at 56:24-57:13.
[404] Emch Report at ¶327; Gaughan Deposition at 56:4-58:6.

185.     Shortly before the exchange cited by Dr. Emch, Mr. Gaughan was asked ▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.[405] The reduction in merchant discount rates I have estimated is far less than this amount. A 50 percent reduction is one more often associated with regulatory interventions. I have noted that such dramatic reductions in interchange rates are inconsistent with the but-for world I discussed in the Lamb Report.[406]

186.     Next, Dr. Emch attempts to support his claims that Annual Fees Net of Rewards would have been higher absent Amex's Anti-Steering Rules by taking issue with certain evidence I cited in the Lamb Report.[407] I address the significant flaws in his claims in this regard below.

187.     Dr. Emch first references a quote from Jack Funda of Amex at the 2014 Amex Trial where he explains why reducing the cardholder rewards offered to consumers would be contrary to a GPCC issuer's economic self-interest.[408] Dr. Emch, quoting just a portion of Funda testimony I quoted in the Lamb Report, claims that Mr. Funda's testimony is unrelated to whether or not a reduction in cardholder rewards would be contrary to the economic self-interests of GPCC issuers.[409] However, the portion of the testimony I quoted in the Lamb Report that Dr. Emch chose to leave out of his reference was:

> Q. Now, you described earlier, I believe, both in response to questions about Mr. Glass, as well as in response to some of the questions I asked, about the costs that American Express incurs that help bring about preference for cardmembers to

---

[405] Gaughan Deposition at 35:4-16, 47:22-48:6.

[406] Dr. Emch further attempts to support his assertions regarding Annual Fees Net of Rewards by asserting that "lower swipe fees per transaction would decrease issuers' incentives to compete for transaction volume." See Emch Report at ¶315. However, in making this claim, Dr. Emch fails to consider the additional, significant losses in revenues that GPCC issuers would also incur from these losses in transaction volume over and above losses in merchant discount fees, such as interest income, which, for issuers of Visa and Mastercard, is by far the largest category of revenue earned on GPCC issuance. See, for example, in 2017, JPMorgan Chase, which issues both Visa and Mastercard GPCCs, "earned an estimated 70% of its revenue from interest payments and 30% from cardholder and interchange fees." See Shelle Santana, Jill Avery, and Christine Sniverly, "Chase Sapphire: Creating a Millennial Cult Brand," *Harvard Business Review*, November 26, 2018 (hereafter "Santana et al.") at p. 3. Furthermore, to the extent that swipe fees are greater than the level of Annual Fees Net of Rewards, GPCC payment networks would still have incentive to increase transaction volume.

[407] Emch Report ¶¶322-326.

[408] Lamb Report at ¶280; 2014 Amex Trial Transcript at 2794:17-2795:20.

[409] Emch Report at ¶324.

want to use their card.  Is that a cost that is a one-time cost per -- or at least mostly a one-time cost -- per cardmember; one you've got them, they're in?

A. No. It's, in fact, very much an ongoing cost. We, as we've established, compete in a very competitive environment for the attention and loyalty of our cardmembers. And we have to continually reinforce and earn that loyalty to maintain the preference that they exhibit for our card products. So these investments are significant and ongoing.[410]

188.   Dr. Emch next highlights some testimony from Jonathan Gantman of Amex I cited in the Lamb Report after a long discussion about cardholder rewards in which Mr. Gantman explains ███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████.[411] ███████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████[412]

Based on this testimony, I noted in the Lamb Report that, given that Amex █████████

███████████████████████████████████████████████

█████████████████████ , it is unlikely that it would raise its annual fees in response to the lower merchant discount rates that would have resulted in a world absent Amex's Anti-Steering Rules.[413]

---

[410] 2014 Amex Trial Transcript at 2794:17-2795:20.  Mr. Funda continues: "Q. What would happen if American Express substantially reduced or stopped engaging in those costs?  A. We would have in all probability seen fewer cardmembers show the kind of strength of preference they do today for using our cards. We would have seen less loyalty to American Express.  And we would have seen less value driven by American Express to our merchant customers because of that.  Q. And how would that affect American Express's business?  A. This would have certainly been a negative for the American Express business. Fewer cardmembers mean less spending, it means less revenue, it means less relevance. And it becomes a circular reinforcing dynamic in which, you know, the American Express business is increasingly less relevant to our merchants."  See 2014 Amex Trial Transcript at 2794:17-2795:20.

[411] Gantman 30(b)(6) Deposition at 76:8-77:15.

[412] Gantman 30(b)(6) Deposition at 90:17-91:3.

[413] Lamb Report at ¶283.  I further noted that, consistent with the economic theory discussed above, it is unlikely that a GPCC issuer would have increased annual fees on GPCCs without corresponding increases in the level of rewards and benefits in a world absent Amex's Anti-Steering Rules.  See Lamb Report at ¶283.

189.    Dr. Emch criticizes my analysis of Mr. Gantman's testimony because Mr. Gantman ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████"[414] While I was unable to review and confirm Dr. Emch's account of his conversation with Mr. Gantman because he did not produce any written or recorded materials concerning this conversation, I note that, for the same reasons as discussed above regarding Mr. Gaughan's testimony cited by Dr. Emch, a decline in merchant discount rates of some 50 percent is inconsistent with the but-for world I described in the Lamb Report that would have resulted absent Amex's Anti-Steering Rules.

190.    Lastly, Dr. Emch refers to "Amex documents and deposition testimony indicating that Amex considered increasing rewards in anticipation of possible merchant steering following the passage of the Durbin Amendment."[415] In an attempt to undermine this evidence, he claims that "this was contemplated as a response to potential steering by merchants, and not to reduced merchant fees on GPCC transactions," adding that "the same documents list increased cardholder rewards as a possible alternative to reducing merchant fees, not as a response to reduced merchant fees."[416] However, as I noted in the Lamb Report, none of the "documents and deposition testimony" referenced by Dr. Emch of Amex's response strategies to prevent Amex-accepting merchants from cancelling or steering away from Amex GPCCs to less expensive GPCCs or other forms of payment following the passage of the Durbin Amendment included a reduction in cardmember rewards or benefits.[417]

191.    In sum, none of Dr. Emch's meritless criticisms regarding the economic theory and evidence I discussed in the Lamb Report regarding Amex's Annual Fees Net of Rewards have caused me to change any of the opinions or conclusions I have reached regarding the anticompetitive effects caused by Amex's Anti- Steering Rules.

---

[414] Emch Report at ¶325 (emphasis in original).
[415] Emch Report at ¶326.
[416] Emch Report at ¶326.
[417] Lamb Report at ¶¶285-290.

113

### b.  **Dr. Emch's Empirical Analysis is Misguided**

192.    In his report, Dr. Emch further criticizes the conclusions I reached in the Lamb Report regarding the levels of Annual Fees Net of Rewards due to empirical evidence of cardholder rewards levels declining following i) the RBA regulations in Australia; and ii) the Durbin Amendment.[418]  As I discuss below, key differences between those two events and the but-for world in this matter that render Dr. Emch's claims in this regard irrelevant.

193.    Regarding cardholder rewards levels following the RBA regulations in Australia, as he did with regards to surcharging in Australia following these regulations, Dr. Emch fails to account for the differences in the competitive landscape following the government regulations that were enacted in Australia (which Ken Chenault of Amex described as among "the most stringent" of any such industry regulations in the world)[419] and the but-for world with heightened levels of competition driven by market forces that would have existed in the U.S. had Amex no longer been able to impose and enforce its Anti-Steering Rules following the 2011 Consent Decree and 2013 Settlement.

194.    For example, common evidence I have reviewed demonstrates that the RBA designed its regulations with the intention of reducing or eliminating cardholder rewards. As Dr. Philip Lowe, Assistant Governor (Financial System) in Australia, stated at a May 2005 panel discussion regarding interchange fees following the RBA's regulations: "To the extent that reward schemes have been cut, that was an intended consequence of the reform—to change relative prices."[420]

195.    To further illustrate this point, as I discussed earlier in this Expert Reply Report, common evidence demonstrates that, in setting the initial interchange rate caps for Visa and Mastercard (which, as I noted above, constituted a significant 40 percent reduction from prevailing rates at the time), the RBA established a "cost-based benchmark" from

---

[418] Emch Report at ¶¶328-351.  See, also, Gaier Report at ¶¶101-103.
[419] 2014 Amex Trial PX0131 at p. 8.
[420] 2005 Australian Interchange Fee Panel Discussion at p. 306.  See, also, Reserve Bank of Australia, "Review of Card Payments Regulation: Issues Paper," March 2015 at p.19.

which the interchange fee caps would be determined, based on a series of eligible costs that, notably, did not include costs associated with the provision of cardholder rewards.[421]

196.    Thus, given the RBA's intention to design its regulations in a way that would eliminate cardholder rewards, including removing the costs of providing such rewards, from the "cost-based benchmark" from which the revised interchange fee caps were determined, it is not surprising to see the reductions in cardholder rewards (or increases in annual fees, which generally are used in part to offer other types of cardholder benefits) that Dr. Emch cites in his report.[422]  In fact, contrary to Dr. Emch's assertions that a reduction in rewards in Australia undermines my conclusions about the levels of Annual Fees Net of Rewards in the U.S. absent Amex's Anti-Steering Rules, it is noteworthy that, despite having interchange fees capped at levels that did not allow for any costs for the provision of cardholder rewards, GPCC issuers still opted to offer some level of cardholder rewards in order to preserve transaction volume as much as possible.[423]  Likewise, despite having to significantly reduce its merchant discount rates due to competitive pressures caused by the RBA regulations, Amex described its strategy in Australia in the following way (which it pursued to maintain and try to increase its market share following these regulations):

> American Express decided to maintain market share and product attractiveness even at the price of reduced profit margins.  American Express launched a number of innovative card products throughout this period, including the Qantas American Express Corporate and Small Business Cards, the Rewards Maximizer Card, the Qantas American Express Card series and the American Express

---

[421] These eligible costs included: "(i) issuers' costs incurred principally in processing credit card transactions, including the costs of receiving, verifying, reconciling and settling such transactions; (ii) issuers' costs incurred principally in respect of fraud and fraud prevention in connection with credit card transactions; (iii) issuers' costs incurred principally in providing authorisation of credit card transactions; and (iv) issuers' costs incurred in funding the interest-free period on credit card transactions, calculated using the average of the cash rate published by the Reserve Bank of Australia over the three financial years prior to the date by which the cost-based benchmark must be calculated."  See Reform of Credit Card Schemes in Australia IV at pp. 42-43.  See, also, Andrew T. Ching and Fumiko Hayashi, "Payment card rewards programs and consumer payment choice," *Journal of Banking and Finance*, Vol. 34, No. 8, August 2010 (hereafter "Ching and Hayashi") at pp. 1774, 1782.

[422] Gantman 30(b)(6) Deposition at 76:8-77:15, 90:17-91:3.

[423] See, for example, United States Government Accountability Office, "Rising Interchange Fees Have Increased Costs for Merchants, but Options for Reducing Fees Pose Challenges," November 2009 (hereafter "GAO Report") at p. 55; Reserve Bank of Australia, "Review of Card Payments Regulation: Issues Paper," March 2015 at p. 19.

Platinum Credit Card. All these products have continued American Express' strategy of delivering premium value products to card users.[424]

197.    Furthermore, Dr. Emch's appeal to changes in the levels of cardholder rewards in Australia in an attempt to undermine the conclusions I reached regarding the levels Annual Fees Net of Rewards in a world absent Amex's Anti-Steering Rules is completely undermined by his own testimony at deposition. As I discussed earlier, at deposition, Dr. Emch incorrectly asserted that the removal of Amex's Anti-Steering Rules constituted a "negative shock to merchant discount rates," which is "likely to reduce card member rewards or […] card member fees net of rewards."[425]   He further described the exogenous negative shock of the removal of Amex's Anti-Steering Rules in the but-for world as a "factor outside of the market [that] is forcing prices down or up."[426]   While I described above why Dr. Emch was incorrect to analyze the but-for world in which Amex's Anti-Steering Rules were removed from the market as being driven by a "factor outside the market," it is important to note that the RBA regulations in Australia did, in fact, constitute a "factor outside of the market" that forced interchange rates to be significantly lower. Thus, unlike the but-for world, the RBA's regulations, which capped interchange rates on GPCC Transactions, did constitute the kind of exogenous negative shock to prices which, as Dr. Emch described, is "likely to reduce card member rewards or […] card member fees net of rewards."[427]

198.    Thus, given that the interchange fee caps in Australia, which constituted a significant reduction in interchange rates, were imposed by the Australian government and took effect all at once (rather than phased in over a longer time horizon) and were set at levels that did not include allowances for the costs associated with cardholder rewards, it is not surprising for there to have been some reductions in cardholder rewards (Dr. Emch cites one source that estimates that "benefits as a portion of spending dropped an average of 23 percent from 2003 to 2007 following the interchange fee reforms").[428]

---

[424] American Express Submission to the Reserve Bank of Australia at pp. 11-12.
[425] Emch Deposition at 111:10-115:18. I note that "card member fees net of rewards," or Annual Fees Net of Rewards, would not decrease in the but-for world.
[426] Emch Deposition at 113:8-114:18.
[427] Emch Deposition at 111:10-115:18.
[428] Emch Report at ¶330; GAO Report at p. 55.

Further, the fact that GPCC issuers continued to offer cardholder rewards following these significant reductions in interchange rates is at odds with Defendants' Economists' assertions that cardholder rewards can only be funded by interchange rates or merchant discount rates, and that the two are "inextricably tied."[429] However, the fact that there were some reductions in cardholder rewards in Australia following these significantly reduced interchange fee caps does not mean the same would be expected in the U.S. in a world absent Amex's Anti-Steering Rules where, as I discussed, reductions in interchange rates or merchant discount rates would not be forced or driven by "stringent" government regulation. Rather, as I discussed in the Lamb Report, the reductions in merchant discount rates would be more modest and be driven by competitive market forces.

199.    Additional so-called "empirical evidence" that Annual Fees Net of Rewards would have increased in a world absent Amex's Anti-Steering Rules that Dr. Emch appeals to is that following the Durbin Amendment, which capped per-transaction Debit Card interchange fees at $0.21 plus an additional 0.05 percent of the transaction's value, and a $0.01 charge "for debit card issuers that meet certain fraud prevention standards,"[430] some covered banks altered the fee structure of some of the checking accounts offered to customers in an effort to offset some of the losses from these lower interchange fees.[431] However, the design and implementation of the Durbin Amendment resulted in key differences in terms of the impact of such regulations on Debit Card issuing banks as compared to the impact of the removal of Amex's Anti-Steering Rules would have on GPCC issuers that render Dr. Emch's comparison in this regard flawed and irrelevant.

200.    First, Dr. Emch fails to account for the differences in the competitive landscape following the implementation of the Durbin Amendment and the but-for world with

---

[429] Bernheim Report at ¶61.
[430] Robert J. Shapiro, "The Costs and Benefits of Half a Loaf: The Economic Effects of Recent Regulation of Debit Card Interchange Fees," *Sonecon*, October 1, 2013 at p. 1; Darryl E. Getter, "Regulation of Debit Interchange Fees," Congressional Research Service, R41913, May 16, 2017 (hereafter "Getter 2017") at p. 5. See, also, Federal Reserve System, "Final Rule, Regulation II, Debit Card Interchange Fees and Routing," *Federal Register*, Vol. 76, No. 139, July 20, 2011, 43394-43475 (hereafter "Federal Reserve Regulation II Final Rule") at p. 43404.
[431] Emch Report at ¶¶337-340.

117

heightened levels of competition driven by market forces that would have existed in the U.S. had Amex no longer been able to impose and enforce its Anti-Steering Rules following the 2011 Consent Decree and 2013 Settlement.  Similar to the Australian experience, the design and implementation of the Durbin Amendment resulted in immediate, "significant" reductions in Debit Card interchange rates earned by covered issuing banks.[432]  For example, according to the Federal Reserve, the Durbin Amendment resulted in a 46 basis point decline in the average interchange rate for Debit Card Transactions when comparing the last three months of 2011 to the first nine months of 2011.[433]  This constituted a 37 percent decrease in the interchange fees paid by merchants for accepting Debit Cards.[434]  At the 2014 Amex Trial, Jack Funda, then Senior Vice President for Global Merchant Pricing at Amex, testified that the caps on fees for Debit Card acceptance caused by the Durbin Amendment was a "significant drop from what the debit cost was before the Durbin Amendment."[435]  Also, like the Australian experience, the caps on Debit Card interchange rates were based on the proportion of the cost incurred by the regulated bank for the provision of Debit Card Transactions, including authorization, clearance, and settlement costs.[436]

201.    Furthermore, as I discussed in the Lamb Report, the issuance and use of Debit Cards differs in a number of key ways compared to the issuance and use of GPCCs.[437]  For example, in contrast to GPCCs, individuals do not make a "buying decision to acquire a debit card."[438]  Rather, banks issue a debit card automatically upon opening a checking account and the debit card corresponds to that account.[439]  The debit card, which also serves as an ATM card, is a "feature of a checking account," individuals may

---

[432] Emch Report at ¶338.
[433] 2014 Amex Trial PX2702 at p. 63.
[434] Board of Governors of the Federal Reserve System, "2011 Interchange Fee Revenue, Covered Issuer Costs, and Covered Issuer and Merchant Fraud Losses Related to Debit Card Transactions," March 5, 2013 at Table 5.
[435] 2014 Amex Trial Transcript at 2720:15-2721:2.
[436] Getter 2017 at p. 2; Darryl Getter, "Recent Trends in Consumer Retail Payment Services Delivered by Depository Institutions," Congressional Research Service, R43364, January 16, 2014 at p. 8.
[437] Lamb Report at ¶¶17, 127-131.
[438] Carol Coye Benson, Scott Loftesness, and Russ Jones, *Payments Systems in the U.S.: A Guide for the Payments Professional.* Third Edition, San Francisco, CA: Glenbrook Partners LLC, 2017 (hereafter "Benson et al.") at p. 98.
[439] Benson et al. at p. 98; Rebecca Lake, "What Is A Checking Account And How Does It Work?" Forbes Advisor, May 26, 2022 (hereafter "Lake").

consider when deciding to open a checking account.[440]  Although Debit Cards do not typically earn substantial (if any) rewards for cardholders,[441] they are still a widely used payment product for individuals wanting to "spend the money they have in their bank account [...] [t]hey can withdraw cash from their account [...]; they can write a check on the account, or they can use their debit card.  The debit card, for many people, wins on convenience and ease of use."[442]

202.     Thus, given the fact that Debit Cards as a payment card are one aspect of the broader use of Debit Cards, as well as the use of checking accounts even more broadly, checking account fee structures associated with Debit Cards following the reductions in interchange fees due to government regulation do not constitute a meaningful analog for how issuers of GPCCs would respond to reductions in GPCC interchange rates absent Amex's Anti-Steering Rules that would be driven by competitive market forces given the additional conflating factors that could also impact checking account fees.  For example, around the same time as the Dubin Amendment in 2010, the Federal Reserve implemented a new amendment to Regulation E, 12 C.F.R. Part 205 concerning overdraft protection programs associated withm Debit Cards.[443]  Under this rule, financial institutions were generally prohibited from "assessing fees for paying ATM and one-time debit card transactions that overdraw consumer accounts unless the consumer affirmatively consents, or opts in, to the overdraft protection program," thus negatively impacting a source of revenue for Debit Card issuers.[444]  In light of the fact that these rule changes impacting consumer checking accounts were taking place at the same time as the Durbin Amendment, one Federal Reserve study cited by Dr. Gaier stated: "To what extent these changes in fees and requirements are attributable to the recent debit card regulatory changes is unclear, however, because the banks may also be reacting to other

---

[440] Other features one may consider when choosing a checking account include type of financial institution (e.g., brick-and-mortar bank, online bank, or credit union), types of fee schedules, and whether there are rewards available. Lake; Benson et al. at p. 98.
[441] Benson et al. at pp. 99-100.
[442] Benson et al. at p. 102.
[443] Ann Jaedicke, "Overdraft Protection: Opt-In Requirements and Related Marketing Issues," Office of the Comptroller of the Currency, OCC Bulletin, No. 2010-15, April 12, 2010 (hereafter "OCC Bulletin").  The rule became effective January 19, 2010, but compliance was not mandatory until July 1, 2010.
[444] OCC Bulletin.

new regulations that have taken effect recently, including overdraft fee regulation."[445] This constitutes another piece of evidence, taken together, that demonstrates that the Durbin Amendment does not constitute a meaningful analog for how issuers of GPCCs would respond to reductions in GPCC interchange rates absent Amex's Anti-Steering Rules.

203.    Dr. Emch further appeals to the fact that most regulated Debit Card issuing banks reduced or eliminated cardholder rewards on Debit Card Transactions in an effort to assert that GPCC issuers would do the same in a world absent Amex's Anti-Steering Rules.  Once again, in making this incorrect claim, Dr. Emch fails to consider the key distinctions between Debit Cards and GPCCs.  As I explained above and in the Lamb Report, typically, Debit Card issuing banks automatically issue Debit Cards when a consumer opens a checking account at that bank.[446]  And further, consumers do not typically base their decision on which checking account to open based on the features and rewards associated with the Debit Card they are automatically issued with their account.[447]  This is in stark contrast to the issuance of GPCCs, where one of the primary factors GPCC issuers compete on is cardholder rewards.[448]  In addition, common evidence I have reviewed indicates that, following the Durbin Amendment, regulated Debit Card issuers that also issued GPCCs were incentivized to try to switch customers from using Debit Cards to GPCCs as their primary payment method, as GPCCs were now much more lucrative for issuers as compared to Debit Cards following the caps on Debit Card interchange fees.[449]  Thus, it is not surprising that, to the extent Debit Card users may have valued the rewards they earned on their Debit Card Transactions prior to the Durbin Amendment, regulated banks would reduce or eliminate those rewards in hopes that those consumers would switch to using GPCCs issued by those banks more often. However, in a world absent Amex's Anti-Steering Rules, GPCC issuers would not have available to them an alternative, ubiquitous payment option that would be more lucrative

---

[445] Fumiko Hayashi, "The New Debit Card Regulations: Initial Effects on Networks and Banks," *Federal Reserve Bank of Kansas City Economic Review*, Fourth Quarter 2012, 79-115 (hereafter "Hayashi (2012)") at p. 103.
[446] Benson et al. at p. 98; Lake.
[447] Benson et al. at p. 98.
[448] Lamb Report at ¶¶66-75, 277-284.
[449] Hayashi (2013) at p. 104, footnote 17; Hayashi (2012) at pp. 100-101.

than GPCCs that it could attempt to switch GPCC users over to by reducing their GPCC cardholder rewards.

204.     More critically, like the Australian experience, the Durbin Amendment, in which government regulation forced significantly lower interchange rates on Debit Card Transactions, is also the kind of exogenous negative shock in the market described by Dr. Emch at his deposition, which is "likely to reduce card member rewards or […] card member fees net of rewards."[450] Thus, consistent with Dr. Emch's testimony, it shouldn't come as a surprise that some regulated banks may have reduced or eliminated cardholder rewards on Debit Card Transactions, or altered the fee structure of some of the checking accounts offered to customers, in response to this kind of government regulation. However, this is in stark contrast to a world in which Amex's Anti-Steering Rules were removed, resulting in heightened levels of competition in the market for GPCC Transactions, which would result in lower two-sided prices for GPCC Transactions. Thus, for the reasons described above, Dr. Emch's assertions regarding the levels of cardholder rewards on Australian GPCC Transactions following the RBA regulations, or the levels of fees or cardholder rewards on Debit Card Transactions following the Durbin Amendment, have no bearing on my analysis of the levels of Annual Fees Net of Rewards in a world absent Amex's Anti-Steering Rules, and, thus, have not caused me to change my opinions or conclusions in this regard.

205.     In light of the common evidence discussed above and in the Lamb Report, taken together, none of Defendants' Economists flawed opinions have caused me to change the conclusions reached in the Lamb Report that Amex's continued imposition and enforcement of its Anti-Steering Rules was anticompetitive in that it caused higher net two-sided prices on GPCC Transactions than otherwise would have occurred.

### C. Dr. Bernheim's Assertions Regarding Procompetitive Effects of Amex's Anti-Steering Rules are Fatally Flawed and Misguided

206.     In his report, Dr. Bernheim makes a number of claims regarding supposed "benefits that flow from the challenged restraints," and that "[c]onsideration of those

---

[450] Emch Deposition at 111:10-115:18.  I note that "card member fees net of rewards," or Annual Fees Net of Rewards, would not decrease in the but-for world.

benefits invalidates [my] conclusions" in the Lamb Report that Amex's continued imposition and enforcement of its Anti-Steering Rules resulted in anticompetitive effects.[451]  At a high level, Dr. Bernheim points to network externalities associated with Amex GPCCs that he claims creates benefits for both merchants and consumers that justify Amex's imposition and enforcement of its Anti-Steering Rules.  He claims: "As the history of the payments industry demonstrates, network externalities are so strong that broad acceptance by a wide variety of merchants is effectively a prerequisite for commercial success."[452]  However, Dr. Bernheim's assertions in this regard reflect a lack of understanding regarding competition in the market for GPCC Transactions.  As Levitin noted in his 2008 paper: "The network effect concern is quite convincing on the surface as an economic argument. It is historically inaccurate, however, as an explanation for merchant restraint rules, and while it makes sense in a stand-alone economic model, it makes little sense in the current competitive environment."[453]

207.    In the Lamb Report, I discussed how, when the GPCC payment networks were nascent, they had to overcome the chicken-and-egg problem and get both sides (merchants and cardholders) onboard.[454]  Before there were many cardholders for a particular GPCC payment network, a merchant may not have had the incentive to incur the costs of accepting the particular network's GPCC Transactions, regardless of the cost.[455]  Likewise, before there was widespread merchant acceptance of a particular GPCC payment network, potential cardholders may not have been interested in becoming cardholders of that GPCC payment network.[456]  One reason for initially setting negative prices on the cardholder side was to solve this chicken-and-egg problem.[457]  As more

---

[451] Bernheim Report at ¶70.

[452] Bernheim Report at ¶44.

[453] Levitin at p. 1366.  Levitin further explains: "The history of merchant restraints has been all but ignored by legal and economic scholarship, which has focused on theoretical modeling arguments about the role of merchant restraints. The history of merchant restraints shows, however, that they were adopted because of regulatory and business reasons, not because of network effects and consumer protection concerns identified in the theoretical literature."  See Levitin at pp. 1367-1382.

[454] Jean-Charles Rochet and Jean Tirole, "Platform Competition in Two-Sided Markets," *Journal of the European Economic Association*, Vol. 1, No. 4, 2003, 990-1029 at p. 990.

[455] Evans and Schmalensee at p. 143. See, also, Jean-Charles Rochet and Jean Tirole, "Cooperation among Competitors: Some Economics of Payment Card Associations," *RAND Journal of Economics*, Vol. 33, No. 4, 2002, 549-570 at p. 551.

[456] Evans and Schmalensee at pp. 143-144.

[457] Evans and Schmalensee at pp. 143-144.

consumers became GPCC cardholders and wanted to use their GPCCs, there was a network effect whereby more merchants wanted to accept the GPCCs, and this wider acceptance then further increased demand from GPCC cardholders.[458]

208.     I further explained, however, that now that the GPCC payment networks have reached maturity, the impact of an additional GPCC cardholder on merchant acceptance or the impact of additional merchant acceptance on cardholder use is small.[459]   However, Dr. Bernheim ignores this and relies upon the need to overcome the chicken-and-egg problem as a justification of Amex's Anti-Steering Rules; put another way, he incorrectly claims that membership externalities are still significant in the market for GPCC Transactions.[460]   Dr. Bernheim is incorrect.   "Now, however, credit card networks are past the chicken-and-egg problem that plagues new two-sided networks.   Credit cards are now widely accepted by merchants and used by consumers.   Credit cards are an established product that does not need subsidization to thrive."[461]

209.     However, even as the market for GPCC Transactions has matured, essentially eliminating the membership externality of card networks, the usage externality still exists, as Dr. Bernheim notes.[462]   However, Dr. Bernheim incorrectly concludes that these externalities create benefits for both merchants and consumers that justify Amex's imposition and enforcement of its Anti-Steering Rules.   Because Amex's Anti-Steering Rules reserve the GPCC usage decision for the cardholder alone, only cardholders benefit from usage externalities.   These usage externalities are also small.   As Levitin explains:

> Mature credit card networks still exhibit network effects.   But network effects
> present different concerns depending on context, and a nascent payment system
> in a market with a limited number of competing products, none of which are

---

[458] Evans and Schmalensee at pp. 143-144.

[459] Stan Sienkiewicz, "Credit Cards and Payment Efficiency," *Consumer Finance Institute Discussion Papers*, Federal Reserve Bank of Philadelphia, No. 01-02, 2001 at p. 10; Hayashi at p. 48.   As explained by Frankel and Shampine in 2006: "Visa and MasterCard now operate the largest card payment systems and enjoy almost ubiquitous penetration among major merchants.   Thus, they probably have little continued need to overcome chicken-and-egg entry barriers."   See Alan S. Frankel and Allan L. Shampine, "The Economic Effects of Interchange Fees," *Antitrust Law Journal*, Vol. 73, No. 3, 2006, 627–673 at pp. 655-656.

[460] Bernheim Report at ¶¶47-54.

[461] Levitin at p. 1387.

[462] Bernheim Report at ¶53.   See, also, Hayashi at p. 48.

strong substitutes, is a very different context than a mature payment system competing with other payment networks.[463]

210. With regards to Dr. Bernheim's claims that Amex's Anti-Steering Rules are necessary to protect its brand, and more broadly to allow Amex to continue to produce these positive network externalities to the benefit of merchants and consumers:

> Network effects are network—that is, brand—specific. There is no generic credit card network effect. Credit card networks compete with each other for cardholders and merchants. To the extent that a cardholder or merchant switches from Visa to Discover, there is a negative network externality on the Visa network's remaining participants, but this is offset by a positive network externality for the Discover network's participants. As between particular credit card brands, competition policy should not care which one succeeds. Antitrust law is, after all, about protecting "*competition*, not *competitors*."[464]

It is through this lens that many of Dr. Bernheim's assertions regarding the supposed pro-competitive benefits of Amex's Anti-Steering Rules can be understood. Dr. Bernheim's claims ultimately reflect Amex's desire to protect its revenues and profits from greater levels of competition in the market for GPCC Transactions, rather than to protect overall levels of consumer welfare in the market. It is not surprising that Dr. Bernheim would take this view, as Jack Funda of Amex admitted at its 2014 Trial that the reason for its Anti-Steering Rules is to avoid competition from Visa and Mastercard, as opposed to trying to deliver greater value to merchants and cardholders:

> Q. So I think what you're saying is that if the United States prevails in this case, one outcome could be that American Express cardholders get more rewards and it comes at the expense of American Express profits?

---

[463] Levitin at p. 1387.
[464] Levitin at p. 1387 (emphasis in original). Levitin adds: "The network effects concern is simply inapplicable in the context of mature payment networks competing against other mature payment networks. Any negative network externality is offset by a positive one when cardholders or merchants switch payment systems. For any given volume of transactions, it is a zero sum game; short of bartering, consumers always need payment systems. Therefore, net social welfare remains constant. It is not an all-or-nothing proposition of having payment systems or not, but a question of which payment system. That question should be answered by the free market." See Levitin at p. 1388.

A. That's part of what I'm saying, yeah. I'm also saying that removing nondiscrimination provisions would have a huge negative impact on what is the smallest of the networks that we're talking about between AMEX, Visa and MasterCard.

Q. And the negative impact would be the loss of some of the profit that would be forced to be spent on cardholder rewards, correct?

A. Well, the loss would be essentially the fact that we are probably least prepared to deal with a situation like that. The reason we have nondiscrimination provisions is to level the playing field and to create a level playing field at the point of sale and not have our cardmembers' choice of payment type be interfered with. And so Visa/MasterCard could easily create incentives for merchants to steer our discount towards them in a way that we could never match.[465]

211.    Consider, for example, Amex's actions during a tense negotiation over high merchant discount fees (30 percent higher than the cost of accepting Visa and Mastercard GPCCs) with Walgreens in which Walgreens decided, after six months of negotiations, that Amex's final offer of a fee reduction was "unacceptable" to Walgreens, leading Walgreens to inform Amex of its intention to terminate its acceptance of Amex GPCCs effective January 2005.[466]  Upon being informed of Walgreens' decision, Amex began developing a plan to start steering customers away from Walgreens towards Walgreens competitors.  As John Theiss of Amex noted in a December 2004 email to colleagues, Amex began working with teams on "deciphering which markets and which accounts would make sense approaching for a campaign to shift share away from Walgreens," and further that Amex had discovered that it had "the ability to communicate directly to Walgreens 'shopper' list […] so we can market directly where it hurts them the most."[467] In particular, Amex had devised plans to offer customers "CVS Below the Line Offers" such as a $25 gift card for new or transferred prescriptions or spending $50 or more on certain items.[468]  Amex further considered having Walgreens removed from the PBM

---

[465] 2014 Amex Trial Transcript at 2748:18-2749:12.
[466] 2014 Amex Trial Transcript at 1352:23-1353:11, 1362:9-1365:19; 2014 Amex Trial PX1966 at WLGVMC 000190; 2014 Amex Trial DX 2219.
[467] 2014 Amex Trial PX0934 at AMEXNDR12768897.
[468] AMEXNDR12060217; 2014 Amex Trial PX1814; 2014 Amex Trial Transcript at 4845:25-4846:20, 4852:2-23.

network for its employees' health plans, a move it understood would "hurt Walgreens[']
bottom line."[469]

212.    Amex's actions as part of this negotiation are emblematic of the contradiction in
many of Dr. Bernheim's claims regarding supposed procompetitive benefits of Amex's
Anti-Steering Rules.  Dr. Bernheim makes numerous claims that Amex's Anti-Steering
Rules are necessary because, if merchants gained the ability to steer customers to less-
expensive payment options, both merchants and cardholders would be harmed, resulting
in overall harm to competition.  However, as the Walgreens example demonstrates,
Amex appears to be perfectly fine with customer steering when it is undertaken as a
means to protect Amex's bottom line.  Thus, just like its motivation in its negotiations
with Walgreens, Amex's motivation in insisting that its Anti-Steering Rules remain in
place is not to protect competition and benefits to merchants and consumers (as Dr.
Bernheim claims), rather it is to protect its own bottom line from the effects of
heightened levels of competition in the GPCC Transactions market absent Amex's Anti-
Steering Rules.  I discuss the flaws in Dr. Bernheim's claims in this regard in greater
detail below.

### i.    Dr. Bernheim's Claims Regarding the Risk of Degradation to Amex's Brand are Misguided and Lack Merit

213.    In support of his claims that Amex's Anti-Steering Rules resulted in
procompetitive effects, Dr. Bernheim asserts that Amex's Anti-Steering Rules are crucial
for protecting Amex's brand, which he alleges benefits consumers in a number of
ways.[470]  In making many of his claims, however, Dr. Bernheim conflates actions that
would raise the level of competition on the merchant side of the market for GPCC
Transactions absent Amex's Anti-Steering Rules with actions that would "discriminate"

---

[469] 2014 Amex Trial PX0886 at AMEXNDR11999654; 2014 Amex Trial Transcript at 4853:24-4857:19.
Before Amex was able to implement its plans to steer business away from Walgreens towards its
competitors, Walgreens came to realize the "absolute mistake" it was making in dropping acceptance of
Amex GPCCs and agreed to new acceptance terms with Amex effective January 2005, despite Amex "not
offer[ing] [Walgreens] anything additional to cause them to change their position."  See 2014 Amex Trial
Transcript at 1391:21-1392:18, 1397:6-1399:4; 2014 Amex Trial PX1962; 2014 Amex Trial PX1965; 2014
Amex Trial PX0142 at AMEXM50102087.
[470] Bernheim Report at ¶¶124-150.

against Amex and degrade its brand.[471] For example, Dr. Bernheim asserts that when a merchant considers whether to steer a customer away from Amex to a less expensive payment option by, say, stating a preference for Visa GPCCs, it weighs the benefits against the costs of alienating the customer, but does not internalize the costs of dissipating the Amex network externality that generated the purchase in the first place.[472] To credit Dr. Bernheim's claim, one must view Amex as having the power to direct the deployment of cardholder purchasing power, rather than as a company that provides a payment service once a cardholder has decided to make a purchase for myriad reasons independent of Amex's offering.[473]

214.    Dr. Bernheim argues further that if Amex were to lose its ability to impose and enforce its Anti-Steering Rules, its core business strategy would be "highly vulnerable to discrimination at the point of sale."[474] He claims that Amex's business strategy "creates value by effectively meeting the needs of service-conscious consumers," and if Amex were no longer able to impose its Anti-Steering Rules, it would be forced to abandon this strategy, and this value would be destroyed, harming both consumers and merchants.[475]

215.    However. as I described in extensive detail above and in the Lamb Report, Amex does not lose welcome acceptance in the but-for world, as Dr. Bernheim assumes. Rather, in the but-for world, Amex achieves welcome acceptance through lower merchant discount rates, rather than through its anticompetitive Anti-Steering Rules. Put simply, Amex achieves welcome acceptance in the but-for world by competing with other GPCC payment networks, instead of by fiat.

216.    Consider, by way of example, Amex's response to the growing threat of differential surcharging in Australia following the RBA regulations in 2003, discussed

---

[471] According to Dr. Bernheim, actions that cause "harm" to the Amex brand that Amex's Anti-Steering Rules protect it against are actions that cause "the consumer is made to question his or her choice to use the Amex card." See Bernheim Report at footnote 194. However, one could apply Dr. Bernheim's logic to most any form of competitive behavior. Consider a retailer receiving a financial incentive for every bottle of Pepsi it sold if it agreed to prominently feature a Pepsi display in its store at the end of an aisle. Under Dr. Bernheim's logic, this would be viewed as degrading Coca Cola's brand, which would negatively impact Coca Cola drinkers.
[472] Bernheim Report at ¶¶126-129.
[473] For the same reason, it is misleading to describe Amex and merchants as vertical partners in a distribution chain, as I discuss in the next section.
[474] Bernheim Report at ¶¶130-135.
[475] Bernheim Report at ¶¶136-144.

extensively above and in the Lamb Report.[476]  For example, in an August 2006 update presentation regarding the RBA reforms, Amex noted that by the end of 2005, there had "been a significant trend in the Australia market towards surcharging in general and differentially surcharging American Express in particular," adding the following update: "Differential [s]urcharge significantly impacts our business and we are therefore taking steps to eliminate this by actively reducing our price for those merchants with Welcome Acceptance or Parity Surcharge."[477]  In a June 2007 update presentation on its response to the RBA reforms, Amex noted that between 2003 and 2006, it had "successfully executed [its] core strategy: minimize effect of surcharging on billings and aggressively leverage opportunities."[478]  Thus, when faced with the threat of differential surcharging in Australia due to government regulations (which is currently prohibited by Amex's Anti-Steering Rules in the U.S.), Amex did not just sit back and watch its core business strategy of welcome acceptance be compromised (as Dr. Bernheim assumes would happen in the but-for world in this matter); rather, Amex responded by competing more vigorously on the basis of price.[479]  As Amex CEO Ken Chenault stated in an August 2010 investor presentation:

> Now, while I firmly believe that competitive markets and the ability to freely negotiate with customers are the best mechanisms for establishing prices, we do have experience dealing successfully in countries where rate regulation is more pervasive.  Among the most stringent is Australia, where the Central Bank established a strong regulatory framework governing Visa and MasterCard interchange pricing among other changes.  Now, we were not directly affected by the pricing changes, but we did adapt.  As you would have expected, our

---

[476] See Lamb Report at ¶¶254-259.  As I noted, as part of this government regulation in Australia, Amex agreed as part of an "Undertaking" with the RBA that it would "not prohibit, or take any action that has the effect of prohibiting, a merchant in Australia from charging an American Express card holder any fee or surcharge for use of an American Express credit or charge card on a transaction."  See 2012 Lorigan Deposition Exhibits 910, 932.

[477] 2012 Lorigan Deposition Exhibits 910, 932 at AMEXNDRAUS00000235.  I describe Amex's preference for parity surcharging over differential surcharging later in this Expert Report.

[478] AMEX-DOJ-10070929-953 at 934.

[479] In a June 2013 earnings call, Edward Gilligan of Amex stated the following regarding the risk of surcharging: "But it's a complicated issue. It's one that regardless of what happens we try to find ways to navigate. There are certain threats that come out of surcharging, but also we look for opportunities. And I think Australia has been a good example where there have been a number of threats to our business model over the years, but we found, you know, many more opportunities to grow our business differently as a result and to adjust our economic model."  See 2014 Amex Trial PX1457 at p. 10.

merchant pricing was competitively affected by the steep decline in interchange. However, over a period of time, we negotiated with our merchants and proved our value to them, our cardmembers, and our GNS partners. As a result, our business in Australia today is both strong and profitable.[480]

217.   Amex's response in Australia is consistent with the "flexible business model" that Amex has claimed it has built and implemented in the past in response to elevated levels of competition in the market (contrary to Dr. Bernheim's assertions about the but-for world in this matter).[481]   Indeed, as then Amex CEO Ken Chenault stated during an August 2013 earnings call regarding the threat of increased competition due to the "state of regulation in the credit card and interchange in particular":

> What we have also demonstrated is that we have a flexible business model that has allowed us to deal with a number of regulatory issues because of the diversity of our business model and I think that's very important.
>
> So there are clearly – I can't predict what will happen in the future. What I do believe, though is that as long as we stay focused on really leveraging the flexibility of our model and we demonstrate that we're providing value to merchants and cardmembers and we're innovating as we have been doing over the last several years with an increase in competition, with an increase in regulation, I think we're going to continue to perform well.[482]

In a separate earnings call from May 2012, Mr. Chenault stated the following regarding the "credit interchange risks" in the U.S. due to "legislative, regulatory, or just market forces driving interchange pressure":

> My own view, as I look at the U.S., is I don't think interchange is going to be regulated.  That said, there are a lot of cases out there, so let's just talk about our view of how we manage in that situation.  I think one, that is most important is

---

[480] 2014 Amex Trial PX0131 at p. 8.
[481] For examples of how Amex has utilized its flexible business model to adapt to changing and challenging market conditions, see 2014 Amex Trial Transcript at 3132:1-3133:6, 4630:2-4631:16, 4998:24-5000:6.
[482] 2014 Amex Trial PX1438 at p. 22.  In a August 2010 earnings call, Mr. Chenault stated: "However, based on our commitment to provide high quality customers and services to merchants, and because of our ability to innovate in the marketplace, we're confident in our ability to adapt to a changing environment." See 2014 Amex Trial PX0131 at p. 7.  Mr. Chenault also stated: What I can tell you, though, is that I believe that merchants and consumers are best served by robust competition, competition in which the marketplace ultimately sets prices, not the government."  See 2014 Amex Trial PX0131 at p. 7.

that, to your point, we've always been in a situation where we have individually negotiated with merchants.  We have had a premium, and we provide substantial value for that premium.  And I think that we've demonstrated an ability around the world in a lot of different situations – some where the rate has been regulated – that we can deliver value to our merchants, and so we can manage through a range of scenarios.[483]

218.    Dr. Bernheim further claims that, were Amex to lose its ability to impose and enforce its Anti-Steering Rules and, in turn, be unable to execute its core business strategy, that this would result in a degradation of services that "would destroy value and harm consumers and merchants," and that Amex's Anti-Steering Rules are necessary to "prevent this value destruction."[484]  With respect to merchants, while describing valuable services Amex provides merchants (such as the "delivery of valuable consumers to a merchant"), Dr. Bernheim claims that, if Amex were to lose its ability to impose and enforce its Anti-Steering Rules, merchants would be incentivized to "discriminate" against the Amex brand (and potentially "free-ride" on Amex's investments), which would result in a degradation of those services to merchants.[485]

219.    However, what Dr. Bernheim fails to explain is, if the services that Amex provides to merchants that he describes are so valuable that a degradation of those services would cause harm to merchants and, thus, would not be in those merchants' best interests (as Dr. Bernheim claims), then why, in a world absent Amex's Anti-Steering Rules, would merchants take steps to "discriminate" against the Amex brand, and risk degrading the value Amex provides them, against their own economic self-interests?[486] Elsewhere in his report, Dr. Bernheim considers an example of a merchant that is presented with an Amex GPCC that is more expensive to accept than other GPCCs it also accepts: "When a consumer presents an Amex card for payment, the merchant has an

---

[483] 2014 Amex Trial PX1473 at p. 11.  In a May 2012 earnings call, Mr. Chenault stated: "What we can say is, as I said, in Australia or Argentina, what we have been able to demonstrate is that because of our flexible model, we have been able to manage through and navigate over that time.  And my view is, because of that flexibility in our model that we will be able to do that."  See 2014 Amex Trial PX1438 at p. 24.

[484] Bernheim Report at ¶¶136-144.

[485] Bernheim Report at ¶¶126-150.

[486] I discuss the flaws in Dr. Bernheim's assertions regarding potential free-riding later in this section.

incentive to steer the customer toward that alternative."[487]  Thus, Dr. Bernheim appears to recognize the benefit to merchants if they had the ability to steer customers to less-expensive payment options, but he provides no explanation as to how the harms he claims that merchants would incur absent Amex's Anti-Steering Rules would outweigh the benefits of lowering their overall GPCC acceptance costs that, as he acknowledges, merchants are incentivized to pursue.

220.   In that regard, one piece of common evidence I have reviewed that would explain these merchants' incentive and willingness to have the ability to steer (and, critically, the credible threat to steer) customers to lower cost GPCCs (or other forms of payment) indicates that Dr. Bernheim likely overstates the value of the services Amex provides to merchants that he claims, if degraded following the loss of its Anti-Steering Rules, would cause significant harm.[488]  For example, as I noted in the Lamb Report, Amex-accepting merchants have acknowledged that they do not receive additional value from accepting Amex GPCCs that justified Amex's higher prices.[489]  For example, at the 2014 Amex Trial, John Robinson of Ikea testified:

> Q. Did Ikea receive anything new, any new value or services in exchange for the higher cost of accepting Amex?
>
> A. No.[490]

---

[487] Bernheim Report at ¶129.

[488] Earlier in this Expert Reply Report I discussed the results of merchant surveys conducted by Amex

[489] Lamb Report at ¶¶165-167.

[490] 2014 Amex Trial Transcript at 395:14-16.  Executives from Hilton Hotels, Sprint, and Alaska Airlines similarly testified that they did not receive additional benefits from Amex in exchange for the higher costs of accepting Amex GPCCs.  See 2014 Amex Trial Transcript at 198:6-11, 1608:25-1609:22, 1687:9-11.  In particular, a number of executives from Amex-accepting merchants testified at the 2014 Amex Trial that Amex took longer to pay merchants than competing GPCC networks, which Jack Funda of Amex recognized was an area of Amex's business that was "less attractive" compared to Visa and Mastercard. See 2014 Amex Trial Transcript at 2581:24-2582:9.  For example, Kevin Thiel of Alaska Airlines testified that Amex takes seven-to-ten days to pay Alaska Airlines after a sale, whereas it gets "next day funding with [its] Visa and MasterCard transactions."  See 2014 Amex Trial Transcript at 188:6-189:12.  Similarly, Chris Priebe of Southwest Airlines testified that Amex pays Southwest seven calendar days after a transaction, which was "much slower" than Amex's competitors.  See 2014 Amex Trial Transcript at 2390:19-2391:19.  Also, Denis Bouchard of Sears testified that Amex's "speed of pay" was three days, as compared to one day for other credit card companies.  See 2014 Amex Trial Transcript at 558:9-19.  Executives from Alaska Airlines, Southwest Airlines, and Sears calculated the costs incurred by the

Jeffrey Rein of Walgreens also testified that Amex cardholders did not account for a higher average sales value compared to cardholders of competing GPCCs.[491]

221.    In January 2015, as Amex's negotiations with Costco to extend its exclusive deal as the sole GPCC accepted at the retailer (under which Costco's costs to accept Amex GPCCs was reported to be approximately "0.6 percent of every purchase") continued, Amex offered to cut its merchant discount rate even further, but Costco insisted on opening up negotiations with other GPCC payment networks to negotiate the lowest costs possible.[492]   As Amex CEO Ken Chenault continued to fight for the deal with Costco, he reminded Costco CEO Craig Jelinek that "Amex hadn't only furnished Costco with its prestigious card; it had been Costco's 'trusted partner,'" at which time Mr. Jelinek was reported to have interrupted Mr. Chenault "and told him that as far as he was concerned, Amex was another vendor, just like the one that sold Costco ketchup."[493]   When Mr. Chenault disclosed the failure to reach a new deal with Costco to investors in February 2015, he also disclosed that "10 percent of the 112 million Amex cards were Costco-branded."[494]   Upon learning this figure, Moshe Orenbuch, an analyst at Credit Suisse, determined that co-branded cards accounted for "23 percent of its $1 trillion in overall card spending last year," adding: "Amex maintains that it has the best brand. [...] Yet they decided not to tell us that 23 percent of their business was actually co-branded, which means it's using someone else's brand. I find those two things somewhat inconsistent."[495]

222.    Furthermore, contrary to Dr. Bernheim's assertions regarding potential "free-riding" or degradation of its brand, Amex does not "deliver" customers or transaction

---

extended period of time it takes those retailers to get paid by Amex to be approximately ten basis points, seven basis points, and three basis points, respectively.  2014 Amex Trial Transcript at 216:22-217:1, 558:9-560:4, 2391:3-2392:6.

[491] 2014 Amex Trial Transcript at 1401:13-19.  Mr. Rein noted that Walgreens had to continue to accept Amex GPCCs despite the higher costs of doing so with no additional value to Walgreens because if it did not, it would lose sales from insistent Amex GPCC cardholders who would "take their business elsewhere" if Walgreens ceased accepting Amex.  See 2014 Amex Trial Transcript at 1401:13-25.

[492] Devin Leonard and Elizabeth Dexheimer, "How Bad Will It Get for American Express?," Bloomberg, October 15, 2015 (hereafter "Leonard and Dexheimer").

[493] Leonard and Dexheimer.  Costco eventually signed an exclusive GPCC acceptance deal with Visa for "better terms" than it had been getting with Amex.  See Leonard and Dexheimer.

[494] Leonard and Dexheimer.

[495] Leonard and Dexheimer.

volume to merchants in any significant way.  Rather, customers and merchants transact with each other for many reasons that are unrelated to their chosen form of payment, and can find and transact with each other without belonging to specific GPCC payment networks.  Further, possessing an Amex GPCC does not increase a cardholder's income and therefore does not increase the volume of commerce that a merchant can expect to receive.  As Denis Bouchard of Sears testified at the 2014 Trial:

> Q. American Express has - - transactions are larger.  Does that, in your mind, have a relationship to the affluence of the cardholder?
>
> A. Yes.
>
> Q. In your view, does an affluent person who happens to be using an American Express card spend more than a similarly affluent person would spend using some other card?
>
> A. No.
>
> Q. Does having the American Express card make you spend more?
>
> A. No.
>
> Q. Being richer make you spend more?
>
> A. Yes.
>
> Q. But having a card doesn't make you spend more?
>
> A. No. It's like if you were going to fill up your gas tank, you wouldn't overfill it just because you have an American Express.[496]

Similarly, as Mr. Orenbuch explained in an interview that "[c]ustomers willing to pay for a premium card are people who will spend more on a card," adding the following regarding "Amex's claim that their cardholders spend more": "The causality is incorrect.  If you put a Signature card [Visa's premium card] in their hand, they will also spend more."[497]

---

[496] 2014 Amex Trial Transcript at 603:24-604:15.
[497] Isabelle Lindenmayer, "Warnings of a Downside for Amex in Bank Cards," *American Banker*, March 22, 2005.

223. Further, in the Lamb Report, I discussed extensive common evidence demonstrating that merchants continued to accept Amex GPCCs because large-enough amounts of their customer bases wanted to pay with Amex GPCCs such that merchants could not practically drop Amex acceptance.[498] Thus, given the overall maturity and ubiquitous acceptance of GPCCs by merchants, Amex and other GPCC payment networks strive to be the payment method chosen for a larger share of a merchant's existing commerce; what is incremental Amex GPCC volume today was cash, Debit Card, or non-Amex GPCC volume yesterday. Thus, the "value" that is "delivered" by Amex to merchants (according to Dr. Bernheim) is not new transaction volume, but already-existing transaction volume that now costs the merchant more to accept due to Amex's artificially-inflated pricing resulting from its continued imposition and enforcement of its Anti-Steering Rules.

224. Dr. Bernheim additionally claims that Amex's Anti-Steering Rules are necessary to protect the investments it has made to create a diversified product, allowing it to attract high-value cardmembers to use its product, and then creates value to merchants by delivering these customers to the merchant.[499] However, in making this claim, Dr. Bernheim confuses a differentiated product with a carefully selected customer base. Firms often use "two-part tariffs" to separate customers who value their product highly from those who attach less value to their product.[500] A common two-part tariff combines a fixed fee with a per-transaction fee.[501] High-valuation credit card customers are willing to pay larger fixed fees because they expect to recover the fee over a relatively large transaction volume. Such customers have large transaction volumes because they have higher incomes.[502] As Dr. Bernheim notes, Amex uses high annual fees to select high-valuation GPCC customers from the population of all customers.[503] It is evident that such fees perform a selection function because Amex's customer base differs from other card networks in its high income and its reduced tendency to revolve credit balances.

---

[498] Lamb Report at ¶¶234-248.
[499] Bernheim Report at ¶¶130-144.
[500] See, for example, Patrick Bolton and Mathias Dewatripont, *Contract Theory*, Cambridge, MA: MIT Press, 2005 (hereafter "Bolton and Dewatripont") at pp. 50-52.
[501] Bolton and Dewatripont (2005) at 50-52.
[502] See, for example, Bernheim Report at ¶24; 2014 Amex Trial Transcript at 603:24-604:15.
[503] Bernheim Report at ¶¶24-25.

Amex's practice of rebating much of the annual fee in the form of fixed rewards (one of the supposed differentiating characteristics highlighted by Dr. Bernheim) further underlines its selection function.[504] Thus, having "skimmed the cream" of the cardholding population, Amex exploits this transaction volume in negotiations with merchants in order to convince those merchants to accept Amex's terms of acceptance (discussed in detail earlier in this Expert Reply Report) as if such volumes did not already exist, and then insists (as Dr. Bernheim does) that it "creates value" for merchants by getting in between high-spending customers and the merchants they already patronize.

225.    In addition, with respect to consumers, Dr. Bernheim asserts that if Amex were to abandon its core business strategy, "its cardmembers would be deprived not only of the payment product that most effectively delivers the type of payments experiences they value, but also promotional information provided through a trusted source that points them toward merchants who more effectively meet their needs."[505] Dr. Bernheim further asserts that this core business strategy "hinges critically on its ability to provide cardmembers with high-quality payments experiences."[506] Regarding a cardholder's payment experience, I discussed above why, in a world absent Amex's Anti-Steering Rules, which would result in greater levels of competition in the market for GPCC Transactions, Amex would be in a position where it would be forced to compete more vigorously in the market for GPCC Transactions in order to execute its core business strategy and protect its welcome acceptance at Amex-accepting merchants, rather than just sit back and watch its core business strategy of welcome acceptance be compromised. In so doing, this would also serve to protect the payment experience for consumers that Dr. Bernheim describes.

226.    Further, to the extent that any of the services Dr. Bernheim asserts Amex provides to cardholders that differentiate Amex from competitors like Visa and Mastercard (such as directing cardholders to merchants that, supposedly, more effectively meet their needs) provide a significant level of value such that they are critical to Amex's success, then it does not make sense that, in the but-for world, Amex would cease offering such services

---

[504] See, for example, Bernheim Report at ¶¶21-26.
[505] Bernheim Report at ¶136.
[506] Bernheim Report at ¶137.

to cardholders and risk the additional loss in revenue that would result from cardholders switching to its competitors.  As I discussed above and in extensive detail in the Lamb Report, cardholder rewards are the predominant factor that consumers consider when selecting a GPCC.[507]  I further discussed how, given the value that cardholders place on the rewards they earn for using a given GPCC, Amex and other GPCC issuers would not reduce the level of cardholder rewards they offered cardholders in a world absent Amex's Anti-Steering Rules, as it would be contrary to their economic self-interests to do so.[508]  Similarly, if one were to accept Dr. Bernheim's assertion that if services such as helping consumers find merchants that best suit their needs are critical to Amex's success, it is similarly the case that Amex would not reduce such services to cardholders in a world in which there are heightened levels of competition in the market for GPCC transactions.  I have noted that this is consistent with how Amex successfully executed its flexible business model (discussed above) when faced with various business challenges and greater levels of competition in the past.[509]  In the next section, I discuss additional flaws regarding Dr. Bernheim's assertions regarding the supposed pro-competitive benefits of Amex's Anti-Steering Rules.

### ii.    Dr. Bernheim's Claims Regarding the Nature and History of Amex's Anti-Steering Rules are Misguided

227.    In his report, Dr. Bernheim claims that, because Amex's Anti-Steering Rules are vertical agreements between a payment network and merchants, "there is general consensus that one should assume that such agreements serve procompetitive ends absent a clear demonstration to the contrary."[510]  Dr. Bernheim adds that companies that enter into vertical agreements "usually have mutual interest in maximizing the value of the ultimate offering to final consumers."[511]  In the previous section of this Expert Reply

---

[507] Lamb Report at ¶¶273-284.
[508] Lamb Report at ¶¶273-284.
[509] As I noted above, in maintaining its success when faced with such challenges of increased competition in the market for GPCC Transactions, Amex sought to continue to demonstrate its value to cardholders as part of its strategy to adapt to the new competitive environment.  See, for example, 2014 Amex Trial PX0131 at p. 8, PX1438 at p. 22.
[510] Bernheim Report at ¶73.
[511] Bernheim Report at ¶73.

Report, I discussed why it is misleading to view Amex and merchants as partners in a distribution channel who coordinate their efforts through vertical restraints.[512]

228.    Dr. Bernheim's speculation in this regard fails to take into account the effect that the market power Amex possesses over merchants has on the agreements merchants enter into with Amex.  Above, and in the Lamb Report, I discussed extensive common evidence demonstrating how Amex exercised market power in the market for GPCC Transactions to routinely impose profitable price increases on merchants that were not driven by costs, as well as to successfully price discriminate, and further how Amex-accepting merchants cannot practically cease their agreements to accept Amex GPCCs to avoid the effects of the Anti-Steering rules contained in those vertical agreements.[513]  In his report, Dr. Bernheim asserts: "Even if, for the sake of argument, one accepts [my] contention that Amex has market power and can impose terms on merchants, [I have] not explained why Amex would use that power to extract acquiescence to a vertical restraint that lessens value created by their relationship."[514]

229.    In making this claim, Dr. Bernheim appears to fail to understand that the vertical restraint that is Amex's Anti-Steering Rules controls not only the terms of acceptance for Amex GPCC transactions, but also the terms of acceptance for competing GPCC payment networks (Visa, Mastercard, Discover), as opposed to a typical vertical restraint in which a manufacturer seeks to control the sale of its own product, thus providing a greater incentive to use its market power to extract acquiescence from merchants.[515]

---

[512] In short, one would have to assume that no transactions take place between Amex cardholders and merchants without the intervention of Amex.

[513] Lamb Report at ¶¶152-175, 234-248.

[514] Bernheim Report at ¶73.

[515] Dr. Bernheim asserts that because Amex's Anti-Steering Rules are a vertical restraint and because he believes that vertical restraints are often innocuous that Amex's Anti-Steering Rules should be presumed to be procompetitive. However, Carlton and Winter explain that the Anti-Steering Restraints can be thought of as a vertical Most Favored Nations agreement ("vMFN") and that it is important when analyzing whether a vMFN is anticompetitive to "keep in mind [...] the sharp contrast between resale price maintenance [a type of vertical restraint that is sometimes found to be procompetitive] and the vMFN vertical restraint. See Bernheim Report at ¶73. Resale price maintenance is a restriction on the price competition among downstream retailers of a single supplier's product, which can enhance the ability of the supplier to compete with other suppliers by increasing retailer promotion of the seller's product. Competition among upstream suppliers can thus increase with resale price maintenance. The vMFN restraint has the opposite effect, as we have shown: it suppresses competition among upstream suppliers." See Dennis W. Carlton and Ralph A. Winter, "Vertical Most-Favored-Nation Restraints and Credit Card

Further, I also discussed in the Lamb Report extensive common evidence demonstrating that the Anti-Steering Rules that were included in the vertical agreements merchants signed with Amex (that Amex's market power allowed it impose) caused those merchants' costs of GPCC acceptance to be higher than they otherwise would have been.[516] However, Dr. Bernheim ignores this evidence, and performs no analysis of his own to adequately demonstrate that Amex's incentives are to maximize the total value of its relationships with merchants as opposed to maximizing Amex's own profits.

230.   Another of Dr. Bernheim's claims regarding supposed procompetitive benefits of Amex's Anti-Steering Rules is that, because Amex's Anti-Steering Rules were originally designed in the 1950s when Amex did not possess market power, this constitutes "compelling evidence that the NDPs were not designed for the purpose of raising prices above competitive levels, much less to create or exploit market power."[517] However, irrespective of the original design or intent of the terms in Amex's standard Card Acceptance Agreement, as I discussed in the Lamb Report, Amex has revised and/or strengthened the language of the non-discrimination provisions contained in its Card Acceptance Agreements many times in response to competition from other payment networks in ways that have made them more restrictive.[518] Thus, Dr. Bernheim's assertions regarding Amex's intentions of its original standard Card Acceptance Agreement from the 1950s have little-to-no bearing on how Amex imposed and enforced its Anti-Steering Rules in more recent years.[519]

---

No-Surcharge Rules," *Journal of Law and Economics,* Vol. 61, May 2018, 215-251 at pp. 231-232.  See, also, Dennis W. Carlton and Ralph A. Winter, "Vertical Most-Favored Nation Restraints and Credit Card No-Surcharge Rules," Journal of law and Economics, Vol. 61, 2018.

[516] Lamb Report at ¶¶176-233.

[517] Bernheim Report at ¶77.

[518] Lamb Report at ¶¶85-86.  For a more comprehensive timeline of changes to Amex's Anti-Steering Rules from 1958 through 2010, see AMEX-CP-000030935-958.

[519] To further support his flawed claims regarding supposed procompetitive effects from Amex's Anti-Steering Rules, Dr. Bernheim points out that Discover has similar provisions as Amex in its card acceptance agreements with merchants despite not possessing market power in the market for GPCC Transactions like Amex does.  See Bernheim Report at ¶77.  However, despite Dr. Bernheim's assertion, it is commonly understood by economists that practices can be anticompetitive when done by a firm with market power where it is not anticompetitive if the same actions are undertaken by a firm that does not have market power. See, for example, The United States Department of Justice Archives, "Competition and Monopoly: Single-Firm Conduct Under Section 2 of the Sherman Act: Chapter 2," March 18, 2022. By way of example, as I noted above and in the Lamb Report, due to Amex's market power in the market for

### iii. Dr. Bernheim's Claims that Amex's Anti-Steering Rules Prevent Merchants from Adopting Strategies that Are Harmful to Consumers and Undermine Competition Lack Merit

231.    In further support of his claims that Amex's Anti-Steering Rules resulted in procompetitive effects, Dr. Bernheim asserts that Amex's Anti-Steering Rules "prevent merchants from adopting strategies that harm consumers and undermine competition among merchants."[520]  In particular, Dr. Bernheim asserts that merchants are incentivized to adopt steering strategies that harm consumers, but that Amex's Anti-Steering Rules prevent merchants from doing so.[521]  Dr. Bernheim focuses much of his discussion in this regard on the potential effects of shrouded surcharging, and his claims that Amex's Anti-Steering Rules prevent consumers from incurring such surcharges.[522]  Before addressing the flaws in Dr. Bernheim's assertions regarding shrouded surcharging, I note first the overarching critical flaw in Dr. Bernheim's claims: For the reasons discussed in detail above and at my deposition, in a world absent Amex's Anti-Steering Rules, the threat of

---

GPCC Transactions, most Amex-accepting merchants cannot practically drop Amex GPCC acceptance to avoid the effects of Anti Steering Rules.  See Lamb Report at ¶234-248.  At the 2014 Amex Trial, John Robinson of Ikea testified that Ikea could not stop accepting Amex because a large enough percentage of its customers expressed a preference for using Amex such that it "couldn't drop American Express without suffering a loss in sales," adding that the "percentage of customers that […] said they might move [was] large enough for Ikea to make a determination not to stop accepting American Express."  See 2014 Amex Trial Transcript at 389:10-390:10.  However, as I noted in the Lamb Report, merchants did not view Discover the same way.  See Lamb Report at ¶¶249-253.  As Diedre O'Malley of Best Buy testified at the 2014 Amex Trial: "Q. Okay. So if the treatment provision we just looked at in your AmEx contract no longer existed, wouldn't Discover's rules prevent you from encouraging customers to use, for example, a MasterCard?  A. I think the rules would state that. I don't think Discover would prevent it.  Q. Why don't you think Discover would prevent it?  A. They are the self-proclaimed small guy out there and I don't think they have the market power required to make a merchant stop doing that."  See 2014 Amex Trial Transcript at 1544:14-23.  Similarly, George Satkowski of Enterprise testified that Enterprise has had conversations with Discover informing them that if Amex were to ever drop its Anti-Steering Rules, "Discover would either need to remove that clause or, if in such case they felt that they couldn't, that we would have to reconsider our agreement with the Discover product," adding that Enterprise has "done a lot of research with Discover and we're fully comfortable that if we were to eliminate the Discover brand that we will not see any loss in any business."  2014 Amex Trial Transcript at 504:1-23.  Kevin Thiel of Alaska Airlines testified: "Q. If the Government wins this lawsuit, and you no longer have the American Airlines rules, what will you do?  A. Well, I guess the first thing that we would do is pick up the phone and call Discover and just say there's been a significant change with one of your competitors and we would like to discuss the language in our agreement and we would try to negotiate an amendment the[n].  Q. Do you think you would have the ability to negotiate with them an amendment? A. Yes."  See 2014 Amex Trial Transcript at 370:3-12.

[520] Bernheim Report at ¶79.
[521] Bernheim Report at ¶¶79-100.
[522] Bernheim Report at ¶¶84-112.

differential surcharging would be sufficient to discipline prices for GPCC Transactions such that actual differential surcharging on GPCC Transactions would be very limited, thus rendering Dr. Bernheim's claims in this regard largely irrelevant.

232.     Beyond this critical flaw, Dr. Bernheim's analysis in this regard disguises Amex's alleged misconduct as a form of benevolent market regulation.  Amex's Anti-Steering Rules are not designed to prevent shrouded surcharging by merchants; rather, they are designed to prevent merchants from steering customers to less expensive GPCCs (or other forms of payment) in order to lower their overall costs.  Thus, in order to achieve that objective, it would be necessary for a customer to be aware about a potential differential surcharge on a particular GPCC Transaction if a merchant hoped to convince them to pay with a less-expensive GPCC (or other form of payment).  To wit: following the 2013 Settlement when Visa and Mastercard allowed surcharging at both the brand and product levels, their revised cardholder agreements with merchants included terms that required merchants that wished to surcharge to clearly disclose its intent to surcharge at the point of entry, point of sale (both in-store and online), and provide a clear disclosure of the amount of the surcharge on the customer's receipt.[523]  Thus, given that actual differential surcharging of GPCCs would be very limited absent Amex's Anti-Steering Rules, the extent to which merchants in these limited instances would shroud any such differential surcharges given the design and intent of such surcharges to steer customers to less-expensive payment options would be even further limited, and, thus, would not outweigh the anticompetitive effects of Amex's Anti-Steering Rules that I discussed at length above and in the Lamb Report.

233.     Another of the "important procompetitive effects" of Amex's Anti-Steering Rules that Dr. Bernheim asserts is that, absent those Anti-Steering Rules, "[m]erchants'

---

[523] See, for example, Visa, "Merchant Surcharge Q and A." Available at: https://usa.visa.com/content/dam/VCOM/global/support-legal/documents/merchant-surcharging-qa-for-web.pdf; the Visa, "Sample Surcharge Disclosure Signage." Available at: https://usa.visa.com/content/dam/VCOM/download/merchants/sample-surcharge-disclosure-signage.pdf; the Mastercard, "What merchant surcharge rules mean to you." Available at: https://www.mastercard.us/en-us/business/overview/support/merchant-surcharge-rules.html; the Mastercard, "U.S. Merchant Class Settlement Mastercard Frequently Asked Questions Merchant Surcharge." Available at: https://www.mastercard.us/content/dam/public/mastercardcom/na/us/en/documents/Merchant_Surcharge_F AQ.pdf; Mastercard, "Mastercard Rules 5.11.2, Effective January 27, 2013," June 6, 2019 at p. 9.

incentives regarding soft steering are contrary to consumers' interests."[524]  He further states that "*merchant steering will induce consumers to make decisions that are contrary to the consumers' interests*," adding: "a consumer would likely choose a payment method that saves a small amount of money at the point of sale, even if he or she sacrifices greater value by foregoing more generous rewards or other benefits."[525]  However, contrary to Dr. Bernheim's assertions, consumers would continue to evaluate which payment instrument is best for them in each purchase situation, and select accordingly. As a matter of economics, consumers will continue to choose their utility-maximizing payment instrument, given the characteristics of their purchases, the environment in which they shop, and many other considerations that will only become fully known in the absence of Amex's Anti-Steering Rules.[526]  Furthermore, later in this Expert Reply Report I discuss how Dr. Bernheim, like Dr. Gaier, simply assumes that a consumer being steered away from their "preferred card" makes them worse off without any analysis or evidence to support his claims, or any consideration of offsetting benefits a given GPCC payment network might offer a cardholder to incentivize them not to switch payment methods when faced with a steering by a merchant.

234.     Furthermore, Dr. Bernheim's assertions that Amex's Anti-Steering Rules are meant to provide "important procompetitive effects" for consumers are at odds with Amex's own design and implementation of these Anti-Steering Rules.  For example, as noted by Defendants' Economists, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.[527]  I have noted that Dr. Bernheim does not explain why ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

---

[524] Bernheim Report at ¶¶120-123.
[525] Bernheim Report at ¶¶117-119 (emphasis in original).
[526] Economists routinely model consumer choice using a 'random utility model' in which the utility of different options is defined as a linear combination of characteristics describing the choice situation plus an idiosyncratic factor specific to the consumer. The option chosen by the consumer is the one that maximizes the consumer's utility. Such models are employed in papers cited by Defendants' Economists, such as John Simon, Kylie Smith, and Tim West, "Price incentives and consumer payment behavior," *Journal of Banking and Finance*, Vol. 34, No. 8, August 2010, 1759-1772, Ching and Hayashi at pp. 1773-1787; Santiago Carbó-Valverde and José M. Liñares-Zegarra, "How effective are rewards programs in promoting payment card usage?" *Journal of Banking and Finance*, Vol. 35, No. 12, December 2011, 3275-3291; Carlos Arango, Kim P. Huynh, and Leonard Sabetti, "Consumer payment choice: Merchant card acceptance versus pricing incentives," *Journal of Banking and Finance*, Vol. 55, June 2015, 130-141.
[527] See, for example, Gaier Report at ¶¶81-90.

████████████████████████████ if such "soft steering [is] contrary to consumers' interests," as he claims.[528]  Further, as noted by Defendants' Economists, Amex has

████████████████████████████████████████████████████

██████████████████████████████████████████."[529] Again, I have noted that Dr. Bernheim fails to explain why Amex is willing ████████████████

████████████████████████████████████████████

████████████████████████████████████

235.    In sum, none of the flawed or misguided claims and assertions contained in Dr. Bernheim's report have caused me to change the conclusions I reached in the Lamb Report that Amex's continued imposition and enforcement of its Anti-Steering Rules resulted in anticompetitive effects.  As noted above, many of Dr. Bernheim's assertions and claims in this regard are based on flawed or misguided understandings of competition in the but-for world or of the alleged misconduct in this matter.  Further, many of the supposed pro-*competitive* benefits asserted by Dr. Bernheim are more aptly considered to be pro-*competitor* benefits, as they are largely concerned with protecting Amex's revenues and profits than they are consumer welfare in the market for GPCC Transactions.

236.    Taken together, the extensive common evidence discussed above and in the Lamb Report demonstrates that Amex's continued imposition and enforcement of its Anti-Steering Rules following the 2011 Consent Decree and 2013 Settlement caused anticompetitive effects in the market for GPCC Transactions.  For the reasons discussed above and in the Lamb Report, none of the criticisms contained in the reports of Defendants' Economists have caused me to change or revise the conclusions I reached in the Lamb Report in this regard.

---

[528] Bernheim Report at ¶¶120-123.  Further at odds with Dr. Bernheim's assertions that Amex's Anti-Steering Rules are meant to protect consumers against soft steering strategies that "are contrary to consumers' interests," I described in the Lamb Report common evidence demonstrating that Amex itself entered into agreements with merchants whereby those merchants agreed to steer customers towards using Amex GPCCs through various types of expressions of preference for Amex GPCCs (which its Anti-Steering Rules prevent merchants from doing with other GPCC payment networks).  See Lamb Report at ¶190.  In his report, Dr. Bernheim fails to explain why Amex is willing to engage in agreements with merchants for soft steering efforts to Amex's own GPCCs which are otherwise prohibited by its Anti-Steering rules given that such "soft steering [is] contrary to consumers' interests," as he claims.
[529] Emch Report at ¶209.

## V.     None of Defendants' Economists' Opinions have Caused Me to Change the Conclusions Reached in the Lamb Report that All or Nearly All Members of the Credit Card Class and Debit Card Class were Injured by Amex's Continued Imposition and Enforcement of its Anti-Steering Rules

237.    As I established in the Lamb Report and reaffirmed above, Amex's continued imposition and enforcement of its Anti-Steering Rules during the Class Periods was anticompetitive in that it forestalled competition in the market for GPCC Transactions, resulting in higher two-sided prices during the Class Periods than otherwise would have prevailed.  As I explained in the Lamb Report, in order to establish class-wide injury in this matter, it is necessary to determine whether all or nearly all members of the Credit Card Class and Debit Card Class paid higher prices on their Qualified GPCC Transactions or Qualified Debit Card Transactions, respectively, as a result of Amex's continued imposition and enforcement of its Anti-Steering Rules.[530]

238.    My analysis in this regard proceeded in two steps.  I first established, using economic theory and evidence common to the Classes, that Amex's continued imposition and enforcement of its Anti-Steering Rules caused Qualified Merchants to incur higher overall GPCC acceptance costs (merchant discount fees) during the Class Periods than they otherwise would have, and that Qualified Merchants passed through at least some portion of the artificially-inflated GPCC acceptance costs that resulted from Amex's continued imposition and enforcement of its Anti-Steering Rules in the form of higher retail prices (and that absent Amex's Anti-Steering Rules, Qualified Merchants would have passed on at least some portion of their cost savings to their customers).[531]  I then established, using economic theory and evidence common to the Classes, that members of the Credit Card Class and Debit Card Class would not have paid higher Annual Fees Net of Rewards (either through higher annual fees and/or lower cardholder rewards) as a

---

[530] Lamb Report at ¶293.
[531] Lamb Report at ¶¶294-328, 339-341.

result of the greater levels of competition on the merchant side of the GPCC Transactions market that would have occurred in the but-for world.[532]

239.     In his report, Dr. Gaier claims that my analysis and conclusions contained in the Lamb Report "fails to demonstrate class-wide antitrust injury."[533]  In the section that follows, I discuss the many fundamental flaws in Dr. Gaier's report, and why none of his opinions have caused me to change the conclusions reached in the Lamb Report that all or nearly all members of the Credit Card Class and Debit Card Class were injured by Amex's continued imposition and enforcement of its Anti-Steering Rules.[534]

### A.   Dr. Gaier's Claims Regarding the Chain of Causation Necessary to Establish Class-Wide Injury are Misguided

240.     Dr. Gaier asserts that my analysis of antitrust injury suffered by all or nearly all members of the Credit Card Class and Debit Card Class "requires a long chain of causation between Amex's NDPs and the alleged antitrust injury to putative class members."[535]  I discuss the many flaws in Dr. Gaier's assertions in this regard below.

### i.   Contrary to Dr. Gaier's Claims, an Appropriate Analysis of the But-For World Can Be Conducted Without Positing an Elaborate Causal Chain or Attempting to Predict the Specific Behaviors of Every Actor in the GPCC Transaction Market

241.     In his report, Dr. Gaier attempts to complicate the analysis of class-wide injury by asserting that such an analysis "requires a long chain of causation that cannot be established on a class-wide basis."[536]  In so doing, Dr. Gaier fixates on the details of the

---

[532] Lamb Report at ¶¶329-330, 341-347.  Consistent with the Lamb Report, unless otherwise noted, throughout the remainder of this Expert Reply Report, I refer to the prices paid on a given Qualified GPCC Transaction (calculated as the sum of the retail price and the Annual Fees Net of Rewards) by members of the Credit Card Class as the "Net GPCC Cardholder Price."  Relatedly, unless otherwise noted, throughout the remainder of this Expert Reply Report, I refer to the prices paid on a given Qualified Debit Card Transaction (calculated as the sum of the retail price and the Annual Fees Net of Rewards) by members of the Debit Card Class as the "Net Debit Cardholder Price."
[533] Gaier Report at ¶17.
[534] I note further that many of the claims and assertions contained in Dr. Gaier's report were also included in the reports of Dr. Bernheim and Dr. Emch and, thus, addressed elsewhere in this report.  Therefore, unless necessary to do so, I do not repeat those responses again in this section as they pertain to Dr. Gaier's claims.
[535] Gaier Report at ¶18.
[536] Gaier Report at ¶18.

but-for world, claiming that it's critical to analyze the detailed process by which, for example, merchants will bargain with GPCC payment networks to achieve lower merchant discount rates and how GPCC issuers will maintain their market share among cardholders.[537]  Dr. Gaier's attempts to complicate the analysis of class-wide injury in this way demonstrates a fundamental misunderstanding of competition in the but-for world.

242.    As I discussed above and in the Lamb Report, Amex's continued imposition and enforcement of its Anti-Steering Rules caused Qualified Merchants to incur higher overall GPCC acceptance costs (merchant discount fees) during the Class Periods than they otherwise would have.[538]  Dr. Gaier improperly argues that in order to establish that Qualified Merchants would have had lower GPCC acceptance costs absent Amex's Anti-Steering Rules, it is necessary to demonstrate the following four-step chain of causation: (1) merchants would either surcharge or credibly threaten to surcharge; (2) GPCC payment networks would respond to this threat by lowering interchange or merchant discount fees; (3) acquiring banks would pass through the lower interchange rates to merchants; and (4) the reduced merchant discount rates would not be offset by lost transactions from customers that "walked away" due to the merchants' steering efforts.[539]  Dr. Gaier further incorrectly concludes that individualized analysis is necessary for each merchant for each of these steps and that there would need to be "uniformity" for any of these steps.[540]

243.    Contrary to Dr. Gaier's assertions in this regard, it is not necessary or appropriate to disaggregate the finding of lower GPCC acceptance costs absent Amex's Anti-Steering Rules into these four steps. As I explained earlier in this Expert Reply Report, removing Amex's Anti-Steering Rules from the market for GPCC Transactions, keeping all else constant, introduces a new form of competition that previously was not there, which creates a new, more competitive equilibrium in the market.  In this new competitive equilibrium, merchants possess increased leverage with which they can extract more

---

[537] Gaier Report at ¶18-19.
[538] Lamb Report at ¶¶176-248.
[539] Gaier Report at ¶18.
[540] In the next section of this Expert Reply Report I discuss how Dr. Gaier further incorrectly concludes that there would need to be "uniformity" for each of these steps in order to establish class-wide injury.

favorable financial terms in the form of lower merchant discount rates.[541]  Furthermore, in the Lamb Report and earlier in this Expert Reply Report I discuss extensive common evidence demonstrating that, given my finding that, in the but-for world, GPCC issuers would not have increased Annual Fees Net of Rewards paid by GPCC cardholders, this change in the equilibrium of merchant discount rates caused by the absence of Amex's Anti-Steering Rules would have resulted in an overall reduction in net two-sided prices of GPCC Transactions.

244.    Furthermore, as I explained at my deposition, in addition to Dr. Gaier's failure to understand the nature of competition in a world absent Amex's Anti-Steering Rules, his assertions regarding the "chain of causation" are irrelevant for the purposes of analyzing class-wide injury in a matter such as this.[542]  Economists compare equilibrium positions – the "comparative statics" of the two equilibria – and focus on the stability of each equilibrium position.[543]  The "transitional dynamics" or process (i.e., the sequence of steps or "chain of causation") by which one moves from one equilibrium position to another equilibrium position are irrelevant for demonstrating class-wide injury, contrary to Dr. Gaier's claims.  Rather, having established that the removal of Amex's Anti-Steering Rules resulted in a new, more competitive equilibrium with heightened levels of competition which caused a reduction in the overall pricing structure of merchant discount fees, it follows that the merchant discount fees would be lower for each of the Qualified Merchants.  While the implicit threat of steering absent Amex's Anti-Steering Rules is what causes the increase in competition between the GPCC payment networks (as I explained at my deposition), there is no reason to think that each Qualified Merchant would have to present a detailed cost/benefit analysis to each of the GPCC payment networks proving that it would be better off steering in order to be able to negotiate for lower fees.  Rather, the lower fees come about because of the new equilibrium with greater levels of competition between the networks.[544]  It is, therefore, unnecessary to

---

[541] See, for example, Lamb Report at ¶¶176-233.
[542] Lamb Deposition at 141:19-150:2, 155:23-160:24.
[543] See, for example, Paul A. Samuelson, *Foundations of Economic Analysis,* Cambridge, MA: Harvard University Press, 1947.
[544] See, for example, Lamb Deposition at 115:2-24.

perform individualized analysis for me to conclude that all Qualified Merchants would have had lower GPCC acceptance costs.

245.    Because the classes are limited to consumers that made at least one GPCC Transaction and/or Debit Card Transaction from at least one of the Qualified Merchants during the Class Periods, it is not necessary to find that all merchants would have had lower acceptance costs.  Rather, to establish that all or nearly all members of the Credit Card Class and Debit Card Class were injured as a result of Amex's alleged misconduct, it is only necessary to demonstrate that the *Qualified Merchants* would have had lower GPCC acceptance costs. The Qualified Merchants are some of the largest and most sophisticated retailers in the country.  Based on my conservative estimate that overall blended merchant discount rates would have come down by 36 basis points over an eight-year period beginning in 2013 across each of the GPCC payment networks as a result of the removal of Amex's Anti-Steering Rules, it follows that blended overall merchant discount rates would have also been reduced for the Qualified Merchants since the Qualified Merchants would have more negotiating leverage than the average merchant.

246.    Dr. Gaier argues that some Qualified Merchants may not have been in a position to negotiate for lower merchant discount rates because these Qualified Merchants such as Kroger and Walmart may not have been able to understand their cost of acceptance of credit cards or credibly threaten surcharging.[545] However, the idea that Kroger and Walmart or the other Qualified Merchants do not understand their cost of credit card acceptance and would not be in a position to threaten networks with steering is absurd. In the Lamb Report, I discussed common evidence demonstrating that Qualified Merchants routinely track their GPCC acceptance costs in the ordinary course of business.[546]  By way of example, at the 2014 Amex Trial, John Robinson of Ikea testified that Ikea closely tracks its overall costs of GPCC acceptance "in the ordinary course of business," including the preparation of a summary document that tracks the all-in rates and costs Ikea pays for accepting GPCCs (as well as each GPCC payment network's

---

[545] Gaier Report at ¶¶20-24.
[546] Lamb Report at ¶¶303-308.

share of total Ikea payments) that Ikea "then use[s] to highlight and assess the changes in payment patterns over time with our customers."[547]

247.    Furthermore, as I noted above, when negotiating new contracts with merchants in Australia after the RBA regulations prohibited GPCC payment networks from banning differential surcharging, Amex's "original strategy focused on securing the top accounts in the marketplace to set a marketplace standard of no surcharge," with Amex reporting that "[b]edding down 'no surcharge' contracts with key merchants was costly, bringing many key accounts to the point of being virtually non-profitable."[548] Thus, Amex's own experience in Australia provides one example of how large merchants such as the Qualified Merchants in this matter are well positioned to credibly threaten Amex and other GPCC payment networks with steering in negotiations, contrary to Dr. Gaier's speculation to the contrary.

248.    In addition, the process by which the GPCC payment networks typically set interchange and/or merchant discount fees leads to a conclusion that all Qualified Merchants would have had lower GPCC acceptance costs in the but-for world.  For example, for many Qualified Merchants, Visa and Mastercard rates are based on the publicly available rate sheets (which publish rates based on industry segment and charge volume that corresponds to a given merchant) that apply to the vast majority of Visa and Mastercard merchants.[549] Therefore, reductions in the standard rates that Visa and

---

[547] 2014 Amex Trial Transcript at 375:7-386:19; 2014 Amex Trial PX2615. Similarly, Diedre O'Malley of Best Buy testified: "Q. In the ordinary course of its business, does Best Buy track the costs of acceptance by payment type?  A. Yes, we do."  See 2014 Amex Trial Transcript at 1523:5-1525:5; 2014 Amex Trial PX2632.  Similarly, Dwaine Kimmet of Home Depot testified that Home Depot routinely tracks and compares its overall costs of GPCC acceptance, as well as the costs of acceptance for each GPCC payment network, in the ordinary course of business.  See 2014 Amex Trial Transcript at 1332:23-1333:11; 2014 Amex Trial PX2422 at USDOJE-THRDP2-00102. While it is not a Qualified Merchant in this matter, I have noted that Ben Mitchell of Official Payments testified that Official Payments tracks its GPCC acceptance costs "very closely," adding: "We either know in realtime what the cost of a particular transaction is going to be or the next day when the transactions settle or in worst case, it's the end of the month."  Mr. Mitchell added that there "is not a single transaction that we process that we don't know the exact cost of that transaction by the end of the month."  When asked why Official Payments tracks its costs of GPCC acceptance so closely, Mr. Mitchell testified: "Because our whole business model is founded on understanding the cost of the transaction so that we can then offer appropriate levels of service to our consumers at the lowest cost possible to them."  See 2014 Amex Trial Transcript at 6123:8-24.
[548] AMEX-DOJ-10070929-953 at 935.
[549] See, for example, VISA, "Visa USA Interchange Reimbursement Fees: Visa Supplemental Requirements," April 23, 2022 (hereafter "Visa April 2022 Interchange Rates"); Mastercard, "Mastercard

Mastercard charge as a result of the increased competition would flow to these Qualified Merchants. While some Qualified Merchants have custom rates with Visa or Mastercard (e.g., Walmart), as I explain below, these Qualified Merchants would similarly have custom rates in the but-for world – just at lower levels reflecting the increased negotiating leverage in the but-for world.[550]

249.    Furthermore, as Amex explained in its amended responses to Plaintiffs' first set of interrogatories in this matter: ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮

▮▮▮▮▮▮

▮▮▮▮▮▮▮

▮▮▮▮▮▮

▮▮▮▮▮

▮▮▮▮[551]    Similarly, according to Roger Hochschild of Discover, when Discover abandoned its low-cost provider strategy in 2000, it "shifted [its] pricing strategy with merchants and started increasing [its] prices to more closely match those of Visa and MasterCard."[552]  Therefore, if Visa and Mastercard were to lower their interchange rates, it follows that Amex and Discover would also lower its merchant discount rates.  Likewise, if Amex were to lower its rates as a result of increased

---

2022-2023 U.S. Region Interchange Programs and Rates," April 22, 2022 (hereafter "Mastercard April 2022 Interchange Rates").  See, also, Jeffrey C. Arnier, Jr., "Encouraging Surcharge: Toward a Market-Driven Solution to Supracompetitive Credit Card Interchange Fees, *Texas Law Review*, Vol. 99, No. 3, 2021 (hereafter "Arnier") at p. 631; GAO Report at p. 36.  Amex determines its merchant discount rates using similar tiers based on industry segment and charge volume (and, beginning in 2018, by card product).  See Amex's Interrogatory Responses at p. 6; Ouellette 30(b)(6) Deposition at 19:22-20:13, 30:17-23.

[550] Common evidence I have reviewed indicates that the custom interchange rates that some of the largest retailers in the U.S. are sometimes able to negotiate with Visa or Mastercard are generally negotiated as a reduction in the "standard interchange fees" that are published by Visa and Mastercard.  See, for example, Arnier at p. 631.  Thus, reductions in these standard interchange rates that Visa and Mastercard charge as a result of the increased competition would likely also flow to Qualified Merchants who possess the leverage to negotiate custom interchange rates with these networks.

[551] Amex's Interrogatory Responses at p. 7.  See, also, Ouellette 30(b)(6) Deposition at 45:12-46:2.

[552] 2014 Amex Trial Transcript at 853:23-854:3.  Mr. Hochschild added: "To the extent that offering a lower price was not going to give us any business benefits, it was leaving money on the table.  It wasn't the right answer for us as a company.  It wasn't the right answer for our shareholders.  We should be - - we needed to be competitively priced.  Because, again, giving the retailers a discount without getting anything in return didn't make business sense."  See 2014 Amex Trial Transcript at 854:7-15.  Mr. Hochschild estimated these price increases began around 2000 or 2001.  See 2014 Amex Trial Transcript at 854:4-6.

149

competition absent Amex's Anti-Steering Rules, then Visa, Mastercard, and Discover would be expected to similarly lower their rates to maintain the structure of prices.[553]

250.    Once I have established that GPCC payment networks would lower interchange fees due to the increased competition between the networks, contrary to Dr. Gaier's assertions, it is not necessary for me to separately analyze the behavior of acquiring banks.  As I explained earlier in this Expert Reply Report and in the Lamb Report, large merchants such as the Qualified Merchants typically use (unbundled) interchange plus contracts in which any changes in interchange and/or merchant discount rates are directly passed through to the merchant.[554]  However, Dr. Gaier improperly relies on a study finding that acquiring banks retained the majority of decreased interchange fees associated with the Durbin amendment for "small and medium merchants."[555]  Critically, none of the Qualified Merchants can be categorized as small- or medium-sized merchants, and therefore, Dr. Gaier's reliance on this flawed and unreliable study has no bearing on the question of class-wide injury. In addition, Dr. Gaier argues that the mechanism for lower interchange fees in his chain of causation would be the merchants' ability to credibly threaten to steer absent a reduction in interchange fees.[556]  However, it would not make any sense for a Qualifying Merchant to undergo the exercise of

---

[553] As I noted elsewhere in this Expert Reply Report, in the actual world, Amex's overall blended merchant discount rate experienced a slight decline over time while the overall blended rates for Visa, Mastercard, and Discover increased over time.  However, as I noted, Amex's declining rates were driven by shifts in industry mix in cardholder spending, and not competition with its rival GPCC payment networks.  See 2014 Amex Trial Testimony at 2650:23-2653:1.  In fact, beginning in 2005, Amex embarked on a pricing initiative called value recapture explicitly to address its shrinking price premium over Visa and Mastercard. See 2014 Amex Trial PX1240 at AMEXNDR19210100; 2014 Amex Trial PX0051 at AMEXNDR10546677; 2014 Amex Trial PX0121 at AMEXNDR11964459; 2014 Amex Trial Transcript at 708:9-710:3.  However, even with these price initiatives, Amex was unable to overcome the impact of industry mix.  See, for example, 2014 Amex Trial PX1753A at AMEXNDR12459029.  However, as I explained earlier, in a world absent Amex's Anti-Steering Rules, GPCC payment networks would compete more vigorously on the merchant side of the market, and thus, in this new, more competitive equilibrium, Amex would lower its prices in response to price reductions from its rival GPCC payment networks.
[554] Lamb Report at ¶45.  Earlier in this Expert Reply Report I discuss how instances where smaller merchants on bundled contracts with merchant acquirers did not immediately get their cost savings passed through to them would be short-lived due to the intense level of competition among merchant acquiring banks.
[555] Gaier Report at ¶29; Lamb Deposition Exhibit 4.  I discuss the flaws and unreliability of this study relied upon by Dr. Gaier and Dr. Emch in greater detail earlier in this Expert Reply Report.
[556] Gaier Report at ¶20.

negotiating lower interchange fees if the aquiring bank would be able to capture those lower interchange fees without passing the lower fees onto the merchant.

251.    Dr. Gaier is also incorrect in his claim that it would be necessary to conduct an individualized inquiry to determine if the merchant would actually save money from the lower merchant discount fees or whether such lower merchant discount fees would be offset by losing customers that were unhappy about the merchant's steering efforts.[557] As I explained earlier in this Expert Reply Report and at my deposition, the amount of surcharging in the but-for world would be very limited.  Furthermore, earlier in this Expert Report I discussed the many flaws in Dr. Emch's speculative analysis of walk-away rates, upon which Dr. Gaier bases his assertions in this regard.[558] Futhermore, no profit maximizing merchant would surcharge in a manner that would be self-defeating as Dr. Gaier implies.[559] Therefore, it would not be necessary or apporpriate to offset any of the reduction in merchant discount based on these speculative lost customers.

252.    After the four steps in Dr. Gaier's "chain of causation" related to lower merchant acceptance costs, Dr. Gaier adds three more steps that he claims are necessary to analyze using individualized inquiry to establish class-wide impact. These include: (5) that the merchants must pass through the reduced merchant acceptance costs to consumers; (6) these lower retail prices must not be offset by the costs to consumers of merchant steering; and (7) the benefits to consumers cannot be offset by lower rewards or higher annual fees.[560]

253.    Contrary to Dr. Gaier's claims of merchant pass-through, I discussed extensive common evidence in the Lamb Report demonstrating that Qualified Merchants, all of whom earn low margins and operate in "highly competitive" industries, would have passed along at least some portion of the reduced overall costs of GPCC acceptance to consumers in the form of lower retail prices.[561] I discuss this common evidence in

---

[557] Gaier Report at ¶¶30-31.
[558] Gaier Report at ¶¶30-31.
[559] Notably, in a 2007 presentation, Amex found that it "is rational for a merchant to differentially surcharge," adding that "[c]ardmembers either pay surcharge or switch payment products.  They do not leave establishments."  See AMEX-DOJ-10133629-638 at 631.  See, also, AMEX-CP-000007335-378 at 348.
[560] Gaier Report at ¶¶18, 32-35.
[561] Lamb Report at ¶¶295-325.

greater detail in the next section below as it pertains to other of Dr. Gaier's criticisms of my analysis of pass-through related to my opinions and conclusions regarding class-wide injury and damages.

254.    I also discuss in greater detail later in this Expert Reply Report the numerous flaws in Dr. Gaier's assertions regarding the supposed "obvious harms" associated with merchant steering, and why none of his assertions in this regard undermine the opinions and conclusions I reached in the Lamb Report regarding class-wide impact. Further, earlier in this Expert Reply Report and in the Lamb Report, I discussed extensive common evidence demonstrating that GPCC issuers would not have increased Annual Fees Net of Rewards paid by consumers (including all or nearly all members of the Credit Card Class) in a world absent Amex's Anti-Steering Rules.[562]   In light of this extensive common evidence, none of Dr. Gaier's specious claims regarding this latter portion of his "chain of causation" undermine my opinions and conclusions that all or nearly all members of the Credit Card Class and Debit Card Class[563] were injured as a result of Amex's continued imposition and enforcement of its Anti-Steering Rules.

## ii.    Dr. Gaier's Claims Regarding Uniformity Throughout His Chain of Causation Lack Merit

255.    As part of his claim that one must establish a "long chain of causation" in order to establish antitrust injury on a class-wide basis, Dr. Gaier asserts that many of the steps in his "chain of causation" cannot be established "uniformly" or on a "common basis" and, thus, my conclusion regarding "class-wide antitrust injury is invalid."[564]  In particular, Dr. Gaier claims that "[c]redit card networks would not reduce merchant fees uniformly,"[565]  "[m]erchants would not realize savings uniformly"[566] and "[m]erchants would not pass-through cost savings to consumers uniformly."[567]  In making these

---

[562] Lamb Report at ¶¶270-290.
[563] I have noted that steps (6) and (7) of Dr. Gaier's "chain of causation" do not apply to the question of injury suffered by members of the Debit Card Class on their Debit Card Transactions.
[564] Gaier Report at ¶¶18-32.
[565] Gaier Report at ¶¶26-27.
[566] Gaier Report at ¶¶30-31.
[567] Gaier Report at ¶32.

assertions, Dr. Gaier is suggesting that "uniformity" is somehow a requirement for demonstrating common injury.

256. Contrary to Dr. Gaier's assertions, it is not necessary for the magnitude of the reductions in GPCC acceptance costs to be uniform across Qualified Merchants for there to be common injury to members of the Credit Card Class or Debit Card Class. I understand from Counsel for the Plaintiffs that the legal standard for the establishment of class-wide antitrust injury considers if all or nearly all members of the class paid an overcharge in the actual world on at least one transaction as a result of anticompetitive conduct. It is not my understanding that the magnitude of injury needs to be uniform across class members in order to establish class-wide injury, as Dr. Gaier seems to suggest. Therefore, even if the magnitude of the reduction in GPCC acceptance costs varied across Qualified Merchants, it would not hinder the finding that all or nearly all member of the Credit Card Class and Debit Card Class suffered antitrust injury as a result of Amex's continued imposition and enforcement of its Anti-Steering Rules.

257. Dr. Gaier ███████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████ as evidence that reductions in the but-for world would not be uniform.[568] But Dr. Gaier is ignoring that the circumstances ██████████████████████████████

█████████████████████████ would exist in both the but-for world as well as in the actual world. However, in addition to the circumstances ████████████████████████████

█████████████████████████ in the actual world, those Qualified merchants would have gained *additional* leverage absent Amex's Anti-Steering Rules ██████████████████

██████████████ of GPCC acceptance that are not reflected in those merchants' actual world ██████████████ Therefore, in the but-for world, █████████████ would be lower than they are in the actual world.

258. Likewise, Dr. Gaier is wrong to suggest that pass through of lower overall costs of GPCC acceptance by merchants in the form of lower retail prices needs to be uniform for there to be common injury.[569] I discuss the flaws in Dr. Gaier's broader claims regarding

---

[568] Gaier Report at ¶26.
[569] Gaier Report at ¶32.

merchant pass-through later in this Expert Reply Report.  However, I note here that as long as the Qualified Merchants passed through at least *some* portion of their lower GPCC acceptance costs in the form of lower retail prices, then all or nearly all members of the classes would have paid lower retail prices in the but-for world compared to what they are paying in the actual world.[570]  In an attempt to support his claim, Dr. Gaier points to language in the Lamb Report that the theoretical magnitude of pass-through could range from zero to 100 percent.[571]  But Dr. Gaier ignores the rest of the discussion in that paragraph of the Lamb Report where I explain that the circumstance where pass through would be zero (i.e., perfectly elastic demand) is "not likely to be encountered in any real market" and "in a multiple-level chain of distribution, *passing on monopoly overcharges is not the exception: it is the rule.*"[572]  Dr. Gaier also ignores the extensive common evidence in the Lamb Report demonstrating that Qualified Merchants would pass through lower overall costs of GPCC acceptance in the form of lower retail prices.[573]  However, I have noted that Dr. Gaier does not offer any opinion or reach any conclusion in his report that Qualified Merchants would not have passed any amount of their GPCC acceptance cost savings onto consumers in the form of lower retail prices.[574]

### B.  Dr. Gaier's Assertions Regarding the "Obvious Harms" of Merchant Steering are Fundamentally-Flawed, Meritless, and Have No Bearing on the Establishment of Class-Wide Injury

259.    As I noted above, in undertaking my analysis of class-wide injury in the Lamb Report, I first established, using economic theory and evidence common to the Classes, that Amex's continued imposition and enforcement of its Anti-Steering Rules caused Qualified Merchants to incur higher overall GPCC acceptance costs (merchant discount fees) during the Class Periods than they otherwise would have, and that Qualified Merchants passed at least some portion of the artificially-inflated GPCC acceptance costs that resulted from Amex's continued imposition and enforcement of its Anti-Steering Rules in the form of higher retail prices (and that absent Amex's Anti-Steering Rules,

---

[570] Lamb Report at ¶293.
[571] Gaier Report at ¶32.
[572] Lamb Report at ¶297 (emphasis in original).
[573] Lamb Report at ¶¶293-328.
[574] Gaier Report at ¶¶32, 119-131.

Qualified Merchants would have passed on at least some portion of their cost savings to their customers).

260.    In his report, Dr. Gaier conducts no analysis nor offers an opinion that, absent Amex's Anti-Steering Rules, Qualified Merchants would not have utilized pro-competitive steering methods to lower their overall GPCC acceptance costs (other than to claim that merchants generally would not done do on "any common basis," or realized savings "uniformly," which I address above).  He also conducts no analysis nor offers an opinion that Qualified Merchants did not pass through at least some portion of the artificially-inflated GPCC acceptance costs that resulted from Amex's continued imposition and enforcement of its Anti-Steering Rules in the form of higher retail prices (and that absent Amex's Anti-Steering Rules, Qualified Merchants would have passed on at least some portion of their cost savings to their customers).[575]

261.    Instead, Dr. Gaier focuses his criticisms on a parsing of the specific types of steering merchants would engage in in the but-for world, adding that this "distinction is critical because surcharging and merchant steering harm consumers and counteract any potential benefits from purported lower retail prices."[576]  Dr. Gaier's assertions in this regard are irrelevant and incorrect for a number of reasons.  First of all, as I explained above and at my deposition, as a matter of economics, it is not necessary to study the different mechanisms merchants would use in a world absent Amex's Anti-Steering Rules to lower their overall costs of GPCC acceptance, resulting in a new, more competitive equilibrium in the market for GPCC Transactions.[577]  What's important for such an analysis is what determines prices in equilibrium, not an enumeration of the strategies available to achieve equilibrium.

262.    Furthermore, the vast majority of Dr. Gaier's assertions in this regard focus on hypothetical actions merchants (not necessarily Qualified Merchants) may or may not take in a world absent Amex's Anti-Steering Rules, or hypothetical GPCC transactions involving one form of steering or another, as well as supposed "obvious harms" to

---

[575] I discuss Dr. Gaier's assertions regarding uniform pass-through of these cost savings later in this Expert Reply Report.
[576] Gaier Report at ¶¶14, 37-74.
[577] Lamb Deposition at 143:17-145:24.

consumers that could occur in such transactions. I address these supposed "obvious harms" in more detail below. However, I note here that, even if one were to accept that the "obvious harms" Dr. Gaier raises did, in fact, "counteract any potential benefits from purported lower retail prices," that still does not address the critical question of whether all or nearly all members of the Credit Card Class or Debit Card Class were injured as a result of Amex's alleged misconduct. Put another way, even if Dr. Gaier were to demonstrate that a given class member would have been made worse off in the but-for world for a given transaction at a given merchant (which he does not), that still does not address whether or not that class member was injured on any of his or her other relevant GPCC Transactions (Credit Card Class) or Debit Transactions (Debit Card Class) during the Class Periods, thus causing that class member to be injured as a result of Amex's alleged misconduct.

263. Notably, members of the Credit Card Class and Debit Card Class were card account holders whose card account was used to purchase a good or service from a Qualified Merchant during the Class Periods in this matter.[578] However, Dr. Gaier's broad assertions regarding hypothetical merchant behavior or hypothetical GPCC Transactions generally do not address GPCC Transactions at Qualified Merchants specifically.[579] Contrary to Dr. Gaier, my analysis of class-wide impact focuses largely on GPCC Transactions that took place at Qualified Merchants. And in the Lamb Report, I presented common evidence demonstrating that Amex's continued imposition and enforcement of its Anti-Steering Rules caused Qualified Merchants to incur higher overall GPCC acceptance costs (merchant discount fees) during the Class Periods than they otherwise would have, and that Qualified Merchants passed at least some portion of the artificially-inflated GPCC acceptance costs that resulted from Amex's continued imposition and enforcement of its Anti-Steering Rules in the form of higher retail prices (and that absent Amex's Anti-Steering Rules, Qualified Merchants would have passed on at least some portion of their cost savings to their customers). Dr. Gaier's failure to

---

[578] Lamb Report at ¶5.
[579] I address Dr. Gaier's misguided assertions regarding Qualified Merchants with co-brand cards in extensive detail later in this Expert Reply Report.

properly analyze the question of class-wide injury render his criticisms and assertions in this regard irrelevant.

264.     In addition to the the flaws in Dr. Gaier's analysis of class-wide impact discussed above, I have noted that many of the supposed "obvious harms" Dr. Gaier discusses with regards to hypothetical merchant steering behavior or hypothetical GPCC Transactions are also discussed in Dr. Bernheim's or Dr. Emch's reports, and are therefore addressed in detail earlier in this Expert Reply Report.  However, in the rest of this section below, I summarize Dr. Gaier's claims in this regard briefly here as it pertains to his assertions regarding class-wide injury.

### i.     Dr. Gaier's Claims Regarding the "Obvious Harms" of Surcharging are Misguided and Incorrect

265.     Similar to Dr. Bernheim and Dr. Emch, Dr. Gaier criticizes my opinion that surcharging in a world absent Amex's Anti-Steering Rules would be very limited.[580]  I addressed Defendants' Economists' flawed claims in this regard in detail earlier in this Expert Reply Report, and thus, do not repeat them here.  Dr. Gaier continues to assert that my analysis "ignores obvious harms" associated with merchant surcharging, stating that "[a]ny putative class member who would pay a surcharge is almost certainly worse off because the magnitude of the surcharge would likely exceed any asserted savings from lower retail prices."[581]  However, in making these speculative and hypothetical claims, Dr. Gaier conducts no analysis regarding the extent to which members of the Credit Card Class, if any, would have been uninjured as a result of such surcharging in the but-for world.

266.     Furthermore, Dr. Gaier's assertions about the "obvious harms" of merchant surcharing (to the extent there would be any) fails to consider any offsetting benefits a given GPCC payment network might offer a cardholder to incentivize them not to switch payment methods when faced with a surcharge by a merchant.  However, common evidence I have reviewed demonstrates that one response to merchant surcharging Amex considered in response to the threat to increase cardholder rewards in order to incentivize

---

[580] Gaier Report at ¶¶37-51.
[581] Gaier Report at ¶¶52-53.

cardholder to continue using Amex GPCCs.[582]  However, Dr. Gaier's speculative hypothetical analysis only considers potential cost increases to cardholders that could result from such merchant surcharging.

267.     Lastly, as I noted in the Lamb Report, the 38 Qualified Merchants in this matter are among the largest retailers in the U.S.[583]  Thus, further reducing the likelihood of uninjured class-members due to "obvious harms" caused by surcharging in the but-for world is the fact that Amex's stated strategy ███████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████████. .[584]  Consistent with this strategy, ████████████████████████████████████ ███████████████████████████████ ████████████████████████████████████████ ████████.[585]  For example, ██████████████████████████ ███████████████████████████████████████████ ████████████████████████.

[582] See, for example, 2014 Amex Trial PX0090 at AMEXNDR12537473; 2014 Amex Trial PX1176 at AMEXNDR18367385.  At the 2014 Amex Trial, Jack Funda, then Amex Senior Vice President for Global Merchant Pricing at Amex, was asked about Amex's proposed strategy to increase cardholder rewards in response to the Durbin Amendment relate to the potential outcome of the trial (i.e., the potential that Amex could no longer enforce its Anti-Steering Rules): "Q. So one possible action in the face of merchants steering from one network brand to another would be to provide cardholders with more benefits to make them resistant to that type of steering, correct?  A. That would be one strategy clearly, yes.  Q. And that's a strategy that American Express might undertake if the United States prevails in this case and the nondiscrimination rules are eliminated, correct?  A. Well, we today invest billions of dollars in improving the value proposition to our cardmembers. So could we improve it further? Absolutely. We work on it hard every day. This would force, right, us to potentially increase benefits at a huge cost to the company just to be able to fight against what we would argue is essentially free riding on the network and steering people at the point of sale."  See 2014 Amex Trial Transcript at 2748:3-17.

[583] Lamb Report at ¶361.

[584] Lamb Report at ¶¶255-261.  For example, in a June 2007 update presentation on its response to the RBA reforms, Amex noted that between 2003 and 2006, it had "successfully executed [its] core strategy: minimize effect of surcharging on billings and aggressively leverage opportunities."[584]  In this same presentation, Amex updated its "Strategic Challenges" for Australia from "2007 onwards" in the following way: "Our original strategy focused on securing the top accounts in the marketplace to set a marketplace standard of no surcharge.  New threats have evolved in the marketplace from small/medium merchants. […] Bedding down 'no surcharge' contracts with key merchants was costly, bringing many key accounts to the point of being virtually non-profitable."  See AMEX-DOJ-10070929-953 at 935.  Amex noted specifically, that in successfully executing this core strategy, it "[s]ecure[d its] top 50 accounts." See AMEX-DOJ-10070929-953 at 934.

[585] AMEX-CP-000094343 at Slide 2.

████████████████."[586]  Thus, even if one were to accept that there would be a significant amount of merchant surcharging absent Amex's Anti-Steering Rules (which I do not), Amex's stated strategy ████████████████████████████. This further undermines the speculative and hypothetical claims made by Dr. Gaier regarding a lack of class-wide injury due to the "obvious harms" of merchant surcharging.

268.    One form of surcharging with "obvious harms" to consumers that Dr. Gaier claims I ignore is parity surcharging, which Amex defines as "[s]urcharging that is applied equally across all Credit products."[587]  However, like differential surcharging, the existence of parity surcharging in a world absent Amex's Anti-Steering Rules would also be very limited.  Like Dr. Emch, Dr. Gaier claims as support for his assertion that ████ ████████████████████████████████████████████████

████[588]  However, as I explained earlier in this Expert Reply Report, ████████████ ████████████████████████████████████████ ██████████████████████████████.[589]  Further, the strategies Amex ████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████.[590]

269.    Dr. Gaier also claims as support for his assertion regarding parity surcharging that ████████████████████████████████████████

---

[586] AMEX-CP-000094343 at Slide 14.
[587] AMEX-CP-000094461-492 at 464, 472.
[588] Gaier Report at ¶59.
[589] AMEX-CP-000094461-492.
[590] As Amex reported in an August 2007 presentation summarizing what it had learned 3.5 years after the RBA reforms in Australia: there had been "[n]o material impacts witnessed for Amex from cases of parity surcharge," "[h]owever Differential Surcharge is an extremely damaging Brand experience."  See AMEX-DOJ-10133629-638 at 631.  As Antonio Gagliardi of Amex explained at deposition, compliant surcharging is "better than parity and certainly much better than differential because all modes of payment get surcharged the same," later adding that "parity surcharging or differential surcharging, even worse, is not something we like."  See Gagliardi 30(b)(6) Deposition at 90:6-15, 143:3-19.

███████████████████████████████████

████████████████████████ "[591]   However, Dr. Emch himself contradicted Dr. Gaier's assertion in this regard when he states that while ███████████████████

██████████████████████████████████████

███████████████████████████████████

██████████████████████████ [592] ████████████████████

████████████████████████████████████

███████████████████████████████████████

██████ [593]   Thus, it's unclear why Dr. Gaier believes that parity surcharging is such a threat in the U.S. absent Amex's Anti-Steering Rules that one must consider the "obvious harms" of parity surcharging ████████████████████████████████████ ███████████████████████████████████ . [594]

270.     In sum, none of Dr. Gaier's claims regarding the supposed "obvious harms" of merchant surcharging have caused me to change the conclusions I reached in the Lamb Report regarding antitrust injury to all or nearly all members of the Credit Card Class.  In the next section I discuss the flaws in Dr. Gaier's claims regarding the "obvious flaws" associated with other forms of merchant steering merchants (including Qualified Merchants) might use in the but-for world to reduce their overall costs of GPCC acceptance.

### ii.   Dr. Gaier's Claims Regarding the "Obvious Harms" of Other Forms of Merchant Steering are Flawed and Meritless

271.     In his report, Dr. Gaier also discusses a number of other "obvious harms" that he claims would likely exceed asserted savings from lower retail prices in an effort to criticize my conclusions regarding class-wide injury. [595]   He asserts that, generally

---

[591] Gaier Report at ¶59.
[592] Emch Report at ¶¶209-210.
[593] Emch Report at ¶210.
[594] It is also unclear why, if there are such "obvious harms" associated with parity surcharging such that Amex's Anti-Steering Rules are necessary in order to prevent surcharging from occurring as Amex claims,
████████████████████████████████████
██████████
[595] Gaier Report at ¶¶52-74.

speaking, class-members "who would be steered to use an alternative payment method […] are also harmed because steering induces them to use a less preferred payment."[596] Before I discuss the numerous flaws in Dr. Gaier's claim, I note here that his analysis in this regard reflects a fundamental misunderstanding of the appropriate assessment of class-wide injury, thus rendering his opinions in this regard irrelevant. As I discuss above, I understand from Counsel for the Plaintiffs that in order to assess class-wide injury as part of an antitrust inquiry, it is appropriate to consider the prices paid by members of the class in the actual world against the prices those class members would have paid on the exact same transaction in a world absent the alleged misconduct (an overcharge). In the context of the market for GPCC Transactison, that would entail comparing the prices (net of the cardholder fee) paid by members of the Credit Card Class on relevant transactions using a given GPCC to the prices (net of the cardholder fee) paid by those class members on those same relevant transactions using the same GPCC as they did in the actual world. Contrary to Dr. Gaier's irrelevant analysis of hypothetical steering, my analysis of class-wide injury contained in the Lamb Report focuses on the appropriate measure of class-wide injury.

272.    However, setting aside this overarching flaw in Dr. Gaier's analysis of class-wide injury, I discuss below the additional flaws in his assertions regarding the "obvious harms" from merchant steering. For instance, as he did with his assertions regarding merchant surcharging, even if one were to accept that a given class member were made worse off by switching away from its "preferred card," causing that class member to have to pay a higher net cardholder fee that could exceed the cost savings from lower retail prices, that still has no bearing on whether or not that class member was injured on any of its other Qualified GPCC Transactions, thus causing that particular class member to be injured as a result of Amex's alleged misconduct. Dr. Gaier does not appear to consider this likelihood when discussing the "obvious harms" of the additional forms of merchant steering he discusses in criticizing my analysis of class-wide impact.

273.    An additional flaw in Dr. Gaier's assertions regarding the "obvious harms" of merchant steering is that he simply assumes that a consumer being steered away from

---

[596] Gaier Report at ¶54.

their "preferred card" makes them worse off without any analysis or evidence to support his claims.[597]   However, Nina Biornstad of Mastercard explained how "point of sale steering or offering financial incentives" provides benefits to consumers: "It adds value to the consumer so adding value will mean either discounting the price that a consumer pays or adding value to the consumer.  And value can be something incremental; so an additional night's stay, additional points in a loyalty program for when they use their Mastercard."[598]   Therefore, whether or not a given GPCC was the "preferred card" of a given class member when they walked through the door at a given Qualified Merchant does not mean that, after being presented with an offer to switch to a less-expensive GPCC (or alternative form of payment), that the initial "preferred card" would remain preferred choice of payment at the point of sale, since the incentive to switch to a different card would likely outweigh any forfeit in rewards or other benefit from eschewing their initial "preferred card."[599]   However, Dr. Gaier does not appear to consider any such added benefit to class members that could come from being steered by merchants in this way.[600]

---

[597] Dr. Gaier's support for these flawed claims mostly consists of statements from named Plaintiffs describing what drives their preference for their card of choice. See Gaier Report at ¶¶54-55. See, also, Bernheim Report at ¶¶117-120.

[598] 2014 Amex Trial Transcript at 3238:21-3239:5.

[599] Common evidence I have reviewed demonstrates that many consumers carry multiple GPCCs in their wallets with differing rewards structures in order to maximize their rewards benefits across different types of GPCC Transactions.  For example, according to one 2018 study: "On average, people carried 2.35 credit cards in their wallets (14% held seven or more cards) but generally only used one on a regular basis.  Thus, issuers strove to make their cards the preferred choice, of 'top of wallet.'" See Santana et al. at p. 2.  Thus, in these instances, a consumer switching away from their initial "preferred card" may very well result in a very insigificant (if any) loss in benefit from paying with an alternative GPCC.  Thus, the incentive offered by merchants to induce such such consumers to switch to a less-expensive GPCC may not need to be significant to overcome any loss of benefit from doing so.  Further, to the extent that class members are multi-homers with more than one GPCC that confers the same level of rewards at a given merchant, then such class members would likely consider switching their choice of payment card without being incentivized to do so.

[600] Dr. Gaier discusses a number of other forms of merchant steering in his discussion of "obvious harms" associated with such steering.  For example, Dr. Gaier claims I don't provide "any specificity" regarding how preference campaigns, and, relatedly, steering-based agreements, could be used by some merchants to lower their overall costs of GPCC acceptance in a world absent Amex's Anti-Steering Rules.  See Gaier Report at ¶¶63-65, 67.  However, in the Lamb Report, I discussed extensive common evidence of Amex using its Anti-Steering Rules to thwart such agreements between merchants and GPCC payment networks, and how, absent Amex's Anti-Steering Rules, merchants would pursue such agreements in order to lower their overall GPCC acceptance costs.  See, for example, Lamb Report at ¶¶191-204.  Dr. Gaier also claims that I do "not acknowledge that many merchants do not sufficiently understand their costs of acceptance to post accurate information" about their costs of GPCC acceptance." Gaier Report at ¶66.  However, in the

274.     Furthermore, as I explained earlier in this Expert Reply Report, nothing about consumer's choice of payment instrument would fundamentally change. Consumers will continue to choose the payment instrument that maximizes their utility in each purchase situation, and given the information and environment prevailing in that situation. Dr. Gaier (as well as Dr. Bernheim) err in assuming that the choice of payment instrument is a once-and-for-all decision that does not vary with the purchase situation—an assumption that is directly contradicted by the empirical literature they cite. Therefore, in the event that an attempt by a merchant to steer a given class member would cause that class member to be worse off, it is unlikely that that class member would be willing to switch to the choice of payment that made them worse off, contrary to Dr. Gaier's assertions.

275.     In sum, none of Dr. Gaier's claims regarding the supposed "obvious harms" of other forms of merchant steering have caused me to change the conclusions I reached in the Lamb Report regarding antitrust injury suffered by all or nearly all members of the Credit Card Class.

### C. Dr. Gaier's Assertions Regarding the Impact of Co-Brand are Fatally-Flawed

276.     In his report, Dr. Gaier further criticizes my analysis of class-wide injury for "fail[ing] to consider the impact of cobrand credit cards offered by many Qualifying Merchants."[601] He claims further that "their prevalence among Qualifying Merchants invalidates his assertion of class-wide antitrust injury."[602] As I explain in detail below, Dr. Gaier's assertions in this regard reflects an astonishing lack of understanding of how co-brand cards work, as well as the nature of competition in the but-for world.

---

Lamb Report, I discussed common evidence demonstrating that Amex used its Anti-Steering Rules to prevent merchants from doing just that. See Lamb Report at ¶¶205-208. As I explained above, it isn't necessary to demonstrate that all, or most, merchants would have posted their costs of GPCC acceptance absent Amex's Anti-Steering Rules in order to establish class-wide injury resulting from Amex's alleged misconduct, as Dr. Gaier asserts. Dr. Gaier makes a similar claim regarding possible merchant discounting practices by merchants in the but-for world, claiming that I offer "no opinion or analysis about what specific discounting practices merchants would undertake." See Gaier Report at ¶74. However, as with posting costs of GPCC acceptance and steering-based agreements such as preference campaigns, it is not necessary to show that all merchants would utilize these specific pro-competitive steering methods to lower their overall costs of GPCC acceptance in order to establish class-wide injury.
[601] Gaier Report at ¶¶81-90.
[602] Gaier Report at ¶82.

277. Dr. Gaier ███████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████████
█████████████████████████████████ ”[603]

278. While Dr. Gaier claims ███████████████████████████
█████████████████████████████.[604] He notes that ████████ and ████████
████ pay low interchange rates for these co-brand cards.[605]

279. Regarding ████████, Dr. Gaier cites selected portions of ███████████████
████████████████████████████████████████████
██████████████████████████████ ' and from this, concludes: " ████████ is
effectively *already operating in Dr. Lamb's but-for scenario*, ███████████████
████████████████████████████████████████████
███████████████████████ ."[606,607] However, despite Dr. Gaier's claims
in this regard, I have noted that, █████████████████████████████████████
████████████████████████████████████████████
███████████████████████████.

280. For example, ██████████████████████████████, like all Amex
Card Acceptance Agreements, ██████████████████████████████████

---

[603] Gaier Report at ¶¶82-88.
[604] Gaier Report at ¶¶81-85.
[605] Gaier Report at ¶¶83-85.
[606] Gaier Report at ¶¶82-83 (emphasis added). The provisions Dr. Gaier cites are as follows:
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████████████ ' Gaier
Report at ¶82 (emphasis in original); AMEX-CP-000094186-4271 at 4232.
[607] Dr. Gaier may have changed his mind about this at his deposition and softened his stance: "I think that language is not very good, to be honest. What I mean is that ████████ is, to some extent, already operating in Dr. Lamb's but-for scenario." See Deposition of Dr. Eric Gaier, March 2, 2023 (hereafter "Gaier Deposition") at 39:7-40:21.

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.[608] ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

281.    In a world absent Amex's Anti-Steering Rules, ▓▓▓▓▓ would be free to utilize any of these steering methods to further reduce its costs of overall GPCC acceptance, contrary to Dr. Gaier's claim that "▓▓▓▓▓ is effectively already operating in Dr. Lamb's but-for scenario" because it has a co-branded card.  For instance, even though Walmart has negotiated low interchange rates for Mastercard GPCC Transactions, under its current agreement with Amex, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

282.    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓.[609]  Another provision omitted by Dr. Gaier states:

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓

▓▓▓▓ [610]

---

[608] AMEX-CP-000094186-4271 at 4232.
[609] AMEX-CP-000094186-4271 at 4232. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓. See AMEX-CP-000094186-4271 at 4232.
[610] AMEX-CP-000094186-4271 at 4232-4233.

283. ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████ , Dr. Gaier

attempts to defend his indefensible stance that ████████ would not be better off absent

Amex's Anti-Steering rules by claiming, with no evidence to support such a claim, that,

████████████████████████████████████████████

███████████████████████████████████████."[611] Dr.

Gaier's assertion is fundamentally-flawed and illogical, as it assumes that ███████████

████████████████████████████████████████. It

further assumes that █████████████████████████████████████████████

██████████████████████████[612]██████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████

████████.[613] However, by Dr. Gaier's logic, if ████████████████

████████████████████████████████████████████

██████████████████████████████████████

284.    The other merchant with a co-brand card ██████████████████████

██████████████████████████.[614] However, despite Dr.

Gaier's characterization, █████████████████████████████████████████

██████████████████████████████████████. For

---

[611] Gaier Deposition at 40:22-41:18.
[612] ████████ SEC Form 10-K for the fiscal year ended January 31, 2019 at p. 31.  Another Diversified Retailer, Academy Sports, stated in its 2021 10-K that the "market for sporting and outdoor recreation goods is highly fragmented and intensely competitive."  See 2021 Academy Sports 10-K at pp. 9, 26. Similarly, Diversified Retailer Big Lots noted in its 2018 10-K that it competes in the "highly competitive discount retail industry."  See 2018 Big Lots 10-K at pp. 4, 7.  Also in 2018, Diversified Retailer Bed Bath & Beyond stated that it "operates in a highly competitive business environment."  See 2018 Bed Bath & Beyond 10-K at pp. 7-8.  See, also, 2019 BJ's Wholesale Club 10-K at p. 13.
[613] For example, I have noted that, while Walmart pays low interchange rates on GPCC Transactions from its co-brand partner Mastercard, Dr. Gaier calculated that it paid an average interchange rate of 1.60 percent on Visa GPCC Transactions every year during the Class Periods.  See Gaier Report at Appendix E.
[614] Gaier Report at ¶¶84-85.

example,

285.    To illustrate the fundamental flaw in Dr. Gaier's speculation that Qualified Merchants with co-brand cards may not have anything to gain by the removal of Amex's Anti-Steering Rules, Diedre O'Malley of Best Buy testified at the 2014 Amex Trial that Best Buy has asked American Express to allow Best Buy to express a preference for its private label card due to the fact that, in part, "from a financial standpoint, it is very beneficial for us to have our consumer use that card," only to have Amex reject those requests.[616]  Ms. O'Malley explained that Best Buy was able to obtain certain carve-outs in its merchant acceptance agreement with Amex that allowed it to promote the use of the Best Buy private label card to customers through offers of extended financing or additional loyalty points from Best Buy's loyalty program, though it is prohibited from expressing a "preference" for its own private label card.[617]  Ms. O'Malley testified that, through its limited ability to promote its private label card, Best Buy was successful in shifting transaction volume to its private label card, which lowered its overall cost of GPCC acceptance.[618]  As I noted above, Best Buy is also prohibited from expressing a preference for its co-brand card as well.

286.    I have noted that Dr. Gaier does not list any Amex Card Acceptance Agreements for Qualified Merchants with co-brand cards (as listed in Figure 18 of his report)[619] on his

---

[615] AMEX-CP-000094064-4111 at 4098.

[616] 2014 Amex Trial Transcript at 1541:11-23.

[617] 2014 Amex Trial Transcript at 1537:6-1540:4; 2014 Amex Trial PX0345 at AMEXNDR00018346-48.

[618] 2014 Amex Trial Transcript at 1538:23-1539:8. Glenda McNeal of Amex testified that, as part of a negotiation for a 2007 agreement between Amex and Target, Target was denied a request to express a "preference" for its own less-expensive private label card.  See 2014 Amex Trial Transcript at 5972:20-5973:22.  Ms. McNeal further testified that other merchants have "asked to be able to use the word 'preference' in negotiations" with Amex, but that Amex's "position has been consistent" that it does not allow merchants to express a preference for certain non-Amex GPCCs.  See 2014 Amex Trial Transcript at 5973:23-5974:20.

[619] Dr. Gaier added Academy Sports to his Figure 5 in the errata to his report.  See United States District Court Eastern District of New York, *Anthony Oliver, et al., Plaintiffs, v. American Express Company and American Express Travel Related Services Company, Inc., Defendants*, Errata to the Expert Report of Eric M. Gaier, Ph.D., No. 1:19-cv-00566-NGG-SJB, February 27, 2023 (hereafter "Gaier Errata Report").

list of "Materials relied on" ▮▮▮▮▮▮▮.[620]  At deposition, Dr. Gaier admitted that he did not look at any Amex Card Acceptance Agreements for the 17 Qualified Merchants with co-brand cards he listed in his Figure 18 ▮▮▮▮▮▮ ▮▮▮▮▮.[621]  Thus, it is not clear how Dr. Gaier reached the conclusions he reached regarding impact of co-brand cards offered by "many Qualified Merchants" (there are 17 such Qualified Merchants with co-brand cards listed on Figure 18 of his report) if he only reviewed ▮▮ of the Amex Card Acceptance Agreements associated with these 17 Qualified Merchants.

287.    Unlike Dr. Gaier, I have reviewed the Amex Card Acceptance Agreements associated with most of these Qualified Merchants that were produced by Amex and provided to me as part of this litigation. I did not review such agreements ▮▮▮▮▮.
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮.  A review of the remaining Amex Card Acceptance Agreements with Qualified Merchants listed on Figure 18 of Dr. Gaier's report that were provided to me ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[620] Gaier Report at Appendix B.

[621] Gaier Deposition at 28:24-29:21, 129:5-142:14.

[622] Letter from Rebecca J. Schindel to Todd Seaver, dated June 24, 2022 (hereafter "Schindel June 24 Letter") at footnote 2.

[623] See, for example, AMEX-CP-000069652-56, AMEX-CP-000069661-677, AMEX-CP-000069657-660, AMEX-CP-000069678-681, AMEX-CP-000094061-63, AMEX-CP-000094112-121 ▮▮▮▮▮▮ ▮▮▮▮; AMEX-CP-000094124-143, AMEX-CP-000072045-056 ▮▮▮▮; AMEX-CP-000083656-674, AMEX-CP-000093363-68 ▮▮▮▮; AMEX-CP-000076540-559, AMEX-CP-000076529-539 ▮▮▮▮▮; AMEX-CP-000076406-414, AMEX-CP-000076417-19, AMEX-CP-000076420-23, AMEX-CP-000076424-26, AMEX-CP-000076427-430, AMEX-CP-000076415-16, AMEX-DOJ-002577-580 ▮▮▮▮▮; AMEXNDR11106414-19 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮.[624]

288.    Furthermore, even though Qualified Merchants generally pay lower interchange rates on their co-brand cards, in a world absent Amex's Anti-Steering Rules, they would be afforded even greater leverage to negotiate even lower interchange rates on those cards given the greater levels of transaction volume Qualified Merchants could steer to those cards.  Relatedly, at the 2014 Amex Trial, when asked about "pricing issues that come up in the co-brand and corporate card context are connected in a real-world sense to the negotiations for discount rate on the acceptance side," then-Amex-CEO Ken Chenault explained how the two sides are "absolutely connected":

> The reality is I've been in a number of situations where my counterpart has said, I'm not talking about the discount rate alone, we have got to talk about the co-brand card, we've got to talk about the corporate card, I really look at this as all connected.  So these are not separate deals.  With many merchants, they, in fact, use these multiple relationships as leverage on the merchant discount rate.  And so, if you will, these are multilayered situations that we have to negotiate.[625]

Thus, this connection in the negotiations for co-brand cards and overall merchant discount rates described by Mr. Chenault further demonstrates how the greater levels of competition that would emerge absent Amex's Anti-Steering Rules could allow Qualified Merchants to negotiate even lower merchant discount rates on for their co-brand cards.

289.    The common evidence discussed above demonstrates that Dr. Gaier erroneously claims that "[s]everal Qualifying Merchants" are permitted by Amex to steer their customers to their co-brand cards such that they're already operating in the but-for world,

---

[624] AMEX-CP-000070053-066, AMEX-CP-000070067-078, AMEX-CP-000070042-050, AMEX-CP-000070051-52 ▮▮▮▮▮▮; AMEX-DOJ-001886-894, AMEX-CP-000073197-3214, AMEX-CP-000073215-16, AMEX-CP-000073217-220, AMEX-CP-000073221-22, AMEXNDR05158262-67 ▮▮ AMEX-CP-000074193-4202, AMEX-CP-000074190-92, AMEX-CP-000074182-89 ▮▮▮▮; AMEX-CP-000075907-936, AMEX-CP-000075937-948, AMEX-DOJ-002409-433 ▮▮ AMEX-CP-000075977-76009, AMEX-CP-000076010-15, AMEX-CP-000075962-976, AMEX-DOJ-002434-37 ▮▮

[625] 2014 Amex Trial Transcript at 4419:15-4420:11.  Mr. Chenault added: "But in this situation, I can tell you that in almost every deal that I have been involved in that  -- where there was a corporate card or a co-branded relationship, they were discussed in the context of the merchant agreement."  See 2014 Amex Trial Transcript at 4420:12-4421:4.

or as Dr. Gaier explains it, "the removal of Amex's NDPs likely would have little or no impact on such cobrand merchants."[626]  As discussed, even Qualified Merchants  Dr. Gaier seems unaware of the greater level of competition that would exist in the but-for world, even for Qualified Merchants who have co-brand cards.  Thus, none of his criticisms in this regard have caused me to change the conclusions I reached in the Lamb Report regarding class-wide injury.

**D. *Dr. Gaier's Assertions Regarding Cross-Subsidization are Wrong***

290.    In the Lamb Report, I discussed common evidence demonstrating that Amex's continued imposition and enforcement of its Anti-Steering Rules resulted in additional adverse effects borne by consumers in that all consumers, not just those paying with GPCCs (such as members of the Credit Card Class), paid for an Amex-accepting merchant's artificially-inflated average cost of GPCC acceptance in the form of higher retail prices.[627]  In his report  Dr. Gaier criticizes my conclusions in this regard, claiming that my "cross-subsidization theory contradicts [my] assertion of class-wide antitrust injury."[628]  Dr. Gaier is wrong.

---

[626] Gaier Report at ¶¶81-88.

[627] Lamb Report at ¶¶331-338.  As I explained, typically, the most expensive GPCCs to accept tend to be the ones that afford users of those cards the highest level of cardholder benefits.  Thus, due to the premium rewards (i.e., negative cardholder fees) they earned on higher-cost GPCCs (and because Amex's Anti-Steering Rules prohibit Amex-accepting merchants from differentially surcharging GPCCs based on the brand and product of the GPCC to recoup some or all of the costs associated with accepting those GPCCs), users of those higher-cost GPCCs pay a relatively lower portion of the merchant's average cost of accepting GPCCs, which constitute incremental benefits enjoyed by users of premium, higher-cost GPCCs.  However, users of these premium, higher-cost GPCCs obtain these incremental benefits at the expense of lower-cost GPCC users, who pay a relatively higher portion of the merchant's average cost of accepting GPCCs, as they earn below-average rates of cardholder rewards, or no rewards at all.  Each is an incremental loss for lower-cost card users.  Further, since merchants raise prices to *all* customers in order to cover their average costs of GPCC acceptance, all other customers who pay with other, less-expensive forms of payment such as Debit Cards, cash, and checks also experience an incremental loss in order to subsidize the premium rewards enjoyed by higher-cost GPCC users.  Thus, the differences in outcomes for higher- and lower-cost GPCC users (as well as users of Debit Cards, cash, and checks) constitutes a transfer from lower- or no-cost payers to higher-cost GPCC users that occurs when members of each group purchase similar bundles of goods at the same merchant.  See Lamb Report ¶¶332-333; Consumer Financial Protection Bureau, "The Consumer Credit Card Market", December 2015 at pp. 209-212.

[628] Gaier Report at ¶¶75-80.

291.    The basis of his flawed criticism is that, because other GPCC issuers like Visa and Mastercard offer premium GPCCs with high levels of rewards, some class members with these GPCCs "would lose the purported transfer they currently enjoy and therefore be worse off if Amex's NDPs were removed.  Contrary to Dr. Gaier's assertion in this regard, in a world absent Amex's Anti-Steering Rules, all consumers, not just those paying with GPCCs (such as members of the Credit Card Class) would be made better off because of the lower retail prices that would have prevailed in the but-for world.  As I explained in the Lamb Report and earlier in this Expert Reply Report, in the but-for world, GPCC issuers would not have raised the Annual Fees Net of Rewards (via an increase in annual fees or a decrease in cardholder rewards).  Therefore, even those class members with high-reward, premium Visa and Mastercard GPCCs would be made better off absent Amex's Anti-Steering Rules, as they would have paid lower retail prices and still enjoyed (at a minimum) the same levels of Annual Fees Net of Rewards as they did in the actual world.  Therefore, contrary to Dr. Gaier's assertions regarding my analysis of the cross-subsidization effect, his criticisms in this regard do not undermine the conclusions I reached in the Lamb Report that all or nearly all members of the Credit Card Class were injured by Amex's continued imposition and enforcement of its Anti-Steering Rules.

### E.  *Dr. Gaier's Assertions Regarding the Impact of Amex's Anti-Steering Rules on Non-Qualifying Merchants have No Bearing on the Question of Class-Wide Injury*

292.    In his report, Dr. Gaier points out the fact that much of my analysis of class-wide injury focuses on Qualified Merchants, adding that this "shortcoming invalidates [my] assertion of class-wide injury as [I do] not even consider the impact of Amex's NDPs for class members' transactions with other merchants."[629]  Instead, Dr. Gaier focuses his analysis on small merchants, and claims that, for a "variety of reasons, I would not expect small merchants to pay lower merchant discount fees absent Amex's NDPs."[630]

---

[629] Gaier Report at ¶91.
[630] Gaier Report at ¶92.  The reasons Dr. Gaier gives to support this claim includes (i) for OptBlue merchants, "discount fees charged to the merchant are determined by the third-party acquirer and not

293.    While it is incorrect to assert that I did not consider the impact of Amex's Anti-Steering Rules for GPCC Transactions at non-Qualified Merchants as part of my analysis, I note that it was not necessary to analyze GPCC Transactions at non-Qualified Merchants in order to have established class-wide injury as I did in the Lamb Report.  As I noted above, members of the Credit Card Class and Debit Card Class were card account holders whose card account was used to purchase a good or service *from a Qualified Merchant* during the Class Periods in this matter.[631]  Thus, since all class member share in common that their card accounts were used to purchase a good or service from at least one of the 38 Qualified Merchants, it would be sufficient to demonstrate that all or nearly all class members were injured by Amex's continued imposition and enforcement of its Anti-Steering Rules if those class members were injured on just a single GPCC Transaction at a Qualified Merchant (which I did in the Lamb Report).[632]

294.    In sum, none of Dr. Gaier's irrelevant assertions regarding the impact of Amex's Anti-Steering Rules on non-Qualifying Merchants has caused me to change the conclusions I reached in the Lamb Report regarding antitrust injury suffered by all or nearly all members of the Credit Card Class.

### F. *Dr. Gaier's Claims Regarding Annual Fees Net of Rewards Absent Amex's Anti-Steering Rules Lack Merit*

295.    In his report, Dr. Gaier repeats the same assertions Dr. Emch makes in his report in claiming that GPCC issuers would increase Annual Fees Net of Rewards (via higher annual fees or reduced cardholder rewards) in response to the heightened levels of

---

Amex," and thus, those small merchants might pay blended rates to acquirers, lessening their incentive to steer; **(ii)** "discount fees are complex and depend on a variety of factors" that could cause a merchant to not understand their costs of GPCC acceptance, therefore leading that merchant not to seek and attain lower GPCC acceptance costs; and **(iii)** "acquirers often act opportunistically with small merchants and should not be assumed to pass through any reductions in their interchange or wholesale rates to small merchants." See Gaier Report at ¶¶91-98.  Each of these arguments we also made by Dr. Emch and, therefore, I have addressed the merits of those arguments earlier in this Expert Reply Report.

[631] Lamb Report at ¶5.

[632] Furthermore, to the extent any of these small merchants did not achieve lower merchant discount rates, they would then simply keep retail price levels the same, and thus class members would be no worse off on their purchases at those merchants as they were in the actual world.  Of course, even if retail prices at these small merchants remained the same, to the extent that GPCC issuers reduced the Annual Fees Net of Rewards on Credit Card Class members' GPCCs in response to the more competitive environment absent Amex's Anti-Steering Rules, those class members would still have been better off in the but-for world on their purchases at these small merchants.

competition that would result in the market for GPCC Transactions absent Amex's Anti-Steering Rules.[633]  Earlier in this Expert Reply Report I addressed these flawed assertions made by both Dr. Gaier and Dr. Emch, and therefore, will not repeat them here.  For the same reasons discussed above, none of Dr. Gaier's flawed criticisms regarding the levels of Annual Fees Net of Rewards in a world absent Amex's Anti-Steering Rules has caused me to change the conclusions I reached in the Lamb Report regarding antitrust injury suffered by all or nearly all members of the Credit Card Class.

### G. None of the Criticisms in Dr. Gaier's Report Have Caused Me To Change the Conclusions I Reached in the Lamb Report Regarding Antitrust Injury Suffered by All Or Nearly All Members of the Debit Card Class

296.    In the Lamb Report, I discussed in detail common evidence demonstrating that all or nearly all members of the Debit Card Class were injured as a result of Amex's Continued Imposition and Enforcement of its Anti-Steering Rules.[634]  In his report, Dr. Gaier offers no separate analysis of my opinions and conclusions regarding injury to all or nearly all members of the Debit Card Class; rather, he notes the potential for "substantial overlap" between members of the Credit Card Class and members of the Debit Card Class, and incorporates by reference his flawed and irrelevant criticisms of my analysis of class-wide injury suffered by members of the Credit Card Class.[635]  Therefore, my responses to his criticisms of class-wide injury suffered by members of the Credit Card Class also apply to Dr. Gaier's criticisms of my analysis and conclusions regarding class-wide injury suffered by members of the Credit Card Class.  As a result, nothing in Dr. Gaier's report has caused me to change the conclusions I reached in the Lamb Report regarding antitrust injury suffered by all or nearly all members of the Debit Card Class.

---

[633] Gaier Report at ¶¶99-105.
[634] Lamb Report at ¶¶339-347.
[635] Gaier Report at ¶106.

### VI.     My Estimation of Damages Suffered by Members of the Credit Card Class and Debit Card Class is Reasonable

297.     In the Lamb Report, I discussed a standard and reliable economic methodology that would allow me to estimate the aggregate amount of overcharge damages suffered as a result of Amex's continued imposition and enforcement of its Anti-Steering Rules by members of the Credit Card Class and Debit Card Class on a class-wide basis without resorting to individualized inquiry.[636]  I also discussed certain summary-level sales data produced by Visa, Mastercard, and Discover, some of which was produced by Visa as late as September 26, 2022, four days before the serving of the Lamb Report on September 30, 2022.[637]  As I noted in the Lamb Report, these data would be used as part of my damages methodology to determine the amount of Relevant GPCC Transaction Volume.[638]

298.     As I noted in the Lamb Report, these Summary-Level Sales Data were not produced in a timely fashion, making it impossible for me to adequately analyze and interpret them prior to the serving of the Lamb Report.[639]  In the Lamb Supplemental

---

[636] Lamb Report at ¶¶348-380.  The overcharge damages estimated by my methodology arise from the difference between the actual Net GPCC Cardholder Prices Credit Card Class members paid on their Qualified GPCC Purchases, and the Net GPCC Cardholder Prices Credit Card Class members would have paid for said Qualified GPCC Purchases absent Amex's continued imposition and enforcement of its Anti-Steering Rules.  The overcharge damages estimated by my methodology arise from the difference between the actual Net Debit Cardholder Prices Debit Card Class members paid on their Qualified Debit Card Purchases, and the Net Debit Cardholder Prices Debit Card Class members would have paid for said Qualified Debit Card Purchases absent Amex's continued imposition and enforcement of its Anti-Steering Rules.

[637] Lamb Report at ¶¶365-380.  See, also, VISAOLIVER-000013482-83. VISAOLIVER-000013484; VISAOLIVER-000014105; MCW_OLIVER_00000001-039; DFS0010162; DFS0010163.  I refer to these data collectively as the "Summary-Level Sales Data" throughout the remainder of this Supplemental Expert Report.

[638] Lamb Report at ¶¶365-380.  In the Lamb Report, I defined Relevant GPCC Transaction Volume as the total volume of GPCC Transactions from each GPCC payment network and for each Relevant State at Qualified Merchants during the Class Periods.  See Lamb Report at ¶365.

[639] On August 30, 2022, Visa produced ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ See VISAOLIVER-000013482-83 at 82; VISAOLIVER-000013484.  On September 26, 2022, Visa produced ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.  See VISAOLIVER-000014105; Letter from Andrew Talbot to Carl Hammarskjold, dated September 26, 2022.  On September 19, 2022, Mastercard produced ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.  See MCW_OLIVER_00000001-039; Email from Gary R. Carney to Carl Hammarskjold et al., dated July 22, 2022.  Furthermore, on September 23, 2022, Discover produced ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓  See DFS0010162; DFS0010163.

Report, after having a little additional time to review and analyze these Summary-Level
Sales Data, I applied the standard and reliable economic methodology discussed in detail
in the Lamb Report to provide a reasonable estimate of the aggregate amount of
overcharge damages suffered by members of the Credit Card Class and Debit Card Class
as a result of Amex's continued imposition and enforcement of its Anti-Steering Rules on
a class-wide basis without resorting to individualized inquiry using these Summary-Level
Sales Data, along with other materials and information discussed in the Lamb Report.[640]

299.    In his report, Dr. Gaier criticizes my damages methodology on a number of
grounds.  As I discuss in the section below, most of Dr. Gaier's criticisms are meritless
and/or divorced from reason.  I further discuss the results of an updated damages
estimation that takes into account ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ the Visa summary-level produced as part of this litigation,
as well as two minor criticisms in Dr. Gaier's report.

### A.  Dr. Gaier's Criticisms of the Use of My Benchmark in My Damages Methodology are Misguided

300.    In his Report, Dr. Gaier criticizes my use of my benchmark in my damages
methodology on a number of grounds.  I discuss Dr. Gaier's flawed and unreliable
criticisms in this regard in detail below.

### i.  Discover's Abandonment of its Low-Cost Provider Strategy Provides a Sound and Reasonable Benchmark for My Damages Methodology

301.    As I discussed, a reasonable and conservative benchmark that I relied upon to
reasonably estimate but-for merchant discount fees in the market for GPCC Transactions
during the Class Periods relates to the low-cost provider strategy Amex's Anti-Steering
Rules (and, prior to 2013, those of Visa and MasterCard as well) foreclosed Discover
from executing that I discussed in detail in the Lamb Report.[641]  In criticizing my use of
this benchmark, Dr. Gaier claims that my "methodology assumes that the *only* reason
Discover purportedly abandoned its low-cost provider strategy was the NDPs utilized by

---

[640] Lamb Supplemental Report at ¶¶1-5.
[641] Lamb Report at ¶¶354-359.

Amex (and Visa, and Mastercard at that time)."[642]  However, contrary to Dr. Gaier's assertions, my methodology doesn't "assume" that Discover's abandonment of its low-cost provider strategy was due to Amex's Anti-Steering Rules (as well as similar rules in place for Visa and Mastercard at the time). In fact, Discover's CEO testified at the 2014 Amex Trial that these Anti-Steering Rules caused Discover to abandon its low-cost strategy.[643]  When asked why Discover was unsuccessful in capturing a significant share of transaction volume from Visa, Mastercard, and Amex, Mr. Hochschild testified: "In some of the discussions with the largest merchants, they made it clear that the rules of other card networks prohibited them from preference programs or a lot of the other ways or tools they would employ to shift share to Discover network."[644]

302.     Dr. Gaier ignores the testimony of Discover's own CEO as to the reasoning behind its decision to abandon its low-cost provider strategy and instead claims that my "assumption is undermined by the fact that Discover did not employ its low-cost provider strategy for the approximately 3 million merchants that did not accept Amex at the time Visa and Mastercard permitted merchant steering."[645]  However, in making this claim, Dr. Gaier fails to realize that employing its strategy on these merchants alone would deliver negligible market share to Discover while incurring substantial acquisition costs. As Dr. Emch pointed out, the approximately three million merchants that made up Amex's coverage gap around that time (i.e., the merchants Amex targeted last in achieving merchant coverage parity with the other GPCC payment networks) were primarily small merchants that accounted for less than $1 million in annual charge volume.[646]  To become the preferred card for the small merchant niche would be a

---

[642] Gaier Report at ¶116 (emphasis in original).

[643] Regarding its decision to abandon its low-cost provider strategy, Mr. Hochschild testified: "To the extent that offering a lower price was not going to give us any business benefits, it was leaving money on the table. It wasn't the right answer for us as a company. It wasn't the right answer for our shareholders. We should be - - we needed to be competitively priced. Because, again, giving the retailers a discount without getting anything in return didn't make business sense." See 2014 Amex Trial Transcript at 854:7-15. See, also, Lamb Report at ¶¶355-356.

[644] 2014 Amex Trial Transcript at 848:15-849:2. Similarly, when asked why Discover was not "able to execute a low price strategy without using steering to shift shares to Discover," Mr. Hochschild testified: "Providing a lower price to merchants isn't transparent to customers. They don't, right now, know the interchange or the pricing that a merchant might pay. So if you don't also let the merchant shift share, you'll be giving away money in the form of a lower interchange rate without getting any benefit in return." See 2014 Amex Trial Transcript at 849:8-15.

[645] Gaier Report at ¶116.

[646] See, for example, Emch Report at ¶¶159, 270.

pyrrhic victory for Discover. Little profit would be generated, and Discover would have to explain to its largest merchants why they were now paying more than its smallest merchants.[647] In fact, when asked about Discover's response to the 2011 Consent Decree at the 2014 Amex Trial, Mr. Hochschild indicated that the key to making its strategy a success was to get its top merchants on board.[648]

303.    Dr. Gaier, again ignoring Discover's CEO's trial testimony, claims that "an obvious alternative explanation for its failed strategy is the fact that most consumers did not (and still do not) carry a Discover card."[649] Thus, like Dr. Emch, Dr. Gaier faults Discover and not Amex's Anti-Steering Rules for Discover's lack of growth and expansion on the fact that Discover had a relatively small cardholder base. As I noted above, contrary to Dr. Gaier's claim in this regard, Discover had a higher number of cardholders than Amex in the U.S. in every year during the Class Periods, and a higher number of GPCCs in circulation than Amex in every year during the Class Periods other than 2015.[650] Further, in making this claim, Dr. Gaier is also conveniently assuming his own conclusion regarding the success and effectiveness of Discover's business strategy and ignoring the role that a vertical restraint that eliminates competition on one side of

---

[647] At the 2014 Amex Trial, Mr. Hochschild testified that following the 2011 Consent Decree and 2013 Settlement, in a world absent Amex's Anti-Steering Rules where "there were no restrictions on what Discover could do with respect to steering at the point of sale," Discover "would aggressively pursue a strategy of lowering [its] prices and providing incentives to merchants that would steer incremental volume to Discover." See 2014 Amex Trial Transcript at 872:3-10.

[648] "Q. It is your understanding that Visa and MasterCard's steering rule for discounts and promotions were removed at that time? A. For merchants that did not have another network that had a rule against steering. Q. Did Discover do anything to try to take advantage of the possibility of steering as a result of the change in other, in Visa and MasterCard steering rulings? A. Yes. Q. What did you do? A. We formed a task force to look for opportunities. We focused on our largest merchants. Unfortunately for our top 100 merchants, all of them also accept American Express. So with that, and again the key leverage was focusing on the largest merchant. Based on that we ended up disbanding the task force and not taking any action. Q. What was the purpose or mandate for the task force? A. The task force's mandate was to identify new opportunities to leverage this new found power to work in conjunction with merchants to see if we could put programs in place to shift volume to Discover network. Q. If American Express's rules were not in place preventing merchants from steering would Discover renew a similar task force? A. Yes." See 2014 Amex Trial Transcript at 986:5-987:4.

[649] Gaier Report at ¶117.

[650] For example, in the U.S. in 2021, Discover had 46.6 million cardholders and 61.0 million GPCCs in circulation, as compared to 40.9 million and 56.4 million for Amex, respectively. See The Nilson Report, No. 1213, February 2022 at p. 7; See, also, The Nilson Report, No. 1191, February 2021 at p. 7; The Nilson Report, No. 1169, February 2020 at p. 9; The Nilson Report, No. 1147, February 2019 at p. 10; The Nilson Report, No. 1125, February 2018 at p. 10; The Nilson Report, No. 1103, February 2017 at p. 10; The Nilson Report, No. 1080, February 2016 at p. 10.

the market (creating a barrier to entry) would have in forestalling the growth of a new market entrant.

304.    In sum, contrary to Dr. Gaier's flawed claims, my use of Discover's abandonment of its low-cost provider strategy as a benchmark in my damages methodology is based on evidence common to the classes in this matter, as well as sound and reliable for the purposes of performing a reasonable estimate of damages.  Given this, I have reaffirmed my usage of Discover's abandonment of its low-cost provider strategy as a benchmark in my damages methodology.

### ii.    The Additional Criticisms Contained in the Gaier Report Regarding My Use of Discover's Abandonment of its Low-Cost Provider Strategy as a Benchmark in My Damages Methodology are Incorrect

305.    Dr. Gaier additionally criticizes my use of Discover's abandonment of its low-cost provider strategy as a benchmark for my damages methodology due to its use of blended overall merchant discount rates paid by all merchants, rather than limited to Qualified Merchants in this matter, due the fact that Qualified Merchants, who are among the largest merchants in the U.S., [redacted] [651]  As an initial matter, I have noted that GPCC payment networks commonly analyze their own blended overall merchant discount rates (as well as those of their competitors) when analyzing pricing.[652]

306.    However, even setting this aside, Dr. Gaier's criticism in this regard has no bearing on the reasonableness of my use of the GPCC payment networks' blended overall merchant discount rates as part of my benchmark to perform a reasonable estimate of class-wide damages.  As I discussed above, the bargaining power that has allowed large merchants such as the Qualified Merchants in this matter [redacted] in the actual world would also exist in a world absent Amex's Anti-Steering Rules.  Thus, these differences in merchant discount rates paid by larger merchants such as Qualified Merchants exist in both the but-for and actual world, with

---

[651] Gaier Report at ¶¶110-117.
[652] See, for example, Ouellette Deposition at 85:17-87:8, Exhibit 3 at AMEX-CP-000094330; 2014 Amex Trial Transcript at 4398:9-25.

the only difference between the two worlds being that Amex's anticompetitive Anti-Steering Rules would be removed in the but-for world, causing prices in the market for GPCC Transactions to shift downward towards a new, more competitive equilibrium. Therefore, comparing the actual and but-for blended overall merchant discount rates provides a reasonable proxy for the difference in the actual merchant discount rates paid by Qualified Merchants and the rates those Qualified Merchants would have paid in a world absent Amex's Anti-Steering Rules.

307.    Relatedly, Dr. Gaier claims that my use of the GPCC payment networks' blended overall merchant discount rates as part of my benchmark to perform a reasonable estimate of class-wide damages is inappropriate because of ⬜⬜⬜⬜⬜⬜ ⬜⬜⬜⬜⬜⬜⬜⬜⬜⬜⬜⬜⬜⬜ in this matter.[653]  Again, Dr. Gaier's claim in this regard lacks merit given the nature of how GPCC payment networks typically set prices in the market for GPCC Transactions, as I discussed above.  Further, as I discussed, the relative bargaining power that allowed individual Qualified Merchants in this matter to negotiate their respective merchant discount rates in the actual world would also exist in a world absent Amex's Anti-Steering Rules, with the only difference between the two worlds being that those merchants would now have additional bargaining power absent Amex's Anti-Steering Rules to negotiate their respective merchant discount rates down even further.  Thus, Dr. Gaier's criticisms in this regard do not undermine the reasonableness of my use of the blended overall merchant discount rates I used in my damages methodology.

308.    Dr. Gaier further asserts that my methodology is unreliable because when you apply the annual reduction in blended overall merchant discount rate from my Discover benchmark, Walmart would have paid negative interchange rates on Mastercard transactions in the but-for world, and that in other instances, other Qualified Merchants would have paid but-for interchange rates that were lower than the rates they were paying for Debit Card Transactions.[654]  Dr. Gaier is wrong.

---

[653] Gaier Report at ¶¶89-90, 110-114.
[654] Gaier Report at ¶¶89, 112-113.

309.    As I discussed, my damages methodology is based on a reasonable benchmark using Discover's overall blended merchant discount rates.[655]  Therefore, the annual reduction in merchant discount rate I estimated using this reasonable Discover benchmark (4.5 basis points annually) is appropriately applied to the overall blended merchant discount rates of Visa, Mastercard, Amex, and Discover in my damages methodology in order to estimate the Merchant Discount Overcharge caused by Amex's continued imposition and enforcement of its Anti-Steering Rules during the Class Periods.[656]  Earlier in this Expert Reply Report and in the Lamb Report, I discussed how, absent Amex's Anti-Steering Rules, merchants such as the Qualified Merchants would gain the use of a competitive toolkit that included various different types of pro-competitive steering methods that those merchants could use (or credibly threaten to use) to lower their overall costs of GPCC acceptance.[657]  However, as I noted at my deposition, different merchants might choose to utilize different pro-competitive steering strategies (or different combinations of pro-competitive steering strategies) that best allowed them to lower their overall costs of GPCC acceptance.

310.    While my damages methodology applies this annual 4.5 basis point reduction in overall blended merchant discount rates for each GPCC payment network, this does not mean, however, that every Qualified Merchant would experience an even, annual 4.5 basis point rate reduction from each GPCC payment network.  Rather, my damages methodology reflects a reasonable estimate of the reduction in Qualified Merchants' *overall* costs of GPCC acceptance.  Thus, while some Qualified Merchants might have chosen to negotiate in a way that achieved an even reduction in GPCC acceptance costs from each GPCC payment network consistent with my estimates, another Qualified Merchant might, for example, extract larger rate reductions from a single GPCC payment network in exchange for becoming that merchant's preferred GPCC brand (e.g., "We Prefer Visa") and more modest reductions from the other GPCC payment networks in such a way that the *overall* reduction in GPCC acceptance costs for that particular

---

[655] Lamb Report at ¶¶354-360.
[656] Lamb Report at ¶¶359-360.
[657] Lamb Report at ¶¶140-141.

Qualified Merchant is consistent with the average overall reduction I estimated in my damages model.

311.     For these reasons, Dr. Gaier's assertion that my damages methodology is unreliable because applying the estimated annual reduction in blended overall merchant discount rate from my Discover benchmark to Walmart's Mastercard transactions in the but-for world causes the merchant discount rate on those transactions to be negative is incorrect.[658]  For instance, earlier in this Expert Report, I discussed how, despite the fact that Walmart already paid low merchant discount rates on Mastercard GPCC Transactions (the GPCC payment network of its co-brand card), ████████████

████████████████████████████████████████

████████████████████████████████████████

████  For example, ████████████████████████████

████████████████████████████████████████

████████████████████████████████.

██████████████████████.

312.     Furthermore, I discussed earlier in this Expert Reply Report that Walmart would have also gained additional leverage with which I could have negotiated even lower merchant discount rates with Mastercard absent Amex's Anti-Steering Rules.  However, even assuming that the already-low average merchant discount rates Walmart paid on Mastercard GPCCs stayed the same in the but-for world, I have noted that another strategy Walmart could have used in the but-for world which is prohibited in ████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████.[659]

---

[658] Gaier Report at ¶89.
[659] One provision in ████████████████████████████
████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████████ See AMEX-CP-000094186-4271 at 4232-4233.

313.    Given the variety of ways in which Qualified Merchants could have achieved lower overall costs of GPCC acceptance, Dr. Gaier's assertion that my damages methodology implies a negative merchant discount rate for Mastercard GPCC Transactions at Walmart is incorrect.  Rather, my damages methodology reflects a reasonable estimate of the reduction in average overall GPCC acceptance costs Qualified Merchants would have achieved in a world absent Amex's Anti-Steering Rules.

314.    Dr Gaier further claims (without performing any analysis of his own to support or confirm his claims) that my damages "methodology inappropriately assumes that *any and all* changes in actual merchant fees paid for credit card transactions after 2012 were caused *only* by Amex's NDPs."[660]  To argue that I failed to account for other confounding factors that impacted prices in the actual world, Dr. Gaier claims that I failed to consider the "growing prevalence of rewards credit cards" during this time, which he asserts contributed to higher merchant discount rates that my damages methodology does not consider.[661]  However, as I explained elsewhere in the Lamb Report and in this Expert Reply Report, absent Amex's Anti-Steering Rules, GPCC issuers, at a minimum, would not have reduced cardholder rewards in response to the lower merchant discount rates that would have prevailed via the more competitive equilibrium that would have prevailed in the market for GPCC Transactions.  Thus, contrary to Dr. Gaier's incorrect assertion in this regard, GPCC issuers would have maintained the same (if not greater) levels of cardholder rewards in the but-for world, but would not have been able to fund those rewards through increasing merchant discount rates paid by Qualified Merchants, consistent with the benchmark methodology I used to perform a reasonable estimate of class-wide damages.

315.    For the reasons discussed above, none of the flawed criticisms contained in the Gaier Report regarding my use and implementation of Discover's abandonment of its low-cost provider strategy as a benchmark have caused me to reconsider the use of this benchmark in my damages methodology.  Thus, I have reaffirmed the opinions and conclusions reached in the Lamb Report and the Lamb Supplemental Report that this

---

[660] Gaier Report at ¶115 (emphasis in original).
[661] Gaier Report at ¶115.

constitutes a sound and reliable benchmark with which to perform a reasonable estimate of damages suffered by all or nearly all members of the Credit Card Class and Debit Card Class as a result of Amex's continued implementation and enforcement of its Anti-Steering Rules.

### B. Dr. Gaier's Criticisms of My Analysis of Pass-Through are Irrelevant

316.    As I explained in the Lamb Report, part of my damages methodology was to determine the extent to which Qualified Merchants would have passed through reduced overall costs of GPCC acceptance to their customers absent Amex's Anti-Steering Rules (including all or nearly all members of the Credit Card Class and Debit Card Class) in the form of lower retail prices.[662]  I understand that Counsel for the Plaintiffs sought data or information pertaining to prices and/or cost of sales from Qualified Merchants as part of discovery in this matter, but no such data or information were produced as of the submission of this Expert Report.[663]

317.    However, as I explained, in the absence of such data, I reviewed evidence in the form of a recent research paper from the Federal Reserve Bank of Kansas City that studied this very question and which provides a reasonable estimate of the rate at which Qualified Merchants would have passed through the GPCC cost savings per dollar of sales that they would have realized during the Class Periods absent Amex's Anti-Steering Rules.[664]  As I noted, in this research paper, economists from the Federal Reserve Bank of Boston, Federal Reserve Bank of Kansas City, and Bank of Canada utilize a pass through rate of 90 percent to measure the effect of merchant discount fees on retail prices.[665] The authors determined that the 90 percent pass-through rate is appropriate

---

[662] Lamb Report at ¶¶367-369.
[663] See, for example, United States District Court Eastern District of New York, *Anthony Oliver, et al., Plaintiffs, v. American Express Company, et al., Defendants*, Plaintiffs Letter Motion to Magistrate Judge Sanket J. Bulsara, No. 1:19-cv-00566-NGG-SJB, May 9, 2022; United States District Court Eastern District of New York, *Anthony Oliver, et al., Plaintiffs, v. American Express Company, et al., Defendants*, Declaration of Todd A. Seaver, No. 1:19-cv-00566-NGG-SJB, May 9, 2022 at ¶¶35-36, Exhibit F.  Should any such data on Qualified Merchant prices or costs be made available to me after the submission of this Expert Reply Report, I reserve the right to revise my analyses accordingly at an appropriate stage of this litigation, if necessary.
[664] Lamb Report at ¶367.
[665] Marie-Hélène Felt, Fumiko Hayashi, Joanna Stavins, and Angelika Welte, "Distributional Effects of Payment Card Pricing and Merchant Cost Pass-through in the United States and Canada*," Research*

because it is "about the midpoint of long-run pass-through rates on retail prices due to industry-wide cost changes estimated by previous empirical studies on U.S. industries."[666] Consistent with the opinions of the authors, it is my opinion that this constitutes a reasonable measure of pass through because the U.S. retail environment is highly competitive, producers in competitive markets pass through almost all changes in their variable costs, and thus a variable cost like merchant discount fees would be passed through like any other industry-wide change in variable cost.

318.    As I further explained, the authors recognized that merchants generally "pass through their cost of accepting payments to consumers […] in a way that does not differentiate prices by payment method, but instead raises retail prices paid by **all customers**."[667] Thus, the authors apply the 90 percent pass-through as a fixed percentage increase in retail prices on **all goods and services** sold by the merchant.[668] Thus, utilizing the same approach to estimate the extent to which Qualified Merchants would have passed through the GPCC cost savings Qualified Merchants would have realized in the but-for world to their customers (including all or nearly all members of the Credit Card Class and Debit Card Class) in the form of lower retail prices is sound and reasonable.  I discuss the numerous flaws in Dr. Gaier's criticisms of my analysis in this regard in greater detail below.

   **i.    Dr. Gaier's Assertions Regarding Alternative Studies of Pass-Through are Meaningless**

---

*Working Papers*, Federal Reserve Bank of Kansas City, No. 20-13, December 2020 (hereafter "Felt et al."). The authors measure the effect of merchant discount fees, rewards, and extent of payment card usage on net retail prices paid (including pass through of merchant discount fees, other fees paid by customers to financial institutions, and rewards earned) by income cohort.

[666] Felt et al. at footnote 13. The authors cite published peer-reviewed and/or empirical studies estimating pass through on coffee (90 percent or 92 percent); gasoline (81 percent or 100 percent); and processed cheese (73-103 percent).

[667] Felt et al. at pp. 5-6 (emphasis added).

[668] Felt et al. at p. 8 (emphasis added). As a sensitivity, the paper examines results based on pass through of 100 percent and 75 percent. Felt et al. at p. 24. An earlier paper also analyzing the impact of merchant discount fees on retail prices used a pass-through rate of 100 percent as a base case and 110 percent as a sensitivity. The use of a pass through greater than 100 percent was due to an assumption of constant markup of 10 percent. See, Scott Schuh, Oz Shy, and Joanna Stavins, "Who Gains and Who Loses from Credit Card Payments? Theory and Calibrations," *Public Policy Discussion Papers*, Federal Reserve Bank of Boston, No. 10-03, 2010 at pp. 39-40.

319.    In his report, Dr. Gaier performs no analysis of his own to determine what an appropriate rate of pass-through would be to perform a reasonable estimate of class-wide damages like those I discussed and performed in the Lamb Report and Lamb Supplemental Report.  Rather, he merely criticizes my analysis of pass-through for "simply assum[ing]—without any empirical analysis—that all Qualifying Merchants would pass through 90% of any lower merchant fees to consumers."[669]  However, contrary to Dr. Gaier's assertion in this regard, I did not simply assume this; rather, I sought, and found, a sound and reliable source in the form of a study conducted by the Federal Reserve which analyzed the very question of merchant pass-through of card acceptance costs from which I could perform a reasonable analysis of such pass-through as part of my damages methodology.

320.    In an attempt to discredit my use of the 90 percent pass-through rate that resulted from this Federal Reserve study, Dr. Gaier summarized over 40 other academic studies that "analyzed pass-through of cost changes by merchants in the United States," showing a range of different pass-through rates in response to price increases and decreases.[670]  However, none of the over 40 studies cited by Dr. Gaier to undermine my use of the Federal Reserve study analyzed the question of pass-through of merchant costs associated with payment card acceptance, as the Federal Reserve study does.  Rather, the studies cited by Dr. Gaier analyze pass-through on a variety of individual products.[671]  It's unclear why Dr. Gaier asserts that alternative studies of pass-through of costs of various products that account for a small share of consumers' overall purchases could constitute a more reasonable estimate of the pass-through of costs associated with GPCC acceptance for the purposes of estimating class-wide damages than the Federal Reserve study I relied upon that estimated pass-through on the aggregate of retail purchases.[672]

321.    I discuss the numerous flaws in the additional claims Dr. Gaier makes in his report regarding my analysis of pass-through in the next section.

---

[669] Gaier Report at ¶123.
[670] Gaier Report at ¶¶125-128, Appendix G.
[671] Gaier Report at ¶¶125-128, Appendix G.
[672] As I discussed at my deposition, from my former experience working at the Federal Reserve Bank of Kansas City, I am aware of how carefully it has studied the evolution of payment systems for nearly 30 years.  See Lamb Deposition at 199:9-200:21.

### ii.   Dr. Gaier's Additional Criticisms of My Analysis of Pass-Through of GPCC Cost Savings are Inconsistent with Statements and Acknowledgments made by Qualified Merchants

322.   Dr. Gaier makes a number of additional claims in criticizing my analysis of merchant pass-through of the lower overall costs of GPCC acceptance that would have resulted absent Amex's Anti-Steering Rules, including statements made by the RBA regarding the pass-through of such savings to consumers in Australia.[673]  Regarding these statements, Dr. Gaier confuses a deficit of data for such pass-through with positive evidence that no such merchant pass-through took place.  As I explained in the Lamb Report, the RBA conducted studies and analyses that demonstrated that RBA merchants generally passed at least some portion of the cost savings they achieved in the form of reduced costs of GPCC acceptance through to customers in the form of lower retail prices following the RBA's reforms.[674]  However, the RBA explained that cost savings are hard to measure precisely, as they are measured relative to a base interchange fee capped by regulation at 50 basis points and unrelated movements in consumer prices are hard to isolate:

> The Bank had previously estimated that the cost savings would be likely to lead to the CPI being around 0.1 to 0.2 percentage points lower than would otherwise be the case over the longer term (all else constant). It is very difficult to detect this against a background where other costs are changing by much larger amounts and the CPI is increasing by around 2½ per cent per year on average. Despite the difficulties of measurement, the Board's judgement remains that the bulk of these savings have been, or will eventually be, passed through into savings to consumers. This judgement is consistent with standard economic analysis which suggests that, ultimately, changes in business costs are reflected in the prices that businesses charge.[675]

---

[673] Gaier Report at ¶129.
[674] Lamb Report at ¶¶326-327.
[675] Reserve Bank of Australia, "Reform of Australia's Payments System – Preliminary Conclusions of the 2007/08 Review," April 2008 at p. 23.

Thus, as the RBA itself explains, competition among merchants supports an inference that merchants will pass through cost savings, contrary to Dr. Gaier's doubts.[676]

323.    Dr. Gaier further attempts to support his claims regarding my analysis of pass-through by asserting that smaller cost changes are not passed through to the same extent as larger ones, and that pass-through of cost savings that would have resulted absent Amex's Anti-Steering Rules and pass-through of the artificial inflation of costs caused by Amex's Anti-Steering Rules are asymmetric.[677]  However, in making these assertions, Dr. Gaier ignores the extensive common evidence I discussed in the Lamb Report demonstrating that at least some portion of the artificially-inflated costs of GPCC acceptance (merchant discount fees) that resulted from Amex's continued imposition and enforcement of its Anti-Steering Rules was passed on to consumers in the form of higher retail prices (and that absent Amex's Anti-Steering Rules, Qualified Merchants would have passed on at least some portion of their cost savings to their customers), including statements and acknowledgements made by Qualified Merchants themselves.[678]

324.    For example, in support of my conclusions regarding merchant pass-through, I discussed extensive common evidence demonstrating that the Qualified Merchants in this matter operate in highly competitive industries and earned low net profit margins during the Class Periods.[679]  I further discussed extensive common evidence that GPCC

---

[676] Similar to the findings of the RBA, Dr. Gaier also states that "there is little empirical evidence that merchants have passed through any significant share of the reduction in debit card acceptance costs associated with Durbin Amendment regulations."  See Gaier Report at ¶130.  However, as with the RBA findings, given the very small nature of these cost savings and the existence of other supply and demand factors that are also influencing prices, it is not surprising that the pass-through of such cost savings could be difficult to view empirically.  For example, according to one Federal Reserve study cited by Dr. Gaier: "The actual pass-through of the changes in interchange fees stemming from the new regulations is difficult to observe, however.  The pass-through of cost savings from merchants to consumers is not easy to measure, even when merchants pass on all their savings to consumers."  See Hayashi (2013) at p. 102.
[677] Gaier Report at ¶131.
[678] Lamb Report at ¶¶319-325.
[679] Lamb Report at ¶¶309-318.  As I explained, Economic theory indicates that in "workably competitive" industries, "a high percentage of a monopoly overcharge will typically be passed on" to the consumer.  This is true even though retailers in each of these industries might engage in different types of strategic behavior or pricing strategies since "market pressures" tend to result in prices approximating marginal costs.  An important distinction is made here between the "workably competitive" industries that the Qualified Merchants operate in (discussed below) and the anticompetitive market for GPCC Transactions.  See Robert Harris, and Lawrence Sullivan, "Passing on the Monopoly Overcharge: A Comprehensive Policy Analysis," *University of Pennsylvania Law Review*, Vol. 128, No. 2, December 1979, 269-357 (hereafter "Harris and Sullivan") at pp. 294, 310.  I further discussed how economic theory indicates that retailers

acceptance costs constituted a significant overall expense for most merchants in the U.S., and how, economic theory, as well as additional common evidence, demonstrates that the total costs of GPCC acceptance are routinely accounted for and reflected in the retail prices charged by these merchants.[680]

325.    As I noted above, consistent with this extensive common evidence, statements and acknowledgments from Qualified Merchants themselves demonstrate that, absent Amex's Anti-Steering Rules, Qualified Merchants would have passed on at least some portion of their reduced overall costs of GPCC acceptance onto their customers in the form of lower retail prices.   For example, at a 2012 deposition, Diedre O'Malley of Best Buy testified:

> Q. If you were able to lower the cost of accepting credit cards, would you pass some of those savings on to customers? […]
>
> THE WITNESS: Yes.
>
> Q. What's your basis for saying that? […]
>
> THE WITNESS: Again, the retail community is – there's nothing more competitive. So kind of by Econ 101 default, that's – that's what happens.  In addition, we've publicly stated things such as low price guarantee. We have price matching for products so you just -- you cannot escape passing everything on to the consumer in our business.[681]

Regarding a potential preference campaign partnership with Mastercard that would lower its overall GPPC acceptance costs, Ms. O'Malley testified at the 2014 Amex Trial:

> Q. If you are able to save money on the cost of acceptance, for example, what would you do with those savings?

---

operating at low profit margins are more likely to pass along a price increase to their customers than retailers operating at high profit margins. This is because retailers with higher profit margins have a greater capacity to absorb increases in cost without raising prices than retailers with low margins.  In contrast, when profit margins are very slim, higher input costs would result in negative earnings unless passed on to purchasers.  See Harris and Sullivan at pp. 277-298.
[680] Lamb Report at ¶¶303-308.
[681] Deposition of Diedre K.M. O'Malley, December 17, 2012 at 58:19-59:10.

A. Get passed on to the consumer.[682]

326.     When asked at the 2014 Amex Trial what Home Depot would do with its savings if it "could reduce its costs of accepting general purpose cards," Dwaine Kimmet testified that Home Depot has "a long standing practice [where,] for any cost reduction we get, we pass along, generally about 60 percent of that to customers, typically in the form of a price decrease, to help drive volume to our stores."[683]  In a May 25, 2016 earnings call, Julie Whalen of Williams-Sonoma explained how the company was able to achieve "cost reductions across the board," in part due to "direct negotiation from the vendor," that allowed it to pass those cost savings onto its customers.[684]

---

[682] 2014 Amex Trial Transcript at 1543:10-1544:6.  In a 2021 earnings call, regarding recent cost increases and expected future cost increases, Advance Auto Parts stated: "As a reminder, our industry has historically been very rationale [sic] and successful in passing on inflationary costs in the form of price and that is our intention this year as well."  See Advance Auto Parts Q1 2021 Earnings Call, June 2, 2021 at p. 6. Relatedly, in a 2018 earnings call, Advance Auto Parts stated: "Importantly, through successful actions, we've been able to pass cost increases through price. We remain diligent in our effort working with our supplier partners to mitigate cost increases where possible. We're confident that in line with historical pricing trend [sic], our industry will continue to pass along future tariff or other inflationary cost increases through pricing actions." See Advance Auto Parts Q3 2018 Earnings Call, November 13, 2018 at p. 4. Furthermore, in a December 3, 2021 earnings call, Bruce Thorn of Big Lots stated: "Right now, we are actually seeing that the price increases that we've put through as a result of covering the costs that we're getting from input product and freight is being absorbed by the customer. She wants the product -- especially going into forth [sic] quarter, she knows that she needs to shop early. We're not seeing that resistance. Most of our pricing has been well, it's been across all categories, and we've been doing it year-to-date and we play a little bit of a catch-up, because we want to make sure we're anchoring entry price points along with the price leaders out there. And we don't want to anticipate or lose that value position with our customers before we actually understand the true cost. And as we implement these increases, we're realizing that she's taking them. I think the most elastic category would be food because of the competitive nature of that, but even that is not that high of a resistance. So we're expecting to be able to continue to pass along these price increases." See Big Lots Earnings Call, December 3, 2021 at pp. 14-15.
[683] 2014 Amex Trial Transcript at 1278:1-14.  Mr. Kimmet added: "It is our fundamental philosophy, if we take price down, we will garner more business and we have actually effectively done that over the years. As a matter of fact, we have now gotten to a point, where we have publicly communicated that we have capped our gross margin so that we send additional savings now all to the top line.  Which means we take down costs.  We take down prices to customers."  See 2014 Amex Trial Transcript at 1278:1-14.  In a February 23, 2022 earnings call, Marvin R. Ellison of Lowe's stated: "You still will have millions of people who will primarily work from home, that's going to drive certainly investments AND repair and maintenance that we think (inaudible) past 2022 and the work that the merchants and the financing has done to drive cost out and they will make sure that whatever price increases driven by inflation, we are pushing towards our customers, we're still doing that at a very competitive price because we're taking more suitable actions to ensure that we're trying to drive other factors for cost out." See Lowe's Earnings Call, February 23, 2022 at p. 15.
[684] "Part of it is product acquisition costs and I'd say the bigger piece of it which is still a subset of that is the fact that we have our insourcing of our foreign agents which is driving incredible cost reductions across the board, [sic] that allows us to pass that along to the customer. So those are probably the biggest pieces that are enabling us to not only still be promotional like everybody is [sic], it's not that the promotional

327.   In a related matter, Dennis Stokely of Safeway (an Albertsons company) testified:

[REDACTED] .[685]

John Briggs of Hy-Vee testified that [REDACTED] [686] Chris Mielke of Albertsons also testified that [REDACTED] "[687] Furthermore, Daniel Webb of Meijer testified that [REDACTED] [688]

_____

environment hasn't changed, it's very promotional. But we are able to compete by the fact that we can lower our cost both from a direct negotiation from the vendor. But also by the fact that we've got our own agents insourced in our company and we can pass that cost along." See Williams-Sonoma Q1 2016 Earnings Call, May 25, 2016 at p. 14. Regarding a recent reorganization of its produce department aimed at developing stronger relationships with smaller local farmers, Sprouts Farmers Market stated: "We're giving long-term commitments to these growers, which provides fresher products and cost benefits that we are proud to pass on to our customers in better pricing."  See Sprouts Farmers Market Q1 2022 Earnings Call, May 4, 2022 at p. 4.

[685] Deposition of Dennis Stokely, July 15, 2008 at 206:2-207:11.

[686] Deposition of John Briggs, May 28, 2008 (hereafter "Briggs Deposition") at 224:11-225:23.  Mr. Briggs also testified: [REDACTED] . See Briggs Deposition at 242:18-243:8.  Mr. Briggs added: [REDACTED] See Briggs Deposition at 226:13-21.

[687] [REDACTED] See Deposition of Chris S. Mielke, June 13, 2008 at 76:13-77:5.

[688] Deposition of Daniel Webb, August 22, 2008 at 155: 23-156:2.  Relatedly, Michael Ross of Meijer testified: [REDACTED]

328.    In late 2004, when Walgreens decided to cease accepting Amex GPCCs due to Amex's high merchant discount fees, Walgreens sent a letter to its store managers in which it noted that the "high cost of doing business with American Express will be reflected in higher prices for all Walgreens customers, not just those who use American Express cards.  We don't think that's fair."[689]  Regarding this statement, Jeffrey Rein of Walgreens testified:

> Yes, it is if we continue to take American Express and charge a higher fee than others, we have to pass those costs on to our customers. The customers eventually have to pay. And so if we have higher fees from them, we look at our total costs in totality and we go ahead and set retail prices, we would have to take, this is one component of our cost. We pass it on to customers.[690]

Conversely, Mr. Rein further testified: "Any time you can lower costs, you can pass it on to the customers, you lower your prices, you get more business, you get more productive and voila, your costs are going down per unit or per sale.  Then you keep doing that until you get more and more […] customers."[691]  Similarly, John Robinson of Ikea testified that as Ikea has found ways to lower its cost of operations, that has allowed it to "also plan the retail pricing in a way that allows us to lower prices for our customers."[692]  In a

See Deposition of Michael Ross, July 25, 2008 at 39:9-20.

[689] 2014 Amex Trial DX 2214 at WLGEDVMC00010345.  On a 2022 earnings call, CVS noted that "for the most part, [it has been] able to pass inflation through to [its] customers."  See CVS Q2 2022 Earnings Call, August 3, 2022 at p. 15. See, also, Kroger Q1 2022 Earnings Call, June 17, 2021 at pp. 7-8; Sprouts Farmers Market Q1 2022 Earnings Call, May 4, 2022 at pp. 2, 6, 10; United Natural Foods Q4 2018 Earnings Call, September 20, 2018 at pp. 2-3.

[690] 2014 Amex Trial Transcript at 1405:22-1406:18.

[691] 2014 Amex Trial Transcript at 1346:19-1347:13.  Mr. Rein referred to this as a "virtuous cycle."  See 2014 Amex Trial Transcript at 1346:19-1347:13.

[692] 2014 Amex Trial Transcript at 382:19-383:7.  While Sears is not a Qualified Merchant in this matter, I have noted that Denis Bouchard of Sears testified: "Q. Would there be an effect on Sears' customers if you were able to reduce your credit card costs? A. Yes. Q. Or stop the increases in your credit cards costs? A. Yes, I think that the -- you know, just the fact that we are in a competitive market with the likes of Walmart and Target and Kohl's and Home Depot and Lowe's, you know, [w]e could be able to lower our prices further and be more competitive with those folks, or offer additional value." See 2014 Amex Trial Transcript at 582:4-12. Also, while Enterprise is not a Qualified Merchant in this matter, I have noted that George Satkowski of Enterprise testified: "Q. Okay.  So, under the steering scenario we talked about, would Enterprise save money if it was steering from a more expensive brand to a less expensive brand? A. Well, in theory, you could do that but what our goal here is that we would take the price difference and we're passing it on to the customer which really be [sic] the point there is to increase their satisfaction so that we have a committed customer where we believe that's far more important in the long run than saving

November 2020 earnings call, Michael O'Sullivan of Burlington Stores stated that the "buying environment in Q2 and Q3 was very strong and our merchants took advantage of great opportunistic deals. These deals allowed us to successfully pass along terrific value to the customer."[693]

329.    In sum, for the reasons described above, none of Dr. Gaier's flawed and irrelevant criticisms regarding my analysis of the pass-through of the reduced overall costs of GPCC acceptance by Qualified Merchants onto their customers (including members of the Credit Card Class and Debit Card Class) have caused me to change my opinions or conclusions reached in the Lamb Report in this regard.

### C.    Dr. Gaier's Assertions Regarding the Impact of Co-Branded Cards on My Damages Methodology are Purely Speculative and Fatally Flawed

330.    Earlier in this Expert Reply Report I summarized Dr. Gaier's bewildering and fatally-flawed claims regarding the impact of co-branded cards offered by many Qualified Merchants.  As I noted, Dr. Gaier cites two examples of Qualified Merchants ▮▮▮▮▮▮▮▮▮▮ that he claims are ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ and that removing Amex's Anti-Steering Rules would have "little or no impact" on those Qualifying Merchants.[694]  However, as I explained above, common evidence demonstrates that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Dr. Gaier claims these Qualified Merchants were permitted to engage in ▮▮▮▮▮▮▮▮ ▮▮▮ I also explained above how these Qualified Merchants ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. ▮▮▮▮▮▮▮▮▮▮▮▮

---

that at that point in time. Q. So, if I understand you, you take the savings and put that in the incentive that you're offering the customer? A. That's correct. So when we're renting cars and every transaction and every location, they are reviewing their net bottom line in the margin and by doing what I just mentioned is we're maintaining the margins that they're currently at but providing a higher value to the customer who, in turn, becomes a more valuable customer." See 2014 Amex Trial Transcript at 499:8-25.  Similarly, while Crate & Barrel is not a Qualified Merchant in this matter, Frank Bruno of Crate & Barrel testified that, in the event that Amex could no longer enforce its Anti-Steering Rules and it could reduce its overall GPCC acceptance costs through steering, Crate & Barrel would then "look to return some of those savings to our customers." See 2014 Amex Trial Transcript at 2328:2-2329:4.
[693] Burlington Q3 2020 Earnings Call, November 24, 2020 at p. 2.
[694] Gaier Report at ¶¶81-88.

████████████████████████████████████████

████████████████████████████████████████

████████████████████████

331.    However, despite the fact that Dr. Gaier admitted at his deposition that he did not look at any Amex Card Acceptance Agreements for the 17 Qualified Merchants with co-brand cards he listed in his Figure 18 other than ████████████████, he takes a shockingly aggressive stance with regards to my damages analysis.[695]  Despite not performing any analysis of his own or offering any opinion on what, if any, impact co-brand cards offered by Qualifying Merchants would have on the questions of class-wide injury or damages, he claims that I should have excluded *all* Qualified Merchants with co-brand cards (17 of 38 Qualified Merchants)[696] from my estimation of damages, which, as he shows, would remove 61.4 percent of all damages.[697]  It is not clear how Dr. Gaier reached the conclusions he reached that *all* Qualified Merchants with co-brand cards should be dropped from my estimation of class-wide damages if he only reviewed ██ of the Amex Card Acceptance Agreements associated with these Qualified Merchants. However, for the reasons described above, contrary to Dr. Gaier's assertions in this regard, it is not appropriate to exclude any of the Qualified Merchants with co-brand cards from my estimation of damages.

332.    The flaw in Dr. Gaier's assertion regarding the elimination of *all* Qualified Merchants with co-brand cards from my estimation of damages is magnified when you consider that ████ of the 17 Qualified Merchants with co-brand cards ██████████.

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████

████████████████████████.[698]  At deposition, Dr. Gaier appears to believe that

---

[695] Gaier Deposition at 28:24-29:24, 129:5-142:14.  As I noted above, Dr. Gaier does not list any Amex Card Acceptance Agreements for Qualified Merchants with co-brand cards (as listed in Figure 18 of his report) on his list of "Materials relied on" other than ████████████.  See Gaier Report at Appendix B.
[696] Dr. Gaier added Academy Sports to his Figure 5 in the errata to his report.  See Gaier Errata Report.
[697] Gaier Report at ¶142, Figure 18.
[698] Schindel June 24 Letter at footnote 2.

each of these 17 Qualified Merchants ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓[699]

Furthermore, as I noted above, other Qualified Merchants with co-brand cards ▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓[700]

333.   Given the purely speculative and overly aggressive nature of Dr. Gaier's opinion in this regard (which stands in stark contrast to the conservative approach I took in performing my reasonable estimate of damages),[701] as well as the fact that his claims about co-branded cards are divorced from the reality of the but-for world (as I explained above), none of Dr. Gaier's fatally-flawed and meritless claims regarding co-branded cards has caused me to change any of the opinions or conclusions I reached in the Lamb Report and Lamb Supplemental Report regarding the soundness and reliability of the reasonable estimate of damages suffered by all or nearly all members of the Credit Card Class and Debit Card Class as a result of Amex's continued imposition and enforcement of its Anti-Steering Rules.

### D. Dr. Gaier's Additional Flawed and Unsupported Criticisms of My Damages Methodology

334.   In his report, Dr. Gaier makes a number of additional flawed and unsupported criticisms of my damages methodology.  For example, while acknowledging that I was not provided with any documents or data that would allow me to directly identify Visa, Mastercard, and Discover GPCC Transactions by individuals who were also Amex GPCC account holders or authorized users, Dr. Gaier criticizes my use of a study

---

[699] Gaier Deposition at 20:14-21:24.
[700] See, for example, AMEX-CP-000069652-56, AMEX-CP-000069661-677, AMEX-CP-000069657-660, AMEX-CP-000069678-681, AMEX-CP-000094061-63, AMEX-CP-000094112-121 ▓▓▓▓▓▓▓ ; AMEX-CP-000094124-143, AMEX-CP-000072045-056 ▓▓▓ ; AMEX-CP-000083656-674, AMEX-CP-000093363-68 ▓▓▓ ; AMEX-CP-000076540-559, AMEX-CP-000076529-539 ▓▓▓▓▓ ; AMEX-CP-000076406-414, AMEX-CP-000076417-19, AMEX-CP-000076420-23, AMEX-CP-000076424-26, AMEX-CP-000076427-430, AMEX-CP-000076415-16, AMEX-DOJ-002577-580 ▓▓▓▓▓ ; AMEXNDR11106414-19 ▓▓▓▓▓▓▓▓▓▓ .
[701] Lamb Report at ¶¶350, 371, Footnotes 846, 865, 872. ▓▓▓▓

conducted by the Federal Reserve as "speculative," and potentially not "representative for the Qualifying Merchants."[702] Dr. Gaier is wrong.

335.    As I explained in the Lamb Report, this study, conducted by the Federal Reserve Bank of Atlanta, Boston, and San Francisco seven times since 2012 (2012, 2015-2020) and known as the Diary of Consumer Payment Choice ("DCPC"), is a study of the "understanding of the cash and noncash payment behavior of adult consumers (ages 18 and older) in the United States."[703]  As I explained, the DCPC is "an online survey administered to diary respondents ('diarists') over three consecutive days," which can be used to estimate the "number, value, and average value of payments that all US adult consumers make using various payment instruments."[704]  I also explained how an "important goal of the DCPC is to provide estimates of payment statistics for the entire population of U.S. consumers over the age of 18."[705]

336.    Given this, contrary to Dr. Gaier's claims that my use of this detailed Federal Reserve study was "speculative," I have reaffirmed my opinion that this study provides a reliable basis from which to reasonably estimate the amount of Visa, Mastercard, and Discover GPCC Transactions made by individuals who were also Amex GPCC account

---

[702] Gaier Report at ¶141.

[703] Gaier Report at ¶141; Lamb Report at footnote 868.  See, also, Claire Greene, Scott Schuh, and Joanna Stavins, "The 2012 Diary of Consumer Payment Choice," Federal Reserve Bank of Boston, *Research Data Reports*, No. 18-1, January 17, 2018; Marco Angrisani, Kevin Foster, and Marcin Hitczenko, "The 2015 and 2016 Diaries of Consumer Payment Choice: Technical Appendix," Federal Reserve Bank of Boston, *Research Data Reports*, No. 18-2, March 2018 (hereafter "Angrisani et al."); Claire Greene and Scott Schuh, "The 2016 Diary of Consumer Payment Choice," Federal Reserve Bank of Boston, *Research Data Reports*, No. 17-7, December 1, 2017; Claire Greene and Joanna Stavins, "The 2017 Diary of Consumer Payment Choice," *Federal Reserve Bank of Atlanta, Research Data Reports*, No. 18-05, September 17, 2018; Claire Greene and Joanna Stavins, "The 2018 Diary of Consumer Payment Choice," *Federal Reserve Bank of Atlanta, Research Data Reports*, No. 19-03 November 25, 2019; Claire Greene and Joanna Stavins, "The 2019 Diary of Consumer Payment Choice," *Federal Reserve Bank of Atlanta, Research Data Reports*, No. 20-4, June 15, 2020; Claire Greene and Joanna Stavins, "The 2020 Diary of Consumer Payment Choice," *Federal Reserve Bank of Atlanta, Research Data Reports*, No. 21-2, May 7, 2021 (hereafter "2020 Diary of Consumer Payment Choice").

[704] 2020 Diary of Consumer Payment Choice at pp. 2, 13.  I further explained that the DCPC includes information on the type (e.g., GPCC, Debit Card) and brand (e.g., Amex, Visa, Mastercard, Discover) of payment instrument that diarists possessed during their survey period, as well as which brand/type of payment instrument was used for each specific purchase during that time, which could allow me to reasonably estimate the share of GPCC purchases made using Visa, Mastercard, and Discover GPCCs by consumers who were also Amex GPCC (including co-branded cards) account holders or authorized users during the Class Periods (and, thus, excluded from the Credit Card Class).  See 2020 Diary of Consumer Payment Choice.  See, also, Oz Shy, "How Many Cards Do You Use?," *Research Department Working Papers*, Federal Reserve Bank of Boston, No. 13-13, 2013.

[705] Angrisani et al. at p. 26.

holders or authorized users for the purposes of excluding from my estimation of class-wide damages.

337.    Another of Dr. Gaier's specious criticisms of my damages methodology is his claim that my estimation of sales of prescription drugs by Qualified Merchants is "speculative," and that I use "undocumented industry-wide averages" in order to estimate such sales to exclude from my analysis.[706] Dr. Gaier is incorrect. In the Lamb Report, I explained in detail the industry-based estimates of such sales that I used in order to reasonably estimate sales of prescription drugs for each Qualified Merchant industry which is known to have some amount of prescription drug sales.[707] Meanwhile, to the extent Dr. Gaier believes my estimations of such sales are "speculative," I have noted that he does not offer any alternative measure of such sales for exclusion from my damages model. Furthermore, I note that the class definition in this matter excluded purchases of prescription drugs for which the purchaser only paid a flat copay per their insurance plan.[708] However, as I explained in the Lamb Report, because detailed data regarding prescription drug purchases made at Qualified Merchants by members of the Credit Card Class or Debit Card Class who only paid a flat copay per their insurance plan have not been made available to me, in order to determine a *conservative* estimate of such purchases as part of my damages methodology, I excluded *all* dollar purchases of prescription drugs made by members of the Credit Card Class and Debit Card Class based on information regarding the portion of a Qualified Merchant's overall sales that were accounted for by prescription drug sales. Given this, none of Dr. Gaier's criticisms in this regard have caused me to change my opinions that my conservative estimate of prescription drug sales by Qualified Merchants for exclusion from my damages model undermines the reasonableness of my estimate of class-wide damages.

338.    In sum, none of Dr. Gaier's additional flawed and unsupported criticisms of my damages methodology discussed above have caused me to change my opinions and conclusions regarding the soundness and reliability of my damages methodology. In the next section I discuss some revisions I have made to my estimations of damages suffered

---

[706] Gaier Report at ¶140.
[707] Lamb Report at footnote 865.
[708] February 2022 Hammarskjold Letter.

by members of the Credit Card Class and Debit Card Class in light of ▒▒▒▒▒ ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒ following the serving of the Lamb Supplemental Report, as well as two minor changes in response to criticisms contained in Dr. Gaier's report.

### E. *Updated Estimation of Damages Suffered by Members of the Credit Card Class and Debit Card Class*

339.    As I noted above, after the serving of both the Lamb Report and Lamb Supplemental Report, ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒ ▒▒▒▒▒▒▒ I have made two changes to my estimation of damages to reflect this new information.

340.    ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒.[710] Therefore, in order to address this data issue, I reduced Visa's annual shares of business GPCC and Debit Card sales based on estimates of Visa's business card transaction volumes from Nilson.[711] I have noted that this adjustment is likely very conservative, as the most common forms of small business card spending is in industry categories that typically do not align with the Qualified

---

[709] VISAOLIVER-000013482-83 at 82; ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒

[710] ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒

[711] The Nilson Report, No. 1090, July 2016 at p. 8; The Nilson Report, No. 1113, July 2017 at p. 12; The Nilson Report, No. 1135, July 2018 at p. 12; The Nilson Report, No. 1158, July 2019 at p. 12; The Nilson Report, No. 1179, July 2020 at p. 12; The Nilson Report, No. 1205, September 2021 at p. 9; The Nilson Report, No. 1232, December 2022 at p. 17; The Nilson Report, No. 1080, February 2016 at p. 8; The Nilson Report, No. 1103, February 2017 at p. 8; The Nilson Report, No. 1125, February 2018 at p. 8; The Nilson Report, No. 1147, February 2019 at p. 7; The Nilson Report, No. 1169, February 2020 at p. 7; The Nilson Report, No. 1191, February 2021 at p. 5; The Nilson Report, No. 1213, February 2022 at p. 5.  I have made a minor adjustment to the timing of the dropping of Mastercard commercial cards to be consistent with how Visa business cards are now being dropped from my model.

Merchants.[712]  For example, Discover published a summary of the five most "Common Uses of Small Business Credit Cards" on its website: Office Supplies (74 percent); Product/Equipment (61 percent); Gas for business vehicle (48 percent); Phone/internet/cable (44 percent); and Travel (42 percent).[713]  Thus, one would not expect to see significant volumes of small business card spending at Qualified Merchants such as American Eagle Outfitters, GameStop, or Williams Sonoma.

341.    

[715]  Similarly, in a letter from Counsel for Mastercard to Rebecca Schindel of Cravath, Swaine & Moore containing responses to questions Defendants' Economists asked[716] about the Mastercard summary-level data that I received after the serving of the Lamb Report and Lamb Supplemental Report, Mastercard stated that the state-level information in the data it produced is provided by the acquirers and it "does not have any visibility into how acquirers determine the relevant state, including for ecommerce transactions."[717]

342.    Thus, given the current level of uncertainty as to how the state field is populated in the Summary-Level Sales Data produced to me as part of this litigation, and in order to be conservative, I dropped all card-not-present GPCC and Debit Card sales data from my estimation of damages.  However, I have noted that in the event that any additional information or replacement and/or supplemental data becomes available to me at a later

---

[712] In the event that Visa were to ███████████████████████████ at a later stage, I reserve the right to incorporate those new data into my estimation of damages at an appropriate time.
[713] See Discover, "How Do Small Business Owners Use Their Credit Cards?," December 7, 2021.
[714] ████████████████████████
[715] ████████████████████████
[716] I also prepared a set of written questions that were sent to Mastercard on October 20, 2022 regarding the summary-level sales data it produced as part of discovery in this litigation.  I have not received any response from Mastercard as of the serving date of this Expert Reply Report.
[717] Letter from Gary R. Carney to Rebecca Schindel, dated October 24, 2022 at p. 1.

point in time that would better allow me to analyze these card-not-present sales and utilize them in a way consistent with the class definitions in this matter, I reserve the right to do so at an appropriate stage of this litigation.

343.    Furthermore, as I noted above, there were two of Dr. Gaier's criticisms of my estimation of damages that, upon consideration, I felt were reasonable and, therefore, I have incorporated them into my damages methodology.  Doing so resulted in minor changes to my estimation of damages.

344.    The first such criticism involved my estimation of Amex GPCC commerce that was used in my estimation of damages.  As I explained in the Lamb Report, I was not provided with similar Amex summary-level data as I was for the other three GPCC payment networks.[718]  Therefore, in order to determine a reasonable estimate of such summary-level data for Amex transactions to use in my analysis, I used the annual GPCC purchase volume totals reported by Nilson for Amex from 2015 through 2021 to project Amex's Relevant GPCC Transaction Volume during those years.[719]  While I maintain that, in the absence of such summary data provided by Amex, estimating Amex's Relevant GPCC Transaction Volume using overall transaction volumes reported by Nilson constitutes a reasonable approach, I have noted that, in making this criticism, Dr. Gaier created a summary of quarterly Amex GPCC Transaction volume at Qualified Merchants in Relevant States during the Class Periods in this matter ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[720]  However, given that I have now received such summary-level data of Amex's Relevant GPCC Transaction Volume through Dr. Gaier's backup production regarding his criticism of my estimation of Amex's Relevant GPCC Transaction Volume, after correcting for an error in Dr.

---

[718] Lamb Report at footnote 855.
[719] Lamb Report at footnote 855.
[720] Dr. Gaier's ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, which I discussed earlier in this Expert Reply Report.

Gaier's programming code,[721] I was able to take those Amex sales data and incorporate them into my estimation of damages.

345.    The second of Dr. Gaier's criticisms of my estimation of damages that, upon consideration, I felt was reasonable and, therefore, also incorporated it into my damages methodology involves my allocation of Discover's summary-level sales data across the Relevant States in this matter.  The summary-level sales data produced to me by Discover as part of discovery in this matter contained monthly summary level ████████████ ████████████████████████████████████████████████████████.  Thus, to ████████████ ████████████████████████████████████████████████, I used annual U.S. population figures.

346.    In his report, Dr. Gaier criticized this approach because, in a handful of instances, it resulted in allocating some of Discover's GPCC Transaction volume for certain merchants to states in which those merchants do not operate.  I agree with Dr. Gaier that this should be addressed in my estimation of damages.

347.    Where Dr. Gaier and I disagree is on the most appropriate way to address this discrepancy.  Consistent with other overly aggressive approaches proposed by Dr. Gaier regarding his other criticisms of my estimation of damages, Dr. Gaier asserts that, "[a]t a minimum," all Discover transactions should be excluded from my model.[722]

348.    Contrary to Dr. Gaier's unreasonable assertion, I have developed a more appropriate and reasonable alternative that better allocates the Discover GPCC sales in its summary-level data to Relevant States without having to exclude all relevant commerce (and, thus, damages) associated with Relevant GPCC Transactions made with Discover GPCCs by members of the Credit Card Class.  To do so, I first reduce the national level sales for each merchant down to annual proportion of U.S. population for the combined 14 Relevant States for each year during the Class Periods.  Then, in order to allocate

---

[721] In his analysis showing that Amex's "[a]ctual charge volume" ██████ than the Amex GPCC charge volume I estimated using overall Nilson sales data, Dr. Gaier's programming code failed to include any sales from Qualified Merchant Foot Locker.  For the purposes of incorporating Amex's "[a]ctual charge volume" into my damages estimate, I have corrected this error so that Foot Locker sales were also included.  See Gaier Report at ¶120.

[722] Gaier Report at ¶¶137-138.

these sales to each Relevant State in a way that more accurately reflects the operations of the Qualified Merchants in those states, I calculate the combined proportion of Visa and Mastercard GPCC sales for each Qualified Merchant across the 14 Relevant States, and then use those proportions to allocate the remaining Discover GPCC Transactions for each Qualified Merchant across each of the Relevant States.  Once I have this updated, more appropriate allocation of Discover GPCC Transactions, I then plug those Discover GPCC Transactions into the version of my damages methodology that also incorporates the updated Amex GPCC Transaction volume calculated by Dr. Gaier (discussed above).[723]

349.    Table 1 below summarizes the results of my updated, reasonable estimation of damages suffered by members of the Credit Card Class and Debit Card Class.  As shown, the estimated aggregate amount of overcharge damages suffered by members of the Credit Card Class during the applicable Class Periods total $251.6 million, and the estimated aggregate amount of overcharge damages suffered by members of the Debit Card Class during the applicable Class Periods total $319.7 million.

---

[723] ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ See DFS0010162; DFS0010163.

# Table 1

### Summary of Updated Estimated Damages Suffered by Members of Credit Card Class and Debit Card Class

| Relevant State | Credit Card Class | Debit Card Class |
|---|---|---|
| AL | $ 19,562,641.31 | $ 30,311,577.28 |
| DC | $ 1,756,203.96 | $ 2,223,112.59 |
| HI | $ 8,804,917.85 | $ 5,653,080.17 |
| IL | $ 56,094,775.44 | $ 67,771,901.22 |
| KS | $ 13,054,584.41 | $ 13,582,346.39 |
| ME | $ 6,092,134.22 | $ 5,329,784.83 |
| MS | $ 8,199,978.29 | $ 13,160,650.91 |
| MT | $ 4,286,558.77 | $ 4,920,356.54 |
| NC | $ 42,800,597.50 | $ 64,350,364.87 |
| OH | $ 47,280,460.89 | $ 56,483,173.09 |
| OR | $ 21,003,631.80 | $ 31,678,463.26 |
| UT | $ 14,911,061.34 | $ 14,600,275.30 |
| VT | $ 1,586,545.08 | $ 1,609,452.73 |
| WV | $ 6,159,001.01 | $ 8,053,209.35 |
| **Total** | **$ 251,593,091.89** | **$ 319,727,748.53** |

**VII.    Conclusions**

351.    Based on my review of the Defendants' Economists' reports, back-up materials, deposition testimony, and my further analyses and research into the market for GPCC Transactions in the United States, as well as my training and experience in economics, I have reaffirmed the conclusions set forth in the Lamb Report and Lamb Supplemental Report.  As I discuss in extensive detail above, I find that many of Defendants' Economists' analyses are flawed and unreliable, or immaterial to my findings and conclusions, or both.  Further, I find that their criticisms of the analyses contained in the Lamb Report and Lamb Supplemental Report are either flawed; based upon a critical misunderstanding of Plaintiffs' allegations, the evidence, and the nature of Amex's alleged anticompetitive conduct, and, thus, are unreliable and without merit; and/or are irrelevant to the conclusions I reached in the Lamb Report and Lamb Supplemental Report.

Russell L. Lamb, Ph.D.

March 17, 2023

# Appendix A



## Russell Lamb, Ph.D.

President
Monument Economics Group
Phone: (703) 615-3474
Email: rlamb@megconsulting.com

**Professional Summary**

Russell Lamb is an expert in antitrust economics and has testified concerning antitrust liability, impact, and damages. He has an extensive background in applied econometrics and has developed econometric models to measure damages in a number of matters involving allegations of horizontal price fixing. He has provided expert testimony in State and Federal Courts in the United States and in Canada on a range of issues including class-certification and economic damages in antitrust, RICO and consumer fraud matters. In addition, he has provided expert advice to client attorneys at all levels of the litigation. Dr. Lamb has an extensive background in the analysis of domestic and international agricultural markets and has authored more than 50 articles in peer-reviewed economics journals, trade press, and major newspapers.

Dr. Lamb's work has been cited by courts in certifying classes in the United States and Canada. For example, in In re Aftermarket Automotive Lighting Products Antitrust Litigation, the court held that his analysis provided "a sufficient basis from which to conclude that Plaintiffs would adduce common proof concerning the effect of Defendants' alleged price-fixing conspiracy on prices class members paid." In certifying the Class in In re: Titanium Dioxide Antitrust Litigation, the Court said, "This Court finds that Dr. Lamb's regression analysis accurately reflects the characteristics of the titanium dioxide industry, and the facts in this case." In In Re: Domestic Drywall Antitrust Litigation, the Court cited extensively to Dr. Lamb's analysis in its decision to certify the Class: "Dr. Lamb's expert opinion fits the facts of the case, is relevant, and is therefore admissible to show classwide injury and measurable damages in support of Plaintiffs' Motion for Class Certification. [...] The Court [...] has thoroughly considered Dr. Lamb's opinion in its decision on the DPPs' Class Certification Motion." In the Canadian LCD Competition Act Class Action, the Court held that Dr. Lamb's analysis provided "evidence of a viable methodology for the determination of loss on a class-wide basis." In In re: Puerto Rican Cabotage Litigation, the Court held that "Dr. Lamb [had] set

1

forth a reputable and workable model for determining damages as to individual class members."  In certifying the class in Clarke and Rebecca Wixon, et al. v. Wyndham Resort Development Corp., et al., the Court held that "Dr. Lamb [had] presented a plausible class-wide method of proof."  In certifying the class in Eugene Allan, et al., v. Realcomp II, Ltd., et al., the Court held that "the Plaintiffs have produced sufficient evidence that common proofs will yield a finding of class-wide damages that predominates over any specific individualized damages. The Lamb Report and Lamb Reply are sufficient to establish this fact."  Furthermore, Dr. Lamb was the Indirect Purchaser Plaintiffs' expert in the In re: Polyurethane Foam Antitrust Litigation matter, which was certified by the Court in April 2014.

With regard to agricultural economics, Dr. Lamb has a particular expertise in agricultural markets and has undertaken extensive original research and econometric analysis on markets for agricultural commodities.  His articles on agricultural economics have been published in peer-reviewed journals, trade press, and major newspapers.  Dr. Lamb regularly presents at conferences on topics including the state of the U.S. Economy and farm policy.

Prior to co-founding Monument Economics Group, Dr. Lamb was a Senior Vice President at Nathan Associates Inc., where he directed the firm's litigation consulting practice nationally.  Dr. Lamb previously served as a Principal at AACG in Arlington, VA, and as Managing Director and DC Office Head at Econ One Research.  He earlier served as an Assistant Professor of Agricultural Economics and faculty member of the Graduate Group in Economics at North Carolina State University and as an Economist and Senior Economist in the Federal Reserve System of the United States, at the Federal Reserve Board and the Federal Reserve Bank of Kansas City.

**Education**

- Ph.D., Economics, University of Pennsylvania, 1994
- M.A., Economics, The University of Maryland, 1989
- B.A., Economics, The University of Tennessee, 1987

**Expert Testimony Offered**

**2022**   *Surgical Instrument Service Company, Inc. v. Intuitive Surgical, Inc.*

- United States District Court Northern District of California
- Case No. 5:21-cv-03496
- Expert Report, December 2, 2022
- Opinion concerning monopolization issues
- Retained by Haley Guiliano LLP

*Anthony Oliver, et al. v.  American Express Company, et al.*

- United States District Court Eastern District of New York
- Case No. 1:19-cv-00566
- Expert Report, September 30, 2022
- Supplemental Expert Report, October 19, 2022
- Testified at deposition, January 5, 2023
- Opinion concerning class certification and damages issues
- Retained by Berman Tabacco

*Las Vegas Sun, Inc. v. Sheldon Adelson, et al.*

- United States District Court District of Nevada
- Case No. 2:19-cv-01667
- Expert Report, September 19, 2022
- Expert Rebuttal Report, January 18, 2023
- Opinion concerning damages issues
- Retained by Lewis Roca Rothgerber Christie LLP

*Value Drug Company v. Takeda Pharmaceuticals U.S.A., Inc., et al.*

- United States District Court Eastern District of Pennsylvania
- Case No. 21-CV-3500
- Expert Report, July 25, 2022
- Amended Expert Report, July 28, 2022
- Testified at deposition, August 17, 2022
- Testified at deposition, September 15, 2022
- Testified at class certification hearing, November 1, 2022
- Expert Report, November 17, 2022
- Supplemental Expert Report, December 22, 2022
- Testified at deposition, January 10, 2023
- Opinion concerning class certification and damages issues
- Retained by Berger & Montague, P.C.

*Serge Asselin v. Ainsi Canada, Inc. et al.*

- Cour Supérieure District de Québec
- Case No. 200-06-000203-169
- Expert Report, May 31, 2022
- Opinion concerning market factors
- Retained by Siskinds LLP, Sotos LLP

*In Re Caustic Soda Antitrust Litigation*

- United States District Court Western District of New York
- Case No. 1:19-cv-00385-EAW-MJR
- Expert Report, April 25, 2022
- Testified at deposition, June 6, 2022
- Expert Reply Report, August 25, 2022
- Testified at deposition, September 23, 2022
- Expert Sur-Rebuttal Report, February 10, 2023
- Opinion concerning class certification and damages issues
- Retained by CERA LLP

*Boothe Farms, Inc., et al. v. The Dow Chemical Co., et al.*

- United States District Court Eastern District of Arkansas Northern Division
- Case No. 3:19-cv-00264-DPM
- Expert Report, April 15, 2022
- Supplemental Expert Report, April 20, 2022
- Testified at deposition, May 4, 2022
- Declaration, May 19, 2022
- Opinion concerning damages issues
- Retained by Lieff Cabraser Heimann & Bernstein, LLP

**2021**   *In Re: Takata Airbag Product Liability Litigation*

- United States District Court Southern District of Florida Miami Division
- MDL No. 2599
- Expert Report, December 23, 2021
- Testified at deposition, January 25, 2022
- Opinion concerning class certification and damages issues
- Retained by Podhurst Orseck

*In Re: Broiler Chicken Antitrust Litigation*

- United States District Court Northern District of Illinois Eastern Division
- Case No. 1:16-cv-08637
- Expert Report, December 20, 2021
- Testified at deposition, February 8, 2022
- Expert Rebuttal Report, July 29, 2022
- Testified at deposition, September 1, 2022
- Opinion concerning damages issues
- Retained by Polsinelli

*KPH Healthcare Services, Inc. a/k/a Kinney Drugs, Inc. v Gilead Sciences, Inc., et al.*

- United States District Court Northern District of California San Francisco Division
- Case No. 3:20-cv-06961-EMC
- Expert Report, October 19, 2021
- Declaration, February 25, 2022
- Declaration, April 13, 2022
- Declaration, April 26, 2022
- Testified at deposition, May 18, 2022
- Expert Merits Report, June 28, 2022

- Expert Rebuttal Report, June 30, 2022
- Testified at deposition, July 19, 2022
- Testified at deposition, July 25, 2022
- Expert Rebuttal Report, August 12, 2022
- Expert Rebuttal Damages Report, August 16, 2022
- Testified at deposition, August 31, 2022
- Opinion concerning class certification and damages issues
- Retained by Roberts Law Firm, P.A.

*In Re: Mallinckrodt plc, et al.*

- United States Bankruptcy Court District of Delaware
- Case No. 20-12522 (JTD)
- Expert Report, August 13, 2021
- Expert Reply Report, August 26, 2021
- Testified at deposition, September 8, 2021
- Supplemental Expert Report, October 29, 2021
- Testified at trial, November 12 and 15, 2021
- Expert Reply Report, December 1, 2021
- Testified at trial, December 16, 2021
- Opinion concerning damages
- Retained by Eimer Stahl LLP and Willkie Farr & Gallagher LLP

*Rebotix Repair LLC v. Intuitive Surgical, Inc.*

- United States District Court Middle District of Florida Tampa Division
- Case No. 8:20-cv-02274-VMC-TGW
- Expert Report, July 26, 2021
- Testified at deposition, October 19, 2021
- Opinion concerning monopolization issues
- Retained by Dovel & Luner

*Irene Breckon and Gregory Sills v. Alsaker AS, et al.*

- Federal Court of Canada
- Court File No. T-1664-19
- Expert Report, July 1, 2021
- Expert Reply Report, July 5, 2022
- Opinion concerning class certification issues
- Retained by Siskinds LLP, Sotos LLP, and Koskie Minsky LLP

*Gazarek Realty Holdings Ltd., et al. v. Corning Incorporated, et al.*

- Ontario Superior Court of Justice
- Court File No. CV-16-549735-00CP
- Expert Report, April 15, 2021
- Opinion concerning class certification issues
- Retained by Camp Fiorante Matthews Mogerman LLP, Sotos LLP, Siskinds LLP

*Kate O'Leary Swinkels v. ZF Friedrichshafen Ag, et al.*

- Ontario Superior Court of Justice
- Court File No. CV-18-00604648-00CP

- Expert Report, April 15, 2021
- Expert Reply Report, January 19, 2022
- Opinion concerning class certification issues
- Retained by Camp Fiorante Matthews Mogerman LLP, Sotos LLP, Siskinds LLP

*David Regan v. Masonite International Corporation, et al.*

- Federal Court of Canada
- Court File No. T-1049-20
- Expert Report, March 31, 2021
- Opinion concerning class certification issues
- Retained by Siskinds LLP

*In Re: JELD-WEN Holding, Inc. Securities Litigation*

- United States District Court for the Eastern District of Virginia Richmond Division
- Case No. 3:20-CV-00112-JAG
- Expert Declaration, January 4, 2021
- Expert Reply Declaration, February 15, 2021
- Testified at deposition, February 26, 2021
- Opinion concerning anticompetitive conduct issues
- Retained by Labaton Sucharow LLP and Robbins Gellar Rudman & Dowd LLP

**2020** *In Re Namenda Indirect Purchaser Antitrust Litigation*

- United States District Court Southern District of New York
- Case No. 1:15-CV-06549
- Expert Report, July 6, 2020
- Testified at deposition, July 23, 2020
- Expert Reply Report, September 21, 2020
- Opinion concerning class certification and damages issues regarding indirect purchasers
- Retained by Miller Law LLC and Safirstein Metcalf LLP

*In Re: Interior Molded Doors Antitrust Litigation*

- United States District Court for the Eastern District of Virginia Richmond Division
- Case No. 3:18-CV-00718-JAG
- Class Certification and Trial Expert Report, January 31, 2020
- Testified at deposition, March 4, 2020
- Class Certification and Trial Expert Reply Report, June 9, 2020
- Testified at deposition, July 16, 2020
- Opinion concerning class certification and damages issues
- Retained by Spector Roseman Kodroff & Willis, P.C., and Berger & Montague, P.C.

**2019** *In Re Zetia (Ezetimibe) Antitrust Litigation*

- United States District Court for the Eastern District of Virginia Norfolk Division
- Case No. 2:18-MD-02836-RBS-DEM
- Expert Declaration, November 18, 2019
- Testified at deposition, December 20, 2019
- Expert Trial Declaration, January 13, 2020
- Expert Reply Declaration, February 20, 2020

- Testified at class certification hearing, May 1, 2020
- Expert Trial Reply Declaration, May 8, 2020
- Expert Supplemental Declaration, May 15, 2020
- Testified at deposition, June 9, 2020
- Opinion concerning class certification and damages issues
- Retained by Miller Law LLC and Motley Rice LLC

*GAËTAN ROY c. JTEKT Corporation & al. (Bearings/Roulements)*

- Cour Supérieure District de Québec
- Case No. 200-06-000159-130
- Expert Report, November 12, 2019
- Opinion concerning class certification issues
- Retained by Siskinds LLP, Sotos LLP

*First Impressions Salon, Inc., et al., v. National Milk Producers Federation, et al.*

- United States District Court for the Southern District of Illinois
- Case No. 3:13-cv-00454-NJR-SCW
- Expert Report, January 4, 2019
- Testified at deposition, February 13, 2019
- Expert Reply Report, May 3, 2019
- Testified at deposition, May 17, 2019
- Opinion concerning class certification and damages issues
- Retained by Barrett Law Group, NastLaw LLC, and Roberts Law Firm

*Sheridan Chevrolet Cadillac Ltd., et al., v. JTEKT Corporation, et al.*

- Ontario Superior Court of Justice
- Court File No. CV-13-478644-00CP
- Expert Report, January 2, 2019
- Opinion concerning class certification issues
- Retained by Sotos LLP

**2018** *Sheridan Chevrolet Cadillac Ltd., et al., v. Hitachi Ltd., et al.*

- Ontario Superior Court of Justice
- Court File No. CV-14-506683-00CP
- Expert Report, October 4, 2018
- Opinion concerning class certification issues
- Retained by Sotos LLP

*In Re Suboxone Direct Purchaser Antitrust Litigation*

- United States District Court for the Eastern District of Pennsylvania
- Case No. 2:13-MD-02445-MSG
- Expert Report, September 18, 2018
- Testified at deposition, October 30, 2018
- Merits Expert Report, November 30, 2018
- Expert Rebuttal Report, January 11, 2019
- Testified at deposition, January 17, 2019
- Expert Merits Rebuttal Report, April 26, 2019
- Testified at deposition, June 12, 2019

- Opinion concerning class certification, merits, and damages issues
- Retained by Berger & Montague, P.C.; Garwin Gerstein & Fisher LLP; and Faruqi & Faruqi LLP

*William Rushing, et al. v. Williams-Sonoma, Inc., et al.*

- United States District Court Northern District of California, San Francisco Division
- Case No. 3:16-cv-01421-WHO
- Expert Report, July 25, 2018
- Testified at deposition, January 24, 2023
- Opinion concerning class certification issues
- Retained by Rose Law Group, PC

*The Hospital Authority of Metropolitan Government of Nashville and Davidson County, Tennessee, et al. v. Momenta Pharmaceuticals, Inc., et al.*

- United States District Court Middle District of Tennessee Nashville Division
- Civil Action No. 15-cv-1100
- Testified at deposition, October 10, 2018
- Expert Report, June 22, 2018
- Expert Reply Report, September 21, 2018
- Testified at class certification hearing, May 13, 2019
- Declaration, May 21, 2019
- Expert Merits Report, May 24, 2019
- Declaration, June 18, 2019
- Expert Report, July 5, 2019
- Expert Supplemental Reply Report, July 5, 2019
- Testified at hearing, July 12, 2019
- Expert Merits Reply Report, July 29, 2019
- Testified at deposition, August 13, 2019
- Opinion concerning class certification and damages issues regarding indirect purchasers
- Retained by Lieff Cabraser Heimann & Bernstein, LLP

**2017** *Fady Samaha and Urlin Rent a Car Ltd. v. Yamashita Rubber Co., Ltd., et al.*

- Ontario Superior Court of Justice
- Court File No. CV-13-472262-00CP
- Expert Report, December 4, 2017
- Supplemental Report, July 13, 2018
- Expert Reply Report, January 23, 2020
- Testified at deposition, April 20, 2020
- Supplemental Report, September 30, 2020
- Opinion concerning class certification issues
- Retained by Siskinds LLP

*In Re Lamictal Direct Purchaser Antitrust Litigation*

- United States District Court New Jersey
- Case No. 1 2-95 -WHW-MCA
- Expert Report, November 6, 2017
- Revised Expert Reply Report, April 16, 2018

- Testified at deposition, June 6, 2018
- Opinion concerning class certification and damages issues
- Retained by Berger & Montague, P.C.

*In Re Namenda Direct Purchaser Antitrust Litigation*

- United States District Court Southern District of New York
- Case No. 1:15-CV-07488
- Expert Report, September 15, 2017
- Amended Expert Report, September 20, 2017
- Expert Reply Report, October 25, 2017
- Amended Expert Reply Report November 9, 2017
- Testified at deposition, October 6, 2017
- Opinion concerning class certification and damages issues
- Retained by Berger & Montague, P.C.; and Garwin Gerstein & Fisher LLP

*In Re Capacitors Antitrust Litigation*

- United States District Court Northern District of California San Francisco Division
- Case No. 3:14-CV-03264 -JD
- Expert Declaration, February 24, 2017
- Expert Reply Declaration, April 28, 2017
- Testified at deposition, May 17, 2017
- Expert Trial Declaration, November 30, 2018
- Expert Trial Reply Declaration, April 19, 2019
- Testified at deposition, May 23, 2019
- Expert Declaration, July 2, 2021
- Opinion concerning class certification issues regarding indirect purchasers
- Retained by Cotchett, Pitre & McCarthy, LLP

**2016** *Deere Construction, LLC, v. Cemex Construction Materials Florida, LLC, et al.*

- United States District Court Southern District of Florida
- Case No. 15-24375-CIV-ALTONAGA/O'Sullivan
- Expert Report, September 14, 2016
- Testified at deposition, September 27, 2016
- Opinion concerning class certification issues
- Retained by Kozyak Tropin & Throckmorton, LLP; Harke Clasby & Bushman, LLP; and McCallum, Methvin & Terrell, P.C.

*Luke Begonja v. Wyndham Vacation Resorts, Inc., et al. (Case No. 2015-CA-010943)*

*Gerrit Brouwer, Jr., et al. v. Wyndham Vacation Resorts, Inc., et al. (Case No. 2014-CA-008533)*

*Gary Gottschalk, et al. v. Wyndham Vacation Resorts, Inc., et al. (Case No. 2015-CA-001957)*

*Susan Hatzipetro, et al. v. Wyndham Vacation Resorts, Inc., et al. (Case No. 2014-CA-007996)*

*Shelly Keegan, et al. v. Wyndham Vacation Resorts, Inc., et al. (Case No. 2015-CA-001953)*

*Yvonne Klebba, et al. v. Wyndham Vacation Resorts, Inc., et al. (Case No. 2014-CA-008535)*

*Adriane McConville, et al. v. Wyndham Vacation Resorts, Inc., et al. (Case No. 2015-CA-001960)*

*Ernest W. Yeager Jr., et al. v. Wyndham Vacation Resorts, Inc., et al. (Case No. 2014-CA-008054)*

- In the Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida
- Expert Report, September 14, 2016
- Testified at deposition, October 27-28, 2016
- Testified at deposition, March 2-3, 2017
- Expert Report, May 19, 2017
- Testified at deposition, August 29, 2017
- Opinion concerning damages issues
- Retained by Badham & Buck, LLC

*In Re: Evanston Northwestern Healthcare Corporation Antitrust Litigation*

- United States District Court for the Northern District of Illinois Eastern Division
- No. 07-C-4446
- Expert Report, July 28, 2016
- Expert Reply Report, January 25, 2017
- Testified at deposition, September 20, 2016
- Testified at deposition, February 22, 2017
- Opinion concerning damages issues
- Retained by Miller Law LLC

*In Re: Ductile Iron Pipe Fittings ("DIPF") Direct Purchaser Antitrust Litigation*

- United States District Court for the District of New Jersey
- Civ. No. 12-711 (AET)(LHG)
- Declaration, May 27, 2016
- Reply Declaration, March 31, 2017
- Testified at deposition, July 8, 2016
- Opinion concerning class certification, merits, and damages issues
- Retained by Cohen Milstein Sellers & Toll PLLC; and Kaplan Fox & Kilsheimer LLP

*Nestlé Purina Petcare Company v. Blue Buffalo Company, Ltd.*

*Blue Buffalo Company, Ltd. v. Nestlé Purina Petcare Company, et al.*

*Blue Buffalo Company, Ltd. v. Wilbur-Ellis Company, et al.*

*Diversified Ingredients, Inc. v. Wilbur-Ellis Company, et al.*

*Diversified Ingredients, Inc. v. Custom AG Commodities, LLC, et al.*

- United States District Court for the Eastern District of Missouri Eastern Division
- Cause No.: 4:14-CV-00859 RWS
- Affidavit, March 17, 2016
- Opinion concerning pricing issues
- Retained by Lashly & Baer, P.C.

*In Re: Cast Iron Soil Pipe and Fittings Antitrust Litigation*

- United States District Court Eastern District of Tennessee at Chattanooga
- Case No.: 1:14-md-2508
- Declaration, March 4, 2016
- Testified at deposition, May 19, 2016
- Opinion concerning class certification and damages issues

- Retained by Cohen Milstein Sellers & Toll PLLC; Cera LLP; and Kaplan Fox & Kilsheimer LLP

*Darren Ewert v. Denso Corporation, et al.*

- Supreme Court of British Columbia
- Case No. S-135610
- Expert Report, February 12, 2016
- Expert Reply Report, January 5, 2017
- Opinion concerning class certification issues
- Retained by Camp Fiorante Matthews Mogerman

*Serge Asselin v. Hitachi, LTD & al.*

- Cour Supérieure Disctirct de Québec
- Case No. 200-06-000180-144
- Expert Report, February 11, 2016
- Opinion concerning class certification issues
- Retained by Siskinds LLP

**2015**  *Thomas Mervyn v. Atlas Van Lines, Inc., et al.*

- United States District Court Northern District of Illinois Eastern Division
- Case No. 1:13-CV-03587
- Expert Declaration, September 3, 2015
- Expert Report, February 4, 2016
- Opinion concerning data issues
- Opinion concerning damages issues
- Retained by Miller Law LLC

*Thomas Mervyn v. Nelson Westerberg, Inc.*

- United States District Court Northern District of Illinois Eastern Division
- Case No. 1:11-CV-06594
- Expert Report, July 27, 2015
- Opinion concerning damages issues
- Retained by Miller Law LLC

*Lane's Gifts and Collectibles, LLC v. Microsoft Online, Inc.*

- United States District Court Western District of Washington at Seattle
- No. 2:12-cv-01181-BJR
- Expert Report, March 23, 2015
- Testified at deposition, May 21, 2015
- Opinion concerning damages issues
- Retained by Nix, Patterson & Roach, L.L.P.; and Kessler Topaz Meltzer & Check, LLP

*BlueCross BlueShield of Tennessee, Inc., et al. v. King Pharmaceuticals, Inc., et al.*

- In the Circuit Court for Cocke County, Tennessee
- Civil Action No. 32941-II
- Expert Report, January 23, 2015
- Opinion concerning impact and damages issues
- Retained by Miller Law LLC

*In Re: Domestic Drywall Antitrust Litigation*

- United States District Court for the Eastern District of Pennsylvania
- MDL No. 2437 13-MD-2437
- Trial Expert Report, January 23, 2015
- Reply Expert Report, April 23, 2015
- Expert Report concerning class certification, August 3, 2016
- Expert Reply Report concerning class certification, January 9, 2017
- Affidavit, July 11, 2019
- Testified at deposition, February 25, 2015
- Testified at deposition, August 30, 2016
- Testified at deposition, February 17, 2017
- Testified at class certification hearing, April 27, 2017
- Expert Supplemental Report, July 31, 2017
- Opinion concerning merits issues regarding direct purchasers
- Opinion concerning class certification issues, impact and damages regarding direct purchasers
- Retained by Cohen Milstein Sellers & Toll PLLC; Berger & Montague, P.C.; and Spector Roseman Kodroff & Willis, P.C.

*In Re: Processed Egg Products Antitrust Litigation*

- United States District Court for the Eastern District of Pennsylvania
- MDL No. 2002
- Expert Declaration, January 22, 2015
- Expert Reply Declaration, April 3, 2015
- Testified at deposition, May 7, 2015
- Opinion concerning merits and damages issues regarding indirect purchasers
- Retained by Straus & Boies, LLP

**2014** *In Re: Class 8 Transmission Indirect Purchaser Antitrust Litigation*

- United States District Court for the District of Delaware
- Civil Action No. 11-cv-00009 (SLR)
- Declaration, November 3, 2014
- Reply Declaration, March 6, 2015
- Trial Declaration, March 27, 2015
- Trial Reply Declaration, July 2, 2015
- Testified at deposition, December 17, 2014
- Testified at deposition, March 16, 2015
- Testified at class certification hearing, March 25, 2015
- Testified at deposition, May 1, 2015
- Opinion concerning class certification issues regarding indirect purchasers
- Opinion concerning merits and damages issues regarding indirect purchasers
- Retained by Glancy Binkow & Goldberg LLP

*Mark S. Wallach, et al., v. Eaton Corporation, et al.*

- United States District Court District of Delaware
- Civil Action No. 10-260-SLR
- Expert Report, November 3, 2014
- Expert Reply Report, March 6, 2015

- Trial Expert Report, March 27, 2015
- Trial Expert Reply Report, July 2, 2015
- Testified at deposition, December 16, 2014
- Testified at deposition, March 16, 2015
- Testified at class certification hearing, March 25, 2015
- Testified at deposition, May 1, 2015
- Opinion concerning class certification issues regarding direct purchasers
- Opinion concerning merits and damages issues regarding direct purchasers
- Retained by Cohen Milstein Sellers & Toll PLLC

*Sheridan Chevrolet Cadillac Ltd., et al., v. Furukawa Electric Co. Ltd., et al.*

*Sheridan Chevrolet Cadillac Ltd., et al., v. Mitsubishi Electric Corporation, et al.*

- Ontario Superior Court of Justice
- Court File Nos. CV-12-446737-00CP / CV-14-496994-00CP
- Expert Report, April 15, 2016
- Expert Report, October 14, 2014
- Opinion concerning class certification issues
- Retained by Siskinds LLP

*Resco Products, Inc., v. Bosai Minerals Group Co., Ltd., et al.*

- United States District Court for the Western District of Pennsylvania
- Civil Action No.: 2:06-cv-235-JFC
- Expert Report, September 24, 2008
- Expert Report, September 29, 2014
- Supplemental Expert Report, December 15, 2014
- Testified at deposition, February 13, 2015
- Opinion concerning damages
- Retained by Boies, Schiller & Flexner LLP

*Fond Du Lac Bumper Exchange Inc., et al. v. Jui Li Enterprise Company Ltd. et al.*

- United States District Court Eastern District of Wisconsin
- Case No.: 2:09-cv-00852-LA
- Affidavit, August 1, 2014
- Affidavit, November 4, 2014
- Declaration, April 24, 2015
- Expert Report, July 15, 2015
- Expert Reply Report, November 24, 2015
- Expert Surreply Report, January 15, 2016
- Expert Trial Report, August 18, 2016
- Expert Trial Reply Report, December 20, 2016
- Testified at deposition, October 1, 2015
- Testified at deposition, February 13, 2017
- Opinion concerning class certification and damages issues
- Opinion concerning Defendants' replacement data
- Opinion concerning Defendant and LKQ transaction-level data
- Opinion concerning merits and damages issues
- Retained by Stueve Siegel Hanson, LLP

*Meredith Corporation, et al., v. SESAC, LLC, et al.*

- United States District Court for the Southern District of New York
- 09 Civ. 9177 (PAE)
- Expert Report, July 10, 2014
- Opinion concerning class certification issues
- Retained by Weil, Gotshal & Manges LLP

*Janet Skold, et al., v. Intel Corporation, et al.*

- Superior Court of the State of California for the County of Santa Clara
- Case No. 1-05-CV-039231
- Expert Report, June 14, 2007
- Testified at deposition, August 31, 2007
- Testified at deposition, January 10, 2014
- Opinion concerning class certification issues
- Opinion concerning damages issues
- Retained by Girard Gibbs LLP

*In Re: Polyurethane Foam Antitrust Litigation*

- United States District Court Northern District of Ohio Western Division 8
- MDL No. 2196
- Declaration, June 11, 2013
- Reply Declaration, October 23, 2013
- Trial Declaration, March 18, 2014
- Reply Trial Declaration, June 30, 2014
- Testified at deposition, August 20, 2013
- Testified at deposition, November 20, 2013
- Testified at class certification hearing, January 15, 2014
- Testified at deposition, April 14, 2014
- Testified at deposition, July 14, 2014
- Opinion concerning class certification issues regarding indirect purchasers
- Opinion concerning merits and damages issues
- Retained by Miller Law LLC

**Professional Experience**

**Economic Consulting Positions**

**Monument Economics Group**, Oct. 11, 2016 - Present

**Nathan Associates, Inc.,** Arlington, VA, *Senior Vice President*, Jan. 2013 – Sep. 20, 2016

**Advanced Analytical Consulting Group, Inc.,** Washington, DC, *Principal*, Mar. 2011– Jan. 2013

**Econ One Research, Inc.,** Washington, DC, Managing Director and DC Office Head, Jul. 2006 – Mar. 2011

- Opened and staffed the DC office; managed office affairs on a daily basis

- Retained as an expert witness for damages and class certification issues in antitrust, breach of contract, product liability and RICO cases; representative testimony

includes determination of liability and damages in a case involving resale price maintenance in consumer products, class certification in a horizontal price-fixing case involving international travel in the airline industry, class certification in a consumer class action involving RICO claims in state court

- Industry pre-litigation analyses for consumer products, chemicals, and other industries

**Navigant Consulting, Inc.**, Washington, DC, *Associate Director*, Feb. 2006 – Jul. 2006

- Case manager for damages analysis in asbestos litigation and personal injury claims

**Nathan Associates, Inc.**, Arlington, VA, *Managing Economist*, Jul. 2004 – Feb. 2006

- Case manager for economic analysis of class certification and damages issues in antitrust and RICO cases involving the chemical, consumer products, and tobacco industries

- Retained as expert on damages for direct purchasers of NBR in the Crompton Global Settlement; submitted an Affidavit on damages and appeared before the Special Master for the Crompton Global Settlement (the Hon. Kenneth Feinberg)

**Board Membership**

- Board of Advisors, American Antitrust Institute, Washington, DC
- Department of Economics Advisory Council, University of Tennessee, Knoxville, Chairman, Spring 2006 – April 2011

**Teaching Positions**

- The University of Tennessee, Knoxville, *Adjunct Professor*, Spring 2019 – present
- The George Washington University, Washington, DC, *Adjunct Assistant Professor of Economics*, Fall 2004 – present
- North Carolina State University (NCSU), *Assistant Professor* (Department of Agricultural and Resource Economics), Fall 1999 – Spring 2004
- The University of Pennsylvania, *Adjunct Instructor*, Summer 1990 – Spring 1994

**Additional Teaching Experience**

- The Wharton School Evening Division, Philadelphia, PA, summer 1993
- Rutgers University, Camden, NJ, summer 1993
- Philadelphia College of Textiles and Science, Philadelphia, PA, fall 1992
- The Pennsylvania State University, Media, PA, 1991
- St. Mary's College of Maryland, St. Mary's City, MD, summer 1989
- The University of Maryland University College, College Park, MD, 1988-1989

**Courses Taught**

- Managerial Economics for MBA students (George Washington University)
- Law and Economics (George Washington University)

- Intermediate Microeconomics – graduate level (George Washington University)
- Latin American Economic Development (George Washington University)
- International Trade: Theory and Policy (George Washington University)
- International Finance: Theory and Policy (George Washington University)
- Agricultural Production and Supply – Ph.D. field course (North Carolina State University)
- U.S. Agricultural Policy (North Carolina State University)
- Microfinance: Theory, Practice and Regulation (Superintendencia de Banca y Seguros)
- Statistical Analysis for Economics (University of Pennsylvania)
- Principles of Microeconomics (University of Maryland, St. Mary's College of Maryland)
- Principles of Macroeconomics (University of Pennsylvania, The Wharton School, Penn State University)
- Fundamentals of Micro/Macro Economics (University of Maryland)
- Environmental and Natural Resource Economics (Rutgers)

**Federal Reserve Experience**

Federal Reserve Bank of Kansas City, *Senior Economist* Jan. 1998 – Aug. 1999; *Economist*, Jan. – Dec. 1997

- Analysis of regional, macroeconomic developments in agriculture, and energy
- Research on public policy towards agriculture in the U.S., especially the impact of farm policy reform
- Briefings to the Bank president and outside groups on the regional economy, agriculture, agricultural trade

Board of Governors of the Federal Reserve System, *Economist*, Jun. 1994 – Dec. 1996

- Analysis of macroeconomic conditions, commodity markets, and prices (CPI, PPI, Core prices)
- Forecasting of agricultural output, prices, and income
- Briefings to the Board of Governors on agriculture and food-price developments

**Other Consulting Experience**

World Perspectives, Inc., 2003 - 2004

- Analysis of trade barriers for U.S. exports of feed ingredients, pet food ingredients, and food ingredients
- Analysis of the impact of a Free Trade Area of the Americas on U. S. soybean producers
- Analysis of the potential for U.S. Halal-certified meat exports to the Middle East

Womble Carlyle Sandridge & Rice, LLP, 2003 - 2004

- Provided expert testimony related to the estimation of business profitability Smith-Moore, 2002 - 2003
- Provided economic analysis of the U.S. Tobacco Program

Superintendencia de Banca y Seguros (Lima, Peru), 1998 - 2000

- Developed and taught a class on Microfinance issues (in English) to students enrolled in a training program for bank examiners; the program was sponsored by the Inter-American Development Bank.

World Bank, Africa Technical Department, 1992 – 1993

- Summarized and provided an overview of data available on African economic and social indicators

ACG-Afrique, January 1993

- Provided critical review of a study document outlining the impact of structural adjustment on African agriculture

**Professional Organizations**

- National Association for Business Economics
- American Economic Association

**Papers, Publications, and Speeches**

## <u>Papers Published in Refereed Journals</u>

- "Losing the Forest for the Trees: On the Loss of Economic Efficiency and Equity in Federal Price-Fixing Class Actions," (with Martin A. Asher and Gregory K. Arenson) *Virginia Law & Business Review*, Vol. 16, No. 2, Spring 2022, 293-325
- "Government Regulation and Quality in the U.S. Beef Market," (with Peyton Ferrier) *Food Policy*, Vol. 32, No. 1, February 2007, 84-97
- "Rent-seeking in U.S.-Mexican Avocado Trade," *Cato Journal*, Vol. 26, No. 1, December 2006, 159-177
- "Consolidation in U.S. Agriculture and the Role of Public Policy," *The ICFAI Journal of Agricultural Economics,* Vol. 1, 2004, 7-16
- "Fertilizer Use, Risk, and Off-farm Labor Markets in the Semi-Arid Tropics of India," *American Journal of Agricultural Economics,* Vol. 85, No. 2, May 2003, 359-371
- "Inverse Productivity: Land Quality, Labor Markets, and Measurement Error," *Journal of Development Economics,* Vol. 71, No. 1, June 2003, 71-95
- "A Market-Forces Policy for the New Farm Economy?" *Review of Agricultural Economics,* Vol. 24, No. 1, 1 March 2002, 15-30

- "Food Crops, Exports, and the Short-run Policy Response of Agriculture in Africa," *Agricultural Economics,* Vol. 22, No. 3, April 2000, 271-298
- "FAIR Act Implications for Land Values in the Corn Belt," (with Jason Henderson) *Review of Agricultural Economics,* Vol. 22, No. 1, Summer – Spring 2000, 102-119
- "Why are Estimates of Agricultural Supply Response So Variable?" (with Francis X. Diebold) *Journal of Econometrics,* Vol. 76, No. 1-2, January – February 1997, 367-373

## Non-refereed Publications, Articles, and Editorials

- "The Predominance Requirement for Antitrust Class Actions – Can Relevant Market Analysis Help?" (with Jeffrey Leitzinger) American Bar Association – Section of Antitrust Law, *Economics Committee Newsletter*, Vol. 7, No. 1, Spring 2007, 17-22
- "Reform of U.S. Farm Policy in an Integrating World Economy," *Developing Countries in the WTO System*, 2006
- "New Farm Economy," *Regulation*, Winter 2003-2004, Cato Institute for Public Policy Research, 2003
- "What Road Will U.S. Economy Take in 2003?" *Southeast Farm Press*, 5 February 2003
- "Fast Track for the Tax Cuts," guest editorial, *News and Observer*, 18 January 2003
- "The 2002 Farm Bill," (with Blake Brown and Michele Marra) *NC State Economist,* November – December 2002
- "Economy-minded Tax Cuts: Bush's Reductions Provided the Boost to Lift U.S. From Recession," guest editorial, *News and Observer*, 2 July 2002
- "Policy Only Effective if Farm Economy is Recognized," special report to *Feedstuffs*, 5 June 2000
- "Aid During Crisis of Little Long-term Help to Farmers," guest editorial, *Kansas City Star,* 23 August 1999
- "Survey of Agricultural Credit Conditions," Federal Reserve Bank of Kansas City," *Regional Economic Digest*, various issues, 1997-1999
- "U.S. Agriculture at the Crossroads in 1999," *Economic Review,* Federal Reserve Bank of Kansas City, Vol. 84, No. 1, 1999, 73-91
- "Can U.S. Oil Production Survive the 20th Century?" *Economic Review,* Federal Reserve Bank of Kansas City, Vol. 84, Quarter I, 1999
- "Will the Tenth District Catch the Asian Flu?" (with Ricardo Gazel) *Economic Review,* Federal Reserve Bank of Kansas City, Vol. 83, Quarter II, 1998, 9-26
- "From the Plains to the Plate: Can the Beef Industry Regain Market Share?" (with Michelle Beshear) *Economic Review,* Federal Reserve Bank of Kansas City, Vol. 83, Quarter IV, 1998, 49-66
- "U.S. Agriculture: Another Solid Year in 1998?" (with Mark Drabenstott) *Economic Review,* Federal Reserve Bank of Kansas City, Vol. 83, No. 1, Quarter I, 1998, 55-74

- "How Will the 1996 Farm Bill Affect the Outlook for District Farmland Values?" *Economic Review,* Federal Reserve Bank of Kansas City, Vol. 82, Quarter IV, 1997, 85-101

- "Food Prices and the Farm Sector," monthly *Greenbook*, Federal Reserve Board of Governors, various issues 1994-1996

- "Hedge to Arrive Contracts," Memo to the Board of Governors, Federal Reserve Board of Governors, 5 June 1996

- "Prices in the May Greenbook," Federal Reserve Board of Governors, 19 May 1996

- "Prices in the March Greenbook," Federal Reserve Board of Governors, 24 March 1996

- "Commodity Price Developments," Weekly memo to the Board of Governors, Federal Reserve Board of Governors, August 1994 – December 1996

**Conference Presentations**

- "Class Action Developments," panelist at the American Antitrust Institute's 6th Annual Private Antitrust Enforcement Conference, Washington, DC: 4 December 2012

- "Consequences for Antitrust Thought and Practice," presented at the American Antitrust Institute Invitational Symposium: Antitrust Challenge of Multi-Channel Distribution in the Internet Age, Washington, DC: 22 June 2011

- "The U.S. Economy in the Year Ahead," presented at the Long Company Annual Conference, Chicago, IL: 11 September 2009 and 19 September 2008

- "The U.S. Economic Outlook," presented at the Industry Outlook Conference, Chicago, IL: 17 October 2006 and 18 October 2005

- "How Will the Economy Impact Your Business?" presented at the Long Company Annual Conference, Las Vegas, NV: 14 August 2004

- "Focus on The Economy" presented at *Milling and Baking News* Annual Purchasing Managers' Conference, Kansas City, MO: 14 June 2004, 10 June 2003 and 11 June 2002

- "The U.S. Economic Outlook and Agriculture," presented at the Industry Outlook Conference, Chicago, IL: October 2003

- "The U.S. Economic Outlook and Agriculture," presented at the Industry Outlook Conference, Breckenridge, CO: 7 April 2002

- "The U.S. Economic Outlook: The Cost of Terror," presented at the Southern Agricultural Outlook Conference, Atlanta, GA: 24 September 2001

- "The Economy in Focus," presented at *Milling and Baking News* annual purchasing managers' conference, Kansas City, MO: 5 June 2001

- "The Great American Growth Machine," presented at the Southern Agricultural Outlook Conference, Atlanta, GA: 27 September 2000

- "The Economy in Focus," presented at *Milling and Baking News* annual purchasing managers' conference, Kansas City, MO: 6 June 2000

- "The Outlook for the U.S. Pork Sector," presented to the Industry Outlook Conference, Las Vegas, NV: 17 April 2000

- "The National Economic Outlook: The Road Ahead," presented to the Food Industry Outlook Conference, Breckenridge, CO: 11 April 1999

- "Farm Policy for the New Millennium," presented to Federal Reserve Bank of Kansas City, Division of Bank Supervision and Regulation, Bank Examiners' Annual Training Conference, 7 January 1999

- "The Impact of the 1996 Farm Bill on Farmland Values," (with Jason Henderson) first place poster presentation at the annual meetings of the American Agricultural Economics Association, Salt Lake City, UT: 4 August 1998

- "A Note on the Inverse Productivity Relationship," presented at the annual meetings of the Western Economic Association International, Seattle, WA: July 1997

- "Off-farm Labor Supply and Fertilizer Use in the Semi-Arid Tropics of India," presented at the annual meetings of the American Agricultural Economics Association, August 1995

- "Prices for Food-Away-From-Home and Core Inflation: Some Empirical Relationships," (with James E. Kennedy) presented at the Federal Reserve System Committee on Agriculture, Richmond, VA: October 1995

- "Some Simple Dynamics of Farming," presented at the annual meetings of the American Agricultural Economics Association, Orlando, FL: August 1993

- "Structural Adjustment and Food Security," (with W. Graeme Donovan), presented at the annual meetings of the American Agricultural Economics Association, Orlando, FL:  August 1993

- "Structural Adjustment and African Agricultural Supply Response to Exchange Rate and Price Movements," (with W. Graeme Donovan), presented at the annual meetings of the Southern Agricultural Economics Association, Tulsa, OK: January 1993

**Other Presentations**

- Panelist, "Injured V. Non-Injured In Class Actions," American Bar Association, 18 October 2022

- Panelist, "If I Am Uninjured, Do I Not Bleed? The Packaged Seafood Decision," American Bar Association Webinar, 22 June 2022

- Panelist, "Antitrust Class Actions – Where Are We? A 360 Degree Perspective," NYSBA Annual Antitrust Law Section Meeting," 30 January 2014

- Panelist, Retrospective on the Baby Products Litigation, ABA Section of Antitrust Law: Pricing Conduct Committee, 31 July 2013

- Panelist, Economic Forecasting Summit, Northern Indiana Workforce Investment Board, Inc., 29 March 2007

- "The Welfare Benefits of USDA Beef Quality Certification Programs" (with Peyton Ferrier), presentation memo, 2007

- "Reform of U.S. Farm Policy in an Integrating World Economy," presented to the Cordell Hull Institute, Trade Policy Roundtable on Reform of U.S. Farm Policy and the WTO System, Washington, DC: 31 March 2006

- "The Case for a Market-forces Farm Policy in the U.S." presented at the Cordell Hull Institute Trade Policy Roundtable, Washington DC: 26 May 2005

- "How Will the Economy Impact Your Business?" presented at the Apple Processors Association annual meeting, Homewood Resort, 20 June 2004

- "The U.S. and International Economic Outlook," presented at the AgFirst Loan Officer's Seminar, Atlanta, GA: 30-31 October 2002

- "Will the U.S. Economy Bounce or Crawl?" presented to the Eastern Bankruptcy Institute, North Myrtle Beach, SC: 1 June 2002

- "The U.S. Economic Outlook and Agriculture," presented to the National Pork Producers Pork Action Group, Washington, DC: 10 April 2002

- "The U.S. Economic Outlook" presented to the Risk Management Associates, Raleigh, NC: 7 February 2002

- "The U.S. Economic Outlook: The Cost of Terror," presented at the National Pork Producers Pork Action Group, Marco Island, FL: 14 November 2001

- "Consolidation in Agriculture and the Role of Public Policy," paper presented to the Southern Extension Meetings, Williamsburg, VA: 13 June 2000

- "The New Farm Economy," presented at the annual meetings of the National Association of County Agricultural Agents, Omaha, NE: 14 September 1999

- "Regional Economic Update," presented to bankers in Kansas, Nebraska, Missouri, and Oklahoma as part of the Regulatory Update Seminar, Federal Reserve Bank of Kansas City, April 1999

- "The National Economic Outlook," presented to Oklahoma State University Advanced Cattle Management Seminar, Stillwater, OK: 11 March 1999

- "Regional Economic Update," presented to Thomas Hoenig, President, Federal Reserve Bank of Kansas City, 13 November 1998

- "Can the Tenth District Survive the Asian Flu?" The Federal Reserve Bank of Kansas City Economic Forums, nine presentations to bankers in Wyoming, Oklahoma, and New Mexico, 21 September – 21 October 1998

- "The Impact of Asian Economic Developments on Tenth District Agriculture," presented to Thomas Hoenig, President, Federal Reserve Bank of Kansas City, 30 January 1998

- "The Outlook for the Nebraska Economy," The Federal Reserve Bank of Kansas City: Nebraska Economic Forums, six presentations to bankers in Nebraska, 6-15 October 1997
- "Update on the Macroeconomy and Special Briefing on Forecast Performance at the Kansas City Fed," presented to Thomas Hoenig, President, Federal Reserve Bank of Kansas City, 13 August 1997
- "Regional Economic Update," presented to Thomas Hoenig, President, Federal Reserve Bank of Kansas City, 14 May 1997 and 21 March 1997
- "Producer Prices, Retail Sales, and Agricultural Commodity Markets," presented to the Board of Governors of the Federal Reserve System, 15 July 1996

**Referee Experience**

**Referee for the Following Academic Journals**

- World Development, 1993
- Journal of Development Economics, 1994, 1995
- International Economic Review, 1995
- Journal of Human Resources, 1997
- Journal of Business and Economics Statistics, 1997
- American Journal of Agricultural Economics, 1999, 2001, 2002
- Agricultural Economics, 2000, 2001, 2004
- Agricultural Finance Review, 2000, 2004
- Review of Agricultural Economics, 2000, 2002, 2004
- Journal of Agricultural and Resource Economics, 2000, 2001, 2002
- Emerging Markets Review, 2001
- Contemporary Economic Policy, 2004

**Fellowships, Honors, and Awards**

**Fellowships**

- Departmental Fellowship, University of Pennsylvania, 1989-1990
- Dean's Fellowship, University of Pennsylvania, 1991-1992
- Graduate School Fellowship, University of Maryland, College Park, 1987-1989

**Honor Societies and Professional Organizations**

- Phi Eta Sigma National Honor Society
- Mortar Board National Honor Society
- Golden Key National Honor Society

- Vice President for Professional Activities, Delta Sigma Pi

**Awards**

- Top Graduate in Liberal Arts, University of Tennessee, Knoxville, Spring 1987
- Chancellor's Citation for Extraordinary Professional Promise, University of Tennessee, Knoxville
- Chancellor's Citation for Outstanding Academic Achievement, University of Tennessee, Knoxville
- First place poster presentation, American Agricultural Economics Association annual meetings, August 1998 (with Jason Henderson)
- Honorable mention, American Agricultural Economics Association, Essay for the 21st Century, 2001, "A Market Forces Policy for the New Farm Economy"
- Honorable mention, American Antitrust Institute Antitrust Enforcement Awards, Outstanding Antitrust Litigation Achievement in Economics (for work in *In Re Titanium Dioxide Antitrust Litigation*)
- American Antitrust Institute Antitrust Enforcement Awards, Outstanding Antitrust Litigation Achievement in Economics (for work in *In Re Domestic Drywall Antitrust Litigation*)
- American Antitrust Institute Antitrust Enforcement Awards, Outstanding Antitrust Litigation Achievement in Economics (for work in *In Re Namenda Direct Purchaser Antitrust Litigation*)

**External Funding**

- "Unmanufactured Flue-Cured Tobacco Exports and the Export Component of the Quota Formula." $13,890 NC Tobacco Foundation. With Blake Brown 2000 – 2001.

**Professional Activities and Services**

**Graduate Student Advising**

M.A. degree, North Carolina State University

- Joe Weinberg (Political Science)

Master of Economics, North Carolina State University

- William Pole (2000)
- Dwight Wilder (Chairman, 2002)
- Adrian Atkeson (2002)
- Sarah Spivey
- Li Zhang (Chairman, 2003)
- Nia Atmadja (2003)

Doctor of Philosophy, North Carolina State University

- William Deese (2003)
- Peyton Ferrier (Chairman, 2004)

- Yang Wang (2003)
- Bobby Huggett (2003)
- Syed Wadood (Chairman, 2004)
- Henry Kuo

**Economic and Statistical Modeling Skills**

- Experience with all major statistical software including SAS, STATA, LIMDEP and C++; applied econometric modeling skills in damage analysis of consumer industries, chemicals industries, and agricultural markets, correlation analysis for class certification.

# Appendix B

HIGHLY CONFIDENTIAL

## Materials Relied Upon

*In addition to all materials listed in the Appendix B of the Lamb Report dated September 30, 2022 and the Appendix A of the Lamb Supplemental Report dated October 19, 2022:*

### Pleadings and Legal Correspondence

Conversation with Angela McGrath of Visa, dated November 9, 2022.

Letter from Gary R. Carney to Rebecca Schindel, dated October 24, 2022.

Letter from Peter T. Barbur to Todd Seaver, dated February 14, 2023.

Letter from Peter T. Barbur to Todd Seaver, dated February 16, 2023.

Letter from Peter T. Barbur to Todd Seaver, dated February 22, 2023.

Letter from Rebecca J. Schindel to Todd Seaver, dated June 24, 2022.

Letter from Todd Seaver to Peter T. Barbur, dated February 10, 2023.

Letter from Todd Seaver to Peter T. Barbur, dated February 20, 2023.

United States District Court Eastern District of New York, *Anthony Oliver, et al., Plaintiffs, v. American Express Company and American Express Travel Related Services Company, Inc., Defendants*, Expert Report of Dr. Russell L. Lamb, No. 1:19-cv-00566-NGG-SJB, September 30, 2022.

United States District Court Eastern District of New York, *Anthony Oliver, et al., Plaintiffs, v. American Express Company and American Express Travel Related Services Company, Inc., Defendants*, Supplemental Expert Report of Dr. Russell L. Lamb, No. 1:19-cv-00566-NGG-SJB, October 19, 2022.

United States District Court Eastern District of New York, *Anthony Oliver, et al., Plaintiffs, v. American Express Company and American Express Travel Related Services Company, Inc., Defendants*, Expert Report of B. Douglas Bernheim, No. 1:19-cv-00566-NGG-SJB, January 16, 2023.

United States District Court Eastern District of New York, *Anthony Oliver, et al., Plaintiffs, v. American Express Company and American Express Travel Related Services Company, Inc., Defendants*, Expert Report of Eric Emch, PhD, No. 1:19-cv-00566-NGG-SJB, January 16, 2023.

United States District Court Eastern District of New York, *Anthony Oliver, et al., Plaintiffs, v. American Express Company and American Express Travel Related Services Company, Inc., Defendants*, Expert Report of Eric M. Gaier, PhD, No. 1:19-cv-00566-NGG-SJB, January 16, 2023.

United States District Court Eastern District of New York, *Anthony Oliver, et al., Plaintiffs, v. American Express Company and American Express Travel Related Services Company, Inc., Defendants*, Errata to the Expert Report of Eric M. Gaier, Ph.D., No. 1:19-cv-00566-NGG-SJB, February 27, 2023.


Depositions and Declarations:

30(b)(6) Deposition and Exhibits of Monique Ouellette, July 8, 2022.

30(b)(6) Deposition and Exhibits of Jonathan Gantman, July 14, 2022.

Deposition and Exhibits of Jason Gaughan, October 24, 2022.

Deposition and Exhibits of Dr. Russell L. Lamb, January 5, 2023.

HIGHLY CONFIDENTIAL

Deposition and Exhibits of Dr. Eric Emch, March 9, 2023.

Deposition and Exhibits of Dr. Eric Gaier, March 2, 2023.

## Bates-Stamped Materials

| | |
|---|---|
| AMEX-CP-000007335 | AMEX-CP-000076415 |
| AMEX-CP-000029726 | AMEX-CP-000076417 |
| AMEX-CP-000035105 | AMEX-CP-000076420 |
| AMEX-CP-000069652 | AMEX-CP-000076424 |
| AMEX-CP-000069657 | AMEX-CP-000076427 |
| AMEX-CP-000069661 | AMEX-CP-000076529 |
| AMEX-CP-000069678 | AMEX-CP-000076540 |
| AMEX-CP-000070042 | AMEX-CP-000083656 |
| AMEX-CP-000070051 | AMEX-CP-000093363 |
| AMEX-CP-000070053 | AMEX-CP-000094061 |
| AMEX-CP-000070067 | AMEX-CP-000094064 |
| AMEX-CP-000072045 | AMEX-CP-000094186 |
| AMEX-CP-000073197 | AMEX-CP-000094112 |
| AMEX-CP-000073215 | AMEX-CP-000094124 |
| AMEX-CP-000073217 | AMEX-CP-000099293 |
| AMEX-CP-000073221 | AMEX-CP-000103448 |
| AMEX-CP-000074182 | AMEX-DOJ-001886 |
| AMEX-CP-000074190 | AMEX-DOJ-002409 |
| AMEX-CP-000074193 | AMEX-DOJ-002434 |
| AMEX-CP-000075907 | AMEX-DOJ-002577 |
| AMEX-CP-000075937 | AMEXNDR00270324 |
| AMEX-CP-000075962 | AMEXNDR05158262 |
| AMEX-CP-000075977 | AMEXNDR08846397 |
| AMEX-CP-000076010 | AMEXNDR11106414 |
| AMEX-CP-000076406 | AMEXNDR12060217 |

HIGHLY CONFIDENTIAL

## Third Party Materials

<u>Academic Literature</u>

A. Michael Spence, "Monopoly, Quality, and Regulation," *Bell Journal of Economics*, Vol. 6, No. 2, 1975, 417-429.

Andrew T. Ching and Fumiko Hayashi, "Payment card rewards programs and consumer payment choice," *Journal of Banking & Finance*, Vol. 34, No. 8, August 2010, 1773-1787.

Aneet Bansal, "Challenges & Opportunities for Merchant Acquirers," Capgemini, 2012.

Carlos Arango, Kim P. Huynh, and Leonard Sabetti, "Consumer payment choice: Merchant card acceptance versus pricing incentives," *Journal of Banking & Finance*, Vol. 55, June 2015, 130-141.

E. Glen Weyl, "A Price Theory of Multi-Sided Platforms," *American Economic Review*, Vol. 100, No. 4, September 2010, 1642-1672.

Jeffrey C. Arnier, Jr., "Encouraging Surcharge: Toward a Market-Driven Solution to Supracompetitive Credit Card Interchange Fees," *Texas Law Review*, Vol. 99, No. 3, 2021.

Jeffrey Church and Roger Ware, *Industrial Organization: A Strategic Approach*. New York, NY: Irwin McGraw-Hill, 2000.

John Simon, Kylie Smith, and Tim West, "Price incentives and consumer payment behavior," *Journal of Banking & Finance*, Vol. 34, No. 8, August 2010, 1759-1772.

Louis Kaplow, and Carl Shapiro, "Chapter 15 Antitrust," *Handbook of Law and Economics*. Vol. 2, Elsevier B.V., 2007.

Marc Rysman and Julian Wright, "The Economics of Payment Cards," *Review of Network Economics*, Vol. 13, No. 3, 2015, 303-353.

Patrick Bolton, and Mathias Dewatripont, *Contract Theory*, Cambridge, MA: MIT Press, 2005.

Paul A. Samuelson, *Foundations of Economic Analysis*, Cambridge, MA: Harvard University Press, 1947.

Santiago Carbó-Valverde and José M. Liñares-Zegarra, "How effective are rewards programs in promoting payment card usage?," *Journal of Banking & Finance*, Vol. 35, No. 12, December 2011, 3275-3291.


<u>Industry Materials</u>

2014 American Express Annual Report.

2011 American Express Annual Report.

2012 American Express Annual Report.

2013 Global Payments Inc. Annual Report.

American Express, "Review of Payments System Reforms: A Submission to the Reserve Bank of Australia," August 2007.

Australian Merchant Payments Forum, "Submission to the Reserve Bank of Australia – Response to Review of Card Surcharging," July 20, 2011.

HIGHLY CONFIDENTIAL

Commonwealth Consumer Affairs Advisory Council, "Credit Card Surcharges and Non-transparent Transaction Fees: A study," July 2013, i-52.

Host Merchant Services, "A Complete Guide to the American Express OptBlue Program".

Letter from Dhun Karai, Head of Group Financial Services, Woolworths Ltd., to Dr. Chris Kent, Head of Payments Policy Department, Reserve Bank of Australia, July 25, 2011.

Mastercard, "Mastercard Rules 5.11.2, Effective January 27, 2013," June 6, 2019.


Investor Materials

American Express 2016 Shareholder/Analyst Meeting Transcript, October 3, 2016.

American Express Q1 2014 Earnings Call Transcript, April 16, 2014.

American Express Q3 2014 Earnings Call Transcript, October 15, 2014.


Government Agency Publications

Ann Jaedicke, "Overdraft Protection: Opt-In Requirements and Related Marketing Issues," Office of the Comptroller of the Currency, *OCC Bulletin*, No. 2010-15, April 12, 2010.

Claire Greene and Joanna Stavins, "The 2017 Diary of Consumer Payment Choice," Federal Reserve Bank of Atlanta, *Research Data Reports*, No. 18-05, September 17, 2018.

Claire Greene and Joanna Stavins, "The 2018 Diary of Consumer Payment Choice," Federal Reserve Bank of Atlanta, *Research Data Reports*, No. 19-03 November 25, 2019.

Claire Greene and Joanna Stavins, "The 2019 Diary of Consumer Payment Choice," Federal Reserve Bank of Atlanta, *Research Data Reports*, No. 20-4, June 15, 2020.

Claire Greene and Joanna Stavins, "The 2020 Diary of Consumer Payment Choice," Federal Reserve Bank of Atlanta, *Research Data Reports*, No. 21-2, May 7, 2021.

Claire Greene and Scott Schuh, "The 2016 Diary of Consumer Payment Choice," Federal Reserve Bank of Boston, *Research Data Reports*, No. 17-7, December 1, 2017.

Claire Greene, Scott Schuh, and Joanna Stavins, "The 2012 Diary of Consumer Payment Choice," Federal Reserve Bank of Boston, *Research Data Reports*, No. 18-1, January 17, 2018.

Darryl E. Getter, "Recent Trends in Consumer Retail Payment Services Delivered by Depository Institutions," Congressional Research Service, R43364, January 16, 2014.

Fumiko Hayashi, "The New Debit Card Regulations: Effects on Merchants, Consumers, and Payments System Efficiency," *Federal Reserve Bank of Kansas City Economic Review*, First Quarter 2013, 89-118.

Fumiko Hayashi and Stuart E. Weiner, "Interchange Fees in Australia, the UK, and the United States: Matching Theory and Practice," *Federal Reserve Bank of Kansas City Economic Review*, Third Quarter 2006, 75-112.

Marco Angrisani, Kevin Foster, and Marcin Hitczenko, "The 2015 and 2016 Diaries of Consumer Payment Choice: Technical Appendix," Federal Reserve Bank of Boston, *Research Data Reports*, No. 18-2, March 2018.

Reserve Bank of Australia, "2002 Annual Report," 2002.

Reserve Bank of Australia, "Review of Card Payments Regulation: Issues Paper," March 2015.

Reserve Bank of Australia, "Reform of Credit Card Schemes in Australia," August 27, 2002.

Reserve Bank of Australia, "Reform of Credit Card Schemes in Australia IV: Final Reforms and Regulation Impact Statement," August 2002.

Reserve Bank of Australia, "Review of Retail Payments Regulation - Consultation Paper," May 2021.

Sumit Agarwal, Andrea F. Presbitero, Andre F. Silva, and Carlo Wix, "Who Pays For Your Rewards? Redistribution in the Credit Card Market," Finance and Economics Discussion Series, Board of Governors of the Federal Reserve System, December 2022.

The United States Department of Justice Archives, "Competition and Monopoly: Single-Firm Conduct Under Section 2 of the Sherman Act: Chapter 2," March 18, 2022.

Thomas M. Hoeing, Philip Lowe, Guillermo Ortíz, and Gertrude Tumpel-Gugerell, "Interchange Fees: Central Bank Perspectives and Options – General Discussion," discussion presented at the conference "Interchange Fees in Credit and Debit Card Industries: What Role for Public Authorities?", Federal Reserve Bank of Kansas City, May 4-6, 2005, 297-307.

United States Government Accountability Office, "Rising Interchange Fees Have Increased Costs for Merchants, but Options for Reducing Fees Pose Challenges," November 2009.

Zhu Wang, Scarlett Schwartz, and Neil Mitchell, "The Impact of the Durbin Amendment on Merchants: A Survey Study," *Federal Reserve Bank of Richmond Economic Quarterly*, Vol. 100, No. 3, Third Quarter 2014, 183-208.


Market Research

The Nilson Report, No. 1090, July 2016.

The Nilson Report, No. 1113, July 2017

The Nilson Report, No. 1135, July 2018.

The Nilson Report, No. 1158, July 2019.

The Nilson Report, No. 1179, July 2020.

The Nilson Report, No. 1205, September 2021.

The Nilson Report, No. 1232, December 2022.


News Articles

David Heun, "Amex Lets Acquirers Price-Match Rival Cards to Win Small Merchants," PaymentsSource, May 6, 2014.

Isabelle Lindenmayer, "Warnings of a Downside for Amex in Bank Cards," *American Banker*, March 22, 2005.

Mayer Hyman, "Some love it, some hate it. Some score points with it, some need to settle a score with it. What is it? Answer: American Express," *Cartis*, February 7, 2023.

Sezen Bakan, "Revealed: Australia's top retailers as shoppers shift priorities amid cost of living crunch," The New Daily, August 12, 2022.

**HIGHLY CONFIDENTIAL**

Shelle Santana, Jill Avery, and Christine Sniverly, "Chase Sapphire: Creating a Millennial Cult Brand," *Harvard Business Review*, November 26, 2018.

Websites

Claire Tsosie, "Where Does the Money for Credit Card Rewards Come From?," Nerdwallet, December 21, 2022. Available at: https://www.nerdwallet.com/article/credit-cards/where-does-money-for-credit-card-rewards-come-from.

Discover, "How Do Small Business Owners Use Their Credit Cards?," December 7, 2021.  Available at: https://www.discover.com/credit-cards/card-smarts/how-do-small-business-owners-use-their-credit-cards/.

Finextra, Our terms, "Terms and conditions of use. " Available at: https://www.finextra.com/community/terms-of-use.aspx.

Mastercard, "What merchant surcharge rules mean to you." Available at: https://www.mastercard.us/en-us/business/overview/support/merchant-surcharge-rules.html.

Mastercard, "U.S. Merchant Class Settlement Mastercard Frequently Asked Questions Merchant Surcharge." Available at: https://www.mastercard.us/content/dam/public/mastercardcom/na/us/en/documents/Merchant_Surcharge_FAQ.pdf.

Visa, "Merchant Surcharge Q and A." Available at: https://usa.visa.com/content/dam/VCOM/global/support-legal/documents/merchant-surcharging-qa-for-web.pdf.

Visa, "Sample Surcharge Disclosure Signage." Available at: https://usa.visa.com/content/dam/VCOM/download/merchants/sample-surcharge-disclosure-signage.pdf.