# CRAVATH

Peter T. Barbur
pbarbur@cravath.com
T+1-212-474-1058
New York

April 24, 2023

*Oliver et al. v. American Express Company et al.*, Case No. 1:19-cv-00566 (NGG) (SJB)

Dear Judge Garaufis:

Pursuant to the amended case schedule entered on December 16, 2022, I write to describe the bases for Amex's anticipated motion for summary judgment.

Plaintiffs allege that the non-discrimination provisions ("NDPs") in Amex's merchant contracts have caused all four credit card networks (Amex, Visa, Mastercard and Discover) to inflate the merchant fees charged on general purpose credit and charge card ("GPCC") transactions, which merchants have passed on to consumers in the form of higher retail prices. Although Plaintiffs' case has been whittled down considerably from their initial complaint, Plaintiffs are still pursuing relief for putative state-wide classes under the antitrust laws of 10 states[1] and the consumer protection laws of three states.[2] Plaintiffs' operative complaint also continues to assert a consumer protection claim under Montana law and an antitrust claim under West Virginia law, although Plaintiffs failed to seek certification of any class for those states.

Although Plaintiffs are pursuing claims under various state laws, they have conceded that federal antitrust law governs their antitrust claims. (*See* Dkt. 144-1, Pls.' Mot. for Class Certification at 22 ("To establish Amex's liability at trial, Plaintiffs must satisfy the analytical framework for the two-sided credit card transactions market set out by the Supreme Court in *Ohio v. American Express Co.*, 138 S. Ct. 2277 (2018)."); *see also id.* Appendix A (noting that "[e]ach state antitrust statute for which claims are made mirrors federal antitrust laws, contains a federal harmonization provision, and/or has been interpreted in harmony with federal law").) Thus, to prevail on their antitrust claims, Plaintiffs must establish that Amex's NDPs have a "substantial anticompetitive effect that harms consumers in the [properly defined] relevant market." *Ohio v. American Express Co.*, 138 S. Ct. 2277, 2284 (2018).

Anticompetitive effects can generally be proven one of two ways: (1) "direct evidence"—*i.e.*, evidence of supra-competitive prices, reduced output or reduced quality, or (2) "[i]ndirect evidence"—*i.e.*, "proof of market power plus some evidence that the challenged restraint harms

---

[1] Alabama, District of Columbia, Hawaii, Kansas, Maine, Mississippi, North Carolina, Oregon, Utah and Vermont.

[2] Hawaii, Illinois and Ohio.

| NEW YORK | LONDON | WASHINGTON, D.C. | CRAVATH, SWAINE & MOORE LLP |
|---|---|---|---|
| Worldwide Plaza | CityPoint | 1601 K Street NW | |
| 825 Eighth Avenue | One Ropemaker Street | Washington, D.C. 20006-1682 | |
| New York, NY 10019-7475 | London EC2Y 9HR | T+1-202-869-7700 | |
| T+1-212-474-1000 | T+44-20-7453-1000 | F+1-202-869-7600 | |
| F+1-212-474-3700 | F+44-20-7860-1150 | | |

competition". *Id*. Here, Plaintiffs must make such a showing in the relevant market they have alleged: the two-sided market for GPCC transactions. Plaintiffs have failed to adduce any evidence of either market power or anticompetitive harm in that market. As a result, Amex is entitled to summary judgment on Plaintiffs' antitrust claims.

In addition, as to both their antitrust and consumer protection claims, Plaintiffs must establish aggregate damages. (*See, e.g*., Dkt. 144-1, Pls.' Mot. for Class Certification, Appendix A ("Each state antitrust law and consumer protection law from which claims are asserted requires proof of the same basic elements: violation, causation, damage.").) Although a plaintiff in an antitrust suit "need not prove its damages with mathematical precision", damages nevertheless "may not be determined based on speculation or guesswork". *Transnor (Berm.) Ltd. v. BP N. Am. Petroleum*, 736 F. Supp. 511, 515 (S.D.N.Y. 1990); *cf. Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 552 (1983) (noting that antitrust plaintiffs who "cannot provide evidence supporting a rational estimate of damages . . . will be vulnerable to a motion for summary judgment"). Plaintiffs have failed to provide any evidence of damages and have instead relied on a number of simplifying assumptions that are demonstrably incorrect and which contradict Plaintiffs' theory of liability. For this reason, too, Amex is entitled to summary judgment on Plaintiffs' antitrust and consumer protection claims.

Plaintiffs Have Failed To Adduce Any Evidence of Market Power.

Amex's share of the U.S. GPCC charge volume peaked at 27% in 2013 and has fallen below 20% since 2020. Such low and declining market shares are well below the threshold that courts view as "presumptively incapable" of exercising market power. *Union Carbide Corp. v. Montell N.V.*, 27 F. Supp. 2d 414, 417 (S.D.N.Y. 1998).

Plaintiffs nevertheless attempt to establish market power by relying on testimony from their economics expert, Dr. Russell Lamb, who claims to identify "direct evidence" of Amex's market power. This so-called "direct evidence" boils down to two theories, both of which fail as a matter of law. Indeed, as discussed, both of Dr. Lamb's theories were specifically rejected by the Second Circuit and the U.S. Supreme Court in the litigation brought against Amex by the U.S. Department of Justice.

*First*, Dr. Lamb points to Amex's *merchant* pricing, ignoring the cardholder side of the two-sided GPCC transaction market. In particular, Dr. Lamb points to evidence that he says establishes that Amex was able to impose non-transitory increases in its merchant prices, that Amex is able to set its merchant discount rates at a level above costs and that Amex can price discriminate as to at least a subset of its merchant base. (Dkt. 138-4, Lamb Rpt. ¶¶ 154-75.) But both the Second Circuit and the Supreme Court clearly held that focusing on "prices" charged to merchants alone is inappropriate given the two-sided nature of the market and that evidence concerning such "one-sided" prices is inadequate to establish market power. *Ohio*, 138 S. Ct. at 2285-86 (in a two-sided market, "charg[ing] one side a price that is below or above cost" does not reflect "market power"); *see also United States v. Am. Express Co*., 838 F.3d 179, 202 (2d Cir. 2016) (one-sided price increases are not evidence of market power because one needs to look at "the all-in price charged to merchants and consumers across Defendants' entire platform" (quoting *United States v. Am. Express Co*., 88 F. Supp. 3d at 203 (E.D.N.Y. 2015)). Indeed, the DOJ made the exact same arguments based on the exact same evidence that Dr. Lamb now makes concerning Amex's "Value Recapture" initiative (*see* Dkt. 138-4, Lamb Rpt. ¶¶ 159-163), and they were specifically rejected, *Am. Express Co*., 838 F.3d at 204-06.

*Second*, Dr. Lamb claims that Amex cardmembers "insist" on using their cards and that Amex has "exploited" that loyalty to the detriment of merchants, who have no choice but to accept Amex. (Dkt. 138-4, Lamb Rpt. ¶ 242; Dkt. 140-3, Lamb Rebuttal Rpt. ¶ 125.) However, this precise theory of market power was also litigated and was also specifically rejected in the DOJ litigation. As the Second Circuit explained, cardholder insistence is not evidence of market power because "[c]ardholder insistence results not from market power, but instead from competitive benefits on the cardholder side of the platform and the concomitant competitive benefits to merchants who chose to accept Amex cards." *Am. Express Co.*, 838 F.3d at 202.

<u>Plaintiffs Have Failed To Establish Anticompetitive Effects Under Either a "Direct Evidence" or "Indirect Evidence" Approach.</u>

In support of their assertions concerning anticompetitive effects, Plaintiffs do not even attempt to point to any evidence of reduced output or reduced quality in the two-sided GPCC transaction market. The only evidence to which Plaintiffs do point—again relating to one-sided merchant pricing—fails for at least three independent reasons.

*First*, as with Plaintiffs' claims concerning market power, Plaintiffs' claims concerning anticompetitive effects are improperly one-sided. Plaintiffs have made no effort to calculate a two-sided price for GPCC transactions or to show trends in the GPCC two-sided price over time. Instead, Plaintiffs and Dr. Lamb focus on the merchant side of the market, arguing that Amex's NDPs have increased costs to merchants in the form of higher discount rates. (Dkt. 138-4, Lamb Rpt. ¶¶ 176-212.) The only thing Plaintiffs and Dr. Lamb say about the cardholder side of the two-sided market is that lower discount rates will have no negative impact on cardholder fees and rewards on the other side of the market. (*Id.* ¶¶ 270-91.) That assertion is not only wholly unsupported by evidence but it also flies in the face of what the Second Circuit said about two-sided markets, what the Supreme Court said about two-sided markets and what all the economic literature cited by both courts say about two-sided markets: that changes in prices on one side of the market *do* affect prices on the other side of the market. *See, e.g.*, *Ohio*, 138 S. Ct. at 2281 (explaining how pricing on one side of the market affects demand on the other side of the market, which means that "[t]wo-sided platforms therefore must take these indirect network effects into account before making a change in price on either side"); *Am. Express Co.*, 838 F.3d at 205 ("A reduction in revenue that Amex earns from merchant fees may decrease the optimal level of cardholder benefits, which in turn may reduce the intensity of competition among payment-card networks on the cardholder side of the market.").

Although purportedly acknowledging that the market is two-sided, Plaintiffs and Dr. Lamb are in substance arguing that the market is not in fact two-sided because there are not significant indirect network effects between the two sides of the market. Apparently to support this remarkable theory, Dr. Lamb asserts that credit card markets are "mature" and that, therefore, there are not significant indirect network effects between one side of the market and the other. (Dkt. 138-4, Lamb Rpt. ¶¶ 64-65.) In other words, he argues that, because the GPCC transaction market is well-developed, "the impact of an additional GPCC cardholder on merchant acceptance or the impact of additional merchant acceptance on cardholder use is likely to be small." (*Id.* ¶ 65.) But the Second Circuit already rejected this exact argument in *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 58-59 (2d Cir. 2019) (holding that the "'mature market' theory, which posits that 'mature markets' . . . do not experience indirect network effects because changing prices on one side of a platform will not affect demand in the market as a whole" was "wrong as a matter of law").

3

*Second*, the basic premise of Plaintiffs' theory of anticompetitive harm—that consumers would benefit absent the NDPs because merchants would save money and pass through those savings to consumers—hinges on mere speculation.  Even if Plaintiffs could establish that eliminating the NDPs would cause merchant fees to decrease (which they cannot do), eliminating the NDPs also means that merchants would be able to engage in various harmful forms of steering including surcharging.  Surcharging can be costly to merchants and consumers.  Consumers are harmed when they pay a surcharge or when, in order to avoid paying a surcharge, they switch away from their preferred payment products and lose rewards and other cardholder benefits.  Merchants are harmed when customers "walk away" in the face of surcharges and the merchants lose transactions and profits.  Plaintiffs and Dr. Lamb have undertaken no analysis whatsoever concerning the amounts and types of surcharging and other forms of steering that would occur if the NDPs were eliminated or what effects such surcharging would have on consumers and merchants.  They thus have no basis to assert that merchants would save money or that consumers would benefit even if merchants did save money and pass on those savings to consumers.  This failing is particularly glaring because the consumer cost savings that Plaintiffs and Dr. Lamb predict (approximately 0.1% of a transaction price) pale in comparison to the potential harms from surcharging (e.g., paying a surcharge of 3% of the purchase price or losing rewards worth 1-5% of the purchase price).

Plaintiffs and Dr. Lamb hypothesize that merchants might just use a "credible threat" of merchant surcharging to force networks to reduce merchant discount fees.  (Dkt. 140-3, Lamb Reply Rpt. ¶ 49.)  Dr. Lamb also asserts—without any supporting analysis—that steering would be "very limited" in the but-for world.  (*E.g.*, *id*. ¶¶ 50, 232, 268.)  However, that is all sheer speculation untethered to evidence.  Indeed, Dr. Lamb does not even define or quantify what he means by "very limited" while dismissing as irrelevant and largely ignoring the undisputed evidence that in Australia, where surcharging has been allowed as a matter of law since 2004, there has been substantial surcharging—including significant excessive surcharging.

*Third*, even if Plaintiffs could establish that two-sided GPCC transaction prices have increased as a result of Amex's NDPs (which they cannot), there is no evidence that those prices are supra-competitive.  Although Plaintiffs' amended complaint alleges that the NDPs cause two-sided prices to be at supra-competitive levels (Dkt. 76, Am. Compl. ¶ 3), Dr. Lamb offers no opinion supporting that allegation.  Indeed, although Dr. Lamb opines that *merchant* prices (not two-sided prices) are above competitive levels (Dkt. 138-4, Lamb Rpt. ¶¶ 147, 153) and that two-sided prices are higher than "otherwise would have prevailed" (*id*. ¶ 270)—and even though he references Plaintiffs' allegation in their amended complaint that two-sided transaction prices are "supra-competitive" (*id*. ¶ 4)—he conspicuously avoids ever opining that two-sided prices are above competitive levels.  Nor do Plaintiffs or Dr. Lamb offer any other evidentiary support for the idea that Amex's two-sided prices are above competitive levels.  This omission is fatal because the Supreme Court in *Ohio* expressly stated that simply proving increases in two-sided prices is not sufficient to establish anticompetitive harm:  "This Court will 'not infer competitive injury from price and output data absent some evidence that tends to prove that output was restricted or prices were above a competitive level.'"  138 S.Ct. at 2288 (quoting *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 237 (1993)).

<u>Plaintiffs Have Provided No Evidence of Damages and Instead Rely on Speculation and Unsupported Assumptions.</u>

Plaintiffs' theory and measure of damages are baseless, speculative and unreliable.  We briefly describe a few critical shortcomings.

4

*First*, Plaintiffs assert an overcharge theory of damages based on the notion that (1) eliminating the NDPs would lead to lower merchant fees, which would thus save merchants money; (2) merchants would then pass on most of those savings to consumers in the form of lower retail prices; and (3) as a result, consumers would save money when they make retail purchases in the but-for world. However, as discussed above, Plaintiffs do not and cannot establish any of that, including because they utterly ignore the costs of surcharging to merchants and to consumers. If a merchant surcharges, the merchant will likely lose some transactions through walk-aways and thus lose profits, meaning that the merchant might have only additional costs as opposed to savings to pass on to consumers. If a consumer is confronted with a surcharge, the consumer will likely experience losses that dwarf the cost savings Plaintiffs predict. Plaintiffs cannot establish any overcharge unless they analyze and take into account these aspects of surcharging, which they utterly fail to do. Put another way, in calculating damages Plaintiffs and Dr. Lamb simply assume that, if the NDPs are eliminated, there will be *no* surcharging in the but-for world. This is not only inconsistent with Dr. Lamb's own opinion that there could be some albeit "very limited" surcharging in the but-for world but it is also utterly unsupported and in fact contradicted by the record.

*Second*, Plaintiffs' measure of damages is improperly disconnected from their theory of liability. In Plaintiffs' but-for world, the NDPs are eliminated for all Amex-accepting merchants. However, Dr. Lamb's damages calculations only consider transactions at 38 so-called "Qualifying Merchants" that were cherry-picked by Plaintiffs' counsel. Plaintiffs and Dr. Lamb simply ignore that, in the but-for world, purported class members would shop at millions of *other* merchants and may experience losses there (because of surcharging and steering) that overwhelm any potential savings from transactions at the "Qualifying Merchants". Plaintiffs' failure to consider such losses is particularly inappropriate given the rich history showing that, when merchants are permitted to surcharge, they often do so in excessive and abusive ways (*e.g.*, imposing a surcharge well in excess of the costs of GPCC acceptance in order to create an additional profit stream).

*Third*, in their damages calculations, Plaintiffs and Dr. Lamb rely on improper assumptions that are demonstrably incorrect. For example, Dr. Lamb begins by calculating the difference between what the Qualifying Merchants paid in GPCC acceptance costs during the putative class period in the actual world and what they supposedly would have paid in his but-for world. (Dkt. 138-4, Lamb Rpt. ¶ 349.) But the "actual rates" feeding into his analysis are not actually the rates paid by the Qualifying Merchants to the four networks—even though Dr. Lamb received data from Visa, Mastercard and Discover that would have enabled him to estimate those merchant-by-merchant rates. Instead, Dr. Lamb's "actual rates" reflect the average rate paid by *all* merchants across the country to each of the four networks. (*Id.* ¶ 184.) This leads to absurd results. For instance, Dr. Lamb assumes that the Qualified Merchants paid 2.2% in transaction fees for Mastercard and Visa transactions in 2017 (*see id.* Figure 17), whereas some merchants paid a mere fraction of that amount (*see* Dkt. 139-17, Gaier Rpt. Figure 23). Dr. Lamb also hypothesizes that all Qualifying Merchants would see a uniform reduction in fees from all networks in the but-for world (*see* Dkt. 138-4, Lamb Rpt. ¶ 359), which means that some merchants would pay *negative* interchange rates in Dr. Lamb's but-for world.

*Fourth*, Plaintiffs lack the data necessary even to identify transactions that fit within the proposed class definition and for which damages thus might be awarded. The proposed class definition is limited to GPCC transactions by putative class members that are made in the same state as the mailing address associated with their GPCC account. (*See* Dkt. 144-1, Pls.' Mot. for Class Certification at 3.) In his initial damages calculations, Dr. Lamb relied on the "state" field

in summary data provided by Visa and Mastercard to determine the state in which Visa and Mastercard transactions supposedly occurred. (Dkt. 138-4, Lamb Rpt. ¶¶ 365-80.) But additional information provided by Visa and Mastercard caused Dr. Lamb to conclude that there is actually "uncertainty as to how the state field is populated"; as a result, Dr. Lamb revised his damages methodology to exclude all "card-not-present" transactions from his damages calculation. (Dkt. 140-3, Lamb Reply Rpt. ¶ 342.)[3] But that very same "uncertainty" also plagues the "card-present" transactions in Visa's and Mastercard's data, and those transactions account for the vast majority of Dr. Lamb's claimed damages. Furthermore, Dr. Lamb conceded at his deposition that he has even less information about the location of *all* Discover transactions than he has for Visa's and Mastercard's "card-not-present" transactions—yet he continues to include Discover "card-present" transactions in his damages calculations. Thus, by Dr. Lamb's own admission, his damages methodology is unreliable, and Plaintiffs have no evidence of damages.

\*    \*    \*

We would be happy to address Amex's anticipated summary judgment motion at a status conference if it would be helpful to the Court. The parties have agreed to meet and confer on a proposed briefing schedule after both sides submit their pre-motion letters.

Respectfully,

*/s/ Peter T. Barbur*
Peter T. Barbur

Honorable Nicholas G. Garaufis
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

VIA CM/ECF

---

[3] "Card-not-present" transactions involve transactions made remotely, such as online transactions, phone orders and mail payments.

Copies to:

All Counsel of Record

VIA CM/ECF