UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANTHONY OLIVER, TERRY GAYLE QUINTON, SHAWN O'KEEFE, ANDREW AMEND, SUSAN BURDETTE, GIANNA VALDES, DAVID MOSKOWITZ, ZACHARY DRAPER, NATE THAYER, MICHAEL THOMAS REID, ALLIE STEWART, ANGELA CLARK, JOSEPH REALDINE, RICKY AMARO, ABIGAIL BAKER, JAMES ROBBINS IV, EMILY COUNTS, DEBBIE TINGLE, NANCI-TAYLOR MADDUX, SHERIE MCCAFFREY, MARILYN BAKER, WYATT COOPER, ELLEN MAHER, SARAH GRANT and GARY ACCORD on behalf of themselves and all others similarly situated, | **MEMORANDUM & ORDER** **19-CV-566 (NGG) (SJB)** |

Plaintiffs,

-against-

AMERICAN EXPRESS COMPANY and
AMERICAN EXPRESS TRAVEL RELATED
SERVICES COMPANY, INC.,

Defendants.

NICHOLAS G. GARAUFIS, United States District Judge.

Plaintiffs in this matter are credit and debit card users that do not and have not used American Express cards. They challenge, under state antitrust and consumer protection laws as a putative class action, the non-discrimination provisions that American Express and American Express Travel Related Services (together, "Amex") impose on merchants that accept Amex cards as a payment method. Plaintiffs seek to certify two classes—credit card users and debit card users—on behalf of themselves and those similarly situated in eleven states for injuries alleged based on transactions at 38 enumerated retailers ("Qualifying Merchants"). (*See* Mot. for Class Cert. (Dkt. 138-2) at 3-6, 21.)

1

Plaintiffs also seek to exclude the testimony of Amex's expert, Dr. Eric Gaier, under *Daubert v. Merrell Dow Pharms.*, Inc., 509 U.S. 579 (1993) and Fed. R. Evid. 702 and 401. (*See generally* Pl. *Daubert* Mot. (Dkt. 177-1).) Amex in turn seeks to exclude the testimony of Plaintiffs' expert, Dr. Russell Lamb. (*See generally* Amex *Daubert* Mot. (Dkt. 170-1).)

As detailed below, the Plaintiffs' motion for class certification is GRANTED with respect to the state debit card classes and is DE-NIED with respect to the state credit card classes. Plaintiffs' motion to exclude the testimony of Dr. Gaier is GRANTED in part and DENIED in part. Plaintiffs' motion is GRANTED as it relates to testimony concerning offsets to class members from non-Qualifying Merchants and is DENIED for all other topics. Amex's motion to exclude the testimony of Dr. Lamb is DENIED.[1]

## I.   BACKGROUND

The court assumes general knowledge of the facts and procedural history of the long-running challenges to Amex's non-discrimination provisions, also referred to as anti-steering provisions ("NDPs"). *See, e.g., In re Am. Exp. Anti-Steering Rules Antitrust Litig. (In re Amex)*, No. 11-md-2221 (NGG), 2016 WL 748089, at *1-4 (E.D.N.Y. Jan. 7, 2016); *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2279-83 (2018); *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 361 F. Supp. 3d 324, 331 (E.D.N.Y. 2019). The challenges to Amex's NDPs at one point included merchants, state attorneys general, and the U.S. Department of Justice as

---

[1] Where the court relies on documents that the parties filed under seal, the court has concluded that the parties' interests in continued sealing of the portions referenced in this Memorandum and Order are insufficient to overcome the presumption of public access to judicial documents. *See Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119-20 (2d Cir. 2006). The court otherwise GRANTS the parties' motions to seal. (*See* Mots. to Seal (Dkt. 138, 139, 140, 143, 148, 149, 150, 155, 156, 163, 167, 168, 169, 176, 180, 181, and 182).)

plaintiffs. In the present action, brought by putative class of non-Amex cardholding consumers, this court granted in part and denied in part Amex's motions to dismiss and for judgment on the pleadings. (*See* Mot. to Dismiss Mem. & Order (Dkt. 43); Mot. for Judgment on the Pleadings Mem. & Order (Dkt. 63).) Plaintiffs are now proceeding under the antitrust laws of eleven jurisdictions [2] and consumer protection laws of four states. [3] (*See generally* Second Amend. Compl. (Dkt. 187).)

Plaintiffs allege that Amex's NDPs act as a vertical non-price restraint on trade in violation of state antitrust and consumer protection laws. (*See id.* ¶ 91, 159, 166-213.) Amex is a bank that operates a payment network for general purpose credit and charge cards ("credit cards"). (*Id.* ¶¶ 34-35.) Unlike its non-bank network competitors Visa and Mastercard, Amex operates a closed loop, meaning that it directly interacts with both consumers, by issuing cards, and with merchants, by contracting with them to accept Amex cards as a method of payment. (*Id.* ¶¶ 52-53.)

In its contracts with merchants, Amex universally includes NDPs which restrict what merchants are allowed to communicate to consumers at the point of sale. (*See id.* ¶ 89-96.) Among other restraints, the NDPs prohibit merchants that accept Amex cards from stating a preference for one network over another, disclosing the fee that the merchant pays for each payment network, or differentially surcharging based on the merchant's cost of processing the payment. (*Id.* ¶ 89-90.)

Plaintiffs allege that the NDPs act as an unlawful restraint on trade because they shield Amex (and the other payment networks) from competition to the detriment of non-Amex-

---

[2] Alabama, D.C., Hawaii, Kansas, Maine, Mississippi, North Carolina, Oregon, Utah, Vermont, and West Virginia.

[3] Hawaii, Illinois, Montana, and Ohio.

cardholding consumers. (*Id.* ¶ 95.) Because consumers choose which payment method to use but merchants bear the direct costs of using the payment network, Amex can raise or maintain its merchant fees without any subsequent decline in payment network usage. (*See id.* ¶ 96.) But the payment network is a two-sided market. *See Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2287 (2018). Amex charges merchants fees for accepting Amex cards, but also provides benefits for Amex cardholders through rewards. *See id.* at 2277. This provides an incentive to Amex cardholders to spend more and to merchants to accept Amex cards, as the payment network provides merchants with consumers that, on average, spend more. (Opp. Class Cert., Ex. 21 (Dkt. 139-23).)

While this arrangement works well for Amex and Amex cardholders, Plaintiffs allege that it harms everyone else. Because the NDPs prevent merchants from passing along the costs of accessing the payment network to the consumers that benefit from the merchants' access, Plaintiffs allege that non-Amex consumers are in effect subsidizing Amex cardholders' consumption. (*See* Second Amend. Compl. ¶ 132.) And when merchants are faced with higher discount rates, they increase prices for all consumers. (*Id.*) Plaintiffs allege harm because but for the NDPs, prices generally would be lower.

## II.  THE PARTIES' *DAUBERT* MOTION

To support their motion for class certification, Plaintiffs rely on Dr. Russell Lamb's expert testimony to show that there was a class-wide injury for which damages can be calculated on a class-wide basis. (*See generally* Mot. for Class Cert.; Lamb Report (Dkt. 138-4).) Amex relies on the testimony of Drs. Eric Gaier and Eric Emch to argue that there is not. (*See generally* Opp. Class Cert. (Dkt. 139-1); Gaier Report (Dkt. 139-17); Emch Report (Dkt. 139-18).) Amex seeks to exclude Dr. Lamb's expert testimony under Fed. R. Evid. 702 and *Daubert* as based on unreliable

methodology and data. (*See generally* Amex *Daubert* Mot.) Plaintiffs likewise seek to exclude the testimony of Dr. Gaier as unhelpful and irrelevant. (*See generally* Pl. *Daubert* Mot.)

## A. Legal Standard

Expert testimony is admissible under Federal Rule of Evidence 702 and *Daubert* if the court finds, by a preponderance of the evidence, that (1) the expert's knowledge will help the trier of fact, (2) the expert forms his or her opinion on sufficient facts or data, (3) the expert uses reliable principles and methods, and (4) the expert reliably applies the methods to the facts of the case. Fed. R. Evid. 702; *see also Fantasia Distribution, Inc. v. Cool Clouds Distribution*, Inc., No. 20-cv-2378 (KAM), 2023 WL 6136628, at *3 (E.D.N.Y. Sept. 20, 2023). The district court thus acts as a "gatekeeper" to ensure that the evidence is helpful to the trier of fact. *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 658 (2d Cir. 2016). This inquiry focuses on the "reliability and relevancy" of the expert's testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). "Expert testimony also should be excluded when it applies the wrong legal standard." *Olin Corp. v. Lamorak Ins. Co.*, No. 84-cv-1968 (JSR), 2018 WL 1901634, at *21 (S.D.N.Y. Apr. 18, 2018).

The court's gatekeeping function under *Daubert* exists to prevent experts from using the opacity and inaccessibility of scientific or technical fields to launder unscientific opinions into judicial proceedings without scrutiny. *See Daubert*, 509 U.S. at 595 (citing Jack B. Weinstein, *Rule 702 of the Federal Rules of Evidence Is Sound; It Should Not Be Amended*, 138 F.R.D. 631, 632 (1991)). Accordingly, the court focuses its analysis on ensuring sound methodology rather than any specific outcome. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

Whether it is appropriate for the court to conduct a full *Daubert* analysis at the class certification stage is an open question in the Second Circuit. *See In re Teva Securities Litigation*, No. 3:17-cv-558 (SRU), 2021 WL 872156, at *10 (D. Conn. 2021); *see also Kurtz v. Costco Wholesale Corp.*, 818 F. App'x 57, 61 n.3 (2d Cir. 2020) (Summary Order affirming district court's complete *Daubert* inquiry at class certification stage as not an abuse of discretion); *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 354 (2011) (expressing "doubt" that "*Daubert* did not apply to expert testimony at the certification stage of class-action proceedings"). The court finds that a full *Daubert* analysis is appropriate here.

The burden is on Plaintiffs, in seeking class certification, to demonstrate that they satisfy the requirements in Rule 23 by a preponderance of the evidence. *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009). In order to satisfy this burden, Plaintiffs rely on the expert testimony of economist Dr. Russell Lamb. District courts in the circuit are required to resolve relevant factual disputes as necessary to determine whether the plaintiffs satisfy their burden at the class certification stage. *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 41-42 (2d Cir. 2006). It therefore follows, in the court's view, that the court should first determine the admissibility of evidence that would form the basis for the factual findings. In this case, discovery is complete and the parties' cross-motions for summary judgment are fully briefed, so there is little risk that the *Daubert* inquiry will force a definitive evidentiary ruling while the factual record is incomplete. This is consistent with other district courts in this Circuit that have conducted a full *Daubert* analysis at the class certification stage of proceedings. *See, e.g., In re Namenda Indirect Purchaser Antitrust Litigation*, No. 1:15-cv-6549 (CM), 2021 WL 100489, *7 (S.D.N.Y. 2021) ("[T]his Court is persuaded that a complete *Daubert* inquiry is necessary to analyzing a motion to exclude at the class-certification stage, and that only expert reports that would otherwise be admissible at trial under *Daubert*

can be considered in support of class certification."); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 470-71 (S.D.N.Y. 2018); *In re Teva Securities*, 2021 WL 872156, at *10.

### B. Amex's *Daubert* Motion to Exclude the Testimony of Dr. Russell Lamb

Amex seeks to exclude two aspects of Dr. Lamb's testimony as unreliable. Amex argues that (1) Dr. Lamb's methodology for determining a class-wide injury is flawed, and (2) that his methodology for calculating damages on a class-wide basis is unreliable. (Amex *Daubert* Mot. at 1-3.)

Dr. Lamb opines that in the but-for world without NDPs, Qualifying Merchants[4] would be able to lower the cost of accepting credit cards. (Lamb Report ¶ 187.) Because Qualifying Merchants could credibly threaten Amex and other payment networks with steering consumers to use a payment method that costs less to process, the Merchants would gain leverage over Amex, and Amex in response would lower the discount rate fee that it collects to process Amex payments so that the Qualifying Merchants would not steer. (*Id.* ¶¶ 83, 259.) Qualifying Merchants operate with low margins; they would pass along the savings from the lower cost of payment processing to consumers in the form of lower prices. (*Id.* ¶¶ 310-11.) Therefore, consumers, including class members, suffer injury when they pay higher prices as a result of Amex's NDPs than they would in the but-for world without NDPs. (*See, e.g., id.* ¶¶ 320, 324, 335.) Dr. Lamb calculated that overall, class members overpaid by 0.1% on their purchases at Qualifying Merchants due to Amex's NDPs. (*See* Gaier Report ¶ 53 (citing Deposition of Dr. Lamb).)

---

[4] The Qualifying Merchants are 38 large retailers as defined in the discussion of Plaintiffs' motion for class certification, *see infra* Part III & n. 12. Non-Qualifying Merchants are all other merchants.

Amex argues that the methodology for determining a class-wide injury is not reliable because Dr. Lamb does not consider harms or "offsets" that consumers would face without Amex's NDPs. Amex contends that if Qualifying Merchants are allowed steer consumers to payment methods with lower merchant fees or impose surcharges that reflect the cost of payment processing, consumers would face costs in the but-for world that offset the putative benefit of lower retail prices that Dr. Lamb describes. (Amex *Daubert* Mot. at 5-11.) And some consumers would walk away from the purchase rather than face steering, reducing the amount that Qualifying Merchants would actually save and pass on to consumers. (*Id.* at 11-14.) Amex claims that Dr. Lamb's testimony is unreliable because he ignores the offsets rather than incorporating them into his model.

Amex also makes four arguments for why Dr. Lamb's damages calculation is unreliable. First, Amex argues that Dr. Lamb does not account for how steering could offset any potential benefit to cardholders. (*Id.* at 16-18.) Second, Dr. Lamb ignores any costs consumers face from non-Qualifying Merchants that can steer or surcharge but may have less leverage over Amex to reduce discount rates. (*Id.* at 18-20.) Third, Dr. Lamb assumes that the merchants will operate uniformly, and so improperly ignores the variance in discount rates and pass through rates for each merchant. (*Id.* at 20-24.) Finally, Amex criticizes Dr. Lamb's use of aggregated credit and debit card sales volume data that is not linked to particular states. (*Id.* at 24-25.)

Amex faults Dr. Lamb's methodology for determining a class-wide injury and his method for calculating damages on a class-wide basis on the same ground: that Dr. Lamb's model is fatally flawed because it did not consider steering. The two are therefore addressed together. The court then addresses in turn each of Amex's three remaining arguments about Dr. Lamb's damage calculations, relating to (1) class member purchases at non-

Qualifying Merchants, (2) Dr. Lamb's assumption of Qualifying Merchant uniformity, and (3) the data Dr. Lamb uses to calculate damages.

### 1.   Methodology to Establish Injury

In their opposition to Amex's motion to exclude the testimony of Dr. Lamb, Plaintiffs argue that any dispute about the effects of steering is not properly addressed through *Daubert* motions, which focus on the reliability of the expert's methodology. (*See* Opp. to Amex *Daubert* Mot. (Dkt. 171) at 2-3.) The court agrees. Dr. Lamb provides support in economic theory for each step of his proposed mechanism of causality, including justifications for not including steering and walkaways in his model. This court's gatekeeping function under *Daubert* is not focused on settling disagreements about the appropriate contours of the but-for world.

Amex argues that Dr. Lamb's methodology is unreliable because it does not account for harms that Plaintiffs could face in the but-for world that would offset the benefit that they receive by way of lower prices. Specifically, because steering—convincing a Plaintiff to use a payment method that could have lower cardholder rewards—or surcharging—requiring a Plaintiff to bear the cost of using a credit or debit card—could increase prices for class members by more than they would benefit from a decrease in prices, Amex asserts that Dr. Lamb simply ignores those unfavorable facts in his model of the but-for world. (*See* Amex *Daubert* Mot. at 16-17.) And since he ignores an offsetting injury that would make class members actually worse off, according to Amex, Dr. Lamb's methodology is unreliable.

To be sure, an expert's methodology is not reliable if he or she simply ignores inconvenient facts. *See In re Apple iPhone Antitrust Litig.*, No. 11-cv-6714 (YGR), 2022 WL 1284104, at *3 (N.D. Cal. Mar. 29, 2022). But Amex's criticisms of Dr. Lamb's report are more properly characterized as disagreements with the expert's

opinion about the state of the but-for world. Disagreements about the but-for world are a particularly poor ground for excluding Dr. Lamb's testimony because the state of the but-for world is unclear even to Amex's own expert, Dr. Gaier. Dr. Gaier simultaneously claims that steering will be pervasive, (*see* Gaier Report ¶¶ 42-51 (referencing Australia, UK and Europe)) and that it does not occur. (*See* Gaier Report ¶ 96 ("[N]early 3 million small merchants who did not then accept Amex were free to steer. Yet, effectively none did so . . .").) Dr. Gaier's arguments are not necessarily inconsistent, but they demonstrate the uncertainty about the extent to which steering would occur but-for Amex's NDPs that Dr. Lamb's decision to not include steering offsets is not sufficient to deem his testimony unreliable such that it will not be admitted. Instead, the steering and surcharging debate, for the purposes of both injury and damages, is more properly settled through vigorous cross-examination and presentation of contrary evidence.

Amex also urges the court to exclude Dr. Lamb's testimony because his analysis that prices would be lower at a new "competitive equilibrium" is insufficiently rigorous. (Amex *Daubert* Mot. at 7.) According to Amex, Dr. Lamb "is simply assuming his conclusion—that consumers would save money—without doing any of the economic analysis necessary to justify the result."[5]

---

[5] Amex cites to *In re Mirena* in support of its argument here. (*See* Amex *Daubert* Mot. at 7-8 (citing *In re Mirena IUD Levonorgestrel-Related Prods. Liab. Litig.,* 341 F. Supp. 3d 213, 248 (S.D.N.Y. 2018)).) However, the court is not persuaded that the *Mirena* court correctly interpreted the Third Circuit's decision in *In re Zoloft (Sertraline Hydrochloride) Prod. Liab. Litig.,* 858 F.3d 787, 796 (3d Cir. 2017) that forms the basis for its decision. The *Mirena* court appeared to create a new stringent *Daubert* standard in part by grafting together requirements from two distinct methodologies described in *Zoloft.* While the details of the methodologies are not relevant to the facts of this case, the court does not find the *Mirena* court's *Daubert* analysis to be persuasive in assessing the reliability or relevancy of Dr. Lamb's testimony.

(*Id.*) The court again disagrees. Dr. Lamb provides support for each of the seven steps of the causal sequence that Amex believes must be met.[6]

First, Dr. Lamb provides evidence that Qualifying Merchants would benefit from steering. Dr. Lamb points to Amex's own steering practices, and the success Amex had in shifting consumers away from airlines that increased Amex's costs. (Lamb Report ¶¶ 79-80.) And Dr. Lamb refers to statements from merchants about the high cost of accepting credit and debit cards, (*id.* ¶¶ 214-18) the steps that merchants take to lower costs, even by basis points, (*id.* ¶ 223) and statements from merchants, in part based on the changes to debit card processing after the Durbin Amendment, that they would steer cardholders based on processing cost if not for Amex's NDPs. (*Id.* ¶¶ 222-29.) Finally, Dr. Lamb provides evidence that Amex itself believes that this step is satisfied, quoting an internal Amex presentation in which the company acknowledges that, in the Australian context "it is rational for a merchant to differentially surcharge." (*Id.* ¶ 255.)

Second, Dr. Lamb provides evidence that if merchants were allowed to steer, they would use that leverage to reduce discount fees. While the Australian regulatory regime differs from the U.S. regime in non-trivial ways, Dr. Lamb notes that Amex itself views Australia as providing important strategy lessons about how to

---

[6] Amex argues that causality requires Plaintiffs and Dr. Lamb to show seven steps: (1) merchants must benefit from steering, (2) when faced with steering, networks must reduce discount fees, (3) acquirers must pass through any reduction in discount fees, (4) merchants must actually save money, (5) merchant must pass through the savings to consumers, (6) consumers must benefit from lower prices by more than they are harmed by steering, and (7) credit card issuers must not increase cardholder fees or reduce rewards. (Gaier Report ¶ 18) The court does not adopt Amex's proposed chain of causality but notes that Dr. Lamb has sufficiently justified his conclusion, based on economic theory and data, for each of the steps that Amex argues is required to prevail.

preempt potentially costly differential surcharging. (*Id.* ¶¶ 260-61.) Dr. Lamb bolsters the argument that discount rates would be lower if steering occurred with Discover's failure to compete as a low-price payment network and its subsequent decision to abandon the strategy and increase the discount rate. (*Id.* ¶¶ 179-86.)

Third, Dr. Lamb provides economic justification for his claim that acquiring banks will pass along savings to merchants. (*Id.* ¶ 45 & n. 142.) Dr. Lamb argues that there is intense competition between acquiring banks for merchants, and that large merchants have leverage to compete downward acquiring fees. Large merchants often switch among acquirers in "an effort to get the best possible price." (*Id.* (citing David S. Evans and Richard Schmalensee, *Paying with Plastic: The Digital Revolution in Buying and Borrowing* (Cambridge, MA: MIT Press, 2005 2d ed.).) In particular, because large merchants often have an "unbundled" fee structure in which the merchant transparently pays the interchange and network fees plus the acquiring bank's fee, it has transparency into pricing that would allow it to compete down the price. (*Id.* ¶ 45.)

Fourth, Dr. Lamb provided evidence that walkaways would not occur. Dr. Lamb cites to Amex internal documents that "cardmembers either pay surcharge or switch payment products. They do not leave establishments." (*Id.* ¶ 255.) Amex disputes this in their *Daubert* motion based on other internal documents and survey results, (Amex *Daubert* Mot. at 12 & n.3) but that sort of factual dispute is one that our adversarial system is well primed to settle. *See Daubert*, 509 U.S. at 596.

Fifth, Dr. Lamb argues that merchants would pass through their savings from lower discount rates to consumers by lowering prices. Dr. Lamb cites extensively to testimony from merchants that emphasize both that merchants pass on the discount rate to

consumers and that the savings would get passed on to consumers because lower prices increase business. (Lamb Report ¶¶ 321-25.) Dr. Lamb further cites meta-analyses that show that merchants do indeed pass through savings. (*Id.* ¶¶ 368-69.) Amex does not appear to dispute that merchants pass along savings (*see* Gaier Report ¶¶ 124-126 (citing studies with pass through rate varying from 22% to 558%)), but instead contests the pass-through rate that Dr. Lamb determines is appropriate for calculating damages. That sort of disagreement on an expert's findings is not enough to exclude Dr. Lamb's expert testimony. *See Daubert*, 509 U.S. at 595 ("The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate.). Amex also raises concerns about the pass-through rate with respect to Dr. Lamb's damages calculation; the court addresses this concern separately below, *see infra* II.B.2.b.

Sixth, Dr. Lamb provides evidence that the benefit to class members from lower prices is greater than the harm to class members from steering. Dr. Lamb argues that limited surcharging will take place. Because surcharging is harmful to Amex's business (Lamb Report ¶ 255 ("Vice Chairman at Amex used the phrase 'Rome is burning' to describe his view on the urgency of acting now to stem the tide of differential surcharge")), Dr. Lamb argues that Amex's strategy in the but-for world would be to head off any surcharging by negotiating lower discount rates with merchants. (*Id.* ¶¶ 257-59.) To support this, Dr. Lamb notes that Amex pursued such a strategy in Australia and cited favorably the strategy for dealing with the potential for surcharging in the United States. (*Id.* ¶¶ 260-63.)

And seventh, Dr. Lamb provides an economic justification for why credit card issuers would not increase fees or reduce rewards that offset the benefits that cardholders receive from lower prices. If Amex were to face increased steering from merchants, it can adjust the two-sided price in two ways: it can lower prices

to merchants, so merchants have less of an incentive to steer, or it can increase rewards to cardholders, so cardholders are more insistent to merchants and overcome merchant efforts to steer. (*Id.* ¶ 288.)

In sum, Dr. Lamb's opinion is well supported by economic theory, academic articles, and the testimony of merchants and Amex itself. Dr. Lamb's relevant and reliable testimony will help the trier of fact determine whether an antitrust injury occurred.

More fundamentally, the parties disagree about the state of the world but for Amex's NDPs. Dr. Lamb argues that the but-for world he analyzes is based on an "equilibrium position" in which Amex's NDPs do not exist, while Amex improperly inserts confusion by analyzing the *transition* from the equilibrium with NDPs to one without. (Lamb Reply (Dkt. 140-3) ¶ 244.) Indeed, Amex's but-for world is much messier. (*See, e.g.*, Opp. Class Cert. at 2; Amex *Daubert* Mot. at 16-18.) Without the NDPs, some merchants might steer. Some might surcharge all credit cards. Some might differentially surcharge based on the cost of processing each card. And some might find that steering or surcharging pushes consumers elsewhere, and so they do nothing. Amex argues that Plaintiffs cannot model the but-for world unless they take this heterogeneity into account, and any attempt to simplify the but-for world with assumptions about how merchants or consumers will respond is improper and makes the methodology unreliable. (*See* Amex *Daubert* Mot. at 14-15.) However, neither Plaintiffs nor Amex know with certainty which method or methods the merchants would use. The merchants themselves likely do not know at this point which, if any, they would use. The optimal strategy will likely depend on the actions of their merchant competitors and Amex's payment network and credit card competitors.

Dr. Lamb, in an opinion supported by economic theory, proposed a but-for world and a corresponding methodology for calculating

14

damages. Amex disagrees with Dr. Lamb's opinion that prices would actually decrease for class members. "[Amex] will have the opportunity . . . to convince the fact finder that [this] expert opinion[ is] erroneous and that in [Plaintiffs'] but-for world, prices would increase, but these are not issues to be resolved on this motion." *US Airways, Inc. v. Sabre Holdings Corp.*, 105 F. Supp. 3d 265, 282 (S.D.N.Y. 2015), *aff'd*, 938 F.3d 43 (2d Cir. 2019).

Plaintiffs allege that Amex's NDPs restrained trade to their detriment. Competition is messy and impossible to model with complete confidence. If the court were to adopt Amex's but-for world and exclude Dr. Lamb's analysis as insufficiently able to account for how different economic agents in the market would compete but for the defendant's alleged restraint on trade, as Amex argues is necessary, then modeling an antitrust injury would be converted from a difficult to an impossible task.

### 2.   Methodology to Calculate Damages

The "burden of proving antitrust damages is not as rigorous as in other types of cases." *New York v. Julius Nasso Concrete Corp.*, 202 F.3d 82, 88-89 (2d Cir. 2000). Antitrust violations require the creation of an alternative reality in which the alleged restraint on trade did not exist, and often the only data upon which parties can rely to model this alternative reality is that which is alleged to have been the result of an unlawful restraint on trade. "The vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation." *J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*, 451 U.S. 557, 566 (1981); *see also Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 780 (2d Cir. 2016) ("Impediments to reaching a reliable damages estimate often flow from the nature and complexity of the alleged antitrust violation."). The court assesses the reliability of Dr. Lamb's antitrust damages

calculation with an acknowledgment of the uncertainty of the contours of the but-for world.

Amex argues that the faults with Dr. Lamb's assessment of class-wide injury similarly taint his methodology for calculating damages on a class-wide basis. However, as discussed above, Dr. Lamb has provided economic justifications for declining to assess the costs of steering, surcharging, and walk-aways, and Dr. Gaier himself fails to consistently argue that steering would occur. The court will not exclude an economic expert for failing to model potential aspects of the but-for world that are in dispute.

Beyond the challenges to Dr. Lamb's damages calculations based on the state of his proposed but-for world, Amex challenges three specific aspects of Dr. Lamb's methodology for calculating damages. First, Amex faults Dr. Lamb for failing to consider offsets that class members could face when they shop at non-Qualifying Merchants, which Amex claims are generally smaller and have less capacity to negotiate with Amex. (Amex *Daubert* Mot. at 18-20.) Second, Amex critiques Dr. Lamb's assumptions and use of averages. (*Id.* at 20-24.) And finally, Amex argues that the data that Dr. Lamb uses to make his damages calculation is insufficiently reliable. (*Id.* at 24-25.) The court considers each argument in turn.

### a.  Non-Qualifying Merchants

Amex argues that Plaintiffs fail to satisfy *Comcast* because they define the putative class based on credit or debit purchases at only the Qualifying Merchants—38 specific retailers—rather than for transactions at all retailers.[7] (Amex *Daubert* Mot. 18-20 (citing *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013).) In *Comcast*, the Supreme Court held that the plaintiffs did not satisfy the predominance requirement because the plaintiffs' expert's

---

[7] *Comcast* is relevant for class certification and is discussed more in depth below in the predominance analysis, *infra* III.F.

"model failed to measure damages resulting from the particular antitrust injury on which petitioners' liability in this action is premised." *Comcast Corp. v. Behrend*, 569 U.S. 27, 36 (2013). In applying *Comcast*, the Second Circuit held that "[a]ll that is required at class certification [after *Comcast*] is that the plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability." *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 90 & n.3 (2d Cir. 2015). Dr. Lamb does so here.

According to Amex, however, Plaintiffs must go further, arguing that to satisfy *Comcast*, Dr. Lamb must analyze the effect of class member purchases at non-Qualifying Merchants; otherwise, the damages model does not match the theory of liability. But Amex's argument that Plaintiffs must account for all the legal liability that Amex's actions created would dramatically expand *Comcast* beyond what the Second Circuit requires.

Amex only arrives at its conclusion that Plaintiffs' damages model does not match the theory of liability by relying on contradictory assumptions about how non-Qualifying Merchants behave. Amex simultaneously argues that (1) non-Qualifying Merchants would steer and surcharge and so class members would be harmed, (Amex *Daubert* Mot. at 19) and (2) that non-Qualifying Merchants "have little incentive to engage in differential surcharging because many do not understand their costs of acceptance." (Opp. Class Cert. at 32.) If there is surcharging, then the non-Qualifying Merchants would gain leverage over Amex to lower fees, while if there is not, class members' injury would be unaffected. Amex cannot have it both ways. The court finds that Dr. Lamb's damages calculation matches the Plaintiffs' theory of liability and therefore satisfies *Comcast*.

### b.  *Assumption of Uniformity*

Amex next challenges Dr. Lamb's assumptions about discount rates and pass through rates. Amex first faults Dr. Lamb for using

17

average merchant discount rates compiled by Nilson, a third-party firm, rather than analyzing the granular data that would allow him to calculate each Qualifying Merchant's discount rate and how each Merchant's rate would change in the but-for world. (Amex *Daubert* Mot. at 21-22.) Amex also faults Dr. Lamb for assuming that merchants would uniformly pass through 90% of any reduction in discount rate to consumers through reduced prices. (*Id.* at 22-23.)

However, the cases that Amex cites to support their challenges to Dr. Lamb's methodologies are off the mark. In *Scentsational Techs., LLC v. Pepsi, Inc.*, the court excluded expert testimony in a patent dispute where she claimed that a project would have succeeded but-for the defendant's patent application. *Scentsational Techs., LLC v. Pepsi, Inc.*, No. 13-cv-8645 (KBF), 2018 WL 1889763, at *7 (S.D.N.Y. Apr. 18, 2018). The expert assumed the relevant project would have been successful without providing any support for *why* the project would succeed. (*Id.*) The expert assumed her conclusion and provided the court no means of analyzing her claim. And similarly, In *In re Apple iPhone Antitrust Litig.*, the expert assumed a benchmark rate to conduct his analysis, but the process by which the expert "arrive[d] at this [rate] remain[ed] a mystery" to that court. No. 11-cv-6714 (YGR), 2022 WL 1284104, at *3 (N.D. Cal. Mar. 29, 2022). Here, by contrast, Dr. Lamb adequately explained each decision and assumption.

Plaintiffs justify Dr. Lamb's use of Nilson blended data instead of calculating a discount rate for each merchant because it is the industry standard and what the payment networks (and Amex's experts) use to analyze their own rates. (Opp. to Amex *Daubert* Mot. at 22.) Dr. Lamb explained his estimate of the amount by which Amex would reduce its discount rates as based on Discover's abandonment of its low-cost strategy, and he provided

evidence that the estimate was in range with the merchant discount fee reductions that Amex itself has previously negotiated with merchants in exchange for marketing concessions. (Lamb Report ¶¶ 359-64.) And Dr. Lamb adopts his estimate for pass-through from a study conducted by researchers in the Federal Reserve System. (*Id.* ¶ 368.) *See also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) (citing *Daubert*, 509 U.S. at 592–594) (noting that a factor that is relevant to the *Daubert* assessment is "[w]hether the theory or technique enjoys general acceptance within a relevant scientific community.") Amex's confusion notwithstanding, it is not a mystery to the court how Dr. Lamb arrived at these methodologies.

The court takes Amex's argument to be a broader critique of the use of averages—that averages mask individual variation in how Amex interacts with merchants (through discount rates) and how merchants interact with consumers (through pass-through rates).[8] Amex cites to *In re Processed Egg Prod. Antitrust Litig.*, to stand for the proposition that "the use of a single overcharge pass-through rate, without consideration as to whether individual retailers pass through the overcharge at different rates, is flawed." (Amex *Daubert* Mot. at 23 (quoting *In re Processed Egg Prod. Antitrust Litig.* 312 F.R.D. 124, 162 (E.D. Pa. 2015)).)

But it is well-established that plaintiffs can rely on an aggregated class-wide calculation of damages. *See, e.g., Gruber v. Gilbertson*, 647 F. Supp. 3d 100, 125 (S.D.N.Y. 2022), *Hickory Sec. Ltd. v. Republic of Argentina*, 493 F. App'x 156, 159 (2d Cir. 2012) (Summary Order) (collecting cases). And if antitrust plaintiffs can calculate damages on a class-wide basis, then they are not required to estimate the pass-through rate for each retailer. The

---

[8] Within Amex's *Daubert* motion is an implicit argument that Dr. Lamb is ignoring individual issues with respect to damages calculations. The court addresses this idea in depth below in the predominance discussion of Plaintiffs' Motion for Class Certification. *See infra* III.F.1.

*Processed Eggs* court acknowledges this. *See* 312 F.R.D. at 162. ("The Court is also not rejecting out-of-hand the notion that a single pass-through rate here could have been a 'just and reasonable inference' for the amount of damages across the class.") Contrary to Amex's representation, the *Processed Eggs* court rejected the expert's model not based on averaging as a rule, but because plaintiffs were seeking to certify multiple state classes without accounting for demonstrated regional variation in egg prices. *Id.* Amex is not arguing that any Qualifying Merchant's pass-through rate would differ in Vermont and Ohio, and so its reliance on *Processed Eggs* is unpersuasive.[9]

---

[9] Given the focus of Amex's arguments, it is helpful to explain why averages are not theoretically problematic. Class actions permit plaintiffs to calculate class-wide damages; an aggregate class-wide damages estimate is a single number that is then partitioned to class members. The steps to arrive at the single class-wide damages estimate can be expressed through averages.

As applied here, for instance, if the removal of the NDPs lowered the discount rate that Qualifying Merchants faced, then, even if the amount the discount rate fell was different for each Merchant, the but-for discount rate could still be expressed as an average. That is because the discount rate is relevant insofar as it reaches the class, by way of the Qualifying Merchants. Perhaps the average rate would have to be weighted by sales or charge volume, but that does not change that it could be expressed as an average. If the discount rate fell for some Qualifying Merchants but increased for others, an average would still reflect that—and if on average the discount rate actually increased in the but-for world, then Plaintiffs' theory would fail. A similar argument follows with Amex's argument about pass-through. Home Depot can pass through 60% of cost savings in the but-for world to consumers and Ikea can pass through 100%, but all that variance can again be expressed as an average. An average is, after all, a single number that represents a distribution. Like the discount rate, Qualifying Merchants' pass-through rates are relevant as felt by the class, whether expressed as each Qualifying Merchant's individual pass-through rate or as an average. So long as class action plaintiffs can calculate damages on a class-wide basis then relying on averages in doing so is acceptable.

Ultimately, it appears to the court that what Amex really disa-
grees with is not the use of averages but the numbers that Dr.
Lamb chooses for his average discount and pass-through rates.
Amex references Home Depot's lower pass-through rate not to
dispute that pass-through occurs but to dispute the *rate* of pass-
through. (Amex *Daubert* Mot. at 22-23.) If Amex finds Dr. Lamb's
rates to be unpersuasive, that issue is better resolved through
cross examination at trial than through evidentiary gatekeeping.

### c.   Data Quality

Finally, Amex challenges Dr. Lamb's reliance on data with flawed
location information. (Amex *Daubert* Mot. at 24-25.) In his Reply
Report, Dr. Lamb agreed with Dr. Gaier that the data that Dr.
Lamb initially used for his analysis was flawed for "card-not-pre-
sent" transactions, which are primarily online, and for Discover
card transactions, which did not disaggregate sales data by state.
(Gaier Report ¶¶ 134-138; Lamb Reply (Dkt. 140-3) ¶¶ 339-49.)
In response, Dr. Lamb dropped "card-not-present" transactions
from his damages calculation and altered his methodology for
analyzing Discover card transactions. (Lamb Reply ¶¶ 339-49.)

Amex contends that even with Dr. Lamb's adjustments regarding
"card-not-present" transactions, the same issue exists for all
transactions. (Amex *Daubert* Mot. at 25.) Dr. Lamb, citing a con-
versation with a company representative, claims otherwise.
(Opp. Amex *Daubert* Mot. at 24-25.)

The parties similarly dispute the sufficiency of Dr. Lamb's data
adjustments for Discover card transaction data. Discover, unlike
Visa and Mastercard, only provided national level sales data in
response to Dr. Lamb's data inquiries. Because Plaintiffs only seek
to certify classes for residents of a handful of states, national level
sales data must be adjusted to provide a reasonable estimate of
the relevant states' sales data. Dr. Lamb initially allocated sales
by state population. (Lamb Reply ¶ 345.) However, this led to
instances in which Dr. Lamb estimated sales data for states in

which Qualifying Merchants did not operate. (Gaier Report ¶ 137.) Dr. Lamb's update, which allocated sales data based on Visa and Mastercard's sales and removed transactions from Qualifying Merchants that were not present, though still imperfect, is an improvement. (Lamb Reply ¶¶ 339-49.)

Imperfections are typical in antitrust analyses of the but-for world and *Daubert* does not require the complete elimination of any alleged imperfection in an expert's analysis. *See Gelboim*, 823 F.3d at 780. Whether there are remaining data issues, even after Dr. Lamb's revision, is an issue that is best resolved through cross-examination and with a presentation of evidence of data errors beyond those that Dr. Lamb corrected. *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-md-1720 (MKB), 2022 WL 15053250, at *29 (E.D.N.Y. Oct. 26, 2022) ("[W]here a qualified expert bases his opinion on 'good grounds based on what is known,' imperfections in the data are properly attacked by the opposing party on cross-examination.").

For the above reasons, Defendant's motion to exclude the testimony of Dr. Lamb is therefore DENIED.

### C. Plaintiff's *Daubert* Motion to Exclude the Testimony of Dr. Eric Gaier

Plaintiffs seek to exclude the testimony of Dr. Eric Gaier on the basis that it is irrelevant and unhelpful. (*See generally* Pl. *Daubert* Mot.) Plaintiffs' main point of contention with Dr. Gaier's testimony is his focus on offsetting harms in the but-for world without NDPs—that without the NDPs, class members would face costs from steering that negate the benefit of lower prices that they would receive. Plaintiffs argue that the offsets that are the focus of Dr. Gaier's expert testimony are speculative and are legally irrelevant. (*See* Pl. *Daubert* Mot. at 8-11.)

It is true that speculative offsets on what could theoretically but improbably occur in the but-for world are irrelevant and unhelpful for determining whether an antitrust injury occurred. *See, e.g., In re Delta/AirTran Baggage Fee Antitrust Litig.*, 317 F.R.D. 675, 690 (N.D. Ga. 2016) (striking Dr. Gaier's testimony with respect to offsets as irrelevant); *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 335 F.R.D. 1, 30 (E.D.N.Y. 2020) (rejecting defendant's argument that plaintiffs would be worse off in the but-for world because "speculative claims about class members' medical reaction to a non-existent drug cannot defeat class certification."). But not all offsets are equally speculative—certain of Dr. Gaier's proposed offsets are more speculative than others.

Dr. Gaier's discussion of offsets concerning non-Qualifying Merchants are speculative and irrelevant and therefore must be excluded. As mentioned while addressing Amex's *Daubert* Motion, *see supra* II.B.2.a., Dr. Gaier's opinion that any benefits that Plaintiffs accrue in the but-for world would be offset by losses at non-Qualifying Merchants is unreliable. Dr. Gaier argues that small merchants would not pay lower merchant discount fees because many do not contract directly with Amex. (Gaier Report ¶ 93.) Instead, they pay acquiring banks the same blended rate for all credit (or credit and debit) transactions. (*Id.*) Sometimes these acquiring banks do not pass along decreases in interchange fees to small merchants. (*Id.* ¶ 95 (discussing the Durbin Amendment).) And even when small merchants do not pay a blended rate, they may not understand the cost of acceptance well enough to properly steer customers to lower-cost payment methods. (*Id.* ¶ 94.) Perhaps for these reasons, Dr. Gaier notes that after the Visa and Mastercard consent decrees in 2011 and 2013, "nearly 3 million small merchants who did not accept Amex were free to steer. Yet, effectively none did so and their merchant fees did not decline." (*Id.* ¶ 96.)

Dr. Gaier uses the complexity of the cost of acceptance to support his argument that small merchants are different from large merchants and are unlikely to steer and so are unlikely to gain leverage over Amex to lower their cost of processing Amex cards. But then, without support and despite his own detailed argument to the contrary, Dr. Gaier speculates that "small merchants may nevertheless impose surcharges or engage in other forms of steering that harm consumers." (*Id.* ¶ 97.) This is precisely the sort of conclusory and internally contradictory argument that the *Daubert* gatekeeping function is meant to prevent. Therefore, the court GRANTS Plaintiffs' motion to exclude Dr. Gaier's testimony insofar as it opines on class members purchases with non-Qualifying Merchants.

But the court disagrees with Plaintiffs' framing of other aspects of Dr. Gaier's opinion as speculative and therefore irrelevant and unhelpful. (*See* Pl. *Daubert* Mot. at 8-11.) Plaintiffs' challenge Dr. Gaier's assertion that "determination of antitrust injury from Amex's NDPs requires analysis of both the *benefits* of asserted lower retail prices and the *harms* imposed by surcharges and other forms of steering (in addition to any changes in annual fees or rewards)." (*See* Pl. *Daubert* Mot. at 9 (citing Gaier Report ¶ 34).) But Plaintiffs' own theory of liability relies on predicting the conduct of third parties: Dr. Lamb argues that Qualifying Merchants must pass through savings to class members by way of lower prices and that non-Amex credit card-issuing banks must not increase annual fees or decrease rewards by more than the benefit that class members receive from the decrease in prices. (*See* Lamb Report ¶¶ 296, 329.) Dr. Gaier's opinion about steering and annual fees are therefore relevant and helpful and will not be excluded.

Steering is relevant to Plaintiffs' theory of antitrust injury because it is a factor in determining the total pass-through rate. To illustrate, suppose a portion of the Qualifying Merchants follow the

mechanism that Dr. Lamb proposes and use the credible threat of steering as leverage to negotiate a lower discount rate with Amex, and then pass along a portion of their savings to class members. (*See* Lamb Report ¶ 259) The pass-through rate for this portion of transactions would be positive. Suppose the remaining Qualifying Merchants instead follow Dr. Gaier's proposed mechanism and differentially surcharge, recouping the cost of acceptance from the consumers that cause the Merchant to incur the charge. (*See* Gaier Report ¶ 53) The pass-through rate would be negative—class members would be worse off in the but-for world. In this stylized example, an antitrust injury exists if, after taking a weighted average of the two pass-through rates, the amount of savings that Qualifying Merchants pass on to class members, in aggregate as a class, is positive in the but-for world. Dr. Gaier's opinion that steering that occurs in the but-for world is therefore not a speculative offset but is relevant and helpful to the trier of fact.

Dr. Gaier's analysis of credit card annual fees and rewards is similarly relevant and helpful. Plaintiffs must show that the reduction in retail prices does not result in an even greater reduction in cardholder rewards for the credit card classes. (Lamb Report ¶ 329.) This requirement is in part a product of the two-sided nature of the relevant transaction market—class members must show that the NDPs caused net harm taking into account both sides of the transaction. *See Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2287 (2018). If annual fees were to increase or credit card rewards were to decline by more than the benefits that the credit card class members would receive from lower prices in the but-for world, then there would be no injury to those class members. Dr. Gaier's opinion about credit card fees and rewards is sufficiently reliable and helpful to the factfinder to withstand Plaintiffs' *Daubert* motion.

For these reasons, Plaintiffs' motion to exclude the testimony of Dr. Gaier is GRANTED with respect to his opinions concerning offsetting injury at non-Qualifying Merchants and is otherwise DENIED.

## III. PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Plaintiffs seek to certify classes under Rule 23(b)(3) for two statewide classes in each of eleven states and the District of Columbia for:

> All card account holders, who are natural persons, and whose account billing address was in [State][10] during the applicable Class Period, [11] and whose [payment card] account was used by an account holder or an authorized user for a purchase of a good or service from a

---

[10] Plaintiffs originally sought class certification for thirteen states and the District of Columbia. (*See* Mot. for Class Cert. at 3-4.) However, unable to find class representatives for the Montana and West Virginia classes, Plaintiffs did not seek to certify classes for those states. (*Id.* at 20 & n.3.) The remaining states are Alabama, District of Columbia, Hawaii, Kansas, Maine, Mississippi, North Carolina, Oregon, Utah, Vermont, Illinois, and Ohio. (*Id.* at 4.)

[11] Plaintiffs seek to certify the following states for the given periods:

| State | Class Period |
|---|---|
| Alabama | January 29, 2015–June 1, 2022 |
| District of Columbia | January 29, 2015–June 1, 2022 |
| Hawaii | January 29, 2015–June 1, 2022 |
| Kansas | January 29, 2016–June 1, 2022 |
| Maine | January 29, 2015–June 1, 2022 |
| Mississippi | January 29, 2016–June 1, 2022 |
| North Carolina | January 29, 2015–June 1, 2022 |
| Oregon | January 29, 2015–June 1, 2022 |
| Utah | January 29, 2015–June 1, 2022 |
| Vermont | June 17, 2016–June 1, 2022 |
| Illinois | January 29, 2016–June 1, 2022 |
| Ohio | January 29, 2017–June 1, 2022 |

Qualifying Merchant[12] during the Class Period that oc-
curred in [same State].

(Mot. for Class Cert. at 3.) For the proposed state credit card
class, the relevant payment card is a "Visa, Mastercard, or Dis-
cover General Purpose Credit or Charge Card." (*Id.*) For the state
debit card class, the payment card is a "Visa or Mastercard Debit
Card." (*Id.*) Plaintiffs exclude from the class any Amex cardhold-
ers, medical purchases where the purchases paid only a copay
under their insurance plan, and Amex and government agents or
affiliates. (*See* Mot. for Class Cert. at 4.)

Plaintiffs seek certification under Rule 23(a) and (b)(3). (*Id.* at
3.) Under Rule 23(a), plaintiffs seeking to certify a class must
satisfy the requirements of numerosity, commonality, typicality,
and adequacy. *See, e.g., Marisol A. v. Giuliani*, 126 F.3d 372, 375
(2d Cir. 1997). For class certification under Rule 23(b)(3), Plain-
tiffs must also show (1) that common questions of law or fact
predominate individual issues and (2) that a class action is supe-
rior to other potential methods of adjudication. *In re Initial Pub.
Offerings Sec. Litig.*, 471 F.3d 24, 32 (2d Cir. 2006). In addition
to the Rule 23(a) and (b)(3) factors, the Second Circuit requires
all classes to satisfy an implied ascertainability requirement,

---

[12] The Qualifying Merchants are the following 38 large retailers: Academy
Sports and Outdoors, Inc.; Advance Auto Parts, Inc.; Albertsons Compa-
nies, Inc.; American Eagle Outfitters, Inc.; Bed Bath & Beyond Inc.; Best
Buy Co., Inc.; Big Lots, Inc.; BI-LO, LLC; BJ's Wholesale Club Holdings,
Inc.; Burlington Stores, Inc.; Camping World Holdings, Inc.; Circle K
Stores, Inc.; CVS Health Corporation; Dick's Sporting Goods, Inc.; Foot
Locker, Inc.; GameStop Corp.; The Gap, Inc.; H&M Hennes & Mauritz Ab;
The Home Depot, Inc.; Hy-Vee, Inc.; Ikea, Inc.; Kohl's Corporation; The
Kroger Co.; Lowe's Companies, Inc.; Meijer, Inc.; Michaels Stores, Inc.;
Publix Super Markets, Inc.; Rite Aid Corporation; Ross Stores, Inc.; Sprouts
Farmers Market, Inc.; Target Corporation; The TJX Companies, Inc.; and
Tractor Supply Company.

which is met by showing that the class is objectively determinable. *See In re Petrobras Sec.*, 862 F.3d 250, 265 (2d Cir. 2017).

Plaintiffs must demonstrate that they satisfy each factor by a preponderance of the evidence. *Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008). At the class certification stage, the court can, and indeed must, assess the merits of the plaintiffs' claim insofar as it is relevant for determining whether plaintiffs satisfied the factors necessary for class certification under Fed. R. Civ. P. 23. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011) ("Frequently that 'rigorous analysis' [required to satisfy Rule 23] will entail some overlap with the merits of the plaintiff's underlying claim.").

The court addresses each of the Rule 23 factors below. Because the ascertainability requirement is a "threshold" requirement, *see Petrobras*, 862 F.3d at 264, the court begins there before turning to the Rule 23(a) and (b)(3) factors.

## A. Ascertainability

The Second Circuit has "recognized an implied requirement of ascertainability in Rule 23." *Petrobras*, 862 F.3d at 260. Ascertainability is a "modest threshold requirement" for class certification that requires that the "proposed class is defined using objective criteria that establish a membership with definite boundaries." *Id.* at 269. In *Petrobras*, the Second Circuit declined to require an administrative feasibility test, holding that the ascertainability requirement "does not directly concern itself with plaintiffs' ability to offer proof of membership." *Id.* Instead, ascertainability focuses on how clearly the class is defined. *Id.* at 266-67.

Plaintiffs' proposed classes are ascertainable. For the ascertainability analysis, Plaintiffs' class definition has four relevant components: the class member must (1) have a qualifying credit

or debit card with (2) a billing address in the relevant state, and he or she must have (3) used the card for a purchase from a Qualifying Merchant (4) in the same state as the customer's billing address. (Mot. for Class Cert. at 3.) The first three components easily satisfy the ascertainability requirement: a putative class member's credit or debit card statement has all the objective criteria necessary. Amex only challenges the fourth component, that the transaction occurred in the same state as the class member's billing address. Amex challenges the ascertainability of the location of the transaction on two grounds: First, Amex argues that the class is not ascertainable because Plaintiffs and Dr. Lamb lack data on where transactions occurred. (Opp. Class Cert. at 43-44.) Second, because Plaintiffs did not define "in the same state," potential class members will not know if an online purchase is in the same state or not. (*Id.* at 44-45.) Neither argument is persuasive.

Amex's assertion that Plaintiffs' proposed class is not ascertainable because Plaintiffs lack accurate transaction location data goes directly against the Second Circuit's holding in *Petrobras*, which rejected the addition of an administrative feasibility requirement. *Petrobras*, 862 F.3d at 269. The location of credit card purchases is an objective criterion that is recorded, whether it is with the merchants, payment networks or the issuer or acquirer banks. Whether the Plaintiffs are in current possession of the data is not relevant.

Amex similarly misapplies *Petrobras* when it contends that failure to define "in the same state" makes the class not ascertainable because consumers may not know where a transaction was "made."[13] To illustrate this, Amex uses an example where a consumer in State A makes an online purchase from a retailer in

---

[13] Amex argues that this point also means that Plaintiffs fail predominance because some states require an individualized inquiry to determine where

State B and asks where the transaction was "made." (Opp. to Class Cert. at 44-45.) However, it is not necessary for Plaintiffs to define a term that each state's law already provides. That a fact is not immediately obvious to a consumer does not mean that the class is not "defined using objective criteria that establish a membership with definite boundaries." *Petrobras*, 862 F.3d at 269. In fact, *Petrobras* itself, which defined ascertainability for the Circuit, involved a mixed question of law and fact regarding whether the securities at issue for class certification were domestic such that they fell within the scope of the securities law. *Id.* at 269-270. The class satisfied the ascertainability requirements because objective facts about the nature of the purchased security meant that the class was well defined; if certain factors were met, then the security was domestic. *Id.* It did not matter if it were immediately clear to the purchaser that the security was domestic. So too here. The court holds that Plaintiffs' proposed classes are ascertainable.

## B.   Numerosity

To certify a class action under Rule 23(b)(3), the putative class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). In the Second Circuit, numerosity is presumed to be satisfied when the putative class has more than 40 members. *Jin v. Shanghai Original, Inc.*, 990 F.3d 251, 263 n.20 (2d Cir. 2021).

Plaintiffs' proposed class consists of thousands or millions (depending on the state) of credit or debit cardholders that used their card at one of 38 merchants that make up some of the nation's largest retailers. Amex does not contest that the proposed class is sufficiently numerous to make joinder impracticable.

---

the transaction was "made." (Opp. Class Cert. at 45) The court addresses this argument in the larger discussion of predominance, *see infra* III.F.4.

Plaintiffs have satisfied the numerosity requirement under Rule 23(a)(1).

### C.   Commonality

To satisfy the commonality requirement, plaintiffs must show that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). *Wal-Mart* clarified that commonality requires that a common *answer* can resolve the matter on a class-wide basis. *See Wal-Mart*, 564 U.S. at 350. In this case, Plaintiffs have moved for certification under Rule 23(b)(3), which requires the court to assess not only whether there are common questions of law or fact, but also whether the common questions predominate. (*See* Mot. for Class Cert. at 16.) *See also* Fed. R. Civ. P. 23(b)(3). The test for predominance is more stringent and subsumes the commonality requirement—if the common questions predominate, then commonality is satisfied. *See In re Namenda Indirect Purchaser Antitrust Litig.*, 338 F.R.D. 527, 547 (S.D.N.Y. 2021). The court therefore addresses commonality when discussing predominance below, *see infra* III.F.

### D.   Typicality

Rule 23(a)(3) requires a finding that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Typicality is satisfied when the named plaintiffs' claims arise out of the same course of conduct and rely on similar legal theories of liability as the putative class members' claims. *See Brown v. Kelly*, 609 F.3d 467, 475 (2d Cir. 2010).

Plaintiffs satisfy the typicality requirement in the antitrust context when the named "plaintiffs and all class members alleg[e] the same antitrust violations by the defendants." *In re Playmobil Antitrust Litig.*, 35 F. Supp. 2d 231, 241 (E.D.N.Y. 1998). In this case, the putative class alleges that Amex's NDPs restrained trade and raised prices. Amex does not contest that Plaintiffs satisfy the

typicality prerequisite to certifying a class. The court finds that typicality is satisfied.

### E.   Adequacy

The adequacy requirement under Rule 23(a)(4) is satisfied when plaintiffs show that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The adequacy requirement is meant to protect class members from a potential conflict of interest and requires an inquiry into whether "(1) plaintiff's interests are antagonistic to the interest of other members of the class and (2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 99 (2d Cir. 2007). "[N]amed plaintiffs in a class action cannot represent a class of whom they are not a part, and can represent a class of whom they are a part only to the extent of the interests they possess in common with members of the class." *Irvin v. Harris*, 944 F.3d 63, 71 (2d Cir. 2019).

Amex challenges the adequacy of the class representation on three grounds: First, certain classes lack named representatives. (Opp. Class Cert. at 39.) Second, certain named representatives have close relationships with the lawyers and do not understand the case. (*Id.* at 40-41.) And third, certain named representatives were Amex cardholders during the class period. (*Id.* at 42.)

### 1.   Classes with No Named Plaintiff

The Hawaii Credit, Hawaii Debit, Alabama Credit, Oregon Credit, and Vermont Debit classes lack named representatives.[14]

---

[14] The parties dispute which classes lack representatives. Amex contends that the Hawaii Credit, Hawaii Debit, Alabama Credit, Oregon Credit, and Vermont Debit classes lack named representatives. Plaintiffs' motion for class certification includes named representatives for the Hawaii Credit and Alabama Credit classes. However, Magistrate Judge Sanket J. Bulsara

The court agrees with Amex that classes without a named representative should be denied class certification because a class with no representation does not provide adequate representation to unnamed class members. *Irvin v. Harris* 944 F.3d 63 (2d Cir. 2019) (holding that named plaintiffs are a prerequisite to class certification).[15] The court therefore DENIES Plaintiffs' motion to certify the Hawaii Credit, Hawaii Debit, Alabama Credit, Oregon Credit, and Vermont Debit classes.

### 2. Named Plaintiffs' Relationship with Counsel and Understanding of the Case

Amex next alleges that the proposed class representatives are inadequate because they do not have a deep understanding of the case and have close relationships with counsel. (Opp. Class Cert. at 40-41.) Indeed, class counsel seemed to have no systematic method for recruiting named plaintiffs and apparently relied predominantly on personal connections. While strategically dubious,[16] the court finds that it does not rise to the level of making the class representatives inadequate.

A class representative's ignorance is generally insufficient to render representation inadequate. *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 42 (2d Cir. 2009). Otherwise, there would be a risk that class representatives' positions would be overly picked apart and presented in a way that does not actually

---

denied Plaintiffs' motion to amend their complaint to add the proposed class representatives. (*See* Mot. to Amend Op. & Order (Dkt. 174).)

[15] The court declines Plaintiffs' invitation to, in the alternative, certify a combined debit and credit class for the states that lack named representatives for one of the two proposed statewide classes. As discussed *infra* III.F., the court finds that the interests of credit card and debit card holders are distinct and such a class would fail predominance.

[16] Indeed, the court calculates that, by failing to recruit named representatives for all the proposed classes in West Virginia, Montana, Oregon, Hawaii and Vermont, class counsel abandoned approximately $60 million in damages. (*See* Mot. for Class Cert. at 4; Lamb Reply at 202 (Table 1).)

reflect inadequacy of representation. This risk would only increase with the complexity of the subject matter. For example, in this case, Amex cites positions from class representatives indicating indifference to credit card rewards that Amex claims are "nonsensical and contrary to Plaintiffs' theory of harm." (Opp. Class Cert. at 42.) But the theory of the case is that consumers are paying higher prices more broadly—it is Amex's *defense* that Plaintiffs are still better off because of the rewards that the higher discount rates allow consumers to accrue. That class representatives appear to disagree does not make their representation inadequate.

More concerning to the court is the class counsel's use of family members as class representatives.[17] "[W]hether a close relationship with class counsel renders a named plaintiff inadequate is a fact-intensive inquiry." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 565 (S.D.N.Y. 2018). The inquiry focuses on whether "the class plaintiff is so closely allied with the class attorney that he or she might have an interest in the legal fees that the attorney may ultimately seek" such that the named representative's interests are antagonistic to those of the rest of the class. *Wexler v. AT & T Corp.*, 323 F.R.D. 128, 130 (E.D.N.Y. 2018). While there is no per se rule against using relatives of class counsel as class representatives, *see Dupler v. Costco Wholesale Corp.*, 249 F.R.D. 29, 42 (E.D.N.Y. 2008), it does increase the risk that class counsel could influence the class

---

[17] Amex also challenges class representatives' with non-familial relationships to class counsel. However, non-family connections to class counsel without a current business relationship are generally not the basis for failing to satisfy the adequacy requirement for class certification. *See DDMB, Inc. v. Visa, Inc.*, No. 05-md-1720 (MKB), 2021 WL 6221326, at *36 (E.D.N.Y. Sept. 27, 2021) (collecting cases).

representative's decisions about whether to settle to the detriment of the class. *See DDMB, Inc. v. Visa, Inc.*, No. 05-MD-1720 (MKB), 2021 WL 6221326, at *36 (E.D.N.Y. Sept. 27, 2021).

The court finds that counsel's relationship with certain class members does not make the named class members inadequate. The proposed class representative for the Maine classes, Abigail Baker, and the proposed representatives for the Ohio classes, Sherie MacCaffrey and Marilyn Baker, have family connections with class counsel. However, based on the record, the court is convinced that these proposed representatives will adequately represent their classes despite their family connections to class counsel. Abigail Baker, Marilyn Baker, and Sherie McCaffrey all demonstrated interest and a general understanding of Plaintiffs' theory of how Amex's NDPs caused harm, and they testified that they disclaimed an interest in an incentive award for acting as class representatives. (*See* Class Cert. Reply, Ex. 4 (A. Baker) (Dkt. 140-6) at 111:4-25 (understanding of theory of harm), 22:25-23:5 (disinterest in incentive award); Class Cert. Reply, Ex. 5 (M. Baker) (Dkt. 140-7) at 224:10-225:11 (understanding of theory of harm), 26:20–27:4 (disinterest in incentive award); Class Cert. Reply, Ex. 12 (McCaffrey) (Dkt. 140-14) at 113:17–116:8 (understanding of theory of harm), 21:12–21:18 (disinterest in incentive award).) The court finds that their interests are aligned with those similarly situated, and they lack a conflict of interest beyond the mere speculative. Thus, the class representatives are not inadequate because of their family relationships.

The court also notes that the family relationship between class counsel and certain class representatives was disclosed to the court. *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d at 565 (noting disclosure is a factor that courts consider). Rule 23(a)(4) is not the only section of Rule 23 that protects the interests of unnamed class members. While not a substitute for a showing of adequate representation at the class

certification stage, any settlement will have to go through the court's renewed scrutiny under Rule 23(e), when the court will again assess whether the class representatives and counsel fairly and adequately represented the class. Fed. R. Civ. P. 23(e)(2). Further, because Plaintiffs seek certification under Rule 23(b)(3), Rule 23(e) affords an additional opportunity for un-named class members to opt out of any settlement in which they feel they were inadequately represented. *See* Fed. R. Civ. P. 23(e)(4). Despite the family relationship between class counsel and proposed class representatives, the court finds that Abigail Baker, Marilyn Baker and Sherie McCaffrey are adequate class representatives.

### 3. Amex Cardholders

Class representatives cannot represent a class of which they are not a part. *Irvin*, 944 F.3d at 71. Here, Plaintiffs' proposed classes exclude "[t]hose who are Amex credit or charge card . . . account holders or authorized users, or who were during the applicable Class Periods." (Mot. for Class Cert. at 4.) Plainly, any proposed class representative who has an Amex card is excluded from the class and cannot adequately represent the class. For this reason, the court agrees with the parties that Nanci-Taylor Maddux, who holds an Amex card through her employer, is not a member of the class and therefore cannot be a class representative for the Mississippi classes. (Opp. Class Cert. at 42, Class Cert. Reply at 19 & n. 22.) Because there are multiple class representatives for the Mississippi classes, the court's rejection of Ms. Maddux as the proposed class representative does not affect the adequacy of the representation of the Mississippi classes.

In a similar vein, because Ellen Maher held a cobranded Costco Amex card until June 17, 2016, she was not a class member until

June 18, 2016.[18] The court accordingly GRANTS Plaintiffs' request to amend the proposed Vermont classes to start on June 18, 2016. This amendment makes Ms. Maher an adequate representative for the amended class period for the Vermont class.

### F.   Predominance

To certify a class action under Rule 23(b)(3), Plaintiffs must show that common issues predominate over individual questions of law or fact. Fed. R. Civ. P. 23(b)(3). The predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 594 (1997). The focus of this inquiry is whether "resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 118 (2d Cir. 2013). The fact that damages may need to be calculated on an individualized basis is not sufficient to defeat class certification. *See Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015).

In order to satisfy predominance, the court must examine the common proof upon with plaintiffs rely. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 35-36. (2013); *see also In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 49 (S.D.N.Y. 2020) (collecting cases). The holding of the Supreme Court's decision

---

[18] The parties disagree about the date at which Ms. Maher became a class member. Amex argues that because Costco did not transition its cobrand card from Amex to Citi until June 20, 2016, that is the correct date for Ms. Maher's entrance into the class. (Opp. Class Cert. at 43.) However, Costco's conduct is only relevant insofar as it relates to Ms. Maher's status as an Amex cardholder. Because her status as an Amex cardholder ended on June 17, 2016, (Class Cert. Reply, Ex. 26 (Dkt. 140-28)) Ms. Maher is a member of the proposed class starting on June 18, 2016.

in *Comcast* is not entirely clear. The Second Circuit interpreted *Comcast* narrowly, holding that that "[a]ll that is required at class certification is that the plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability." *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 88 (2d Cir. 2015); *see also Strougo v. Barclays PLC*, 312 F.R.D. 307, 313 (S.D.N.Y. 2016) (citing *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 407–08 (2d Cir. 2015)) ("The Second Circuit has rejected a broad reading of Comcast."). Yet district courts in this circuit, relying on decisions from the D.C. and Third Circuits, have held that *Comcast* requires that "district courts carefully examine, at the class certification stages, the soundness of an expert's model relied upon to establish classwide impact." *Aluminum Warehousing*, 336 F.R.D. at 47.

The court agrees that the Plaintiffs must show that their expert's model is sound. Whether this requirement derives from *Comcast* or the Second Circuit's longstanding requirement that plaintiffs establish Rule 23's requirements by a preponderance of the evidence, the court reaches the same result. *See Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008). If plaintiffs seek to certify a class using a model that relies on common evidence but that is wrong, it plainly cannot be shown by a preponderance of the evidence to *resolve* common questions of liability with a common answer. *See Wal-Mart*, 564 U.S. at 350.

Even if *Comcast* heightened the scrutiny that district courts give to plaintiffs' damages models, "[c]alculations need not be exact." *Comcast*, 569 U.S. at 35. Plaintiffs are not required at this stage to show by a preponderance of the evidence that the pass through and discount rates in the but-for world would be a specific number. But they are required to show by a preponderance of the evidence that the proposed model is consistent with the

38

plaintiffs' theory of liability and *can* soundly measure the damages that the anticompetitive violation caused. *See id.*

The court now turns to whether Plaintiffs demonstrate predominance under this standard. Plaintiffs allege that Amex's NDPs were an unlawful restraint on trade. "Without common proof of injury and causation, [antitrust] plaintiffs cannot establish predominance." *Aluminum Warehousing*, 336 F.R.D. at 45 (quoting *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619, 623 (D.C. Cir. 2019)). Plaintiffs must therefore establish, through common evidence, the following: (1) but for the NDPs, Amex would have charged the Qualifying Merchants lower merchant discount rate fees, (2) Qualifying Merchants would have passed along the lower payment processing costs to consumers in the form of lower prices, and (3) non-Amex card-issuing banks would not have increased annual fees or reduce credit card rewards. As discussed herein, common evidence predominates for the first two steps, but individual inquiries overwhelm the common proof for the third step. However, the third step is only relevant for the credit card classes, not the debit card classes. Therefore, the court finds that the statewide debit card classes satisfy the Rule 23(b)(3) predominance requirement and the statewide credit card classes do not.

### 1. Common Evidence of Qualifying Merchants' Interactions with Banks and Networks

Plaintiffs, relying on the testimony of Dr. Lamb, use common evidence to argue that without Amex's NDPs, Qualifying Merchants would be able to negotiate for lower discount rates with Amex. Without the NDPs, Dr. Lamb argues that Qualifying Merchants would be able to credibly threaten to differentially surcharge. (Lamb Report ¶ 103.) There are two types of surcharging: parity surcharging and differential surcharging. Parity surcharging would allow Qualifying Merchants to charge all credit cards (or

all credit and debit cards) one flat fee that covers the cost of processing the payment. (*Id.* ¶ 265.) Differential surcharging, however, would allow Qualifying Merchants to charge cardholders based on the cost of processing the cardholder's specific payment method. (*See id.* ¶ 277.) Amex charges the highest discount rate to merchants, so if Qualifying Merchants were allowed to differentially surcharge, it is reasonable Amex cardholders would be charged the most. (*Id.* ¶ 113 (Table 6).)

To establish how Amex would behave in a but-for world in which differential surcharging could occur, Dr. Lamb points to Amex's response to a regulatory change in Australia in 2003 that allowed merchants to differentially surcharge in the country. (*Id.* ¶ 254.) Amex acknowledged in an internal document at the time that because it is in the merchants' financial interest to differentially surcharge, it was a "key challenge [it] face[s]." (*Id.* ¶ 255.) In Australia, Amex's response was to "adopt[] a strategy whereby it would offer merchants a significant reduction in their merchant discount fee in exchange for agreeing not to differentially surcharge Amex" cards. (*Id.* ¶ 256; *see also id.* ¶¶ 257, 259.)

And notably, even though their strategy for preventing differential surcharging was not completely successful in the years following Australia's regulatory intervention in 2003 (*see* Gaier Report ¶¶ 42-43 (noting prevalence of merchant surcharging)), Amex relied on their experience in Australia to inform their strategy for heading down the potential risk of differential surcharging in the United States in 2010. (*See* Lamb Report ¶¶ 261, 263.)

To determine the extent to which Amex would lower its merchant discount rate in the but-for world, Dr. Lamb looks to the experience of Discover, a rival payment network. Discover adopted a strategy to aggressively court merchants by offering a

low merchant discount rate. (*Id.* ¶ 354.) However, because industry[19] NDPs prevented merchants from steering consumers towards their lowest cost of payment, Discover eventually abandoned its low-cost strategy and raised its discount rate to more closely align with the rates that Visa and Mastercard charged. (*Id.* ¶¶ 355-58.) The Discover card could not become the preferred card of merchants if merchants could not meaningfully influence which payment card consumers used. (*Id.*) After abandoning the low-cost strategy, Discovery proceeded to increase its effective discount rate by 36 basis points. (*Id.* ¶ 358.) Dr. Lamb uses the 36 basis points as a benchmark for estimating how much the payment networks would lower its effective discount rate without the NDPs. (*Id.* ¶ 359.)

Discover is an imperfect benchmark—it is the smallest payment network by transaction volume and its cardholders spend less per transaction than do Visa, Mastercard, or Amex cardholders. (*Id.* ¶¶ 11-15.) But despite these differences, the court is persuaded that Dr. Lamb's model is acceptable for three reasons. First, the estimated reduction—36 basis points—is in line with concessions that Amex itself offered to merchants when attempting to counter Visa's marketing campaign in the past. (*Id.* ¶ 362 (offering a 35-basis point reduction in the discount rate).) Second, the payment network market is highly concentrated and the networks set discount rates with reference to their competitors' prevailing discount rates. (*See, e.g., id.* ¶ 358 (Discover setting prices based on Visa and Mastercard prices); *id.* ¶ 156 (Amex setting prices based on price premium over Visa and Mastercard); *id.* ¶ 113 (Table 6, noting that Visa and Mastercard rates move together).) It is therefore plausible that the effective rate for the four companies would fall in unison. Finally, the paucity of data is a result of what Plaintiffs allege is an unlawful restraint on trade. *See New*

---

[19] Prior to a 2011 Consent Decree and 2013 Settlement, Visa and Mastercard also included NDPs. (*See* Lamb Report ¶¶ 98-103.)

*York v. Julius Nasso Concrete Corp.*, 202 F.3d 82, 88-89 (2d Cir. 2000). At this stage, Dr. Lamb's estimates are not required to be exact. *Comcast*, 569 U.S. at 35. Dr. Lamb's model based on Discover's abandonment of its strategy is sufficiently rigorous to estimate how Discover's competitor payment networks would respond. The court therefore is satisfied that Dr. Lamb's model can show, relying on common evidence, that Amex would lower the merchant discount rates in the but-for world.

Dr. Gaier, Amex's expert, has multiple objections to Dr. Lamb's analysis. First, Dr. Gaier objects to Dr. Lamb's reliance on Australia, because the regulatory regime was sufficiently different to not be a useful comparison. (Gaier Report ¶ 41.) Second, Dr. Gaier and Dr. Emch, another of Amex's experts, opine that Dr. Lamb should have addressed the risk of walkaways, where consumers leave stores rather than allow merchants to steer them at the point of sale. (*See id.* ¶¶ 30-31; Emch Report ¶¶ 251-58.) And third, Dr. Gaier objects to Dr. Lamb's use of Discover's average, effective rate to estimate the discount rate reduction rather than independently estimating what each Qualifying Merchant's rate reduction would be. (Gaier Report ¶¶ 83-89; Opp. Class Cert. at 34.) Amex's objections are unpersuasive and misconstrue what is required to establish predominance. Each of Amex's objections is addressed in turn.

### a. Australia Comparison

Amex and Dr. Gaier object to Dr. Lamb's reliance on Australia because the regulatory regime had enough confounding factors to make the comparison not helpful. (*See* Opp. Cert. Mot. at 28; Gaier Report ¶ 41.) In Australia, the removal of the prohibition on differential surcharging was combined with a rate cap for Visa and Mastercard. (Lamb Report ¶ 254) So, argues Amex, it is not possible to connect Australia's reduction in the discount rate to differential surcharging, as opposed to Amex's competition with Visa and Mastercard. (*See* Gaier Report ¶¶ 45-46.)

But this objection misunderstands Dr. Lamb's use of common proof. Dr. Lamb does not point to the reduction in discount rates in Australia as the relevant common evidence; he uses Australia as indicative of Amex's strategy when faced with differential surcharging. Indeed, the parties seem to agree that the differences in Australia's regulatory scheme are sufficiently large to confound any direct comparison with the United States. (*See* Lamb Reply ¶ 64; Gaier Report ¶¶ 41-45.) Rather than focusing on any specific outcome in Australia, Dr. Lamb uses Australia to provide insights into how Amex would respond to a risk of differential surcharging, as they did in Australia. The differences in the two countries' regulations do not affect Amex's response and do not make Dr. Lamb's model for class-wide injury unsound.

### b. *Walkaways*

Amex next objects to Dr. Lamb's dismissal of the potential for walkaways. (*See* Opp. Cert. Mot. at 16.) If consumers respond to merchants' steering by walking away and not proceeding with the transaction, merchants may not be able to negotiate with the networks for a reduction in discount rates. (*Id.*; *see also* Emch Report ¶¶ 251-58.) If consumers walk away in sufficient numbers, then merchants would not be made better off by steering, and they could not credibly threaten to do so. Therefore, according to Amex, because Dr. Lamb does not account "for the fact that the costs of surcharging [from walkaways] may exceed the benefits for certain merchants[,] . . . Plaintiffs have not offered common proof that all merchants would save money in the but-for world." (Opp. Cert. Mot. at 24-25.)

Amex's objection here is insufficient to defeat predominance for three reasons. The first is that Amex confuses the requirements of the predominance inquiry under Rule 23(b)(3). Rule 23(b)(3) requires the court to find "that the questions of law or fact common to the *class members* predominate over any questions

43

affecting only *individual members*." Fed. R. Civ. P. 23(b)(3) (emphasis added). Amex does not defeat predominance by showing that the Qualifying Merchants' individual issues predominate. Even if Plaintiffs were required to individually assess each Qualifying Merchant's response to the risk of walkaways, that body of analysis would still be used to answer a question common to the class members and not grounds to defeat predominance. Walkaway analysis would not require an individual assessment into whether each *class member* would walk away. This must be the case: walkaways play into the *merchant's* decision about whether to steer. A merchant makes this decision based on the predicted conduct of all of its customers, not just class members.

Perhaps Amex is arguing instead that Dr. Lamb's failure to do individually analyze each Qualifying Merchant's walkaway rate means that his model, even if common to all class members, is unsound. That also fails—Amex itself has stated that walkaways do not occur. (*See* Lamb Report ¶ 255 (citing an internal Amex presentation that cardmembers "either pay surcharge or switch payment products. They do not leave establishments.").) To be sure, Amex provides other survey results that indicate otherwise—that some consumers would abandon the purchase if faced with steering. (Amex *Daubert* Mot., Ex. 4 (Dkt. 170-6), Ex. 5 (170-7).) But the court finds these self-reported survey results to be less credible than Amex's own market research, made for its internal business planning, that walk-aways are unlikely to occur.

Finally, Amex's emphasis on walkaways exemplifies the disagreement about the state of the but-for world, addressed above in the discussion of Amex's *Daubert* Motion. In Amex's but-for world, the merchants must "actually save money" by steering, taking into account potential reduced revenue from walk-aways. (Gaier Report ¶ 18.) This step of the analysis only makes sense, however, if the court is analyzing a but-for world in transition rather

than one in equilibrium. (*See* Lamb Reply ¶ 244.) Amex's but-for world assumes a negative shock—the removal of the NDPs—and that merchants are deciding for the first time whether to steer. In the short-term, a merchant may, as Dr. Gaier proposes, iteratively probe and determine, through trial and error, whether steering is an effective way to increase profits. But in equilibrium, merchants are profit-maximizing; if a merchant knows that its clientele will walk away if steered, it will engage in steering only insofar as it increases profits. According to an internal Amex presentation, merchants would. (*See* Lamb Report ¶ 255 (noting that Amex conceded that it is in merchants' "best financial interest" to differentially surcharge).) Dr. Lamb's evidence concerning walkaways therefore relies on evidence common to all class members.

c.   *Average Discount Rate Reduction*

Finally, Amex argues that Dr. Lamb's "assumption of a homogenous 36 basis-point reduction in discount rates across all merchants" defeats predominance because it leads to nonsensical results. (*See* Opp. Cert. Mot. at 34.) The court addressed this argument in large part in its discussion of averages in response to Amex's *Daubert* motion, *see supra* II.B.2.b., and will not rehash the analysis here.[20] It is worth briefly reviewing, however, why

---

[20] In a similar vein, Amex objects to Dr. Lamb's assumption that acquirers will pass through reductions in the interchange or discount fees to merchants. (*See* Opp. Class Cert. at 22-23.) Dr. Lamb sufficiently justified this assumption—the competition between acquiring banks for Qualifying Merchants is intense, and the prices that the Merchants pay are transparent so they would know when the full reduction is not passed along. (*See* Lamb Report ¶ 45.) As a result, the Merchants can and often do switch between acquiring banks. (*Id.* at n. 42.) Dr. Lamb's assumption is consistent with the research of economists that study the payment system. *See* Marie-Helene Felt, Fumiko Hayashi, Joanna Stavins, and Angelika Welte, *Distributional Effects of Payment Card Pricing and Merchant Cost Passthrough in the United States and Canada*, Research Working Papers, No. 20-18, Federal Reserve Bank of Kansas City (December 2020).

the existence of cobrand cards does not defeat predominance here.

The focus of Amex's argument is that the estimated reduction in discount rate is not plausible because Dr. Lamb uses averages. (*Id.*) The reduction in discount rates that Dr. Lamb proposes is based on the blended average of the increase in Discover's rate over time after it abandoned the low-cost strategy. (*See* Lamb Report ¶¶ 354-59.) But this blended rate—an average—incorporates Discover's interactions with merchants, including those with cobranded cards. To the extent that Amex is arguing that the presence of cobrand cards means that Dr. Lamb's model is fatally flawed, "[c]alculations need not be exact." *Comcast*, 569 U.S. at 35; *see also Waggoner v. Barclays PLC*, 875 F.3d 79, 106 (2d Cir. 2017) (affirming district court that granted class certification when plaintiffs' expert explained that "damages for individual class members could be calculated by applying a method across the entire class" but that did not take into account variations in the amount of damages). The court finds that Dr. Lamb's model of the discount rate reduction is sound and common to all class members.

### 2.   Common Evidence of Qualifying Merchants' Pass Through of Savings

Plaintiffs next argue, using common evidence, that Qualifying Merchants would pass on savings to consumers, including class members, in the but-for world. Dr. Lamb principally relies on a research paper put out by the Federal Reserve Banks of Boston and Kansas City and the Bank of Canada to argue that merchants pass through discount fees to consumers. (*See* Lamb Report ¶¶ 368-69 (citing Marie-Helene Felt, Fumiko Hayashi, Joanna Stavins, and Angelika Welte, *Distributional Effects of Payment Card Pricing and Merchant Cost Pass-through in the United States and Canada*, Research Working Papers, No. 20-18, Federal Reserve Bank of Kansas City (December 2020).) In the paper, the

central bank researchers use a rate of 90% after conducting a meta-analysis of empirical studies of pass-through rates of industry-wide costs changes in various industries. (*Id.* ¶ 368 & n. 859.) The central bank paper then used this 90% pass-through rate to estimate the extent to which merchants pass through the cost of accepting credit card payments to consumers. (*Id.* ¶ 369.) The specific rate that the researchers—and Dr. Lamb—used was the midpoint estimate of the meta-analysis and robust across industries. (*Id.* ¶ 368 & n. 859.)

Dr. Lamb further provides common evidence that the Qualifying Merchants would pass through the savings equally to all class members. Dr. Lamb argues that in the but-for world, Amex would offer price concessions to Qualifying Merchants in exchange for an agreement to not differentially surcharge. This is the other side of the coin of Dr. Lamb's common evidence that Amex would lower its merchant discount rate, discussed above, *see supra* III.F.1.a. Dr. Lamb again turns to Amex's strategy in the face of surcharging in Australia.

As discussed in the context of the negotiations between the Qualifying Merchants and payment networks, while the extent to which surcharging occurred in Australia may be of limited use in terms of determining whether there would be differential surcharging but for Amex's NDPs, Australia *is* useful in assessing Amex's *strategy* when faced with the risk of differential surcharging. In a 2007 internal Amex analysis of the impact that the Australian regulations permitting differential surcharging could have on Amex's business, Amex executives noted that differential surcharging posed a significant risk and that it was a key challenge that Amex faced. (*Id.* ¶ 255.) Three years later, in an assessment of the risk of differential surcharging in the United States, Amex pointed to the success that the Australia team had in preempting differential surcharging. (*See id.* ¶ 261.) In exchange for pricing and marketing concessions, Amex negotiated

with Australian merchants to agree not to surcharge. (*Id.*) The court is persuaded that Mr. Lamb provides a sound model that demonstrates that, if NDPs were removed in the but-for world, Amex would similarly use pricing and marketing concessions to prevent the "significant financial impact" that "widespread surcharging in the U.S." could have. (*Id.* ¶ 263.) After all, of the payment alternatives, Amex credit cards cost merchants the most to process,[21] so Amex has the most to lose from differential surcharging. (*Id.* ¶ 113 (Table 6).)

Amex disputes Dr. Lamb's pass-through analysis on two grounds. First, Amex objects to Dr. Lamb's use of a uniform pass-through rate of 90%. (Opp. Class Cert. at 35.) Second, Amex argues that Qualifying Merchants would in fact differentially surcharge, which would impact class members differently depending on their card type. (Opp. Class Cert. at 27-29.)

### a. *Pass-Through Rate*

Tellingly, Amex and Dr. Gaier do not appear to dispute that Plaintiffs can rely on common evidence to show that merchants would pass through a reduction in discount rates to class members. (*See* Gaier Report ¶ 126 (citing studies that show pass-through).) Instead, Amex's primary objection with Dr. Lamb's pass-through analysis is the uniform use of a 90% pass through rate for all merchants. (*See id.* ¶ 127; Opp. Class Cert. at 35-36.) But as discussed previously, *see supra* II.B.2.b. and III.F.1, the

---

[21] Amex notes that the difference in discount rate between Amex and its competitors has diminished to argue that steering would not occur. (Opp. Class Cert. at 7.) But Plaintiffs allege that the existence of the NDPs was an unlawful restraint on trade that allowed the payment networks to increase discount rates without any loss in network usage. (*See* Mot. for Class Cert. at 35.) Amex is therefore arguing that market participants would not take certain actions in the but-for world by pointing to their conduct that is the result of the alleged restraint on trade as issue. That argument does not persuade.

disagreement about the appropriate rate (which can be ex-
pressed as an average) does not defeat predominance.

The rate at which Qualifying Merchants pass through savings
from a discount rate reduction is a decision at the Qualifying
Merchant level, not the individual class member level, and is ev-
idence that is common to all class members. Class members are
not linked to specific Qualifying Merchants—there is not a Best
Buy class or a Hy-Vee class—so the merchant decisions about the
rate of pass-through are common proof to all class members.

### b.  Differential Surcharging

Amex further objects that Dr. Lamb's omission of the effects of
surcharging[22] "masks uninjured class members by using an aver-
aging mechanism to allocate injury across the class." (Opp. Class
Cert. at 33 (citing *Aluminum*, 336 F.R.D. at 49).) If Qualifying
Merchants differentially surcharge, the pass-through rate that Dr.
Lamb uses, even if acceptable in aggregate, would affect different
class members differently. (*See* Opp. Class Cert. at 27-29.) If dif-
ferentially surcharged, a class member would pay the cost that
the Qualifying Merchant pays to accept the payment method.
Merchants pay different amounts by payment card type and de-
pending on the level of cardholder rewards, so if class members
were to pay a differential surcharge, individual inquiries into the
class member's card type would overwhelm common issues. (*See*
Lamb Report ¶¶ 49-50; Opp. Class Cert. at 27.) Amex argues that
the Qualifying Merchant's decision to surcharge could offset the

---

[22] The court focuses the analysis on surcharging here because surcharging
is more likely to differentially affect class members. (*See* Gaier Report ¶ 33
(noting consumer harm from loss of *option* to pay preferred method with-
out a surcharge) (emphasis added).) If merchants steer, on the other hand,
consumers do not lose the option to continue using their preferred pay-
ment method without charge, "social pressure" notwithstanding. (*See id.* ¶
65.) Class members can prevent the individual inquiries that Amex claims
defeats predominance by declining to use their less preferred payment
method when steered.

lower prices and make certain class members worse off in the but-for world.

The extent to which surcharging occurs in the but-for world is highly relevant for determining whether individual issues predominate. It is also very uncertain, with only limited data upon which the court can rely to make the necessary determination. The main data that the parties point to, despite disclaimers from both sides, is Amex's experience with surcharging in Australia. (*See* Lamb Reply ¶ 64 (noting regulatory differences between Australia and the United States); Gaier Report ¶¶ 41-45 (same).)

The Australian regulatory regime does little to clarify the but-for world here. In Australia, regulations that went into effect in 2003 that allowed merchants to differentially surcharge also included an interchange fee cap on Visa and Mastercard. (Lamb Reply ¶¶ 66-67.) While not bound by the fee cap, Amex generally sets its prices in reference to Visa and Mastercard's rates. (*See id.* ¶ 171 (discussing how Amex sets discount rates as a rate premium on top of Visa and Mastercard rates).) Therefore, the fee cap regulations exerted significant downward pressure on Amex's discount rates independent of merchants' newly created ability to surcharge. This limits the usefulness of Australian data to consider whether surcharging occurs in a world without NDPs.

Amex argues that even if its takeaways from its experience in Australia in 2010 were to negotiate down prices to prevent surcharging, that analysis is no longer relevant because surcharging, including excessive surcharging[23] is still pervasive in Australia. (Gaier Report ¶ 47.) But while surcharging may have grown further, as Dr. Gaier asserts, surcharging was prevalent from 2003 to 2010. (*See id.* ¶¶ 42-43 (noting prevalence of merchant surcharging).) That did not stop Amex from proposing in 2010 the

---

[23] That is, surcharging beyond the cost of accepting the payment method. (*See* Gaier Report ¶ 47.)

Australian strategy of offering concessions to pre-empt surcharg-
ing in the U.S. (*See* Lamb Report ¶ 261.) Amex clearly thought
that offering concessions to prevent surcharging was strategically
sound, even if not completely effective.[24]

While Australia's different regulatory regime makes direct com-
parison not useful, it is reasonable that differential surcharging
would persist given the details of Australia's regulations. Part of
Amex's appeal to merchants, according to Amex, is that Amex
cardholders spend more than the average consumer. *See Ohio v.
Am. Express Co.*, 138 S. Ct. 2274, 2282 (2018) ("Amex tends to
attract cardholders who are wealthier and spend more
money.").[25] In exchange for these high value consumers, Amex
charges a premium discount rate to merchants. *See id.* at 2288.
Normally, if a merchant does not comply with Amex's NDPs,
Amex does not allow the merchant to process Amex cards. (*See*
Lamb Report ¶¶ 238-239, 324, 335 (describing Walgreens's deci-
sion to not accept Amex and its subsequent reversal).) Because
of the insistence of Amex cardholders and the rewards that Amex
provides for Amex cardholders to spend using their Amex card,
merchants continue to accept Amex despite the higher price.

Without the NDPs, Amex would not lose this appeal of providing
merchants with high value consumers. And if merchants differ-
entially surcharged, they would indeed risk alienating their
consumer base—differentially surcharging in normal market

---

[24] Dr. Gaier opines that surcharging continued to be "significant" in Aus-
tralia. (Gaier Report ¶ 48.) In 2019, 3.9% of all transactions—5.0% of
credit card and 3.4% of debit card transactions—were surcharged. (*Id.*)

[25] The court's calculations, based on the data provided in Dr. Lamb's report,
support the finding that Amex cardholders on average spend more. (*See*
Lamb Report ¶ 11.)

conditions is not riskless.[26] (*Cf.* Lamb Report ¶¶ 238-239 (describing Walgreens experience).)

In Australia, the fee cap regulations further increased merchants' leverage over Amex. Because merchants could differentially surcharge and the interchange fee was capped, merchants ran a smaller risk by surcharging. There were no NDPs and they were not violating a term of the contract with Amex, so Amex could not stop accepting them. And to remain competitive, Amex could not charge substantially more than Visa and Mastercard. Amex had to independently lower its merchant discount rate because of the cap, or else increase the risk that merchants would stop accepting Amex altogether. In Australia, Amex lost substantial leverage over the merchants in a way that is not relevant in the but-for world in this case. Therefore, the court is not persuaded that the "pervasive merchant surcharging in Australia" would occur in the but-for world. (Gaier Report ¶ 47.) Instead, the court finds that surcharging in the but-for world would be, if not negligible, then meaningfully lower[27] than the 2019 rates in

---

[26] Amex and Qualifying Merchants are repeat players with an ongoing relationship. In a repeated game, repeat players can choose the strategy that makes both players better off in the long run, even if that strategy is different from the optimal strategy in which the players only interact once. *See* Jack L. Goldsmith & Eric A. Posner, *A Theory of Customary International Law*, 66 U. Chi. L. Rev. 1113, 1125 (1999) (citing Douglas G. Baird, Robert H. Gertner and Randal C. Picker, Game Theory and the Law 164-72 (Harvard 1994); Robert Gibbons, Game Theory for Applied Economists 82-99 (Princeton 1992)) ("When the prisoner's dilemma is repeated over an indefinite period of time, however, the optimal outcome . . . becomes possible in each round."). For Amex and Qualifying Merchants, surcharging is mutually harmful; because of the repeated interactions, the parties are able to reach the optimal outcome that avoids surcharging.

[27] Without deciding an exact rate of surcharging that would occur in the but-for world, there is a risk that high-rewards cardholders (with high payment processing costs for Qualifying Merchants) are uninjured by the NDPs. However, because the court declines to certify the credit card class,

Australia. Australia's level of surcharging would serve as an upper bound. The court therefore finds that Plaintiffs have established through common proof that Qualifying Merchants would pass through savings to class members.

### 3. Common Evidence of Class Members' Credit Card Rewards

Plaintiffs assert that common evidence demonstrates that credit card issuing banks would not raise annual fees net of rewards[28] in the but-for world. However, the court finds that Plaintiffs are unable to make this showing by a preponderance of the evidence, and so the credit card classes are unable to show an injury that is demonstrable through common proof. The debit card classes, however, do not face the same issue.

### a. Credit Card Classes

Dr. Lamb described how credit card issuing banks compete with one another to obtain "top of wallet" status—that is, the primary credit card for purchases. (Lamb Report ¶ 277.) Because of the intense competition for cardholders, credit card issuers are required to consistently invest in credit card rewards and products to attract and retain cardholders. (*Id.* ¶ 280.) Dr. Lamb cites to Amex and Amex's credit card-issuing competitors to support his opinion that credit card issuers would not raise the annual fees

---

the court does not see it necessary at this point to find at what exact rate of surcharging would exist in the but-for world.

Amex's expert explains the harm of steering as losing out on points when paying with a debit card instead of a rewards debit card. (*See* Gaier Report ¶ 54.) Combined with the substantially lower cost of acceptance (*see* Lamb Report ¶ 113 (Table 6)), the court finds that surcharging, even if it were to occur at Australian levels, would not offset the harm to the debit card class.

[28] Dr. Lamb uses this phrase to simplify the ongoing relationship that credit cardholders have with their card-issuing bank. Rewards credit cardholders often pay an annual fee for using the card, but then receive "points" or other rewards than offset in part or in whole this fee. (Lamb Report ¶ 272.)

net of rewards that the issuers charge customers. (*Id.* ¶¶ 280-81.) And Dr. Lamb notes that Amex sets merchant discount rates independent of costs, so a reduction in the discount rate fee revenue would not impact its ability to continue to offer cardholder rewards. (*Id.* ¶¶ 164, 283.)

Dr. Lamb further points to Amex's own potential strategy for dealing with differential surcharging. When faced with a surcharge, an Amex cardholder will either switch to a lower cost payment or pay the surcharge. (*Id.* ¶ 255.) Either way, the result is a lower number of Amex transactions—either Amex cardholders use other cards for their purchases, or they pay higher prices and make fewer transactions. However, Amex is not powerless to prevent a reduction in transaction volume. In a two-sided market like the credit card transactions market, Amex can spur transactions in two ways—it can make using the Amex network more favorable for either the merchant or the cardholder (or both). (*See id.* ¶ 286-87.) Amex could spur transactions by lowering merchant discount rates and reducing merchants' incentive to surcharge. Amex could also, argues Dr. Lamb here, increase cardholder rewards such that Amex cardholders would not be deterred from spending, as the increased rewards from using an Amex card would overcome any surcharging. (*Id.*)

Plaintiffs fail to show by a preponderance of the evidence that they can rely on common evidence to show that non-Amex credit card-issuing banks would not increase annual fees net of rewards. Dr. Lamb's opinion based on common evidence persuades the court that there is currently vigorous competition among card-issuing banks for cardholders. But that is not enough for class certification: Plaintiffs were required to show, using common evidence, that in the but-for world without NDPs, competition between card-issuing banks for cardholders would be so vigorous such that annual fees net of rewards would stay the same or decrease.

54

On the contrary, Plaintiffs' theory of liability indicates that competition for cardholders would be less vigorous. Plaintiffs allege that the NDPs restricted the extent to which networks could compete to be merchants' preferred payment processor by offering the lowest discount rate. (Lamb Report ¶ 350.) Plaintiffs point to Discover's inability to sustain its low-cost model and the subsequent increase in discount rates that it charged merchants. (*Id.*) Importantly, Discover operates a closed loop network, meaning that it interacts with both merchants and cardholders. (*Id.* ¶ 34 & n. 100.) According to Plaintiffs' theory of liability Discover was forced to compete for cardholders because it was not able to compete for merchants. (*Id.* ¶¶ 355-358.) Without Amex's NDPs, Discover could have focused its efforts to become merchants' preferred network, thereby easing competition on the cardholders' side of the payment platform.

Plaintiffs' reliance on Amex's statements that they may decrease the annual fee net of rewards to overcome steering does not salvage their case because Amex's business model is distinct from that of many Visa and Mastercard-issuing banks. (*See* Gaier Report ¶ 105.) Amex pursues a "spend-centric" model, where the primary source of revenue is from the fees it collects from merchants to process Amex card transactions. (*Id.*) Many Visa and Mastercard-issuing banks, on the other hand, operate "lend-centric" models, in which they primarily generate interest income from revolving credit balances. (*Id.*) It is arguably plausible that Visa charging a lower interchange fee would not affect the annual fee net of rewards that a Visa credit card-issuing bank charges its cardholders. But Plaintiffs have not provided the court with the requisite common evidence to make that finding. Class members that receive credit card rewards therefore fail the predominance requirement under Rule 23(b)(3).

It is possible that the credit card class could be split into rewards credit card and non-rewards credit card subclasses. *See* Fed. R.

Civ. P. 23(c)(5); *see also Marisol,* 126 F.3d at 379 ("Rule 23 gives the district court flexibility to certify subclasses as the case progresses and as the nature of the proof to be developed at trial becomes clear."). A non-rewards credit card subclass would have satisfied the Rule 23(b)(3) requirement that class members show an injury using common evidence, and it would be unaffected by the lack of common evidence showing that credit card-issuing banks do not increase annual fees in the but-for world. However, the non-rewards credit card subclass would have to satisfy the other requirements for class certification; because the court as of now cannot find that proposed class representatives are part of the class, *see Irvin v. Harris* 944 F.3d 63 (2d Cir. 2019), Plaintiffs have not satisfied the adequacy requirement for the non-rewards credit card subclass.

### b.   *Debit Card Classes*

The debit card class is unaffected by Plaintiffs' failure to provide common evidence regarding credit card rewards. Since the Durbin Amendment regulating debit card fees was implemented, debit cardholders have not received rewards. (*See* Gaier Report ¶ 103; Lamb Report ¶ 17.) Therefore, the debit card class has shown its injury through common evidence and satisfies the predominance requirement.

Amex contends that the debit card class must fail the predominance requirement because debit card owners may own credit cards as well. (Opp. Class Cert. at 30-31.) True enough that class members can be members of multiple classes. But the court here does not hold that the credit card class fails predominance based on a finding that the class would be worse off in the but-for world. Instead, it finds that Plaintiffs' model could not demonstrate, by a preponderance of the evidence, that predominance was satisfied. If a debit card class member has a rewards credit card, that does not negate the antitrust injury. It may require an individual adjustment to the calculations of their damages. But

the court finds that in this case, it is not enough to defeat predominance. *See Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 408 (2d Cir. 2015).

### 4. Individual Inquiry Under Illinois Law

Finally, Amex objects that Illinois law requires an individual inquiry into whether a transaction occurred in the state, and so, for at least the Illinois class, individual issues predominate. (*See* Opp. Class Cert. at 45.) But Amex here misreads the Illinois Supreme Court's decision in *Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill. 2d 100 (2005). (Opp. Class Cert. at 45.) *Avery* involved a putative nationwide class action against State Farm alleging violation of the state fraud statute because the consumer contract was drafted at State Farm's headquarters in Illinois. *Avery*, 216 Ill. 2d at 187-90. The court decertified the nationwide class because insurance contracts sold out of Illinois were not in the scope of the statute simply because State Farm's corporate headquarters were in Illinois. *Id.* at 189-90. But the Illinois court in *Avery* still allowed certification of a class of Illinois residents without an individual inquiry into each transaction, even though aspects of a transaction with a state resident could have still conceivably occurred out of state. *Id.* at 190. Indeed, if the Illinois Supreme Court required an individual assessment of each consumer's contract, it would have made class actions inapplicable to the Illinois Consumer Fraud Act. That is not what the *Avery* court held. *Id.* Instead, the court in *Avery* conducted an individual inquiry into *types* of transactions—residents or non-residents—but did not require an inquiry into each potential class member's transaction. *Id.*

The proposed Illinois class is consistent with the Illinois Supreme Court's decision in *Avery*. Illinois class members must have an Illinois billing address. (*See* Mot. for Class Cert. at 3.) There are only so many variations of an online transaction that can occur, the most common variation likely being an online transaction

shipped to an Illinois mailing address. And this inquiry would only be to determine membership in the class—the court would be required to conduct the individualized inquiry only if a potential class member only conducted online transactions and did not have any purchases at physical locations that qualified. If and when that problem arises, the court has the tools under Rule 23 to modify the class accordingly. *See* Fed. R. Civ. P. 23(c)(1)(C); Fed. R. Civ. P. 23 (c)(5).

In sum, the credit card classes fail to satisfy the predominance requirement. The potential non-rewards subclass does not satisfy the Rule 23(a) adequacy requirement. Therefore, Plaintiffs' motion to certify the credit card classes is DENIED. The debit card classes satisfy the predominance requirement.

### G. Superiority

Amex does not dispute that a class action is a superior method of resolving the present case. Indeed, it is generally accepted that such antitrust claims, which involve small dollar injuries to a whole market of consumers, "are well suited for class actions." *In re Playmobil Antitrust Litigation*, 35 F. Supp. 2d 231, 238 (E.D. N.Y. 1998). Given the high cost of litigating a complex injury and the small per person expected payout, the court finds that Plaintiffs satisfy the Rule 23(b)(3) superiority requirement.

## IV. CONCLUSION

For the foregoing reasons, Amex's *Daubert* motion is DENIED; Plaintiffs' *Daubert* motion is GRANTED in part, with respect to Dr. Gaier's testimony about non-Qualifying Merchants and is otherwise DENIED; and Plaintiffs' motion for class certification is GRANTED in part and DENIED in part. Specifically, Plaintiffs' motion to certify the debit card classes for Alabama, D.C., Illinois, Kansas, Maine, Mississippi, North Carolina, Ohio, Oregon, and Utah is GRANTED. Plaintiffs' motion to certify the debit card classes for Hawaii, Montana, Vermont, and West Virginia is DENIED.

And Plaintiffs' motion to certify the credit card classes for Alabama, D.C., Hawaii, Illinois, Kansas, Maine, Mississippi, Montana, North Carolina, Ohio, Oregon, Utah, Vermont, and West Virginia is DENIED.

The parties' joint sealing requests are GRANTED. The parties' are DIRECTED to confer and submit proposed redactions, if any, that are necessary to comply with this opinion on or before January 19, 2024.

SO ORDERED.

Dated:    Brooklyn, New York
          January 9, 2024

                                    s/Nicholas G. Garaufis
                                    NICHOLAS G. GARAUFIS
                                    United States District Judge