UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ANTHONY OLIVER, TERRY GAYLE QUINTON, SHAWN O'KEEFE, ANDREW AMEND, SUSAN BURDETTE, GIANNA VALDES, DAVID MOSKOWITZ, ZACHARY DRAPER, NATE THAYER, MICHAEL THOMAS REID, ALLIE STEWART, ANGELA CLARK, JOSEPH REALDINE, RICKY AMARO, ABIGAIL BAKER, JAMES ROBBINS IV, EMILY COUNTS, DEBBIE TINGLE, NANCI-TAYLOR MADDUX, SHERIE MCCAFFREY, MARILYN BAKER, WYATT COOPER, ELLEN MAHER, SARAH GRANT and GARY ACCORD, on behalf of themselves and all others similarly situated,

                     Plaintiffs,

    -against-

AMERICAN EXPRESS COMPANY and AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, INC.,

                     Defendants.

**MEMORANDUM & ORDER**
**19-CV-566 (NGG) (SJB)**

NICHOLAS G. GARAUFIS, United States District Judge.

On January 9, 2024, this court issued a Memorandum and Order that certified ten classes of debit cardholders, denied Defendants American Express Company and American Express Travel Related Services Company's (collectively, "Amex") motion to exclude expert testimony, and granted in part Plaintiffs' motion to exclude expert testimony. (*See generally* Class Cert. and *Daubert* Mem. & Order ("M&O") (Dkt. 220).) Amex now moves for reconsideration of the court's decision to exclude part of the testimony of its expert, Dr. Eric Gaier. (*See* Notice of Defs.' Motion (Dkt. 225); Mem. in Support of Defs.' Mot. for Reconsideration

1

("Mot.") (Dkt. 225-1); *see also* M&O at 22-24.) For the reasons that follow, the motion is DENIED.

I.  BACKGROUND

The court presumes familiarity with the background facts and procedural history of this matter, as set forth in the January 9, 2024 M&O, and only reviews the aspects of the case that are relevant for this motion. *See Oliver v. Am. Express Co.*, No. 19-CV-566 (NGG), 2024 WL 100848 (E.D.N.Y. Jan. 9, 2024), *amended in part*, No. 19-CV-566 (NGG), 2024 WL 217711 (E.D.N.Y. Jan. 19, 2024).

In brief, Amex provides a payment service to merchants that allows customers to purchase goods or services with an Amex charge or credit card. Amex charges the merchant a fee for use of the payment service. As a condition for allowing a merchant to process payments over the Amex payment network, Amex includes a provision that prohibits the merchant from steering the customer to a different card payment method. This provision is called an anti-steering rule or a non-discrimination provision ("NDP"). Plaintiffs, credit and debit card users that do not own Amex cards, allege that NDPs are illegal restraints on trade, in violation of various state antitrust and consumer protection laws, because the NDPs prevent merchants from steering customers to lower cost payment processing methods. As a result, merchants are required to raise prices for all customers, including those without Amex cards, causing harm to Plaintiffs who must pay higher prices than they would but for the existence of NDPs.

In support of their motion for class certification, Plaintiffs relied on the economics expert Dr. Russell Lamb. To model how Amex would behave in the but-for world, Dr. Lamb looked to Amex's response to an Australian regulation that permitted merchants to differentially surcharge. (*See* M&O at 39-40 (citing Lamb Report (Dkt. 138-4) ¶¶ 254-57, 259, 261, 263; Gaier Report (Dkt. 137-

17) ¶¶ 42-43).) Amex's strategy in the face of surcharging was to preempt any surcharging before it could take effect by offering pricing concessions on the discount rate[1] in exchange for an agreement with the merchant to not surcharge. Dr. Lamb relied on Amex's internal documents at the time of the implementation of the regulations and internal presentations made years later in which Amex looked to its experience in Australia as strategic guidance for how to mitigate the threat of differential surcharging in the United States. Dr. Lamb opined that Amex's response to the Australian regulations indicated that Amex would move to lower discount rates in the but-for world.

Relevant to this motion is that Plaintiffs seek damages based only on class member purchases at any of 38 Qualifying Merchants, which are mostly large nationwide retailers, rather than from all potential merchants that accept Amex cards. (*See* M&O at 16-17.) Opposing class certification, Amex argued that the Supreme Court's decision in *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) required Plaintiffs' model of damages to consider the effects that NDPs would have on purchases at non-Qualifying Merchants. (M&O at 16-17.) The court rejected the argument that *Comcast* required Plaintiffs' model to incorporate purchases at non-Qualifying Merchants, noting that the Second Circuit interpreted *Comcast* to require only that plaintiffs "show that their damages stemmed from the defendant's actions that created the legal liability." (*See* M&O at 17 (quoting *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 90 & n.3 (2d Cir. 2015).) Because the damages based on purchases at the Qualifying Merchants stemmed from Amex's agreement that allegedly restrained trade, *Comcast* was satisfied.

In making its *Comcast* argument, Amex relied on the expert testimony of Dr. Gaier, who opined that Dr. Lamb failed to consider

---

[1] "Discount rate" is the term that Amex uses for the percentage fee that the company charges merchants for each transaction.

3

the impact of Amex's NDPs on non-Qualifying Merchants. (*See* Gaier Report ¶¶ 91-98; Amex Opp. to Class Cert. (Dkt. 139-1) at 31-33.) The focus of Dr. Gaier's testimony was on small merchants: Dr. Gaier opined that small merchants would not be able to extract pricing concessions with Amex in the but-for world without NDPs because they do not contract directly with Amex, they do not understand the cost of acceptance to be able to steer to lower-cost cards, and their acquiring banks would be unlikely to pass on any reduced discount fee. (*Id.* ¶¶ 92-95.) As support for this argument, Dr. Gaier pointed to how certain small merchants behaved when Visa and Mastercard's prohibitions on steering and differential surcharging were lifted: "nearly 3 million small merchants who did not then accept Amex were free to steer. Yet, effectively none did so and their merchant fees did not decline as Dr. Lamb predicts." (*Id.* ¶ 96.) Dr. Gaier then opined that "small merchants may nevertheless impose surcharges or engage in other forms of steering that harm consumers." (*Id.* ¶ 97.)

The court found this portion of Dr. Gaier's testimony to be "conclusory and internally contradictory," and therefore excluded it under Federal Rule of Evidence 702. (M&O at 24.) In doing so, the court noted that Dr. Gaier did not provide support for this opinion and that the opinion was inconsistent with the evidence that he presented that small merchants previously did not steer even when they were able to. Amex now moves the court to reconsider the exclusion of this portion of Dr. Gaier's testimony.

## II. LEGAL STANDARD

A motion for reconsideration is an "an extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources." *In re Initial Public Offering Sec. Litig.*, 399 F. Supp. 2d 298, 300 (S.D.N.Y. 2005).[2] It is properly

---

[2] When quoting cases, unless otherwise noted, all citations and internal quotation marks are omitted, and all alterations are adopted.

granted only "where a court has overlooked controlling decisions or factual matters that were put before it on the underlying motion and which, if examined, might reasonably have led to a different result." *Drapkin v. Mafco Consol. Grp., Inc.*, 818 F. Supp. 2d 678, 695 (S.D.N.Y. 2011) (citing *Eisemann v. Greene*, 204 F.3d 393, 395 n.2 (2d Cir. 2000)). "[A] motion to reconsider should not be granted where the moving party seeks solely to relitigate an issue already decided." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995).

### III. AMEX'S MOTION FOR RECONSIDERATION

Rule 702 of the Federal Rules of Evidence governs admissibility of expert testimony. Fed. R. Evid. 702. The Supreme Court "made clear that the district court has a 'gatekeeping' function under Rule 702—it is charged with the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (citing *Daubert v. Merrell Dow Pharms., Inc*, 509 U.S. 579, 597 (1993)). The *Daubert* inquiry is "flexible," depending on the facts of each case. *Id.* at 266; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141-42 (1999). "In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos*, 303 F.3d at 267.

Amex moves for reconsideration, arguing that the court committed clear error in its Order excluding Dr. Gaier's testimony. First, Amex contends that the court erred when it "criticized as unreliable Dr. Gaier's purported opinion that any class member savings at Qualifying Merchants would be fully offset by losses at non-Qualifying Merchants," because Dr. Gaier "never offered any such opinion." (Mot. at 2.) Instead, Amex asserts that "Dr. Gaier's

5

actual opinion is that Dr. Lamb erroneously failed to consider the impact of steering and surcharging at the millions of non-Qualifying Merchants," including large merchants. (*Id.* at 5.) And second, Amex argues that the court erred when it found Dr. Gaier's statements that "3 million small merchants who did not then accept Amex were free to steer", "[y]et effectively none did" contradicted Dr. Gaier's statement that "small merchants may nevertheless impose surcharges or engage in other forms of steering," because Dr. Gaier did not opine that Amex-accepting small merchants would not surcharge in the but-for world. (*Id.* at 3-4.)

In its motion, Amex focuses on the court's one sentence summary of Dr. Gaier's opinion to argue that the court committed an error that warrants reconsideration. (*Id.* at 2 (citing M&O at 23) ("Dr. Gaier's opinion that any benefits that Plaintiffs accrue in the but-for world would be offset by losses at non-Qualifying Merchants . . .").) But for the reasons discussed in the M&O and expanded upon below, Dr. Gaier's testimony was not excluded based on the court's summary of his opinion; it was excluded because the analysis underlying the opinion was not reliable.

In his testimony, Dr. Gaier provided four reasons to support his proffered opinion that "[he] would not expect small merchants to pay lower merchant discount fees absent Amex's NDPs." (Gaier Report ¶ 92.)

First, many small merchants that accept Amex cards do so through Amex's OptBlue program, which serves merchants with less than one million dollars in annual Amex charge volume. (*Id.* ¶ 93.) An OptBlue merchant does not directly contract with Amex; instead, the merchant interacts with a "third-party acquirer" that offers a blended rate for all credit card networks. (*Id.*) Therefore, OptBlue merchants have no incentive to steer or differentially surcharge; they do not directly interact with payment networks or face different costs if customers use different

6

payment cards, and so they are indifferent to which payment method their customers use. (*Id.*)

Second, the calculation of the discount fee is complex and depends on a variety of factors, including credit card network, type of credit card, type of transaction, and transaction size. (*Id.* ¶ 94.) Dr. Gaier noted that one store had 28 total different fee categories for processing various versions of Visa, Mastercard, Amex, and Discover cards. (*Id.* ¶ 94 & n.169.) Because of the complexity of the cost of acceptance, many merchants "simply do not understand their costs of acceptance sufficiently to steer customers to lower-cost credit cards." (*Id.* ¶ 94.)

Third, Dr. Gaier opined that the third-party acquirers often act opportunistically with small merchants. (*Id.* ¶ 95.) With large merchants, acquirers normally charge a processing fee that is directly tied to the interchange fee rate that payment networks charge. (*Id.* ¶ 95 & n.171.) Small merchants, on the other hand, often pay "bundled" fees that are less transparent and allow acquirers to extract the majority of savings from reduced interchange fees. (*Id.*) In the simplest form of bundling, merchants pay a flat rate for all types of credit card fees charged, regardless of card brand. (*Id.*) Therefore, small merchants are unlikely to benefit from any reduction in interchange fees.

Finally, Dr. Gaier pointed to small merchant behavior after Visa and Mastercard's consent decrees and settlements, which permitted merchants that only accepted Visa or Mastercard to engage in steering and differential surcharging. (*Id.* ¶ 96.) Looking at small merchants that did not accept Amex cards in 2011 and 2013 (and were therefore not bound by Amex's still-binding NDPs), Dr. Gaier noted that despite being free to steer, "effectively none did so and their merchant fees did not decline." (*Id.*)

Dr. Gaier then summed up the relevance of these four observations: "small merchants are unlikely to achieve lower merchant

discount fees absent Amex's NDPs in the way that Dr. Lamb predicts for Qualifying Merchants." (*Id.* ¶ 97.)[3] Unlike Qualifying Merchants, small merchants would be unlikely to be able to credibly threaten to steer customers to lower cost payment methods—they would have no incentive to steer because of the complexity of the fee schedule and fee bundling. Therefore, according to Dr. Gaier, "many putative class members likely benefit from Amex's NDPs for their transactions with small merchants, which Dr. Lamb does not consider." (Gaier Report ¶ 97.) This proffered consequence formed the basis for Dr. Gaier's opinion that "Dr. Lamb's damages methodology is disconnected from his theory of anticompetitive harm" because he "ignores the impact of Amex's NDPs on merchants other than Qualifying Merchants." (*Id.*)[4]

But the focus of Dr. Gaier's testimony concerning non-Qualifying Merchants was that small merchants would be unlikely to achieve lower *discount fees* (Gaier Report ¶ 97 ("The relevance of these observations is that small merchants are unlikely to achieve lower merchant discount fees absent Amex's NDPs in the way that Dr. Lamb predicts for Qualifying Merchants")); beyond a statement that small merchants "may" steer, the discussion of steering or surcharging suggests that small merchants were *less* likely to steer in the but-for world. OptBlue merchants faced a blended rate and so steering would not affect their costs. The complexity of how processing costs are calculated meant that

---

[3] Dr. Lamb's prediction, as a reminder, was that Qualifying Merchants would use a credible threat of steering absent Amex's NDPs to negotiate lower discount fees. (Lamb Report ¶¶ 149-51, 178, 209-12, 259-69.)

[4] In its motion for reconsideration, Amex also summarizes Dr. Gaier's opinion to be that "Dr. Lamb erroneously failed to consider the impact of steering and surcharging at the millions of non-Qualifying Merchants." (Mot. at 5; *see also* Reply in Support of Reconsideration ("Reply") (Dkt. 231) at 1 (stating that Dr. Gaier opined that Dr. Lamb failed "to consider losses incurred in transactions at non-Qualifying Merchants.").)

8

small merchants—even if they did not pay a blended rate—would be unlikely to effectively lower their costs through steering customers to lower cost payment methods. And acquirers' relative leverage over small merchants meant that small merchants would be unlikely to benefit from any reduction in discount fees, minimizing the incentive to steer to begin with. The very same argument that Dr. Gaier used to say that small merchants would not achieve lower discount fees—they did not have a credible threat to steer—meant that the risk that Plaintiffs incurred losses from steering was also diminished. Therefore, the opinion underlying Dr. Gaier's criticism of "Dr. Lamb for failing to consider losses incurred in transactions at non-Qualifying Merchants"—that Plaintiffs would incur losses from steering at non-Qualifying Merchants—itself was the result of an unreliable, incomplete analysis. (Reply at 1.)

Amex tries to salvage Dr. Gaier's testimony with two points. First, Amex argues that the court conflates steering and surcharging, and "it is undisputed that some merchants would engage in surcharging in Plaintiffs' but-for world." (Mot. at 4.) Second, "Dr. Gaier's criticisms of Dr. Lamb's opinions on this issue do not hinge on the behavior of small merchants alone because the universe of non-Qualifying Merchants includes many large merchants." (*Id.* at 5.)

Amex is correct that steering and surcharging, while in some instances overlapping, are distinct. A merchant may steer—incentivize a customer to use a lower cost payment method—using a variety of methods, including a differential surcharge. But there are other surcharges that apply more broadly that do not provide customers with an incentive to switch between payment methods. Just as not all surcharges are forms of steering, it is worth keeping in mind that not all surcharges are violative of Amex's NDPs—merchants may incentivize payment via cash, check or electronic funds transfer and still comply with the anti-

steering restrictions that Amex places on their conduct. (Lamb Report ¶ 87.)

Amex points to Dr. Gaier's testimony that surcharging occurs for reasons beyond steering, including "profit reasons," to argue that small merchants would surcharge in the but-for world.[5] But Dr. Gaier discussed non-steering "profit reasons" for surcharging in the context of "compliant surcharges," in which debit card and credit cards are surcharged at the same level. (*Daubert* Hearing Tr. at 222:9-14.) These surcharges are "compliant" because merchants are permitted to impose them under the terms of Amex's NDPs. Surcharges that would exist whether or not the NDPs were in place are not relevant for calculating Plaintiffs' damages in the but-for world, and Amex cannot point to these as evidence of small merchant surcharging or class member losses in the but-for world. The only relevant surcharging for the present analysis is surcharging that exists in the but-for world that would otherwise not occur if Amex's NDPs remained in force.

Finally, Amex argues that the court should reconsider its exclusion of Dr. Gaier's testimony because non-Qualifying Merchants include large merchants and "Dr. Gaier's criticisms of Dr. Lamb's opinions on this issue do not hinge on behavior of small merchants alone." (Mot. at 5.) While of course true that the definition of non-Qualifying Merchants includes large merchants, Dr. Gaier's criticism that Dr. Lamb failed to consider the impact of

---

[5] Dr. Gaier opined that "surcharges don't occur just for steering; rather, there can be profit reasons and so forth to have surcharges." (*Daubert* Hearing Tr. at 222:16-18.) But of course, merchants are interested in steering customers to lower cost payment methods for "profit reasons" as well. (*See, e.g.*, Lamb Report ¶¶ 303-08 (discussing management of payment costs as a profit consideration).) The court understands "profit reasons" to mean non-steering reasons that merchants surcharge.

Amex's NDPs on non-Qualifying Merchants focused primarily on small merchants. (*See* Gaier Report ¶¶ 92-97.)[6]

In its motion for reconsideration, Amex does not point to any specific testimony of Dr. Gaier's concerning large merchants the court overlooked. That could be because Dr. Gaier had little to say about large merchants. One thing that Dr. Gaier did say about large merchants was that they individually negotiate with Amex in the same way that Qualifying Merchants do.[7] If the mechanism by which Qualifying Merchants and large non-Qualifying Merchants reduce their discount fees is the same, then that undercuts Dr. Gaier's opinion that "Dr. Lamb acknowledges that Amex's NDPs would be rescinded for all merchants but ignores the impact of Amex's NDPs on merchants other than Qualifying Merchants." (Gaier Report ¶ 97.) According to Dr. Lamb's damages methodology, merchants that have a credible threat to steer are able to negotiate with Amex to lower the discount rate and incur savings. Dr. Lamb opined that his damages model applies

---

[6] When summarizing this issue, Gaier noted: that the "relevance of these observations is that small merchants are unlikely to achieve lower merchant discount fees absent Amex's NDPs in the way that Dr. Lamb predicts . . ."; that "small merchants may nevertheless impose surcharges . . ."; and that "many putative class members likely benefit from Amex's NDPs for their transactions with small merchants, which Dr. Lamb does not consider." (*Id.* ¶ 97.)

[7] Dr. Gaier testified at the evidentiary hearing: "The networks also have decisions to make. They are going to look at individual negotiations that they engage in with some of the larger merchants, including many of the qualifying merchants and they're going to decide how much they're willing to reduce interchange or wholesale rates, if at all, in response to the merchants' credible threats to steer or actual steering. My point[] here is that these—particularly for the qualifying merchants, or any really large merchant, these are individually negotiated agreements." (*Daubert* Hearing Tr. at 145:5-14.)

equally to Qualifying Merchants and non-Qualifying Merchants.[8] If anything, Dr. Gaier's statement here about large non-Qualifying Merchants seems to corroborate Dr. Lamb's opinion that the mechanism through which merchants would reduce discount fees is not limited to Qualifying Merchants.

Dr. Gaier also opined that Plaintiffs "signal[ed]" the differences between Qualifying and non-Qualifying merchants by seeking damages only for the Qualifying Merchants related to pass through:

> [T]he classes seek damages for transactions at qualifying merchants only. This is because qualifying merchants, because of their ultra thin profit margins, are certain to reliably pass through inflated GPCC merchant acceptance cost into retail prices. Plaintiffs do not seek damages for transactions at nonqualifying merchants. So the significance of this to me is that it's an acknowledgment or even a concession that there's something particularly unique about the qualifying merchants that because, at least in plaintiffs—under plaintiffs' logic, because of their ultra thin profit margins, that they are certain to reliably pass through, which, of course, to me, signals that for nonqualifying merchants, they understand that that's likely not the case. (*Daubert* Hearing Tr. at 201:15-202:5.)

---

[8] Dr. Lamb, in his deposition, opined that his methodology would apply broadly, not just to the Qualifying Merchants: "I note that the qualified merchants cover a broad set of products and services, and I expect that the changes that occur in the marketplace for GPCC card transactions apply to non-qualified merchants, as well as the qualified merchants. And I believe that the passing on of the cost savings that would arise from the decline in the merchant discount or the interchange fees at non-qualified merchants would be like the passing on that happens to qualified merchants. And I think therefore there's injury on those transactions as well." (Gaier Report ¶ 91 & n.165 (quoting Deposition of Dr. Lamb).)

Dr. Gaier's testimony that Plaintiffs acknowledged or conceded that Qualifying Merchants are distinct from other non-Qualifying Merchants is unsupported. He did not provide analysis to show that Qualifying Merchants have different profit margins than non-Qualifying Merchants[9] or otherwise indicate that the Qualifying Merchants are unique. Amex has not demonstrated that reconsideration is warranted.[10]

---

[9] In its motion for reconsideration, Amex points to its summary judgment briefing in which it lists Dollar Tree, among others, as an example of a large non-Qualifying Merchant that Dr. Lamb did not consider. (Mot. at 5.) Though not relevant for the motion to reconsider exclusion of Dr. Gaier's testimony because Dr. Gaier did not opine on it, even if he had, a store that is known for selling things for a dollar is not a good foil to the Qualifying Merchants' "ultra thin profit margins."

[10] One final note: Amex references two of the court's findings in its motion. First, Amex states that "the Court criticized as unreliable Dr. Gaier's purported opinion that any class member savings at Qualifying Merchants would be fully offset by losses at non-Qualifying Merchants." (Mot. at 2.) And second, "Dr. Gaier's actual opinion is that Dr. Lamb erroneously failed to consider the impact of steering and surcharging at the millions of non-Qualifying Merchants. As the Court found, these kinds of potential losses are legally relevant and important to consider." (Mot. at 5 (citing M&O at 24).)

Both of these statements misunderstand or misconstrue the court's M&O. To clarify, the court did not state that Dr. Gaier's opinion was that losses at non-Qualifying Merchants would "fully offset" class member savings at the Qualifying Merchants. That phrase appears only in Amex's briefing. And the court did not find steering and surcharging at non-Qualifying Merchants to be "legally relevant and important to consider." It found only that Dr. Gaier's opinion about steering in the context of Qualifying Merchants was relevant. (*See* M&O at 24.)

13

## IV. CONCLUSION

For the foregoing reasons, Amex's motion is DENIED.

SO ORDERED.

Dated: Brooklyn, New York
       June 21, 2024

s/Nicholas G. Garaufis
NICHOLAS G. GARAUFIS
United States District Judge
