UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANTHONY OLIVER, TERRY GAYLE QUINTON, SHAWN O'KEEFE, ANDREW AMEND, SUSAN BURDETTE, GIANNA VALDES, DAVID MOSKOWITZ, ZACHARY DRAPER, NATE THAYER, MICHAEL THOMAS REID, ALLIE STEWART, ANGELA CLARK, JOSEPH REALDINE, RICKY AMARO, ABIGAIL BAKER, JAMES ROBBINS IV, EMILY COUNTS, DEBBIE TINGLE, NANCI-TAYLOR MADDUX, SHERIE MCCAFFREY, MARILYN BAKER, WYATT COOPER, ELLEN MAHER, SARAH GRANT and GARY ACCORD, on behalf of themselves and all others similarly situated, | MEMORANDUM & ORDER 19-CV-566 (NGG) (SJB) |

Plaintiffs,

-against-

AMERICAN EXPRESS COMPANY and
AMERICAN EXPRESS TRAVEL RELATED
SERVICES COMPANY, INC.,

Defendants.

NICHOLAS G. GARAUFIS, United States District Judge.

The parties in this antitrust class action bring cross-motions for summary judgment. Plaintiffs move for partial summary judgment as to the relevant market definition. (Plaintiffs' Mot. for Partial Summary Judgment ("Pl. Mot.") (Dkt. 196-2); Amex Opp. (Dkt. 197-1); Pl. Reply (Dkt. 198-1).) Defendants American Express Company and American Express Travel Related Services Company (collectively, "Amex") move for summary judgment on five grounds: Plaintiffs' standing, the Ohio consumer protection statute, antitrust injury, anticompetitive effects, and damages. (Amex Mot. for Summary Judgment ("Amex Mot.") (Dkt. 199-

1

1); Pl. Opp. (Dkt. 200); Amex Reply (Dkt. 201).) For the following reasons, Plaintiffs' and Amex's motions are each GRANTED in part and DENIED in part.

## I.  BACKGROUND

The court assumes familiarity with the factual background and procedural history of this long-running antitrust dispute and refers to facts in the discussion section as necessary to evaluate the parties' arguments. More detailed accounts of the facts underlying this Memorandum and Order are available in the court's past orders and in the opinions stemming from the merchants' and federal and state governments' previous cases on this issue. *See Oliver v. Am. Express Co.*, No. 19-CV-566 (NGG), 2024 WL 100848 (E.D.N.Y. Jan. 9, 2024), *amended in part*, No. 19-CV-566 (NGG), 2024 WL 217711 (E.D.N.Y. Jan. 19, 2024), *reconsideration denied*, No. 19-CV-566 (NGG), 2024 WL 3086266 (E.D.N.Y. June 21, 2024); *United States v. Am. Exp. Co.*, 88 F. Supp. 3d 143, 149 (E.D.N.Y. 2015); *Ohio v. Am. Express Co.*, 585 U.S. 529 (2018); *In re Am. Exp. Anti-Steering Rules Antitrust Litig.*, 361 F. Supp. 3d 324 (E.D.N.Y. 2019).

## II.  LEGAL STANDARD

At summary judgment, the court only grants the motion if there is no genuine dispute of material fact that would allow a reasonable jury to return the verdict for the non-moving party. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In assessing whether there is a material dispute, the court "resolve[s] all ambiguities and draw[s] all permissible factual inferences in favor of the party against whom summary judgment is sought." *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).[1] A fact is material for the purposes of Rule 56 if it "might

---

[1] When quoting cases, unless otherwise noted, all citations and internal quotation marks are omitted, and all alterations are adopted.

affect the outcome of the suit under the governing law." *Liberty Lobby*, 477 U.S. at 248.

The initial burden at summary judgment is on the moving party to establish that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Once the moving party has met this burden, the party opposing summary judgment must identify specific facts and affirmative evidence that contradict those offered by the moving party to demonstrate that there is a genuine issue for trial." *Gonzalez v. Kmart Inc.*, No. 13-CV-5910 (PKC), 2016 WL 3198275, at *2 (E.D.N.Y. June 8, 2016) (citing *Celotex*, 477 U.S. at 324).

However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Liberty Lobby*, 477 U.S. at 247-48. "A disputed fact is immaterial when the outcome of the case remains the same regardless of the disputed issue." *Mitsui Marine & Fire Ins. Co. v. China Airlines, Ltd.*, 101 F. Supp. 2d 216, 219 (S.D.N.Y. 2000). "The non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998).

## III. PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiffs move for partial summary judgment on the relevant market definition, asserting that "undisputed facts establish that the relevant market is the two-sided market for GPCC transactions in the United States." (Pl. Mot. at 1.) In support of their motion, Plaintiffs rely primarily on practical indicia to argue that debit card transactions and emerging payment technologies are not part of the general purpose credit and charge card ("GPCC" or "credit card") market. (*See generally id.*) To distinguish the

credit card transaction market from that of debit cards, Plaintiffs note that credit cards have a different source of funds than debit cards, credit cards offer materially different levels of rewards than debit cards, merchants' cost of acceptance for credit cards is materially different than for debit cards, and credit card networks do not take debit card prices into account when setting their prices to merchants. (*Id.* at 3-5.) Plaintiffs also assert that the credit card transaction market is distinct from transactions using emerging payment technologies because many payment technologies use existing payment networks or otherwise do not take market share from credit cards in the transactions market. (*Id.* at 5.)

Amex responds that Plaintiffs' motion is improper because they seek to resolve an immaterial dispute through summary judgment. (Amex Opp. at 3-4.) Because the inclusion of debit cards or emerging payment technology would not influence the case's outcome, Amex argues that summary judgment is an improper vehicle to resolve the dispute. And even if it were material, Amex continues, there are genuine disputes as to whether debit card and emerging technology transactions are sufficiently interchangeable with credit card transactions such that they could exert pressure on credit card transaction prices. (*See id.* at 4-8.)

Amex is incorrect that market definition is immaterial for Plaintiffs' case. Plaintiffs allege that the non-discrimination provisions ("NDPs") that Amex imposes on Amex-accepting merchants are unreasonable vertical restraints on trade. (*See* Second Amended Compl. (Dkt. 187) ¶¶ 1-2.)[2] As the Supreme Court noted in a previous rendition of this dispute brought by the attorneys general of several states:

---

[2] Merchants that accept Amex cards must not:

The plaintiffs argue that we need not define the relevant market in this case because they have offered actual evidence of adverse effects on competition—namely, increased merchant fees. We disagree. . . . Vertical restraints often pose no risk to competition unless the entity imposing them has market power, which cannot be evaluated unless the Court first defines the relevant market.

*Ohio v. Am. Express Co.*, 585 U.S. 529, 544 n.7 (2018) (citing *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 898 (2007); Frank H. Easterbrook, *Vertical Arrangements and the Rule of Reason*, 53 Antitrust L. J. 135, 160 (1984)).

Because the Supreme Court requires market definition for vertical restraints, partial summary judgment to define the relevant antitrust market is proper. *Id.*; *see also Fed. Trade Comm'n v.*

---

• indicate or imply that they prefer, directly or indirectly, any Other Payment Products over our Card;

• try to dissuade Cardmembers from using the Card;

• criticize or mischaracterize the Card or any of our services or programs;

• try to persuade or prompt Cardmembers to use any Other Payment Products or any other method of payment (*e.g.*, payment by check);

• impose any restrictions, conditions, disadvantages, or fees when the Card is accepted that are not imposed equally on all Other Payment Products, except for ACH funds transfer, or cash and checks;

• engage in activities that harm our business or the American Express Brand (or both); or

• promote any Other Payment Products (except the Merchant's own private label card that they issue for use solely at their Establishments) more actively than the Merchant promotes our Card

(*Id.* ¶ 90; *see also* Expert Report of Dr. Russell Lamb ("Lamb Report") (Dkt. 138-4) ¶ 87.)

*Surescripts, LLC*, 665 F. Supp. 3d 14, 38 (D.D.C. 2023); Fed. R. Civ. P. 56 Advisory Committee Note (2010) (noting that revisions were made to the language in Rule 56(a) to "make clear" that "summary judgment may be requested not only as to an entire case but also as to a claim, defense, or part of a claim or defense").

"A relevant product market consists of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered." *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002). Stated more technically, products are interchangeable when there is "cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962). The cross-elasticity of demand is a gauge of substitutability between products, and measures how demand for a given product changes when the price of potential substitutes changes.[3] But "the mere fact that a firm may be termed a competitor in the overall marketplace does not necessarily require that it be included in the relevant product market for antitrust purposes." *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1075 (D.D.C. 1997). Instead, "the relevant market should be construed to include only competitor products that a significant percentage of consumers could substitute for [credit card transactions] without incurring substantial costs." *Surescripts*, 665 F. Supp. 3d at 35.

Courts use the concept of cross-elasticity of demand to define product markets for antitrust purposes. *See, e.g., Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 339 (2d Cir.

---

[3] If a price increase in one product, say chunky peanut butter, causes consumers to shift their buying habits and consume more of a different product, say smooth peanut butter, then consumers are price sensitive and their demand between the two products is elastic. If an increase in the price of one product—chunky peanut butter—does not affect how much of a different product—ketchup, for instance—consumers buy, then the consumers are cross-price inelastic and the products are not interchangeable.

2024). If cross-price elasticity between two products is high, then they are interchangeable and part of the same market. Under the Hypothetical Monopolist Test ("HMT"), the court imagines that there is only one producer—the monopolist—of the relevant product in the proposed market. *United States v. Am. Express Co.*, 838 F.3d 179, 198-99 (2d Cir. 2016). If the hypothetical monopolist imposes a profitable small but significant non-transitory increase in price ("SSNIP"), then the proposed market is the relevant market. *See id.* at 199; *Fed. Trade Comm'n v. IQVIA Holdings Inc.*, No. 23-CV-6188 (ER), 2024 WL 81232, at *25 (S.D.N.Y. Jan. 8, 2024). The profitability of the price increase means that there are not products outside the market that consumers view as interchangeable, so they would not shift their consumption habits away from the monopolist's product. *See IQVIA Holdings*, 2024 WL 81232, at *25. If, on the other hand, a SSNIP is unprofitable, that means that there are products outside of the proposed market that are reasonably interchangeable, and consumers react to the price increase by simply buying other products that they view as essentially equivalent. *See United States v. Am. Express Co.*, 838 at 199. The proposed market then expands to these products and repeats until the hypothetical monopolist can impose a profitable SSNIP. A SSNIP is commonly understood to be a price increase of five percent that endures for at least a year. *Fed. Trade Comm'n v. Shkreli*, 581 F. Supp. 3d 579, 626 (S.D.N.Y. 2022).

The two-sided nature of the credit card transactions market complicates the HMT analysis. The two distinct consumers—here, cardholders and merchants—may have different elasticities, so the same price increase on the cardholder or merchant side could produce different measures of interchangeability. *See* Lapo Filistrucchi, Damien Geradin, Eric van Damme & Pauline Affeldt, *Market Definition in Two-Sided Markets: Theory and Practice*, Tilburg Law School Legal Studies Research Paper Series No. 09/2013, at 37 (March 16, 2023) [hereinafter "Filistrucchi et

al."].[4] And because the value in a two-sided market is derived from both cardholders and merchants using the platform, there are indirect network effects or externalities on one consumer when the other ceases to use the platform. *Ohio v. Am. Express Co.*, 585 U.S. at 535. As the Second Circuit advised in a previous iteration of this dispute:

> A proper application of the HMT in this case would not have merely assumed that a decrease in quantity of network services demanded by merchants facing a SSNIP would be too small to render the accompanying price increase unprofitable. The District Court instead should have considered the extent to which even a low level of merchant attrition might cause some cardholders to switch to alternative forms of payment. Application of the HMT to a two-sided market must consider the feedback effects inherent on the platform by accounting for the reduction in cardholders' demand for cards (or card transactions) that would accompany any degree of merchant attrition. *United States v. Am. Express Co.*, 838 F.3d at 199-200.

A SSNIP in a two-sided market is based on the two-sided price, or "the sum of the prices paid for the transaction by the two parties." Filistrucchi et al., at 37; *see also US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 59 (2d Cir. 2019) (analyzing a two-sided price in two-sided market). If a hypothetical monopolist can implement a profitable SSNIP, taking into account the dynamics of the market from the indirect network effects, then that is the relevant market.

---

[4]    *Available    at*    https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2240850.

The HMT is not the only methodology that courts use to define the relevant market. The Second Circuit has also relied on "practical indicia" of the market's boundaries, such as "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *US Airways*, 938 F.3d at 64 (citing *Brown Shoe*, 370 U.S. at 325). Though less technically complex than the HMT, particularly when considering the externalities present in a two-sided platform, the focus of the inquiry is the same: to determine which products are reasonably interchangeable.

Plaintiffs here seek partial summary judgment for the relevant market by pointing to practical indicia that debit card and emerging technology transactions are distinct from credit card transactions.[5] But because they do not take the two-sided market into account for debit cards, Plaintiffs' use of the practical indicia is insufficient to establish that there is no genuine dispute of fact that would warrant summary judgment. For emerging payment technology transactions, however, there is no genuine dispute of material fact, and summary judgment is appropriate.

### A.  Debit Card Transactions

Plaintiffs focus on the distinct prices for credit card and debit card transactions. *See Brown Shoe*, 370 U.S. at 325 (holding "distinct prices" are relevant for determining market). Plaintiffs note that the credit card transaction price is distinct from the debit card transaction price on both the cardholder side of the market and the merchant side: credit cards frequently offer rewards, while debit cards overwhelmingly do not, and credit cards are much

---

[5] The parties do not dispute that the relevant geographic market is the United States. (*See* Pl. Rule 56.1 Statement (Dkt. 196-3) ¶¶ 26-27; Amex Resp. to Pl. Rule 56.1 Statement (Dkt. 197-2) ¶¶ 26-27.)

more expensive for merchants to accept than debit cards are. (Pl. Mot. at 3-4.) And credit card payment networks do not take debit rates into account when setting credit card processing fees. (*Id.* at 4.)

Plaintiffs point to the market response to the Durbin Amendment in 2011, which limited the interchange rate for debit card transactions. (*Id.*; *see also* Lamb Report ¶¶ 89-91, 118-21, 342-47.) The Durbin Amendment "was equivalent to a massive price increase for GPCC card acceptance in relation to debit," and yet merchants did not drop credit card acceptance in favor of debit card transactions. (Pl. Mot. at 4.) Merchants' lack of response to a change in price indicates, according to Plaintiffs, that credit and debit card transactions are not interchangeable.

Amex counters, and the court agrees, that Plaintiffs incorrectly focus only on one side of the two-sided market. In a two-sided market, the relevant price is the two-sided price. In this context, the two-sided price is the merchants' cost of accepting the card plus the cardholders' cost of using the card. The cardholder's cost is often negative, as many credit card issuers offer rewards to incentivize their use. (*See* Lamb Report ¶ 64; Expert Report of Dr. Eric Emch ("Emch Report") (Dkt. 139-18) ¶ 241.) Therefore, the fact that merchants did not shift to debit cards after the Durbin Amendment is not probative of the relevant market because the Durbin Amendment also caused a significant decrease in debit card rewards—the price decreased for merchants but also became less negative for debit card users. (*See* Emch Report ¶ 346.) It is therefore possible that the Durbin Amendment had a limited impact on the two-sided debit card transaction price, and the fact that merchants did not shift to debit cards was a result of diminished customer demand for debit card transactions with the reduction in debit card rewards. Plaintiffs cannot show that the two-sided price is materially different for credit and debit cards

by arguing that the price is distinct on each side of the market without evaluating both sides of the market together.

The final *Brown Shoe* indicum that Plaintiffs rely on in support of their credit card transaction-only market is the distinct source of funds between credit and debit cards: credit cardholders draw on a line of credit each time they use the card, while debit cards require cardholders to have sufficient funds in their accounts at the time of the transaction. (Pl. Mot. at 3.) Credit and debit card-holders therefore often have different financial health and associated preferences: some consumers that use debit cards are not eligible to qualify for credit cards because of their poor credit scores, or else use debit cards to avoid overspending and risking unsustainable credit card debt. (Lamb Report ¶ 112.) Credit and debit cards serve distinct purposes for distinct customers, and therefore the transactions should be considered differently.

But it is not clear that the different source of funds is what drives credit cardholders to use their credit card. Approximately half of credit cardholders in 2021 did not carry a balance on their credit card, implying that the extension of credit was not necessary for their decision to use their credit card. (*Id.*) For credit card users that do not carry a balance, there is an issue of fact as to whether credit card and debit card transactions are sufficiently inter-changeable such that a small but significant non-transitory increase in the price of credit card transactions (whether in the form of decreased rewards or increased discount rate that causes merchant attrition) would persuade consumers and merchants to transact with debit cards at such a rate that an increase in the credit card transaction price would not be profitable.

In general, Plaintiffs here risk repeating the mistakes the federal and state governments made in their case against Amex nearly a decade ago. By seeking to define the market by focusing only on how a customer on one side of the two-sided market views the transaction, Plaintiffs ignore the externalities that exist and the

11

indirect network effects that are important for determining the relevant market. If a hypothetical credit card payment network monopolist imposes a SSNIP on merchants that accept credit cards, it could be profitable when assessing only the merchant side of the two-sided platform. But if the increase in processing payment costs causes some merchants to leave the network and decline to accept credit cards, then the value to cardholders is reduced; cardholders may then reduce their credit card usage or else require more rewards to spur their credit card use. It is possible that a SSNIP imposed on merchants is profitable for the hypothetical payment network monopolist, but that it is no longer profitable when the externalities that change cardholder behavior are considered. While debit cards may very well not be part of the relevant market, Plaintiffs have not made the requisite showing that there is no genuine dispute on this issue to grant summary judgment in their favor.

## B.  Emerging Payment Technologies Transactions

Plaintiffs also seek summary judgment that transactions using emerging technologies are not part of the relevant market. The products that financial technology companies provide—and that the parties discuss—do not always lend themselves to easy classification. PayPal, a leading financial technology company, offers variations of digital wallet, person-to-person ("P2P") payment, and buy-now-pay-later ("BNPL") loan products to its users. *See* PayPal, *2021 Annual Report* (Form 10-K), at 6.[6] Some of these products use already existing credit and debit card networks, while others involve direct transfers between bank accounts and still others extend credit to users. *Id.* For the purposes of this motion, transactions using digital wallets or P2P payments that are

---

[6]  *Available at* https://s201.q4cdn.com/231198771/files/doc_financials/2022/ar/PayPal-Holdings-Inc.-2022-Combined-Proxy-Statement-and-Annual-Report.pdf.

linked to an already-existing credit or debit card are not emerging technologies; they are simply novel forms of conducting credit or debit card transactions and are more properly included in the analysis of credit and debit card transactions. (*See* Pl. Rule 56.1 Statement ¶ 19; Amex Resp. to Pl. Rule 56.1 Statement ¶ 19.) Transactions that occur via direct transfers between bank accounts, however, have the potential to compete with credit card transactions rather than building on already-existing networks; these are the P2P payments that the court will consider on this motion. Some popular payment platforms that include P2P services are PayPal, Venmo, Zelle, and Cash App. (Lamb Report ¶ 26.)

BNPL transactions similarly have the potential to compete with credit card transactions. A BNPL credit product is a short-term installment loan that allows consumers to make purchases on credit and repay the loan over time. (*Id.* ¶ 27.) The repayment period can vary from four interest-free installments over the course of six weeks to 60-month interest-bearing loans. *See* Julian Alcazar & Terri Bradford, "The Appeal and Proliferation of Buy Now, Pay Later: Consumer and Merchant Perspectives," Federal Reserve Bank of Kansas City 1-2 (Nov. 10, 2021) [hereinafter "Alcazar & Bradford"].[7] Though similar to credit cards in that it allows customers to make purchases on credit, BNPL does not require creditworthiness, and so its users are often lower-income and with poor or no credit history. *See id.* at 2-3. Fintech companies that offer BNPL services, such as Klarna, Affirm, AfterPay, and others, generate revenue from fees charged to merchants and from late fees or penalties charged to consumers who fail to make timely payments. *Id.* at 1-2.

---

[7] *Available at* https://www.kansascityfed.org/research/payments-system-research-briefings/the-appeal-and-proliferation-of-buy-now-pay-later-consumer-and-merchant-perspectives/.

Plaintiffs' motion to exclude P2P payments and BNPL transactions from the relevant market is granted because the dispute is not material for evaluating the alleged anticompetitive effects that Amex's NDPs may have had over the class period.

In support of their motion, Plaintiffs argue that P2P payment platforms "piggy-back on existing payment networks including GPCCs)" and so cannot be considered substitutes for credit card transactions. (Pl. Mot. at 5.) But as discussed *supra*, while some P2P payments rely on already-existing credit or debit networks, not all do, and P2P payments that involve direct bank transfers could substitute for credit card transactions. (*See* Amex Resp. to Pl. Rule 56.1 Statement ¶ 19.)

Plaintiffs also argue that BNPL payments are not substitutes because while they are similar to credit cards in that they extend credit, "they do not take market share from GPCCs." (Pl. Mot. at 5.) Dr. Lamb relies on Alcazar & Bradford to support his opinion that the emerging technologies do not discipline credit card transaction prices. (Lamb Report ¶¶ 27-29, 134; *see also Daubert* Hearing Tr. at 19:19-20-11.) The price that merchants face for a BNPL transaction is substantially higher than for a credit card transaction, with the cost ranging from "1.5 to 7 percent of the purchase value" for BNPL, compared to "1 to 3 percent" for credit card transactions. Alcazar & Bradford at 4. Because BNPL services do not offer consumer rewards, unlike credit cards, *see id.* at 2, the difference between the two-sided price for the two products is even greater.

Amex faults Plaintiffs for improperly focusing on "whether a competing product is *currently* taking away market share . . . . Rather, the relevant question is whether the products are reasonably interchangeable." (Amex Opp. at 8 (emphasis in original).) But this is an action seeking damages for past anticompetitive acts; after the dismissal of the Sherman Act claim, Plaintiffs do not seek prospective relief. (Mot. to Dismiss Mem. & Order (Dkt.

43) at 23; Second Amended Compl. at 1 n.1; *id.* ¶¶ 157-213.)
The terminology that the parties use for payment technologies
hints at why the transactions are not material: they are emerging,
not yet emerged, payment technologies. Though Amex is correct
that the relevant question is whether the products are inter-
changeable, the products must have had sufficient adoption at
the time of the allegedly anticompetitive restraint of trade to be
interchangeable in practice. There is no dispute that P2P pay-
ments made up less than one percent of U.S. consumer
transaction volume in 2019, (Lamb Report ¶ 133 & n.388 (citing
Amex strategy presentation)), nor that BNPL represented two
percent of U.S. online retail sales in 2021. Alcazar & Bradford at
*3.

The market definition inquiry focuses on interchangeability to
determine which products could exert competitive pressures on
a firm attempting to restrict trade. Even if the court were to find
that the emerging payment transactions were interchangeable
with credit card transactions, the inclusion of these transactions
in the market would not affect the case's outcome. Defining the
market in vertical restraint cases is a means for evaluating
whether the market is highly concentrated, because vertical re-
straints frequently require market power or some other form of
market control to have anticompetitive effects. *Ohio v. Am. Ex-
press Co.*, 585 U.S. at 544 n.7. The inclusion of products in the
relevant market that marginally increase the size of the market
(by less than one percent over the class period) would not impact
the concentration of the market or the anticompetitive effects of
the restraint.

The facts that Amex relies on in opposition to Plaintiffs' motion
do not make the dispute material. Amex argues that summary
judgment on the relevant market is not warranted because "con-
sumers view BNPL products as a viable substitute for GPCC
cards." (Amex Opp. at 8.) In an online self-reported survey, "38%

of BNPL users said that BNPL services would eventually replace their credit cards." (Emch Report ¶ 125.) But evidence that customers may in the future substitute the financial technology for credit card transactions is not enough to create a material dispute that the technology was interchangeable during the class period that ends in 2022.

That banks stand to lose money from emerging technology companies is also not enough to create a material dispute. Amex points to studies by McKinsey & Company that estimate that "US issuers could by 2025 lose up to 15 percent of incremental profits to newer forms of borrowing," some of which are BNPL products, and that since 2019, "banks have lost $8-10 billion in annual revenues to fintech companies." (Amex Resp. to Pl. Rule 56.1 Statement ¶ 18; Amex Rule 56.1 Counterstatement (Dkt. 197-2) ¶ 60; *see also* Emch Report ¶ 130 (citing Visa's 2022 annual report in which Visa cites competitive pressures from, among others, P2P payment networks and cryptocurrencies).) But the fact that firms see themselves as competitors does not require that their products are part of the same relevant market for antitrust purposes. *Staples, Inc.,* 970 F. Supp. at 1075. Both banks and emerging technology companies have multiple products and generate revenue from a variety of services. PayPal, for instance, has a digital wallet product, P2P payment product, and credit products that can be funded by any number of potential sources, including bank accounts, PayPal accounts, Venmo account balance, credit cards, debit cards, cryptocurrencies, or credit card rewards. *See* PayPal, *2021 Annual Report* (Form 10-K), at 6. Aggregate estimates of profit and revenue do not create a factual dispute that specific emerging payment technologies are reducing bank profits through competition with credit card transactions.

Amex's reliance on Zelle's transaction volume is similarly irrelevant for the inquiry at hand. Zelle's 2021 transaction volume of

$490 billion includes "P2P (including payments to small businesses), corporate and government disbursements, bill pay and deposit check transactions." (Emch Report ¶ 130.) Disbursements, bill pay, and check deposits are features unrelated to credit card transactions. P2P payments between individuals, rather than to small businesses, similarly would not compete with credit card transactions. And some of the relevant volume that involves transactions that could theoretically compete with credit card transactions—P2P payments to small businesses—may have been over a debit card network, in which case it would be properly analyzed as a debit card transaction, not a P2P transaction. (*Id.* ¶ 130 & n.248.) Amex points to no facts that would allow a jury to conclude that the inclusion of P2P payments and BNPL transactions in the relevant market during the class period would be material to the outcome of this case.

For the reasons above, Plaintiffs' motion for partial summary judgment is GRANTED for the geographic market, DENIED as to debit card transactions, and GRANTED as to emerging payment technology transactions.

## IV. AMEX'S MOTION FOR SUMMARY JUDGMENT

Amex raises five reasons for which it believes it is entitled to summary judgment on some or all of the claims: (1) Plaintiffs have no standing to sue for state law claims in which there is no named plaintiff; (2) the Ohio consumer protection statute does not permit antitrust claims; (3) Plaintiffs cannot show antitrust injury; (4) Plaintiffs cannot show anticompetitive effects; and (5) Plaintiffs cannot establish damages. The court addresses each in turn.

### A. Standing for State Law Claims with No Named Plaintiff

Amex argues that Plaintiffs do not have Article III standing to pursue certain state law claims in which there is no class representative. (Amex Mot. at 15-17.) In opposing class certification,

Amex made a similar argument—that classes with no class representative did not satisfy the requirements of Rule 23. (*See* Amex Opp. to Class Cert. (Dkt. 139-1) at 39-40.) The court agreed and denied class certification for proposed classes without a class representative. (*See* Class Cert. Mem. & Order (Dkt. 220) at 32-33.) Because Plaintiffs have represented that they will not move forward with claims for which there was no named plaintiff, and Amex agrees that the issue is resolved, Amex's motion is DENIED as moot. (*See* Oral Argument Tr. at 6:22-24; *id.* at 8:17-20; Pl. Opp. at 1 n.1, 6 n.4.) Plaintiffs no longer seek relief under the antitrust laws of Hawaii, Vermont, and West Virginia nor the consumer protection laws of Hawaii and Montana.[8]

## B.   Ohio Consumer Sales Practices Act Claim

Amex next argues that it is entitled to summary judgment on Plaintiffs' Ohio Consumer Sales Practices Act claim because the Ohio Supreme Court has interpreted the consumer protection statute to not apply to antitrust claims. (Amex Mot. at 17-18 (citing *Johnson v. Microsoft Corp.*, 834 N.E.2d 791, 801 (Ohio 2005).) Plaintiffs concede that summary judgment is warranted on this claim. (*See* Pl. Opp. at 1 n.1.) The court also agrees that *Johnson* prohibits plaintiffs from relying on Ohio's consumer protection law to bring claims based on anticompetitive conduct. Amex's motion for judgment in its favor on the Ohio Consumer Sales Practices Act claim is GRANTED. Plaintiffs Sherie McCaffrey and Marilyn Baker are DISMISSED.

## C.   Existence of Antitrust Injury

Amex argues that Plaintiffs are unable to establish antitrust injury because the claimed injury is too remote and because Plaintiffs

---

[8] Plaintiffs also conceded claims under New Hampshire and Rhode Island law. (*See* Pl. Opp. at 1 n.1 & 6 n.4.) However, Plaintiffs had already amended their complaint to exclude claims under New Hampshire and Rhode Island law. (*See* Second Amended Compl. at 1 n.1.)

cannot prove they would be better off in the but-for world because of steering and surcharging. (Amex Mot. at 20-23.) The court has considered and rejected versions of these arguments in past orders that resolved Amex's motions to dismiss and for judgment on the pleadings, and Plaintiffs' motion for class certification. (*See* Mot. to Dismiss Mem. & Order at 25-34; Mot. for Judgment Mem. & Order (Dkt. 63) at 4-16; Class Cert. Mem. & Order at 46-53.) It once again considers and rejects these arguments.

### 1.    Application of *AGC*

Amex contends that all of Plaintiffs' antitrust claims fail because Plaintiffs do not have antitrust standing. (Amex Mot. at 21.) Because Plaintiffs relied on federal precedents for class certification, Amex believes that Plaintiffs "are now bound by their argument that federal antitrust law governs their state antitrust law claims." (*Id.* at 19.) Because indirect purchasers do not have antitrust standing under federal law, *see Associated General Contractors of California v. California State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*"), Amex argues that Plaintiffs' state antitrust claims must be dismissed as well.

Amex's argument fails for three reasons. First, Amex misunderstands state harmonization statutes, in which states "harmonize" their antitrust laws to federal law with varying levels of fidelity. *See In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420 (YGR), 2014 WL 4955377, at *9-10 (N.D. Cal. Oct. 2, 2014) (collecting cases). Because state courts interpret their own harmonization statutes, some state courts "have found that their jurisdictions would apply AGC in accordance with federal precedents; some have not." *Id.* at *10. Reliance on federal antitrust precedents to interpret state law does not "bind" Plaintiffs to all aspects of federal antitrust for every state.

Second, even if Plaintiffs had stipulated to following all aspects of federal law for their state law claims, it does not follow that

federal law automatically applies. "Parties can stipulate to issues of fact, but they cannot by stipulation amend the law." *Alexander v. S.C. State Conf. of the NAACP*, 144 S. Ct. 1221, 1241 n.6 (2024). The court, not the parties, decides which law applies by analyzing a state's decisional law, its constitution, and its statutes. *Santalucia v. Sebright Transp., Inc.*, 232 F.3d 293, 297 (2d Cir. 2000).

And, finally, the court already determined which law applies. In its Memorandum and Order granting in part and denying in part Amex's motion to dismiss, the court held that the antitrust laws of Kansas, North Carolina, and Oregon diverge from federal antitrust law and do not apply the *AGC* factors to determine whether a plaintiff has antitrust standing. (*See* Mot. to Dismiss Mem. & Order at 26-27, 29-33.) Then, in deciding Amex's motion for judgment on the pleadings, it held that Maine, Utah, and the District of Columbia similarly do not follow *AGC*. (*See* Mot. for Judgment Mem. & Order at 5-6, 10-11.) Plaintiffs alleged violations of Alabama and Mississippi antitrust law, (*see* Complaint (Dkt. 1) ¶¶ 158, 170), which Amex did not challenge. (*See generally* Mot. to Dismiss (Dkt. 37); Mot. for Judgment on the Pleadings (Dkt. 59).)

These holdings are the law of the case and will not be revisited. "The law of the case doctrine, while not binding, counsels a court against revisiting its prior rulings in subsequent stages of the same case absent cogent and compelling reasons such as an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Ali v. Mukasey*, 529 F.3d 478, 490 (2d Cir. 2008). Amex points to no cogent and compelling reason that would warrant reconsideration, and so its motion for summary judgment based on *AGC* is denied.

### 2. Costs of Steering and Surcharging

Amex next argues that steering and surcharging in the but-for world mean that Plaintiffs are unable to establish injury. (Amex Mot. at 22.) Based on the calculations of Amex's expert, Dr. Eric Gaier, Plaintiffs estimated that the class members would save one-tenth of a percent on purchases at Qualifying Merchants in the but-for world. (*See* Gaier Report (Dkt. 139-17) ¶ 53 & n.96.) Amex argues that there is no factual dispute that "merchants with both the ability and desire to surcharge would do so at a level far exceeding 0.1%, and often exceeding any reasonable measure of their costs of card acceptance." (Amex Mot. at 23.) Therefore, class members cannot establish an injury because the increased prevalence of steering and surcharging would mean that Plaintiffs would not be able to prove that the class was better off in the but-for world.

The principal piece of evidence that Amex relies on to support this claim is Dr. Lamb's concession that five percent of all transactions could be surcharged in the but-for world and that steering would be even more common than surcharging. (Amex Mot. at 22.) Amex's argument fails because a factual dispute about the scope of steering and surcharging remains despite Dr. Lamb's statement.

At the evidentiary hearing, Dr. Lamb stated that a five percent level of surcharging was consistent with what he called "limited" surcharging that he believed would occur in the but-for world. (*Daubert* Hearing Tr. 96:22-97:1.) For surcharging to "completely overwhelm whatever cost savings Dr. Lamb predicts would occur in the but-for world," as Amex contends is the case, (Amex Mot. at 22), merchants would have to add, on average, a two percent surcharge to the five percent of transactions that

21

they surcharge.[9] Even if there is no factual dispute that five percent of transactions are surcharged in the but-for world, there remains a dispute as to what percent surcharge Plaintiffs would face on those transactions. Plaintiffs are debit and non-reward credit card users, (*see* Class Cert. Mem. & Order at 58-59; Amended Class Cert. Mem. & Order (Dkt. 224) at 4), and payment networks on average charge merchants a lower fee to process these payments than for rewards credit cards, resulting in a correspondingly lower surcharge. (*See* Gaier Report ¶ 77; Lamb Report ¶¶ 49-50.)

It is also unclear what type of surcharge—compliant, parity, or differential—Dr. Lamb was referring to in his deposition. The type of surcharge is relevant for estimating the change in class member welfare in the but-for world. If parity surcharging occurs, then debit cards users would not face additional costs in the but-for world. If compliant surcharging occurs in the but-for world, then there would be no change in welfare when comparing the status quo with the but-for world. Compliant surcharges are those that are permitted under the terms of Amex's NDPs and allow merchants to impose a surcharge on transactions as long as the surcharge is the same for all credit and debit cards. (*See Daubert* Reconsideration Mem. & Order (Dkt. 233) at 10 (citing *Daubert* Hearing Tr. at 222:9-14).) Because merchants can currently impose compliant surcharges, one would not expect the removal of NDPs to affect the prevalence of these surcharges, and their existence in the but-for world is not relevant for comparing the but-for world to the status quo.

---

[9] For surcharges on 5% of transactions to offset a 0.1% savings on class-wide purchases, each surcharge would have to be on average 2%. (5% x 2% = 0.1%.) (*See* Gaier Report ¶ 53 & n.96 (discussing 0.1% savings).) This back-of-the-envelope calculation assumes an average that is unweighted by transaction size, which may skew down the breakeven surcharge rate if consumers generally use credit cards for big ticket purchases.

Finally, Dr. Lamb predicted that the discount fees that payment networks charge would decline in the but-for world. (Lamb Report ¶ 359.) If that is true, then even if the five percent of transactions that were surcharged were all with a rewards credit card (the most expensive for merchants to process), it is not clear that surcharging fully offsets savings in the but-for world. In 2021, merchants paid on average 2.26% to process payments via an Amex card and 2.22% for Visa or Mastercard credit cards. (*Id.* ¶ 113.) Dr. Lamb predicted that processing costs would decline 36 basis points in the but-for world, pushing the average cost for credit card processing below two percent. (*Id.* ¶ 359.) If merchants imposed a surcharge of less than two percent on five percent of all class member transactions, class members would still be better off in the but-for world and an antitrust injury would still exist.[10]

Thus, there are factual disputes that exist even if we take Dr. Lamb's statement that five percent of transactions would be surcharged in the but-for world as undisputed. But when Dr. Lamb made the statement during the evidentiary hearing, he provided relevant context that Amex omits on its current motion. In the hearing, in response to a question about "whether 5 percent surcharging is consistent with your opinion" that limited surcharging would occur in the but-for world, (*Daubert* Hearing Tr. 96:22-24), Dr. Lamb answered:

> I believe 5 percent is consistent with it. It might be less than that in the but-for world in the U.S. In fact, I think it would be because I think the experience in Australia .

---

[10] *See supra* note 9. To illustrate, if the discount rate decreased to 1.9% and 5% of transactions were surcharged, then the surcharging would not offset the savings and there would still be a class-wide injury, assuming 0.1% total savings in the but-for world. (5% x 1.9% = 0.095% < 0.1%.)

. . likely shows far more—would show far more sur-
charging than in the U.S. (*Daubert* Hearing Tr. at 96:25-
97:5.)

In its Class Certification Memorandum and Order, the court
agreed with Dr. Lamb that the level of surcharging in Australia
was greater than the level that would occur in the but-for world
in the United States. (*See* Class Cert. Mem. & Order at 49-53.) In
Australia, the government implemented financial regulations
that simultaneously permitted merchants to impose surcharges
and capped the fees that Visa and Mastercard could charge.
(Lamb Report ¶ 254.) The court reasoned that the effect of the
two regulatory changes was to shift leverage from payment net-
works to merchants beyond what would occur in the but-for
world in the United States. (*See* Class Cert. Mem. & Order at 52-
53.) Both changes exerted downward pressure on the fees that
merchants pay to payment networks, including Amex. Even
though Amex's fees were not limited by the regulations, Amex's
fees were anchored by the Visa and Mastercard fees and could
not dramatically diverge.

Dr. Lamb argued that Amex's method to persuade merchants to
not engage in surcharging was to offer a price concession in ex-
change for an agreement to not surcharge. (Lamb Report ¶¶ 254-
59.) But if the fees that merchants pay to payment networks in-
dependently decrease, as was the case in Australia's regulatory
regime, Amex has fewer tools to persuade merchants to abstain
from surcharging. And the risk that merchants' imposition of sur-
charges generates customer dissatisfaction is lower when the
overall amount of the surcharge is also lower. Because Australian
merchants imposed a surcharge on an estimated 5% of credit
card transactions and 3.4% of debit card transactions in 2020
despite the merchant-friendly regulations, (Gaier Report ¶ 48),
there remains a factual dispute as to what level of surcharging
would occur in the but-for world in the United States.

And finally, on a more fundamental level, there is a dispute of fact about what the but-for world that the parties are analyzing looks like. Plaintiffs fault Amex's fixation on steering and surcharging as misunderstanding the mechanism through which competition reduces the discount fees that merchants would pay. (Pl. Opp. at 22.) Though steering and surcharging could occur in the immediate aftermath of the removal of Amex's NDPs, Dr. Lamb argues that they are not properly considered as part of the but-for world. (*See* Rebuttal Report of Dr. Russell Lamb ("Lamb Reply") (Dkt. 140-3) ¶ 244.) Instead, they are the very instruments that alter the networks', merchants', and consumers' behavior in a way that would lead to a reduction in discount fees. (*See id.* (discussing transitional dynamics).) Plaintiffs distinguish between the transition but-for world, which Plaintiffs claim is Amex's focus and in which steering and surcharging could occur, and the equilibrium but-for world, in which steering and surcharging are limited. Which version of the but-for world is appropriate to analyze for determining antitrust injury is a factual question that is best put before a jury.

## D.  Anticompetitive Effects

Plaintiffs in this case allege that the NDPs act as an unreasonable vertical restraint on trade. By prohibiting merchants from steering to lower cost payment methods, Amex's NDPs effectively increase prices on all products that the merchants sell. Amex argue that Plaintiffs are unable to demonstrate any anticompetitive effects from the restraint.

The court uses the rule of reason to assess whether the vertical restraint in this case, the NDPs, have an anticompetitive effect. The rule of reason has three burden-shifting steps. *Ohio v. Am. Express Co.*, 585 U.S. at 541. The burden starts with the plaintiff to prove that the restraint has anticompetitive effects that harm consumers in the relevant market. *Id.* If the plaintiff establishes anticompetitive effects, the burden shifts to the defendant to

25

show a procompetitive justification for the restraint. *Id.* If the defendant carries its burden, the burden then shifts back to the plaintiff to show that there is a less-restrictive means of achieving the procompetitive efficiencies. *Id.* at 542.

Before assessing whether there are questions of fact outstanding in the rule of reason analysis that would preclude granting Amex's motion for summary judgment, it is worth spelling out the potential procompetitive justifications and anticompetitive effects for a vertical restraint. The prototypical vertical restraint is between a manufacturer of a product and the retailer or distributor of that product. *See* Phillip Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1620d (5th ed. 2023) ("Areeda & Hovenkamp"). A manufacturer may require that the retailer sell the product for a certain price, or it may limit the conditions under which retailers are permitted to sell the product. *See Leegin Creative*, 551 U.S. at 889-92. Vertical restraints can have procompetitive efficiencies—they can focus the competition towards competitor manufacturers and remove potential competition among retailers that sell the same product. *See id.* In other words, it promotes interbrand competition by restricting intrabrand competition. *Id.* at 890; *Ohio v. Am. Express*, 585 U.S. at 551. A restriction on intrabrand competition can promote a manufacturer's maintenance of its branding and reputation, and it can incentivize retailers to provide high quality service and customer support. In this way, the restraint allows the manufacturer to invest in its brand and focus its competitive efforts on its peer manufacturers.

But the restraint can also prove harmful to competition when manufacturing of the product is concentrated in a few firms. *See* Areeda & Hovenkamp ¶ 1632d2; Frank H. Easterbrook, *Vertical Arrangements and the Rule of Reason,* 53 Antitrust L. J. 135, 160 (1984). While the conditions that a manufacturer places on a retailer can promote brand differentiation and competition in a

competitive market, they can stifle competition in a concentrated market by permitting coordination among manufacturers. *See, e.g., Leegin Creative*, 551 U.S. at 893. For example, if there are only a few manufacturers of a certain product, the existence of a vertical restraint means that the conditions of resale are visible to all manufacturers, facilitating coordination among manufacturers in a way that would not be possible in a competitive market. If all the manufacturers impose conditions that require high quality service or that limit discounting, then it is possible that the restraint is anticompetitive if the vertical restraint requires customers to purchase the product at a higher price or with higher quality service than they otherwise would desire.

In this case, the analysis of the effects of the vertical restraint is complicated by the two-sided nature of the product. Normally, a customer purchases a manufacturer's product through a retailer—the retailer is an intermediary that allows the manufacturer to sell its products to a consumer. *See id.* at 882. The retailer may provide services to the consumer on the manufacturer's behalf, but it itself is not a consumer of the manufacturer's product. In this case, however, the retailer is a joint consumer of the product with the customer. *See Ohio v. Am. Express Co.*, 585 U.S. at 545. Together, they consume the credit card transactions that payment network service providers, like Amex, produce. The vertical restraint on the retailer is therefore also a direct restraint on the conditions of the merchant's consumption of the product.

For a credit card transaction to occur, both customers and retailers must agree; a customer must want to use a certain brand credit card, and the retailer must also have an agreement with that brand of payment network services to be able to accept payments with that card. In this way, the two sides of the market are akin to perfect complements, as the customer's use of a credit card only has value when the retailer accepts that card. *See*

Areeda & Hovenkamp ¶ 565d2. But as the Supreme Court clarified in *Ohio v. American Express*, these are not complementary goods; instead, customers and retailers are joint consumers of the single product of transactions. *Compare Ohio v. Am. Express Co.*, 585 U.S. at 545 n.8, *with id.* at 562 (Breyer, J., dissenting). With standard complementary goods in use—say, peanut butter and jelly—an increase in the price of peanut butter reduces the quantity of peanut butter demanded. Assuming that peanut butter is consumed with jelly, an increase in the price of peanut butter would also reduce the amount of jelly demanded, because jelly is worth less when not consumed with peanut butter. A single consumer can take the prices of both peanut butter and jelly into account when deciding how much of each to consume. When faced with an increase in the price of peanut butter, the single consumer can adjust the amount of peanut butter and jelly consumed and can find his or her own optimal ratio of consumption of peanut butter and jelly.

But with credit card transactions, the two sides of the product are consumed by different parties, and so the actions of one side affect the welfare of the other. A retailer's decision to accept payments over a certain network has an externality on the customer, because a customer places more value on a credit card brand that is accepted more widely. *See id.* at 551. The ability of one side of the transaction to affect the other side's decision about which credit card to use is called the "indirect network effect." *Id.* at 545. In assessing whether the vertical restraint is procompetitive or anticompetitive, it is important for the factfinder to take the indirect network effect into account.

A plaintiff satisfies the first step of the rule of reason through either direct or indirect evidence. Direct evidence requires "proof of actual detrimental effects on competition," while indirect evidence requires "proof of market power plus some evidence that the challenged restraint harms competition." *Id.* at 542. Direct

28

evidence of anticompetitive effects includes "reduced output, increased prices, or decreased quality in the relevant market." *Id.* In this case, Plaintiffs rely on direct evidence of increased prices to show anticompetitive effects. (Pl. Opp. at 11.)

Amex argues that summary judgment is warranted for two reasons: First, "Plaintiffs have adduced no evidence that the two-sided price for GPCC transactions is *supra-competitive*, as opposed to simply (purportedly) higher," (Amex Mot. at 27); and second, Plaintiffs improperly ignore the effect that NDPs have on spurring credit cardholder rewards. (*Id.* at 27-29.) Because genuine disputes of fact remain, summary judgment is denied.

Amex relies on *Ohio v. Am. Express* to argue that Plaintiffs cannot rely on an increase in the two-sided price to establish anticompetitive effects. (*Id.* at 26.) In *Ohio v. Am. Express,* the plaintiffs "stake[d] their entire case on proving that Amex's agreements increase[d] merchant fees" by pointing out that Amex was able to repeatedly increase merchant fees between 2005 and 2010. 585 U.S. at 547-49. The issue in *Ohio v. Am. Express* was that the plaintiffs relied on real-world evidence of price increases on one side of the market that were also consistent with an increase in demand when contemplating the two-sided market. *Id.* at 549. The Court held that the plaintiffs could not show anticompetitive effects while ignoring how the two sides of the platform interact. *See id.* at 552.

Plaintiffs in this case try a different tack. Rather than relying on real-world evidence of an increase in prices on one side of the two-sided market, as the plaintiffs in *Ohio v. Am. Express* did, Plaintiffs here compare the real-world two-sided price to the two-sided price that would exist in a but-for model of the world in which there were no NDPs. (*See, e.g.,* Lamb Report ¶ 364.) Plaintiffs have presented evidence that the NDPs increased two-sided prices when comparing the real world to the but-for world; *Ohio v. Am. Express* does not require more.

29

Amex further faults Plaintiffs and their economic expert, Dr. Lamb, for his determination "that annual fees net of rewards would not increase" when economic theory suggests that they would. (Amex Mot. at 28.) But even if Amex is correct that economic theory suggests that annual fees net of rewards would increase in the but-for world, it is still possible that the two-sided price is supra-competitive.

Dr. Lamb predicted that the discount rate that Amex would charge merchants would be lower in the but-for world. (Lamb Report ¶ 359.) And he opined that because Amex sets its discount rate independently of costs, a reduction in discount fee revenue would not necessarily lead to a reduction in credit card rewards. (*Id.* ¶¶ 154-57.) Instead, Amex sets its prices to merchants based on the "value" it provides, because Amex transactions are more profitable for the merchant than the average transaction. (*Id.* ¶ 154.) The extent to which credit card rewards are lower in the but-for world, and whether they decrease by more than the amount of the reduction in discount fees, is a question of fact that precludes summary judgment.

If Plaintiffs carry their burden and show direct evidence of anticompetitive effects by way of higher prices, the burden then shifts to Amex to show that there are procompetitive efficiencies that justify the restraint. It is worth remembering that for much of the history of the credit card industry, Amex was on the receiving end of its competitors' anticompetitive practices. Visa and Mastercard began as banking cooperatives, each with tens of thousands of overlapping member banks. *See United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 235 (2d Cir. 2003). Because each network had thousands of banks, Visa and Mastercard were able to facilitate credit card transactions through already existing banking relationships. *Id.* And, crucially for Amex, the network rules explicitly prohibited member banks from issuing Amex cards

30

while also accessing the Visa and Mastercard networks, effectively thwarting Amex's expansion. *Id.* at 237. In 2001, Visa and Mastercard's exclusionary rule was enjoined as an illegal restraint on trade, which the Second Circuit affirmed. *Id.* at 236; *see also United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322, 408 (S.D.N.Y.), *modified*, 183 F. Supp. 2d 613 (S.D.N.Y. 2001).

Around the same time, Visa also implemented a "We Prefer Visa" marketing strategy in response to a growing competitive threat from Amex. (Lamb Report ¶ 191; Emch Report ¶ 288.) The campaign focused on convincing merchants to express a preference for Visa at the point of sale, and it effectively shifted market share from Amex to Visa. (Lamb Report ¶¶ 193-94.) In response, Amex beefed up its NDPs and restricted Amex-accepting merchants from engaging in Visa's preference campaign. (*Id.* ¶ 196.)

In *Ohio v. American Express*, the Court noted that NDPs stem negative externalities from indirect network effects and encourage investment in the Amex cardholder experience. *Ohio v. Am. Express*, 585 U.S. at 551. A preference campaign may degrade the customer experience, which in turn could reduce the cardholder's propensity to use an Amex card; the NDPs can protect the network against such campaigns. Because the cardholders' insistence affects the merchants' willingness to accept payments via an Amex card, point of sale steering could harm competition by degrading the Amex network and reducing its ability to effectively compete against Visa, Mastercard, and Discover.

But a jury could find that the procompetitive efficiencies today are less than they were under the facts that the *Ohio v. Am. Express* court considered. Because starting a two-sided platform requires coordinating two distinct parties with potentially divergent interests, there is a high barrier to entry and to expansion for credit card networks. This coordination issue is referred to as the "chicken-and-egg problem." (*See* Emch Report ¶ 283; Lamb Report ¶ 64.) Creating an effective payment network requires

convincing two separate consumers to jointly consume a product at the same time. But a merchant will not sign up for a network that has no users, while a customer will not sign up for a credit card that merchants do not accept. (*See* Emch Report ¶ 283.)

Amex and other operators in two-sided markets can surmount the chicken-and-egg problem by subsidizing one side of the market to spur the other side to join the network. (Lamb Report ¶ 64.) By offering Amex cardholders rewards that create an incentive for cardholders to spend more than average, Amex also incentivizes merchants to join the network and reap the benefits of a having a wealthier customer base that spends more. *Ohio v. Am. Express*, 585 U.S. at 548. Amex in effect invests in its cardholders to create "cardholder insistence" that persuades merchants to join the Amex network. *United States v. Am. Express Co.*, 838 at 202-03. The NDPs protect this investment by preventing merchant free-riding, in which they would enjoy the benefits of high-spending customers without having to pay the associated higher merchant fees. *Ohio v. Am. Express*, 585 U.S. at 551.

Because of the coordination required to establish a nascent payment network, a preference campaign that targets merchants in the network's expansion phase can be particularly devastating. (Lamb Report ¶ 64.) The value of the network grows as more merchants and cardholders join the network, (*id.*), so a well-timed steering campaign can have externalities on the ability of the network to wholesale compete with other networks. If merchants are persuaded to not accept a type of payment before the cardholders can demonstrate, through their high spending, the benefits of accepting that type of payment, then it is possible that the up-and-coming payment network never overcomes the chicken-or-egg problem, and competition would be harmed.

When the state and federal governments last challenged Amex's NDPs, Amex was in the process of expanding its network. At the time, the Amex network was substantially smaller than those of

Visa, Mastercard, and Discover, with 6.4 million locations accepting Amex compared to over 9 million that accepted Visa, Mastercard, and Discover. *Ohio v. Am. Express*, 585 U.S. at 537-38. The Supreme Court emphasized the important role that the NDPs played in promoting "welcome acceptance," and the debilitating effect that a lack of welcome acceptance could have had on the viability of the Amex network. *Id.* at 551.

The difference in the size of the network was further relevant because it was evidence of competition that existed for merchant acceptance, despite the imposition of the vertical restraint: "Perhaps most importantly, [NDPs] do not prevent Visa, MasterCard, or Discover from competing against Amex by offering lower merchant fees or promoting their broader merchant acceptance." *Id.* Even with a vertical restriction on steering, merchants were able to exert negative downward pressure on Amex's discount fees by declining to join the Amex network.

Since the governments' challenge, however, merchant acceptance has diminished as a source of competition. There is no longer a meaningful difference in merchant acceptance between Amex and its competitors, with 10.6 million locations accepting Amex in 2019 compared with 10.7 million accepting its competitors. (Emch Report ¶ 159 & n.300.) And while the chicken-and-egg problem means that a restraint may be justified to overcome the high barrier to entry in the credit card transactions market, a jury could find that such a restraint is not necessary to *maintain* its position in the network. (*See* Lamb Report ¶ 65 (distinguishing between the merchant acceptance externalities for emerging and mature markets).) It is possible that the procompetitive efficiencies of a restraint are different for a firm attempting to expand the reach of its network to the size of that of its competitors than one that has reached parity.

Finally, if Amex carries its burden to show that NDPs create procompetitive efficiencies, the burden then shifts back to Plaintiffs

33

in the third step of the rule of reason analysis. To prevail, Plaintiffs must show that there are less anticompetitive means of achieving the same procompetitive efficiencies. A jury could find that Plaintiffs have met their burden.

Though often referred to as a single restraint throughout this litigation, it is worth keeping in mind that NDPs are a series of several restraints. Even if a jury finds that some restraints with procompetitive justifications are narrowly constructed to minimize their anticompetitive effects, a jury is not required to find that to be true for all NDPs. The NDPs cover a variety of merchant practices that are similar in nature but potentially have distinct effects on competition and customer experience. As discussed above, Amex's NDPs prohibit merchants from expressing a preference for one payment over another. Even if a jury finds that the procompetitive efficiencies of preventing an anti-Amex preference marketing campaign justify the restraint, that does not necessarily imply that it would necessarily find that a different provision, say that restricts surcharging, is equally procompetitive. That is particularly true at this stage of the litigation, where the court is free to credit Dr. Lamb's opinion that surcharging would be limited in the but-for world but that the freedom from the restraint would allow merchants to bargain for lower discount fees. (*See* Lamb Reply ¶ 50; *Daubert* Hearing Tr. at 94:20-23.)

In short there remains a question of fact as to whether Plaintiffs carry their burden under the rule of reason. Summary judgment is therefore denied.

### E.   Damages

Amex's final argument that it recycles from its class certification briefing is that summary judgment is warranted because Plaintiffs cannot establish damages. (Amex Mot. at 29-33.) Amex makes two familiar arguments as to damages: First, Dr. Lamb does not account for steering and surcharging in his damages

model. (*Id.* at 30-31.) And second, Dr. Lamb's failure to consider steering and surcharging at non-Qualifying Merchants does not satisfy *Comcast*. (*Id.* at 31-33.)

The "burden of proving antitrust damages is not as rigorous as in other types of cases." *New York v. Julius Nasso Concrete Corp.*, 202 F.3d 82, 88 (2d Cir. 2000). That is because, in antitrust cases, there is often a lack of available market information that is unaffected by the defendant's allegedly anticompetitive restraint on trade. *New York v. Hendrickson Bros.*, 840 F.2d 1065, 1077-78 (2d Cir. 1988). "Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim. It would be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery, by rendering the measure of damages uncertain." *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946). Therefore, to satisfy their burden to show damages, plaintiffs in antitrust actions "need only provide the court with some relevant data from which the district court can make a reasonable estimated calculation of the harm suffered. In this way, the finder of fact can make 'a just and reasonable inference' of damages based on the proof available." *Julius Nasso*, 202 F.3d at 89. As the court previously ruled in its Memorandum and Order granting class certification, Dr. Lamb's model of damages is sufficiently rigorous to be put before a jury. (Class Cert. Mem. & Order at 42.)

### 1.    Steering and Surcharging

Amex argues that Dr. Lamb's model overstates damages because it does not account for steering and surcharging that would overwhelm any benefit that class members receive in the but-for world. (Amex Mot. at 30-31.) As outlined above, there are significant factual disputes about the extent to which steering and surcharging will occur in the but-for world such that failure to incorporate them into the damages model cannot be the basis for granting summary judgment.

Dr. Lamb's model of damages, the details of which are discussed
more in depth in the court's Class Certification Memorandum
and Order, has two steps: First, Amex will lower payment pro-
cessing fees in response to a merchant's credible threat to steer
or surcharge. (*See* Class Cert. Mem. & Order at 39-46.) And sec-
ond, merchants will pass along their lower costs to class members
in the form of lower prices. (*See id.* at 46-53.) The second step is
the focus of Amex's objection.

Dr. Lamb opined that merchants would pass through 90% of sav-
ings to customers. (Lamb Report ¶ 368.) He came to this
conclusion based on a meta-study done by the central banks of
the United States and Canada that concluded that 90% was the
median pass-through rate for industry-wide changes in costs.
(*Id.*) Because Dr. Lamb calculated damages on a class-wide basis,
the 90% estimated pass-through rate is an average of the rate
that Qualifying Merchants would pass on. (*See* Class Cert. Mem.
& Order at 20 n.9 (explaining averages).) Dr. Gaier did not dis-
pute that merchants would pass on cost savings to customers, but
he did dispute that 90% was the correct rate. (*See id.* at 48 (citing
Gaier Report ¶ 126).)

Amex's argument about steering and surcharging is an extension
of the parties' disagreement about the correct pass-through rate.
To illustrate, suppose that Qualifying Merchants passed along
90% of the cost savings they received to class members in the
form of lower prices, but they also added a surcharge to cover
the payment processing cost on five percent of the credit card
transactions. If that were the case, then the estimated pass-
through rate would be lower than 90%, as merchants would not
pass through savings (and indeed would pass through costs) on
the surcharged transactions. If the surcharging were to be so
prevalent as to completely offset any savings, then the correct

36

pass-through rate would be zero percent. At its core, this is a factual dispute about the correct pass-through rate, and so summary judgment is not warranted.

The cases that Amex cites in support do not dictate a different result. In *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, the Ninth Circuit held that plaintiffs in an antitrust case can only recover damages for injuries that resulted from the defendant's anticompetitive conduct. 791 F.2d 1356, 1368 (9th Cir. 1986). Amex relies on *Los Angeles Mem'l Coliseum* to argue that Dr. Lamb's model must offset damages for harms that Plaintiffs would suffer in the but-for world. But the Ninth Circuit decided *Los Angeles Mem'l Coliseum* after all factual disputes had been resolved at trial. Here, on summary judgment, a jury could find Dr. Lamb's variation of the but-for world, in which surcharging is baked into the model, to be more compelling. In that case, offsets would not be necessary. Amex similarly relies on *In re Namenda Indirect Purchaser Antitrust Litig.*, but *Namenda* also does not require Plaintiffs' damages model at summary judgment to account for offsets that they argue do not exist in the but-for world. 338 F.R.D. 527, 557 (S.D.N.Y. 2021).

The only case that addresses what level of specificity of damages is required at summary judgment is *Toscano v. PGA Tour, Inc.*, 201 F. Supp. 2d 1106, 1124 (E.D. Cal. 2002). In *Toscano*, the District Court for the Eastern District of California, relying on Ninth Circuit precedent, held that summary judgment would be warranted based on the plaintiffs' damages model if "there is no admissible evidence of damages" or "if the plaintiff's sole evidence of damages is seriously flawed in some way that cannot be remedied before or at trial." *Id.* (citing *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 808 (9th Cir. 1988), *D.A. Rickards v. Canine Eye Registration Found., Inc.*, 704 F.2d 1449, 1452 (9th Cir. 1983), and *City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361,

1372 (9th Cir. 1992)). Though not binding on this court, Plaintiffs in this case satisfy both *Toscano* conditions. There is admissible evidence of damages because the court denied Amex's *Daubert* motion to exclude Dr. Lamb's testimony, finding that it was relevant and helpful. (*See* Class Cert. Mem. & Order at 22.) And if the jury finds that harms from steering in the but-for world warrant offsetting the damages, there is no indication that Dr. Lamb could not add that discrete feature to his existing model as necessary. *Cf. City of Vernon*, 955 F.2d at 1372 (plaintiffs' sole evidence of damages did not segregate losses from legal and illegal conduct). Permitting Dr. Lamb's model of damages to survive summary judgment is consistent with Second Circuit and Supreme Court case law that consistently permit damages models that allow "the finder of fact [to] make a just and reasonable inference of damages." *Julius Nasso*, 202 F.3d at 89; *see also Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) ("Calculations need not be exact.").

### 2.   Non-Qualifying Merchants

Amex also argues that there is no factual dispute that Dr. Lamb's damages methodology does not consider harms that may occur from class member purchases at small merchants. (Amex Mot. at 31-33.) However, for the reasons discussed above, failure to include an aspect of the but-for world over which there is a factual dispute does not doom Dr. Lamb's damages model at summary judgment. Dr. Lamb contests that class members are worse off from their purchases at non-Qualifying Merchants. (*See* Gaier Report ¶ 91 & n.165 (quoting Deposition of Dr. Lamb).) Further, because the court previously excluded Dr. Gaier's testimony about non-Qualifying Merchants, Amex is unable to point to any facts in the record to support its motion on this ground. (*See* Class Cert. Mem. & Order at 24; *see generally Daubert* Reconsideration Mem. & Order.)

Amex's motion for summary judgment based on challenges to Dr. Lamb's damages model fails.

## V. CONCLUSION

For the foregoing reasons, Plaintiffs' motion for partial summary judgment is GRANTED in part and DENIED in part; Plaintiffs' motion for summary judgment on the geographic market is GRANTED on consent; its motion is GRANTED as to emerging payment technology transactions and DENIED as to debit card transactions. Amex's motion for summary judgment is GRANTED in part and DENIED in part; Amex's motion for summary judgment as to the Ohio Consumer Sales Practices Act claim is GRANTED and is otherwise DENIED. Plaintiffs Sherie McCaffrey and Marilyn Baker are DISMISSED.

Plaintiffs' antitrust claims under the laws of Alabama, District of Columbia, Kansas, Maine, Mississippi, North Carolina, Oregon, and Utah, and consumer protection claims under Illinois law will proceed to trial. The parties are DIRECTED to confer and contact the chambers of Magistrate Judge Sanket J. Bulsara to schedule a pre-trial conference.

SO ORDERED.

Dated:   Brooklyn, New York
         August 23, 2024

                                    s/Nicholas G. Garaufis
                                    NICHOLAS G. GARAUFIS
                                    United States District Judge