UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

TERRY GAYLE QUINTON, SHAWN O'KEEFE, ANDREW AMEND, DAVID MOSKOWITZ, NATE THAYER, RICKY AMARO, NANCI-TAYLOR MADDUX, ABIGAIL BAKER, WYATT COOPER, JAMES ROBBINS IV, MARILYN BAKER, SHERIE MCCAFFREY, ALLIE STEWART, ELLEN MAHER, DEBBIE TINGLE, ANGELA CLARK, EMILY COUNTS, and SARAH GRANT, on behalf of themselves and all others similarly situated,

**MEMORANDUM & ORDER**
**19-CV-566 (NGG) (JRC)**

Plaintiffs,

-against-

AMERICAN EXPRESS COMPANY and AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, INC.,

Defendants.

NICHOLAS G. GARAUFIS, United States District Judge.

Pending before the court are Plaintiffs' and Defendants American Express Company and American Express Travel Related Services Company, Inc.'s (collectively, "Amex") respective motions *in limine,* numbering seven in total. (Pls.' First Mot. (Dkt. 260); Pls.' Second Mot. (Dkt. 261); Pls.' Third Mot. (Dkt. 262); Pls.' Fourth Mot. (Dkt. 263); Amex's First Mot. (Dkt. 264-1); Amex's Second Mot. (Dkt. 265-1); Amex's Third Mot. (Dkt. 266-1).) The parties oppose each other's motions. (Amex's First Opp. (Dkt. 270); Amex's Second Opp. (Dkt. 271); Amex's Third Opp. (Dkt. 272); Amex's Fourth Opp. (Dkt. 273); Pls.' First Opp. (Dkt. 275); Pls.' Second Opp. (Dkt. 276); Pls.' Third Opp. (Dkt. 277).) For the reasons that follow, Plaintiffs' motions *in limine* are GRANTED in part and DENIED in part, and Amex's motions *in limine* are GRANTED in part and DENIED in part.

1

## I.  BACKGROUND

The court assumes familiarity with the factual background and procedural history of this long-running antitrust dispute and refers to facts in the discussion section as necessary to evaluate the parties' arguments. More detailed accounts of the facts underlying this Memorandum and Order are available in the court's past orders and in the opinions stemming from the merchants' and federal and state governments' previous cases on this issue. *See Oliver v. Am. Express Co.*, No. 19-CV-566 (NGG) (SJB), 2024 WL 100848, at *1-2 (E.D.N.Y. Jan. 9, 2024), *amended in part*, 2024 WL 217711 (E.D.N.Y. Jan. 19, 2024), *reconsideration denied*, 2024 WL 3086266 (E.D.N.Y. June 21, 2024); *United States v. Am. Express Co.*, 88 F. Supp. 3d 143, 149-167 (E.D.N.Y. 2015); *United States v. Am. Express Co.*, 838 F.3d 179, 184-93 (2d Cir. 2016); *Ohio v. Am. Express Co.*, 585 U.S. 529, 529-40 (2018); *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 361 F. Supp. 3d 324, 331-33 (E.D.N.Y. 2019).

As relevant here, the parties submitted their fully briefed motions *in limine* on February 21, 2025, and their proposed jury instructions, verdict forms, voir dire, and, in the case of Plaintiffs, a statement of damages, on February 28, 2025. (Amex's First Opp.; Amex's Second Opp.; Amex's Third Opp.; Amex's Fourth Opp.; Pls.' First Opp.; Pls.' Second Opp.; Pls.' Third Opp; Amex's Proposed Jury Instrs. (Dkt. 278); Amex's Proposed Verdict Form (Dkt. 278-1); Amex's Proposed Voir Dire (Dkt. 279); Pls.' Proposed Jury Instrs. (Dkt. 282); Pls.' Proposed Verdict Form (Dkt. 282-1); Pls.' Proposed Voir Dire (Dkt. 283); Pls.' Statement of Damages (Dkt. 284).) Trial in this case is set to begin on July 28, 2025. Both parties move *in limine* requesting several rulings in

advance of trial. The court considers Plaintiffs' motions *in limine* before turning to Amex's motions.[1]

## II. LEGAL STANDARD

The purpose of motions *in limine* is "to aid the trial process by enabling the [c]ourt to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial." *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996).[2] "Evidence should be excluded on a motion *in limine* only when the evidence is clearly inadmissible on all potential grounds." *Jean-Laurent v. Hennessy*, 840 F. Supp. 2d 529, 536 (E.D.N.Y. 2011). The Federal Rules of Evidence ("FRE") govern the admissibility of evidence at trial.

"[C]ourts considering a motion *in limine* may reserve decision until trial, so that the motion is placed in the appropriate factual context." *Id.* A district court's ruling on a motion *in limine* is preliminary and "subject to change when the case unfolds, particularly if the actual testimony differs from what was [expected]." *Luce v. United States*, 469 U.S. 38, 41 (1984). As such, at trial, the court may exercise its discretion "to alter a previous *in limine* ruling." *Id.* at 41-42.

## III. PLAINTIFFS' MOTIONS

Plaintiffs move *in limine* to preclude (1) evidence or argument concerning the absence of Plaintiffs during trial; (2) "cumulative

---

[1] This Memorandum and Order deals only with the parties' respective motions *in limine*; the court will finalize the jury instructions and verdict form at a later date. The magistrate judge randomly assigned to conduct jury selection will decide whether and how to implement the parties' proposed voir dire.

[2] When quoting cases, unless otherwise noted, all citations and internal quotation marks are omitted, and all alterations are adopted.

expert testimony"; (3) certain third-party publications; and (4) evidence or testimony concerning the Class Representatives' adequacy. (*See* Pls.' First Mot.; Pls.' Second Mot.; Pls.' Third Mot.; Pls.' Fourth Mot.) The court addresses each motion in turn.

### A. The Absence of Plaintiffs During Trial

First, Plaintiffs request that the court preclude Amex from "offering evidence or argument concerning the absence of the Class Representative Plaintiffs or other Plaintiffs (such as dismissed Plaintiffs or previously proposed Plaintiffs) . . . during the trial pursuant to Rules 401, 402, and 403." (Pls.' First Mot. at 1.) Plaintiffs state that, while the Class Representative Plaintiffs plan to testify in person at trial, because they are from 9 different states, they do not intend to remain in the courtroom during the entirety of the 16-day trial. (*Id.*) However, Plaintiffs suspect that Amex "may seek to improperly bolster an argument that the Class Representative Plaintiffs or other Plaintiffs are uninterested in the outcome of the trial . . . by referring to their absence from the courtroom." (*Id.*) Plaintiffs assert that such an argument would run afoul of FRE 401, 402, and 403, and therefore request that the court prohibit Amex from referencing the attendance or non-attendance of the Class Representative Plaintiffs at trial. (*Id.*)

Amex opposes Plaintiffs' motion on two bases. First, Amex represents that it "has no intention of" making comments about the presence or absence of Plaintiffs during trial, and, as such, there is "no live dispute" regarding this issue. (Amex's First Opp. at 1.) Second, Amex asserts that Plaintiffs' motion must be denied because their requested relief uses "loose language" and "skirts a serious concern" held by Amex: that Plaintiffs "must call their own witnesses to testify live at trial," rather than present their testimony by deposition designation. (*Id.*)

The parties' respective submissions demonstrate that there is no live dispute as to this issue. Amex does not intend to comment on the presence or absence of Plaintiffs during trial, and the Class

4

Representative Plaintiffs plan to testify in person at trial. As such, Plaintiffs' first motion *in limine* is denied without prejudice to renewal should Amex retreat from its current position at trial. Furthermore, should Amex decide to raise this issue at trial, Amex must provide the court and Plaintiffs with 24 hours' notice of its intent to do so.

### B.  Expert Testimony

Second, Plaintiffs request that the court bar Amex from introducing "cumulative" expert testimony at trial pursuant to FRE 403. (Pls.' Second Mot. at 1.) Amex's Trial Witness List provides that Amex "will call" three expert witnesses at trial: Dr. B. Douglas Bernheim, who will testify to "[p]rocompetitive justifications of Amex's [Non-Discrimination Provisions, or] NDPs"; Dr. Eric Emch, who will testify to "[c]ompetitive effects"; and Dr. Eric M. Gaier, who will testify to "[i]njury, causation, and damages." (Amex's Trial Witness List (Dkt. 258-2) at 5; Pls.' Second Mot. at 1.) Plaintiffs contend that Drs. Emch and Bernheim are likely to testify on the "[o]verlapping" issue of competitive effects, which "entails examining both anticompetitive harms and any procompetitive benefits of a restraint." (Pls.' Second Mot. at 3.) Additionally, Plaintiffs assert that Drs. Gaier and Bernheim may offer "overlapping testimony" on the issue of surcharging, including whether surcharging "is beneficial, detrimental, or neutral for competition." (*Id.*) Plaintiffs cite the Doctors' respective expert reports in support of their concerns that the experts will needlessly present cumulative evidence. (*Id.* at 3-4.) Plaintiffs assert that duplicative testimony from these experts "would provide Amex with an unfair advantage," allowing the jury to hear "two experts for Amex addressing the same core questions, while the jury only hears from one expert for Plaintiffs." (*Id.*) Thus, Plaintiffs request that the court "enter an Order barring [Amex] from eliciting cumulative expert testimony." (*Id.* at 5.)

Amex opposes Plaintiffs' motion on three bases. First, Amex asserts that because Amex's experts have yet to testify, the extent of overlap in their testimony, if any, is unknown. (Amex's Second Opp. at 1.) Therefore, Amex claims that there is no live dispute regarding this issue. (*Id.*) Second, Amex argues that the opinions offered by Drs. Emch, Bernheim, and Gaier are not duplicative. (*Id.*) According to Amex, Dr. Emch will opine that Dr. Lamb, Plaintiffs' expert, fails to demonstrate that Amex's NDPs have a substantial anticompetitive effect in the relevant market, while Dr. Bernheim will opine that Amex's NDPs actually have *procom*petitive effects, and Dr. Gaier will criticize Dr. Lamb's theory of injury and damages. (*Id.* at 2-4.) Third and finally, Amex contends that, to the extent the experts may "refer to similar foundational terms and principles" in their testimony, "some duplication does not render an expert's testimony *needlessly* cumulative pursuant to [FRE] 403." (*Id.* at 1, 9.) Amex represents that it "has no plans to present unnecessarily duplicative testimony." (*Id.* at 4.)

"The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. "Evidence is cumulative when it replicates other admitted evidence, and the exclusion of relevant, but cumulative, evidence is within the discretion of the trial court." *United States v. Jamil*, 707 F.2d 638, 643 (2d Cir. 1983). When multiple expert witnesses express the same opinion on a subject, such testimony "is a waste of time and needlessly cumulative." *On Track Innovations Ltd. v. T-Mobile USA, Inc.*, 106 F. Supp. 3d 369, 414 (S.D.N.Y. 2015). It also "raises the unfair possibility that jurors will resolve competing expert testimony by 'counting heads' rather than evaluating the quality and credibility of the testimony." *Id.*

The court will not preclude the anticipated testimony of Drs. Emch, Bernheim, or Gaier at this time. The court agrees with Amex that Plaintiffs' motion is premature. Regardless of the information contained in their respective expert reports, Drs. Emch, Bernheim, and Gaier have yet to testify. It is therefore unknown whether the overlap in their reports, if any, will materialize in their testimony at trial. As of now, Amex represents that its experts will opine on distinct topics—Dr. Emch on the issue of "substantial anticompetitive effect," the first element of the three-step, burden-shifting rule of reason framework; Dr. Bernheim on the issue of "procompetitive rationale," the second element of the rule of reason framework; and Dr. Gaier on the issue of Dr. Lamb's theory of injury and damages. *See Ohio*, 585 U.S. at 541-42 (outlining the burden-shifting framework). (Amex's Second Opp. at 2-4; *see also* Amex's Trial Witness List at 5.)

The court disagrees with Plaintiffs that Dr. Emch, in opining on the first element of the burden shifting framework, "necessarily addresses the procompetitive side of the ledger." (Pls.' Second Mot. at 3.) And the fact that the term "surcharging" appears 120 times in Dr. Gaier's report and 94 times in Dr. Bernheim's report does not necessarily mean that both experts will "delve into surcharging" at trial. (*Id.*) Until Amex's experts actually seek to offer needlessly cumulative opinions at trial, the court will not preemptively limit their testimony. *See Jamil*, 707 F.2d at 643 ("At this stage of the litigation, when the trial has not yet commenced and no evidence has yet been put before a jury, it is premature to conclude that this evidence is cumulative."); *Ali v. Connick*, No. 11-CV-5297 (NGG) (VMS), 2016 WL 3002403, at *11 (E.D.N.Y. May 23, 2016) ("[A]t this time it is impossible to know whether one witness's testimony will be cumulative of another witness's because neither has testified. . . . If it turns out at trial that the testimony of Plaintiff's [witnesses] is cumulative, Defendants may raise their objection then."); *Aristocrat Leisure*

*Ltd. v. Deutsche Bank Trust Co. Ams.*, 262 F.R.D. 293, 299 (S.D.N.Y. 2009) ("[I]t is difficult to determine whether testimony will be cumulative or irrelevant before it is actually proffered.").

Furthermore, Plaintiffs' requested relief—an order "barring [Amex] from eliciting cumulative expert testimony"—is vague and overly broad. (Pls.' Second Mot. at 5.) Were the court to issue such an order, Amex would likely struggle to determine how it should comply. And as Amex points out, some overlap in testimony does not necessarily render that testimony needlessly cumulative under FRE 403. *See, e.g., Guardino v. Alutiiq Diversified Servs., LLC*, 457 F. Supp. 3d 158, 164 (N.D.N.Y. 2020) (noting that certain expert opinions, "although they may overlap, would not be needlessly cumulative"). Plaintiffs' requested relief would prohibit *any* cumulative testimony, a remedy not warranted under the Rules of Evidence.

At the same time, the court is sensitive to Plaintiffs' concerns. The court takes seriously the risk that jurors "will resolve competing expert testimony by 'counting heads' rather than evaluating the quality and credibility of the testimony." *On Track Innovations*, 106 F. Supp. 3d at 414. Ultimately, if Amex wishes to present in three witnesses opinions that could be presented in one, that is its prerogative (within the time limits agreed upon by the parties in their joint pretrial submission). But the court will not allow needlessly cumulative testimony at trial, especially from experts. As such, while the court is prepared to preclude needlessly cumulative expert testimony at trial, because it is unclear what that testimony will entail, Plaintiffs' second motion *in limine* is denied without prejudice to renewal.

### C. Third-Party Publications

Third, Plaintiffs request that the court preclude Amex from "using" 123 documents with their experts on direct examination, including: 13 third-party publications "that were not previously disclosed as a source relied upon by Amex's experts in forming

8

their previously disclosed opinions"; and 110 articles "that on their face cannot qualify as learned treatises under Rule 803(18)." (Pls.' Third Mot. at 1; *see also* Third-Party Publications (Dkt. 262-1) (containing first category of documents); Article Exs. (Dkt. 262-2) (containing second category of documents).) Plaintiffs also "call attention" to a third group of documents: over 100 articles "that Plaintiffs will likely object to . . . as lacking the foundation to qualify as learned treatises"; although Plaintiffs do not request preclusion of those documents at this juncture. (Pls.' Third Mot. at 1; *see also* Remaining Article Exs. (Dkt. 262-3) (containing third category of documents).) The court considers the first two groups of documents in turn.[3]

### 1.  First Group of Documents

Plaintiffs ask the court to preclude Amex "from reading into evidence or soliciting testimony on direct examination from" 13 third-party publications "that were not previously disclosed as a source relied upon by Amex's experts in forming their previously disclosed opinions." (Pls.' Third Mot. at 3; *see* Third-Party Publications (containing first category of documents).) Plaintiffs characterize Rule 803(18)(A) of the Federal Rules of Evidence as permitting a learned treatise to be read into evidence if an expert "relied on" that document during their direct examination. (Pls.' Third Mot. at 3.) Plaintiffs argue that Amex cannot meet this standard as to the 13 challenged documents because Amex's experts did not disclose those documents as relied upon in their expert reports. (*Id.*) Plaintiffs assert that allowing an expert to rely upon a document on direct examination that he did not disclose as relied upon in his expert report would also violate the disclosure requirement of Rule 26(a)(2)(B) of the Federal Rules

---

[3] The court does not consider the third group of documents, as the parties agree that the court should not "decide the issue of admissibility until and unless Amex offers [those] documents at trial." (Pls.' Third Mot. at 5; Amex's Third Opp. at 1 n.1.)

of Civil Procedure ("FRCP") and would "amount to offering undisclosed information at trial" in violation of FRCP 37(c)(1). (*Id.*) As such, Plaintiffs contend that the court should preclude Amex from using "any [of these 13 documents] with one of its experts on direct examination if that document was not relied on by that expert." (*Id.* at 4.)

Amex opposes Plaintiffs' request on three bases. (Amex's Third Opp. at 7-8.) First, Amex points out that 3 of the 13 objected-to articles *were* previously disclosed as relied upon by Amex's experts. (*Id.* at 7 n.19.) Second, Amex argues that Plaintiffs "wrongly assume" that Amex seeks to admit these documents into evidence at all, and that FRE 803(18) would be the sole basis for its doing so. (*Id.* at 7-8.) Amex points out that this court's Individual Rules require parties to disclose not only "exhibits to be offered in evidence" but also all "possible impeachment documents and/or exhibits, as well as exhibits that will be offered only on rebuttal." (*Id.* at 1 (quoting Individual Rules of Judge Nicholas G. Garaufis VI.A.10).) Because Amex has yet to offer these documents into evidence, Amex argues that Plaintiffs' motion is premature. (*Id.*) Finally, Amex contends that FRCP 37(c)(1), by its own terms, permits a party to rely on previously undisclosed information so long as the lack of disclosure was "substantially justified" or "harmless"; which standard is met here. (*Id.* at 8.)

FRCP 26 provides that a testifying expert must file a report containing, among other things, "a complete statement of all opinions the witness will express and the basis and reasons for them," and "the facts or data considered by the witness in forming [the opinions]." Fed. R. Civ. P. 26(a)(2)(B)(i); *see also New Old Music Grp., Inc. v. Gottwald*, 122 F. Supp. 3d 78, 92 (S.D.N.Y. 2015) ("It should be assumed that at the time an expert issues his report, that report reflects his full knowledge and complete opinions on the issues for which his opinion has been sought.").

The disclosure requirement "applies not only to information actually relied upon by a testifying expert, but also to information that was not relied upon, but considered by the expert." *Schwab v. Philip Morris USA, Inc.*, No. 4-CV-1945 (JBW), 2006 WL 721368, at *2 (E.D.N.Y. Mar. 20, 2006); *Tikkun v. City of New York*, 265 F.R.D. 152, 155 (S.D.N.Y. 2010) (same). Additionally, "[a] party who has made a disclosure under Rule 26(a) . . . must supplement or correct its disclosure" if "the party learns that in some material respect the disclosure . . . is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A); *see also Lewis v. FMC Corp.*, 786 F. Supp. 2d 690, 705 (W.D.N.Y. 2011) ("The duty to supplement arises when the expert subsequently learns of information that was previously unknown or unavailable, and the new information renders the earlier report incomplete or inaccurate.").

If a party fails to provide information as required by FRCP 26(a) or (e), "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1); *see also* Fed R. Evid. 402 Advisory Committee Note on Proposed Rules ("The Rules of Civil and Criminal Procedure in some instances require the exclusion of relevant evidence."). "The purpose of [FRCP 37(c)(1)] is to prevent the practice of sandbagging an opposing party with new evidence." *New Old Music Grp.*, 122 F. Supp. 3d at 92. The Second Circuit reviews a district court's decision to preclude evidence under FRCP 37(c)(1) for abuse of discretion, guided by the following considerations:

> (1) the party's explanation for the failure to comply with the disclosure requirement; (2) the importance of the testimony of the precluded witnesses; (3) the prejudice suffered by the

opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance.

*Design Strategy, Inc. v. Davis*, 469 F.3d 284, 296 (2d Cir. 2006).

It is undisputed that Amex's experts did not disclose 10 of the 13 objected-to documents as relied upon or considered authority. Thus, Amex "is not allowed to use that information . . . to supply evidence . . . at a trial, unless the failure [to disclose] was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

Amex's failure to disclose these documents was not substantially justified. Amex argues that its failure to disclose DX-547, DX-549, DX-603, DX-604, and DX-605 was justified because those documents were published *after* the disclosure of expert reports on January 16, 2023. (Amex's Third Opp. at 8.) While the court agrees that Amex's experts cannot be faulted for failing to disclose in their expert reports documents that did not yet exist, FRCP 26(e) creates a duty to supplement a report when an expert "learns of information that was previously unknown or unavailable, and the new information renders the earlier report incomplete or inaccurate." *Lewis*, 786 F. Supp. 2d at 705. Amex provides no justification for the failure to supplement its expert reports. Nor does Amex provide *any* justification for its failure to disclose the remaining five documents, all of which were published well before the expert disclosure date. (*See generally* Amex's Third Opp. at 8-9; Third-Party Publications.) As such, Amex's failure to disclose these documents was not substantially justified.

Nor was Amex's failure to disclose these documents harmless. Amex argues that "all of the [challenged documents] concern topics that Amex's experts previously disclosed as material to their expert opinions"; as such, "Plaintiffs can hardly claim they would somehow be prejudiced by Amex relying on [such] articles." (Amex's Third Opp. at 8-9.) The court disagrees. While the

topics covered in the objected-to documents may not be surprising to Plaintiffs, the fact remains that these documents constitute "new information" not previously disclosed as relied upon by Amex's experts. And Plaintiffs would, in fact, be prejudiced by Amex's experts' reliance on these documents because Plaintiffs and their experts would have little time to familiarize themselves with the new information ahead of trial. This practice of "sandbagging" is exactly what FRCP 26 and 27 are meant to prevent. *New Old Music Grp.*, 122 F. Supp. 3d at 92. Thus, Amex's failure to disclose these documents was not harmless.

*Farook v. Bailey*—the sole case relied upon by Amex in opposing Plaintiffs' request to preclude the first group of documents—does not convince the court otherwise. No. 5-CV-3785 (LTS) (DF), 2007 WL 2076764 (S.D.N.Y. July 16, 2007). There, defendants requested that the court "disregard" certain evidence proffered by the plaintiff in opposition to defendants' motion for summary judgment on the ground that the evidence was not previously disclosed pursuant to FRCP 26(a)(2). *Farook*, 2007 WL 2076764, at *2. The evidence included a report and several affirmations prepared by plaintiff's experts for the purpose of opposing defendants' motion. *Id.* The court rejected defendants' request to preclude, reasoning: "Because the issues [the materials] address were clearly known to Defendants prior to their disclosure and the materials apparently did not exist prior to the general deadline for disclosure of expert materials, the Court finds that Defendants have not been harmed by the timing of their disclosure." *Id.*

The circumstances in *Farook* are distinguishable from the present case. In *Farook,* the plaintiff produced new expert material in direct response to specific issues raised in defendants' motion for summary judgment; as such, defendants could not have been harmed or surprised by the timing of plaintiff's disclosure, and plaintiff could not have been expected to produce materials that

did not yet exist. Here, by contrast, Amex has produced new materials, not in connection with any specific arguments raised by Plaintiffs for the first time after the expert disclosure deadline, but in connection with Plaintiffs' claims and Amex's defenses more generally, all of which have been known to the parties for years. The excuse for and lack of prejudice in the belated disclosures in *Farook* are simply not applicable here.[4] As such, the court grants Plaintiffs' request to preclude Amex from reading into evidence or soliciting testimony on direct examination from the following 10 documents: DX-547, DX-549, DX-552, DX-553, DX-562, DX-563, DX-567, DX-603, DX-604, and DX-605.

As noted by Amex, either Dr. Bernheim's or Dr. Gaier's reports cite the remaining 3 documents—DX-323, DX-463, and DX-470. (*See* Third-Party Publications at 1; Redacted Bernheim Report (Dkt. 184-1) at ECF p. 20 n.143 (citing DX-323); Redacted Gaier Report (Dkt. 157-6) at ECF pp. 73 n.258 (citing DX-463), 126 n.321 (citing DX-470).) Nevertheless, Plaintiffs request that the court "preclude Amex from using any [document] on direct examination if that document was not relied on by that expert, even if the document was relied upon by one or more of Amex's other experts." (Pls.' Third Mot. at 4.) For the reasons articulated

---

[4] The considerations outlined by the Second Circuit in *Design Strategy, Inc.* also weigh in favor of granting Plaintiffs' request. 469 F.3d at 296. As discussed above, Amex provides virtually no explanation for its failure to comply with the disclosure requirements, and Plaintiffs would suffer prejudice from the introduction of this belatedly disclosed expert evidence. Moreover, Amex's assertion that the documents simply "concern topics that Amex's experts [already] disclosed as material to their expert opinions" leads the court to conclude that the documents are not critical to Amex's expert witnesses and their respective conclusions, for which they have already provided documentary support. (Amex's Third Opp. at 8.) Finally, while a continuance would be possible, neither party has requested it, and it is time for this long-running dispute to reach its conclusion. For these additional reasons, the court concludes that preclusion is warranted under FRCP 37(c)(1).

above, the court grants this aspect of Plaintiffs' request. To the extent a particular Amex expert did not disclose any of these documents as relied upon, Amex is precluded from reading that document into evidence via that witness or soliciting testimony from that witness regarding that document. *See In re Omeprazole Pat. Litig.*, Nos. M-21-81, 1291, 98-CV-3657 (BSJ), 98-CV-8094 (BSJ), 99-CV-8928 (BSJ), 99-CV-9888 (BSJ), 99-CV-8926 (BSJ), 99-CV-9887 (BSJ), 00-CV-4467 (BSJ), 2002 WL 287785, at *8 (S.D.N.Y. Feb. 27, 2002) (explaining that an expert "who never opined on [certain] documents at any time before trial[] may not now opine upon them or rely on them [at trial]").

### 2. Second Group of Documents

Plaintiffs request that the court exclude entirely 110 articles "that on their face cannot qualify as learned treatises under Rule 803(18)." (Pls.' Third Mot. at 1; *see also* Article Exs. (containing second category of documents).) Specifically, Plaintiffs contend that these documents—published by sources like Nerdwallet.com, Packagedfacts.com, and *The Los Angeles Times*—are "non-scholarly," unreliable, and cannot be considered "learned treatises" within the meaning of FRE 803(18)(A). (Pls.' Third Mot. at 4.) As such, Plaintiffs ask the court to exclude these "facially disqualified" exhibits in their entirety as inadmissible hearsay. (*Id.* at 5.)

Amex opposes Plaintiffs' request on four bases. (Amex's Third Opp. at 3-7.) First, because Amex has yet to introduce any of the challenged documents into evidence and has not given any details about how it plans to do so, Plaintiffs' motion is premature. (*Id.* at 3.) Second, to the extent Amex offers any of the documents for their truth, FRE 803(18)(A) is not the sole basis for their admission. (*Id.* at 4-5.) Third, Plaintiffs' assertion that all 110 documents fail to satisfy the requirements of FRE 803(18)(A) is incorrect. (*Id.* at 5-6.) Fourth and finally, even if

the documents are inadmissible, FRE 703 allows an expert to reveal the facts or data upon which they based their opinion "if their probative value in helping the jury evaluate the expert's opinion substantially outweighs their prejudicial effect." (*Id.* at 6.)

The court will not preclude these 110 documents at this time. The court agrees with Amex that Plaintiffs' motion is premature. As noted above, a court should exclude evidence on a motion *in limine* only when the evidence "is clearly inadmissible on *all* potential grounds." *Jean-Laurent*, 840 F. Supp. 2d at 536 (emphasis added). Even accepting Plaintiffs' argument that these documents do not fall within the learned treatise exception to the rule against hearsay, Plaintiffs presume that FRE 803(18)(A) is the only avenue through which Amex may seek to admit these documents, or that Amex intends to offer these documents for the truth of the matters asserted therein.[5] Because Plaintiffs have not demonstrated that these documents are clearly inadmissible on *all* potential grounds, the court will not exclude entirely the 110 objected-to documents.

In sum, Plaintiffs' third motion *in limine* is granted in part and denied in part without prejudice to renewal.

### D.  The Class Representatives' Adequacy

Finally, Plaintiffs request an order excluding "documents, live and/or designated testimony, and argument relating to issues going to the Class Representatives' adequacy," *i.e.*, FRCP 23(a)'s requirement that the "'representative parties will fairly and adequately protect the interests of the class.'" (Pls.' Fourth Mot. at 1

---

[5] As Amex points out, this court's Individual Rules require a party's schedule of "exhibits to be offered in evidence" to include "possible impeachment documents and/or exhibits, as well as exhibits that will be offered only on rebuttal." Individual Rules of Judge Nicholas G. Garaufis VI.A.10.

(citing Fed. R. Civ. P. 23(a)).) Specifically, Plaintiffs seek to preclude evidence concerning the Class Representatives': (a) knowledge of antitrust law and the claims asserted; (b) relationship to counsel; (c) circumstances of retaining counsel; and (d) agreement with counsel on attorneys' fees and costs. (*Id.*) Plaintiffs contend that this evidence "is irrelevant and inadmissible under Rules 401, 402, and 403 of the Federal Rules of Evidence." (*Id.* at 1, 4.)

Additionally, Plaintiffs assert that the court should reject any argument by Amex that the above evidence is probative of the Class Representatives' bias. (*Id.* at 3.) According to Plaintiffs, the Class Representatives will testify "that they are a resident of a state and made one or more purchases from a Qualifying Merchant located in that state during the applicable class period, using a debit card or non-rewards credit card."[6] (*Id.*) Plaintiffs add that such testimony "will be based on, and corroborated by, evidence of their purchases in the form of billing statements or other documents generated by third party financial institutions." (*Id.* at 3-4.) Thus, because the Class Representatives' testimony "will not depend on their memory or perception," Plaintiffs argue that Amex's purported evidence of bias "is irrelevant and inadmissible under Rules 401 and 402." (*Id.* at 4 ("That a class representative may not have a firm grasp of antitrust law or may have a close personal relationship with his or her counsel does not make the fact of qualifying purchases more or less probable.").) Moreover, permitting Amex to cross-examine the Class Representatives regarding their personal or familial relationship with counsel would, according to Plaintiffs, "result in confusion, delay, unfair prejudice and waste of time in contravention of Rule 403." (*Id.*)

---

[6] On this point, Amex notes that it plans to call the Class Representatives as witnesses, as well, to "examine them on broader issues about steering, surcharging, rewards, their own alleged harm and other issues related to the merits of Plaintiffs' claims." (Amex's Fourth Opp. at 11.)

17

As such, Plaintiffs request that the court exclude these four categories of evidence.

Amex opposes Plaintiffs' motion. As a preliminary matter, Amex asserts that it "will not try the issue of Rule 23(a) adequacy to the jury," because "[t]hat is a question for the Court, and the Court has answered it." (Amex's Fourth Opp. at 1.) However, Amex argues that Plaintiffs' motion should be denied as "vague and premature" because Plaintiffs seek to use Rule 23(a) "as a strawman to sweep in four vaguely described categories of evidence." (*Id.*) In any event, Amex contends that it should be permitted to examine the Class Representatives on these subjects because they are probative of the Class Representatives' bias. (*Id.* at 10-13.)

The court agrees with Amex that Plaintiffs seek to lump several disparate groups of evidence under the FRCP 23(a) umbrella. While Plaintiffs are correct that "the class representative's adequacy . . . is not a fact of consequence in determining liability or damages," they are incorrect that the above, broadly phrased categories of evidence pertain only to the issue of class adequacy. (Pls.' Fourth Mot. at 2.) Rather, as Amex points out, the evidence may go to other relevant issues like the Class Representatives' bias. (*See* Amex's Fourth Opp. at 10-13.) Thus, the court considers each group of evidence in turn.

### 1. Class Representatives' knowledge of antitrust law and the claims asserted

First, Plaintiffs request that the court preclude "documents, live and/or designated testimony, and argument relating to" the Class Representatives' knowledge of antitrust law and the claims asserted. (Pls.' Fourth Mot. at 1.) Plaintiffs contend that "any evidence that a class representative does not have a deep understanding of the case . . . has no probative value and must be excluded under Rules 401 and 402." (*Id.* at 2; *see also id.* at 4

("That a class representative may not have a firm grasp of anti-trust law . . . does not make the fact of qualifying purchases more or less probable.").) Amex, in addition to arguing that Plaintiffs' request must be denied as vague and premature, asserts that it is entitled to probe the Class Representatives' understandings of the factual bases for their claims. (Amex's Fourth Opp. at 7-9.) Specifically, while Amex "will not ask Class Representatives about their knowledge of 'antitrust law' or the legal basis for their claims," Amex asserts that Plaintiffs "must have knowledge of the factual basis for the[ir] claims." (*Id.* at 2 (emphases omitted).) This includes "their understanding of the factual bases for their own complaint, their experiences with surcharging, their views on rewards programs[,] and their understanding of . . . how they have been harmed by Amex's NDPs"; topics about which Amex has already elicited testimony from the Class Representatives. (*Id.* at 9.)

The court denies Plaintiffs' request to exclude all evidence concerning the Class Representatives' "knowledge of antitrust law and the claims asserted" as overly vague. A court "may deny motions *in limine* that are so vague that it cannot determine whether the disputed evidence would be inadmissible at trial." *Cantelmo v. United Airlines, Inc.*, No. 17-CV-1730 (NGG) (RER), 2019 WL 13147326, at *7 (E.D.N.Y. Sept. 30, 2019) (collecting cases). Plaintiffs' request is vague because it does not specify "the writings or potential testimony that [they] believe should be excluded"; as a result, the court "is unable to determine, with any degree of certainty, whether the writings and testimony sought to be excluded from the trial would be inadmissible under any of the provisions of the Federal Rules of Evidence." *Viada v. Osaka Health Spa, Inc.*, No. 4-CV-2744 (VM) (KNF), 2005 WL 3435111, at *1 (S.D.N.Y. Dec. 12, 2005). Moreover, the court agrees with Amex that it should be permitted to examine the Class Representatives regarding the factual bases for their complaint;

Plaintiffs' requested relief would seemingly prohibit such testimony. As such, Plaintiffs' request to exclude all evidence concerning the Class Representatives' "knowledge of antitrust law and the claims asserted" is denied without prejudice to renewal.

### 2. Class Representatives' relationships to counsel

Second, Plaintiffs request that the court preclude "documents, live and/or designated testimony, and argument relating to" the Class Representatives' relationships to counsel. (Pls.' Fourth Mot. at 1.) As discussed in a previous order, several Class Representatives have varying degrees of personal connections with class counsel. *Oliver*, 2024 WL 100848, at *17. For example, Abigail Baker is the niece of class counsel, Sarah Grant is a family friend of class counsel, and Emily Counts and Debbie Tingle are employed by an attorney who is an acquaintance of class counsel. *Id.* (Amex's Fourth Opp. at 2, 5-6.) Relying on this court's previous statement that "'counsel's relationship with certain class members does not make the named class members inadequate,'" Plaintiffs assert that "any evidence that a class representative . . . has a close relationship with counsel has no probative value and must be excluded under Rules 401 and 402." (Pls.' Fourth Mot. at 2 (quoting *Oliver*, 2024 WL 100848, at *17).)

Amex argues that evidence of the relationship between the Class Representatives and class counsel is probative of the Class Representatives' bias. (Amex's Fourth Opp. at 10.) Specifically, Amex asserts that it should be permitted to examine the Class Representatives about their relationships with counsel "so the jury may consider whether the prospect of a monetary recovery for class counsel influenced their decision to pursue their claims and offer favorable testimony." (*Id.* at 11.) Because proof of bias "is almost always relevant [to] the jury," Amex contends that it should be permitted to ask the Class Representatives about their relationships with counsel. (*Id.*)

Evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence;" and "(b) the fact is of consequence in determining the action." Fed. R. Evid. 401. All relevant evidence is admissible, except as otherwise provided by the U.S. Constitution, federal statute, or applicable rules. Fed. R. Evid. 402. "The Supreme Court has held that impeachment for bias is admissible under Rule 402 even when the impeachment material is not independently admissible under Rule 608 as concerning the witness's character for truthfulness or untruthfulness." *United States v. Figueroa*, 548 F.3d 222, 229 (2d Cir. 2008). In particular, a witness's credibility may be attacked "by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand." *Fuentes v. Griffin*, 829 F.3d 233, 247 (2d Cir. 2016). As the Supreme Court has explained:

> Bias is a term used in the "common law of evidence" to describe the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party. Bias may be induced by a witness' like, dislike, or fear of a party, or by the witness' self-interest. Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony.

*United States v. Abel*, 469 U.S. 45, 52 (1984); *see also Fuentes*, 829 F.3d at 247-48 (citing *Abel*'s interpretation of the definition of bias). A successful showing of bias has "a tendency to make the facts to which [the witness] testified less probable in the eyes of the jury than it would be without such testimony." *Fuentes*, 829 F.3d at 248. However, "[e]vidence of bias may not be admissible . . . where its probative value is substantially outweighed by a danger of unfair prejudice or where irrelevant to Plaintiff's

claims." *Ross v. Guy*, No. 18-CV-1340 (WFK) (PK), 2022 WL 768196, at *5 (E.D.N.Y. Mar. 14, 2022).

The court concludes that evidence of the Class Representatives' personal relationships with counsel is admissible for impeachment purposes. The Class Representatives' relationships with counsel are probative of their bias because they "might lead [the Class Representatives] to slant, unconsciously or otherwise, [their] testimony in favor of or against a party." *Abel*, 469 U.S. at 52. For example, the fact that Abigail Baker is class counsel's niece might cause Baker to slant her testimony in favor of Plaintiffs and against Amex, perhaps out of "fear" that her uncle may begrudge her for providing unhelpful testimony, or out of a desire to achieve a positive result for her uncle. *Id.* The same is true of the other Class Representatives with personal ties to counsel. This sort of evidence "is almost always relevant[,] because the jury . . . has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony." *Id.* As such, the court will permit Amex to impeach the Class Representatives for bias using their respective personal relationships with counsel.

Plaintiffs' arguments do not convince the court otherwise. The fact that Plaintiffs intend to cabin the Class Representatives' testimony to factual matters which may be confirmed via documentary evidence does not mean that Amex cannot inquire into the Class Representatives' respective biases. *See United States v. Guo*, No. 23-CR-118 (AT), 2024 WL 1939221, at *7 (S.D.N.Y. May 2, 2024) ("The law is well settled in this Circuit, as in others, that bias of a witness is not a collateral issue and extrinsic evidence is admissible to prove that a witness has a motive to testify falsely."). Additionally, this court's prior decision on class certification is inapplicable to the instant motion *in limine*: that the Class Representatives' personal relationships with counsel bore no relevance to class members' *adequacy* under FRCP 23 does not

necessarily mean that their personal relationships bear no relevance to the question of their *bias* in testifying at trial. Finally, the court is satisfied that a limited inquiry into this probative issue will not unfairly prejudice Plaintiffs or confuse the jurors in contravention of FRE 403.

For the foregoing reasons, the court will permit limited inquiry into the Class Representatives' respective relationships with counsel for impeachment purposes. Plaintiffs' request that the court exclude all evidence concerning the Class Representatives' relationships to counsel is therefore denied.

### 3. Class Representatives' circumstances of retaining counsel

Third, Plaintiffs request that the court preclude "documents, live and/or designated testimony, and argument relating to" the Class Representatives' circumstances of retaining counsel, on the ground that such evidence is irrelevant. (Pls.' Fourth Mot. at 1-2 (citing *In re Yasmin & Yaz (Drospirenone) Mktg., Sales Pracs. & PMF Prods. Liab. Litig.*, No. 9-MD-2100 (DRH), 2011 WL 6740391, at *16 (S.D. Ill. Dec. 22, 2011)).)

Amex argues that the circumstances surrounding the Class Representatives' retention of counsel—specifically, the fact that class counsel "approached Class Representatives about retaining them and pursuing these claims"—is probative of the Class Representatives' bias. (Amex's Fourth Opp. at 12.) In support of its argument, Amex cites two out-of-circuit district court decisions and one decision from the Southern District of New York. (*Id.* at 11-12 (citing *Chavez v. Arancedo*, No. 17-CV-2003, 2018 WL 4627302, at *5 (S.D. Fla. Sept. 26, 2018); *In re Tableware Antitrust Litig.*, No. C-04-3514, 2007 WL 781960, at *2 (N.D. Cal. Mar. 13, 2007); *Antolini v. McCloskey*, No. 19-CV-9038 (GBD) (SDA), 2021 WL 5411176, at *10 (S.D.N.Y. Nov. 19, 2021)).)

Unlike their personal relationships with counsel, the circum-
stances surrounding the Class Representatives' retention of
counsel are irrelevant to the issue of bias. As noted above, the
term "bias" describes "the relationship between a party and a wit-
ness which might lead the witness to slant, unconsciously or
otherwise, his testimony in favor of or against a party." *Abel*, 469
U.S. at 52; *see also Fuentes*, 829 F.3d at 248 (noting that bias has
"a tendency to make the facts to which [the witness] testified less
probable in the eyes of the jury than it would be without such
testimony"). Amex does not explain how the fact that class coun-
sel approached Class Representatives to participate in this
lawsuit might lead the Class Representatives to slant their testi-
mony in favor of Plaintiffs or against Amex. Unlike their personal
relationships with counsel, which might motivate the Class Rep-
resentatives to alter their testimony in favor of their friends or
family, how counsel came to represent the Class Representatives
has no tendency to make a fact of consequence in determining
the action more or less probable. *See* Fed. R. Evid. 401. The fact
that class counsel approached the Class Representatives to par-
ticipate in this lawsuit is no more probative of their bias than the
simple fact that the Class Representatives are Plaintiffs, and
Amex is the Defendant. And even if such evidence bore some pro-
bative value, which it does not, its probative value would be
substantially outweighed by a risk of confusing the issues and
wasting time. Fed. R. Evid. 403. As such, Plaintiffs' request to ex-
clude all evidence concerning the circumstances surrounding the
Class Representatives' retention of counsel is granted.[7]

---

[7] *Antolini v. McCloskey*—the only in-circuit case cited by either party on this
issue—does not convince the court otherwise. There, plaintiff requested
that the court preclude the defendant from inquiring as to how plaintiff
and his attorney met, on the ground that such inquiries would abridge
plaintiff's attorney-client privilege. 2021 WL 5411176, at *10. Because the
attorney-client privilege did not extend to this information, the court found

4. Class Representatives' agreement with counsel on attorneys' fees and costs

Fourth, Plaintiffs request that the court preclude "documents, live and/or designated testimony, and argument relating to" the Class Representatives' agreement with counsel on attorneys' fees and costs. (Pls.' Fourth Mot. at 1.) Plaintiffs argue that such evidence is irrelevant and prejudicial, citing two out-of-circuit district court decisions and one decision from the Eastern District of New York where the court, without explanation, excluded reference to plaintiffs' counsel's 25% contingency fee. (*Id.* at 3 (citing *Pucci v. Litwin*, No. 88-CV-10923, 1993 WL 405448, at *1 (N.D. Ill. Oct. 4, 1993); *Bailey PVS Oxide (Delta) LLC v. Plas-Tanks, Inc.*, No. 2-CV-7363, 2005 WL 1377874, at *2 (N.D. Ohio June 6, 2005); *Falise v. Am. Tobacco Co.*, No. 99-CV-7392 (JBW), 2000 WL 1804602, at *1 (E.D.N.Y. Nov. 30, 2000)).)

Amex argues that the Class Representatives' agreement with counsel regarding attorneys' fees and costs is probative of the Class Representatives' bias. (Amex's Fourth Opp. at 12.) Specifically, Amex asserts that the jury "should be permitted to hear about how a Class Representative may be biased to testify favorably because his or her counsel—in some cases, an uncle or a lifelong family friend—stands to recover potentially millions of dollars in fees if Plaintiffs are successful at trial." (*Id.* at 13.) In support of its argument, Amex cites three out-of-circuit district court decisions and one decision from the Northern District of New York, where the court declined to preclude evidence or argument demonstrating that plaintiff's motive for filing suit was purely pecuniary. (*Id.* at 12-13 (citing *In re: EpiPen (Epinephrine*

---

"nothing inappropriate" about defense counsel's questions regarding how plaintiff and his attorney met. *Id.* Plaintiffs have not raised an attorney-client privilege argument here. And *Antolini* did not address whether the circumstances surrounding the plaintiff's retention of counsel were probative of his bias. As such, *Antolini* is inapposite.

*Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, No. 17-MD-2785, 2022 WL 226130, at \*6 (D. Kan. Jan. 26, 2022); *Simpson v. Brewer*, No. 19-CV-410 (NJR), 2021 WL 3511324, at \*4 (S.D. Ill. Aug. 10, 2021); *Primrose v. Mellott*, No. 11-CV-835, 2012 WL 3890135, at \*1 (M.D. Pa. Sept. 7, 2012); *Ferreira v. City of Binghamton*, No. 13-CV-107, 2016 WL 4991600, at \*15 (N.D.N.Y. Sept. 16, 2016)).)

The Class Representatives' fee arrangements with counsel are irrelevant to the issue of bias. Amex's sole argument in support of its position is that, because the Class Representatives have close personal relationships with counsel, they will be motivated to slant their testimony to ensure counsel receives their contingency fee. This argument is ultimately duplicative of Amex's earlier argument, that the Class Representatives' personal relationships with counsel expose their potential biases. As explained above, the court will permit Amex to examine the Class Representatives concerning their personal relationships with counsel; thus, the jury will understand that a win for the Class Representatives is also a win for the attorneys who are their family or friends. Unlike their personal relationships with counsel, however, Plaintiffs' retainer agreements and fee arrangements have no tendency to make a fact of consequence in determining the action more or less probable. And even if such evidence bore some probative value, which it does not, its probative value would be substantially outweighed by a danger of unfair prejudice and confusing the issues. *See Sparano v. JLO Auto., Inc.*, No. 19-CV-681 (VAB), 2022 WL 266159, at \*13 (D. Conn. Jan. 29, 2022) (adopting same approach); *Barbarian Rugby Wear, Inc. v. PRL USA Holdings, Inc.*, No. 6-CV-2652 (JGK), 2009 WL 884515, at \*8 (S.D.N.Y. Mar. 31, 2009) (same); *Falise*, 2000 WL 1804602, at

26

*1 (same). As such, Plaintiffs' request to exclude all evidence concerning the Class Representatives' agreement with counsel on attorneys' fees and costs is granted.[8]

In sum, Plaintiffs' fourth motion *in limine* is granted in part and denied in part without prejudice to renewal.

## IV. AMEX'S MOTIONS

Amex moves *in limine* to preclude (1) testimony and exhibits from *United States v. Am. Express Co.*, No. 10-CV-4496 (NGG) (RER) (E.D.N.Y.) (the "DOJ Action"); (2) "any evidence of damages purportedly suffered by a class of plaintiffs from Alabama . . . before January 29, 2017, as barred by the applicable statute of limitations"; and (3) testimony of Amex's in-house counsel, Katherine Currie. (Amex's First Mot.; Amex's Second Mot. at 1; Amex's Third Mot.) The court addresses each motion in turn.

### A. The DOJ Action

Amex requests that the court preclude certain testimony and exhibits from the bench trial in the DOJ Action, which took place in July and August of 2014. (Amex's First Mot. at 1; Pls.' First Opp. at 1.)

Plaintiffs' Trial Witness List indicates that they "will" or "may" seek to introduce the prior testimony of 14 witnesses, either on "[d]irect, impeachment or rebuttal." (Pls.' Trial Witness List (Dkt. 258-1) at 4-5, 7-8; Amex's First Mot. at 3-4.) However, Plaintiffs'

---

[8] *Ferreira v. City of Binghamton*—the only in-circuit case cited by Amex—does not convince the court otherwise. There, plaintiff argued that the defendants "should be precluded from introducing evidence or argument alleging that Plaintiff's motive for filing the lawsuit was a purely pecuniary one." 2016 WL 4991600, at *15. The court reserved decision, reasoning that the "[e]vidence at trial may make such argument admissible." *Id. Ferreira* did not address whether the plaintiff's retainer agreement or fee arrangement with counsel were probative of their bias. As such, *Ferreira* is inapposite.

memorandum in opposition clarifies that they only plan to introduce the prior testimony of 5 witnesses,[9] and will not introduce the prior testimony of the remaining 9 witnesses "unless circumstances arise at trial to change [their] outlook." (Pls.' First Opp. at 1.) The court summarizes Plaintiffs' proposed prior witness testimony in the following chart, bolding and underlining those witnesses who Plaintiffs "will call" via their prior testimony in the DOJ Action:

| | Name | Location | Plaintiffs' Designation |
|---|---|---|---|
| **Amex Witnesses** | 1. Kenneth Chenault – Former Chief Executive Officer | New York, NY | May call (designated) Direct, cross, impeachment, or rebuttal |
| | **2. Jack Funda – Former Senior Vice President** | New York, NY | **Will call (live)[10] Direct, cross, impeachment, or rebuttal** |
| | 3. Joseph Quagliata – Former Senior Vice President | Rockville Centre, NY | May call (live or designated) Direct, cross, impeachment, or rebuttal |

---

[9] Plaintiffs state that their trial witness list identifies four third-party witnesses as those who they "will call"; however, in a footnote, Plaintiffs note that they plan to introduce the testimony of Frank Bruno, the Treasury Director of Crate & Barrel, bringing the count up to five. (Pls.' First Opp. at 1 n.1.)

[10] (*See* Pls.' First Opp. at 1 n.1 (stating that Plaintiffs intend to compel Mr. Funda's attendance at trial rather than introduce his former trial testimony).)

|  |  |  |  |
|---|---|---|---|
|  | 4. Joshua Silverman – Former President of Consumer Products and Services | New York, NY | May call (live or designated) Direct, cross, impeachment, or rebuttal |
| **Competitor Witnesses** | 5. Nina Biornstad – Vice President, Mastercard | Rye, NY | May call (live or designated) Direct, impeachment, or rebuttal |
|  | 6. Roger Hochschild – Former Chief Executive Officer, Discover | Riverwoods, IL | **Will call** (designated) Direct, impeachment, or rebuttal |
|  | 7. Bradford Morgan – Former Vice President, Visa | Denton, TX | May call (designated) Direct, impeachment, or rebuttal |
| **Merchant Witnesses** | 8. Frank Bruno – Treasury Director, Crate & Barrel | Unknown | **Will call** (designated)[11] Direct, impeachment, or rebuttal |
|  | 9. Dwaine Kimmet – Treasurer and Vice President, Home Depot | Atlanta, GA | **Will call** (designated) Direct, impeachment, or rebuttal |
|  | 10. Deidre O'Malley – Senior Director of Payment Acceptance, Best Buy | St. Paul, MN | **Will call** (designated) Direct, impeachment, or rebuttal |

---

[11] (See Pls.' First Opp. at 1 n.1 (stating that Plaintiffs intend to introduce Mr. Bruno's former trial testimony).)

29

| | | | |
|---|---|---|---|
| | 11. Christopher Priebe – Director of Payment Strategies, Southwest Airlines | Frisco, TX | May call (designated) Direct, impeachment, or rebuttal |
| | 12. Jeffrey Rein – Former Chief Executive Officer, Walgreens | Tucson, AZ | **Will call** (designated) Direct, impeachment, or rebuttal |
| | 13. John Robinson – Treasurer, Ikea North America | Haddon Heights, NJ | May call (designated) Direct, impeachment, or rebuttal |
| | 14. Kevin Thiel – Managing Director, Alaska Airlines | Normandy Park, WA | May call (designated) Direct, impeachment, or rebuttal |

Additionally, Plaintiffs' exhibit list includes 40 exhibits from the DOJ Action. (Pls.' Trial Exs. with Objs. (Dkt. 258-6) at 2-4 (listed as PX-71-PX-110).) However, Plaintiffs represent that they expect to offer only 2 of these 40 exhibits into evidence: PX 82 (formerly DOJ PX 75) and PX 84 (formerly DOJ PX 1285). (Pls.' First Opp. at 2 n.3.) The court admitted PX 82 and PX 84 into evidence at the DOJ trial via the testimony of Roger Hochschild, Discover's former CEO. (*Id.*) PX 82 is an April 27, 2001 presentation from Discover and Morgan Stanley titled "Merchant Pricing Strategy." (*See* DOJ PX 75.) PX 84 is an October 15, 2007 presentation from Discover titled "Pricing & Product Strategy." (*See* DOJ PX 1285.)

Amex argues that the court should preclude the above testimony and exhibits pursuant to FRE 402, 403, and 802. (Amex's First Mot. at 1.) Plaintiffs oppose Amex's motion. (Pls.' First Mot. at

1.) The court considers each basis for preclusion in turn and concludes that the questionable probative value of this evidence is substantially outweighed by a danger of unfair prejudice, confusing the issues, and wasting time. Thus, the court grants Amex's request to preclude the above-identified testimony and exhibits pursuant to FRE 403.

### 1.  Rule 402

Amex argues that the testimony and exhibits from the DOJ Action are irrelevant because they are over a decade old and "the competitive landscape for electronic payments has changed drastically in the last 15-20 years." (Amex's First Mot. at 5.) Additionally, Amex asserts that the DOJ Action "focused on fundamentally different issues than those presented by Plaintiffs' case." (*Id.* at 6-7.) In particular, while Plaintiffs' case "focus[es] almost exclusively on surcharging," the DOJ Action "expressly did *not* challenge Amex's NDPs as they related to merchants' abilities to impose differential surcharges." (*Id.* at 6.) Additionally, Amex contends that while the DOJ Action focused on just one side of the two-sided market, Plaintiffs define the relevant market as "the market for two-sided general purpose credit and charge card transactions," which focuses on both the merchant and cardholder sides of the two-sided market. (*Id.* at 7.) Thus, Amex asserts that the testimony and exhibits from the DOJ Action are irrelevant to the present case.

Plaintiffs contend that the prior testimonies of the 5 witnesses they "will call"—representatives of third-parties like Discover, Home Depot, and Best Buy—are relevant because each witness testified to the effects of Amex's anti-steering rules, an issue of importance in this case, and those rules and the corresponding anticompetitive landscape "have not changed in any material way" since the DOJ Action. (*Id.* at 5-14.) Specifically, Plaintiffs assert that while the DOJ Action did not seek to enjoin surcharging, each witness testified that merchants' inability to steer

customers resulted in higher credit-card acceptance costs on the merchant side and prevented card companies like Discover from pursuing certain strategies. (*Id.* at 5.) Therefore, Plaintiffs contend that the prior testimony is relevant to prove the effects of Amex's anti-steering rules on third-parties. (*Id.* at 5-7.) Furthermore, Plaintiffs argue that the competitive landscape and Amex's business model remain "materially unchanged" from the 2014 DOJ Action to the class periods in this case, which run from 2015 to 2022.[12] (*Id.* at 8-14.) For example, according to Plaintiffs, as in 2014, there are only four U.S. credit card networks: Visa, Mastercard, Amex, and Discover. (*Id.* at 8.)

[13] (*Id.*) Thus, because the competitive landscape and Amex's business model remain materially unchanged, Plaintiffs argue that certain witnesses' prior testimony is relevant to this case. (Pls.' First Opp. at 9-14.)

---

[12] In January 2024, the court certified two groups of classes pursuant to FRCP 23(b)(3): debit cardholder classes in Alabama, the District of Columbia, Illinois, Kansas, Maine, Mississippi, North Carolina, Ohio, Oregon, and Utah; and non-rewards credit cardholder classes in the District of Columbia, Illinois, and Kansas. *Oliver*, 2024 WL 100848, at *13, *28; *Oliver*, 2024 WL 217711, at *1. The court certified the following class periods: for the Illinois, Kansas and Mississippi Plaintiffs, from January 29, 2016 to June 1, 2022; and for the remaining Plaintiffs (Alabama, D.C., Maine, North Carolina, Oregon and Utah), from January 29, 2015 to June 1, 2022. 2024 WL 100848, at *13 n.11, *28; *Oliver*, 2024 WL 217711, at *1.

[13] The foregoing two sentences contain material designated confidential or highly confidential by Amex under the Protective Order entered in this case; as such, these sentences have been redacted from the public version of this Memorandum and Order. (*See* Protective Order (Dkt. 47-1).)

The court concludes that the testimony and exhibits from the
DOJ Action are of questionable probative value to the issues in
this litigation. It is generally true that this action and the DOJ
Action focus on a similar issue: the effects of Amex's anti-steering
rules. But even accepting that Amex's anti-steering rules are the
same as in 2014, it is not necessarily true that the effect of those
rules on merchants and card companies like Discover have re-
mained unchanged throughout the class periods in this case. For
example, Roger Hochschild, the former CEO of Discover, testified
at the DOJ trial as follows:

> Q When Discover sets prices for its credit card network ser-
> vices for merchants, does it consider the prices of the debit
> card networks?
>
> A No.
>
> Q When setting credit card network prices for merchants,
> which competitors['] prices does Discover look to?
>
> A Discover looks to the pricing of Visa, MasterCard, and
> American Express' credit card volumes.

(*Id.* at 9-10.) Plaintiffs contend that the above testimony is pro-
bative of the lack of interchangeability of credit and debit cards
on the merchant side of the two-sided market. (*Id.* at 9.) How-
ever, to the extent Hochschild testified to Discover's business
practices at the time, his testimony is not necessarily probative of
Discover's business practices throughout the class periods in this
case. Put another way, Hochschild's testimony is outdated; it

therefore bears little probative value to the issue of card compa-
nies' reactions to Amex's anti-steering rules throughout the class
periods in this case.[14]

The testimonies of the merchant-witnesses suffer from similar is-
sues. Consider the following exchange between counsel and
Frank Bruno, the Treasury Director of Crate & Barrel:

> Q So would Crate & Barrel consider steering or promoting to
> other general purpose credit cards?
>
> A Yes, if we were given the opportunity, that's—yes.
>
> Q You just said if you were given the opportunity. What do
> you mean by that?
>
> A Well, we're precluded from steering to date with the mer-
> chant regulations.
>
> Q Are you talking about AMEX's—American Express's mer-
> chant regulations?
>
> A Yes, I am.
>
> Q Has Crate & Barrel considered ways that it might steer to
> other general purpose credit cards?

---

[14] The remaining excerpts from Hochschild's testimony—all of which
speak to Discover's then-current understandings of the competitive land-
scape and how it would react to certain changes in that landscape—are
also of questionable probative value to Discover's reaction to Amex's anti-
steering policies *throughout the class periods in this case*. (*See* Pls.' First Opp.
at 10 ("Q When were the Durbin related pricing changes for debit imple-
mented? A I think it would have been late 2011 or early 2012. Q Did
Discover observe any substitution between debit cards and credit cards fol-
lowing the Durbin price changes? A No."); *id.* at 10-11 ("Q If merchants
are able to steer volume from competitor cards to Discover cards, could
Discover increase its sales volume among merchants? A Yes. Q And is Dis-
cover able to do that *today*? A No." (emphasis added)); *id.* at 11 (excerpt
of colloquy where counsel asked, "how would Discover act?" if presented
with various circumstances).)

A Sure. I mean, I would—yes.

Q Can you tell me what Crate & Barrel has considered.

A Sure. I mean, I think what we would look to do is to cultivate and enrich a larger partnership with a specific card brand. We would most likely introduce some competition. We would put out an RFP for not only a preferred merchant card-related status with our company, but we have a wide array of other book of business and services that we could utilize with card companies. So I could very well see that we would put up RFPs, let the various general purpose card companies know what our total array of offerings look like that we could work together to cultivate a larger partnership and an opportunity for hopefully some concession pricing that we could, you know, then look to return some of those savings to our customers.

Q Would Crate & Barrel consider partnering with any of the credit card networks that it currently works with?

A Yes.

Q Including American Express?

A Yes.

(*Id.* at 11-12.) Plaintiffs contend that Bruno's testimony is probative of "anti-steering rules' effect on merchant-side competition and . . . of [the] likelihood of [the] fact of pass-through of changes in credit card acceptance costs into retail prices." (Pls.' Sealed First Opp. at 11-12.) However, as with Hochschild, to the extent Bruno testified regarding the effect of Amex's rules on Crate & Barrel in 2014, his testimony is not necessarily probative of the effect of Amex's rules on Crate & Barrel throughout the class periods in this case. Likewise, that Crate & Barrel "would" have taken a particular course of action in 2014 does not necessarily mean that it would take the same course of action if

presented with similar circumstances in 2025, or even in January 2015. In other words, because Bruno's testimony is outdated, it bears little probative value to the issue of the effects of Amex's anti-steering rules on merchant-side competition during the class periods in this case. The excerpts of Kimmet's[15] and O'Malley's[16] testimonies implicate similar staleness concerns. As such, the court concludes that the outdated prior witness testimony is of minimal probative value.[17]

---

[15] (*See, e.g.*, Pls.' First Opp. at 12-13 ("Q How much did Home Depot pay *last year* to accept general purpose credit cards? A We paid roughly half a billion dollars. Q That was just for one year? A Correct. Q How does that roughly half a billion dollars that Home Depot spent to accept general purpose credit cards compare to some of Home Depot's other operating expenses? A It *is* clearly one of our most significant costs." (emphases added)); *id.* at 13 (responding to the question "If Home Depot could reduce its costs of accepting general purpose cards, what would it do with the savings?").)

[16] (*See, e.g.*, Pls.' First Opp. at 14 ("Q Without stating any numbers, how does Best Buy's costs of acceptance of debit compare with its cost of acceptance of credit? A It *is* much lower. Q So has Best Buy *ever considered* accepting only debit card and not credit cards? A No, we *have not*." (emphases added)); *id.* ("Q Are you permitted to have a broader preference campaign with MasterCard *today* under the treatment provision of your AmEx agreement? A No. Q Why would partnering with, for example, MasterCard be an attractive proposition for Best Buy? A I am sure there would be some financials included with that. Q It might save you some money? A Yes. Q If you are able to save money on the cost of acceptance, for example, *what would you do* with those savings? A Get passed on to the consumer." (emphases added)).)

[17] The court cannot assess with particularity the testimony of the remaining 10 witnesses, including the prior testimony of Jeffrey Rein, because Plaintiffs have not provided excerpts of the portions of testimony they may seek to introduce. However, the court suspects that the remaining witnesses' testimonies raise similar staleness concerns. Ultimately, the court need not rule decisively on the relevance of each witness's testimony because the court concludes that said testimony should be precluded under FRE 403.

The exhibits are even more outdated. PX 82 and PX 84 are presentations prepared by Discover and Morgan Stanley in 2001, and Discover in 2007, respectively, concerning Discover's and Morgan Stanley's "Merchant Pricing" and Discover's "Pricing & Product" strategies *as of those years*. (*See* DOJ PX 75; DOJ PX 1285.) Plaintiffs argue that these exhibits "are made admissible by the designated prior trial testimony [of Hochschild], which laid the proper foundation for admissibility." (Pls.' First Opp. at 2 n.3.) But Plaintiffs do not explain how these roughly twenty-year-old exhibits are relevant to the issues in this trial, including the effects of Amex's anti-steering rules on merchants and card companies *during the relevant class periods*. (*See* Pls.' First Opp.) That Discover adopted certain strategies in 2001 and 2007 in response to Amex's policies does not necessarily mean that Discover adopted those same strategies at any point during the class periods in this case. As such, the court concludes that PX 82 and PX 84 are of minimal probative value.[18]

In sum, the court concludes that the testimony and exhibits from the DOJ Action are minimally relevant to this action because they are outdated. While the court might exclude the evidence on this basis alone, the court finds that FRE 403 provides the stronger basis for preclusion.

### 2.   Rule 403

Amex argues that any probative value of the testimony and exhibits from the DOJ Action is substantially outweighed by a danger of unfair prejudice, confusing the issues, and wasting time. (Amex's First Mot. at 7-13.) Amex points out that the parties agreed not to introduce evidence of the existence of other

---

[18] The court cannot assess with particularity the remaining 38 exhibits, although it suspects that they implicate similar staleness concerns. Ultimately, the court need not rule decisively on the relevance of each exhibit, because the court concludes that the exhibits from the DOJ Action should be precluded under FRE 403.

actions against Amex, including the DOJ Action. (Stipulation & Order (Dkt. 267) at 2.) However, Amex contends that introduction of the prior testimony and exhibits "would necessarily reveal the existence of the DOJ Action to the jury," causing undue prejudice to Amex. (Amex's First Mot. at 10.) Additionally, Amex argues that evidence from the DOJ Action would confuse the jury and waste time in numerous respects. (*Id.* at 11.) First, someone would have to read the testimony into the record, taking up time and introducing additional disputes regarding "the persons reading the testimony and their demeanor, tone[,] or inflection." (*Id.*) Second, introduction of the prior testimony and exhibits "risks diversions and minitrials" into the context of that evidence. (*Id.*) Third, because the testimony and exhibits predate the class periods in this case, there is a substantial risk that the jury will be presented with outdated information. (*Id.* at 11-12.) As such, Amex requests that the court preclude the testimony and exhibits from the DOJ Action pursuant to FRE 403.

Plaintiffs argue that FRE 403 does not bar testimony or exhibits from the DOJ Action. (Pls.' First Opp. at 15-17.) First, they assert that admission of this evidence will not necessarily alert the jurors to the existence of the DOJ Action: the court "can give a brief, neutral explanation for the existence of prior testimony that prevents the jury from learning about the prior lawsuit," and can "cover[] . . . up or whit[e] . . . out" old trial exhibit stamps. (*Id.* at 15-16.) Second, Plaintiffs contend that testimony from the DOJ Action will not confuse the jurors any more than "other prior testimony that may be published to the jury." (*Id.* at 17.) Finally, Plaintiffs represent that the portions of testimony they anticipate using at trial "will not require an inordinate amount of time," and will, in any event, remain within the 35-hour time limit agreed upon by the parties. (*Id.*)

Relevant evidence may be excluded if its probative value is substantially outweighed by a danger of, among other things, unfair

prejudice, confusing the issues, or wasting time. Fed. R. Evid. 403. In general, "courts are reluctant to cloud the issues in the case at trial by admitting evidence [from a] previous litigation involving one or both of the same parties." *Arlio v. Lively*, 474 F.3d 46, 53 (2d Cir. 2007). This is because admitting such evidence "inevitably results in trying those cases before the jury," and "the merits of the other cases would become inextricably intertwined with the case at bar." *Id.* Thus, "[c]ourts in this circuit generally preclude evidence of other lawsuits, both related and unrelated to the case before the court, due to concerns of confusing the jury and unfairly prejudicing defendants." *Hettiarachchi v. Cnty. of Suffolk*, No. 14-CV-6731 (DLI) (SJB), 2023 WL 6283287, at *4 (E.D.N.Y. Sept. 25, 2023); *see also Thompson v. Spota*, No. 14-CV-2473 (NGG) (AYS), 2022 WL 17253464, at *9 (E.D.N.Y. Nov. 28, 2022) (same) (collecting cases); *MF Glob. Holdings Ltd. v. PricewaterhouseCoopers LLP*, 232 F. Supp. 3d 558, 568 (S.D.N.Y. 2017) (excluding evidence from prior litigation because the jury "could easily confuse any evidence regarding the merits of the [prior action] with the merits of this case, causing undue prejudice to the [party seeking to exclude such evidence]"); *Birch v. Town of New Milford*, No. 20-CV-1790 (VAB), 2025 WL 289205, at *15 (D. Conn. Jan. 24, 2025) (excluding "any evidence, reference, or testimony related to" a settlement agreement with certain defendants because "the claims against [those defendants] are so inextricably tied with the claims headed to trial against the [remaining defendants]" that there is a risk the jury "might feel a strong compulsion to conform their verdict with that of the settlement"); *Aghaeepour v. N. Leasing Sys., Inc.*, No. 14-CV-5449 (NSR), 2024 WL 2700564, at *8 (S.D.N.Y. May 24, 2024) (excluding evidence from prior litigation where "[t]he jury could easily confuse the merits of the instant action with litigation arising from the same alleged scheme").

The court concludes that the minimal probative value of the testimony and exhibits from the DOJ Action is substantially outweighed by a danger of unfair prejudice, confusing the issues, and wasting time. *See* Fed. R. Evid. 403.

Introducing evidence from the DOJ Action runs a substantial risk of alerting the jury to the existence of that action, which the parties agreed not to do, and which would cause Amex undue prejudice. Plaintiffs assert that the parties can avoid revealing the existence of the DOJ Action by providing a "neutral explanation for the existence of prior testimony" and whiting out old exhibit stamps. (Pls.' First Opp. at 15.) This argument, however, presumes that Amex will not seek to contextualize the prior testimony and exhibits, which may necessitate divulsion of the existence of the DOJ Action and its ultimate outcome. (*See* Amex's First Mot. at 11 ("[I]ntroducing this evidence risks diversions and minitrials into what the prior context was about. . . . Here, would the jury hear about the Second Circuit decision? About the Supreme Court decision? About subsequent litigation and developments in the many years since?").) Admitting this evidence would put Amex between a rock and a hard place: either Amex would have to avoid disclosing the existence of the DOJ Action, thereby forfeiting its opportunity to contextualize the prior testimony and exhibits, or it would have to expose the existence of the DOJ Action in order to provide the context it deems necessary, prejudicing itself via the revelation of the prior lawsuit. Either way, introduction of this evidence poses a substantial risk of unfair prejudice to Amex that cannot be justified given the minimal probative value of the evidence. *See Hettiarachchi*, 2023 WL 6283287, at *4 ("Courts in this circuit generally preclude evidence of other lawsuits, both related and unrelated to the case before the court, due to concerns of confusing the jury and unfairly prejudicing defendants.").

Admission of this evidence also runs a substantial risk of confusing the issues and wasting time. As noted by Amex, reading the prior testimony into the record would take time and might introduce additional disputes regarding the speaker's demeanor and tone. Furthermore, introduction of prior testimony and exhibits would almost certainly lead to diversions and minitrials into the context of that evidence and the merits of the DOJ Action more broadly. This is exactly why courts preclude evidence from prior lawsuits: it "inevitably results in trying [the prior] case[] before the jury." *Arlio*, 474 F.3d at 53. Not only would such diversions waste time, but they would also risk confusing the jury as to the issues at stake in *this* litigation. As Plaintiffs recognize in their memorandum in opposition, the claims against Amex in the DOJ Action are inextricably tied with the claims headed to trial now. In such circumstances, there is a substantial risk that the jury might "confuse any evidence regarding the merits of the [DOJ Action] with the merits of this case," *MF Glob.*, 232 F. Supp. 3d at 568, or "feel a strong compulsion to conform their verdict with that of the [DOJ Action]," *Birch*, 2025 WL 289205, at *15. Thus, the court concludes that allowing Plaintiffs to introduce evidence from the DOJ Action "would improperly turn the trial into a multi-ringed sideshow of mini-trials on collateral issues that would cause confusion and undue delay." *United States v. O'Sullivan*, No. 20-CR-272 (PKC), 2021 WL 1979074, at *12 (E.D.N.Y. May 18, 2021).

In sum, because the minimal probative value of the DOJ Action evidence is substantially outweighed by a danger of unfair prejudice, confusing the issues, and wasting time, the objected-to evidence is precluded in its entirety pursuant to FRE 403. Because FRE 403 provides the basis for preclusion, the court need not address the parties' remaining arguments regarding FRE 802. *See United States v. Bourne*, No. 8-CR-888 (NGG) (VVP), 2011 WL 4458846, at *16 (E.D.N.Y. Sept. 23, 2011) ("The court need

not address the admissibility of testimony about this incident under 404 or otherwise, because Rule 403 precludes its admission."). Amex's first motion *in limine* is granted.

## B.  The Alabama Class

Amex requests that the court preclude evidence of damages suffered by the certified class of plaintiffs from Alabama (the "Alabama Class") before January 29, 2017, on the ground that such evidence is barred by the applicable statute of limitations. (Amex's Second Mot. at 1.) Specifically, Amex points out that the statute of limitations for antitrust claims under Alabama law is two years. (*Id.* at 2.) As such, Amex contends that to the extent Plaintiffs' damages estimate for the Alabama Class includes transactions that occurred before January 29, 2017, those claims are time-barred, and the court should exclude any evidence concerning those transactions pursuant to FRE 402 and 403.[19] (*Id.* at 3-4.) Amex argues that it preserved this issue by raising the statute of limitations as an affirmative defense in its Answer and again in the parties' Joint Pretrial Order. (*Id.* at 2 (citing Answer to Second Am. Class Action Compl. ("Answer") (Dkt. 190) at 48 ("Plaintiffs' claims against Amex are barred by the applicable statutes of limitation and/or repose, or the doctrine of laches.")); Joint Pretrial Order ("JPTO") (Dkt. 258) at 4 (same).)

Plaintiffs oppose Amex's motion on two bases. First, Plaintiffs argue that Amex's motion is procedurally improper because it seeks a dispositive ruling on an affirmative defense, rather than a decision on an evidentiary issue. (Pls.' Second Opp. at 3-4.) Second, Plaintiffs contend that Amex waived its statute of limitations defense by failing to meaningfully raise it earlier in the proceedings. (*Id.* at 5-6.) In particular, Plaintiffs assert that Amex could have

---

[19] Plaintiffs' damages estimate for the Alabama Class begins on January 29, 2015—four years before Plaintiffs filed this lawsuit. (Amex's Second Mot. at 1.)

raised the statute of limitations issue at the class certification, summary judgment, and class notice stages, during which the court repeatedly confirmed that the Alabama Class period began on January 29, 2015. (*Id.* at 1-2.) Additionally, Plaintiffs argue that Amex's "generalized assertions" of a statute of limitations defense in its answer and the JPTO—neither of which mentions the Alabama statute of limitations specifically—do not suffice to preserve the defense for trial. (*Id.* at 5.) Finally, Plaintiffs contend that granting Amex's motion would cause them undue prejudice, altering one of the certified class periods and forcing Plaintiffs' expert to recalculate the damages estimate for the Alabama Class. (*Id.* at 5-6.) As such, Plaintiffs argue that Amex's motion should be denied.

The court agrees with Plaintiffs that Amex's motion is procedurally improper. It is well settled that a motion *in limine* "is not the proper vehicle for seeking a dispositive ruling on a claim." *Williams v. Rushmore Loan Mgmt. Servs. LLC*, No. 15-CV-673 (RNC), 2017 WL 822793, at *1 (D. Conn. Mar. 2, 2017); *Funk v. Belneftekhim*, No. 14-CV-376 (BMC), 2019 WL 3035124, at *4 (E.D.N.Y. July 11, 2019) (same); *Simmons v. Ferrigno*, No. 17-CV-6176 (FPG), 2024 WL 1229285, at *6 (W.D.N.Y. Mar. 22, 2024) (same). While Amex frames its request as a motion *in limine*, in reality, Amex seeks a dispositive ruling on its statute of limitations defense. Such a maneuver is procedurally improper. *See Funk*, 2019 WL 3035124, at *4 ("Parties may . . . use motions *in limine* to . . . narrow the issues, shorten the trial, and save costs for the litigants, . . . but not—as defendants attempt to do here—as a substitute for a dispositive motion."). Therefore, Amex's motion to exclude evidence of alleged damages suffered by the Alabama Class prior to January 29, 2017 is denied.

However, "courts in this Circuit . . . occasionally convert[] motions *in limine* into motions to dismiss or motions for summary judgment, or simply address[] them on the merits." *Simmons*,

2024 WL 1229285, at *6 (collecting cases); *Funk,* 2019 WL 3035124, at *4 (noting the same). While Amex's motion is procedurally improper, at some point, either the court or the jury will have to resolve the legal dispute underlying its request. "Strictly speaking, the Court need not do so until the charge conference," but "in light of the fact that the issue may have some bearing on the parties' strategies at trial and may be helpful when it comes time to discuss the jury instructions," the court "offers its preliminary view" that Amex has *not* waived its statute of limitations defense. *Broadspring, Inc. v. Congoo, LLC,* No. 13-CV-1866 (JMF), 2014 WL 7392905, at *8 (S.D.N.Y. Dec. 29, 2014) (offering the court's "preliminary view" on the merits of defendants' procedurally improper motion *in limine*).

At least with respect to waiver, the Second Circuit treats statutes of limitations differently than other affirmative defenses. Two cases underscore this point: *Kulzer* and *Jones*. In *Kulzer,* a wrongful death action brought pursuant to a New York revival statute,[20] one of the defendants raised a general statute of limitations defense in its answer but did not raise the issue again until the close of plaintiff's proof at trial, where it moved for a directed verdict on the ground that plaintiff's claim was time barred due to an exception to the revival statute. *Kulzer v. Pittsburgh-Corning Corp.,* 942 F.2d 122, 123-24 (2d Cir. 1991). The district court determined that the defendant waived its statute of limitations

---

[20] A revival statute creates a time window for claimants to bring civil claims that are otherwise time barred. *See, e.g., Poppel v. Rockefeller Univ. Hosp.,* No. 19-CV-1403 (ALC), 2019 WL 3334476, at *1 (S.D.N.Y. July 25, 2019) (explaining that the Child Victims Act, enacted in 2019, "provides for a one-year revival window during which a survivor of any age may bring claims that were previously time-barred under the statute of limitations"); *see also Morrison v. Scotia Cap. (USA) Inc.,* No. 21-CV-1859 (SHS), 2023 WL 8307930, at *2 (S.D.N.Y. Dec. 1, 2023) (noting that the Adult Survivors Act "created a year-long window . . . for plaintiffs to bring certain sexual assault claims occurring in New York, even if those claims would otherwise be time-barred.").

defense by failing to plead it more specifically or to press the issue in pretrial motions. *Id.* at 124. The jury returned a verdict for defendants, but the court ultimately granted plaintiff's motion for a new trial. *Id.* During the period between the first and second trials, the same defendant moved to dismiss the complaint, again on the ground that an exception to the revival statute rendered plaintiff's claims time-barred. *Id.* The district court found that the defendant waived its limitations defense by failing to plead it with sufficient specificity. *Id.* This time, the jury returned a verdict for plaintiff, and the defendant appealed to the Second Circuit. *Id.*

The Second Circuit reversed, concluding that the district court's rationales for finding waiver—defendant's failure to pursue the limitations defense through pretrial motions and the "boiler-plate" manner in which it raised the defense—did not support a finding of waiver. *Id.* at 125. First, the court emphasized its holding from a prior case that a statute of limitations defense "need not be articulated with any rigorous degree of specificity: The defense is sufficiently raised for purposes of Rule 8 by its *bare assertion*." *Id.* Additionally, assertion of a statute of limitations defense in a defendant's answer, "rather than in its . . . motions for dismissal and summary judgment," is sufficient to render the defense both preserved and timely. *Id.* As such, the court concluded that "[t]he assertion of a limitations defense in the answer preserved [the defendant's] right to raise the defense both during the first trial and before the second." *Id.*

The Second Circuit applied the same principles in *Jones*. There, a plaintiff sued her former school district in state court "for harms she suffered after a teacher sexually abused her when she was fifteen and sixteen years old," pursuant to another New York revival statute. *Jones v. Cattaraugus-Little Valley Cent. Sch. Dist.*, 96 F.4th 539, 541 (2d Cir. 2024). Although the revival statute included a six month "waiting period" that required individuals to

wait six months from the effective date of the statute before filing suit, plaintiff filed suit *before* the conclusion of the waiting period. *Id.* at 541-42. The defendant removed the case to federal court and filed an answer asserting numerous affirmative defenses, including a general statute of limitations defense. *Id.* at 541. The parties proceeded with discovery, which continued for over two years, until the defendant moved for summary judgment on its statute of limitations defense, arguing that plaintiff's suit was untimely because it was filed before the conclusion of the waiting period. *Id.* The district court agreed and granted summary judgment to defendant. *Id.* Plaintiff appealed. *Id.* at 542.

The Second Circuit certified to the New York Court of Appeals the question whether the six-month waiting period established a statute of limitations or some other affirmative defense. *Id.* at 546. The court cited *Kulzer* for the general proposition that "a defendant may litigate a statute-of-limitations defense even as late as trial so long as the defense was timely asserted under Federal Rule of Civil Procedure 8(c)." *Id.* at 542 (citing *Kulzer*, 942 F.2d at 125). Although the court did not decide the merits of the case, it opined that if the waiting period *did* establish a statute of limitations, the court would affirm the district court's grant of summary judgment to the defendant. *Id.* at 545. If, however, the waiting period did *not* establish a statute of limitations but *some other* affirmative defense, the Second Circuit would "be compelled" to "deem the affirmative defense to have been forfeited" because the defendant "did not raise [the] waiting-period defense—other than through the bare assertion of a statute of limitations defense in its answer—until summary judgment." *Id.* at 545-46.

While the rationale behind the rule is less than obvious, the directive from the Second Circuit is clear: a statute of limitations defense is preserved and may be raised as late as mid-trial if pleaded—even at a high level of generality—in the defendant's

answer. *Kulzer*, 942 F.2d at 125; *Jones*, 96 F.4th at 545-46; *see also Colon v. Goord*, 115 F. App'x 469, 470 (2d Cir. 2004) (summary order) ("Defendants have not waived their statute of limitations defense by failing to raise it in their motion under Rules 12(c) and 56."). Amex met this requirement by raising the statute of limitations as an affirmative defense in its answer and in the parties' JPTO. (Answer at 48; JPTO at 4.) The waiver-related cases cited by Plaintiffs—which do not grapple with the waiver of a *statute of limitations* defense—are inapposite. (Pls.' Second Opp. at 6 n.9.) As such, it appears that Amex adequately preserved its statute of limitations defense, which may be adjudicated by the jury or the court, via an appropriate motion.

The court recognizes the potential unfairness of such an outcome in these circumstances. As Plaintiffs point out, Amex had ample opportunity to raise this issue at class certification, where the court defined the Alabama Class period as spanning from January 29, 2015 to June 1, 2022, *Oliver*, 2024 WL 100848, at *13 n.11, 28; at summary judgment, where the court incorporated the Alabama Class period by reference, (Summ. J. M&O (Dkt. 236) at 2); and at the class notice stage, where the court again incorporated the Alabama Class period by reference, (Class Notice M&O (Dkt. 257) at 2-3.) And Plaintiffs are correct that an alteration of the Alabama Class period will complicate their dissemination of notice and will require their expert to recalculate the damages estimate for the Alabama antitrust claims. (Pls.' Second Opp. at 5-6.) Nevertheless, in light of *Kulzer* and *Jones*, the court must treat Amex's statute of limitations defense as preserved.

In sum, Amex's second motion *in limine* is denied as procedurally improper.

## C. Katherine Currie

Finally, Amex requests "an order precluding Plaintiffs from calling an Amex in-house counsel, Katherine Currie, as a witness at

trial." (Amex's Third Mot. at 1.) Ms. Currie verified Amex's responses to Plaintiffs' interrogatories, declaring as follows:

> 1. I am Vice President & Senior Counsel in the Global Litigation & Investigations team at American Express Company. I am authorized to execute this Verification on behalf of [Amex]. I have reviewed Amex's Amended Responses and Objections to Plaintiffs' First Set of Interrogatories and Amex's Responses and Objections to Plaintiffs' Second Set of Interrogatories (together, the "Responses").
>
> 2. Subject to the General Objections and the specific objections set forth therein, the Responses are true to the best of my knowledge, information and belief.
>
> I declare under penalty of perjury that the foregoing is true and correct.

(Currie Verification (Dkt. 266-3) ¶¶ 1-2.) Plaintiffs' Trial Witness List states that Plaintiffs "[m]ay call" Ms. Currie to testify regarding "Verified Interrogatory Answers," either on "[d]irect, cross, impeachment[,] or rebuttal." (Pls.' Trial Witness List at 5.)

Amex argues that the court should prohibit Plaintiffs from calling Ms. Currie as a witness at trial. According to Amex, Plaintiffs plan to solicit Ms. Currie's testimony regarding Amex's response to Plaintiffs' first interrogatory, where Plaintiffs asked Amex to "[d]escribe in detail how You determine the Discount Fee You charge, and Discount Rate You apply to, merchants in the United States to accept Your Credit and Charge cards." (Amex's Am. Resps. and Objs. to Pls.' First Set of Interrogs. (Dkt. 266-4) at ECF p. 4.) Amex argues that its response to that question does not require testimony from Ms. Currie, "especially given that Monique Ouellette, Amex's Senior Vice President of Global Merchant and Network Pricing, testified [via deposition] about this very topic," (Amex's Third Mot. at 3), and that Plaintiffs list Ms. Ouellette as a witness they "[w]ill call" to discuss "any topics

within the scope of her . . . deposition," (Pls.' Trial Witness List at 5.) While "Plaintiffs have said expressly that they would not call Ms. Currie as a witness unless Ms. Ouellette contradicts her own deposition testimony," Amex nevertheless asks the court to preclude Plaintiffs from calling her as a witness. (Amex's Third Mot. at 3.) In support of its request, Amex cites and applies the factors set forth in *In re Subpoena Issued to Dennis Friedman*, 350 F.3d 65, 70 (2d Cir. 2003) for determining when it is appropriate to permit a party to *depose* opposing counsel. (Amex's Third Mot. at 3-9.) Amex contends that the *Friedman* factors weigh against allowing Plaintiffs to call Ms. Currie as a witness. (*Id.*)

Plaintiffs argue that Ms. Currie made herself a fact witness when she verified Amex's responses to interrogatories. (Pls.' Third Opp. at 1.) They also contend that while Ms. Currie is an attorney for Amex, Plaintiffs "are not seeking attorney testimony," but rather, "testimony, if necessary, from the person who verified a key interrogatory response." (*Id.* at 2.) In any case, Plaintiffs argue that the *Friedman* factors weigh in favor of permitting Ms. Currie to testify because she is the "only witness" who can authenticate the interrogatory responses and Plaintiffs have "no . . . intention" to elicit privileged information from Ms. Currie. (*Id.* at 2 n.2.) As such, Plaintiffs assert that they "are entitled to examine Ms. Currie to introduce the responses, authenticate the responses, and [ask] about the basis for her verification." (*Id.* at 4.) Moreover, Plaintiffs "have identified an inconsistency" between the interrogatory response verified by Ms. Currie and "other testimony obtained in pre-trial discovery," and Plaintiffs may wish to call Ms. Currie "[i]f this inconsistency emerges through live testimony." (*Id.* at 4-5.) Finally, Plaintiffs argue that it is premature to preclude Ms. Currie's testimony before Amex's witnesses have testified. (*Id.* at 5.)

"The Second Circuit has not established a standard for determining when a court should allow a party to call the opposing party's

counsel as a witness at trial." *Finkel v. Zizza & Assocs. Corp.*, No. 12-CV-4108 (JS) (ARL), 2021 WL 1375655, at *2 (E.D.N.Y. Apr. 12, 2021). Amex asks the court to apply the factors set forth by the Second Circuit in *Friedman* for determining when it is appropriate to permit a party to *depose* opposing counsel. (Amex's Third Mot. at 3-9.) In *Friedman*, the Second Circuit observed, in dicta, that courts faced with a request to depose opposing counsel should adopt a "flexible approach" that considers "all of the relevant facts and circumstances to determine whether the proposed deposition would entail an inappropriate burden or hardship." *Friedman*, 350 F.3d at 72. "Such considerations may include": (1) "the need to depose the lawyer," (2) "the lawyer's role in connection with the matter on which discovery is sought and in relation to the pending litigation," (3) "the risk of encountering privilege and work-product issues," and (4) "the extent of discovery already conducted." *Id.*; *see also Finkel*, 2021 WL 1375655, at *2 (same). These considerations "may, in some circumstances, be especially appropriate to consider in determining whether interrogatories should be used at least initially and sometimes in lieu of a deposition." *Friedman*, 350 F.3d at 72. Ultimately, "the fact that the proposed deponent is a lawyer" is simply one circumstance to be considered, and "does not automatically insulate [the lawyer] from a deposition nor automatically require prior resort to alternative discovery devices." *Id.* While *Friedman* dealt with *depositions* of opposing counsel, several district courts in this Circuit have applied the case in the context of trial testimony of opposing counsel. *See Finkel*, 2021 WL 1375655, at *2 (collecting cases).

Plaintiffs suggest that the court may disregard the *Friedman* factors because they do "not seek[] attorney testimony." (Pls.' Third Opp. at 2 ("Amex dutifully analyzes the *Friedman* factors. But Plaintiffs are not seeking attorney testimony. Plaintiffs seek testimony, if necessary, from the person who verified a key interrogatory response—a person who is an Amex Vice President

and also happens to be an attorney.").) But Plaintiffs cite no authority, and the court is aware of none, to suggest that the *Friedman* factors do not apply to a person who "wears multiple hats" as both a corporate executive and in-house counsel. (*See id.* at 1.) Nor is there any authority to suggest that the *Friedman* factors do not apply to testimony of in-house counsel. *See Tailored Lighting, Inc. v. Osram Sylvania Prods., Inc.,* 255 F.R.D. 340, 344 (W.D.N.Y. 2009) ("[Plaintiff] has not cited any authority, however, nor has this Court found any, to suggest that the *Friedman* considerations do not apply to depositions of in-house counsel."). As such, in an abundance of caution, the court applies the *Friedman* factors and concludes that they weigh in favor of permitting Plaintiffs to call Ms. Currie as a witness at trial.

The first *Friedman* factor—the need to call the lawyer as a witness—weighs in favor of Plaintiffs. "The keystone to determining the need to subpoena opposing counsel is whether the information sought may be obtained from another source." *Finkel,* 2021 WL 1375655, at *3. If "the information sought from the attorney can be provided by non-attorney witnesses, that weighs against permitting the deposition of an attorney." *Id.* Plaintiffs seek to examine Ms. Currie "to introduce the [interrogatory] responses, authenticate the responses, and [ask] about the basis for her verification." (Pls.' Third Opp. at 4.) They also wish to call Ms. Currie as a witness in the event that expected trial testimony conflicts with Amex's interrogatory responses. (*Id.* at 4-5.)

The information sought from Ms. Currie—that is, the basis for Amex's interrogatory responses—cannot be obtained from another source, because Ms. Currie is the sole verifier of Amex's interrogatory responses. Amex is correct that its interrogatory responses serve as admissions for trial and may be used at trial like testimony. (Amex's Third Mot. at 4-5.) But that does not mean Plaintiffs are precluded from examining the individual who verified those interrogatory responses, especially in the event that

those responses conflict with any live trial testimony. Even if Plaintiffs can obtain the same substantive information from Ms. Ouellette, Ms. Ouellette cannot testify as to the basis for Amex's interrogatory responses. Thus, the first *Friedman* factor weighs in favor of Plaintiffs. *See Tailored Lighting*, 255 F.R.D. at 345-46 (permitting deposition of attorney-verifier where the attorney "appears to be the only witness who could testify to the myriad bases for [defendant's] interrogatory responses").

The second *Friedman* factor—the lawyer's role in connection with the matter on which testimony is sought and in relation to the pending litigation—weighs neutrally. This factor requires the court to assess Ms. Currie's role both in this proceeding and in the subject as to which her testimony is sought. *Finkel*, 2021 WL 1375655, at *4. The second *Friedman* factor supports attorney testimony where the attorney "neither works on behalf of [the defendant] nor represents them" in the case and "there is no ongoing attorney-client relationship to disrupt between the parties." *GLD3, LLC v. Albra*, No. 21-CV-11058 (VR), 2024 WL 4471672, at *6 (S.D.N.Y. Oct. 11, 2024). On the other hand, the second *Friedman* factor weighs against permitting attorney testimony where the attorney serves as counsel for a party and there are "other witnesses who can testify regarding that same topic." *Finkel*, 2021 WL 1375655, at *4.

On the one hand, Ms. Currie's role in this proceeding appears to weigh against permitting her testimony. According to Amex, Ms. Currie "has served as a member of Amex's in-house legal department since this litigation's inception and has actively participated in Amex's representation in this litigation." (Amex's Third Mot. at 7.) On the other hand, Ms. Currie's role in the subject as to which her testimony is sought is unique: she is the only person who can testify as to the bases for Amex's interrogatory responses. *See Tailored Lighting*, 255 F.R.D. at 345 (concluding that

an attorney's "role was central to the matter about which discovery [was] sought—the bases for [defendant's] answers to interrogatories"). This case is therefore unlike *Finkel*, where defendants sought to depose plaintiff's counsel on issues relating to their statute of limitations defense. *Finkel*, 2021 WL 1375655, at *1-2. There, the court found that the attorney's role in the representation, coupled with the fact that two other witnesses could testify regarding the same topic, weighed against permitting his deposition. *Id.* at *4. *Finkel* did not grapple with the circumstances presented in this case, where an attorney acted as the sole verifier for a party's interrogatory responses. Thus, the court concludes that the second *Friedman* factor weighs neutrally.

The third *Friedman* factor—the risk of encountering privilege and work-product issues—weighs in favor of Amex. While the bases for Amex's interrogatory responses is a proper subject of examination, "the risk of encountering privileged information in the course of doing so . . . cannot be discounted." *Tailored Lighting*, 255 F.R.D. at 345. For example, Ms. Currie's "thought processes concerning whom and what documents to consult" and her "deliberations about what information to include and what to exclude" likely fall within the ambit of the work-product privilege. *Id.* Moreover, there is a possibility that Ms. Currie "may have had privileged communications about the facts and information [s]he assembled." *Id.* While Plaintiffs do not intend to elicit privileged information, the risk of encountering such information cannot be ignored. (*See* Pls.' Third Opp. at 2 n.2.) Nevertheless, in *Tailored Lighting*, the court did not find that the risk of encountering privileged information required preclusion of attorney-testimony, but rather, created "a strong need to carefully and cautiously circumscribe any permissible areas of testimony." 255 F.R.D. at 345. Thus, while this factor weighs in favor of Amex, it does not necessitate preclusion of Ms. Currie's testimony.

The parties agree that the fourth *Friedman* factor—the extent of discovery conducted—weighs neutrally. (Amex's Third Mot. at 4; Pls.' Third Opp. at 2 n.2.) Thus, the first factor favors Plaintiffs, the second and fourth factors weigh neutrally, and the third factor favors Amex.

The court concludes that the "flexible," non-exhaustive *Friedman* factors support a "narrowly-circumscribed" examination of Ms. Currie. *Tailored Lighting*, 255 F.R.D. at 346 (concluding the same). At bottom, Amex seeks to insulate the bases for its interrogatory responses from scrutiny, despite the fact that *Amex chose* to have its in-house counsel sign those responses. If other non-lawyers possess the same substantive knowledge as Ms. Currie, perhaps one of those non-lawyers should have verified Amex's responses. But the court will not preclude Plaintiffs from examining Ms. Currie about the bases for interrogatory responses that she, and she alone, verified. Thus, Ms. Currie may testify regarding (1) the information provided to and relied upon by her, whether through communications with individuals or review of documents, in answering the interrogatories; (2) the particular source of that information; and (3) non-privileged communications between Ms. Currie and her human sources about said information that occurred in the course of investigating and answering the interrogatories.[21] Amex's third motion *in limine* is therefore denied.

---

[21] The court finds support for its approach in *Tailored Lighting* and *ValveTech*—the only cases cited by the parties that address prospective testimony of attorneys who verified a party's interrogatory responses. *See Tailored Lighting*, 255 F.R.D. at 346 (adopting same approach regarding the deposition of an attorney who verified the defendant's interrogatory responses); *ValveTech, Inc. v. Aerojet Rocketdyne, Inc.*, No. 17-CV-6788 (FPG) (MJP), 2021 WL 630910, at *4 (W.D.N.Y. Feb. 18, 2021) (same). To the extent other courts have excluded attorney testimony in cases not involving attorney-verified interrogatory responses, those cases are inapposite. (*See generally* Amex's Third Mot.)

## V.  CONCLUSION

For the reasons stated above, Plaintiffs' motions *in limine* are GRANTED in part and DENIED in part, and Amex's motions *in limine* are GRANTED in part and DENIED in part.

The court rules as follows:

- Plaintiffs' request that the court preclude Amex from offering evidence or argument concerning the absence of the Class Representative Plaintiffs or other Plaintiffs during the trial is DENIED without prejudice to renewal should Amex retreat from its current position at trial. Additionally, should Amex decide to raise this issue at trial, Amex is DIRECTED to provide the court and Plaintiffs with 24 hours' notice of its intent to do so.
- Plaintiffs' request that the court bar Amex from introducing "cumulative" expert testimony at trial pursuant is DENIED without prejudice to renewal.
- Plaintiffs' request that the court preclude Amex from using 123 documents with their experts on direct examination is GRANTED in full as to DX-547, DX-549, DX-552, DX-553, DX-562, DX-563, DX-567, DX-603, DX-604, and DX-605; GRANTED in part as to DX-323, DX-463, and DX-470, to the extent that if a particular expert did not disclose these documents as relied upon, Amex may not read that document into evidence via that witness or solicit testimony from that witness regarding that document; and DENIED without prejudice to renewal as to the remaining 110 documents.
- Plaintiffs' request that the court exclude all evidence concerning the Class Representatives' knowledge of antitrust law and the claims asserted is DENIED without prejudice to renewal.

- Plaintiffs' request that the court exclude all evidence of the Class Representatives' relationships to counsel is DENIED.
- Plaintiffs' request that the court exclude all evidence concerning the circumstances surrounding the Class Representatives' retention of counsel is GRANTED.
- Plaintiffs' request that the court exclude all evidence concerning the Class Representatives' agreement with counsel on attorneys' fees and costs is GRANTED.
- Amex's request that the court preclude certain testimony and exhibits from the bench trial in the DOJ Action is GRANTED.
- Amex's request that the court preclude evidence of alleged damages suffered by the Alabama Class prior to January 29, 2017 is DENIED as procedurally improper.
- Amex's request that the court preclude Plaintiffs from calling an Amex in-house counsel, Katherine Currie, as a fact witness at trial, is DENIED. Ms. Currie may testify regarding (1) the information provided to and relied upon by her, whether through communications with individuals or review of documents, in answering the interrogatories; (2) the particular source of that information; and (3) non-privileged communications between Ms. Currie and her human sources about said information that occurred in the course of investigating and answering the interrogatories.

SO ORDERED.

Dated:     Brooklyn, New York
          May 13, 2025

                                        NICHOLAS G. GARAUFIS
                                        United States District Judge