UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

TERRY GAYLE QUINTON, SHAWN O'KEEFE, ANDREW AMEND, DAVID MOSKOWITZ, NATE THAYER, RICKY AMARO, NANCI-TAYLOR MADDUX, ABIGAIL BAKER, WYATT COOPER, JAMES ROBBINS IV, MARILYN BAKER, SHERIE MCCAFFREY, ALLIE STEWART, ELLEN MAHER, DEBBIE TINGLE, ANGELA CLARK, EMILY COUNTS, and SARAH GRANT, on behalf of themselves and all others similarly situated,

**MEMORANDUM & ORDER**
**19-CV-566 (NGG) (JRC)**

Plaintiffs,

-against-

AMERICAN EXPRESS COMPANY and AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, INC.,

Defendants.

NICHOLAS G. GARAUFIS, United States District Judge.

Pending before the court are Plaintiffs' and Defendants American Express Company and American Express Travel Related Services Company, Inc.'s (collectively, "Amex") respective motions *in limine*, numbering four in total, and Plaintiffs' motion for reconsideration of the court's decision on the parties' earlier motions *in limine*. (Pls.' Mot. for Recons. ("Mot. for Recons.") (Dkt. 292-1); Pls.' Fifth Mot. (Dkt. 298); Pls.' Sixth Mot. (Dkt. 308); Amex's Fourth Mot. (Dkt. 299-1); Amex's Fifth Mot. (Dkt. 300-1).) The parties oppose each other's motions. (Amex's Opp. to Mot. for Recons. (Dkt. 297); Amex's Fifth Opp. (Dkt. 304); Amex's Sixth Opp. (Dkt. 314); Pls.' Fourth Opp. (Dkt. 306); Pls.' Fifth Opp. (Dkt. 305).) For the reasons that follow, Plaintiffs' motions are GRANTED in part and DENIED in part, and Amex's motions are GRANTED in part and DENIED in part.

## I.  BACKGROUND

The court assumes familiarity with the factual background and procedural history of this long-running antitrust dispute and refers to facts in the discussion section as necessary to evaluate the parties' arguments. More detailed accounts of the facts underlying this Memorandum and Order are available in the court's past orders and in the opinions stemming from the merchants' and federal and state governments' previous cases on this issue. *See Oliver v. Am. Express Co.*, No. 19-CV-566 (NGG) (SJB), 2024 WL 100848, at *1-2 (E.D.N.Y. Jan. 9, 2024), *amended in part*, 2024 WL 217711 (E.D.N.Y. Jan. 19, 2024), *reconsideration denied*, 2024 WL 3086266 (E.D.N.Y. June 21, 2024); *United States v. Am. Express Co.*, 88 F. Supp. 3d 143, 149-67 (E.D.N.Y. 2015); *United States v. Am. Express Co.*, 838 F.3d 179, 184-93 (2d Cir. 2016); *Ohio v. Am. Express Co.*, 585 U.S. 529, 529-40 (2018); *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 361 F. Supp. 3d 324, 331-33 (E.D.N.Y. 2019).

As relevant here, on May 13, 2025, the court granted in part and denied in part the parties' respective motions *in limine*, numbering seven in total. (Mem. & Order ("M&O") (Dkt. 291) at 1.) Specifically, the court denied without prejudice Plaintiffs' first motion to preclude evidence or argument concerning the absence of Plaintiffs during trial; denied without prejudice Plaintiffs' second motion to preclude certain expert testimony; granted in part and denied in part Plaintiffs' motion to preclude certain third-party publications; and granted in part and denied in part Plaintiffs' motion to preclude evidence or testimony concerning the Class Representatives' adequacy. (*Id.* at 55-56.) Additionally, the court granted Amex's motion to preclude certain testimony and exhibits from *United States v. Am. Express Co.*, No. 10-CV-4496 (NGG) (RER) (E.D.N.Y.) (the "DOJ Action"); denied as procedurally improper Amex's motion to preclude evidence of alleged damages suffered by the certified class of

plaintiffs from Alabama (the "Alabama Class") prior to January 29, 2017; and denied Amex's motion to preclude Plaintiffs from calling Amex in-house counsel, Katherine Currie, as a fact witness at trial. (*Id.* at 56.)

Following the court's decision on the first round of motions *in limine*, Plaintiffs moved for reconsideration of the court's decision precluding testimony and exhibits from the DOJ Action to "carve out" four exhibits. (Mot. for Recons. at 1.) Thereafter, the court held a pretrial conference at which the parties discussed a briefing schedule for Plaintiffs' motion for reconsideration and additional motions *in limine*. (Min. Entry Dated 5/27/2025.) On June 9, 2025, the court endorsed a joint stipulation in which the parties agreed that the damages period for the Alabama Class shall begin no earlier than January 29, 2017. (Stip. & Order (Dkt. 296).) On June 11, 2025, Amex filed its opposition to Plaintiffs' motion for reconsideration, Plaintiffs filed their fifth motion *in limine*, and Amex filed its fourth and fifth motions *in limine*. (Amex's Opp. to Mot. for Recons.; Pls.' Fifth Mot.; Amex's Fourth Mot.; Amex's Fifth Mot.) The parties submitted their oppositions to the motions *in limine* on June 18, 2025. (Amex's Fifth Opp.; Pls.' Fourth Opp.; Pls.' Fifth Opp.) Finally, Plaintiffs filed their sixth motion *in limine* on June 27, 2025, and Amex filed its opposition to the same on July 8, 2025. (Pls.' Sixth Mot.; Amex's Sixth Opp.)

The court considers Plaintiffs' motions before turning to Amex's motions.

## II.  LEGAL STANDARD

The purpose of motions *in limine* is "to aid the trial process by enabling the [c]ourt to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the

trial." *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996).[1] "Evidence should be excluded on a motion *in limine* only when the evidence is clearly inadmissible on all potential grounds." *Jean-Laurent v. Hennessy*, 840 F. Supp. 2d 529, 536 (E.D.N.Y. 2011). The Federal Rules of Evidence govern the admissibility of evidence at trial.

"[C]ourts considering a motion *in limine* may reserve decision until trial, so that the motion is placed in the appropriate factual context." *Id.* A district court's ruling on a motion *in limine* is preliminary and "subject to change when the case unfolds, particularly if the actual testimony differs from what was [expected]." *Luce v. United States*, 469 U.S. 38, 41 (1984). As such, at trial, the court may exercise its discretion "to alter a previous *in limine* ruling." *Id.* at 41-42.

## III. PLAINTIFFS' MOTIONS

Plaintiffs move (1) for partial reconsideration of the court's decision excluding evidence and testimony from the DOJ Action; (2) to exclude evidence or argument concerning Class Representative Andrew Amend's involvement in "prior unrelated lawsuits"; and (3) to preclude Amex witness Sarah Wood from testifying about events regarding Amex's Australia experience that occurred prior to her employment with Amex. (Mot. for Recons.; Pls.' Fifth Mot.; Pls.' Sixth Mot.) The court considers each motion in turn.

### A. Motion for Reconsideration

Plaintiffs request that the court reconsider or modify its decision excluding evidence and testimony from the DOJ Action to "carve out" four exhibits, which Plaintiffs refer to as the "Durbin Working Group Documents": PX 74 (formerly DOJ PX 89); PX 75

---

[1] When quoting cases, unless otherwise noted, all citations and internal quotation marks are omitted, and all alterations are adopted.

(formerly DOJ PX 90); PX 76 (formerly DOJ PX 91); and PX 79 (formerly DOJ PX 1176). (Mot. for Recons. at 1; Pls.' Trial Exs. with Objs. (Dkt. 258-6) at 2; PX 74 (Dkt. 292-2); PX 75 (Dkt. 292-3); PX 76 (Dkt. 292-4); PX 79 (Dkt. 292-5).) In 2010, Amex established an internal "Durbin Working Group" to analyze the potential effects of a then-current draft of the Durbin Bill, which would have permitted merchants in the United States to steer and differentially discount forms of payment, including credit cards. (Mot. for Recons. at 1; PX 75 at ECF p. 4 (summarizing "Key Provisions" of the Durbin Bill).) The Durbin Working Group Documents are emails and presentations prepared by the Durbin Working Group which analyze the potential effects of the Durbin Bill on Amex and the market as a whole.

Plaintiffs contend that the Durbin Working Group Documents are relevant to a "central" issue in this case: "what the but-for world would look like in the absence of Amex's Anti-Steering Rules." (Mot for Recons. at 3.) Plaintiffs point out that the but-for world is "a hypothetical, unobservable, counterfactual construct," and, as such, evidence relating to such a hypothetical world is "in short supply." (*Id.*) Plaintiffs argue that the Durbin Working Group Documents "are some of the most probative, nonprivileged evidence" of the but-for world because they reflect Amex's "internal planning" when it believed Congress might act to permit merchant steering and differential surcharging—effectively invalidating essential components of its Non-Discrimination Provisions ("NDPs"). (*Id.*) While "more recent documents exist that likely show how Amex would have operated its business if it could no longer enforce its [NDPs]," Plaintiffs represent, Amex "successfully asserted attorney-client privilege and work-product protection over" such documents. (*Id.* at 4.) Additionally, although the Durbin Working Group Documents are 15 years old, Plaintiffs point out that the parties plan to introduce even older documents into evidence, including evidence of the Australia experience dating back to 2003. (*Id.*) Furthermore, Plaintiffs note

Amex intends to introduce certain documents falling under the "ancient documents" exception to the rule against hearsay, meaning the documents were prepared before January 1, 1998. (*Id.* at 4 n.5 (referencing Amex's intention to rely on the ancient documents exception).) Thus, Plaintiffs argue that the Durbin Working Group Documents are relevant.

Plaintiffs further assert that the Durbin Working Group Documents do not pose the same Rule 403 concerns as the remaining DOJ Action evidence. (*Id.* at 4.) In particular, unlike prior testimony from the DOJ Action, Plaintiffs argue that "there would be no reasonable motivation or utility for Amex to 'contextualize' its own business records by divulging 'the existence of the DOJ action and its ultimate outcome.'" (*Id.* at 5 (citing M&O at 40).) Plaintiffs contend that the "sole, vestigial trace of the prior DOJ trial on the Durbin Working Group documents are . . . trial exhibit stamps" which "can be readily removed or masked [at trial]." (*Id.*) As such, Plaintiffs argue that admission of the Durbin Working Group Documents would not risk a "minitrial" into the merits of the DOJ Action.[2] (*Id.*)

Amex opposes Plaintiffs' motion on three bases. First, Amex contends that Plaintiffs have not met their burden to obtain reconsideration of the court's prior decision. (Amex's Opp. to Mot. for Recons. at 1 (citing E.D.N.Y. Loc. Civ. R. 6.3 (explaining that motions for reconsideration must "set[] forth concisely the matters or controlling decisions which the moving party believes the court has overlooked")).) Second, Amex argues that the Durbin Working Group Documents, like the remainder of the DOJ

---

[2] Plaintiffs additionally contend that the rule against hearsay does not bar admission of the Durbin Working Group Documents because the documents are party admissions. (Mot. for Recons. at 5 (citing Fed. R. Evid. 801(d)(2).) Amex does not raise a hearsay-related basis for preclusion. (*See generally* Amex's Opp. to Mot. for Recons.) The court agrees with Plaintiffs that the Durbin Working Group Documents are non-hearsay party admissions. Fed. R. Evid. 801(d)(2).

Action evidence, are of minimal relevance because they are over 15 years old and do not reflect Amex's current views or strategies. (*Id.* at 3-4.) Additionally, Amex points out that the Durbin Working Group Documents "were created by lower-level employees and are filled with statements saying [the documents] are not the views of senior management." (*Id.* at 4.) Third and finally, Amex asserts that the Durbin Working Group Documents should be precluded under Rule 403. (*Id.* at 4-5.)

As a preliminary matter, Plaintiffs need not meet the motion for reconsideration standard to obtain a modification of the court's *in limine* ruling. As the court explained in its prior decision, "[a] district court's ruling on a motion *in limine* is preliminary and 'subject to change,[']" and the court "may exercise its discretion 'to alter a previous *in limine* ruling.'" (M&O at 3 (quoting *Luce*, 469 U.S. at 41-42).) Thus, Plaintiffs need not point to "overlooked controlling decisions or factual matters" for the court to reconsider its prior ruling. (Amex. Opp. to Mot. for Recons. at 1.)

Turning to the substance, the court concludes that the Durbin Working Group Documents are relevant, and that their relevance is not substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, or undue delay. *See* Fed. R. Evid. 401, 402, 403.

The Durbin Working Group Documents meet the "very low" bar for relevance. *Belvin v. Electchester Mgmt., LLC*, 635 F. Supp. 3d 190, 197 (E.D.N.Y. 2022). Amex does not dispute that the but-for world—*i.e.*, the world if Amex's NDPs did not exist—is of critical importance to Plaintiffs' case. (*See* Amex's Opp. to Mot. for Recons. at 3-4.) Indeed, an essential element of Plaintiffs' antitrust claims is proof that Amex's NDPs unreasonably restrain trade, which requires analysis of, among other things, competitive harm and procompetitive rationales for the restraint. *See Ohio v. Am. Express*, 585 U.S. at 541-42. The Durbin Working Group Documents go to the heart of these issues. The documents

reflect internal Amex analyses regarding how merchants and consumers might react to the elimination of Amex's NDPs, and strategies Amex might adopt if it could no longer prohibit merchant steering or differential discounting. Put simply, the Durbin Working Group Documents are relevant to the but-for world. (*See* PX 74 at ECF p. 4 (slide explaining how merchants might react "[i]f the Durbin Bill becomes law" and discussing the economics of each possibility); PX 75 at ECF p. 5 (slide analyzing "[w]here . . . Debit rates [might] end up" in response to the Durbin Bill); *id.* at ECF pp. 6-7 (slides analyzing "[h]ow . . . merchants & financial industry players [will] react" to the Durbin Bill); *id.* at ECF pp. 8-9 (slides discussing options for merchants if the Durbin Bill becomes law); *id.* at ECF p. 10 (slides discussing "[p]otential strategic options for [Amex]" and the "[p]otential [r]eactions" of industry players, including merchants, to each of those options); PX 76 at ECF pp. 2-3 (internal Amex emails reflecting executive-level involvement in the Durbin Working Group); *id.* at ECF pp. 5-14 (slides discussing potential merchant reactions to the Durbin legislation and potential Amex responses); PX 79 at ECF pp. 2-15 (same).)

The fact that the Durbin Working Group Documents are over 15 years old does not preclude their admission. The court's previous decision focused, as the parties did, on the prior testimony of five third-party witnesses and two exhibits previously introduced via the testimony of one such witness. (M&O at 27-30.) Although the court ultimately excluded the evidence on Rule 403 grounds, the court remarked that the prior testimony was "of questionable probative value" given its outdatedness. (*See id.* at 33 ("[E]ven accepting that Amex's anti-steering rules are the same as in 2014, it is not necessarily true that the effect of those rules on merchants and card companies like Discover have remained unchanged throughout the class periods in this case.").) The outdated nature of the evidence was of particular concern because Plaintiffs sought to use the prior testimony as a replacement for

live, up-to-date testimony from third-party witnesses. Here, while the Durbin Working Group Documents are over 15 years old, Plaintiffs correctly point out that they are the most recent examples of how Amex might operate its business in the absence of its NDPs. (Mot. for Recons. at 4.) And unlike old testimony, where there is no opportunity for the witness to explain any changes or updates to their position, here, if these documents no longer reflect the attitudes of Amex, then Amex's witnesses may so testify. Additionally, the fact that the Durbin Working Group Documents "were created by lower-level employees and are filled with statements saying they are not the views of senior management" goes to the weight of the evidence, not its admissibility. (Amex Opp. to Mot. for Recons. at 4.) If the documents do not reflect the views of senior management, then testifying Amex executives may inform the jury of that fact. Thus, the court concludes that the Durbin Working Group Documents are relevant.

Furthermore, unlike the evidence discussed in the court's prior decision, the Durbin Working Group Documents do not pose a substantial danger of unfair prejudice, confusing the issues, misleading the jury, or undue delay. The court excluded the prior testimony and related exhibits because their admission would result in diversions and minitrials into the DOJ Action, the existence of which the parties agreed not to discuss. (M&O at 40.) And, as Plaintiffs recognize, there was no way to cure this prejudice because the prior testimony "was generated in a prior trial and would not have existed if not for that trial." (Mot. for Recons. at 4.) By contrast, Amex created the Durbin Working Group Documents independent of the DOJ Action. Indeed, their only connection to the DOJ Action are old exhibit stamps which can be easily removed. Therefore, the court concludes that the relevance of the Durbin Working Group Documents is not substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, or undue delay.

Amex's arguments do not convince the court otherwise. Amex contends that admission of the Durbin Working Group Documents, like the remaining DOJ Action evidence, would force Amex to decide between providing the proper context for the exhibits, thereby revealing the existence of the DOJ Action, or avoiding disclosure of the DOJ Action, thereby forfeiting its opportunity to contextualize the exhibits. (Amex's Opp. to Mot. for Recons. at 5.) Specifically, Amex opines that if Plaintiffs "call [Jack] Funda for live testimony and ask him about these documents, Amex again would be 'between a rock and a hard place' in its own examination of Mr. Funda, considering his now-excluded prior testimony about those same exhibits." (*Id.* (citing M&O at 40).) However, Amex does not explain *how* answering questions about the Durbin Working Group Documents—which, as explained above, were created independent of the DOJ Action—would require Mr. Funda to discuss his prior testimony in the DOJ Action. And Amex does not argue that the Durbin Working Group Documents themselves would necessarily reveal the existence of the DOJ Action. Thus, the court rejects Amex's argument that admission of the Durbin Working Group Documents would prompt the parties to divulge the existence of the DOJ Action.

Amex also argues that admission of the Durbin Working Group Documents would result in "diversions and minitrials" into the history and context of the Durbin Bill and Amex's reaction thereto. (*Id.*) It is true that the jury will need to learn about the context of the Durbin Bill and the Durbin Working Group in order to understand the documents. But these "diversions" will be no greater than those required to explain the history and context of Amex's Australia experience, for example. And Amex does not object to the admission of that evidence. Additionally, the 35-hour time limit placed on each side will further limit any diversions on this topic. (Joint Pretrial Order (Dkt. 258) at 5.) Finally,

any expenditure of time on this issue does not substantially outweigh the relevance of the exhibits. Therefore, the court rejects Amex's request to preclude the Durbin Working Group Documents under Rule 403.

In sum, Plaintiffs' motion for reconsideration as to PX 74, 75, 76, and 79 is granted. The parties are directed to remove any DOJ trial exhibit stamps from PX 74, 75, 76, and 79.

### B. Fifth Motion *in Limine*

Next, Plaintiffs request that the court "exclude evidence or argument regarding any prior unrelated lawsuits in which Plaintiff and Class Representative Andrew Amend . . . has been either a party plaintiff or party defendant." (Pls.' Fifth Mot. at 1.)

Plaintiff Andrew Amend has been involved in prior litigation as both a plaintiff and a defendant. (*Id.*) In particular, Amend has participated in at least four lawsuits as a plaintiff, including a suit against his business partner, a suit against a contractor who performed work on his driveway, an action against a vendor in small claims court, and an eviction action against a tenant for non-payment. (*Id.*) Additionally, in 2004, AOL sued Amend and others in the Eastern District of Virginia for their respective roles in sending unsolicited commercial emails. *Am. Online, Inc. v. Ambro Enters., Inc.*, No. 4-CV-1498 (E.D. Va.) (hereinafter "America Online"). (America Online Am. Compl. (Dkt. 304-2).) Amend and one of the corporate defendants, Ambro Enterprises, Inc. ("Ambro"), reached a settlement agreement and entered into a Stipulated Final Judgment and Order for Permanent Injunction, which held Amend and Ambro "jointly and severally liable to AOL for damages in the total amount of $100,000" and permanently enjoined them from sending spam emails. (America Online Stipulated Judgment (Dkt. 304-3) at ECF pp. 2-3.)

Plaintiffs request that the court exclude evidence or argument regarding the above-mentioned litigation. (Pls.' Fifth Mot. at 1.)

Plaintiffs contend that Amend's involvement in unrelated litigation is irrelevant to this case. (*Id.* at 3-4.) Additionally, to the extent Amex seeks to introduce Amend's prior lawsuits "to characterize Mr. Amend as a chronic litigant" or "suggest [his] purported propensity to act in a certain manner," Plaintiffs assert that such evidence would be inadmissible under Rule 404(b)(1). (*Id.* at 3, 5.) Plaintiffs also argue that discussion of Amend's litigation history would result in undue prejudice and "distract from the merits of the case." (*Id.* at 4 (citing Fed. R. Evid. 403).) In particular, Plaintiffs contend that evidence or testimony concerning the America Online suit "carr[ies] a high risk of unfair prejudice" because the jury may view Amend as "a perpetrator of spam." (*Id.*) Thus, Plaintiffs request that the court preclude evidence or argument regarding Amend's prior litigation history. (*Id.* at 5.)

For its part, Amex represents that it "do[es] not plan to inquire" into Amend's litigation as a plaintiff, but reserves the "right to introduce evidence or inquire into [said] litigation . . . if it becomes relevant for impeachment purposes or Plaintiffs otherwise open the door." (Amex's Fifth Opp. at 2, 2 n.2.) However, Amex argues that it may inquire into the America Online suit under Rule 608(b) because it is probative of Amend's character for truthfulness. (*Id.* at 2-4.) In support of its argument, Amex points to several allegations from the operative America Online complaint, in which AOL claimed that the defendants engaged in misleading, false, and fraudulent behavior.[3] (*Id.* at 3.) Amex also

---

[3] Amex cites the following allegations from the operative complaint: "Defendants initiated or procured the transmission of AOL's protected computers, of commercial e-mail messages that contained, or were accompanied by, header information that was materially false or materially misleading," (America Online Am. Compl. ¶ 37); "Without authority, Defendants have obtained access to and used AOL's computers and computer network with the intent to obtain the use of AOL's property and services by false pretenses," (*id.* ¶ 52); "Defendants used a computer or a computer

cites the Stipulated Final Judgment and Order for Permanent Injunction, which enjoined Amend and Ambro from, among other things, "[c]reating . . . any email account . . . by providing false or misleading information" and "[s]ending . . . any e-mail . . . bearing false, fraudulent, anonymous, inactive, deceptive, incomplete, or invalid header information." (America Online Stipulated Judgment at ECF pp. 1-2; *see also* Amex's Fifth Opp. at 3.) On these bases, Amex contends that the America Online suit is probative of Amend's character for truthfulness.

The court concludes that evidence or testimony concerning Amend's prior litigation as a plaintiff is inadmissible under Rules 403, 404(b)(1), and 608(b). First, there is no evidence that those lawsuits bear on Amend's character for truthfulness. (Pls.' Fifth Mot. at 1 (explaining that Amend "su[ed] a business partner in 2008, su[ed] a contractor who worked on his driveway, t[ook] a vendor to small claims court, and [sought to] evict[] a tenant for non-payment").) Therefore, evidence or testimony concerning those suits is not admissible under Rule 608(b). *See* Fed. R. Evid. 608(b) (explaining that the court may allow specific instances of a witness's conduct to be inquired into on cross-examination *if* "they are probative of the [witness's] character for truthfulness or untruthfulness"). Additionally, to the extent Amex may attempt to use this evidence to show that Amend is a repeat litigant, such propensity evidence is inadmissible under Rule 404(b)(1). *See* Fed. R. Evid. 404(b)(1) ("Evidence of any other . . . act is not admissible to prove a person's character in order to

---

network with the intent to falsify or forge electronic mail transmission information or other routing information in connection with the transmission of unsolicited bulk electronic mail through or into AOL's computer network or its Members," (*id.* ¶ 59); and "Defendants' acts of trespass have been undertaken intentionally with malice, oppression and fraud, justifying the imposition of punitive damages," (*id.* ¶ 78). (Amex's Fifth Opp. at 3.)

show that on a particular occasion the person acted in accordance with the character."); *Scoma v. City of New York*, No. 16-CV-6693 (KAM) (SJB), 2021 WL 1784385, at *7 (E.D.N.Y. May 4, 2021) ("[C]ourts have generally precluded evidence of prior lawsuits to show the plaintiff's litigiousness unless there was evidence that the prior lawsuits were fraudulently filed.") (collecting cases). The risk of prejudice substantially outweighs any probative value, given the danger that the evidence will be used to draw an impermissible inference that Amend is a repeat litigant and that he acted in accordance with that character trait in this case. Fed. R. Evid. 403. The court therefore concludes that evidence or testimony concerning Amend's prior litigation as a plaintiff is irrelevant and inadmissible, including for impeachment purposes.

The court likewise concludes that evidence or testimony concerning the America Online suit is inadmissible under Rules 403, 404, and 608(b). As to Rule 608(b), courts in this circuit have repeatedly held that the existence of a complaint containing unproven allegations, or a settlement agreement lacking any adverse findings, is not probative of a witness's character for truthfulness. *See, e.g., United States v. Clanton*, 769 F. Supp. 3d 147, 155 (E.D.N.Y. 2024) ("Settled civil lawsuits that lack adverse findings or admissions of wrongdoing are not probative of truthfulness."); *United States v. Ahmed*, No. 14-CR-277 (DLI), 2016 WL 3647686, at *3 (E.D.N.Y. July 1, 2016) ("The Court does not consider the existence of a complaint containing unproven allegations or a settlement agreement lacking any adverse findings probative of the witness' truthfulness."); *United States v. Motovich*, No. 21-CR-497 (WFK), 2024 WL 3303723, at *18 (E.D.N.Y. July 2, 2024) ("[T]he Amended Complaint does not make specific allegations regarding [the witness's] truthfulness nor have there been any findings in that case as to [the witness's] truthfulness, as required to bring it within the ambit of Rule 608(b)."); *Manbro Energy Corp. v. Chatterjee Advisors, LLC*, No. 20-CV-3773 (LGS), 2023

14

WL 2563054, at *3 (S.D.N.Y. Mar. 17, 2023) ("[E]vidence that
[the witness] was accused by the SEC of insider trading decades
ago is of limited probative value in evaluating [the witness's]
character for truthfulness under Rule 608(b), given the time
elapsed and that the matter settled with no admission of wrong-
doing."); *Senior v. Eihab Human Servs., Inc.*, No. 15-CV-1009
(ENV) (PK), 2023 WL 7134076, at *1 (E.D.N.Y. Apr. 19, 2023)
("Evidence of prior . . . litigation that is remote in time, lacks
any adverse findings probative of truthfulness, or contains unproven
allegations is not probative of truthfulness.").

Claims in a complaint are merely unsubstantiated allegations of
wrongdoing, and settlement agreements are not admissions of
liability. Amend resolved the America Online suit via a "binding
Settlement Agreement," pursuant to which he and Ambro agreed
to the entry of a Stipulated Final Judgment and Order for Perma-
nent Injunction. (America Online Stipulated Judgment at 1.)
That stipulation contained no findings of fact or admissions of
wrongdoing; it simply effectuated a monetary judgment and a
forward-looking injunctive relief. (*See generally id.*) Thus, the op-
erative America Online complaint and Stipulated Judgment,
neither of which contains any adverse findings or admission of
wrongdoing, are not probative of Amend's character for truthful-
ness. Furthermore, the America Online suit is "too remote in time
to have any significance," given that it was filed and settled
nearly 20 years ago. *See Ahmed*, 2016 WL 3647686, at *3 (law-
suit settled 20 years ago too remote to bear on witness's character
for truthfulness); *see also United States v. Schwab*, 886 F.2d 509,
514 n.3 (2d Cir. 1989) (explaining that Congress intended the
matter of timeliness of prior misconduct to be left to "the discre-
tion of the court"). As such, evidence or testimony concerning the
America Online suit is not admissible under Rule 608(b).

Additionally, to the extent Amex may attempt to use the America
Online suit to portray Amend as "a perpetrator of spam," (Pls.'

Fifth Mot. at 4), such propensity evidence is inadmissible under Rule 404(b)(1), Fed. R. Evid. 404(b)(1). And the potential for prejudice substantially outweighs any probative value, given the risk that the evidence will be used to draw an impermissible inference that Amend is a person of poor moral character who acted in accordance with that character trait in this case. Fed. R. Evid. 403. The court therefore concludes that evidence or testimony concerning the America Online suit is irrelevant and inadmissible, including for impeachment purposes.

Plaintiffs' fifth motion *in limine* is granted.

### C.   Sixth Motion *in Limine*

Finally, Plaintiffs request an order precluding Sarah Wood "from testifying about events regarding 'Amex's Australia Experience' that occurred prior to February 2019, when she joined Amex." (Pls.' Sixth Mot. at 1.)

Ms. Wood joined Amex in February 2019 as a Director of Government Affairs for Australia and New Zealand. (Amex's Excerpts of Wood Dep. Tr. ("Amex's Wood Dep. Tr.") (Dkt. 314-2) 10:9-20.) She held that role until January 2024, when she became the Vice President of Government Affairs for the Asia Pacific region ("APAC"), which includes Australia. (*Id.* 7:21-8:1.) As Vice President of Government Affairs for APAC, Ms. Wood is responsible for "tracking policy and regulatory developments for [Amex]"; "advising [Amex] on those developments"; "managing [Amex's] relationships with relevant government and regulatory stakeholders"; and "advocating for [Amex's] interests in relation to those matters." (*Id.* 8:1-7.) However, Ms. Wood "did not work on payments regulation until [she joined] American Express in 2019." (*Id.* 23:22-24.) Rather, Ms. Wood worked as an attorney at an Australian law firm, where she primarily engaged in commercial litigation, and then held various advisory positions within the Australian government. (Pls.' Excerpts of Wood Dep. Tr. ("Pls.' Wood Dep. Tr.") (Dkt. 308-2) 12:16-24, 15:1-9.) So, to

prepare herself for her duties at Amex, Ms. Wood "read up" on the "history of regulation in Australia as it pertains to what the RBA [the Reserve Bank of Australia] is doing today."[4] (*Id.* 22:16-23:5.) In particular, Ms. Wood consulted "Reserve Bank reports," internal Amex documents, and "other government documents that would be relevant to the work that [she does] right now." (Amex's Wood Dep. Tr. 23:12-16, 28:2-14.) It is from this review and her experience at Amex to date that Ms. Wood claims a familiarity with "the regulatory environment . . . in Australia," both past and present, and "the impact of that environment on [Amex]." (*Id.* 20:19-22.) Amex identified Ms. Wood as a potential fact witness in October 2024, and disclosed in January 2025 that it "Will Call" Ms. Wood to testify about "Amex's Australia Experience." (Pls.' Sixth Mot. at 1 n.1; Amex's Sixth Opp. at 2 n.2; Amex's Witness List (Dkt. 258-2) at 2).)

Plaintiffs contend that Ms. Wood cannot testify about any aspect of Amex's Australia experience before February 2019 because she has no personal knowledge of those "historical" events. (Pls.' Sixth Mot. at 3-6 (citing Rules 602 and 701).) Plaintiffs further argue that Ms. Wood lacks personal knowledge of Amex's pre-2019 experience in Australia because her information regarding that time period "comes from third-party documents rather than company records or business events that she herself has firsthand knowledge of." (*Id.* at 4.) Furthermore, to the extent Ms. Wood's testimony "would be based on her understanding and knowledge that she specifically attributes to RBA and other third-party reports," Plaintiffs contend that such testimony would constitute inadmissible hearsay. (*Id.* at 5.) Finally, Plaintiffs claim that Ms. Wood cannot provide expert testimony pursuant to Rule 702,

---

[4] The Reserve Bank of Australia or RBA "is the payments regulator in Australia." (Amex's Wood Dep. Tr. 21:22-23.) The RBA "look[s] at the retail payment system and the regulatory settings for that system, over various reviews; and [it has] been doing that since the early 2000s." (*Id.* 21:23-22:1.)

both because she "is not qualified to do so" and because the deadline for expert disclosures has passed. (*Id.* at 6-8.) As such, Plaintiffs argue that Ms. Wood should not be permitted to testify about Amex's Australia experience before February 2019.

Amex opposes Plaintiffs' motion on several bases. First, Amex contends that Plaintiffs' motion is premature because "challenge[s] [to] the basis or credibility of Ms. Wood's testimony . . . go to the weight of the evidence, not its admissibility." (Amex's Sixth Opp. at 4.) Second, Amex argues that Ms. Wood gained personal knowledge of events predating 2019 by virtue of her position at the company, and through a review of both internal and third-party documents. (*Id.* at 5-6.) To that end, Amex asserts that Ms. Wood does not intend to testify about "historical" matters, but rather, "her personal knowledge about how the Australian regulatory framework that came into existence in 2002 has influenced and continues to influence Amex's business post-2019." (*Id.* at 6.) Furthermore, Amex claims that the caselaw does not support Plaintiffs' contention that a witness may not rely on a review of records to establish personal knowledge. (*Id.* at 7-8.) Third and finally, Amex represents that it has no intention to elicit expert testimony from Ms. Wood. (*Id.* at 10-11.) Amex does not address Plaintiffs' hearsay-related argument.

"The Federal Rules of Evidence allow the admission of fact testimony so long as the witness has personal knowledge, . . . while opinion testimony can be presented by either a lay or expert witness." *United States v. Cuti*, 720 F.3d 453, 457-58 (2d Cir. 2013) (citing Fed. R. Evid. 602, 701, 702). A lay witness "may testify to a [factual] matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the [factual] matter." Fed. R. Evid. 602. "Evidence to prove personal knowledge may consist of the witness's own testimony." *Id.* Additionally, a lay witness may offer opinion testimony, so long as the opinion is: "(a) rationally based on the witness's perception;

(b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701.

"[T]he personal knowledge of a witness may be inferred based on her position with a company." *Borukh v. Experian Info. Sols., Inc.*, No. 24-CV-6022 (NRM) (JRC), 2025 WL 1220042, at *5 (E.D.N.Y. Apr. 28, 2025). In a similar vein, "[i]t is axiomatic that a corporate representative may testify . . . based on knowledge gained from a review of corporate books and records." *Boniel v. U.S. Bank N.A.*, No. 12-CV-3809 (ERK) (MDG), 2013 WL 1687709, at *1 (E.D.N.Y. Apr. 18, 2013); *Pace v. Air & Liquid Sys. Corp.*, 171 F. Supp. 3d 254, 272 (S.D.N.Y. 2016) (same); *see also Borukh*, 2025 WL 1220042, at *6 ("[A] witness may establish personal knowledge based on a review of business records."). For example, in *Rigas*, a witness possessed personal knowledge of a company's books and records by conducting a thorough review of those records, despite the fact that the records were prepared before he started working at the company. *United States v. Rigas*, 490 F.3d 208, 223 (2d Cir. 2007) ("In the course of nearly twenty months at [the company], [the witness] developed what he characterized as fairly extensive knowledge of the debt area of [the company] by reviewing the Co–Borrowing Agreements, and other documents within the company, . . . . [and] familiariz[ing] himself with [the company's] accounting system and the software used to generate reports."). Courts have repeatedly deemed a witness to have personal knowledge based on his or her review of business records. *See, e.g., Borukh*, 2025 WL 1220042, at *6-7 (collecting cases).

To the extent Plaintiffs argue that Ms. Wood may not testify based on knowledge gained from a review of Amex records predating her employment, such argument is contrary to the law. *Boniel*, 2013 WL 1687709, at *1; *Borukh*, 2025 WL 1220042, at

19

*5. Unlike the witnesses in the two out-of-circuit cases cited by Plaintiffs, Ms. Wood does not plan to testify on "a matter of historical fact" on which she lacks personal knowledge or an expert understanding. *Ala. State Conf. of NAACP v. Alabama*, No. 16-CV-731 (WKW), 2020 WL 579385, at *3 (M.D. Ala. Feb. 5, 2020) (lay witness lacked personal knowledge as to whether Alabama had certain interests "in its collective mind when it adopted its present system [of voting for appellate judges]"); *Sovereign Mil. Hospitaller Ord. v. Fla. Priory of Knights Hospitallers of Sovereign Ord.*, 702 F.3d 1279, 1295 (11th Cir. 2012) (lay witness lacked personal knowledge of the history of the Order of Malta). Rather, Amex intends to solicit testimony from Ms. Wood based on her review of Amex's internal business records. As such, the court infers Ms. Wood's personal knowledge of Amex's Australia experience, pre- and post-2019, based on her position within the company and her review of Amex's records. *See Borukh*, 2025 WL 1220042, at *5.

To the extent Plaintiffs argue that Ms. Wood may not testify based on knowledge gained from a review of third-party, or, in this case, official government documents, Plaintiffs cite no authority to support that assertion. Far from relying on "an evaluation of other investigations," *Disability Advocs., Inc. v. Paterson*, No. 3-CV-3209 (NGG) (MDG), 2008 WL 5378365, at *17 (E.D.N.Y. Dec. 22, 2008), Ms. Wood studied both internal Amex documents and Australian government documents in conducting *her own* review of Amex's Australia experience. (Amex's Wood Dep. Tr. 23:12-16, 28:2-14.) This case is similar to *Bank of China*, where the Second Circuit concluded that a lay witness's testimony was rationally "based on his perceptions" to the extent it was grounded in an investigation he undertook in his role as an employee of the plaintiff. *Bank of China, N.Y. Branch v. NBM LLC*, 359 F.3d 171, 181 (2d Cir. 2004) (lay testimony admissible "so long as the testimony was based on [the witness's] investigation and reflected his investigatory findings and conclusions, and was

not rooted exclusively in his expertise in international banking"). Like the witness in *Bank of China*, Ms. Wood's testimony is "based on her perceptions" because it is grounded in her review of Amex's Australia experience. There is simply no legal support for Plaintiffs' contention that a lay witness's investigation may not involve a review of third-party documents.[5] As such, the court rejects Plaintiffs' request to preclude Ms. Wood's testimony pursuant to Rules 602 and 701.

Plaintiffs' hearsay argument is premature. "The Federal Rules of Evidence define hearsay as a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." *Sohnen v. Charter Comms., Inc.*, 761 F. Supp. 3d 556, 581 (E.D.N.Y. 2025). "Hearsay is not admissible except as provided by [the federal] rules or by other rules prescribed by the Supreme Court pursuant to statutory authority or by Act of Congress." *Id.* (citing Fed. R. Evid. 802). The sole case cited by Plaintiffs in support of their

---

[5] *Ferrari Club of America* and *East Point Systems*—the only other cases cited by Plaintiffs in support of this point—are inapposite. (Pls.' Sixth Mot. at 5 (citing *Ferrari Club of Am., Inc. v. Bourdage*, No. 12-CV-6530 (EAW), 2017 WL 1498080, at *4 (W.D.N.Y. Apr. 25, 2017); *E. Point Sys., Inc. v. Maxim*, No. 13-CV-215 (VAB), 2015 WL 8023569, at *2 (D. Conn. Dec. 4, 2015)).) Both cases dealt with the unique issue of whether and under what circumstances an accountant must testify as an expert, rather than a lay witness. *Ferrari Club*, 2017 WL 1498080, at *1-4; *E. Point Sys.*, 2015 WL 8023569, at *2-3. And in both cases, the court concluded that technical opinions or calculations based on financial documents with which the witness was not familiar or involved in compiling did not constitute lay testimony. *Ferrari Club*, 2017 WL 1498080, at *1-4; *E. Point Sys.*, 2015 WL 8023569, at *2-3. Here, Ms. Wood does not offer the technical opinion of a third-party accountant. Rather, she offers testimony concerning her current employer's experience in the Australian market, which she learned about, in part, by reviewing Australian government documents. Neither *Ferrari Club of America* nor *East Point Systems* supports Plaintiffs' contention that Ms. Wood cannot, in any respect, base her personal knowledge on these government documents.

hearsay argument, *A Slice of Pie Productions*, concluded that "where [a witness] specifically attributes his understanding or knowledge to a statement of another . . . , where those statements do not constitute an admission by a party opponent, [the witness's] testimony constitutes inadmissible hearsay (as offered for the truth of the matter asserted)." *A Slice of Pie Prods., LLC v. Wayans Bros. Ent.*, 487 F. Supp. 2d 33, 37 (D. Conn. 2007). At this stage, it is unclear whether Ms. Wood "specifically attributes" any of her understanding or knowledge to another's statement, as defined by Rule 801. *See* Fed. R. Evid. 801. It is also unclear whether the RBA reports are admissible under any exception to the rule against hearsay. *See* Fed. R. Evid. 803, 807; *see also United States v. Otufale*, 740 F. Supp. 3d 233, 241 (E.D.N.Y. 2024) ("The court may exclude the disputed evidence only if the evidence is clearly inadmissible on all potential grounds."). Thus, until Ms. Wood testifies, the court cannot conclude whether her testimony will involve inadmissible hearsay. *See Sohnen*, 761 F. Supp. 3d 581 (concluding that similar challenge to witness testimony was "premature").

Finally, the court disagrees with Plaintiffs that "[m]aking sense of the Australia experience . . . requires the 'specialized knowledge' of a Rule 702 expert." (Pls.' Sixth Mot. at 8.) While Dr. Russell Lamb, Plaintiffs' expert witness, plans to discuss Amex's Australia experience in the context of his analysis of the but-for world, Ms. Wood intends to testify regarding the actual effects of Australian regulations on Amex's business in that country. Her testimony is "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702," Fed. R. Evid. 701(c); rather, it is "based on [her] investigation and reflect[s] [her] investigatory findings and conclusions" regarding Amex's Australia experience, *Bank of China*, 359 F.3d at 181. Ms. Wood's testimony is admissible "not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that [she] has by virtue

of [her] position in the business." *Id.* (*See* Pls.' Wood Dep. Tr. 12:1-13:21, 15:1-21 (testimony reflecting Ms. Wood's lack of technical expertise in the payments industry prior to joining Amex).) Thus, Ms. Wood's testimony, at least as currently articulated, is admissible pursuant to Rule 701.

Plaintiffs' sixth motion *in limine* is denied.

## IV.  AMEX'S MOTIONS

Amex moves *in limine* to preclude (1) four exhibits from the DOJ Action, PX 70, 73, 84, and 95; and (2) evidence or argument concerning cross-subsidization as evidence of anticompetitive effects. (Amex's Fourth Mot.; Amex's Fifth Mot.) The court considers each motion in turn.

### A.  Fourth Motion *in Limine*

Amex requests "an order precluding Plaintiffs from disclosing previously excluded evidence to the jury, including in the course of expert testimony." (Amex's Fourth Mot. at 1.) According to Amex, Plaintiffs plan "to offer into evidence and disclose to the jury the contents of" four exhibits: PX 70; PX 73 (formerly DOJ PX 5); PX 84 (formerly DOJ PX 1285); and PX 95 (formerly DOJ PX 2). (*Id.*; Pls.' Trial Exs. with Objs. 2-3; PX 70 (Dkt. 299-4); PX 73 (Dkt. 299-5); PX 84 (Dkt. 299-6); PX 95 (Dkt. 299-7).) The court excluded PX 73, 84, and 95 as part of its decision precluding evidence and testimony from the DOJ Action; the court has yet to rule on the admissibility of PX 70. (M&O at 30 (listing objected-to exhibits as PX-71-PX-110).)

Amex requests that the court remind Plaintiffs of its decision excluding PX 73, 84, and 95, and reject any attempt by Plaintiffs to admit or otherwise disclose the contents of PX 70, 73, 84, or 95 pursuant to Rule 703. (Amex's Fourth Mot. at 1-2.) Specifically, Amex contends that the court's decision excluding the DOJ Action evidence pursuant to Rule 403 bars Plaintiffs "from doing

anything to 'disclose' the excluded exhibits to the jury." (*Id.* at 1.) According to Amex, this includes any attempt by Dr. Lamb (1) to rely on these exhibits in formulating—and offering—his opinions, or (2) to disclose or describe the contents of the exhibits in an effort to help the jury evaluate his opinions.[6] (*Id.* at 6-8, 10-11.)

Plaintiffs oppose Amex's motion on several bases. First, Plaintiffs contend that the court's decision excluding the DOJ Action evidence pursuant to Rule 403 did not reflect a judgment that the evidence is inadmissible for Rule 703 purposes. (Pls.' Fourth Opp. at 8-12.) Second, Plaintiffs point out that Rule 703 allows an expert to rely on inadmissible facts or data in forming his opinion, as long as experts in the particular field would reasonably rely on such facts or data. (*Id.* at 12.) As such, Plaintiffs claim that Dr. Lamb's disclosed opinions, even if premised on inadmissible evidence, are admissible. (*Id.*) Finally, Plaintiffs argue that Dr. Lamb may disclose the contents of PX 70, 73, 84, and 95 to the jury pursuant to Rule 703 because their probative value in helping the jury evaluate his opinions substantially outweighs their prejudicial effect. (*Id.* at 13-16.)

Rule 703 provides that an expert "can testify to opinions based on inadmissible evidence . . . if experts in the field reasonably rely on such evidence in forming their opinions." *United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008); *Linde v. Arab Bank, PLC*, 922 F. Supp. 2d 316, 323 (E.D.N.Y. 2013) (same). However, "if the facts or data would otherwise be inadmissible, the proponent

---

[6] Amex does not argue that Dr. Lamb's opinions are inadmissible because experts in Dr. Lamb's field would not rely on PX 70, 73, 84, or 95 in forming their opinions. Fed. R. Evid. 703. (*See generally* Amex's Fourth Mot.) Rather, Amex contends that the court's previous *in limine* decision renders certain of Dr. Lamb's opinions, including the facts and data upon which he relied in formulating those opinions, inadmissible.

of the opinion may disclose them to the jury only if their proba-
tive value in helping the jury evaluate the opinion substantially
outweighs their prejudicial effect." Fed. R. Evid. 703; *Gill v. Arab
Bank, PLC*, 893 F. Supp. 2d 523, 530 (E.D.N.Y. 2012) (same).

To the extent Amex argues that Dr. Lamb may not present to the
jury any opinions premised on PX 70, 73, 84, or 95, it is incorrect.
Rule 703 explicitly permits an expert to base his opinions on in-
admissible evidence "if experts in the particular field would
reasonably rely on [such evidence] in forming an opinion"; and
Amex makes no argument that experts in Dr. Lamb's field would
not rely on these exhibits in formulating their opinions. Fed. R.
Evid. 703. (*See generally* Amex's Fourth Mot.; *see also* Mem. &
Order Denying Amex's Motion to Exclude Dr. Lamb's Testimony
(Dkt. 220) at 7-22.) As such, Dr. Lamb may rely on PX 70, 73,
84, and 95 in formulating his opinions, irrespective of whether
those exhibits are admissible.

The court likewise rejects Amex's argument that the court's deci-
sion excluding the DOJ Action evidence pursuant to Rule 403
necessarily bars Plaintiffs "from doing anything to 'disclose' the
excluded exhibits to the jury." (Amex's Fourth Mot. at 1.) Amex
is correct that the Rule 703 balancing, which asks whether the
"probative value [of the exhibits] . . . substantially outweighs
their prejudicial effect," Fed. R. Evid 703, is distinct from the Rule
403 balancing, which asks whether the "probative value [of the
exhibits] is substantially outweighed by a danger of . . . unfair
prejudice," Fed. R. Evid. 403. And the parties devote some pages
to discussing whether a finding of inadmissibility under Rule 403
necessitates a finding of inadmissibility under Rule 703. (Amex's
Fourth Mot. at 5-10; Pls.' Fourth Opp. at 8-9.) Ultimately, the
court need not resolve this legal question because the court de-
termines that PX 70 and 73 are not "otherwise . . . inadmissible"
such that their disclosure triggers Rule 703's balancing test. *See*
Fed. R. Evid. 703. To the extent such a determination conflicts

with the court's prior decision, that decision is modified. Additionally, insofar as a finding of prejudice under Rule 403 requires a finding of prejudice under Rule 703, the court modifies its previous *in limine* ruling to permit Dr. Lamb to disclose PX 84 to the jury pursuant to Rule 703. Finally, the court leaves undisturbed its decision excluding PX 95. The court discusses each exhibit in turn.

### 1.  PX 70

PX 70 is an excerpt from an Amex presentation dated March 26, 2010, titled "Regulation Driven Surcharging/Discounting Threats." (PX 70 at ECF p. 2.) The presentation covered, among other things, the impacts and takeaways from Amex's experience in Australia, where government regulation abolished anti-steering and no-surcharge rules. (*Id.* at ECF pp. 5-6, 13-14.) According to Plaintiffs, Dr. Lamb relies on PX 70 as a basis for his opinion that Amex "viewed its experience in Australia following the reforms there as instructive to how Amex should act in the U.S. should Amex lose its ability to enforce its anti-steering rules and should a credible threat of differential surcharging come to exist." (Pls.' Fourth Opp. at 6-7.) Dr. Lamb relies on PX 70 "in forming his opinion that Amex would have reacted to the threat of differential surcharging . . . by proactively lowering its price to large U.S. merchants *before* surcharging could take hold." (*Id.* at 2.)

Amex does not discuss PX 70 at length in its motion, except to argue that the court's prior decision bars Plaintiffs from offering or using PX 70 at trial, and that the exhibit is an "internal Amex Australia document[] from more than a decade ago." (Amex's Fourth Mot. at 2, 4-5.) Plaintiffs, for their part, argue that PX 70 has probative value in helping the jury evaluate Dr. Lamb's opinions about the extent of surcharging in the but-for world. (Pls.' Fourth Opp. at 2, 6-7, 15.)

As noted above, the court has yet to decide the admissibility of PX 70. (M&O at 30 (listing objected-to exhibits as PX-71-PX-110).) Nevertheless, the court concludes that PX 70 is probative of a key issue in this case: what the but-for world would look like in the absence of Amex's NDPs. (*See supra* III.A.) PX 70 provides insight into how Amex might react if its NDPs were abolished in the United States. The only potential prejudice identified by Amex is that PX 70 is over a decade old; however, that is not due to some failure by Plaintiffs to obtain more up-to-date evidence, but rather, the mere fact that Australia adopted the relevant regulations in 2003, and both the market and Amex reacted to those regulations in the years thereafter. (PX 70 at ECF p. 13 (noting that Australia adopted the relevant regulations in 2003, those regulations began to affect the market in 2006 and 2007, and Amex Australia adapted to the new environment between 2007 and 2009).) Additionally, to the extent Amex argues that disclosure of PX 70 would lead to revelation of the DOJ Action, Amex provides no basis for that assertion. (Amex's Fourth Mot. at 9.) Like the Durbin Working Group Documents, Amex created PX 70 independent of the DOJ Action. Thus, unlike prior trial testimony, there is no apparent need to "contextualize" PX 70 within the DOJ Action. (*Id.*) Therefore, the court concludes that PX 70 is relevant, and that its probative value is not substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, or wasting time. Fed. R. Evid. 401, 402, 403. Because PX 70 is not "otherwise . . . inadmissible" under Rule 703, Dr. Lamb may rely upon and disclose it to the jury.

### 2.  PX 73

PX 73 is a slide from an October 8, 2010 Amex presentation titled "Global Pricing & Revenue Management 2011 SQP Review." (PX 73 at ECF p. 2.) The slide discusses the "Canada Code of Conduct"—an agreement among networks and acquirers that allowed merchants to differentially price by payment network in

Canada—and the threat it posed to Amex's business model. (*Id.* at ECF p. 3.) The slide also analyzes the threat posed by the Durbin Bill. (*Id.*) According to Plaintiffs, Dr. Lamb relies on PX 73 as a basis for his opinion that Amex's NDPs "successfully prevented Amex-accepting merchants from credibly threatening to differentially surcharge credit-card transactions." (Pls.' Fourth Opp. at 7.)

Amex does not discuss PX 73 in its motion, except to argue that the court's prior decision bars Plaintiffs from offering or using PX 73 at trial. (Amex's Fourth Mot. at 2, 4.) Plaintiffs argue that PX 73 has probative value in helping the jury evaluate Dr. Lamb's opinions about the extent of surcharging in the but-for world. (Pls.' Fourth Opp. at 2, 15.)

The court modifies its previous *in limine* ruling as to PX 73. *Luce,* 469 U.S. at 41. Although the court excluded PX 73 in its prior decision, it did not consider PX 73 individually, nor did it rule decisively on the exhibit's relevance. (M&O at 37 n.18 (noting that the court "cannot assess with particularity" each exhibit).) Considering PX 73 for the first time on an individual basis, the court concludes that the exhibit is probative of the but-for world because it demonstrates Amex's belief that legislation permitting differential surcharging posed a threat to its business model. (PX 73 at ECF p. 3.) To the extent Amex argues that PX 73 is prejudicial because it is 15 years old, such an argument fails for the same reasons articulated above: the exhibit reflects Amex's reactions to then-current changes in legislation/Code; it is not Plaintiffs' fault that such changes occurred—or were proposed—over 10 years ago. Additionally, there is no indication that disclosure of PX 73 would lead to revelation of the DOJ Action. (*See* Amex's Fourth Mot. at 9.) Amex created PX 73 independent of the DOJ Action; thus, unlike prior trial testimony, there is no apparent need to "contextualize" PX 73 within the DOJ Action. (*Id.*) As such, the court concludes that PX 73 is relevant, and that its probative value is not substantially outweighed by a danger of

unfair prejudice, confusing the issues, misleading the jury, or wasting time. Fed. R. Evid. 401, 402, 403. Because PX 73 is not "otherwise . . . inadmissible" under Rule 703, Dr. Lamb may rely upon and disclose it to the jury.

### 3. PX 84

PX 84 is a slide from a Discover presentation dated October 15, 2007, which contains a chart depicting the effects of Discover's pivot from a low-cost provider strategy to a strategy of raising its rates to merchants. (PX 84 at ECF pp. 2-3.) According to Plaintiffs, Dr. Lamb relies on PX 84 as a "key document" for his damages benchmark. (Pls.' Fourth Opp. at 5.) Specifically, Dr. Lamb opines that "the extent to which Discover raised its merchant discount rates after deciding that its low-cost provider strategy could not succeed due to rival card networks' (including Amex's) anti-steering rules" represents a suitable proxy "for the extent to which Amex's anti-steering rules caused merchant discount rates to be artificially inflated during the class period." (*Id.*)

Amex argues that PX 84 is inadmissible under Rule 703 for the same reasons articulated in the court's prior decision. (Amex's Fourth Opp. at 4-5 (citing M&O at 37).) Specifically, Amex contends that PX 84 is of minimal probative value because it is over 15 years old and "does not reflect any strategy Discover adopted during the class period." (*Id.* at 9 (noting that the "the graph itself only includes data until 2008").) Plaintiffs assert that PX 84 would help the jury evaluate the validity of Dr. Lamb's damages calculations. (Pls.' Fourth Opp. at 14.) Additionally, while the court previously concluded that PX 84 bore little probative value "as *substantive evidence* tending to prove how Discover would have behaved in the 2015–2022 class period," Plaintiffs argue, the court has yet to consider PX 84's probative value "as *basis evidence* to help the jury evaluate Dr. Lamb's opinion that Discover's pricing behavior is a reasonable benchmark for estimating

the level of overcharge caused by Amex's Anti-Steering Rules." (*Id.* at 6.)

The court concludes that the probative value of PX 84 in helping the jury evaluate Dr. Lamb's opinion substantially outweighs its prejudicial effect. Although the court excluded PX 84 in its prior decision, it did so in the context of determining that third-party testimony from the DOJ Action was minimally probative of those third parties' thoughts and opinions during the class periods in this case. (M&O at 37-38.) Additionally, the court's decision did not assess the admissibility of PX 84 pursuant to Rule 703. (*Id.* at 27-42.) The court determines that disclosure of PX 84 will help the jury evaluate Dr. Lamb's opinion because it is a visualization of the facts and data upon which Dr. Lamb relied in reaching his damages benchmark calculations. (PX 84 at ECF p. 3.) To the extent Amex argues that PX 84 is prejudicial because it is over 15 years old and does not reflect Discover's activity or behavior during the class period, such argument falls flat in this context, where the exhibit is merely used as a model for Dr. Lamb's damages calculation. Finally, there is no indication that disclosure of PX 84 would reveal the existence of the DOJ Action. (*See* Amex's Fourth Mot. at 9.) Discover created PX 84 independent of the DOJ Action; thus, unlike prior trial testimony, there is no apparent need to "contextualize" PX 84 within the DOJ Action. (*Id.*) As such, the court concludes that the probative value of PX 84 in helping the jury evaluate Dr. Lamb's opinion substantially outweighs its prejudicial effect, which is minimal in this context. Dr. Lamb may rely upon and disclose PX 84 to the jury pursuant to Rule 703; however, the exhibit remains excluded for the purposes articulated in the court's prior decision.

### 4. PX 95

Lastly, PX 95 is a copy of an earlier version of Amex's NDPs, effective April 2012. (PX 95 at ECF p. 2.) Dr. Lamb did not cite PX 95 as relied upon in his expert report. (*See* Lamb Report (Dkt.

138-4).) Nor do Plaintiffs claim that Dr. Lamb relied on PX 95 in generating any specific opinions. (*See* Pls.' Fourth Opp. at 7.) Nevertheless, Plaintiffs assert that PX 95 has "probative value in helping the jury evaluate Dr. Lamb's opinions about . . . Amex's anti-steering rules over time." (*Id.* at 15.) Additionally, in an email appended to Amex's motion *in limine*, Plaintiffs represented that PX 95 "could be used or relied on to show the consistency of [Amex's NDPs]," should Amex "dispute that its anti-steering rules materially changed from the beginning of the class period to the end in 2022." (Email Exchange (Dkt. 299-3) at ECF p. 2.) Amex does not discuss PX 95 at length in its motion, except to point out that the document "predates all class periods" in this case. (Amex's Fourth Mot. at 5.)

At this stage, the court cannot conclude that PX 95 has "probative value in helping the jury evaluate" Dr. Lamb's opinions. Fed. R. Evid. 703. Dr. Lamb did not cite to PX 95 in his expert report; as such, it is unclear exactly which opinions Dr. Lamb may offer based on this exhibit. And the court cannot determine PX 95's probative value in helping the jury evaluate Dr. Lamb's opinions without knowing the precise opinions at issue. Furthermore, to the extent Dr. Lamb may rely on PX 95 as evidence that Amex's NDPs remained materially unchanged "from the beginning of the class period to the end in 2022," as Amex points out, PX 95 predates the beginning of the class periods in this case by several years. (Email Exchange at ECF p. 2; Amex's Fourth Mot. at 5 (noting that PX 95 is from 2012 and the earliest class period begins in January 2015).) It is therefore unclear whether PX 95 would serve Plaintiffs' intended purpose. Thus, because the court cannot conclude that PX 95 would help the jury evaluate Dr. Lamb's opinions, he may not disclose the contents of PX 95 to the jury.

In sum, Amex's fourth motion *in limine* is denied as to PX 70, 73, and 84, and granted as to PX 95. The parties are directed to remove any DOJ trial exhibit stamps from PX 70, 73, and 84. Additionally, the parties may propose a limiting instruction to be read in the event that Dr. Lamb discloses the contents of PX 84 to the jury.

## B.   Fifth Motion *in Limine*

Finally, Amex requests an order precluding Plaintiffs from introducing evidence or argument regarding "cross-subsidization as a basis for suggesting that Amex's [NDPs] have caused anticompetitive effects or harm." (Amex' Fifth Mot. at 1.)

In his expert report, Dr. Lamb explores how Amex's NDPs caused merchants "to incur higher overall costs of GPCC [general purpose credit card] acceptance (merchant discount fees) on GPCC Transactions than they otherwise would have." (Lamb Report ¶ 331.) Dr. Lamb opines that, because Amex's NDPs prevent merchants from charging customers a fee commensurate with the cost of accepting their particular credit card, merchants "raise prices to *all* customers in order to cover their average costs of GPCC acceptance." (*Id.* ¶ 333.) The result, according to Dr. Lamb, is that users of premium, higher-cost GPCCs obtain incremental benefits—*i.e.*, cardholder rewards—at the expense of lower-cost GPCC users and users of other, less expensive forms of payment like debit cards, cash, and checks. (*Id.*) Dr. Lamb adds that these users "pay a relatively higher portion of the merchant's average cost of accepting GPCCs [because] they earn below-average rates of cardholder rewards, or no rewards at all." (*Id.*) In other words, Dr. Lamb states that Amex's NDPs "resulted in a regressive cross-subsidization that caused *all consumers*, not just those paying with GPCCs, to pay the artificially-inflated retail prices charged

by Amex-accepting merchants."[7] (*Id.* ¶ 339.) Dr. Lamb discusses cross-subsidization in the portion of his expert report titled "Common Evidence Demonstrates that All or Nearly All Members of the Credit Card Class and Debit Card Class were Injured by Amex's Continued Imposition and Enforcement of its Anti-Steering Rules." (*Id.* Section VI.)

Amex requests that the court preclude evidence or argument regarding cross-subsidization as a basis for proving anticompetitive effects or harm pursuant to Rules 401, 402, and 403.[8] (Amex's Fifth Mot. at 1-3.) Amex contends that testimony and evidence of cross-subsidization is irrelevant. (*Id.* at 4-7.) Amex notes that an antitrust plaintiff must demonstrate harm to the competitive process as a whole, and "'direct evidence of anticompetitive effects'" requires "'proof of actual detrimental effects on competition, such as reduced output, increased prices, or decreased quality in the relevant market.'" (*Id.* at 6 (quoting *Ohio v. Am. Express*, 585 U.S. at 542).) According to Amex, cross-subsidization is irrelevant to competitive harm because it is a "distributional concern" that "says nothing about whether competition *as a whole* has been harmed." (*Id.* at 4.) In other words,

---

[7] Dr. Lamb explains that the cross-subsidy is "regressive" because it reflects "a transfer [of a subsidy] from lower-income consumers (who were typically unable to enjoy the benefits of premium rewards GPCCs) to higher-income consumers (who were most likely to use the premium rewards GPCCs that were among the most expensive for merchants to accept)." (Lamb Report ¶ 338.)

[8] Although Amex frames its request as limited to evidence or argument regarding "cross-subsidization *as a basis for suggesting that Amex's [NDPs] have caused anticompetitive effects or harm*," the relief it requests is broader. (Amex's Fifth Mot. at 1, 9 (emphasis added).) For example, in addition to arguing that cross-subsidization is irrelevant to the issue of competitive harm, Amex also suggests that cross-subsidization is "wholly irrelevant to Dr. Lamb's damages model." (*Id.* at 6.) Furthermore, Amex's contention that cross-subsidization evidence "would be an impermissible appeal to class-based prejudices" seems to suggest that such evidence would be inappropriate regardless of its purpose. (*Id.* at 9.)

Amex argues that cross-subsidization "has nothing to do with reduced output, increased prices[,] or decreased quality in the relevant market." (*Id.* at 7.) In support of its assertion, Amex cites two law review articles authored by the same professor. (*Id.* at 5 (citing Herbert Hovenkamp, *Whatever Did Happen to the Antitrust Movement?*, 94 NOTRE DAME L. REV. 583, 624 (2018); Herbert Hovenkamp, *Progressive Antitrust*, 2018 U. ILL. L. REV. 71, 110 (2018)).) Amex also points out that Dr. Lamb himself does not opine that cross-subsidization represents harm to competition; rather, he lists it as an "additional adverse effect" of Amex's NDPs. (*Id.* at 6 (quoting Lamb Report ¶ 338).) Thus, Amex argues that testimony or evidence regarding cross-subsidization is irrelevant.

Amex further contends that any probative value of cross-subsidization evidence is substantially outweighed by a danger of unfair prejudice and confusion. (*Id.* at 7-9.) In particular, Amex claims that cross-subsidization evidence would confuse or mislead the jury "because cross-subsidization is not evidence of anticompetitive effects under the law." (*Id.* at 7.) Additionally, Amex asserts that Plaintiffs "disclaimed reliance on this [cross-subsidization] theory by repeatedly asserting that they are only pursuing a direct evidence case based on the idea that the NDPs harm competition because they result in higher two-sided prices." (*Id.* at 8.) Allowing Plaintiffs to "change course" this close to trial would prejudice Amex "in at least two ways,": first, Plaintiffs "denied Amex the opportunity to secure summary judgment" on this issue by "saying that they intended to prove anticompetitive effects only through direct evidence"; and second, Amex "has been preparing for trial by focusing [only] on Plaintiffs' direct evidence theory." (*Id.*) Finally, Amex argues that Plaintiffs' cross-subsidization theory would be an "impermissible appeal to class-based biases." (*Id.* at 9.) For these reasons, Amex requests that the court preclude evidence or argument regarding cross-subsidization pursuant to Rule 403.

Plaintiffs oppose Amex's motion. As a general matter, Plaintiffs characterize Amex's request as "seek[ing] to deny the jury a full picture of the actual market reality." (Pls.' Fifth Opp. at 2.) According to Plaintiffs, "[t]o hear only that Amex charges higher merchant fees and that it provides its cardholders with higher rewards, but not that the increased retail prices . . . result in cross-subsidization, would leave the jury in the dark." (*Id.*) "Without showing cross-subsidization," Plaintiffs contend, "the jury would hear only half the story." (*Id.*)

With respect to Rules 401 and 402, Plaintiffs assert that cross-subsidization is relevant to competitive harm because "increased prices" paid by market participants "are a classic anticompetitive effect and are direct evidence of anticompetitive harm." (Pls.' Fifth Opp. at 3 (citing *Ohio v. Am. Express*, 585 U.S. at 542).) Plaintiffs also contend that cross-subsidization is relevant to refuting Amex's position that its NDPs "are procompetitive and enhance competition in the two-sided market for credit and charge card transactions." (*Id.*) Additionally, Plaintiffs assert that cross-subsidization "has special relevance" to their Illinois Claim and request for punitive damages under Illinois law. (*Id.*) Specifically, Plaintiffs argue that cross-subsidization "confirms" that Amex's NDPs violate public policy, and that Amex's conduct warrants punitive damages. (*Id.* at 3-4.)

As to Rule 403, Plaintiffs assert that cross-subsidization "has been a prominent element of [their] case since the initial complaint." (*Id.* at 4-5 (citing references to cross-subsidization in the Complaint, Amended Complaint, Second Amended Complaint, Amex's Answer to the Second Amended Complaint, Amex's Opposition to Plaintiffs' Motion for Class Certification, Plaintiffs' Reply in Support of their Motion for Class Certification, Dr. Lamb's report, the Deposition of Dr. Lamb, and Dr. Gaier's report).) Plaintiffs state that they "have never represented, in the summary-judgment proceedings or otherwise, that they did not

intend to present evidence of cross-subsidization." (*Id.* at 5.) As such, Plaintiffs contend, Amex cannot be surprised by their reliance on cross-subsidization evidence. (*Id.*) Additionally, Plaintiffs assert that there is no "legal support" for Amex's contention that it would be prejudicial for Plaintiffs to present cross-subsidization evidence that they did not rely upon at summary judgment. (*Id.* at 6.) Regardless, Plaintiffs argue, they "are not raising a different theory of liability by presenting cross-subsidization evidence." (*Id.*) Finally, Plaintiffs reject Amex's argument that cross-subsidization is an appeal to class prejudice, reasoning that cross-subsidization "is simply a fact, and a part of explaining the consequences of Amex's [NDPs]." (*Id.*)

The court concludes that evidence of cross-subsidization is relevant, and that its relevance is not substantially outweighed by a danger of unfair prejudice or confusing the issues. Fed. R. Evid. 401, 402, 403.

Evidence of cross-subsidization meets the low bar for relevance. *Belvin*, 635 F. Supp. 3d at 197. The parties do not dispute that the alleged anticompetitive effects of Amex's NDPs is a "fact . . . of consequence in determining the action." Fed. R. Evid. 401(b) (Amex's Fifth Mot. at 2, 4-5; Pls.' Fifth Opp. at 3.) Instead, the parties dispute whether cross-subsidization "has any tendency to make [anticompetitive effects] more or less probable than it would be without the evidence." Fed. R. Evid. 401(a). As the parties point out, a plaintiff can prove anticompetitive effects "directly or indirectly," and "[d]irect evidence of anticompetitive effects would be proof of actual detrimental effects on competition, . . . such as reduced output, increased prices, or decreased quality in the relevant market." *Ohio v. Am. Express*, 585 U.S. at 542.

Here, the jury has yet to determine the relevant product market. Nevertheless, whether the relevant market is the two-sided market for credit card transactions in the United States, or the two-

sided market for credit card and debit card transactions in the United States, cross-subsidization has a tendency to prove "increased prices" in these markets. Specifically, cross-subsidization tends to show that, while merchants raise prices to *all* consumers in order to cover the costs of GPCC acceptance, those increased prices weigh more heavily on lower-cost GPCC users and users of other forms of payment like debit cards, cash, and checks, because those individuals earn below-average rates of cardholder rewards or no rewards at all, and thus reap fewer—or none—of the cardholders benefits that led to the higher prices in the first place. (Lamb Report ¶¶ 331-39.) The court agrees with Plaintiffs that cross-subsidization is part of the "full picture" of increased prices in the relevant market. (Pls.' Fifth Opp. at 2.) Therefore, the court concludes that cross-subsidization evidence is relevant. Ultimately, it will be for the jury to decide the weight, if any, to give the evidence.

Amex's arguments do not convince the court otherwise. While Amex points out that Plaintiffs "do not have any cases to support the position that cross-subsidization is relevant [to proving competitive harm]," neither does Amex. (Amex's Fifth Mot. at 5.) Amex cites caselaw discussing the concept of competitive harm in general, but those cases do not mention, let alone decide the relevance of, cross-subsidization as evidence of competitive harm.[9] (*Id.* (citing *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998) (no mention of cross-subsidization); *Epic Games, Inc. v. Apple Inc.*, 493 F. Supp. 3d 817, 839 (N.D. Cal. 2020) (no mention of cross-subsidization); *SCM Corp. v. Xerox Corp.*, 645 F.2d 1195, 1203 (2d Cir. 1981) (no mention of cross-subsidization)).)

---

[9] The fact that the Supreme Court did not discuss cross-subsidization in its analysis of competitive harm in *Ohio v. Am. Express* is not "[n]otabl[e]," as Amex suggests. (Amex's Fifth Mot. at 6 n.2.) The fact that the Supreme Court did not address the issue means just that—it did not address the issue.

Nor is the court aware of any case addressing the issue. Additionally, while some scholars opine that cross-subsidization does not necessarily reflect anticompetitive harm, others adopt the opposite view. *Compare* Herbert Hovenkamp, *Whatever Did Happen to the Antitrust Movement?*, 94 NOTRE DAME L. REV. 583, 624 (2018) ("[A]ntitrust has no place in addressing distribution of wealth aside from concerns for competition."), *and* Herbert Hovenkamp, *Progressive Antitrust*, 2018 U. ILL. L. REV. 71, 110 (2018) ("Antitrust is neither a tax-and-transfer system, nor one that is structured in a way that permits managed cross-subsidization."), *with* Trent Earl, *Merchant Restraints in Ohio v. American Express—Why the Supreme Court Got It Wrong*, 34 BYU J. PUB. L. 277, 293-99 (2020) ("The poor subsidizing the rich due to competitive restraints is exactly what the Sherman Act was implemented to prevent. . . . This Robin-Hood-in-reverse system causes significant harm to competition in the form of supracompetitive prices."), *and* Br. for Amici Curiae John M. Connor, et al. in Supp. of Pet'rs, *Ohio v. Am. Express*, 585 U.S. 529, 2017 WL 6492474, at *25 ("[C]ustomers, who tend to have incomes or credit scores too low to qualify for high rewards credit cards, will . . . end up subsidizing the rewards of more affluent cardholders. . . . This is further evidence of inefficient pricing and adverse impacts on consumers that are not Amex card users."). Thus, given the lack of caselaw and divergence of scholarly opinions, the court rejects Amex's argument that Plaintiffs' cross-subsidization theory "is wrong as a matter of law." (Amex's Fifth Mot. at 1.)

The court further concludes that the relevance of cross-subsidization evidence is not substantially outweighed by a danger of unfair prejudice or confusing the issues. Amex's argument that cross-subsidization evidence would confuse or mislead the jury assumes that cross-subsidization is irrelevant to anticompetitive effects. (Amex's Fifth Mot. at 7.) Likewise, Amex's assertion that it would be prejudiced by Plaintiffs' "late" attempt to "change

course" also presumes that cross-subsidization cannot constitute direct evidence of anticompetitive effects. (*Id.* at 3, 8.) While Amex contends that Plaintiffs "disclaimed reliance on [cross-sub-sidization] by repeatedly asserting that they are only pursuing a direct evidence case based on the idea that the NDPs harm competition because they result in higher two-sided prices," (*id.* at 8), Plaintiffs assert that they "are not raising a different theory of liability by presenting cross-subsidization evidence" because, in their view, cross-subsidization *is* direct evidence of anticompetitive effects, (Pls.' Fifth Opp. at 3, 6.) Thus, Amex's claim of surprise or prejudice is premised on its own assumption that cross-subsidization does not constitute direct evidence of anti-competitive effects.

In any event, Amex cannot be surprised by the inclusion of cross-subsidization evidence. As Plaintiffs point out, cross-subsidization "has been a part of [their] case since the beginning." (*Id.* at 1.) It is mentioned in each of their complaints, in Dr. Lamb's report, and in Amex's own expert's report, among other places. (Compl. (Dkt. 1) ¶¶ 7, 120; Am. Compl. (Dkt. 68) ¶¶ 7, 135; Second Am. Compl. (Dkt. 187) ¶¶ 7, 132; Lamb Report ¶¶ 302, 331-39; Gaier Report (Dkt. 139-17) ¶¶ 75-80, 104.) While Amex claims that Plaintiffs "never disclosed [in connection with summary judgment briefing] that they intended to pursue a case based on alleged cross-subsidization," Amex cites no authority that would require Plaintiffs to make such a disclosure.[10] (Amex's

---

[10] Amex cites *USA Petrol. Co. v. Atl. Richfield Co.*, 13 F.3d 1276 (9th Cir. 1994) in support of its assertion that Plaintiffs "should not be permitted to resurrect" a theory on which they "denied Amex the opportunity to secure summary judgment." (Amex's Fifth Mot. at 8.) In addition to being out-of-circuit, *USA Petrol.* is inapposite. In that case, the Ninth Circuit concluded that the plaintiff had waived an alternative theory of liability by failing to raise it in its opposition to summary judgment. *USA Petrol. Co.*, 13 F.3d at 1280-82. *USA Petrol.* did not grapple with the issue presented here: whether Plaintiffs' alleged representation at summary judgment that they

Fifth Mot. at 1, 7-9.) And the fact that Amex failed to prepare for cross-subsidization evidence in the lead-up to trial is again a product of its own assumption that cross-subsidization is not part of Plaintiffs' "direct evidence theory." (*Id.* at 8.) Without evidence of an explicit representation by Plaintiffs that they would not introduce evidence of cross-subsidization at trial, the court cannot accept Amex's claim of surprise or unfair prejudice.

Finally, the court rejects Amex's claim that cross-subsidization evidence would "be an impermissible appeal to class-based prejudices." (*Id.* at 9.) While "appeals to class prejudice are highly improper," the cases cited by Amex in support of its argument are factually distinguishable. *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 239 (1940). In *Socony-Vacuum Oil Co.*, an antitrust case brought by the federal government, the Supreme Court criticized the statements made to the jury by government counsel that improperly appealed to class-based prejudices, including that the case involved the "biggest men" in the country who "controll[ed] vast volumes of financial influence," that "these more powerful people are above the law and can't be reached and can't be brought to book," and other similar statements. *Id.* at 237-39. Likewise, in *McMennamin*, the district court set aside a damages verdict after defense counsel's summation focused at length on the plaintiff's wealth and privilege, which the court characterized as a "blatant appeal to class prejudice." *McMennamin v. Plaza Hotel*, No. 82-CV-6274 (RO), 1984 WL 572, at *1-2 (S.D.N.Y. July 9, 1984). Lastly, in *Retamosa*, the district court granted the defendant's motion to preclude evidence or argument that jurors should base their damages verdict on "an amount the jurors[] would charge if they endured similar injuries

---

would pursue only a direct liability theory at trial, which Amex assumed to exclude evidence of cross-subsidization, requires preclusion of cross-subsidization evidence at trial pursuant to Rule 403.

or that a verdict for the Plaintiff will somehow make the community a safer and better place to live and work." *Retamosa v. Target Corp.*, No. 19-CV-5797 (DSF), 2021 WL 4499236, at *1 (C.D. Cal. May 4, 2021). The court agreed with the defendant that such arguments had "a substantial likelihood of unfairly prejudicing the jury because [they] may encourage the jury to render a verdict based on personal interest and bias rather than on the evidence." *Id.*

Here, the court is not faced with inappropriate, blatant appeals to class-based prejudices made directly to the jury. Nor do Plaintiffs intend to ask jurors to assess damages based on an amount they would prefer if they had suffered the same injuries, or based on their own view of how the market should operate. Rather, cross-subsidization is simply another aspect of Plaintiffs' theory of anticompetitive harm. It is no more an appeal to class-based prejudices than other evidence of harm to competition in the market. Therefore, the court concludes that evidence of cross-subsidization, at least as currently articulated, would not impermissibly appeal to class-based prejudices.

In sum, the court concludes that evidence of cross-subsidization is relevant, and that its relevance is not substantially outweighed by a danger of unfair prejudice or confusing the issues. Amex's fifth motion *in limine* is denied.

## V.  CONCLUSION

For the reasons stated above, Plaintiffs' motion for reconsideration is GRANTED, Plaintiffs' fifth motion *in limine* is GRANTED, Plaintiffs' sixth motion in limine is DENIED, Amex's fourth motion *in limine* is GRANTED in part and DENIED in part, and Amex's fifth motion in limine is DENIED.

The court rules as follows:

- Plaintiffs' motion for reconsideration as to PX 74, 75, 76, and 79 is GRANTED. These exhibits are no longer precluded pursuant to the court's prior decision. The parties are DIRECTED to remove any DOJ trial exhibit stamps from PX 74, 75, 76, and 79.

- Plaintiffs' request to exclude evidence or argument concerning Plaintiff Andrew Amend's involvement in prior litigation is GRANTED.

- Plaintiffs' request to preclude Sarah Wood from testifying about events regarding Amex's Australia experience that occurred prior to February 2019 is DENIED.

- Amex's request to preclude Plaintiffs from disclosing PX 70, 73, 84, or 95 to the jury is DENIED as to PX 70, 73, and 84, and GRANTED as to PX 95. The parties are DIRECTED to remove any DOJ trial exhibit stamps from PX 70, 73, and 84. The parties may propose a limiting instruction to be read in the event that Dr. Lamb discloses the contents of PX 84 to the jury.

- Amex's request to preclude Plaintiffs from introducing evidence or argument about cross-subsidization as a basis for suggesting that Amex's NDPs caused anticompetitive effects or harm is DENIED.

SO ORDERED.

Dated:     Brooklyn, New York
           July 17, 2025

                              S/ Nicholas G. Garaufis
                              NICHOLAS G. GARAUFIS
                              United States District Judge