UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____

DAVID MOSKOWITZ, SHAWN O'KEEFE,
ANDREW AMEND, ALLIE STEWART, ANGELA
CLARK, RICKY AMARO, ABIGAIL BAKER,
JAMES ROBBINS IV, EMILY COUNTS, DEBBIE
TINGLE, WYATT COOPER, and SARAH
GRANT, on behalf of themselves and all others
similarly situated,

                              Plaintiffs,

            -against-

AMERICAN EXPRESS COMPANY and
AMERICAN EXPRESS TRAVEL RELATED
SERVICES COMPANY, INC.,

                              Defendants.
_____

**MEMORANDUM & ORDER
19-CV-566 (NGG) (JRC)**

NICHOLAS G. GARAUFIS, United States District Judge.

The court assumes familiarity with the factual background and procedural history of this antitrust class action. Trial in this case began on August 11, 2025. On August 13, 2025, the court: (1) overruled Defendants American Express Company and American Express Travel Related Services Company, Inc.'s (collectively, "Amex") objection to a slide Plaintiffs intended to use during the testimony of their expert, Dr. Russel Lamb; and (2) overruled Plaintiffs' objections to the admissibility of a July 15, 2025 Reserve Bank of Australia Report. (Text Order Dated 8/13/2025.) Following the testimony of Dr. Lamb, Amex moved for a mistrial or, in the alternative, a cautionary jury instruction. (First Mot. for Mistrial (Dkt. 363-1); *see also* Pls.' First Mistrial Opp. (Dkt. 364).) Thereafter, on August 19, 2025, the court excused Juror #4 for good cause on a motion from Plaintiffs and over Amex's objection. (Min. Entry Dated 8/19/2025; Pls.' Public Ltr. re Juror #4 (Dkt. 360); Pls.' Sealed Ltr. re. Juror #4 (Dkt. 373-1); Amex's

1

Public Ltr. re Juror #4 (Dkt. 362); Amex's Sealed Ltr. re. Juror #4 (Dkt. 361-1).) Finally, after closing arguments, Amex again moved for a mistrial. (Second Mot. for Mistrial (Dkt. 376-1).) This Memorandum & Order details the reasoning behind the aforementioned rulings, DENIES Amex's first and second motions for a mistrial, and GRANTS Amex's request for a cautionary jury instruction.

## I.    DISCUSSION

### A.    Amex's Objection to Plaintiffs' Slide & Motions for Mistrial

On August 12, 2025, Amex objected to a slide Plaintiffs planned to use in connection with their examination of Dr. Lamb. (Amex's Objs. to Slide (Dkt. 356).) The slide—PDX02-023—is titled "Relevant Market: Market Power" and contains three, enumerated points: (1) "Merchant fees unrelated to cost"; (2) "Able to profitably raise prices"; (3) "Able to price discriminate."[1] (PDX02-023 (Dkt. 356-1).) Amex argued that Plaintiffs should be precluded from discussing or introducing evidence of market power. (*See generally* Amex's Objs. to Slide.) Amex pointed out that, under *Ohio v. American Express*, a plaintiff may prove liability for a vertical restraint either "directly, through 'proof of actual detrimental effects [on competition]' or indirectly, through 'proof of market power plus some evidence that the challenged restraint harms competition.'" (*Id.* at 1 (quoting *Ohio v. Am. Express Co.*, 585 U.S. 529, 542 (2018) ("*Amex III*")).) However, Amex argued that Plaintiffs abandoned an indirect evidence approach by failing to defend that theory of liability at summary judgment. (*Id.* at 1.) To permit Plaintiffs to "change course" at this late stage—

---

[1] These points track the three sub-points from a section of Dr. Lamb's September 30, 2022, Expert Report, titled "Amex Exercised Market Power in the Market for GPCC Transactions in the United States During the Class Period." (9/30/2022 Expert Report of Dr. Lamb (Dkt. 138-4) ¶¶ 152-75.)

after trial had begun—would, Amex argued, prejudice Amex and "pose a significant risk of confusing the issues for the jury." (*Id.* at 2.)

Plaintiffs opposed Amex's motion at a break in the proceedings on August 13, 2025. (8/13/2025 Trial Tr. 198:1-208:15.) Plaintiffs represented that they intended to pursue a direct evidence theory of the case, which, according to Plaintiffs, requires no affirmative proof of market power. (*Id.* 199:12-200:17, 206:1-8.) However, Plaintiffs argued that Amex opened the door to market power evidence by including in its opening statement arguments regarding Amex's purported lack of market power. (*Id.* 207:14-24.) Absent a stipulation that "neither side puts in evidence [related to] market power," Plaintiffs asserted that they were entitled to rebut Amex's market power evidence. (*Id.* 201:3-202:2.) Plaintiffs represented that "[i]t would be fundamentally unfair to have the defendants tell the jury that they do not possess any market power for various reasons, and then muzzle the plaintiffs [from offering rebuttal evidence]." (*Id.* 204:8-10.) In addition, Plaintiffs argued that market power evidence is also relevant to issues of "motive and intent." (*Id.* 200:5-21.)

During the same break in the proceedings, Amex expanded on its initial argument for preclusion of PDX02-023. Moving away from its waiver-related argument, Amex asserted that Plaintiffs' proposed rebuttal evidence of market power "is not legally cognizable as evidence of market power under *Ohio v. American Express*." (*Id.* 202:11-13.) In particular, Amex argued that "evidence of insistence, merchant prices, like [V]alue [R]ecapture, [and] price discrimination . . . are the three points the Supreme Court rejected" as evidence of market power. (*Id.* 202:17-19.) Thus, Amex's point was "not that [Plaintiffs] can't talk about market power," (*id.* 203:6-7,) but that "they can't . . . tell [the] jury that the reason [Amex] has market power . . . is because of insistence, is because of merchant prices, is because of price

discrimination," (*id.* 203:11-14). Amex asserted it "would . . . be reversible error" to allow Plaintiffs "to say to the jury that market power can be proven by merchant prices alone." (*Id.* 208:12-14.) In response, Plaintiffs represented: (i) that they "are not offering any evidence of card holder insistence"; (ii) that "merchant fees . . . unrelated to cost" is relevant to Amex's "[ability] to profitably raise prices"; and (iii) that Amex's "[ability] to price discriminate" is "not cardholder insistence." (*Id.* 203:20-204:5.)

Based on Plaintiffs' representations and Amex's apparent concession that Plaintiffs could offer legally cognizable evidence of market power, the court overruled Amex's objection to Plaintiffs' use of PDX02-023. (Text Order Dated 8/13/2025.) The court explained:

> Plaintiffs may discuss market power with Dr. Lamb to rebut Amex's arguments, made in its opening and during the testimony of Antonio Gagliardi, that it lacks market power. The parties may propose a limiting instruction to the effect that market power evidence is introduced only for purposes of rebutting Amex's arguments, and not as affirmative evidence of anticompetitive effects, which Plaintiffs intend to prove through direct evidence.

(*Id.*) Neither party proposed a limiting instruction in response to the court's text order.

On August 14, 2025, Dr. Lamb testified regarding PDX02-023. (*See* 8/14/2025 Trial Tr. 552:15-555:14.) Dr. Lamb opined, in pertinent part:

> . . . I concluded that American Express has market power in the market for credit card transactions. And I base that on a number of factors. Primarily, the fact that American Express has a certain set of consumers that are characterized by things that merchants like to be able to access: High income,

high spending power. But I also looked at American Express's conduct in the market.

If you bring up the next slide [PDX02-023], it might be helpful.

I look at evidence that American Express doesn't set its merchant fees in relationship to its costs or cost structure, that the merchant fees are unconnected to costs. And to an economist that's an important issue because when firms are in a competitive market . . . [their] prices are set in relationship to the cost of what it costs [them] to bring that product to market.

I also determined that there's evidence that American Express was able to profitably increase its price through a program called Value Recapture, an American Express term.[2] And it raised price, which you—in a competitive market you would think means that you were going to lose some sales. Just think about Walmart and Target and how they would price a product. If one of them raised the price of . . . eggs from $4 to $7, . . . the other firm would see a big increase maybe in the sale of eggs. And so that price increase would have been unprofitable.

American Express was able to go and raise its prices based on its determination of . . . what it thought was the value it

---

[2] Value Recapture ("VR") was an Amex initiative that "comprised a series of targeted price increases in certain industry segments between 2005 and 2010." *United States v. American Express Co.*, 838 F.3d 179, 201 (2d Cir. 2016) ("*Amex II*") (internal quotations and citations omitted). "The VR initiatives collectively comprised at least twenty separate price increases accomplished through a combination of increased discount rates, new or increased per transaction fees, and reduced side payments to merchants." *Id.* Amex imposed these increases "on an industry-specific basis, with several merchant segments—typically those with relatively high rates of cardholder insistence—targeted for multiple rounds of price hikes." *Id.*

brought to merchants and using its card. And it didn't lose market share. It didn't lose sales. It was a profitable price increase.

And then finally, American Express is able to price discriminate in the pricing of its cards. And I think there was some discussion in the openings about the fact that you can . . . go to a merchant and buy exactly the same product, and I can pull out a Chase Sapphire card and the merchant has to pay more for . . . processing that American—that Mastercard than if somebody pulls out a no-rewards Visa or Mastercard and processes that.

And the same thing . . . is true with respect to American Express's products. They're able to price discriminate based on the product that you're using.

(*Id.* 553:4-554:25.) All told, Dr. Lamb's PDX02-023-related testimony, at least on direct examination, spanned approximately three pages of trial transcript. (*See* 552:15-555:14.)

Following Dr. Lamb's testimony, on August 18, 2025, Amex moved for a mistrial or, in the alternative, a cautionary jury instruction. (First Mot. for Mistrial at 1-3.) Amex argues that two aspects of Dr. Lamb's market power testimony were improper under *United States v. American Express Co.*, 838 F.3d 179 (2d Cir. 2016) ("*Amex II*") and *Amex III*. First, Amex contends that Dr. Lamb offered improper cardholder insistence testimony when he explained that the "primary" basis for his conclusion that Amex possesses market power is "'the fact that American Express has a certain set of consumers that are characterized by things that merchants like to be able to access: High income, high spending power.'" (*Id.* at 4 (quoting 8/14/2025 Trial Tr. 553:4-10).) Amex asserts that this testimony runs afoul of *Amex II*, where the Second Circuit held that cardholder insistence—"a term . . . used to describe the segment of Amex's cardholder base who insist on paying with their Amex cards and who would shop elsewhere or

6

spend less if unable to use their cards of choice"—is not evidence of market power. 838 F.3d at 202-03.[3] While Dr. Lamb "avoided using the term 'insistence' at trial," Amex argues that Dr. Lamb did, in fact, offer testimony regarding insistence as proof of market power, which the Second Circuit has held invalid. (First Mot. for Mistrial at 5.)

Second, Amex argues that Dr. Lamb offered improper testimony regarding merchant pricing when he opined that the "purported fact that 'American Express doesn't set its merchant fees in relationship to its costs or cost structure' and its alleged ability 'to price discriminate in the price [sic] of its cards' is indicative of market power." (*Id.* (first quoting 8/14/2025 Trial Tr. 553:13-15 and then quoting *id.* 554:14-15).) Amex also takes issue with Dr. Lamb's statement that Amex's ability to "'profitably increase its price through a program called Value Recapture' without losing market share . . . constituted proof of market power." (*Id.* (quoting 8/14/2025 Trial Tr. 552:24-554:12).) Amex asserts that the foregoing testimony runs afoul of *Amex II*, where the Second Circuit rejected this court's finding that Amex's "ability to impose significant price increases during its Value Recapture initiatives . . . without any meaningful merchant attrition is compelling evidence of Amex's power in the [relevant] market." 838 F.3d at 201. Additionally, to the extent the Second Circuit "took no issue" with this court's determination that price discrimination evidence is of limited probative value to the market power analysis, Amex contends that Dr. Lamb's testimony also conflicts with *Amex II* on that basis. (First Mot. for Mistrial at 6 (citing *Amex II*, 838 F.3d at 201 n.48); *see also id.* at 2 (quoting *Amex III*, 585 U.S. at 547 ("Evidence of a price increase on one side of a two-sided transaction platform cannot by itself demonstrate an anti-competitive exercise of market power.")).)

---

[3] When quoting cases, unless otherwise noted, all citations and internal quotation marks are omitted, and all alterations are adopted.

Amex argues that the above testimony, combined with statements by Dr. Lamb that Amex uses its market power "to cram the anti-steering rules down" on merchants, was so prejudicial that a mistrial is warranted. (*Id.* at 7-8 (quoting 8/14/2025 Trial Tr. 731:7-9).) In the alternative to a mistrial, Amex requests that the court include a cautionary instruction in its final jury charge. (*Id.* at 9.)

Plaintiffs oppose Amex's motion on four bases. (*See* Pls.' First Mistrial Opp.) First, Plaintiffs contend that Dr. Lamb's testimony could not have prejudiced Amex since market power is not a dispositive, or even relevant, issue in their direct evidence case. (*Id.* at 6 ("While the [market power] evidence may have some utility to help the jury understand Amex's motive, intent, and why merchants continue to accept Amex cards and agree to be bound to the harmful anti-steering rules . . . [a]t bottom, it is not a 'key' or 'dispositive' issue.").) Second, Plaintiffs argue that Amex cannot claim error in the introduction of testimony that it elicited from Dr. Lamb on cross-examination. (*Id.* at 7-8; *see also id.* at 2-3 (citing certain portions of Dr. Lamb's cross-examination).) Third, Plaintiffs contend that Dr. Lamb's testimony was not objectionable. (*Id.* at 8-9.) Plaintiffs distinguish *Amex II* from this case on the basis that there, the Government advanced an indirect, rather than direct evidence case. (*Id.* at 8 (citing *Amex II*, 838 F.3d at 200).) Additionally, Plaintiffs argue that the Second Circuit and Supreme Court faulted the district court's market power analysis only insofar as it focused on one side of the two-sided market. (*See id.* at 8-9.) In other words, "[i]t was the District Court's incomplete market power analysis, and not the admissibility of the evidence it was based on, that the Second Circuit and the Supreme Court found fault with." (*Id.* at 9.) Moreover, Plaintiffs contend that "Dr. Lamb's testimony regarding Amex's power to provide merchants with access to a category of high-spending consumers—the 'spend-centric' model—is distinct from the 'cardholder insistence' paradigm" discussed in *Amex II*. (*Id.*) While

cardholder insistence "focuses on . . . 'the segment of Amex's cardholder base who insist on paying with their Amex cards,'" (*id.* (quoting *Amex II*, 838 F.3d at 202)), Dr. Lamb's testimony concerned "Amex's power to bring cardholders in the door for the merchant's benefit," (*id.*). Furthermore, Plaintiffs argue that Dr. Lamb's discussion of the Value Recapture program "is relevant and admissible evidence of the operation of the merchant side of the two-sided market." (*Id.*) Fourth and finally, Plaintiffs assert that Dr. Lamb's purported incendiary language—relating to Amex "cram[ming]" its Non-Discrimination Provisions down on merchants—is not unduly prejudicial. (*Id.* at 10.) Plaintiffs point out that Dr. Lamb only used the phrase twice and on cross-examination, and that Amex did not object to Dr. Lamb's testimony at the time. (*Id.*) Thus, Plaintiffs assert that Amex's motion for a mistrial should be denied, and that any curative instruction should simply inform the jury that market power is not at issue in this case. (*Id.* at 11 (providing proposed instruction).)

During the charge conference on August 22, 2025, the court indicated to the parties that it planned to deny Amex's motion for a mistrial but deliver a cautionary jury instruction along the lines suggested by Amex. (8/22/2025 Trial Tr. 2041:23-2042:10, 2047:3-2048:8; *see also* Court's Exhibit 1 at 33 (containing draft cautionary jury instruction).) Nevertheless, despite the court's oral pronouncement, during his rebuttal closing argument on August 26, 2025, Plaintiffs' counsel made direct reference to the objected-to market power evidence:

> He talks about market power, Mr. Orsini, and they spent a lot of time trying to say whether American Express does or doesn't have market power. I submit to you they do. They are one of only four players in the network side. They're right there neck in neck with the second, Mastercard. *They have the people who spend the most money.* They have a lot of clout. They're in 99 percent of the stores. They're in their banking

hat, their issuer hat. They're the big dog. They chase every year for the biggest one.

I would submit they have market power. Let's make that one easy. You don't need to find it. What you'll see when His Honor goes to the jury instructions and if you look at them, we don't need to show that they have market power. What the rules say is, if we are perceiving by showing that there is a direct harm to, in our case, our clients because prices are different, that's called direct proof. We don't need to show market power.

I think they have market power, but you don't need to decide that. It's wasted time, another red herring.

(8/26/2025 Trial Tr. 2559:23-2560:17 (emphasis added).) After the jury was excused for the day, Amex made an oral motion for a mistrial, arguing that counsel improperly argued "that American Express has market power because [it has] wealthy customers merchants want." (*Id.* 2576:19-2577:3.) In opposition, Plaintiffs' counsel stated that he "said it as one of many like five or six—or four or five—I forget the list of things, but I said various facts. . . . I didn't argue it as a sole issue." (*Id.* 2577:5-10.) The court stated that it would consider the issue "[a]s part of a post[-]trial motion practice." (*Id.* 2579:8-9.) Later that night, Amex filed its second motion for a mistrial, arguing that counsel's statements during closing warrant a mistrial.[4] (*See generally* Second Mot. for Mistrial.)

---

[4] Amex also argues that judgment as a matter of law, or, in the alternative, a mistrial, is warranted based on certain statements made by Plaintiffs' counsel during his rebuttal closing argument relating to punitive damages. (Second Mot. for Mistrial at 5-10.) The court finds no misconduct in counsel's comments, which reflect Plaintiffs' theory of punitive damages. (*See id.* at 6-8 (quoting from Plaintiffs' counsel's rebuttal closing argument).)

The court denies Amex's motions for a mistrial. However, the court grants Amex's request for a cautionary jury instruction.

As a preliminary matter, it is unclear whether a mistrial is the appropriate vehicle to adjudicate this evidentiary issue. Unlike the Federal Rules of *Criminal* Procedure, the Federal Rules of Civil Procedure do not contemplate a motion for a mistrial. *Compare* Fed. R. Crim. P. 26.3 ("Mistrial") *and* Fed. R. Crim. P. 31 (contemplating a mistrial in the event that "the jury cannot agree on a verdict") *with* Fed. R. Civ. P. 50 ("Judgment as a Matter of Law in a Jury Trial; Related Motion for a New Trial; Conditional Ruling"), Fed. R. Civ. P. 59 ("New Trial; Altering or Amending a Judgment") *and* Fed. R. Civ. P. 60 ("Relief from a Judgment or Order"). While some courts have entertained a motion for a mistrial in civil cases, *see, e.g.*, *Carroll v. Trump*, No. 20-CV-7311 (LAK), 2024 WL 475140, at *5-6 (S.D.N.Y. Feb. 7, 2024), the majority of mistrial-related authority in the Second Circuit, including the mistrial-related authority cited by Amex, arises in the criminal context. (*See* First Mot. for Mistrial at 3 (citing *United States v. Hamdy*, No. 5-CR-232S, 2006 WL 6623084, at *2 (W.D.N.Y. June 28, 2006)).) Thus, it is unclear whether a motion for a mistrial is the appropriate vehicle to challenge evidentiary rulings in a civil case. *See LNC Investments, Inc. v. First Fidelity Bank*, 126 F. Supp. 2d 778, 787 (S.D.N.Y. 2001) (explaining that

---

Amex's argument on this point is a rearticulation of its objection to a punitive damages instruction, (*see* Amex Proposed Jury Instr. (Dkt. 278) at 40-42), which the court has overruled at least twice—first in its decision to include the charge in its final jury instruction, (*see* Court's Exhibit 1 at 59-61, 59 n.67), and again when the court orally denied Amex's motion for judgment as a matter of law, (8/26/2025 Trial Tr. 2402:5-6). As the court explained in its first draft jury charge, Plaintiffs are entitled to a punitive damages instruction under Illinois law. Whether Plaintiffs are, in fact, entitled to punitive damages is a question for the jury to decide. Amex's motion for judgment as a matter of law on this issue is, once again, denied. Amex's alternative motion for a mistrial on this basis is also denied.

"[a] trial judge's erroneous evidentiary rulings *may* furnish a basis for granting a post-verdict motion for a new trial under Rule 59" of the Federal Rules of Civil Procedure) (emphasis added). It is likewise unclear whether the standards applicable to a motion for a mistrial in the criminal context apply with equal force in the civil context.

Nevertheless, even assuming that the motion for a mistrial is proper and that the same standards apply as in the criminal context, a mistrial is unwarranted here. The court agrees with Amex that certain portions of Dr. Lamb's testimony and Plaintiffs' counsel's statements during closing arguments, ran afoul of *Amex II*; however, any prejudice to Amex can be cured by a cautionary jury instruction.

Plaintiffs' attempt to distinguish Dr. Lamb's purported "spend-centric" model testimony from cardholder insistence testimony slices the bologna too thin. While most of Dr. Lamb's testimony mirrored PDX02-023 and the portion of his expert report pertaining to market power, (*see* 9/30/2022 Expert Report of Dr. Lamb ¶¶ 152-75), the point regarding Amex's high income, high spending power user base did not appear in either PDX02-023 or the relevant portion of his report. Rather, that portion of Dr. Lamb's testimony appears to originate from a section of his expert report relating to cardholder insistence:

> As discussed above, the rewards programs Amex offers its cardholders constitutes one example of why most Amex-Accepting merchants cannot practically drop Amex GPCC acceptance to avoid the effects of Amex's Anti-Steering Rules, *as these rewards programs incentivize Amex GPCC cardholders to increase the amount of spending they choose to make with their Amex GPCCs, which, in turn, risks a greater potential sales loss for Amex-accepting merchants if they were to cease accepting Amex GPCCs* in order to avoid the effects of Amex's Anti-Steering Rules, allowing them to reduce their

overall GPCC acceptance costs. Another such example of such cardholder insistence that Amex acknowledges also increases this risk of lost sales is due to the strength of its corporate card segment.

(9/30/2022 Expert Report of Dr. Lamb ¶ 245 (emphasis added).) Thus, Dr. Lamb himself recognizes that the desirability of Amex's high income, high spending power user base to merchants is simply another aspect of cardholder insistence. The Second Circuit rejected this exact theory of market power in *Amex II*, not because of a deficiency in the evidentiary record or because this court failed to analyze both sides of the two-sided market, but because of its conclusion that "[c]ardholder insistence results not from market power, but instead from competitive benefits on the cardholder side of the platform and the concomitant competitive benefits to merchants who choose to accept Amex cards." 838 F.3d at 202. In other words, the Second Circuit determined, as a matter of law, that cardholder insistence is not evidence of market power. *See generally id.* at 202-04. Thus, the court agrees with Amex that Dr. Lamb's testimony regarding Amex's high income, high spending power user base was improper under *Amex II*.

In the same vein, certain statements made by Plaintiffs' counsel's during his rebuttal closing argument ran afoul not only of *Amex II*, but also of this court's stated intention to issue a cautionary jury instruction that would advise the jury that Amex's high income, high spending power user base is not proof of market power. Counsel "submit[ted]" to the jury that Amex has "market power," (8/26/2025 Trial Tr. 2559:23-2560:1), based in part on the fact that "[Amex] ha[s] the people who spend the most money," (*id.* at 2560:3). As stated above, this is another aspect of cardholder insistence, which the Second Circuit has rejected as evidence of market power. *See Amex II*, 838 F.3d at 202. Thus, the court agrees with Amex that Plaintiffs' counsel made an argument during closing that is contrary to *Amex II*.

13

Dr. Lamb's testimony regarding Value Recapture likewise runs afoul of *Amex II*. In its findings of fact and conclusions of law in the U.S. Government-initiated action against Amex, this court concluded that Amex's "ability to profitably impose [Value Recapture] price increases across a broad swath of its merchant base with little or no meaningful buyer attrition is compelling proof of [its market] power." *United States v. Am. Express Co.*, 88 F. Supp. 3d 143, 196 (E.D.N.Y. 2015) ("*Amex I*"). On appeal, the Second Circuit determined that this court "erred in its evaluation of the Value Recapture program by failing to recognize that increased demand on the cardholder side of the platform expands value on the merchant side." *Amex II*, 838 F.3d at 202. Put another way, increases in *merchant* pricing cannot be properly viewed as changes to the *net* prices charged by Amex "because merchant pricing is only one half of the pertinent equation." *Id.* Dr. Lamb offered precisely this testimony during his direct examination. Dr. Lamb testified that Amex "was able to profitably increase its price through a program called Value Recapture . . . based on its determination of . . . what it thought was the value it brought to merchants and using its card," and that Amex "didn't lose sales. It was a profitable price increase." (8/14/2025 Trial Tr. 553:24-554:13.) This one-sided view of the two-sided price is exactly what the Second Circuit found problematic in *Amex II*. *See* 838 F.3d at 202 ("[M]erchant pricing is only one half of the pertinent equation."). Thus, the court agrees with Amex that Dr. Lamb's testimony regarding the Value Recapture program was improper under *Amex II*.

However, the court disagrees with Amex that Dr. Lamb's price discrimination testimony ran afoul of *Amex II*. The Second Circuit's discussion of price discrimination is limited to one sentence in one footnote, which reads in relevant part: "The District Court found that the price discrimination evidence was of 'limited probative value' because Plaintiffs did not provide any reliable measure of Amex's per-transaction margins across its industry

groups." *Amex II*, 838 F.3d at 201 n.48 (quoting *Amex I*, 88 F. Supp. 3d at 198). The court cannot conclude, as Amex suggests, that this sentence summarizing this court's findings was meant to convey the Second Circuit's approval of that finding, much less that it constituted a determination, as a matter of law, that price discrimination is not evidence of market power. As such, the court rejects Amex's argument that Dr. Lamb's price discrimination testimony was improper under *Amex II*.

The court also disagrees with Amex that Dr. Lamb's testimony relating to Amex "cramming" its Non-Discrimination Provisions down on merchants warrants a mistrial. As Plaintiffs point out, Dr. Lamb used the term twice, while exploring certain hypotheticals with Amex's counsel on cross-examination. (8/14/2025 Trial Tr. 731:7-10; 8/15/2025 Trial Tr. 914:16-23.) *Amex's counsel* repeated the term "cram" or "cramming" five times in the course of questioning Dr. Lamb. (8/14/2025 Trial Tr. 731:17-18, 731:19-22, 732:4-6, 744:7-12, 744:14-16.) Thus, Amex's complaint that this language was "extraordinary prejudicial" falls flat given counsel's repeated use of the very same language. More importantly, Amex did not timely object to this testimony. Therefore, its objection was waived. *See* Fed. R. Evid. 103(a)(1)(A) ("A party may claim error in a ruling to admit or exclude evidence only if . . . a party . . . timely objects or moves to strike[.]"); *United States v. Chartier*, No. 17-CR-0372 (JS), 2021 WL 3795352, at *42 (E.D.N.Y. Aug. 26, 2021) ("[Defendant's] failure to make trial objections to the complained-of testimony constitutes a waiver of those objections."); *In re Air Disaster at Lockerbie Scotland on Dec. 21, 1988*, 37 F.3d 804, 827 (2d Cir. 1994) ("By failing to object when the statement was made, the objection was waived."), *abrogated on other grounds by Zicherman v. Korean Air Lines Co.*, 516 U.S. 217 (1996).

Any prejudice Amex may have suffered from the above-identified errors can be cured by a cautionary jury instruction. "The Second

Circuit has held that the prejudicial nature of witness testimony can be redressed through striking the problematic testimony and issuing limiting instructions for the jury." *Scarlett v. United States*, Nos. 10-CR-809 (KAM), 18-CV-2802 (KAM), 2021 WL 2809818, at *16 (E.D.N.Y. July 6, 2021) (citing *United States v. Delance*, 694 F. App'x 829, 835-36 (2d Cir. 2017)). Additionally, "the law recognizes a strong presumption that juries follow limiting instructions." *United States v. Snype*, 441 F.3d 119, 129 (2d Cir. 2006). Dr. Lamb testified for nearly two full days; his testimony on these issues spanned only a few pages of trial transcript. Likewise, Plaintiffs' counsel's rebuttal lasted several hours; his testimony on this issue spanned one paragraph of trial transcript. Thus, while Dr. Lamb offered testimony contrary to the law, and Plaintiffs' counsel made an argument contrary to the law, the limited nature of such testimony and argument indicates that a cautionary jury instruction, rather than a mistrial, is the appropriate remedy.

The court issued the following cautionary instruction in its final charge to the jury:

> I'd like to make a note here about certain testimony offered regarding market power. Various witnesses testified that American Express has a high income, high spending power customer base, which merchants might not be able to access unless they accept American Express cards. Witnesses also testified that American Express was able to profitably increase its price to merchants through a program called Value Recapture without losing market share. All such testimony is not evidence of market power as a matter of law and should be disregarded for this purpose.

(Court's Exhibit 3 at 30.) The court's instruction rejects Plaintiffs' proposed instruction, which would simply instruct the jury that market power is not at issue, because it would not suffice to clarify the issues discussed above. (*See* Pls.' First Mistrial Opp. at 11.)

However, the court's instruction incorporates Plaintiffs' suggestion not to single out Dr. Lamb, which the jury might interpret as the court casting doubt on Dr. Lamb's credibility. (Pls.' Objs. to Final Charge (Dkt. 374) at 2.) The court's instruction also rejects as superfluous Amex's proposal to call attention to counsel's statements during closing arguments. (Second Mot. for Mistrial at 5.) The court's charge explains that the jury should "disregard . . . [a]rguments or statements by lawyers" because such statements are not evidence. (Court's Exhibit 3 at 8.) Thus, it is presumed that the jury will disregard counsel's statements. *Snype*, 441 F.3d at 129. Additionally, the jury might interpret such an instruction as an aspersion on Plaintiffs' counsel. For these reasons, the court instructed the jury as set forth above.

In sum, Amex's first and second motions for a mistrial are DENIED, and its request for a cautionary instruction is GRANTED.

### B.  Plaintiffs' Objections to the RBA Report

The Reserve Bank of Australia ("RBA") "has regulatory powers in respect of payment systems and their participants" in Australia. (RBA Consultation Paper Dated July 15, 2025 ("RBA Report") (Dkt. 323-4) at 11.) The RBA's payments system policy is set by the Payment Systems Board ("PSB"), "with a mandate to control risk in the financial system, promote the efficiency of the payments system[,] and promote competition in the market for payment services consistent with the overall stability of the financial system." (*Id.*) The RBA "has used these powers since the early 2000s to introduce standards and access regimes relating to card payments and has periodically reviewed its regulations to ensure they remain fit for purpose." (*Id.*)

In 2003, the RBA introduced a "surcharging framework" that "[required] card networks to remove their 'no-surcharge' rules, thereby allowing merchants to apply a surcharge to card transactions." (*Id.* at 12.) While "[t]he framework has been amended

over time," the surcharging-permissive aspect of the framework remains in effect today. (*Id.*)

In October 2024, the RBA published an "Issues Paper" in which it "sought views from stakeholders on . . . whether the RBA's surcharging framework remains fit for purpose." (*Id.* at 11.) Following publication of the Issues Paper, the RBA received 94 written submissions and conducted approximately 40 consultation meetings. (*Id.*) Thereafter, on July 15, 2025, the RBA published a "Consultation Paper" titled "Review of Merchant Card Payment Costs and Surcharging"—the RBA Report at issue here. (*See generally id.*) The RBA Report contains numerous factual findings and presents the "preliminary conclusions" of the PSB. (*Id.* at 8.) As relevant here, the report explains that the PSB "has reached the view that the surcharging framework . . . is no longer achieving its intended purpose." (*Id.*) Based on that view, "the RBA proposes to revoke its prohibition on 'no-surcharge' rules." (*Id.*) The RBA "seeks comments on these preliminary conclusions and draft standards, with the expectation that the PSB will reach its final conclusions by the end of 2025." (*Id.*)

Throughout this litigation, Plaintiffs have cited the "Australia experience" as "a benchmark that helps predict what the but-for world in this case would have looked like had Amex been unable to enforce its anti-steering rules in the [United States]." (Pls.' Sixth Mot. *in limine* (Dkt. 308) at 2; *see also* 9/30/2022 Expert Report of Dr. Lamb ¶¶ 254-69 (discussing the Australia experience).) Amex contends that the RBA Report "undercuts Plaintiffs' entire theory." (Amex Ltr. Dated 7/22/2025 (Dkt. 323) at 5.) Plaintiffs, for their part, "don't have the same take of that report." (8/1/2025 Pretrial Conf. Tr. 15:4-5.) Nevertheless, when Amex notified Plaintiffs of its intention to introduce the RBA Report into evidence at trial, Plaintiffs objected. (*See* Pls.' Ltr. Dated 7/21/2025 (Dkt. 321) at 3-4.) Specifically, Plaintiffs argued that Amex's use of the RBA Report with its experts would be improper

because these experts did not rely on the Report in reaching their opinions and it would be needlessly cumulative for all three of Amex's experts to testify about the same report. (*Id.*) The court overruled Plaintiffs' objections and provided all experts with an opportunity to file submissions "outlining how they plan to utilize the RBA Report" at trial.[5] (Min. Entry Dated 7/23/2025.) The court also allotted Plaintiffs "up to a half day following Amex witness Sarah Wood's direct testimony to prepare for their cross-examination of Ms. Wood as it may relate to the RBA Report." (*Id.*)

Trial in the case began on July 28, 2025. (Min. Entry Dated 7/28/2025.) However, for reasons irrelevant to this Memorandum & Order, on July 30, 2025, the court adjourned trial to August 11, 2025. (Min. Entry Dated 7/30/2025.) Thereafter, at a pretrial conference on August 1, 2025, Plaintiffs again raised a general objection to the RBA Report. (8/1/2025 Pretrial Conf. Tr. 13:23-16:10.) In response to Plaintiffs' concerns, the court directed Amex to "disclose to Plaintiffs any documentation, including emails, relating to the RBA Report," and to "make Ms. Wood available for a virtual deposition." (Min. Entry Dated 8/1/2025.) Amex represents that it "did both." (Amex's Opp. to Pls.' Objs. to RBA Report ("Amex's RBA Opp.") (Dkt. 357) at 2.)

On August 10, 2025, Plaintiffs objected to several slides from Amex's proposed opening slide deck. (Pls.' Obj. to Slides (Dkt. 352).) Ten of these slides referenced the Australia experience and the RBA Report. (*Id.* at 1; *see also* Amex Opening Slides (Dkt.

---

[5] On July 27, 2025, Amex's experts disclosed supplemental opinions on the report. (Dr. Emch Supp. Opinion (Dkt. 332); Dr. Gaier Supp. Opinion (Dkt. 333); Dr. Bernheim Supp. Opinion (Dkt. 334).) On the same day, Plaintiffs submitted a letter stating that Dr. Lamb "does not intend to offer an affirmative opinion on the [RBA Report]," but that "[t]o the extent [Amex's] experts offer affirmative opinion(s) concerning the RBA Report, Dr. Lamb may offer rebuttal opinion testimony." (Pls.' Ltr. Dated 7/27/2025 (Dkt. 331).)

352-1).) Notably, these slides were included in an earlier version of Amex's opening slide deck, which Amex disclosed to Plaintiffs ahead of the original July 28 trial date. (Amex's Opp. to Pls.' Obj. to Slides (Dkt. 353) at 1.) However, Plaintiffs did not object to the slides at that time. (*See* Pls.' Original Obj. to Slides (Dkt. 337).) The court overruled Plaintiffs' objections to the Australia-related slides. (Text Order Dated 8/11/2025.)

Amex delivered its opening statement on August 12, 2025, in which it discussed both the Australia experience and the RBA Report. (*See generally* 8/12/2025 Trial Tr.) At a break in the proceedings, Plaintiffs again objected to the RBA Report, primarily on the ground that the Report is inadmissible hearsay and therefore an improper topic for Amex's opening statement. (*Id.* 90:25-94:25.) The court directed the parties to file written submissions on the issue. (*Id.* 97:2; *see* Pls.' Objs. to RBA Report ("Pls.' RBA Objs.") (Dkt. 355); Amex's RBA Opp.) Thereafter, the court overruled Plaintiffs' objections and stated that a written memorandum would follow. (Text Order Dated 8/13/2025.)

Plaintiffs argue that the RBA Report: (1) is hearsay and not admissible under Federal Rule of Evidence 803(8); and (2) should be excluded under Federal Rule of Evidence 403 because it would confuse the issues and mislead the jury. (*See* Pls.' RBA Objs.) Amex opposes both bases for preclusion. (*See* Amex's RBA Opp.)

The court concludes that the RBA Report is admissible under the public records exception to the rule against hearsay, Federal Rule of Evidence 803(8).[6] That rule provides that a "record or statement of a public office" is not excluded by the rule against

---

[6] Plaintiffs do not dispute that the RBA Report is relevant, as it bears directly on one of their examples of a but-for world. (*See* Pls.' RBA Objs. (containing no relevance objection).) Additionally, the parties appear to

hearsay if: (A) the record sets out (i) "the office's activities," (ii) "a matter observed while under a legal duty to report," or (iii) "in a civil case[,] . . . factual findings from a legally authorized investigation," and (B) "the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness." Fed. R. Evid. 803(8). Plaintiffs argue that the RBA Report falls outside the scope of Rule 803(8) because it contains only "tentative conclusions and proposed recommendations" that are "preliminary, non-final, and subject to change." (Pls.' RBA Objs. at 1-2.) Amex contends that the RBA Report falls squarely within Rule 803(8)(A)(iii) because it contains factual findings based upon an investigation made pursuant to legal authority. (Amex's RBA Opp. at 2.) The court agrees with Amex.

To be admissible under Rule 803(8)(A)(iii), the proffered evidence must (1) contain factual findings (2) based upon an investigation made pursuant to legal authority. Fed. R. Evid. 803(8)(A)(iii). "The unreviewed findings of an agency are . . . admissible as evidence under [Rule] 803(8)(A)(iii) as factual findings from a legally authorized investigation by a public office." *Cortes v. MTA New York City Transit*, 802 F.3d 226, 232 (2d Cir. 2015). Once the proponent satisfies these minimum requirements, the burden shifts to the opposing party to show untrustworthiness. Fed. R. Evid. 803(8)(B). To evaluate the trustworthiness of a factual report, the court considers: "(a) the timeliness of the investigation, (b) the special skills or experience of the official, (c) whether a hearing was held and the level at which it was conducted, and (d) possible motivation problems." *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 143 (2d Cir. 2000).

The RBA Report contains factual findings based upon an investigation made pursuant to legal authority. Fed. R Evid.

---

agree that the RBA Report is hearsay, because it is an out-of-court statement that Amex seeks to admit for the truth of the matters asserted therein. *See* Fed. R. Evid. 801.

803(8)(A)(iii). Specifically, the Report contains the PSB's factual findings that removing surcharging would, among other things, "lower wholesale card payment costs for merchants by around $1.2 billion per year," "reduce the disparity in card payment costs faced by small and large merchants," "[i]ncrease competitive pressure between the designated card networks," and "reduce the cross-subsidisation of credit cardholders by debit cardholders." (RBA Report at 9.) The Report also contains factual findings regarding the potential impact of removing surcharging as it relates to consumers, merchants, card issuers, and card networks. (*Id.* at 10.) Additionally, as summarized *supra*, the PSB based these factual findings on an investigation made pursuant to legal authority. While the "conclusions"—*i.e.*, what action, if any, to take—remains preliminary and open to comment, the factual findings are final. As such, the court concludes that Amex has met its burden to show that the RBA Report falls under the minimum requirements of Rule 803(8)(A)(iii). *See Cortes*, 802 F.3d at 232.

Additionally, Plaintiffs have not met their burden of demonstrating that the RBA Report is untrustworthy. Plaintiffs anchor their untrustworthiness arguments in the preliminary nature of the Report. (Pls.' RBA Objs. at 3 ("The preliminary report of the RBA . . . is not a reliable or trustworthy source of the position taken by the RBA on surcharging—for the simple fact that the RBA has not yet arrived at a final position.").) However, this argument ignores the fact that the RBA Report contains factual findings; Rule 803(8)(A)(iii) requires no more. Moreover, there is no evidence that the Report's timeliness, the special skills or experience of the PSB or RBA, whether a hearing was held, or possible motivations indicate a lack of trustworthiness in this case. *Bridgeway Corp.*, 201 F.3d at 143. As such, the court concludes that the RBA Report is admissible under the public records exception to the rule against hearsay.

The in-circuit authorities cited by Plaintiffs on this issue do not convince the court otherwise. (Pls.' RBA Objs. at 1-2 (citing *City of New York v. Pullman Inc.*, 662 F.2d 910, 914 (2d Cir. 1981) and *In re Sept. 11 Litig.*, 621 F. Supp. 2d 131, 155 (S.D.N.Y. 2009)).) In *Pullman*, the Second Circuit found no abuse of discretion where a district court excluded an "interim" staff recommendation to the Administrator of the Urban Mass Transit Administration. 662 F.2d at 914-15. Likewise, in *In re Sept. 11 Litig.*, the court excluded interim factual findings of the 9/11 Commission staff, which were meant only to "inform the development of the Commission's recommendations." 621 F. Supp. 2d at 155 (contrasting the staff reports with "[t]he 9/11 Report[,] [which] constituted the Commission's final report, containing the findings of a duly-constituted public agency as required by [Rule 803]"). The RBA Report does not contain interim findings of the PSB's staff meant only to inform the eventual recommendations of the PSB or RBA. Rather, the RBA Report contains the factual findings of the PSB itself, following a duly authorized investigation and public comment process. (*See* RBA Report at 8-11.) Thus, the court concludes that the RBA Report is admissible under Rule 803(8).

The court further concludes that the probative value of the RBA Report is not substantially outweighed by a danger of confusing the issues or misleading the jury. *See* Fed. R. Evid. 403. Plaintiffs assert that the preliminary nature of the Report will confuse and mislead the jury. (Pls.' RBA Objs. at 6.) However, as noted *supra*, the RBA Report contains the *final* factual findings of the PSB and RBA. While Plaintiffs argue that it is inaccurate to characterize the Report as reflecting "a rejection of the surcharging and payment regulatory scheme in Australia," (*id.*), Plaintiffs are free to argue that distinction to the jury. Indeed, the RBA Report itself acknowledges that the RBA has not made a final decision to abandon its surcharging scheme, but rather, "seeks comments" on the PSB's factual findings and preliminary conclusions, "with

the expectation that the PSB will reach its final conclusions by the end of 2025." (RBA Report at 8.) Furthermore, the court is concerned that it would mislead the jury *not* to introduce the RBA Report, as the absence of the Report would provide an incomplete picture of the "Australia experience." Thus, preclusion of the RBA Report is unwarranted under Rule 403.

In sum, it is for the foregoing reasons that the court overruled Plaintiffs' objections to the RBA Report.

### C. Excusal of Juror #4

On August 19, 2025, the court excused Juror #4 for good cause and stated that a written memorandum would follow. (Min. Entry Dated 8/19/2025; Sealed 8/19/2025 Trial Tr. 6:8-11.)

Voir dire in this case occurred on August 11, 2025. (Min. Entry Dated 8/11/2025.) During voir dire, Juror #4[7] explained that she works for a company in the garment district that manufactures women's bathing suits for distribution to larger retailers. (8/11/2025 Trial Tr. 208:5-12 (explaining that she has worked for the company "for eight and a half years").) When asked whether "you or a family member or close friend [has] ever been employed by or owned stock in any of the entities described in" a handout listing, among other things, the 38 Qualified Merchants, Juror #4 asked "Can we sidebar? I'm not comfortable." (*Id.* 97:19-21, 98:19-20.) At a sidebar with the court and the parties, Juror #4 stated, in relevant part: "I work for a company in the garment district. We manufacture bathing suits, kids and women. Our biggest client is Target. We do two and a half million. I manage all of their inventory." (*Id.* 118:24-119:2.) When the court asked whether she "ha[d] any concerns about the fact

---

[7] Juror #4 was prospective Juror #7. (8/11/2025 Trial Tr. 207:19-209:2.) She became Juror #4 when the jury was empaneled and she was sat in Seat #4.

that you deal with them as to whether you could be fair and impartial in this case?" Juror #4 responded "I don't, no." (*Id.* 119:6-9.) Later, when the court asked all the jurors whether they could keep an open mind and decide the case fairly and impartially based only on the evidence presented at trial and the law as the court explains it, Juror #4 responded "[Y]es, I can keep an open mind." (*Id.* 209:1.) Neither party raised any issues or objections regarding Juror #4, and she was empaneled as a juror in this case.

Dr. Lamb's testimony began on August 14, 2025 and finished in the afternoon of August 15, 2025. (Min. Entry Dated 8/14/2025; Min. Entry Dated 8/15/2025.) On the morning of August 15, Juror #4 asked to speak with the court in private. She stated, in pertinent part:





(Sealed 8/15/2025 Trial Tr. 2:9-3:8.)

(*Id.* 3:11, 3:20-22.)



(*Id.* 4:1-20.)

Thereafter, the court sent Juror #4 back to the jury room, met with the parties, and summarized its conversation with the juror. (*Id.* 6:3-12:9.)

(*Id.* 7:4-5, 10:11-12.)

(*Id.* 8:4-5.) While neither party objected to Juror #4 remaining on the jury at that time, counsel for Plaintiffs raised the following concern:



(*Id.* 8:9-18.) The court did not inquire further of Juror #4. Instead, the court and the parties left the issue as follows:



(*Id.* 10:18-11:1.)

On August 17, 2025, Plaintiffs filed a letter requesting that the court excuse Juror #4 for cause. (Pls.' Public Ltr. re Juror #4; *see also* Pls.' Sealed Ltr. re. Juror #4.) Plaintiffs argued that dismissal of Juror #4 was proper because she exhibited actual or implicit bias against Plaintiffs, her statements to the court indicated that she could not "analyze or accept the evidentiary record presented at trial," and she posed a "significant risk of tainting the rest of the jury by introducing unverified, anecdotal information from outside the proceedings during (or before) deliberations." (Pls.' Public Ltr. re Juror #4 at 2-3.) Amex filed its opposition on August 18, 2025, arguing that excusal of Juror #4 would be improper because she exhibited no actual or implicit bias, and "the fact that [she] comes to the jury with life experiences does not support striking her for cause." (Amex's Public Ltr. re Juror #4 at 2-3 (bold and capitalizations omitted).)

"During trial or deliberation, the court may excuse a juror for good cause." Fed. R. Civ. P. 47(c). Whether to excuse a juror, and what reasons constitute good cause, is left to the court's discretion. *See Davis v. Velez*, 797 F.3d 192, 208-09 (2d Cir. 2015); *see also Cruz v. Jordan*, 357 F.3d 269, 270 (2d Cir. 2004) ("We review a district court's rulings regarding dismissal of jurors for abuse of discretion, and reverse only if there is clear abuse of the district court's discretion.").

The court exercised its discretion to excuse Juror #4 for good cause in an oral order on August 19, 2025. (Min. Entry Dated 8/19/2025; Sealed 8/19/2025 Trial Tr. 4:21-5:11.) The court listed four "causes for concern, each of which constitute good cause for dismissal." (Sealed 8/19/2025 Trial Tr. 4:24-25.) The court expands on each of those grounds here.

First, Juror #4 has specialized industry knowledge that goes beyond that of an average person's understanding of the matters at issue in this case. It is well-established that jurors "need not be

totally ignorant of the facts and issues" in a case, as long as they "can lay aside [their] impression or opinion and render a verdict based on the evidence presented in court." *United States v. Kelly*, 609 F. Supp. 3d 85, 152 (E.D.N.Y. 2022); *see also Murphy v. Florida*, 421 U.S. 794, 799-800 (1975) (articulating same principles). As such, during deliberations, jurors may rely on their "common knowledge drawn from their life experiences," and, on a case by case basis, their "specific knowledge about a particular subject." *United States v. Chin*, 275 F. Supp. 2d 382, 384 (E.D.N.Y. 2003); *accord Corines v. Superintendent, Otisville Corr. Facility*, 621 F. Supp. 2d 26, 40 (E.D.N.Y. 2008) ("[I]t is well-established that jurors do not leave their knowledge of the world behind when they enter a courtroom."). Still, "[t]he line between this permissible activity and the consideration of improper evidence is seldom clear." *Bulger v. McClay*, 575 F.2d 407, 412 (2d Cir. 1978). "The touchstone . . . is . . . not the mere fact of infiltration of extra-record matter but the nature of what has been infiltrated and the probability of prejudice." *Tin Yat Chin*, 275 F. Supp. at 385 (citing *United States v. Owen ex rel. McMann*, 435 F.2d 813, 816 (2d Cir. 1970)).

Juror #4 possesses specialized knowledge not only about a particular subject, but about a key factual issue in this case: whether and to what extent merchants would pass through their savings to consumers in a but-for world. The parties' experts discussed this issue at length. (*See, e.g.*, 8/14/2025 Trial Tr. 538:20-539:7 (direct examination of Dr. Lamb regarding pass through of savings); *id.* 622:23-624:5 (direct examination of Dr. Lamb, using Target as an example to discuss expected pass through of savings); 8/15/2025 Trial Tr. 919:25-930:20 (cross-examination of Dr. Lamb regarding pass through of savings); 8/21/2025 Trial Tr. 1833:20-1834:2 (direct examination of Amex expert Dr. Gaier that Dr. Lamb's theory of pass through savings "doesn't add up" when Dr. Gaier "look[s] at the real-world evidence"); 8/25/2025 Trial Tr. 2343:25-2345:7 (cross-examination of Dr.

Lamb regarding pass-through of savings); *see also* 8/26/2025 Trial Tr. 2451:2-4, 2493:10-2502:8 (closing statement of Amex regarding pass through savings).)



Her specialized, near expert knowledge about a key issue subject to extensive expert testimony sets Juror #4 apart from other jurors whose personal experiences do not disqualify them from service. *See Tin Yat Chin*, 275 F. Supp. 2d at 384-85 (not improper for juror to discuss Chinese family values in criminal action for impersonating a U.S. officer and tax evasion, because such information was not "highly specialized, nor was it the subject of expert testimony at the trial"); *Cocconi v. Pierre*, 146 F. Supp. 2d 427, 432-33 (not improper for corporate travel consultant to share knowledge regarding the reputations of New York City hotels in action brought against one such hotel for gender-based discrimination under Title VII and local human rights laws); *Stowe v. Nat'l R.R. Passenger Corp.*, 793 F. Supp. 2d 549, 575-76 (E.D.N.Y. 2011) (not improper for juror to discuss his "vague" "training or knowledge" regarding the upper body in damages action under the Federal Employers Liability Act for personal injuries sustained as an Amtrak employee); *Bibbins v. Dalsheim*, 21 F.3d 13, 17 (2d Cir. 1994) (not improper for juror to share her knowledge, based on living in the area, that storefronts were boarded-up in state prosecution for criminal sale and possession of a controlled substance). This case is distinguishable from *Corines*, where the court found that it was not improper for a nurse to make general statements about intravenous ("IV") procedures during jury deliberations where the key issue in the case did not relate to IV procedures but to whether a person had aided and abetted the unauthorized practice of medicine by an anesthesiologist whose license had been suspended. 621 F. Supp. 2d at 39-41. Here, by contrast, Juror #4's specialized knowledge

bears on a key issue in the case. Additionally, this outside knowledge—which Juror #4 doubted she could disregard—has a high "probability of prejudic[ing]" Plaintiffs, because it indicates Juror #4's inability to credit Dr. Lamb's testimony. *See Tin Yat Chin*, 275 F. Supp. 2d at 385 (citing *McMann*, 435 F.2d at 816). Thus, the court finds good cause to excuse Juror #4 on this basis.

Second, the court also excused Juror #4 based on an apparent bias against Plaintiffs. Courts typically divide juror bias into two categories: actual bias and implied bias.[8] *United States v. Torres*, 128 F.3d 38, 43 (2d Cir. 1997). Actual bias, also known as "bias in fact," is "the existence of a state of mind that leads to an inference that the person will not act with entire impartiality." *Id.* A court may find actual bias "either because the juror admits partiality," or because the court makes a finding of "actual partiality based upon the juror's voir dire answers." *Id.* Implied bias, also known as "presumed bias," is "bias conclusively presumed as a matter of law from circumstances in which an average person in the position of the . . . juror would be prejudiced." *United States v. Quinones*, 511 F.3d 289, 301 (2d Cir. 2007). "Circumstances giving rise to implied bias are quite rare, as this form of bias deals mainly with jurors who are related to the parties or who were victims of the alleged crime itself." *Curry v. Lynch*, 323 F. App'x 63, 65 (2d Cir. 2009); *accord Torres*, 128 F.3d at 46 (explaining that implied bias is reserved for "exceptional situations").

---

[8] Much of the caselaw on this topic arises in the context of cause challenges during voir dire. *See, e.g., United States v. Torres*, 128 F.3d 38, 42 (2d Cir. 1997) (juror excused for cause during voir dire); *United States v. Quinones*, 511 F.3d, 289, 300-02 (2d Cir. 2007) (juror excused for cause based on response to questionnaire). Nevertheless, the parties do not argue that such caselaw is inapplicable in the context of for-cause challenges during trial. Nor is the court aware of any caselaw drawing such a distinction. As such, the court applies the juror bias standards articulated in *Torres*. *See* 128 F.3d at 43-48.

However, the Second Circuit also recognizes a third category of juror bias: "inferred bias." Inferred bias exists "when a juror discloses a fact that bespeaks a risk of partiality sufficiently significant to warrant granting the trial judge discretion to excuse the juror for cause, but not so great as to make mandatory a presumption of bias." *Torres*, 128 F.3d at 47. The court may dismiss a juror on the ground of inferable bias "after having received responses from the juror that permit an inference that the juror in question would not be able to decide the matter objectively." *Id.* Importantly, and in contrast to actual bias, "the juror need not be asked the specific question of whether he or she could decide the case impartially." *Id.* Rather, "once facts are elicited that permit a finding of inferable bias, then . . . the juror's statements as to his or her ability to be impartial become irrelevant." *Id.*

As a preliminary matter, Juror #4's initial statement to the court ████████████████████████████████████████████████ ████████████                    [                         ██—either is, or comes dangerously close to, an admission of partiality. (Sealed 8/15/2025 Trial Tr. 2:11-12.) *Cf. Torres*, 128 F.3d at 43 ("A juror is found by the judge to be partial [where] the juror admits partiality[.]"). An admission of partiality permits a finding of actual bias. *Id.*; *see also United States v. Haynes*, 398 F.2d 980, 984 (2d Cir. 1968) (actual bias is "based upon express proof, e.g., by a voir dire admission by the prospective juror of a state of mind prejudicial to a party's interest"). While Juror #4 stated that she could keep an open mind after sharing her work experience during voir dire, her subsequent request to speak to the court in private and specific statements casting doubt on Plaintiffs' expert strongly indicate to the court that she no longer felt that way. Thus, the court determines that Juror #4 likely exhibited actual bias against Plaintiffs by her own admission of partiality. *See Murphy v. Florida*, 421 U.S. 794, 800 (1975) (a juror's representations concerning his or her ability to judge a case fairly and impartially are not dispositive); *Torres*, 128 F.3d at 44, n.6 ("[A]

trial judge might find that a juror is biased even in a situation where, when specifically asked, the juror professes that he or she could be impartial.").

Nevertheless, even if Juror #4 did not exhibit actual bias against Plaintiffs, her statements indicate inferred bias.



(Sealed 8/15/2025 Trial Tr. 2:18, 4:10.) (Id. 3:4-8.) (Id. 2:18-20.) (Id. 4:9-11.) These "responses . . . permit an inference that [Juror #4] would not be able to decide the matter objectively"; that is, that she would be unable to decide the case based solely on the evidence presented at trial and not what she believes her own experiences and research show. Torres, 128 F.3d at 47. Having found inferred bias, Juror #4's statements as to her ability to be impartial are "irrelevant." Id. Thus, the court also finds good cause to excuse Juror #4 on this independent basis.

Third, Juror #4's statements indicate an inability to follow the court's instructions, namely, to keep an open mind, decide the case fairly and impartially based only on the evidence presented at trial and the law as the court explains it, and to avoid doing any outside research. Good cause exists to dismiss a juror where the juror's conduct or statements indicate an unwillingness or inability to follow the court's instructions and obey her oath. See, e.g., United States v. Fazio, 770 F.3d 160, 170 (2d Cir. 2014) (no

abuse of discretion where district court "determined that the juror continued to violate the instructions of the court such that the district court had reasonable cause to believe that the juror could no longer serve according to her oath"); *United States v. Vera*, 362 F. App'x 199, 200 (2d Cir. 2010) (no abuse of discretion where "[t]he juror indicated her inability to follow the court's instructions"); *United States v. Wilson*, 493 F. Supp. 2d 422, 428 (E.D.N.Y. 2006) (explaining that the court would "exclude those jurors who . . . clearly demonstrate an unwillingness or an inability to follow my instructions and obey their oaths"). Juror #4's statement that ▮▮▮ evinces an inability to follow the court's instructions. (Sealed 8/15/2025 Trial Tr. 3:7-8.) Thus, the court also finds good cause to excuse Juror #4 on this independent basis.

Fourth and finally, Juror #4 felt strongly enough above the above issues that she asked to speak with the court during voir dire and again in the middle of Dr. Lamb's testimony. Her volunteering of this information indicates the strength and seriousness of her concerns. This, too, supports the court's determination of good cause.

In sum, it is for the foregoing reasons that the court excused Juror #4 for good cause.

## II.  CONCLUSION

In sum, it is for the foregoing reasons that the court overruled Amex's objection to PDX02-023, overruled Plaintiffs' objections to the RBA Report, and excused Juror #4 for good cause. Additionally, for the foregoing reasons, Amex's first and second motions for a mistrial are DENIED, and its request for a cautionary instruction is GRANTED.

SO ORDERED.

SO ORDERED.

Dated:     Brooklyn, New York
           August 29, 2025

                                          s/NGG
                                     NICHOLAS G. GARAUFIS
                                     United States District Judge